Case 1:26-cv-00659-KM   Document 9-3   Filed 05/19/26   Page 1 of 71

2021 WL 100666
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Gustave AKSELROD

v.

MARKETPRO HOMEBUYERS LLC

Civil No. CCB-20-2966
|
Signed 01/11/2021
|
Filed 01/12/2021

**Attorneys and Law Firms**

John Thomas McGowan, Jr., Kinner & McGowan PLLC, Washington, DC, Anthony I. Paronich, Pro Hac Vice, Paronich Law PC, Hingham, MA, for Gustave Akselrod.

Eric M. Hurwitz, Stradley Ronon Stevens & Young LLP, Cherry Hill, NJ, Thomas Francis Lucchesi, III, Stradley Ronon, Washington, DC, for MarketPro Homebuyers LLC.

### <u>MEMORANDUM & ORDER</u>

Catherine C. Blake, United States District Judge

**\*1**  In this action, plaintiff Gustave Akselrod brings a class action complaint alleging two claims under the TCPA, 47 U.S.C. § 227, *et seq.*, against defendant MarketPro Homebuyers ("MarketPro")—(1) a violation of the TCPA's prohibitions on autodialing the telephones of individuals without their consent, and (2) making telephone solicitations to individuals who are registered on the National Do-Not-Call Registry. Before the court is MarketPro's proposed modification (ECF 13) to the court's proposed scheduling order. MarketPro seeks to stay this case pending a decision from the United States Supreme Court in *Facebook v. Duguid*, No. 19-511, or, in the alternative, to bifurcate liability and class discovery and limit discovery at this time to potentially dispositive issues. Akselrod opposes both requests. (ECF 14). The court, having considered the parties' submissions and their arguments during a scheduling conference call on December 29, 2020, will deny the request to stay the case, but will grant the request to bifurcate discovery. Discovery may be taken as to (1) the capabilities of the system used to make the communications at issue in this case; and (2) whether the communications sent to the plaintiff were "telephone solicitations" under the TCPA.

A stay of the case is not warranted. In considering whether the court should exercise its inherent authority to stay a proceeding, three factors are relevant: (1) whether the stay will promote judicial economy, measured by whether a stay would simplify or complicate the issues in the case; (2) the hardship to the moving party if the case is not stayed; and (3) the potential prejudice to the non-moving party if the stay is granted. *See Int'l Refugee Assistance Project v. Trump*, 323 F. Supp. 3d 726, 730–31 (D. Md. 2018). As to prejudice, it appears that any hardship to MarketPro from denying a stay is evenly balanced with the possibility of prejudice to Akselrod if a stay is granted. As to the ability of a stay to simplify the issues in the case, the court agrees with Akselrod that a complete stay while *Facebook v. Duguid* remains pending is likely to delay and further complicate rather than simplify this litigation.

In order to succeed on its autodialing claim, Akselrod must prove that the communications he received were made using an automated telephone dialing system ("ATDS"). The issue in *Duguid* is whether an ATDS includes technology that simply has the capacity to store numbers to be dialed automatically, as the Ninth Circuit has held, *Duguid v. Facebook*, 926 F.3d 1146, 1151 (9th Cir. 2019), or whether the technology must also use a random or sequential number generator in order to fall within the definition, as the Third and Eleventh Circuits have held, *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018); *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1306–08 (11th Cir. 2020). It appears to the court from Akselrod's complaint that the system MarketPro used to send messages to Akselrod could fall within either (or neither) of the contested definitions of an ATDS. This raises the possibility that if the case is stayed until the Supreme Court resolves the definition of an ATDS, discovery and briefing regarding whether MarketPro's system qualifies as an ATDS would still be necessary. But if the case proceeds now, the parties will be able to take targeted discovery so that when *Duguid* is decided, the case may be resolved more quickly based on the Court's definition of an ATDS and the parties' knowledge of the system's capabilities. Additionally, a stay would delay the resolution of Akselrod's Do-Not-Call Registry claim, which is distinct from the autodialing claim. Thus, the more efficient approach, as other courts have held in TCPA cases where discovery on the ATDS would be necessary regardless of the outcome of *Duguid* or where a stay would delay additional unrelated claims, is to allow at least some discovery to proceed. *See, e.g.*, *Lacy v. Comcast Cable Commc'ns, LLC*, Case No. 3:19-cv-05007-RBL, 2020 WL 4698646, *2 (W.D. Wash. Aug. 13, 2020); *Pittenger v. First Nat'l Bank of Omaha*, No. 20-CV-10606, 2020 WL 5596162, at *3 (E.D. Mich. Sept. 18, 2020). [1]

**\*2** As to the bifurcation of liability and class discovery, the court considers (1) the overlap between individual and class discovery, (2) whether bifurcation will promote Federal Rule of Civil Procedure 23's requirement that certification be decided at "an early practicable time," (3) judicial economy, and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery. *See* 1 McLaughlin on Class Actions § 3:10 (11th ed. 2014). MarketPro argues that whether the system used in this case was an ATDS and whether the messages sent were telephone solicitations are potentially dispositive and that limited discovery on these issues would save the parties the time and expense of class discovery. Akselrod disagrees, arguing that class issues and liability issues substantially overlap, that bifurcation will lead to additional, time-consuming disputes regarding whether discovery relates to class issues or individual issues, and that a delay in class discovery poses a risk that the third-party MarketPro used to send the messages at issue will destroy relevant call records before Akselrod can obtain them. The court concludes that whether an ATDS was used and whether messages were telephone solicitations are issues of liability largely distinct from class certification issues (e.g., numerosity, commonality, typicality, and adequacy of representation). *See* Fed. R. Civ. P. 23. Limited discovery has the potential to simplify the case and to save both parties the time and expense of class discovery, which can be particularly resource intensive, *see, e.g.*, *Physicians Healthsource, Inc. v. Janssen Pharm., Inc.*, No. CIV.A. 12-2132 FLW, 2014 WL 413534, at *4 (D.N.J. Feb. 4, 2014) (granting motion to bifurcate discovery in TCPA case where bifurcation would promote efficiency by permitting discovery on potentially dispositive issues that did not overlap with class issues), and at any rate, it may not be practicable to determine class certification until after *Duguid* is resolved. To prevent the possibility of evidence spoliation, Akselrod may subpoena the third party at issue or take some other action to ensure the preservation of records.

During the conference call with the court, the parties raised an additional question regarding the extent of discovery that should be permitted into whether the messages at issue are telephone solicitations. Akselrod contends that discovery into MarketPro's subjective purpose in sending the messages is relevant, and MarketPro argues that the issue turns on an objective analysis of the content of the messages to determine their purpose. *See* 47 U.S.C. § 227(a)(4) (defining "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, ..."). The court does not find it necessary at this time to determine how much discovery is needed as to the "purpose" of the messages. It appears that some courts have focused on the content of the message in determining their purpose, *see, e.g.*, *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-CV-1459-ORL, 2013

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 3 of 71

**Akselrod v. MarketPro Homebuyers LLC, Not Reported in Fed. Supp. (2021)**

WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013), *aff'd* on other grounds 797 F.3d 1302 (11th Cir. 2015), but this issue can be more fully briefed at a later time.

Accordingly, it is hereby ORDERED that:

1. MarketPro's request to stay the case is DENIED;

2. MarketPro's request to bifurcate liability and class discovery is GRANTED;

3. Limited discovery will be permitted into (1) the capabilities of the system used to make the communications at issue in this case; and (2) whether the communications sent to the plaintiff were "telephone solicitations" under the TCPA;

4. To prevent the possibility of evidence spoliation, Akselrod may subpoena the third party at issue or take some other action to ensure the preservation of records;

5. Initially the courts sets a deadline for the limited discovery to be complete by April 15, 2021, with a status report due the same day; and

6. Counsel shall notify the court when an opinion has been issued in *Facebook v. Duguid.*

**All Citations**

Not Reported in Fed. Supp., 2021 WL 100666

---

**Footnotes**

1    Unpublished opinions are cited for the persuasiveness of their reasoning and not for any precedential value.

---

**End of Document**                                                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Disagreed With by   Sotomayor v. Bank of America, N.A.,   C.D.Cal.,   May 3, 2019

2018 WL 3474444
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

AMERICA'S HEALTH AND RESOURCE CENTER, LTD.; Affiliated Health Group, Ltd., Plaintiffs,

v.

PROMOLOGICS, INC.; Janssen Pharmaceuticals, Inc., Defendants.

Case No. 16 C 9281
|
Signed 07/19/2018

**Attorneys and Law Firms**

Phillip A. Bock, James Michael Smith, Tod Allen Lewis, Daniel J. Cohen, Molly Stemper Gantman, Bock Law Firm, LLC dba Bock, Hatch, Lewis & Oppenheim, LLC, Christopher Phillip Taylor Tourek, Cafferty Clobes Meriwether & Sprengel, LLP, Julia Lynn Mohan, Roetzel & Andress LPA, Chicago, IL, Kimberly M. Watt, Sb2, Inc., Harrisburg, PA, for Plaintiffs.

Avanti Bakane, Brian H. Myers, Christina Rose Spiezia, Gordon Rees Scully Mansukhani LLP, David Luther Hartsell, Susan E. Groh, McGuireWoods LLP, Bradley Joseph Andreozzi, Iman N. Boundaoui, Drinker Biddle & Reath LLP, Chicago, IL, Elizabeth Z. Timmermans, McGuireWoods LLP, Raleigh, NC, Robert A. Muckenfuss, McGuireWoods LLP, Charlotte, NC, Marsha J. Indych, Drinker Biddle & Reath LLP, New York, NY, for Defendants.

### <u>AMENDED MEMORANDUM OPINION AND ORDER</u>

Harry D. Leinenweber, Judge

 **\*1**  Defendant Janssen moves to strike the class allegations asserted by Plaintiffs America's Health & Resource Center, Ltd. and Affiliated Health Group, Ltd., and to bifurcate discovery. (Dkts. 75, 78.) Defendant Promologics has joined in those Motions. (Dkts. 87, 89.) For the reasons stated herein, the Court grants in part and denies in part the Motion to Strike the class allegations and grants the Motion to Bifurcate.

### I. <u>BACKGROUND</u>

The Court has previously summarized the facts of this case in an earlier ruling. *See, Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.*, No. 16 CV 9281, 2017 WL 5001284, at \*1 (N.D. Ill. Nov. 2, 2017). All that is relevant for now is that Plaintiffs allege Defendants sent them, and each member of their proposed class, a fax in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227. (Am. Compl. ¶¶ 1-10, Dkt. 21.) Defendants contend that this class action is incurably defective, however, and so they move to strike those allegations. Beyond that, Defendants take issue with what they see as a shortage of proof to back up the viability of the named Plaintiffs' individual claims. Defendants accordingly move to bifurcate discovery so they and the Court can first ascertain whether the named Plaintiffs have individual claims before contending, if still necessary, with the proposed class allegations.

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 5 of 71

America's Health and Resource Center, Ltd. v. Promologics, Inc., Not Reported in Fed....

## II. ANALYSIS

### A. Motion to Strike Class Allegations

According to Defendants, the Court should strike the class allegations in part or in whole for three reasons: (1) Under the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1783-84 (2017), this Court lacks personal jurisdiction over the Defendants as to the claims of the non-Illinois-resident class members; (2) due to an imprecise class definition, the named Plaintiffs' claims are not typical of the claims of the other class members; and (3) individualized issues of consent predominate over common questions of law or fact, so the class fails to clear Federal Rule of Civil Procedure 23(b)(3), as required here. The Court finds only the first of these arguments convincing.

### 1. Personal Jurisdiction under Bristol-Myers Squibb

Personal jurisdiction may be "general" or "specific." General jurisdiction lies only where the defendant has "continuous and systematic" contacts with the forum state. *See,* *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415-16 (1984). In all but the most exceptional cases, general jurisdiction over a corporation is limited to its place of incorporation and/or principal place of business. *Leibovitch v. Islamic Republic of Iran*, 188 F. Supp. 3d 734, 746 (N.D. Ill. 2016) (citing *Daimler AG v. Bauman*, 134 S Ct. 746, 761 n.19 (2014) ), *aff'd,* 852 F.3d 687 (7th Cir. 2017). In contrast, "[s]pecific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) ). In either case, the plaintiff must also demonstrate that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945).

**\*2** Despite contending in their Complaint that Defendant Janssen is subject to this Court's general jurisdiction (Am. Compl. ¶ 18, Dkt. 21), Plaintiffs make no general jurisdiction arguments in their present briefing as to either Defendant, both of which are incorporated and maintain their principal places of business outside of Illinois. *See,* *Daimler*, 134 S. Ct. at 761 n.19. As such, the remaining jurisdictional inquiry is specific. Here, that inquiry depends on the Supreme Court's ruling in *Bristol-Myers Squibb.* 137 S. Ct. at 1783-84. That case began as a mass tort action in California state court involving hundreds of individual plaintiffs, most of whom were not California residents. *Id.* at 1777. On review, the Supreme Court considered the compatibility of the state court's exercise of jurisdiction with the Fourteenth Amendment's due process clause and concluded that the state court lacked specific jurisdiction over the defendant as to the claims of the nonresident plaintiffs. *Id.* at 1779, 1783-84. In so holding, the Court clearly limited its ruling to state court jurisdiction, thus "leav[ing] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784 (citation omitted). That limitation is no barrier to the rule's application here, however, where this Court sits in diversity jurisdiction and accordingly looks to Illinois state law. *See, LDGP, LLC v. Cynosure, Inc.*, No. 15 CV 50148, 2018 WL 439122, at \*2 (N.D. Ill. Jan. 16, 2018) (applying *Bristol-Myers Squibb* holding in case of diversity jurisdiction); *McDonnell v. Nature's Way Prods., LLC*, No. 16 CV 5011, 2017 WL 4864910, at \*4 n.7 (N.D. Ill. Oct. 26, 2017) (same).

But that is not the only possible barrier to *Bristol-Myers Squibb*'s application to this case. What remains is whether that case applies with equal force to class actions as to mass torts and, if so, whether the Defendants' personal-jurisdiction objection

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 6 of 71

America's Health and Resource Center, Ltd. v. Promologics, Inc., Not Reported in Fed....

predicated on that case is either timely or, if untimely, excusable. The precise membership of the proposed class is still unclear, but the allegations suggest that the proposed nationwide class contains members who neither reside, nor were harmed in, Illinois. It is this group of plaintiffs whose claims Defendants seek to shear from the case, and if the Court answers the questions presented above in the affirmative, Defendants' efforts will prevail.

As for the first question: *Bristol-Myers Squibb* left open whether its jurisdictional rule applies in the class action context. *See* 137 S. Ct. at 1789 n.4 (Sotomayor, J., dissenting) ("The Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there."). District court rulings have begun to fill that vacuum, though with contradictory results. *Compare* *Casso's Wellness Store & Gym, LLC v. Spectrum Lab. Prods., Inc.*, No. 17 CV 2161, 2018 WL 1377608 (E.D. La. Mar. 19, 2018); *In re Morning Song Bird Food Litig.*, No. 12 CV 01592, 2018 WL 1382746, at *5 (S.D. Cal. Mar. 19, 2018); *Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360, 1365-66 (N.D. Ga. 2018); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622, at *12 (E.D. La. Nov. 30, 2017) (cases finding *Bristol-Myers Squibb* inapplicable to class actions), *with* *Maclin v. Reliable Reports of Tex., Inc.*, No. 17 CV 2612, 2018 WL 1468821, at *4 (N.D. Ohio Mar. 26, 2018); *Wenokur v. AXA Equitable Life Ins. Co.*, No. 17 CV 00165, 2017 WL 4357916, at *4 n.4 (D. Ariz. Oct. 2, 2017); *In re Dental Supplies Antitrust Litig.*, No. 16 CV 696, 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017) (finding the opposite). This Court has also weighed in and agreed with those courts finding *Bristol-Myers Squibb* applicable to class actions. *See,* *DeBernadis v. NBTY, Inc.*, No. 17 CV 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018). That ruling comports with the position taken by the other courts in this District which have answered this question. *See,* *McDonnell*, 2017 WL 4864910, at *4; *Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 874 (N.D. Ill. 2017).

Those decisions finding *Bristol-Myers Squibb* applicable to class actions have generally observed that due process requirements do not differ between class and non-class actions. In either event, as the Supreme Court articulated, due process requires "a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb*, 137 S. Ct. at 1781; *see,* *Greene*, 289 F. Supp. 3d at 874 (stating same); *Maclin*, 2018 WL 1468821, at *4 (remarking that the respective due process protections of the Fifth and Fourteenth Amendments engender the same effects as far as personal jurisdiction are concerned); *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *9 ("The constitutional requirements of due process do[ ] not wax and wane when the complaint is individual or on behalf of a class."). This Court agrees with that observation and now endorses it once again, reflecting this Court's belief that *Bristol-Myers Squibb* applies in equal measure to class actions.

 **\*3** But answering this first question in the affirmative does not yet give Defendants a victory in their quest to cut down the proposed class. There is also the question of timeliness. Plaintiffs contend that even if this Court believes *Bristol-Myers Squibb* applies with equal force to class actions, Defendants' Motion still fails because, by challenging this Court's personal jurisdiction, Defendants' filing is nothing more than a 12(b)(2) motion in disguise. And as such, it is susceptible to the same timeliness requirements—and the attendant waiver penalties for tardiness—as any other challenge to personal jurisdiction.

Ordinarily, defendants must assert personal jurisdiction challenges in their first responsive pleading, or else waive them. FED. R. CIV. P. 12(b)(2), (h)(1); *see,* *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982) (explaining failure to object timely to personal jurisdiction constitutes waiver of said objection). Defendants suggest they should not be held to that standard here, however, where they moved to dismiss the Amended Complaint on May 25, 2017—roughly one month before the Supreme Court issued *Bristol-Myers Squibb*. According to Defendants, that opinion signified an intervening change in the law, and so they cannot be held to account for having failed, pre-*Bristol-Myers,* to raise the new defense that decision made available to them. This Court is not convinced.

Case 1:26-cv-00659-KM   Document 9-3   Filed 05/19/26   Page 7 of 71

America's Health and Resource Center, Ltd. v. Promologics, Inc., Not Reported in Fed....

First, the Supreme Court admonished that the result in *Bristol-Myers Squibb* represented a "straightforward application" of "settled principles regarding specific jurisdiction." 137 S. Ct. at 1782-83. This was an odd characterization for the Court to deploy if it intended its decision to be interpreted as a change in controlling law. Second, it is not clear that pre-*Bristol-Myers* authority precluded Defendants from raising their personal jurisdiction challenge when they filed their first responsive pleadings in May 2017, meaning Defendants should not be excused for failing to do so. *Cf. Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009) (remarking that personal jurisdiction defense is not waived where, prior to the time it was raised, it would have been "contrary to controlling precedent"). The First Circuit has explained that a party may be excused for failing to raise a then-unavailable defense, *i.e.*, a defense that, "if asserted, would have been futile under binding precedent." *Bennett v. City of Holyoke*, 362 F.3d 1, 7 (1st Cir. 2004); *accord Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 862 (N.D. Ill. 2018) (quoting and applying same). The problem for Defendants, who filed their first responsive pleadings over a year ago (Dkts. 44, 46), is that this Court is not aware of any pre-*Bristol-Myers*, Seventh-Circuit authority that would have rendered futile a challenge to personal jurisdiction as to the non-resident, proposed class members. *Accord Greene*, 289 F. Supp. 3d at 876 (reciting that pre-*Bristol-Myers* Seventh Circuit precedent "did not foreclose [defendants] from pressing [the *Bristol-Myers*] theory" as an affirmative defense). Without an intervening change in the law and without an earlier, controlling authority blockading such efforts, the Defendants' failure to mount a timely challenge to personal jurisdiction constitutes forfeiture of that challenge.

However, though the Defendants forfeited their personal-jurisdiction challenge by failing to raise it earlier, the Court will excuse the forfeiture. In a similar ruling, Judge Gary Feinerman remarked that under Supreme Court guidance, lower courts " 'retain [ ] the independent power to identify and apply the proper construction of governing law,' even where the parties 'fail[ ] to advert' to the applicable rule in their own briefing." *Greene*, 289 F. Supp. 3d at 877 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ) (excusing forfeiture of *Bristol-Myers* jurisdiction challenge); *see also, ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001) (excusing forfeiture and remarking that "[f]ederal courts are entitled to apply the right body of law, whether the parties name it or not"), *as amended* (July 2, 2001). The Supreme Court made clear in *Bristol-Myers* what standard to apply in scrutinizing personal jurisdiction as to the claims of nonresident plaintiffs, and this Court will follow that direction. *See, Practice Mgmt.*, 301 F. Supp. 3d at 864 (endorsing *Greene*'s forfeiture reasoning).

**\*4**  In this class action, the *Bristol Myers* opinion is applicable and its import clear: The Court lacks jurisdiction over the Defendants as to the claims of the nonresident, proposed class members. As such, the Defendants' Motion is granted in relevant part, and those class members who are not Illinois residents and who allegedly received the fax outside of this state's borders may not be part of this case. To the extent that the proposed class allegations comprise any such unnamed plaintiffs, they are stricken. Subtracting those proposed class members shrinks the class but might not destroy it; the Complaint is unclear as to how many of the proposed plaintiffs are Illinois residents, so the Court cannot yet say whether the remaining balance is sufficiently numerous to satisfy Rule 23. Given that uncertainty, the Court will address the rest of Defendants' Motion-to-Strike arguments lest any of them succeeds in further reducing the proposed class.

### 2. Typicality Challenge

Beyond their jurisdictional assault, Defendants also attack the proposed class under Federal Rule of Civil Procedure 23. To do so, Defendants cite to this Court's reasoning in another TCPA case, *A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, No. 16 CV 2513, 2018 WL 488257, at \*4 (N.D. Ill. Jan. 18, 2018). There, the Court found that because the proposed class definition failed to distinguish between those members who received unsolicited faxes and those members who received solicited faxes, the claims of the named plaintiffs—who allegedly received only the former variety—were not typical of the claims of the class. *Id.* at \*4 (remarking upon absence of congruence between those claims given that the class members who

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 8 of 71

America's Health and Resource Center, Ltd. v. Promologics, Inc., Not Reported in Fed....

received only solicited faxes would not have a valid TCPA claim at all). However, the *Kabbage* opinion did not take into account that this typicality critique cannot hold if the solution is to add a consent requirement to the class definition. If the instant class were defined by a legal parameter such as consent of the recipient class member, the result would be an impermissible "fail-safe" class in which "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015) (citation omitted). Such classes are non-ascertainable and cannot be certified. *See, e.g.*, *G.M. Sign Inc. v. Stealth Sec. Sys., Inc.*, No. 14 CV 09249, 2017 WL 3581160, at *3 (N.D. Ill. Aug. 18, 2017) (citing *Mullins*, 795 F.3d at 660). Accordingly, Defendants' typicality objection carries no weight.

There is one other aspect of the *Kabbage* case that bears on the instant litigation, however. *Kabbage* detailed the history of the now-defunct Solicited Fax Rule, which once mandated that under the TCPA, all faxes, whether solicited or not, were required to include an opt-out notice. *Id.* at *2. A consolidated Hobbs Act appeal decided by the D.C. Circuit invalidated that rule in a decision which is binding on this Court. *See, id.* (citing *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 1043 (2018) ). The Defendants point out that the Amended Complaint, which predates *Yaakov,* frames the proposed class in terms of the Solicited Fax Rule's opt-out requirement which *Yaakov* invalidated. The proposed class is:

> Each person that was sent one or more facsimiles from [Defendants] inviting them to participate in a promotional educational program *that did not state on its first page that the fax recipient may request that the sender not send any future fax and that the failure to comply with such a request within 30 days would be unlawful.*

(Am. Compl. ¶ 50 (emphasis added).) Because this class definition rests upon abrogated authority, it does not properly describe a class of TCPA plaintiffs. The Court accordingly grants Defendants' Motion to Strike this definition, but allows Plaintiffs leave to amend.

### 3. Predominance Challenge

**\*5** As their final argument, Defendants charge that individualized issues of consent predominate over common questions of law or fact and thus confound class certification. FED. R. CIV. P. 23(b)(3). But "where the defendant's objection to class certification fails to set forth specific evidence 'and instead only makes vague assertions about consent,' individualized issues regarding consent will not predominate over common questions of law or fact." *Karpilovsky v. All Web Leads, Inc.*, No. 17 CV 1307, 2018 WL 3108884, at *5 (N.D. Ill. June 25, 2018) (quoting *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 587 (N.D. Ill. 2018) (citation omitted) ). Though the Defendants assert in their papers that the proposed class includes members "who provided consent and/or had an ongoing business relationship with Defendants," the Defendants have not produced any evidence whatsoever to back up that assertion. (Mem. in Supp. of Mot. to Strike at 10, Dkt. 76.) Supposition alone does not create a meritorious consent objection in this context. *See,* *Savanna Group, Inc. v. Trynex, Inc.*, No. 10 CV 7995, 2013 WL 66181, at *3-4 (N.D. Ill. Jan. 4, 2013) (St. Eve, J.) (rejecting defendant's consent-inquiry-based predominance objection to class definition because defendant failed to offer specific evidence of consent). Defendants' predominance objection thus fails.

### B. Defendants' Motion to Bifurcate

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 9 of 71

America's Health and Resource Center, Ltd. v. Promologics, Inc., Not Reported in Fed....

In their second Motion, Defendants seek to bifurcate discovery and thus exchange, first, information related to the named Plaintiffs' individual claims, and thereafter, information related to the claims of the proposed class as a whole. According to Defendants, this will help the parties quickly determine whether the named Plaintiffs have viable claims. If they do not, perhaps the parties can entirely forgo class-wide discovery, saving resources and expense on all sides. *See, Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001) ("[If] the court determines that the named plaintiffs' claims lack merit, such a decision ordinarily, though not invariably, disqualifies the named plaintiffs as proper representatives, thus resolving the issue of class certification." (citation and internal quotation omitted) ). Whether to bifurcate discovery is a determination that rests within the discretion of the trial court. *See, Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc.*, No. 02 CV 2523, 2004 WL 609326, at *2 (N.D. Ill. Mar. 23, 2004) (citations omitted); *cf. Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998) ("[D]istrict courts have broad discretion in matters related to discovery.").

The present litigation is poised to cross the two-year mark, and yet Plaintiffs have not produced basic, requested discovery which would prove up their individual claims. They attached the allegedly unlawful fax to their Amended Complaint, but that document does not identify the telephone number(s) of the fax machine(s) that received it nor does it explain in any other way how Plaintiffs came to obtain it. (Copy of Fax, Dkt. 21-1.) To date, Plaintiffs have not provided verified interrogatory responses. After Defendants filed their Motion to Bifurcate, Plaintiffs made good on one of their promises to supplement their discovery responses by providing a fax number for the machine that allegedly received the unlawful communique. (*See,* Pls.' Resps. to Defs.' First Set of Interrogatories, Dkt. 80-1, -2 (Plaintiffs responding simply, "will supplement" in response to request for the telephone number that received the fax).) But as it happens, this disclosure confounds, rather than clarifies, matters: Defendants respond by filing a declaration stating that they have no record of sending any fax to that number. (Wurtsbaugh Decl. ¶ 4, Dkt. 103-1.)

**\*6** Bifurcation is not always warranted in TCPA class actions, nor is it universally appropriate or helpful. But in the circumstances presented here, where some limited, first-stage production could stave off substantial wasted efforts, the Court believes bifurcation is appropriate. *See,* FED. R. CIV. P. 1 (stating that the Federal Rules of Civil Procedure should be administered "to secure the just, speedy, and inexpensive determination of every action and proceeding"). The Motion to Bifurcate Discovery is granted.

## III. CONCLUSION

For the reasons stated herein, Defendants' Motion to Strike Class Allegations is granted in part and denied in part, and their Motion to Bifurcate Discovery is granted.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3474444

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3417416
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

CEPHALON, INC., Plaintiff,

v.

SUN PHARMACEUTICAL INDUSTRIES, LTD., and Caraco Pharmaceutical Laboratories, Ltd., Defendants.

Civil Action No. 11–5474 (FLW)(DEA).
|
July 8, 2013.

**Attorneys and Law Firms**

Allyn Zissel Lite, Mayra Velez Tarantino, Michael E. Patunas, Susana Cruz Hodge, Lite Depalma Greenberg, LLC, Newark, NJ, for Plaintiff.

Damian P. Conforti, Podvey, Meanor, Catenacci, Hildner Cocoziello & Chattman, PC, Newark, NJ, Gregory D. Miller, Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman PC, Newark, NJ, for Defendants.

OPINION

WOLFSON, District Judge.

**\*1** In this patent infringement action filed by Plaintiff Cephalon, Inc. ("Cephalon"), Defendants Sun Pharmaceutical Industries, Ltd. and Caraco Pharmaceutical Laboratories, Ltd. ("Defendants") have appealed the April 3, 2013 Letter Order of the Magistrate Judge, Dkt. No. 227, ("Letter Order") denying Defendants' request to bifurcate the case on the issues of liability and damages for discovery and trial purposes. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the Court affirms in part and vacates in part the decision of the Magistrate Judge.

**BACKGROUND**

The parties are familiar with the underlying facts in this matter, which the Court most recently detailed in its Opinion on December 20, 2012, denying Cephalon's motion for a preliminary injunction. *See* Dkt. No. 187. Thus, the Court will only briefly recite the facts necessary to deciding the instant appeal. During an Initial Scheduling Conference held on February 26, 2013, the Magistrate Judge rejected on the record the parties' Joint Discovery Plan, including Defendants' proposal to bifurcate liability and damages issues in this case. In a letter to the Magistrate Judge dated March 12, 2013, Defendants informally renewed their request to bifurcate both the discovery and trial portions of the case.[1] *See* Dkt. No. 219 at 2 ("Sun respectfully requests bifurcation of both discovery and trial of the potential issues of damages, willfulness and exceptional case ...."). Relying on the decision in *Princeton Biochemicals, Inc. v. Beckman Instruments, Inc.,* 180 F.R.D. 254 (D.N.J.1997), for support, Defendants contended that bifurcation was necessary because of the complexity of the case, the threat of prejudice due to jury confusion, and considerations of judicial economy. *See* Dkt. No. 219 at 3–7. After thoroughly considering the arguments from both sides, although not presented by formal motion, the Magistrate Judge rejected Defendants' renewed bifurcation request, finding that: (1) the case is not complex; (2) contrary to Defendants' position, bifurcation would likely delay the litigation and result in duplication of effort rather than promote judicial economy; and (3) Defendants' reliance on the *Princeton* decision was misplaced. *See* Letter Order at 2. *Id.* Defendants then filed the instant appeal.

## STANDARD OF REVIEW

A United States Magistrate Judge may hear and determine any non-dispositive pretrial matter pursuant to 28 U.S.C. § 636(b)(1) (A). To that end, a district court will only reverse a magistrate judge's decision on these matters if it is contrary to law or clearly erroneous. *Id.;* Fed.R.Civ.P. 72(a). "The party filing the notice of appeal bears the burden of demonstrating that the magistrate judge's decision was clearly erroneous or contrary to law." *Marks v. Struble,* 347 F.Supp.2d 136, 149 (D.N.J.2004). A ruling is "contrary to law" when the magistrate judge has misinterpreted or misapplied the applicable law. *Pharmaceutical Sales & Consulting Corp. v. J.W.S. Delavau Co., Inc.,* 106 F.Supp.2d 761, 764 (D.N.J.2000). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (citing *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Under this standard, "a district judge's simple disagreement with the magistrate judge's findings is insufficient to meet the clearly erroneous standard of review." *Andrews v. Goodyear Tire & Rubber Co., Inc.,* 191 F.R.D. 59, 68 (D.N.J.2000), and a district court will not reverse a magistrate judge's finding even "in circumstances where the [reviewing] court might have decided the matter differently." *Bowen v. Parking Auth. of City of Camden,* No. 00–5765(JBS), 2002 U.S. Dist. LEXIS 14585, at *3, 2002 WL 1754493 (D.N.J. July 30, 2002).

**\*2** Where a magistrate judge has ruled on a non-dispositive matter "such as a discovery motion, his or her ruling is entitled to great deference and is reversible only for abuse of discretion." *Kresefksy v. Panasonic Communications & Sys. Co.,* 169 F.R.D. 54, 64 (D.N.J.1996). An abuse of discretion "may be found where the [magistrate] judge's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 527 (3d Cir.2004) (internal quotations omitted).

## DISCUSSION

Initially, I address the scope of the Magistrate Judge's decision and the issues presented on appeal. Defendants initially raised —and the Magistrate Judge rejected—their bifurcation request in the context of the proposed Joint Discovery Plan, suggesting that Defendants sought bifurcation for discovery purposes. In Defendants' renewed letter application for bifurcation, however, Defendants raise arguments concerning bifurcation for both discovery and trial purposes, and, indeed, the Magistrate Judge's Letter Order could be read as denying bifurcation as to both the discovery and trial portions of this case. Such a determination regarding trial proceedings is premature in this matter, and, accordingly, to the extent that the Letter Order denied bifurcation at trial, I vacate that portion of the Magistrate Judge's decision. *See N.A.A.C.P. v. North Hudson Regional Fire and Rescue,* 255 F.R.D. 374, 393 (D.N.J.2009) (denying without prejudice a motion for bifurcation, filed in connection with motions for a preliminary injunction and class certification, on the basis that such a motion was premature "[g]iven the early stage of [the] litigation"). Although Defendants' application to bifurcate trial is premature at this stage, the parties may submit another application if and when trial should occur in this case—ideally, at the time of the final pretrial conference.

The sole issue, then, that remains on appeal is whether the Magistrate Judge abused his discretion in deciding not to bifurcate discovery relating to liability and damages issues. Generally, bifurcation is permitted "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed.R.Civ.P. 42(b). To that end, the Third Circuit has stated "the trial judge is entrusted with discretion [to decide case management issues such as bifurcation] because he is in a far better position than we to appraise the effect of [a particular procedure on the parties]." *Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128, 133 (3d Cir.1999). Thus, the decision to permit or deny bifurcation rests within the sound discretion of the court. [2] *Bair Laboratories, Inc., v. Abbott Laboratories,* 978 F.2d 98, 115 (3d Cir.1992); *Gardco Mfg. ., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1212 (Fed.Cir.1987); *Princeton,* 180 F.R.D. at 256.

**\*3** Courts in this district do not routinely grant motions to bifurcate discovery, unless there is some showing on the part of the moving party as to why bifurcation is appropriate. *E.g.,* ⚑*In re GI Holdings Inc.,* 218 F.R.D. 428, 440 (D.N.J.2003) (denying motion to bifurcate discovery or trial based on finding that denial would cause no prejudice to moving party); *Glennon v. Wing Enterprises, Inc.,* CIV.A. 10–0324 JAP, 2010 WL 4782773, at \*17 (D.N.J. Nov.17, 2010) (denying bifurcation of discovery based on finding that issues were not sufficiently complex and that bifurcation would not promote settlement); *see also* ⚑*Innovative Office Prods. v. SpaceCo, Inc.,* No. 05–4037, 2006 U.S. Dist. LEXIS 29439, at \*4–5, 2006 WL 1340865 (E.D.Pa. May 15, 2006) ("bifurcation remains the exception rather than the rule"). In that connection, the moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties. *See Glennon,* 2010 WL 4782773, at \*17.

Notwithstanding the foregoing, Defendants argue that the Magistrate Judge clearly erred by finding that: (1) the case lacks complexity; (2) bifurcation would be less efficient, and (3) the *Princeton* decision does not mandate bifurcation. I address each of these issues in turn. First, Defendants contend that, in this case, "a full and fair evaluation of the issue of infringement—standing alone—presents a daunting task for anyone, particularly a jury." Def. Br. at 4. Similarly, with respect to damages, Defendants argue that "the question of a 'reasonable royalty' can be exceedingly complex." *Id.* at 5. Thus, Defendants reason that "this is precisely the type of case where bifurcation of liability and damages issues is necessary." *Id.* at 6. Much of that argument appears to relate to the issue of bifurcation of trial, no discovery. Defendants do not, however, point to any mistake of fact or law on this appeal showing that the Magistrate Judge abused his discretion in finding that the issues in this case were not so complex as to require bifurcation of discovery. Instead, Defendants simply reiterate the same arguments advanced before the Magistrate Judge, which he "thoroughly considered" and then rejected; indeed, Defendants have not provided any basis for this Court to determine that the Magistrate Judge erred when he found that there was "a relative lack of complexity" in the issues in this case. Letter Order at 2. Accordingly, the Court finds that the Magistrate Judge did not err in his findings or abuse his discretion in this regard.

Next, Defendants claim that bifurcation would promote judicial economy because the issue of damages is "purely contingent" upon a finding of liability.[3] Def. Br. at 8. In that respect, Defendants argue that it does not make sense "to expend the tremendous time and resources necessary to prepare damages issues for summary judgment or trial" because this Court has already denied Cephalon's preliminary injunction motion based in part on a failure to demonstrate likelihood of success on its claims. *Id.* Again, Defendants do not highlight any mistake of fact or law made by the Magistrate Judge. Rather, Defendants' argument is merely a disagreement with the Magistrate Judge's finding. Such disagreement is "insufficient to meet the clearly erroneous standard of review." ⚑*Andrews,* 191 F.R.D. at 68. Accordingly, Defendants' argument fails in this respect as well.

**\*4** Lastly, Defendants claim the Magistrate Judge abused his discretion by ignoring controlling case law, to wit, ⚑*Princeton Biochemicals, Inc. v. Beckman Instruments, Inc.,* 180 F.R.D. 254 (D.N.J.1997). To that end, Defendants rely on the following language in *Princeton:*

> In the normal case separate trial of issues is seldom required, but in a patent infringement suit considerations exist which suggest that efficient judicial administration would be served by separate trials on the issues of liability and damages. The trial of the damages question in such a suit is often difficult and expensive, while being easily severed from the trial of the questions of validity and infringement of the patent.

Def. Br. at 9 (quoting ⚑*Princeton,* 180 F.R.D. at 256). Even cursory review of this language reveals that Defendants' reliance on *Princeton* is misplaced. To begin, the issue of bifurcation in *Princeton* concerned trial, not discovery. Here, however, I am reviewing the Magistrate Judge's decision regarding bifurcation for discovery purposes only. Indeed, the complexity issue in

*Princeton* related to a concern of jury confusion, which is not implicated in discovery proceedings.[4] Thus, the Magistrate Judge did not abuse his discretion in concluding that "the concerns and considerations presented in *Princeton* are, therefore, not similarly implicated here." Letter Order at 2.

Moreover, even assuming *arguendo* that the rationale in *Princeton* should be extended to discovery, bifurcation is still not mandated in the present case. Contrary to Defendants' position, *Princeton* does not stand for the principle that bifurcation is *required* in any case; rather, the *Princeton* decision clearly explained that "the decision to bifurcate ... remains within the sound discretion of the district court." *Princeton,* 180 F.R.D. at 258. Indeed, as discussed *supra* in this Opinion, there is no bright line rule for when bifurcation is appropriate. *See id.* ("A substantial body of case law has arisen to which a court may turn to inform its discretion. However, the actual decision reached in any one of those cases is of limited value because only the specific facts and circumstances of the case before the court can provide the answer to the question of whether the advantages of bifurcation outweigh the disadvantages."). *Compare Dutch Branch of Streamserve Dev. AB v. Extream Software, LLC,* Civ. No. 08–343–SLR, 2009 WL 2706932, at *1 (D.Del. Aug.26, 2009) (stating that "bifurcation is appropriate, if not necessary, in all but exceptional patent cases"), *with* *Graco Inc. v. PMC Global, Inc.,* No. 08–1304(FLW), 2009 WL 904010, at *36 (D.N.J. Mar.31, 2009) (stating that "bifurcation is the exception rather than the rule in patent cases"). Thus, even were *Princeton* controlling in this case, it would not mandate bifurcation, and accordingly would not show that the Magistrate Judge abused his discretion in denying bifurcation.

 **\*5** Overall, many of the concerns Defendants raised in the bifurcation application before the Magistrate Judge, and again here on appeal, relate to issues that would arise at trial. As explained in this Opinion, although I conclude that the Magistrate Judge did not abuse his discretion in denying bifurcation with respect to discovery, any ruling on the bifurcation of issues for trial is premature at this preliminary stage of the case. Thus, should a trial be necessary, the parties are free to revisit the issue of bifurcation at a more appropriate time, *e.g.,* during their final pretrial conference.

**CONCLUSION**

Defendants have failed to show that the Magistrate Judge abused his discretion in denying Defendants' request to bifurcate discovery, and accordingly, the Magistrate Judge's Letter Order is affirmed in that respect. To the extent that the Magistrate Judge also denied bifurcation of issues for trial, that portion of the Magistrate Judge's decision is vacated, as such an application is premature.

An appropriate order shall follow.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3417416

---

**Footnotes**

1    Specifically, Defendants seek bifurcation of liability from the issues of "damages, willfulness and exceptional case," and wish to stay all discovery and trial matters relating to these latter issues. *See* Dkt. No. 219 at 2 n. 2. For the sake of clarity, like Defendants, I refer to these issues collectively as "damages."

2    Defendants suggest, for the first time in a footnote in their reply brief, that the Magistrate Judge's bifurcation decision is a wholly legal conclusion subject to *de novo* review on appeal. *See* Def. Reply at 2 n. 2. Although unclear from the footnote, Defendants may have asserted such a position based on their understanding that the Magistrate Judge

denied bifurcation as to both discovery and trial. As explained above, any ruling with respect to the bifurcation of trial is premature and thus vacated. With respect to discovery issues, however, the Magistrate Judge's determination regarding bifurcation necessarily entailed factual findings regarding the complexity of this case and whether bifurcation would promote judicial economy. Thus, I reject Defendants invitation to apply a *de novo* standard on this appeal to the Magistrate Judge's decision concerning bifurcation of discovery, and instead I follow the general rule that discovery disputes are subject to abuse of discretion review. *See* ⚑*Kresefksy v. Panasonic Communications & Sys. Co.,* 169 F.R.D. 54, 64 (D.N.J.1996).

3    Of course, Defendants' argument in this regard applies to *every* case, since the issue of damages is always contingent upon a finding of liability. In other words, according to Defendants, bifurcation is *always* appropriate. Such reasoning contravenes the language of Rule 42(b) and the case law cited in this Opinion. The Magistrate Judge certainly did not abuse his discretion in rejecting such reasoning.

4    In *Princeton,* I found the case to be complex and thus warranting bifurcation at trial because the jury would be require to process volumes of technical exhibits, and "this task would be surely overwhelming to even the most sophisticated jurors." ⚑*Princeton,* 180 F.R.D. at 258. Additionally, regarding judicial economy, I found that "litigating the damages issue ... may ultimately prove unnecessary" because the accused product was a multi-million dollar product line; thus, a liability determination would "define the parameters of the allegedly infringing product." ⚑*Id.* at 259. Neither of these findings exist at this point in the present case.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1839602
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Peter A. GOTTLIEB, Individually and on Behalf of All Persons Similarly Situated, Plaintiff,

v.

AMICA MUTUAL INSURANCE COMPANY, Defendant.

Civil Action No. 20-10509-DJC
|
Filed 05/07/2021

**Attorneys and Law Firms**

John P. Zavez, Brendan M. Bridgeland, Noah N. Rosmarin, Adkins, Kelston and Zavez, P.C., Boston, MA, for Plaintiff.

Anthony J. Antonellis, Christopher M. Reilly, Laura M. Gregory, Sloane & Walsh LLP, Ryan B. MacDonald, Robins Kaplan LLP, Boston, MA, for Defendant.

ORDER ON DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

[Docket No. 41]

Boal, U.S. MAGISTRATE JUDGE

**\*1** Defendant Amica Mutual Insurance Company ("Amica") has moved for a protective order prohibiting plaintiff Peter Gottlieb from (1) seeking discovery regarding his dismissed claims; (2) seeking class discovery; and (3) seeking discovery of information which is unrelated to any allegation he has made in the complaint. Docket No. 41. [1] For the following reasons, I grant in part and deny in part the motion.

I. RELEVANT BACKGROUND

On January 31, 2020, Gottlieb filed this putative class action in Massachusetts Superior Court. See Docket No. 15 at 11-25. Amica removed the action to this Court on March 12, 2020. Docket No. 1. Gottlieb alleges that Amica has charged him and other homeowners who are Amica insurance policyholders excessive and unsupported premium increases based on purported increases in reconstruction costs. Gottlieb asserted five claims against Amica arising from Amica's alleged excessive premium increases: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) money had and received; and (5) unfair or deceptive acts under M.G.L. c. 93A.

On December 21, 2020, Judge Casper granted in part and denied in part Amica's motion to dismiss. Docket No. 24. Specifically, Judge Casper dismissed the breach of contract and breach of the implied covenant of good faith and fair dealing claims. Id. at 4-6. She dismissed the Chapter 93A claim to the extent that it was based on the breach of contract and/or breach of the implied covenant of good faith and fair dealing but allowed it to proceed only to the extent that it relied upon the conduct underlying the unjust enrichment and money had and received claims. Id. at 9.

On January 19, 2021, Judge Casper held a scheduling conference. Docket No. 32. Gottlieb proposed an eight-and-a-half month discovery period for the parties to conduct discovery on Gottlieb's individual and the putative class claims. Docket No. 30 at 4. Amica, on the other hand, proposed filing a motion for summary judgment first. Id. at 5. Should Amica's motion for summary

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 16 of 71

Gottlieb v. Amica Mutual Insurance Company, Not Reported in Fed. Supp. (2021)

judgment be denied, then it requested phased discovery with a three-month period for discovery of Gottlieb's individual claim first and, then, if necessary, a six-month period for class discovery. Id. at 5-6.

At the end of the scheduling conference, Judge Casper took the matter under advisement stating:

> This may be a case - - and I understand the plaintiff's position - - this may be a case where I think that it is appropriate to proceed with discovery as to the individual plaintiff ahead of the class, but I want to give that a little more thought, but I'll keep the intervals that were suggested on either side in mind when I adopt that schedule.

Docket No. 38 at 11-12. On January 22, 2021, Judge Casper entered the following order:

> Having considered the parties' joint statement as to the further deadlines to be set, and as a supplement to the schedule adopted in D. 32, the Court further orders as follows: fact discovery shall be completed by May 12, 2021. Summary judgment motions must be filed by 6/12/2021 (and may be filed before this date) and opposition shall be due 21 days after the motion is filed. Status Conference set for 5/17/21 02:00 PM in Courtroom 11 before Judge Denise J. Casper.

**\*2** Docket No. 33.

On March 11, 2021, Gottlieb filed a motion for leave to file an amended complaint, which sought to change the proposed class from Massachusetts residents only to residents of all fifty states. Docket No. 36. Gottlieb also explained that the dismissed counts had been left in the proposed amended complaint "to preserve and clarify Plaintiff's right in the event of any subsequent appeals." Id. at 3, n. 2. Judge Casper allowed the motion for leave to file an amended complaint over Amica's opposition, stating that:

> The Court does not conclude that the amendments would be futile (where Plaintiff has noted that he has included Counts I and II only to preserve their objection to the Court's dismissal of same for any appeal, D. 36-1 at 1 n. 1, and these Counts will not be pressed in light of that dismissal) and where the Court does not conclude that amendment at this time prejudices Defendant.

Docket No. 45.

On March 29, 2021, Amica filed the instant motion. Docket No. 41. Gottlieb filed an opposition on April 9, 2021. Docket No. 48. I heard oral argument on May 5, 2021.

## II. ANALYSIS

### A. Standard Of Review

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Whether discovery is proportional to the needs of the case depends on, among other things, "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

Case 1:26-cv-00659-KM Document 9-3 Filed 05/19/26 Page 17 of 71

Gottlieb v. Amica Mutual Insurance Company, Not Reported in Fed. Supp. (2021)

information, the parties' resources, the importance of discovery in resolving the issues, and whether the expense of the proposed discovery outweighs its likely benefit." Id.

Rule 26(c) of the Federal Rules of Civil Procedure provides that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden of expense" in connection with discovery requests. Fed. R. Civ. P. 26(c)(1). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984). "As specified in [Rule] 26(c), however, a showing of good cause is required to justify any protective order." Baker v. Liggett Group, Inc., 132 F.R.D. 123, 125 (D. Mass. 1990) (citing Anderson v. Cryovac, Inc., 805 F.2d 1, 7 (1st Cir. 1986)). The party seeking a protective order has the burden of demonstrating good cause. See Anderson, 805 F.2d at 7-8(citations omitted).

B. Gottlieb May Not Conduct Class Discovery Pending Resolution Of Amica's Anticipated Motion For Summary Judgment

This Court has discretion to bifurcate this case so that discovery and dispositive motions on Gottlieb's individual claims take place before allowing discovery on class issues. See Deleon v. Time Warner Cable LLC, No. 09-2438, 2009 WL 10674767, at *1 (C.D. Cal. Nov. 2, 2009); see also Chow v. SentosaCare, LLC, No. 19-CV-3541-FB-SJB, 2020 WL 559704, at *2 (E.D.N.Y. Jan. 23, 2020) ("It is true that where the named plaintiff's claim is subject to dispositive motions, delaying class discovery is often appropriate."). Indeed, Judge Casper's comments at the scheduling conference as well as the scheduling order entered in this case indicate that she has already determined that it is appropriate to proceed in this manner in this case. For example, she picked the shorter time period for fact discovery consistent with Amica's proposal for plaintiff discovery only. Therefore, I find that Gottlieb may not conduct class discovery at this stage.

C. Relevance

**\*3** Amica argues that Gottlieb is not entitled to any discovery regarding its dismissed contractual claims. Docket No. 42 at 4-9. Amica takes too narrow a view of relevance. Though the contractual claims have been dismissed, there is overlap in the factual allegations relevant to both dismissed and non-dismissed claims.

For example, Amica argues that the Endorsement is not relevant because Judge Casper found that the "Endorsement in the 2015-2016 Policy does not govern Amica's ability to increase coverage limitation in the 2016-2017 Policy" and that neither the 2015-2016 Policy nor the 2016-2017 Policy "guarantee him another coverage limit or require a particular calculation procedure." Docket No. 42 at 6. However, in connection with his unjust enrichment claim, Gottlieb alleges that Amica artificially inflated increases in premiums based on purported increases to reconstruction costs and that it would be inequitable for Amica to retain the alleged overcharge in payments where the calculation of the same is undisclosed and exceeds reasonably expected rates. See Docket No. 24 at 7. The Endorsement therefore remains relevant to Gottlieb's unjust enrichment claims.

Amica also argues that several of Gottlieb's discovery requests seek irrelevant information because they are unrelated to his allegations. Docket No. 42 at 18-19. To the extent that Amica argues that in order to be relevant, information needs to have been specifically alleged in the complaint, see, e.g., Answer to Interrogatory No. 7,[2] that view of relevance is also too narrow. Accordingly, within two weeks, Amica shall provide further answers to Gottlieb's interrogatories and requests for production of documents consistent with this opinion. In addition, within two weeks, Gottlieb shall serve a revised notice of Rule 30(b)(6) deposition of Amica consistent with this opinion. If the parties still have disputes about the applicability of this Court's decision to specific requests or topics of examination, they shall first confer in an effort to resolve those disputes before filing any further motions. The parties are also reminded of their obligation to confer in good faith about the matters for examination pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 18 of 71

## III. ORDER

For the foregoing reasons, I grant in part and deny in part Amica's motion for a protective order as set forth herein.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1839602

---

**Footnotes**

1       On April 13, 2021, Judge Casper referred the motion to the undersigned. Docket No. 49.

2       See Docket No. 42-1 at 10.

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.



KeyCite Yellow Flag

Distinguished by   Ahmed v. HSBC Bank USA, National Association,   C.D.Cal.,   January 5, 2018

2012 WL 686709

Only the Westlaw citation is currently available.

United States District Court,

N.D. Illinois,

Eastern Division.

Mike HARRIS and Jeff Dunstan, individually and on behalf of a class of similarly situated individuals, Plaintiffs,

v.

COMSCORE, INC., a Delaware Corporation, Defendant.

No. 11 CV 5807.
|
March 2, 2012.

**Attorneys and Law Firms**

Jay Edelson, Ari Jonathan Scharg, Chandler Randolph Givens, Rafey S. Balabanian, Steven W. Teppler, Edelson McGuire, LLC, William Charles Gray, Chicago, IL, for Plaintiffs.

Andrew H. Schapiro, Stephen A. Swedlow, Quinn Emanuel Urquhart & Sullivan, LLP, Amanda S. Williamson, Emanuel Urquhart & Sullivan LLP, David Zev Smith, Leonard Ernest Hudson, Reed Smith LLP, Mark William Wallin, Paul F. Stack, Stack & O'Connor Chartered, Chicago, IL, Michael G. Rhodes, Ray A. Sardo, Whitty Somvichian, Cooley Godward Kronish LLP, San Francisco, CA, for Defendant.

### MEMORANDUM OPINION and ORDER

YOUNG B. KIM, United States Magistrate Judge.

**\*1**  In this putative class action, Plaintiffs Mike Harris and Jeff Dunstan allege that comScore, Inc. ("comScore") improperly collected and disseminated personal information belonging to them and a class of similarly situated individuals. They claim that comScore violated the Stored Communications Act, 18 U.S.C. § 2701(a) (1) and (2), the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)(a) and (d), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. Ann. 505/1 (2007), and was unjustly enriched by its actions. This matter is before the court on the motion of comScore to bifurcate discovery into two phases—the first relating to class certification, and the second relating to the merits—and to stay discovery on the merits until further order of the court. For the following reasons, the motion is granted:

### Facts and Procedural History

Plaintiffs allege that comScore, an Internet market research company, induces individuals to download and install its software by "bundling" it with free items such as screensavers, games, and third-party computer applications like CD burning software or greeting card templates. (R. 1, Compl.¶¶ 13, 33.) After a user installs the comScore software, the software surreptitiously collects information about the user's online activity, scans some of the user's computer files, and transmits the information to

comScore's servers. (*Id.* at ¶¶ 5, 9.) comScore then aggregates the data it mines from the individual users for the purpose of developing market research reports, which it sells to its clients. (*Id.* at ¶ 25.)

Plaintiffs allege that they, as well as a class of similarly situated individuals, were misled by comScore's Terms of Service ("ToS"). (*Id.* at ¶ 37.) They allege that in some cases, comScore's ToS display screens do not refer to comScore's full license agreement (*Id.* at ¶ 38), and in other cases, do not adequately alert consumers to a link containing comScore's license agreement (*Id.* at ¶ 40). They further allege that comScore's ToS and Privacy Policy are incomplete because they fail to disclose pertinent information such as the types of modifications that the comScore software will make to the user's computer settings, the breadth of personal data that the software will collect from the user's computer, and the possibility that the installation of the software will result in comScore scanning files on computers found on the user's local networks. (*Id.* at ¶¶ 7, 10, 11, 37, 51.) Moreover, Plaintiffs allege that the comScore software, once installed, is difficult to remove. (*Id.* at ¶¶ 57, 58.)

Approximately two million internet users have installed comScore's software. (*Id.* at ¶¶ 31, 67, 70.) Harris alleges that when he downloaded a free screensaver, he unwittingly installed comScore's software, but did not agree to comScore's ToS or understand that the screensaver was bundled with comScore's software. (*Id.* at ¶¶ 67–69.) Harris alleges that he was able to uninstall the comScore software from his Macintosh computer but only after "conducting hours of diligent research." (*Id.* at ¶ 68.) Dunstan alleges that when he downloaded a free greeting card template it was secretly bundled with comScore's software. (*Id.* at ¶ 70.) Dunstan alleges that his computer, which ran the Windows operating system, was "debilitated" by the comScore software. (*Id.* at ¶¶ 70, 71.) Dunstan alleges that he had to purchase and use a $40 anti-virus software to remove the comScore software and restore his computer's functionality. (*Id.* at ¶ 73.)

**\*2** Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiffs brought this action on behalf of themselves and all other persons similarly situated. They seek to represent a class consisting of "all individuals and entities in the United States that have had comScore's surveillance software ("Surveillance Software") installed on their computer(s) and a Subclass of all individuals and entities in the United States that have incurred costs in removing the Surveillance Software." (R. 2, Pls.' Mot. to Certify Class at 2.)

Harris [1] propounded his first set of interrogatories and document requests to comScore in December 2011. (R. 67–1, 67–2.) comScore characterizes these requests as "sweeping and intrusive ... encompassing virtually all aspects of comScore's business." (R. 67, Def.'s Mem. in Support of Bifurcation at 1.) comScore seeks to delay responding to these requests except as they relate to class certification issues. (*Id.* at 11.) To that end, comScore has agreed to respond to the interrogatories and requests for production that it believes relate to class certification issues. It has already produced the source code for the software in dispute, including the source code for its "RK Verify" software, which comScore describes as the software "that confirms that consumers have viewed and agreed to comScore's Terms of Service before installing the software." (*Id.* at 2.)

## Analysis

comScore argues that it would be inefficient and wasteful to conduct merits discovery before the assigned District Judge rules on the pending class certification motion. comScore predicts that if class certification is denied, Plaintiffs will settle or voluntarily withdraw their complaint because the statutory damages at issue—maximum $1,000 for Harris and $1,040 for Dunstan—are meager. In that event, any merits discovery already performed would be a wasted, expensive effort. If, on the other hand, the court certifies a class or classes, the certification order will clarify the issues to be litigated on the merits and will thereby narrow the scope of merits discovery. comScore suggests that the court might certify a class limited to Macintosh users or limited to Windows users because the comScore software for the two operating systems differs for at least two reasons: (1) comScore sold the data it collected from Windows users, but not the data collected from Macintosh users (*see* R. 59, Ans. at ¶ 38); and (2) comScore's software for Windows did not authorize data collection from local networks, though its software for Macintosh did allow limited connection to computers networked with its Macintosh users (*see id* .¶ 10). comScore suggests that if the

court certifies a class limited to either group of users, discovery on the merits relating to the other group would be rendered irrelevant and wasteful.

Plaintiffs disagree. They argue that bifurcated discovery will delay the litigation. They are particularly sensitive to any delay induced by comScore because of comScore's repeated praise of the "rocket docket" of Virginia, its preferred venue. Secondly, they argue that bifurcation will require increased judicial supervision because the parties will disagree about the permissible scope of class certification discovery. Third, they argue that comScore has not met its burden of establishing "good cause" for a protective order delaying merits discovery.

**\*3** "The Federal Rules of Civil Procedure give magistrate judges broad discretion in resolving discovery disputes." *Heyman v. Beatrice Co., Inc.,* No. 89 C 7381, 1992 WL 245682, at \*2 (N.D.Ill. Sept.23, 1992). That discretion extends to decisions to bifurcate discovery. *See Ocean Atlantic Woodland Corp. v. DRH Cambridge Homes, Inc.,* No. 02 C 2523, 2004 WL 609326, at \*2 (N.D.Ill. March 23, 2004) ("[w]hether to bifurcate discovery is a matter committed to the discretion of the trial court"). Though the Federal Rules of Civil Procedure do not explicitly provide for bifurcated discovery, the 2003 Advisory Committee Notes to Rule 23 recognize that bifurcation is often appropriate: "it is appropriate to conduct controlled discovery ... limited to those aspects relevant to making the certification decision on an informed basis." Fed.R.Civ.P. 23 Advisory Committee's Notes. In deciding motions to bifurcate merits discovery from class certification discovery, courts consider the following factors: (1) expediency, meaning whether bifurcated discovery will aid the court in making a timely determination on the class certification motion, *see Plummer v. Chicago Journeyman Plumbers' Local Union No. 130, U . A.,* 77 F.R.D. 399, 402 (N.D.Ill.1977); (2) economy, meaning "the potential impact a grant or denial of certification would have upon the pending litigation," *see Gonzalez v. Pepsico, Inc.,* No. 06–2163–KHV, 2007 WL 1100204, at \*3 (D.Kan. April 11, 2007), and whether the definition of the class would "help determine the limits of discovery on the merits," *see American Nurses' Assoc. v. State of Illinois,* 1986 WL 10382, at \*3 (N.D.Ill. Sept.12, 1986); and (3) severability, meaning whether class certification and merits issues are closely enmeshed, *see Gray v. First Winthrop Corp.,* 133 F.R.D. 39, 41 (N.D.Cal.1990).

An evaluation of these factors leads to the conclusion that bifurcation of discovery is the more sensible approach to discovery in this particular case. Proceeding with merits discovery, which may well involve the review of millions of documents not directly relevant to the issues of class certification, may delay the parties' submission of supplemental briefing on the class certification issue. Any delay would frustrate the court's effort to certify the action as a class action "[a]t an early practicable time," as is mandated by Rule 23(c)(1)(A). For this reason, the Manual for Complex Litigation counsels that "[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary." Manual for Complex Litigation (Fourth) § 21.14 (2011). Regarding this expediency concern, Plaintiffs do not address whether bifurcation will result in a speedier determination of the class certification issue, but rather counter that bifurcation will significantly delay the resolution on the merits. This argument fails because bifurcated discovery will not take significantly more time than would non-bifurcated discovery. The parties' report of their Rule 26(f) planning meeting specifies that non-bifurcated discovery should take 10 months. (R. 60, Report of the Pty.'s Planning Meeting at 3.) This is approximately the same total length of time as comScore envisions for bifurcated discovery, excluding the pause while the assigned District Judge considers the fully-briefed class certification motion-a required pause before reaching the merits of the case. Moreover, if a class is certified, the definition of "that class should help determine the limits of discovery on the merits," *American Nurses' Assoc.,* 1986 WL 10382 at \*3, which will save time as the parties move forward with the litigation. Overall, the potential for a modest delay in reaching resolution on the merits does not outweigh the court's obligation under Rule 23(c) to resolve the class certification issue 7F'at an early practicable time."

**\*4** Secondly, considerations of economy weigh in favor of bifurcating discovery in this case. As comScore points out, the limited statutory damages available to Plaintiffs are likely an insufficient motivation to litigate in the absence of class certification. Notably, Plaintiffs do not argue that they would pursue the merits as individual plaintiffs. Instead, they argue that economy is not an appropriate consideration before the court. (R. 70, Pls.' Resp. at 7.) Two treatises disagree with Plaintiffs on this point. According to the Manual for Complex Litigation, "in cases that are unlikely to continue if not certified, discovery

into aspects of the merits unrelated to certification ... can create extraordinary and unnecessary expense and burden." Manual for Complex Litigation at § 21.14. Similarly, McLauchlin on Class Actions summarizes that "[c]ourts are more likely to decline requests to stay pure merits discovery when the nature of the putative representative's claims suggests that it would continue to prosecute individual claims if certification is denied," which suggests that courts are indeed more likely to grant requests to stay merits discovery when the nature of the putative representative's claims indicates that the claimant would *not* pursue their claims if certification is denied. *See* McLauchlin on Class Actions (Eighth) § 3:10 (2011). In this case, bifurcation of discovery will be economical not only if certification is denied, but also if it is approved. As discussed above, if comScore's averments about the differences between its Macintosh and Windows software are borne out by discovery, the court might certify a limited class. Waiting until the court has made that determination may avoid needless discovery into issues that are ultimately not relevant to the litigation.

The final factor—the severability of class certification issues from merits issues—also points towards bifurcation of discovery. Though the "boundary between a class determination and the merits may not always be easily discernible," *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.,* 657 F.2d 890, 895 (7th Cir.1981), it is possible to draw general lines in this case. Discovery relevant to class certification will focus on the prerequisites for class actions provided by Rule 23(a): (1) numerosity of party plaintiffs; (2) commonality of questions of law and fact; (3) typicality of the representative parties' claims and defenses to those of the class; and (4) adequacy of representation. Fed.R.Civ.P. 23(a). Regarding numerosity, the inquiry is whether "a class approach would be useful to avoid the practical problems of trying to join many named plaintiffs or otherwise clog the docket with numerous individual suits," *Eggleston,* 657 F.2d at 895, so certification discovery will seek to determine the approximate number of potential members of the class. Regarding commonality, the inquiry is whether "there appear to be common questions of law or fact." *Id.* Here, the commonality prong will likely turn on whether the putative class members' consent, and the scope of consent, is subject to evaluation on a class-wide basis, and whether comScore's adherence to the scope of consent is subject to analysis on a class-wide basis. The third prong, typicality, "requires a showing, not unrelated to commonality, that others suffer from similar alleged grievances" of Plaintiffs. *Id.* at 896. Here, the typicality prong will turn on whether Harris' and Dunstan's alleged experiences downloading and removing the comScore software are similar to those of the putative class. Lastly, the adequacy prong asks whether "the named parties are qualified and capable of fully pursuing the common goals of the class without collusion or conflicts of interests." *Id.*

**\*5** In this case, the following issues are not relevant to the class certification analysis because they do not touch on any of the four prongs of Rule 23(a): (1) the development of the comScore software; (2) internal comScore emails; (3) comScore's relationships with its bundling partners (excluding comScore's agreements with bundling partners to obtain consent from prospective comScore users); and (4) comScore's relationships with its clients. To the extent that class certification matters are tightly intertwined with merits discovery, comScore must produce the information and/or documents requested so that Plaintiffs may develop their arguments relevant to class certification. While Plaintiffs are likely correct that bifurcation will result in more active judicial supervision, that alone is not sufficient to deny comScore's motion.

Turning now to the specific interrogatories and requests for production currently at issue, this court concludes that comScore must answer the following requests as they pertain to the certification issues: (1) Interrogatories 1–5, 11 (with limitation), 15–17, and 22; and (2) Requests for Production ("RFP")1. [2] Interrogatories 1–5 and RFP 1 seek general information about comScore's process of answering interrogatories and RFPs. comScore must respond to these requests to the extent they relate to the Interrogatories and RFPs that comScore has agreed to answer and is ordered to answer.

Interrogatory 11 seeks discovery about the types of data that third-party entities purchased, specified by the purchasers. Plaintiffs argue that this discovery is necessary to establish "whether the class members suffered damages and, if so, whether such damages predominate ... or are incidental." (R. 70, Pls.' Resp. at 10.) This court agrees that whether the members of the proposed classes suffered similar damages is relevant to the issue of commonality, and further agrees that whether comScore sold similar types

of panelist data is relevant to the issue of whether comScore's alleged breach of the putative class members' scope of consent is subject to evaluation on a class-wide basis. But, the identities of comScore's clients are not relevant to the class certification analysis. Defendant is ordered to answer this interrogatory without having to identify the third-party purchasers.

Interrogatory 15 seeks information about comScore's source code control and source code library retention policies and practices. comScore argues that the source code it has agreed to produce to Plaintiffs will allow them to "test their core allegations on the merits while also addressing the central issues on class certification." (R. 67, Def.'s Mem. in Support of Bifurcation at 2 .) But the information sought by Interrogatory 15 may be necessary to assess the integrity of comScore's source code.

Interrogatories 16 and 17[3] ask comScore to identify and describe each type of information that the comScore software "monitors, collects, retains, and/or transmits" from the Windows and Macintosh panelists. Whether comScore collected the same, or substantially the same, types of content from the panelists is relevant to the commonality prong of the class certification analysis. Interrogatory 22 seeks factual information relating to comScore's position that class certification is inappropriate in this case. This interrogatory clearly seeks information directly related to the class certification issues.

 **\*6** The remaining interrogatories (9, 10 and 18–21) and RFPs (3–12, 14, 16, 17, 19, 20, 29–33, 36–39 and 44–45) are outside the scope of class certification discovery and are stayed pending resolution of the class certification issues. Interrogatories 9 and 18 and RFPs 4, 9–12, 31–33, and 37, seek discovery about comScore's "bundling partners" and its "Trees for the Future" program. comScore's bundling partners are the entities that offer comScore's software in conjunction with their own free software applications. (R. 1, Compl. at ¶ 13.) comScore's Trees for the Future program induces Internet users to become panelists in exchange for having trees planted. (R. 70, Pls.' Resp. at 12.) comScore's relationships with third-parties are not relevant to the issues of numerosity, commonality, typicality, and adequacy of representation. To the extent that Plaintiffs believe that responses to these Interrogatories and RFPs would address issues of consent for the panelists who obtained the comScore software through a bundling partner or the Trees for the Future program, they are unnecessary because comScore has already agreed to produce that information in response to Interrogatories 13 and 14 and RFPs 15 and 24–26. (R. 67, Def.'s Mem. in Support of Bifurcation at 11 n. 6.) Plaintiffs will also be able to explore comScore's methods of obtaining consent from prospective panelists by examining the source code and RK Verify software.

Interrogatory 10 seeks discovery about the purchasers of comScore's market research data. Plaintiffs argue that this discovery is necessary to establish "whether the class members suffered damages and, if so, whether such damages predominate ... or are incidental." (R. 70, Pls.' Resp. at 10.) As stated earlier this court agrees that whether the members of the proposed classes suffered similar damages is relevant to the issue of commonality but the identities of comScore's clients are not relevant to the certification analysis.

Interrogatory 19 and RFP 8 seek information related to comScore's investigation and termination of its Macintosh panel. Plaintiffs argue that they need this discovery to establish whether injunctive relief is appropriate. But these requests are overly broad for that purpose. For example, Interrogatory 19 requests that comScore describe its "investigation of the MAC PANEL, INCLUDING the reasons for its ultimate termination, and IDENTIFY ALL DOCUMENTS RELATING TO such investigation." Similarly, RFP 8 requests all documents and ESI relating to the investigation and termination of the Macintosh panel. How comScore investigated its Macintosh panel and its reasons for terminating it are not relevant to the appropriateness of injunctive relief in this case. If Plaintiffs need discovery to verify comScore's termination of the Macintosh panel, they should propound a more limited request to that end.

Interrogatory 20 and RFP 44 seek discovery about comScore's public relations response to the litigation. comScore's efforts to manage its public relations are not relevant to the Rule 23 prerequisites for class certification. Interrogatory 21, which seeks discovery about comScore's affirmative defenses, goes to the merits and is not relevant to class certification.

**\*7** RFPs 3, 5–7, and 14 seek information about comScore's development of its software. This request is unduly burdensome and unlikely to yield discovery relevant to the certification issues. The members of the putative class were not impacted by the development of comScore's software, but by the software itself.

RFPs 16, 17, 19, 20, 28,[4] 36, and 38 seek communications between comScore and its employees on a variety of topics. At this stage in the litigation, Plaintiffs need to establish that comScore's software impacted the putative class members in a common manner. comScore's internal communications are less relevant to that issue than how the software actually impacted the putative class. Plaintiffs have access to the source code, which, in conjunction with the discovery responses mandated in this order, should demonstrate how the software impacted the members of the putative class.

RFPs 27,[5] 29, and 30 seek documents, ESI, and communications relating to comScore's use and sale of information personal to Harris and other panelists. This court agrees with Plaintiffs that whether comScore sold similar types of personal information of other panelists is relevant to commonality, and whether comScore sold Harris's personal information is relevant to typicality. However, as framed, the scope of these requests are overly broad as they would include comScore's contracts and contract negotiations with its clients, neither of which is relevant to the ⚑Rule 23 analysis. Furthermore, comScore's answer to Interrogatory 11 should provide Plaintiffs with information on the types of personal data comScore sold to others.

RFP 45, which seeks information about comScore's liability insurance, is also not relevant to the class certification issues. However, based on the parties' joint statement in their Report of the Parties' Planning Meeting, comScore should have produced a copy of the relevant policies on December 7, 2011, pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iv).[6] (R. 60 at 1.)

## Conclusion

For the foregoing reasons, comScore's motion to bifurcate discovery is granted. Discovery on the merits is stayed until after the court rules on Plaintiffs' motion to certify the action as a class action. comScore is ordered to respond to the written discovery requests as detailed herein by March 23, 2012.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 686709

## Footnotes

1   The record does not explain why Dunstan's name does not appear on the written requests for discovery but this ruling applies to all parties in this case.

2   comScore has agreed to respond to Interrogatories 6–8, and 12–14, and Requests for Production 2, 13, 15, 18, 21–26, 34, 35, and 40–42. (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n. 5 and 11 n. 6.) The parties have also agreed to a process for addressing Interrogatory 23 and RFP 43, which relate to expert reports and discovery. (*Id.* at 15 and R. 70, Pls.' Resp. at 13 n. 5.)

3   According to comScore, its commitment to produce the relevant source code "addresses Plaintiffs' Requests for Production Nos. 2, 27–28, and Interrogatories 16 and 17." (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n. 5.) This court disagrees in regards to Interrogatories 16 and 17. While the source code would likely enable Plaintiffs to access the information sought by Interrogatories 16 and 17, Plaintiffs suggest that having to "go fish" through the code

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 25 of 71

is burdensome. (R. 70, Pls.' Resp. at 14.) Because Interrogatories 16 and 17 clearly relate to class certification issues, Plaintiffs are entitled to that discovery now.

4    According to comScore, its commitment to produce the relevant source code "addresses Plaintiffs' Requests for Production ... 27–28." (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n. 5.) Because RFP 28 also requests communications between comScore and its employees, the source code is not responsive.

5    According to comScore, its commitment to produce the relevant source code "addresses Plaintiffs' Requests for Production ... 27–28." (R. 67, Def.'s Mem. in Support of Bifurcation at 10 n. 5.) In fact, RFP 27 requests documents and ESI relating to agreements between comScore and the panelists. The source code, alone, is therefore not responsive to RFP 27.

6    Because the parties have not provided the court with substantive arguments regarding RFP 39, the court is unable to determine whether this request is relevant to the class certification or merits issues. The parties should meet and confer in regard to RFP 39.

---

**End of Document**     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4630852
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Dawn HARTLEY–CULP, individually and on behalf of all others similarly situated, Plaintiff

v.

CREDIT MANAGEMENT COMPANY, Defendant.

Civil Action No. 3:CV–14–0282.
|
Signed Sept. 15, 2014.

**Attorneys and Law Firms**

Cynthia Levin, Law Offices of Todd M. Friedman, PC., King of Prussia, PA, for Plaintiff.

James McNally, Justin M. Tuskan, Metz Lewis Brodman Must O'Keefe LLC, Pittsburgh, PA, for Defendant.

### *MEMORANDUM AND ORDER*

THOMAS M. BLEWITT, United States Magistrate Judge.

### I. BACKGROUND.

 **\*1** This putative class action case was instituted, through counsel, on February 17, 2014, by Plaintiff Dawn Hartley–Culp, individually and on behalf of all others similarly situated. (Doc. 1). Named as sole Defendant is Credit Management Company ("CMC"). Plaintiff alleges that Defendant CMC began placing a series of calls to her cellular telephone ("cell phone") beginning in November of 2013. Plaintiff alleges that the calls made by Defendant CMC to her cell phone violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq.,* since the calls were placed by an automated telephone dialing system ("ATDS") or, by an artificial or recorded voice without her prior express consent. Plaintiff also alleges that Defendant CMC left numerous pre-recorded messages on her cell phone.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. [1]

On April 8, 2014, after being granted an extension of time, Defendant CMC filed its Answer to the Complaint with Affirmative Defenses. (Doc. 8). Defendant CMC admitted that it contacted Plaintiff for the purpose of collecting a debt which Plaintiff allegedly owed. In its Affirmative Defenses, Defendant CMC asserted that Plaintiff gave express consent to CMC's client to whom Plaintiff allegedly owed the debt, and that the calls made to Plaintiff were not placed via an ATDS. [2]

Subsequently, the Court issued a scheduling order and set case deadlines, and then extended the deadlines on two occasions. (Docs. 19, 22 & 26). The current discovery deadline is November 28, 2014. Plaintiff's Motion for Class Certification is due December 12, 2014.

Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the undersigned for all matters. (Doc. 17).

The parties are currently engaged in discovery. Plaintiff indicates that on July 26, 2014, she served written discovery on Defendant and scheduled a Rule 30(b)(6) deposition for August 26, 2014.

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 27 of 71

Hartley-Culp v. Credit Management Co., Not Reported in Fed. Supp. (2014)

On August 12, 2014, Defendant CMC filed a Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings. (Doc. 23). Defendant CMC simultaneously filed its support brief with Exhibits. (Docs. 24 & 24–1 to 24–4). Plaintiff filed her opposition brief on August 28, 2014. (Doc. 28). Defendant filed its reply brief on September 9, 2014, with Exhibits. (Docs. 29, 29–1 & 29–2).

Defendant CMC seeks the Court to bifurcate discovery into two phases with the first phase limited to the issue of whether Plaintiff expressly consented to receiving calls on her cell phone. Defendant CMC maintains that if it proves Plaintiff provided her express consent, then the calls it placed to her do not violate the TCPA. Defendant CMC then states that if it can show the calls placed to Plaintiff did not violate the TCPA, then Plaintiff will not be able to proceed as the representative of the purported class.

In the alternative, Defendant CMC moves the Court to stay all proceedings in this case since it contends that many of Plaintiff's allegations in her Complaint turn on issues currently pending before the Federal Communication Commission ("FCC"). Defendant CMC states that the FCC has primary jurisdiction to determine the issues raised by Plaintiff in this case.

## II. DISCUSSION.

**\*2**  Initially, based on the very recent Middle District of Pennsylvania case of *Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D. Pa. June 4, 2014, J. Conaboy), which is directly on point with our case, as well as *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013), and based on the well-reasoned decision of Judge Conaboy, with which we completely concur, we will deny Defendant CMC's alternative Motion to Stay all Proceedings in this case under the primary jurisdiction doctrine. This Court in *Fenescey* largely relied upon the Third Circuit's decision in *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013). This Court in *Fenescey* stated that "[g]iven the force and clarity of the [*Gager* ] precedential opinion, we have no need to further evaluate the doctrine of primary jurisdiction on the question of whether the TCPA applies to debt collection calls made to cellular phones." 2014 WL 2526571, \*2. This Court in *Fenescey* also found that based on *Gager,* there was no basis to stay its case on the ATDS issue. *Id.,* \*3. [3]

Since we concur entirely with the Court in *Fenescey,* we do not repeat its decision herein, and shall deny Defendant CMC's alternative Motion to Stay Proceedings in this case.

Next, we turn to Defendant CMC's primary Motion to Bifurcate Discovery.

As mentioned, Plaintiff alleged in her Complaint that Defendant CMC violated the TCPA by placing calls to her cellular telephone number without her prior express consent using an automatic telephone dialing system, and by leaving serval voice mail messages. The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Also, as stated, the TCPA applies to debt collection calls made to cellular phones. *Fenescey,* 2014 WL 2526571, \*2(citing *Gager, supra* ). "Prior express consent is deemed to be granted only if the wireless number is provided by the consumer to the creditor, and the number was provided during the transaction that resulted in the debt owed." *Wattie–Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, \*2 (M.D.Pa. Jan.14, 2014) (citation omitted). Also, the burden is on the creditor regarding the issue of whether express consent was provided and the creditor must show that the required prior express consent was obtained. *Id.* (citation omitted).

There is no question that the Court, in its discretion, can bifurcate discovery under Fed.R.Civ.P. 42. In *Stemrich v. Zabiyaka,* 2014 WL 931069, \*1 (M.D.Pa. March 10, 2014), the Court stated:

Under Federal Rule of Civil Procedure 42, a trial court may, in its discretion, bifurcate a trial. The rule provides as follows:

Hartley-Culp v. Credit Management Co., Not Reported in Fed. Supp. (2014)

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 28 of 71

**\*3** For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed.R.Civ.P. 42(b). The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis. *See Idzojtic v. Pennsylvania R.R. Co.,* 456 F.2d 1228, 1230 (3d Cir.1972) ("The district court is given broad discretion in reaching its decision whether to separate the issues of liability and damages."). In exercising its discretion, the court "must weigh the various considerations of convenience, prejudice to the parties, expedition, and economy of resources." *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984).

The moving party bears the burden of establishing that bifurcation is appropriate. *See Innovative Office Prods., Inc. v. Spaceco, Inc.,* Civ. No. 05–cv–4037, 2006 WL 1340865, \*1 (E.D.Pa. May 15, 2006).

We disagree with Defendant CMC and its contentions in its briefs that discovery at this stage of the case, *i.e.,* before Plaintiff files her Motion for Class Certification, should be limited to the issue of whether its calls to Plaintiff fall within the "prior express consent" exception. As stated, the burden is on the creditor (in this case Defendant CMC) regarding the issue of whether prior express consent was provided. Also, as stated, the burden is on Defendant CMC to demonstrate that it did not use an automated telephone service when it contacted Plaintiff. If Defendant CMC can meet either of its burdens, Defendant CMC will be entitled to summary judgment on Plaintiff's TCPA claim. On the other hand, if genuine disputes of material fact exist as to whether Defendant obtained Plaintiff's prior express consent, then Defendant will not be entitled to summary judgment on Plaintiff's TCPA claim. *Wattie–Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, \*3. Likewise, if disputed issues of fact remain as to whether Defendant CMC used automated telephone services in its contacts with Plaintiff, then summary judgment will not be appropriate. *Id.,* \*6(citations omitted). However, we concur with Plaintiff that "whether or not [Defendant] CMC had [prior express consent] to contact Plaintiff is not a threshold question that must be resolved at this stage, before the parties have had an opportunity to conduct class-wide discovery." (Doc. 28–1, p. 6, citing *Grant v. Capital Mgmt. Servs., L.P.,* 449 Fed.Appx. 598, 600 (9th Cir.2011) (" 'express consent' is not an element of a TCPA Plaintiff's prima face case, but rather is an affirmative defense for which the Defendant bears the burden of proof.").

We also agree with Plaintiff that despite Defendant CMC's contention and its Exhibits, that it would not be unduly burdensome on Defendant at this point of the case to respond to Plaintiff's discovery requests, including requests regarding the putative class action. Also, we find prejudice to Plaintiff if discovery was bifurcated as Plaintiff maintains. As Plaintiff points out, she "primarily seeks documents that are ordinarily maintained as business records, and to the extent that CMC will be burdened by having to produce any such documents, CMC can respond with the appropriate objections and substantiate them during the meet and confer process." (Doc. 28–1, p. 5). Defendant CMC will still be able to conduct any discovery it deems necessary to try and meet its burden as to its affirmative defenses, and it will be able to file a dispositive motion at the conclusion of discovery. Moreover, we agree with Plaintiff that she should have the benefit of discovery before she has to file her Motion for Class Certification, especially since Plaintiff has the burden of class certification. *See Hawk Valley, Inc. v. Taylor,* —— F.R.D. ——, 2014 WL1302097 (E.D.Pa. March 31, 2014) (citation omitted) (court granted Plaintiff's motion for class certification in a TCPA unsolicited-fax case since it found, in part, common issues of law and fact predominated).

**\*4** Finally, we concur with Plaintiff that bifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions.

## III. CONCLUSION.

Accordingly, the Court will deny entirely Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings (**Doc.23**).[4]

An appropriate Order will be issued.

Hartley-Culp v. Credit Management Co., Not Reported in Fed. Supp. (2014)

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 29 of 71

*ORDER*

**AND NOW,** this *15* day of **September, 2014,** based on the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings (**Doc.23**) is **DENIED IN ITS ENTIRETY.**

2. The discovery deadline in this case is extended to **December 29, 2014,** and the deadline for Plaintiff's Motion for Class Certification is extended to **January 12, 2015.**

**All Citations**

Not Reported in Fed. Supp., 2014 WL 4630852

---

**Footnotes**

1    Jurisdiction of this Court is properly based on federal question, 28 U.S.C. § 1331, pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq. See Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D.Pa. June 4, 2014).

2    According to Defendant CMC's Doc. 24 brief, p. 3 n. 2, Plaintiff allegedly owed a debt to Defendant CMC's client Extendicare Health Services, Inc. Defendant CMC notes that it is presently pursuing discovery to try and show that Plaintiff voluntarily provided her cell phone number to Extendicare staff during her intake interview upon becoming a patient of Extendicare's rehabilitation division.

3    *See Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir. Aug.22, 2013) (Third Circuit Court reversed dismissal of case alleging violations of 47 U.S.C. § 227(b) (1)(A)(iii), "the TCPA's provision banning certain automated calls to cellular phones."). In *Gager,* Plaintiff alleged that Defendant was obliged under the TCPA to stop autodialed calls to her cellular phone since she withdrew her prior express consent to be called on said phone via an automatic dialing system. The District Court granted Defendant's Rule 12(b)(6) Motion to Dismiss since it found that Plaintiff could not revoke her prior express consent. *See Gager v. Dell Financail Services, LLC,* 2012 WL 1942079 (M.D.Pa. May 29, 2012). The Third Circuit Court reversed the dismissal and found that "(1) the TCPA affords [Plaintiff] the right to revoke her prior express consent to be contacted on her cellular phone via an autodialing system and (2) there is no temporal limitation on that right." 727 F.3d 265, 2013 WL 4463305, *2.

4    The Court notes that it will, sua sponte, extend the discovery deadline and the deadline for Plaintiff to file her Motion for Class Certification. The discovery deadline will be extended to December 29, 2014, and Plaintiff's Motion for Class Certification will be extended to January 12,2015.

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 5075928
Only the Westlaw citation is currently available.
United States District Court, N.D. Oklahoma.

Dr. Sam Lebarre HORTON, Plaintiff,

v.

SOUTHWEST MEDICAL CONSULTING, LLC, et al., Defendants.

Case No. 17-CV-0266-CVE-mjx
|
Signed 08/14/2017

**Attorneys and Law Firms**

James A. Streett, Streett Law Firm, P.A., Russellville, AR, Jason Bjorn Aamodt, Indian and Environmental Law Group, PLLC, Tulsa, OK, Joey Paul Leniski, Jr., Branstetter, Stranch & Jennings, PLLC, Nashville, TN, for Plaintiff.

Bryan Joseph Wells, Conner & Winters LLP, Ryan S. Wilson, Wilson Law Firm, Oklahoma City, OK, Daniel P. Guillory, Errol J. King, John B. Davis, Baker Donelson Bearman Caldwell & Berkowitz PC, Baton Rouge, LA, Jason Alan McVicker, Mary Quinn-Cooper, Michael Franklin Smith, McAfee & Taft, Tulsa, OK, for Defendants.

**ORDER**

CLAIRE V. EAGAN, UNITED STATES DISTRICT JUDGE

**\*1** Now before the Court is the parties' Joint Status Report (Dkt. # 43). This case arises from an allegedly unsolicited facsimile (fax) transmission. Plaintiff filed a class action complaint alleging that defendants committed common law conversion and violated the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227 (TCPA), by sending an unsolicited fax that failed to include an opt-out provision. Dkt. # 2, at 32-34. Plaintiff defines the purported class as follows:

> All persons, natural or otherwise, in the United States and its territories who were successfully sent one or more facsimile transmissions advertising the SoonerCare healthcare provider network being offered by Molina Healthcare, Inc. During the period from four years prior to the filing of this Complaint through the present.

Id. at 18. In the Joint Status Report, defendants ask the Court to bifurcate class certification and merits discovery. Dkt. # 43, at 6. Plaintiff objects, arguing that the two issues are "intermingled." Id.

Courts often bifurcate discovery in class action cases for the sake of efficiency. See, e.g., Doe v. Unified Sch. Dist. No. 259, No. 05-1151-JTM, 2007 WL 1796202, at *1 n.6 (D. Kan. June 19, 2007). However, discovery bifurcation is not always more efficient. For example, bifurcation may be less efficient in cases where the merits/class discovery distinction is muddled or "cases that are large and likely to continue even if not certified." Gonzalez v. Pepsico, Inc., No. 06-2163-KHV, 2007 WL 1100204, at *3 (D. Kan. Apr. 11, 2007).

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 31 of 71

In this case, the Court agrees with defendants that bifurcation will be more efficient because class certification discovery should be straightforward and distinguishable from merits discovery. The parties will first have a short period of discovery for issues related to class certification, during which plaintiff may inspect the fax machine(s) used to send the alleged unsolicited faxes and any transmission history. Additionally, the parties may conduct depositions of one Rule 30(b)(6) witness of each defendant on issues related to class certification only. After this phase of discovery, plaintiff may file a motion for class certification or a notice of intent not to proceed with class certification. If necessary, the Court will enter a scheduling order related to merits discovery after ruling on any class certification motion.

**IT IS THEREFORE ORDERED** that the following scheduling order is hereby entered:

| | |
|---|---|
| Class Certification Discovery Cutoff: | October 31, 2017 |
| Motion for Class Certification: | November 15, 2017 |
| Response Briefs: | November 29, 2017 |
| Reply Brief: | December 6, 2017 |

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5075928

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2004-2 Trade Cases P 74,620

KeyCite Yellow Flag

Distinguished by   In re Special Grand Jury 89-2,   10th Cir.(Colo.),   June 15, 2006

2004 WL 2743591

United States District Court, E.D. Pennsylvania.

In re PLASTICS ADDITIVES ANTITRUST LITIGATION

No. Civ.A. 03–2038.
|
Nov. 29, 2004.

*MEMORANDUM ORDER*

DAVIS, J.

**\*1**  Presently before the Court are Defendants' Joint Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 88) filed on September 14, 2004; Plaintiffs' Opposition to Motion for Bifurcation (Doc. No. 92) filed on October 1, 2004; Defendants' Joint Memorandum in Further Support of Defendants' Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 98) filed on October 21, 2004; Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 93) filed on October 1, 2004; Defendants' Opposition to Plaintiffs' Motion for Entry of Proposed Scheduling Order (Doc. No. 96) filed on October 15, 2004; and Plaintiffs' Reply Memorandum in Support of Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 103) filed on November 10, 2004.

For the following reasons, Defendants' motion to bifurcate will be DENIED and Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order will be GRANTED in part and DENIED in part.

I. Factual and Procedural History

This case is a class action antitrust case concerning the plastics additives industry. Defendants are alleged manufacturers and/or sellers of plastic additives. (Am. Compl. at ¶¶ 19–29). Plaintiffs are allegedly purchasers of "plastics additives," what the plaintiffs define as "heat stabilizers, impact modifiers, and processing aids used to process plastics." (Am. Compl. at ¶ 7). Plaintiffs seek to represent a nationwide class of purchasers of plastics additives for the time period of January 1, 1990 through December 31, 2003. (*Id.* at ¶ 1).

In February 2003, the United States Department of Justice Antitrust Division ("DOJ") commenced an investigation into the plastics additives industry. (Def. Mot. to Bifurcate, at 4). Two grand juries were convened in the Northern District of California. (*Id.*). Both grand juries are currently proceeding in secret. One grand jury is focusing on heat stabilizers and the other grand jury involves heat impact modifiers and processing aids. (*Id.*). All defendants have been subpoenaed as part of one or both of the investigations. (*Id.*).

On March 28, 2003, plaintiff Gitto/Global Corporation filed a complaint on behalf of themselves and the putative class, alleging that defendants engaged in a price-fixing scheme for the sale of plastic additives in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. (Doc. No. 1). Subsequently, six separate complaints were filed against defendants based upon alleged antitrust violations. On August 14, 2003, this Count entered a pretrial order consolidating the seven related actions under a master file, directing plaintiffs to file a consolidated complaint, and holding discovery in abeyance pending the resolution of motions filed in response to the complaint. (Doc. No. 23). [1]

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 33 of 71

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

Plaintiffs filed an amended complaint on September 3, 2003. (Doc. No. 28). Plaintiffs contend that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a conspiracy in restraint of trade to artificially raise, fix, and/or stabilize priecs for plastic additives in the United states. (*Id.* at ¶¶ 49–50). Plaintiffs contend that defendants agreed to charge prices at higher levels and to allocate prices in order to artificially manipulate the price of plastic additives. (Id. at ¶ 50). Plaintiffs further allege that they had no knowledge of the conspiracy because defendants fraudulently concealed it. (*Id.* at ¶ 52). As a result, plaintiffs allege that they and other members of the class were required to pay more for plastic additives than they would have in a competitive marketplace. (Id. at ¶ 11).

**\*2** On December 1, 2003, defendants moved for dismissal and partial dismissal. (Doc. No. 54, 56). This Court denied defendants' motions on May 26, 2004, prompting the parties to meet to discuss an ongoing plan for discovery. (Doc. No. 72). The parties failed to reach an agreement on a discovery schedule, and, on September 14, 2004, defendants moved for bifurcation of discovery and for a stay of merits-based discovery. (Doc. No. 88). On October 1, plaintiffs filed a motion for entry of plaintiffs' proposed scheduling order. (Doc. No. 92). After an array of briefs and response briefs, the final brief in support of the parties' respective positions was filed on November 10, 2004. (Doc. No. 103).

II. Motion to Bifurcate

Defendants have moved this Court to bifurcate discovery into class certification issues and merit-based issues. Defendants present three major reasons for bifurcation. First, defendants claim that bifurcation will promote the early and efficient resolution of class issues contemplated by Federal Rule of Civil Procedure 23©)(1). (Def. Mot. To Bifurcate, at 7–13). Second, defendants claim that bifurcation is necessary due to pending grand jury proceedings in California. (*Id.,* at 13–17). Third, defendants claim that bifurcation will save the parties time and expense because resolution of the class certification issue will influence further proceedings. (*Id.,* at 11). This Court rejects defendants' arguments in favor of bifurcation.

Class certification must be made "as soon as practicable after commencement of an action." Fed.R.Civ.P. 23(c)(1) & (3). This mandate recognizes that "class certification or its denial will have a substantial impact on further proceedings, including the scope of discovery, the definition of issues, the length and complexity of trial, and the opportunities for settlement." Federal Judicial Center, Manual For Complex Litigation § 11.213, at 40 (4th ed.2004). To ensure that the mandate of Federal Rule of Civil Procedure 23(c)(1) is followed, courts have the discretion to "allow classwide discovery on the certification issue and postpone discovery on the merits." *Washington v. Brown & Williamson Tobacco,* 959 F.2d 1566, 1570–1571 (11 [th] Cir.1992).

The Third Circuit has not set a bright line test as to when a court should bifurcate discovery in class action litigation. Generally, however, courts allow classwide discovery on the certification issue and postpone classwide discovery on the merits of the claims when bifurcation serves the interests of "fairness and efficiency." *See* Manual for Complex Litigation § 11.213, at 40 ("discovery may proceed concurrently if bifurcating class discovery from merits discovery would result in significant duplication of effort and expense to the parties"); *see also Williamson Tobacco Corp.,* 959 F.2d at 1570–71 ("[t]o make early class determination practicable and to best serve the interests of fairness and efficiency, courts may allow classwide discovery on the certification issue and postpone classwide discovery on the merits").

**\*3** Both parties rely upon the Manual for Complex Litigation (the "Manual") as an authoritative source to determine when bifurcation is fair and efficient. (Def. Mot. to Bifurcate, at 5; Pl. Opp'n to Mot. to Bifurcate, at 9). According to the Manual, "courts often bifurcate discovery between certification issues and those related to the merits of the allegation." *Id.* § 21.14, at 256. Nonetheless, the Manual voices several concerns with bifurcation. The Manual notes that the distinction between merits-based discovery and class-related discovery if often blurry, if not spurious. *See id.* § 21.14, at 255 ("generally, application of the Rule 23 criteria requires the judge to examine the elements of the parties' substantive claims and defenses in order to analyze commonality, typicality, and adequacy of representation under Rule 23(a)"). The Manual further notes that "some merits

discovery during the precertification period is generally more appropriate for cases that are large and likely to continue even if not certified." *Id.; see also* 🚩*Gray v. First Winthrop,* 133 F.R.D. 39, 41 (N.D.Cal.1990) (denying order to stay merits-based discovery until resolution of class certification motion would be "unworkable," "impracticable," and "inefficient" and would deny plaintiffs ability to develop facts in support of motion). Accordingly, the Manual suggests that the prime considerations in whether bifurcation is efficient and fair include whether merits-based discovery is sufficiently intermingled with class-based discovery and whether the litigation is likely to continue absent class certification.

Bifurcation would be inefficient, unfair, and duplicative in this case for several reasons. First, bifurcation would further delay the resolution of the litigation in derogation of Rule 1 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 1 (procedural rules must be administered to secure "the just, speedy, and inexpensive determination of every action"). This case has already been on the docket for over 18 months without a decision on class certification. Failure to permit simultaneous discovery of merits-related and class-related issues will further delay the length of the overall discovery period, thereby inhibiting plaintiffs from receiving an expeditious resolution of their claims. [2] *See, e.g., In re Sulfuric Acid Antitrust Litigation,* MDL No. 1561, No. 03 C 4576 (N.D.Ill.2003) (refusing to bifurcate discovery in antitrust litigation in part because of delays created by bifurcation). Bifurcation would also belie principles of judicial economy, as the Court may be forced to spend time and resources resolving discovery disputes over what is "merit" discovery as compared to "class" discovery. *See, e .g., In re Hamilton Bancorp, Inc. Securities Litigation,* 2002 WL 463314, at \*1 (S.D.Fla. Jan.14, 2002) (noting that "bifurcation of discovery may well-increase litigation expenses by protracting the completion of discovery, coupled with endless disputes over what is 'merit' versus 'class' discovery").

**\*4** Second, class certification discovery in this litigation is not "easily" differentiated from "merits" discovery. *See, e.g.,* 🚩*Gray,* 133 F.R.D. at 41 (noting that "discovery relating to class certification is closely enmeshed with merits discovery" and "cannot be meaningfully developed without inquiry into basic issues of the litigation"). There will be a substantial overlap between what is needed to prove plaintiff's price-fixing claims, as well as the information needed to establish class-wide defenses, and what is needed to determine whether the elements of class certification are met. For example, according to the defendants' proposed scheduling order, determination of whether the elements of class certification are met [3] would require discovery into whether the agreements between the parties for the sale of plastic additives, competitor contracts, defendants' business plans and strategies for marketing and selling plastic additives, the impact of the defendants' conduct on plaintiffs, and services provided by defendants to plaintiffs in connection with the sale of plastic additives. (Def. Proposed Scheduling Order, attached as Exhibit A). Discovery on these issues will also be necessary to prove the merit of plaintiffs' claim, namely whether defendants' engaged in a nation-wide price-fixing scheme for the sale of plastic additives and whether, as a result, the plaintiffs suffered damages. *See, e.g.,* 🚩*In re Linerboard Antitrust Litigation,* 305 F.3d 145, 151 (3d Cir.2002) (damages in antitrust litigation can be proved by establishing that free market prices would be lower than prices paid and that plaintiffs made purchases at higher prices). Due to the intermingling of the facts necessary to evaluate class certification and the merits of plaintiffs' claims, separating the two would duplicate discovery efforts, which, in turn, would force both parties to incur unnecessary expenses and would further protract the litigation.

Third, contrary to defendants' assertions, there is no reason to believe that denial of class certification will terminate this litigation. *See* Manual for Complex Litigation § 21.14, at 256 (bifurcation not appropriate if litigation likely to proceed without certification). Seven individual lawsuits were filed against the defendants and then consolidated under this master file. The six additional lawsuits have not been terminated, but, instead, have been stayed pending class certification in this litigation. If class certification is denied, it is reasonable to assume that the individual plaintiffs will pursue their claims through the cases that are currently stayed. (Pl. Opp'n to Def. Mot. to Bifurcate, at 10). This is particularly true because one of the defendants, Crompton Corporation ("Crompton"), has been accepted into the Department of Justice's corporation leniency program, and has agreed to assist plaintiffs' counsel in the prosecution of claims against non-settling defendants. (*Id.,* at 10–11). The likelihood of the continuation of individual claims, regardless of class certification, belies whatever time and expense may be saved in the future through the narrowing of discovery pursuant to the resolution of class certification motions.

**\*5** Because bifurcation of discovery would be inefficient, unfair, and duplicative, this Court denies defendants' motion to bifurcate discovery into a class-based stage and a merits-based stage. [4]

III. Motion to Stay Merits–Based Discovery

In addition to the request for straightforward bifurcation, defendants expressly ask this Court to issue a stay of all merits-based discovery pending a determination of class certification. (Def. Mot. to Bifurcate, at 12–13). Defendants support their argument by reference to the standard for determining whether to stay civil proceedings pending the resolution of related criminal proceedings. (*Id.,* at 12–13). In so doing, defendants implicitly ask this court to stay merits-based discovery until the outcome of ongoing grand jury proceedings in California. (*Id.,* at 15) ("If, however, the grand jury has not concluded by the time the class certification motion has been decided, the Court can re-evaluate at that time whether to permit merits discovery to go forward and with what limitations").

It is well-settled that defendants in a criminal prosecution do not have a due process right to stay proceedings in a parallel civil case. *United States v. Kordel,* 397 U.S. 1, 9–10, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). However, it is equally well-settled that the Court has the inherent authority to control the disposition of cases on it dockets. *See, e.g., Landis v. North Am. Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). This includes the power to stay civil discovery until termination of related criminal proceedings. *See Texaco, Inc. v. Borda,* 383 F.2d 607, 608 (3d Cir.1967).

The "stay" of a civil case is an "extraordinary remedy." *Weil v. Markowitz,* 829 F.2d 166, 174 n. 17 (D.C.Cir.1987). In determining whether the "extraordinary" remedy of a stay is appropriate, this Court looks at five competing interests:

(1) interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay;

(2) burden which any particular aspect of the proceedings may impose on defendants;

(3) convenience of the court in the management of its cases, and the efficient use of judicial resources;

(4) interests of persons not parties to the civil litigation; and

(5) interest of the public in the pending civil and criminal litigation.

*See, e.g., Golden Quality Ice Cream Co. v. Deerfield Specialty,* 87 F.R.D. 53, 56 (E.D.Pa.1980) (promulgating factors). Ultimately, the decision whether to grant a stay must be made on a case-by-case basis. *See Shirsat v. Mutual Pharmaceutical Co.,* 1995 WL 695109, at \*1 (E.D.Pa. Nov.21, 1995).

This Court refuses to bifurcate discovery on the basis of concurrent grand jury proceedings that may extend indefinitely. To the extent that defendants are asking for an official stay on merits-based discovery pending the resolution of grand jury proceedings, and perhaps even criminal prosecutions, this Court also denies the defendants' request based upon a balancing of all relevant factors. *See Sterling Nat'l Bank v. A–1 Hotels Int'l, Inc.,* 175 F.Supp.2d 573, 579 (S.D.N.Y.2001) (treating request for stay of depositions for six months as request for stay of case pending resolution of ongoing grand jury proceedings and criminal investigations because "the argument for a further stay [six months later] will be at least as potent as it is now").

A. Plaintiffs' Interest and Potential Prejudice

**\*6** Staying merits-based discovery would prejudice plaintiffs by preventing the expeditious resolution of the lawsuit. *See, e.g., Sterling Nat'l Bank,* 175 F.Supp.2d at 575 (concluding that "it would be perverse if plaintiffs who claim to be the victims of

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 36 of 71

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)
2004-2 Trade Cases P 74,620

criminal activity were to receive slower justice than other plaintiffs because the behavior they allege is sufficiently egregious to have attracted the attention of the criminal authorities"). It is "only through the discovery procedure that a plaintiff can determine the merit (or lack of merit) in his [or her] case and develop the strategy which will guide him [or her] throughout the litigation." ⚑ *Golden Quality Ice Cream Co.,* 87 F.R.D. at 56. While the initiation and resolution of the California grand jury proceedings against defendants may narrow the scope of this litigation, this possibility is too remote to be considered at this stage. Furthermore, staying discovery on this rationale would result in an indefinite stay, as there is no way to predict when grand jury proceedings will end, whether an indictment will be delivered, and whether criminal proceedings will ensue. *See In re Residential Doors Antitrust Litigation,* 900 F.Supp. 749, 756 (E.D.Pa.1995) (rejecting argument that discovery can be stayed without prejudice to plaintiffs until completion of government's criminal investigation of unspecified others at unknown future date).

   B. Burden on Defendants

Defendants have not established that they would suffer actual prejudice if merits-based discovery proceeds. As corporations, defendants will not be able to invoke the privilege against self-incrimination. ⚑ *United States v. Kordel,* 397 U.S. 1, 9, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) (right against self-incrimination not available to corporations). However, if defendants' employees invoke their Fifth Amendment right against self-incrimination during the discovery process, such as by refusing by refusing to answer deposition questions or interrogatories, the defendants' chances of success at trial may diminish. Indeed, a court may impose "reasonable" discovery sanctions in such a situation, such as preventing the witness from testifying on behalf of the defendant concerning the factual matters that were concealed by the invocation of the Fifth Amendment. *See, e.g.,* ⚑ *Securities & Exch. Comm'n v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir.1994) (reliance on Fifth Amendment right against self-incrimination in civil cases may give rise to adverse inference against party claiming benefits).

This Court recognizes the seriousness of defendants' concerns. However, the weight to be attached to these fears is minimized by the layers of speculation upon which they are built. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578 (denying motion to stay pending resolution of grand jury proceedings because "there is no way of measuring with any precision what questions defendants may refuse to answer, or what damage may be done to their position in the civil case by any assertions of privilege they choose to make"). Defendants presume that employees, who have yet to be indicted, will need to, and will actually invoke, their Fifth Amendment privilege during discovery. *Id.* Defendants then presume that this Court will impose discovery sanctions for the exercise of this right. *Id.* These presumptions render the actual prejudice to defendants "inherently unclear" at this pre-indictment phase. *Id* . at 577–578.

 **\*7** This Court also finds defendants' fears concerning discovery sanctions incommensurate with defendants' request for a stay of merits-based discovery. Because merits-based discovery and class-based discovery overlap, the progression of class-based discovery, to which defendants have agreed, may require the defendants' employees to exercise their Fifth Amendment rights during discovery events. Paradoxically, this would lead to the very result that defendants' request for a stay seeks to prevent. Accordingly, defendants' failure to request a blanket stay of all discovery pending the resolution of criminal grand jury proceedings in California undermines their argument that a stay of merits-based discovery will avoid actual prejudice.

Finally, this Court notes that defendants have not argued that merits-based discovery will divert resources that may be necessary for defense of a possible criminal action. Nor have defendants argued that the expense of defending the civil litigation and the grand jury proceedings in California would be unreasonable. Accordingly, although the defendants may experience some future prejudice if this Court refuses to grant a stay of merits-based discovery, particularly with respect to negative inferences to be drawn from the exercise of Fifth Amendment rights by individual witnesses, this prejudice is both remote and uncertain. *See State Farm Mutual Automobile Ins. Co. v. Beckham–Easley,* 2002 WL 31111766, at \*2 (E.D.Pa. Sept.18, 2002) (pre-indictment requests for stay are typically denied because risks are more remote than for indicted defendant). [5]

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 37 of 71

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)
2004-2 Trade Cases P 74,620

### C. Burden on the Court

Staying merits-based discovery in the litigation hinders the Court's responsibility to keep its docket moving to provide litigants with a timely and effective resolution of their claims. *See, e.g., Dawson v. Dodd,* 1999 WL 410366, at *3 (E.D.Pa. June 17, 1999) ("The Court has a responsibility to control the disposition of the cases on its docket with economy of time and effort for all actors including itself."). To delay merits-based discovery pending the resolution of grand jury proceedings at some unforeseeable date in the future would hinder the Court from performing its responsibility. This duty is particularly important when, as in the instant matter, the complaint that is the subject of the motion to stay has been lingering on the docket for more than 18 months.

The Court realizes that, in some instances, staying discovery until the resolution of parallel criminal proceedings may minimize the Court's burden. A stay may avoid duplicative judicial efforts, eliminating the need for parties to claim the Fifth Amendment right against self-incrimination or removing the burden upon plaintiffs to prove antitrust liability. *See, e.g., White v. Mapco Gas Products, Inc.,* 116 F.R.D. 498, 502 (E.D.Ark.1987). In this case, however, these possibilities are too remote to be given significant consideration. *See, e.g., Anthony v. City of Philadelphia,* 2001 WL 118964, at *2 (E.D.Pa. Feb.9, 2001) (rejecting argument as too speculative that plaintiff and court will benefit from stay because resolution of criminal case may reduce or simplify issues). There has been no indictment handed down in either of the grand jury proceedings. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 580 (refusing to grant stay of parallel civil proceedings when no indication that grand jury's investigation reached critical stage or that indictment is imminent because stay would "substantially halt the civil litigation indefinitely, without any predictability as to when the case would return to the Court's active docket"). As such, no criminal charges have been filed, nor has a date been set for trial. It is therefore uncertain how long the requested stay will last, and whether future criminal proceedings will alleviate the evidentiary and analytical burdens on the parties and on the court. *See Beckham–Easley,* 2002 WL 3111176, at *3 Beckham–Easley, 2002 WL 3111176, at *3 (denying motion to stay discovery despite defendants' contentions that indictment would be issued within 120 days from filing motion to stay). Accordingly, the interests of immediate judicial economy trump the defendants' speculations that waiting until the completion of grand jury proceedings would lessen the Court's burden.

### D. Burden on Non-parties

**\*8** Corporations speak and function only through their officers and employees. *See Upjohn,* 449 U.S. at 389–392. As the defendants note, the DOJ frequently requires current and former employees from companies under investigation to testify before the grant jury. (Def. Mot. To Bifurcate, at 14–15). These employees are not parties to this litigation. However, if faced with a discovery request, whether in the form of depositions, written interrogatories, or document production, these witnesses may have to invoke their Fifth Amendment right against self-incrimination to avoid disclosing information that may lead to a future criminal conviction. The pressure of whether to invoke this right during civil discovery can be severe. *See Golden Quality Ice Cream,* 87 F.R.D. at 58; *see also White,* 116 F.R.D. at 503 (noting that corporations' officers and managers may have Fifth Amendment privileges by virtue of grand jury probe and that interest of non-parties against self-incrimination favors staying discovery).

While the dilemma of whether a non-party should invoke her Fifth Amendment right against self-incrimination may be severe, the personal consequences that attach to this decision are not as grave. This Court may not impose discovery sanctions on non-parties who invoke their Fifth Amendment rights during civil discovery. Nor can the exercise of this right be used against such witnesses in future criminal prosecutions. *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (no adverse inference may be drawn nor penalty imposed on criminal defendant who chooses not to testify by exercising Fifth Amendment right against self-incrimination). Furthermore, to lessen the burden on non-party witnesses in deciding to invoke the privilege, defendants may seek the entry of a protective order, which forbids the dissemination of information gathered through civil discovery to outside parties. Finally, to this Court's knowledge, no indictments have been handed down against defendants or their employees, thereby further weakening the degree of risk to non-parties if merits-based discovery progresses. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578 (noting that burden is greater to indicted party because risk of liberty, importance

2004-2 Trade Cases P 74,620

of safeguarding constitutional rights, and strain on resources and attention make defending parallel civil litigation particularly difficult). Consequently, the burden on non-parties in this instance is marginal.

### E. Public Interest

Public interest considerations weigh against granting a stay of merit-based discovery. The public's interest in vigorously enforcing national anti-trust laws through the expeditious resolution of a private antitrust litigation is particularly great. *See* *Golden Quality Ice Cream,* 87 F.R.D. at 58; *In re Residential Doors,* 900 F.Supp. at 756 (public interest prejudiced by delay in discovery proceedings in class action antitrust litigation). This interest is even greater when the nature of the litigation is a class action lawsuit, filed on behalf of nationwide consumers of a particular product over the course of more than a decade. Furthermore, the public also has a significant interest in ensuring the flow of this Court's judicial docket so that justice may be administered to the instant litigants, as well as all other litigants before this Court, in a timely fashion. These interests are not rendered less acute by the federal government's decision to spend resources on behalf of the public investigating potential antitrust violations by defendants and convening grand jury proceedings, particularly when no indictments have been delivered and when the federal government has not intervened to request a stay of discovery on the basis of ensuring the secrecy, integrity, and timeliness of such proceedings. *See, e.g., Kaiser v. Steward,* 1997 WL 66186, at *5 (E.D.Pa.1997) (refusing blanket stay of civil proceedings pending outcome of criminal trial, even when government prosecuting parallel criminal case requests stay to prevent defendants from using civil discovery as vehicle to gain information on possible future criminal prosecutions); *Golden Quality Ice Cream,* 87 F.R.D. at 58 (public interest in quick and diligent resolution of antitrust violations through private litigation only weakened when federal government receives indictment and chooses to prosecute criminal antitrust case).

**\*9** The defendants ask the Court to weigh these significant interests against the public interest in maintaining the secrecy of grand jury proceedings, as embodied in Rule 6(e) of the Federal Rules of Criminal Procedure. Defendants note that witnesses may be asked to provide testimony and documents that reveal information provided to the grand jury, thereby helping the litigants in this matter to identify other witnesses who have been called to testify before one or both grand juries. (Def. Mot. To Bifurcate, at 17). As stated more fully in Section III.A.1 of this opinion, Rule 6(e) neither applies to witnesses nor to documents created independent of grand jury proceedings. *See* Fed. R.Crim. Pro. 6(e). Accordingly, defendants' argument that permitting civil merits discovery will violate the grand jury secrecy provisions of Rule 6(e) is unfounded.

### F. Conclusion

A careful weighing of the factors indicates that discovery should not be bifurcated. Nor should merits-based discovery be stayed pending the resolution of class certification, ongoing grand jury proceedings, or subsequent criminal prosecutions. This Court recognizes the legitimacy of defendants' concerns about possible prejudice from employees asserting their right against self-incrimination during the discovery process. Nonetheless, rather than delaying this litigation to allay defendants' speculative concerns, such as by staying merits-based discovery or preventing the taking of depositions of defendants' employees prior to class certification, this Court will progress with discovery and will attempt to accommodate defendants' concerns if and when the situations triggering these concerns actually arise.

### IV. Plaintiffs' Motion for Entry of a Scheduling Order

Plaintiffs argue that the Court should enter the proposed scheduling order, which does not bifurcate discovery. Plaintiffs' scheduling order allocates sixty days for the completion of discovery concerning class certification issues. (Pl. Proposed Order, at ¶ 2(d)). It imposes the following obligations on the parties. First, it requires defendants to produce within forty-five days of the order all documents relating to plastics additives "that were produced to the Department of Justice, any grand jury, and any investigatory authority, foreign or domestic (including but not limited to the European Union, Canada, or Japan), on a rolling basis...." (*Id.* at ¶ 2(a)). Second, it requires defendants to produce within sixty days of the order "in electronic format, all transactional data relating to their sales of Plastics Additives, as defined in the Complaint, in the United States during the period

January 1, 1990 through to December 31, 2003" and to make available defendants' documentation and computer personnel to help understand and use the data. (*Id.* at ¶ 2(b)). Third, it requires plaintiffs to produce within 45 days "all documents relating to their purchases of plastics additives ... from the defendants." (*Id.* at ¶ 2(c)).

**\*10** Defendants object to this proposed scheduling order on several grounds. First, defendants contend that the production of all documents produced to the DOJ, any grand jury, or any domestic investigatory authority violates Rule 6(e) of the Federal Rules of Criminal Procedure. (Def. Opp'n to Pl. Mot., at 8–12). Second, defendants contend that the production of all documents produced to any foreign investigatory authority is excessively burdensome and not geared towards the acquisition of relevant evidence. (*Id.* at 11–13). Third, defendants contend that sixty days is insufficient to conduct class-related discovery and allows for inadequate time for factual development on class issues. (*Id.*, at 15). Fourth, defendants contend that the discovery plan imposes no reciprocal burden upon plaintiffs to produce data in electronic format and to provide technical assistance to defendants in understanding the use of that data. (*Id.*). Finally, defendants contend that they should be expressly allowed to take discovery from plaintiffs related to plaintiffs' sales of plastics products to their customers. (*Id.*).

A. Documents related to plastic additives that were submitted to the Department of Justice, any grand jury, and any domestic investigatory body

Defendants claim that defendants should not have to produce documents related to plastic additives that were submitted as part of a domestic government investigation because Rule 6(e)(2) of the Federal Rules of Criminal Procedure bars disclosure and because case law does not dictate such a result. (Def. Mem. In Opp'n to Pl. Mot., at 8).

1. Rule 6(e)(2) is inapplicable.

Defendants claim that Federal Rule of Criminal Procedure 6(e)(2) prevents plaintiffs from receiving documents that defendants produced to the DOJ in connection with California grand jury investigations. (Def. Mem. in Opp'n to Pl. Mot., at 8). Defendants' arguments lack legal support.

Federal Rule of Criminal Procedure 6(e)(2)(A) states that "no obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Fed.R.Crim.P. 6(e)(2)(A). Rule 6(e)(2)(B) prohibits certain people from disclosing "a matter occurring before the grand jury." Fed.R.Crim.P. 6(e)(2)(B). This list of persons includes the following: a grand juror; an interpreter; a court reporter; an operator of a recording device; a person who transcribes recorded testimony; an attorney for the government; or any person to whom disclosure is made. *Id.* Conspicuously absent from this list are witnesses, whether witnesses that testify at grand jury proceedings or witnesses that provide documents to grand juries during the course of their proceedings. *See* Susan W. Brenner, Gregory G. Lockhart, Federal Grand Jury: A Guide to Law and Practice § 8.3.1 (2004); *see also* Andrea M. Nervi, FRCP 6(E) And the Disclosure of Documents Reviewed by a Grand Jury, 57 U. Chi. L.Rev. 221, 224–225 (1990). This omission was not unintentional, as the Advisory Committee Note to Rule 6(e) specifies that the rule "does not impose any obligation of secrecy on witnesses." *Id.*

**\*11** Despite its express language, courts disagree as to whether Rule 6(e)(2) applies to witnesses and other private parties not listed in the rule. *Compare Illinois v. Sarbaugh, 552 F.2d 768, 777–78 (7th Cir.1977)* (private corporations indicted through grand jury proceedings subject to secrecy obligations of Rule 6(e), although state demonstrated particularized need within meaning of Rule 6(e) to force corporate employer of grand jury witness to turn over transcripts of grand jury testimony concerning highway construction fraud) *and Cumberland Farms, Inc. v. Browning–Ferris Ind., Inc. ., 1989 WL 90884, at \*1 (E.D.Pa. April 18, 1989)* (applying Rule 6(e) without discussion to private party defendants and requiring showing of particularized need for documents created by or for grand jury) *with In re Grand Jury Subpoena Duces Tecum, 575 F.Supp. 1219, 1221 (E.D.Pa.1983)* (Rule 6(e) does not impose obligation of secrecy on witnesses, nor does the court retain

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 40 of 71

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

a general supervisory authority to impose restraints on witnesses who seek to disclose testimony given before grand jury). Although the Third Circuit has not squarely addressed this issue, this Court agrees with those courts holding that Rule 6(e)(2) does not impose secrecy obligations on a witness who supplies documents to a grand jury proceeding. *See, e.g.,* ⚑*In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. 554, 555–556 (D.Minn.1989) (defendants in antitrust litigation are not among the parties enumerated in Rule 6(e)(2) and are required to release documents which were produced independent of the grand jury); ⚑*Golden Quality Ice Cream Co., Inc.,* 87 F.R.D. at 59 (disclosure of documents produced by defendants in class action to grand jury not prohibited by ⚑Federal Rule of Criminal Procedure 6(e)). This analysis comports with the text of the rule and with the advisory comment explaining the purpose and genealogy of the rule. *See* ⚑Fed.R.Crim.P. 6(e) (no obligation of secrecy on any person except those listed in ⚑Rule 6(e)(2)(B)).

Furthermore, even if ⚑Rule 6(e)(2) was applicable to private parties not listed in the rule, documents generated for purposes independent of the grand jury investigation, such as during the ordinary course of a defendant's business, are not "matters occurring before the grand jury." *See, e.g.,* ⚑*In re Grand Jury Matter* (Catania), 682 F.2d 61, 64 (3d Cir.1982) (information developed by the FBI during course of investigation and presented to federal grand jury was not subject to ⚑Rule 6(e) because information exists apart from and was developed independently of grand jury, even though developed with an eye towards ultimate use in grand jury proceeding); *In re Grand Jury Matter,* 640 F.Supp. 63, 65 (E.D.Pa.1986) (⚑Rule 6(e) does not apply to materials created for purposes independent of the grand jury investigation and, thus, business records subpoenaed by grand jury could be disclosed to Inspector General as part of a separate investigation). The Third Circuit has expressly declared that "information does not become a matter occurring before the grand jury simply by being presented to the grand jury, particularly where it was developed independently of the grand jury." *U.S. v. Chang,* 2002 WL 31108904, at *2 (3d Cir. Sept.20, 2002) (unpublished opinion); ⚑*In re Grand Jury Matter* (Catania), 682 F.2d at 64. Nonetheless, materials created at a grand jury's request, such as subpoenas, transcripts, and document lists, constitute matters "occurring before the grand jury" within the meaning of ⚑Rule 6(e), thereby requiring parties to demonstrated particularized need to acquire these materials. *See, e.g.,* ⚑*United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (requiring party seeking grand jury transcript to demonstrate "particularized" need for disclosure).

**\*12** Because defendants are not one of the enumerated parties in ⚑Rule 6(e), and because the defendants have not asserted that the documents were created at the request of grand jury proceedings in California rather than during the ordinary course of defendants' business operations, the obligation of secrecy does not apply.[6] *See* Manual for Complex Litigation § 11.49 ("The production to a grand jury of otherwise discoverable material does not, however, entitle it to ⚑Federal Rule of [Criminal] Procedure 6 protection. Copies of material produced to a grand jury are subject to discovery ."). Indeed, this Court does not believe that the production of documents submitted during the California grand jury proceedings is likely to disclose the "essence" of those proceedings. *See, e.g.,* ⚑*In re Grand Jury Investigation,* 630 F.2d 996, 1000 (3d Cir.1980) (holding that ⚑Rule 6(e)'s policy of secrecy "designed to protect from disclosure only the essence of what takes place in the grand jury room" and recognizing that mere fact that particular document was reviewed by grand jury does not subject document to ⚑Rule 6(e) protections). Consequently, defendants' objection to plaintiffs' proposed order on the ground of ⚑Rule 6(e)(2) lacks merit.

2. Plaintiffs' request for all documents submitted to the DOJ, any grand jury, and any domestic investigatory body is supported by case law.

Rejecting the defendants' defense to plaintiffs' discovery request is not the same as endorsing the content of plaintiffs' proposed order. It appears, however, that defendants in antitrust litigation regularly agree through joint discovery schedules to produce

2004-2 Trade Cases P 74,620

documents submitted to the DOJ, grand juries, and other investigatory authorities concerning the basis for the antitrust civil suit. *See, e.g., In re Acrylonitrile Butadiene Rubber (NBR) Antitrust Litigation,* 03–cv–1898 (W.D. Pa. June 14, 2004) (parties agreeing in proposed discovery schedule to produce documents submitted to grand jury or DOJ); *In re Rubber Chemicals Antitrust Litigation,* 03–CV–1496 (N.D.Cal. Jan. 26, 2004) (documents produced to grand jury or DOJ subpoenas in related criminal investigation included within Rule 26 initial disclosures); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (PCD) (D.Conn. Oct. 31, 2003) (parties agreeing in proposed discovery schedule to produce all documents submitted to DOJ or grand jury). This willingness to produce such documents at the outset of litigation signals the appropriateness and relevance of such a discovery request.

Plaintiffs also cite several cases in which defendants have been compelled to produce documents relating to government investigations. *See, e.g.,* ⚑*In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556 (requiring defendants to product "documents which they submitted to the government in response to an investigation of the wirebound box industry and which they created independently from any such investigation); ⚑*Golden Quality Ice Cream,* 87 F.R.D. at 59. These cases recognize the relevance of these documents to antitrust litigation. *See* ⚑*In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556. They also recognize that the production of these documents will impose only a minimum burden on the defendants, "since the documents in question have already been identified and sorted." *See, e.g.,* ⚑*Golden Quality Ice Cream,* 87 F.R.D. at 59. In fact, ordering production of these documents "seems to accord with prevailing practice." *Id.* [7]

**\*13** This Court agrees with the logic of *In re Wirebound Boxes AntiTrust Litigation* and *Golden Quality Ice Cream.* [8] Applying this logic, defendants shall be required to produce all documents that were produced to the DOJ, any grand jury, and any domestic investigatory authority in connection with an investigation of the plastics additives industry. *See* Grand Jury Law and Practice § 5:6 (2d ed.2004) (evidence obtained independently of the grand jury proceeding does not ordinarily constitute a "matter occurring before the grand jury," even if same witness or similar evidence has been or will be presented to grand jury).

B. Documents related to plastics additives that were submitted to foreign investigatory bodies

Defendants present two major objections to the proposal that defendants produce all documents turned over to foreign investigatory bodies in conjunction with the investigation of the plastics additives industry. First, defendants claim that documents produced to foreign investigative authorities are irrelevant to this lawsuit. (Def. Opp'n To Pl. Mot., at 12). Specifically, defendants claim that plaintiffs have alleged only that defendants engaged in a price-fixing conspiracy "in the United States," rather than a foreign price-fixing conspiracy; that foreign investigators focus on domestic markets over which they have control and jurisdiction; and that foreign investigators generally conduct wholesale seizures of files, thereby collecting documents irrelevant to the antitrust issues in this litigation. (*Id.*)

Second, defendants claim that this request, at such an early stage in the litigation, would impose an unnecessary burden on the parties. (*Id.* at 13). Defendants stress that foreign investigators may object to the production of documents, as the United States often does, and that production may disclose information about ongoing investigations. (*Id.*). Defendants further claim that foreign criminal investigations into alleged antitrust violations involve a different process than domestic criminal investigations into alleged antitrust violations. (*Id.*). Accordingly, because of this methodological difference, defendants claim that they would need to conduct a thorough review of the documents to determine the applicability of evidentiary privileges, that this review would be complicated by the fact that many of the documents are not likely to be in English, and that companies in defendants' position are not likely to have copies of documents that were seized pursuant to a foreign investigation into the plastic additives industry. (*Id.*).

Plaintiffs respond to defendants' objections by arguing that documents produced to foreign investigative bodies are as relevant as those produced to grand juries in the United States. (Pl. Reply Mem., at 8). Plaintiffs cite a recent order from *In re: Automotive Refinishing Paint Antitrust Litigation,* MDL Docket No. 1426 (E.D.Pa. October 29, 2004) (J. Surrick), in which the court

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 42 of 71
In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)
2004-2 Trade Cases P 74,620

affirmed its previous order requiring antitrust defendants, in response to document requests and interrogatories, to produce documents submitted to foreign investigative bodies relating to the production, pricing, marketing, sale, or distribution of automotive refinishing paint. *Id.* at *5–6. The court reasoned that such information was relevant because foreign-price fixing activities would impact the domestic market for automotive refinishing paint, because evidence of foreign price-fixing among defendants would establish the existence of an illegal conspiracy in restraint of trade within the meaning of section 1 of the Sherman Act, and because evidence of foreign price-fixing would be material "to prove that they had the opportunity and ability to engage in domestic price-fixing for automotive refinishing paint." *Id.* at *8. The court further reasoned that the burden of producing these documents would not be significant because defendants had already agreed to produce all documents and information related to the United States; thus, requiring blanket production was easier than compelling defendants to sift through documents submitted to foreign investigative bodies for materials relevant to the United States. *Id.* at *10–11.

**\*14** It is well-settled that courts presiding over antitrust cases generally take a liberal view of relevance in determining the scope of discovery. *See, e.g., New Park Entm't, LLC v. Elec. Factory Concerts, Inc.,* 2000 WL 62315, at *3 (E.D.Pa. Jan.13, 2000)* (internal quotations omitted). Applying this expansive view of relevance, this Court agrees that documents produced to foreign investigative bodies are relevant to determine whether defendants have engaged in price-fixing that affects American commerce. Regardless of whether plaintiffs have alleged a global conspiracy, materials produced to international government authorities may cover transactions involving the sale or marketing of plastic additives in the United States. They may also cover transactions and decision-making outside the United States that influence the sale or marketing of plastic additives in the United States. Accordingly, these documents may lead to evidence that illuminates defendants' motive and opportunity for the alleged conspiracy within the United States, the breadth of the conspiracy, and the manner by which defendants fraudulently concealed the conspiracy from plaintiffs. *See, e.g., In re Vitamins Antitrust Litigation,* 2001 WL 1049433, at *11–12 (D.D.C. June 20, 2001)* (refusing to place geographic limitation on merits-based discovery in global price-fixing case because, although acts or communications outside the United States may be admissible to establish existence of conspiracy). In addition, such materials may help plaintiffs to discover the identity and location of potential witnesses and to impeach defendants' trial witnesses. *Id.*

This Court also rejects defendants' position that production of all documents submitted to international investigative authorities concerning plastic additives at this juncture in the litigation would pose a substantial burden on defendants. The scope of document production in antitrust litigation is often quite expansive. *See, e.g., In re Fine Paper Antitrust Litigation,* 685 F.2d 810, 818 (3d Cir.1982)* (no abuse of discretion where trial court permitted taking of 270 depositions and production of nearly two million documents in complex, nationwide antitrust claim); *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 614 (7th Cir.1997)* (pretrial discovery involved more than 1,000 depositions and over fifty million pages of documents); *In re Linerboard Antitrust Litigation,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003)* (pretrial discovery required production of millions of pages of documents). Furthermore, although foreign antitrust investigations generally may be conducted in a distinct manner from domestic antitrust investigations, defendants have not provided this Court with specific, individualized reasons why the production of documents that defendants supplied to foreign investigative bodies would be burdensome in this particular litigation. Defendants fail to present evidence, such as affidavits from employees or written documentation, indicating that wholesale files were seized from defendants' international offices, that the documents produced to foreign investigative authorities are in languages other than English, or that defendants would need to review each and every document to determine whether it invokes applicable privileges. Nonetheless, this Court gives serious consideration to the defendants' generic contention that companies subject to foreign seizures of corporate records are not likely to have either lists of the documents seized or records indicating what was taken. Accordingly, defendants shall be required to provide documents related to plastic additives that were produced to foreign investigatory authorities, to the extent that defendants have knowledge of the identity of these documents and/or can reasonably obtain knowledge of the identity of these documents.

### C. Time Period

**\*15** Defendants contend that the proposed discovery schedule of 60 days for class-related discovery is unrealistic. (Def. Opp'n to Pl. Mot., at 15). Defendants claim that this period allows inadequate time for factual development on class issues. (*Id.*).

2004-2 Trade Cases P 74,620

This Court has refused to bifurcate discovery. This decision may require the parties to spend substantial time in responding simultaneously to merits-based discovery and class-based discovery. Because merits-based discovery may deflect attention and resources from establishing a record for class certification, this Court agrees that sixty days for class-based discovery is inadequate, particularly when both party may employ expert witnesses in support of their respective positions on class certification. *See, e.g .,* *Larson v. Burlington Northern and Santa Fe Railway Co.,* 210 F.R.D. 663, 667 (D.Minn.2002) (granting bifurcation but supplying only ninety days to create record for class certification). Instead, this Court will give the parties 120 days to conduct fact-based discovery on the class certification issue.

### D. Production of Data in Electronic Format and Technical Assistance

Defendants also object to the obligation that defendants provide data in electronic format to plaintiffs and that defendants provide technical assistance to plaintiffs in understanding this data. (Def. Opp'n to Pl. Mot., at 15). Defendants do not question the relevance of these obligations, only the fact that no similar burden is imposed upon plaintiffs. (*Id.*).

This Court agrees with defendants' objections. Both parties must provide all transactional data in electronic format, to the extent reasonably feasible. *See, e.g., In re: Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (D.Conn. October 31, 2003) (parties agree to produce transactional data in electronic format, but only to extent "reasonably feasible"). However, defendants shall not be required to make available "documentation and computer personnel" to help plaintiffs understand that data. Requiring this condition as a matter of right in contested litigation undermines the adversarial nature of antitrust litigation. Unless otherwise agreed upon, interpretations of data produced through discovery should be obtained through traditional discovery outlets and through the hiring of expert witnesses. Although the parties may privately agree to provide technical assistance to one another, this Court will not impose such an obligation on either party as a matter of course.

### E. Discovery of Downstream Data

Defendants further object to the plaintiffs' proposed discovery order on the basis that the discovery order does not require plaintiffs to produce information about "demand conditions on the end markets for defendants' products and the varying types of pricing terms to the proposed class members that have resulted from those conditions." (Def. Mem. In Opp'n to Pl. Mot., at 3). Defendants claim that this information must be provided at the outset of the discovery period because it is relevant to whether plaintiffs meet the elements necessary for class certification. (*Id.* at 15).

**\*16** Plaintiffs note that their proposal does not prohibit defendants from requesting this information, as both parties are free to serve discovery requests seeking any information they require. (Pl. Reply Mem., at 9). However, in an effort to preempt future discovery disputes, plaintiffs note that case law prevents discovery of events occurring in the chain of distribution after the initial sales of the price-fixed product, information otherwise known as "downstream data." (*Id.* at 15; Pl. Mem. In Opp'n to Def. Mot., at 19–25).

This Court agrees that plaintiffs' proposed schedule does not prohibit defendants from seeking downstream data, to the extent relevant, through discovery. This Court also agrees that defendants have not established the relevance of plaintiffs' downstream data to the merits of plaintiffs' claims or to class certification issues. Defendants provide no case law in support of their argument. In fact, the case law brought to the Court's attention holds that downstream data is irrelevant to determine whether defendants are liable for price-fixing under the Sherman Act. *See, e.g., Illinois Brick Co. v. Illinois,* 431 U.S. 720, 724–725, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (holding that the overcharged direct purchaser, and not other indirect purchasers who receive the passed-on price of the illegal overcharge, may sue to recover the illegal overcharge and that antitrust defendants may not introduce evidence that indirect purchasers were injured by illegal overcharge) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). As such, courts have refused to require production of downstream data in

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 44 of 71

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

antitrust price-fixing cases. *See, e.g.,* 🚩*In re Vitamins Antitrust Litigation,* 198 F.R.D. 296, 301 (D.D.C.2000) (noting that "no court has even allowed production of individualized downstream data" in antitrust case and refusing to grand defendants' motion to compel documents that relate to plaintiffs' use, manufacture, sale, marketing, distribution, or supply of vitamin products); *In re Wirebound Boxes Antitrust Litigation,* 131 F.R.D. 578 (D.Minn.1990) (denying motion to compel document requests for materials concerning plaintiffs' financial information in price-fixing antitrust litigation because plaintiffs do not seek to recover lost profits); *In re Carbon Dioxide Antitrust Litigation,* MDL 940, slip op. at 4 (M.D.Fl. Nov. 19, 1993) (refusing to permit discovery in antitrust litigation of plaintiffs' sales, profits, and costs of products for which liquid carbon dioxide and nitrogen are used because plaintiffs seek to recover overcharges from defendants' antitrust violations). Consequently, although this Court will not *per se* preclude defendants at this time from requesting downstream data through discovery, this Court will certainly not require plaintiffs to produce downstream data at the outset of the discovery period through the entry of a scheduling order.

V. Conclusion

For the following reasons, defendants' motion to bifurcate discovery is denied and plaintiffs' motion for entry of a discovery schedule is granted in part and denied in part. An order and scheduling order consistent with this opinion follow.

*ORDER*

**\*17** AND NOW, this _____ day of November 2004, upon consideration of Defendants' Join Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 88) filed on September 14, 2004, Plaintiffs' Opposition to Motion for Bifurcation (Doc. No. 92) filed on October 1, 2004, Defendants' Joint Memorandum in Further Support of Defendants' Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 98) filed on October 21, 2004, Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 93) filed on October 1, 2004, Defendants' Opposition to Plaintiffs' Motion for Entry of Proposed Scheduling Order (Doc. No. 96) filed on October 15, 2004, and Plaintiffs' Reply Memorandum in Support of Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 103) filed on November 10, 2004, it is hereby ORDERED as follows:

1. Defendants' Motion for Bifurcation is DENIED.

2. Plaintiffs' Motion for Entry of a Proposed Scheduling Order is GRANTED in part and DENIED in part.

3. Discovery shall be completed according to the Scheduling Order that accompanies this Order.[*]

**All Citations**

Not Reported in Fed. Supp., 2004 WL 2743591, 2004-2 Trade Cases P 74,620

**Footnotes**

1       By order dated September 15, 2004, the other six cases against defendants were placed in deferred status pending the outcome of class certification in this litigation.

2       This delay is evident from the defendants' proposed order bifurcating discovery, which would not resolve the issue of class certification until (at a minimum) March 2006 and which, throughout this period, would not permit plaintiffs to engage in merits-based discovery. (Def. Mot. to Bifurcate, at 20). Defendants' proposed scheduling order delays both the class certification issue and the ultimate resolution of this litigation, whether through a trial on the merits, settlement,

Case 1:26-cv-00659-KM   Document 9-3   Filed 05/19/26   Page 45 of 71

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

or dispositive motions. (*Id.*). Defendants' proposed scheduling order therefore violates the rationale of efficiency upon which the theory of discovery bifurcation is based.

Class action certification is appropriate only if the following four elements are met: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representatives will fairly and adequately protect the interests of the class ("adequacy of representation"). *See* Fed.R.Civ.P. 23(a).

This Court also disagrees with defendants' assertions that bifurcation is appropriate because other state courts, which are adjudicating state antitrust claims concerning plastics additives against the same defendants, have chosen to bifurcate discovery. Defendants cite two orders from parallel state litigation in Ohio and California for this proposition. However, these cases are not relevant to this Court's analysis. First, in *Competition Collision Center LLC v. Crompton Corp., et al.,* Case No. CGC–04–431278 (Cal.Super.Ct. May 18, 2004), the California Superior Court only stated that the discovery period *"may* be bifurcated into class certification and other issues" [emphasis added]. Second, in *Heritage Plastics, Inc. v. Rohm and Haas Company, et al.,* Case No. 03–CV–0113 (Ohio CCP July 26, 2004), the Court of Common Pleas for Belmont County, Ohio bifurcated discovery, but implied that bifurcation was appropriate primarily because of the congestion in the Court's docket and because federal antitrust litigation against the same defendants was proceeding in this Court.

Defendants claim that no general rule exists disfavoring pre-indictment requests for a stay of parallel civil proceedings. (Def. Mem. In Further Support of Mot. to Bifurcate, at 8 n. 7). Defendants also claim, that, if such a rule exists, it is inapplicable in this situation because defendants have not asked for a blanket stay of all civil proceeding, only merits-based discovery. (*Id.*). Although this Court agrees that there is no *per se* rule against pre-indictment stays of parallel civil proceedings, there is certainly a strong judicial preference against such stays. *See, e.g., Sterling Nat'l Bank,* 175 F.Supp.2d at 576–77 (courts generally grant the extraordinary remedy of stay only after defendant seeking stay has been indicted). Furthermore, the logic behind rejecting a blanket stay of parallel civil proceedings prior to a defendant's indictment applies with equal force to a determination of whether merits-based discovery should be stayed pending ongoing grand jury proceedings. In fact, the argument in favor of a stay of merits-based discovery at the pre-indictment phase may be weaker than the argument in favor of a blanket stay because, in the former situation, defendants and their employees may be forced into the Fifth Amendment dilemma through the progression of class-based discovery even if the stay is granted.

Defendants have not asked this Court to exercise its supervisory powers over grand jury proceedings as a basis to prevent disclosure of the documents at issue. Accordingly, this Court need not address whether a federal court has the authority to supplement the text of Rule 6(e)(2) by imposing the obligation of secrecy on witnesses or other private parties not mentioned in the rule. *See* Brenner, Federal Grand Jury § 8.3.1 (noting that "it is unclear whether courts have the authority to supplement" Rule 6(e)'s provisions to impose secrecy obligation on parties not enumerated).

In *In re Wirebound Boxes AntiTrust Litigation,* defendants were not required to produce all documents related to government investigations into the wirebound box industry 136 F.R.D. at 556. Instead, the court struck a compromise between the need of civil litigants to discover relevant materials and the need to preserve the secrecy of the grand jury process, regardless of the literal text of Rule 6(e). *Id.* The court achieved this balance by requiring defendants to produce all documents created independently from any government investigation, while requiring plaintiffs to show particularized need prior to disclosing documents created by a grand jury or at a grand jury's request, such as subpoenas, transcripts, and lists of documents. *Id.* Although this Court agrees with the general principles of *In re Wirebound Boxes AntiTrust Litigation,* it will not adopt a judicially created discovery limitation in contravention of the literal text of

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 46 of 71

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

⚑Rule 6(e), which imposes no secrecy obligation on witnesses or private parties who supply documents to grand jury proceedings.

8     The case cited in support of defendant's position, ⚑*In re Sulfuric Acid Antitrust Litigation,* 2004 WL 769376, at *3–5 (N.D.Ill. April 9, 2004), which prevented discovery in antitrust litigation of all documents related to sulfuric acid that were provided to a grand jury in connection with a related criminal investigation, is inapplicable. The court in *In re Sulfuric Acid Antitrust Litigation* was compelled to follow the Seventh Circuit's interpretation of ⚑Rule 6(e) as covering documents supplied to a grand jury, although created for purposes other than or independent of grand jury investigations. ⚑*Id.* at *3. It was also forced to follow the Seventh Circuit's interpretation of ⚑Rule 6(e)(2)(B) as covering civil defendants who have supplied documents to a grand jury in a related criminal investigation. ⚑*Id.* at *2.

\*     Editor's Note: Scheduling Order is not included in this publication.

---

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Graco, Inc. v. PMC Global, Inc.,   D.N.J.,   March 31, 2009

2006 WL 1340865

Only the Westlaw citation is currently available.

United States District Court,

E.D. Pennsylvania.

INNOVATIVE OFFICE PRODUCTS, INC., Plaintiff,

v.

SPACECO, INC., et al., Defendants.

Civil Action No. 05-04037.

|

May 15, 2006.

**Attorneys and Law Firms**

Samantha Melanie Kameros, Stephen B. Goldman, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, Westfield, NJ, for Plaintiff.

Benjamin E. Leace, Paul F. Prestia, Ratner and Prestia, Valley Forge, PA, John B. Hardaway, III, Nexsen Pruet, Greenville, SC, Kevin Alan Keeling, Ratner Prestia, Berwyn, PA, for Defendants.

*MEMORANDUM AND ORDER*

STENGEL, J.

**\*1**  Innovative Office Products, Inc. ("Innovative") filed this patent infringement action against SpaceCo, Inc. ("SpaceCo") seeking monetary damages as well as injunctive relief. SpaceCo has moved to bifurcate the trial into two phases pursuant to Rule 42(b) of the Federal Rules of Civil Procedure. I will deny this motion because SpaceCo has failed to satisfy its burden of demonstrating that bifurcation would (1) serve judicial economy; (2) avoid inconvenience; and (3) not prejudice any of the parties.

**I. BACKGROUND**

Innovative initiated this lawsuit on July 28, 2005 by filing a complaint against defendants SpaceCo and Haworth, Inc.[1] for patent infringement. The patents at issue are:

(1) United States Patent No. 6,505,988, entitled "Tilter for Positioning Electronic Devices" (the "'988 patent"); (2) United States Patent No. 6,719,253, entitled "Channel for an Arm Apparatus for Mounting Devices with Cable Management System" (the " ′253 patent"); and (3) United States Patent No. 6,854,698, entitled "Arm Apparatus for Mounting Electronic Devices" (the "'698 patent"). Innovative seeks damages for past infringement and injunctive relief for future infringement of the ′988, ′253, and ′698 patents. SpaceCo has asserted a counterclaim against Innovative, alleging that Innovative tortiously interfered with SpaceCo's contractual relations. Presently before the Court is SpaceCo's motion to bifurcate the trial on the issues of liability and damages.

**II. LEGAL STANDARD**

Rule 42(b) of the Federal Rules of Civil Procedure allows a district court to bifurcate a trial in its discretion. Rule 42(b) provides:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

FED. R. CIV. P. 42(b).

Whether to bifurcate a trial is a "matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." *Sprinturf, Inc. v. Southwest Recreational Indus., Inc.,* No. Civ.A.01-7158, 2004 WL 96751, at *1 (E.D.Pa. Jan. 15, 2004) (quoting *Lis v. Robert Packer Hosp.,* 579 F.2d 819, 824 (3d Cir.1978)). While courts have generally been more willing to bifurcate patent trials than other types of cases, bifurcation in these cases remains the exception rather than the rule. *Sprinturf,* 2004 WL 96751, at * 1 (citing *Real v. Bunn-O-Matic Corp.,* 195 F.R.D. 618, 620 (N.D.Ill.2000)). The moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties. *Spectra-Physics Lasers, Inc. v. Uniphase Corp .,* 144 F.R.D. 99, 101 (N.D.Cal.1992).

**\*2** In *Real, 195 F.R.D. at 620-21,* the Northern District of Illinois surveyed the federal case law addressing bifurcation and identified a number of factors for courts to consider when deciding whether to bifurcate a trial. The Real court noted that the most important consideration is that of balancing the "competing prejudices" in a given case. *Id.* at 621 (citing *Corrigan v. Methodist Hosp.,* 160 F.R.D. 55, 57-58 (E.D.Pa.1995)). Specifically, courts should balance the prejudice of potential jury confusion on complex questions of liability and damages against the prejudice caused by the considerable delay that results from holding separate trials. *Real, 195 F.R.D. at 620-21.* The Real court also identified a number of other factors for courts to consider, including: (1) the need to review voluminous documents to resolve damages issues; (2) complex infringement issues; (3) multiple patents, infringing products, claims, counterclaims, or parties; and (4) the probability that the defendant would prevail on the infringement issue. *Id.* at 620. [2]

## III. DISCUSSION

SpaceCo argues that I should bifurcate this trial on the issues of liability and damages for three primary reasons. First, SpaceCo asserts that bifurcation will promote judicial economy. Specifically, SpaceCo argues that, should a jury find in its favor during the liability phase, the damages phase will become less complicated or even unnecessary. Second, SpaceCo alleges that bifurcation will assist the jury's understanding of the "complex, but unrelated" issues of liability and damages. Finally, SpaceCo argues that bifurcation will not prejudice Innovative. I find that SpaceCo has failed to satisfy its burden to bifurcate this trial for the following reasons.

### A. Judicial Economy

SpaceCo's first argument is mere speculation. "[T]he validation of this type of self-serving argument, without more, would permit all defendants in all cases to sever liability from damages." *Reading Tube Corp. v. Employers Ins. of Wausau,* 944 F.Supp. 398, 404 (E.D.Pa.1996). Such speculative reasoning does not justify bifurcating this trial.

### B. Reducing Jury Confusion

SpaceCo's second argument in favor of bifurcation is equally unconvincing. In *Sprinturf,* Judge Pollack denied the defendant's motion to bifurcate because, *inter alia,* the defendant failed to (1) indicate why the presentation of damages evidence would be more complex than in a typical patent case; (2) identify which aspects of the damages issue would be particularly difficult for jurors to comprehend; or (3) suggest that the damages trial would require the production and inspection of an extremely large amount of documents. *Sprinturf,* 2004 WL 96751, at *2.

Similarly, Innovative makes a mostly generic argument that a determination of the damages in this case will be "complex." While there are six patents at issue here, they are all closely related to a mechanical monitor extension arm and its components. As Innovative notes in its opposition, each of these patents relates to a relatively simple mechanical device with which many jurors may have personal experience, as opposed to more complex chemical or electrical patents. I have confidence that the jury in this case will be able to effectively and fairly consider both the liability and damages evidence related to these patents in one trial.

**\*3** Moreover, bifurcation could actually increase jury confusion in this case. SpaceCo has raised a counterclaim of tortious interference with contractual relations. Under Pennsylvania law, that cause of action requires the four following elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Crivelli v. Gen. Motors Corp.,* 215 F.3d 386, 394 (quoting *Strickland v. Univ. of Scranton,* 700 A.2d 979, 985 (Pa.Super.Ct.1997)).

If I were to bifurcate this trial, the jury would consider SpaceCo's counterclaim during the liability phase. The final element of tortious interference with contractual relations requires a demonstration of actual damages. The jury would therefore be forced to consider one set of damages during the liability phase (those relating to SpaceCo's counterclaim) and another during the damages phase (those relating to Innovative's patent infringement claim).

### C. Prejudice to Innovative

Finally, I find that bifurcation of this trial would prejudice Innovative. As I have noted above, prejudice due to jury confusion is not of particular concern in this case. The prejudice of delay inherent in holding two separate trials therefore outweighs the prejudice of possible juror confusion. *See Real,* 195 F.R.D. at 620-21 (holding that federal courts considering bifurcation must balance the competing prejudices in a case). This factor also favors denying SpaceCo's motion to bifurcate.

### IV. CONCLUSION

For the reasons described above, I will not depart from the general rule of holding a single patent infringement trial in this case. I therefore deny SpaceCo's motion to bifurcate. An appropriate Order follows.

### *ORDER*

AND NOW, this 15th day of May, 2006, upon consideration of Defendant SpaceCo's Motion to Bifurcate (Docket No. 33) and Innovative's response thereto (Docket No. 35), it is hereby ORDERED that the motion is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1340865

---

**Footnotes**

1      Innovative voluntarily dismissed defendant Haworth, Inc. from this case on April 6, 2006.

2      Courts must also consider the Seventh Amendment's guarantee of a fair trial before granting a motion to bifurcate. *See In re Paoli R.R. Yard PCB Lit.,* 113 F.3d 444, 452 n. 5 (3d Cir.1997). In particular, a "separate trial of a particular issue cannot be ordered ... when the issue is so interwoven with the other issues in the case that it cannot be submitted to the jury independently of the others without confusion and uncertainty that would amount to a denial of a fair trial." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2391 (2d ed.1995). *See also Paoli,* 113 F.3d at 452 n. 5 ("The Seventh Amendment requires that, when a court bifurcates a case, it must divide issues between separate trials in such a way that the same issue is not reexamined by different juries") (quotations and citations omitted).

---

**End of Document**          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 957129
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Samuel KATZ et al., Plaintiffs,

v.

LIBERTY POWER CORP., LLC et al., Defendants.

Civil Action No. 18-cv-10506-ADB

|

Signed 02/27/2019

**Attorneys and Law Firms**

David Christopher Parisi, Pro Hac Vice, Suzanne L. Havens Beckman, Pro Hac Vice, Parisi & Havens LLP, Santa Monica, CA, Ethan Mark Preston, Pro Hac Vice, Preston Law Offices, Dallas, TX, Grace Parasmo, Pro Hac Vice, Yitzchak H. Lieberman, Pro Hac Vice, Parasmo Lieberman Law, Los Angeles, CA, John L. Fink, Sims and Sims LLP, Brockton, MA, Matthew R. Mendelsohn, Pro Hac Vice, Mazie Slater Katz & Freeman, LLC, Roseland, NJ, for Plaintiff Samuel Katz.

Ethan Mark Preston, Preston Law Offices, Dallas, TX, David Christopher Parisi, Parisi & Havens LLP, Santa Monica, CA, Grace Parasmo, Parasmo Lieberman Law, Los Angeles, CA, John L. Fink, Fink Law, Westborough, MA, Matthew R. Mendelsohn, Pro Hac Vice, Mazie Slater Katz & Freeman, LLC, Roseland, NJ, for Plaintiff Alexander Braurman.

David Christopher Parisi, Parisi & Havens LLP, Santa Monica, CA, Ethan Mark Preston, Preston Law Offices, Dallas, TX, Grace Parasmo, Parasmo Lieberman Law, Los Angeles, CA, John L. Fink, Sims and Sims LLP, Brockton, MA, Matthew R. Mendelsohn, Pro Hac Vice, Mazie Slater Katz & Freeman, LLC, Roseland, NJ, for Plaintiff Lynne Rhodes.

Charles A. Zdebski, Pro Hac Vice, Jeffrey P. Brundage, Pro Hac Vice, Eckert Seamans Cherin & Mellott, LLC, Washington, DC, Pamela C. Rutkowski, Craig R. Waksler, Rachel E. Moynihan, Eckert Seamans Cherin & Mellott LLC, Boston, MA, for Defendant Liberty Power Corp., LLC.

Charles A. Zdebski, Pro Hac Vice, Jeffrey P. Brundage, Pro Hac Vice, Eckert Seamans Cherin & Mellott, LLC, Washington, DC, Craig R. Waksler, Pamela C. Rutkowski, Rachel E. Moynihan, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Defendant Liberty Power Holdings, LLC.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO BIFURCATE CLASS DISCOVERY AND PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER

ALLISON D. BURROUGHS, U.S. DISTRICT JUDGE

**\*1** Plaintiffs Samuel Katz, Alexander Braurman, and Lynne Rhodes allege violations of the Telephone Consumer Protection Act of 1991 ("TPCA") and fraudulent transfers to the detriment of four putative nationwide classes of persons who received telemarketing calls on behalf of Defendants Liberty Power Corp, LLC and Liberty Power Holdings, LLC (together "Liberty Power"). Before the Court are Liberty Power's Motion to Bifurcate Class Discovery, [ECF No. 66], and Plaintiffs' Motion for a Protective Order regarding certain third-party subpoenas, [ECF No. 88]. For the reasons explained herein, individual and class discovery are bifurcated, and the Motion for a Protective Order is GRANTED in part and DENIED in part.

## I. DISCUSSION

This action was filed on March 16, 2018. [ECF No. 1]. The complaint has been amended twice, most recently on November 14, 2018. [ECF No. 109]. On January 9, 2019, Liberty Power filed a motion to dismiss the Second Amended Complaint. [ECF No. 118]. Although the Court has not yet ruled on that motion, the parties have—quite appropriately—engaged in considerable discovery. As a result, Liberty Power has identified several perceived weaknesses in the named Plaintiffs' claims and argues that it may be able to show, after limited additional individual discovery, that the named Plaintiffs lack viable claims. [See ECF No. 67]. Liberty Power requests that the Court bifurcate discovery and permit a dispositive motion on the named Plaintiffs' claims before class discovery.

As part of Liberty Power's efforts to secure discovery to support its arguments that the named Plaintiffs do not have viable claims, it issued third-party subpoenas to Verizon, Cellco Parnership, Vonage, and Google, providers of telephone and email services used by Plaintiffs. Plaintiffs move for a protective order prohibiting enforcement of those third-party subpoenas, or alternatively narrowing their scope. [ECF No. 88].

### A. Bifurcation of Discovery

District courts possess "inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " Dietz v. Bouldin, 136 S. Ct. 1885, 1891 (2016) (quoting Link v. Wabash R. Co., 370 U.S. 626, 630–31 (1962) ). A district court's exercise of its "inherent power must be a 'reasonable response to the problems and needs' confronting the court's fair administration of justice" and "cannot be contrary to any express grant of, or limitation on, the district court's power contained in a rule or statute." Id. at 1892 (quoting Degen v. United States, 517 U.S. 820, 823–24 (1996) ). District courts "enjoy broad discretion in managing the pace of pretrial proceedings, including the timing of discovery." Vineberg v. Bissonnette, 548 F.3d 50, 54 (1st Cir. 2008). Controlling the scope of discovery is particularly appropriate where discovery will impose considerable expense and the claims may be resolved on issues that require only limited or targeted discovery. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007) (emphasizing the requirement of plausibility at the motion to dismiss stage, in part because "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching" summary judgment or trial); see also L.R. 16.3(a)(3)(B) (noting that a judicial officer may sequence discovery into two or more stages at a case management conference).

**\*2** Courts in this district have bifurcated individual merits and class discovery where doing so served the interests of justice given the allegations and circumstances of particular cases. E.g. O'Connell v. Sterling Jewelers, Inc., No. 13-cv-13165-DPW (D. Mass. Dec 14, 2013), ECF No. 61 (denying motion to strike class claims, but allowing merit discovery and summary judgment motions as to named plaintiffs' claims before class discovery); Huzarsky v. Little Kids, Inc., No. 15-cv-13613-DJC (D. Mass. Feb. 22, 2016), ECF No. 22 (allowing summary judgment motions on individual claims before addressing class issues).

Here, the need for class discovery may be eliminated if Liberty Power is able to demonstrate that all of the named Plaintiffs lack viable individual claims. See Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001) ("Despite the fact that a case is brought as a putative class action, it ordinarily must be dismissed as moot if no decision on class certification has occurred by the time that the individual claims of all named plaintiffs have been fully resolved."). But see S. Orange Chiropractic Ctr., LLC v. Cayan LLC, No. 15-cv-13069-PBS, 2016 WL 1441791, at *7 (D. Mass. Apr. 12, 2016) (holding that tendering complete relief of named representative's individual claim under Rule 68 did not moot TCPA class claims because class claims fell within "inherently transitory" exception). Further, class discovery is not necessary to address certain issues that may be dispositive of Plaintiffs' individual claims or ability to bring the asserted class claims, including whether the phone numbers at issue are within the TCPA, whether named Plaintiffs' are within the classes [1] they purport to represent, and whether any named Plaintiffs with a viable claim can demonstrate the Court's jurisdiction to resolve that claim. [See ECF No. 67 at 5–10]. The parties shall complete discovery relevant to the alleged TCPA violations committed against the named Plaintiffs by May 22, 2019. Class

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 53 of 71

Katz v. Liberty Power Corp., LLC, Not Reported in Fed. Supp. (2019)

discovery is stayed until further order of the Court, and the parties shall file a joint letter setting forth their respective positions concerning class discovery by May 31, 2019. Liberty Power shall file any motion for summary judgment based on the named Plaintiffs' individual claims by June 21, 2019. Plaintiffs shall respond in accordance with the local rules.

### B. Third-Party Subpoenas for Emails

Liberty Power has issued a subpoena to Google that demands all emails and attachments from Mr. Katz's Gmail account with the words "liberty," "garrison," or "TCPA," excluding emails with a limited set of Mr. Katz's attorneys. [ECF No. 89-6]. The subpoena requests that those emails be produced to Liberty Power's counsel in the District of Columbia. [Id. at 2]. Plaintiffs move for a protective order, which they have standing to pursue because of Mr. Katz's interest in avoiding the disclosure of personal information and privileged materials that may be contained in the emails sought from Google. See Wright & Miller, 9A Federal Practice & Procedure § 2459 (3d ed. 2018) ("Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought.").

 **\*3** Federal Rule of Civil Procedure 45 allows third-party subpoenas in connection with civil litigation but requires parties to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Although the subpoena at issue requests the production of emails in the District of Columbia and a motion to quash or modify the subpoena would be more properly filed in the United States District Court where performance is required, see Fed. R. Civ. P. 45(d)(3), this Court retains jurisdiction to restrict the scope of discovery and issue protective orders in accordance with Rule 26, see Fed. F. Civ. P. 26(b)(2)(C) ("On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that ... the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive.").

Google email is an electronic communication service within the meaning of the Stored Communications Act, and Google is generally not permitted and cannot be compelled to respond to civil subpoenas that seek email communications. See ⚑18 U.S.C. § 2701(c)(1); Bower v. Bower, 808 F. Supp. 2d 348, 350 (D. Mass. 2011) ("[C]ourts have repeatedly held that providers such as Yahoo! and Google may not produce emails in response to civil discovery subpoenas."); see also ⚑In re Facebook, Inc., 923 F. Supp. 2d 1204, 1206 (N.D. Cal. 2012) (quashing subpoena issued pursuant to 28 U.S.C. § 1782 because "civil subpoenas may not compel production of records from providers like Facebook"); ⚑In re Subpoena Duces Tecum to AOL, LLC, 550 F. Supp. 2d 606, 609 (E.D. Va. 2008) ("[T]he plain language of the [Stored Communications Act] prohibits AOL from producing the [plaintiff's] e-mails, and the issuance of a civil discovery subpoena is not an exception to the provisions of the [Stored Communications Act.]"); ⚑Viacom Int'l Inc. v. YouTube Inc., 253 F.R.D. 256, 264 (S.D.N.Y. 2008) (granting protective order and denying motion to compel production from YouTube).

Therefore, Plaintiffs' Motion for a Protective Order with respect to the subpoena of Mr. Katz's emails from Google is granted.[2] Given the absolute clarity of the law in this area, Defendants are warned that similar subpoenas could result in sanctions.

### C. Third-Party Subpoenas for Telephone Records

Liberty Power has issued subpoenas seeking "all contracts, inbound and outbound phone call and fax logs, billing statements, features, and payment history" for relevant periods related to the telephone accounts at issue from the companies that provided the telephone lines that were allegedly illegally called. [ECF Nos. 89-2, 89-3, 89-4, 89-7, 89-8]. In addition to reflecting the calls at issue here, Plaintiffs' account records may be relevant to defenses, including that the calls in question were consented to or that certain phone lines were not "residential telephone line[s]" within the meaning of the TCPA. See ⚑47 U.S.C. § 227(b)(1); see also Bank v. Indep. Energy Grp., No. 12-CV-1369 JG VMS, 2015 WL 4488070, at *2 (E.D.N.Y. July 23, 2015) ("[W]hile a telephone subscriber can have a telephone number registered as 'residential' with the telephone company, 'if the subscriber

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 54 of 71

Katz v. Liberty Power Corp., LLC, Not Reported in Fed. Supp. (2019)

holds out such a telephone number to the general public as a business line, the line should not be considered "residential" for the purposes of the TCPA—even if it is registered as "residential" with the telephone company.' " (quoting ⚑Bank v. Indep. Energy Grp., No. 12-cv-1369, 2014 WL 4954618(JG), at *1 (E.D.N.Y. Oct. 2, 2014) ) ); [ECF No. 100 at 6-9]. [3]

 **\*4**  In addition to subpoenaing account records for the telephone numbers that were allegedly called in violation of the TCPA, Liberty Power has subpoenaed "[f]or 2016 and 2017, all contracts, phone call logs (inbound and outbound), billing statements, invoices, features, and payment history" related to a Google Voice account that Liberty Power claims is Mr. Katz's true residential number, but which is not the phone number that Mr. Katz alleges Liberty Power illegally called. [ECF No. 89-5]. Liberty Power claims that Mr. Katz uses that Google Voice number as his actual residential number and forwards calls from his purported residential line to his Google Voice number to track telemarketing calls for the purpose of filing lawsuits. [ECF No. 67 at 7]. The Google Voice records may therefore contain relevant information bearing on the telemarketing calls at issue and whether Mr. Katz's purported residential number falls within the provisions of the TCPA.

Courts often permit discovery of records related to the telephone numbers at issue in TCPA cases. See Molnar v. NCO Fin. Sys., Inc., No. 13CV131-BAS (JLB), 2014 WL 3371414, at *3 (S.D. Cal. July 8, 2014) (granting defendant complete and unredacted telephone records, including records of irrelevant calls where plaintiff acknowledged some of calls at issue might not appear on telephone records); Lucas v. Telemarketer Calling From (407) 476-5670 & Other Tel. Numbers, No. 1:12-CV-630, 2014 WL 12656102, at *2 (S.D. Ohio May 22, 2014) (granting motion to compel production of all of defendant's call records from a relevant month). Here, given the uncertainty as to how some of the Plaintiffs' phone numbers were being used, the subpoenaed account records are potentially relevant and do not impose an undue burden on the named Plaintiffs. See ⚑Mintz v. Mark Bartelstein & Assocs., Inc., 885 F.Supp.2d 987, 1001 (C.D. Cal. 2012) ( "[T]he disclosure of telephone numbers, as well as the date, time, and duration of calls does not represent a significant intrusion of [p]laintiff's privacy."). Plaintiffs' Motion for a Protective Order concerning subpoenas of telephone account records is therefore denied.

Defendants shall treat the records produced in response as "Confidential" under the Protective Order, [ECF No. 20], and shall not inquire at any deposition as to the content of calls that Plaintiffs concede do not concern Defendants, their agents, or TCPA claims. Defendants may inquire whether calls are of a business or personal nature but may not go beyond that for calls that do not relate to TCPA violations alleged here or elsewhere.

## II. CONCLUSION

Accordingly, discovery in this case is BIFURCATED. Discovery relevant to the merits of the named Plaintiffs' individual claims shall conclude by May 22, 2019. Class discovery is stayed until further order by the Court, and the parties shall file a joint letter stating their positions on class discovery by May 31, 2019. Defendants shall file a status report on or before May 31, 2019 to inform the Court as to whether they intend to move for summary judgment for some or all of the named Plaintiffs' claims. [4] Defendant may then move for summary judgment with respect to some or all of the named Plaintiffs' claims by June 21, 2019.

Plaintiffs' Motion for a Protective Order is GRANTED with respect to Liberty Power's subpoena of emails, but DENIED with respect to the subpoenas of telephone account records, including call logs and other requested information.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 957129

**Footnotes**

1    Plaintiffs bring claims on behalf of four putative classes: (1) the Robocall Class, (2) the Residential Class, (3) the National Do Not Call Class, and (4) the Internal Do Not Call Class. Plaintiff Rhodes is the sole representative of the Robocall Class, while the other three classes are represented by all three named plaintiffs. Given the multiple putative classes, individual discovery may curtail the scope of class discovery, even if Defendants are unsuccessful in resolving all claims brought by the named plaintiffs.

2    Even assuming the communications could be produced by Google without violating Title 18, the Court would issue a protective order given that the subpoena would be entirely duplicative of discovery that could be obtained from Plaintiffs without the risk of obtaining privileged communications.

3    In holding that discovery of call logs and other account information is appropriate, the Court does not express a view as to whether a "residential" line that is used for business purposes can be considered a "residential telephone line" under the TCPA.

4    If Defendants do not move for summary judgment sufficient to eliminate all class claims, the Court will likely open class discovery as to at least the class claims that will remain regardless of its summary judgment ruling, assuming the pending motion to dismiss [ECF No. 118] has not been granted.

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Kemen v. Cincinnati Bell Telephone Company LLC, Not Reported in Fed. Supp. (2024)

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 56 of 71

2024 WL 3633333
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division.

Susan KEMEN, Plaintiff,

v.

CINCINNATI BELL TELEPHONE COMPANY LLC, Defendant.

Case No. 1:22-cv-152
|
Signed August 2, 2024

**Attorneys and Law Firms**

Brian T. Giles, Giles & Harper, LLC, Cincinnati, OH, Avi R. Kaufman, Pro Hac Vice, Kaufman P.A., Coral Gables, FL, for Plaintiff.

Douglas Edward Hart, Douglas E. Hart, Cincinnati, OH, Aaron Paul Heeringa, Pro Hac Vice, Manatt, Phelps & Phillips, LLP, Chicago, IL, John W. McGuinness, Pro Hac Vice, Manatt, Phelps & Phillips, LLP, Los Angeles, CA, for Defendant.

## OPINION AND ORDER

DOUGLAS R. COLE, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff Susan Kemen alleges that Defendant Cincinnati Bell Telephone Company LLC, (Cincinnati Bell), violated the Telephone Consumer Protection Act of 1991 (TCPA), ⚑47 U.S.C. § 227, by making unwanted telemarketing calls to her cell phone. (*See* Second Am. Compl., Doc. 19). The matter is now before the Court on Cincinnati Bell's Motion to Bifurcate Discovery (Doc. 32). For the reasons briefly discussed below, the Court **GRANTS** the Motion. [1]

Because the Court recounted the factual and procedural background of this case in detail in its previous Opinions and Orders, (Doc. 12, #149–53; Doc. 29, #308–15), it does not do so here. At a high level, Kemen alleges that, after she filled out a quote request form on Cincinnati Bell's website, Cincinnati Bell repeatedly called and emailed her to solicit her to buy its "products and services" despite her multiple requests that it stop contacting her. (Doc. 19, #222–25). She allegedly received four phone calls and one email in 12 days. (*Id.* at #223–24). So she sued, alleging violations of the TCPA. (Compl., Doc. 1). After several rounds of motions practice, the operative complaint is the Second Amended Complaint. (Doc. 19). It raises a single claim under subsection (c)(5) of the TCPA, ⚑47 U.S.C. § 227(c)(5), for breaching the requirements of ⚑47 C.F.R. § 64.1200(d). (Doc. 19, #227–29).

Cincinnati Bell has now moved to bifurcate discovery. (Doc. 32). Citing a desire to avoid costly, resource-intensive putative-class-based discovery, Cincinnati Bell seeks a 90-day limited discovery period during which the parties will focus solely on discovery relating to the merits of Kemen's individual claim. (*Id.* at #347). According to Cincinnati Bell, those relevant issues are: (1) "whether [it] ha[d] the requisite minimum procedures in place at the time of the alleged calls"; (2) whether Kemen made a legally effective do-not-call (DNC) request, and whether her request was honored in a "reasonable" amount of time; (3) whether Kemen is a "residential telephone subscriber"; and (iv) whether she has standing. (*Id.* at #354). Kemen responds that all class members' claims (including her own) will depend on whether Cincinnati Bell had adequate procedures in place. (Doc. 34, #363). And she says answering that question "necessarily requires discovery regarding who, other than Plaintiff, may have

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 57 of 71

Kemen v. Cincinnati Bell Telephone Company LLC, Not Reported in Fed. Supp. (2024)

requested to not be called, and whether their requests were properly recorded and timely honored." (*Id.* at #364). As discussed below, Cincinnati Bell has the better argument.

The decision to bifurcate discovery "is within the discretion of the court. To determine whether bifurcating discovery is appropriate, courts consider the benefits and detriments to each party's interest, as well as the Court's interest in reaching a just, speedy, and efficient resolution of the issues raised by the pleadings." *Chenault v. Beiersdorf, Inc.*, No. 1:20-cv-174, 2020 WL 5016795, at *2 (S.D. Ohio Aug. 24, 2020) (cleaned up); *Garcia v. Travco Ins. Co.*, No. 1:23-cv-439, 2023 WL 11116754, at *1 (S.D. Ohio Dec. 6, 2023) ("Federal Rule of Civil Procedure 42(b) permits the Court in its discretion to bifurcate claims for convenience, to avoid prejudice, or to expedite and to economize." (cleaned up)). In line with those principles, bifurcation "is permissible if it serves judicial economy and does not unfairly prejudice any party." *Galloway v. Nationwide Mut. Fire Ins. Co.*, No. 3:09-cv-491, 2010 WL 3927815, at *1 (W.D. Ky. Oct. 5, 2010) (citing *Hines v. Joy Mfg. Co.*, 850 F.2d 1146, 1152 (6th Cir. 1988)). When evaluating prejudice, the Court considers whether bifurcation will create substantial costs or delays. *See Brown v. Toscano*, 630 F. Supp. 2d 1342, 1347 (S.D. Fla. 2008) ("An unreasonable delay in a case's resolution amounts to prejudice to the one opposing separation." (cleaned up)); *Blankenship v. Jordan*, No. 3:19-cv-372, 2019 WL 4197115, at *4 (S.D.W. Va. Sept. 3, 2019) ("[C]osts and delays are strong evidence that an insured will be unduly prejudiced by bifurcated discovery."). As this description suggests, "a decision ordering bifurcation is dependent on the facts and circumstances of each case." *Garcia*, 2023 WL 11116754, at *2.

 **\*2**  Kemen brings a single claim for violating the TCPA and related regulations. And on that front, the Court reads the Second Amended Complaint as alleging that Cincinnati Bell had no policies in place at all, or that the *content* of those policies was inadequate, rather than alleging that Cincinnati Bell had adopted policies as a formal matter but disregarded them in practice. Indeed, in its previous Opinion and Order in this matter, the Court referred to the claimed lack of a policy (or at least one that met the minimum regulatory requirements) as the plausible inference arising from Kemen's factual allegations that would allow Kemen's case to move forward. (Doc. 17, #213 ("[P]erhaps on a fuller understanding of the record, the Court (or a jury) will conclude Cincinnati Bell had a policy in place designed to honor Kemen's request within a reasonable time. But for now, ... a twelve-day delay is long enough to support a plausible inference Cincinnati Bell *lacked the requisite minimum procedures*." (emphasis added)); *see also* Doc. 29, #318 (noting that the Court's denial of Cincinnati Bell's dismissal was premised on Kemen's plausibly alleging that Cincinnati Bell did not have "the requisite minimum internal procedures in place")). That allegation remains the crux of her sole claim, as she has framed it.

So then, to prevail on her claim as pleaded, Kemen must prove that: (1) she is a residential phone subscriber, (2) who received a call made for telemarketing purposes, (3) from an entity that has not instituted the minimum procedures required by 47 C.F.R. § 64.1200(d) (either because the policies did not exist or because their contents fell below the minimum requirements), (4) more than one time in a twelve-month period. *See* TCPA, 47 U.S.C. § 227(a), (c)(5); 47 C.F.R. § 64.1200(d), (f)(13). As to third element, the "minimum standards" for procedures the entity "institute[s]" require those procedures to include provisions calling for the entity: (1) to have "a written policy, available upon demand, for maintaining a do-not-call list"; (2) to train all "[p]ersonnel ... who are engaged in any aspect of telemarketing" on the existence and use of that DNC list; (3) to record DNC requests and "honor" them "within a reasonable time"; (4) to have employees engaged in telemarketing activities identify themselves when making calls; (5) to apply DNC requests to affiliated entities if "the consumer reasonably would expect them to be included"; and (6) to maintain a DNC list and to honor DNC requests for 5 years from the request. 47 C.F.R. § 64.1200(d)(1)–(6). So here, Kemen is claiming that Cincinnati Bell has no policy for internal DNC lists at all, or that the policy Cincinnati Bell has does not include these required component parts.

Given that understanding of the claim, coupled with the other individualized defenses that Cincinnati Bell asserts relating to Kemen and the calls Kemen alleges she received, the Court concludes bifurcating discovery is appropriate. Class discovery is expensive and resource intensive. *Babare v. Sigue Corp.*, No. C20-0894, 2020 WL 8617424, at *2 (W.D. Wash. Sept. 30, 2020) ("It is well-recognized that discovery in class actions is expensive and asymmetric, with defendants bearing most of the

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 58 of 71

Kemen v. Cincinnati Bell Telephone Company LLC, Not Reported in Fed. Supp. (2024)

burdens."); *cf. Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC,* Civ. No. 11-11, 2013 WL 663301, at *5 (D.N.J. Feb. 21, 2013) (noting that a TCPA class action involved "the potential for hefty litigation expenses and an extensive use of judicial resources"). And "the need for class discovery may be eliminated if Defendant is able to demonstrate that the Named Plaintiff lacks viable individual claims." *Osidi v. Assurance IQ, LLC,* No. 21-cv-11320, 2022 WL 623733, at *2 (D. Mass. Mar. 3, 2022). Especially given the nature of the allegations here, it is reasonable for Cincinnati Bell to seek to test Kemen's personal claims before engaging in extensive class discovery.

The limited discovery necessary to test Kemen's claims would focus on (1) her standing, (2) whether she is a residential subscriber within the meaning of the TCPA's regulations, (3) whether she made a legally effective DNC request, and (4) the existence and contents of Cincinnati Bell's policies. If the facts obtained through the limited discovery show she fails on any of the first three fronts, presumably that would be the end of the matter.

**\*3** But as to the fourth issue (and assuming Cincinnati Bell does not prevail, based on the limited discovery, as to any of the first three), the Court acknowledges that discovery relating to the existence and contents of Cincinnati Bell's policies may not fully answer the question. After all, even if Cincinnati Bell had a policy in place that met the minimum requirements as written, Kemen presumably still could seek to show she received "more than one telephone call within any 12-month period by or on behalf of the same entity in violation of" the terms of the written policy itself. 47 U.S.C. § 227(c)(5). That in turn could raise questions as to whether Cincinnati Bell had actually "instituted" the policy as the regulations require. 47 C.F.R. § 64.1200(d). Or perhaps to put it a little differently, at that point, the statutorily provided "affirmative defense"—"that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations"—would come into play. 47 U.S.C. § 227(c)(5). Should the parties need to explore that affirmative defense, questions of how well Cincinnati Bell followed its own policies and how much oversight it exercised over its employees on that front—both of which would likely require broader discovery—could come to the fore given they are relevant to the "due care" element of that defense. But as things stand Kemen is not alleging (and has pleaded no facts suggesting) that Cincinnati Bell has a regulatorily-compliant policy that it is failing to follow. So the Court declines to borrow trouble now by discussing the potential need for broader discovery on such issues down the road. In short, even as to this fourth issue, because Kemen has framed her claim as whether Cincinnati Bell even *has* policies that reflect the requirements set forth in 47 C.F.R. § 64.1200(d), the amount of discovery needed to answer *that* question should be comparatively modest.

Taken altogether, Cincinnati Bell has identified various threshold issues that both require little discovery and could be dispositive of Kemen's individual claim. So bifurcating discovery has the potential to promote the "speedy" and "efficient" resolution of this matter. *Chenault,* 2020 WL 5016795, at *2. Doing so therefore avoids potential prejudice to Cincinnati Bell (in the form of substantial, unnecessary costs) and "serves judicial economy." *Galloway,* 2010 WL 3927815, at *1.

On the other side of the scale, bifurcation will require Kemen to produce only a comparatively modest amount of discovery, much of which (a) is likely already in her possession or easily obtainable and (b) she would need to produce in any event even absent bifurcation. Moreover, a 90-day discovery period will not substantially delay this case. So the Court concludes that bifurcating discovery will not unduly prejudice Kemen. *See Brown,* 630 F. Supp. 2d at 1347; *Blankenship,* 2019 WL 4197115, at *4.

## CONCLUSION

For the reasons discussed above, Court **GRANTS** the Motion to Bifurcate Discovery (Doc. 32). The parties **SHALL** conduct 90 days of discovery limited to the following topics: (1) Kemen's standing; (2) whether she is a residential subscriber within the meaning of the TCPA regulations; (3) whether she made a legally effective DNC request; and (4) the existence and contents of Cincinnati Bell's internal DNC policies. Absent a future order of the Court to the contrary, the limited discovery period will

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 59 of 71

**Kemen v. Cincinnati Bell Telephone Company LLC, Not Reported in Fed. Supp. (2024)**

close 90 days from the date of the entry of this Order. Until then, the parties **SHALL NOT** engage in discovery on other topics (absent mutual agreement). Any discovery previously issued on topics other than those set forth above is hereby **STAYED** (again, absent mutual agreement).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3633333

---

**Footnotes**

1    Because the Court is granting this Motion, it also notes that it **DENIES AS MOOT** Cincinnati Bell's request for oral argument on the Motion, (Doc. 35, #367).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Extend by   Quinn v. Specialized Loan Servicing, LLC,   N.D.Ill.,   February 9, 2017

2015 WL 5032052
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Logan LOREAUX, et al., Plaintiffs,

v.

ACB RECEIVABLES MANAGEMENT, INC., et al., Defendants.

Civil Action No. 14–710 (MAS).

|

Signed Aug. 25, 2015.

**Attorneys and Law Firms**

Joseph K. Jones, Law Offices of Joseph K. Jones, LLC, Fairfield, NJ, Benjamin Jarret Wolf, Law Offices of Joseph K. Jones LLC, New York, NY, for Plaintiffs.

Jonathan S. Ziss, Goldberg Segalla LLP, Philadelphia, PA, for Defendants.

MEMORANDUM OPINION

BONGIOVANNI, United States Magistrate Judge.

 **\*1**  This matter comes before the Court upon Defendant ACB Receivables Management, Inc.'s ("ACB") motion to bifurcate discovery. [Docket Entry No. 24]. Plaintiffs Logan Loreaux, an infant by parent and natural guardian Katelyn Jones, and Katelyn Jones ("Plaintiffs") oppose ACB's motion. The Court has fully reviewed and considered all of the arguments made in support of and in opposition to ACB's motion. The Court considers same without oral argument pursuant to L.Civ.R. 78.1(b). For the reasons set forth more fully below, ACB's motion is GRANTED.

### I. Background and Procedural History

In light of the parties' familiarity with the facts of this matter, they shall not be restated at length herein. Instead, the Court shall recount only those facts necessary for the resolution of ACB's motion to bifurcate. This case concerns whether the debt collection correspondence sent by ACB to Plaintiffs allegedly listing an "Amount Due" different than the "Amount Owed" was false, deceptive or misleading within the meaning of the Fair Debt Collection Practices Act (the "FDCPA"). Plaintiff alleges that the correspondence sent out was deceptive and false in violation of the FDCPA. In contrast, ACB argues that the correspondence did not warrant any plausible misleading or incorrect interpretation and, therefore, does not violate the FDCPA.

Through this motion, ACB asks that discovery be initially limited to Plaintiffs' claims that the debt collection correspondence sent to them by ACB, listing an "Amount Due" different than the "Amount Owed," was false, deceptive or misleading. (ACB Br. at 1; Docket Entry 24). ACB believes Plaintiffs' individual claims regarding the correspondence involve a narrow, potentially dispositive issue that is isolated and distinct from class discovery. (*Id.* at 2). After conducting the aforementioned limited discovery, ACB anticipates filing a motion for summary judgment with regard to Plaintiffs' individual claims that ACB's correspondence to them violated the FDCPA because it was deceptive and false. (ACB Reply Br. at 1; Docket Entry No. 29).

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 61 of 71

ACB contends that bifurcating discovery in this manner represents the most efficient and effective approach to this litigation. Specifically, ACB claims that bifurcating discovery would allow the parties to expeditiously reach potentially case dispositive motion practice. In this regard, ACB notes that if its anticipated motion for summary judgment is granted, said motion would dispose of the entire action, maximizing efficiencies and cost savings by rendering class discovery entirely unnecessary. (ACB Br. at 2). Further, ACB claims that even if its summary judgment motion is denied, the case will not have been derailed because complete class discovery can still occur without any prejudice to Plaintiffs.

Relying on *Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc.,* No. 3:12–cv–02132 FLW–TJB, Docket Entry No. 52–1 (D.N.J. Sept. 13, 2013), ACB argues that bifurcation is appropriate given the narrow, potentially case dispositive issue to be addressed by the Court coupled with the fact that class wide discovery creates significant costs and burdens it and the Court. (*Id.* at 3). ACB notes that in *Physicians Healthsource,* the Court granted a motion to bifurcate where there was a limited and potentially dispositive issue involving the plaintiff's Telephone Consumer Protection Act ("TCPA") claim. In so doing, the Court took note of the costs associated with class discovery as well as the fact that the defendant's anticipated summary judgment motion could render said discovery unnecessary.

 **\*2** With respect to the discovery already sought by Plaintiffs, ACB argues that several of the class discovery demands propounded are unduly burdensome on their face. ACB notes that it uses a third party vendor to generate its debt collection correspondence and that the production of the information requested would require ACB to review private information and medical claim information with regards to members of the proposed class and family members of the class insured under their guarantor's healthcare policy. (*Id.* at 2–3). Thus, ACB anticipates dealing with HIPAA issues in the course of providing the information requested by Plaintiffs. (*Id.* at 3).

ACB notes that pursuant to FED.R.CIV.P. ("Rule") 42(b), it is within a trial court's discretion to bifurcate discovery and courts consider judicial economy and expedition when making such a decision. (*Id.*) ACB argues that because there is no significant overlap between the individual discovery relevant to Plaintiffs' specific claims and class-wide discovery, there is no danger of duplication or of increase in litigation costs if discovery is done in two steps. (ACB Reply Br. at 6). ACB claims that conducting discovery in two phases will neither be protracted nor unduly delay these proceedings because key, pertinent facts relevant to the individual claims are already in the record as well as the Rule 26 disclosures served by the parties. Further, ACB notes that initial written individual discovery is well underway, including ACB's document production, interrogatory responses, and responses to Plaintiffs' requests for admissions. (*Id.* at 7).

Further, ACB argues that the earlier denial of its motion to dismiss does not constitute a determination that Plaintiffs' individual FDCPA claims are meritorious because the applicable standard for a motion to dismiss is highly deferential; whereas, the applicable standard for a motion for summary judgment requires Plaintiffs to present more facts and evidence to establish their claims. (ACB Br. at 4). ACB contends that the Court has yet to consider the meaning of the two amounts listed on the debt collection correspondence and, thus, has not made a decision on whether Plaintiffs have legally viable claims. (*Id.*) ACB argues that discovery should be bifurcated to address this narrow issue first so that ACB can file a motion for summary judgment on same. ACB argues that doing so would allow the Court to address the merits of this issue before determining class certification, a costly and time consuming undertaking. (*Id.* at 4–5). As a result, ACB claims that bifurcating discovery would preserve judicial resources and the litigants' resources as well. Lastly, ACB argues that denying bifurcation would prevent an early and efficient determination regarding the merits of Plaintiffs' individual claims and, therefore, would go against the principles embodied in Rule. 1. (*Id.* at 5–6).

In response to Plaintiffs' arguments asserting that their requested class discovery only entails production of debt collection correspondence to all class members, ACB points out that Plaintiffs have yet to withdraw their other class-based discovery requests or their discovery requests directed to Defendants' net worth information. (ACB Reply Br. at 5). Because Plaintiffs have failed to offer any explanation regarding their additional class-based discovery requests and have, likewise, failed to have withdrawn same, ACB claims bifurcation is necessary. Further, ACB contends that even providing only debt collection correspondence to all class members would prove burdensome to it for the reasons described above.

**\*3** Plaintiffs, however, claim that the requested bifurcation should be denied because ACB cannot meet the legal standard for it in part because the requested discovery is neither overly complicated nor unduly burdensome. As such, Plaintiffs argue that ACB's motion should be denied. (Pl. Opp. Br. at 2; Docket Entry 28). With respect to the discovery requests they have served, Plaintiffs suggest entering into Stipulation/Consent Order limiting same. (*Id* .) Plaintiffs argue that really the only class discovery at issue is directed to the sole issue of how many letters similar to that sent to Plaintiffs were mailed by ACB to other New Jersey consumers during the class period. (*Id.*) Plaintiffs contend that medical information, including sensitive HIPAA information, will not be needed in the course of discovery. Indeed, Plaintiffs assert that they only request the debt collection letters sent by ACB. (*Id.* at 3).

Further, Plaintiffs contend that ACB's arguments regarding the burdensomeness and cost of not bifurcating discovery are totally conclusory in nature and should be afforded no weight. In this regard, Plaintiffs argue that ACB's claims amount to nothing more than blanket generalizations without any evidence of the approximate costs associated with discovery, name of the third party vendor alluded to by ACB or the business relationship between ACB and that vendor. (*Id.* at 3–4). Plaintiffs distinguish this matter from the *Physicians Healthsource* case, noting that that matter involved a TCPA violation, not a FDCPA violation. (*Id.* at 5).

Relying on Rule 42(b), Plaintiffs argue that ACB has failed to sustain its burden because it has yet to prove that bifurcation would best serve the interests of judicial economy and that it would not unduly prejudice Plaintiffs. Further, Plaintiffs argue that here there is no need to divide discovery as to liability and damages. (*Id.* at 6–7). Again, Plaintiffs claim that it would not be burdensome for ACB to provide Plaintiffs with the form debt collection letters, similar to the debt collection letter ACB mailed them, which were sent to New Jersey consumers that stated different monetary amounts for "Amount Owed" and "Amount Due." For these reasons, Plaintiffs argue that ACB's motion to bifurcate discovery should be denied.

## II. Analysis

Federal Rule of Civil Procedure 42(b) governs requests to bifurcate. According to Rule 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." *Medpointe Healthcare, Inc. v. Hi–Tech Pharmacal Co., Inc.,* Civil Action No. 03–555(MLC), Civil Action No. 04–1686(MLC), 2007 U.S. Dist. LEXIS 4652, at \*12–13, 2007 WL 188285 (D.N.J. Jan. 22, 2007) (internal quotation marks and citation omitted). Further, the broad discretion afforded courts in handling discovery disputes extends to decisions over bifurcating discovery. *See Weiss v. First Unum Life Ins. Co.,* Civil Action No. 02–4249(GEB), 2008 WL 755958, \*1 (D.N.J. March 19, 2008); *see also Bandai America Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70, 74 (3d Cir.1985) (holding that bifurcation orders and orders controlling order of discovery are reviewed for abuse of discretion).

**\*4** Here, the Court finds that bifurcating discovery as proposed by ACB is warranted under Rule 42(b). In this regard, the Court agrees with ACB that a narrow, potentially dispositive issue exists concerning whether ACB's correspondence to Plaintiffs violated the FDCPA's prohibition against deceptive and false communications. Further, the Court is not persuaded by Plaintiffs' argument that the denial of ACB's Motion to Dismiss precludes summary judgment being granted in ACB's favor. The District Court never determined whether the existence of the two conflicting amounts on the debt correspondence does, in fact, represent a violation of the FDCPA as argued by Plaintiffs. As a result, depending on what evidence is ultimately presented, the District Court may determine that summary judgment is warranted.

In addition, the Court finds that whether ACB's correspondence to Plaintiffs is deceptive and false is a narrow and distinct issue that does not implicate class wide discovery. Further, the Court finds that there will be no significant overlap between the two and therefore no real danger of a duplication of efforts or corresponding increase in litigation costs. Moreover, the Court finds that bifurcating the two issues has the potential to save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery. While Plaintiffs fault ACB for not supporting their claims concerning the burdens and costs associated with class action discovery, it is generally recognized that class actions involve the potential "for hefty

litigation expenses and an extensive use of judicial resources in the resolution of these claims[.]" *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC,* Civ. No. 11–00011, 2013 WL 663301, at \*5 (D.N.J. Feb.21, 2013). It is also generally understood that the costs can be particularly "enormous" for defendants. *Id.* Furthermore, while the Court agrees with Plaintiffs that medical information, including sensitive HIPAA information, will likely not be needed in the course of discovery, the Court finds that bifurcating discovery and, as a result, providing ACB with an opportunity to file a motion for summary judgment, will best serve the interests of judicial economy and promote efficiency.

For the reasons stated above, the Court finds that bifurcating discovery into two phases will promote the efficient resolution of this matter. It will allow the Court to address a narrow, potentially dispositive issue in a timely and cost effective manner with no significant prejudice to Plaintiffs. Consequently, the Court hereby bifurcates discovery as requested by ACB. The parties are therefore directed to meet and confer to submit a proposed schedule for the first phase of discovery. This schedule shall be submitted no later than ***September 14, 2015.***

### III. Conclusion

For the reasons set forth above, ACB's motion to bifurcate discovery is GRANTED. An appropriate Order follows.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5032052

---

**End of Document**                                                                 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 205896
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Gisela M. NAZARIO Plaintiff,

v.

SHARINN & LIPSHIE, P.C., et al Defendants.

Civil Action No. 2:19-cv-04604-SDW-SCM
|
Signed 01/14/2020

**Attorneys and Law Firms**

Catherine K. Rhy, Yongmoon Kim, Kim Law Firm LLC, Hackensack, NJ, for Plaintiff.

Scott C. Sharinn, The JD Stuart Law Group, Forest Hills, NY, Monica M. Littman, Richard J. Perr, Fineman, Krekstein & Harris, PC, Philadelphia, PA, for Defendants.

**OPINION ON MOTION TO BIFURCATE DISCOVERY**

**D.E. 18, 19**

Steven C. Mannion, United States Magistrate Judge.

 **\*1**  Before this Court is an informal motion by Defendant Unifund CCR, LLC ("Unifund") to bifurcate class-discovery filed via the parties' joint discovery plan and joint dispute letter.[1] Plaintiff Gisela Nazario ("Ms. Nazario") opposes bifurcation. The Court decides the motion without oral argument.[2] For the reasons set forth herein, the motion to bifurcate will be **GRANTED** in part and **DENIED** in part.

**I. BACKGROUND AND PROCEDURAL HISTORY**[3]

The Complaint was filed on February 4, 2019, alleging individual and class action claims under the Fair Debt Collection Practices Act ("Fair Debt Act") against defendants Sharinn & Lipshie, P.C., and Unifund.[4] Ms. Nazario alleges that (1) Unifund's purchase of the debts of Ms. Nazario and other class members was void under New Jersey law because they were bought from an unlicensed broker, and (2) that the particular debt collection practices used were misleading and violated the Fair Debt Act.

**II. MAGISTRATE JUDGE AUTHORITY**

Magistrate judges are authorized to decide any non-dispositive motion designated by the Court.[5] This District specifies that magistrate judges may determine all non-dispositive pre-trial motions which includes discovery motions.[6] A decision by a magistrate judge on non-dispositive matters such as a discovery dispute "is entitled to great deference and is reversible only for abuse of discretion."[7] That includes whether or not to stay discovery.[8]

## III. LEGAL STANDARD

The Federal Rules of Civil Procedure afford magistrate judges broad control over case schedules to expedite disposition of an action and to discourage wasteful pretrial activities.[9] Decisions to bifurcate discovery remain within the sound discretion of the court.[10] Courts only bifurcate discovery if there is some showing as to why bifurcation is appropriate.[11] Bifurcation "is appropriate to conduct controlled discovery ... limited to those aspects relevant to making the certification decision on an informed basis."[12] "Courts generally postpone class-wide discovery on the merits of the claims when bifurcation serves the interests of "fairness and efficiency."[13]

## IV. DISCUSSION

**\*2** Here, the Court has considered the parties' respective submissions in determining whether bifurcation is appropriate. Unifund argues that class and other discovery should be bifurcated pending a summary judgment decision on whether its actions violated the Fair Debt Act and the New Jersey Consumer Finance Licensing Act. Ms. Nazario counters that bifurcation would be inefficient, unfair, and duplicative.

The Court finds that fairness and efficiency favors allowing fact discovery as to Ms. Nazario (the putative representative) on all claims, as well as discovery for Fed.R.Civ.P. 23 class certification. Even if class certification is not granted, the fees and costs for engaging in this discovery will not have been expended needlessly because fact discovery specific to Ms. Nazario will still be needed for her to pursue the case in her individual capacity. But fairness and efficiency also favors deferring class merits discovery until a decision on certification has been made. If class certification is not granted, the fees and costs for engaging in that discovery would have been expended needlessly. For these reasons, the Court finds that judicial economy favors bifurcating discovery. Unifund's motion will be granted in part and denied in part.

Class merits discovery is deferred until a decision on certification. The Court notes that it will only allow one motion for summary judgement. When Ms. Nazario moves for class certification, Unifund may either seek leave to use its one motion then, or may save it until all discovery is complete.

An appropriate Order follows:

## ORDER

**IT IS** on this Tuesday, January 14, 2020,

1. **ORDERED**, that Defendants' Unifund CCR, LLC's informal motion to bifurcate class-discovery is **GRANTED** in part and **DENIED** in part; and it is further

2. **ORDERED**, that fact discovery as to the putative class representative(s) and Fed.R.Civ.P. 23 class certification is to continue in accordance with the scheduling order; and it is further

3. **ORDERED**, that class merits discovery is deferred until a decision on certification; and it is further

4. **ORDERED**, that the January 16, 2020 telephone conference is adjourned to January 30, 2020 at 2:45 pm.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 205896

Nazario v. Sharinn & Lipshie, P.C., Not Reported in Fed. Supp. (2020)

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 66 of 71

**Footnotes**

1       (ECF Docket Entry No. ("D.E.") D.E. 18, 19). Unless indicated otherwise, the Court will refer to documents by their docket entry number and the page numbers assigned by the Electronic Case Filing System.

2       L. CIV. R. 78.1.

3       The allegations set forth within the pleadings and motion record are relied upon for purposes of this motion only. The Court has made no findings as to the veracity of the parties' allegations.

4       (D.E. 1, Complt).

5       28 U.S.C. § 636(b)(1)(A).

6       L. CIV. R. 72.1(a)(1); 37.1.

7       *Kresefky v. Panasonic Commc'ns and Sys. Co.*, 169 F.R.D. 54, 63-64 (D.N.J. 1996); *Cooper Hosp./Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 127 (D.N.J. 1998).

8       *Gerald Chamales Corp. v. Oki Data Americas, Inc.*, 247 F.R.D. 453, 454 (D.N.J. 2007).

9       Fed. R. Civ. P. 16(a).

10      *Princeton Biochemicals, Inc. v. Beckman Instruments, Inc.*, 180 F.R.D. 254, 258 (D.N.J.1997).

11      *Cephalon, Inc. v. Sun Pharm. Indus., Ltd.*, No. CIV.A. 11-5474 FLW, 2013 WL 3417416, at *3 (D.N.J. July 8, 2013).

12      *Conner v. Perdue Farms, Inc.*, No. CIV.A. 11-888 MAS LH, 2013 WL 5977361, at *3 (D.N.J. Nov. 7, 2013) (quoting Fed.R.Civ.P. 23 Advisory Committee's Notes).

13      *Id.* (quoting *In re Plastics Additives Antitrust Litigation*, 2004 WL 2743591, at *2 (E.D.Pa. Nov.29, 2004) (quoting Williamson Tobacco Corp., 959 F.2d 1566, 1570–71 (11th Cir.1992); see also Manual for Complex Litigation § 11.213 at 40 ("discovery may proceed concurrently if bifurcating class discovery from merits discovery would result in significant duplication of effort and expense to the parties").

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Extend by   Quinn v. Specialized Loan Servicing, LLC,   N.D.Ill.,   February 9, 2017

2014 WL 413534

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

PHYSICIANS HEALTHSOURCE, INC., Plaintiff,

v.

JANSSEN PHARMACEUTICALS, INC., et al., Defendants.

Civil Action No. 12–2132 (FLW).

|

Feb. 4, 2014.

**Attorneys and Law Firms**

Matthew Nicholas Fiorovanti, Giordano Halleran & Ciesla P.C., Red Bank, NJ, Michael J. Canning, Giordano, Halleran & Ciesla, P.C., Middletown, NJ, for Plaintiff.

Marsha Jessica Indych, Drinker Biddle & Reath LLP, New York, NY, Kathleen M. Fennelly, Thomas R. Curtin, George C. Jones, Graham Curtin, P.A., Morristown, NJ, for Defendants.

MEMORANDUM OPINION

BONGIOVANNI, United States Magistrate Judge.

**\*1** This matter comes before the Court upon Defendants Alert Marketing, Inc., Janssen Pharmaceuticals, Inc. and Ortho–McNeil Pharmaceutical, LLC's (identified as Ortho–McNeil Pharmaceutical, Inc.) (collectively "Defendants") motion to bifurcate discovery. [Docket Entry No. 52]. Plaintiff Physicians Healthsource, Inc. ("Plaintiff") opposes Defendants' motion. The Court has fully reviewed and considered all of the arguments made in support of and in opposition to Defendants' motion. The Court considers same without oral argument pursuant to L.Civ.R. 78.1(b). For the reasons set forth more fully below, Defendants' motion is GRANTED.

### I. Background and Procedural History

In light of the parties' familiarity with the facts of this matter, they shall not be reinstated at length herein. Instead, the Court shall recount only those facts necessary for the resolution of Defendants' motion to bifurcate. This case concerns whether two identical unsolicited faxes sent by Defendants to Plaintiff on or about April 8, 2008 and May 6, 2008 violated the Telephone Consumer Protection Act ("TCPA"). The faxes concern the reclassification of Levaquin for insurance purposes.[1] Plaintiff alleges that the faxes were sent as commercial advertisements in violation of the TCPA. In contrast, Defendants argue that the faxes are informational and, therefore, exempted from the TCPA.

In response to Plaintiff's Complaint, Defendants j ointly moved to dismiss Plaintiff's claims arguing that the faxes as a matter of law were informational and, as such, exempted from the TCPA. The District Court held argument on Defendants' motion. For the reasons set forth on the record on January 31, 2013 and for those set forth in the Supplemental Opinion dated February 6, 2013, the District Court granted Defendants' motion to dismiss, finding that "the faxes are indeed informational and that they

include only an incidental amount of commercial material." (Supplemental Opinion of 2/6/2013 at 1; Docket Entry No. 28). Consequently, the District Court determined that the "faxes are not actionable under the TCPA." (*Id.*)

Plaintiff responded to this decision by filing a motion to reconsider the District Court's January 31, 2013 Order pursuant to FED.R.CIV.P. 59(e) and L.Civ.R. 7.1(i). In the alternative, Plaintiff sought leave to file an amended complaint. The District Court denied Plaintiff's motion for reconsideration finding that Plaintiff had not asked the court to "correct errors of law or fact upon which [its] rulings were based in order to prevent manifest injustice, [n]or was there an intervening change in the prevailing law." (Opinion of 6/6/2013 at 6; Docket Entry No. 43). Instead, the District Court noted that Plaintiff's motion for reconsideration was based on two new allegations that Plaintiff referred to as new evidence: (1) the receiver of the faxes in question, a physician, never prescribed Levaquin; and (2) because Levaquin was reclassified in 2004, not in 2008 when the faxes were sent, the fax "created a 'false impression that it was being sent for informational purposes.' " (*Id.* (quoting Plaintiff's Opp. Brief at 6)). The District Court found that these new allegations were not evidence for reconsideration purposes and since there was no allegation that the information supporting these allegations was not available when the District Court rendered its initial decision, there was no basis upon which the District Court could reconsider its prior rulings.

**\*2** The District Court also found that Plaintiff's proposed amended complaint was futile because the only new allegations set forth in the pleading concerned the alleged fact that there was no prior business relationship between the parties. The District Court found these allegations to be insufficient because its "prior holding that the fax is an advertisement is not relevant to a finding of a prior business relationship, and as a result, amending the Complaint to include such allegations would not change the result." (*Id.* at 7). In addition, the District Court noted that Plaintiff's proposed amended complaint was devoid of any allegations that the faxes at issue "could not be considered truly informational" because "Levaquin was actually reclassified in 2004, and since the drug was already a Tier 2 drug in 2008, there was no 'reclassification,' 'up-to-date,' or 'breaking news' reimbursement information" to be disseminated at the time they were sent. (*Id.*) While Plaintiff raised these assertions in its brief, the District Court could not consider same because they were un-pled.

Despite the failures in Plaintiff's proposed amended complaint, the District Court permitted Plaintiff to amend its Complaint, although not in the form submitted with Plaintiff's motion. Instead, the District Court permitted Plaintiff to "amend its Complaint with whatever allegations it deems would be sufficient." (*Id.* at 8). In so doing, the District Court specifically noted that it was not making any findings as to whether Plaintiff's allegations concerning the timing of Levaquin's reclassification could state a claim.

Plaintiff filed its Amended Complaint on June 26, 2013. [Docket Entry No. 45]. Defendants filed answers in response to same on July 19, 2013. [Docket Entry Nos. 47 & 48]. Shortly thereafter, the Court set an Initial Conference with the parties to discuss the schedule to be set in this matter. During the Initial Conference, Defendants indicated their desire to bifurcate discovery. The Court directed Defendants to file a motion to that effect. Defendants did so by filing the instant motion.

Defendants seek to bifurcate discovery into two phases. During the first phase, the parties would focus on discovery related to whether the faxes at issue are informational or whether the informational content is a sham designed to conceal the fact that they are advertisements. During the second phase, the parties would conduct discovery on all matters, including class action issues. Before the second phase of discovery commences, Defendants would file a motion for summary judgment on the issue of whether the faxes are informational and therefore exempted from the TCPA. Using this approach, the parties would only engage in class action discovery if Plaintiff survived Defendant's anticipated motion for summary judgment.

Defendants argue that bifurcating discovery in this matter is warranted in light of the narrow, potentially dispositive issue that exists concerning whether the faxes at issue are informational. Defendants argue that this issue is "totally distinct from class action discovery" and "can be fully explored in a limited time, with limited costs, and with limited burdens on the parties and the Court." (Def. Br. at 4; Docket Entry No. 52). In contrast, Defendants argue that unbounded class action discovery involves substantial costs and burdens both for the parties and the court. Further, Defendants claim that the burden of class discovery is significantly greater for defendants than plaintiffs. Indeed, Defendants contend that "[c]ertification and potential class liability are a sword of Damocles for Defendants[.]" (*Id.* at 5). Defendants argue that this would be particularly true here where the

Case 1:26-cv-00659-KM   Document 9-3   Filed 05/19/26   Page 69 of 71

Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc., Not Reported in...

District Court has previously determined that the faxes at issue are informational. Consequently, Defendants argue that they should not be forced to spend resources engaging in class discovery from the outset. Instead, they argue that the most efficient manner for this case to proceed is for discovery to be bifurcated so that the issue of whether the faxes are informational, and therefore exempted under the TCPA, can be decided first.

**\*3** Plaintiff opposes Defendants' motion to bifurcate. Plaintiff argues that, despite Defendants' claims to the contrary, bifurcation will not promote efficiencies in the litigation of this matter. In this regard, Plaintiff claims that "[n]o matter what evidence or testimony Defendants could hope to submit to support any forthcoming motion for summary judgment, there will at the very least still remain a genuine question of fact since the documents presented by Plaintiff already show *no Tier ranking change.*" (Pl. Opp. Br. at 2; Docket Entry No. 53). Further, Plaintiff argues that Defendants have not shown that it will be more timely and less costly to litigate this matter by bifurcating discovery. Indeed, Plaintiff claims that "Defendants provide no analysis whatsoever of the expected savings of time and costs, rendering their motion wholly conclusory." (*Id.* at 4).

In contrast, Plaintiff contends that bifurcation will just further delay this case, which has already been "pending for almost eighteen months due in large part to Defendants' insistence that the faxes were informing of a Levaquin Tier change." (*Id* ) Specifically, Plaintiff contends that if this matter is bifurcated, the first phase of discovery will take nearly a year to complete. Plaintiff argues that such an expense of time cannot be justified. Plaintiff also argues that Defendants "fail to explain just how separation of the Tier change issue from the normal class certification discovery can be accomplished." (*Id.* at 5).

In addition, Plaintiff argues that bifurcation ignores the need to preserve evidence in this TCPA matter. Plaintiff notes that in TCPA cases, electronic discovery involves databases of transmissions records. Plaintiff further notes that both IT and non-IT personnel are responsible for the integrity of these databases. Plaintiff argues that given the different personnel involved in maintaining the databases, there is always a risk that the actual integrity of the databases has been compromised. Plaintiff claims that this issue is compounded by the fact that "the steps taken to actually send the faxes at issue may involve known *and even* unknown outside parties or vendors" coupled with the common practice in data storage to delete data on quick intervals to increase efficiencies and decrease costs. (*Id.* at 7). As such, Plaintiff argues that there is a risk that vendors, both known and unknown, may be deleting or destroying databases relevant to this case. Plaintiff argues that bifurcation will only multiply problems associated with evidence preservation by delaying Plaintiff's ability to secure evidence for almost a year.

Indeed, Plaintiff argues that it will be inherently prejudiced if this matter is bifurcated. In this regard, Plaintiff claims that "[s]ince no discovery has occurred in this case, Plaintiff will be forever prejudiced if evidence relevant to proving this case, evidence in the form of electronic data, is innocently destroyed or deleted as a matter of course by anyone who participated in the sending of the faxes at issue here." (*Id.* at 8). For these reasons, Plaintiff argues that Defendants' motion to bifurcate discovery should be denied.

## II. Analysis

**\*4** Federal Rule of Civil Procedure 42(b) governs requests to bifurcate. According to Rule 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." *Medpointe Healthcare, Inc. v. HiTech Pharmacal Co., Inc.,* Civil Action No. 03–555(MLC), Civil Action No. 04–1686(MLC), 2007 U.S. Dist. LEXIS 4652, at \*12–13, 2007 WL 188285 (D.N.J. Jan. 22, 2007) (internal quotation marks and citation omitted). Further, the broad discretion afforded courts in handling discovery disputes extends to decisions over bifurcating discovery. *See Weiss v. First Unum Life Ins. Co.,* Civil Action No. 02–4249(GEB), 2008 WL 755958, \* 1 (March 19, 2008); *see also Bandai America Inc. v. Bally Midway Mfg. Co.,* 775 F.2d 70, 74 (3d Cir.1985) (holding that bifurcation orders and orders controlling order of discovery are reviewed for abuse of discretion).

Here, the Court finds that bifurcating discovery as proposed by Defendants is warranted under Rule 42(b). In this regard, the Court agrees with Defendants that a narrow, potentially dispositive issue exists concerning whether the faxes sent to Plaintiffs are informational and therefore not actionable under the TCPA. Further, the Court is not persuaded by Plaintiff's argument that

Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc., Not Reported in...

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 70 of 71

the information contained in and attached to its Amended Complaint regarding the lack of Levaquin Tier changes since at least 2004 precludes summary judgment being granted in Defendants' favor. Defendants have already referenced evidence of Tier changes occurring as late as 2007. Conflicting evidence does not always preclude summary judgment. Moreover, the District Court never determined that Plaintiff's now asserted sham allegations do, in fact, state a claim. As a result, even absent Tier changes, the District Court could find that the faxes are informational. As a result, depending on what evidence is ultimately presented, the District Court may determine that summary judgment is warranted.

In addition, the Court finds that the issue concerning whether the faxes here are informational is totally distinct from class issues. Unlike Plaintiff, the Court finds that there will be no significant overlap between the two and therefore no real danger of a duplication of efforts or corresponding increase in litigation costs. Moreover, the Court also finds that bifurcating the two issues has the potential to save the parties and the Court from the substantial costs and burdens associated with whole scale class action discovery. While Plaintiff faults Defendants for not supporting their claims concerning the burdens and costs associated with class action discovery, it is generally recognized that class actions involve the potential "for hefty litigation expenses and an extensive use of judicial resources in the resolution of these claims[.]" *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC,* Civ. No. 11–00011, 2013 WL 663301, at *5 (D.N.J. Feb.21, 2013). It is also generally understood that the costs can be particularly "enormous" for defendants. *Id.*

 **\*5**  Similarly, the Court finds Plaintiff's projection regarding how long the first phase of discovery will take to be unreasonable. The discovery at issue in phase one is narrow and relates solely to whether the faxes sent to Plaintiff are informational or whether their apparent informational content is a sham. Given this limited scope of discovery, there is simply no reason why it should take close to a year to complete. Instead, the Court is confident that it can be conducted in approximately 4 months.

Further the Court is not convinced that Plaintiff will be prejudiced by bifurcation. While Plaintiff raises concerns over delay and the possibility that evidence will be lost or destroyed, these concerns are not overly persuasive. First, the faxes at issue were sent in the Spring of 2008, nearly four years before Plaintiff elected to file suit. If evidence preservation and the elapse of time were a substantial concern, one would have expected this case to have been filed more expediently. Second, the fact that no discovery has taken place to date can hardly be blamed on Defendants. In response to Plaintiff's original Complaint, Defendants filed a motion to dismiss. Defendants succeed on that motion: the District Court determined that Plaintiff had failed to assert a viable claim under the TCPA. In response to the District Court's decision, Plaintiff moved for reconsideration or in the alternative to file an amended Complaint. The District Court denied Plaintiff's motion for reconsideration and found that Plaintiff's proposed amended complaint failed to state a claim under the TCPA. Nevertheless, the District Court permitted Plaintiff to file an amended pleading, albeit not in the form attached to the motion for reconsideration. Plaintiff filed its Amended Complaint on June 26, 2013, over 14 months after the initial Complaint was filed. Defendants certainly are not responsible for delaying discovery during this period of time. Quite to the contrary, they moved to dismiss Plaintiff's Complaint and they succeeded on that motion. Third, Defendants have notified third parties of this lawsuit and have put them on notice to preserve evidence. Under these circumstances, the Court finds that Plaintiff will not be prejudiced by an additional 4 month delay caused by bifurcating discovery into two phases.

Everything considered, the Court finds that bifurcating discovery into two phases will promote the efficient resolution of this matter. It will allow the Court to address a narrow, potentially dispositive issue in a timely and cost effective manner with no significant prejudice to Plaintiff. Consequently, the Court hereby bifurcates discovery as requested by Defendants. The parties are directed to submit a proposed schedule for fact discovery concerning whether the faxes sent were informational or whether their apparent informational content was a sham and the faxes were in reality advertisements. The schedule submitted shall have this phase of discovery closing no later than June 13, 2014. [2]

### III. Conclusion

 **\*6**  For the reasons set forth above, Defendants motion to bifurcate discovery is GRANTED. An appropriate Order follows.

**WESTLAW**   © 2026  Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 9-3    Filed 05/19/26    Page 71 of 71

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 413534

---

**Footnotes**

1      The specific content of the faxes is discussed in detail in the District Court's Supplemental Opinion dated February 6, 2013 [Docket Entry No. 28]. As such, the Court does not go into further detail here.

2      The Court notes that after Defendants' motion to bifurcate was filed, Defendants filed a motion for summary judgment. In response, Plaintiff has filed an opposition arguing that certain discovery is needed in order to respond to Defendants' motion for summary judgment. This Opinion does not reach that issue, but only addresses Defendants' motion to bifurcate.

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.