Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 1 of 199

A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc., Not Reported in Fed. Supp....

2018 WL 488257
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

A CUSTOM HEATING & AIR CONDITIONING, INC.,

Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

KABBAGE, INC.; Gulfco Leasing LLC; Michael Henry; and John Does 1-12, Defendants.

Case No. 16 C 2513
|
Signed 01/18/2018

**Attorneys and Law Firms**

James Michael Smith, Tod Allen Lewis, Phillip A. Bock, John P. Orellana, Kimberly M. Watt, Bock Law Firm, LLC dba Bock, Hatch, Lewis & Oppenheim, LLC, Chicago, IL, for Plaintiff.

Kristine Marie Schanbacher, Shannon Young Shin, Dentons US LLP, Heather Lynn Maly, Isaac J. Colunga, Ice Miller LLP, Chicago, IL, Mark A. Silver, Nathan Lewis Garroway, Dentons US LLP, Atlanta, GA, Bart Thomas Murphy, Martha Larson Kohlstrand, Ice Miller LLP, Lisle, IL, for Defendants.

Michael Henry, Green Cove Springs, FL, pro se.

**MEMORANDUM OPINION AND ORDER**

Harry D. Leinenweber, Judge

 **\*1**  Defendant Kabbage, Inc. moves [ECF No. 104] to strike the class allegations from Plaintiff's First Amended Complaint (the "FAC")[ECF No. 52]. For the reasons stated herein, Kabbage's Motion is granted, but Plaintiff A Custom Heating & Air Conditioning, Inc., is granted leave to amend its Complaint.

**I. BACKGROUND**

This opinion presumes familiarity with the factual and procedural background described at length in this Court's June 16, 2017 opinion. (Ct. Mem. Op. and Order, June 16, 2017, ECF No. 89.) The short version is this: Plaintiff A Custom Heating & Air Conditioning, Inc. ("Plaintiff") sued Defendant Kabbage, Inc. ("Kabbage"), among others, claiming that Defendants sent or caused to be sent to Plaintiff fax advertisements in violation of the Telephone Consumer Protection Act, as amended by the Junk Fax Protection Act of 2005, 🚩47 U.S.C. § 227 (together, "the Act" or "the TCPA"). Plaintiff pursued other causes of action as well, but this Court dismissed them for failure to state a claim under Rule 12(b)(6). (Ct. Mem. Op. and Order, June 16, 2017.) Now, Kabbage moves the Court to strike the TCPA class action allegations from Plaintiff's FAC.

**II. LEGAL STANDARD**

"The standard for evaluating motions to strike class allegations is the same as the standard for certifying a class under Rule 23." *Everett v. Baldwin,* No. 13 C 04697, 2016 WL8711476, at \*4 (N.D. Ill. Jan. 15, 2016) (citations omitted). An exhaustive class

A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc., Not Reported in Fed. Supp....

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 2 of 199

certification analysis is not necessary here. Rule 23(c)(1)(A) requires courts to determine whether to certify an action as a class action "[a]t an early practicable time." *Cholly v. Uptain Grp., Inc.,* No. 15 C 5030, 2017 WL 449176, at *3 (N.D. Ill. Feb. 1, 2017). Though a court might often find this determination not practicable at the pleading stage, "sometimes the complaint will make it clear that class certification is inappropriate." *Pumputiena v. Deutsche Lufthansa, AG,* No. 16 C 4868, 2017 WL 66823, at *8 (N.D. Ill. Jan. 6, 2017). That is the case here, but not for the reason put forth by Kabbage.

## III. DISCUSSION

Before addressing the ultimate shortcoming of Plaintiff's proposed class, however, the Court addresses another issue raised by the parties. Namely, whether the D.C. Circuit's recent decision in *Bais Yaakov of Spring Valley v. FCC,* 852 F.3d 1078, 1079 (D.C. Cir. 2017)—which opined that the Act does not impose an opt-out notice requirement on solicited faxes and further that the Act does not empower the FCC to impose such a requirement—is binding authority in the Seventh Circuit. The Court finds that it is.

### A. Whether *Yaakov* Controls in the Seventh Circuit

The heart of Kabbage's objection to the class allegations is Plaintiff's proposed class definition:

> All persons who were sent one or more telephone facsimile messages on or after four years prior to the filing of this action, that advertised the commercial availability of property, goods, or services offered by Defendants, that did not contain an opt-out notice that complied with federal law.

**\*2** (FAC ¶ 26.) The trouble here is imprecision. Plaintiff defines its proposed class as a group of persons who received advertisements lacking TCPA-compliant opt-out notices. Kabbage cries foul because, as the Court earlier observed, the definition fails to distinguish between those class members that gave prior permission to Defendants to receive such advertisements and those members that did not. (*See,* Ct. Mem. Op. and Order, June 16, 2017, at 3.)

According to Kabbage, this lack of definition renders Plaintiff's class "impossible to certify" in the wake of a recent D.C. Circuit opinion. In *Yaakov,* the D.C. Circuit ruled on thirteen consolidated petitions for review originally filed in multiple courts of appeals seeking to set aside the FCC's Solicited Fax Rule. *Yaakov,* 852 F.3d at 1079. Before the FCC issued the Solicited Fax Rule (the "Rule") in 2006, the TCPA required opt-out notices only for unsolicited faxes. The Rule expanded this requirement to solicited faxes as well. *See,* 47 C.F.R. § 64.1200(a)(4)(iv) (codification of the Solicited Fax Rule). But months ago, *Yaakov* stated that the Act does not empower the FCC to impose an opt-out notice requirement on solicited faxes and that the TCPA itself does not impose that requirement. *Yaakov,* 852 F.3d at 1080-83. Plaintiff claims *Yaakov* is not controlling here. Instead, Plaintiff points to *Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682 (7th Cir. 2013), in which, according to Plaintiff's telling of the case, the Seventh Circuit held that the TCPA imposes the opt-out notice requirement for solicited faxes. (*See,* Pl.'s Resp. to Kabagge's Mot. to Strike at 14, ECF 120.)

Thus, the issue is whether, in the Seventh Circuit, opt-out notices are required even for those advertisements that are solicited. If *Yaakov* controls, then those members of Plaintiff's proposed class (if any) who received only solicited faxes have no valid claim against Defendants.

A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc., Not Reported in Fed. Supp....

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 3 of 199

This issue has been the source of recent disagreement in this District, and two opposing camps have emerged. The first camp has held that *Turza* indeed stated that opt-out notices are required on solicited faxes and that this rule binds our District. *See,* *Orrington v. Scion Dental, Inc.,* No. 17-CV-00884, 2017 WL 2880900, at *2 (N.D. Ill. July 6, 2017) (holding that under binding precedent in *Turza,* "opt-out notices are still required under the TCPA, even for solicited faxes"); *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.,* No. 12 C 3233, 2017 WL 2391751, at *2 (N.D. Ill. June 2, 2017) (same). The second camp has held that not only is *Yaakov* controlling in this District, but also that *Turza* does not even stand for the proposition—as Plaintiff suggests—that opt-out notices must be included on even solicited faxes. *See,* *Alpha Tech Pet Inc. v. LaGasse, LLC,* No. 16 C 4321, 2017 WL 5069946, at *3 (N.D. Ill. Nov. 3, 2017) (stating that *Yaakov* is binding outside of the D.C. Circuit, and that "*Turza* does not even involve solicited faxes"); *Brodsky v. HumanaDental Ins. Co.,* No. 10-CV-03233, 2017 WL 3704824, at *4, 8-9 (N.D. Ill. Aug. 28, 2017) (same). This Court agrees with the second camp.

**\*3** The D.C. Circuit is not the Seventh, and decisions of that court are not typically binding on decisions made in this District. As Kabbage correctly observes, however, *Yaakov* is not a typical case. (*See,* Kabbage's Mem. in Supp. of Mot. to Strike ("Kabbage's Mem.") at 7 n.4, ECF 105.) The *Yaakov* court ruled on thirteen consolidated petitions for review of an FCC decision concerning the Solicited Fax Rule from multiple courts of appeals, a consolidation which transformed the D.C. Circuit into the "sole forum for addressing ... the validity of the FCC's rule." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,* 863 F.3d 460, 467 (6th Cir. 2017) (quoting *Peck v. Cingular Wireless, LLC,* 535 F.3d 1053, 1057 (9th Cir. 2008)), *as corrected on denial of reh'g en banc* (Sept. 1, 2017). The purpose behind such consolidation—improving judicial efficiency and guaranteeing uniformity across circuits—would be undone if courts outside of D.C. continued to follow contrary precedent. *See, id.*

But as Judge John Blakey described in detail in *Brodsky v. HumanaDental Ins. Co.,* No. 10-CV-03233, 2017 WL 3704824, at *8-9 (N.D. Ill. Aug. 28, 2017), *Turza* is not contrary to *Yaakov* anyway. The relevant portions of the TCPA cited in *Turza* "never mention solicited messages at all; instead, they refer to the FCC's ability to promulgate additional rules regarding opt-out notices (such as the Solicited Fax Rule)." *Brodsky,* 2017 WL 3704824, at *8. *Turza* and *Yaakov* are not at odds over whether solicited faxes require an opt-out notice, and *Yaakov*'s holding that such notices are not required is binding in the Seventh Circuit.

### B. Kabbage's Motion to Strike

Given that *Yaakov* controls, the Court now considers whether Plaintiff's proposed class meets the requirements of Rule 23. A party seeking class certification must prove by a preponderance of the evidence that its proposed class meets all requirements of Rule 23. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). First, Rule 23(a) sets forth four requirements: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). FED. R. CIV. P. 23(a). Plaintiffs who meet this initial burden must also prove that the proposed class satisfies one of the three requirements of Rule 23(b). Where, as here, the plaintiff seeks money damages, the plaintiff must meet the requirements of Rule 23(b)(3), namely that questions of law or fact common to the members of the class predominate over any questions affecting only individual members (predominance), and that a class action is superior to all other available methods for fair and efficient adjudication of the controversy (superiority). FED. R. CIV. P. 23(b)(3); *see,* *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC,* 318 F.R.D. 712, 720 (N.D. Ill. 2016).

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 4 of 199

A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc., Not Reported in Fed. Supp....

Kabbage asserts, however obliquely, that Plaintiff's proposed class cannot satisfy 🚩Rule 23(b)'s predominance requirement and so the class allegations should be struck from Plaintiff's FAC. (*See,* Kabbage's Mem. at 4.) Kabbage's argument is this: *Yaakov* killed the TCPA cause of action for any class members who received only solicited faxes, and given the ambiguity of the class definition, Plaintiff's proposed class may well contain such members. Accordingly, if Plaintiff moved to certify the proposed class, "the Court would have to individually evaluate each proposed class member to determine whether that class member provided valid consent to be contacted" and thus received only solicited faxes. (Kabbage's Reply at 3, ECF No. 124.) Kabbage contends that such a thicket of "individual issues of consent" bars class certification. (Kabbage's Mem. at 8.) Plaintiff responds that if Kabbage contends some proposed class members gave consent to receive the alleged at-issue faxes (Kabbage's Reply at 4-7), Kabbage must produce evidence demonstrating as much (Pl.'s Resp. in Opp'n to Mot. to Strike at 4, ECF No. 120). Kabbage says this rejoinder "misses the point." (Kabbage's Reply at 3.) The Court agrees with Plaintiff.

 **\*4**  "Courts determine whether issues of individualized consent defeat commonality and predominance in ... TCPA cases on a case-by-case basis after evaluating the specific evidence available to prove consent." *Physicians Healthsource,* 318 F.R.D. at 725. Where the defendant only makes "vague assertions about consent ... individualized issues regarding consent will not predominate over common questions of law or fact so as to prevent class certification." *Id.*

Kabbage has not presented any specific evidence of consent by any class member and argues instead that the very specter of *possible* consent by any class member demands an individualized inquiry too burdensome for the Court to bear if it certifies Plaintiff's proposed class. Case law disapproves of Kabbage's reasoning. *See, e.g.,* 🚩*G.M. Sign, Inc. v. Finish Thompson, Inc.,* 2009 WL 2581324, at \*6 (N.D. Ill. Aug. 20, 2009) (certifying a TCPA class over defendant's predominance and commonality objections when no evidence in the record indicated that individual issues of consent would subsume common issues and noting that consent issues thus remained "hypothetical").

Kabbage's predominance argument fails, but Plaintiff's proposed class cannot be certified for another reason. In light of *Yaakov* and the ambiguity as to whether the proposed class excludes those members that solicited faxes, the proposed class cannot meet 🚩Rule 23(a)'s typicality requirement.

"A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." 🚩*Keele v. Wexler,* 149 F.3d 589, 595 (7th Cir. 1998). "Typicality requires 'enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group.' " *Physicians Healthsource,* 318 F.R.D. at 723 (quoting *Rosen Family Chiropractic, S.C. v. Chi-Town Pizza on Division St., Inc.,* No. 11 C 6753, 2015 WL 638522, at \*3 (N. D Ill. Feb. 13, 2015)) (citation omitted). Finally, "[c]ourts faced with an overbroad class definition may deny certification for want of typicality. *McGarvey v. Citibank (S. Dakota) N.A.,* No. 95 C 123, 1995 WL 404866, at \*4 (N.D. Ill. July 5, 1995).

Plaintiff alleges that it received an unsolicited fax advertisement from—or one caused to be sent by—Defendants. (FAC ¶ 17.) But if, as the proposed class definition currently allows, the class contains members who received only solicited faxes, there will not be "enough congruence" between their claims and Plaintiff's. *Physicians Healthsource,* 318 F.R.D. at 723. Indeed, there will be no congruence at all, given that post-*Yaakov*, the members that received only solicited faxes have no TCPA claim against Defendants. The class definition is thus overbroad, encompassing members who do not share a viable claim with the representative Plaintiff. If, as Plaintiff contends elsewhere in its FAC (*see* FAC ¶ 24), all of the proposed class members received only unsolicited faxes, the class definition should say so.

*Yaakov* indeed spelled doom for the Plaintiff's proposed class. But *Yaakov* is not the death knell for every class the Plaintiff might propose. Kabbage argues that any attempt by Plaintiff to amend its class definition would be "futile," (Kabbage's Reply at 1), because even re-framing the class to comply explicitly with *Yaakov* would not dispel the requirement on the Court to make an individual inquiry into consent. But as already discussed, Kabbage cannot destroy Plaintiff's chances at class certification

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 5 of 199

by summoning hypothetical consent issues while failing to produce any specific evidence demonstrating the actual existence of those issues. *G.M. Sign, Inc.,* 2009 WL 2581324, at *6.

**\*5** Accordingly, striking the class action allegations is appropriate, but so is granting Plaintiff leave to amend its FAC.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Kabbage's Motion to Strike Class Allegations [ECF No. 104] is granted. Plaintiff is granted leave to amend its Complaint and its proposed class definition.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 488257

---

**End of Document**                                                                 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1027431
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Keith BARNES, Plaintiff,

v.

The COCA-COLA COMPANY, Defendant.

No. 1:22-cv-01511-KJM-EPG
|
Signed April 4, 2025
|
Filed April 7, 2025

**Attorneys and Law Firms**

Joshua D. Arisohn, Pro Hac Vice, Arisohn LLC, Litchfield, CT, Scott A. Bursor, Bursor & Fisher P.A., Miami, FL, Lawrence Timothy Fisher, Neal J. Deckant, Bursor and Fisher, PA, Walnut Creek, CA, for Plaintiff.

Michael Dietz Roth, King & Spalding LLP, Los Angeles, CA, Zachary A. McEntyre, Pro Hac Vice, Paige Lauren Burroughs, Pro Hac Vice, King & Spalding LLP, Atlanta, GA, for Defendant.

ORDER

 **\*1**  In this case brought under the Telephone Consumer Protection Act (TCPA), plaintiff Keith Barnes proposes bringing his claims on behalf of a nationwide class. Defendant The Coca-Cola Company (Coca-Cola) moves to dismiss one of Barnes's claims and to strike the proposed class allegations. For the reasons below, the **court grants both the motion to dismiss** and **the motion to strike** with leave to amend.

**I. BACKGROUND**

Barnes's claims arise from a series of calls and voicemails from Coca-Cola. Compl., ECF No. 1 ¶ 12. These calls used an artificial or prerecorded voice. *Id.* ¶ 13. Barnes alleges that when he answered Coca-Cola's calls, he heard a message: "Hello, this call is Coca-Cola calling to remind you that we will be contacting you soon for your upcoming delivery ...." *Id.* ¶ 14. Coca-Cola also left voicemails with the same message. *Id.* Barnes contends that he never consented, in writing or otherwise, to receiving any of these prerecorded calls. *Id.* ¶¶ 13, 15.

In November 2022, Barnes filed this action, alleging the Coca-Cola knowingly or willfully violated the TCPA. *See* Compl. ¶¶ 33–42 (citing 47 U.S.C. § 227). Barnes seeks an injunction, statutory damages, treble damages, fees, costs and other relief. *See id.* ("Prayer for Relief"). He also seeks to represent a class of "[a]ll persons within the United States who (a) received a telephone call on his or her landline or cellular telephone; (b) made by or on behalf of Defendant." *Id.* ¶ 17.

Coca-Cola moves to dismiss Barnes's claim of knowing or willful violations of the TCPA under Rule 12(b)(6). Mot., ECF No. 18 (sealed). [1] Fed. R. Civ. P. 12(b)(6). Coca-Cola also moves to strike the class allegations under Rules 12(f) and 23. Fed. R. Civ. P. 12(f), 23. The motion is fully briefed. *See generally* Opp'n, ECF No. 22; Reply, ECF No. 28 (sealed). In its discretion, the court determined a hearing on the matter was not necessary and submitted the matter on the papers.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 7 of 199

Barnes v. Coca-Cola Company, Not Reported in Fed. Supp. (2025)

## II. MOTION TO DISMISS

### A. Legal Standard

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In response, the court begins by assuming the complaint's factual allegations are true, but not its legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court then determines whether those factual allegations "plausibly give rise to an entitlement to relief" under Rule 8. *Id.* at 679. This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.* A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Twombly*, 550 U.S. at 555. The court construes all factual allegations "in the light most favorable to the nonmoving party." *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).

**\*2** Courts may not ordinarily consider evidence and other materials from outside the pleadings when deciding whether a complaint must be dismissed under Rule 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). "When 'matters outside the pleading are presented to and not excluded by the court,' the 12(b)(6) motion converts into a motion for summary judgment under Rule 56." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (quoting Fed. R. Civ. P. 12(d)).

### B. The Telephone Consumer Protection Act

The TCPA prohibits making certain calls "using any automatic telephone dialing system or an artificial or prerecorded voice" to a wireless number. 47 U.S.C. § 227(b)(1)(A). Specifically, the TCPA provides:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

... (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call ....

47 U.S.C. § 227(b)(1)(A)(iii).

There are three elements to a TCPA claim based on the use of an automatic dialing system (ATDS) or an artificial or prerecorded voice: (1) the defendant called a cellular telephone number; (2) using an ATDS, or an artificial or prerecorded voice; (3) without the recipient's prior express consent. *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). In 2012, the Federal Communications Commission clarified that the form of prior express consent required under the statute depends on the nature of the telephone call. Rules & Reguls. Implementing Tel. Consumer Prot. Act of 1991 ("2012 TCPA Order"), 27 FCC Rcd. 1830, 1838 (2012) (effective October 16, 2013); 47 C.F.R. § 64.1200(a). Any telephone call that "includes or introduces an advertisement or constitutes telemarketing" cannot be made without "the prior express written consent of the called party." 47 C.F.R. § 64.1200(a)(2); *see also* 2012 TCPA Order, 27 FCC Rcd. at 1838–44. All other calls not including an advertisement require only "prior express consent." 47 C.F.R. § 64.1200(a)(1).

Barnes v. Coca-Cola Company, Not Reported in Fed. Supp. (2025)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 8 of 199

Under the TCPA, "if the court finds that the defendant willfully or knowingly violated [⚑Section 227], the court may, in its discretion" award treble damages. ⚑47 U.S.C. § 227(b)(3). At present, neither the Act, the FCC nor the Ninth Circuit has clarified the definition of "willful or knowingly" within the Act. ⚑*Lamkin v. Portfolio Recovery Assocs., LLC*, No. 18-03071, 2019 WL 4670829, at *4 (E.D. Cal. Sept. 25, 2019) (collecting cases), *vacated and remanded on other grounds*, No. 19-16947, 2021 WL 9569379 (9th Cir. Aug. 27, 2021). Persuasive decisions in this district have interpreted the threshold as "low," requiring only that defendant "intends or knows that it was performing each of the elements of a TCPA claim." *Id.* (internal citations and quotations omitted).

### C. Analysis

Coca-Cola contends Barnes fails to state a claim under Rule 12(b)(6) because his complaint does not allege the calls were "telemarketing" or "advertising" within the meaning of the TCPA, or that Coca-Cola willfully or knowingly made the calls. Mot. at 12. Barnes's failure to allege these two facts, Coca-Cola argues, provides "interdependent reasons" the complaint should be dismissed under Rule 12(b)(4). *Id.*

**\*3** Because the nature of the calls determines what form of consent is required, the court begins with Barnes's allegations that the calls were "telemarketing" calls. It is unclear from the briefs whether Barnes was ever a customer of Coca-Cola. Even so, Barnes does not describe the calls as advertisements in his complaint, and the portion of the calls he quotes in his complaint do not permit the court to infer they were advertisements, even when they are taken in the light most favorable to Barnes. According to the complaint, Coca-Cola called only to "remind" him about an "upcoming delivery," not to encourage him to make a purchase, to let him know that some good or service was available, to promote a product, or something similar. Compl. ¶ 14; *see* ⚑47 C.F.R. § 64.1200(f)(1), (13) (defining "advertising" and "telemarketing"); ⚑*Aderhold v. Car2go N.A., LLC*, No. 13-489, 2014 WL 794802, at *9 (W.D. Wash. Feb. 27, 2014) (finding analogous text message was not "telemarketing" under TCPA), *aff'd*, 668 F. App'x 795 (9th Cir. 2016) (unpublished) (agreeing with FCC guidance that messages are not "telemarketing" or "advertising" if their purpose is "to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender").

Barnes provides the full call transcript for the first time in his opposition to Coca-Cola's motion, including the following sentence: "If you're ready to place your order now, press 1 to be connected to a beverage expert." Opp'n at 11. But considering only the facts asserted in the complaint, as the court must at this stage, Barnes's complaint does not provide "sufficient factual matter" to make his second claim for relief plausible. ⚑*Iqbal*, 556 U.S. at 678. The complaint itself must "contain sufficient allegations of underlying facts to give fair notice" of the plaintiff's claims. ⚑*AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting ⚑*Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Because the complaint does not permit the court to infer the call was an advertisement or a telemarketing call, Barnes's claim for treble damages must be dismissed. Given that it appears Barnes could amend this claim, the court grants the motion to dismiss claim two with leave to amend. *See* ⚑*AE ex rel. Hernandez*, 666 F.3d at 636 ("A district court abuses its discretion by denying leave to amend unless amendment would be futile or the plaintiff has failed to cure the complaint's deficiencies despite repeated opportunities.").

### III. MOTION TO STRIKE

#### A. Legal Standard

Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."

*Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)). "Motions to strike are generally regarded with disfavor." *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002); *see also Neveu v. City of Fresno*, 392 F. Supp. 2d 1159, 1170 (E.D. Cal. 2005) ("[M]otions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." (citation omitted)).

In the context of class action complaints, while motions to strike class allegations at the pleading stage are disfavored in this Circuit, they are not "procedurally improper *per se*." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939 (9th Cir. 2009) (emphasis in original); *see, e.g.*, *Kay v. Wells Fargo & Co. N.A.*, No. 07-01351, 2007 WL 2141292 (N.D. Cal. July 24, 2007); *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123 (N.D. Cal. 2010). Some discovery is usually necessary before a court analyzes the proposed class under Rule 23, nevertheless, district courts have "broad discretion to control the class certification process" even before the discovery process commences. *Vinole*, 571 F.3d at 942; *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1063 (N.D. Cal. 2015) ("The Ninth Circuit has opined that 'compliance with Rule 23 is not to be tested by a motion to dismiss for failure to state a claim.' ") (quoting *Gillibeau v. City of Richmond*, 417 F.2d 426, 432 (9th Cir. 1969)); *Kirchner v. Shred-it USA Inc.*, No. 14-1437, 2014 WL 6685210, at *3 (E.D. Cal. Nov. 25, 2014) (declining to dismiss class claims prior to a motion for class certification).

**\*4** When another court has ruled on a substantially similar case, a motion to strike class allegations may be supported under principles of comity. *See, e.g.*, *Baker v. Home Depot USA, Inc.*, No. 11C6768, 2013 WL 271666 at *4–5 (N.D. Ill. Jan. 24, 2013). In a unanimous decision, the Supreme Court explained lower federal courts are expected "to apply principles of comity to each other's class certification decisions when addressing a common dispute." *Smith v. Bayer Corp.*, 564 U.S. 299, 317 (2011) (per curiam). While the applicability of comity is disputed by lower courts, at a minimum *Smith* requires one federal district court to pay close attention if another federal district court has considered and rejected a very similar proposal to litigate as a class. *See Smentek v. Dart*, 683 F.3d 373, 377 (7th Cir. 2012) (expressing doubts about concept of "comity" but agreeing federal district court judge should "pay respectful attention to the decision of another judge in a materially identical case"); *Ford v. Ford Motor Co.*, No. 13-8335, 2014 WL 12570925, at *4 (C.D. Cal. Jan. 17, 2014) (agreeing district judge should "carefully and seriously consider the views of other courts who have ruled on the certification of the same or closely related classes"); *Murray v. Sears, Roebuck & Co.*, No. 09-5744 CW, 2014 WL 563264, at *6 (N.D. Cal. Feb. 12, 2014) (holding another federal court's decision offers "strong guidance" about right result in similar or identical class action). That is, comity "persuades; but it does not command" federal district courts facing class pleadings in similar cases. *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488 (1900).

A district court may strike class allegations before discovery when "the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982); *see, e.g.*, *Sanders*, 672 F. Supp. at 990. When a defendant raises issues of class certification before discovery is complete:

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 10 of 199

Barnes v. Coca-Cola Company, Not Reported in Fed. Supp. (2025)

> [T]he plaintiff bears the burden of advancing a prima facie showing that the class action requirements of [⚑Rule 23] are satisfied or that discovery is likely to produce substantiation of the class allegations. Absent such a showing, a trial court's refusal to allow class discovery is not an abuse of discretion.

⚑*Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) (citing ⚑*Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977)).

When granting a motion to strike class allegations under Rule 12(f) and ⚑Rule 23, the court may grant leave to amend the complaint so long as amendment would not be futile. *Sanders*, 672 F. Supp. at 991; ⚑*AE ex rel. Hernandez*, 666 F.3d at 636; *see also* ⚑Fed. R. Civ. P. 23(d) ("In conducting an action under this rule, the court may issue orders that ... require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or deal with similar procedural matters.").

### B. Analysis

Coca-Cola does not argue Barnes's complaint includes redundant, immaterial, impertinent or scandalous matters. Mot. at 18–21. Instead, Coca-Cola asserts its pre-discovery motion to strike class allegations is supported because: (1) the proposed class is fatally overbroad; and (2) the principle of comity counsels that no class can be certified, now or in the future. *Id.* Barnes opposes the motion to strike, broadly asserting that "striking class allegations at the pleading stage is almost never appropriate" in the Ninth Circuit and that any need to "refine the class definition" can be completed after discovery if necessary. Opp'n at 14. Barnes does not otherwise explain why discovery is necessary or how it could substantiate his class allegations. The court begins with Coca-Cola's assertion that the proposed class is fatally overbroad and then proceeds to an analysis of comity.

#### 1. Overbreadth

Barnes seeks to represent a class that includes every person in the United States who has ever "received a telephone call ... made by or on behalf of" Coca-Cola. Compl. ¶ 17. Coca-Cola contends the sheer breadth of the proposed class is "implausible" and raises questions of standing among individual class members. Mot. at 20–21. In response to such a motion, Barnes must make a prima facie showing that discovery is necessary and likely to substantiate his proposed class allegations. *See* ⚑*Mantolete*, 767 F.2d at 1424. Beyond Barnes's blanket assertion that the motion to strike is premature, he also contends "there is currently no evidence before the Court that [Coca-Cola] did not subject all class members to its TCPA violations." Opp'n at 14. Barnes further asserts that the breadth of the proposed class raises no standing issues because "[i]n the Ninth Circuit, a violation of the TCPA itself constitutes an injury for purposes of Article III standing." *Id.* at 15.

**\*5** The court agrees with Coca-Cola that the proposed class's breadth is "implausible" and therefore raises adequacy and typicality questions under ⚑Rule 23. ⚑Fed. R. Civ. P. 23. At present, the proposed class includes every person in the United States who has ever received a telephone call from Coca-Cola. The class is not limited temporally or to those calls made with a pre-recorded voice or made without consent, characteristics core to calls that violate the TCPA. That is, the proposed class very likely includes persons who suffered no injury based on a call from Coca-Cola, and the court therefore must consider whether their presence "means that the class definition is fatally overbroad." *See* ⚑*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668–69 (9th Cir. 2022); ⚑Fed. R. Civ. P. 23(b)(3).

Barnes v. Coca-Cola Company, Not Reported in Fed. Supp. (2025)

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 11 of 199

The court need not allow such facially overbroad claims to proceed beyond the pleadings stage or rely on Barnes's assertion that he "can easily refine the class definition in his motion for class certification as needed." Opp'n at 14. Coca-Cola—like all defendants facing suit—is "entitled to know the class definition being alleged against them." *DuRocher v. Nat'l Collegiate Athletic Ass'n*, No. 13-01570, 2015 WL 1505675, at \*7 (S.D. Ind. Mar. 31, 2015) (striking similarly broad class allegations at pleadings stage). At present, the proposed class could not proceed on a classwide basis, and the court therefore grants the motion to strike the class action allegations in the complaint. Compl. ¶¶ 17–32; *see, e.g.*, *Martinez-Sanchez v. Anthony Vineyards, Inc.*, No. 19-01404, 2021 WL 5769471, at \*2 (E.D. Cal. Dec. 6, 2021) ("[C]lass allegations can be stricken at the pleadings stage if the claim could not possibly proceed on a classwide basis."); *Sanders*, 672 F. Supp. at 991 ("[I]t is not clear that a nationwide class action is the 'superior' method for adjudication of rights. Accordingly, the class allegations will be stricken, with leave to amend. The Court urges Plaintiffs to consider whether a more narrowly defined class might be appropriate."). [2]

### 2. Comity

In the interest of addressing the applicability of comity and out of respect for other federal district courts, the court proceeds to an analysis of comity. As explained above, Coca-Cola further contends the motion to strike is proper under the principle of comity and points to another putative class action filed in May 2019 and dismissed on August 29, 2022, in the Southern District of Florida. *See Spaner v. The Coca-Cola Co.*, Case No. 19-22210 (S.D. Fla. July 27, 2022) *report and recommendation adopted in full* (S.D. Fla. Aug. 22, 2022). [3] Coca-Cola acknowledges that the court is not bound by the decision in *Spaner*. Reply at 13. In opposition, Barnes again argues the motion to strike is premature and asserts the controlling law in the Southern District of Florida differs materially from the law binding this court, thereby negating the applicability of comity principles.

**\*6** Barnes repeatedly overstates the differences between controlling Ninth and Eleventh Circuit law as applicable here. The Ninth and Eleven Circuits agree federal courts have subject matter jurisdiction over class actions if at least one named plaintiff has constitutional standing and that the standing inquiry differs from the Rule-based requirements for class actions, such as adequacy and superiority. *See, e.g.*, *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015) (agreeing with holding of *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir. 2000)); *see also* *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019) ("[A]ll that the law requires is that a named plaintiff have standing.").

Even so, courts in both the Ninth and Eleventh Circuits may consider the relevance of individual class members' standing —or lack of standing—when analyzing the appropriateness of class action litigation. As addressed above, when questions of individual injury in fact predominate in a proposed class, a district court in the Ninth Circuit—as in the Eleventh—must consider whether the presence of uninjured class members indicates a proposed class is fatally overbroad. *See* *Olean Wholesale*, 31 F.4th at 668–69 (agreeing with Eleventh Circuit's holding in *Cordoba* that "[w]hen individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions"). Here, questions about the standing of individual class members cannot be ignored or cast aside as "premature." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021); *Olean Wholesale*, 31 F.4th at 668-69.

The court agrees with Barnes, however that there are differences between the Ninth and Eleventh Circuit law controlling the definition of constitutional injury in fact under the TCPA. Barnes asserts Eleventh Circuit caselaw requires calls to be unwanted and not-consented-to in order to support standing under the TCPA, whereas Ninth Circuit law requires that the calls only be not-consented-to. *See* *Drazen v. Pinto*, 74 F.4th 1336, 1344–46 (11th Cir. 2023) (en banc) (finding text or call must be "unwanted" to cause concrete injury and agreeing with Ninth Circuit's holding in *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017)).

In *Spaner*, the Southern District of Florida case, the magistrate judge explained numerous class members did not have standing under the TCPA because customers "provided their telephone number in the course of a business relationship and used that number to place [their] orders." *Spaner* at 29. While some of these customers may not have agreed to receive these calls, such an inquiry in the Eleventh Circuit would require "the type of individualized discovery that defeats class certification." *Id.*

In the Ninth Circuit, "the receipt of unsolicited phone calls or text messages in violation of the TCPA is 'a concrete injury in fact sufficient to confer Article III standing.' " *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 985–86 (9th Cir. 2023) (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)). In *Hall v. Smosh*, defendant contacted the owner and subscriber of a phone with a number on the Do-Not-Call Registry after her son, using his mother's number, solicited the messages through an online form. 72 F.4th at 985–86, 990–91. The Ninth Circuit held that plaintiff had standing to bring her TCPA claim, and any question of consent or the sufficiency of consent under the TCPA "requires an analysis of the merits." *Id.* at 990 (quoting *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118 n.7 (9th Cir. 2022)). The court in *Hall* explained "prior express consent is relevant to the merits of a TCPA claim, not to Article III standing." *Id.* at 985 n.1. Here, Barnes's contention that the standing requirements between the Ninth and Eleventh Circuits are so "fundamentally different [that] class certification will likely turn out differently in this case," is not a foregone conclusion. Opp'n at 18. Nevertheless, at the pleading stage the nuances of each Circuit's caselaw sufficiently preclude striking the class allegations under principles of comity.

## IV. SEALING

**\*7** "[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) (footnotes omitted). Although that right is not absolute, " 'a strong presumption in favor of access' is the starting point." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). For these reasons, courts grant requests to seal records in civil cases in only limited circumstances, such as to protect against "gratif[ication of] private spite or promot[ion of] public scandal" or to preclude court dockets from being "reservoirs of libelous statements" or "sources of business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 597 (citations omitted). The Eastern District of California has adopted rules to clarify procedures for parties' compliance with the law reviewed above. E.D. Cal. L.R. 141(a). Local Rule 141 provides that documents may be sealed only by a written order of the court after a particularized request to seal has been made; a mere request to seal is not enough under the local rules. While the court notes the previously assigned district judge granted sealing and redaction as Coca-Cola requested upon the filing of the Motion, Reply, and supporting documents in this matter, upon close review in the course of resolving the pending motion, this court is not persuaded that continued sealing and redaction is justified. Therefore, Coca-Cola is **ordered to show cause** within fourteen (14) days why the unredacted Motion, Reply, and supporting documents should not be unsealed under the local rules of this district and the court's standing order. ECF Nos. 18–20, 27–28; E.D. Cal. L.R. 141(a).

## V. CONCLUSION

For the above reasons, the court **grants the motion to dismiss** and **grants the motion to strike** with leave to amend. Any amended complaint shall be filed within thirty (30) days of the date of this order.

Defendant Coca-Cola is ordered to **show cause within fourteen (14) days** of the filed date of this order why its Motion to Dismiss, ECF No. 18 (sealed), Requests to Seal and related documents, ECF Nos. 19, 20, 27 (sealed), and Reply, ECF No. 28 (sealed), should not be fully unsealed.

This order resolves ECF No. 21.

IT IS SO ORDERED.

**Barnes v. Coca-Cola Company, Not Reported in Fed. Supp. (2025)**

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 13 of 199

**All Citations**

Not Reported in Fed. Supp., 2025 WL 1027431

---

**Footnotes**

1    Upon review of the docket, the court is not persuaded Coca-Cola's Motion to Dismiss, Reply, and Requests to Seal qualify for continuing redaction or sealing. As explained later in this order, Coca-Cola is ordered to show cause why these filings should not be unsealed.

2    Parties are specifically reminded of this court's rules regarding citations. The basic purpose of a legal citation is to allow the reader to locate a cited source accurately and efficiently. Referenced cases should be authoritative and subsequent history overturning or abrogating a case should be properly indicated. Cited authority should be relevant to the matter at hand and identify the source and specific page referenced. Any deviations from these rules may result in sanctions and the court may refuse to consider those non-compliant filings.

3    While neither party requests the court take judicial notice of the relevant court orders from another federal district court, this court considers them given their relevance to this matter. The court assumes neither that their allegations are true nor that their legal claims are valid. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir.1998).

---

**End of Document**                               © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Distinguished by   Healey v. Jefferson County Kentucky Louisville Metro Government,   W.D.Ky.,   March 29, 2018

2007 WL 1434876
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Southern Division, at London.

Daniel BRASHEAR and Tony Halcomb, Plaintiffs,

v.

PERRY COUNTY, KENTUCKY and Tammie Walls, Defendants.

Civil Action No. 6:06–143–DCR.
|
May 14, 2007.

**Attorneys and Law Firms**

Robert B. Newman, Newman & Meeks Co., Cincinnati, OH, for Plaintiffs.

Randall S. May, Barrett, Haynes, May, Carter & Davidson, P.S.C., Hazard, KY, Stacey A. Blankenship, Denton & Keuler, Paducah, KY, for Defendants.

## MEMORANDUM OPINION AND ORDER

DANNY C. REEVES, United States District Judge.

**\*1**  This matter is pending consideration of the Plaintiffs' Renewed Motion for Class Certification [Record No. 27] and Renewed Motion for Leave to File an Amended Complaint [Record No. 37] and the Defendants' Motion to Supplement the Response to the Motion for Class Certification or, in the alternative, Motion for Summary Judgment. [Record No. 35] For the reasons discussed below, the Court will deny all pending motions.

### I. BACKGROUND

This action was filed on April 4, 2006, by two current or former inmates of the Perry County Detention Center. In the Complaint, the Plaintiffs assert claims under 42 U.S.C. § 1983 for alleged violations of the Eighth and Fourteenth Amendments to the United States Constitution. They also allege violations of Kentucky state law. The main thrust of the Plaintiffs' Complaint is that Perry County detained them in overcrowded cells.

On June 22, 2006, the Plaintiffs filed a motion for class certification. The named Plaintiffs purported to represent a class of similarly-situated individuals who "currently are ... have been ... or will be incarcerated in the future at the Perry County Detention Center." [Record No. 1, p. 1] Specifically, the Plaintiffs sought to include the following persons in the class:

> All persons incarcerated in the Perry County Detention Center within one year of the date of the filing of this action, all persons presently incarcerated, and all person (sic) incarcerated in the Perry County Jail in the future.

[Record No. 7, p. 1]

On October 23, 2006, the Court denied the Plaintiffs' initial motion for class certification, concluding that the proposed class definition was too broad and failed to satisfy the numerosity, commonality, typicality, or adequacy of representation requirements of Rule 23(a) of the Federal Rules of Civil Procedure. Unhappy with the Court's ruling, the Plaintiffs filed a motion to amend the complaint and a second motion for class certification. However, they subsequently moved the Court to assign this matter to mediation. The Court granted the request and denied, without prejudice, the motion to amend the complaint and second motion for class certification. After mediation was unsuccessful, the Plaintiffs renewed the second motion for class certification and motion for leave to amend the complaint.

On April 30, 2007, the Court conducted a hearing on the Plaintiffs' pending motion for class certification and motion for leave to amend the complaint and the Defendants' motion for summary judgment. These motions are now ripe for review by the Court.

## II. LEGAL ANALYSIS

### A. RENEWED MOTION FOR CLASS CERTIFICATION

#### 1. The Standard for Determining the Maintainability of a Class Action

Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for maintaining a class action. For the Court to certify a class, the proposed class must satisfy all four of the threshold requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. If each of these four prerequisites is established, then the Plaintiffs must show that the class may be maintained under one of the theories available under Rule 23(b).

**\*2** A party seeking to certify a class bears the burden of establishing that certification is proper. *In re American Medical Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). A class action may not be approved simply "by virtue of its designation as such in the pleadings" nor may prospective class representatives simply rely upon "mere repetition of the language of Rule 23(a)" to support their motion. *Id.* Instead, an adequate basis for *each* prerequisite must be pled and supported by the facts. *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir.1974). Additionally, the court must engage in a rigorous analysis to determine whether the prerequisites of Rule 23 are satisfied. *American Medical,* 75 F.3d at 1078–79 (citing *General Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982)).

#### 2. Class Definition

"Before engaging in the 'rigorous analysis' required by Rule 23, the Court must first consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *See Chaz Concrete Co., LLC v.Codell,* 2006 WL 2453302 (E.D.Ky. August 23, 2006) (citing *Bentley v. Honeywell Int'l, Inc .,* 223 F.R.D. 471, 477 (S.D.Ohio 2004)). Although Rule 23 does not explicitly identify these requirements, one necessary element is that there must be a "class." 7A

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1760 (3rd ed.2006). Important elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner. *Id.*

While the identities of the class members do no need to be specified for certification, the proposed class must be sufficiently definite in order to demonstrate that a class actually exists. "The class definition identifies the persons who are entitled to relief, bound by final judgment, and entitled to notice under Rule 23(b)(3)." *Id.* (citing *Rodriguez v. Gates,* 2002 WL 1162675, at *9 (C.D.Cal. May 30, 2002)). Where extensive factual inquires are required to determine whether individuals are members of a proposed class, class certification is likely improper. *Snow v. Atofina Chemicals, Inc.,* 2006 WL 1008002, at *8–9 (E.D.Mich. March 31, 2006). Moreover, "[a] proposed class my be deemed overly broad if it 'would include members who have not suffered harm at the hands of the Defendant and are not at risk to suffer such harm.' " *Chaz,* at *6 (citing *McGee v. East Ohio Gas Co.,* 200 F.R.D. 382, 388 (S.D.Ohio 2001)).

In the Amended Complaint, the Plaintiffs seek to redefine the class as follows:

> All persons who have been incarcerated in the Perry County Jail from April 4, 2005, to the present in cells 135, 136, 137, 148, 149, 173, 175, 176, 181, 183 and 184 wherein the cell count was 50% above the design capacity, and wherein the class member was incarcerated in one of the above cells at that population level for seven or more days.

**\*3** Initially, the Court notes that the Plaintiffs' new class definition suffers from many of the same problems as the initial proposed class definition. [1] As noted in the Court's prior opinion:

> Overcrowding in a prison setting is not itself a violation of the constitution. *See Rhodes v. Chapman,* 452 U.S. 337, 347–48 (1981); *see also Owens v. Campbell,* 198 F.3d 246 (6th Cir.1999). While overcrowded conditions can be restrictive and even harsh, they do not violate the Eighth Amendment unless they deprive the inmate of the minimal civilized measure of life's necessities. *See Rhodes,* 452 U.S. at 348; *Ivey v. Wilson,* 832 F.2d 950, 954 (6th Cir.1987). In order to allege a constitutional violation, each class member must allege and present evidence that he was denied basic human needs such as food, warmth, or sanitation, or was otherwise subjected to cruel and unusual punishment by virtue of the alleged overcrowded conditions to justify monetary relief. *See Wilson v. Seiter,* 501 U.S. 294, 298 (1991); *Rhodes,* 452 U.S. at 348. Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey,* 832 F.2d at 954. For example, "[s]hort term deprivations of toilet paper, towels, sheets, blankets, mattresses toothpaste, toothbrushes and the like do not rise to the level of a constitutional violation." *Ramos v. Lamm,* 639 F.2d 559, 685.

[Record No. 13]
While the proposed class identifies individuals that were detained in overcrowded cells, it does not identify persons that have suffered from an unconstitutional condition, such as lack of food, warmth or sanitation, as a result of the overcrowding. In particular, the proposed class definition fails to identify those individuals that are entitled to relief and would be bound by a final judgment in the case inasmuch as factual inquiries are required to determine whether an individual is a class member. If the Court were to certify a class based on the Plaintiffs' proposed class definition, it would be required to analyze the circumstances surrounding each potential plaintiff's incarceration to determine if he/she was subjected to *unconstitutional* overcrowding conditions . [2]

Many of the benefits that are the hallmark of a proper class action would be lost of the Court were to certify a class based on the Plaintiffs' proposed class definition. The fact that a former or current inmate was in the Perry County Jail at the time that it was over 50% capacity does not demonstrate that a particular individual was subjected to an intolerable, unconstitutional condition. To make that determination, the Court would be required to make individual factual inquiries into the circumstances surrounding each inmates' incarceration. The difficulties inherent in identifying membership in the Plaintiffs' proposed class present administrative burdens that are inconsistent with the efficiencies expected in a class action. *See* *Sanneman v. Chrysler Corp.,* 191 F.R.D. 441 (E.D.Pa.2000) (certification denied where determining class membership "would essentially require a mini-hearing on the merits" of each proposed class member's case); *Luedke v. Delta Airlines,* 155 B.R. 327, 332 (S.D.N.Y.1993) (certification denied because it would require "an unmanageable number of individualized, somewhat subjective determinations of the validity" of the potential claims). Inasmuch as it would be impossible to definitely identify class members prior to individualized fact-finding and litigation, the Court finds that the Plaintiffs' have failed to concisely define a class.

### 3. Rule 23(a) Requirements

**\*4** Rule 23(a) governs the prerequisites for certifying a class action. Specifically, it provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Each of these elements will be examined in turn.

#### a. Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). This rule is often referred to as the numerosity requirement. 7A Charles Alan Wright & Arthus R. Miller, Federal Practice and Procedure § 1762 (3d. ed.2006). A proposed class meets the numerosity requirement by demonstrating the impracticality, not the impossibility, of joinder. *Fox v. Massey–Ferguson, Inc.,* 172 F.R.D. 653, 660 (E.D.Mich.1995). "Impracticability" depends upon all the circumstances of the case. *Cash v. Swifton Land Corp.,* 434 F.2d 569, 571 (6th Cir.1970). No specific minimum number of alleged class members is necessary. Instead, the appropriate inquiry is whether plaintiffs have sufficiently demonstrated the existence of the numbers of persons they purport to represent. *Young v. Trailwood Lakes, Inc.,* 61 F.R.D. 666 (E.D.Ky.1974); *Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir.1989). In making this determination the Court may consider "reasonable inferences drawn from facts before it." *Senter v. General Motors Corp.,* 532 F.2d 511, 523 (6th Cir.1976), *cert. denied,* 429 U.S. 870 (1976). In reviewing this issue, the Court cannot rely on speculation or the conclusory allegations of the proposed representatives. Instead, the Plaintiffs must "show some evidence of or reasonably estimate the number of class members." *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672 (S.D.Ca.1999); *Sims v. Parke Davis & Co.,* 334 F.Supp. 774, 781 (E.D.Mich.1971) ( "Speculation cannot be used to establish that a prospective class is so numerous as to make joinder impracticable.")

The Plaintiffs argue that their re-defined class satisfies the numerosity requirement because it precisely identifies those individuals that are potential members of the class. While the Plaintiffs' proposed class seemingly identifies those individuals

that were housed at the Perry County Jail during a specified time period (a time period that the Plaintiffs claim that the Jail was overcrowded), it does identify particular persons eligible to participate in the proposed class. However, the fact that an inmate was housed in an overcrowded jail is not in and of itself a violation of the Eighth Amendment and/or Fourteenth Amendments. Crowding may be viewed as cruel and unusual punishment only if it leads to "deprivations of essential food, medical care, or sanitation" or it is "increase[d] the violence amount inmates or create[d] other conditions intolerable for prison confinement."

*Rhodes,* 452 U.S. at 348. Therefore, the Court concludes that the Plaintiffs have failed to meet the numerosity requirement.

### b. Commonality

**\*5** Rule 23(a)(2) states that, in order for a class to be certified, there must be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Where there are common questions of law or fact, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155 (1982) (citation omitted).

The Sixth Circuit has held that in order to satisfy the commonality requirement "there need only be a single issue common to all members of the class." *American Medical,* 75 F.3d at 1080. However, the existence of any common question is insufficient because "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What is necessary is a common issue the resolution of which will advance the litigation." *Sprague v. General Motors,* 133 F.3d 388, 397 (6th Cir.1998).

Here, the Plaintiffs have presented a common question of law, *i .e.,* whether certain inmates housed at the Perry County Jail suffered from an unconstitutional condition. However, to resolve this issue, the Court will be required to examine a number of factual issues that will differ depending on the nature of the particular Plaintiffs' claims. These individualized issues will predominate at trial and, therefore, the Court cannot conclude that the purpose of the commonality requirement in providing a means for saving resources for both the Court and the parties in resolving issues in an economical fashion will be satisfied in this case. *American Medical Sys. Inc.,* 75 F.3d at 1080.

As previously noted, if the Plaintiffs' class were certified, the Court, during trial, would be required to examine the actual conditions of confinement faced by each Plaintiff and determine whether those conditions constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments. Moreover, at the April 30, 2007, hearing, the Defendants represented that they will likely have individualized defenses to each of the Plaintiff's claims, depending on the alleged constitutional deprivation. Given that the different circumstances of each Plaintiff might warrant different outcomes or different damages, the Court concludes that class litigation is not the superior method for resolving these potential claims.

### c. Typicality

Rule 23(a)(3) requires that the claims of the representatives be typical of the claims of the class. Fed. R. Civ. Pro. 23(a)(3); 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1764 (3d. ed.2006). In conducting this analysis, the Court must determine "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." Newberg and Conte, § 3.13, at 3–75, 76. "The premise of the typicality requirement is simply stated: as goes the claims of the named plaintiff, so go the claims of the class." *Sprague,* 133 F.3d at 399. The representatives' interests must be aligned with those of the putative class and the pursuit of their claims must also advance the interest of the class. *American Medical,* 75 F.3d at 1082.

**\*6** The Sixth Circuit describes the purpose of the typicality requirement as follows:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.... Thus a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*American Medical,* 75 F.3d at 1082. Typicality is required so that the class representative may "advance the interest of the entire class." "Under the commonality prong, a court must ask whether there are sufficient factual or legal questions in common among the class members' claims to make class certification economical and otherwise appropriate. In contrast, under the typicality prong, a court must ask whether, despite the presence of common questions, each class member's claim involves so many distinct factual or legal questions as to make class certification inappropriate." In other words, commonality focuses on similarities, while typicality focuses on differences. *See Marquis v. Tecumseh Products Co.,* 206 F.R.D. 132, 158, 59 (E.D.Mich.2002) (citing *Fuller v. Fruehauf Trailer Corp.,* 168 F.R.D. 588, 597–98 (E.D.Mich.1996).

In the present case, the typicality requirement fails for reasons similar to those discussed with respect to the commonality requirement. That is, the near certainty that important factual differences will arise between various class members prevents this Court from concluding that the named Plaintiffs claims are typical of those of the class.

#### d. Adequacy of Representation

Rule 23(a)(4) sets forth the "adequacy of representation" requirement and provides, in relevant part, that a class may be maintained only if "the representative parties will fairly and adequately protect the interests of the class." The adequacy of representation requirement relates to both the Plaintiffs' class representatives and their counsel. The Sixth Circuit has adopted a two-part analysis for the adequacy of representation requirement. *Senter v. General Motors Corp.,* 532 F.2d 511, 524–25 (6th Cir.1976) (citing *Gonzales v. Cassidy,* 474 F.2d 67, 73 (6th Cir.1973). This test requires that the representatives: (1) have common interests with unnamed members of the class; and (2) will vigorously prosecute the interests of the class through qualified counsel. *See Senter,* 532 F.2d at 524–35; *see also Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026 (6th Cir.1977) (The rule tests "whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent" and "the experience of the counsel for the plaintiffs.") Additionally, the second element requires that attorneys for the class must be qualified to conduct the proposed litigation." *See Cross,* 553 F.2d at 1031. These determinations are questions of fact and are dependent upon the circumstances of each case. Further, the party seeking certification has the burden of proof on these issues. *See* Wright and Miller, § 1765.

**\*7** The Court has thoroughly discussed that there is a lack of common interest between the named Plaintiffs and the other potential unnamed Plaintiffs. The facts and circumstances surrounding each potential Plaintiffs' incarceration are unique. Therefore, it would be impossible for the named Plaintiffs to adequately represent the interests of all the unnamed Plaintiffs. While a jury *may* determine that the representative Plaintiffs suffered from constitutional violations caused by overcrowding at the jail, it is also possible that a jury could find that the named Plaintiffs were not subjected to unconstitutional deprivations of basic human needs. In that case, the various unnamed Plaintiffs would be prejudiced by an unfavorable outcome in this litigation. Since the class members will be bound by the decision as to the named Plaintiffs, the unique defenses applicable to each person renders the Plaintiffs (or any Plaintiff) inadequate for purposes of protecting the interests of the class.

With respect to whether Plaintiffs' counsel is qualified to represent the class, the Court notes that at the April 30, 2007, hearing, counsel noted that he has extensive experience in prison overcrowding cases and indicated that has represented various Plaintiffs in class action lawsuits. Thus, he stated that he is qualified to represent the proposed class this jail overcrowding class action. While counsel may have extensive experience is this area of litigation, the Court cannot conclude, based on the lack of common interests among the named and potentially unnamed Plaintiffs, that the adequacy of representation requirement is satisfied in this case.

Because the Plaintiffs' proposed class is overly broad and fails to satisfy the requirements of Rule 23(a) of the Federal Rules of Civil Procedure, the motion for class certification will be denied.

### B. MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

The Plaintiffs have asserted that the reason for seeking an amendment to the Complaint was to cure the deficiencies of the class definition set forth in the initial Complaint. Because the deficiencies have not been cured by the class definition in the Amended Complaint, the Plaintiffs' motion for leave to file an amended complaint will be denied.

### C. MOTION FOR SUMMARY JUDGMENT

On April 3, 2007, the Defendants filed a motion to supplement the response to the motion for class certification or, in the alternative, motion for summary judgment. In that motion, the Defendants claimed that the overcrowding issue at the Perry County Jail has been alleviated inasmuch as the Breathitt County inmates were moved from Perry County to the Lee County Jail. The Defendants noted that Perry County is a member of the Regional Jail and that, on March 1, 2007, Breathitt County voted not to become a member of the Kentucky River Regional Jail. Therefore, Breathitt County was required to move their prisoners from the Perry County Jail. In their motion, the Defendants represented that, as of March 30, 2007, Perry County had only 141 inmates in its facility and the Department of Corrections' square footage regulations state that the facility can house up to 152 inmates. [See Record No. 35, Ex. A, Affidavit of Tim Kilburn] Therefore, because the overcrowding issue at the Jail no longer existed, the Defendants claimed that the issues in this case have become moot.

**\*8** However, at the April 30, 2007, hearing, the Defendants represented that the number of inmates at the Perry County Jail had increased since the filing the summary judgment motion. In particular, the Defendants stated that, the number of inmates had increased to 176 and that the numbers were still in excess of the Department of Corrections' regulations. Despite the increase in the number of inmates, the Defendants indicated that they were not withdrawing their motion for summary judgment.

The Sixth Circuit addressed the issue of mootness in the context of changed circumstances in a recent unpublished opinion, *Hood v. Keller, et. al.,* 2007 WL 1028805, No. 04–4373 (April 2, 2007). In that case, James D. Hood, II, appealed the district court's order granting summary judgment to the Defendants. Hood alleged that the Defendants violated his First Amendment rights to freedom of speech and free exercise of religion by arresting him pursuant to Ohio state law for preaching and handing out religious literature without a permit on the grounds surrounding the Capitol. Hood sought declaratory and injunctive relief, compensatory damages, costs, and attorney's fees. The district court held that Hood's claims were rendered moot by a prior decision from the Sixth Circuit, *Parks v. Finan,* 385 F.3d 694 (6th Cir.2004). On appeal, however, the Sixth Circuit concluded that, although the *Parks* decision mooted Hood's claim for declaratory and injunctive relief, it did not moot his claims for damages and attorney's fees.

The Sixth Circuit also addressed the issue of mootness in an earlier decision, *Murray v. Board of Trustees, University of Louisville,* 659 F.2d 77 (6th Cir.1981). In that case, the plaintiff filed suit under 42 U.S.C. § 1983 seeking injunctive relief, monetary damages and attorney's fees. The plaintiff claimed that he was unlawfully fired for allegedly expressing speech in his job as editor. The court held that:

the District Judge was correct in dismissing on grounds of mootness that portion of the complaint which sought injunctive relief. But we do not feel his dismissal of the entire cause of action as moot was justified.

In the present posture of this case, we do not consider it ripe for appellate decision and we therefore do not reach the District Judge's finding to constitutional violations under the First and Fourteenth Amendments. While we accept as not clearly erroneous his finding that plaintiff failed to prove actual damages, the Supreme Court's holding in *Carey v. Piphus,* 435 U.S. 247, 257 n. 11 (1978), require remand for District Judge to consider in this § 1983 action plaintiff's claims for *nominal damages and attorney fees.*

*Id.* at 78–79 (emphasis added); *see also Owen of Ga., Inc. v. Shelby County,* 648 F.2d 1084, 1094 (6th Cir.1981) (dismissing appeal on claim for injunctive relief as moot but remanding to the trial court for consideration of money damages); 13A Charles Alan Wright et al., *Federal Practice & Procedure Jurisdiction 2d,* 3533.3, at 262 ("Claims for damages or other monetary relief automatically avoid mootness ...")

**\*9** The Plaintiffs argue that the injunctive relief claim is not moot because the Defendants have not demonstrated that "there is no reasonable expectation that the wrong will be repeated." *Mosley v. Hairston,* 920 F.2d 409, 415 (6th Cir.1990) citing *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953). The Court agrees particularly in light of the Defendants' representations at the hearing that the number of inmates had again increased and remained in excess of the Department of Corrections' regulation. Because the Defendants have not satisfied their burden of proof in establishing that "there is no reasonable expectation" that overcrowding at the Perry County Jail will occur in the future, the Court will deny the motion for summary judgment.

### III. CONCLUSION

For the reasons discussed herein, it is **ORDERED** as follows:

1. The Plaintiffs' Renewed Motion for Class Certification [Record No. 27] is **DENIED;**

2. The Plaintiffs' Motion for Leave to File an Amended Complaint [Record No. 37] is **DENIED;** and

3. The Defendants' Motion for Summary Judgment [Record No. 35] is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1434876

---

**Footnotes**

1   Many of the inadequacies that existed regarding the Plaintiffs' initial proposed class still exist with respect to the amended class definition. Although duplicative, for the sake of completeness, the Court has again examined all of the relevant factors in determining whether class certification is proper.

2   The Defendants argue that one of the factual determinations that this Court would be required to make is whether each individual plaintiff exhausted his/her administrative remedies. The Plaintiffs disagree stating that, because the named

Plaintiffs have exhausted the grievance procedures, the Prison Litigation Reform Act's exhaustion requirement has been satisfied for the class.

Pursuant to ⚑42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under ⚑42 U.S.C. § 1983 must exhaust available administrative remedies. *See* ⚑*Porter v. Nussle,* 534 U.S. 516 (2002); *Booth v. Churner,* 532 U.S. (2001). As a general matter, the exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought. ⚑*Porter,* 534 U.S. at 520; ⚑*Booth,* 532 U.S. at 741. A district court must enforce the exhaustion requirement sua sponte. ⚑*Brown v. Toombs,* 139 F.3d 1102, 1104 (6th Cir.1998).

In support of their position that only the representative Plaintiffs must exhaust their administrative remedies, the Plaintiffs have cited four cases from other circuits. They have indicated that they unaware of any authority from this circuit or any other controlling authority which requires that only the named plaintiffs are subjected to the exhaustion requirements. It is also notable that the Plaintiffs acknowledge that Christopher Caudill, who they seek to add as a named plaintiff through the Amended Complaint, has not exhausted his administrative remedies.

While the issue of exhaustion is not dispositive in this case, it is another reason that certification of the Plaintiffs' proposed class is not proper.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 23 of 199

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag
Distinguished by   Pine v. A Place for Mom, Inc.,   W.D.Wash.,   April 9, 2019

2017 WL 3610490
Only the Westlaw citation is currently available.
<u>NOT FOR PUBLICATION</u>
United States District Court, D. New Jersey.

Timothy BROKING, on behalf of himself and all others similarly situated, Plaintiff,

v.

GREEN BROOK BUICK GMG SUZUKI and Blue Bonnet Technology, LLC, Defendants,

and

Green Brook Buick GMG Suzuki, Defendant/Third-Party Plaintiff,

v.

Blue Bonnet Technology, LLC, Third-Party Defendant.

Civil Action No. 15-1847 (BRM)(LHG)
|
Signed 08/22/2017

**OPINION**

HON. BRIAN R. MARTINOTTI, United States District Judge

 **\*1**  Before this Court are Defendant Green Brook Buick GMC, Inc. d/b/a Green Brook Mitsubishi's ("Green Brook") Motion for Summary Judgment (ECF No. 60), Plaintiff Timothy Broking's ("Plaintiff" or "Broking") Motion for Summary Judgment (ECF No. 63) and Motion to Certify Class (ECF No. 66), and Defendant Blue Bonnet Technology, LLC's ("Blue Bonnet") Motion for Summary Judgment (ECF No. 61). [1]  Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on August 1, 2017. For the reasons set forth below, Green Brook's Motion for Summary Judgment is **GRANTED**; Broking's Motion for Summary Judgment is **DENIED**; Broking's Motion to Certify Class is **DENIED AS MOOT**; and Blue Bonnet's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

## I. FACTUAL BACKGROUND

In this action brought under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), Plaintiff asserts claims against Defendants Green Brook and Blue Bonnet (collectively, "Defendants") for alleged violations of the TCPA. The case arises from one automated call made to Plaintiff's residence on December 15, 2014. The full content of the pre-recorded phone call was:

> This is Green Brook Mitsubishi calling regarding your last service visit. Please press 1 to speak to Mr. Gates or call us at 732-653-9500 and ask for Mr. Gates. You may press 9 to be removed from this calling list. Thanks and have a great rest of your day from all of us here at Green Brook Mitsubishi.

(Green Brook Br. (ECF No. 60-3) at 4-5.) [2]

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 24 of 199

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

#### A. Green Brook and Blue Bonnet

Green Brook hired Blue Bonnet to conduct a robocall campaign (the "Campaign") in December 2014. (Green Brook's Sec. Am. Ans. (ECF No. 55) at 15 and Blue Bonnet's Br. (ECF No. 62) at 2 ¶ 4.) [3] Peter Posterino ("Posterino"), a sales manager for Green Brook, had a longstanding relationship with Blue Bonnet and its principals and contacted them to arrange the logistics of the Campaign. (ECF No. 60-3 at 6 ¶¶ 18-19.) On December 3, 2014, Posterino signed a hold harmless agreement (the "Hold Harmless Agreement"), which stated Green Brook would indemnify Blue Bonnet for all reasonable costs and expenses that arose from any claim related to the Campaign. (ECF No. 62-1.) Green Brook's owner and president, David Ferraez ("Ferraez"), testified the agreement Posterino signed was not valid because only Ferraez had authority to sign contracts on Green Brook's behalf and that he never saw nor was he aware of the Hold Harmless Agreement until after this litigation began. (ECF No. 77 at 27:4-11, 46:13-47:12.)

**\*2** Green Brook paid Blue Bonnet $10,000 for, *inter alia*, three days of phone calls, a "7000 piece mailer to be [sent] the week of 12/08/2014," and the provision of two Blue Bonnet staff members for two of the three days of the phone portion of the Campaign. (Invoice #2115 (ECF No. 60-11).) Green Brook provided Blue Bonnet with a customer list that contained the phone numbers used in the Campaign. (ECF No. 62 at 2 ¶ 5 and ECF No. 77 at 3 ¶ 5.) During the course of the Campaign, 4739 calls were made from Green Brook's dealership site. (ECF No. 60-3 at 7 ¶ 22, ECF No. 62 at 3 ¶ 7, ECF No. 77 at 3-4 ¶ 7, and Broking Statement of Material Facts in Opp. (ECF No. 80) at 6 ¶ 22.) The Parties stipulate Green Brook used an automatic telephone dialing system ("ATDS") during the Campaign. (ECF No. 62 at 3 ¶ 9, ECF No. 65 at 4 ¶ 6, and Green Brook Opp. (ECF No. 75) at 3 ¶ 6.)

#### B. Green Brook's Call to Plaintiff

Plaintiff alleges in his Amended Complaint that he "received numerous automated telephone calls to his residential phone number" related to the Campaign (ECF No. 24 ¶ 12), though he later testified at his deposition that he received one. (ECF No. 65 at 4 ¶ 8 and ECF No. 80 at 3 ¶ 7.) He pled the "purpose of the calls was to persuade [him] to buy a car from Green Brook" (ECF No. 24 ¶ 12) but later testified he could not recall the content of the one call he received. (ECF No. 60-7 at 55:16-56:17 and ECF No. 80 at 4 ¶ 10.) He also pled he had no prior business relationship with Green Brook or Blue Bonnet (ECF No. 24), but at his deposition he testified his car was serviced for approximately thirty days at Green Book after an accident at the recommendation of his insurer. (ECF No. 65 at 3 ¶¶ 3-5 and ECF No. 80 at 2-3 ¶¶ 2-4.) The service to Plaintiff's vehicle took place between 2011 and December 14, 2014. (ECF No. 60-7 at 20:22-25.). While Green Brook was servicing Plaintiff's car, Plaintiff called Green Brook at least two times to inquire about the status of the repairs. (*Id.* at 33:2-5.)

Plaintiff received the phone call giving rise to this lawsuit on December 15, 2014, at 3:03 p.m. (ECF No. 65 at 4 ¶ 8 and ECF No. 80 at 3 ¶ 7.) Plaintiff's residential phone number is, and was at the time of the calls, registered on the national "Do Not Call" Registry. (ECF No. 24 ¶ 18.) He answered the phone after one or two rings but could not recall the content of the phone call at his deposition. (ECF No. 60-3 at 4 ¶ 11 and ECF No. 80 at 4 ¶ 10.) Through discovery, it was revealed Plaintiff and Green Brook were not aware of the full content of the pre-recorded message until after Green Brook answered interrogatories and all depositions were taken. (ECF No. 88 at 4-5.)

Plaintiff testified he called the number on his caller ID device three times to determine who had placed the call. (ECF No. 60-3 at 5 ¶ 14 and ECF No. 80 at 5 ¶ 13.) Plaintiff reached someone at Green Brook on his third attempt, and he told the person, "I've never done any business with your company. How did you get my number?" (ECF No. 60-3 at 5 ¶ 15 and ECF No. 80 at 5 ¶ 14.) The Green Brook employee apologized, and Green Brook made no further calls to Plaintiff nor had any additional contact with him. (ECF No. 60-3 at 5-6 ¶¶ 15-16 and ECF No. 80 at 5 ¶¶ 14-5.)

### II. PROCEDURAL BACKGROUND

On March 12, 2015, Plaintiff filed his Complaint in this action. (ECF No. 1.) Green Brook filed a motion to dismiss the Complaint (ECF No. 4), which this Court denied (ECF No. 13).[4] Plaintiff filed the Amended Complaint on January 7, 2016. (ECF No. 24.) Plaintiff asserts claims against both Green Brook and Blue Bonnet and against each pleaded in the alternative on behalf of himself and a putative class made up of the recipients of 4,108 calls completed during the call campaign. (ECF No. 24 and Broking Br. (ECF No. 64) at 2-3.) Plaintiff seeks damages of $6,685,000.00, calculated as $1,500.00—the statutory amount permitted for each willful violation—multiplied by 4457 calls attempted during the Campaign. (ECF No. 64 at 2-3) (citing 47 U.S.C. § 227(b)(3).)

**\*3** Green Brook filed a Crossclaim against Blue Bonnet, alleging Blue Bonnet is liable for any injury to Plaintiff and asserts claims against Blue Bonnet for: negligence (Counts I and II); negligent or intentional misrepresentation (Count III); breach of contract (Count IV); and indemnification (Count V). (ECF No. 55 at 15-20.) Blue Bonnet likewise filed a Crossclaim, arguing: Green Brook is liable for: breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and seeking declaratory relief (Count III). (ECF No. 28 at 8-10.)

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' " *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also* *Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*,

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

*477 U.S. at 322-23*. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## IV. DECISION

**\*4** Congress enacted the TCPA "to protect individual consumers from receiving intrusive and unwanted calls." *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 268 (3d Cir. 2013). The TCPA prohibits a party from using an ATDS "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," unless the call falls within one of the statute's enumerated exemptions. 47 U.S.C. § 227(b)(1)(B). The exemptions include "calls that are not made for a commercial purpose" and commercial calls that "do not include the transmission of any unsolicited advertisement." 47 U.S.C. § 227(b)(2)(B).

"[A]utodialed calls—to both cellular phones and land-lines—are lawful so long as the recipient has granted permission to be called at the number which they have given, *absent instructions to the contrary*." *Gager*, 727 F.3d at 268 (citations omitted). Pursuant to the statute, an ATDS means "equipment which has the capacity ... (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Further, the TCPA creates a private cause of action by allowing a "person or entity" to bring a private right of action to enjoin violators of the TCPA and "recover for actual monetary loss from such a violation, to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3).

Before turning to the parties' respective motions, the Court notes the Amended Complaint is replete with inaccuracies. Plaintiff claimed he received several calls (ECF No. 24 ¶ 12) before he ultimately admitted he received one. (ECF No. 65 at 4 ¶ 8 and ECF No. 80 at 3 ¶ 7.) He claimed the call encouraged him to buy a car (ECF No. 24 ¶ 12) though later testified he could not remember what the call said. (ECF No. 60-7 at 55:16-56:17 and ECF No. 80 at 4 ¶ 10.) He alleged he had no prior dealings with Green Brook (ECF No. 24) before he admitted his car was serviced there for nearly a month. (ECF No. 65 at 3 ¶¶ 3-5 and ECF No. 80 at 2-3 ¶¶ 2-4.) Plaintiff emphasizes Green Brook's interrogatory responses, which stated the Campaign was a marketing effort, despite the fact Green Brook responded to interrogatories without the benefit of knowing the content of the call. (ECF No. 79 at 2 n.4). Yet, Plaintiff offers no explanation for the ways discovery served to discredit many aspects of his claims. The Court cannot fathom Congress intended, in enacting the TCPA, to create a cause of action in a case such as this, where a plaintiff's account of an alleged violation was shown to be inaccurate in many respects. Nevertheless, the Court examines the Motions against the current legal landscape of TCPA cases.

### A. Green Brook's Motion

Green Brook makes three arguments in support of its motion. First, Green Brook argues the recorded call did not violate the TCPA, because it was not an advertisement or a telemarketing message. Second, Green Brook argues it is exempt from liability pursuant to 47 U.S.C. § 227(a)(4)(B), because Plaintiff and all other recipients of the call had an established business relationship with Green Brook. Third, Green Brook argues that, because Plaintiff received only one call, he has not sustained a particularized injury to have standing to assert a TCPA claim under the Supreme Court's precedent in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). [5]

### 1. Whether the Robocall Constituted "Telemarketing"

**\*5** Green Brook argues the phone call to Plaintiff does not violate the TCPA, because the call did not constitute telemarketing. "[T]elemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). Green

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 27 of 199

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

Brook argues the content of the call, which explicitly told recipients was "regarding [their] last service visit," did not include any mention of purchasing, renting, or investing in property, goods, or, or services. (ECF No. 60-3 at 12 (citing 47 C.F.R. § 64.1200(f)(12)).)

Plaintiff counters that a call's purpose, not only its content, determines whether the call constitutes telemarketing. (ECF No. 79 at 3 (citing 47 C.F.R. § 64.1200(f)(11)-(12)).) He cites the testimony of Postorino, the former Green Brook employee, who stated the purpose of the Campaign was to reach customers and inform them about offers to purchase cars. (ECF No. 83-2 at 89:9-25.) Plaintiff cites Green Brook's interrogatory response in which it stated the Campaign's purpose was "to invite past ... customers to purchase a vehicle." (ECF No. 68-5 at 7 ¶ 11.) [6] Plaintiff also notes Blue Bonnet has stipulated to the fact that the Campaign was a marketing effort. (ECF No. 62 at 2-3 ¶¶ 4, 6.) Plaintiff argues this Court should consider the call he received in light of Green Brook's overall efforts to reach customers. (ECF No. 79 at 3-4) (citing *Physicians Healthsource, Inc. v. Janssen Pharm., Inc.*, No. 12-2132 FLW-TJB, 2015 WL 3827579, at *4 (D.N.J. June 19, 2015), *reconsideration denied*, No. 12-2132 FLW-TJB, 2015 WL 5164821 (D.N.J. Sept. 2, 2015).)

This Court finds Green Brook's robocall did not constitute telemarketing—even under the Ninth Circuit's more expansive standard, which Plaintiff asks the Court to apply. [7] The Ninth Circuit held "explicit mention of a good, product, or service [is not necessary] where the implication is clear from the context" that a message constitutes telemarketing. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). On the other hand, "messages 'whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements.' " *Aderhold v. car2go N.A. LLC*, 668 Fed.Appx. 795, 796 (9th Cir. 2016) (quoting *In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 21 FCC Rcd. 3787, 3812 ¶ 49 (Apr. 6, 2006)).

Here, the purpose of the robocall was to complete or confirm Plaintiff's satisfaction with his service visit. *See P&S Printing LLC v. Tubelite, Inc.*, No. 14-1441, 2015 WL 4425793, at *5 (D. Conn. July 17, 2015) (finding a fax was not an advertisement when its primary purpose was to communicate with customers rather than solicit goods). Plaintiff emphasizes the fact that Green Brook's former employee and Blue Bonnet claimed the purpose of the Campaign was ultimately to sell more cars to former customers. This purpose is too attenuated from the robocall, however, to render the robocall a telemarketing message.

*See Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1067-68 (C.D. Cal. 2017) (holding a business's "overarching incentive to retain customers" is not enough to "transform" a communication into telemarketing). Green Brook may have been motivated by a desire to cultivate goodwill with former customers through the robocall, but such a broad view of a business's aims "would transform practically *all* communication from any entity that is financially motivated and exchanges goods or services for money into telemarketing or advertising, which would contravene the delineated definitions of telemarking and advertising in 47 C.F.R. § 64.1200(f)(10), (12)." *Id.* at 1068.

**\*6** The Court finds, therefore, Green Brook's robocall did not constitute telemarketing and did not violate the TCPA.

### 2. The Established Business Rule and Consent

"[T]he TCPA does not apply if calls are made to customers with whom the caller has an Established Business Relationship." *Zelma v. Art Conway*, No. 12-00256, 2013 WL 6498548, at *2 (D.N.J. Dec. 11, 2013). An established business relationship is

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity
> and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 28 of 199

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call ... which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(5); *Zelma*, No. 12-00256, 2013 WL 6498548, at \*2. Here, Plaintiff testified in his deposition that he had his car repaired at Green Book in 2011. (ECF No. 60-7 at 19:10-20:21.) Plaintiff's car was serviced at Green Brook for approximately thirty days, and Plaintiff testified he called Green Brook several times during that time. (*Id.* at 22:19-21, 31:12-14, 32:7-15.)

Plaintiff argues the established business relationship exception does not apply, because the exception was eliminated effective October 16, 2013. (ECF No. 79 at 5.) The Court agrees. *See In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1837 (2012) ("[W]e eliminate the 'established business relationship exemption as it previously applied to telemarketing robocalls to residential lines."). Green Brook cites the definition of established business relationship at 47 U.S.C. § 227(a)(4)(b) in arguing the exception applies to the Campaign (ECF No. 60-3 at 11), but the statute applies the exception only to subsection (b)(1)(C)(i), which governs unsolicited advertisements made to a "facsimile machine." *See* 47 U.S.C. § 227(b)(1)(C)(i). Here, the contact at issue was a telephone robocall, not a fax. The Court finds, therefore, the established business relationship does not apply.

The established business relationship is not the only exception in the TCPA. The TCPA does not prohibit telephone robocalls made "with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). Plaintiff argues there was no consent in this matter, because Green Brook did not obtain "prior express *written* consent." (ECF No. 64 at 6-7 (citing 47 C.F.R. § 64.1200(a)(2)) (emphasis added).) Green Brook does not dispute that Plaintiff did not give prior express written consent. (*Id.* at 7-8.) The TCPA requires written consent for calls that constitute telemarketing. 47 C.F.R. § 64.1200(a)(2). As the Court has found Green Brook's robocall did not constitute telemarketing, written consent was not required.

Instead, Green Brook needed only to obtain the "prior express consent of the called party." *See* 47 U.S.C. § 227(b)(1)(A). This Court has interpreted the consent requirement to be met when a plaintiff knowingly released his phone number. *See Chisholm v. AFNI, Inc.*, No. 15-3625, 2016 WL 6901358, at \*5 (D.N.J. Nov. 22, 2016) ("Under the TCPA, 'persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.' " (quoting *Rules and Regulations Implemented the Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992))). Plaintiff provided Green Brook with his phone number when Green Brook was repairing his car, and he never gave instructions not to call him. *See Gager*, 727 F.3d at 268-69, 271 (recognizing a party consents to be called at a number provided to a business absent express revocation of that consent). Once Plaintiff called to complain about the call he received, a Green Brook employee apologized and Green Brook made no further calls to Plaintiff nor had any additional contact with him. (ECF No. 60-3 at 5-6 ¶¶ 15-16 and ECF No. 80 at 5 ¶¶ 14-5.)

**\*7** The Court finds Plaintiff consented to be called at the phone number he provided to Green Brook, and the robocall did not violate the TCPA.

### 3. *Spokeo* and Plaintiff's Standing to Assert a Claim

The Court cannot grant Green Brook's Motion until it addresses the issue of Plaintiff's standing to assert his claims. Green Brook argues Plaintiff has not suffered a particularized injury that grants him Article III standing under the Supreme Court's decision in *Spokeo*. Green Brook acknowledges the Third Circuit's decision in *Susinno* but argues, while one call is sufficient injury to confer standing and survive a motion to dismiss, one call is not sufficient to establish a particularized injury as a matter of law.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 29 of 199

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

(ECF No. 97 at 6.) Green Brook reiterated at oral argument that Plaintiff must demonstrate a particularized injury in order to satisfy the standing requirements of *Spokeo* and argued he cannot do so as a matter of law.

Article III "standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560(1992)). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

As in *Spokeo*, "[t]his case primarily concerns injury in fact, the '[f]irst and foremost' of standing's three elements." *Id.* at 1547 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' " *Id.* (citations omitted). "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.' " *Id.* "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* ("When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.' "). "Concreteness, therefore, is quite different from particularization." *Id.*

Here, Plaintiff has presented sufficient evidence that could allow a reasonable jury to conclude he suffered a particularized and concrete injury. First, a reasonable jury could conclude an unwanted call constitutes a particularized injury in a TCPA case insofar as such a call creates a nuisance or invades a plaintiff's privacy. *See* *Smith*, 228 F. Supp. 3d at 1063 (denying defendant's summary judgment on issue of standing because invasion of privacy is a particularized injury); *Nghiem v. Dick's Sporting Goods, Inc.*, 222 F. Supp. 3d 805, 811 (C.D. Cal. 2016) (invasion of privacy is a concrete and particularized injury); *Mey v. Venture Data, LLC*, No. 14-123, 2017 WL 1193072, at *8 (N.D. W. Va. Mar. 29, 2017) (denying defendant's summary judgment motion where alleged invasion of plaintiff's privacy was a particularized and concrete harm); *see also Physician's Healthsource, Inc. v. Vertex Pharm. Inc.*, No. 15-11517 JCB, 2017 WL 1534221, at *8 (D. Mass. Mar. 28, 2017) (finding unwanted fax created particularized injury by occupying plaintiff's fax machine).

 **\*8**  The Third Circuit applied the two-part test established in *In re Horizon Healthcare Inc. Data Breach Litig.*, 846 F.3d 635 (3d Cir. 2017) to hold a single call can give rise to sufficiently concrete injury to satisfy the standing requirements of *Spokeo*. *Susinno*, 862 F.3d at 351. It stated:

> We summarize *Horizon's* rule as follows. When one sues under a statute alleging [1] "the very injury [the statute] is intended to prevent," and [2] the injury "has a close relationship to a harm ... traditionally ... providing a basis for a lawsuit in English or American courts," a concrete injury has been pleaded. We do not, and need not, conclude that intangible injuries falling short of this standard are never concrete. Rather, we simply observe that all intangible injuries that meet this standard *are* concrete.

*Id.* (citations omitted). The Third Circuit reasoned one unwanted communication is a concrete injury under the first prong, because Congress enacted the TCPA precisely to address the injury caused by unwanted calls. *Id.* The second prong is satisfied, because the TCPA's protection from the injury of one call has a close relationship to the common law protection of plaintiffs' privacy rights. *Id.* at 352.

In light of the Third Circuit's ruling, the Court finds a reasonable jury could conclude Plaintiff sustained a concrete injury and therefore has Article III standing. The Court finds, though, Green Brook did not violate the TCPA, because the one call to Plaintiff was not telemarketing. Therefore, Green Brooks Motion for Summary Judgment (ECF No. 60) is **GRANTED**.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 30 of 199

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

### B. Plaintiff's Motion for Summary Judgment

Plaintiff argues there is no genuine dispute of material fact that Green Brook, or in the alternative Blue Bonnet, violated the TCPA. (*See* ECF No. 64.) As in his opposition to Green Brook's motion, Plaintiff argues a call's purpose, not only its content, determines whether the call constitutes telemarketing. (*Id.* at 8-9.) Plaintiff cites Green Brook's interrogatory responses stating Green Brook hoped former customers would purchase cars, but as noted above, Ferraez testified he did not know the content of the robocall and Green Brook was unaware of the language of the robocall until after it answered interrogatories and all depositions were taken. (ECF No. 88 at 4-5.) Further, even if the Court were to assume Green Brook's goal was to cultivate goodwill with former customers, that purpose is too attenuated from the robocall to render the robocall a telemarketing message. *See* 🚩 *Smith*, 228 F. Supp. 3d at 1067-68 (holding a business' "overarching incentive to retain customers" is not enough to "transform" a communication into telemarketing).

Because the Court finds Green Brook's robocall did not constitute telemarketing and no violation of the TCPA took place, Plaintiff's Motion for Summary Judgment (ECF No. 63) is **DENIED**.

### C. Plaintiff's Motion for Class Certification

At oral argument, Plaintiff acknowledged if there was no violation as to Plaintiff, there could be no violation as to any recipient of the robocall. As there was no violation of the TCPA, Plaintiff's Motion for Class Certification (ECF No. 66) is **DENIED AS MOOT**.

### D. Blue Bonnet's Motion

Blue Bonnet makes two arguments in support of its motion. First, Blue Bonnet argues it cannot be liable under the TCPA, because it is a common carrier and was not the "maker or initiator" of the calls. (ECF No. 62 at 4-5.) Second, Blue Bonnet argues Green Brook is bound by the Hold Harmless Agreement, which would shield Blue Bonnet from liability and entitle it to reimbursement of the cost of defending itself from Plaintiff's claims. (*Id.* at 7-8.)

 **\*9** Because the Court has concluded that Green Brook is not liable for any damages to Plaintiff, as there was no violation of the TCPA, Blue Bonnet is likewise not liable, and Blue Bonnet's Motion as to its liability under the TCPA is **GRANTED**. While Blue Bonnet did not move for summary judgment on the ground that the robocall did not constitute telemarketing, Plaintiff was aware of Green Brook's assertion of that argument and he presented an opposing argument. Plaintiff therefore suffers no prejudice through the Court's grant of summary judgment to Blue Bonnet on the same ground. [8]

The Court declines to analyze Blue Bonnet's argument it cannot be liable under the TCPA as a common carrier. Green Brook and Blue Bonnet have asserted contractual crossclaims against each other for damages arising from the defense of Plaintiff's claims. The Court therefore considers Blue Bonnet's argument concerning the Hold Harmless agreement.

### 1. The Hold Harmless Agreement

Blue Bonnet and Green Brook dispute the extent to which the Hold Harmless Agreement the two parties signed is binding. Ferraez testified he never saw the Hold Harmless Agreement until after this lawsuit was filed, and he believes it was created after the fact. (ECF No. at 11-12.) Postorino, Green Brook's former employee, testified he signed the Hold Harmless Agreement around the time of the Campaign. (ECF No. 62 at 8.) At oral argument, Blue Bonnet argued Postorino had apparent authority to sign the Hold Harmless Agreement and that he had held himself out as having such authority.

"Apparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." 🚩 *American Tel. and Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1439 (3d Cir. 1994) (citation omitted). A plaintiff who asserts a claim based

on an agent's apparent authority must allege the principal's actions misled the plaintiff into believing the agent acted on the principal's behalf. *Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 618 (D.N.J. 1999). "Whether an agent is cloaked with apparent authority is a factual question." *Id.* at 619 (citing *Gizzi v. Texaco, Inc.*, 437 F.2d 308, 310 (3d Cir. 1971)).

Blue Bonnet argues without reference to any authority that "[t]he actions of Mr. Postorino as an employee of the dealership establish apparent authority." (ECF No. 62 at 6.) An agent's actions cannot establish apparent authority, however. *See Automated Salvage Transport, Inc.*, 106 F. Supp. 2d at 618. Rather, Blue Bonnet must establish Ferraez, as Green Brook's owner and president, misled Blue Bonnet into believing Postorino had apparent authority to sign the Hold Harmless Agreement. Blue Bonnet has not established any reasonable jury must conclude Ferraez's actions misled Blue Bonnet to such a conclusions. Therefore, summary judgment is not appropriate.

As there are disputes of material fact as to the legitimacy of the Hold Harmless Agreement, Blue Bonnet's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

### V. CONCLUSION

**\*10** For the foregoing reasons Green Brook's Motion for Summary Judgment is **GRANTED**; Plaintiff's Motion for Summary Judgment is **DENIED**; Broking's Motion to Certify Class is **DENIED AS MOOT**; and Blue Bonnet's Motion for Summary Judgment is **GRANTED IN PART** as to Plaintiff's claims and **DENIED IN PART** as to Green Brook's claims. Judgment is entered in favor of Green Brook and Blue Bonnet as to Plaintiff's claims. Green Brook's and Blue Bonnet's crossclaims against each other, insofar as each seeks reimbursement from the other for the costs incurred defending themselves from Plaintiff's claims, shall proceed. An appropriate Order will follow.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3610490

---

**Footnotes**

1       While Blue Bonnet does not join Green Brook's Motion, the issue of liability under the TCPA applies to both parties insofar as neither would be liable to Plaintiff if no TCPA violation occurred.

2       The parties were not aware of the content of the call until after Green Brook answered interrogatories and all depositions took place. (Green Brook Reply (ECF No. 88) at 4.)

3       The parties dispute the nature of the Campaign, as Plaintiff and Blue Bonnet characterize it as a marketing/sales campaign (ECF No. 62 at 2 ¶ 4 and Broking Statement of Material Facts (ECF No. 65) at 4 ¶ 8), while Green Brook contends the Campaign was "not for telemarketing purposes" as the content of the call was to determine customer satisfaction with service visits (Green Brook Opp. (ECF No. 77) at 3 ¶ 4).

4       The Honorable Michael A. Shipp, U.S.D.J. issued the order denying Green Brook's motion to dismiss. The case was later reassigned to the undersigned. (ECF No. 40.)

5       While these motions were pending, the Third Circuit held a plaintiff who received a single call to her cell phone had "alleged a concrete, albeit intangible, harm" and established Article III standing to assert a TCPA claim. *Susinno v.*

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 32 of 199

Broking v. Green Brook Buick GMG Suzuki, Not Reported in Fed. Supp. (2017)

*Work Out World Inc.*, 862 F.3d 346, 352 (3d Cir. 2017) (citing ⚑ *Spokeo*, 136 S. Ct. at 1549). Plaintiff and Green Brook supplemented their papers arguing the extent to which *Susinno* applies in this case. (ECF Nos. 96 and 97.)

6      The Court notes Ferraez testified he did not know the content of the robocall at the time of the Campaign, and, as noted above, Green Brook was unaware of the language of the robocall until after it answered interrogatories and all depositions were taken. (ECF No. 88 at 4-5.)

7      The Third Circuit has yet to decide "whether a Court should indeed look beyond the four comers of a fax's contents and examine other potentially relevant facts in its determination as to whether a particular fax indeed constitutes an advertisement." *Physicians Healthsource, Inc.*, 2015 WL 3827579, at *4. While this case stems from a robocall, not a fax, the Court finds the two types of communication are analogous. *See* ⚑⚠*Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 106 (3d Cir. 2011), *opinion reinstated in part*, No. 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012) (recognizing the TCPA was enacted to curb both unsolicited faxes and telephone calls).

8      The Third Circuit has held a court can *sua sponte* grant summary judgment as long as "(1) the point at issue is purely legal; (2) the record was fully developed, and (3) the failure to give notice does not prejudice the party...." ⚑*Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 219 (3d Cir. 2004). While the grant of summary judgment to Blue Bonnet on a ground Blue Bonnet did not argue is not a *sua sponte* grant of summary judgment, the Court takes note of the factors provided by the *Gibson* court.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 33 of 199

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

KeyCite Yellow Flag

Distinguished by   Shelton v. Freedom Forever, LLC,   C.D.Cal.,   October 14, 2025

2024 WL 3367536

Only the Westlaw citation is currently available.

United States District Court, S.D. California.

Stephanie BROWN, individually and on behalf of others similarly situated, Plaintiff,

v.

NANO HEARING TECH OPCO, LLC d/b/a Nano Hearing Aids, Defendant.

Case No.: 3:24-cv-00221-BTM-JLB

|

Signed July 9, 2024

**Attorneys and Law Firms**

Aryanna Yvette Young, Ryan Lee McBride, Kazerouni Law Group, APC, San Diego, CA, for Plaintiff.

Kenneth M. Fitzgerald, Fitzgerald Knaier LLP, San Diego, CA, Michael L. Simes, Pro Hac Vice, Simes Law P.C., New York, NY, for Defendant.

### ORDER GRANTING DEFENDANT NANO HEARING AIDS' MOTION TO DISMISS

### [ECF NO. 6]

Barry Ted. Moskowitz, United States District Judge

 **\*1**  Defendant Nano Hearing Tech Opco, LLC doing business as Nano Hearing Aids ("Nano") has filed a Motion to Dismiss Plaintiff's Complaint. (ECF No. 6 ("Def.'s MTD").) In response, Plaintiff Stephanie Brown ("Brown") filed an opposition. (ECF No. 7 ("Pls.' Opp'n")). Nano then filed a reply. (ECF No. 10 ("Def.'s Reply").) For the reasons discussed below, the Court **grants** Nano's Motion to Dismiss and Motion to Strike.

### I. BACKGROUND

Brown, on behalf of herself and a potential class, filed suit against Nano alleging unsolicited marketing that constitutes negligent and willful violations of the Telephone Consumer Protection Act ("TCPA"),  47 U.S.C. § 227(c)(5). (ECF No. 1 ("Complaint").) Brown alleges she "has been on the National Do Not Call Registry since approximately June 12, 2009," and that she has never consented to contact from Nano. (Id. at ¶¶ 28, 35.) Brown alleges that despite the above, she received two phone calls on or around January 19, 2023 from the phone numbers 727-431-6059 and 727-413-6449, both of which she alleges "[u]pon information and belief ... belong[ ] to Defendant and/or Defendant's agent." (Id. at ¶¶ 30–31.) She alleges the callers both promoted Nano Hearing Aids to her. (Id.) Next, Brown alleges she received another phone call on or around February 15, 2023 from the phone number 727-373-1759, during which she "spoke to Daniel Houston who said he was with Life Care." (Id. at ¶ 32.) Mr. Houston then transferred the call to someone named Ken, who gave Brown a callback number of 619-348-6968 x 21. (Id.) Brown alleges this call was also made by Defendant's agent who also spoke to her about Nano Hearing Aids, and that "[w]hen called back, this number goes to Nano Hearing." (Id.)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 34 of 199

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

Brown's Complaint asks for declaratory and injunctive relief and damages under section 277 of the TCPA. (Id. at 14.) Brown seeks to represent a putative class of similarly situated individuals, called a "Federal TCPA DNC Class," which she defines in her Complaint as:

> All persons within the United States who received two phone calls within a 12-month period from Defendant to said person's telephone, and such person had previously included their name on the National Do Not Call Registry at least 31 days prior to receiving Defendant [sic] first call, within the four years prior to the filing of this Complaint.

(Id. at ¶ 41.)

## II. STANDARD

Nano moves to dismiss Brown's Complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) for failure to state a claim and 12(b)(1) for lack of subject matter jurisdiction. (ECF No. 6.) In the alternative or in addition, Nano moves to strike the class allegations under FRCP 12(f) and 23. (Id.) For the reasons discussed below, the Court grants Nano's Motion to Dismiss and Motion to Strike.

### A. Motion to Dismiss for failure to state a claim under 12(b)(6)

A motion to dismiss under FRCP 12(b)(6) should be granted only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). When reviewing a motion to dismiss, the allegations of material fact in plaintiff's complaint are taken as true and construed in the light most favorable to the plaintiff. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Although detailed factual allegations are not required, factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Only a complaint that states a plausible claim for relief will survive a motion to dismiss. *Id.*

### B. Motion to Dismiss for lack of subject matter jurisdiction under 12(b)(1)

**\*2**  Nano challenges the Complaint, in part, on the ground that Brown lacks Article III standing. (ECF No. 6.) Standing is an element of subject matter jurisdiction. Therefore, Nano moves to dismiss Brown's Complaint for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. Fed. R. Civ. P. 12(b)(1). In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Generally, on a 12(b)(1) motion regarding subject matter jurisdiction, unlike a 12(b)(6) motion, a court need not defer to a plaintiff's factual allegations. *Id.* But the Supreme Court has held that where a 12(b)(1) motion to dismiss is based on lack of standing, the court must defer to the plaintiff's factual allegations and must "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Therefore, to show standing "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 35 of 199

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

party invoking federal subject matter jurisdiction has the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).

### C. Motion to Strike class allegations under 12(f) and 23

Rule 12(f) authorizes courts to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Before a motion to strike is granted, the court must be convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009) (citing *RDF Media Ltd. v. Fox Broadcasting Co.*, 372 F. Supp. 2d 556, 566 (C.D. Cal. 2005)). "When considering a motion to strike, a court must view the pleadings in a light most favorable to the non-moving party." *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 888 (N.D. Cal. 2012) (citation omitted).

Plaintiffs bear the burden of pleading, and ultimately demonstrating, compliance with Rule 23's requirements. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). Though "[i]n general, the appropriateness of proceeding as a class action is not tested at the pleading stage," *Hernandez v. State Farm Fire & Cas. Co.*, No. 16CV200-LAB (JLB), 2017 WL 932198, at *2 (S.D. Cal. Mar. 9, 2017), "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982). "In the Ninth Circuit, motions to strike are proper, even if the material is not prejudicial to the moving party, if granting the motion would make trial less complicated or otherwise streamline the ultimate resolution of the action." *Brown*, 913 F. Supp. 2d at 888 (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)).

### III. DISCUSSION

#### A. <u>Motion to Dismiss for failure to state a claim under 12(b)(6)</u>

**\*3** Brown seeks relief under the TCPA for three phone calls allegedly placed to her cellular telephone. There are two potential theories of liability under the TCPA: (1) direct liability and (2) vicarious liability. *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014). In other words, "[f]or a person to 'make' a call under the TCPA, the person must either (1) directly make the call, or (2) have an agency relationship with the person who made the call." *Pascal v. Agentra, LLC*, No. 19-CV-02418-DMR, 2019 WL 5212961, at *2 (N.D. Cal. Oct. 16, 2019) (citation omitted).

#### I. Direct TCPA Liability

First, Nano argues Brown's Complaint does not plausibly allege that Nano, rather than some third party, physically placed the alleged calls. (ECF No. 6, 8–10.) In response, Brown argues the Complaint plausibly alleges direct liability because it alleges all three calls promoted Nano's products and that "an individual associated with the final call gave a callback number (with an extension) that is directly associated with Nano Hearing." (ECF No. 7, 10–11.)

Direct liability under the TCPA applies only to persons or entities that directly "make" or "initiate" calls, which requires "tak[ing] the steps necessary to physically place" the call. *Sheski v. Shopify (USA) Inc.*, No. 19-CV-06858-HSG, 2020 WL 2474421, at *2 (N.D. Cal. May 13, 2020) (analyzing claim under section 227(b) of TCPA) (citing *In re Dish Network, LLC*, 28

F.C.C. Rcd. 6574, 6583 ¶ 26 (2013)); *see Naiman v. Freedom Forever, LLC*, No. 19-CV-00256-JSC, 2019 WL 1790471, at \*4 (N.D. Cal. Apr. 24, 2019) (applying substantially similar rule to claims asserted under TCPA ⚑ section 227(c)).

Here, Brown merely alleges "on information and belief" that these phone numbers belonged to Nano or Nano's agent. (ECF No. 1, ¶¶ 30–32.) The Complaint does not explain the reasons behind this belief. In her Opposition, Brown explains that she believed these numbers belonged to Nano or its agent because the callers promoted Nano Hearing Aids to her and because one of the calls was transferred to a phone number that connects to Nano. (ECF No. 7, 11.) Brown does not allege that any of the callers identified themselves as representatives of Nano. These allegations are insufficient to establish that Nano directly made the calls. *See* ⚑*Canary v. Youngevity Int'l, Inc.*, No. 5:18-CV-03261-EJD, 2019 WL 1275343, at \*3 (N.D. Cal. Mar. 20, 2019) (holding "the Complaint lacks sufficient facts to support a plausible inference that [the defendant] dialed [the plaintiff's] telephone number" where plaintiff only alleged the calls were made by defendant's agent based on "understanding and belief" and a callback number which reached an individual who may have been employed by defendant); *Naiman*, No. 19-CV-00256-JSC, 2019 WL 1790471, at \*4 (finding allegations that "Defendant made the calls in question" without "further details (i.e., how the caller identified itself or what entity it was calling on behalf of)" did not show direct liability for DNC claim).

Further, the only caller whose identity Brown describes in the Complaint identified himself as an employee of Life Care, not Nano. (ECF No. 1, ¶ 32.) Brown does not allege that "Life Care" is Nano or affiliated with Nano. In addition, the only phone number which Brown alleges she called is the alleged callback number, 619-348-6968 ("619 Number"). (Id.) Even if the Court takes Brown's allegation that the 619 Number belongs to Nano as true, the Complaint indicates that no call was placed *from* the 619 Number. The allegation that, after being transferred from a representative of Life Care, someone identified only as "Ken" gave Brown a callback number that reaches Nano is insufficient to show that Nano made any of the calls to Brown. (See id.)

## II. Vicarious TCPA Liability

**\*4** "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." ⚑*Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd but criticized on other grounds*, ⚑577 U.S. 153 (2016), *as revised* (Feb. 9, 2016). "To determine whether a plaintiff has established an agency relationship, the Ninth Circuit 'relies on the Restatement (Third) of Agency.'" ⚑*Ewing v. Freedom Forever, LLC*, No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at \*7 (S.D. Cal. Jan. 19, 2024) (quoting ⚑*Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018)). Common law agency under the Restatement requires a consensual relationship between an alleged principal and agent. Restatement (Third) of Agency, § 1.01, cmt. C. This is "more than mere passive permission; it involves request, instruction, or command." *Klee v. United States*, 53 F.2d 58, 61 (9th Cir. 1931). "For an agency relationship to exist, an agent must have authority to act on behalf of the principal and '[t]he person represented [must have] a right to control the actions of the agent.'" ⚑*Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (quoting Restatement (Third) Of Agency § 1.01, cmt. C). "Though 'the precise details of the agency relationship need not be pleaded to survive a motion to dismiss, sufficient facts must be offered to support a reasonable inference that an agency relationship existed.'" ⚑*Ewing*, No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at \*7 (quoting ⚑*Kristensen*, 12 F. Supp. 3d at 1301).

"Three theories of agency could support vicarious liability: (1) actual authority; (2) apparent authority; and (3) ratification." *Abante Rooter & Plumbing v. Farmers Grp., Inc.*, No. 17-CV-03315-PJH, 2018 WL 288055, at \*4 (N.D. Cal. Jan. 4, 2018) (citing ⚑*Thomas*, 582 Fed. App'x at 679).

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 37 of 199

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

**i. Actual Authority**

Nano argues Brown failed to allege sufficient facts to establish that Nano had an agency relationship with any third parties who allegedly placed the calls. (ECF No. 6, 12–13.) In response, Brown argues the Complaint plausibly alleges actual authority because it alleges all three calls promoted Nano's products and Nano's phone number was provided as a callback number in the last call. (ECF No. 7, 12–14.)

To allege actual authority, a plaintiff must allege facts showing that (1) the principal "controlled or had the right to control" the agent; (2) the principal " 'manifest[ed] assent' to their right to control" the agent; and (3) the principal "either communicated a direction to" the agent to make the calls or the calls were "consistent with" the principal's "general statement of what [the agent] [was] supposed to do." *Pascal*, No. 19-CV-02418-DMR, 2019 WL 5212961, at *3 (quoting ⚑*Mavrix*, 873 F.3d at 1054).

Here, Brown's conclusory allegations are also insufficient to show actual authority. Brown does not allege that any of the callers identified themselves as Nano's agents or had any interactions with Nano. Brown's allegations that "[u]pon information and belief, [each] number belongs to Defendant and/or Defendant's agent" are conclusory and insufficient to plead vicarious liability. (ECF No. 1, ¶¶30–32); *see Naiman*, No. 19-CV-00256-JSC, 2019 WL 1790471, at *4 (finding "boilerplate allegation asserting the existence of an agency relationship" that "each and every Defendant was acting as an agent and/or employee of each of the other Defendants" "is wholly conclusory" and insufficient to plead vicarious liability).

Further, even if Brown had sufficiently alleged Life Care made the third call on Nano's behalf, she still fails to allege facts showing the three prongs necessary for actual authority. There are no allegations supporting the existence of an agency relationship between the two companies, any "request, instruction, or command," *Klee*, 53 F.2d at 61, or that Nano demonstrated "a right to control the actions of [an] agent." Restatement (Third) Of Agency § 1.01, cmt. C. Since Brown has failed to allege "sufficient facts ... to support a reasonable inference that an agency relationship existed," ⚑*Ewing*, No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at *7, she cannot hold Nano liable under vicarious liability through actual authority. *See* ⚑*Panacci v. A1 Solar Power, Inc.*, No. 15-CV-00532-JCS, 2015 WL 3750112, at *7 (N.D. Cal. June 15, 2015) (finding no vicarious liability where plaintiff did not allege that defendant "controlled, authorized, or even knew about [third party's] phone calls or that [defendant] had any control over" the caller, and where plaintiff pleaded "virtually no [factual] allegations regarding the relationship" between defendant and the caller). Finally, Brown also fails to allege any facts that connect Life Care or Nano to the first two calls she received, as the calls came from different phone numbers, and Brown does not allege any identifying information of either caller.

 **\*5** Brown made nearly identical arguments in *Barnes v. SunPower Corp.*, No. 22-CV-04299-TLT, 2023 WL 2592371 (N.D. Cal. Mar. 16, 2023), and the Northern District of California rejected them for the same reasons. The *Barnes* court explained, "[a]ccording to Plaintiff Brown, the ability of the caller to transfer her directly to ... [']Sarah at [Defendant] indicates that the caller either worked at [Defendant] or was previously authorized to the place the call by [Defendant], as did the confirmatory text and email,' but this allegation is conclusory and insufficient to establish that Defendant directly made the call or that Defendant has an agency relationship with 'solar project' who made the initial call." No. 22-CV-04299-TLT, 2023 WL 2592371, at *3 (citation omitted). Similarly here, even if the 619 Number belongs to Nano, this allegation is insufficient to establish that Nano made or authorized any of the calls through an agent.

This case is unlike *Ewing*, where this Court found the plaintiff alleged actual authority by pleading "each of the [ ] callers indicated that they were acting on behalf of Freedom Forever, either by introducing themselves as a 'master dealer' for Freedom Forever, indicating that they refer leads to Freedom Forever, or emailing links to websites associated with ⚑Freedom Forever." No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at *7. The *Ewing* Court also relied on the facts of ⚑*Bilek v. Fed. Ins. Co.*, 8 F.4th 581 (7th Cir. 2021), where the Seventh Circuit "determined that the plaintiff had met his burden by pleading that: (1)

the defendant authorized the callers to make calls using its approved scripts, tradename, and proprietary information; (2) the callers quoted him the defendant's health insurance[;] and (3) the defendant provided said callers those quotes and permitted said callers to enter information into its system." *Id.* (citing 8 F.4th at 587–88). Unlike the plaintiffs in *Ewing* and *Bilek*, Brown failed to plead concrete facts meeting the elements of actual authority. *See id.*; 8 F.4th at 589.

### ii. Apparent Authority

Brown argues she also sufficiently alleged apparent authority because it is "obvious that some agreement existed between Defendant and its agents regarding the placing of calls, the promotion of Defendant's products, and the transfer of that call to Defendant." (ECF No. 7, 15.) In response, Nano argues Brown failed to plead apparent authority because the allegations do not sufficiently connect Nano to the callers, and the caselaw she relies on was overruled. (ECF No. 10, 3–5.)

An agency relationship may also be created through apparent authority. *Mavrix Photographs, LLC*, 873 F.3d at 1054 (citation omitted). "Apparent authority results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969). "The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority." *Id.* (citation omitted). Apparent authority "can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.' " *Thomas*, 582 F. App'x at 679 (quoting *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997)).

Here, Brown's apparent authority theory fails because Brown fails to allege any facts of interaction between Nano and Brown or Nano and the callers that could support a belief that the callers had authority to make calls on Nano's behalf. *See Thomas*, 582 F. App'x at 679. Allegations of the alleged agents' statements alone are insufficient. *See Hawaiian Paradise Park Corp.*, 414 F.2d at 756; *Hanson v. Am. W. Airlines, Inc.*, 544 F. Supp. 2d 1038, 1043 (C.D. Cal. 2008) ("Only the acts of the principal, not of the agent, give rise to apparent authority.") (citing *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 479 (9th Cir. 2000)).

**\*6** Brown's arguments in her Opposition also fail. Brown relies on a single case to support an apparent authority theory based entirely on the actions of the callers, but the case was overruled on the exact ground for which Brown relies on it. (ECF No. 7, 16); *see Mey v. Monitronics Int'l, Inc.*, 959 F. Supp. 2d 927 (N.D.W. Va. 2013), *subsequently rev'd sub nom. In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 527 (N.D.W. Va. 2016), *aff'd sub nom. Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243 (4th Cir. 2018) ("This Court is well aware that in so ruling, I am rejecting the prior decision of this Court in this case[:] *Mey v. Monitronics International, Inc.*, 959 F.Supwp.2d 927 (N.D.W. Va. 2013)."). Brown argues, "[s]imilarly to *Mey*, Plaintiff here has clearly pled that the representatives on the calls were holding themselves out as representatives of Defendant." (ECF No. 7, 16.) In overruling *Mey*, the *Monitronics* court held that "the fact that entities were permitted to hold themselves out as authorized dealers or some similar description is insufficient" to hold a defendant vicariously liable. *In re: Monitronics International, Inc., Telephone Consumer Protection Act Litigation*, 223 F. Supp. 3d at 527–28; *see also Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW AGRX, 2015 WL 3526253, at \*10 (C.D. Cal. May 18, 2015) (disagreeing generally with the conclusion reached in *Mey*, 959 F. Supp. 2d, that an agreement allowing an entity to hold itself out as an authorized dealer of another's products was sufficient to establish apparent authority). The court explained this is because "the mere fact that a dealer uses a supplier[']s name does not render it an agent of the supplier, just as every bar

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 39 of 199

**Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)**

which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise." *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d at 527–28.

### iii. Ratification

In response to Nano's arguments that Brown failed to plead vicarious liability, Brown argues the Complaint also alleges vicarious liability through a theory of ratification because Nano "ratified its agent's actions through accepting the benefits of their telemarketing services." (ECF No. 7, 16–17.) Nano responds that the Complaint never mentions ratification, and that a vicarious liability theory based on ratification fails regardless because it still requires proof of an agency relationship. (ECF No. 10, 6–7.)

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) Of Agency § 4.01. "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Id.* "The set of effects that ratification creates are the consequences of actual authority." *Id.*, cmt. B. "Although a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it." *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003), *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017).

Here, Brown's ratification theory fails for the same reasons her other vicarious liability theories fail: she has not sufficiently pleaded an agency relationship. The Complaint lacks facts alleging that Nano acted as a principle or that it ratified any of the alleged conduct. Brown "cannot show [Nano] is liable under a ratification theory because 'the principal-agent relationship is still a requisite.' " *Abante Rooter & Plumbing*, No. 17-CV-03315-PJH, 2018 WL 288055, at *6 (quoting *Batzel*, 333 F.3d at 1036).

Accordingly, the Court **GRANTS** Nano's FRCP 12(b)(6) Motion to Dismiss with leave to amend.

### B. Motion to Dismiss for lack of subject matter jurisdiction under 12(b)(1)

### I. Article III Standing

Next, Nano argues that Brown's Complaint should be dismissed for lack of subject matter jurisdiction under FRCP 12(b)(1) because it fails to meet the causation and redressability elements of Article III standing.

Standing is a necessary element of federal court jurisdiction under Article III of the U.S. Constitution. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Accordingly, standing is a "threshold question in every federal case." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citing *Warth*, 422 U.S. at 498.). To establish standing, (i) a plaintiff must have suffered a "concrete and particularized" "injury in fact"; (ii) "there must be a causal connection between the injury and the conduct complained of" ("causation"); and (iii) the injury must be capable of being "redressed by a favorable decision" ("redressability"). *Lujan*, 504 U.S. at 560–61. "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007).

**\*7** For causation, "the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. Eastern*

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 40 of 199

*Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)). In order to establish causation under a theory of vicarious liability, the plaintiff must show a causal relationship between the agent making the calls and the actions of the principle. *Freidman v. Massage Envy Franchising, LCC*, No. 3:12-CV-02962-L-RBB, 2013 WL 3026641, at *4 (S.D. Cal. June 13, 2013). For redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43).

Here, Nano argues Brown's complaint fails for many of the reasons discussed above. First, the Complaint fails to plead causation. As explained above, the Complaint does not establish direct or vicarious liability because Brown fails to allege facts showing that Nano or an agent of Nano placed any of the calls. *See, e.g.,* *Freidman*, No. 3:12-CV-02962-L-RBB, 2013 WL 3026641, at *4 (finding no Article III standing where plaintiff did not plead direct or vicarious liability); *Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399, 414 (N.D. Cal. 2009) (finding allegations that "all of the named Defendants engaged in the conduct alleged and caused each of them injury" and that one defendant "is an 'agent, subsidiary, parent, joint venturer or predecessor' " of another are insufficient for standing). Accordingly, Brown's injury is not fairly traceable to Nano. *Lujan*, 504 U.S. at 560–61 (citation omitted). Further, the absence of facts establishing this connection to Nano leaves room for a substantial possibility that any injury was "th[e] result [of] the independent action of some third party not before the court." *Id.* (citation omitted).

Second, the Complaint also fails to plead redressability. Since the injury may have been caused by someone other than Nano, a decision favorable to Brown and against Nano would not necessarily redress the injury. *See* *Simon*, 426 U.S. at 41.

Since causation and redressability are speculative at best, Brown lacks standing.

## II. Injunctive Relief

Nano also argues Brown's Complaint lacks standing to seek injunctive relief. (ECF No. 6, 14–15.) In response, Brown argues the Complaint plausibly alleged future harm for purposes of injunctive relief. (ECF No. 7, 17–18.)

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citations omitted). For injunctive relief, the threat of injury must be "actual and imminent," or "*certainly impending*," not merely conjectural or hypothetical. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). "Allegations of possible future injury do not satisfy the requirements." *Whitmore*, 495 U.S. at 158. "Where standing is premised entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that he will again be wronged in a similar way.' " *Davidson*, 889 F.3d at 967 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (citing *Lujan*, 504 U.S. at 560).

**\*8** Here, Brown requests injunctive relief in her Complaint. (ECF No. 1, 14, ¶ 60 ("Plaintiff and the class are also entitled to an injunction against future calls.").) However, Brown fails to allege any likelihood of future injury. The Complaint does not allege any facts regarding potential future calls. In addition, Brown alleges she received three calls within one month in 2023 and does not allege she has received any additional calls since then. (ECF No. 1, ¶¶ 30–32.) The timing and number of calls do

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 41 of 199

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

not show "a sufficient likelihood that [s]he will again be wronged in a similar way." *Lyons*, 461 U.S. at 111; *see* *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) ("The fact that a class member was a target of collection efforts sometime between 2008 and 2011, however, does not without more establish that he or she would likely be contacted by ARS again after October 2013."); *Miller v. Time Warner Cable Inc.*, No. 816CV00329CASASX, 2016 WL 7471302, at *4 (C.D. Cal. Dec. 27, 2016) (granting motion to dismiss plaintiff's claims for injunctive relief because, without evidence to the contrary, "the risk [defendant] will continue to make unsolicited phone calls to plaintiff's phone is too speculative to establish a real or immediate threat of repeated injury."). Brown's conclusory argument in her Opposition that the Complaint "demonstrated a pattern of unlawful behavior that will not cease without court intervention" does not resolve the lack of any facts alleging that this pattern would continue. (ECF No. 7, 17.) Thus, Brown lacks standing to seek injunctive relief.

Accordingly, the Court **GRANTS** Nano's FRCP 12(b)(1) Motion to Dismiss with leave to amend.

### C. Motion to Strike class allegations under 12(f) and 23

Next, Nano moves to strike class allegations from the Complaint on two grounds. First, Nano argues Brown's class allegations should be stricken as overbroad. (ECF No. 6, 15–17.) Second, Nano argues Brown's class allegations should be stricken because Brown is not a member of the class she seeks to represent. (Id. at 17–18.) Brown responds to both arguments that "the class allegations have been sufficiently pled," "the proposed class may evolve throughout discovery," and regardless, the Court should not rule on class issues prior to a motion for class certification. (ECF No. 7, 18–19.)

#### I. Sufficiency of Class Definition

A defendant may move to strike class allegations before discovery when the complaint shows a class action could not be maintained on the facts alleged. *Sanders*, 672 F. Supp. 2d at 990. "[N]o class may be certified that contains members lacking Article III standing." *Id.* at 991 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). In *Sanders*, the court granted a motion to dismiss and struck class allegations under FRCP 12(f) because the class definition "include[d] all persons within the United States who own a 20–inch Aluminum iMac," which "necessarily include[d] individuals who did not purchase their 20–inch Aluminum iMac, individuals who either did not see or were not deceived by advertisements, and individuals who suffered no damages." *Id.* The court explained that "[s]uch individuals would lack standing to bring these claims." *Id.*

Here, the class definition is overly broad because it fails to exclude any members who may have consented to receiving phone calls from Nano. The TCPA expressly precludes claims made by individuals who consented to be called. 47 U.S.C. § 227(b)(1)(A) (excluding from liability any call "made with the prior express consent of the called party.") Brown's class definition necessarily includes any individuals who have consented to calls from Nano. (*See* ECF No. 1, ¶ 41.) Like in *Sanders*, these individuals would also lack standing. 672 F. Supp. 2d at 991; *see Hernandez*, No. 16CV200-LAB (JLB), 2017 WL 932198, at *6 (striking class allegations in part "[b]ecause the class definition includes insureds who were not injured at all.").

#### II. Typicality

Rule 23(a)(3) requires that an individual plaintiff's claims be typical of those that the proposed class would advance. Fed. R. Civ. P. 23(a)(3). The test for Rule 23(a) typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 42 of 199

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

the same course of conduct." 🚩*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." 🚩*E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting 🚩*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).

**\*9**  Here, Brown has not alleged that she falls into her own class definition. For the reasons discussed above, Brown failed to plead she was injured by Nano because the Complaint does not sufficiently allege the calls were made by Nano or its agent. As a result, her claims cannot be typical of those that the proposed class would advance, and other class members cannot "have been injured by the same course of conduct." 🚩*Ellis*, 657 F.3d at 984. Since the Complaint does not name any other plaintiffs, the purported class lacks typicality. *See Galan Segura v. CRST Van Expedited, Inc.*, No. EDCV1201901TJHSPX, 2014 WL 12567799, at \*2 (C.D. Cal. June 16, 2014) (denying class certification in part for lack of typicality because the named plaintiff "has not suffered any injuries under the alleged [ ] violations ... and, therefore, is not a class member.").

Accordingly, the Court **GRANTS** Nano's FRCP 12(f) Motion to Strike class allegations with leave to amend.

## IV. CONCLUSION

For the reasons discussed above, Nano's Motion to Dismiss Brown's Complaint under FRCP 12(b)(6) and 12(b)(1) is **GRANTED.** Nano's Motion to Strike class allegations from the Complaint under FRCP 12(f) and 🚩23 is also **GRANTED**. Brown has leave to file an amended complaint by August 6, 2024.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3367536

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 242063
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Joni S. BYNUM, et al., individually and on behalf of a proposed class, Plaintiffs,

v.

RED RIVER TALC, LLC f/k/a LLT Management LLC f/k/a LTL Management, LLC et al., Defendants.

Civil Action No. 24-7065 (MAS) (RLS)

|

Signed 01/29/2026

**Attorneys and Law Firms**

Patricia Leigh O'Dell, Montgomery, AL, Jeffrey Morrow Pollock, Pollock Law LLC, Trenton, NJ, Kevin William Fay, Richard M. Golomb, Golomb Legal, P.C., Philadelphia, PA, for Plaintiffs Joni S. Bynum, Robin Coburn, James Coburn.

Jeffrey Morrow Pollock, Pollock Law LLC, Trenton, NJ, Kevin William Fay, Richard M. Golomb, Golomb Legal, P.C., Philadelphia, PA, for Plaintiffs Donnaletta F. Ruiz, Shelly Williams.

Jessica Leigh Brennan, Barnes & Thornburg LLP, Morristown, NJ, Susan M. Sharko, Faegre Drinker Biddle & Reath LLP, Florham Park, NJ, for Defendants Red River Talc LLC, Johnson & Johnson, New JJCI, Johnson & Johnson Holdco (NA) Inc, Janssen Pharmaceuticals, Inc., Kenvue Inc, J&J Services, Inc.

**MEMORANDUM OPINION**

SHIPP, District Judge

 **\*1**  This matter comes before the Court upon Defendants Red River Talc, LLC ("Red River"), Johnson & Johnson ("J&J"), New JJCI, Johnson & Johnson Holdco (NA) Inc., Janssen Pharmaceuticals, Inc., Kenvue Inc., and J&J Services, Inc.'s (collectively, "Defendants") Motion to Strike the Class Allegations and Dismiss Plaintiff Joni S. Bynum's ("Bynum") Medical Monitoring Claim (the "Motion"). (ECF No. 46.) Plaintiffs Bynum, Robin Coburn, James Coburn, Donnaletta F. Ruiz, and Shelly Williams (collectively, "Plaintiffs") opposed (ECF No. 49), and Defendants replied (ECF No. 50). After careful consideration of the parties' submissions, the Court decides Defendants' Motion without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons outlined below, Defendants' Motion is granted.

**I. BACKGROUND**

This action arises out of the long-running multidistrict litigation captioned *In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation* (the "Talc Litigation," MDL No. 16-2738). Because the parties are familiar with the underlying MDL, the Court recounts only those facts necessary to resolve the instant motion.

On June 17, 2024, nearly eight years after the Talc Litigation commenced, Plaintiffs filed the instant action as a putative class action complaint. (*See generally* Compl., ECF No. 1.) Plaintiffs seek to represent a nationwide class consisting of: (1) all female U.S. residents who genitally applied Johnson's Baby Powder and/or Shower to Shower products (the "Defendants' Products") between 1960 and the present for more than four years, and who have not commenced an individual action or signed a written retainer agreement with non-class counsel for the pursuit of any individual, non-class personal injury claims arising from the use of and/or exposure to Defendants' Products ("Qualifying Talc Users"); (2) the authorized representatives of deceased or

Bynum v. Red River Talc, LLC, Slip Copy (2026)

legally incapacitated or incompetent Qualifying Talc Users; and (3) the spouses or family members of Qualifying Talc Users who may properly assert derivative or independent claims. (Am. Compl. ¶ 44, ECF No. 30.)

Plaintiffs allege that their use of Defendants' Products either caused them to develop epithelial ovarian cancer, fallopian tube cancer, or primary peritoneal cancer (a "Defined Injury"), or placed them at an "increased risk of developing" one of these cancers. (*Id.* at 3, ¶¶ 1-5.) Of the five named Plaintiffs, one alleges that she developed serous fallopian tube cancer as a result of her use of Defendants' Products; three allege no present physical injury and instead assert claims based on an "increased risk" of developing a Defined Injury; and one asserts a derivative claim based on his relationship to another named Plaintiff. [1] (*Id.* ¶¶ 1-5.)

Plaintiffs assert a total of nineteen claims against Defendants, including medical monitoring, strict liability, negligence-based claims, fraud and misrepresentation, statutory consumer protection claims under numerous state laws, conspiracy-based claims, loss of consortium, wrongful death, survival, and claims for punitive damages. (*Id.* ¶¶ 336-496.)

**\*2** Plaintiffs assert these claims on behalf of themselves and all others similarly situated in five discrete subclasses. (*See id.* ¶ 45.) Specifically, Subclasses 1, 2, and 5 include individuals with no current Defined Injury, while Subclasses 3 and 4 include individuals who allege a Defined Injury. (*Id.*) Moreover, while Subclasses 1, 2, and 3 seek medical monitoring, Subclasses 4 and 5 seek compensatory and punitive damages. (*Id.*) Plaintiffs define the five subclasses as follows:

[Subclass 1: Independent Claim For Medical Monitoring—] Qualifying Talc Users (Class Members) residing in Alaska, Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Hawaii, Idaho, Maine, Massachusetts, Minnesota, Montana, New Hampshire, New Mexico, Pennsylvania, South Dakota, Utah, West Virginia, or Wyoming and the Representative Claimants of legally incapacitated or incompetent Qualifying Talc Users (residing in the aforementioned jurisdictions) who as of the date of the Court's Preliminary Approval and Class Certification Order have not been diagnosed with a [Defined Injury].

[Subclass 2: Medical Monitoring Remedy—Qualifying Talc Users] (Class Members) residing in California, the District of Columbia, Guam, Indiana, Kansas, Maryland, Missouri, Nevada, New Jersey, New York, Ohio, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Vermont, the U.S. Virgin Islands, Virginia, or Washington and the Representative Claimants of legally incapacitated or incompetent Qualifying Talc Users (residing in the aforementioned jurisdictions) who as of the date of the Court's Preliminary Approval and Class Certification Order have not been diagnosed with a [Defined Injury].

[Subclass 3: Medical Monitoring Remedy—] Qualifying Talc Users (Class Members) residing in Alabama, Connecticut, Delaware, Georgia, Illinois, Iowa, Kentucky, Louisiana, Michigan, Nebraska, Oklahoma, Oregon, Wisconsin and the Representative Claimants of legally incapacitated or incompetent Qualifying Talc Users (residing in the aforementioned jurisdictions) who as of the date of the Court's Preliminary Approval and Class Certification Order have been diagnosed with a [Defined Injury].

[Subclass 4: Compensatory and Punitive Damages for Current Defined Injury—] Qualifying Talc Users (Class Members) residing in any state or territory of the United States who as of the date of the Court's Preliminary Approval and Class Certification Order have been diagnosed with a [Defined Injury].

[Subclass 5: Compensatory and Punitive Damages for Future Defined Injury—] Qualifying Talc Users (Class Members) residing in any state or territory of the United States who as of the date of the Court's Preliminary Approval and Class Certification Order have not been diagnosed with a [Defined Injury].

(*Id.*)

Defendants move to strike Plaintiffs' class allegations under Federal Rule of Civil Procedure 12(f), [2] and to dismiss Plaintiff Bynum's medical monitoring claim under Rule 12(b)(6). (ECF No. 46.) The Motion is now ripe for disposition.

## II. LEGAL STANDARD

### A. Motion to Strike Class Allegations

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011) (quotation marks omitted). "To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) (citing Fed. R. Civ. P. 23(a)-(b)).

**\*3** To satisfy Rule 23(a), (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply, adequacy). *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)-(4)).

Rule 23(b) permits class certification if: (1) separate actions would create a risk of inconsistent adjudications; (2) injunctive or declaratory relief is sought; or (3) common questions predominate over the individual questions and a class action is superior to other methods of bringing the suit. Fed. R. Civ. P. 23(b). Rule 23(b)(3) requires that common class questions predominate over questions affecting only individual members and that the class action mechanism be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

Although class certification typically follows discovery, courts may strike class allegations at the pleading stage where it is clear from the face of the complaint that the requirements of Rule 23 cannot be satisfied as a matter of law. *See Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 615 (E.D. Pa. 2015). Rule 12(f) permits courts to strike any "redundant, immaterial, impertinent, or scandalous matter" from a pleading, and Rule 23(c)(1) requires courts to determine "[a]t an early practicable time" whether a proposed class satisfies class certification requirements. Fed. R. Civ. P. 12(f), 23(c)(1).

Whether to grant a motion to strike is reserved to the discretion of the district court. *Krisa v. Equitable Life Assurance Soc'y*, 109 F. Supp. 2d 316, 319 (M.D. Pa. 2000) (citation omitted). A district court may strike class action allegations without permitting discovery or waiting for a certification motion where the complaint and any affidavits clearly demonstrate that the plaintiff cannot meet the requirements for a class action. *See Zarichny*, 80 F. Supp. 3d at 615; *Semenko v. Wendy's Int'l, Inc.*, No. 12-0836, 2013 WL 1568407, at \*11 (W.D. Pa. Apr. 12, 2013).

### B. Motion to Dismiss

Rule 8(a)(2) "requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify "the elements a plaintiff must plead to state a

claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must identify all of the plaintiff's well-pleaded factual allegations, accept them as true, and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III. DISCUSSION

### A. Motion to Strike Class Allegations

**\*4** Defendants argue that Plaintiffs' proposed class and subclasses cannot be certified as a matter of law because they fail Rule 23's adequacy, predominance, and superiority requirements. (*See generally* Defs.' Moving Br., ECF No. 46-1.) Because Rule 23's adequacy requirement is dispositive of Defendants' Motion to Strike, the Court addresses this issue first.

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." [3] Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citations omitted). The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012) (citations omitted).

If a "fundamental" conflict exists within a class, the adequacy requirement is not satisfied, and class certification will be denied. *Dewey*, 681 F.3d at 183-84; *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 431 (3d Cir. 2016), *as amended* (May 2, 2016) (explaining that a "fundamental" conflict "will defeat a finding of adequacy"). One such fundamental conflict arises when a proposed class combines both "present and future injury plaintiffs." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d at 431.

Two decisions from the Supreme Court, *Amchem* and *Ortiz*, address this fundamental conflict in the context of mass tort litigation, and provide the governing framework for the Court's analysis. *See Amchem Prods., Inc.*, 521 U.S. at 591; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

In *Amchem*, counsel sought to approve a class settlement and certify a nationwide class of persons who were exposed to asbestos-containing products. *See Amchem Prods., Inc.*, 521 U.S. at 591. The class settlement purported to resolve the claims of persons who had already sustained injuries because of asbestos exposure, and those who had been exposed to asbestos, but had not yet developed any injury. *See id.* The district court approved the settlement and certified the class, but the Third Circuit reversed, finding, *inter alia*, that "serious intra-class conflicts" existed between the "presently injured and future[ ] plaintiffs," and this conflict precluded a finding of adequacy. *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630-31 (3d Cir. 1996), *aff'd sub nom., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). As the Third Circuit explained, presently-injured

plaintiffs, and plaintiffs without any injury, have materially different priorities in negotiating a settlement. *Id.* While presently-injured plaintiffs seek to "maximize current payouts," exposure-only plaintiffs seek to preserve funds for future claims, protect against inflation, ensure flexibility as science evolves, and retain meaningful opt-out rights should injury later occur. *Id.* The Supreme Court affirmed the Third Circuit on this point and agreed that "the interests of those within the single class are not aligned." *Amchem*, 521 U.S. at 626.

**\*5** *Ortiz* reinforced this principle.[4] There, the Court emphasized that after *Amchem*, it is "obvious" that a class divided between holders of present and future claims "requires division into homogeneous subclasses ... with separate representation to eliminate conflicting interests of counsel." *Ortiz*, 527 U.S. at 856 (citations omitted).

The principles articulated in *Amchem* and *Ortiz* apply in equal force here.[5] Plaintiffs seek to litigate a class action on behalf of individuals who allege a present cancer diagnosis, as well as individuals who allege no present injury at all. (*See generally* Am. Compl.) As the Supreme Court recognized in *Amchem* and *Ortiz*, these groups have materially divergent interests. *Amchem*, 521 U.S. at 626; *Ortiz*, 527 U.S. at 856. Those already diagnosed with cancer may reasonably prioritize immediate compensatory and punitive damages, while those without a cancer diagnosis may reasonably prioritize a fund for medical monitoring, long-term preservation of resources, and protections against premature valuation of their claims.

Plaintiffs attempt to address these material conflicts by dividing the class into five subclasses. (Am. Compl. ¶ 45.) Critically, however, Plaintiffs do not identify separate counsel for the different subclasses or articulate any safeguards to ensure that the interests of one group are not subordinated to those of another. *See* *Ortiz*, 527 U.S. at 856 ("[A] class divided between holders of present and future claims ... requires division into homogenous subclasses ... *with separate representation to eliminate conflicting interests of counsel*." (emphasis added) (citations omitted). The Amended Complaint offers no explanation of how counsel would navigate these competing incentives without separate representation, or how the conflicts identified in *Amchem* and *Ortiz* would otherwise be eliminated. *See* *Amchem*, 521 U.S. at 627 (denying class certification where there was no "structural assurance of fair and adequate representation for the diverse groups and individuals affected").

Plaintiffs principally rely on *In re Valsartan* to argue that their subclasses are sufficient. (Pls.' Opp'n Br. 16, 18, 20-23, ECF No. 49 (citing *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 19-2875, 2023 WL 1818922, at \*1 (D.N.J. Feb. 8, 2023)).) Plaintiffs' reliance on this case, however, is misplaced. In *Valsartan*, the defendants did not challenge the adequacy of the medical monitoring subclasses, nor contend that the interests of the class members were not aligned. *In re Valsartan*, 2023 WL 181922, at \*35. The Court, accordingly, did not analyze adequacy *under Amchem* or *Ortiz*, nor discuss the varying interests between holders of present and future claims.[6] *See id.*

**\*6** Applying the principles articulated in *Amchem* and *Ortiz*, the Court concludes that absent structural protections such as separate representation for the different subclasses, the proposed class suffers from a fundamental adequacy defect that cannot be cured through discovery. *See* *Georgine*, 83 F.3d at 631 (denying class certification and holding that "[t]he lack of any structural protections in this case thwarted the adequate representation of the disparate groups of plaintiffs"). The Court, accordingly, will grant Defendants' Motion to Strike, and Plaintiffs' class allegations will be stricken from the Amended Complaint. *See* *Semenko*, 2013 WL 1568407, at \*11 (granting motion to strike on the pleadings because "no amount of discovery will demonstrate that the class can be maintained").[7]

### B. Motion to Dismiss [8]

Defendants also move to dismiss Plaintiff Bynum's medical monitoring claim as insufficiently pleaded under either New Jersey or Washington law. (Defs.' Moving Br. 37-38.) Defendants argue that both jurisdictions permit medical monitoring claims only where a plaintiff alleges a present, existing injury, and here, Bynum alleges none. (*Id.*)

Plaintiffs do not dispute that Bynum has not been diagnosed with a Defined Injury, nor do they dispute that New Jersey and Washington law require a present injury to sustain a medical monitoring claim.[9] (Am. Compl. ¶ 1; Pls.' Opp'n Br. 34-35.) Plaintiffs instead contend that Bynum adequately alleges an injury because her asserted need for medical monitoring constitutes "a present and ongoing economic injury."[10] (Pls.' Opp'n Br. 34-35.)

**\*7** Plaintiffs' argument is unpersuasive. As an initial matter, the Amended Complaint does not plausibly allege Bynum has suffered any economic injury. (*See generally* Am. Compl.) After reviewing the 189-page Amended Complaint, the Court can discern only a vague and conclusory allegation that Plaintiffs "have suffered economic losses." (Am. Compl. ¶ 429.) Plaintiffs, however, allege no facts in support of this claim, and the Court therefore cannot plausibly infer a present, economic loss from the allegations in the Amended Complaint.[11] (*See id.*) Even assuming, arguendo, that Bynum plausibly alleged an economic injury, economic harm alone is insufficient to sustain a medical monitoring claim under either New Jersey or Washington state law. *Sinclair v. Merck & Co.*, 948 A.2d 587, 595 (N.J. Sup. Ct. 2008) (holding that "injury" for a medical monitoring claim "requires something physical" such as illness or death); *Duncan v. Nw. Airlines Inc.*, 203 F.R.D. 601, 606, 609-10 (W.D. Wash. 2001) (explaining that Washington law does not permit recovery for a potential disease absent a "present, actual injury" and a "reasonable certainty that [the plaintiff] will contract the disease" (internal quotation and citations omitted)).

The Court, accordingly, dismisses Bynum's medical monitoring claim for failure to state a claim.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion is granted. The Court strikes Plaintiffs' class allegations, and Bynum's medical monitoring claim is dismissed without prejudice. The Court will issue an Order consistent with this Memorandum Opinion.

**All Citations**

Slip Copy, 2026 WL 242063

---

**Footnotes**

1    Plaintiff James Coburn brings a derivative claim based on his spouse Robin Coburn's use of Defendants' Products. (Am. Compl. ¶ 5.)

2    All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

3    "The adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem. Prods., Inc.*, 521 U.S. at 626 n.20 (citation and internal quotation marks omitted). "The adequacy heading also factors in competency and conflicts of class counsel." *Id.*

*Ortiz* also concerned a settlement in a class action suit against an asbestos manufacturer. 🚩527 U.S. at 855-59.

Although *Amchem* and *Ortiz* arose in the settlement context, their adequacy analysis is not limited to settlement classes. In both cases, the Supreme Court's reasoning relied on 🚩Rule 23(a)(4) itself, which applies equally to litigation classes. *See* 🚩*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 818 (3d Cir. 1995) (explaining that "the standard for [class] certification is the same for settlement classes as for conventional classes").

The facts of *Valsartan* are also distinguishable. *Valsartan* involved a products liability action in which it was "uncontested that the defendants' products were contaminated." *In re Insulin Pricing Litig.*, No. 17-699, 2024 WL 416500, at *40 (D.N.J. Feb. 5, 2024) (denying class certification and finding *Valsartan* "distinguishable"). The *Valsartan* plaintiffs also proposed extensive subclasses—asserting 93 subclasses for one set of economic loss claims and 19 subclasses for another —to account for variances in state law. 🚩*In re Valsartan*, 2023 WL 1818922, at *5. Here, by contrast, Defendants vigorously dispute Plaintiffs' core factual allegations, and Plaintiffs propose only five subclasses to encompass nineteen different claims. (*See generally* Am. Compl.)

Because the Court concludes that Plaintiffs have failed to satisfy the adequacy requirement, the Court does not reach Defendants' additional arguments regarding predominance and superiority. 🚩*Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 147-49 (3d Cir. 2008). The Court, however, notes that Plaintiffs may face substantial obstacles to class certification if this litigation proceeds. *See, e.g.*, 🚩*Georgine*, 83 F.3d at 627 (discussing the "proliferation of disparate factual and legal issues" that make class certification of medical monitoring and related claims improper); *Almond v. Janssen Pharms., Inc.*, 337 F.R.D. 90, 95-96 (E.D. Pa. 2020) (dismissing a nationwide no-injury medical monitoring class because "the variation in state law alone is sufficient to establish that maintenance of the action as a class is inappropriate" (citation and internal quotation marks omitted)); 🚩*Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 146 (3d Cir. 1998) (concluding class treatment involving medical monitoring claims was inappropriate in part because each class member would need to "present evidence" regarding his medical history); 🚩*Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 489 (E.D. Pa. 1997) (finding "individual issues predominate over common issues" for medical monitoring claims).

While Defendants' Motion to Dismiss seeks dismissal of "Plaintiffs' medical monitoring claims," (Defs.' Moving Br. 40), Plaintiffs correctly observe that Defendants only advance Rule 12(b)(6) arguments as to Plaintiff Bynum's medical monitoring claim (Pls.' Opp'n Br. 34). Defendants do not contest this characterization in their reply. (*See generally* Defs.' Reply Br., ECF No. 50.) The Court therefore confines its Rule 12(b)(6) analysis to Plaintiff Bynum's medical monitoring claim.

Plaintiffs also do not dispute that either New Jersey law (where Defendants reside) or Washington law (where Bynum resides) governs Bynum's medical monitoring claim. (Pls.' Opp'n Br. 34-35.) Because both jurisdictions require a present injury, the Court need not engage in a choice-of-law analysis. *See* 🚩*P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008) (citations omitted) (explaining that under New Jersey's choice-of-law framework, "there is no choice-of-law issue to be resolved" where no actual conflict exists).

Plaintiffs further argue, in cursory fashion, that because talcum powder exposure has been linked to "chronic inflammation and oxidative stress on genital tissues or cells," Bynum has suffered a physical injury sufficient to support a medical monitoring claim. (Pls.' Opp'n Br. 34-35.) The Amended Complaint, however, does not allege that Bynum experiences chronic inflammation, oxidative stress, or any other physical injury. (*See generally* Am. Compl.) Rather, it cites a single study concluding that "talc is a possible cause of cancer based on the totality of evidence ... and a plausible biological pathway including chronic inflammation and oxidative stress." (Am. Compl. ¶ 133(z).) Because Plaintiffs do not allege that Bynum herself suffers from any physical injury, and because it is "axiomatic" that a plaintiff may not

amend a complaint through opposition briefing, this argument fails. *See* 🚩*Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007).

11 Plaintiffs also fail to cite any specific paragraph of the Amended Complaint in support of their asserted economic-injury theory. (*See* Pls.' Opp'n Br. 34.)

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 51 of 199

2021 WL 5443265
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

COLGATE-PALMOLIVE CO., Tom's of Maine Inc., Petitioners,

v.

Anne DE LACOUR, individually and on behalf of all others similarly situated, et al., Respondents.

21-1234
|
September 16, 2021

**Attorneys and Law Firms**

Hannah Y.S. Chanoine, Esq., Gerard A. Savaresse, Esq., O'Melveny & Myers LLP, New York, NY, Richard Goetz, Esq., O'Melveny & Myers LLP, Los Angeles, CA, for Petitioner Colgate-Palmolive Co.

Hannah Y.S. Chanoine, Esq., Gerard A. Savaresse, Esq., O'Melveny & Myers LLP, Samir Deger-Sen, Esq., Latham & Watkins LLP, New York, NY, Richard Goetz, Esq., O'Melveny & Myers LLP, Los Angeles, CA, for Petitioner Tom's of Maine Inc.

Neal J. Deckant, Esq., Bursor & Fisher, P.A., Walnut Creek, CA, Frederick John Klorczyk, III, Esq., Bursor & Fisher, P.A., New York, NY, Sarah Westcot, Bursor & Fisher P.A., Miami, FL, for Respondents.

Present: John M. Walker, Jr., William J. Nardini, Steven J. Menashi, Circuit Judges.

**Opinion**

 **\*1**  Petitioners request, pursuant to Federal Rule of Civil Procedure 23(f), leave to appeal the district court's order granting Respondents' motion for class certification. Petitioners also move for leave to file a reply. Upon due consideration, it is hereby ORDERED that the motion for leave to file a reply is GRANTED, but the Rule 23(f) petition is DENIED because an immediate appeal is not warranted. *See* *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139–40 (2d Cir. 2001).

**All Citations**

Not Reported in Fed. Rptr., 2021 WL 5443265

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Pedro-Salcedo v. Haagen-Dazs Shoppe Company, Inc.,   N.D.Cal.,   October 11, 2017

2015 WL 7454260
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Sunil DANIEL, Plaintiff,
v.
FIVE STARS LOYALTY, INC., Defendant.

Case No. 15-cv-03546-WHO
|
Signed 11/24/2015

**Attorneys and Law Firms**

Mark Samuel Greenstone, Lionel Z. Glancy, Marc Lawrence Godino, Glancy Prongay & Murray LLP, Los Angeles, CA, Abigail Ameri Zelenski, David Zelenski, Michael Joe Jaurigue, Jaurigue Law Group, Glendale, CA, for Plaintiff.

Lee Scott Brenner, Catherine Dong Eun Lee, Kelley Drye and Warren LLP, Los Angeles, CA, Edward James Mullins, III, Lauri Anne Mazzuchetti, Kelley Drye and Warren, Parsippany, NJ, for Defendant.

## ORDER GRANTING MOTION TO DISMISS AND DENYING WITHOUT PREJUDICE MOTION TO STAY

Re: Dkt. No. 28

WILLIAM H. ORRICK, United States District Judge

## INTRODUCTION

**\*1**  Defendant Five Stars Loyalty, Inc. ("Five Stars"), a consumer rewards program that works with merchants to give consumers rewards points that can then be redeemed for free products or services, moves to dismiss plaintiff Sunil Daniel's First Amended Complaint ("FAC") that alleges a single cause of action under the Telephone Consumer Protection Act ("TCPA"),

47 U.S.C. § 227. Daniel alleges that Five Stars sent him a text message that constituted a willful and knowing violation of the TCPA and seeks to represent a national class of persons who received advertising or telemarketing texts from Five Stars. But the FAC establishes that Daniel asked a restaurant cashier about the Five Stars program and provided the cashier with his telephone number. The text he then received was not an advertisement or telemarketing within the meaning of the TCPA, and by providing his telephone number Daniel gave his prior express consent to receive the text. Five Stars' motion to dismiss is GRANTED. [1]

## BACKGROUND

### I. FACTUAL BACKGROUND

I assume the truth of the allegations in the FAC for the purposes of the motion to dismiss. On April 16, 2015, Daniel had lunch at a Flame Broiler restaurant in North Hollywood. First Amended Complaint ¶ 19 ("FAC") (Dkt. No. 26). "Having noticed a Five

Stars sign, upon purchase, [he] asked the cashier about Five Stars." *Id.* The cashier told him that, through Five Stars, customers earn points for food purchases, and that the points can then be redeemed for free food. *Id.*

The cashier asked for Daniel's telephone number, which Daniel provided orally. *Id.* The cashier then swiped a plastic card over a scanning device and handed the card to Daniel. *Id.* Within minutes, Daniel received a text message from Five Stars. *Id.* The message stated, "Welcome to Five Stars, the rewards program of Flame Broiler. Reply with your email to finish registering and get free pts! Txt STOP to unsubscribe." *Id.*

Daniel states that he was not told when he provided his telephone number that a text would be sent to him for any purpose, and that, "on information and belief, and based on the investigation of counsel, it is not necessary for consumers to reply to [the text he received], as the Five Stars card is operational upon receipt from the merchant." *Id.* ¶ 20. He alleges that the "clear purpose" of the text "is to encourage the customer to return and make additional purchases by expressly offering the enticement of free points...and to collect additional information (an email address), which furthers Five Stars' own marketing efforts, as well as the sales efforts of participating merchants." *Id.* ¶ 21. He also alleges that "if a response is sent to the text message, it is followed up with additional marketing messages...offering various incentives and discounts." *Id.*

## II. PROCEDURAL BACKGROUND

**\*2** On June 23, 2015, approximately two months after his visit to Flame Broiler, Daniel filed this action in the Superior Court of California for the County of San Francisco. Notice of Removal, Ex. A (Dkt. No. 1). His complaint alleged a single TCPA cause of action under 47 U.S.C. § 227(b)(1) and identified a putative class defined as "[a]ll persons throughout the United States who, since October 16, 2013, received one or more text messages transmitted by Five Stars on their cellular telephones, and made for a marketing or advertising purpose." *Id.*

Five Stars removed the case to federal court on July 31, 2015, claiming subject matter jurisdiction on the basis of federal question jurisdiction and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Notice of Removal ¶ 5. After Five Stars filed an initial motion to dismiss or, in the alternative, to stay the case, Daniel filed a notice of intent to amend as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B). Dkt. Nos. 19, 23. He filed the FAC on September 11, 2015. Dkt. No. 26.

The FAC brings the same single TCPA cause of action under 47 U.S.C. § 227(b)(1) as the original complaint and identifies the same putative class. *See* FAC ¶¶ 26, 33-38. Pursuant to 47 U.S.C. § 227(b)(3), the FAC seeks statutory damages in the amount of $500 per text message received, treble damages for willful and knowing violation of the TCPA, and injunctive relief. *Id.* ¶ 38. Five Stars filed the instant motion to dismiss or, in the alternative, to stay the case on October 2, 2015. Dkt. No. 28 ("Mot."). Pursuant to Civil Local Rule 7-1(b), I determined that the motion was suitable for disposition without oral argument and vacated the hearing set for November 18, 2015. Dkt. No. 43.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to

survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). "[I]t is within [the court's] wheelhouse to reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

## DISCUSSION

**\*3** Congress enacted the TCPA "to protect the privacy interests of telephone subscribers." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012) (in enacting the TCPA, Congress found that "[u]nrestricted telemarketing...can be an intrusive invasion of privacy") (internal quotation marks omitted). The TCPA provision at issue here, 28 U.S.C. § 227(b)(1)(A)(iii), makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system...to any telephone number assigned to a...cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).[2]

Under the current version of the implementing regulation, which took effect on October 16, 2013, the level of prior consent required to remove a call from the scope of section 227(b)(1)(A)(iii) depends on the character of the call. Where the call "includes or introduces an advertisement or constitutes telemarketing," the called party must have given his "prior express *written* consent." 47 C.F.R. § 64.1200(a)(2) (emphasis added). With respect to other calls – i.e., calls that do not include or introduce an advertisement or constitute telemarketing – only "prior express consent" is required. 47 C.F.R. § 64.1200(a)(1). In other words, texts that "'includ[e] or introduc[e] an advertisement or constitut[e] telemarketing'...may only be sent with the recipient's prior express *written* consent, whereas other texts require only prior express consent to be legal." *Reardon v. Uber Technologies, Inc.*, No. 14-cv-05678-JST, 2015 WL 4451209, at \*3 (N.D. Cal. July 19, 2015) (emphasis in original).

The same implementing regulation defines "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12).

The parties do not dispute this basic framework. *See, e.g.,* FAC ¶ 36; Mot. at 9-10; Opp. at 18 n.15 (Dkt. No. 40) ("Generally speaking, plaintiff does not does not contest that a more relaxed standard [of prior consent] applies for non-advertisements and non-telemarketing."). Nor do they dispute that there is no indication in the FAC that Daniel gave his prior express *written* consent to receive the Five Stars text message. Their dispute turns on (1) whether the text, as alleged in the FAC, was a non-advertisement and non-telemarketing message, and (2) if so, whether Daniel has alleged that he gave his prior express consent to receive it.[3] I address each issue in turn.

## I. ADVERTISEMENT OR TELEMARKETING

Five Stars argues that the text message Daniel received merely "provided information about how to complete registration per [his] request and does not constitute an advertisement or telemarketing." Reply at 2 (Dkt. No. 41). In support of this argument, Five Stars relies principally on *Aderhold v. Car2go N.A., LLC*, No. 13-cv-00489, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014), which held that a text message similar to the one Daniel received did not constitute telemarketing under the TCPA. *See id.* at *9. The text at issue in *Car2Go* stated in whole, "Please enter your car2go activation code 145858 into the emailed link. We look forward to welcoming you to car2go." *Id.* *1. The plaintiff received the text within seconds of submitting an online registration form to car2go (a car-sharing service operating in Seattle, Washington and several other cities). *Id.* As part of the online registration form, the plaintiff entered his telephone number and email address among other personal identifying information. *Id.* In dismissing the plaintiff's section 227(b)(1)(A)(iii) claim, the court rejected the argument that the text was telemarketing because it directed the plaintiff to place the activation code into the emailed link, which, in turn, connected to the car2go website, which, in turn, included marketing for car2go. *Id.* The court found that "[t]here is no indication that the text was intended for anything other than the limited purpose stated in its two sentences: to permit [plaintiff] to complete [his] registration...It is manifestly insufficient that [plaintiff] could, after choices of his own making, divert himself from the registration process to [view] car2go marketing." *Id.* at *9.

 **\*4**  *Car2go* was decided under a prior version of 47 C.F.R. § 64.1200, and the opinion does not specifically refer to the regulation's definition of "telemarketing." Nevertheless, given that the applicable version of the regulation defined "telemarketing" in exactly the same way as the current version, the case is persuasive here, and I agree with its holding: a text sent solely for the purpose of allowing the recipient to complete a registration process that he or she initiated shortly before receiving the text is not telemarketing within the meaning of 47 C.F.R. § 64.1200(f)(12). [4]

Daniel makes two counterarguments, neither of which is convincing. First, he emphasizes that "[w]hether a message qualifies as an advertisement or telemarketing cannot be determined from its face alone;" rather, "the FCC requires courts to look at the context in which the message is sent...to figure out what its purpose is." Opp. at 18. He points to *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012), in which the Ninth Circuit indicated that the characterization of a call for the purposes of the TCPA should be "approach[ed] with a measure of common sense." *Id.* at 918. According to Daniel, considering the context in which his text was sent and applying common sense, "a reasonable inference is that the message [was] designed to encourage future purchases at Flame Broiler." Opp. at 20.

Context and common sense do not help Daniel: both cut squarely against his position. The context in which the text message was sent – i.e., minutes after Daniel asked the Flame Broiler cashier about Five Stars and gave the cashier his telephone number – merely highlights the text's purpose of enabling Daniel to complete the registration process that he had initiated minutes before. Likewise, common sense points to the conclusion that Daniel received a confirmatory text as part of the process of registering for Five Stars, not a telemarketing message. To the extent that it could be reasonably inferred based on context or otherwise that the text's purpose was also to "encourage future purchases at Flame Broiler," that purpose is simply too attenuated to make the text telemarketing within the meaning of 47 C.F.R. § 64.1200(f)(12). Certainly, the text was designed to allow Daniel to complete the registration process, which could result in an increase in the chances of Daniel making future purchases at Flame Broiler or other participants in the Five Stars program. But Daniel cites no authority indicating that this degree of connection between communication and purchase is sufficient to transform a text of the sort he received into a telemarketing message.

Daniel relies heavily on *Chesbro* for his context and common sense argument, but the facts of that case are substantially different from those at issue here. There, the plaintiff purchased a computer from Best Buy and signed up for a payment plan, in the process providing his telephone number. 705 F.3d at 915. The parties disputed whether at the same time the plaintiff also enrolled in the "Reward Zone Program," which allowed customers to earn coupons that could be applied to future purchases at

Best Buy. *Id.* at 915-16. Over the course of the next approximately one year, the plaintiff received several automated calls from Best Buy regarding the Reward Zone Program, despite his repeated requests that he not be called. *Id.* at 916, 918. One of the calls consisted of the following script:

> **\*5** Hello, this is Andrea from Best Buy Reward Zone calling for (Recipient's first and last name) to remind you that your Reward Certificates are about to expire. (Certificate amount) dollars in Reward Certificates were mailed to you on (Mail date) and they will expire if not used by (Expiration Date). If you do not have your reward certificates, you can re-print them online at myrewardzone.com. Thank you for shopping at Best Buy.

*Id.* at 916. The Ninth Circuit "approach[ed] the problem with a measure of common sense" and concluded that the automated calls constituted telemarketing, highlighting that the calls

> urged the listener to "redeem" his Reward Zone points, directed him to a website where he could further engage with the [Reward Zone Program], and thanked him for 'shopping at Best Buy.' Redeeming Reward Zone points required going to a Best Buy store and making further purchases of Best Buy's goods. There was no other use for the Reward Zone points.

*Id.* at 918. The Ninth Circuit recognized that the calls did not explicitly reference any specific product or service but found that their "implication is clear from the context," and that "any additional information provided in the calls does not inoculate them" against liability under the TCPA. *Id.*

In contrast with the plaintiff in *Chesbro*, Daniel received a single text message in direct and immediate response to his inquiry regarding the Five Stars program and to his provision of his telephone number. The message he received did not urge him to "redeem" Five Stars points, did not direct him to a location where points could be redeemed or where more information about the Five Stars program could be obtained, and did not reference shopping or purchasing. Apart from the presence of rewards points and the absence of any express reference to a specific product or service, Daniel does not identify any similarities between *Chesbro* and this case. While the common sense inference in *Chesbro* was that the calls constituted telemarketing, that is not the case here.

Daniel's second argument focuses on the mention of "free pts" in the second sentence of the text he received. *See* Opp. at 18. He argues that because these "free pts" are "obviously meant to be redeemed" at Flame Broiler, the text "on its face" encourages the purchase of a product. *Id.* This argument fails because it runs smack into Daniel's first argument, i.e., that a message must be considered in context, not in a vacuum. While in certain circumstances a similar reference to rewards points might be enough to justify characterizing a message as an advertisement or telemarketing, it is not enough here: the message Daniel received did not urge him, either expressly or impliedly, to redeem any Five Stars points, nor did it direct him to a location where points could be redeemed or where more information about the Five Stars program could be obtained. Rather, as alleged in the FAC, the reference to "free pts" could be reasonably understood to mean either (1) that Daniel would earn points specifically by replying with his email and/or by completing the registration process, or (2) that joining the Five Stars program would as a general matter enable him to earn points. Under either of these readings, the mention of "free pts" is merely a brief reference to a basic consequence of Daniel replying with his email or of registering for and/or participating in the Five Stars program. Given the context of the message, that brief reference does not rise to the level of encouraging the purchase of goods or services. Nor

Case 1:26-cv-00659-KM Document 13-1 Filed 05/20/26 Page 57 of 199

Daniel v. Five Stars Loyalty, Inc., Not Reported in Fed. Supp. (2015)

does it threaten the sort of "intrusive invasion of privacy" that Congress contemplated in enacting the TCPA. *Mims*, 132 S. Ct. at 745. The text Daniel received did not include or introduce an advertisement and did not constitute telemarketing. [5]

## II. PRIOR EXPRESS CONSENT

**\*6** Because the text Daniel received did not include or introduce an advertisement or constitute telemarketing, it "require[d] only prior express consent to be legal." *Reardon*, 2015 WL 4451209, at \*3. I agree with Five Stars that the allegations in the FAC establish that Daniel gave his prior express consent to receive the text.

While there is a minority of courts that have found otherwise, the great weight of authority holds that an individual who knowingly provides her telephone number to another party without limiting instructions has giving her prior express consent to receive calls at that number from that party. In its 1992 order interpreting the TCPA, the FCC observed that

> persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached.

7 F.C.C. Rcd. 8752 ¶ 31 (1992) (internal footnotes omitted). [6],[7] In line with this order, "the vast majority of cases to address the issue have held that a telephone customer who provides her number to another party consents to receive calls or texts from that party." *Reardon*, 2015 WL 4451209, at \*6 (collecting cases); *see also Baird v. Sabre Inc.*, 995 F. Supp. 2d 1100, 1102-03 (C.D. Cal. 2014) ("Myriad federal district courts have relied on the [FCC's 1992 order] to conclude that plaintiffs who provided a business with their telephone number and then received a text message from the business had no claim under the [TCPA].") (collecting cases); *Roberts*, 2015 WL 6524840, at \*1 (holding that, under the FCC's 1992 order, the plaintiff "expressly consented to text messages from [defendant] when he provided [defendant] his cell phone number"); *but see, e.g., In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1258 (S.D. Cal. 2012).

Further, in its 2015 order interpreting the TCPA, the FCC again explained that prior express consent exists where the recipient provides her telephone number without limiting instructions. It stated: "For non-telemarketing and non-advertising calls, express consent can be demonstrated by the called party giving prior express oral or written consent or, in the absence of instructions to the contrary, by giving his or her wireless number to the person initiating the autodialed or prerecorded call." 30 F.C.C. Rcd. 7961 ¶ 52 (2015) (internal footnotes omitted).

**\*7** Daniel cites no authority to the contrary (although, as noted above, there is some), and, indeed, offers no argument whatsoever in his opposition brief regarding prior express consent. [8] Five Stars has shown that, as alleged in the FAC, the text it sent to Daniel was a non-advertisement and non-telemarketing message sent with the prior express consent of the recipient. Accordingly, the TCPA cause of action must be dismissed.

## CONCLUSION

Five Stars' motion to dismiss is GRANTED. Daniel shall file his second amended complaint, if any, within 25 days of the date of this Order. Five Stars' motion to stay is DENIED WITHOUT PREJUDICE to resubmission upon the filing of Daniel's second amended complaint.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 58 of 199

Daniel v. Five Stars Loyalty, Inc., Not Reported in Fed. Supp. (2015)

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7454260

---

**Footnotes**

1    In the alternative, Five Stars moves to stay the case pending resolution of the appeals in *Campbell-Ewald Co. v. Gomez*, 135 S. Ct. 2311 (2015), and *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892 (2015). That request is DENIED WITHOUT PREJUDICE.

2    The Ninth Circuit has held that a text message qualifies as a "call" within the meaning of the TCPA. *See* *Satterfield*, 569 F.3d at 952-54.

3    Five Stars also moves to dismiss on the ground that Daniels has not plausibly alleged that Five Stars used an "automatic telephone dialing system" to send the text. *See, e.g.,* Mot. at 7-9. Because I resolve the motion on the grounds stated in this Order, I do not address that argument.

4    Daniel focuses his briefing on whether the text he received constituted "telemarketing" under 47 C.F.R. § 64.1200(f) (12), and it is unclear whether he means to allege that the text also included or introduced an "advertisement" within the meaning of 47 C.F.R. § 64.1200(f)(1). To the extent that he does base his TCPA claim on this theory, the claim fails. I do not see how the text could be reasonably characterized as including or introducing "material advertising the commercial availability or quality of any property, goods, or services," 47 C.F.R. § 64.1200(f)(1), and Daniel does not even attempt to explain how it could be.

5    Although Daniel alleges in the FAC that "it is not necessary for consumers to reply to [the text he received], as the Five Stars card is operational upon receipt from the merchant," and that "if a response is sent to the text message, it is followed up with additional marketing messages...offering various incentives and discounts," FAC ¶ 20, he does not explain either in the FAC or in his opposition brief how these allegations help his case. On their face, they do not. In light of the absence of any explanation of their relevance, they do not change the advertisement/telemarketing analysis set out above.

6    Under the Hobbs Act, I am bound by an FCC final order unless it is invalidated by a court of appeals. *See* 28 U.S.C. § 2342(1); *see also US W. Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1054 (9th Cir. 2000); *Leckler v. Cashcall, Inc.*, No. 07-cv-04002-SI, 2008 WL 5000528, at *2-3 (N.D. Cal. Nov. 21, 2008). The FCC's 1992 order, as well as its 2015 order discussed below, are final orders within the meaning of the Hobbs Act. *See* *Reardon*, 2015 WL 4451209, at *6; *Roberts v. Paypal, Inc.*, No. 13-16304, 2015 WL 6524840, at *1 (9th Cir. Oct. 29, 2015); *see also US W. Commc'ns*, 224 F.3d at 1054 (9th Cir. 2000) ("[A]gency orders are 'final orders' for the purposes of the Hobbs Act if they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process") (some internal quotation marks omitted).

7    Five Stars' unopposed request for judicial notice of the FCC's 1992 and 2015 orders and two other orders issued by the FCC, Dkt. No. 30, is GRANTED.

---

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 59 of 199

Daniel v. Five Stars Loyalty, Inc., Not Reported in Fed. Supp. (2015)

8      Daniel does dispute Five Stars' alternative arguments that it possessed a "good faith belief" of prior express consent, and that its alleged misconduct is shielded from liability under the exception, set out in the FCC's 2015 order, for "a one-time text sent in response to a consumer's request for information." 30 F.C.C. Rcd. 7961 ¶ 106. However, because I find that Daniel's allegations establish that he gave his prior express consent to receive the text, I do not address those arguments.

---

**End of Document**            © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1505675
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

John DUROCHER individually and on behalf of all others similarly situated, Darin Harris
individually and on behalf of all others similarly situated, Anthony Mirando, Plaintiffs,
v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION Transferred per the conditional
transfer order (Docket # 54) to the Northern District of Illinois, Riddell, Inc., All American Sports
Corporation doing business as Riddell/All American, Riddell Sports Group, Inc., Easton–Bell Sports,
Inc., Easton–Bell Sports, LLC, EB Sports Corporation, RBG Holdings Corporation, Defendants.

No. 1:13–cv–01570–SEB–DML.
|
Signed March 31, 2015.

**Attorneys and Law Firms**

David B. Franco, James Dugan, The Dugan Law Firm, New Orleans, LA, Don Barrett, Barrett Law Office PA, Lexington, MS, Elizabeth J. Cabraser, Lieff Cabraser Heimann & Bernstein, San Francisco, CA, Irwin B. Levin, Lynn A. Toops, Richard E. Shevitz, Scott D. Gilchrist, Vess Allen Miller, Cohen & Malad LLP, Indianapolis, IN, Wendy Ruth Fleishman, Lieff Cabrasher Heimann & Bernstein LLP, New York, NY, for Plaintiffs.

Mark S. Mester, Latham & Watkins LLP, Chicago, IL, Cary A. Slobin, Bowman & Brooke, LLP, Dallas, TX, Paul Cereghini, Bowman & Broke LLP, Phoenix, AZ, Randall R. Riggs, Frost Brown Todd LLC, Indianapolis, IN, Robert Latane Wise, Bowman and Brooke LLP, Richmond, VA, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO STRIKE CLASS ALLEGATIONS [DKT. NO. 78]**

SARAH EVANS BARKER, District Judge.

**\*1** This matter comes before us on Defendants' Motion to Strike Class Allegations. [Dkt. No. 78.] The motion is fully briefed, including supplemental briefing filed by both parties. [*See* Dkt. Nos. 79, 84, 91, 100, 101, 102.] For the following reasons, we GRANT Defendants' Motion. Plaintiffs are allowed to recast their proposed class consistent with the discussion and findings below as well as the Court's Order on Defendants' Motion to Dismiss within the next twenty (20) days.

**Background and Procedural History**

Defendants include a thorough recitation of the facts in their opening brief. [Dkt. No. 79 at 3–14.] Plaintiffs do not dispute any of these facts or set forth any additional facts in support of their position. [Dkt. No. 84 at 1–2.] Many of the facts are set forth in our Order on Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, entered contemporaneously herewith. Thus, we outline only the class-action-specific allegations below.

As a preliminary matter, Defendants invoke matters outside the pleadings on their motion to strike, both in their opening brief and their subsequent briefs. "Generally, material outside of the pleadings is not considered on a motion to strike" because

"the Court must treat all well pleaded facts as admitted." *Perez v. PBI Bank, Inc.,* No. 1:14–cv–01429–SEB–MJD, 2015 WL 500874, at *10 (S.D.Ind. Feb., 4, 2015) (citing *Sun–Flex Co. Inc. v. Softview Computer Prods. Corp.,* 750 F.Supp. 962, 964 (N.D.Ill.1990); *U .S. Oil Co. v. Koch Ref. Co.,* 518 F.Supp. 957, 959 (E.D.Wis.1981)). Even on a motion to strike class allegations, it is not appropriate for the Court to consider matters outside the pleadings. *Guzman v. Bridgepoint Educ., Inc.,* No. 11cv69 WQH (WVG), 2013 WL 593431, at *7 (S.D.Cal. Feb. 13, 2013) (citation omitted). In *Blihovde v. St. Croix County, Wis.,* the court noted that a "motion to strike" class allegations was mislabeled because generally in a "motion to strike under Fed.R.Civ.P. 12(f), a party argues that portions of the pleadings are facially improper." 219 F.R.D. 607, 612 (W.D.Wis.2003). However, in *Blihovde,* "both parties [ ] cited a number of materials outside the pleadings to support their positions" and as a result, the court construed the motion as one for denial of class certification under Rule 23(c) (1). *Id.* Here, Defendants have cited matters outside the pleadings and Plaintiffs responded only by offering more complete portions of the evidence Defendants cited (i.e., the *Arlington v. NCAA* docket at No. 101–1). Consequently, we will not consider materials cited by Defendants that are outside the pleadings in ruling on Defendants' Motion to Strike. [*See, e.g.,* Dkt. No. 100.]

**A. Proposed Class.**

Plaintiffs' Second Amended Complaint (SAC) filed on March 14, 2014 [Dkt. No. 71] includes class action allegations. Specifically, Plaintiffs seek to certify a class defined as follows:

> All present or former members of a college football team in the United States, who, while wearing a helmet manufactured by Defendants, participated in a college football game or practice from November 15, 2000 through the present and, while playing in such a game or practice, experienced a head impact.

> **\*2  Riddell Subclass A:**

> All present or former members of a college football team at a school in Arizona, California, Colorado, District of Columbia, Florida, Guam, Illinois, Indiana, Maryland, Massachusetts, Missouri, Montana, Ohio, Oregon, Pennsylvania, Utah, Washington or West Virginia, who, while wearing a helmet manufactured by Defendants, participated in a college football game or practice from November 15, 2000 through the present and, while playing in such a game or practice, suffered a head impact.

> **Riddell Subclass B:**

> All present or former members of a college football team at a school in Alabama, Alaska, Arkansas Connecticut, Delaware, 44 Georgia, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Oklahoma, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virgin Islands, Virginia, Washington, Wisconsin, or Wyoming, who, while wearing a helmet manufactured by Defendants, participated in a college football game or practice from November 15, 2000 through the present and, while playing in such a game or practice, suffered a head impact and subsequently suffered a concussion or one or more concussion-like symptoms, defined as: amnesia; confusion; headache; loss of consciousness; balance problems or dizziness; double or fuzzy vision; sensitivity to light or noise; nausea; feeling sluggish, foggy or groggy; feeling unusually irritable; concentration or memory problems; and slowed reaction time.

[Dkt. No. 71 at ¶ 154.] The proposed class (including subclasses) expressly excludes "Defendants and their subsidiaries and affiliates; all former college football players who played professional football in the National Football League; all persons who make a timely election to be excluded from the Class and subclasses; governmental entities; and any judicial officers or staff to whom this case is referred, and their immediate family members." [*Id.*] Defendants direct our attention to the fact that Subclasses A and B overlap by including present and former members of college football teams in Oregon and Washington. Plaintiffs also allege that the proposed class would "include hundreds if not thousands of persons who have developed or will develop mental or physical problems as a result of sustaining traumatic brain injuries, concussions or concussion-like symptoms while

playing in a college football game or practice, and that the locations of such persons is geographically dispersed throughout the country." [SAC ¶ 156.]

**B. Individual Experiences of Plaintiffs.** [1]

Plaintiffs each had unique college experiences. Mr. DuRocher played football at the University of Oregon in 2003 before he transferred to the University of Washington, where he finished his playing career in 2006. [SAC ¶ 13.] Mr. Harris, on the other hand, began his college football career in 2004, playing for the University of Washington until 2008. [*Id.* ¶ 15.] Mr. DuRocher played quarterback, while Mr. Harris played strong safety and was on the special teams unit. [*Id.* ¶¶ 13, 15.] Defendants conclude, therefore, that Plaintiffs would have been exposed to different coaches, team physicians, managers, and trainers and would have participated under different health and fitness policies. [*Id.*] Additionally, each Plaintiff has his own pre- and post-college backgrounds and personal health histories. [*Id.*]

**\*3** Mr. DuRocher was hit during a 2006 game, leaving him lightheaded and dizzy, for which the coaching staff, team physician, or trainer removed him from the game. [SAC ¶ 13.] He was later diagnosed with a concussion. [*Id.*] Mr. DuRocher also claims to have experienced "other similar head impacts" but cannot recall them specifically. [SAC ¶ 13.]

Mr. Harris recounts a hit he sustained during a 2007 game in which he was blindsided that caused him to experience lightheadedness. [*Id.* ¶ 16.] Mr. Harris was not removed from the game, but instead returned to play the next time the defense took the field. [*Id.*] Mr. Harris recalls experiencing another hit during the following season in 2008, after which he was removed from the game. [*Id.* ¶ 16.]

Messrs. DuRocher's and Harris's alleged injuries differ. Mr. Harris claims he has experienced headaches, memory loss, an inability to concentrate or focus, anxiety, and depression after graduating from college. [*Id.* ¶ 16.] Except for headaches, DuRocher claims to have experienced none of the same alleged symptoms as Harris.

**C. Available Concussion-related Information.**

Plaintiffs' SAC contains an extensive recitation of the available information relating to the effect of concussions over time. [SAC ¶¶ 56–77.] For example, in addition to the information they recite as being publicly available in the 1990s (*id.* ¶¶ 61–64) —when the putative class members who played college football in the early 2000s would have been in high school—Messrs. DuRocher and Harris also describe various publicly available reports and studies by college-football-playing universities and other institutions and organizations about concussions and head injuries at different times throughout the class period, including publications issued in 2000, 2001, 2002, 2003, 2005, 2006, 2007, 2008 and 2010 (*id.* ¶¶ 65–77).

Plaintiffs also refer to specialized and unique programs focused on athletes and sports injuries at certain football-playing universities, such as the University of North Carolina–Chapel Hill's Center for the Study of Retired Athletes. [SAC ¶¶ 68– 69, 73.] Plaintiffs also refer to the NCAA which issues concussion awareness posters and materials (*e.g.,* SAC ¶ 32), and its efforts from 2004–2009 to document concussions in football through its "injury surveillance system" (*id.* ¶¶ 71–72). The earlier iterations of Plaintiffs' complaint cited the NCAA's Concussion Management Plan established in August 2010. [First Am. Class Action Compl. (ECF No. 9) at ¶ 91.] According to DuRocher and Harris, the NCAA's Concussion Management Plan also affected the level of awareness concerning concussion risks.

In light of the Court's Order on Defendants' Motion to Dismiss, the remaining claims for which we must decide whether a class action might be appropriate are strict liability for design defect and manufacturing defect. [*See* Order on Dkt. No. 76, entered concurrently with this Order.] Plaintiffs' medical monitoring and negligence claims have been dismissed.

**Analysis**

**A. Class Certification and Motions to Strike/Prematurity Standards**

**\*4** Two competing principles drive the parties' opposing arguments. First, motions to strike class allegations are generally regarded as premature because the shape and form of the class is to be given time to evolve through discovery. [2] On the other hand, personal injury claims are generally not appropriate for class treatment due to both the individualized nature of personal injuries as well as variations among applicable state laws. [3] Both principles present valid and legitimate arguments informing our determination of the proper path of this litigation.

Often the procedural order for a proposed class action is that the complaint is filed, discovery is conducted, and plaintiffs file a motion to certify the proposed class by demonstrating that the class and its representative(s) meet the requirements of Federal Rule of Civil Procedure 23(a) and one of the subsections of Rule 23(b). Those familiar requirements provide as follows:

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**\*5 (D)** the likely difficulties in managing a class action.

Fed.R.Civ.P. 23. The Rule 23(a) requirements have been succinctly summarized as: numerosity, commonality, typicality, and adequacy. *See* *Wal–Mart Stores v. Dukes,* —— U.S. —— 131 S.Ct. 2541, 180 L.Ed.2d 374 (2001).

As we have noted and as is evidenced by Plaintiffs' citations, several courts have held that, "[b]ecause a class determination decision generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, a decision denying class status by striking class allegations at the pleading stage is inappropriate." *Boatwright v. Walgreen Co.,* No. 10 C 3902, 2011 WL 843898, at \*2 (N.D.Ill. Mar.4, 2001) (citing *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). These courts hold that class certification "issues are better raised after the parties have had an opportunity to conduct class discovery and fully brief the motion for class certification." *De Falco v. Vibram USA, Inc.,* No. 12 C 7238, 2013 WL 1122825, at \*9 (N.D.Ill. Mar.18, 2013). Indeed, in the Fifth Circuit it may be an abuse of discretion for the district court to strike class action allegations based solely on the initial pleadings. *Jones v. Diamond,* 519 F.2d 1090, 1099 (5th Cir.1975) ("The court too bears a great responsibility to insure the just resolution of the claims presented; it should be loathe to deny the justiciability of class actions without the benefit of the fullest possible factual background."). Numerous other courts have similarly held. *See* n. 2, *supra.* Indeed, the Supreme Court has advised:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U.S., at 160, 102 S.Ct. 2364, 72 L.Ed.2d 740, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," *id.,* at 161, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740; *see* *id.,* at 160, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 ("[A]ctual, not presumed, conformance with Rule 23(a) remains .... indispensable"). Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. " '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Falcon, supra,* at 160, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); some internal quotation marks omitted). Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation. *See* *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676–677 (C.A.7 2001) (Easterbrook, J.).

\*6 *Dukes,* 131 S.Ct. at 2551–52.

The procedure of delaying a ruling on class certification until some amount of discovery is completed, however, is not ironclad or without exception. Both the Third and the Sixth Circuits along with a myriad of district courts have granted motions to strike when the court was unable to "see how discovery or for that matter more time would have helped" the plaintiffs strengthen the class allegations. *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 949 (6th Cir.2011); *see also* *Landsman & Funk PC v. Skinder–Strauss Assocs.,* 640 F.3d 72, 93 n. 30 (3d Cir.2011) (holding that the case before it was not among the rare "cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met.") (citing *Rios v. State Farm Fire & Cas. Co. .,* 469 F.Supp.2d 727, 740 (S.D.Iowa 2007)); *see, e.g.,* *Bd. of Educ. of Tp. High School v. Climatemp, Inc.,* No. 79 C 3144, 1981 WL 2033, at \*2 (N.D.Ill. Feb.20, 1981) ("Although the Attorney General claims that such a motion is improper technically and procedurally, motions to strike are a reflection of the court's inherent power to prune pleadings in order to expedite the administration of justice and to prevent abuse of its process. This procedure is useful in bringing into focus issues the resolution of which governs the broader question of whether a class action is maintainable,

and a number of courts in this circuit have employed it.") (citing 2A Moore's Federal Practice, § 12.21 at p. 2419; *Thill Sec. Corp. v. New York Stock Exch. [1972 TRADE CASES P 74,239],* 469 F.2d 14 (7th Cir.1972) (denial of motion to strike class action is not appealable under 28 U.S.C. § 1291); *United States Dental Inst. v. Am. Assoc. of Orthodontist* s, 1977–2 TRADE CASES, P 61,557, No. 74 C 2924, 1977 WL 1442 (N.D.Ill. July 21, 1977) (motion to strike class action allegations granted); *Miller v. Motorola,* 76 F.R.D. 516 (N.D.Ill.1977) (motion to strike class action allegations granted)). [4] In the exceptional case, circumstances may warrant a motion to strike class allegations to conserve court and party resources and where the "pleadings make clear that the suit cannot satisfy Rule 23." *Hioll v. Wells Fargo Bank, N.A.,* 946 F.Supp.2d 817, 830 (N.D.Ill.2013). "Even when the defendant initiates the court's review of class allegations, the burden remains on the plaintiff to establish that the suit may be maintained as a class action." *Wright v. Family Dollar, Inc.,* No. 10 C 4410, 2010 WL 4962838, at *2 (N.D.Ill. Nov.30, 2010).

Defendants argue that this is such an exceptional and rare case that warrants striking Plaintiffs' class allegations prior to discovery and prior to a motion for certification. Defendants seek to strike Plaintiffs' class action allegations for two overarching reasons. First, Defendants argue that personal injury product liability claims are inherently individual and state-law specific. As a result, common issues suitable for nationwide class treatment under Fed.R.Civ.P. 23 do not exist. Second, Defendants argue that Plaintiffs have not defined a proper class because membership in the class can only be ascertained through individual inquiry based on subjective criteria. Defendants argue that the class definition alleged in the SAC can never be certified and, as a result, we should strike the class allegations in their entirety.

**\*7** Plaintiffs place all of their proverbial eggs in one basket. [5] Their entire retort to Defendants' Motion to Strike is an argument based on timing—that Plaintiffs should be given time to conduct discovery before being forced into what is essentially a certification dispute. [6] Plaintiffs do not dispute Defendants' factual statement. In fact, Plaintiffs do not respond to Defendants' arguments at all, relying on an unconvincing sidestep that they can always amend their class definition at a later date. Not true. A determination of whether Defendants' motion is premature necessarily depends on the viability of Plaintiffs' class action allegations, which issue, unfortunately, Plaintiffs did not defend.

Mindful of the narrow road we must traverse here, we are persuaded that Defendants' Motion to Strike is not entirely premature. The parties and Court can enjoy significant time and resource savings by striking allegations of the SAC that it is clear even now will never come to fruition. Although Plaintiffs press their claim that discovery may shape the class definition and that they may narrow or change the class definition as is their prerogative, Plaintiffs have not explained *how* discovery might enlighten the pursuit of class treatment or *what* discovery they would seek. In short, "[P]laintiffs do not explain how discovery could make a difference to the issue of certification." *See Ladik v. Wal–Mart Stores, Inc.,* 291 F.R.D. 263, 273 (W.D.Wis.2013). Plaintiffs do not refute that "when the defendant advances a legal argument based on the pleadings, discovery is not necessary for the court to evaluate whether a class action may be maintained." *Wright,* 2010 WL 4962838, at *1. It is Plaintiffs who are "oblig[ed] in [their] complaint to allege facts bringing the action within the appropriate requirements of the rule [23]." *Cook County Teachers Union, Local 1600, Am. Fed. of Teachers, AFL–CIO v. Byrd,* 456 F.2d 882, 885 (7th Cir.1972).

Plaintiffs cannot promise to, at some undisclosed time in the future, revise their proposed class definition to satisfy Rule 23's requirements. Plaintiffs may be "permitted to seek certification of a more narrowly defined class than that currently defined, which may consist of fewer states and/or claims, should it become necessary to do so at the class certification" [Dkt. No. 101 at 3], but Defendants are entitled to know the class definition being alleged against them and their motion to strike the class certification claim requires us to rule now, for the reasons previously cited.

**B.** **Rule 23** **Requirements.**

### 1. Individual Factual Inquiries.

Defendants argue that the overwhelming precedent denying the certification of personal injury class actions warrants an early inquiry into the sustainability of Plaintiffs' class action claim.[7] Defendants contend that personal injury products liability class actions struggle to satisfy the commonality requirement of Rule 23(a). "Commonality" pursuant to Rule 23 requires:

**\*8** that the issues raised by the complaint be "common to the class as a whole" and that they "turn on questions of law applicable in the same manner to each member of the class." The Supreme Court has recently injected more rigor into the commonality inquiry, clarifying that it does not suffice for a plaintiff merely to raise common "questions," since "any competently crafted class complaint" will do so. "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Shepherd v. ASI, Ltd.,* 295 F.R.D. 289, 297 (S.D.Ind.2013) (internal citations omitted) (citing *General Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (citing *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)); *Dukes,* 131 S.Ct. at 2551 (quoting Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.Rev. 97, 132 (2009)).

The SAC alleges that the following common questions of law and fact are shared by the putative class members:

because the Class Members all played under the same rules and practices; all played with the same equipment; and they all suffered or were exposed to an increased risk of traumatic brain injuries, concussions or concussion-like symptoms while playing football and wearing helmets manufactured by Defendants. Such common questions include:

(a) whether Defendants voluntarily undertook and/or otherwise had a duty to provide warnings to players about the injuries associated with repeated brain trauma, concussions and concussion-like symptoms;

(b) whether Defendants failed to appropriately warn or otherwise inform players about their risks of concussions even while wearing Defendants' helmets;

(c) whether Defendants had a duty to use liner materials with newer energy-absorbing capabilities within subject helmets to effectively reduce acceleration of the head on impact by compressing to absorb force during the collision; and

(d) whether Defendants willfully and wantonly concealed evidence related to the injuries associated with repeated brain trauma, concussions and concussion like symptoms.

[SAC ¶ 157.]

Defendants complain that the common questions alleged by Plaintiff of "whether Defendants failed to appropriately warn or otherwise inform players about their risks of concussions even while wearing Defendants' helmets" (SAC ¶ 157(b)):

splinters into a host of individual legal and factual inquiries—e.g., what time period is being evaluated; what Riddell warnings the player received; whether Riddell had a duty to warn about risks it did not create; whether Riddell satisfied its duty to warn by providing warnings to colleges purchasing helmets; what information the player already had from public knowledge, from his prior playing experience, from his university or his team, from his team physicians and trainers, and from his treating physicians—to name just a few.

**\*9** [Dkt. No. 79 at 16, 20.] Often, failure-to-warn cases are inherently case- and fact-specific. *See Block v. Abbott Labs.,* No. 99C 7457, 2002 WL 485364, at \*4 (N.D.Ill. Mar.29, 2002) ("[W]e are very troubled by the prospect of having to resolve the highly individualized issue of proximate cause with respect to the failure-to-warn claim.").

Defendants contend that player-specific inquiries are pervasive in Plaintiffs' design and manufacturing defect claims as well. For example, Defendants maintain that the Court will be required to consider individualized inquiries such as the condition, care, misuse, and alteration of each player's helmet and proximate cause related to each individual's concussion or head inquiry, which requires consideration of the specifics of the impact—magnitude, direction, duration, circumstances, etc. [Dkt. No. 79 at 20.] Defendants also argue in their Reply that a statute-of-limitations defense is individualized for each class member based on Indiana's discovery rule. [Dkt. No. 91 at 12 (citing *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 149 (3d Cir.1998)).]

Though Plaintiffs make no response to Defendants' arguments, it is not impossible to imagine how these questions *could possibly* have common answers. For example, if the insufficient warranty spanned the entire class period and we assume that the class members had the most complete publicly-available information, the class would share common questions that could have common answers. Indeed, Defendants' example of the question "whether Riddell had a duty to warn about risks it did not create" is the quintessential common question that would inform the class's failure to warn claim and would be shared among all class members. Similarly, like in *A .K.W. v. Easton–Bell Sports, Inc.,* 454 Fed. Appx. 244 (5th Cir.2011), where the actual helmet at issue was lost, an expert could assume that helmets were in perfect condition and proffer opinions about the least drastic concussions in the best possible scenarios to arrive at a conclusion of the manufacturing and design defects of Defendants' helmets.

We say again that Defendants' required showing on a motion to strike class allegations is a steep one—we cannot say that the "pleadings make clear that the suit cannot satisfy Rule 23" with respect to the alleged facts and commonality. *Hioll,* 946 F.Supp.2d at 830. It is also conceivable that a class definition could be crafted narrowly enough to eliminate a statute of limitations concern, such that we cannot say it would be impossible to do so. Common questions of fact that could be shared among the putative class members weighs in favor of denying Defendants' motion to strike.

Defendants also contend that the medical causation necessary to prove the putative plaintiffs' claims requires individual, not class, treatment. [Dkt. No. 79 at 20–21.] For example, family and medical history, age, diet, and lifestyle may affect each putative plaintiff's response to head-related injuries. [*Id.* (citing *In re PPA Prods. Liab. Litig.,* 208 F.R.D. 625, 631–32 (W.D.Wash.2002) (cataloguing individual medical issues relevant to causation); *In re Rezulin Prods. Liab. Litig.,* 21 210 F.R.D. 61, 66–67 (S.D.N.Y.2002) (same)).] Defendants criticize Plaintiffs' class definition because it does "not limit class members' claims to objectively diagnosable diseases but instead include[s] largely subjective and commonly experienced symptoms such as loss of memory, sleeplessness, and mood swings." [*Id.* at 21 (citing SAC ¶ 144).] Although not part of the SAC, Defendants point to Mr. DuRocher's pre-existing congenital brain tumor and brain surgery as one example of the individualized nature of a class plaintiff's medical history that could have a significant impact on medical causation that would negative class treatment. [*Id.*]

**\*10** Medical causation and personal injury allegations raise a significant hurdle that makes class treatment questionable. As Defendants note, "no federal appellate court has approved a nationwide personal injury, product liability or medical monitoring class." [*Id.*] The individualized inquiries related to medical causation described by Defendants weigh heavily in favor of striking Plaintiffs' class action allegations and foreshadow a tremendous uphill battle for Plaintiffs to certify a class action based on personal injuries of individual class members.

### 2. Differing Laws.

Defendants also contend that because the litigants are not governed by the same legal rules, a class action is not proper. "No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and

superiority requirements of ⚑Fed.R.Civ.P. 23(a), ⚑(b)(3)." ⚑*In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1015 (7th Cir.2002). Defendants argue that 55 different jurisdictions' laws would be at issue under the current proposed class definition and therefore a class action is not proper. [Dkt. No. 79 at 17 (citing ⚑*In re Bridgestone/Firestone, Inc.,* 288 F.3d at 1015).] Because Indiana follows the rule of *lex loci delicti,* the court will apply the substantive law of the place of the harm—or where the last event necessary to make defendant potentially liable took place. [Dkt. No. 77 at 9–11; ⚑*Klein v. DePuy, Inc.,* 506 F.3d 553, 555 (7th Cir.2007) ].[8]

Defendants also note that products liability law differs among the jurisdictions at issue. Indeed, Defendants' Second Appendix compares many jurisdictions' products liability law and contrasts the differences that may impede the common treatment of claims across the class, even after considering the segregation of states into two proposed subclasses. [*See* Dkt. No. 79–2.] At a minimum, Defendants have established that the laws at issue in the proposed class are varied, inconsistent, and conflicting. [*Id.;* ⚑*Zinser v. Accufix Res. Inst., Inc.,* 253 F.3d 1180, 1188 (9th Cir.2001) ("[T]he laws of negligence, product[s] liability, and medical monitoring all differ in some respects from state to state.") (citing ⚑*Castano v. Am. Tobacco Co.,* 84 F.3d 734, 743 n. 15 (5th Cir.1996)). The inconsistent laws applicable to the putative members' claims weighs heavily in favor of striking Plaintiffs' current class definition.

### 3. Subclasses.

Pursuant to ⚑Fed.R.Civ.P. 23(c)(4) and (5), certification of particular issues for class treatment is authorized as well as the dividing of a class "into subclasses that are each treated as a class under this rule." Plaintiffs suggest dividing their putative class into two subclasses based on the location of the college football team for which they played. [*See* SAC ¶ 154.] Defendants argue that these subclasses do not eliminate the obstacles to class treatment.

First, Plaintiffs do not explain the purpose of the subclasses or the commonality among the locations contained in each subgroup or why Washington and Oregon are both included in each subgroup. [*See* Dkt. No. 79 at 24.] These gaps may ultimately be filled by discovery, if we denied the motion to strike.

**\*11** However, Defendants argue that the subclasses do not—indeed, cannot—remedy the concerns presented by the major or nuanced differences among the jurisdictions contained in each subclass. For example, as Defendants note, "[w]ithin subclass A, the jurisdictions take differing approaches to strict products liability, whether by adopting statutory versus common-law systems (*see, e.g.,* App. 2 at 9 ns. 23–27), or with differing elements to the claims (*see, e.g., id.* at 10–11), or different recognized defenses (*see, e.g., id.* at 17–18.)[.] Subclass B sees similar variations, including that some jurisdictions, such as Virginia, do not even recognize strict liability. (*Id.* at 9 n. 26.)" [Dkt. No. 79 at 26.] According to Defendants' analysis (to which Plaintiffs do not respond or object), "[d]igging down further into the 'subordinate concepts' of product liability law across all 55 jurisdictions only further reveals that no matter how the classes were subdivided, all of the putative class members would not be 'governed by the same legal rules,' as the law requires." [*Id.* at 26–27 (citing ⚑*Bridgestone–Firestone,* 288 F.3d at 1015; ⚑*Yaz & Yasmin,* 275 F.R.D. at 275).][9]

As discussed above, the differences (both major and nuanced) between the potentially 55 different jurisdictions pose a major impediment to class treatment. Plaintiffs have not suggested how their proposed class treatment would address this potential roadblock to class certification. Based on the plain language of the proposed subclasses coupled with the differing treatment of products liability law among the jurisdictions at issue, serious questions exist signaling that the putative class members' claims are unable to be adjudicated in either a class setting or via the use of subclasses.

### 4. Class Member Identification.

Classes must be defined in such a way that membership in the class can be readily determined based on objective criteria. *See Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006). Said another way, if determining the membership of the class turns on subjective criteria requiring plaintiff-by-plaintiff inquiry, the class is not ascertainable. *Adashunas v. Negley,* 626 F.2d 600, 603 (7th Cir.1980) (class not ascertainable where members highly diverse and difficult to identify); *Gomez v. Ill. State Bd. of Educ.,* 117 F.R.D. 394, 397 (N.D.Ill.1987) (membership must be capable of determination by reference to objective criteria). When a class is not ascertainable (i.e., the membership is not objectively determinable), a court is within in its authority to strike the class allegations. *In re Vioxx Prods. Liab. Litig.,* No. MDL 1657, 2012 WL 2061883, at *3 (E.D.La. June 6, 2012) (striking class allegations because "ascertaining the class cannot be done by any objective method" and would instead involve "examin[ing] the specific circumstances" of each purported class member).

Defendants argue that the class proposed here by Plaintiffs is not ascertainable for several reasons. First, they maintain that the term "head impact" (which a putative member must have experienced while playing college football) is subjective and undefined. [Dkt. No. 79 at 30.] This term, they stress, is overly broad because it would include those who experienced "only *de minimis* risk or harm" and, as drafted, would include those who experienced "head impact" and then later suffered a single headache. [*Id.*] Although we find Defendants concerns respecting the term "head impact" to be valid, this alone would not warrant striking the class allegations. Defining the term "head impact" is not impossible, despite its being a subject of debate in a class certification motion.

**\*12** Although Defendants attack the proposed class definition with respect to whether a putative class member wore a Riddell helmet when the head impact occurred [Dkt. No. 79 at 31], we have already found this issue does not impede the claim. [*See* Order on Motion to Dismiss issued concurrently herewith.] It is conceivable that discovery will enlighten the facts pertaining to the sale and distribution of Riddell helmets to college football teams. Whether the putative class members wore a Riddell helmet is akin to most product liability-based class actions where the class definition includes members who used the challenged product. We do not find this issue to justify striking Plaintiffs' class action allegations.

Defendants also assert that the concussion and concussion-like symptoms described in Subclass B require class member-specific factually inquiries. [Dkt. No. 79 at 31.] In support, Defendants point to *In re Rezulin,* where the court found that "whether an individual is asymptomatic or has manifested physical injury can be determined only by a physician." 210 F.R.D. at 74. Based on the plain language of the proposed Subclass B, we are not convinced that treating healthcare professionals will be required to identify the members of the class. Subclass B's language includes players who:

> suffered a head impact and subsequently suffered a concussion or one or more concussion-like symptoms, defined as: amnesia; confusion; headache; loss of consciousness; balance problems or dizziness; double or fuzzy vision; sensitivity to light or noise; nausea; feeling sluggish, foggy or groggy; feeling unusually irritable; concentration or memory problems; and slowed reaction time.

[SAC ¶ 154.] In our view, it would not be *impossible* for a putative plaintiff to show membership in the class absent the testimony of a healthcare professional. At least some of the symptoms described in the definition such as headache, dizziness, double or fuzzy vision, sensitivity to light or noise, nausea, etc., do not require verification by a healthcare professional; rather, they are symptoms easily recognized as such by an individual class member. Clearly, such symptoms can impact the issue of whether claims are individually based or common to the class, but we are not persuaded that it turns on whether a healthcare professional would be required to make that determination. At this point, we do not find that identifying the putative class members is impossible based on the proposed class definition.

### Conclusion.

Defendants set forth a persuasive argument supported by the facts of the SAC and controlling legal precedent that Plaintiffs' current class definition should not be certified and that granting a motion to strike is the appropriate means by which class action allegations that cannot be certified are disposed of. However, Defendants have "not definitively establish[ed] that a class action cannot be maintained in *any* form." [*See* Dkt. No. 84 at 7.] Plaintiffs are entitled to an opportunity to narrow and more specifically define their proposed class in light of and consistent with the law and facts discussed herein.

**\*13**  Therefore, we GRANT Defendants' Motion to Strike Class Allegations. Plaintiffs' class allegations contained in paragraphs 154–63 of the SAC are accordingly stricken. Plaintiffs are allowed an opportunity to recast their proposed class by filing an amended complaint within twenty (20) days from the date of this Order.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1505675

### Footnotes

1      In addition to the facts set forth below, Defendants explain that Plaintiffs fail to identify the style of Riddle helmet that they wore (or those worn by the putative class) or the warnings that they or the putative plaintiffs received. [Dkt. No. 79 at 9–10 (describing the differences and advancements in helmet technology as well as the 2002 warning and pre–2002 warning accompanying Riddle helmets).] We do not believe these facts create an impediment to class allegations such that a motion to strike is warranted. Similar to our ruling in the Order related to Defendants' Motion to Dismiss, identification of the helmets at issue may be resolved through discovery and subclasses could be delineated therefrom.

       The same is true for the array of injuries potentially suffered by the putative class members. Defendants criticize Plaintiffs for not defining "head impact" in the proposed class definition. [Dkt. No. 79 at 13–14.] This certainly is an issue that can been addressed through the class certification process and is not a sufficient basis for striking the class allegations.

2      Plaintiffs cite to several cases in the Seventh Circuit and nationwide holding that motions to strike class allegations are premature. Dkt. No. 84 at 2–3 (citing *Miller v. Janssen Pharmaceutical Prods., L.P.,* No. 05–CV–4076–DRH, 2006 WL 488636, at \*1–2 (S.D.Ill. Feb.28, 2006); *Boatwright v. Walgreen Co.,* No. 10 C 3902, 2011 WL 843898, at \*2 (N.D.Ill. Mar.4, 2011) ("Because a class determination decision generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, a decision denying class status by striking class allegations at the pleading stage is inappropriate."); *De Falco v. Vibram USA, Inc.,* No. 12 C 7238, 2013 WL 1122825, at \*9 (N.D.Ill. Mar.18, 2013) ("While there may indeed be issues with the proposed class, the Court believes it is premature to engage in this analysis at the motion to dismiss stage. Rather, these issues are better raised after the parties have had an opportunity to conduct class discovery and fully brief the motion for class certification."); *Worix v. MedAssets, Inc.,* 869 F.Supp.2d 893 (N.D.Ill.2012); *Damasco v. Clearwire Corp.,* 662 F.3d 891, 897 (7th Cir.2011) ("[A] court may abuse its discretion by not allowing for appropriate discovery before deciding whether to certify a class."); *see also Chenensky v. N.Y. Life. Ins. Co.,* No. 07 Civ. 11504, 2011 WL 1795305, at \*1 (S.D.N.Y. Apr. 27, 2011) ("Motions to strike are generally looked upon with disfavor [and] a motion to strike class allegations ... is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of ... litigation ...

DuRocher v. National Collegiate Athletic Ass'n, Not Reported in F.Supp.3d (2015)

before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."); *Ehrhart v. Synthes (USA),* No. 07–01237, 2007 WL 4591276, at *5 (D.N.J. Dec.28, 2007) ("Decisions from our sister courts (and courts in a number of other jurisdictions) have made clear that dismissal of class allegations at [the motion to dismiss] stage should be done rarely and that the better course is to deny such a motion because the 'shape and form of a class action evolves only through the process of discovery.' ") (citing cases); *Smith v. Wash. Post. Co. .,* 962 F.Supp.2d 79, 89–90 (D.D.C.2013) ("[A] motion to strike is a disfavored, drastic remedy[.] Courts rarely grant motions to dismiss or strike class allegations before there is a chance for discovery."); *Thorpe v. Abbott Labs., Inc.,* 534 F.Supp.2d 1120, 1125 (N.D.Cal.2008) ("Motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle"); *Iniguez v. The CBE Group,* 969 F.Supp.2d 1241, 1248 (N.D.Cal.2013) ("Dismissing class allegations at the pleading stage ... is rare because the parties have not yet engaged in discovery and the shape of a class action is often driven by the facts of a particular case.")).

3    Defendant provide an appendix collecting decisions in which federal courts have rejected nationwide or multi-state class actions for personal injury/product liability claims. Dkt. No. 79–1 at 2 (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (affirming circuit court's rejection of a nationwide class of personal injury, product liability asbestos exposure claims alleging injuries from exposure to asbestos produced by 20 asbestos manufacturers); *In re St. Jude Med., Inc.,* 425 F.3d 1116, 1122 (8th Cir.2005) (reversing district court's certification of a 17–state medical monitoring class of prosthetic heart-valve recipients, in part because each plaintiff's need or lack of need for monitoring was highly individualized and "[d]ifferences in state laws on medical monitoring further compound[ed] these disparities"); *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180 (9th Cir.2001) (affirming denial of class certification of products liability, medical monitoring, and negligence claims by recipients of the defendant's pacemakers, in part because of individual issues of causation and damages, as well as variations in the laws of the 48 states implicated by the class claims), *opinion partially amended on denial of reh'g,* 273 F.3d 1266 (9th Cir.2001); *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 743 n. 15 (5th Cir.1996) (decertifying national products liability class because district court failed to consider how variations in state law would affect predominance and superiority and noting that differences in class members' nicotine exposure, product(s) used, knowledge about the effects of smoking, and reasons for smoking "impact[ ] the application of legal rules such as causation, reliance, comparative fault, and other affirmative defenses"); *Georgine v. Amchem Prods. ., Inc.,* 83 F.3d 610, 618, 627 (3d Cir.1996) (reversing district court's order certifying a nationwide personal injury, product liability class, in part because factual "[d]ifferences in amount of exposure and nexus between exposure and injury lead to disparate applications of legal rules, including matters of causation, comparative fault, and the types of damages available to each plaintiff" and because legal and factual differences "when exponentially magnified by choice of law considerations, eclipse any common issues"), *aff'd sub nom. Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1085 (6th Cir.1996) (directing district court to decertify nationwide class of persons claiming injury from allegedly defective penile implants, in part because the district court failed to consider how law applicable to proposed class members' claims differs from jurisdiction to jurisdiction and because "the products are different, each plaintiff ha[d] a unique complaint, and each receive[d] different information and assurances from his treating physician"); *see also id.* at 1089 & n. 4 (noting a "national trend to deny class certification in drug or medical product liability/personal injury cases" and citing 18 cases dating from 1978 to 1995 for that proposition); *In re Rhone–Poulenc Rorer, Inc. .,* 51 F.3d 1293 (7th Cir.1995) (ordering district court to decertify nationwide class of hemophiliacs allegedly infected by defendants' HIV-tainted blood products, in part because of state-law differences with respect to negligence), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995)); *see also id.* at 3–8 (collecting district court decisions).

DuRocher v. National Collegiate Athletic Ass'n, Not Reported in F.Supp.3d (2015)

4    Defendants provide a robust compilation of cases within the Seventh Circuit and elsewhere that have granted or affirmed motions to strike class allegations over the course of the past last five years. *See* Dkt. No. 91 at 5, n. 1 (citing *Pilgrim v. Universal Health Card LLC,* 660 F.3d 943 (6th Cir.2011); *Sauter v. CVS Pharmacy, Inc.,* No. 2:13–CV–846, 2014 WL 1814076 (S.D.Ohio May 7, 2014); *Alqaq v. CitiMortgage, Inc.,* No. 13 C 5130, 2014 WL 1689685 (N.D.Ill. Apr.29, 2014); *Trunzo v. Citi Mortg.,* No. 2:11–CV–01124, 2014 WL 1317577 (W.D.Pa. Mar.31, 2014); *Wolfkiel v. Intersections Ins. Servs. Inc.,* No. 13 C 7133, 2014 WL 866979 (N.D.Ill. Mar.5, 2014); *Hill v. Wells Fargo Bank, N.A.,* 946 F.Supp.2d 817 (N.D.Ill.2013); *Loreto v. Procter & Gamble Co.,* No. 1:09–CV–815, 2013 WL 6055401 (S.D.Ohio Nov.15, 2013); *Trazo v. Nestle USA, Inc.,* No. 5:12–CV–2272 PSG, 2013 WL 4083218 (N.D.Cal. Aug.9, 2013); *Bohn v. Boiron, Inc.,* No. 11 C 08704, 2013 WL 3975126 (N.D.Ill. Aug.1, 2013); *In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.,* No. MDL 2385, 2013 WL 3791509 (S.D.Ill. July 18, 2013); *Ladik v. Wal–Mart Stores, Inc.,* 291 F.R.D. 263 (W.D.Wis.2013); *Zulewski v. Hershey Co.,* No. CV 11–05117–KAW, 2013 WL 1748054 (N.D.Cal. Apr.23, 2013); *Semenko v. Wendy's Int'l, Inc.,* No. 2:12–CV–0836, 2013 WL 1568407 (W.D.Pa. Apr.12, 2013); *Cowit v. CitiMortgage, Inc.,* No. 1:12–CV–869, 2013 WL 940466 (S.D.Ohio Mar.8, 2013); *Route v. Mead Johnson Nutrition Co.,* No. CV 12–7350–GW JEMX, 2013 WL 658251 (C.D.Cal. Feb.21, 2013); *Lindsay Transmission, LLC v. Office Depot, Inc.,* No. 4:12–CV–221 CEJ, 2013 WL 275568 (E.D.Mo. Jan.24, 2013); *Lawson v. Life of the S. Ins. Co.,* 286 F.R.D. 689 (M.D.Ga.2012); *Stanley v. Cent. Garden & Pet Corp.,* 891 F.Supp.2d 757 (D.Md.2012); *Baker v. Microsoft Corp.,* 851 F.Supp.2d 1274 (W.D.Wash.2012); *Edwards v. Zenimax Media Inc.,* No. 12–CV–00411–WYD–KLM, 2012 WL 4378219 (D.Colo. Sept.25, 2012); *Vandenbrink v. State Farm Mut. Auto. Ins. Co.,* No. 8:12–CV–897–T–30TBM, 2012 WL 3156596 (M.D.Fla. Aug.3, 2012); *Arango v. Work & Well, Inc.,* No. 11 C 1525, 2012 WL 3023338 (N.D.Ill. July 24, 2012); *In re Vioxx Prods. Liab. Litig.,* No. MDL 1657, 2012 WL 2061883 (E.D.La. June 6, 2012); *Rikos v. Procter & Gamble Co.,* No. 1:11–CV–226, 2012 WL 641946 (S.D.Ohio Feb.28, 2012); *Scott v. Family Dollar Stores, Inc.,* No. 3:08CV540, 2012 WL 113657 (W.D.N.C. Jan.13, 2012) *aff'd in part, rev'd in part on other grounds,* 733 F.3d 105 (4th Cir.2013); *In re Yasmin & Yaz (Drospirenone) Mktg.,* 275 F.R.D. 270 (S.D.Ill.2011); *Bevrotte ex rel. Bevrotte v. Caesars Entm't Corp.,* No. CIV.A. 11–543, 2011 WL 4634174 (E.D.La. Oct.4, 2011); *Bauer v. Dean Morris, L.L.P.,* No. CIV.A. 08–5013, 2011 WL 3924963 (E.D.La. Sept.7, 2011); *Schilling v. Kenton Cnty., Ky.,* No. CIV.A. 10–143–DLB, 2011 WL 293759 (E.D.Ky. Jan.27, 2011); *Stearns v. Select Comfort Retail Corp.,* 763 F.Supp.2d 1128 (N.D.Cal.2010); *Hall v. Equity Nat'l Life Ins. Co.,* 730 F.Supp.2d 936 (E.D.Ark.2010); *Tietsworth v. Sears,* 720 F.Supp.2d 1123 (N.D.Cal.2010); *Wright v. Family Dollar, Inc.,* No. 10 C 4410, 2010 WL 4962838 (N.D.Ill. Nov.30, 2010); *Cornette v. Jenny Garton Ins. Agency, Inc.,* No. 2:10–CV–60, 2010 WL 2196533 (N.D.W.Va. May 27, 2010); *Bearden v. Honeywell Int'l, Inc.,* No. 3:09–01035, 2010 WL 1223936 (M.D.Tenn. Mar.24, 2010); *In re St. Jude Med. Inc. Silzone Heart Valves Prods. Liab. Litig.,* No. MDL. 01–1396JRTFLN, 2009 WL 1789376 (D.Minn. June 23, 2009); *In re Katrina Canal Breaches Consol. Litig.,* No. CIV.A. 05–4182, 2009 WL 1707923 (E.D.La. June 16, 2009)).

5    Plaintiffs make a half-hearted attempt to have the Court stay Defendants' Motion; however, the request is unsupported, fails to comply with Local Rules, and belies their response to the motion. *See* S.D. Ind. L.R. 7–1(a) ("Motions must be filed separately,.... A motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court."). Instead of responding in full to Defendants' Motion, Plaintiffs seek a stay if we reject their prematurity argument. This we will not do. Plaintiffs are reminded that they must respond in full to motions or risk

waiving a substantive response. Should Plaintiffs seek alternative treatment of a motion (such as staying the briefing of a motion), they should file a separate motion compliant with S.D. Ind. L.R. 7–1(a).

6　Defendants criticize two cases cited by Plaintiffs in which the court denied motions to strike in products liability/ personal injury cases—⚑*Ehrhart v. Synthes (USA),* No. 07–01237(SDW), 2007 WL 4591276 (D.N.J. Dec.22, 2007) and ⚑*Miller v. Janssen Pharmaceutica Products, L.P.,* No. 05–CV–4076–DRH, 2006 WL 488636 (S.D.Ill. Feb.28, 2006).* [Dkt. No. 91 at 7–9 (citing Dkt. No. 84 at 3).] Those cases contain no *Twomblyl/Iqbal* discussion and more recent decisions in the same court have stricken class allegations when the inappropriateness was evident from the face of the complaint. In *Miller,* the court deferred a certification determination where the parties had already agreed to a certification briefing schedule, but then the court denied certification after a year of discovery and briefing. ⚑2006 WL 488636 at *1, 6–7. Here, the parties have not agreed to a certification briefing schedule and the Defendants contend that the reasons to deny certification are already obvious from the class allegations in the SAC.

7　Defendants filed a Supplemental Brief in Support of Defendants' Motions to Strike Class Allegations and to Dismiss Plaintiffs' Second Amended Complaint [Dkt. No. 100] to which Plaintiffs responded [Dkt. No. 101]. Defendants argue that in a hearing in the NCAA MDL Plaintiffs' counsel admitted that "[w]e think case law is quite clear, you cannot certify personal injury claims." [Dkt. No. 100 at 1.] Defendants cite to many troublesome statements by Plaintiffs in that case (which include Messrs. DuRocher and Harris) admitting that "it is essentially unquestionable that personal injury claims can no longer be certified as litigation classes," and that "in any of these concussion cases, you've got to examine on an individual basis the sequence of events for each kid," among others. [*Id.* at 8–12.] Plaintiffs respond that these opinions are not shared by everyone, including the MDL court, and that this statement was made in the context of appointing class counsel and in consideration of the class settlement in terms of the rights that the class would be giving up in favor of the settlement. [Dkt. No. 101 at 3, 8–11.] Plaintiffs also point out the qualifiers in various statements that class treatment is "generally" or "essentially" or "virtually" not appropriate, but dispute that they have admitted that their proposed class here would not be certifiable. [Dkt. No. 101 at 9.] Materials outside the pleadings are not to be considered on a motion to strike, *see Perez,* 2015 WL 500874, at *10; however, we are deeply concerned that counsel for Messrs. DuRocher and Harris and the Plaintiffs themselves would disavow the availability of a personal injury class action in the NCAA MDL and then pursue a products liability/personal injury class action against Defendants here. These statements will certainly be considered on a motion to certify should Plaintiffs choose to replead their class allegations, and Plaintiffs will need to do more than point to qualifying adjectives to avoid a denial of certification in such similar circumstances.

8　Neither Defendants nor Plaintiffs had the benefit of our Order on Defendants' Motion to Dismiss prior to Defendants' Motion to Strike and subsequent briefing. By Order issued concurrently with this Order, Plaintiffs' medical monitoring and negligence claims have been dismissed. A great deal of Defendants' arguments relate to those two common law claims, which are now inapplicable. [*See, e.g.,* Dkt. No. 79 at 23–24, 25–26.]

9　Although Plaintiffs have not suggested that they might propose individual state subclasses, Defendants argue that such subclasses would not eliminate the barriers to class treatment because individual issues of fact would still remain. [Dkt. No. 79 at 27 (citing ⚑*In re Yaz & Yasmin,* 275 F.R.D. at 277).] Defendants argue that the case-management obstacles to 55 subclasses would be insurmountable. [*Id.*] Because Plaintiffs have not suggested 55 subclasses and our review at this stage is limited to the allegations of the SAC, we will not consider the viability of a proposed class with 55 state-specific subclasses. The same is true of Defendants' argument that issue-specific subclasses would not resolve the impediment to the necessity of individualized inquiries. [*See id.*] Because Plaintiffs have not made this proposal, any analysis of this scenario remains purely hypothetical.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 922148
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

HARLEYSVILLE MUTUAL INSURANCE COMPANY Plaintiff,

v.

GE REINSURANCE CORPORATION Defendant.

No. CIV. A. 02–171.
|
May 6, 2002.

CLARENCE C. NEWCOMER, S.J.

*MEMORANDUM*

**\*1** Plaintiff's Motion to Strike Portions of the Affidavit of Frank J. Kehrwald, Defendant's Motion for Summary Judgment, and Plaintiff's Motion to Dismiss Certain Counterclaims and Strike Certain Affirmative Defenses are presently before the Court.

I. *BACKGROUND*

Plaintiff is an insurance company located in Harleysville, Pennsylvania. Defendant is an insurance company located in Barrington, Illinois. In this case, Plaintiff sues Defendant for breach of contract, specific performance, and a declaratory judgment in connection with a Quota Share Reinsurance Agreement (the "Quota Agreement"). Under the Quota Agreement, Defendant reinsured Plaintiff for a nonstandard automobile insurance program in the State of California. [1] An entity called Access General Insurance Company of California ("Access General") managed the program pursuant to an agreement between Harleysville and Access General (the "Access General Agreement").

The Quota Agreement is divided into Articles with Article 13 providing for arbitration and/or litigation. The following are the relevant portions of Article 13:

13.1 As a condition precedent to any right of action hereunder, in the event of any dispute ... with respect to this Agreement, including its formation ... it is hereby mutually agreed that such dispute ... shall be submitted to arbitration.

13.6 In the event that the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000), including such calculation all amounts of compensatory and punitive damages, upon written election of either party to the other, such claim or counterclaim shall not be subject to arbitration ...

13.7 In the event of a dispute between [Plaintiff and Defendant] concerning this Agreement and the [Access General Agreement] (regardless of whether either party has claims against [Access General] ) the entire dispute ... shall be subject to arbitration as provided in this Article.

The Quota Agreement further states that it "is the entire agreement between the parties and supersedes any and all previous agreements, written or oral, and amendments thereto." *Quota Agreement,* at ¶ 21.6. Additionally, Article 17.5 sets forth the following:

> Reinsurer [GE] warrants and represents that it has conducted its own due diligence of the business operations of the General Agent [Access General] including but not limited to the rates and forms used by the General Agent and the General Agent's ability to accurately report the necessary data and information. The Reinsurer shall not sue or seek arbitration against the Company [Harleysville] for any claims or causes of action arising from or relating to General Agent's operations, including but not limited to the use of the rates and forms in effect at the effective date of this Agreement.

In its Answer, Defendant raises several counterclaims, which in essence, claim that after Plaintiff discovered that one of its insurance programs was going to generate significant losses, it sought a reinsurance program from Defendant. Specifically, Plaintiff raises, among others, the following counterclaims: 1) Count I, Fraud; 2) Count II, Breach of the Duty of Utmost Good Faith; 3) Count III, Bad Faith; 4) Count IV, Unilateral Mistake; 5) Count V, Negligent Misrepresentation; and 6) Count VI, Known Loss. Defendant also raises several affirmative defenses in its Answer, including the following ones: 1) Second Affirmative Defense alleging that Plaintiff's claims in Counts I, II, and III are barred by fraud; 2) Third Affirmative Defense alleging Plaintiff's claims in Counts I, II, and III are barred by Plaintiff's breach of its duty of utmost good faith; 3) Fourth Affirmative Defense alleging Plaintiff's claims in Counts I, II, and III are barred by Plaintiff's breach of its duty of good faith; 4) Fifth Affirmative Defense alleging Plaintiff's claims in Counts I, II, and III are barred by Plaintiff's negligent misrepresentations; and 5) Sixth Affirmative Defense alleging Plaintiff's claims in Counts I, II, and III are barred by operation of the known loss doctrine.

In a December 28, 2002 letter to Plaintiff, Defendant demanded arbitration invoking Article 13 of the Quota Agreement. On January 7, 2002, Plaintiff notified Defendant, pursuant to paragraph 13.6 of the Quota Agreement, of its election to address the parties' dispute in Court. Plaintiff filed this action on January 11, 2002.

 **\*2**  On January 25, 2002, Defendant filed a Motion to Dismiss and/or Stay and To Compel Arbitration, and on February 12, 2002, this Court denied that Motion finding that "this case is properly before the Court under paragraph 13.6 of the parties' agreement." Now, in their Motion for Summary Judgment, Defendant again argues that this case should be arbitrated. In support of that Motion, Defendant has submitted the affidavit of Frank J. Kehrwald, Defendant's General Counsel. Plaintiff has responded to that Motion, and in its response, Plaintiff has moved the Court to strike paragraphs 12 through 17 of Mr. Kehrwald's affidavit. Plaintiff has also moved to dismiss the counterclaims and affirmative defenses listed above, and Defendant has responded to Plaintiff's Motion. The Court now turns to the parties' motions.

II. *DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

 A. *Legal Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (1994). The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Id.* at 324.

Further, under Federal Rule of Civil Procedure 56(e), affidavits supporting a motion for summary judgment "shall set forth such facts as would be admissible in evidence." Fed.R.Civ.P. 56(c). Accordingly, the Court may strike an affidavit containing

testimony that would be barred by the parol evidence rule. *See Berger Realty Group, Inc. v. Pullman,* 1986 WL 7919, at *6–*7 (E.D.Pa. Jul 16, 1986).

B. *Arbitration*

Defendant argues that this case is subject to arbitration and in support of its arguments, Defendant offers the affidavit of Frank J. Kehrwald, Defendant's General Counsel. In response, Plaintiff has moved the Court to strike paragraphs 12 through 17 of Mr. Kehrwald's affidavit based upon the parol evidence rule. Thus, for this Court to resolve whether this case should be arbitrated, it must first resolve whether that affidavit should be stricken.

In Pennsylvania, "if a written contract is unambiguous and held to express the embodiment of all negotiations and agreements prior to its execution, neither oral testimony nor prior written agreements or other writings are admissible to explain or vary the terms of that contract." *Lenzi v. Hahnemann University,* 445 Pa.Super. 187, 664 A.2d 1375, 1379 (Pa.Super.Ct.1995). Whether a writing constitutes an integrated contract is a question of law. *Id.* (citing *Murray v.University of Pennsylvania Hospital,* 340 Pa.Super. 401, 490 A.2d 839 (Pa.Super.Ct.1985). A contract is integrated if it represents a final and complete expression of the parties' agreement. *Id.*

Additionally, a contract is ambiguous only if it is reasonably susceptible of different constructions, and is capable of being understood in more than one way. *Samuel Rappaport Family Partnership v. Meridian Bank,* 441 Pa.Super. 194, 657 A.2d 17, 21 (Pa.Super.Ct.1995). However, a contract is not ambiguous merely because parties do not agree upon the proper construction of the contract. *Seven Springs Farm, Inc. v. Croker,* 748 A.2d 740, 744 (Pa.Super.Ct.2000).

**\*3** Here, the Court finds that the Quota Agreement is clear and unambiguous. As discussed in more detail below, Article 13 clearly created a system where certain disputes are subject to arbitration, but other larger disputes may be litigated in Court. Further, the Court finds that the Quota Agreement represents the parties' entire agreement, and represents the parties' final and complete expression of that agreement. Indeed, the parties agreed that the Quota Agreement "is the entire agreement between the parties and supersedes any and all previous agreements, written or oral, and amendments thereto," *Quota Agreement,* at ¶ 21.6. The effect of such a clause is to make the parol evidence rule particularly applicable. *See McGuire v. Schneider, Inc.,* 368 Pa.Super. 344, 534 A.2d 115, 117–18 (Pa.Super.Ct.1987). In light of the parties' integration clause, and the overall structure of the contract, the Court concludes that the Quota Agreement is integrated and clear, and paragraphs 12 through 17 of Mr. Kehrwald's affidavit are not admissible because they are intended to explain or vary the terms of the parties' agreement. *See Kehrwald Affidavit,* at ¶¶ 12–17.

With those paragraphs stricken, the Court will now address whether the Quota Agreement mandates that the parties arbitrate this case. The Court notes that there is a strong federal policy favoring the arbitration process. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (noting that the Federal Arbitration Act manifests a liberal federal policy favoring arbitration agreements). Thus, "where the contract contains an arbitration clause, there is a presumption of arbitrability ... 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)(quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 584–85, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Id.* at 648. Further, an express provision excluding a particular grievance from arbitration may overcome the presumption of arbitrability. *See id.,* at 650.

Just as it was on February 12, 2002, the Court remains convinced that this case is properly before the Court under paragraph 13.6 of the Quota Agreement. That paragraph allows a party to elect litigation in court instead of arbitration when "the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000)...." Here, Defendant does

not dispute that the claims or counterclaims exceed two million dollars, or that the Defendant properly exercised its litigation option.

**\*4**  When arguing that paragraph 13.6 does not cover this case, Defendant contends that because paragraph 13.6 uses the word "claim", that paragraph was only intended to govern "liquidated claims in excess of 2.0 million arising from the underlying insurance program." *Defendant's Memorandum of Law in Support of Motion for Summary Judgment,* at 5. However, the Court finds that this is a strained interpretation that makes little sense in light of whole Quota Agreement. The Quota Agreement does not concern itself with individual claims made on any underlying insurance policies. Further, Defendant's interpretation does not comport with that paragraph's use of the word "counterclaims"; Defendant fails to argue, and the Court doubts it could, that "counterclaim" is a term of art in the insurance industry. Finally, to prove its interpretation, Defendant cites paragraph 12 of Mr. Kehrwald's affidavit, but that paragraph has been stricken. Thus, the Court is left to interpret the plain meaning of the word "claim". *E.g., CGU Ins. v. Tyson Assoc.,* 140 F.Supp.2d 415, 421 (E.D.Pa.2001)("An insurance contract must be construed according to the plain meaning of its terms ..."). The Court cannot say that the plain meaning of the word "claim" in paragraph 13.6 does not encompass this case. As the Quota Agreement bound only Plaintiff and Defendant, the Court finds the word "claim" means claims between them, and that this case involves such a claim.

Defendant contends that this dispute is subject to arbitration under paragraphs 13.1 and 13.7 of the Quota Agreement. Paragraph 13.1 states generally that "in the event of any dispute ... with respect to this Agreement, including its formation ... it is hereby mutually agreed that such dispute ... shall be submitted to arbitration." However, paragraph 13.1 does not address claims or counterclaims in excess of two million dollars; only paragraph 13.6 specifically does that. It is a general principle of contract law

that, where two provisions of a contract are inconsistent, general language must yield to more specific language. *Affiliated Food Distributors, Inc. v. Local Union No. 229,* 483 F.2d 418 (3d Cir.1973); *see also* Restatement (Second) Contracts § 203. Thus, paragraph 13.1 must yield to paragraph 13.6. Defendant's argument that paragraph 13.6 does not cover this dispute because this dispute involves the formation and validity of the Quota Agreement is also unavailing. Paragraph 13.6 governs "any claim or counterclaim" in excess of two million dollars, and nothing in paragraph 13.6, or elsewhere, suggests that those claims and counterclaims cannot concern disputes about formation and validity.

Defendant also argues that paragraph 13.7 compels arbitration because it contends its counterclaims for fraud, breach of the utmost duty of good faith, and bad faith concern both the Quota Agreement and the Access General Agreement. Those counterclaims each allege that Defendant is liable for "misrepresenting to [Plaintiff] that the [Access General Agreement] required Access General to issue policies based on the rates and rating factors of the Coast National Program." Defendant's Counterclaim, ¶¶ 29(b), 36(b), 43(b). As illustrated above, paragraph 13.7 of the Quota Agreement states that:

> **\*5**  In the event of a dispute between [Plaintiff and Defendant] concerning this Agreement and the [Access General Agreement](regardless of whether either party has claims against [Access General] )
> the entire dispute ... shall be subject to arbitration as provided in this Article.

Thus, according to the plain meaning of paragraph 13.7, where a dispute between Plaintiff and Defendant involves both the Quota Agreement and the Access General Agreement, that dispute is subject to arbitration as provided in Article 13 of the Quota Agreement. Accordingly, paragraph 13.7 must be read "subject to" paragraph 13.6. As such, because this case involves claims or counterclaims in excess of two million dollars, Plaintiff has properly elected to litigate this case here under paragraph 13.6. Contrary to Defendant's contention, this interpretation does not render paragraph 13.7 meaningless. Indeed, if a dispute involved less than two million dollars, and involved both the Quota Agreement and the Access General Agreement, paragraph 13.7 would mandate arbitration. Moreover, without paragraph 13.7, parties might have to litigate disputes involving the Quota Agreement, but arbitrate disputes concerning the Access General Agreement.

In the end, the Quota Agreement simply allows the parties to take the big cases to court, and requires that they arbitrate the smaller ones. *E.g., Higman Marine Services, Inc. v. BP Amoco Chemical Co.,* 114 F.Supp.2d 593, 597 (S.D.Tex.2000)(interpreting a similar agreement and stating that the parties "intended to convey the simple idea that 'big' disputes may go to court while 'little' disputes must go to arbitration"). For these reasons, the Court will deny Defendant's Motion for Summary Judgment, and once again finds that this case is properly before the Court under paragraph 13.6 of the Quota Agreement.

III. *PLAINTIFF'S MOTION TO DISMISS CERTAIN COUNTERCLAIMS AND STRIKE CERTAIN AFFIRMATIVE DEFENSES*

Plaintiff first moves to dismiss and strike Defendant's counterclaims I through VI pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f). Second, Plaintiff moves to strike Defendant's Second, Third, Fourth, Fifth and Sixth Affirmative Defenses pursuant to Rule 12(f).

A. *Legal Standard*

1. *Under Rule 12(b)(6)*

The standard for dismissal of a counterclaim does not differ from the standard for dismissal of a complaint. *United States v. Union Gas Co.,* 743 F.Supp. 1144, 1150 (E.D.Pa.1990). When evaluating a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept each allegation in a well pleaded complaint as true. *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Additionally, a Motion to Dismiss should only be granted if the Court finds that no proven set of facts would entitle the non-moving party to recovery under the filed pleadings. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

It is also firmly established that in reviewing a Federal Rule of Civil Procedure 12(b)(6) motion, the Court must draw all reasonable inferences in the plaintiff's favor. *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991).

2. *Under Rule 12(f)*

**\*6** Under Rule 12(f), a court may strike "from any pleading any insufficient defense or any redundant, immaterial impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Generally, motions to strike will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties. *Environ Products, Inc. v. Total Containment, Inc.,* 951 F.Supp. 57, 59 (E.D.Pa.1996) (citing Wright & Miller, *Federal Practice and Procedure* § 1382 at 704 (1990)). To strike an affirmative defense, the Court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defenses succeed. *Union Gas Co.,* 743 F.Supp. at 1150; *Smith, Kline & French Laboratories v. A.H. Robins Co.,* 61 F.R.D. 24, 33 (E.D.Pa.1973). Nevertheless, a motion to strike is the proper procedure to eliminate insufficient defenses and save the time and expense which would otherwise be spent in litigating issues that would not affect the outcome of the case. *Union Gas Co.,* 743 F.Supp. at 1150; *United States v. Geppert Bros., Inc.,* 638 F.Supp. 996, 998 (E.D.Pa.1986).

B. *Defendant's Counterclaims and Affirmative Defenses*

Plaintiff argues that Defendant's counterclaims I through VI and second through sixth affirmative defenses are barred by the Article 17.5 of the Quota Agreement. Article 17.5 sets forth the following:

> Reinsurer [GE] warrants and represents that it has conducted its own due diligence of the business operations of the General Agent [Access General] including but not limited to the rates and forms used by the General Agent and the General Agent's ability to accurately report the necessary data and information. The Reinsurer shall not sue or seek arbitration against the Company [Harleysville] for any claims or causes of action arising from or relating to General Agent's operations, including but not limited to the use of the rates and forms in effect at the effective date of this Agreement.

Accordingly, Plaintiff argues that Defendant expressly agreed that it would not sue Plaintiff on causes of action arising from Access General's rates, and stated expressly that it had conducted its own investigation into Access General's rates. Thus, Plaintiff argues that this Court should strike the counterclaims and affirmative defenses because they each allege, in some form, that Plaintiff misled Defendant about Access General's rates.

Upon a review of Defendant's counterclaims and affirmative defenses, and because Defendant does not disagree, the Court finds that Defendant's counterclaims and affirmative defenses do allege, in essence, that Plaintiff misled Defendant about Access General's rates. In light of Defendant's express statement that it conducted its own investigation into Access General's rates, and its contractual promise not to sue Plaintiff for any claims arising from Access General's rates, Defendant cannot now allege that Plaintiff misled Defendant about Access General's rates in a counterclaim or affirmative defense.

When interpreting a contract, the Court's fundamental goal is to give effect to the parties' intent. *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 389 (Pa.1986); *Anchel v. Shea,* 762 A.2d 346, 352 (Pa.Super.Ct.2000). Here, to allow Defendant to allege that Plaintiff misled Defendant about Access General's rates would disregard the unambiguous language in paragraph 17.5 of the Quota Agreement. According to that language, Defendant assumed the burden of investigating Access General's rates for itself. Thus, Defendant's counterclaims and affirmative defenses would impose obligations upon Plaintiff that Plaintiff specifically contracted to avoid. *See Agrecycle, Inc. v. City of Pittsburgh,* 783 A.2d 863, 867 (Pa.Cmwlth.Ct.2001) (concluding that a breach of the duty of good faith claim fails under Pennsylvania law where Defendant "specifically contracted to avoid such duty in the [parties'] Agreement.").

**\*7** Defendant contends that Article 17.5 does not bar its counterclaims and affirmative defenses because that Article only relates to Access General's "business operations." However, as discussed above, Article 17.5 is not so narrow, and does encompass Defendant's counterclaims and affirmative defenses here. Consequently, the Court finds that dismissal of these counterclaims and affirmative defenses is proper. Similarly, the Court will strike those claims and defenses because there are no facts in dispute, the law is clear, and under no set of circumstances could the claims and defenses succeed.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 922148

---

### Footnotes

1      Nonstandard automobile insurance generally includes the underwriting of higher risk insurance policies with commensurately higher premiums. *See Plaintiff's Complaint,* at ¶ 8.

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Nichols v. eHealthInsurance Services, Inc.,   N.D.Cal.,   March 3, 2025

2013 WL 3872171

Only the Westlaw citation is currently available.

United States District Court,

N.D. Illinois,

Eastern Division.

Kofi JAMISON, Plaintiff,

v.

FIRST CREDIT SERVICES, INC. d.b.a. Accounts Receivbable

Technologies, and American Honda Finance Corporation, Defendants.

No. 12 C 4415.
|
July 29, 2013.

### *MEMORANDUM OPINION AND ORDER*

VIRGINIA M. KENDALL, District Judge.

**\*1** Plaintiff Kofi Jamison filed a putative class action complaint against Defendants First Credit Services, Inc. ("FCS") and American Honda Finance Corporation ("Honda") alleging violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. The Court denied Jamison's Motion for Class Certification. Jamison has moved the Court to reconsider its decision. For the reasons set forth below the motion for reconsideration is denied.

## BACKGROUND

This case involves an alleged violation of the TCPA whereby FCS, on behalf of Honda, allegedly called Jamison's cellular telephone multiple times without Jamison's consent in an effort to collect a debt owed to Honda by Jamison's sister. FCS obtained the cellular telephone number by running a "skip-trace" on Jamison's sister.[1] The TCPA prohibits a creditor from making a call using an automated telephone dialing system or an artificial or prerecorded message to a wireless telephone number for purposes of collecting a debt unless the call is made with the "prior express consent" of the called party. *See* *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02–278, 23 F.C.C. Rcd 559, 564, ¶ 9 (2008).[2] The facts of this case are described in detail in the Court's March 28, 2013 Memorandum Opinion and Order and incorporated herein by reference.

As a result of the calls made by FCS on behalf of Honda, Jamison filed a complaint in this Court on June 6, 2012 on behalf of a putative class defined to include:

> (1) All persons in the United States (2) to whose cellular telephone number (3) FCS or American Honda placed a non-emergency telephone call (4) using an automatic telephone dialing system or an artificial or prerecorded voice (5) within 4 years of the complaint (6) with respect to a debt allegedly owed to

> American Honda (7) where FCS or American Honda obtained the cellular telephone that was called via skip trace methods.

(Docket No. 1, the Complaint, at ¶ 32.) After the parties completed briefing the motion, this Court denied the motion for class certification on March 28, 2013. *See* Memorandum Opinion and Order dated March 28, 2013 (the "Order") at Doc. 104. The Court denied the motion for three reasons. First, the Court found that Jamison's felony conviction for access device fraud rendered him inadequate to serve as the class representative under Federal Rule of Civil Procedure 23(a)(4). Second, Jamison failed to satisfy the "predominance" requirement of Rule 23(b)(3) because individualized issues of consent would predominate over common questions of law and fact. Third, the proposed class was overbroad and not ascertainable. [3] Jamison now contends that all three of the Court's reasons for denying class certification were wrong and should be reconsidered. The Court disagrees.

## LEGAL STANDARD

Motions for reconsideration are extraordinary in nature and are viewed with disfavor. *See, e.g., Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990); *see also Marmi E. Graniti D'Italia Sicilmarmi S.p.A. v. Universal Granite and Marble,* 757 F.Supp.2d 773, 781 (N.D.Ill.2010). A motion for reconsideration is not an appropriate vehicle for relitigating arguments that the court previously rejected or for arguing issues that could have been raised during the consideration of the motion presently under reconsideration. *See Caisse Nationale de Credit Agricole v. CBI Industries, Inc.,* 90 F.3d 1264, 1270 (7th Cir.1996); *Musch v. Domtar Industries, Inc.,* 587 F.3d 857, 861 (7th Cir.2009); *Sigsworth v. City of Aurora,* 487 F.3d 506, 512 (7th Cir.2007) (internal citation omitted). As a result, they are appropriate only: (1) where a court has misunderstood a party; (2) where the court has made a decision outside the adversarial issues presented; (3) where the court has made an error of apprehension; (4) where a significant change in the law has occurred; or (5) where significant new facts have been discovered. *See Broaddus v. Shields,* 665 F.3d 846, 860 (7th Cir.2011) (citing *Bank of Waunakee,* 906 F.2d at 1191). Indeed "[a] motion to reconsider is frivolous if it contains no new evidence or arguments of law that explain why the [court] should change an original order that was proper when made." *Magnus Electronics, Inc. v. Masco Corp. of Indiana,* 871 F.2d 626, 630 (7th Cir.1989).

## DISCUSSION

### I. Jamison Identifies No Valid Basis for this Court to Reconsider His Adequacy as Class Representative

**\*2** In its original opinion, the Court found that Jamison failed to meet his burden in establishing himself to be an adequate representative for the class because he had been convicted for fraud in 2008. *See* Order at 21–23. This was because a class plaintiff who has serious credibility problems may not be an adequate class representative. *See CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 726 (7th Cir.2011). While it is necessary that admissible evidence exists that "so severely undermin[es] plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims" for a credibility attack to succeed, *Id.* at 728 (quoting *Dubin v. Miller,* 132 F.R.D. 269, 272 (D.Colo.1990)), a recent fraud conviction has such an effect. *See, e.g., Schleicher v. Wendt,* No. 02 C 1332, 2009 WL 761157, at \*3 (S.D.Ind. Mar. 20, 2009) (Hamilton, J.) (finding that "a fraud conviction undermines a proposed class representative's adequacy to represent the class."); *Kirkpatrick v. Ironwood Communications,* No. C05–1428JLR, 2006 WL 2381797, at \*6

(W.D.Wash. Aug. 16, 2006) (finding convictions for fraud rendered representative inadequate); *Xianglin Shi v. Sina Corp.,* No. 05 C 2154, 2005 WL 1561438 (S.D.N.Y. July 1, 2005); *Hartsell v. Source Media,* No. 98 C 1980, 2003 WL 21245989, at *3 (N.D.Tex. Mar. 31, 2003); *In re Proxima Corp. Securities Litigation,* No. 93 C 1139, 1994 WL 374306 (S.D.Cal. May 3, 1994).

Jamison's motion for reconsideration concedes "that there is authority that the Court can find plaintiff inadequate based on his felony conviction alone." (Doc. 105 at ¶ 18.) However, Jamison then contends the Court did not find him inadequate based on his fraud conviction alone but, instead, misapprehended the facts and the TCPA in focusing on: (1) Jamison's monetary loss; and (2) the fact that Jamison does not pay the bill for the cellphone in question. These assertions are incorrect and provide no basis for reconsideration.

First, the Court specifically found that Jamison's recent fraud conviction for access device fraud rendered him inadequate because the conviction was admissible under Federal Rule of Evidence 609, would be offered to impeach his credibility with the jury, and would detract from the claims of the class. Specifically, the Court held:

> Jamison pled guilty to a felony charge to access device fraud in 2008. This is obviously a conviction for fraud, which is sufficient by itself to render Jamison an inadequate representative under the case law. This conviction is admissible and may be offered to impeach his credibility with a factfinder. As a result, there is a strong likelihood that the jury will focus on Jamison's credibility and not the claims of a potential class.

Order at 22. It then found that Jamison's credibility problems were further heightened by the specific facts of the case. *Id.* Therefore, regardless of the Court's purported misapprehension, Jamison is not an adequate class representative because a recently convicted fraudster should not serve as a fiduciary for a class.

**\*3** However, there was also no misapprehension by the Court. The Court noted that Jamison's credibility issues were heightened because there was an open question as to whether Jamison or his mother paid the bill for the cellphone that was allegedly called and determining whether Jamison suffered any monetary loss as result of the alleged conduct will be an issue at trial. The Court found that these issues could further impact Jamison's credibility because the "[t]he jury could reasonably conclude that Jamison is a convicted fraudster who is seeking a windfall in litigation despite the fact that he never suffered any monetary loss." Order at 23. In his motion, Jamison contends that these issues are irrelevant and would not undermine his credibility with the jury. However, this misses the point. The recent fraud conviction is admissible and would severely undermine Jamison's credibility with the jury. *See, e.g., Schleicher,* 2009 WL 1561438, at *3. Moreover, while the Court does not need to rule definitively here, these factual disputes are relevant because Jamison will need to establish that he was the subscriber of the wireless number that FCS called in order to establish a valid claim under the TCPA.

The relevant portion of the TCPA provides that:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... (iii) to any telephone number assigned to a paging service,

cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call[.]

47 U.S.C. 227(b)(1). It is axiomatic that the person or entity who has a TCPA claim is the "called party." [4] Thus, to begin with Jamison will need to establish that he was called. The fact that the cellphone may belong to his mother and not him is relevant to this threshold question. His felony fraud conviction cuts against him here alone.

However, assuming FCS called a cellphone Jamison possessed, there is still a legal question of who is the "called party?" Is it the owner of the cellphone in question who is charged for the call? Or is it simply the recipient of the call? Generally, with respect to the cellphone, the question is redundant because people do not answer other people's wireless phones. *See* *Soppet v. Enhanced Recovery, Co., LLC,* 679 F.3d 637, 640 (7th Cir.2012) ("For cell service, the subscriber and the person who answers almost always are the same, given the norm that one person does not answer another's cell phone."). However, a number of district courts, including courts within this district, have concluded that the "called party" is not necessarily the party who is charged for the call but is instead the recipient of the call. *See, e.g., Strickler v. Bijora, Inc.,* No. 11 C 3468, 2012 WL 5386089, at *3 (N.D.Ill. Oct. 30, 2012); *Lozano v. Twentieth Century Fox Film Corp.,* 702 F.Supp.2d 999, 1009–10 (N.D.Ill.2010); *Abbas v. Selling Source, LLC,* No. 09 C 3413, 2009 WL 4884471, at *3 (N.D.Ill.Dec. 14, 2009); *See* *Manno v. Healthcare Revenue Recovery Group, LLC,* No. 11 C 61357, 2013 WL 1283881, at *4–5 (S.D.Fla. Mar. 26, 2013). The underlying rationale for this conclusion is that the purpose of the TCPA was not only to prevent unwanted expenses but also to prevent an invasion of privacy.

 **\*4**  However, this Court believes that the Seventh Circuit would limit the right of action to the wireless number's "subscriber" because, while not dealing with this question explicitly, the Court defined the term "called party" to mean "the person subscribing to the called number at the time the call is made." *See* *Soppet,* 679 F .3d at 643. [5] It is unlikely that it would use a different definition for the same term in the same part of the statute. *See* *id.* at 639–40 (citing *Mohasco Corp. v. Silver,* 447 U.S. 807 (1980)) ("The presumption [is] that a statute uses a single phrase consistently ..."). Therefore, in order to recover, Jamison will need to prove that he was the current subscriber of the wireless number that was called.

While *Soppet* did not explicitly adopt a definition for subscriber, its language suggests that the subscriber is the person who pays the bill. First, the Court defined "called party" in 227(b)(1)(A)(iii) to "mean Cell Number's current subscriber, because only the current subscriber pays." *Id.* at 639. Subsequently it noted that the current subscriber "is the person who pays the bills or needs the line in order to receive other calls ." Therefore, under *Soppet,* Jamison's monetary loss, or lack thereof, is relevant because it goes to show whether or not he is the subscriber of the wireless number called by FCS. Even if *Soppet* separately defined a person who "needs the line in order to receive other calls" as a distinct category of subscriber from the payor, Jamison's lack of monetary loss is still relevant and admissible to prove that Jamison's mother and not Jamison was the subscriber of wireless phone in issue. Thus, while the recent felony fraud conviction is sufficient by itself to render Jamison inadequate as class representative, the fraud conviction combined with the relevant lack of loss could be especially damaging.

**II. Jamison Identifies No Valid Basis for this Court to Reconsider Its Decision that Individualized Issues of Consent Predominate**

Jamison does not even attempt to manufacture a purported error of apprehension with respect to the Court's decision to find that individualized issues predominate in this case; rather, he simply the asserts the Court decided incorrectly. This is an improper basis for a motion for reconsideration and may be rejected summarily. *See* *Caisse Nationale de Credit Agricole,* 90 F.3d at 1270 (holding that motions for reconsideration do not provide an opportunity to litigate previously rejected arguments). If

Jamison believes the Court erred in finding that individual issues of consent predominate, his recourse should be to appeal the Court's decision to the Seventh Circuit pursuant to Federal Rule of Civil 23(f). It should not be to file serial motions with this Court.

Moreover, Jamison again fails to show that issues of consent will not predominate. Federal Rule of Civil Procedure 23(b)(3) requires a plaintiff to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Rule 23(b)(3) " 'inquiry trains on the legal or factual questions that qualify each class member's case as a genuine case or controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.' " Messner v. Northshore Univ. Healthsystem, 669 F.3d 802, 814 (7th Cir.2012) (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997)). Predominance is similar to Rule 23(a)'s typicality and commonality requirements; however, it is "far more demanding." Amchem Products, 521 U.S. at 623–24. While "[i]ndividual questions need not be absent," they may "not predominate over the common questions affecting the class as a whole ." Messner, 669 F.3d at 815.

**\*5** It is indisputable that courts have reached different opinions in TCPA cases regarding whether issues of individualized consent predominate so as to prevent class certification. *Compare, e.g.,* Gene & Gene L.L.C. v. BioPay, L.L.C., 541 F.3d 318, 326–29 (5th Cir.2008) (holding that district court abused its discretion in certifying class because the individualized issue of whether "fax advertisements were transmitted without the prior express invitation or permission of each recipient" prevented plaintiff from "advanc[ing] any viable theory employing generalized proof concerning the lack of consent with respect to the class ... [which] leads to the conclusion that myriad mini-trials cannot be avoided."); G.M. Sign, Inc. v. Brink's Mfg. Co., No. 09 C 5528, 2011 WL 248511, at \*8 (N.D.Ill. Jan. 25, 2011) (holding that individualized issues of consent predominated over common issues because defendant set forth specific evidence showing large percentage of putative class consented to receive faxes), *with* Meyer v. Portfolio Recovery Associates, LLC, 707 F.3d 1036, 1042 (9th Cir.2012) (finding the individualized issue of consent did not predominate because the defendant "did not show a single instance where express consent was given before the call was placed."); G.M. Sign, Inc. v. Finish Thompson, Inc., No. 07 C 5953, 2009 WL 2581324, at \*6 (N.D.Ill. Aug. 20, 2009) (Kendall, J.) (The defendant "cannot defeat class certification by asserting the vague possibility that some of the individuals on the anonymous lists have perchance consented to receiving the fax.").

Such disparate results make sense because "there are no invariable rules regarding the suitability of a particular case filed under this subsection of the TCPA for class treatment; the unique facts of each case generally will determine whether certification is proper." Gene & Gene, 541 F.3d at 328. However, this Court determined that the lesson that could be extracted from these cases is that issues of individualized consent predominate when a defendant sets forth specific evidence showing a significant percentage of the putative class consented to receiving calls on their wireless phone. *See* Order at 25–26. The Court found in its prior opinion that the determinative question is whether Jamison can employ generalized proof to show that the issue of consent will not exist as to a significant number of class members and concluded that he could not. *See id.* at 27–28.

The parties determined that there were 2,887 wireless phone numbers that were called by FCS on behalf of Honda that FCS had obtained by employing "skip-trace" methods. However, Honda offered evidence that customers provide Honda with their wireless phone numbers in at least four ways: (1) when the customer signs an installment sales contract; (2) when the customer fills out a credit application; (3) when the customer provides Honda with insurance information; and (4) when the customer speaks with a Honda customer service representative on the phone. *See* Doc. 74–2, Declaration of Melissa Metcalf at ¶ 3. Honda also established that when a Honda customer service representative speaks to a Honda customer, they obtain the customer's preferred number to be contacted at. This number is generally entered into the phone field in Honda's Customer Account Servicing System ("CASS") or into CASS's "notes" field. *Id.* at ¶ 7. Honda further established that due to system limitations

these numbers are not given to FCS when Honda employs FCS to collect debts allegedly owed to Honda. *Id.* at ¶ 10. Finally, Honda established that over 1,200 of the 2,887 wireless phone numbers that are potentially at issue in this case are located in the phone field in CASS. *Id.* at ¶ 11. This evidence has not been rebutted by Jamison. [6]

**\*6** As a result, the issue of consent exists with respect to at least 1,200 class members but likely exists with respect to many more who furnished Honda with their cellphone numbers on sales contracts, credit applications, insurance information sheets or in speaking with customer service representatives who entered the information in CASS's notes field. Therefore, since the unrebutted evidence showed that Honda collected the wireless phone numbers of a large number of the persons called by FCS, individual inquiries would be needed to determine whether these persons consented to be called on their wireless phone number. In other words, the Court would be required to conduct a series of mini-trials to determine the population of the class and to determine liability. Since there was no class-wide basis for determining which persons gave consent to be called on their wireless numbers and which did not, individual issues predominated over class-wide issues.

Jamison's motion appears to argue that: (1) this Court should certify Jamison's class because district courts, including this Court, have certified classes that use a similar definition as Jamison does; (2) the Court inappropriately required Jamison to prove the merits of his case at the class certification stage by importing a consent requirement into the class definition; and (3) the class definition may be revised so that consent is no longer an issue. As stated above, these arguments do not even purport to raise a valid basis for reconsideration and are incorrect.

First, while other district courts, including this Court (as it explicitly noted in its original opinion), have certified classes that have similar definitions to the class here, such similarities are irrelevant for purposes of the predominance analysis because a determination of whether a class is certifiable for an alleged violation of the TCPA turns on the unique facts of each case. *See* *Gene & Gene,* 541 F.3d at 328. As this Court stated in its prior opinion, in those cases where the issue of consent is speculative, it does not predominate. However, in cases where there is specific evidence of consent with respect to significant number of potential class members, that issue will predominate. *See* Order at 25–26. Since that is the case here, individualized issues predominate over general ones.

Second, the Court has not required Jamison to prove the merits of his case at the class certification stage. Nowhere in the Court's prior opinion did it state that Jamison must prove that Honda and FCS are liable to each potential class member in order for the Court to certify the class. Nowhere did it state that the burden was on Jamison to prove lack of consent. Consent is an affirmative defense and the burden would be on Honda and FCS at trial to prove consent at trial. *See* *In the Matter of Rules of Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02–278, 23 F.C.C.R. 559, 565 (Dec. 28, 2007) ("[W]e conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent."); *but see* *Meyer,* 707 F.3d at 1043 (defining the elements of a TCPA claim to include the lack of "the recipient's prior express consent"). Regardless, issues of liability and issues of predominance are not the same. Individualized issues necessary to decide an affirmative defense may predominate so as to prevent class certification. *See* *Gene & Gene,* 541 F.3d at 327; *In re Monumental Life Ins. Co.,* 365 F.3d 408, 420 (5th Cir.2004) (internal citations omitted) ("predominance of individual issues necessary to decide an affirmative defense may preclude class certification"). For purposes of class certification, it is Jamison's burden to prove that they do not. *See* *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2012) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties common questions of law or fact, etc.") (emphasis in the original). It is then the Court's duty to rigorously analyze whether Jamison has met this burden. *See id.*

**\*7** Since Honda produced evidence that a substantial number of the potential class members consented to receiving calls on their wireless phone numbers, class certification would only be proper if Jamison articulated a method of employing generalized proof by which a court or jury could determine whether potential class members gave their consent. *See* *Gene & Gene,* 541

F.3d at 329 (The plaintiff "has failed to advance a viable theory of generalized proof to identify those persons, if any, to whom [defendant] may be liable under the TCPA .... [t]his prevents the purported class from having the required cohesiveness and defeats the predominance requirement."). Jamison failed to do this.

Indeed, when he was confronted with this requirement on the initial briefing of the motion for class certification, Jamison effectively conceded that the individualized issue of consent would predominate with respect to the class defined in the complaint because instead of any attempting to articulate any method of employing generalized proof, Jamison attempted to amend the class definition *instanter* to exclude individuals who may have given their consent. [7] *See* Doc. 90 at 19–20 ("the parties have already identified the individuals who could have possibly consented to the telephone calls at issue .... [t]hese individuals can simply be excluded from the class by narrowing the definition as follows ...").

This segues into Jamison's third complaint with the Court's prior opinion. Namely, that the amended class definition first proposed in Jamison's reply brief in support of his motion for class certification removes the issue of consent because only those individuals who never provided their wireless phone number to Honda would be potential class members. However, this argument misses the entire point because it merely replaces one predominance problem with another. Instead of conducting mini-trials to determine whether potential class members provided consent to Honda to be called on their wireless phone numbers, the Court would now be required to determine if each class member's wireless number appeared in Honda's records. Jamison has failed to articulate a method of employing generalized proof for determining whether various class members' wireless telephone numbers appeared in Honda's records. Therefore, Jamison has failed to meet his burden under ⚑Rule 23(b)(3) because individual issues predominate over common ones. [8]

### III. Jamison Identifies No Valid Basis for this Court to Reconsider Its Decision that the Proposed Class is Not Ascertainable

Jamison also complains that the Court's holding that the proposed class was not ascertainable was based on additional purported misapprehensions of law and fact. While not an explicit requirement of ⚑Rule 23, a class definition "must be definite enough that the class can be entertained." ⚑*Oshana v. Coca Cola,* 472 F.3d 506, 513 (7th Cir.2006). This means that the "class must be identifiable as a class and membership within it must be determined by application of precise, objective criteria." *Bridgeview Health Ctr., Ltd. v. Clark,* No. 09 C 5601, 2011 WL 4628744, at *2 (N.D.Ill. Sept. 30, 2011); *see also, e.g., Pawelczak v. Financial Recovery Services,* 286 F.R.D. 381, 385 (N.D.Ill.2012).

 **\*8**  In its original opinion, the Court held that the class defined in Jamison's complaint was not sufficiently definite to warrant certification. The Court found that because Jamison's proposed class could potentially include thousands of individuals who consented to receiving calls on their cellphones and thus have no grievance under the TCPA, the class was overbroad under the Seventh Circuit's holding in *Oshana. See* Order at 29 (internal citations omitted); *see also* ⚑*Oshana,* 472 F.3d at 513–14 (affirming denial of class certification on ascertainability grounds as proposed class was overbroad because it contained millions of potential members who were not actually deceived into purchasing Diet Coke and thus did not have an ICFA claim); *see also, e.g.,* ⚑*Vigus v. Southern Illinois Riverboat/Casino Cruises, Inc.,* 274 F.R.D. 229 (S.D.Ill.2011) (denying certification of TCPA claims on ascertainability grounds and noting that "[w]here a class is overbroad and could include a substantial number of people who have no claim under the theory advanced by the named plaintiff, the class is not sufficiently definite."); *Pesce v. First Credit Services,* No. 11 C 1379 (N.D.Ill.) at Doc. 126 (decertifying class as too broad in case that preceded the instant case because potential class members included people where "the original creditors' records show that the person provided the cell phone number to the creditor but the defendant's records do not.").

Jamison does not identify any misapprehension of fact with respect to the decision to find the class definition proposed in the Complaint overbroad, he simply asserts that the Court was incorrect. Such an argument may be summarily rejected. *See*

⚑*Caisse Nationale de Credit Agricole,* 90 F.3d at 1270. Jamison's argument is also without merit. First, Jamison attempts to draw a distinction between class definitions that include a large number of potential members who potentially cannot satisfy an element of the claim versus a class definition that includes a large number of potential members who are not liable due to the same affirmative defense. However, *Oshana* makes no such distinction. Rather, it held that a class is overbroad where it contains a large number of potential members who have "no grievance" with the defendant. ⚑*Oshana,* 472 F.3d at 514. Since this is the case here, Jamison's class definition is overbroad.

Second, despite Jamison's arguments to the contrary, this Court's decision in *GM Sign v. Finish Thompson* also does not dictate a different result. In that case, which involved allegations that fax blasts violated the TCPA, this Court found that the issue of consent did not predominate and did not render a class definition overbroad. However, Jamison repeatedly overlooks the critical distinction between that case and the instant case. There, this Court specifically found that at the time of class certification "there [was] no evidence in the record that any recipient of the fax consented" to receiving the fax. ⚑*G.M. Sign, Inc.,* 2009 WL 2581324, at *8. Conversely here, there was evidence in the record at the time certification was decided that a large percentage of the potential class did consent to receiving calls on their wireless numbers. Therefore, the proposed class was not ascertainable.

 **\*9** Jamison also complains that the class definition he proposed for the first time in his reply fixes any ascertainability problems. However, because the Court misapprehended the facts, according to Jamison, it found ascertainability problems remain because there would be no way to identify the "called party" for purposes of establishing liability. In its original opinion, the Court found that newly proposed class would not fix the ascertainability problems because there may still be no way to identify the subscribers of the cellphone at the time those cellphones were called. In reaching this conclusion, the Court cited the facts of the *Soppet* case as well as Jamison's own peculiar circumstances. [9] *See* Order at 31. Namely, that debt collectors do not always call who they intend to call and as a result, there is no way to determine who were the subscribers of the wireless numbers who are potentially class members at the time the allegedly offending calls were made. *See id.*

Jamison contends that the Court misapprehended the facts because the Court stated that FCS intended to call Jamison's sister, not Jamison; however, in actuality, FCS intended to call Jamison to collect his sister's debt. He also argues that the Accurint records will show the subscriber of the cell phones called at the time those calls were placed. Jamison's support for this argument is as follows: (1) Exhibit 4 to his reply brief in support of his motion for certification contains a screen shot of the Accurint skip-trace ran on Jamison's sister Kai; (2) the screen shot also contained Jamison's name and address and an associated telephone number; (3) a separate exhibit showed a log of the calls made by FCS in pursuit of Kai's debt; (4) this log contains Jamison's wireless number. As a result, it is clear, according to Jamison, that FCS intended to call Jamison and not his sister.

However, this ignores some key facts. First, Jamison's wireless number does not appear in the screenshot attached as Exhibit 4. Second, the number listed as Jamison's in Exhibit 4 does not appear in the call log exhibit. Thus, it appears that FCS never called that number in pursuit of Kai's debt. Third, a number that belongs to Kai appears in the screenshot without a name or address listed next to it. Jamison claims that his wireless number would have been included in the screen shot but it was deleted. However, he did not present evidence showing that if the wireless number had been included in the screen shot, it would have been associated with Jamison and not his sister. The Court fails to see how it made a mistake of apprehension based on this record.

It was presented with evidence that FCS mistakenly called Jamison's cellphone number. The skip-trace of Jamison's sister presented to this Court did not show the wireless number at issue. The call log presented to the Court did not contain the number associated with Jamison. Even accepting Jamison's statement that his wireless number was deleted from the screenshot (which was never supported until the reply in support of the motion for reconsideration), there is no evidence that FCS intended to call Jamison because there is no evidence that his wireless number was associated with Jamison and not Kai in the screenshot. Indeed, the reasonable inference is the opposite. The FCS log shows that it called the number associated with Kai in the screenshot but not the number associated with Jamison. See Doc. 91 at Exhibits 4 & 5 to Motion for Class Certification (XXX–XX–XXXX is associated with Kai in the screenshot in Exhibit 4 and appears on the call log in Exhibit 5; XXX–XX–XXXX is associated

with Jamison in the screenshot in Exhibit 4 but does not appear on the call log in Exhibit 5). If it did not call one number specifically associated with Jamison, why would FCS call the other unless that number was not specifically associated with Jamison? Moreover, since he did not produce a single Accurint record of another putative class member, the Court gives no weight to Jamison's conclusory assertions that FCS's records will render the newly proposed class ascertainable. It is Jamison's burden to establish that the proposed class is ascertainable and he has failed to meet this burden. Regardless, Jamison has not identified any error on the Court's part that would warrant reconsideration of the Court's prior order.

## *CONCLUSION*

**\*10** For the reasons set forth above Jamison's motion for reconsideration of this Court's March 28, 2013 Order denying the motion for class certification is denied.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3872171

### Footnotes

1    A "skip-trace" is a process used to develop "new telephone, address, job or asset information on a customer, or verifying the accuracy of such information." *Meyer v. Portfolio Recovery Associates, LLC,* 707 F.3d 1036, 1040 n. 1 (9th Cir.2012).

2    A final order made by the Federal Communications Commission interpreting the TCPA is binding on this Court under the Administrative Orders Review Act, 28 U.S.C. § 2342(1). *See CE Design, Ltd. v. Prism Business Media, Inc.,* 606 F.3d 443, 446 (7th Cir.2010).

3    The Court found that Jamison satisfied the other requirements necessary for class certification.

4    The Court notes that other district courts have found that a plaintiff does not need to be the "called party" in order to assert a "cellular" claim under the TCPA. *See, e.g., D.G. v. William W. Siegel & Associates,* 791 F.Supp.2d 622, 625 (N.D.Ill.2011); *Nelson v. Santander Consumer USA, Inc.,* No. 11 C 307, 2013 WL 1141009, at \*5–6 (W.D.Wis. Mar. 8, 2013). However, these holdings appear to be the result of a semantic distinction with this Court. Those courts did not hold that anyone could assert a claim for a violation of the TCPA; rather, they held that the plaintiff did not need to be the "called party" as defined by the defendants in those cases. In both cases, the plaintiffs were the actual recipients of the calls. This Court, however, disagrees with *Nelson* that *Soppet's* definition of "called party" is limited to who can give express consent and should not be used for determining who possesses a claim under the TCPA. *Soppet* analyzed the use of the term throughout the statute and specifically invoked the Supreme Court's presumption that a statute uses a single phrase consistently in arriving at its result that a "called party" is a subscriber. Therefore, as described below, this Court believes that the wireless number's subscriber is one who possesses a claim under the TCPA.

5    The courts in this district that have concluded any recipient has a cause of action under the TCPA appear to have been decided before *Soppet* or did not consider the import of *Soppet*. However, the recent case from the Southern District of Florida relied on by Jamison, *Manno v. Healthcare,* supports this Court's analysis. There, the Court was asked to

consider whether the "called party," i.e., the claim holder, was the "subscriber" or "regular user and carrier of the phone." *See* 🚩*Manno,* 2013 WL 1283881, at \*4–5. It concluded the latter but noted the distinction between the terms.

In his motion for consideration, Jamison takes issue with the weight the Court accorded the Metcalf deposition. However, Jamison presented no reason for the Court to question the competency of this evidence. If Jamison thought it was improper, he could have moved to strike it. He did not. If he thought it was incompetent, he could have offered evidence to rebut it. He did not. However, now he attempts to offer an expert affidavit to rebut Metcalf's testimony. This is clearly improper and the affidavit is stricken. *See* 🚩*Mannoia v. Farrow,* 476 F.3d 453, 456–57 (7th Cir.2007) (affirming district court's decision to strike expert report as untimely where the report was filed in opposition to a motion for summary judgment but was not disclosed before the court's discovery deadline passed). However, the affidavit is also irrelevant. The Court's ruling that issue of consent predominated turned on the fact that the Defendants established that consent would be an issue for a large percentage of the class members so that the Court would be required to conduct mini-trials to determine whether the Defendants were actually liable to each of those class members. The ease of identifying wireless numbers in Honda's CASS system is not relevant to the resolution of this issue.

The Court noted in its prior opinion that there is a split of opinion as to whether a putative class plaintiff may amend their proposed class definition in the motion for certification without seeking to amend the complaint. *See* Order at 19. However, the Court does not need to address the propriety of Jamison's action because both proposed class definitions fail. However, it should be noted, the Court is not aware of any authority that has permitted a class plaintiff to amend their class definition through the use of a reply brief.

Jamison also argues that the Court erred because a recent opinion issued by a United States District Court from the Southern District of Florida found the issue of consent did not preclude a finding of commonality. *See* 🚩*Manno,* 2013 WL 1283881, at \*8. However, an opinion from the Southern District of Florida does not bind this Court. The opinion was also issued before the Court issued its prior opinion. It, therefore, cannot constitute a change in the controlling law that would warrant reconsideration by this Court of its prior opinion.

*Soppet* involved a suit brought by two cellphone subscribers who were called repeatedly by debt collectors seeking to collect a debt from the previous subscriber of those cell phone numbers. *See* 🚩*Soppet,* 679 F.3d at 638–39.

---

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 91 of 199

Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC, Not Reported in Fed....

2019 WL 7195309
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

LACKAWANNA CHIROPRACTIC P.C., a New York professional
corporation, individually and on behalf of all others similarly situated, Plaintiff,
v.
TIVITY HEALTH SUPPORT, LLC, a Delaware limited liability company, Defendant.

18-CV-00649-LJV-JJM
|
Signed 08/29/2019

**Attorneys and Law Firms**

Avi R. Kaufman, Pro Hac Vice, Kaufman P.A., Miami, FL, Stefan Louis Coleman, Law Offices of Stefan Coleman, P.A., New York, NY, for Plaintiff.

Emma Jane O'Connor, Pro Hac Vice, David C. Layden, Pro Hac Vice, Jenner & Block LLP, Chicago, IL, Sharon M. Porcellio, Bond, Schoeneck & King, PLLC, Buffalo, NY, for Defendant.

## REPORT AND RECOMMENDATION

JEREMIAH J. MCCARTHY, United States Magistrate Judge

**\*1** This action has been referred to me by District Judge Lawrence J. Vilardo for supervision of pretrial proceedings [40].[1] Before the court is plaintiff Lackawanna Chiropractic P.C.'s unopposed Motion seeking preliminary approval of a class action settlement [39]. For the following reasons, I recommend that the motion be denied.[2]

## BACKGROUND

**A. Litigation History**

Lackawanna Chiropractic commenced this action on June 7, 2018, seeking relief on behalf of itself and others for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Complaint [1]. Subject to certain exceptions (47 U.S.C. § 227(b)(1)(C)(i-iii)), the TCPA prohibits the "use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" (47 U.S.C. § 227(b)(1)(C)), and defines "unsolicited advertisement" to mean "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise". 47 U.S.C. § 227(a)(5). It allows "recover[y] for actual monetary loss from such a violation, or ... $500 in damages for each such violation, whichever is greater" (47 U.S.C. § 227(b)(3)(B)), and provides treble damages for "willful[ ] or knowing[ ]" violations. 47 U.S.C. § 227(b)(3).

Lackawanna Chiropractic alleges that defendant Tivity Health Support, LLC sent "facsimile advertisements ... to Plaintiff and members of the Class without their prior express invitation or consent, and despite the lack of an existing business relationship

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 92 of 199

Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC, Not Reported in Fed....

between it and members of the Class", and that "[b]y sending the unsolicited advertisement faxes at issue to Plaintiff and members of the Class without their prior express invitation or permission, Defendant violated ⚑47 U.S.C. § 227(b)(1)(C)". Amended Complaint [15], ¶¶30-31. That pleading defined the proposed class as "[a]ll persons and entities who (1) on or after four years prior to the filing of the initial complaint in this action, (2) were sent a telephone facsimile advertisement, (3) by or on behalf of Tivity, and (4) from whom Tivity did not have a record of prior express consent to send the facsimile advertisements, or from whom Tivity claims to have obtained consent in the same manner it claims to have obtained consent from Plaintiff" (id., ¶19). [3]

Prior to answering, Tivity moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. ("Rule") 12(b)(6), arguing that Lackawanna Chiropractic failed to plausibly allege that the fax which Tivity sent to it [15-1] constituted an "unsolicited advertisement" within the meaning of ⚑47 U.S.C. § 227. [19]. In a Corrected Decision & Order dated January 23, 2019 [24], Judge Vilardo denied that motion. While noting that "[i]f Tivity did not have the commercial purpose of promoting its products and services when sending the fax, it may not have violated the TCPA", he concluded that "plaintiffs have plausibly alleged that Tivity sent a fax with a commercial purpose of advertising the commercial availability and quality of its goods and services and that the fax therefore was commercial in nature.... Tivity can rebut that allegation, but only after answering the complaint and proceeding to discovery". Id., p. 8

**\*2**  Thereafter, Tivity answered the Amended Complaint, denying that it faxed unsolicited advertisements to Lackawanna Chiropractic or members of the alleged class (Tivity's Answer [29] ¶¶30-31), and affirmatively alleging that Lackawanna Chiropractic "and/or the members of the putative class provided express permission or invitation to receive the faxes at issue" and "had an established business relationship ('EBR') with Tivity". Id., p. 14, ¶¶3-4.

## B. The Proposed Settlement

Unlike the class defined in the Amended Complaint, the proposed settlement class consists of "[a]ll individuals and entities within the United States who were sent a fax by or on behalf of Tivity for the purpose of recruiting the recipient, or an individual or entity affiliated with the recipient, to join a Tivity network from June 7, 2014 through the date of the Preliminary Approval Order". Settlement Agreement and Release [39-1], ¶53. [4]  Tivity agrees to pay up to $645,000, retaining any unclaimed portion of that amount. Id., ¶54. It further agrees not to contest counsel's claim for attorney's fees up to $200,000, counsel's costs up to $10,000, and a service award to Lackawanna Chiropractic of $5,000, all to be paid from the $645,000 settlement funding. Id., ¶¶70, 80-81.

In order to participate in the settlement, each class member must submit a claim form stating "under penalty of perjury that to the best of my knowledge I received one (1) or more faxes seeking to recruit an individual or entity to join a Tivity network between June 7, 2014 and the present". Id., p. 47 of 74 (CM/ECF pagination). The amount to which each member is entitled is determined by multiplying "the number of Tivity Faxes sent to the fax number of the Settlement Class Member" by "$375.00 minus a *pro-rata* allocation of Settlement Costs (which allocation is calculated by taking total Settlement Costs divided by the total number of Tivity Faxes sent to the Settlement Class). By way of example only, if 1,720 Tivity Faxes were sent to the Settlement Class, and total Settlement Costs are $230,000, a Settlement Class Member submitting an Approved Claim with respect to one Tivity Fax will be paid $241.28 ($375.00-($230,000/1,720))." Id., ¶70. [5]  Any class member who does not timely opt out of the class is deemed to have released all claims "arising from Tivity Faxes". Id., ¶39.

## DISCUSSION

Although class counsel insists that "[t]here can be no doubt that this Settlement is a fair and reasonable" (Kaufman Declaration [39-2], ¶14), the court may not simply take his word for it. *See* ⚑Martin v. Cargill, Inc., 295 F.R.D. 380, 386 (D. Minn. 2013)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 93 of 199

Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC, Not Reported in Fed....

("the parties seek the Court's blessing over their settlement, based primarily upon their *ipse dixit* - the proposed settlement is fair, adequate, and reasonable because they say so. The Court cannot approve a settlement on such a rocky foundation").

While there is a "strong judicial policy in favor of settlements, particularly in the class action context", Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005), "preliminary approval of a proposed class action settlement is not simply a judicial 'rubber stamp' of the parties' agreement". Oladapo v. Smart One Energy, LLC, 2017 WL 5956907, *16 (S.D.N.Y.), adopted, 2017 WL 5956770 (S.D.N.Y. 2017). Acting as "a guardian of the rights of absent class members", Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 52 (2d Cir. 2000), the court must "carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness ... and that it was not a product of collusion". D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001).

**\*3** "When a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." Id. Therefore, preliminary approval "should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval". 2018 Advisory Committee Notes, Rule 23(e)(1). Rule 23(e)(1)(B) requires the parties to show "that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal".

The proposed settlement "must stand or fall in its entirety", and I may not "delete, modify or substitute" its terms. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998); Plummer v. Chemical Bank, 668 F.2d 654, 656, n. 1 (2d Cir. 1982). Having carefully reviewed the proposal, I have several concerns:

## A. Definition of the Settlement Class

The court's obligation to "protect absentees by blocking unwarranted or overbroad class definitions ... demand[s] undiluted, even heightened, attention in the settlement context". Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997).

The TCPA prohibits the faxing of an "unsolicited advertisement". 47 U.S.C. § 227(b)(1)(C). However, the definition of the proposed settlement class encompasses anyone who received certain faxes from Tivity, *regardless* of whether they were unsolicited, and that is improper. *See* Forman v. Data Transfer, Inc., 164 F.R.D. 400, 404 (E.D. Pa. 1995) ("[p]laintiff has mischaracterized the basis of liability as arising from defendant's mere *use* of the facsimile machine to send advertisements.... Under the language of the statute, however, liability arises only if a transmitted advertisement is *unsolicited*") (emphasis in original); Brodsky v. HumanaDental Insurance Co., 910 F.3d 285, 291 (7th Cir. 2018) ("it is necessary to distinguish between faxes sent with permission of the recipient and those that are truly unsolicited. The question of what suffices for consent is central, and it is likely to vary from recipient to recipient"); Gorss Motels, Inc. v. Brigadoon Fitness Inc., —— F.R.D. ——, 2019 WL 2171506, *5 (N.D. Ind. 2019) ("[d]etermining which of the hundreds of customers in Brigadoon's accounting system provided permission for Brigadoon to send facsimiles, and the status of any permission, would require an individualized inquiry that could not be resolved for all members of a class in a single adjudication").

"A proper definition includes the requirement that the class not include members who have no claim against the defendant." In re Montano, 488 B.R. 695, 704-05 (Bk. D.N.M. 2013). This requirement ensures that only "those individuals actually harmed by defendant's wrongful conduct will be the recipients of the awarded relief". Oshana v. Coca-Cola Bottling Co., 225 F.R.D. 575, 580 (N.D. Ill. 2005), aff'd, 472 F.3d 506 (7th Cir. 2006). *See also* Vigus v. Southern Illinois Riverboat/ Casino Cruises, Inc., 274 F.R.D. 229, 235 (S.D. Ill. 2011) ("Vigus' proposed class includes a substantial number of people who voluntarily gave their telephone numbers to the Casino knowing the Casino would call those numbers to present special commercial offers. They have no grievance with the Casino, and ... their inclusion in the proposed class definition renders it

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 94 of 199

Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC, Not Reported in Fed....

overbroad and the class unfit for certification"). Since the defined settlement class is not limited to those who may actually have claims against Tivity, the class is overbroad.

Not only is the proposed settlement class overbroad, but its precise contours are not reasonably ascertainable. "This Court has ... recognized an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." ⚑In re Petrobras Securities, 862 F.3d 250, 260 (2d Cir. 2017). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." ⚑Brecher v. Republic of Argentina, 806 F.3d 22, 24-25 (2d Cir. 2015).

 **\*4**  The Motion does not indicate whether the faxes allegedly sent by Tivity to other class members were identical in form to the fax attached to the Amended Complaint [15-1]. Therefore, in order to ascertain the scope of the settlement class, it would be necessary to determine not only whether the other faxes were sent "by or on behalf of Tivity", but also whether they were sent "for the purpose of" recruiting others to join the Tivity network. As Judge Vilardo noted, "the purpose of the message is critical. If Tivity did not have the commercial purpose of promoting its products and services when sending the fax, it may not have violated the TCPA". January 23, 2019 Decision & Order [24], p. 8. *See also* id., pp. 5-6, n. 2 (*citing* ⚑Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharmaceuticals, Inc., 847 F.3d 92, 97 (2d Cir. 2017) for the proposition that the purpose of a fax may be subject to different interpretations).

Since it would be necessary to examine each fax to determine its purpose, the proposed settlement class is not sufficiently ascertainable. *See* ⚑Menkes v. Stolt-Nielsen S.A., 270 F.R.D. 80, 93 (D. Conn. 2010) ("the need for numerous individualized determinations or insufficiently precise criteria in defining class membership can preclude the propriety of class certification").

**B. Analysis of Claims and Potential Defenses**

"The most significant factor for the district judge is the strength of plaintiffs' case balanced against the settlement offer. He is required to explore the facts sufficiently to make an intelligent comparison between the amount of the compromise and the probable recovery.... Therefore, the Court must insist that the parties present evidence that would enable possible outcomes to be estimated, so that it can at least come up with a ballpark valuation." Zink v. First Niagara Bank, N.A., 155 F. Supp. 3d 297, 312 (W.D.N.Y. 2016). While the Motion suggests that the proposed settlement "is a fair and reasonable recovery in light of Defendant's defenses" (Memorandum of Law [39], p. 17), it does not discuss any of those defenses. *See* ⚑Martin, 295 F.R.D. at 385 ("the parties have provided nothing but generalities about the relative strengths and weaknesses of the class's claims and Cargill's potential defenses.... But they offer no specifics").

Moreover, Rule 23(e)(2)(D) requires the court to consider whether "the proposal treats class members equitably relative to each other". "Put simply, the court's goal is to ensure that similarly situated class members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." 4 Newberg on Class Actions, § 13:56 (5th ed. 2019). While class counsel claims to have "conducted a thorough analysis of Plaintiff's claims" (Kaufman Declaration [39-2], ¶11), the Motion does not discuss potential differences among those claims. For example, although ⚑47 U.S.C. § 227(b)(3) authorizes treble damages for knowing or willful violations of the TCPA, the Motion does not address whether Tivity's alleged violations were knowing or willful as to any class members.

Absent greater detail as to the nature and strength of the various settlement class members' claims, I cannot decide whether they are being treated "equitably relative to each other". *See* Rule 23 Advisory Committee Notes, 2018 Amendments ("[m]atters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims"). "Courts may deny preliminary approval based on the settling parties' failure to furnish the court with

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 95 of 199

Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC, Not Reported in Fed....

enough information and evidence to enable it to rationally assess the reasonableness of the proposed consideration." Zink, 155 F. Supp. 3d at 313.

### C. The Notice of Settlement

"[A] court's role is to safeguard the class's interest by ensuring that class members, most of whom are operating in good faith, receive the best opportunity possible to comprehend and respond to the proposed settlement." 4 Newberg, § 13:30. Whereas "a class member would presumably want to know how the proposed settlement amount would compare to his or her maximum potential recovery", Zink, 155 F. Supp. 3d at 314, neither the Motion nor the proposed Notice to class members ([39-1], pp. 37-45 of 74, CM/ECF pagination) even mentions the maximum potential recovery under the statute.

 **\*5**  Compounding the difficulty in predicting a class member's recovery is the fact that the $375 figure is to be reduced by "a *pro-rata* allocation of Settlement Costs" (Settlement Agreement and Release [39-1], ¶71), which, in turn, are defined as "the costs of the Settlement Administrator, the Service Award approved by the Court and the attorneys' fees and costs awarded to Class Counsel by the Court". Id., ¶46. However, the "costs of the Settlement Administrator" are nowhere estimated or capped, and the amount of attorney's fees (and/or the "Service Award" to Lackawanna Chiropractic) would not be determined until *after* the deadline for submitting claims or opting out of the class. Therefore, in deciding whether to submit a claim or opt out, a potential class member would have no way of ascertaining the amount which it could expect to receive.

Moreover, the proposed Notice requires a class member objecting to the proposed settlement to "submit a letter that includes the following: ... [a] statement of all your objections to the Settlement including your legal and factual basis for each objection ... [t]he number of times in which you have objected to a class action settlement within the five years preceding the date that you filed the objection, the caption of each case in which you have made such objection, and a copy of any orders related to or ruling on your prior such objections that were issued by the trial and appellate courts in each listed case ... [a] statement confirming you intend to appear at the Final Approval Hearing ... [t]he number of times in which your counsel and/or counsel's law firm have objected to a class action settlement within the five years preceding the date that you file the objection, the caption of each case in which counsel or the firm has made such objection, and a copy of any orders related to or ruling upon counsel's or the firm's prior objections that were issued by the trial and appellate courts in each listed case ... [and] [a]ny and all agreements that relate to the objection or the process of objecting - whether written or verbal - between you or your counsel and any other person or entity". [39-1], pp. 42-43 of 74 (CM/ECF pagination).

Many of these requirements appear designed to discourage objections, in order to enhance the likelihood of final approval of the settlement - presumably because "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart Stores, Inc., 396 F.3d at 118. "[B]ecause they have some interest in curtailing objections ... the settling parties will often propose to the court ... [an] onerous procedure for the filing of objections." 4 Newberg, § 13:30. However, "[c]ourts should be cautious of objection formats that unduly chill class members' capacity to object to the settlement." Id.; *see also* Rule 23 Advisory Committee Notes, 2018 Amendments ("[c]ourts should take care ... to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards").

"[A] court's role is to safeguard the class's interest by ensuring that class members, most of whom are operating in good faith, receive the best opportunity possible to comprehend and respond to the proposed settlement. Courts will accordingly carefully scrutinize proposed limitations on objection formats and curtail those that over-reach." 4 Newberg, § 13.30. For example, I see "no reason why a personal appearance is necessary for the Court's consideration of an objection". Rhodes v. Olson Associates, P.C., 308 F.R.D. 664, 668 (D. Colo. 2015); 4 Newberg, § 13:30 ("class members may file written objections and need not appear at the fairness hearing for their objections to be considered by the court"). Nor do I see any legitimate reason for requiring unrepresented objectors to state the "legal basis" for their objections. "This requirement is too onerous for lay class members, whose objections may be valid notwithstanding the fact that they cannot provide the 'specific legal basis' ... that supports their objections." Rhodes, 308 F.R.D. at 668. These are but a few examples of my concerns with the objection requirements.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 96 of 199

Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC, Not Reported in Fed....

**D. The Possibility of Collusion**

**\*6** In order to approve a proposed settlement, the court must be satisfied that "it was not a product of collusion" (D'Amato, 236 F.3d at 85), and I am not satisfied. "Signs of collusion include, but are not limited to: (1) a disproportionate distribution of the settlement fund to counsel; (2) negotiation of a 'clear sailing provision'; and (3) an arrangement for funds not awarded to revert to defendants rather than to be added to the settlement fund." Philliben v. Uber Technologies, Inc., 2016 WL 4537912, \*3 (N.D. Cal. 2016); Stewart v. USA Tank Sales and Erection Co., Inc., 2014 WL 836212, \*6 (W.D. Mo. 2014).

The Settlement Agreement and Release contains a "clear sailing" provision whereby Tivity agrees not to oppose a fee award to class counsel and a "Service Award" to Lackawanna Chiropractic ([39-1], ¶¶80-81), and further provides that unclaimed settlement funds revert to Tivity. Id., ¶54. Tivity's "actual payout to class members is a function of participation rates. Thus, if participation is low, [it] will receive a large reversion, significantly reducing [its] total payout". Stewart, 2014 WL 836212, \*6.

"The heart of the concern ... is the risk that settlement agreements will be designed to give the appearance of the creation of a very large fund upon which fees may be based, frequently combined with low participation rates". Parker v. Time Warner Entertainment Co., L.P., 631 F. Supp. 2d 242, 265 (E.D.N.Y. 2009), aff'd, 378 Fed. App'x 63 (2d Cir. 2010). "In any given case, class member nonparticipation may be attributed to a variety of factors", meaning that "the defendant is likely to bear only a fraction of the liability to which it agrees". Id., pp. 265-66. Therefore, absent a reliable projection of the participation rate by class members if the settlement were to proceed, the fact that counsel intends to seek fees "not to exceed $200,000 ... payable solely out of the Settlement Funding" (Settlement Agreement and Release [39-1], ¶80) does little to dispel the possibility of collusion.

The same can be said for Lackawanna Chiropractic's request for approval of a $5,000 Service Award "to be paid by Tivity from the Settlement Funding". Id., ¶81. When coupled with its anticipated claim payment (not to exceed $375), this would amount to over 14 times the payment that similarly situated class members would receive. "Payments to class representatives, while not foreclosed, should be closely scrutinized", Ortiz v. Chop't Creative Salad Co. LLC, 89 F.Supp.3d 573, 580 (S.D.N.Y. 2015), for "when representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised". In re Western Union Money Transfer Litigation, 2004 WL 3709932, \*16 (E.D.N.Y. 2004).

Therefore, "[s]ettlements entailing disproportionately greater benefits to named parties are proper only when the totality of circumstances combine to dispel the cloud of collusion which such a settlement suggests." Allapattah Services, Inc. v. Exxon Corp., 454 F.Supp.2d 1185, 1219 (S.D. Fla. 2006); Zink, 155 F. Supp.3d at 310. Unfortunately, the numerous concerns discussed herein regarding the proposed settlement do nothing to dispel that cloud of collusion.


**CONCLUSION**

For all of these reasons, I recommend that Lackawanna Chiropractic's Unopposed Motion [39] be denied. Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by September 12, 2019. Any requests for extension of this deadline must be made to Judge Vilardo. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 97 of 199

**\*7** Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7195309

---

**Footnotes**

1    Bracketed references are to the CM/ECF docket entries. Unless otherwise indicated, page references are to numbers reflected on the documents themselves rather than to the CM/ECF pagination.

2    "[A] motion seeking the Court's preliminary approval of the settlement of the case may be effectively dispositive." Keirsey v. eBay, Inc., 2013 WL 5609318, \*2 (N.D. Cal. 2013).

3    That class definition is subject to certain exclusions which are irrelevant to this motion (id., ¶20).

4    The settlement class definition is likewise subject to certain exclusions which are irrelevant to this motion (id.).

5    " 'Settlement Costs' means the costs of the Settlement Administrator, the Service Award approved by the Court and the attorneys' fees and costs awarded to Class Counsel by the Court" (id., ¶46), and " 'Tivity Fax' means a fax sent by or on behalf of Tivity for the purpose of recruiting the recipient, or an individual or entity affiliated with the recipient, to join a Tivity network." Id., ¶51.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 7194525
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

LACKAWANNA CHIROPRACTIC P.C., a New York professional
corporation, individually and on behalf of all others similarly situated, Plaintiff,

v.

TIVITY HEALTH SUPPORT, LLC, a Delaware limited liability company, Defendant.

18-CV-649
|
Signed 12/26/2019

**Attorneys and Law Firms**

Avi R. Kaufman, Pro Hac Vice, Kaufman P.A., Miami, FL, Stefan Louis Coleman, Law Offices of Stefan Coleman, P.A., New York, NY, for Plaintiff.

Emma Jane O'Connor, Pro Hac Vice, David C. Layden, Pro Hac Vice, Jenner & Block LLP, Chicago, IL, Sharon M. Porcellio, Bond, Schoeneck & King, PLLC, Buffalo, NY, for Defendant.

DECISION & ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT JUDGE

**\*1** On June 7, 2018, the plaintiff commenced this putative class action. Docket Item 1. On May 21, 2019, the parties informed the Court that they had reached a settlement agreement. Docket Item 37. On May 22, 2019, this Court ordered that the case be dismissed in light of the parties' agreement but preserved the parties' right to reopen the case upon good cause shown within 60 days if the settlement was not consummated. Docket Item 38.

On June 28, 2019, the plaintiff moved for preliminary approval of the class action settlement. Docket Item 39. After the defendant did not respond, on August 21, 2019, this Court reopened this case and referred it to United States Magistrate Judge Jeremiah J. McCarthy for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 40.

On August 29, 2019, Judge McCarthy issued a Report and Recommendation ("R&R") finding that the plaintiff's motion should be denied. Docket Item 41. The parties did not object to the R&R, and the time to do so now has expired. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).[1]

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). A district court must conduct a de novo review of those portions of a magistrate judge's recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). But neither 28 U.S.C. § 636 nor Federal Rule of Civil Procedure 72 requires a district court to review the recommendation of a magistrate judge to which no objections are raised. *See* *Thomas v. Arn*, 474 U.S. 140, 149-50 (1985).

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 99 of 199

Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC, Not Reported in Fed....

Although not required to do so in light of the above, this Court nevertheless has reviewed Judge McCarthy's R&R as well as the parties' submissions to him. Based on that review and the absence of any objections, the Court accepts and adopts Judge McCarthy's recommendation to deny the plaintiff's motion.

For the reasons stated above and in the R&R, the plaintiff's motion for preliminary approval of the class action settlement, Docket Item 39, is DENIED. The case is referred back to Judge McCarthy for further proceedings consistent with the referral order of August 21, 2019, Docket Item 40.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7194525

---

**Footnotes**

1       Although the parties requested and received several extensions to the deadline for objections, *see* Docket Items 43, 44, 46, and 47, neither party filed an objection by the extended deadline of December 13, 2019.

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2632396
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Dominick LEON

v.

LOANDEPOT.COM, LLC

Case No. 2:25-cv-01787-JLS-AGR
|
Filed August 22, 2025

**Attorneys and Law Firms**

Alexander James Adducci Taylor, Sulaiman Law Group, Lombard, IL for Dominick Leon.

Eric J. Troutman, Brittany A. Andres, Troutman Amin, LLP, Irvine, CA, for Loan Depot LLC.

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING
DEFENDANT'S MOTION TO STRIKE CLASS ALLEGATIONS (Doc. 22)**

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a Motion to Strike Class Allegations filed by Defendant loanDepot, LLC. (Mot. to Strike, Doc. 22.) The Court finds this matter appropriate for disposition without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. Accordingly, the hearing set for August 29, 2025, at 10:30 a.m. is VACATED. For the reasons set forth below, the Court GRANTS the Motion to Strike.

**I. BACKGROUND**

Plaintiff Dominick Leon initiated this putative class action against Defendant loanDepot, LLC on February 28, 2025, and filed a First Amended Complaint ("FAC") on July 14, 2025. (Compl., Doc. 1; FAC, Doc. 20.) Defendant is a mortgage lender who placed "no less than twenty" calls to Plaintiff's cellular phone number "in an effort to sell Plaintiff a mortgage loan." (FAC ¶¶ 19, 25.) Plaintiff alleges that he registered his phone number on the National Do-Not-Call Registry and seeks redress for Defendant's alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* (*Id.* ¶¶ 18, 46–52.) Specifically, Plaintiff alleges that Defendant violated 47 C.F.R. § 64.1200(c), a regulation promulgated under the TCPA that prohibits calling individuals who have registered their phone numbers on the National Do-Not-Call Registry. (*Id.* ¶¶ 47–48.)

Plaintiff seeks to represent a class defined as:

> All individuals in the United States (1) to whom Defendant, or a third party acting on Defendant's behalf, placed, or caused to be placed, a phone call; (2) directed to a residential or cellular telephone number; (3) that is registered on the National Do-Not-Call Registry; (4) in which the purpose of the call was to market Defendant's mortgage loans; (5) within the four years preceding the date of the original complaint through the date of class certification.

(*Id.* ¶ 30.)

Following a conference with Plaintiff's counsel, Defendant moved to strike the FAC's class allegations on July 28, 2025. (Mot. to Strike.) Plaintiff's response was due no later than August 8, 2025. *See* C.D. Cal. R. 7-9 (requiring an opposition brief to be filed not later than twenty-one days before the hearing). On August 12, 2025, Defendant filed a Notice of Non-Receipt of Opposition to its Motion to Strike. (Doc. 24.) Six day later, on August 18, 2025, Plaintiff filed a Motion to Extend Plaintiff's Deadline to Respond to Defendant's Motion, setting the hearing on his Motion to Extend on September 12, 2025, two weeks after the scheduled hearing on Defendant's Motion to Strike. (Mot. to Extend, Doc. 25.) Plaintiff's Motion explains that Plaintiff's counsel mis-calendared the response due date for August 18, 2025. (*Id.* ¶ 4.) Notably, having claimed that he believed the response date to be August 18, 2025, Plaintiff did not accompany his motion with a copy of the opposition he would have filed, and a request to file it late. Rather, Plaintiff has, to date, filed *no* substantive opposition.

## II. PLAINTIFF'S FAILURE TO RESPOND

Local Rule 7-12 provides that "failure to file any required paper, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion." C.D. Cal. R. 7-12. Ordinarily, Plaintiff's failure to timely oppose Defendant's Motion alone constitutes a sufficient basis to grant the Motion. C.D. Cal. R. 7-12; *see also* *Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir. 1995) (per curiam) (concluding that a motion to dismiss was properly granted for failure to comply with the local rules where the plaintiff "received notice" and "was given ample time to respond" to the motion but failed to do so).

**\*2** However, because here, Plaintiff filed a bare bones document indicating a future intent to oppose the Motion, the Court addresses Plaintiff's filing. [1] First, as noted above, Plaintiff's opposition to Defendant's Motion was due on August 8, 2025. Plaintiff had notice of Defendant's Motion both because the parties met and conferred about the Motion and because Defendant subsequently filed a Notice of Non-Receipt of Opposition. Yet Plaintiff waited until August 18, 2025—ten days after his deadline to oppose and six days after Defendant filed the Notice of Non-Receipt of Opposition—just to request an extension of his deadline to oppose. Hence, even if he had mis-calendared the due date, he was apprised of the error as of the August 12, 2025 Notice of Non-Opposition, and took no prompt action. Further, when the incorrectly calendared date of August 18, 2025 arrived, Plaintiff failed to file even a proposed opposition. The Court is therefore skeptical of the validity of his docketing error claim. While Plaintiff also vaguely points to other work Plaintiff's counsel was doing and a death, at some point, in Plaintiff's counsel's "extended family," none of this sufficiently explains or provides good cause for Plaintiff's wholesale failure to file any substantive response. (Mot. to Extend ¶¶ 5–6.)

Accordingly, while the Court may treat the failure to timely file an opposition as consent to the granting of the Motion to Strike, here the Court does not do so, but rather independently considers the merits of the motion. However, the Court does not find good cause to continue the hearing and extend Plaintiff's deadline to file an opposition.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(f), a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

"[M]otions to strike, as a general rule, are disfavored." *Daniel v. Lennar Corp.*, 2019 WL 8194735, at \*2 (C.D. Cal. Oct. 16, 2019). Moreover, "the issue of class relief is generally more appropriately determined through a motion for class certification" because "the shape and form of a class action evolves only through the process of discovery." *Lightbourne v. Printroom Inc.*, 2014 WL 12597108, at \*8 (C.D. Cal. Sept. 8, 2014) (citations omitted).

However, the Supreme Court and Ninth Circuit have both recognized that striking class allegations may be appropriate in certain cases. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) ("[A] party seeking class certification is not always entitled to discovery on the class certification issue[.]"). It is appropriate to strike class allegations at the pleading stage if the action "could not possibly proceed on a classwide basis." *Heredia v. Sunrise Senior Living LLC*, 2019 WL 5149854, at *6 (C.D. Cal. Mar. 4, 2019); *see also Garza v. Swift Beef Co.*, 2024 WL 5415842, at *12 (C.D. Cal. Jan. 23, 2024) ("A court, therefore, may strike class allegations when no class action can possibly be maintained on the face of the pleading."); *Stokes v. CitiMortgage, Inc.*, 2015 WL 709201, at *4 (C.D. Cal. Jan. 16, 2015) ("Rule 12(f) also grants courts the authority to strike class allegations that cannot possibly move forward on a classwide basis." (citations omitted)); *Route v. Mead Johnson Nutrition Co.*, 2013 WL 658251, at *8 (C.D. Cal. Feb. 21, 2013) ("[W]here the matter is sufficiently obvious from the pleadings, a court may strike class allegations.").

### A. Analysis

**\*3** Plaintiff's class allegations must be stricken because the proposed class is overly broad.

The regulations promulgated under the TCPA prohibit entities from initiating "any telephone solicitation" to an individual who has registered his or her phone number on the National Do-Not-Call Registry. 47 C.F.R. § 64.1200(c)(2); 47 U.S.C. § 227(c). Notably, however, entities will not be liable under the TCPA where they have obtained the person's "prior express invitation or permission," or where they have an "established business relationship" with the person. 47 C.F.R. § 64.1200(c)(2)(ii), (f)(15)(ii); *see Brown v. Nano Hearing Tech Opco, LLC*, 2024 WL 3367536, at *8 (S.D. Cal. July 9, 2024) ("The TCPA expressly precludes claims made by individuals who consented to be called."). Moreover, only individuals who have received two or more phone calls by the same entity within a twelve-month period have a private right of action under this provision of the TCPA. 47 U.S.C. § 227(c)(5); *see Greene v. Select Funding, LLC*, 2021 WL 4926495 (C.D. Cal. Feb. 5, 2021) ("[M]ore than one telephone solicitation is needed to trigger a violation.").

Plaintiff's proposed class includes who individuals who clearly have no cognizable claim against Defendant under the TCPA. The proposed class includes all individuals in the United States with phone numbers on the National Do-Not-Call Registry, who received a call from Defendant within the four years preceding the date of the original complaint where the purpose of the call was to market Defendant's mortgage loans, subject to very limited exceptions. (FAC ¶ 30.) Such a broad class includes individuals who gave Defendant consent to contact them, who had a prior business relationship with Defendant, or who received only one phone call from Defendant in any given twelve-month period, and who therefore have no viable claim against Defendant under the relevant TCPA provisions. Because the class fails to exclude these members who necessarily lack standing to sue under the TCPA, the class is overly broad. *See Brown*, 2024 WL 3367536, at *8 ("[The] class definition necessarily includes any individuals who have consented to calls .... [T]hese individuals would also lack standing.").

Although it is generally inappropriate to strike class allegations at the pleading stage, here the defects in the proposed class could not possibly be remedied through discovery. *Cf. Hadi v. Toyota Motor Corp.*, 2024 WL 4452784, at *6 (C.D. Cal. Aug. 21, 2024) (Staton, J.) (denying motion to strike class allegations as premature where defendant's arguments hinged on "two highly fact-intensive" inquiries that were better addressed after discovery). Because it is "sufficiently obvious" that the class as currently defined cannot possibly be maintained, striking the class allegations is appropriate at this stage. *Route*, 2013 WL 658251, at *8 ("[W]here the matter is sufficiently obvious from the pleadings, a court may strike class allegations.").

Accordingly, Defendant's Motion is GRANTED.

## IV. <u>CONCLUSION</u>

For the above reasons, Defendant's Motion to Strike is GRANTED, and Plaintiff's Motion to Extend Deadline to Respond is DENIED. Accordingly, Plaintiff's class allegations are STRICKEN from the FAC as overbroad. Any amended Complaint must be filed no later than **September 5, 2025**.

**\*4** Initials of Deputy Clerk: kd

**All Citations**

Slip Copy, 2025 WL 2632396

---

**Footnotes**

1    Because Plaintiff filed its Motion to Extend as a regularly-noticed motion to be heard on September 12, 2025, the Court would be within its discretion to ignore its contents altogether. Instead, the Court considers it here, but for the reasons stated herein, DENIES the Motion.

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2829601
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Charlene MARTINEZ, individually and on behalf of all others similarly situated, Plaintiff,

v.

TD BANK USA, N.A., a National Bank, and Target Corporation, a Minnesota corporation, Defendants.

Civil Action No. 15-7712(JBS/AMD)
|
Signed 06/30/2017

**Attorneys and Law Firms**

Stefan Louis Coleman, Esq., 1072 Madison Ave., Suite 1, Lakewood, NJ 08701, Attorney for Plaintiff.

Jarrod D. Shaw, Esq., MCGUIRE WOODS LLP, 625 Liberty Avenue, 23rd Floor, Pittsburgh, PA 1522, Attorney for Defendants.

**OPINION**

JEROME B. SIMANDLE, U.S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Charlene Martinez brings this putative class action against Defendants TD Bank USA, N.A. ("TD Bank") and Target Corporation ("Target"), alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and a California law entitled the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code §§ 1788-1788.33, arising from telephone calls placed in connection with Defendants' efforts to collect a consumer debt from Plaintiff's credit card. [Docket Item 25.] The Court previously dismissed Plaintiff's claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq., for lack of standing. [Docket Items 60 & 61.] Before the Court is Defendants' motion for summary judgment, or, in the alternative, to strike Plaintiff's class allegations. [Docket Item 54.] Plaintiff has filed a Response [Docket Entry 57] and Defendants have filed a Reply [Docket Entry 62].

Defendants argue, first, that there is no genuine dispute of material fact regarding whether Defendants violated the TCPA because Plaintiff provided prior express consent before all of the calls at issue and did not revoke that consent before any of the calls were made. Second, Defendants argue that there is no genuine dispute of material fact as to whether harassment occurred within the meaning of the RFDCPA and summary judgment in their favor is appropriate. Defendants also argued that they were entitled to summary judgment as to Plaintiff's UCL claim, as that claim had not yet been dismissed at the time when Defendants filed the instant motion. Finally, Defendants argue that Plaintiff's class allegations should be stricken as they improperly propose a fail-safe class.

For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion for summary judgment and will strike Plaintiff's class allegations.

**II. BACKGROUND**[1]

TD Bank is a large national bank chain that, inter alia, "owns and underwrites a portfolio of credit card accounts." [FAC ¶ 1.] Target is a corporation headquartered in Minnesota and doing business in New Jersey and nationwide. [Id. at ¶ 8.]

Plaintiff Charlene Martinez, a California resident, opened a Target credit card account in 2007. At all times relevant to this action, Target was the servicer of her credit card account. When Plaintiff opened the account, she agreed that Target or its agents were permitted to call her, including her mobile telephone, regarding her account, and that they could make such calls using an automated dialing/announcing device. [Pl. Statement of Material Facts in Opp., Docket Item 58 ¶¶ 1-3.]

**\*2** Plaintiff obtained the cell phone number at issue here, ending in -2420, in 2011. When she updated her account information with Target on its website on September 17, 2012, she provided this number as her "home" telephone number and received a disclosure that stated that, by providing her phone number on that page, she consented to receiving, at that phone number, autodialed and prerecorded calls from Target or on Target's behalf. Plaintiff then clicked "Submit" after that disclosure was provided. [Id. at ¶¶ 4-9.]

Before that date, Plaintiff had updated her account information (e.g., her address or her phone number) in other ways: by writing the new address on her monthly statement, by calling Target and using Target's automated phone system, and by calling Target and speaking to a live customer service representative. [Id. at ¶¶ 12(a)-(e).] At one point, Plaintiff called Target's customer service and spoke to a live representative to change her phone number; on another occasion, she called Target's customer service and spoke to a live representative to revoke her consent for Target to call that number (ending in -2460). [Id. at ¶¶ 12(f) & (g).] On September 9, 2013 (almost one year after Plaintiff provided the -2420 number on Target's website), Plaintiff called Target and provided an updated address to a live customer service representative; she did not provide an updated phone number during that conversation. [Id. at ¶ 12(i).] On July 9, 2014, Plaintiff again used Target's website to provide an updated home address and did not change the phone number from the -2420 number. [Id. at ¶ 12(j).]

Plaintiff had landline telephone service in her name from 2014 to 2015. [Id. at ¶ 13.]

Plaintiff's Target credit card account became delinquent sometime in late 2014; between August 29, 2014 and April 15, 2015, Target placed 165 calls to Plaintiff's cell phone regarding the delinquent account. [Id. at ¶¶ 14-15.] Plaintiff concedes the accuracy of Target's dialer records as to the "date, time, content, and duration of Defendants' calls to Plaintiff." [Id. at ¶ 16.] On 19 of those days, Plaintiff received two calls per day; on two days, she received three calls per day. Of the 165 calls, 162 calls had durations of 0 seconds, i.e., were not answered by Plaintiff or another party. [Id. at ¶¶ 17(a)-(e).] On August 29, 2014, a 6-second call occurred where the person who answered stated that Plaintiff was not home; on August 30, 2014, a 487-second call occurred where the person who answered promised to pay; and on April 15, 2015, a 159-second call occurred where Plaintiff told Target she was filing for bankruptcy. [Id. at ¶ 17(f).]

While Plaintiff initially alleged that she spoke with Target on April 14, 2015 and told them to stop calling her, she later amended that to state that she spoke with Target both on April 14 and April 15; she also stated in her deposition that it is possible that her memory is incorrect. While at one point during this case, Plaintiff stated that she called Defendants to ask them to stop calling the -2420 number, she has no record of making such a call; generally speaking, Plaintiff cannot contradict Target's dialer records because she does not have any call logs and cannot estimate the number of calls she received between August of 2014 and April of 2015. [Id. at 18-20.]

Plaintiff alleges that on April 10, 2015, Plaintiff's bankruptcy attorney, Daniel Shay, faxed cease-and-desist letters to two fax numbers, "revoke[ing] any prior express consent that may have been given [by Plaintiff or her husband] to receive telephone calls, especially to Clients' cellular telephones, from an Automated Telephone Dialing System, or a pre-recorded voice" as outlined in the TCPA." The letters were faxed to two numbers: (856) 533-1138 and (302) 683-6889. The transmission report for the faxes indicated that the transmission for each was "OK." [Pl. Supp. Statement of Material Facts in Opp., Docket Item 59 at ¶¶ 1-3, citing Docket Item 58-2 at ¶¶ 4 & 5 and Exhs. 1 & 2.] Defendants dispute these factual allegations inasmuch as they "have no record of receiving the cease and desist letters." [Def. Response to Statement of Material Facts in Opp., Docket Item 63 at ¶¶ 1-3.]

**\*3**  The (856) 533-1138 number receives faxes for TD Bank, N.A.'s Business Solutions group. However, Defendants note that TD Bank, N.A. "is a different entity than the one related to the Target REDcard." [Docket Item 63 at ¶ 4, citing Docket Item 56-9 at 4.]

The (302) 683-6889 number receives faxes for TD Bank USA, N.A. as well as for TD Bank, N.A.; however, Defendants note that "the number was not provided as a method to communicate regarding the Target REDcard." [Docket Item 63 at ¶ 5, citing Docket Item 56-9 at 4.]

During the deposition of Target's Rule 30(b)(6) designee, Susan Wolf, Ms. Wolf was unable to state the fax number where cease-and-desist letters (or other revocations of consent) could or should be sent; however, Defendants point out, Ms. Wolf stated that, while she did not know the number, it "might" be found online or be given out by a customer service representative to a caller. [Docket Item 63 at ¶ 9, citing Docket Item 59-1 at 14-15.]

Target placed four calls to the -2420 number from April 11, 2015 to April 15, 2015. [Docket Item 63 at ¶ 6.] Target stopped calling Plaintiff after April 15, 2015, when a Target representative reported in Target's account system that Plaintiff had retained a bankruptcy attorney. [Id. at ¶ 7.]

Neither Plaintiff's electricity bill nor her cell phone bills increased as a result of the calls made by Defendants to the -2420 number. [Docket Item 58 at ¶¶ 23-24.] Plaintiff no longer uses the -2420 cell phone number. [Id. at ¶ 26.]

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Credibility determinations are not appropriate for the court to make at the summary judgment stage. *Davis v. Portlines Transportes Maritime Internacional*, 16 F.3d 532, 536 n.3 (3d Cir. 1994).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The non-moving party " 'need not match, item for item, each piece of evidence proffered by the movant,' " but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. *Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Anderson*, 477 U.S. at 252).

## IV. ANALYSIS

### A. TCPA

Defendants argue that they are entitled to summary judgment on Plaintiff's claim that they violated the TCPA because there is no genuine dispute of material fact that Plaintiff provided her prior express consent to receiving autodialed calls to her cell phone, and she did not receive any calls from Defendants after revoking that consent. [Docket Item 55 at 20-26.]

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 107 of 199

Martinez v. TD Bank USA, N.A., Not Reported in Fed. Supp. (2017)

**\*4**  In response, Plaintiff concedes that she provided consent for Defendants to call her using an autodialer on September 17, 2012. [Docket Item 57 at 13.] However, she submits, there is a genuine dispute of material fact as to whether Defendants continued to call her after she revoked that consent: she contends that she has submitted sufficient evidence for a reasonable finder of fact to conclude that she revoked her consent to be called on April 10, 2015 via the cease-and-desist letters faxed by her bankruptcy attorney, and that she nevertheless received four calls from April 11, 2015 to April 15, 2015, in violation of the TCPA. [Docket Item 57 at 13-18.]

To prove a violation of the TCPA, 47 U.S.C. § 227(b)(1)(A), a plaintiff must put forth evidence that "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Van Patten v. Vertical Fitness Group, LLC*, 22 F. Supp. 3d 1069, 1073 (S.D. Cal. 2014) (internal citations omitted). If a defendant, as an affirmative defense, can show that the called party provided his or her express consent, then the TCPA claim will fail. Id.

Plaintiff has conceded that she provided her prior express consent before 161 of the 165 calls were made to her cell phone. She alleges, however, that she revoked her consent on April 10, 2015—or that there is a genuine dispute of material fact as to this point—and that Defendants nevertheless made four more calls to her in violation of the TCPA.

The FCC has stated that "[c]onsumers have a right to revoke consent, using any reasonable method including orally or in writing"; in order for a called party to revoke his or her consent, "the TCPA requires only that the called party clearly express his or her desire not to receive further calls." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 (hereinafter "2015 FCC Order"), 30 F.C.C. Rcd. 7961, 7996-97, ¶¶ 64, 67 (July 10, 2015). In response to a concern that "allowing [e.g.,] oral revocation puts defendant callers at a disadvantage," the FCC disagreed: "The well-established evidentiary value of business records means that callers have reasonable ways to carry their burden of proving consent. We expect that responsible callers, cognizant of their duty to ensure that they have prior express consent under the TCPA and their burden to prove that they have such consent, will maintain proper business records tracking consent.... We, therefore, find that the consumer may revoke his or her consent in any reasonable manner that clearly expresses his or her desire not to receive further calls, and that the consumer is not limited to using only a revocation method that the caller has established as one that it will accept." Id. at 7998-99, ¶ 70.

Courts, when considering whether consent was revoked under the TCPA, have looked to common-law understandings of consent. See *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270-271 (3d Cir. 2013) ("Our holding that the TCPA allows consumers to revoke their prior express consent is consistent with the basic common law principle that consent is revocable.... [A]t common law, consent may be withdrawn. Restatement (2d) of Torts § 892A, cmt. I (1979) ('[C]onsent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct.')"). A court should not consider the called party's subjective intent and should, instead, look to the words the called party used to consider whether the alleged revocation of consent either informed the caller or gave the caller reason to know that the called party was revoking his or her consent to be called. See *Dixon v. Monterey Fin. Servs., Inc.*, No. 15-cv-03298, 2016 WL 3456680, at \*3 (N.D. Cal. June 24, 2016).

 **\*5**  The parties appear to agree that the substance of the cease-and-desist letters, faxed by Plaintiff's bankruptcy attorney on April 10, 2015, would have sufficed to give Defendants reason to know that Plaintiff was withdrawing her consent to be called. The sole dispute is as to whether the faxing of the letters to the fax numbers in question, where Defendants submit that the evidence is clear that they never received either letter, was a reasonable method of informing Defendants that Plaintiff was revoking her consent.

Plaintiff has cited case law where courts have "honored consumers' revocation of consent through submission of a cease-and-desist letter ..., even where there are deficiencies with the letter, such as failing to 'indicate that the number [in the request]

was for a cellular phone.' " [Docket Item 57 at 15, citing ⚑*Baldwin v. Monterey Fin. Servs., Inc.*, No. 14-cv-2346, 2016 WL 5723734, at \*5 (M.D. Pa. Sept. 30, 2016) and ⚑Gager, 727 F.3d at 267.] However, the alleged deficiencies in the April 10 faxes do not go to deficiencies within the letter, but rather the deficiency in the method of communication as a whole, such that it was no longer a "reasonable method" of revoking Plaintiff's consent.

The crux of Defendants' argument that the faxing of the cease-and-desist letters to the two numbers on April 10 was not a reasonable method of revoking Plaintiff's consent is that, in the first instance, Target was the servicer of Plaintiff's credit card account and Target was not one of the parties faxed, and second, neither number that was faxed was one that was provided for consumers to use to communicate about their Target credit card accounts. [Docket Items 55 at 25-26; 57 at 16-17.]

Furthermore, Defendants argue that they cannot be said to have had reason to know that Plaintiff revoked her consent on April 10, 2015 when they assert that they never received the revocation, their business records do not reveal having received the faxes, and Plaintiff cannot point to any evidence that they received the faxes beyond the numbers themselves and the fact that the faxes marked their transmission as "OK." [Docket Items 55 at 25-26; 57 at 17-18.] Defendants argue: "Plaintiff never actually communicated revocation of consent to someone with responsibility for (or knowledge of) her Target REDcard." [Docket Item 62 at 9.] They continue: "Although the declaration from Plaintiff's bankruptcy attorney may serve as evidence that faxes were <u>sent</u>, it is not evidence that they were received by <u>Defendants</u>. Plaintiff's attorney does not even provide any detail as to how he obtained the fax numbers or why he believed they were an appropriate method to revoke consent. Thus, the affidavit provides no basis to infer that the faxes were received by Defendants." [<u>Id.</u> at 11 (emphasis in original).]

The Court finds that Plaintiff has not produced sufficient evidence to allow a reasonable finder of fact to conclude that she revoked her consent on April 10, 2015, thus allowing her claim under the TCPA for the four calls placed from April 11, 2015 to April 15, 2015 to go forward. A reasonable finder of fact could not conclude that faxing a letter to a fax number only known to be associated with one party that is simply connected to the credit card account at issue, and has never serviced that account, cannot constitute a reasonable method of revoking consent to be contacted regarding that account. This is especially true where, as here, the consumer has previously effectively revoked consent in a different manner.

 **\*6**  The undisputed evidence is that Plaintiff's attorney faxed appropriately clear cease-and-desist letters to two fax numbers associated with TD Bank, N.A., and TD Bank USA, N.A. Only the latter entity is a party to this action, and it has never acted as the servicer of Plaintiff's Target credit card. Plaintiff's only evidence that the indicated fax numbers received the fax is that the faxes were marked as their transmission having been "OK." The Court finds that this does not create a genuine dispute of material fact as to whether TD Bank USA, N.A. (a defendant in this action) knew or had reason to know of this fax, where TD Bank USA, N.A.'s records show that it did not receive the facts and Plaintiff has put forth no evidence to suggest why faxing the letter to <u>that specific fax number</u> would have given TD Bank USA, N.A. reason to know that she had revoked her consent.

Further undisputed evidence shows that Plaintiff revoked her consent to be called on a different telephone number on a prior date using a different method, and that Defendants honored that revocation. Plaintiff has not put forth evidence that would tend to show why she believed that faxing her letter to the numbers her attorney faxed on April 10 would have or should have effectively communicated her revocation to Defendants as she previously had, herself, done.

In *Reyes v. Lincoln Auto. Fin. Servs.*, No. 15-0560, 2016 WL 3453651, at \*2 (E.D.N.Y. June 20, 2016), the court granted summary judgment on a TCPA claim where, despite the plaintiff's argument that he had revoked his consent by letter, the letter was "merely addressed to 'Lincoln Credit,' with nothing more," was not signed by the plaintiff, the plaintiff testified that the letter was a form letter, that he did not recall the address he mailed the letter to, that he had no record that the letter was actually sent to the defendant, and that a response letter from the defendant concededly stated that it never received the plaintiff's letter revoking consent.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 109 of 199

Martinez v. TD Bank USA, N.A., Not Reported in Fed. Supp. (2017)

In *Johnston v. USAA Fed. Savings Bank*, No. 12-cv-02486, 2014 WL 5439965, at *3-*4 (D. Colo. Oct. 27, 2014), although the agreement between the plaintiff and defendant required the plaintiff to revoke his consent in a different manner, the court found that the plaintiff's fax to defendant requesting "that it '[p]lease stop immediately calling my cell phone # xxx-xxx-xxxx' " could "serve to revoke his consent" under the TCPA where "the undisputed evidence is that Defendant received Plaintiff's written request ... via facsimile on Saturday, July 28, 2012." However, the dispute in this case is not over in what manner Defendants and Plaintiff agreed Plaintiff could revoke her consent, but rather whether the Defendants named in this suit ever actually received Plaintiff's revocation (or had reason to know of it). In Johnston, the "undisputed evidence" was that the defendant had received the fax. The Court therefore finds it inapposite.

Plaintiff submits that the successful transmission of the fax creates a question of fact for a jury. Under these circumstances, the Court disagrees. While courts have found that "a fax confirmation generated by the sender's machine" can create a genuine issue of fact about whether the fax was received when the fax was absent from the intended recipient's relevant file, see *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 476-79 (7th Cir. 2009), but in this case, it is precisely the intended recipient that is at issue; in addition, while the relevant agency in Laouini "never 'denied' " having received the fax, the Defendants here do deny having received it. In Laouini, the EEOC supervisor confirmed that "the number on ... [the] fax-transmission record is indeed the fax number attorneys are instructed to use for submitting charges." Id. at 475. The Laouini decision cited *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 459, where the court ruled that, where "notice was properly addressed, stamped and mailed, there is a presumption that Bunn received it on behalf of the creditor. Bunn's denial of receipt alone does not rebut the presumption, but merely creates a question of fact." Here, however, the question of fact is not necessarily created as Plaintiff urges, because there is insufficient evidence to show that the faxes, by virtue of having been sent to the fax numbers they were sent to, were effectively "properly addressed."

**\*7** In *Stevens Shipping & Terminal Co. v. JAPAN RAINBOW, II MV*, 334 F.3d 439, 44 (5th Cir. 2003), the court ruled that a fax confirmation sheet "created a rebuttable presumption that" a party received the notice and was deemed to have actual knowledge of its contents. This was the case even though the party contended that the "fax machine at issue was in an area separate from the company's administration and was not one that officers would use," in part because he "conceded that the fax number" where the fax was sent "belonged to a fax machine in the agency department of [its] downtown corporate office" and, most relevantly to the instant analysis, it was sent to "the fax number listed in [the vessel charterer's] voyage instructions[.]" Id. at 441-43. Here, in contrast, Defendants submit that the evidence is clear that the fax to TD Bank USA, N.A. was not sent to any entity that had any relationship with Plaintiff's credit card account; nor was it the method specified in any instructions provided by Defendants to Plaintiff on how to communicate with Defendants.

Defendants state: "Plaintiff's theory is that a credit card holder could fax any phone number even remotely associated with any subsidiary or branch of a major national bank or retailer and that such an action would constitute effective revocation, even where the actual entities named as Defendants never received or had reason to know of these attempted revocations." [Docket Item 62 at 13.] While the Court does not understand Plaintiff to go quite that far in her argument, the Court nonetheless finds that Plaintiff has not raised a genuine dispute of material fact that her method of revocation was, under the circumstances, a reasonable one.

For those reasons, the Court finds that Plaintiff has not put forth sufficient evidence to allow a reasonable finder of fact to conclude that she used a reasonable method to communicate to Defendants, on April 10, 2015, revocation of her consent to be called. Given that, her conceded prior express consent was still in effect, and Plaintiff cannot prevail on her claim that the four calls from April 11, 2015 to April 15, 2015, constituted violations of the TCPA. Accordingly, the Court will grant summary judgment to Defendants as to the TCPA claim.

**B. RFDCPA**

Defendants argue that they are entitled to summary judgment on Plaintiff's claims under the RFDCPA and Cal. Civ. Code § 1788.17, which incorporates failure to comply with provisions of the Federal Debt Collection Practices Act ("FDCPA"), Sections 1692b through j, which also relate to "harassment or abuse of a person in connection with collection of a debt" because "the undisputed call logs show that no harassment occurred" as a matter of law. [Docket Item 55 at 26-27.] Plaintiff argues that the undisputed call logs show that Defendants called Plaintiff 165 times over an eight-month period, which a reasonable jury could find to constitute harassment within the meaning of the RFDCPA, and that courts have denied summary judgment in cases with patterns of calls that were lower in amount and frequency. [Docket Item 57 at 19-21.]

The RFDCPA prohibits harassing conduct related to debt collection, including "causing a telephone to ring repeatedly or continuously to annoy the person called" and "communicating with such frequency as to be unreasonable and to constitute harassment under the circumstances." Cal. Civ. Code §§ 1788.11(d) & (e). It also prohibits parties from "engaging in conduct, the natural consequence of which is to harass or abuse a person in connection with the collection of a debt." Cal. Civ. Code § 1788.17 (referencing 15 U.S.C. § 1692d).

"The determination of whether a debt collection agency's telephone calls amount to 'actionable harassment or annoyance turns not only on the volume of calls made, but also on the pattern of calls.' " Saltzman v. I.C. Sys., Inc., No. 09-10096, 2009 WL 3190359, at *7 (E.D. Mich. Sept. 30, 2009) (quoting Akalwadi v. Risk Mgmt. Alternatives, Inc., 336 F. Supp. 2d 492, 505 (D. Md. 2004)).

 *8  None of the statutory provisions at issue here expressly mandate that such conduct must occur in the absence of the called person's consent, as other provisions of 15 U.S.C. §§ 1692 et seq. do. See 15 U.S.C. § 1692c. The Court has located no definitive guidance whether a cause of action under the RFDCPA can arise from cell phone calls received during a period of prior consent, or whether such consent is not deemed to permit a pattern of abusive calls in any event. In at least one case of which the Court is aware, a reviewing court has found both (1) that a consumer consented to receive seventy-three calls but not the final twenty-six calls from a creditor, and (2) that there was nevertheless a genuine dispute of material fact as to whether the overall volume and pattern of all ninety-nine calls (again, most of which were made with the consumer's consent) violated § 1788.11 of the RFDCPA. Haysbert v. Navient Solutions, Inc., No. CV 15-4144 PSG (Ex), 2016 WL 890297, at *9-*10, *13 (C.D. Cal. Mar. 8, 2016). While a consumer's consent may constitute evidence that the conduct of the caller was not unreasonable or did not constitute harassment under the circumstances and therefore did not violate the RFDCPA, the Court is inclined to treat the effect of such consent on the claim that the conduct was harassing as a question of fact rather than law. See also Chisholm v. AFNI, Inc., No. 15-3625, 2016 WL 6901358, at *3-*6 (D.N.J. Nov. 22, 2016) (granting summary judgment to defendant on FDCPA claim under 15 U.S.C. § 1692d based on volume and pattern of calls and separately granting summary judgment to defendant on TCPA claim because consumer consented to receiving calls).

The Court has reviewed relevant case law, and notes the following holdings (and, where relevant, their attendant procedural postures).

In Arteaga v. Asset Acceptance, LLC, the court found that the plaintiff "fail[ed] to raise a genuine issue of material fact" as to whether the defendant's conduct was harassing where the plaintiff presented "no evidence that Asset called her immediately after she hung up, called multiple times in a single day, called her place of employment, family, or friends, called at odd hours, or called after she requested Asset to cease calling." 733 F. Supp. 2d 1218, 1229 (E.D. Cal. 2010). The only circumstance present in this case, the Court finds, that was not present in Arteaga was that, on several occasions, Defendants called Plaintiff multiple times in one day. (As described supra, the Court finds that Plaintiff has not raised a genuine issue of material fact that Defendants called her after she effectively communicated revocation of her consent to be called by them.)[2]

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 111 of 199

Martinez v. TD Bank USA, N.A., Not Reported in Fed. Supp. (2017)

In Akalwadi, the court found that, in a situation where the defendant allegedly made between 26 and 28 calls to the plaintiff in a two-month period, although "none of the calls were made either excessively early in the morning or late in the evening[,]" the record reflected "periods in which telephone calls were made on a daily basis and three telephone calls being made within five hours on the same day," the "reasonableness of this volume of calls and their pattern is a question of fact for the jury[,]" and denied summary judgment. 336 F. Supp. 2d at 506.

Citing Akalwadi, the court in *Green v. Creditor Iustus Remedium, LLP* found that a complaint plausibly stated a claim and could survive a motion to dismiss where the plaintiffs alleged that the defendant called the plaintiffs "on a near daily basis for approximately two months, including some calls [to one of the plaintiffs] while she was working." No. 1:13-cv-01414, 2013 WL 6000967, at *3 (E.D. Cal. Nov. 12, 2013).

 **\*9**  In *Joseph v. J.J. Mac Intyre Cos., LLC*, the court ruled that "genuine issues of material fact remain for trial" where, making every inference in favor of the plaintiff, the court found that "roughly 75 calls made to Ms. Joseph's residence within the statutory period" "may be deemed to comprise part of the pattern of harassing calls allegedly received by Plaintiff[,]" although the defendants argued that the calls were meant for other residents of the plaintiff's home. 281 F. Supp. 2d 1156, 1164-65 (N.D. Cal. 2003).

In *Alborzian v. JPMorgan Chase Bank, N.A.*, the California Court of Appeal, on evaluation of "whether the operative complaint state[d] facts sufficient to state a cause of action[,]" found that, although the complaint did "not allege that defendants' calls were ever answered," but did "allege that they were intentionally made 'in a campaign of harassment,' " the complaint was sufficient because the "making of frequent calls itself can constitute actionable harassment under the Rosenthal Act." 235 Cal. App. 4th 29, 34, 38 (Ct. App. 2d Dist. 2015) (citing *Komarova v. Nat'l Credit Acceptance, Inc.*, 175 Cal. App. 4th 324, 345 (Ct. App. 1st Dist. 2009) ("[W]e do not interpret the statute to require that a plaintiff answer harassing collection calls before they can be actionable")).

In Haysbert, the court ruled on cross-motions for summary judgment as to the plaintiff's claim under the RFDCPA. 2016 WL 890297, at *13. The plaintiff claimed that he was entitled to summary judgment "because Defendant called him 2-5 times a day"; the defendant claimed it was entitled to summary judgment "because plaintiff 'has presented absolutely no evidence the calls at issue rose to the level of harassment within the meaning of the' RFDCPA." Id. The court considered "the volume and pattern of calls made" to the plaintiff and noted that "courts have been inconsistent in applying the standards" of whether "a particularly volume or pattern leads to liability[.] Id. The court ultimately ruled that there was, "at a minimum, ... a triable issue of fact as to whether Defendant's conduct was harassing" where "Defendant called Plaintiff ninety-nine times over a one-and-a-half year period, and Plaintiff presents evidence that he frequently received between two and five calls a day.... [which] caused interruptions in his day and ... he answered at least some of these calls." Id.

In contrast, the court in Saltzman found that there was no genuine issue of material fact for trial where: the defendant "only placed calls to Plaintiff's residence"; the plaintiff alleged that she asked the defendant to stop calling her but "did not send Defendant a cease and desist letter" or "dispute the amount owed"; the plaintiff did not answer "the vast majority of Defendant's telephone calls" and "did not recall Defendant leaving any voice messages for her." 2009 WL 3190359, at *7. The court found instructive the holding of *Udell v. Kansas Counselors, Inc.*, 313 F. Supp. 2d 1135, 1143-44 (D. Kan. 2004), which found that "a debt collector does not necessarily engage in harassment by placing one or two unanswered calls a day in an unsuccessful effort to reach the debtor, if this effort is unaccompanied by any oppressive conduct such as threatening messages." Saltzman, at *7 (quoting *Millsap v. CCB Credit Servs., Inc.*, No. 07-11915, 2008 WL 8511691, at *7 (E.D. Mich. Sept. 30, 2008)). The Saltzman court stated that this pattern of calls

 **\*10**  suggests a "difficulty of reaching Plaintiff, rather than an intent to harass." ...

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 112 of 199

Martinez v. TD Bank USA, N.A., Not Reported in Fed. Supp. (2017)

Plaintiff has not pointed to any evidence in the record regarding the amount, frequency, pattern, or content of Defendant's calls that would suggest anything other than a legitimate, albeit persistent, effort to reach her. As the FDCPA does not prohibit such legitimate attempts to contact a debtor, and due to Plaintiff's failure to produce evidence demonstrating a genuine issue of material fact, Defendant is entitled to summary judgment in its favor on this claim.

2009 WL 3190359, at *7 (quoting Millsap, 2008 WL 8511691, at *7).

Similarly, in *Shand-Pistilli v. Prof. Acct. Servs., Inc.*, the court considered a claim that the defendant called plaintiff "only ten times over seventy-three days. Defendant never called plaintiff more than once on the same day and, indeed, only once called plaintiff on consecutive days. Most of the phone calls went unanswered because plaintiff was not at home at the time of the call.... [T]he fact that defendant continued to call plaintiff after she stated ... that she was 'not interested in these solicitation calls' and that she considered such calls to be harassment ... is also not sufficient to raise a genuine issue of material fact with respect to defendant's intent.... In light of the polite tone of the phone calls and their relative infrequency I find that defendant's phone calls to plaintiff were legitimate attempts to reach her." No. 10-01808, 2011 WL 2415142, at *5-*6 (E.D. Pa. June 16, 2011).

After careful consideration, the Court is persuaded that the relevant case law supports a finding that Plaintiff, in this case, has raised a genuine dispute of material fact as to whether the volume and pattern of calls in this case could constitute actionable harassment under the RFDCPA. Courts have found a genuine issue of material fact in a case where the plaintiff received ninety-nine calls over a one-and-a-half year period, frequently received between two and five calls a day, and answered at least some of those calls. Haysbert, 2016 WL 890297, at *13. The volume of calls here is greater (165 calls over an eight-month period) and the pattern is similar, with Defendants here calling multiple times per day on several occasions (21 multi-call days of two or three calls each day)—an allegation which was not present in cases where courts granted summary judgment. See, e.g., Shand-Pistilli, 2011 WL 2415142, at *5; Arteaga, 733 F. Supp. 2d at 1229.

The Court will therefore follow the approach of the courts in Green and Akalwadi and find that, under these circumstances, the "reasonableness of this volume of calls and their pattern is a question of fact for the jury[,]" Green, 2013 WL 6000967, at *3 (quoting Akalwadi, 336 F. Supp. 2d at 506), because the evidence presented could "provide an adequate basis for the finder of fact to find a violation" of the RFDCPA, Joseph, 281 F. Supp. 2d at 1165. The existence of the recipient's prior consent to receive calls regarding her account is a factor for consideration in evaluating the reasonableness of the pattern of calls under the RFDCPA. For that reason, the Court will deny Defendants' motion for summary judgment as to Plaintiff's RFDCPA claim.

### C. California's Unfair Competition Law

**\*11** The Court previously dismissed without prejudice Plaintiff's claim under the UCL because, without entitlement to one of the forms of equitable relief for which the UCL provides, she lacked standing. [Docket Item 60 at 18-25.] Defendants also moved to dismiss Plaintiff's UCL claim on the grounds that she lacked standing because she did not adequately allege that she lost money or property and suffered an injury in fact, as the UCL requires under Cal. Bus. & Prof. Code § 17204. The Court found at that time, however, that Plaintiff had adequately alleged that she had lost money or property. [Id. at 14-18.]

In their Motion for Summary Judgment, Defendants move for summary judgment as to the UCL claim on the grounds that Plaintiff has failed to bring forth evidence to show that she suffered an economic injury caused by Defendants. [Docket Item 55 at 31-34.]

In her Response, filed before the Court's opinion and order dismissing without prejudice her UCL claim, Plaintiff did not address Defendants' arguments in favor of granting summary judgment to Defendants on that claim and conceded that summary judgment was appropriate. [Docket Item 57 at 13 n.1.]

Furthermore, the Court agrees that, for the reasons described by Defendants and apparently conceded by Plaintiff, Plaintiff has not brought forth evidence sufficient to create a genuine dispute of material fact as to the allegation that she suffered an economic injury caused by Defendants. No reasonable finder of fact could conclude, based on the evidentiary record before the Court, that Plaintiff in fact suffered such an injury. Accordingly, the Court finds that she lacks standing under the UCL and will grant summary judgment on that claim to Defendants. To the extent that the UCL claim was previously dismissed without prejudice [Docket Item 60 at 25], the Court will now modify that ruling and dismiss the UCL claim with prejudice.

### D. Class Allegations

Plaintiff seeks certification of the following class under Rule 23(b)(3), Fed. R. Civ. P.:

> Every individual in the United States who: (1) received a call on his or her cellular telephone; (2) placed by or on behalf of Defendants; (3) relating to a Target credit card; (4) using a dialer; and (5) where Defendants did not have prior express consent to place such a call at the time it was placed.

Amended Complaint ¶ 39. Defendants seek to strike the class allegation on grounds of lack of ascertainability. The Third Circuit has held in *Marcus v. BMW of N.A. LLC*, 687 F.3d 583, 593 (3d Cir. 2012): "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Similarly, a noted treatise has observed that "[a] class definition is inadequate if a court must make a determination of the individual claims to determine whether a particular person is a member of the class." 5 James W. Moore, <u>Moore's Federal Practice</u> ¶ 23.21[3][c] (3d ed. 2007).

Further, Defendants object to this class because Plaintiff Martinez herself would not be a member. She consented to receive the vast majority of these calls, including all calls made on multi-call days. It is tautological that a class representative must be a class member to satisfy Rule 23 requirements including adequacy, typicality and commonality. (See Def. Rep. Br. at 13-15.)

Defendants also move to strike the class allegations from Plaintiff's Amended Complaint because she "impermissibly attempts to create a 'fail-safe' class where the question of 'whether a person qualifies as a member depends on whether the person has a valid claim.' " [Docket Item 55 at 37, quoting *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 623 (E.D. Pa. 2015).]

**\*12** In response, Plaintiff claims that the motion to strike is premature, because Plaintiff "has not had the opportunity to take <u>any</u> discovery on class certification issues" and Defendant does not argue "that 'no amount of discovery or time will allow for plaintiff[ ] to resolve deficiencies in [the] class definition[ ].' *McPeak [v. S-L Distribution Co.*, No. CIV 12-348,] 2014 WL 4388562, at \*4 [ (D.N.J. Sept. 5, 2014).]" [Docket Item 57 at 23 (emphasis in original).] Plaintiff states that she "will be able to obtain through discovery information bearing on the common characteristics of potential class members who did not consent to receive calls from Defendants." [<u>Id.</u>] Plaintiff urges that, should the Court strike her class allegations, she be given leave to amend "to allege, if she can, a proposed class that is not fail-safe." [<u>Id.</u> at 24, citing Dixon, 2016 WL 3456680, at \*5.]

"[A]n essential prerequisite of a Rule 23 action is that there <u>be</u> a class, and courts have generally articulated this essential prerequisite as the implied requirement of ascertainability—that the members of the class are identifiable at the moment of certification[;] ... [i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." Zarichny, 80 F. Supp. 3d at 625.

As Defendants state: "By defining the class as individuals called without their prior express consent, Plaintiff seeks to create a class consisting only of individuals to whom defendants are necessarily liable under the TCPA. This is a 'heads, I win, tails you lose' proposition: 'either the class members win or, if the defense prevails, no class exists, and the putative class members, unbound by the judgment, are free to pursue individual claims.' Zarichny, 80 F. Supp. 3d at 624." [Docket Item 55 at 39.] Moreover, as Defendants demonstrate, Plaintiff Martinez would not be a member of this class because she gave express consent to autodialed calls to her cell phone concerning her Target credit card.

Courts have previously rejected the same proposed class because identifying the class requires "the sort of extensive fact-finding that class actions should avoid" and because "any other putative class recipient would be free to litigate the same claim" against the defendant should the defendant prevail. Zarichny, 80 F. Supp. 3d at 625-26. See also Dixon, 2016 WL 3456680, at *4-*5 (in TCPA case, proposed class was fail-safe class where plaintiff proposed proceeding on behalf of people who had not previously consented to receiving autodialed calls on their cell phones); Olney v. Job.com, Inc., No. 1:12-CV-01724, 2013 WL 5476813 at *11 (finding that proposed class based on people who had not previously consented was improper failsafe class in TCPA case).

The Court agrees with Defendants that Plaintiff's proposed class is a fail-safe class. No amount of additional class discovery will alter that conclusion: her proposed class both is defined in terms of Defendants' liability to the proposed class members, and would require extensive fact-finding (as Plaintiff's own case has done) to determine whether the putative class members failed to provide express prior consent to be called. Her class allegations are stricken pursuant to Fed. R. Civ. P. 23(d)(1)(D).

Because the Court has granted summary judgment to Defendants on Plaintiff's TCPA claims, the Court will not grant Plaintiff leave to amend the class allegations with regard to claims under the TCPA, because Plaintiff will not fall into the revised class definition. See Olney, 2013 WL 5476813, at *11-*12.

Further, because Plaintiff's only remaining claim survives under California's RFDCPA, any class definition would be limited to residents of California [3] who received such calls.

**\*13** Finally, as noted, Plaintiff's membership in the class as presently defined is a nullity. With all this constraints, it is doubtful but not impossible that Plaintiff could serve as class representative of a very different class. Any such effort to revive this class must be made by motion to amend before expiration of the deadline for amended pleadings herein under Rule 16(a)(3)(A), Fed R. Civ. P, and L. Civ. R. 16.1(b)(1)(A).

Accordingly, Defendants' motion to strike Plaintiff's class allegations will be granted.

**V. CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' motion to for summary judgment as to Plaintiff's claim under the RFDCPA (Count II of Plaintiff's First Amended Complaint) and will grant Defendants' motion for summary judgment as to Plaintiff's claims under the TCPA (Count I) and the UCL (Count III). The Court will also grant Defendants' motion to strike the class allegations. The accompanying Order will be entered.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2829601

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 115 of 199

## Footnotes

1       For purposes of the instant motion and pursuant to Local Civil Rule 56.1, the Court looks to Defendants' Statement of Undisputed Material Facts (Docket Item 56), its supporting exhibits, and Plaintiff's related Response (Docket Item 58), as well as Plaintiff's Supplemental Statement of Undisputed Material Facts (Docket Item 59), its supporting exhibits, and Defendants' Response to the Supplemental Statement (Docket Item 63).

2       In *Reddin v. Rash Curtis & Assocs.*, the court addressed the issue of whether a call placed after a consumer did request the caller cease calling her could raise a genuine dispute of material fact as to whether the calls were harassing: "Even pretending that a reasonable jury could find that two telephone calls are sufficiently repetitive and continuous so as to annoy, abuse, or harass a person, the undisputed evidence is that defendant removed plaintiff's number from its file after she requested it to cease calling her and the second call was inadvertently placed before the automated dialer system was updated that night. Based on this evidence, a reasonable jury could not find that defendant placed the second phone call 'with intent to annoy, abuse, or harass,' 15 U.S.C. § 1692d(5) .... Because the court finds that defendant is entitled to summary judgment as a matter of law on plaintiff's FDCPA claim, the court must also grant defendant's motion for summary judgment on her RFDCPA claim." No. 2:15-cv-01305, 2016 WL 3743148, at *3, *5 (E.D. Cal. July 13, 2016) (emphasis added).

3       Of course, for a class of California residents applying California law, one would question how New Jersey would be a proper venue.

---

**End of Document**                                            © 2026 Thomson Reuters. No claim to original U.S. Government Works.

RICO Bus.Disp.Guide 9687

KeyCite Yellow Flag

Distinguished by   De Souza v. New York,   S.D.N.Y.,   March 19, 2026

1999 WL 179358

United States District Court, S.D. New York.

PFT OF AMERICA, INC., on behalf of itself and all others similarly situated, Plaintiffs,

v.

TRADEWELL, INC., Defendant.

No. 98 CIV. 6413(RPP).

|

March 31, 1999.

**Attorneys and Law Firms**

Ateshoglou, Kavourias & Chrysanthem, P.C., New York, By Nicholas P. Chrysanthem, Esq., Counsel for Plaintiff.

Blank Rome Comisky & McCauley LLP, Philadelphia, PA, By James T. Smith, Esq., Counsel for Defendant.

OPINION AND ORDER

PATTERSON, D.J.

**\*1**  Defendant Tradewell, Inc. ("Tradewell") moves to strike plaintiff the class action allegations of PFT of America ("PFT") as insufficient under Rule 23 of the Federal Rules of Civil Procedure, and to dismiss each of the four causes of action in PFT's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. For the reasons that follow, the Court grants defendant's motion to strike the class action allegations and to dismiss the claims alleging common law fraud and violation of the Arizona RICO statute. The Court denies, however, defendant's motion to dismiss the breach of contract and conversion claims.

BACKGROUND

Tradewell is a New York corporation engaged in the business of providing barter services that permit companies to exchange their excess inventories for trade credits that reduce the cash cost of certain business expenditures, including radio, television and print advertising and travel accommodations obtained through Tradewell.

On or about April 30, 1997, Tradewell and PFT, an Arizona corporation, entered into a written agreement pursuant to which Tradewell purchased certain construction equipment from PFT and, in exchange, Tradewell provided PFT with $253,921.75 in trade credits (Compl.Ex. 5). PFT alleges it was induced to enter into the agreement by defendant's representations about cash savings available through Tradewell in advertisements (Compl.Exs.1–2), a letter (Compl.Ex. 3), and oral representations (Compl.¶ 3).

After signing the agreement, PFT sought to use its trade credits for hotels (*id.* ¶¶ 16–17), computer equipment (*id.* ¶¶ 18–19), the printing of company brochures (*id.* ¶¶ 20–21), T-shirts (*id.* ¶ 22) and trade magazine advertising (*id.* ¶¶ 23–24), but was unable to use Tradewell's trade credits at any cost savings.

Rather than simply suing for recission or breach of contract, plaintiff brings this action as a class action pursuant to Rule 23(b)(3) on behalf of itself and "all other persons and entities similarly situated and wherever located with whom defendant entered into an agreement to purchase inventory or equipment in exchange for Tradewell's trade credits (the 'Damages Class')" (*id.* ¶ 26). The exact size of the Damages Class is unknown but is estimated to have not fewer than 2,000 members, and plaintiff claims this class is so numerous that the joinder of individual numbers is impracticable (*id.* ¶ 27).

The complaint sets forth four causes of action: breach of contract, violation of the Arizona RICO statute, common law fraud, and conversion/unjust enrichment.

## DISCUSSION

I. *Motion to Strike the Class Action Allegations*
In its motion papers, plaintiff does not contradict defendant's assertions that plaintiff's complaint fails to identify a single member of the purported class other than itself and that plaintiff has failed to conduct an investigation to determine if there are other class members before filing this action (Defendant's Memorandum of Points and Authorities ("Def.'s Mem. in Supp.") at 23). Although Exhibit 2 to the complaint identifies a number of major companies with whom Tradewell has engaged in barter arrangements, plaintiff cites no facts from which it can be determined that there is any basis other than speculation as to whether there are other members of the class.

**\*2** The only conclusion to be drawn is that the class action representations in the complaint are speculation and were not "formed after an inquiry reasonable under the circumstances," in violation of Rule 11(b) of the Federal Rules of Civil Procedure. If pleadings can be based on speculation and presented without reasonable inquiry, every complaint sounding in contract or commercial fraud could include Rule 23 class action allegations. Accordingly, defendant's motion to strike the class action allegations is granted. 2 Herbert Newberg & Alba Conte, Newberg on Class Actions § 6.20, at 6–82 (3d ed.1992) (noting that "[t]he plaintiff's allegations must indicate sufficiently that the adjudication of his or her claim will necessarily involve one or more common questions concerning persons similarly situated," and that class action pleadings "should not be merely conclusory").

II. *Motions to Dismiss for Failure to State a Claim*
Defendant's motion to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) is granted in part and dismissed in part. Motions to dismiss may only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claims which would entitle [it] to relief." *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957); *see also Branham v. Meachum,* 77 F.3d 626, 628 (2d Cir.1996). When passing on a motion to dismiss, the court must accept the allegations in the complaint as true and construe them in favor of the pleader. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972) (per curiam); *Branham,* 77 F.3d at 628.

Plaintiff's first claim, based on the Arizona RICO statute, is dismissed. The complaint's allegations relating to PFT constitute a single predicate act of fraud alleged with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure (Compl.¶¶ 39–44). Those allegations relate to a single loss by plaintiff, namely, the loss of the value of the construction equipment transferred to defendant pursuant to the agreement between the parties. The complaint's allegations as to other predicate acts merely state:

RICO Bus.Disp.Guide 9687

> Upon information and belief, Defendant engaged in a pattern of unlawful activity by unlawfully purchasing inventory and equipment in exchange for worthless trade credits, hundreds, if not thousands of times over the past several years. These acts were related to each other and were continuous.

(Compl.¶ 45).

This allegation does not plead fraud with the particularity required by ⚐Rule 9(b), and thus does not constitute the pleading of other predicate acts. Accordingly, the complaint does not sufficiently plead two predicate acts which satisfy the definition of a "pattern of racketeering activity" or which pose a threat of continuing criminal activity. ⚐Ariz.Rev.Stat. § 13–2314.04(S)(3);[1] *see also* ⚐*GICC Capital Corp. v. Technology Fin. Group, Inc.,* 67 F.3d 463, 465 (2d Cir.1995) (construing federal RICO statute), *cert. denied,* 518 U.S. 1017 (1996). The Arizona RICO claim is dismissed.

**\*3** ⚐Rule 9(b) of the Federal Rules of Civil Procedure also applies to plaintiff's second cause of action, which sounds under common law fraud. Under both New York and Arizona law, one of the elements of fraud is plaintiff's reasonable reliance or plaintiff's right to rely on defendant's misrepresentation. *See* ⚐*Marcus v. AT & T Corp.,* 138 F.3d 46, 63 (2d Cir.1998); ⚐*Nielson v. Flashberg,* 419 P.2d 514, 518 (Ariz.1966). When the parties enter into a written agreement, generally neither party has a right to claim fraud based on representations about the terms of the agreement made prior to the agreement. *See* ⚐*Chase v. Columbia Nat'l Corp.,* 832 F.Supp. 654, 660 (S.D.N.Y.1993); ⚐*Lininger v. Sonenblick,* 532 P.2d 538, 540 (Ariz.Ct.App.1975); ⚐*Apolito v. Johnson,* 414 P.2d 442, 443 (Ariz.Ct.App.1966). The parties are expected, instead, to rely on the terms of the agreement itself. As summarized by the Second Circuit in *Bridgestone of Firestone, Inc. v. Recovery Credit Services, Inc.,* a fraud action is not sufficiently distinct from a breach of contract action unless it arises from "a legal duty separate from the duty to perform under the contract," or from "a misrepresentation collateral or extraneous to the contract." ⚐98 F.3d 13, 20 (2d Cir.1996). A similar rule pertains in Arizona: "In order to form a basis for rescission, the misrepresentations must be as to some collateral matter and not mere contradictions of the provisions of the contract expressed in clear, unambiguous language." ⚐*Apolito,* 414 P.2d at 443.

PFT, in its responsive brief, states that its claim for fraud is based upon the following representations by Tradewell:

1. That Tradewell would arrange advertising for PFT in magazines *of PFT's choice.*

2. That Tradewell *would match* the prices obtained by PFT on media, printing, hotels and other products and services.

3. That Tradewell *would beat* PFT's current pricing on printing.

(PFT's Response to Tradewell's Motions ("PFT's Resp.") at 32.)

The agreement between the parties pertains to Tradewell's performance in each of these three areas and sets forth its obligations in these areas (Compl. Ex. 5 ¶ 5(a)-(d) and Ex. B at pp. 1–2 attached thereto).

The allegedly fraudulent representations of defendant are related to the services plaintiff expected under the contract and therefore do not relate to a legal duty separate from the duty to perform under the contract and are not representations extraneous or collateral to the contract. Accordingly, the common law fraud claim is dismissed.

PFT of America, Inc. v. Tradewell, Inc., Not Reported in F.Supp.2d (1999)
RICO Bus.Disp.Guide 9687

Defendant's motion to dismiss plaintiff's breach of contract claims and conversion claims is denied. However, to the extent that plaintiff seeks to state a separate claim of unjust enrichment, distinct from the conversion claim, such claim is dismissed. *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,* 971 F.2d 401, 408–09 (9th Cir.1992) (under Arizona law, a plaintiff cannot recover on its claim of unjust enrichment when relationship between plaintiff and defendant was governed by valid express contract); *Allard v. Arthur Anderson & Co. (USA),* 924 F.Supp. 488, 495–96 (S.D.N.Y.1996) (same).

 **\*4** Plaintiff may move to file an amended complaint within 30 days of the filing of this opinion and order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 179358, RICO Bus.Disp.Guide 9687

---

### Footnotes

1    The Arizona RICO statute provides that a "pattern of racketeering activity" can also be demonstrated by a single act of racketeering if it is an act of a particular type, but no such acts are alleged in this action. Ariz.Rev.Stat. § 13–2314.04(S)(3).

---

**End of Document**                                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 120 of 199

Rombough v. Robert D. Smith Insurance Agency, Inc., Not Reported in Fed. Supp. (2022)

🚩 KeyCite Yellow Flag

Declined to Follow by   Nichols v. eHealthInsurance Services, Inc.,   N.D.Cal.,   March 3, 2025

2022 WL 2713278
Only the Westlaw citation is currently available.
United States District Court, N.D. Iowa, Cedar Rapids Division.

Caitlin ROMBOUGH, on behalf of herself and others similarly situated, Plaintiff,

v.

ROBERT D. SMITH INSURANCE AGENCY, INC., and State Farm Mutual Automobile Insurance Co., Defendants.

No. 22-CV-15-CJW-MAR
|
Signed June 9, 2022

**Attorneys and Law Firms**

Eric David Puryear, Puryear Law, PC, Davenport, IA, Aaron David Radbil, Pro Hac Vice, Greenwald Davidson PLLC, Boca Raton, FL, for Plaintiff.

James Gaughan, Pro Hac Vice, Riley Safer Holmes & Cancila LLP, Chicago, IL, J. Michael Weston, Lederer Weston & Craig PLC, Cedar Rapids, IA, for Defendants.

**ORDER**

C.J. Williams, United States District Judge

### I. INTRODUCTION

**\*1**  This matter is before the Court on defendants' April 15, 2022, motion to dismiss plaintiff's complaint. (Doc. 15). Plaintiff timely filed a resistance. (Doc. 18). Defendants timely filed a reply. (Doc. 20). For the following reasons, defendants' (Doc. 15) motion is **granted** and this case is **dismissed with prejudice**.

### II. BACKGROUND

Plaintiff's claim arises out of defendants' unwanted contact with her via telephone, both by voice message and text message. The following facts are from plaintiff's complaint. (Doc. 1). Plaintiff is an Iowa resident. (*Id.*, at 2). Defendant Robert D. Smith Insurance Agency, Inc. is an Iowa insurance company, which assists customers in obtaining insurance from defendant State Farm Mutual Automobile Insurance Co. ("State Farm"). (*Id.*, at 2–3). Defendant State Farm is an Illinois insurance company. (*Id.*, at 3).

On October 25, 2021, defendants delivered a voice message and text message marketing State Farm insurance to plaintiff's personal residential telephone number, which had been registered with the national do-not-call registry since April 7, 2017. (*Id.*, at 4–6). The message was intended for a recipient other than plaintiff. (*Id.*, at 6). Plaintiff did not request information from either defendant and is not, and never has been, a State Farm customer. (*Id.*). She suffered actual harm in the form of invasion of privacy, intrusion, and a private nuisance. (*Id.*).

On February 21, 2022, plaintiff brought suit against defendants, on behalf of herself and others similarly situated, (*Id.*, at 1), and alleges that class certification is proper for her claim. (*Id.*, at 7–10). Plaintiff asserts one claim, alleging that defendants violated the Telephone Consumer Protection Act ("TCPA"), Title 47, United States Code, Section 227, by delivering messages as prohibited by Title 47, Code of Federal Regulations, Section 64.1200(c). (*Id.*, at 10–12).

On April 15, 2022, defendants filed their motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Doc. 15).

### III. APPLICABLE LAW

A complaint filed in federal court must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8 does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nevertheless, it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that relies on "naked assertion[s]" devoid of "further factual enhancement," "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 557.

Before filing an answer, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Federal Rules of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (citation omitted). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court must also grant "all reasonable inferences" from the pleadings "in favor of the nonmoving party." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility is not equivalent to probability, but it is something "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "The question ... is not whether [a plaintiff] might at some later stage be able to prove [its claims]; the question is whether [a plaintiff] has adequately asserted facts (as contrasted with naked legal conclusions) to support his claims." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1129 (8th Cir. 2012).

### IV. DISCUSSION

**\*2** Plaintiff alleges that defendants violated Section 227(c)(5) by violating Section 64.1200(c), causing her harm. (Doc. 1). In its motion to dismiss, defendants argue plaintiff's claim fails to meet the federal pleading standard because she does not plausibly allege an existing cause of action. (Doc. 15). Specifically, defendants argue plaintiff fails to allege that she personally registered her telephone number with the do-not-call registry, as required by Section 64.1200(c). (*Id.*, at 3, 6–7).

For the following reasons, the Court finds plaintiff fails to state a claim based on the plain language of Section 64.1200(c). Plaintiff's arguments in support of another interpretation are unavailing. Further, the Court declines plaintiff's request to amend her complaint.

#### A. Plain Language

"Congress enacted the TCPA to protect consumers from the 'proliferation of intrusive [telemarketing] calls to their homes.'" *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 819 (8th Cir. 2015) (alteration in original) (quoting *Mims v. Arrow Fin. Servs.*, LLC, 565 U.S. 368, 372 (2012)). The key provision of the TCPA applicable to this case is Section 227(c)(5).

Section 227(c)(5) provides, in pertinent part, a private right of action to "[a] person who has received more than one telephone call [1] within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under [Section 227(c)]." Section 227(c) requires rulemaking and regulations based on that rulemaking "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." Section 64.1200(c) is one such regulation. Section 64.1200(c) prohibits all telephone solicitations to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]" Thus, Section 227(c) provides a private action based on the circumstances in Section 64.1200(c).

The plain language of Section 64.1200(c) indicates that Section 227(c)(5)'s private action exists only for a residential telephone subscriber *who has registered his or her telephone number* on the national do-not-call registry. "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). "If the statute itself does not display an intent to create a private remedy, then a cause of action does not exist." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) (internal quotations omitted). Section 227(c)(5) only displays an intent to create a private remedy where its promulgated regulations so provide. Section 64.1200(c) was promulgated under Section 227(c)(5). But Section 61.1200(c) does not include a private remedy for a residential telephone subscriber who has not registered his or her telephone number on the national do-not-call registry. The regulation's plain language provides no distinction for a telephone number that had previously been registered on the national do-not-call registry by someone else.

When "the words of a statute are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (cleaned up); *see* *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009) (discussing regulations). As discussed, the plain language of Section 61.1200(c) states that a violation occurs only when a person or entity initiates a telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry. The Court finds no ambiguity in this language. Thus, the Court limits its interpretation to the plain language of Section 64.1200(c). [2]

**\*3** Here, plaintiff alleges that "[s]ince April 7, 2017, [her] telephone number (319) XXX-3342 has been registered with the DNC Registry." (Doc. 1, at 4). Plaintiff does not allege, either directly or indirectly, that *she* registered her telephone on the do-not-call registry. Although plaintiff alleges defendants violated Section 64.1200(c), thereby entitling her to recovery under Section 227(c)(5), she does not allege that she registered her telephone number on the do-not-call-registry. [3] Further, Section 227(c)(5) does not display an intent to create a private remedy as plaintiff alleges it. *Ziglar*, 137 S. Ct. at 1856. Thus, plaintiff fails to state a claim that defendants violated Section 64.1200(c), as her complaint alleges. [4] *See* *Iqbal*, 556 U.S. at 678; *Whitney*, 700 F.3d at 1129.

### B. Plaintiff's Arguments

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 123 of 199

Rombough v. Robert D. Smith Insurance Agency, Inc., Not Reported in Fed. Supp. (2022)

Plaintiff argues that other statutory language and policy consideration show that dismissal of her claim is inappropriate despite Section 64.1200(c)'s plain language. The Court is not persuaded by these arguments.

Plaintiff argues she can properly state a claim under Section 64.1200(c) because Section 227(c)(5) allows "a person," not just a "subscriber," to bring a claim. (Doc. 18, at 9–10). There are two problems with this argument. First, although plaintiff alleges defendants violated Section 227(c)(5) based on Section 64.1200(c), (Doc. 1, at 11), for the reasons discussed, plaintiff fails to sufficiently allege a Section 64.1200(c) violation. Section 227(c)(5)'s terminology does not change this. Second, even if Section 64.1200(c) did allow for plaintiff to bring a claim on someone else's behalf, plaintiff fails to allege that she does so here. Plaintiff alleges that defendants called her telephone number attempting to reach "Kevin" and she alleges that her telephone number was registered to the do-not-call registry, (Doc. 1, at 4–5), but she does not allege that Kevin registered the telephone number such that defendants' calls could be viewed as "initiat[ing] ... telephone solicitation to" a residential telephone subscriber who has registered his or her telephone number with the do-not-call registry, as required by Section 64.1200(c).

 **\*4**  Plaintiff's corresponding analogy to the court's analysis of the Federal Trade Commission's Telemarketing Sales Rule ("TSR") in *United States v. Dish Network, LLC*, 75. F. Supp. 3d 916 (C.D. Ill. 2014), is likewise unavailing. Plaintiff argues that because the *Dish Network* court found "[t]he TSR does not say the call must be initiated to the person who registered the number on the [do-not-call] Registry," the Court should similarly interpret Section 64.1200(c). (Doc. 18, at 10–11). But "the TSR states that it is a violation of that rule to initiate 'any outbound telephone call to a person' when '[t]hat person's telephone number is on [the Registry].' " *Dish Network*, 75 F. Supp. 3d. at 935 (citing 16 C.F.R. § 310.4(b)(1)(iii)(B)). Here, plaintiff alleges a Section 64.1200(c) violation, not a TSR violation. (Doc. 1). And unlike the TSR, Section 64.1200(c) expressly limits its violation to telephone solicitations made to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry." Thus, Section 64.1200(c) plainly requires that the call to be initiated to the person who registered the number on the registry—even if the TSR does not.

Plaintiff also argues policy considerations should prevent the Court from dismissing her claim. Plaintiff first argues that re-registration of a telephone number on the do-not-call registry is impossible. (Doc. 18, at 19–21). Although the do-not-call registry website is confusing, plaintiff herself demonstrates that she was able to register her telephone number. (*Id.*, at 20 n.4). She states that when she attempted to register "[f]or the sake of example," she nevertheless received a confirmation email thanking her for registering her telephone number. (*Id.*). Though the date of registration did not update from her telephone number's earlier registration, which seemingly occurred while it was assigned to someone else, she nevertheless *could* register, according to the website and its confirmation. (*See id.*). Second, website registration is not the only way a subscriber can register for the do-not-call registry; a subscriber can call a toll-free number. *See National Do Not Call Registry FAQs*, FTC, https://consumer.ftc.gov/articles/national-do-not-call-registry-faqs (last visited June 9, 2022). There, registration of an already registered telephone number results in a confirmation with no mention of the previous registration date. Third, the FTC website and phone registration emphasize the need for "you" to register "your new number" when obtaining a new telephone number. *See National Do Not Call Registry*, FTC, https://www.donotcall.gov/register.html (last visited June 9, 2022). The website registration is less clear, though it includes the modifier "your" in both verification and registration. This language, coupled with the actual ability to re-register the same telephone number via both the website and toll-free number, suggests that a subscriber can register a telephone number that was already registered. Further, the do-not-call registry statute provides that reassigned numbers will be periodically taken off the list, suggesting that a telephone subscriber who finds their telephone number already registered cannot rely on that previous registration for protection. 15 U.S.C. § 6155. In sum, the Court does not find plaintiff's policy arguments based on re-registration availing.

Plaintiff then argues the Court should liberally construe Section 64.1200(c) because the TCPA is a remedial statute. (Doc. 18, at 21–22). A court cannot liberally construe a statute when it finds the plain language is unambiguous and therefore does

not engage in statutory construction. *See* Brown v. J.B. Hunt Transport Servs., Inc.*, 586 F.3d 1079, 1086 (8th Cir. 2009);* Babb*, 140 S. Ct. at 1177.* Here, because the Court has found the regulation's plain language unambiguous, the Court does not engage in statutory construction. Thus, the Court declines to follow plaintiff's policy argument based on liberal construction.

**\*5** In sum, despite plaintiff's arguments to the contrary, she fails to state a claim that defendants violated Section 64.1200(c).

### C. Amendment

Alternatively, plaintiff requests that the Court permit her to amend her complaint to add adequate facts. (Doc. 18, at 24). The Court declines plaintiff's request for several reasons. First, plaintiff's request does not comply with Local Rules because she failed to attach her proposed amended complaint. *See* LR 15. Second, plaintiff had the right to amend her complaint as a matter of course within "21 days after service of a motion under Rule 12(b)"—that is, a motion to dismiss. *See* FED. R. CIV. P. 15; FED. R. CIV. P. 12. Here, defendants filed their motion to dismiss on April 15, 2022, and plaintiff was served on that date. (Doc. 15). This means plaintiff could have amended her Complaint through May 6, 2022, without the Court's permission. *See* FED. R. CIV. P. 6. But plaintiff did not.

Finally, although the Court could find that justice requires that the Court allow plaintiff to amend her complaint, *See* FED. R. CIV. P. 15, it does not find that justice requires amendment here. This Court has allowed amendment of a complaint when "dismissal of the plaintiff's present pleadings is appropriate," but there is "no reason to believe that the plaintiff[ ] cannot adequately plead, as opposed to have not adequately pleaded, a factual basis for [her claim]." *Moller v. Tyson Foods, Inc.*, No. C 14-4056-MWB, 2014 WL 4437548, at *4 (N.D. Iowa Sept. 9, 2014). When arguing for amendment, plaintiff states "if necessary, Plaintiff can amend her complaint to allege that she is the subscriber" to her telephone number. (Doc. 18, at 24). But the issue here is not whether plaintiff is a subscriber. The issue is whether she was the subscriber who registered her telephone number with the do-not-call registry, such that she can state a claim that defendants violated Section 64.1200(c) when they called her. Further, even if plaintiff means to say that she is a subscriber who registered, it appears plaintiff only registered her telephone number with the do-not-call registry as "for the sake of example" in her argument, and had not registered at the time defendants called her. (*See id.*, at 20 n.4). As such, the Court has reason to believe plaintiff cannot adequately plead, as opposed to has not adequately pleaded, a factual basis for her claim. *See Moller*, 2014 WL 4437548, at *4. Thus, the Court declines plaintiff's request to amend her complaint.

For these reasons, the Court grants defendants' motion. [5]

### V. CONCLUSION

For these reasons, defendants' motion to dismiss (Doc. 15) is **granted**. This case is **dismissed with prejudice**. The Clerk of Court is directed to **enter judgment** in favor of defendants and against plaintiff.

**IT IS SO ORDERED** this 9th day of June, 2022.

### All Citations

Not Reported in Fed. Supp., 2022 WL 2713278

**Footnotes**

1      It is undisputed that a text message is a call under the TCPA.

2      Accordingly, the Court does not consider the parties' arguments relating to extratextual sources. (Docs. 18, at 22–23; 20, at 4–5).

3      In Count I of her complaint, plaintiff alleges that defendants violated Section 64.1200(c) "by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff and the class members who registered their respective residential telephone numbers with the [do-not-call] Registry[.]" (Doc. 1, at 11). But in her factual allegations and her briefing, plaintiff does not state that *she* registered her telephone number with the do-not-call registry. (*See* Doc. 1, at 4 ("Since April 7, 2017, [plaintiff's telephone number] has been registered with the [do-not-call] Registry.")). Further, plaintiff argues whether she or someone else registered the number with the do-not-call registry is of no consequence. (*See generally* Doc. 18). The Court disagrees.

      Plaintiff also argues other courts have found allegations like hers sufficient to state a claim under the TCPA in motions to dismiss, motions for default judgment, and bench trials. (Doc. 18, at 11–19). Plaintiff notes that defendants do not "reference a single decision adopting their argument." (*Id.* at 5). The decisions that plaintiff cites, however, are from district courts, meaning they are non-binding on this Court. Further, these decisions are from district courts outside the Eighth Circuit Court of Appeals, which detracts from them even being persuasive. For the reasons discussed in this order, the Court declines to follow these courts.

4      That Section 64.1200(c) requires "such do-not-call registrations must be honored indefinitely," makes no difference here because this language appears in the context of the violation the Court has found plaintiff does not adequately allege. (*See* Doc. 20, at 4).

5      Thus, the Court does not reach the parties' arguments about plaintiff's proposed class. (Docs. 15-1, at 3 n.4; 18, at 7 n.1).

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

🏴 KeyCite Yellow Flag

Distinguished by Austin v. Invention Submission Corporation, W.D.Pa., April 13, 2020

2013 WL 1568407

United States District Court,

W.D. Pennsylvania.

Patricia SEMENKO, individually, and on behalf of others similarly situated, Plaintiff,

v.

WENDY'S INTERNATIONAL, INC., Defendant.

No. 2:12–cv–0836.
|
April 12, 2013.

**Attorneys and Law Firms**

Gregory G. Paul, Morgan & Paul, PLLC, Sewickley, PA, for Plaintiff.

James S. Urban, Brandon J. Lester, Jones Day, Pittsburgh, PA, for Defendant.

**MEMORANDUM OPINION AND ORDER**

TERRENCE F. McVERRY, District Judge.

**\*1** Before the Court for disposition is the MOTION TO STRIKE, with brief in support, filed by Defendant, Wendy's International, Inc. ("Wendy's") (ECF Nos. 5 and 6), the RESPONSE in opposition filed by Plaintiff, Patricia Semenko, individually, and on behalf of others similarly situated, ("Semenko") (ECF No. 9), and the REPLY filed by Wendy's (ECF No. 10). The matter has been thoroughly briefed and is ripe for disposition. For the reasons that follow, the Motion to Strike will be granted.

**Factual Background**

Semenko initiated this lawsuit on June 19, 2012, by the filing of a three-count Complaint in Class Action in which she raised both individual and class claims under the Americans with Disability Act, as amended ("ADA"), 42 U.S.C. §§ 1201, et seq.,

and the Pennsylvania Human Relations Act, as amended ("PHRA"), 🏴43 Pa. Stat. Ann. §§ 951, et seq. and seeks "declaratory, injunctive, and compensatory relief from defendants (sic), Wendy's International, Inc., for denial of employment, failure to accommodate on the basis of actual, and regarded as or record of disability." Complaint, at ¶ 1.

Semenko alleges that she worked for Wendy's for approximately thirty (30) years, first in hourly and later in managerial positions. Semenko suffers from degenerative arthritis and in January 2007 took a disability leave to treat her cervical radiculopathy and lower back pain, which leave was approved for long-term disability benefits sponsored by her employer. According to the Complaint, on or about November 14, 2007, Semenko was released by her treating physician to return to work full-time, with restrictions. She requested to return to work with accommodations, but Wendy's denied her request. Her employment with Wendy's was terminated on January 11, 2008. *Id.* at ¶¶ 7–14.

27 A.D. Cases 1378

The Complaint states that Semenko's "action is brought and may be properly maintained as a class action pursuant to ⚑F.R.C.P. 23." *Id.* at ¶ 27. Distilled to its essence, Wendy's argument is that Semenko's class allegations:

> cannot be adjudicated within the parameters of ⚑Rule 23 such that a determination of classwide liability and relief can be reached. Rather, establishing the unlawful discrimination alleged by [Semenko] would require determining whether class members are 'qualified' under the ADA [and PHRA], an assessment that encompasses inquiries ... too individualized and divergent ... to warrant certification under ⚑Rule 23(a) and ⚑(b)(2).

Def's Response at 1 (quoting ⚑*Hohider v. United Parcel Service, Inc.,* 574 F.3d 169, 185–86 (3d Cir.2009)). Not surprisingly, Semenko responds that (i) she has alleged viable class claims and (ii) the motion to strike should be denied as premature as a motion for class certification has not been filed and the parties have not engaged in any pre-certification discovery.

### Standard of Review

Wendy's requests that the Court strike the class allegations contained in the Complaint pursuant to Federal Rules of Civil Procedure 12(f), ⚑23(c)(1)(A), and ⚑23(d)(1)(D).

#### a. *Federal Rule of Civil Procedure 12(f)*

**\*2** Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." " 'The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.' " ⚑*Goode v. LexisNexis Risk & Information Analytics Group, Inc.,* 284 F.R.D. 238, 243–44 (E.D.Pa.2012) (quoting ⚑*McInerney v. Moyer Lumber & Hardware, Inc.,* 244 F.Supp.2d 393 (E.D.Pa.2002)). Relief under Rule 12(f) is generally disfavored and will be denied unless the allegations "have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Id.*

#### b. ⚑*Federal Rule of Civil Procedure 23*

"⚑Rule 23 provides a one-size-fits all formula for deciding the class-action question." ⚑*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins.* Co., 559 U.S. 393 ——, 130 S.Ct. 1431, 1437, 176 L.Ed.2d 311 (2010). Under ⚑Rule 23(d)(1)(D), a court adjudicating a class action may "require that the pleadings be amended to eliminate allegations about representations of absent persons and that the action proceed accordingly." However, courts rarely grant motions to strike under ⚑Rule 23(d)(1)(D) prior to class discovery, doing so only where *"[n]o amount of additional class discovery will alter th[e] conclusion"* that the class is not maintainable. *Thompson v. Merck & Co., Inc.,* 2004 WL 62710, at \*2 (E.D.Pa. Jan.6, 2004) (emphasis added).

Generally, courts do not consider whether a proposed class meets the ⚑Rule 23 requirements until after plaintiffs move for class certification. However, in rare cases, the "complaint itself demonstrates that the requirements for maintaining a class action cannot be met." ⚑⚠*Landsman & Funk PC v. Skinder–Strauss Associates,* 640 F.3d 72, 93 n. 30 (3d Cir.2011) (ruling that

the decision of the district court that a class could not potentially fit within ⚑Rule 23 determined on a motion to dismiss was premature.) . [1] As the United States Supreme Court has noted:

> Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claims, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.
>
> ⚑*General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

The plaintiff bears the burden of advancing a prima facie showing that the class action requirements of ⚑Federal Rule of Civil Procedure 23 are satisfied or that discovery is likely to produce substantiation of the class allegations. Absent such a showing, a trial court's refusal to allow class discovery is not an abuse of discretion. ⚑*Mantolete v. Bolger,* 767 F.2d 1416, 1424 (9th Cir.1985). Thus, even though the instant motion is a motion to strike, it is necessary to make a preliminary determination regarding the sufficiency of Semenko's class allegations. *See* ⚑*Korman v. Walking Co.,* 503 F.Supp.2d 755, 762–63 (E.D.Pa.2007) (treating the motion to strike and its opposition as a motion for class certification and its opposition).

**\*3** Pursuant to ⚑Rule 23, a member of a class may sue on behalf of all members only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." ⚑Fed.R.Civ.P. 23(a).

### Discussion

A. *Neither Discovery Nor a Certification Motion is Necessary to Resolve the Instant Dispute*
At the outset, the Court must determine whether discovery or a certification motion is necessary in order to resolve the pending Motion to Strike. In this case, no discovery has taken place nor has a motion for class certification been filed.

A court must determine whether the action may be maintained as a class action as soon as is practicable after the action is filed. ⚑Fed.R.Civ.P. 23(c)(1). Discovery is likely warranted where it will resolve factual issues necessary for the determination of whether the action may be maintained as a class action.

District courts have broad discretion to control the class certification process, and "[w]hether or not discovery will be permitted ... lies within the sound discretion of the trial court." ⚑*Kamm v. Cal. City Dev. Co.,* 509 F.2d 205, 209 (9th Cir.1975). "In **rare** cases where it is clear from the complaint itself that the requirements for maintaining a class action cannot be met, a defendant may move to strike the class allegations before a motion for class certification is filed." *NBL Flooring, Inc. v. Trumball, Inc. Co.,* No. 10–4398, 2011 WL 4481918, at * 1 (E.D.Pa. Sept.27, 2011) (emphasis added). *See* ⚑*Doninger v. Pac. Nw. Bell, Inc.,* 564 F.2d 1304 (9th Cir.1977) (holding that class certification was properly denied without discovery where plaintiffs could not make a *prima facie* showing of ⚑Rule 23's prerequisites or that discovery measures were not likely to produce persuasive information substantiating the class action allegations); ⚑*Woodard v. FedEx Freight East, Inc.,* 250 F.R.D. 178, 182 (M.D.Pa.2008) (noting that a "district court will strike class action allegations without permitting discovery or waiting for a certification motion where the complaint and any affidavits clearly demonstrate that the plaintiff cannot meet the requirements for a class action.")

"There is precedent for treating a Rule 12(f) motion to strike class allegations as a motion to deny class certification." ⚑*Bearden v. Honeywell Int'l Inc.,* 720 F.Supp.2d 932, 942 (M.D.Tenn.2010). Accordingly, as will be discussed *infra,* because the Court

27 A.D. Cases 1378

finds and rules that the issues in this particular case "are clear and discovery on class certification is unnecessary," it will treat the motion to strike and its opposition as a motion for class certification and its opposition without permitting discovery or waiting for a certification motion to be filed. *Korman v. Walking Co.,* 503 F.Supp.2d 755, 762–63 (E.D.Pa.2007).

B. *Analysis of Class Certification Issue*

**\*4** As explained *supra,* Wendy's argues that the Court should strike the class allegations from the Complaint and order the case to proceed solely on Semenko's individual claims, which are not being challenged by Wendy's at this time. In the Complaint, Semenko defines the putative class as follows:

> [A]ll persons who have been terminated or separated from employment following a leave of absence and/ or otherwise not accommodated by defendant's failure to transfer to vacant and funded positions.

*Id.* at ¶ 28. [2]

Class certification is governed by Rule 23, which states, in relevant part:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is no numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; ***and***

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) Types of Class Actions. A class action may be maintained ***if*** *Rule 23(a)* ***is satisfied and if:***

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

⚑ Federal Rule of Civil Procedure 23 (emphasis added).

The Court of Appeals for the Third Circuit clarified the type of thorough and rigorous analysis that must be performed to determine whether the prerequisites of ⚑ Rule 23 are met:

> In deciding whether to certify a class under ⚑ Fed.R.Civ.P. 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties. In this appeal, we clarify three key aspects of class certification procedure. First, the decision to certify a class calls for findings by the court, not merely a "threshold showing" by a party, that each requirement of ⚑ Rule 23 is met. Factual determinations supporting ⚑ Rule 23 findings must be made by a preponderance of the evidence. Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits-including disputes touching on elements of the cause of action. Third, the court's obligation to consider all relevant evidence and arguments extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it.

**\*5** ⚑ *In re Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 307 (3rd Cir.2008). Our appellate court emphasized that "a class may not be certified without a finding that each ⚑ Rule 23 requirement is met." ⚑ *Id.* at 310.

Semenko contends that (i) Wendy's has a "written policy ... not to provide reasonable accommodation for permanent restrictions," Resp. at 4, and this generally applicable policy creates commonality for class purposes; (2) the class is sufficiently narrow because it is "limited to those individuals with permanent medical restrictions who applied for long-term disability benefits," Resp. at 3, and (3) the claims in the Complaint satisfy Rule 12(b)(6).[3] Defendant argues that the elements of commonality, typicality, or adequacy under ⚑ Rule 23(a) are not satisfied and, further, that Semenko cannot satisfy either of the two requirements of ⚑ Rule 23(b) that she contends to have satisfied. A party must satisfy all four of the requirements found in ⚑ Rule 23(a) and at least one of the three criteria found in ⚑ Rule 23(b). The Court will address the elements of ⚑ Rule 23 seriatim.

1. ⚑ *Rule 23(a)*

a. *Numerosity*

The numerosity requirement of ⚑ Rule 23(a)(1) is satisfied where a named plaintiff demonstrates that the putative class includes more than forty (40) individuals. ⚑ *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001). Semenko alleges in her Complaint that "membership in the Class potentially numbers in the hundreds." Complaint at ¶ 29. Therefore, the Court finds that the numerosity requirement of ⚑ Rule 23(a) is met.

Semenko v. Wendy's Intern., Inc., Not Reported in F.Supp.2d (2013)
27 A.D. Cases 1378

b. *Commonality*

The commonality requirement of Rule 23(a)(2) is satisfied if the named plaintiff "share[s] at least one question of fact or law with the grievances of the prospective class." *Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). [4] In *Wal–Mart Stores, Inc. v. Dukes,* the United States Supreme Court explained that a plaintiff attempting to satisfy the commonality requirement must demonstrate that the claims of the proposed class members "depend upon a common contention" that is "capable of classwide resolution." —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011), In order for a "contention" to constitute a "common question," it must yield the same answer with respect to each member of the proposed class. *Id.* at 2551 (remarking that a "common contention" is "capable of classwide resolution" if the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

The Court finds that the commonality requirement of Rule 23(a) (2) has not been met in this case. In *Wal–Mart,* a Title VII case, the Supreme Court found a lack of commonality because no single discriminatory pay policy applied to the full class. In the instant case, Plaintiff argues that Wendy's has a discriminatory disability policy which applies to the full proposed class. In support, she relies upon a determination letter from the EEOC in an attempt to establish that Wendy's has "admitted" that it has a disability policy which "constitutes a per se violation of the ADA."

**\*6** Not surprisingly, Wendy's strongly disputes that it has "admitted" that it has a policy which is a per se violation of the ADA. Further, while Title VII categorically prohibits discrimination, the ADA "only protects from discrimination those disabled individuals who are able to perform, with or without reasonable accommodation, the essential functions of the job they hold or desire." *Hohider,* 574 F.3d at 191. Thus, there is an important distinction between Title VII and ADA claims for class action purposes and courts presiding over ADA cases must determine not just whether the employer acted improperly, but also "whether class members are 'qualified'-which includes whether they can or need to be reasonably accommodated-before a classwide determination of unlawful discrimination ... can be reached." *Id.* at 191.

In approaching the commonality question, the Court is guided by the decision of the United States Court of Appeals in *Hohider v. United Parcel Service, Inc.,* 574 F.3d.169 (3d Cir.2009). [5] In *Hohider,* our appellate court reversed a class-certification order which had been entered in an action involving allegations that the defendant had engaged in a pattern or practice of unlawful discrimination against its employees under the ADA. Specifically, *Hohider* involved allegations that the defendant's company-wide policy which refused accommodations to employees who attempted to return to work after medical absences violated the ADA. *Id.* at 172. The Court of Appeals noted:

> the elements necessary to establish a pattern or practice of unlawful discrimination on behalf of a class may not mirror those necessary to establish a valid individual claim of discrimination, [citation omitted], and so the fact that individualized inquiries might preclude certification of class members' various individual claims of relief is not necessarily dispositive of whether that class's pattern-or-Fractice claim satisfies Rule 23. *It is the ADA, however, and not the Teamsters* [6] *evidentiary framework, that controls the substantive assessment of what elements must be determined to prove a pattern or practice of unlawful discrimination in this case.*

*Hohilder,* 574 F.3d at 184–85 (emphasis added).

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Accordingly, in order to determine whether each claimant was subjected to prohibited discrimination, the Court must probe

Semenko v. Wendy's Intern., Inc., Not Reported in F.Supp.2d (2013)
27 A.D. Cases 1378

into factual details and then conduct a multi-step legal analysis. For example, as to each claimant, the Court must resolve each of the following questions:

1. Is the claimant "a qualified individual with a disability?" This question alone depends upon several factors, one of which is when in time does the class member claim to have suffered discrimination. The question is necessitated because the standards changed on January 1, 2009, when the ADA Amendments Act ("ADAAA") of 2008 became effective. The ADAAA "broadened the category of individuals entitled to statutory protection from discrimination under the ADA." ⚑*Chedwick v. UPMC,* Civil Action No. 07–806, 2011 WL 1559792, * 19 (W.D.Pa. April 21, 2011). However, the amendments to the ADA do not apply retroactively. Therefore, the Court must use the laws and interpretations of those laws in effect at the time of the complained-of actions.

 **\*7** 2. Can the individual perform the essential functions of the job with or without accommodation? First, the Court will need to determine the job of each claim member. Then, the Court would have to determine the essential functions of the job. This inquiry requires that the Court give consideration to the "employer's judgment as to what functions of a job are essential," then balance those requirements against the limitations imposed by the impairment. ⚑42 U.S.C. § 12111(8). The Court would also need to determine whether the claim member could perform the job with or without an accommodation, notwithstanding the impairment. *Id.*

3. Did the class member allege a failure to accommodate and if so, was the requested accommodation reasonable? "The term 'reasonable accommodation' may include (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignments to a vacant position,...." ⚑42 U.S.C. § 12111(9).

4. Does the requested accommodation impose an undue hardship on the employer? "The term 'undue hardship' means an action requiring significant difficulty or expense...." ⚑42 U.S.C. § 12111(10). Multiple factors are to be considered when determining whether the accommodation would impose an undue hardship on the employer. *See* ⚑42 U.S.C. § 12111(10)(B). For each class member, the Court would also have to determine whether Wendy's was aware of the purported accommodation request and/or did the class member otherwise trigger the duty to engage in an interactive process.

5. Did the class member suffer prohibited discrimination?

Moreover, the Court would be required to analyze a variety of individualized defenses that Wendy's might have in response to the claims of class members, including whether the class member is judicially estopped from asserting a disability discrimination claim; did the class member pursue Social Security disability benefits; and/or did the class member pursue short—or longterm disability insurance benefits. Def's Br. at 14–15.

A number of courts have denied class certification when the class is defined so broadly that all persons with any disabilities, regardless of requested accommodations or modifications, are included. *See Burkett v. U.S. Postal Serv.,* 175 F.R.D. 220, 223–24 (N.D.W.Va.1997) (observing, in declining to certify class of persons with varying medical conditions, that "[i]n the view of several federal courts, the need for this individualized, fact-driven determination renders ... ADA actions ill-suited for class treatment."); ⚑*Perdue v. Murphy,* 915 N.E.2d 498 (Ind.Ct.App.2009) (applying an Indiana rule that is not materially different from ⚑Rule 23 and declining to certify a class of persons injured by the Family and Social Services Administration's failure to reasonably accommodate their various disabilities and its accompanying denial of benefits due to their alleged failure to cooperate).

**\*8**  Nevertheless, there are situations when ADA class actions are certified. *See, e.g.,* 🚩*Bates v. United Parcel Serv.,* 204 F.R.D. 440 (N.D.Cal.2001) (certifying class of plaintiffs with hearing disabilities); 🚩*Wilson v. Pa. State Police Dep't,* No. Civ. A. 94–cv–6547, 1995 WL 422750 (E.D.Pa. July 17, 1995) (certifying class of candidates for police officer denied employment due to their vision problems). However, as the *Perdue* court noted, in these cases, "there appear to be some unifying criteria, such as a common disability or requested accommodation, for example, so that classwide evaluation of 'qualification' may be conducted without requiring a prohibitive number of individual mini-trials." 🚩*Perdue,* 915 N.E.2d at 510. *See* 🚩*Hohider,* 574 F.3d at 189 (suggesting that unifying criteria might include common conditions suffered or accommodations sought).

After reviewing the substantive requirements of the ADA and the definition of the proposed class, the Court finds and rules that the commonality requirement of 🚩Rule 23(a)(2) cannot be met as each class member must prove that he or she is a "qualified individual with a disability," a highly individualized analysis which would require a "number of individual mini-trials." Perdue, 915 N.E.2d a 510.


c. *Typicality*

The typicality requirement of 🚩Rule 23(a)(3) requires that a representative plaintiff must show that his or her claims are "typical" of the claims asserted by the other potential class members. The inquiry pertaining to this requirement focuses on whether the named plaintiff is "markedly different from the class as a whole." 🚩*Marcus v. BMW of North America,* LLC, 687 F.3d 583, 598 (3d Cir.2012). The prerequisite is met if the class representative's claims are "generally the same" as those of the other class members in terms of both "the legal theory advanced" and "the factual circumstances underlying that theory." 🚩*In re Schering Plough Corp. ERISA Litig.,* 589 F.3d at 599. Typicality is measured through a three-part test that examines whether: (i) the putative representative's claims are generally the same as the class members' claims, relative to both the legal theory at issue and the underlying facts; (ii) the putative representative is subject to a defense that may not be alleged against many other class members and that may become a major issue in the litigation; and (iii) the putative representative's interests are "sufficiently aligned" with other class members. *Id.*

Wendy's argues that Semenko's claim is not "typical" of the claims of the potential class members for several reasons. First, the ADA inquiry is highly individualized, and Semenko's claim may look factually different than other putative class members. For example, factual differences may include, *inter alia,* "the type of impairment, the degree of limitation, the job held, the essential functions of the job held (or to which transfer is sought), accommodation sought, and the degree to which the requested accommodation caused undue hardship." Def's Br. at 16. Furthermore, Wendy's argues that Semenko's legal theories may differ from those asserted by other class members. For example, those "class members who contend they suffered discrimination after the ADAAA became effective would rely on different standards than Semenko to establish that they are disabled under the statutes." *Id.*

**\*9**  Next, Wendy's argues that some class members may be subjected to different defenses. For example, some class members will be subject to the defense of judicial estoppel if they pursued short or long-term disability benefits and/or Social Security Disability,[7] while others may not be subject to that defense. There may be an individual statute of limitations defense applicable to Semenko's individual claim that does not apply to other class members. *Id.* Likewise, the defense of reasonableness of accommodation will vary from case to case.

Finally, Wendy's argues that the interests of Semenko do not align with the members of the purported class. Specifically, while Semenko wanted to return to work,[8] some former employees may not want to return to work, while others may. Some current employees may want specific accommodations other than a transfer to a vacant and funded position, and some may not. *Id.*

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 134 of 199
Semenko v. Wendy's Intern., Inc., Not Reported in F.Supp.2d (2013)
27 A.D. Cases 1378

In *Baby Neal v. Casey,* 43 F.3d 48, 58 (3d Cir.1994), our appellate court explained that factual differences will not necessarily defeat typicality, particularly where an action challenges a policy or practice. However, the Court of Appeals also recognized that typicality will be lacking due to intraclass conflicts if the legal theories of the named plaintiffs are at odds with those of the absentee class members. *Id.* at 57–58.

"The premise of the typicality requirement is simply stated: as goes the claim of the named Plaintiff, so go the claims of the class ." *Sprague v. General Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998). Here, as discussed *supra,* the facts and evidence needed to prove the claims of each member of the proposed class will be unique to each claimant. Determining whether each claimant is entitled to recover under the ADA will be a highly individualized inquiry. Proof of Semenko's individual claims will not prove the claims of other class members.

A plaintiff's individual claims are "typical" of other members of the class only if proof of the plaintiff's factual circumstances will also automatically prove the claims of all other members of the class. "[C]ommon requests for relief ... or common legal theories do not establish typicality when the facts required to prove the claims are markedly different among class members." *Retired Chicago Police Ass'n v. Chicago,* 141 F.R.D. 477, 486 (N.D.Ill.1992), *aff'd in part and rev'd in part,* 7 F.3d 585 (1993). "If proof of the representatives' claims could not necessarily prove all of the proposed class members' claims, the representatives are not typical of the proposed members' claims." *Liberty Lincoln Mercury v. Ford Mktg. Corp.,* 149 F.R.D. 65, 77 (D.N.J.1996).

For these reasons, the Court finds and rules that typicality is lacking because Plaintiff's individual claim will not prove the issue with respect to the claims of the other proposed class members. Accordingly, the Court finds and rules that Plaintiff's claim is not typical of the purported class claims for the purpose of class-wide adjudication under Rule 23(a)(3).

d. *Adequacy*

**\*10** The final requirement under Rule 23(a) is that the named plaintiff must be able to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The United States Court of Appeals for the Third Circuit has advised that the "adequacy" inquiry has two components. First, the adequacy inquiry "tests the qualifications of the counsel to represent the class."[9] Second, it seeks to "uncover conflicts of interest between named parties and the class they seek to represent." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 521 (3d Cir.2004).

The "intraclass conflict" aspect of the adequacy analysis dovetails with the typicality inquiry. Wendy's argues that two clear conflicts of interest between Semenko and other class members are apparent from the face of the Complaint. First, a plaintiff is not an adequate representative where "any member of the putative class who reported to plaintiff would be claiming that plaintiff acted in violation of the law and of defendant's policies." *Wright v. Family Dollar, Inc.,* No. 10 C 4410, 2010 U.S. Dist. LEXIS 126643, *7, 2010 WL 4962838 (N.D.Ill. Nov.30, 2010). To the extent that any of the proposed class members reported to Semenko, she may have been involved in the Company's allegedly improper failure to accommodate.

Second, Wendy's argues that classes of proposed putative members that include former employees and currently employed managers raise additional conflict of concerns "because allegations that current managers 'violated both defendant's policies and [applicable] law ... could have a negative effect on current store managers' employment." Def.'s Br. at 17 (quoting *Wright,* 2010 U.S. Dist. LEXIS 126643, at *7, 2010 WL 4962838).

Semenko v. Wendy's Intern., Inc., Not Reported in F.Supp.2d (2013)

27 A.D. Cases 1378

Plaintiff did not address these arguments in her response. However, a plaintiff must satisfy all four of the prerequisites found in ⚑Rule 23(a). Because the Court has ruled that Plaintiff cannot meet the prerequisites enumerated in ⚑Rule 23(a)(2) and (3), the Court need not address the adequacy requirement contained in ⚑Rule 23(a)(4).

b. ⚑*Rule 23(b)*

Semenko relies upon both ⚑Rule 23(b)(2) and ⚑Rule 23(b)(3). Because the Court has determined that the commonality and typicality prerequisites in ⚑Rule 23(a) are not met, it need not address in detail whether Plaintiff satisfies the requirements of ⚑Rule 23(b)(2) and/or ⚑Rule 23(b)(3). [10]

Certification under ⚑Rule 23(b)(2) is appropriate only when the relief sought is primarily injunctive or declaratory. Further, ⚑Rule 23(b)(2) does not authorize class certification when each class member would be entitled to an individualized award of monetary damages. ⚑*Wal–Mart Stores, Inc.,* 131 S.Ct. at 2557–58 (holding monetary claims for individualized relief do not satisfy ⚑Rule 23(b) (2)). Here, Semenko seeks a variety of monetary damages of various types on behalf of the proposed class, including back pay with prejudgment interest, compensatory and punitive damages. Complaint at ¶ 36. Importantly, the requested monetary damages are not subject to across-the-board relief, but rather require individualized inquiries to determine the individual back pay, the individual compensatory damages, and the individual punitive damages. Given these circumstances, the class would become almost unmanageable, mandating multiple sub-trials to resolve all outstanding issues.

**\*11** As to ⚑Rule 23(b)(3), the Court is not persuaded by Semenko's arguments with regard to predominance and does not find, especially in light of the highly individualized inquiries that will be necessary given the disability discrimination allegations, that a class action of the sort proposed by Semenko is superior to other available methods for fairly and efficiently adjudicating the controversy. ⚑Fed.R.Civ.P. 23(b)(3). "⚑Rule 23(b)(3)'s predominance criterion is even more demanding than ⚑Rule 23(a). ⚑*Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515, 2013 WL 1222646 (March 27, 2013) (citing ⚑*Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). *See also* ⚑⚠*in Re LifeUSA Holding,* Inc., 242 F.3d 136, 144–47 (3d Cir.2001) (holding that a situation that did not satisfy the less demanding commonality requirement of ⚑Rule 23(a) did not satisfy the predominance requirement of ⚑Rule 23(b)(3) as well). As the court explained in ⚑*Lockwood Motors, Inc. v. General Motors Corp.,* 162 F.R.D. 569, 580 (D.Minn.1995), predominance exists only "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position."

As explained *supra,* individual issues clearly predominate over common issues with respect to both liability and damages in this case, and the proposed class members' claims cannot be adjudicated in a one size fits all, class action format, as required by ⚑Rule 23(b)(3) for class certification. Accordingly, the Court finds and rules that Semenko has not met the requirements for class action relief set forth in either ⚑Rule 23(b)(2) or ⚑Rule 23(b)(3).

### Conclusion

The Court recognizes that district courts within the Third Circuit typically conclude that motions to strike class action allegations filed before plaintiffs move for class certification are premature. However, after a careful and deliberate review of the applicable

27 A.D. Cases 1378

case law and the parties' respective positions, the Court concludes that this is one of those rare cases in which no amount of discovery will demonstrate that the class can be maintained.

The Court finds and rules that Plaintiff has failed to demonstrate that all of the prerequisites in Rule 23(a) have been met. Specifically, the Court concludes that Semenko does not satisfy the requirements of commonality and typicality. Further, the Court also concludes that Semenko does not meet any of the criteria of Rule 23(b). Accordingly, the motion to strike will be granted and the proposed class can not be certified.

An appropriate Order follows.

## ORDER OF COURT

**AND NOW,** this 12th day of April, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED AND DECREED that Defendant's Motion to Strike is **GRANTED.**

Pursuant to Federal Rule of Civil Procedure 23(d)(1)(D), Plaintiff is hereby **ORDERED** that on or before April 22, 2013, she shall amend her Complaint in Class Action to reflect that her class action allegations have been deleted. Thereafter, Defendant shall respond on or before May 6, 2013.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1568407, 27 A.D. Cases 1378

## Footnotes

1    *Landsman* involved claims that defendants sent faxes to the class of plaintiffs without their consent. 640 F.3d at 72. The district court held that the class could not meet Rule 23's typicality or predominance requirements because "there were too many 'crucial factual determinations to be made with respect to claims and defenses that will vary from party to party,' in particular, consent to receive faxes...." *Id.* at 93. The appellate court responded that "it is not clear that, as a matter of law, differences regarding consent are sufficient to defeat class allegations." *Id.* at 94.

2    In her Response to the Motion to Strike, Plaintiff changed the definition of the class and stated "that the proposed class would be limited to those individuals with permanent medical restrictions who applied for long-term disability benefits." Pl.'s Resp. at 3.

3    The Court notes, however, that Wendy's did not move to dismiss the class allegations under Rule 12(b)(6), but rather moves to strike the class allegations under Rule 12(f), 23(c)(1)(A), and 23(d)(1)(D).

4    Although Rule 23(a)(2) refers to "questions of law or fact common to the class," the plural form of the word "question" has not been construed to require a showing of multiple common questions. *In re: Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 597 n .10 (3d Cir.2009).

5    The Honorable Sandra Day O'Connor, *Associate Justice (Ret.)* of the Supreme Court of the United States, who sat by designation, was a member of the panel in this case. *Hohider,* 574 F.3d at 171.

6    *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In *Teamsters,* the government brought suit against a trucking company and a union representing employees of the company under Title VII of the Civil Rights Act. The government argued that both the company and the union exhibited a pattern and practice of discrimination in denying preferable, higher paying jobs to minorities. The Supreme Court noted that once a pattern and practice of discrimination was established, the individual need only demonstrate that he was denied a relevant employment benefit. *Id.* at 363. The burden would then shift to the defendant "to demonstrate that the individual ... was denied an employment opportunity for lawful reasons." *Id.* In other words, where a single minority employee may not be able to establish discrimination simply by demonstrating that he was denied a job, where a pattern and practice of discrimination by the employer has already been proved, this mere denial of an employment benefit is sufficient to make out a claim for discrimination.

7    In her Complaint, Semenko alleges that she received long-term disability benefits during the time of her medical leave. Complaint at ¶ 9.

8    It appears that in late 2007, the Wendy's facility at which Semenko had worked was permanently closed. Pl.'s Resp., Ex. 1.

9    The Court notes that Plaintiff's attorney is a skilled and experienced class action litigator whose qualifications are not challenged.

10    The Court notes that Plaintiff did not specifically address Wendy's arguments about her inability to meet the requirements of Rule 23(b)(2) and/or Rule 23(b)(3). Rather, Plaintiff changed her class definition. However, even if such changed class definition was accepted by the Court, it would not eliminate the highly individualized inquiries that must be made on the disability discrimination claims alleged in this lawsuit.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 7525900
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division.

Alice SOWDERS, DVM d/b/a Fairborn Animal Hospital, individually
and as the representative of a class of similarly-situated persons, Plaintiff,

v.

SCRATCH FINANCIAL, INC., Defendant,

Case No. 3:23-cv-56
|
Signed November 14, 2023

**Attorneys and Law Firms**

Scott D. Simpkins, Climaco Lefkowitz Peca Wilcox & Garofoli LPA - 1, Cleveland, OH, for Plaintiff.

Stephen Joseph Stephens, III, Dinsmore & Shohl, LLP, Cincinnati, OH, for Defendant.

## ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, ALTERNATIVELY, TO STRIKE PLAINTIFF'S CLASS ALLEGATIONS

THOMAS M. ROSE, UNITED STATES DISTRICT JUDGE

**\*1** Currently before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint or, Alternatively, to Strike Plaintiff's Class Allegations (the "Motion"). (Doc. No. 7.) Plaintiff Alice Sowders, DVM d/b/a Fairborn Animal Hospital ("FAH") filed the instant Complaint (the "Complaint") against Defendant Scratch Financial, Inc. ("Scratch") on behalf of itself and as the representative of a class of similarly-situated persons (the "Putative Class"). (Doc. No. 1.) FAH alleges a single cause of action arising under the "junk fax" provisions of the Telephone Consumer Protection Act, ⚑ 47 U.S.C. § 227(b)(1)(C) (the "TCPA"). (*Id.* at PageID 18-24.) In its Motion, Scratch avers that, (a) FAH lacks standing to confer the Court with subject matter jurisdiction in this action, and (b) FAH has failed to state a claim upon which relief may be granted. (Doc. No. 7 at PageID 81.) Alternatively, Scratch requests that the Court strike FAH's class allegations. (*Id.*) For the reasons set forth below, the Court **GRANTS, IN PART,** and **DENIES, IN PART,** Scratch's Motion. FAH shall be **GRANTED** leave to file an amended complaint within **fourteen (14) days** of this Order.

## I. BACKGROUND

This action arises from an allegedly unsolicited promotional fax that Scratch sent to FAH in violation of the TCPA. (Doc. No. 1 at PageID 1-2.) FAH is a veterinary clinic operating in Fairborn, Ohio. (*Id.* at PageID 4.) Scratch partners with veterinary offices and other medical providers to offer patients and pet owners financing options for those professional services. (*Id.* at PageID 5.)

Scratch acts as an intermediary between providers and prospective patients and pet owners. (*See id.*) The Complaint alleges that Scratch offers patients and pet owners financing allowing them to receive immediate care and pay Scratch in subsequent installments. (*Id.*) Additionally, Scratch connects providers with prospective patients and pet owners in exchange for a percentage of the providers' fees. (*Id.*) Scratch ultimately markets itself to providers as a simple financing solution that will help "grow revenues and reduce accounts receivable." (*Id.*)

Scratch's marketing strategy included sending promotional faxes to providers. (*Id.* at PageID 6.) FAH received one such fax from Scratch on February 20, 2019, advertising Scratch's services. (Doc. No. 1-1.) However, FAH did not welcome Scratch's promotional fax. (*See* Doc. No. 1 at PageID 10-11.) To be sure, FAH alleges that, as a rule, it does not use its fax machine to "send or receive advertising material." (*Id.* at PageID 11.) Specifically regarding Scratch's promotional fax to FAH, FAH states that it had not previously done business with Scratch, nor did FAH expressly consent to receive marketing materials from Scratch. (*Id.* at PageID 10-11.)

The advertisement included a conspicuous writing at the bottom of the page stating: "[t]o be removed from future fax communications with Scratchpay, please email 'UNSUBSCRIBE+[fax number]' to support@scratchpay.com." (Doc. No. 1-1.) FAH immediately sent Scratch a return fax requesting that FAH be removed from Scratch's fax list. (Doc. No. 7-2.) FAH does not allege that it received any additional promotional faxes from Scratch.

 **\*2**  FAH insinuates that it was the recipient of a "bulk fax broadcast" by Scratch. (*Id.* at PageID 12.) The Complaint alleges that the header of Scratch's promotional fax indicates that the fax was sent to a potentially lengthy computerized list of veterinary offices and healthcare providers. (*Id.*) As such, FAH has pled this case as a class action, utilizing the following class definition:

> All persons and entities who were sent one or more facsimiles from Scratch Financial, Inc., on or after February 20, 2019, containing any material advertising the commercial availability or quality of Scratch's property, goods, or services, and not including the opt-out notice required by 47 U.S.C. § 227(b)(2)(D), but who did not sign-up or register to do business with Scratch.

(*Id.* at PageID 13.)

FAH filed its Complaint on February 20, 2023, exactly four years after receiving Scratch's promotional fax, seeking statutory damages under the TCPA and injunctive relief for itself and the Putative Class. (Doc. No. 1.) Scratch filed the instant Motion on May 11, 2023. (Doc. No. 7.) FAH filed its response in opposition to Scratch's Motion (the "Response") (Doc. No. 8) on June 1, 2023, and Scratch timely filed its reply (Doc. No. 9). Thus, this matter is ripe for review and decision.

## II. STANDARD OF REVIEW

### 1. Subject Matter Jurisdiction

Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally fall into one of two categories: facial attacks or factual attacks. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). A facial attack questions the sufficiency of the pleading. *Id.* In reviewing a facial attack, a trial court takes the allegations in the complaint as true. *Id.* If those allegations adequately establish jurisdiction, then the court will find that jurisdiction exists. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (internal citations omitted). In reviewing a factual attack, no presumptive truthfulness applies. *Id.*

A factual attack on subject matter jurisdiction has been commonly termed a "speaking motion." *Id.* (citing *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325). When the facts regarding subject matter jurisdiction create a factual controversy, the court must weigh the conflicting evidence to determine whether subject matter jurisdiction exists. *Id.* "In its review, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Id.*

Because the issue in a factual attack is the court's jurisdiction, the reviewing court may go beyond the pleadings and "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *see also Anestis v. United States*, 749 F.3d 520, 524 (6th Cir. 2014).

However, a court will engage in this factual inquiry "only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek*, 491 F.3d at 330 (citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997)). If a factual attack on subject matter jurisdiction implicates the merits of the plaintiff's claim, "the district court should '*find that jurisdiction exists* and deal with the objection as a direct attack on the merits of the plaintiff's claim.' " *Id.* (internal citations omitted) (emphasis in original). This subjects the party posing a factual attack on a court's subject matter jurisdiction to the standards of Fed. R. Civ. P. 12(b)(6) and/or Fed. R. Civ. P. 56. *Id.*

**\*3** The party asserting jurisdiction has the burden of proof. *Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015). This burden must be satisfied by a preponderance of the evidence. *Wright v. United States*, 82 F.3d 419 (6th Cir. 1996).

## 2. Failure to State a Claim

"The purpose of a Rule 12(b)(6) motion to dismiss is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 897 (S.D. Ohio 2013) (citing *Mayer v. Mylod*, 988 F. 2d 635, 638 (6th Cir. 1993)). Moreover, the purpose of the motion is to test the formal sufficiency of the statement of the claim for relief. *Id.* "[F]or the purposes of a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff and its allegations taken as true." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

To survive a 12(b)(6) motion to dismiss, a plaintiff must provide more than labels and conclusions; a formulaic recitation of the elements of a cause of action is not enough. *Bell Atlantic v. Twombly*, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The factual allegations must be enough to raise a right to relief above the speculative level and must also do something more than merely create a suspicion of a legally cognizable right. *Id.* A court is not bound to accept as true a legal conclusion couched as factual allegation or draw unwarranted factual inferences. *Id.* at 555, 127 S.Ct. 1955; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). In sum, only well-pleaded facts are construed liberally in favor of the party opposing the motion to dismiss. *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F. 3d 716, 726 (6th Cir. 1996).

## 3. Motion to Strike Class Allegations

Federal class actions must be brought in accordance with Fed. R. Civ. P. 23. *Progressive Health & Rehab Corp. v. Quinn Med., Inc.* 323 F.R.D. 242, 244 (S.D. Ohio 2017). To successfully proceed with a class action, plaintiffs must demonstrate that:

Sowders v. Scratch Financial, Inc., Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 141 of 199

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* (quoting Fed. R. Civ. P. 23(a)). "Plaintiffs must also show that the class action falls into at least one of the three categories set forth by Rule 23(b)." *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)).

There are two procedural mechanisms that a court may use to strike class allegations from a plaintiff's complaint. *See Carmouche v. A1 Diabetes Med. Supply, Inc.*, 586 F. Supp. 3d 795, 799 (W.D. Tenn. 2022). First, a court may strike class allegations from a complaint pursuant to Fed. R. Civ. P. 12(f) if the allegations concern a " 'redundant, immaterial, impertinent, or scandalous matter.' " *Id.* (quoting Fed. R. Civ. P. 12(f)). Second, a party may request that the court strike class allegations from the plaintiff's complaint on the grounds that the prerequisites of Fed. R. Civ. P. 23(a) and (b) cannot possibly be satisfied. *Id.* (quoting *Schilling v. Kenton Cnty., Ky.*, No 10-143-DLB, 2011 U.S. Dist. LEXIS 8050, at *12, 2011 WL 293759, at *4 (E.D. Ky. Jan 27, 2011)) ("nothing in Rule 23 prevents a defendant from attempting to preemptively deny certification on the grounds that Rule 23(a) and (b) can never be satisfied").

**\*4** Generally, "courts should exercise caution when striking class action allegations based solely on the pleadings ...." *Progressive Health*, 323 F.R.D. at 244-45 (internal citations and quotation marks omitted). A court's determination to strike class allegations "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (internal citations and quotation marks omitted). To this end, some courts review motions to strike class allegations taking all well-pled allegations as true and construing the allegations in the light most favorable to the plaintiff, as when reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Eldridge v. Cabela's, Inc.*, No. 3:16-cv-536-DJH, 2017 U.S. Dist. LEXIS 160427, at *24, 2017 WL 4364205, at *7 (W.D. Ky. Sept. 28, 2017). Although, the burden of proving that Fed. R. Civ. P. 23 has been satisfied remains with the plaintiff. *Progressive Health*, 323 F.R.D. at 245 (internal citations omitted).

### III. ANALYSIS

As an initial matter, the Court notes that it must consider jurisdictional issues before addressing more substantive challenges. *Amacher v. Tennessee*, No. 3:21-cv-638, 2022 U.S. Dist. LEXIS 7567, at *5, 2022 WL 141607, at *2 (M.D. Tenn. Jan. 13, 2022) (citing *In re: 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016)). Further, "a challenge to a plaintiff's standing under Article III of the Constitution is a challenge to subject matter jurisdiction." *Id.* (quoting *Tennessee Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019)).

Therefore, for purposes of deciding the present Motion, the Court will first address the challenges to FAH's standing. The Court will then consider whether FAH has stated a claim upon which relief may be granted and whether it is appropriate to strike the class allegations of FAH's Complaint, respectively.

### 1. Standing

Standing is a doctrine of limitation "rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). The doctrine defines a court's authority to hear a case and the "category of litigants empowered to maintain a lawsuit ...." *Id.* (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

It is well settled that to establish standing a party invoking a federal court's jurisdiction must satisfy three elements. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Accordingly, such a party must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338, 136 S.Ct. 1540 (citing *Lujan*, 504 U.S. at 560-61, 112 S.Ct. 2130; *Friends of the Earth, Inc. v. Laidlow Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)).

### i. Facial Challenge

To start, Scratch contends that FAH's complaint does not plead sufficient facts to establish standing. (Doc. No. 7 at PageID 93.) In particular, Scratch argues FAH has failed to allege any concrete and particularized injury that the company itself "actually suffered." (*Id.* at PageID 94.) In response, FAH posits that alleging its receipt of a single unsolicited fax advertisement from Scratch sufficiently demonstrates an injury in fact to survive Scratch's facial challenge here. (Doc. No. 8 at PageID 119-21.)

The Supreme Court has defined an injury in fact as an injury that is both "concrete and particularized," and "actual or imminent." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (internal citations and quotation marks omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339, 136 S.Ct. 1540 (internal citations and quotation marks omitted); *Valley Forge*, 454 U.S. at 472, 102 S.Ct. 752 ("... Art. III requires the party who invokes the court's authority to show that [s]he *personally* has suffered some actual or threatened injury ..." (emphasis added)) (internal citations and quotation marks omitted). In the simplest terms, an alleged injury "must actually exist" to be considered concrete. *Spokeo*, 578 U.S. at 340, 136 S.Ct. 1540.

**\*5** The most easily identifiable concrete harms will involve "physical or monetary injury to the plaintiff." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 141 S.Ct. 2190, 2204, 210 L.Ed.2d 568 (2021). Nevertheless, intangible harms may likewise be considered concrete under the right circumstances. *Id.* (citing *Spokeo*, 578 U.S. at 340-41, 136 S.Ct. 1540). The Supreme Court has held that intangible harms are likely concrete where they bear a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* Specifically included in these types of intangible harms are traditional injuries such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* (internal citations omitted).

By way of its constitutional lawmaking authority, Congress may create new causes of action where none previously existed. *Spokeo*, 578 U.S. at 341, 136 S.Ct. 1540 (quoting *Lujan*, 504 U.S. at 578, 112 S.Ct. 2130) ("Thus we said in *Lujan* that Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law' "). "Courts must afford due respect to Congress's decision" to enact a statute establishing a private cause of action. *TransUnion*, 141 S.Ct. at 2204. However, an injury will not be made concrete simply because Congress says so. *Id.*

at 2205; *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018) ("We know of no circuit court decision since *Spokeo* that endorses an anything-hurts-so-long-as-Congress-says-it-hurts theory of Article III injury"). For instance, a plaintiff cannot establish standing where she alleges "a bare procedural violation." *Spokeo*, 578 U.S. at 341, 136 S.Ct. 1540 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)). To illustrate this point in *TransUnion*, the Supreme Court offered the following hypothetical:

> Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine. The violation did not personally harm the plaintiff in Hawaii.

*TransUnion*, 141 S.Ct. at 2205.

The TCPA is one such statute that establishes a cognizable right of action where one did not exist before. *Imhoff Inv., LLC v. Alfoccino, Inc.*, 792 F.3d 627, 733 (6th Cir. 2015). In essence, "the TCPA promotes an 'interest in seclusion,' " the intrusion upon which bears a close relationship to harms traditionally recognized in American courts. *Id.* (quoting *Owners Ins. Co. v. Eur. Auto Works, Inc.*, 695 F.3d 814, 820 (8th Cir. 2012); *TransUnion*, 141 S.Ct. at 2204) (citing *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)) (intrusion upon seclusion). Further, with respect to unsolicited promotional faxes, the TCPA seeks to provide a remedy for the harms – tangible and intangible – associated with such unsolicited faxes. *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 544 (6th Cir. 2014) (citing *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (8th Cir. 2013)) ("unsolicited fax advertisements impose costs on all recipients, irrespective of ownership and the cost of paper and ink, because such advertisements waste the recipients' time and impede the free flow of commerce"). As such, when a plaintiff alleges that she has received an unsolicited promotional fax, she has alleged a particularized and concrete injury under the TCPA. *Imhoff*, 792 F.3d at 631 (finding a concrete and particularized injury where named plaintiff only received two unsolicited promotional faxes).

**\*6** In the current action, FAH has adequately alleged an injury in fact to establish standing. As stated above, Scratch argues that FAH's Complaint fails to allege an injury that it "actually suffered." (Doc. No. 7 at PageID 94.) However, FAH's Complaint specifically alleges that FAH itself received an unsolicited fax advertisement from Scratch which resulted in real costs and infringed upon FAH's privacy interests. (Doc. No. 1 at PageID 23.) In short, FAH has alleged a personal (i.e., particularized) injury. What's more, FAH has adequately alleged a concrete injury in this case. The Court finds that the Complaint clearly frames FAH's injury as an intrusion upon its seclusion. Per the Supreme Court, such an intrusion is a concrete intangible harm bearing a close relationship to traditional harms recognized in American courts. Therefore, FAH has sufficiently alleged an injury in fact and Scratch's facial challenge is denied.

### ii. Factual Challenge

The Court turns next to Scratch's factual challenge to subject matter jurisdiction. Scratch submits that FAH lacks standing to bring this action because, as a matter of fact, FAH has suffered no injury at all under the TCPA. (Doc. No. 7 at PageID 88.) To support this factual challenge, Scratch has provided the declaration of its Vice President of Sales, Neil Stanga, to demonstrate

that FAH provided consent to receive Scratch's promotional fax. (Doc. No. 7-1.) Additionally, Scratch asserts that, regardless of FAH's consent, Scratch and FAH had an existing business relationship ("EBR") within the meaning of the TCPA. (Doc. No. 7 at PageID 90-93.) FAH counters, arguing that Scratch's factual challenge here is improper. (Doc. No. 8 at PageID 115.) It contends that Scratch's factual challenge attacks the merits of FAH's claim and, therefore, must be construed under Rule 12(b)(6). (*Id.*)

Courts have generally been instructed to "assume jurisdiction when statutory standing and merits questions converge." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 443-44 (6th Cir. 2006) (citing *Bell v. Hood,* 327 U.S. 678, 681-82, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). As a rule, "[t]he question of subject matter jurisdiction and the merits will normally be considered intertwined where the [same] statute provides both the basis of federal court subject matter jurisdiction and the cause of action." *Id.* (quoting *Eubanks v. McCotter,* 802 F.2d 790, 793 (5th Cir. 1986)) (internal citations and quotation marks omitted). When standing and the merits of a plaintiff's claim are so intertwined, courts are encouraged to "find that jurisdiction exists and deal with the objection as a direct attack on the merits." *Gentek,* 491 F.3d at 330 (internal citations and quotation marks omitted). At the pleading stage, this requires courts to consider a party's factual challenge under Rule 12(b)(6). *Id.*

Here, the Court finds that Scratch's factual challenge relies on purported facts which are intertwined with the merits of FAH's claim under the TCPA. Consider Scratch's assertion that consent to receive the promotional fax at issue deprives FAH of standing. (Doc. No. 7 at PageID 88-90.) Under the junk fax provisions of the TCPA, promotional faxes must be unsolicited to violate the statute. 47 U.S.C. § 227(b)(1)(C). As a matter of common sense, an act cannot be unsolicited if it was consented to. For the Court to consider whether FAH provided consent in this case, the Court must necessarily rule on the merits of FAH's claim. The same is true with respect to Scratch's contention that Scratch and FAH had an EBR under the TCPA. EBRs constitute a statutory exception to the general rule of the TCPA's junk fax provisions. 47 U.S.C. § 227(b)(1)(C)(i). An individual has no claim under the TCPA if she had an EBR with the sender of a fax and the sender otherwise complies with the statute. The Court cannot consider whether the Parties here had an EBR without addressing the merits of FAH's claim. Therefore, the Court must consider Scratch's factual challenge here pursuant to the standards of Rule 12(b)(6)

**\*7** To this end, the Court is unpersuaded by Scratch's argument. Scratch would have the Court determine that FAH consented to receiving Scratch's promotional facts and, if not, that the Parties had an EBR as set forth in the TCPA. (Doc. No. 7 at PageID 88-93.) Yet, this is directly contradictory to the allegations of the Complaint. (Doc. No. 1 at PageID 10-11.) Accepting the well-pled allegations of the Complaint as true, the Court thus disregards Scratch's contradictory allegations at the pleading stage of these proceedings. Scratch submits no arguments based on the face of the Complaint to support a finding of consent or an EBR here. Accordingly, Scratch's factual challenge to standing is denied.

### iii. Injunctive Relief

To close the page on standing, the Court must determine whether FAH possesses standing to seek injunctive relief under the TCPA. Scratch avers that FAH has failed to allege it is likely to be harmed again by Scratch's fax advertisements in the future. (Doc. No. 7 at PageID 94-95.) FAH offers no response to this argument. Instead, FAH appears to rest on its request for injunctive relief in the Complaint. (Doc. No. 1 at PageID 25.)

A plaintiff will only have standing to request injunctive relief where she can demonstrate "continuing, present adverse effects" traceable to the conduct of a defendant. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 109, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *O'shea v. Littleton,* 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects") (internal quotation marks omitted). At present, FAH has only alleged that it received a

single unsolicited fax advertisement from Scratch in 2019. (Doc. No. 1 at PageID 1-2.) FAH makes no mention of a continuing harm to itself or the Putative Class. FAH does summarily state that "Plaintiff receives unsolicited advertisements on its fax machine." (*Id.* at PageID 11.) However, FAH provides no additional allegations that would allow the Court to infer any ongoing harm in violation of the TCPA by Scratch. Hence, FAH lacks standing to seek injunctive relief in this action.

### 2. Failure to State a Claim

Moving on, the Court now addresses whether FAH has properly stated a claim upon which relief may be granted. Scratch argues that FAH has not pled sufficient facts to establish that it received Scratch's fax advertisement through the proper medium. (Doc. No. 7 at PageID 95.) Specifically, Scratch contends that FAH's TCPA claim fails because FAH did not receive Scratch's unsolicited fax "on a traditional standalone fax machine over a regular telephone line." (*Id.*)

FAH responds with two arguments. First, FAH argues that Scratch's Motion calls on the Court to impermissibly draw factual inferences in Scratch's favor. (Doc. No. 8 at PageID 121.) Second, FAH disagrees with Scratch's interpretation of the TCPA to require that unsolicited promotional faxes be received on a traditional standalone fax machine. (*Id.* at PageID 122.)

To resolve this issue, courts may rely on the plain language of the TCPA. *American Copper*, 757 F.3d at 544 (citing 47 U.S.C. § 227(b)(1)(C)). The TCPA prohibits the "use [of] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C).

The key requirement of the statute is that the signal sending any unsolicited fax must be received over a telephone line. *Lyngaas v. Ag*, 992 F.3d 412, 426 (6th Cir. 2021). Such faxes include faxes received on a standalone fax machine as well as electronic faxes received via efax line or a computer so long as they are transmitted in "end-to-end communication."[1] *Id.* at 427 (internal citations and quotations marks omitted). However, emails and messages received on an online fax server will not fall within the ambit of the TCPA. *Id.* To illustrate the difference, faxes that are routed to a recipient's computer or efax folder utilize a telephone line and impose burdens on recipients that the TCPA seeks to remedy. *Id.* By contrast, messages sent via email or delivered to an online fax server originate over the internet rather than a telephone line. *Id.*

**\*8** With this understanding, Scratch's argument here is unavailing. In the Complaint, FAH clearly alleges that it received Scratch's promotional fax on its "fax machine." (*See* Doc. No. 1 at PageID 11.) FAH makes no mention of a fax server or email. Although it would not be fatal, FAH also does not muddy the waters here by suggesting that it received Scratch's fax via electronic fax. Instead, a glance at the fax, attached to the Complaint, that FAH received indicates that Scratch's promotional fax was transmitted through a telephone line to a telephone number presumably belonging to FAH. (Doc. No. 1-1.) Thus, drawing all inferences in the light most favorable to FAH, the Court finds that FAH has adequately stated a claim under the TCPA.

### 3. Class Allegations

Finally, the Court turns its attention to Scratch's alternative motion to strike the class allegations contained in the Complaint. As a practical matter, the Court finds that Scratch has made no assertion that FAH's class allegations contain any redundant, immaterial, impertinent, or scandalous matter. Therefore, the Court will base its determination here on whether the requirements of Rule 23 can be satisfied under the class allegations as pled.

Sowders v. Scratch Financial, Inc., Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 146 of 199

### i. Predominance

In the Complaint, FAH alleges in part that common questions of law or fact predominate over any individual questions amongst the Putative Class. (Doc. No. 1 at PageID 14.) Scratch argues that this cannot be. (*See* Doc. No. 7 at PageID 97.) In short, Scratch submits that questions regarding consent and potential EBRs are individualized inquiries that will necessarily predominate over questions common to the Putative Class. (*Id.* at PageID 97-100.) FAH argues that Scratch's motion to strike here relies on speculation rather than the face of the Complaint. (Doc. No. 8 at PageID 125.)

Class allegations rooted in ⚑Rule 23(b)(3) must establish, in pertinent part, that "questions of law or fact common to the class members predominate over any questions affecting only individual members." ⚑Fed. R. Civ. P. 23(b)(3). Common questions must be "subject to generalized proof" such that they are applicable to the entire class. ⚑*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (quoting ⚑*Bridging Cmtys., Inc. v. Top Flite Fin.*, 843 F.3d 1119, 1124 (6th Cir. 2016)) (internal quotation marks omitted). " 'If the same evidence will suffice for each [class] member to make prima facie showing,' " then there is a common question. ⚑*Id.* (quoting ⚑*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016)).

To determine whether common questions predominate, courts search for "substantive issues that will control the outcome" of the case at bar. ⚑*Id.* (quoting ⚑*Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008)) (internal quotation marks omitted). However, predominance does not require that every element of a claim be subject to class wide proof. ⚑*Bridging Cmtys.*, 843 F.3d at 1124 (quoting ⚑*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467-68, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013)). Further, that a potential defense may "affect different class members differently" does not defeat allegations of predominance. ⚑*Id.* at 1125 (quoting ⚑*Young v. Nationwide Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012)) (internal quotation marks omitted). Courts have refused to entertain such speculative defenses "[e]ven where defendants point to some evidence that a defense will indeed apply to some class members." ⚑*Id.* (citing ⚑*Young*, 693 F.3d at 544; ⚑*Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007); *In re HCA Holdings, Inc.*, No. 14-0511, 2015 U.S. App. LEXIS 3015, at *5, 2015 WL 10575861, at *2 (6th Cir. 2015)).

Here, the Court finds that the Complaint sufficiently alleges predominance with respect to the TCPA claim at issue. FAH clearly sets forth a conclusive list of common questions that allegedly predominate in this class action. (Doc. No. 1 at PageID 15-16.) The fact that Scratch identifies possible defenses that could affect individual members of the Putative Class differently is immaterial, particularly at this stage of the litigation. Moreover, if Scratch can later point to individualized defenses in this case, the Court can then utilize "procedural mechanisms" to prune the class. ⚑*Bridging Cmtys.*, 843 F.3d at 1126. Although, the Court will not entertain the merits of Scratch's potential individualized defenses at the pleadings stage. *See e.g.*, ⚑*Sandusky*, 863 F.3d at 465 (allowing discovery before addressing issues of individualized defenses). Accordingly, the Court will not strike FAH's class allegations on this ground. [2]

### ii. Overbreadth [3]

**\*9** Scratch next argues that FAH's proposed class definition is impermissibly overbroad and therefore facially uncertifiable. (Doc. No. 7 at PageID 100.) Substantively, Scratch contends that the proposed class definition will inevitably include individuals who did not receive fax advertisements on a traditional fax machine over a phone line. (*Id.*) Scratch also argues that the proposed

class definition is overbroad because it will include members who consented to receive promotional faxes from Scratch. (*Id.* at PageID 100-101.)

Conversely, FAH again disagrees with Scratch's interpretation of the TCPA's junk fax provisions to require that unsolicited fax advertisements must be received on a traditional fax machine. (Doc. No. 8 at PageID 127.) FAH further argues that to include consent in the proposed class definition would run contrary to relevant case law on the subject. (*Id.*) Specifically, FAH states that including consent in the proposed class definition here would transform the Putative Class into an impermissible "fail safe" class. (*Id.)*

The Court agrees with FAH on this issue. Scratch's overbreadth arguments are largely recycled from its previous arguments made throughout the Motion, which the Court has already found to be lacking. The Court finds it unnecessary to reiterate its analyses here. Nonetheless, the Court does acknowledge that the issue of overbreadth may be raised again in this case after some factual development. At such time, the Court would reserve the authority to exclude members of the Putative Class as needed. *Bridging Cmtys.*, 843 F.3d at 1126 ("[the Court] can place class members with potentially barred claims in a separate subclass or exclude them from the class altogether") (internal citations and quotation marks omitted).

### iii. "Fail-Safe" Class

Nevertheless, the Court does find that FAH's proposed class definition creates an impermissible fail-safe class. The Parties themselves to not substantively argue that the proposed class definition in the Complaint does or does not constitute a fail-safe class. FAH only offhandedly states that the proposed class definition is not an impermissible fail-safe class because the class is not defined solely by members who have a viable claim under the TCPA. (Doc. No. 8 at PageID 127.)

Briefly, fail-safe classes are classes that only include members who are entitled to relief. *Progressive Health*, 323 F.R.D. at 245 (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)). This is to say, membership in the class is predicated on having a successful claim. *Id.* Such fail-safe classes are impermissible because it is impossible to ascertain who its members are until judgment is rendered. *Sauter v. CVS Pharmacy, Inc.*, No. 2:13-cv-846, 2014 U.S. Dist. LEXIS 63122, at *23, 2014 WL 1814076, at *9 (S.D. Ohio May 7, 2014).

In the context of the TCPA's junk fax provisions, the Southern District of Ohio has identified proposed class definitions that will constitute impermissible fail-safe classes. *See Swetlic Chiropractic Rehab Ctr. v. Foot Levelers, Inc.*, 235 F. Supp. 3d 882, 891 (S.D. Ohio 2017). In *Swetlic*, the court found that a proposed class definition including persons who received an unsolicited fax "which did not display a proper opt-out notice" was an impermissible fail-safe class. *Id.* Yet, at the early stages of litigation, courts have permitted plaintiffs to amend their proposed class definition to remedy this issue. *Id.* (citing *Sauter*, 2014 U.S. Dist. LEXIS 63122 at *23, 2014 WL 1814076, at *9) (internal citations omitted).

 **\*10** In the instant Complaint, FAH has submitted a class definition that renders the Putative Class an impermissible fail-safe class. FAH's proposed class definition expressly includes parties who received an unsolicited fax "not including the opt-out notice required by 47 U.S.C. § 227(b)(2)(D)." (Doc. No. 1 at PageID 13.) The Court acknowledges that the opt-out notice requirements of the TCPA would not be wholly dispositive of the Putative Class's claims. But the issue of whether Scratch included a statutorily compliant opt-out notice on its promotional faxes is deeply enmeshed in the merits of FAH's class allegations. Therefore, the Court will strike FAH's proposed class definition as an impermissible fail-safe class. Though, at this early stage of the proceedings, the Court will afford FAH the opportunity to file an Amended Complaint consistent with this analysis.

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 148 of 199

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS, IN PART,** and **DENIES, IN PART,** Defendant's Motion to Dismiss Plaintiff's Complaint or, Alternatively, to Strike Plaintiff's Class Allegations (Doc. No. 7) and finds the following:

1. FAH has sufficiently pled an injury in fact to satisfy standing in this action with respect to its claims for statutory damages.

2. FAH has stated a claim upon which relief may be granted.

3. FAH does not have standing to seek injunctive relief under the junk fax provisions of the TCPA.

4. The Court hereby **STRIKES** FAH's proposed class definition as an impermissible fail-safe class.

5. FAH shall be **GRANTED** leave to file an amended complaint within **fourteen (14) days** of this Order.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, November 14, 2023.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 7525900

---

**Footnotes**

1    The Court notes that the Federal Communications Commission may promulgate developments in this area of the law. *See e.g.,* 🚩*In the Matter of Amerifactors Fin. Grp., LLC*, 34 F.C.C.R. 11950, 11953 (F.C.C. Dec. 9, 2019). However, the FCC continues to reconsider its decision in *Amerifactors* on an application for review. Therefore, the Court will not integrate *Amerifactors* into this analysis.

2    The Court will strike FAH's allegedly common question pertaining to injunctive relief (Doc. No. 1 at PageID 16), as the Court has already found that FAH lacks standing to seek injunctive relief in this matter.

3    In a footnote, Scratch suggests that the Putative Class definition is overbroad because it does not specify that it is limited to persons or entities in the United States. (Doc. No. 7 at PageID 101, fn. 11.) Without any additional argument, the Court finds this contention to be without merit and disregards the putative argument for purposes of this Entry and Order.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2946421
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

SPINE AND SPORTS CHIROPRACTIC, INC., an Ohio corporation, individually
and as the representative of a class of similarly-situated persons, Plaintiff

v.

ZIRMED, INC., and John Does 1–10, Defendants.

Civil Action No. 3:13–CV–00489–TBR.
|
Signed June 30, 2014.

**Attorneys and Law Firms**

Brian J. Wanca, Ryan M. Kelly, Anderson & Wanca, Rolling Meadows, IL, George D. Jonson, Matthew E. Stubbs, Montgomery, Rennie & Jonson, Cincinnati, OH, for Plaintiff.

Catherine Grealis, Tonia Klausner, Wilson Sonsini Goodrich & Rosati, New York, NY, Janet P. Jakubowicz, Natalie D. Montell, Bingham Greenebaum Doll LLP, Louisville, KY, for Defendants.

### MEMORANDUM OPINION AND ORDER

THOMAS B. RUSSELL, Senior District Judge.

**\*1** This matter is before the Court upon Plaintiff Spine and Sports Chiropractic, Inc.'s, Motion for Class Certification and Request for Oral Argument. (Docket No. 34.) Defendant ZirMed, Inc., has responded. (Docket No. 36.) Plaintiff Spine and Sports Chiropractic, Inc., has replied. (Docket No. 40.) This matter is now fully briefed and ripe for adjudication. For the following reasons and consistent with the below opinion, the Court will **GRANT** Plaintiff Spine and Sports Chiropractic, Inc.'s, Motion for Class Certification, with the amendments discussed below. (Docket No. 34.) The Court's amended class definition is the following:

> All persons or entities who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five Transmission Lists; (3) that were successfully sent a copy of the Fax Ad from ZirMed; (4) on November 7th or 8th of 2012.

Proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc., Chiropractic has recently filed a Motion to Intervene. (Docket No. 47.) Defendant ZirMed has responded. (Docket No. 51.) Proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc., has replied. (Docket No. 52.) The Court will **DENY** this motion because, as will be discussed further below, entities that were unsuccessfully sent the ZirMed fax advertisement cannot state a claim as a matter of law. (Docket No. 47.)

### BACKGROUND

Plaintiff Spine and Sports Chiropractic, Inc. (S & S), alleges that on November 8, 2012, it received an advertisement, (Docket No. 1–2), via its facsimile machine for various products and services offered by Defendant ZirMed. (*See* Docket No. 34–3.) S & S alleges ZirMed had not received permission to send this advertisement, and the fax ad did not include an opt-out notice meeting the requirements of the Telephone Consumer Protection Act (TCPA). The TCPA makes it unlawful "to send to a telephone facsimile machine an unsolicited advertisement, unless—" certain requirements are met. 47 U.S.C. 227(b)(1)(C). S & S claims entitlement to the statutory damages provided by the TCPA.[1] Additionally, S & S seeks to represent a class consisting of other recipients of ZirMed's allegedly unlawful advertisement. (Docket No. 34, at 3.)

Regarding the proposed class, S & S alleges that through SimplyCast, a hired fax broadcaster, ZirMed attempted to transmit the fax ad to approximately 1,500 chiropractors via their fax machines in five batches occurring over the course of November 7th and 8th.[2] It appears that 663 fax ads successfully transmitted on November 7th and 8th 2012, while 799 transmissions failed to be sent for various reasons. (Docket No. 36, at 13.) These reasons included busy signals and lack of detection of a carrier. (*Id.*) The proposed class definition seeks to encompass all of these recipients, regardless of whether the transmission was successful. It is undisputed that the same fax advertisement was sent or attempted to be sent to all proposed class members, including S & S. Plaintiff's proposed class definition is:

> **\*2** All persons who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five Transmission Lists; (3) that was successfully or unsuccessfully sent a copy of the Fax Ad from Zirmed; (4) on November 7th or 8th of 2012.

(Docket No. 34, at 24.) ZirMed opposes this proposed class definition for several reasons and argues the Court should deny class certification.

## STANDARD

**I. Standard for Class Certification Under Federal Rule of Civil Procedure 23**

A district court has broad discretion in certifying a class action, but it must exercise that discretion within the framework of Federal Rule of Civil Procedure 23. *Coleman v. General Motors Acceptance Corp.,* 296 F.3d 443, 446 (6th Cir.2002). A court may not certify a class that fails to satisfy all four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Ball v. Union Carbide Corp.,* 385 F.3d 713, 727 (6th Cir.2004). Rule 23(a) provides, in relevant part:

> (a) **Prerequisites.** One or more members of a class may sue ... as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

A court must conduct "a rigorous analysis" to ensure that each of the four prerequisites of Rule 23(a) are satisfied. *Ball,* 385 F.3d at 727. "Such an analysis," the Supreme Court counsels, "will frequently entail overlap with the merits of the plaintiff's

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 151 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

underlying claim ... because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend,* ––– U.S. –––, –––, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (internal quotation marks omitted) (quoting *Wal– Mart Stores, Inc.v. Dukes,* ––– U.S. –––, ––––––, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2013)).

In addition to satisfying Rule 23(a)'s prerequisites, the moving party "must demonstrate that the class fits under one of the three subdivisions of Rule 23(b)." *Coleman,* 296 F.3d at 446; *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998) (en banc). In this case, Plaintiff S & S claims certification is appropriate under Rule 23(b)(3). Rule 23(b)(3) states:

> (b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> ....
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ...

For Rule 23(b)(3), a court must "find that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast,* 131 S.Ct. at 1432 (internal quotation marks omitted). The Supreme Court advises that "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," given that Rule 23(b)(3) "is designed for situations in which class-action treatment is not as clearly called for." *Id.* (internal quotation marks omitted) (quoting *Dukes,* 131 S.Ct. at 2558; *Amchen Prods., Inc. v. Windsor,* 521 U.S. 591, 614–15, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

## DISCUSSION

**\*3** In Defendant ZirMed's response, (Docket No. 36, at 9–10), to Plaintiff's Motion for Class Certification, (Docket No. 34), it asserts two primary objections to certification: (1) the proposed class definition is improper because it includes persons/entities who do not have a TCPA claim as a matter of law; and (2) Plaintiff S & S is not a member of the class it seeks to represent. ZirMed also makes several additional arguments for why the Court should deny the Motion for Class Certification

The Court will address ZirMed's two primary objections first, and then address the remaining arguments by considering each of the applicable requirements of Federal Rule of Civil Procedure 23.

*Defendant ZirMed's First Primary Objection: Plaintiff's Proposed Class Includes Persons/Entities Who Do Not Have a TCPA Claim as a Matter of Law*

"Although not specifically mentioned in [ Rule 23], the definition of the class is an essential prerequisite to maintaining a class action." *Adams v. The Fed. Materials Co.,* 2006 WL 3772065, at \*3 (W.D.Ky. Dec.19, 2006). The class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the class. *See id.* ZirMed argues the Court should deny S & S's motion before even addressing the requirements of Rule 23 "because of multiple problems with S & S's proposed class definition." (Docket No. 36, at 17.) S & S has requested that the Court certify the following class:

> All persons who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five Transmission Lists; (3) that was successfully or unsuccessfully sent a copy of the Fax Ad from Zirmed; (4) on November 7th or 8th of 2012.

(Docket No. 34, at 24.) ZirMed argues this class definition includes persons/entities that cannot state a TCPA claim as a matter of law. Specifically, ZirMed argues that: (1) only fax machine owners, rather than holders/subscribers of the account associated with a fax number, can state a TCPA claim as a matter of law; and (2) the persons/entities who were "unsuccessfully" sent the fax ad cannot state a TCPA claim as a matter of law.

1) ZirMed's First Claim: Fax Phone Number Subscribers Cannot State a TCPA Claim as a Matter of Law

ZirMed argues that only owners of the fax machine, and not subscribers of the relevant fax phone number, have cognizable claims under the TCPA. The Eastern District of Michigan and at least one state court have found that only owners of fax machines have cognizable claims under the TCPA. *See Compressor Eng'g Corp. v. Mfrs. Fin. Corp.,* 292 F.R.D. 433, 448–49 (E.D.Mich.2013); *Machesney v. Lar–Bev of Howell, Inc.,* 292 F.R.D. 412, 425 (E.D.Mich.2013); *APB Assocs., Inc. v. Bronco's Saloon, Inc.,* 297 F.R.D. 302, 2013 WL 1789275, at *16 (E.D.Mich. Apr.26, 2013); *Kennard v. Electronic Data Sys. Corp.,* 1998 WL 34336245 (Tex.Dist.1998).

On the other hand, a substantial majority of courts have found that ownership of a fax machine is not required to state a claim under the TCPA and strongly imply, if not outright hold, that subscribers to fax phone numbers have standing to assert a claim under the TCPA. *See, e.g., Arnold Chapman & Paldo Sign & Display Company v. Wagener Equities, Inc.,* 747 F.3d 489, 491–92 (7th Cir.2014) (stating it would be "arbitrary" to limit relief to owners of fax machines "and there is no suggestion of such a limitation in the statute" and implying subscribers are proper claimants by stating "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it"); *St. Louis Heart Ctr., Inc. v. Vein Ctrs. For Excellence, Inc.,* 2013 WL 6498245, at *5 (E.D.Mo.2013); *Physicians Healthsource v. Stryker Sales,* 1: 12–cv–00729, at 9–10 (W.D.Mich.2013); *Chapman v. Wagener Equities, Inc.,* 2014 WL 540250, at *4 (N.D.Ill.2014); *Bridgeview Health Care Ctr. Ltd. v. Clark,* 2011 WL 4628744, at *3 (N.D.Ill.2011) ("language regarding ownership of the receiving machine is not required by the Act"); *A Aventura Chiropractic Ctr. ., Inc. v. Med Waste Mgmt., LLC,* 2013 WL 3463489, at *5 (S.D.Fla.2012) (finding that defining class membership by ownership is problematic). Under the proposed class definition a member of the class must be a "subscriber to the account associated with the fax number," which may not necessarily be the owner of the fax machine. Therefore, the Court must determine whether subscribers of fax numbers can state a TCPA claim as a matter of law.

a. Statutory Language and Legislative History

**\*4** As for who can assert a claim for junk fax violations, the TCPA states, in relevant part:

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the **recipient** is within the United States ... **to send,** to a telephone facsimile machine, an unsolicited advertisement, unless—

(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

(ii) the sender obtained the number of the telephone facsimile machine through—

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 153 of 199

(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution ... **and**

(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D)

....

(3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(1), (3) (emphasis added). The plain language of this statute gives standing to any "person or entity" that was a "recipient" of an "unsolicited advertisement." There is no indication that this classification is reserved only for fax machine owners.

ZirMed argues that the legislative history requires the finding that only fax machine owners have standing. The Court highlights the legislative history here to provide context for the cases which rely upon it, however, ultimately the Court finds the plain language of the statute is determinative. The legislative history, in relevant part, states:

FACSIMILE ADVERTISING

An office oddity during the mid–1980s, the facsimile machine has become a primary tool for business to relay instantaneously written communications and transactions. In an effort to speed communications and cut overnight delivery costs, millions of offices in the United States currently send more than 30 billion pages of information via facsimile machine each year. However, the proliferation of facsimile machines has been accompanied by explosive growth in unsolicited facsimile advertising, or "junk fax ."

 **\*5** Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.

....

The Committee found that when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter. In the case of fax advertisements, however, the recipient assumes both **the cost associated with the use of the facsimile machine** and, the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised.

In addition to the **costs** associated with fax advertisements, when a facsimile machine is receiving a fax, **it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications.** Only the most sophisticated and expensive facsimile machines can process and print more than one message at a time. Since businesses have begun to express concern about the interference, interruptions and expense that junk fax have placed upon them, states are taking action to eliminate these telemarketing practices. Connecticut and Maryland have enacted laws banning the use of facsimile machines for unsolicited advertising. Similar bills are currently pending in the legislatures of about half the states.

H.R. REP. 102–317, 10, 25 (emphasis added). This Court reads the legislative history as expressing that the TCPA was intended to address the costs—including paper, ink, and time—of receiving these unwanted "junk" faxes. These "costs" would include the tying up of the fax line while processing these faxes. *See generally* 🚩*Compressor,* 292 F.R.D. at 447–48. Accordingly, the Court does not read the legislative history as requiring fax machine ownership in order to state a claim. Instead, the Court reads the legislative history as expressing an intention to broadly combat the costs associated with "junk" faxes, whether those costs are imposed on the fax machine owners or on other types of plaintiffs—such as subscribers to the fax phone numbers.

b. Split of Non–Binding Authority as to Whether Ownership of a Fax Machine is Required to State a Claim Under the TCPA

There is a split of non-binding authority as to whether ownership of a fax machine is required to state a claim under the TCPA. The vast majority of courts find ownership of a fax machine is not required to state a claim under the TCPA and strongly imply, if not outright hold, that subscribers of phone numbers can state a claim under the TCPA. On the other hand, a small minority of courts find that only fax machine owners are proper claimants. Other than arguably the Seventh Circuit, no Court of Appeals, including the Sixth Circuit, has decided this issue. *See* 🚩*Wagener Equities, Inc.,* 747 F.3d at 492 (stating that it would be "arbitrary" to limit relief to owners of fax machines "and there is no suggestion of such a limitation in the statute"). [3] This Court is not bound by any of this authority. However, because the parties relied on many of the cases in their briefing, the Court will discuss the split of authority to present the arguments on either side.

i. Case Law Holding Only Fax Machine Owners Can State a Claim Under the TCPA

**\*6** ZirMed submits to the Court, (Docket No. 36, at 20), that the reasoning in the *Compressor* case, which held that only owners of the fax machine and not holders of the phone numbers have a claim under the TCPA, is persuasive and should be followed here. 🚩*Compressor Eng'g Corp.,* 292 F.R.D. at 448–49. In that case, the Eastern District of Michigan stated:

Defendants have challenged the standing of proposed class members to assert claims and have challenged the proposed class definitions as fundamentally flawed because they do not include a requirement that the class members owned the fax machines that received the fax advertisements at issue.

....

Although there is no Sixth Circuit authority addressing the standing issue, this Court concludes that, based upon the language of the statute and its legislative history, the person or entity that owned the fax machine that received the unsolicited fax advertisement at issue is the person or entity with standing to assert a TCPA claim. Thus, Plaintiffs would have to identify the *persons or corporate entities who owned the fax machines* that received the fax advertisements at issue in order to determine who would be a member of any of the classes.

*Id.* at 447, 450. In coming to this conclusion, the court emphasized the language of the statute makes it unlawful to send an unsolicited fax advertisement "to a telephone facsimile machine" and the legislative history. *Id.* at 448–49.

ii. Case Law Holding Ownership is Not Required to State a Claim Under the TCPA and Fax Machine Phone Number Subscribers Can State a Claim Under the TCPA

Conversely, other cases have found that ownership is not required to state a claim under the TCPA and strongly imply, if not outright hold, that subscribers of fax lines have standing to assert a claim for a TCPA violation. For example, in *St. Louis Heart Center,* the Eastern District of Missouri considered the reasoning in the *Compressor* case and emphasized that the TCPA provides that a "person or entity" may bring an action "based on a violation of this subsection or the regulation prescribed under this subsection." *St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at *5. It found "[t]here is no language in the TCPA indicating that only fax machine owners have a private right of action" and that the courts finding otherwise, such as *Compressor,* should not have turned to the legislative history because the statute is not ambiguous. *Id.* Additionally, the court noted this conclusion comports with common sense because the TCPA was intended to, at the very least, address "the misuse of ink and paper by junk advertisers" and the "*misappropriation of the fax line,* preventing legitimate faxes from being sent or received." *Id.* (emphasis added). [4] The court further noted that "[a] party other than a fax machine owner could be and often is responsible for supplying ink and paper or *paying a telephone company for use of a fax line* and should not be excluded from the putative class." *Id.* (emphasis added). Thus, the court explicitly held that ownership of a fax machine is not required to state a claim and strongly implied, if not outright held, that subscribers of phone numbers could state a claim. Responding to concerns of potential liability to multiple parties for each fax sent, the court noted that the TCPA sets statutory damages at $500 for "each such violation," not per person.

**\*7** A large number of other courts have come to the same conclusion as *St. Louis Heart Center,* explicitly holding that ownership of a fax machine is not required to state a claim under the TCPA and strongly implying, if not outright holding, that subscribers of phone numbers can state a claim under the TCPA. *See, e.g.,* *Wagener Equities, Inc.,* 747 F.3d at 491–92 (stating it would be "arbitrary" to limit relief to owners of fax machines "and there is no suggestion of such a limitation in the statute" and implying subscribers are proper claimants by stating "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it"); *Chapman,* 2014 WL 540250, at *4 (N.D.Ill.2014) (finding the TCPA does not contain language requiring ownership); *Clark,* 2011 WL 4628744, at *3 ("language regarding ownership of the receiving machine is not required by the Act"); *Stryker Sales,* 1:12–cv–00729, at 9–10 (W.D.Mich.2013) (opining that limiting a class definition to fax machine owners does not eliminate the mismatch between the identifiable person and the injured person and that limiting the class definition to subscribers results in a close fit between the identifiable information and at least one injury: interrupted use of the fax line); *Med Waste Mgmt. ., LLC,* 2013 WL 3463489, at * 5 (finding that defining class membership by ownership is problematic). Notably, although not determinative, the Seventh Circuit recently explicitly held that relief is not limited to owners of fax machines and strongly implied, if not outright held, that subscribers can state a claim under the TCPA. *Wagener Equities, Inc.,* 747 F.3d at 491–92 (stating "[w] hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it").

c. Conclusion—Fax Line Subscribers are Proper Claimants

The Court notes this is a developing area of law and one where the Sixth Circuit has yet to definitively speak. However, it is clear that a substantial majority of the courts opining on this issue have found that ownership of the fax machine is not required to state a claim. In fact, it appears the Eastern District of Michigan and a state trial court are the only courts to explicitly hold that ownership is required. Furthermore, many courts, upon holding that ownership of a fax machine is not required to state a claim, have gone on to strongly imply, if not outright hold, that subscribers to phone numbers are proper claimants under the TCPA.

Upon a careful review of the plain language of the statute, the parties' comprehensive briefing, and the above mentioned cases, this Court agrees with the reasoning of the cases finding that ownership of a fax machine is not required to state a TCPA claim. This Court also agrees with the cases that strongly imply, if not outright hold, that subscribers of fax phone numbers are proper claimants under the TCPA. This conclusion comports with the plain language of the statute, which gives standing to a "person or entity" who is a "recipient," with no indication these recipients must also be fax machine owners. A subscriber to the fax phone number would clearly be a "recipient" of a fax upon a successful transmission of that fax, as would an owner of the fax machine. Therefore, this Court holds that both subscribers of phone numbers and owners of fax machines are proper claimants under the TCPA and that TCPA relief is not limited to owners of fax machines. Accordingly, Plaintiff S & S's proposed class is not improper because it encompasses subscribers.

**\*8**  Even if the Court were to consider the legislative history, which is unnecessary given the plain language of the statute, the Court would find it supports this holding because the legislative history expresses that the TCPA was intended to address the costs of "junk" faxes. These "costs" would include the tying up of the fax line while processing these faxes. *See* *Compressor,* 292 F.R.D. at 447–48; *Wagener Equities, Inc.,* 747 F.3d at 491–92 (stating "[w] hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it"); *St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at \*5 (E.D.Mo.2013) (stating "[a] party other than a fax machine owner could be, and often is, responsible for ... paying a telephone company for use of a fax line and should not be excluded from the putative class"). The tying up of the fax line is a cost incurred by the fax phone number subscriber, irrespective of whether they own the fax machine.

For the above reasons, this Court holds that Plaintiff S & S's proposed class is not improper because it includes subscribers to the fax phone numbers. Ownership of a fax machine is not required to state a TCPA claim. Fax phone number subscribers, like owners of the fax machines, are proper claimants under the TCPA.

### 2) ZirMed's Second Claim: "Intended" Recipients Who Were "Unsuccessfully" Sent a Fax Cannot State a Claim as a Matter of Law

ZirMed also argues that the class definition includes persons/entities that cannot state a TCPA claim as a matter of law because it includes those who were "unsuccessfully" sent the fax ad. There is a split of authority as to whether "intended" recipients who were "unsuccessfully" sent a fax can state a claim as a matter of law. Some courts find that such "intended" recipients cannot state a claim as a matter of law. *See, e.g., Chapman,* 2014 WL 540250, at \* 8–9 (finding that "to send" under the TCPA means that the fax was released from the sending machine and the receiving device indicated receipt, but noting that circumstantial evidence that the fax was successfully transmitted is sufficient—direct proof of actual receipt is not required); *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris,* 2013 U.S. Dist. LEXIS 155912, at \* 44, 2013 WL 5972173 (S.D.Fla. Oct. 22, 2013). ZirMed argues the reasoning in these cases is persuasive and should be followed by this Court.

Other courts find that "intended" recipients who were "unsuccessfully" sent a fax can state a claim as a matter of law.[5] *See, e.g., St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at \*4 (acknowledging that "success rate" of sending the fax was only 80%, but nonetheless finding that the failed 20% could be included in the class); *A Fast Sign Co. v. Am. Home Servs., Inc. .,* 291 Ga. 844, 846–47, 734 S.E.2d 31 (Ga.2012); *Critchfield Physical Therapy v. Taranto Group, Inc.,* 293 Kan. 285, 298–99, 263 P.3d 767 (Kan.2011). S & S argues the reasoning of these cases is persuasive and should be followed by this Court.[6] The Court notes that it is not bound by any of the authority cited by the parties and that no Circuit, including the Sixth Circuit, has decided this issue.

### a. Case Law Holding "Intended" Recipients of "Unsuccessful" Transmissions Have Standing

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 157 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

**\*9**  In *A Fast Sign Company, Inc.,* the Georgia Supreme Court, in a short opinion mainly relying on authority from Kansas state courts, found that a sender was "liable for the unsolicited advertisements it attempts to send to fax machines, whether or not the transmission is completed or received by the targeted recipient." *A Fast Sign Co.,* 291 Ga. at 847, 734 S.E.2d 31. It based its decision on the "construction and interpretation of the language" of the TCPA. *Id.* In *Critchfield,* relied upon by the Georgia Supreme Court, the Kansas Supreme Court found that the TCPA did not require a successfully completed fax transmission, but only an attempt to complete a fax transmission. *Critchfield,* 293 Kan. at 299, 263 P.3d 767. In so holding, the court emphasized that the TCPA prohibits using electronic devices "to send" unsolicited advertisements, while creating no requirement that a transmission be received. *Id.*

b. Case Law Holding "Intended" Recipients of "Unsuccessful" Transmissions Do Not Have Standing

Courts finding intended recipients of unsuccessful transmissions are not proper claimants under the TCPA have also emphasized the plain language of the statute. For example, in *Sarris,* the Southern District of Florida emphasized the presence of "recipient" in the statute and stated:

> In conjunction with its prohibition on sending an unsolicited fax advertisement, the TCPA also contemplates that the fax advertisement have a "recipient." In the prohibition provision alone, the statute states that it is unlawful to send a fax advertisement "if the *recipient* is in the United States" and goes on to mention the "recipient" five more times. *See* 47 U.S.C. § 227(b)(1)(C) (emphasis added). In so doing, Congress recognized that only a recipient could suffer the injury the TCPA was intended to address.

> While the TCPA provides that a person who sends a fax advertisement may be liable, nowhere in the statute does Congress express an intent to circumvent the requirement that a plaintiff have Article III case-or-controversy standing to bring a claim, which requires that the plaintiff demonstrate "a distinct and palpable injury to himself." *See* *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Congress can enact a statute (such as the TCPA) that puts into place a "bounty"— a reward—for a plaintiff who assists in enforcing federal laws. *See* *Crabill v. Trans Union, LLC,* 259 F.3d 662, 665–66 (7th Cir.2001). However, there still must be an injury for the plaintiff to recover under the statute. *See id.*

> In *US Fax Law Center, Inc. v. iHire, Inc.,* the court addressed whether a plaintiff who never received the "junk faxes" at issue had standing to bring TCPA claims against the defendants who allegedly sent the faxes. 362 F.Supp.2d 1248, 1252–53 (D.Colo.2005). There, the plaintiff was an assignee of the TCPA claims of certain entities contending that the defendants had sent "junk faxes." *Id.* at 1250. Examining the question of Article III case-or-controversy standing *sua sponte,* the court concluded that the plaintiff did not suffer an injury in fact sufficient to give it standing to bring the TCPA claims; in fact, plaintiff "suffered no injury at all." *Id.* at 1253; *cf.* *Doe v. Nat'l Bd. of Med. Exam'rs,* 199 F.3d 146, 153 (3d Cir.1999) (noting that a violation of a statute by itself does not equate to injury and that "[t]he proper analysis on standing focuses on whether the plaintiff suffered an actual injury, not on whether a statute was violated"). Thus, pursuant to the TCPA, Congress conferred a private remedy upon the ***injured recipients*** of a fax advertisement, not upon assignees of the alleged recipients.

> **\*10**  ...

> There is no evidence that this Plaintiff was injured by receiving a fax advertisement from Defendant or that this Plaintiff's privacy was ever invaded by Defendant, as the TCPA contemplates.

*Sarris,* 2013 WL 5972173, at \*12–13. Similarly, in a Northern District of Illinois case, the court emphasized "to send" under the TCPA "means not only that a fax was released from the sending machine, but that the receiving device indicated receipt." *Chapman,* 2014 WL 540250, at \*8. Accordingly, that court found the proposed class definition "appropriately excludes unsuccessful transmissions," limiting the class to those successfully sent transmissions. *Id.* at \* 8–9.

c. This Court's Conclusion—"Intended" Recipients of Unsuccessful Transmissions Are Not Proper Claimants
The Court reiterates that the above authority is not binding upon it. The applicable language of the TCPA states that:

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the **recipient** is within the United States ... **to send,** to a telephone facsimile machine, an unsolicited advertisement ...

47 U.S.C. § 227(c) (emphasis added). The Court finds that the inclusion of "to send" negates any argument that unsuccessful transmissions give an intended recipient standing, because inherent in "to send" is that the transmission was *successful*. Additionally, the inclusion of "recipient" requires that a transmission was successfulotherwise there is no "recipient." When an unsuccessful transmission occurs no one "receives" anything.[7] Accordingly, the Court finds that "intended" recipients of "unsuccessful" transmissions are unable to state a claim as a matter of law and, therefore, are not appropriate members of the proposed class.

While the Court reaches this result by relying on the plain language of the statute, the legislative history is not inconsistent with this result because, as was noted above, the legislative history focuses on the *costs* associated with these unsolicited fax advertisements. Without a *successful* transmission there are no costs imposed, such as tying up of the fax phone number, wasting of ink and paper, or even time spent reading the advertisement, because the transmission was *unsuccessful*.[8]

Accordingly, this Court agrees with ZirMed that S & S's class definition is overbroad in that it includes persons who have no claim under the TCPA. However, this error is not fatal and can be remedied by amending the class definition to remove "unsuccessfully" sent transmissions, leaving only "successfully" sent transmissions.[9]

The Court notes that proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc., Chiropractic has recently filed a Motion to Intervene, (Docket No. 47), alleging the same claim Plaintiff S & S makes against Defendant ZirMed. The Court will **DENY** this motion because, as was discussed above, entities that were unsuccessfully sent the ZirMed fax advertisement cannot state a claim as a matter of law. Accordingly, Shelby Chiropractic is not a proper plaintiff and cannot intervene.[10]

*Defendant ZirMed's Second Primary Objection: Plaintiff S & S is Not a Proper Member of the Class it Seeks to Represent*
 **\*11** Defendant ZirMed argues that Plaintiff S & S is not a member of the class it seeks to represent. (Docket No. 36, at 9.) Specifically, ZirMed argues S & S has not demonstrated it was a subscriber to the account associated with a fax number "to which ZirMed either sent or attempted to send the ZirMed Fax on November 7 or 8 2012." (Docket No. 36, at 10.) The telephone records for the fax number used by S & S[11] reflect that an entity named "Spine RX Management Co." is the subscriber to that number.[12]

In its reply brief, S & S maintains that it is a proper member of the class. S & S states that it holds the referenced account with XO Communications and is the only entity or person that pays the bills associated with this account. (*See* Docket No. 40, at 10.) As for the reason "Spine RX Management Co." appeared on the November 2012 phone bill, S & S alleges that it formerly went by the name Spine RX Management and that some of the bills never got changed.[13] *Id.* S & S also argues its responses to interrogatories establish it is a proper member of the class:

*Interrogatory No. 12*

Identify all facsimile telephone numbers used by or assigned to You. [referring to Spine & Sports Chiropractic]

RESPONSE: (614) 573–7750

*Interrogatory No. 13:*

Identify any other Person with which You have shared facsimile number, and identify the facsimile number and the dates that the Person(s) shared the facsimile telephone number with You. **RESPONSE: Spine & Sports Chiropractic does not share a facsimile number with any other person. Instead, it holds an account with XO Communications from which it is assigned the number (614) 573–7750. No other person or entity shares this account with Spine & Sports Chiropractic.**

*Interrogatory No. 14*

State whether You were the owner of the facsimile number (614) 573–7750 during the time period to which these interrogatories refer and further identify the telephone service provider, under what name the number is listed, and any Person who has paid for the number to remain active.

**RESPONSE: Yes. XO Communications. Spine & Sports Chiropractic is the holder of the account with XO Communications and is the only entity or person that pays the bills associated with this account.**

(Docket No. 40–1, at 5–6.)

In ZirMed's sur-reply, it argues the interrogatory responses are "self-serving" and the assertion that Spine RX Management Co. changed its name to S & S is "contradicted by other evidence." (Docket No. 43–1, at 7.) Specifically, ZirMed points out that Kevin Kemp testified that "Spine RX was established at the same time that Spine & Sports was." (Docket No. 37–8, at 16.) Kempt stated that:

A: Spine RX was established at the same time that Spine & Sports was ... It was a management company that was managing the practice because I had several physicians and that all—back in—like I said back in '94 and '95.

**\*12** Q: And is that entity still in existence or—

A: I don't believe it is. Things get a little hazy during a divorce and there was a divorce five years ago, and so, you know, like I have to transfer everything and sometimes honestly the legal—the legal naming of things and stuff like that kind of like, okay, this is what we're doing, this is what we're doing, and the judge is standing in front of you, you own this, you own that, da, da, da, da, and you hire an attorney to handle all that stuff for you and I'm not the expert, so ...

Q: Okay. What was—what was the relationship between Spine RX Management and Spine and Sports?

A: You know, Spine RX was a management company that managed two different locations and a group of doctors, and it rented space to the chiropractic corporation, it rented employees, things like that.

(Docket No. 37–8, at 16–17.) Subsequently, Kemp further discussed Spine RX Management Company:

Q: ... Now, you mentioned Spine RX Management Company earlier and I believe you testified that it's no longer in existence?
A: We did a name change.

Q: Name change?

A: To Spine & Sports.

Q: Okay.

A: Yes.

Q: Do you recall when the name was changed?

Case 1:26-cv-00659-KM     Document 13-1     Filed 05/20/26     Page 160 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

A: I don't.

Q: Now I believe earlier you testified that Spine RX Management and Spine & Sports were both in existence at the same time; is that correct?

A: Yes.

Q: And so did Spine RX Management merge into Spine & Sports or how did that work?

A: Again, I think a little—probably a little more legalese then I'm able to tell you.

Q: So—

A: Back in the day, Spine RX Management Company paid the bills.

Q: Okay.

A: And eventually—and it became the medical corporation later down the line where the actual services were performed as well. Now, what actually happens in—at the Secretary of State's office, I'm not really exactly sure. I know they have to file papers and do all that, but—

Q: Okay. Now, the bill on the first page is—at least it's dated due January 15th, 2013?

A: Uh-huh.

Q: So this —— the name change would have occurred in the past year?

A: It didn't. I think probably some of the bills just never got changed because you're—I mean, when you—when you have a corporation like that, you know, listing out like each individual human being who has to know the name change and the phone bill still comes in and it probably just never got changed.

(Docket No. 37–8, at 52–53.)

"A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."

⚑ *Dukes,* 131 S.Ct. at 2550 (citations omitted). S & S has proposed a class of "subscriber[s] to the account associated with a fax number ... that [were] successfully or unsuccessfully sent a copy of the Fax Ad from Zirmed."

Based upon the responses to the interrogatories, the deposition testimony of Kevin Kemp, the parties' briefing, and the discussion at the hearing, the Court finds that S & S is a proper member of the class because it is a "subscriber to the account associated with a fax number" to which a fax from ZirMed was successfully sent. Kemp testified he was the "sole owner" and "President" of S & S. (Docket No. 37–8, at 14–5.) He also testified that he paid any bills, which would include the relevant phone bill. (*Id.* at 18.) It appears that when Kemp's chiropractic practice was initially set up, it was divided into multiple corporations. One of the corporations was set up to own the property of the practice and the other was set up to employ the persons associated with the practice and collect the revenue. At some point before November 2012, Kemp got rid of Spine RX Management Company and the practice strictly operated under the name of S & S, but Kemp neglected to change the name on the phone bill. Notwithstanding this oversight, Kemp continued to pay that phone bill on behalf of S & S, despite the listing of the then defunct Spine RX Management Company on that bill. Accordingly, the Court finds that S & S is a proper member of the class as the "subscriber to the account associated with a fax number" to which a fax from ZirMed was successfully sent.

*Defendant ZirMed's Remaining Arguments and the* ⚑*Rule 23 Requirements*

**\*13** The Court will address Defendant ZirMed's remaining arguments opposing class certification by considering each of the requirements of Federal Rule of Civil Procedure 23. The Court reiterates that in addition to satisfying Rule 23(a)'s prerequisites, the moving party "must demonstrate that the class fits under one of the three subdivisions of Rule 23(b)." *Coleman,* 296 F.3d at 446; *see also Ball,* 385 F.3d at 727; *Sprague,* 133 F.3d at 397. In this case, Plaintiff S & S claims certification is appropriate under 23(b)(3), which imposes two additional requirements of predominance and superiority

I. FRCP 23(a)(1)—Numerosity

A class may not be certified unless it is so large that joinder of all class members would be "impracticable." FED.R.CIV.P. 23(a)(1). "There is no strict numerical test for determining impracticability of joinder." *In re American Med. Sys. Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). "However, sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of Amercia Mfg., Inc.,* 370 F.3d 565, 570 (6th Cir.2004) (internal citations omitted).

It is undisputed that the proposed class contains hundreds of persons/entities to whom ZirMed sent advertisements. After accounting for the 799 persons/entities that, as discussed above, are not proper members of the class because they were "unsuccessfully" sent a fax, 663 members remain in the amended class definition. Accordingly, the numerosity requirement of Rule 23(a) is met.

I. FRCP 23(a)(2)—Commonality

The second requirement for class certification is that "there are questions of law or fact common to the class." FED.R.CIV.P. 23(a)(2). "Although Rule 23(a)(2) speaks of 'questions' in the plural, ... there need only be one question common to the class." *Sprague,* 133 F.3d at 397. "It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Id.* What the Court must look for "is a common issue the resolution of which will advance the litigation." *Id.* "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury." *Glazer,* 722 F.3d at 852.

Other courts have found the commonality requirement satisfied when a class of recipients of a "fax blast" of advertisements and TCPA violations are alleged. *See, e.g., Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.,* 279 F.R.D. 442, 444–45 (N.D.Ohio 2012). This Court finds the commonality requirement is met in this case. All class members were sent the same fax and make the same claim: violation of the TCPA based on the receipt of an unlawful advertisement. As a result, the Court's resolution of whether a statutory violation of the TCPA occurred upon receipt of this advertisement, which would include an analysis of whether the opt-out language on the fax ad complies with the requirements of the TCPA, will resolve the claims of each member of the class. The damages issue is also common to the entire class because each class member is only seeking an award of $500 in statutory damages.[14] The Court also notes, as will be discussed further in the predominance analysis, the established business relationship and consent defense issues can be resolved on a class-wide basis.

III. FRCP 23(a)(3)—Typicality

**\*14** Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(2). A court must determine "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 162 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

conduct." *Sprague,* 133 F.3d at 399 (citing *Am. Med. Sys.,* 75 F.3d at 1082). "A claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' " *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 561 (6th Cir.2007) (quoting *Am. Med. Sys.,* 75 F.3d at 1082). "[F]or the district court to conclude that the typicality requirement is satisfied, 'a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law.' " *Id.* On the other hand, a claim, if proven, is not typical if it would only prove the named plaintiff's claim. *See Sprague,* 133 F.3d at 399.

Other courts have found the typicality requirement satisfied when a proposed class of recipients of a "fax blast" of advertisements and TCPA violations are alleged. *See, e.g., Beachwood Hair Clinic, Inc.,* 279 F.R.D. at 445. Plaintiff S & S's claim that ZirMed sent a fax in violation of the TCPA arises from the same allegedly prohibited practice that gives rise to the claims of other class members, as it is undisputed the same fax advertisement was sent to all class members. Additionally, Plaintiff is seeking the same damages as all other class members. Accordingly, the typicality requirement is satisfied.

IV. FRCP 23(a)(4)—Adequacy

The fourth requirement for class certification is that "the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.P. 23(a)(4). "There are two criteria for determining whether the representation of the class will be adequate: (1) the representative must have common interests with unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. General Motors Corp.,* 532 F.2d 511, 524–25 (6th Cir.1976); *see also Am. Med. Sys.,* 75 F.3d at 1083. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between the named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

a. Adequacy of the Representative

Plaintiff S & S was one of the many chiropractors targeted by ZirMed in its facsimile advertising campaign. There is no apparent conflict of interest between S & S and the class it seeks to represent. S & S is entitled to the same relief as all of the other class members, apart from the possibility of an incentive award. There is no indication S & S will not vigorously prosecute the interests of the class, despite ZirMed's contentions otherwise. Accordingly, S & S's interests are aligned with the other class members, and it is an adequate representative of the class.

b. Adequacy of Counsel

**\*15** Federal Rule of Civil Procedure 23(g) delineates the considerations a court must and may consider when appointing class counsel. Rule 23(g)(1)(A) states that a court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 163 of 199

A court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class ..." 🚩FED.R.CIV.P. 23(g)(1)(B).

There does not appear to be a dispute as to the adequacy of counsel to represent the interests of the class. Both Anderson & Wanca and Montgomery, Rennie & Jonson have handled TCPA claims for years and have been designated as class counsel in TCPA matters. The Court has reviewed their credentials and experience, (Docket No. 34, Exhibits J and K), and finds it is adequate. From the briefing, it is apparent they have sufficient knowledge of the applicable law. Finally, it appears they are adequately committed to representing the class and will devote sufficient resources toward that representation. Accordingly, the adequacy requirement is met.

V. 🚩FRCP 23(b)(3)—Predominance Requirement

🚩Federal Rule of Civil Procedure 23(b)(3) requires that the court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members ..." 🚩FED.R.CIV.P. 23(b)(3). The 🚩Rule 23(b)(3) predominance requirement parallels the 🚩Rule 23(a)(2) commonality requirement in "that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." 🚩*Am. Med. Sys.,* 75 F.3d at 1084. "To satisfy the predominance requirement in 🚩Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof ... predominate over those issues that are subject only to individualized proof." 🚩*Beattie,* 511 F.3d at 564.

The court must determine if the questions common to the class are "at the heart of the litigation." 🚩*Powers v. Hamilton County Public Defender Comm'n,* 501 F.3d 592, 619 (6th Cir.2007). "[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." 🚩*Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988). "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." 🚩*In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 307 (E.D.Mich.2001). "Common questions need only predominate: they need not be dispositive of the litigation." *Id* .

**\*16** ZirMed argues that S & S has only alleged one common issue, whether the opt-out language on the ZirMed fax substantially complies with the FCC regulations, while ignoring three substantive issues that predominate over the single opt-out issue.[15] (Docket No. 36, at 28.) These three issues are: (1) whether each class member had an "established business relationship" with ZirMed; (2) whether the ZirMed Fax was "unsolicited" with respect to each class member; and (3) who is a member of the class. *Id.* The Court will address each of these issues to determine whether they predominate over common issues.

### 1. Established Business Relationship Defense

With respect to (1), the established business relationship defense, ZirMed alleges it maintains a database of prospective customer information, including fax numbers, which it has received through a variety of sources. ZirMed states a "preliminary review" reflects that at least 35 faxes were successfully sent to "individuals or entities for which ZirMed already had contact information —from sources other than Eleadlists—at the time of ZirMed's trial fax campaign." (Docket No. 36, at 34.) Accordingly, ZirMed argues that individualized proof will be required to determine whether each fax was sent to an entity with which ZirMed had an existing business relationship.

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 164 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

In response to these arguments, S & S contends that the established business relationship defense is: (1) not even available because of the absence of a compliant opt-out notice; [16] and (2) in any event, is an affirmative defenses for which ZirMed bears the burden of proof and has not produced any evidence whatsoever. (Docket No. 40, at 20.) Specifically, S & S points out that, even assuming an established business relationship existed, for an unsolicited advertisement to be lawful under the TCPA it must contain a compliant opt-out notice:

(b) Restrictions on use of automated telephone equipment

(1) It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

.....

(C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, **unless**—

(i) the unsolicited advertisement is from a sender with an **established business relationship** with the recipient;

(ii) the sender obtained the number of the telephone facsimile machine through-

(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before such date of enactment; **and**

**\*17  (iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),**

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E)

47 U.S.C. § 227(b) (emphasis added). Accordingly, even assuming an established business relationship existed between ZirMed and some potential class members, the existence of that relationship is irrelevant if the opt-out notice does not meet the requirements under 47 U.S.C. 227(b)(2)(D). This is because sending an unsolicited fax advertisement to a recipient with whom an established business relationship exists is still a violation of the TCPA if the opt-out notice is not compliant.
The opt-out notice on the ZirMed fax advertisements states: "To unsubscribe from ZirMed faxes, please visit info.zirmed.com/ optout." (Docket No. 34–3.) 47 U.S.C. 227(b)(2)(D) delineates the requirements for a compliant opt-out notice:

(2) Regulations; exemptions and other provisions The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

.....

(D) shall provide that **a notice contained in an unsolicited advertisement complies** with the requirements under this subparagraph only if—

Case 1:26-cv-00659-KM     Document 13-1     Filed 05/20/26     Page 165 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

(i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

(ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii) the notice sets forth the requirements for a request under subparagraph (E);

(iv) the notice includes—

(I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

(II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

(v) the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual to make such a request at any time or any day of the week; **and**

**\*18**  (vi) the notice complies with the requirements of subsection (d) of this section.

47 U.S.C. 227(b)(2)(D) (emphasis added). The opt-out notice on the ZirMed fax sent in this case does not meet these requirements.

In violation of paragraph (ii), the notice does not state that the recipient may make a request to stop future unsolicited advertisements and that "failure to comply, within the shortest reasonable time ... with such a request is unlawful." In violation of paragraph (iii), it does not set forth the requirements for a request to stop future unsolicited advertisements under 47 U.S.C. 227(b)(2)(E). In violation of paragraph (iv), it arguably does not include "a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender." Additionally, it appears the notice may violate paragraph (v) because it is not clear the telephone and facsimile machine numbers "permit an individual to make such a request at any time on any day of the week." [17]  The use of the word "and" in paragraph (v) connotes that each paragraph, (i)-(vi), must be satisfied for a notice to be compliant. It is clear that, at the very least, the opt-out notice on the ZirMed fax fails to satisfy several of these paragraphs.

ZirMed's passing citation to Landsman & Funk, P.C. v. Lorman Bus. Ctr., Inc., 2009 WL 602019 (W.D.Wis. Mar.9, 2009), for the notion that only "substantial compliance" is required is not applicable. In that case, the opt-out notice stated that "[f]ailure to comply within a reasonable time with a request to opt-out would be unlawful," which the court found satisfied paragraph (ii). Id. at \*2, \*5–6. The opt-out notice in this case does not state that ZirMed's failure to comply with an opt-out request would be unlawful. Furthermore, unlike the opt-out notice in Landsman, it does not convey what an opt-out notice must state in order to comply with the TCPA. See Bais Yaakov of Spring Valley v. Alloy, Inc., 936 F.Supp.2d 272, 288 (S.D.N.Y.2013) ("Unlike Landsman, where defendant conveyed the essence of the required information, Defendants here are alleged not to have addressed the prescribed issues at all.").

Because the opt-out notice is not compliant, whether an established business relationship existed between some potential class members and ZirMed is irrelevant. Accordingly, it is unnecessary to inquire into whether an established business relationship

existed for each proposed class member and it cannot be found that this issue "predominates" over the common issues so as to preclude granting of class certification. [18]

### 2. Permission/Consent Defense

Regarding the permission/consent defense, ZirMed argues that it purchased the chiropractor list from Eleadlists only after it "sought assurances ... that the Chiropractor List only included contacts that had provided consent." [19] (Docket No. 36, at 29–30.) Essentially, ZirMed argues that consent presents an issue that is not subject to generalized proof and, therefore, class certification is not appropriate. As with the established business relationship defense, S & S argues this defense is: (1) not available because of the absence of a compliant opt-out notice; and (2) in any event, is an affirmative defense for which ZirMed bears the burden of proof and has not produced any evidence whatsoever. (Docket No. 40, at 20.)

**\*19** Federal Regulations require a compliant opt-out notice on facsimile advertisements that are sent with the recipient's permission:

> (iv) A facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section.

47 C.F.R. § 64.1200(a)(4)(iv); *see also* 71 FR 25972, 23972 ("entities that send facsimile advertisements to consumers from whom they obtained permission must include on the advertisements their opt-out notice and contact information to allow consumers to stop unwanted faxes in the future"); *Landsman,* 2009 WL 602019, at * 2, \*4–7 (considering the compliance of an opt-out notice, despite finding that permission for future advertisements existed). [20] The requirements for a compliant opt-out notice in 47 C.F.R. 64.1200(a)(4)(iii) contain essentially the same requirements as 47 U.S.C. 227(b)(2)(D), which the Court has already found the ZirMed fax did not meet in the analysis of the established business relationship defense.

Notwithstanding these regulations, ZirMed argues, (Docket No. 36, at 33 n. 15), that the FCC had no authority to expand TCPA liability, and the FCC recently "sought comment to clarify this ambiguity and confusion it has caused courts." (*See* Docket Nos. 37–14; 37–15 .) The FCC seeking comment on its regulations requiring "fax advertisements sent to a consumer who has provided prior express invitation or permission to include an opt-out notice" is not legally significant. (Docket No. 37–14.) Additionally, Defendant's passing argument that the FCC was without authority to expand TCPA liability was not supported by any citations and, in any event, the Court disagrees that the FCC is without such authority.

Other courts, including two Courts of Appeals, have found that even advertisements sent with consent/permission must include an opt-out notice that complies with the applicable requirements. [21] *See, e.g., Nack v. Walburg,* 715 F.3d 680, 685 (8th Cir.2013); *Ira Holtzman, C.P.A. & Assocs. V. Turza,* 728 F.3d 682, 684 (7th Cir.2013); *Bais Yaakov of Spring Valley v. Alloy, Inc.,* 936 F.Supp.2d 272, 286–87 (S.D.N.Y.2013); *see also Hinman v. M and M Rental Center, Inc.,* 545 F.Supp.2d 802, 807 (N.D.Ill.2008) (stating "[t]he possibility that some of the individuals on the list may have separately consented to the transmissions at issue is an insufficient basis for denying certification"). The Court agrees with S & S that ZirMed's arguments for the alternative, that an opt-out notice isn't required, relies on cases decided before the FCC issued its regulatory guidance in 47 C.F.R. § 64.1200 and 71 FR 25967, or do not appropriately acknowledge the applicability of these regulations.

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 167 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

Accordingly, whether potential class members provided permission/consent for advertisements from ZirMed is irrelevant because the fax ad that was sent did not contain a compliant opt-out notice. [22] As a result, it is irrelevant whether permission/consent existed for each proposed class member and it cannot be found that this issue "predominates" over the common issues, which would preclude class certification.

3. Who is a Member of the Class

**\*20**  Defendant ZirMed's final argument for why predominance doesn't exist is that individual fact finding will be required to identify the subscribers of the relevant fax numbers to which the fax advertisement was sent on November 7th and 8th of 2012.

*See generally* *Compressor,* 292 F.R.D. at 451 (finding that even if the class was modified to include only fax machine owners there would need to be individualized determinations in order to ascertain members of the class because of the evidentiary problem of matching up the phone numbers with fax machine ownership, precluding class certification). The crux of ZirMed's argument is that it would be difficult to match up the actual person/entity that is the subscriber for each phone number from the chiropractor list to which faxes were sent because the list identifies chiropractors associated with the fax numbers—not necessarily the *subscribers* of those fax numbers. (Docket No. 36, at 25.) Essentially, ZirMed argues the names on the successful transmission lists do not necessarily correspond to the subscribers of those numbers. This argument by ZirMed challenges both whether common issues do "predominate" and whether the proposed class is ascertainable.

Relatedly, other courts have found that determining owners of fax machines corresponding with fax machine numbers which advertisements were sent would be feasible through the claims administration process. *See, e.g.,* *City Select Auto Sales, Inc. v. David Randall Associates, Inc.,* 296 F.R.D. 299, 313–14 (D.N.J.2013) (stating "[t]his Court will follow the Northern District of Illinois and hold that the class is ascertainable based on the list of fax numbers who were successfully sent David Randall's advertisement in 2006"); *G.M. Sign, Inc. v. Finish Thompson, Inc.,* 2009 WL 2581324, at \*8 (N.D.Ill. Aug.20, 2009) (finding plaintiff can use the fax numbers on the transmission logs to determine the identity and contact information of class members). Similarly, this Court finds that determining the subscribers of the fax machine numbers to whom the fax advertisements were sent would be feasible through the claims administration process. While ZirMed is apparently correct in arguing that some persons/entities on the chiropractor list are not the subscribers to the corresponding fax machine phone number on that list, determining subscribers would only entail matching the phone number account bill with the numbers to whom the fax advertisements were successfully sent or obtaining an affidavit stating a claimant was the subscriber during November 2012. Furthermore, the list is a good starting point for beginning this inquiry and it is likely that a substantial majority of the persons/entities listed were, in fact, the subscribers to the fax machine phone numbers. Indeed, the difficulty of ascertaining this class is less than in other class actions. Accordingly, while there will be some limited individualized inquiry necessary for this issue, the Court finds that common issues still "predominate," as is required by Rule 23(b)(3).

VI. FRCP 23(b)(3)—Superiority Requirement

**\*21**  Federal Rule of Civil Procedure 23(b)(3) requires that the court find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). S & S argues the TCPA lends itself to class actions because damage awards are only for $500 and it does not provide for attorney fees, making individual actions rare because the cost of litigation would dwarf any potential recovery. *See* *Mims v. Arrow Fin. Servs., LLC,* —— U.S. ——, ——, 132 S.Ct. 740, 753, 181 L.Ed.2d 881 (2012) (finding virtually all TCPA claims in federal courts are class actions). "Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *Glazer,* 722 F.3d at 861. S & S also points out that persons/entities who receive facsimile advertisements are, in all likelihood, completely unaware of their potential claims. Consequently, in the absence of a class action, these potential claimants are unlikely to bring individual claims. (*See* Docket No. 34–1, at 20.)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 168 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

ZirMed argues, (Docket No. 36, at 28–29), that "Congress specified individual actions as the preferred means of addressing alleged TCPA violations ... preferably in small claims court." For this proposition, ZirMed relies on the Congressional Record and statements by Senator Hollings that "small claims court or a similar court would allow the consumer to appear before the court without an attorney." 137 Cong. Rec. S16, 205–06 (Statement of Sen. Hollings). Some courts have relied on this legislative history in concluding that a class action would not be superior to individual actions for TCPA claims. *See, e.g.,* ⚑*Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 404 (E.D.Pa.1995).

In S & S's reply, it asserts that ZirMed's argument "demonstrates a near complete lack of understanding of small claims court," (Docket No. 40, at 29), and argues that corporations cannot represent themselves in court, as this generally constitutes the unauthorized practice of law. S & S also reiterates that not a single recipient has brought an individual action against ZirMed and that it is unrealistic to suggest any individual recipient will ever do so. In ZirMed's sur-reply, (Docket 43–1, at 15–16), it established that, notwithstanding S & S's arguments, corporations are permitted to represent themselves in small claims courts in Ohio and Kentucky.

After reviewing the applicable precedent and reviewing the parties' extensive briefing on this issue, the Court believes that the class action is a superior method for adjudicating the claims. While the legislative history arguably indicates a contrary Congressional intent, that history is not controlling given the plain language of the statute does not preclude class actions. Many courts have found that class actions are superior to individual actions in the context of the TCPA and permitted class certification. *See, e.g.,* ⚑*Beachwood Hair Clinic, Inc.,* 279 F.R.D. at 446 (finding class action is superior); ⚑*G.M. Sign, Inc.,* 2009 WL 2581324, at *7 (same). Furthermore, the Court believes it is clear that individual actions are unlikely to ever be filed in these matters, supporting the finding that the class action is a superior method for adjudicating the claims. Accordingly, this Court finds that a class action is a superior method for adjudicating the claims.

*Class Certification*

 **\*22**  Having found that all of the requirements of ⚑Federal Rule of Civil Procedure 23 are met, the Court will **GRANT** Plaintiff's Motion for Class Certification. (Docket No. 34.) However, consistent with the Court's conclusions above, the Court will make some amendments to the class definition. The Court's amended class definition is:

> All persons or entities who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five Transmission Lists; (3) were successfully sent a copy of the Fax Ad from ZirMed; (4) on November 7th or 8th of 2012.

The amended class definition appropriately accounts for the Court's holding that subscribers to fax account numbers who were *unsuccessfully* sent a fax do not have a claim as a matter of law by removing the "unsuccessfully" language and leaving only "successfully." Additionally, the Court added the language "or entities" after "persons" because many of the recipients are entities rather than persons. *See* ⚑*City Select Auto Sales, Inc.,* 296 F.R.D. at 321 ("The Court will also add 'or entities' to the first clause to make clear that the class includes both 'persons' and 'entities.' This addition follows the TCPA's language, which provides a private right of action to 'a person or entity'").

CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED that Plaintiff's Motion for Class Certification, (Docket No. 34), is **GRANTED,** with the amendments discussed above. Proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc ., Chiropractic's Motion to Intervene, (Docket No. 47), is **DENIED.**

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 2946421

---

**Footnotes**

| | |
|---|---|
| 1 | 47 U.S.C. 227(b)(3) provides that "a person or entity may" bring "an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater." Additionally, if the Court finds the defendant "willfully or knowingly violated this subsection or regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available." |
| 2 | The FCC has concluded that "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *Compressor Eng'g Corp. v. Mfrs. Fin. Corp.,* 292 F.R.D. 433, 436 (E.D.Mich.2013). "Thus, a defendant 'cannot escape liability simply by hiring an independent contractor to transmit the unsolicited facsimiles on their behalf.' " *Id.* (citation omitted). |
| 3 | The Court notes that the parties submitted supplemental briefing, (Docket Nos. 49, 50), on the *Wagener Equities* case and disagree on whether it addressed if "subscribers" are proper claimants under the TCPA. While the Seventh Circuit did not explicitly address this issue, this Court reads the decision as strongly implying subscribers can state a claim under the TCPA because of its explicit holding finding no ownership limitation in the TCPA. *See Wagener Equities, Inc.,* 747 F.3d at 491–92. Notably, that decision stated that "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it ...". *Id.* |
| 4 | The court also noted that since "[a] party other than the fax machine owner could be, and often is, responsible for supplying ink and paper or paying a telephone company for use of a fax line, it should not be excluded from the putative class." *St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at *5. |
| 5 | ZirMed contends that some of the cases cited by S & S do not actually stand for the proposition that unsuccessful transmission attempts give "intended" recipients standing to assert a claim under the TCPA. (Docket No. 36, at 23–24.) Rather, they merely stand for the proposition that circumstantial evidence, apart from the plaintiff printing out the actual fax, is permissible to show faxes had been "sent" for TCPA purposes. The Court agrees with ZirMed that S & S has confused the propositions for which these cases stand, but notes that, in any event, other cases—which are cited by this Court—do stand for the proposition that unsuccessful transmissions give standing for a TCPA claim. |
| | Relatedly, the Court notes there is distinction between a *successful transmission* of a fax advertisement and *physical proof of receipt* of a fax advertisement. *See Reliable Money Order, Inc. v. McKnight Sales Co.,* 281 F.R.D. 327, 331 (E.D.Wis.2012) (noting that "[s]everal courts have found that the TCPA does not require knowledge of receipt, only that a fax was successfully transmitted," when certifying a class of those to whom the fax was "successfully transmitted"). As the Court will hold below, the former is necessarily required for standing under the TCPA. The latter is not necessarily |

required for standing. In this case, there was admittedly no successful transmission of the fax advertisement to a portion of the proposed class. Accordingly, the evidentiary concerns involving proof of receipt, which was the subject of many of the cases cited by S & S, is irrelevant.

S & S also appears to contend that the Court should refrain from deciding this legal issue and certify the class. However, this is an issue that can be decided as a matter of law, the parties briefed, and has a direct bearing on the appropriate definition of a class. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the ⚑Rule 23 prerequisites for class certification are satisfied." ⚑*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* —— U.S. ——, —— – ——, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013). The certification analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim ... because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." ⚑*Comcast Corp.,* 133 S.Ct. at 1432 (internal quotation marks omitted) (quoting ⚑*Dukes,* 131 S.Ct. at 2551–52)). Accordingly, the Court will decide whether the "intended" recipients who were unsuccessfully sent a fax have a claim as a matter of law under the TPCA.

This is not inconsistent with cases holding that proof of actual receipt is not necessarily required for standing under the TCPA. When a successful transmission takes place, there is a "recipient" under the TCPA regardless of whether the recipient actually viewed or retrieved the fax.

While a few courts have apparently concluded that a "cost" is still borne on intended recipients of unsuccessful transmissions because those recipients may have considered it necessary to turn off their fax machine due to unwanted fax transmissions, this Court believes that such a conclusion is based on strained reasoning not consistent with the legislative history. *See, e.g., A Fast Sign Co. .,* 291 Ga. at 847, 734 S.E.2d 31. Therefore, this Court respectfully disagrees with the notion that an unsuccessful transmission still imposes a "cost," as is discussed in the legislative history, on intended recipients.

Plaintiff has alleged the proposed class contains "1,462 persons." (Docket No. 34–1, at 9.) Apparently, only 663 of these potential class members were "successfully sent" a fax ad. (Docket No. 36, at 13.) Accordingly, it appears the remaining 799 proposed class members cannot state a claim under the TCPA as a matter of law and will not be part of the amended class.

Shelby Chiropractic's Motion to Intervene establishes that it was an "intended" recipient of an "unsuccessfully" transmitted fax:

> Second, to the extent that both Spine & Sports Chiropractic and Shelby Chiropractic are adequate representatives, Shelby Chiropractic can serve as the representative of the class of *intended* recipients while Spine & Sports can serve as the representative of the class of actual recipients.
>
> ....
>
> As for timeliness, Shelby Chiropractic had no knowledge that Zirmed had sent it a Fax Ad *as its fax line was busy at the time Zirmed repeatedly attempted to do so.* As such, Shelby Chiropractic only became aware of Zirmed's conduct as a result of discovery conducted in this case.

(Docket No. 47–1, at 4, 7) (emphasis added).

Pursuant to an office sharing agreement, S & S shared its office space with another chiropractor, Dr. Kyle Alexander of Alexander Chiropractic. Under that agreement, Alexander Chiropractic and S & S share use of the fax machine associated with the fax number 614–573–7750.

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 171 of 199

Additionally, and alternatively, ZirMed argues that the fax sent to this shared fax number was intended for Alexander Chiropractic, not S & S. (Docket No. 36, at 14.) ZirMed supports this allegation by pointing out that contact information for Alexander Chiropractic is listed next to the shared fax number on the fax campaign list and the successful transmission list designates Alexander Chiropractic next to the shared fax number, not S & S. The full chiropractic list ZirMed purchased from Eleadlists included separate entries for Alexander Chiropractic and S & S, but ZirMed only uploaded Dr. Alexander's contact information to SimplyCast.

However, the Court notes the fax itself did not specify to who it was intended. In any event, because the Court holds that fax phone number subscribers may make claims, S & S has standing if it is the subscriber to the account to which ZirMed successfully sent a fax, irrespective of whether it was the "intended" recipient.

This explanation is also provided in the deposition of Dr. Kevin Kemp, the President, sole shareholder, and corporate representative of Spine & Sports Chiropractic.

47 U.S.C. 227(b)(3)(B) permits an action to recover actual monetary loss or $500 in statutory damages from a violation, whichever is greater.

Plaintiff S & S also alleges that whether the ZirMed fax is an "advertisement," as that term is defined by the TCPA, and damages are common issues. ZirMed argues these are not common issues because it has admitted that the fax meets the TCPA's definition of an advertisement and the damages have already been determined to be $500 for each class member.

ZirMed argues that the determination of whether the fax advertisement's opt-out notice is compliant is an issue that should be resolved at the merits stage and not at the class certification stage. (Docket No. 43–1, at 11–13.) The Court notes that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.,* 133 S.Ct. at 1194–95. The certification analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim ... because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. .,* 133 S.Ct. at 1432 (internal quotation marks omitted) (quoting *Dukes,* 131 S.Ct. at 2551–52)).

Whether the opt-out notice is compliant is an issue that has direct bearing on the appropriateness of class certification—specifically the predominance requirement—because it impacts whether individualized inquiries into the established business relationship and permission/consent defenses are necessary. Therefore, the Court can resolve this issue at the class certification stage. In any event, as the Court will note, ZirMed has not presented any evidence on these affirmative defenses.

The Court also notes the notice is arguably not "clear and conspicuous," as required by paragraph (i), because it is in a type-face smaller than the remainder of the ad copy and at the bottom of the page.

In any event, the Court notes that ZirMed has the burden of proving this defense and it failed to meet this burden. The Federal Regulations clearly place the burden on the sender, ZirMed:

To ensure that the EBR exemption is not exploited, the Commission concludes that **an entity that sends a facsimile advertisement on the basis of an EBR should be responsible for demonstrating the existence of the EBR.** The entity sending the fax is in the best position to have records kept in the ordinary course of business showing an EBR, such as purchase agreements, sales slips, applications and inquiry records. (Digitized documents would be acceptable if kept in the ordinary course of business and if they established the existence of the EBR.) The Commission does emphasize that it is not requiring any specific records be kept by facsimile senders. Should a question arise, however, as to the validity of an EBR, **the burden will be on the sender to show that it has a valid EBR with the recipient.**

Case 1:26-cv-00659-KM     Document 13-1     Filed 05/20/26     Page 172 of 199

Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., Not Reported in Fed. Supp. (2014)

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967, at 25967* (emphasis added). Other courts have also concluded that the burden is on the sender. *See, e.g.,* *Lampkin v. GGH, Inc.,* 2006 OK Civ.App. 131, at 854–55, 146 P.3d 847 (Okla.Ct.App.2006). ZirMed has produced no evidence to meet this burden and did not respond to Plaintiff S & S's discovery requests for documents indicating an established business relationship existed between Defendant and any person to whom a facsimile transmission was sent.

ZirMed filed a notice of supplemental authority, (Docket No. 48), bringing to the Court's attention a recent, non-binding Northern District of Ohio case holding that the commonality requirement was not satisfied because there was evidence of the existence of permission and established business relationships. *Sandusky Wellness Center, LLC v. Wagner Wellness, Inc.,* 2014 U.S. Dist. LEXIS 38475, 2014 WL 1224418 (N.D.Ohio Mar. 24, 2014). The Court notes this case is distinguishable because, as discussed, there is no evidence of these present.

In any event, the Court would respectfully disagree with that court's analysis. With respect to the established business relationship defense/exception, that court did not acknowledge that a plain reading of the statute provides that an established business relationship alone is not enough to preclude liability—among other requirements is a compliant opt-out notice. This is established by the presence of "and" in 47 U.S.C. 227(b)(1)(C) within the list of requirements/exceptions after "unless." Regarding the permission defense, that court did not discuss or acknowledge the federal regulations requiring a compliant opt-out notice, even in situations where permission or consent is present.

The Court notes that 47 U.S.C. § 227(b)(3)(B) permits a person or entity to bring a private right of action based on a violation of the regulations prescribed under the TCPA.

The Court notes the cases cited by the ZirMed from Ohio state courts focused on the placement, in the context of the entire regulatory scheme, of the regulation requiring opt-out notices in advertisements sent with consent/permission in finding that regulation does not apply. While the Court admits the placement of the cited regulation is not ideal and confusing, the language itself clear and this Court would respectfully disagree with those courts' holdings.

The Court notes that, in any event, similar to the established business relationship defense, the burden is on ZirMed to establish the "permission" defense:

> The Commission is concerned that permission not provided in writing may result in some senders erroneously claiming they had the recipient's permission to send facsimile advertisements. Commenters that discussed this issue agree that **a sender should have the obligation to demonstrate that it complied with the rules, including that it had the recipient's prior express invitation or permission.** Senders who choose to obtain permission orally are expected to take reasonable steps to ensure that such permission can be verified. In the event a complaint is filed, **the burden of proof rests on the sender to demonstrate that permission was given.** The Commission strongly suggests that senders take steps to promptly document that they received such permission. (An example of such documentation could be the recording of the oral authorization. Other methods might include established business practices or contact forms used by the sender's personnel.) Express permission need only be secured once from the consumer in order to send facsimile advertisements to that recipient until the consumer revokes such permission by sending an opt-out request to the sender.

> *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967, at 25972* (emphasis added). ZirMed has produced no evidence with which to meet this burden. Notably, ZirMed has not responded to Plaintiff S & S's discovery requests for "[a]ll documents indicating any person gave prior express permission of invitation to receive facsimile transmissions." (Docket No. 40–3, at 6.)

**End of Document**          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM Document 13-1 Filed 05/20/26 Page 173 of 199

St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc., Not Reported in Fed....

KeyCite Yellow Flag

Declined to Follow by   Practice Management Support Services, Inc. v. Cirque du Soleil, Inc.,   N.D.Ill.,   March 12, 2018

2017 WL 2861878
Only the Westlaw citation is currently available.
United States District Court, E.D. Missouri, Eastern Division.

ST. LOUIS HEART CENTER, INC., individually and on behalf of all others similarly situated, Plaintiff,

v.

VEIN CENTERS FOR EXCELLENCE, INC., Defendant.

Case No. 4:12 CV 174 CDP
|
Signed 07/05/2017

**Attorneys and Law Firms**

Phillip A. Bock, Bock and Hatch, LLC, Chicago, IL, Brian J. Wanca, Ryan M. Kelly, Anderson and Wanca, Rolling Meadows, IL, Max G. Margulis, Margulis Law Group, Chesterfield, MO, for Plaintiff.

Don V. Kelly, Brian R. Shank, Evans and Dixon, St. Louis, MO, for Defendant.

**MEMORANDUM AND ORDER**

CATHERINE D. PERRY, UNITED STATES DISTRICT JUDGE

**\*1**  Plaintiff St. Louis Heart Center, Inc. brought this action under the Telephone Consumer Protection Act, 47 U.S.C. 227(b)(1)(C), alleging that defendant Vein Centers for Excellence, Inc., a marketing firm that provides graphic design and other services to doctors, sent "junk faxes" to Heart Center and thousands of others. I certified a class under Rule 23, Fed. R. Civ. P., with Heart Center as the named representative. Notice was sent to potential class members and one opt out was returned. Plaintiff Heart Center then sought summary judgment and statutory damages for 35,211 unsolicited fax transmissions. I denied summary judgment because, based on the evidence presented, no absent class member could prove that they were "sent" a Vein Centers junk fax, as required by the class definition. Now, defendant Vein Centers seeks summary judgment, or alternatively, class decertification because of the same lack of proof of class membership.

Based on the Eighth Circuit's recent opinion discussing the 'ascertainability' requirement for class certification, *McKeage v. TMBC, LLC*, 847 F.3d 992 (8th Cir. 2017), and the fact that Heart Center provides no objective criteria or common evidence for identifying potential class members, the class in this case will be decertified. I will deny summary judgment, and this case will proceed to trial as to the named plaintiff only.

**Background** [1]

Around 2007 or 2008, defendant Vein Centers hired fax broadcaster Westfax to send out form fax advertisements to thousands of fax numbers belonging to doctors and medical centers. Westfax charged Vein Centers for the 35,212 successful fax transmissions, but not the many attempted transmissions that did not go through. Westfax did not provide a list of the fax

numbers which were successfully sent an advertisement, and there are no records available to correctly identify the junk fax recipients. ECF No. 102-7 at 88:4-23.

Plaintiff Heart Center is a corporation owned by cardiologist Ronald Weiss. It claims to have received multiple fax advertisements from Vein Centers, including one that was part of a Westfax fax broadcast that went to more than five thousand cardiologists on September 15, 2009. ECF No. 106 at ¶ 32. However, the year on the date of the Heart Center fax submitted as evidence is unclear, and when Dr. Weiss was shown the document in his deposition he testified he received it one year earlier, on September 15, 2008. ECF No. 5-4; ECF No. 83-2 at 34:6-36:22.

The Telephone Consumer Protection Act (TCPA), 47 U.S.C. 227(b)(1)(C), prohibits the sending of unsolicited fax advertisements. Heart Center filed this suit under the TCPA on behalf of itself and others who received unsolicited fax advertisements from Vein Centers. With Heart Center as the named representative, I certified a class under Rule 23, Fed. R. Civ. P., with the following class definition:

> **\*2** All persons or entities who, between January 15, 2008 and September 15, 2009, were sent one or more telephone facsimile messages by Westfax on behalf of Vein Centers for Excellence, Inc. that did not inform the fax recipient both that (1) he or she may make a request to the sender of the advertisement not to send any future facsimile advertisements and that (2) failure to comply with the request, within 30 days, is unlawful.

Using the lists of fax numbers that Vein Centers provided to Westfax for the unsolicited fax broadcasts (which include all the fax numbers to whom transmission was attempted—not just the ones to whom transmission was successful), class notice was sent to potential class members by fax and then U.S. Mail, if necessary. In response, one class member requested exclusion from the class.

Next, Heart Center sought summary judgment for 35,211 unsolicited fax transmissions. I denied Heart Center judgment as a matter of law because the undisputed evidence did not show that any individual person met the class definition. ECF No. 99. Although Heart Center provided evidence of the *number* of successfully transmitted junk faxes by Vein Centers, there was no evidence of exactly *which* fax numbers were successfully sent the junk faxes, and so the plaintiff class was not entitled to summary judgment. Defendant Vein Centers now seeks summary judgment, or alternatively, class decertification.

## Discussion

### A. Summary Judgment on Class Claims

In determining whether to grant a motion for summary judgment, the court views the facts—and any inferences from those facts—in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant bears the burden of establishing that (1) it is entitled to judgment as a matter of law and (2) there are no genuine issues of material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e).

Given the lack of evidence as to which fax numbers the junk faxes were successfully transmitted, Vein Centers argues that it is entitled to summary judgment for the same reason I denied it to Heart Center—because no class member can prove that they were "sent" one of the junk faxes. With no classwide proof, Vein Centers maintains that if class members came forward with

individual testimony or submitted their own evidence of fax receipt, the court would be required to hold mini-hearings on the evidence in violation of 🚩Rule 23.

Heart Center responds that summary judgment is not appropriate here because the facts demonstrate that Vein Centers did violate the TCPA, and any issues with identifying the victims of that violation does not equate to inadequate proof of liability. I agree. The evidence currently before the court does not identify the fax numbers which were successfully sent a junk fax by Vein Centers, but the undisputed evidence shows that Vein Centers violated the TCPA by sending unsolicited fax advertisements. Granting summary judgment in Vein Centers' favor could foreclose valid claims brought later by individuals who were sent the junk faxes at issue in this case. Vein Centers is not entitled to judgment as a matter of law.

## B. Class Decertification under 🚩Rule 23

**\*3** As an alternative to summary judgment, Vein Centers argues for class decertification. When considering class certification, a court "must undertake a rigorous analysis that includes examination of what the parties would be required to prove at trial."

🚩*Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (internal quotation marks omitted). "[T]here are no invariable rules regarding the suitability of a particular case filed under ... the TCPA for class treatment; the unique facts of each case generally will determine whether certification is proper." 🚩*Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th Cir. 2008).

According to Vein Centers, the inability to identify potential class members violates 🚩Rule 23's class requirements of commonality, predominance, and ascertainability. *See* 🚩Fed. R. Civ. P. 23(a)(2) (setting forth the prerequisite for class certification that there be "questions of law or fact common to the class"); 🚩Fed. R. Civ. P. 23(b)(3) (setting forth an additional requirement that there be "questions of law or fact common to class members [that] predominate over any questions affecting only individual members"); 🚩*McKeage*, 847 F.3d at 998 (discussing "🚩Rule 23's implicit requirement that a class must be adequately defined and clearly ascertainable").

Heart Center contends that precise identification of class members is not required at this stage of the litigation and that members should be able to identify themselves in response to notice, after the case is resolved on the merits. According to Heart Center, the Eighth Circuit rejected the need for a heightened ascertainability standard in 🚩*Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.(Sandusky)*, 821 F.3d 992 (8th Cir. 2016), and because the fax number lists are only slightly over inclusive—with approximately 80% accuracy—there is sufficient proof to satisfy the 🚩Rule 23 acertainability requirement. [2]

### 1. Ascertainability

As discussed in my prior Memorandum and Order of February 7, 2017, the Eighth Circuit addressed a class action similar to this one in *Sandusky*, which also involved violations of the TCPA by the sending of unsolicited facsimile advertisements. 🚩821 F.3d 992 (8th Cir. 2016). The Court of Appeals found a class definition—like the one here which includes all class members who were "sent" a junk fax—to be ascertainable. [3] The court said that the TCPA's "recipient" of the fax, or the person or entity with an authorized private right of action, is "the person or entity that gets the fax." 🚩821 F.3d at 997 (citing 🚩47 U.S.C. § 227(b)(1), 🚩(b)(3)). Ultimately, the court held that the fax logs in the record, which showed the numbers that received the faxes, are objective criteria that make the recipient clearly ascertainable. *Id.*

**\*4** Following the release of *Sandusky*, and since my denial of summary judgment for Heart Center, the Eighth Circuit has issued an additional clarifying opinion on class ascertainability: 🚩*McKeage v. TMBC, LLC*, 847 F.3d 992 (8th Cir. 2017).

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 176 of 199

St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc., Not Reported in Fed....

In *McKeage*, boat buyers brought a class action suit alleging unauthorized practice of law against defendant boat seller who charged a document fee when selling boats and trailers under form contracts governed by Missouri law. After defendant filed a motion to decertify the nationwide class, the district court required class counsel "to hire reviewers to manually inspect each of [defendant's] customer files in order to determine which contracts contained a Missouri choice-of-law provision, the inclusion of which formed the basis for the nationwide class." 847 F.3d at 997. After the district court granted summary judgment in favor of the class and awarded damages, the defendant appealed. Defendant argued that the district court erred in certifying a class because such certification required an individualized inquiry related to both the identification of the class members and the evidence necessary to establish liability once a class had been identified. *Id.* at 998.

On appeal, the Eighth Circuit reiterated that "[a] class may be ascertainable when its members may be identified by reference to objective criteria," and provided the fax logs in *Sandusky* as an example of such objective criteria. *McKeage*, 847 F.3d at 998-99 (citing *Sandusky*, 821 F.3d at 997-98). The appellate court found the intensive customer file-by-file review process used in *McKeage* to be valid objective criteria for class identification, and affirmed the class certification. *Id.* at 999-1000.

"[A] dispute regarding the method for identifying class members calls for an independent discussion of whether a class is ascertainable." *McKeage*, 847 F.3d at 998. Although the class definition here closely resembles the one approved by the Eighth Circuit in *Sandusky*, there is no "objective criteria," like fax logs, available to clearly ascertain the class members. *Id.* Although Heart Center provides evidence of the *number* of successfully transmitted junk faxes by Vein Centers, there is no evidence of exactly *which* fax numbers were successfully sent a junk fax. Without fax logs of successful transmissions or other such evidence, the only way potential class members could prove they were "sent" junk faxes, as required by the class definition, is through individual testimony.

Heart Center argues that potential class members should be able to identify themselves in response to notice after this case is resolved; however, Heart Center fails to provide any theory of generalized proof of liability that could be presented to the court to make a reasonable determination of class membership. Heart Center mentions, but provides no details on, the use of "a claim forms process or affidavits." ECF No. 105 at 11. But here reliance on claims forms or affidavits is especially troublesome because of the nature of the proof required. Whether someone can actually remember receiving a specific junk fax sent many years earlier raises credibility issues best determined by a trier of fact after testimony subject to cross-examination. This is an appropriate issue for a trial, but not for a claim form or affidavit. *See also Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc. (ASD Specialty)*, No. 3:13 CV 2085, 2016 WL 75535, at *3 (N.D. Ohio Jan. 7, 2016) (where fax logs unavailable and no theory of generalized proof has been proposed, the district court found it suspect in nature to rely on affidavits from all potential class members certifying receipt of a fax received many years prior).

Without any generalized classwide proof of liability, similar to the fax logs that showed receipt of faxes in the Eighth Circuit's *Sandusky* case, the court would be required to conduct "mini-hearing[s] on the merits of each case" in order to identify class members. *Leyse v. Lifetime Entm't Servs., LLC*, Nos. 16-1133-cv, 16-1425-cv, 2017 WL 659894, at *2 (2d Cir. Feb. 15, 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 25 (2d Cir. 2015))(affirming denial of class certification based on the inability to ascertain the class where no list of class members existed). Individual inquiries into the validity of each potential class member's claim to determine if they were "sent" a Vein Centers' junk fax during the period at issue is something that could be accomplished at individual trials, but it there is no objective way to determine it on a class-wide basis. Based on the unique facts of this case, identifying class members through some objective basis is not possible and therefore the class is unascertainable.

### 2. Predominance and Commonality

**\*5** Class certification is only appropriate where common issues of fact or law predominate over individual questions. Fed. R. Civ. P. 23(b)(3). Common questions are those that can be established through common evidence. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011). Here, the lack of a classwide method for identifying class members results in a lack of cohesiveness and causes individual issues to predominate. Where members of the proposed class cannot prove class membership with proof common to the class, class certification is not proper. *Blades v. Monsanto Co.*, 400 F.3d 562, 572-75 (8th Cir. 2005)(affirming district court's denial of class certification where appellants proffered no common evidence nor identified any yet to be discovered common evidence which would prove classwide injury). *See also Gene & Gene LLC,* 541 F.3d at 329 (reversing class certification for failure to satisfy the predominance requirement where there was no classwide basis for establishing proof of a TCPA requirement, and therefore proof of class membership); *ASD Specialty,* 2016 WL 75535, at \*4 (denying class certification where no fax logs available and where some class members consented to fax, because such circumstances would "overwhelm the common questions" and "devolve into a series of mini-trials, which Rule 23(b)(3) seeks to prevent").

Like *Sandusky*, this case involves the common question of "whether class members received an unsolicited fax advertisement violating the TCPA." 821 F.3d at 998. The Eighth Circuit found the class in *Sandusky* to meet the Rule 23 commonality and predominance requirements because this question was "capable of classwide resolution." *Id.* But in this case, there is no common proof available to make this question resolvable on a classwide basis. This class no longer meets the Rule 23 requirements for class certification.

"Class certification 'is inherently tentative' and may 'require revisiting upon completion of full discovery.' " *Zurn Pex Plumbing,* 644 F.3d at 613 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978); *Blades,* 400 F.3d at 567). Based on the specific facts of this TCPA case and the evidence before the court, I find that there is no objective criterion available to accurately identify potential class members, making the class unascertainable. In addition, with no common evidence available to apply on a classwide basis, the class lacks commonality and predominance. Because the class requirements of Federal Rule of Civil Procedure 23 are no longer satisfied, I must decertify the class.

**C. Summary Judgment as to Named Plaintiff Heart Center**

Vein Centers also argues that the named plaintiff Heart Center cannot show that it is entitled to relief. The copy of the junk fax received by Heart Center's owner, Ronald Weiss, includes a header with a date of transmission; however, only the month and day ("9/15") portion of the date is completely readable—the year is distorted. ECF No. 5-4. At Weiss' deposition, the questioning attorney pointed out to Weiss that the year on the fax was "a little obscured," yet Weiss stated that he received the fax on September 15, 2008. ECF No. 83-2 at 34:6-36:22. According to records from Westfax, it did not send a batch fax transmission for Vein Centers on September 15, 2008, but it did send one to cardiologists exactly one year later on September 15, 2009. ECF No. 83-12 at 13.

In response to Vein Centers' motion for summary judgment, Heart Center has now filed a new declaration from Ronald Weiss stating that he made a mistake in his deposition. He blames the poor quality of the copy of the fax that he was shown at the deposition for what his claimed mistake in saying the fax was received in 2008. ECF No. 106-1. Weiss now states that he received the fax on September 15, 2009, which he determined after viewing an enlargement of the date area of the copied fax and the original fax received. *Id.* at ¶ 6-10.

Vein Centers argues that Heart Center is creating a sham factual dispute on the date of the fax transmission in order to avoid summary judgment. In most cases, a party cannot avoid summary judgment by filing an affidavit that contradicts previous sworn testimony. *Cole v. Homier distributing Co., Inc.,* 599 F.3d 856, 867 (8th Cir. 2010). But in this case, a factual dispute is not

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 178 of 199

St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc., Not Reported in Fed....

being created—it already exists, and the circumstance of Weiss's deposition testimony is something that a trier of fact should be able to consider in deciding whether plaintiff actually received one of the faxes that defendant sent. I previously denied summary judgment to plaintiff because Weiss testified that he received a fax on a date that defendant denied sending a fax—a clear dispute of fact. Weiss's explanation of his mistake—especially in light of examination of the enlargement—is something that a jury may very well believe. Given the undisputed evidence that the junk fax at issue did come from Vein Centers and that Westfax did send a fax blast to cardiologists, including Weiss, on September 15, 2009, this is not a sham issue created by Weiss's affidavit. ECF No. 83-8 at 4, 102-3 at 1. Vein Centers is not entitled to judgment as a matter of law on Heart Center's TCPA claim.

**\*6**  Accordingly,

**IT IS HEREBY ORDERED** that defendant Vein Center's motion for summary judgment is denied, but its alternative motion for class decertification [ECF No. 100] is granted. The Rule 23 class in this case is decertified and this case shall proceed as to the named plaintiff St. Louis Heart Center, Inc. only.

**IT IS FURTHER ORDERED** that counsel for the parties shall meet and confer and file, no later than **July 20, 2017** a joint proposed schedule for all steps remaining that are necessary to resolve this case, including proposing several dates that both sides are available for trial and stating the anticipated length of trial. If the parties cannot agree as to any matter, the disagreement must be set out clearly in the joint proposal.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2861878

---

## Footnotes

1       My previous Memorandum and Order issued February 7, 2017, provides greater detail into the background and history of this matter, which has not changed and need not be restated it its entirety here. ECF No. 99.

2       Heart Center states that "more than 80% of the targeted vascular surgeons, 85% of the targeted OB/GYNs, 88% of the targeted dermatologists, 88% of the targeted vein doctors, and 80% of the targeted cardiologists received at least one of Defendant's fax ads." ECF No. 106 at ¶ 30. Vein Centers denies this fact, disagreeing with Heart Center's percentage calculations. Heart Center appears to be taking the *greatest* percentage of successful transmissions per recipient type, whereas Vein Centers thinks the correct calculation is the *average* percentage of successful transmissions per recipient type. Regardless of the method of calculation, all the fax numbers on the lists were not successfully sent a junk fax and therefore, not all persons associated with all fax numbers on the list are proper class members in this case.

3       The class definition approved in *Sandusky* was:

        All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages regarding lead testing services by or on behalf of Medtox, and (3) which did not display a proper opt out notice. 821 F.3d at 996.

---

End of Document                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM Document 13-1 Filed 05/20/26 Page 179 of 199

Weister v. Vantage Point AI, LLC, Not Reported in Fed. Supp. (2022)

 KeyCite Overruling Risk

Overruling Risk   Drazen v. Pinto,   11th Cir.(Ala.),   July 24, 2023

2022 WL 3139373
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Jason WEISTER, Plaintiff,

v.

VANTAGE POINT AI, LLC, Defendant.

Case No. 8:21-cv-1250-SDM-AEP
|
Signed August 3, 2022

**Attorneys and Law Firms**

Avi Robert Kaufman, Kaufman P.A., Coral Gables, FL, Rachel Elizabeth Kaufman, Kaufman P.A., Miami, FL, Samuel J. Strauss, Turke & Strauss LLP, Madison, WI, for Plaintiff.

Jeffrey J. Wilcox, Hill Ward Henderson, PA, Tampa, FL, Robert A. Shimberg, Hill Ward Henderson, PA, Tampa, FL, Matthew A. Keilson, Ryan D. Watstein, Kabat Chapman & Ozmer LLP, Atlanta, GA, for Defendant.

## ORDER

STEVEN D. MERRYDAY, UNITED STATES DISTRICT JUDGE

 **\*1**  After texting "DEMO" in response to a radio spot touting VantagePoint AI's "artificial intelligence" stock trading software, Jason Weister received by text a hy-perlink to register for a training webinar. Weister decided not to register but in the following months received from VantagePoint fifteen pre-recorded "ringless" voicemails that persisted in inviting Weister to register for other training webinars. During these training webinars, VantagePoint allegedly attempts to sell the artificial intelligence software. Weister sues under the TCPA and on behalf of a putative class.

In accord with the parties' joint litigation plan and before class discovery be-gins, VantagePoint moves (Doc. 29) for summary judgment on Weister's claim. Weister responds (Doc. 33) in opposition and VantagePoint replies (Doc. 36) in sup-port of summary judgment.

## BACKGROUND

The following facts are either undisputed or construed in Weister's favor. VantagePoint sells "financial, technical analysis software, artificial intelligence, for retail [stock] traders." (Doc. 41-1 at 5) VantagePoint hosts live and webinar events to train traders to use VantagePoint's "artificial intelligence" software. (Doc. 41-1 at 2) To promote these training events, Trader Marketing Group, an affiliate of Van-tagePoint, purchases radio spots and transmits promotional texts and voicemails to consumers. (Doc. 41-1 at 3)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 180 of 199

Weister v. Vantage Point AI, LLC, Not Reported in Fed. Supp. (2022)

In December 2020, Trader Marketing Group ran a radio spot, which stated, "Text DEMO to 411411 to get what you need to stay ahead of market trends and find explosive moves before they happen," "Text DEMO to 411411 to find out how our technology can forecast market trends up to 3 days in advance with incredible ac-curacy," and "Text DEMO to 411411 and experience VantagePoint for free." (Doc. 36-2 at ¶ 4) After hearing the radio spot, Weister texted "DEMO" to 411411. (Doc. 33-1) In response, Weister received a text stating, "VP: START NOW! https://vpai.us/start-naw for a free online AI class or call 800-732-5407 during busi-ness hours ET. STOP to cancel." (Doc. 33-1) Weister decided not to attend the event and neither responded to the text nor entered information on the webpage.

From January through March 2021, Weister received fifteen pre-recorded "ringless" voicemails promoting training events hosted by VantagePoint. (Doc. 29-3 at 6) To transmit these "ringless" voicemails, Trader Marketing Group uses "Slybroadcast," a program that transmits in rapid succession two calls: the first call to momentarily occupy the cellular telephone's line and the second call to bypass the occupied line, access the voicemailbox directly, and deliver the pre-recorded voicemail. (Doc. 33-4)

Although the scripts for VantagePoint's pre-recorded ringless voicemails differ, each script invites the recipient to attend a "free live training webinar" about Van-tagePoint's artificial intelligence software. (Doc. 29-1 at 11–25) Some of the scripts offer a "free AI forecast" for each webinar attendee. (Doc. 29-1 at 22) Also, each voicemail script informs the recipient of the option to cease voicemails by visiting a URL and entering both a name and a cellular telephone number. (Doc. 29-1 at 22) The following voicemail transcription represents the fifteen ringless voicemails Weister received.

> **\*2**  Hi, this is Harold calling from VantagePoint AI. I hope you're having great success in the financial markets. It's currently Fri-day, January 29th. The reason for my call is that you had re-cently expressed an interest in wanting to learn more about arti-ficial intelligence trading. So I wanted to connect and extend an invitation and let you know that this afternoon at two o'clock Eastern time, we're actually doing a live webinar where we're going to discuss the two trading strategies using artificial intelli-gence to dominate 2021. To register, all you have to do is go to tradingeducation.com. That's tradingeducation.com. On this webinar, what we do is we're going to basically dissect every sector of the market so that you can see what the artificial intel-ligence has been forecasting. But most importantly, you're also going to get the opportunity to see what artificial intelligence is forecasting for the days and weeks ahead.
>
> All attendees to the webinar will also get a free AI forecast for whatever assets you're trading in your portfolio that you're un-sure about and would like to see what the artificial intelligence is forecasting for them. So head on over to tradingeduca-tion.com, get yourself registered. And I look forward to seeing you on the webinar very shortly. If for some reason you want to stop receiving these voicemail invitations, that's fine. Simply head on over to stopvoicemail.com and you will be remove[d] from the invitations list. Look forward to seeing you on the webinar very shortly. Thank you.

(Doc. 29-1 at 22) Although by texting "DEMO" to 411411 Weister consented to re-ceive a text containing the registration link, Weister contends that the fifteen pre-rec-orded messages exceed Weister's consent and subject VantagePoint to liability under the TCPA.

### DISCUSSION

Enacted in 1991, the TCPA prohibits a person's "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or pre[-] recorded voice ... to any telephone number assigned to a ... cellular telephone ser-vice." 47 U.S.C. § 227(b)(1)(A). In other words, the TCPA subjects to liability a per-son who (1) uses an automatic telephone dialing system or a pre-recorded voice (2) to call (3) a cellular telephone (4) in the absence of an emergency purpose or the "prior express consent" of the recipient.

The TCPA offers no definition of "prior express consent" but delegates to the FCC the power to "prescribe regulations to implement" Section 227. In a 2012 or-der, the FCC requires "prior express consent" to take the form of "prior express *writ-*

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 181 of 199

Weister v. Vantage Point AI, LLC, Not Reported in Fed. Supp. (2022)

*ten* consent" if the call constitutes telemarketing or advertising. *In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830 (2012); 47 C.F.R. § 64.1200(a)(2). Before the 2012 FCC order, an oral acceptance or the provision of a telephone number furnished "prior express consent" for telemarketing, advertising, and any other category of communication. But under the 2012 FCC or-der, the called party must furnish "prior express *written* consent," which means "an agreement, in writing, bearing the signature of the person called that clearly author-izes ... advertisements or telemarketing messages." 47 C.F.R. § 64.1200(f)(9).

Although texting "DEMO" furnishes consent to receive the text containing the registration link, Weister claims that the fifteen pre-recorded ringless voicemails that followed constitute telemarketing for which Weister never furnished the "prior express *written* consent" required under the 2012 FCC order. Moving for summary judgment, VantagePoint argues (1) that by texting "DEMO" Weister invited the fif-teen pre-recorded voicemails and thus suffered no injury-in-fact even in the absence of prior express *written* consent, (2) that the FCC's heightened form of consent vio-lates the First Amendment, and (3) that the fifteen pre-recorded voicemails constitute neither telemarketing nor advertising. Weister opposes each argument.

## I. The standing challenge

 **\*3**  Under Section 2 of Article III of the United States Constitution, the "judicial power" extends to "cases" and "controversies." To constitute a case or controversy, the plaintiff must demonstrate "standing" to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (Alito, J.) ("The doctrine [of standing] developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood."). The "irreducible constitutional minimum of standing" comprises (1) an "injury-in-fact," (2) a "causal connection" between the plaintiff's injury and the defendant's conduct, and (3) a likelihood that a favorable decision can redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (Scalia, J.).

An "injury-in-fact" requires "an invasion of a legally protected interest" that is "concrete and particularized" and that is "actual or imminent, not conjectural or hy-pothetical." *Lujan*, 504 U.S. at 560. A concrete injury must "be '*de facto*'; that is, it must actually exist." *Spokeo*, 578 U.S. at 340 (citing BLACK'S LAW DICTIONARY 479 (9th ed. 2009)). Although a concrete injury is "real" and not "abstract," an "intangi-ble harm" can constitute a concrete injury. *Spokeo*, 578 U.S. at 340–41. But an in-tangible harm causes a concrete injury (1) only if the intangible harm "has a close re-lationship to a harm" cognizable "traditionally" at common law and (2) only if the "judgment" of Congress "elevat[es] to the status of legally cognizable" an injury "previously inadequate in law." *Spokeo*, 578 U.S. at 341 (quoting *Lujan*, 504 U.S. at 578). However, the injury-in-fact requirement is "not automatically satisf[ied] ... whenever a statute grants a right and purports to authorize a suit to vindicate it." *Spokeo*, 504 at 341. Even an intangible harm identified by Congress must have some analogue to a harm historically recognized at common law. For instance, a "bare procedural violation [of a statute], divorced from any concrete harm," cannot estab-lish an injury-in-fact under Article III. *Spokeo*, 504 at 341 (reasoning that a credit re-port containing inaccurate marital and employment information causes no concrete injury absent disclosure to, and reliance by, a third party).

In *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) (Branch, J.), the defendant contended that the transmission of a single, brief text message promoting discounted legal services causes no concrete injury because the recipient spent only a few sec-onds reviewing and deleting the text. Although recognizing that a concrete injury "need only be an 'identifiable trifle,' " *Salcedo* finds that neither the judgment of Con-gress nor an analogue in the common law supports recognizing the receipt of a sin-gle, unsolicited text message as a concrete injury. *Salcedo*, 936 F.3d at 1167 (quoting *United States v. Students Challenging Reg. Agency Procs.*, 412 U.S. 669 (1973)).

Studying the legislative record, *Salcedo* finds no statement by Congress about the harms of unsolicited text messaging. *Salcedo*, 936 F.3d at 1169. Although text messaging was non-existent when Congress enacted the TCPA in 1991 and although

the FCC by regulation has later expanded the TCPA to encompass text messaging, *Salcedo* correctly reads *Spokeo* to require a consideration of Congress's contemporane-ous judgment — not a consideration of an agency's judgment and not speculation about how Congress might judge the harm attending a new technology. *Salcedo*, 936 at F.3d at 1170. Absent a congressional statement about the harm of an unsolicited text message, *Salcedo* reviews generally the congressional findings underlying the TCPA and confirms that the TCPA principally endeavors to eliminate "intrusive in-vasion[s] of privacy into the home." However, *Salcedo* finds that "by nature of their portability and their ability to be silenced, cell phones may involve less of an intru-sion than calls to a home phone" and that "a single unwelcome text message will not always involve an intrusion into the privacy of the home in the same way that a voice call to a residential line necessarily does." *Salcedo*, 936 F.3d at 1170 (quoting Pub. L. No. 102-243, § 2, ¶ 5). Accordingly, *Salcedo* reasons that the judgment of Congress "provides little support" for concluding that the receipt of a single unsolic-ited text constitutes a concrete injury. *Salcedo*, 936 F.3d at 1170.

 **\*4** Studying the common law, *Salcedo* considers whether the receipt of an unsolic-ited text message bears a "close relationship" to the possibly kindred torts of intru-sion upon seclusion, conversion, and trespass to chattel.[1] Intrusion upon seclusion requires a "substantial" and "strongly object[ionable]" invasion into the "solitude or seclusion" of a person's private affairs. *Salcedo*, 936 F.3d at 1171 (citing Restatement (Second) of Torts § 652B). Although the Restatement (Second) of Torts recognizes that persistent telephone calls can intrude upon seclusion, *Salcedo* observes that a sin-gle unsolicited text message lacks — by definition — the "degree" of persistence to transform a single solicitation into a harassing intrusion. *Salcedo*, 936 F.3d at 1171 (citing Restatement (Second) of Torts § 652B, cmt. d (finding "liability "only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff.")).

Unlike the single text received in *Salcedo*, Weister received fifteen voicemails, each of which invited Weister to register for a training webinar. Although a single communication lacks — by definition — a harassing or hounding quality, the receipt of fifteen voicemails yields a qualitative change from the "fleeting" annoyance in *Salcedo* to conduct bearing a "close relationship" to the hounding and harassment actionable at common law. *Spokeo*, 136 S. Ct. at 1549; *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019) ("The receipt of more than one unwanted tele-marketing call made in violation of the provisions enumerated in the TCPA is a con-crete injury that meets the minimum requirements of Article III standing.").

Attempting to avoid this straightforward application of *Salcedo* and *Cordoba*, VantagePoint argues that, because Weister "invited" communication from Vantage-Point by texting "DEMO" to 411411, Weister suffered no injury-in-fact by receiving the fifteen voicemails. Although the analysis of standing often overlaps with the analysis of the merits, in this instance the analyses remain distinct. In an action un-der the TCPA, consent functions as an affirmative defense to liability and not "as an issue of constitutional standing." *Reese v. Marketron Broad. Sols.*, Inc., No. CV 18-1982, 2018 WL 2117241, \*2 (E.D. La. May 8, 2018) (collecting cases). Regardless, Weister's one-time text of "DEMO" in response to the radio spot naturally invited a one-time registration text from VantagePoint — not fifteen voicemails "inviting" Weister to attend a training webinar. *Daniel v. Five Stars Loyalty, Inc.*, No. 15-CV-03546-WHO, 2015 WL 7454260 (N.D. Cal. Nov. 24, 2015) ("[A] text sent solely for the purpose of allowing the recipient to complete a registration process that he or she initiated shortly before receiving the text is not telemarketing."). Under prevailing precedent, Weister demonstrates standing to sue under the TCPA.

## II. The First Amendment challenge

### a. The Hobbs Act

VantagePoint contends that the FCC's requiring "prior express consent" for informational communications but requiring "prior express *written* consent" for tele-marketing and advertising communications constitute a content-based restriction vio-lative of the First Amendment. In response, Weister argues that the Hobbs Act fore-closes in the district court a challenge to the FCC's implementation of the TCPA. In reply, VantagePoint contends that the Hobbs Act cannot preclude a district court's resolving an as-applied challenge under the First Amendment.

The Hobbs Act, ⚑28 U.S.C. § 2342, empowers the federal courts of appeals with the "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to de-termine the validity" of "all final orders of" the FCC, among other agencies. How-ever, under 28 U.S.C. § 2344, a party "aggrieved" by a "final order" must petition for review not later than sixty days after entry of the final order. Under 28 U.S.C. § 2348, the Attorney General "is responsible for and has control of the interests of the Government," and the agency may appear "as of right."

**\*5** An informed observer might suppose that the Hobbs Act's jurisdictional bar extends only to the pre-enforcement, direct review of the validity of a final order of the FCC. Further, the observe might suppose that the jurisdictional bar has no appli-cation in private litigation — perhaps years after the final order — in which a private party endeavors to bind a private adversary to the FCC's interpretation of the TCPA. After all, the observer might suppose, only an energetic and sophisticated party can remain abreast of the FCC's relentless and elaborate stream of final orders, divine whether a proposed order might — immediately or prospectively — impede the party's interest, and within sixty days retain counsel, resolve to litigate against the Attorney General and the FCC, and lodge a petition with a circuit court. Further, the observer might suppose that a district court neglects the Article III duty to "say what the law is" by sitting idly in response to a claim that an agency clearly misinter-preted a statute or clearly exceeded delegated authority. But the observer would sup-pose wrongly.

⚑*Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014), holds that the Hobbs Act not only eliminates the district court's jurisdiction to review a final order of the FCC but eliminates the jurisdiction of the district court to issue any ruling that has "the practical effect" of contradicting or countermanding a final order of the FCC. Under *Mais*, the district court lacks jurisdiction in private litiga-tion "to consider claims to the extent they depend on establishing that all or part of an FCC order subject to the Hobbs Act is 'wrong as a matter of law' or is 'otherwise invalid.'" ⚑*Mais*, 768 F.3d at 1120 (quoting ⚑*Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 462 (11th Cir. 2012). Under *Mais*, a private litigant accused of conduct violative of a final order interpreting the TCPA has no recourse other than "to ask the Com-mission to reconsider its interpretation" or apply to the FCC for a retroactive waiver or to petition the FCC to rescind the rule. ⚑*Mais*, 768 F.3d at 1121.

Bound by *Mais* and *Self*, the district court must dutifully comply with the pro-hibition against considering any contention that a final order "is wrong as a matter of law" or "is otherwise invalid" and decline to consider even a challenge that a final order of the FCC results in an unconstitutional application of the TCPA. *See* ⚑*Woods v. Santander Consumer USA Inc.*, No. 2:14-CV-02104-MHH, 2017 WL 1178003, n.8 (N.D. Ala. Mar. 30, 2017) (Haikala, J.); *Drake v. FirstKey Homes, LLC*, 439 F. Supp. 3d 1313, 1328 n.6 (N.D. Ga. 2020) (May, J.); *see also* ⚑*Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1149 (D. Minn. 2017) (Wright, J.).

But this rule might end soon. In a unanimous concurrence, ⚑*Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094 (11th Cir. 2019), marshals formidable authority crit-icizing the rule announced in *Mais* and *Self* (and in other circuits) and concludes that these decisions either misinterpret the Hobbs Act or fail to confront the serious ques-tions presented by a statute that strips the district court of the power to issue a ruling in private litigation that "countermand[s]" the FCC. First, *Gorss* reasons that by committing to the circuit courts the "exclusive jurisdiction" to "enjoin, set aside, sus-pend," or "determine the validity" of a final order of the FCC, the Hobbs Act pre-vents a district court's enjoining or vacating a final order of the FCC but does not limit a district court's interpreting the TCPA as applied in litigation between private parties. ⚑*Gorss*, 931 F.3d at 1107. *Gorss* invokes Justice Kavanaugh's concurrence in ⚑*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051 (2019), which reasons:

[A] court "determines the validity" of the order only by enter-ing a declaratory judgment that the order is valid or invalid. Critically, if a district court in an enforcement action disagrees with the agency interpretation, the district court does not issue a declaratory judgment or an injunction against the agency.

**\*6** Rather, the district court simply determines that the defendant is not liable under the correct interpretation of the statute. In other words, in an enforcement action, a district court does not determine the validity of the agency order.

*Gorss*, 931 F.3d at 1108.

Second, *Gorss* explains that the interpretation of the Hobbs Act advanced in *Mais* and *Self* (and in other circuits) presents constitutional doubts under Article III and the Due Process Clause. *Gorss* cites Justice Thomas's concurrence in *PDR Net- work*, which reasons persuasively, "If the [Hobbs] Act truly 'precluded the district court from even reaching' the text of the TCPA and instead required courts to treat 'FCC interpretations of the TCPA' as authoritative, ... then the Act would trench upon Article III's vesting of the 'judicial Power' in the courts." And *Gorss* cites Jus-tice Kavanaugh's concurrence in *PDR Network,* which reasons persuasively that "bar-ring defendants in as-applied enforcement actions from raising arguments about the reach and authority of agency rules enforced against them raises significant questions under the Due Process Clause." Although *Gorss* persuades that *Mais* and *Self* incor-rectly interpret the Hobbs Act (or correctly interpret the Hobbs Act but fail to con-front the act's contingent unconstitutionality), *Gorss* confirms that *Mais* and *Self* gov-ern in the Eleventh Circuit.

b. Regulation of commercial speech

But even if the Hobbs Act (as interpreted by *Mais* and *Self*) permits Vantage-Point's challenge, VantagePoint presents no persuasive argument that the require-ment of "prior express *written* consent" imposes on speech a restriction triggering strict scrutiny. Of course, the requirement of prior express *written* consent for "tele-marketing" and "advertising" imposes on speech a restriction based on content, but the restriction remains permissible because the restriction comports with the distinc-tion under the First Amendment between commercial speech, such as telemarketing and advertising, and non-commercial speech, such as political or religious speech.

Commercial speech is "expression related solely to the economic interests of the speaker and its audience" and enjoys "lesser protection" than "other constitution-ally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 561 (1980). Because of commercial speech's "subordinate position in the scale of First Amendment values," the government enjoys an "ample scope of regulatory authority" over commercial speech. *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 477 (1989). Under *Central Hudson*, a restriction on truthful commercial speech about a lawful activity is subject to "intermediate scrutiny," which requires that the restriction advance a substantial government interest by means not more extensive than necessary. *Cent. Hudson,* 447 U.S. at 566.

The Supreme Court has occasionally asserted (broadly and in dicta) that any content-based restriction on speech is subject to strict scrutiny. *See, e.g.,* *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 156 (2015) ("A law that is content-based on its face is subject to strict scrutiny"); *Barr v. Am. Ass'n of Pol. Consultants, Inc.,* 140 S. Ct. 2335 (2020) ("Content-based laws are subject to strict scrutiny."). Of course, any law that treats commercial speech less favorably than other speech constitutes a content-based restriction on speech because such a law " 'on its face' draws distinctions based on the message a speaker conveys." *Reed,* 576 U.S. at 156. But none of these decisions sug-gest an intent to displace the rule of *Central Hudson*.

**\*7** In *Reed*, a municipal sign ordinance imposed a hierarchy of requirements, that is, imposed requirements on the directional signs of a church, requirements that dif-fered from the requirements imposed on political signs and those — again different — imposed on ideological signs. *Reed,* 576 U.S. at 164. Finding the ordinance "con-tent based on its face," *Reed* subjected the

ordinance to strict scrutiny. Although broadly stating that "[a] law that is content based on its face is subject to strict scru-tiny," *Reed*, 576 U.S. at 165, *Reed* analyzed religious speech, political speech, and ideological speech — the "speech at the heart of the First Amendment," *Recht v. Mor- risey*, 32 F.4th 398, 409 (4th Cir. 2022). Thus, *Reed* "never needed to mention com-mercial speech in that vein." *Recht*, 32 F.4th at 409. "Rather than overruling long-settled precedent, *Reed* simply concerned a totally different context; it cannot be dis-torted to so unsettle the *Central Hudson* regime." *Recht*, 32 F.4th at 409 (" '[T]he Su-preme Court 'does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.' ") (quoting *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)).

And in *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) (*AACP*), a plurality applies strict scrutiny to a 2015 amendment of the TCPA that exempts from liability a person attempting to collect a government debt. Because under the exemption the collector of a government debt can "robo-call" with impunity but a political group, for example, cannot, *AACP* reasons that the government-debt exemption warrants strict scrutiny because the exemption prefers governmental and commercial speech to political and other non-commercial speech. But the restriction challenged in this action is the opposite: the heightened requirement of "prior express *written* consent" applies to commercial speech (telemarketing and advertising) and the lessened requirement of "prior express consent" applies to other speech. That is, *AACP* subjects to strict scrutiny a requirement preferring commercial or government speech to other speech, but the consent requirement challenged in this action permis-sibly prefers other speech to commercial speech. Although broadly stating that "[c]ontent-based laws are subject to strict scrutiny," *AACP*, 140 S. Ct. at 2346, *AACP* distinguishes "impermissible content-based speech restrictions from traditional or or-dinary economic regulation of commercial activity that imposes incidental burdens on speech" and disavows any "expan[sion] [of] existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial ac-tivity." *Barr*, 140 S. Ct. at 2347; *see also* *Recht*, 32 F.4th at 409 (recognizing that *Barr* neither overrules nor supplants *Central Hudson*).

A restriction on commercial speech is subject to intermediate scrutiny only, and VantagePoint advances no argument that the FCC's requirement of prior express *written* consent fails intermediate scrutiny. Thus, VantagePoint's constitutional argu-ment — even if cognizable despite the Hobbs Act — fails.

III. The merits challenge

On the merits, VantagePoint argues that the pre-recorded voicemails are not "telemarketing" and for that reason escape the 2012 FCC order's heightened requirement of prior express *written* consent. The FCC at 47 C.F.R. § 64.1200(f)(13) defines "telemarketing" as "the initiation of a telephone call or message for the pur-pose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." Even if offering nothing for sale, a call constitutes telemarketing if a "purpose" of "initiating" the call is to promote a sale. *Golan v. Veritas Ent., LLC*, 788 F.3d 814 (8th Cir. 2015). In *Golan*, the plaintiff received an unsolicited voicemail message stating, "Liberty. This is a public survey call. We may call back later." Although the voicemail message offered nothing for sale, the record in *Golan* revealed that the caller employed the survey to screen for consumers likely to watch a film produced by the caller. Unlike an "advertisement," which depends solely on the "content of the call[ ]," *Golan* reasons that for "telemar-keting":

**\*8** [n]either the TCPA nor its implementing regulations "require an explicit mention of a good, product, or service" where the implication of an improper purpose is "clear from the context." Chesbro v. Best Buy Stores, L.P., 705 F.3d 913, 918 (9th Cir.2012). Congressional findings indicate that consumers con-sider "prerecorded calls, regardless of the content [of the] mes-sage, to be a nuisance and an invasion of privacy." See TCPA of 1991, Pub.L. No. 102–243, 105 Stat. 2394, § 2(10). Even when the intended content of a message is not conveyed, the intrusion into the home and the "seizure" of the phone line

Case 1:26-cv-00659-KM     Document 13-1     Filed 05/20/26     Page 186 of 199

Weister v. Vantage Point AI, LLC, Not Reported in Fed. Supp. (2022)

is the same. Id. § 2(5). [...] "Telemarketing" occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services."

*Golan*, 788 F.3d at 820 (citations omitted). Accordingly, *Golan* finds the voicemail messages "telemarketing" because the "survey calls" served principally to promote the sale of tickets for a film. *Golan*, 788 F.3d at 820.

*Eldridge v. Pet Supermarket Inc.*, 446 F. Supp. 3d 1063 (S.D. Fla. 2020) (Wil-liams, J.), finds that a pet store's texts promoting an adoption event constitute tele-marketing — even though the text offered nothing for sale — because a purpose of the text is to encourage attendance at the adoption event and a purpose of the adop-tion event is to promote the sale of the pet store's products and services. In other words, *Eldridge* holds that if a purpose of a call is to promote attendance at an event and a purpose of the event is to promote the sale of the caller's product or service, the call constitutes telemarketing.

Similarly, *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharmacies, Inc.*, 847 F.3d 92 (2d Cir. 2017), analyzes the TCPA's analogous prohibition against an unsolicited fax and finds that an invitation to attend a free seminar implies "the com-mercial purpose of promoting [the seller's] products or services" because "[b]usi-nesses are always eager to promote their wares and usually do not fund presentations for no business purposes."

The record reveals no dispute that VantagePoint's purpose in sending the fif-teen pre-recorded voice messages is to promote participation in VantagePoint's train-ing webinars. And the record permits the inference that a purpose of the training webinars is to promote VantagePoint's "artificial intelligence" software. First, some of VantagePoint's voice messages acknowledge that attendees to the webinar receive a "free trial" of VantagePoint's trading platform, and a "free trial" presumes the ex-istence of a paid version. Second, Weister cites a YouTube video in which a Van-tagePoint "coach" explains VantagePoint's program and offers VantagePoint's products for sale through a hyperlink. Third, Weister cites Better Business Bureau reviews explaining that at the end of VantagePoint's training webinar a coach at-tempts to sell VantagePoint's program. The material marshalled by Weister to op-pose VantagePoint's motion for summary judgment — far from incontrovertible but reinforced by the timeless observation that "[t]here ain't no such thing as a free lunch" —supports the inference that the pre-recorded voicemails constitute telemar-keting for which VantagePoint lacks Weister's prior express *written* consent.[2]

**\*9**   The motion (Doc. 29) for summary judgment is **DENIED**. Not later than **AUGUST 18, 2022**, the parties must submit a revised case management report.

ORDERED in Tampa, Florida, on August 3, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3139373

---

**Footnotes**

1        *Salcedo* also compares the receipt of an unsolicited text message to the torts of trespass and private nuisance but finds no analogy because the unsolicited text invades no interest in real prop- erty. *Salcedo*, 936 F.3d at 1171.

2        An order, for example, resolving a dispositive motion after the completion of discovery might reject Weister's material as inadmissible or constituting no more than a scintilla of evidence or both. Under Rule 26, Federal Rules of Civil Procedure, Weister can propound interrogatories and requests for admission, depose witnesses, request documents, and

the like. A failure to fruitfully em- ploy Rule 26 to develop the record on the telemarketing claim might result in an order granting a dis- positive motion after the close of discovery.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Weister v. Vantage Point AI, LLC, Not Reported in Fed. Supp. (2022)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 188 of 199

2022 WL 7026495
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Jason WEISTER, Plaintiff,

v.

VANTAGE POINT AI, LLC, Defendant.

CASE NO. 8:21-cv-1250-SDM-AEP
|
Signed October 12, 2022

**Attorneys and Law Firms**

Avi Robert Kaufman, Kaufman P.A., Coral Gables, FL, Rachel Elizabeth Kaufman, Kaufman P.A., Miami, FL, Samuel J. Strauss, Turke & Strauss LLP, Madison, WI, for Plaintiff.

Jeffrey J. Wilcox, Robert A. Shimberg, Hill Ward Henderson, PA, Tampa, FL, Ryan D. Watstein, Matthew A. Keilson, Kabat Chapman & Ozmer LLP, Atlanta, GA, for Defendant.

### ORDER

STEVEN D. MERRYDAY, UNITED STATES DISTRICT JUDGE

**\*1** Alleging that he received from VantagePoint fifteen unsolicited ringless voicemails, Jason Weister sues (Doc. 1) VantagePoint under the TCPA. Arguing that a 2012 FCC rule violates the First Amendment by imposing a more burdensome consent requirement for "advertisements or telemarketing messages" than for other categories of communication, VantagePoint moved (Doc. 29) for summary judgment on Weister's claim before class discovery began. An August 3, 2022 order (Doc. 42) denies the motion both because the Hobbs Act — interpreted by *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014), and *Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453 (11th Cir. 2012) — precludes a district court from "considering any contention that a final order [of the FCC] is 'wrong as a matter of law' or 'otherwise invalid' " and because "VantagePoint's constitutional argument — even if cognizable despite the Hobbs Act — fails." VantagePoint moves (Doc. 47) under 28 U.S.C. § 1292 to certify the order (Doc. 42) for interlocutory appeal. Weister opposes (Doc. 51).

Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal if "such order involves a controlling question of law as to which there is substantial ground for difference of opinion and [if] an immediate appeal from the order may materially advance the ultimate termination of the litigation." VantagePoint identifies three "controlling questions of law" warranting interlocutory appeal: "(1) whether the Hobbs Act deprives the Court of jusdisdiction, (2) whether the FCC's express *written* consent rule is ... subject to strict scrutiny instead of intermediate scrutiny ..., and (3) whether the FCC's rule even survives intermediate scrutiny." (Doc. 47) Although each issue presents a "controlling question of law," Weister correctly notes that VantagePoint fails to demonstrate a "substantial ground for difference of opinion" about any issue.

A substantial ground for difference of opinion requires "substantial doubt as to how" a controlling legal issue "should be decided." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1256 (11th Cir. 2004). In other words, the party requesting interlocutory appeal must demonstrate a "substantial dispute about the correctness of [a legal] premise" on which the order rests.

*McFarlin*, 381 F.3d at 1259; *see Davis v. City of Apopka*, 2019 WL 9832059, at \*3 (M.D. Fla. 2019) ("For there to be a substantial difference [of opinion] the [movant] must show that at least two courts interpreted the legal principal differently."). Substantial grounds for difference of opinion might exist if the order rests on a legal premise (1) that is "difficult and of first impression," (2) on which district courts within the circuit have split, or (3) on which other circuit courts have split. *Consumer Fin. Prot. Bureau v. Fredrick J. Hanna & Assoc., P.C.*, 165 F. Supp. 3d 1330, 1335 (N.D. Ga. 2015).

VantagePoint first argues that "there is a substantial difference of opinion on whether" *Mais* correctly holds that the Hobbs Act precludes a district court from considering a civil defendant's challenge to an FCC rule. This argument rests on the recognition (1) that "commentary and [non-precedential] opinions" (including a concurrence by the Eleventh Circuit) suggest that "[*Mais*'s] rule might end soon" and (2) that *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 262 (4th Cir. 2020), conflicts with *Mais* and thus causes a split between the Fourth and Eleventh Circuits. (Doc. 47 at 7–9)

**\*2** As Weister notes, however, these arguments fail to establish a "substantial dispute about the correctness of any pure law premise ... applied" in the order because "there is ... no serious doubt" that *Mais* precludes VantagePoint's challenge to the FCC's heightened consent rule. (Doc. 51 at 3) A circuit split and other persuasive authority supports a substantial difference of opinion only if the controlling circuit "has not commented on the conflicting issue." *Lord v. Senex Law, P.C.*, 2022 WL 97046, at \*6 (W.D. Va. 2022); *see Giardiello v. Balboa Ins. Co.*, 661 F. Supp. 644, 646 (S.D. Fla. 1985) (certifying interlocutory appeal based on "the dichotomy between the square holdings of the Ninth Circuit and the implied holdings" of the Eleventh Circuit). If the challenged order rests on binding precedent squarely deciding the controlling legal issue, "no substantial grounds for a difference of opinion exists and there is no reason for an immediate appeal" — even if the binding precedent is controversial or provokes criticism. *Kirkland & Ellis v. CMI Corp.*, 1996 WL 674072, at \*4 (N.D. Ill. 1996); *See McFarlin* 381 F.3d at 1258 (noting that "the 'substantial ground for difference of opinion requirement' could not be met" if "the resolution of [the legal issue] is so clear" because of binding circuit precedent); *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013) ("[W]e view the relevant inquiry to be whether there is a circuit split on a question that *our own circuit has not answered. Where our circuit has answered the question, the district court is bound by our published authority. And so are we.*") (emphasis in original). Section 1292(b) is unavailable to a party explicitly endeavoring to overturn binding precedent that compels an unfavorable result.

As recently as 2019, the Eleventh Circuit has confirmed that under binding circuit precedent the Hobbs Act precludes a district court's considering a challenge to an FCC rule. *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1109 (11th Cir. 2019) (unanimous and compelling concurrence emphasizing and explaining the error in the circuit's precedent). Neither a conflicting decision from another circuit nor disbelief in the longevity of this current precedent undermines the current precedent's binding effect. Unless and until an *en banc* Eleventh Circuit (or the Supreme Court) overturns *Mais*, the decision controls (in this district and in this circuit) any action challenging an FCC rule. Because the order (Doc. 42) denying summary judgment rests on *Mais*, which squarely decides the legal issue, "no substantial grounds for a difference of opinion exists."

Further, as Weister notes (Doc. 51 at 4), even if the Eleventh Circuit overruled *Mais*, VantagePoint fails to demonstrate a difference of opinion over the conclusion that the FCC's heightened consent rule satisfies the First Amendment. VantagePoint attempts to establish a difference of opinion by arguing that "strict scrutiny — not intermediate — applies" to the FCC rule and by arguing — for the first time — that the FCC rule fails even intermediate scrutiny. (Doc. 47 at 9–16)

The request for strict scrutiny rests solely on the (renewed) argument that *Barr v. AAPC*, 140 S. Ct. 2335 (2020), implicitly abrogates *Central Hudson Gas & Electric Company v. Public Service Commission of New York*, 447 U.S. 469 (1989), and compels strict scrutiny of a restriction on commercial speech that distinguishes based on speaker or content. This argument was rejected earlier in this action (Doc. 42 at 13–16), resolutely rejected in other actions both in this district and in other districts within the Eleventh Circuit (Doc. 51 at 4–5) (collecting cases), and rejected by the several circuit courts that considered the

Weister v. Vantage Point AI, LLC, Not Reported in Fed. Supp. (2022)

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 190 of 199

argument, *see, e.g.*, *Recht v. Morrisey*, 32 F.4th 398, 409 (4th Cir. 2022); *Flanigan's Enterprises, Inc. of Ga. v. City of Sandy Springs*, 703 Fed. Appx. 929, 935–36 (11th Cir. 2017). [1] VantagePoint's argument supplies no "grounds for a difference of opinion."

**\*3** Similarly, although devoting several pages of the motion to the argument that the FCC rule fails intermediate scrutiny (Doc. 47 at 11–16), VantagePoint fails to identify a single decision reaching this conclusion. *See Davis v. City of Apopka*, 2019 WL 9832059, at \*3 (M.D. Fla. 2019) ("For there to be a substantial difference [of opinion] the [movant] must show that at least two courts interpreted the legal principal differently."). And, as Weister notes in response (Doc. 51 at 4–5), several district courts in the Eleventh Circuit conclude that a parallel written consent requirement imposed by the Florida Telephonic Solicitation Act satisfies intermediate scrutiny. *See Turizo v. Subway Franchisee Advert. Fund Tr.*, 2022 WL 2919260, at \*9–11 (S.D. Fla. 2022); *Borges v. SmileDirectClub, LLC*, 2022 WL 4269564, at \*7–8 (S.D. Fla. 2022); *Pariseau v. Built USA, LLC*, 2022 WL 3139243, at \*6 (M.D. Fla. 2022).

Because the order (Doc. 42) denying summary judgment rests on binding precedent squarely holding that the Hobbs Act precludes VantagePoint's challenge and because VantagePoint otherwise fails to establish substantial grounds for a difference of opinion, VantagePoint fails to satisfy 28 U.S.C. § 1292(b). [2] Accordingly, the motion (Doc. 47) to certify an interlocutory appeal is **DENIED**. VantagePoint's motion (Doc. 53) for leave to reply is **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on October 12, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 7026495

---

**Footnotes**

1    Even *International Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 705 (6th Cir. 2020), which VantagePoint cites in its motion (Doc. 53) for leave to reply, applies strict scrutiny to "an ordinance that regulates both commercial and non-commercial speech" and seemingly recognizes that intermediate scrutiny applies to a rule that "regulate[s] commercial speech only." Because the "express written consent requirement" applies to commercial speech only and applies to " 'the full range of commercial advertising,' " the rule warrants intermediate scrutiny. *See International Outdoor, Inc.*, 974 F.3d at 705 (quoting *Vugo, Inc. v. City of New York*, 931 F.3d 42, 44–45 (2d Cir. 2019)).

2    Also, although Weister fails to dispute the argument, VantagePoint's claim that an interlocutory appeal of this order would "materially advance the ultimate termination of this action" is doubtful. Under *McFarlin*, 381 at 1259, an interlocutory appeal is warranted if the appeal "would serve to avoid trial or otherwise substantially shorten the litigation." VantagePoint claims that an interlocutory appeal would avoid trial and shorten the litigation because "a favorable ruling on any of the controlling questions above would end this case on the merits." To the contrary, to avoid trial, VantagePoint must secure a favorable ruling on at least two of the three controlling questions, that is, a decision both overruling *Mais* and holding that the FCC rule violates either strict or intermediate scrutiny. A decision that, for example, overrules *Mais* but remands for further proceedings to assess the constitutional and interpretive challenges would not avoid a trial.

Further, even if VantagePoint ultimately prevails on appeal, the procedural posture suggests that an interlocutory appeal in this action offers little—if any—benefit to this litigation's resolution. As discussed, *Mais* squarely controls the

---

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 191 of 199

resolution of VantagePoint's motion. And under ⚑⚠ *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), a decision by a panel of the Eleventh Circuit persists until overturned by a decision of the circuit sitting *en banc*. In other words, to prevail, VantagePoint must either secure an initial hearing *en banc* or (almost certainly) lose before a panel of the Eleventh Circuit, secure rehearing *en banc* (or *certiorari* from the Supreme Court), brief the issues again, likely conduct oral argument again, and await a decision. Conversely, if VantagePoint wins at trial, the parties will avoid possibly years of delay on appeal. Thus, unlike other orders warranting interlocutory appeal, this motion offers little, if any benefit to judicial efficiency.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5553460
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Stephen YAGMAN
v.
ALLIANZ INSURANCE, et al.

Case No. LA CV15–00921 JAK (JCx)
|
Signed May 11, 2015

**Attorneys and Law Firms**

Stephen Yagman, Venice Beach, CA, pro se.

Laurie E. Sherwood, Alexander Felix Pevzner, WFBM, LLP, San Francisco, CA, for Allianz Insurance, et al.

**Proceedings: (IN CHAMBERS) ORDER RE DEFENDANTS' JEFFERSON INSURANCE CO., ET AL.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND TO STRIKE CLASS ACTION ALLEGATIONS, AND REQUEST FOR PUNITIVE DAMAGES, ATTORNEY'S FEES, INJUNCTIVE RELIEF (DKT. 16)**

Honorable JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

**I.** *Factual and Procedural Background*

**\*1** On or about September 27, 2014, Stephen Yagman ("Plaintiff") purchased travel insurance from Allianz Insurance, Allianz of America, Inc., and Jefferson Insurance Company ("Defendants"). First Amended Complaint ("FAC"), Dkt. 12 at 5; Contract, *id.* Ex. 1. The transaction was memorialized in a written contract ("Contract"). *Id.* A Letter of Confirmation ("Letter"), which was sent with the Contract, states that the planned dates of travel were "December 20, 2014—December 27, 2014." *Id.* at 14. [1] On December 19, 2014, Plaintiff made a claim under the Contract. FAC, Dkt. 12, ¶ 13. Plaintiff alleges that Defendants "failed and refused to pay Yagman's claim or to indemnify Yagman." *Id.* ¶ 14.

On February 9, 2015, Plaintiff, who is self-represented, filed a Complaint in this action. Dkt. 1. He subsequently filed a First Amended Complaint ("FAC"). Dkt. 12. [2] The FAC advances four causes of action: (i) breach of written agreement; (ii) fraud; (iii) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), ⚑18 U.S.C. §§ 1961–⚑68; and (iv) insurance bad faith. *Id.* ¶¶ 25–68. Plaintiff also seeks certification of "the discrete class of persons whose defining characteristic is that its members were insureds under agreements of insurance to insure for and to indemnify against risks of cancellation of air travel and who were insured by defendants, who submitted claims on the policies of insurance, and whose claims were not paid," and seeks to act as the representative of this putative class. *Id.* ¶¶ 100, 105. The FAC also seeks punitive damages, treble damages under RICO, attorney's fees, and "[i]njunctive relief that defendants properly pay claims that are valid and not refuse to pay claims that are valid and engage only in fair claims practices." *Id.* at 9. Plaintiff contends jurisdiction is proper because RICO presents a federal question. *Id.* ¶ 1. In addition, he alleges that the parties are of diverse citizenship, and "the matter in controversy exceeds the sum or value of $75,000." *Id.*

Defendants brought a Motion to dismiss the FAC and strike the class action allegations and requests for punitive damages, attorney's fees and injunctive relief ("Motion"). Dkt. 16. Plaintiff opposed the Motion on its merits, contends that Defendants

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 193 of 199

Yagman v. Allianz Insurance, Not Reported in Fed. Supp. (2015)

did not properly serve him, and that there is no jurisdiction to hear it. Dkt. 24. [3] A hearing on the Motion was held on May 4, 2015, and it was taken under submission. Dkt. 33. For the reasons stated in this Order, the Motion is **GRANTED IN PART**.

## II. *Analysis*

A. Whether the Motion Was Properly Served on Plaintiff

### 1. *Legal Standard*

**\*2** Fed.R.Civ.P. 5 governs the service of any "written motion, except one that may be heard ex parte." Fed.R.Civ.P. 5(a)(1)(D). Service by mail may be completed by "mailing it to the person's last known address—in which event service is complete upon mailing." Fed.R.Civ.P. 5(b)(2)(C). It is also required that "[a]ny paper after the complaint that is required to be served—together with a certificate of service—must be filed [with the court] within a reasonable time after service." Fed.R.Civ.P. 5(d)(1).

Local Rule 5–3.1.2 provides that, where service of documents is not made electronically, proof of service "must be made by declaration of the person accomplishing the service." This must include "(a) The day and manner of service; (b) Each person and/or entity served; (c) The title of each document served; and (d) The method of service employed (e.g., personal, mail, substituted, etc.)." Local Rule 5–3.1.2.

Actual notice of materials subject to Rule 5(b) is not sufficient, and a party must "demonstrate exceptional good cause for failing to comply with Rule 5(b)." *Magnuson v. Video Yesteryear,* 85 F.3d 1424, 1431 (9th Cir.1996). At least one court has held that failure to comply with Fed.R.Crim.P. 49, which is similar to Fed.R.Civ.P. 5, is a "jurisdictional" defect that may divest the court of the ability to order certain relief. *United States v. Carvajal–Minota,* 706 F.Supp. 726, 727 (N.D.Cal.1989).

### 2. *Application*

The Proof of Service attached to the Motion includes the following language:

> I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with WFBM, LLP's [the law firm representing Defendants] practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at San Francisco, California.

> I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Mot., Dkt. 16 at 29.

Plaintiff contends this is improper because the declarant did not personally place the Motion in the mail. Opp'n, Dkt. 24 at 10. Thus, "there is no admissible evidence of service because of want of personal knowledge. F.R. Evid. Rule [sic] 602 (want of personal knowledge renders inadmissible statements *not* on personal knowledge). There is no statement as to who actually purported to place the motion with the USPS. There is no proof that service was made." *Id.* In his Complaint, Plaintiff expressed the view that a certificate of service of this kind "is not permitted in federal courts," and warned Defendants that, if such a certificate were filed, "a motion will be made to strike whatever document purportedly was served." *Id.* at 9 (citing Compl., Dkt. 1 at 30). Plaintiff does not contend that he did not have actual notice of the Motion, or that he was prejudiced by these alleged

defects in service. Rather, he argues that make ineffective the claimed service of the Motion for purposes of Fed.R.Civ.P. 5, and divest the Court of jurisdiction. *Id.* at 11–13.

**\*3** Plaintiff's position is not persuasive. For purposes of this Motion, the statement of the declarant is sufficient evidence that Plaintiff was served in accordance with Fed.R.Civ.P. 5. Under Fed.R.Evid. 406, evidence of "an organization's routine practice may be admitted to prove that on a particular occasion the ... organization acted in accordance with the ... routine practice." The declarant stated, under the penalty of perjury, that she was "employed in the office of a member of the bar of this Court at whose direction the service was made." This is foundation, under Fed.R.Evid. 602, for the statement that she is familiar with her law firm's mail collection and processing practices. [4] Defendants have presented proof that, after the declarant placed the items in the appropriate location, they were deposited "with the United States Postal Service, in a sealed envelope with postage fully prepaid." Mot., Dkt. 16 at 29. That Plaintiff appears to have received the Motion and claims no prejudice is consistent with this conclusion. [5]

For these reasons, the certificate of service sufficiently shows that the Motion was mailed to Plaintiff in accordance with the requirements of Fed.R.Civ.P. 5 and the Local Rules. The Motion will not be denied on this basis. Therefore, there is jurisdiction to hear it.

### B. Motion to Dismiss and Strike

#### 1. *Legal Standard*

Fed.R.Civ.P. 8(a) provides that a "pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citations and quotations omitted).

A party may move to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir.2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–338 (9th Cir.1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.* 536 F.3d 1049, 1055 (9th Cir.2008) (citing *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001)).

**\*4** Pursuant to Fed.R.Civ.P. 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." " 'The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial....' " *Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d 970, 973 (9th Cir.2010) (quoting *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993)). Whether to strike matter under Fed.R.Civ.P. 12(f) is within the sound discretion of the district court. *Id.*

Case 1:26-cv-00659-KM    Document 13-1    Filed 05/20/26    Page 195 of 199

Yagman v. Allianz Insurance, Not Reported in Fed. Supp. (2015)

2. *Application*

a) Motion to Strike Class Action Allegations

Defendants argue that Plaintiff may not assert class action allegations because he is representing himself. Mot., Dkt. 16 at 24 (citing cases). Plaintiff concedes that he "may not represent a class *qua* counsel," but states that "no case of which plaintiff knows prevents a *pro per* plaintiff who is not a lawyer from preserving his ability to be a class representative who, if a class were certified, and then [sic] retain counsel." Opp'n, Dkt. 24 at 30–31.

Fed.R.Civ.P. 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." "[C]ourts have routinely adhered to the general rule prohibiting pro se plaintiffs from pursuing claims on behalf of others in a representative capacity." *Simon v. Hartford Life, Inc.*, 546 F.3d 661, 664 (9th Cir.2008) (citing cases). The Ninth Circuit has not, in a decision with precedential effect, addressed whether a self-represented party may act as a class representative. However, in unpublished dispositions, it has concluded that this is not permitted under Fed.R.Civ.P. 23(a)(4). *See Perondi v. Schriro,* 370 Fed.Appx. 805 (9th Cir.2010) (unpublished disposition); *White v. Geren,* 310 Fed.Appx. 159, 160 (9th Cir.2009) (unpublished disposition). District courts that have considered this issue have reached the same conclusion. *See, e.g., Langan v. United Servs. Auto. Ass'n,* 2014 WL 4744790, at *15 (N.D.Cal. Sept. 23, 2014); *Mackenzie v. Hutchens,* 2013 WL 8291758, at *1 (C.D.Cal. Nov. 19, 2013). The reasoning of these decisions is persuasive. Plaintiff cannot serve as an adequate class representative for purposes of Fed.R.Civ.P. 23(a)(4).

Defendants' motion to strike these allegations is timely. Fed.R.Civ.P. 23(d)(1)(D) expressly authorizes the court to "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." Class allegations are not generally stricken at the pleading stage, but they may be stricken, with leave to amend, where "the face of the complaint shows conclusively that the proposed class cannot be certified." *Langan,* 2014 WL 4744970, at *15. These circumstances are present. Plaintiff's proposed solution—to let the class allegations stand due to what is at present the speculative possibility that he might later obtain counsel—is not tenable. It would inject significant uncertainty as to the scope of discovery and other pre-trial proceedings. Thus, it is an appropriate subject of a motion to strike. *See Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d 970, 973 (9th Cir.2010).

For these reasons, the Motion is **GRANTED** without prejudice, *i.e.,* with leave to amend, as to Plaintiff's class action allegations. Plaintiff may seek to reassert these allegations in an amended complaint if he is represented by counsel, such counsel has entered an appearance in this action and there is a reasonable basis to assert the necessary elements of a class proceeding. *See Langan,* 2014 WL 4744970, at *16 (granting motion to strike self-represented litigant's class action allegations, and imposing similar conditions on re-pleading of those allegations).

b) Motion to Strike Prayer for Attorney's Fees

 **\*5** The dispute as to Plaintiff's prayer for attorney's fees parallels the one as to class action allegations. Thus, Defendant argues this prayer should be stricken because a self-represented plaintiff is not entitled to recover attorney's fees. Mot., Dkt. 16 at 27 (citing *Gonzalez v. Kangas,* 814 F.2d 1411, 1411 (9th Cir.1987)). Plaintiff agrees that this general rule applies, but argues that this request is proper because he "pleads entitlement to attorneys' fees only in the event he would be represented by counsel." Opp'n, Dkt. 24 at 30.

The FAC does not, by its terms, condition the request for fees on the subsequent appointment of counsel. As pleaded, the prayer for attorney's fees is not relevant and could not be granted even if Plaintiff prevails in this action. Therefore, the Motion is **GRANTED** without prejudice, *i.e.,* with leave to amend, as to Plaintiff's prayer for attorney's fees. Such a proposed amendment may be presented only if Plaintiff is represented by counsel who has entered an appearance and who has a good faith basis to assert a claim for a fee award.

### c) RICO

A civil RICO claim under 18 U.S.C. § 1962(c) requires proof of: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.... In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Racketeering activities (also called "predicate acts") are defined in 18 U.S.C. § 1961(1) and include mail fraud, wire fraud, money laundering, bribery and securities fraud. A "pattern" "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). There must be a demonstrable relationship between the predicate acts and threatened continued activity to establish a pattern. *Howard v. Am. Online Co., Inc.,* 208 F.3d 741, 746, 749 (9th Cir.2000). "Related" conduct "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (internal quotation marks omitted). It is not enough to show only that the acts have the same participants. *Id.*

The FAC alleges that, by "doing the things alleged hereinabove, defendants thereby committed wire fraud, by using instrumentalities of interstate commerce to accomplish the crime." FAC, Dkt. 12, ¶ 41. It is alleged that Defendants, individually and collectively, are "enterprises" for purposes of RICO. *Id.* ¶¶ 43–45. The "pattern" of "racketeering activity" is pleaded as follows:

> The pattern of racketeering activities included a continuous pattern and practice potentially involving activities, including any potential civil RICO predicates, set forth in the RICO predicate statutes, including extortion, mail fraud, wire fraud, fraudulent concealment, fraud, and potentially obstruction of justice.

> On information and belief, the enterprises' activities have occurred on more than one and on many occasions over at least the past 10 years and have been done on numerous occasions and constitute at least three separate acts.

> The wrongful acts described in the matters enumerated hereinabove occurred over a significant period of time, and are related in that they evidence civil RICO predicates, including at least fraud, wire fraud, mail fraud, extortion, and obstruction of justice and pose a threat of continued criminal activity, have the same or similar purposes, results, participants and kinds and categories of participants, victims, methods of commission, and are otherwise interrelated by their common characteristics, are not isolated events, and each and all constitute a continuing pattern of racketeering activity and constitute a long term threat of continuing racketeering activity.

**\*6** *Id.* ¶¶ 47–49 (numbering omitted).

Defendants argue that these allegations are not sufficient to establish an enterprise or a pattern of racketeering activity. Mot., Dkt. 16 at 20–22. Plaintiff argues that RICO is a remedial statute, subject to the liberal pleading standards of Fed.R.Civ.P. 8, that he "lacks access to all facts necessary to detail the claim," and that the RICO claim is sufficiently pleaded, "both *simpliciter* and for conspiracy." Opp'n, Dkt. 24 at 19–29.

Assuming, without deciding, that the FAC alleges the existence of a RICO enterprise, it fails sufficiently to allege a pattern of racketeering activity. The allegation that, "over at least the past 10 years," Defendants engaged in a "continuous pattern and practice potentially involving activities, including any potential civil RICO predicates"—of which there are dozens, *see* 18 U.S.C. § 1961(1)—does not comport with even the liberal notice pleading standards of Rule 8. Thus, it fails to give Defendants fair notice of the allegations that they would have to address in connection with their defense of the claims. Rather, it sets forth only legal conclusions and not the facts necessary to state a plausible claim for relief. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (complaint must provide more than a "formulaic recitation of the elements of a cause of action"); *see also Rao v. BP Products N. Am., Inc.,* 589 F.3d 389, 399 (7th Cir.2009) (restatement of RICO elements "in boilerplate fashion" not adequate under *Twombly* ).

Even if the FAC were construed to allege that the predicate acts by Defendants were similar to those that were allegedly directed to Plaintiff, *e.g.,* "wire fraud" in the solicitation of insurance premiums with the intent not to cover any losses incurred, it would not adequately state a civil RICO claim. Predicate acts of this nature must be pleaded with specificity required by Fed.R.Civ.P. 9(b), and "the pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392–93 (9th Cir.1988). Plaintiff argues that this standard should be "relaxed on a civil RICO claim, particularly when, as here, there has not been any factual development of this case." Opp'n, Dkt. 24 at 26 (citing *Corley v. Rosewood Care Ctr., Inc.,* 142 F.3d 1041, 1051 (7th Cir.1998)). However, even assuming that this relaxed standard should apply—an issue that is not decided by this Order—Plaintiff fails to allege any specifics as to these predicate acts, which is "a fatal defect under Fed.R.Civ.P. 9(b)." *Alan Neuman Prods., Inc.,* 862 F.2d at 1392.

Construing the FAC in the light most favorable to Plaintiff, it fails to allege under the applicable pleading standards that Defendants engaged in a pattern of racketeering activity. Thus, it fails to state a claim under RICO. Therefore, the Motion is **GRANTED** without prejudice, *i.e.,* with leave to amend, as to the RICO claim.

### d) Plaintiff's Remaining State Law Claims

 **\*7**  Defendants contend that Plaintiff's remaining three claims under state law, for breach of contract, fraud, and insurance bad faith, are not adequately pleaded. This contention is not persuasive if only the face of the face of the FAC is considered. However, in Defendants' Rule 16(b)/26(f) Report and at the hearing on the Motion, Defendants claimed they had paid Plaintiff the full amount due under the Contract after the Complaint was filed. Assuming that this representation is accurate, it affects these claims. Dkts. 29, 33. At the hearing, Plaintiff acknowledged this effect, stated that the bad faith claim was now the principal one that he planned to pursue under state law, and represented that he intended to amend the FAC to address these issues. Dkt. 33. For these reasons, in any Second Amended Complaint, Plaintiff shall address these issues.

During the hearing, the assertion of diversity jurisdiction was also addressed. Plaintiff stated that he is a citizen of New York and that the Defendants are not. Plaintiff also asserted that the amount in controversy as to the state law claims is more than $75,000 notwithstanding that the Contract provided for insurance coverage in a substantially smaller amount. Thus, based on the face of the FAC, it appears the coverage limit for the Contract is $4515.40, which is $2257.70 for each of the two travelers. Contract, Dkt. 12, Ex. 1 at 14. [6]  Generally, courts "look no farther than the pleadings to determine the amount in controversy unless from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed." *Kelly v. Fleetwood Enterprises, Inc.,* 377 F.3d 1034, 1037 (9th Cir.2004) (internal quotation marks omitted). Even if punitive and bad faith damages are considered, issues may be present as to whether they could be recovered in an amount that would

Case 1:26-cv-00659-KM   Document 13-1   Filed 05/20/26   Page 198 of 199

Yagman v. Allianz Insurance, Not Reported in Fed. Supp. (2015)

satisfy the amount in controversy. "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003) (punitive award based on, *inter alia,* fraud and insurance bad faith was excessive); *see also Bell–Sparrow v. Wiltz,* 2014 WL 2927354, at *4 (N.D. Cal. June 27, 2014) ("When determining the amount in controversy, a claim for punitive damages is to be given closer scrutiny, and the trial judge accorded greater discretion, than a claim for actual damages.") (citations omitted).

For these reasons, in an amended complaint, Plaintiff shall make clear the good faith basis for his contention as to the amount in controversy.

### III. *Conclusion*

For the reasons stated in this Order, the Motion is **GRANTED IN PART** without prejudice, *i.e.,* with leave to amend. Plaintiff shall file his Second Amended Complaint no later than May 26, 2015.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 5553460

---

### Footnotes

1    The Letter also states: "We will refund your insurance premium if you cancel your plan within 10 days of purchase and you haven't started your trip or filed a claim." Contract, Dkt. 12, Ex. 1 at 14.

2    The FAC was filed on March 24, 2015. Dkt. 12. Defendants contend it was untimely. Mot., Dkt. 16 at 11. Thus, Defendants moved to dismiss the Complaint on March 2, 2015, and served Plaintiff with that motion by mail on the same date. Dkt. 8–1. Fed.R.Civ.P. 15 authorizes one amendment to a pleading "as a matter of course" within 21 days of service of a motion or responsive pleading. Fed.R.Civ.P. 6(d) extends by three days the time to respond to a motion served by mail. Under these rules, Plaintiff was permitted to file an amended complaint as of right no later than March 26, 2015. Therefore, the FAC was timely filed.

3    Plaintiff also contends that the Motion should be denied because Defendants failed to meet and confer as required by Local Rule 7.3. Opp'n, Dkt. 24 at 7–8. The parties did engage in a telephonic conference prior to the filing of the first motion to dismiss, which concerned a complaint that was, in most material respects, very similar to the FAC. Mot., Dkt. 16 at 9–10. Plaintiff argues this conference did not excuse Defendants from initiating a second with respect to their subsequent motion. Dkt. 24 at 7. In the exercise of its discretion and to advance an efficient resolution of the present issues, Plaintiff's objection is overruled. However, the parties are directed to work diligently to comply with all procedural requirements in the future.

4    This analysis assumes the Federal Rules of Evidence, which do not apply to certain "miscellaneous proceedings," are to be considered when evaluating certificates of service submitted in connection with Rule 5. Fed.R.Evid. 1101(d)(3).

5    Further, despite initiating this action *in pro se,* Plaintiff made and received several filings, including the Motion, through an email account associated with Joseph Reichmann, who is an attorney. Dkt. 18; *see* Local Rule 5–3.2.2 ("A *pro se* litigant who registers to receive service of documents through the CM/ECF System will be deemed to consent, for

---

Case 1:26-cv-00659-KM     Document 13-1     Filed 05/20/26     Page 199 of 199

**Yagman v. Allianz Insurance, Not Reported in Fed. Supp. (2015)**

purposes of F.R. Civ. P. 5(b)(2)(E), to receive electronic service of documents through the CM/ECF System."). Plaintiff subsequently filed a notice of self-representation that disclaimed electronic service. Dkt. 22.

6       This per-traveler figure is the sum of $250 in baggage delay coverage plus $603.08 in trip cancellation protection plus $500.00 in travel/trip delay coverage plus $904.62 in trip interruption protection. Contract, Dkt. 12, Ex. 1 at 14.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.