Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 1 of 114

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

🚩 KeyCite Yellow Flag

Distinguished by Bryant v. Byron Udell & Associates Inc., E.D.Va., August 11, 2023

2023 WL 1782728
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Stewart ABRAMSON, individually and on behalf of a
class of all persons and entities similarly situated, Plaintiff,

v.

AP GAS & ELECTRIC (PA), LLC, Defendant.

Civil Action No. 22-1299
|
Filed February 6, 2023

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bellefonte, PA, for Plaintiff.

Frederick P. Santarelli, Steven Tolliver, Jr., Elliott Greenleaf & Siedzikowski, PC, Blue Bell, PA, for Defendant.

Re: ECF No. 13

**OPINION**

KELLY, Magistrate Judge

**\*1** Plaintiff Stewart Abramson ("Abramson") initiated this action against Defendant AP Gas & Electric (PA), LLC ("AP Gas") alleging that AP Gas violated the Telephone Consumer Protections Act ("TCPA"), 47 U.S.C. § 227, by sending pre-recorded telemarketing calls to Abramson and purported class members to promote AP Gas goods and services without their consent. ECF No. 1.

Presently before the Court is a Motion to Dismiss filed on behalf of AP Gas. ECF No. 13. AP Gas contends that dismissal is warranted pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim or, alternatively, that Abramson's claim for injunctive relief must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing. In addition, AP Gas seeks to strike the class allegations. For the reasons that follow, the Motion to Dismiss will be denied.[1]

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Abramson alleges that AP Gas provides gas and energy services to consumers and uses telemarketing to promote its products and solicit new clients. ECF No. 1 ¶¶ 16-17. The telemarketing program includes the use of automated calls to send prerecorded messages. Abramson states that he received at least eleven pre-recorded calls from AP Gas between August 9 and 18, 2022. At least one of these calls was received on his residential line that is used for personal purposes. Id. ¶¶ 20-22. Abramson identified the message as "clearly pre-recorded" because there was a delay after he answered the phone with a distinctive "click" that was followed by the pre-recorded message. The message was delivered in a monotone, non-personalized and generic manner, followed by a prompt to press a button in response to the recorded message. Id. ¶ 24. Abramson alleges that he received multiple

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 2 of 114

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

calls that delivered the same pre-recorded message. The calls used a "spoofed" Caller ID number to make them appear to originate from a local phone number.

On August 18, 2022, Abramson received one of the calls and pressed a button in response. Abramson then spoke with a live individual identified as "Christopher", who told Abramson that he was calling to offer AP Gas services at a specified rate for 36 months. Id. ¶¶ 25-27. Christopher provided a telephone number for AP Gas for Abramson to call to obtain a verification number. Id. ¶¶ 28-31. Christopher listened to the conversation Abramson had with the person who performed the recorded verification and immediately came back on the line after the verification was completed. Id. ¶ 32.

Abramson alleges that he and other automated call recipients were harmed by these calls because they were temporarily deprived of legitimate use of their phones because the phone line was tied up; they were charged for the calls; their privacy was improperly invaded; and the calls were frustrating, obnoxious, annoying, a nuisance and disturbed the solitude of Abramson and the class. Id. ¶¶ 33-34.

 **\*2**  The following month, Abramson initiated this action with a Complaint filed on behalf of himself and a purported class against AP Gas. ECF No. 1. In response, AP Gas filed the pending Motion to Dismiss and brief in support. ECF Nos. 13-14. Abramson filed a brief in opposition to the Motion to Dismiss. ECF No. 18. AP Gas filed a reply brief. ECF No. 19.

The Motion to Dismiss is now ripe for disposition.

## II. STANDARD OF REVIEW

### 1. Rule 12(b)(1)

"A motion to dismiss for want of standing is ... properly brought pursuant to [Federal Rule of Civil Procedure] 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted). The standard applied by the Court in reviewing a Rule 12(b)(1) motion challenging standing depends on whether the motion presents a "facial" or a "factual" attack on the issue presented. In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). "[A] facial attack contests the sufficiency of the pleadings, ... whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." Const. Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) (internal citation and alterations omitted).

In reviewing a facial challenge, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). A factual challenge, however, permits a court to weigh and consider evidence outside the pleadings. Id. In evaluating a factual attack on standing, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Mortenson v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

The Motion to Dismiss Abramson's claim for injunctive relief is properly understood as a facial attack because AP Gas contends that the Complaint lacks sufficient factual allegations to establish standing. ECF No. 14 at 29. Thus, the facts alleged are construed in Abramson's favor, as the nonmoving party.

### 2. Rule 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009). Plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Instead,

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 3 of 114

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

"[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

"To determine the sufficiency of a complaint, a court must take three steps. First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' " Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011), as amended (June 6, 2011) (quoting Iqbal, 556 U.S. at 675). "Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at [664]. Third, 'whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' " Id. If the facts alleged in the complaint "show" that the plaintiff is entitled to relief, the court should deny the motion to dismiss. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

## III. DISCUSSION

### A. The TCPA

**\*3** The TCPA was intended to combat, among other things, the proliferation of automated telemarketing calls (known as "robocalls") to private residences, which Congress viewed as a nuisance and an invasion of privacy. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 375 (2012). Thus, the TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes ... or is exempted by rule or order by the Commission." 47 U.S.C. § 227(b)(1)(B). The TCPA further provides that a "person or entity" may bring an action to enjoin violations of the statute and recover actual damages or $500 in statutory damages per violation, or treble damages for willful violations. 47 U.S.C. § 227 (b)(3)(B). "Because the TCPA is a remedial statute, it should be construed to benefit consumers." Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 271 (3d Cir. 2013).

Pursuant to the TCPA, Abramson seeks injunctive relief prohibiting AP Gas from using a pre-recorded message to make or direct future calls to residential telephone numbers to advertise its good or services. ECF No. 1 at 9. Abramson also seeks statutory damages on behalf of himself and the proposed class of individuals who have been similarly harmed by AP Gas's violations of the TCPA. Id.

In the Motion to Dismiss, AP Gas challenges the sufficiency of facts alleged to state a claim under the TCPA, Abramson's standing to pursue injunctive relief, and the sufficiency of the class action allegations. The Court addresses each basis for dismissal as follows.

### B. 12(b)(6) Motion to Dismiss for Failure to State a Claim

To state a claim under Section 227(b)(1)(B) of the TCPA, a plaintiff must allege: (1) that the defendant initiated a telephone call to a residential telephone line, (2) using an artificial or prerecorded voice to deliver a message, (3) without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(B). AP Gas contends that Abramson fails to adequately allege that it initiated the call or that the telephone line was a residential line. ECF No. 14 at 15-27. In addition, AP Gas suggests that the Complaint fails to allege a willful or knowing violation. Id. at 28-29. At this stage of the litigation, each argument is readily resolved in favor of Abramson.

First, Abramson alleges that he received at least one of the eleven pre-recorded calls "on his residential line. 412-XXX-0871. That number is not associated with a business and is used for personal purposes." ECF No. 4 ¶¶ 21-22. These factual allegations are given their plain meaning and are sufficient to support a plausible inference that a call was received on Abramson's residential line.

Second, Abramson alleges that he received a call that started with the following pre-recorded message:

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 4 of 114

> Hello, this is a call from your utility company. You have been paying more than your consumption from the previous few months. You will be compensated by fifty dollars along with thirty five percent reduction on your electric and gas bill. Please press one to get your compensation.

Id. ¶ 23. This allegation sufficiently alleges that the caller used a prerecorded message.

Third, the call was then transferred to an agent who identified himself as "Christopher" who "told the Plaintiff that he was calling to sign individuals up for AP Gas's services." Id. ¶ 25. Christopher provided an AP Gas telephone number, directed Abramson to call the number for a verification number, stayed on the line during the verification process, and then returned on the line. These allegations, taken as true as they must at this stage of the litigation, along with any permissible and plausible inferences, are sufficient to establish a direct or otherwise authorized connection to AP Gas and thus "cross over the line to plausibly state a claim for relief...." Abramson v. Josco Energy USA, LLC, No. 21-1322 (W.D. Pa. Aug. 1, 2022) (ECF No. 30 at 5) (similar allegations "go beyond formulaically reciting the elements of Plaintiff's cause of action," and taken as true, state a claim for relief).

 **\*4**  This case contrasts with many of those cited by AP Gas, when the plaintiff "alleged merely that the calls at issue were made by, or on behalf of, or with the authorization of [the defendants]" and failed to allege that a representative on the phone stated that they were calling on behalf of the defendant. Bank v. GoHealth, LLC, No. 19-CV-5459, 2021 WL 1884671, at \*12 (E.D.N.Y. May 11, 2021), aff'd, No. 21-1287, 2022 WL 1132503 (2d Cir. Apr. 18, 2022) (contrasting Bank v. Lifewatch, No. 15-CV-5708 (E.D.N.Y. July 10, 2017), where the plaintiff alleged that at the end of a robocall he was transferred to a live person who claimed to work for the defendant)). AP Gas's reliance on Sheski v. Shopify (USA) Inc., No. 19-06858, 2020 WL 2474421, at \*2 (N.D. Cal. May 13, 2020) fairs no better. In that case, a text message was sent on the defendant's platform, which lacked "any control over a retailer's actual text marketing campaigns," and was thus not within the scope of the TCPA. Id. Equally unavailing is AP Gas's citation to Smith v. Direct Bldg. Supplies, LLC, No. 20-3583, 2021 WL 4623275, at \*3 (E.D. Pa. Oct. 7, 2021) where the First Amended Complaint "provide[d] no details specifying how Smith knew that Direct Building Supplies in fact placed these calls, such as that ... the persons with whom Smith spoke identified themselves as representatives of Direct Building Supplies...." And in Maldando-Rodriguez v. Citibank, N.A., No. 2:12-CV-150, 2013 WL 350814, at \*5 (N.D. Ind. Jan. 28, 2013), the district court rejected a claim under the Fair Debt Collections Practices Act, 15 U.S.C. §§ 1692, et seq., because the plaintiff invoked boilerplate language to attribute improper conduct to the defendant, stating that it "acted through their agents, employees, officers, members, directors, heirs, assigns, principals, trustees, sureties, subrogees, representatives, and insurers." This allegation was "woefully insufficient," id., and stands in stark contrast to the allegations in Abramson's Complaint that plausibly infer a direct connection to AP Gas. Finally, Klein v. Just Energy Grp., Inc., No. 14-1050, 2016 WL 35359137, at \*8 (W.D. Pa. June 29, 2016), was decided after discovery on defendants' motion for summary judgment, and the "uncontroverted evidence show[ed] that the calls were not made by or on behalf of the [named defendants]."

AP Gas next asserts that Abramson fails to allege that any violation was willful or knowing, and therefore the Complaint fails to state a claim for treble damages. ECF No. 14 at 28. Under the TCPA, the court has discretion to impose treble damages if the defendant's violation was "willful[ ] or knowing[ ]." See 47 U.S.C. § 227(b)(3)(C). To the extent that such an allegation is necessary only for an award of treble damages, the Complaint sufficiently sets forth a plausible claim for relief. Abramson alleges that the calls at issue were made at a time after AP Gas was sued for identical conduct. ECF No. 1 ¶ 19. Despite notice of the potential illegality of its conduct, AP Gas made at least eleven prerecorded calls to Abramson without his consent, with at least one call made to his residential phone. Id. These facts state a claim for a knowing violation of the TCPA. See, e.g., KHS Corp. v. Singer Fin. Corp., 376 F. Supp. 3d 524, 530 (E.D. Pa. 2019) ("A defendant commits a willful and knowing violation of the TCPA if he or she sends an unsolicited faxed advertisement that he or she knows to be a violation of the TCPA.").

For each of these reasons, the allegations of the Complaint and the plausible inferences drawn from them state a claim against AP Gas for the violation of the TCPA. Thus, dismissal is not warranted.

### C. Article III Standing

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 5 of 114

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

AP Gas next contends that Abramson lacks standing to pursue injunctive relief because the Complaint fails to allege "any threat of possible *future* injury" by AP Gas as required under Article III of the United States Constitution. ECF No. 14 at 29 (emphasis in original). Abramson responds that Article III standing is adequately stated based on allegations that AP Gas has adopted a strategy of marketing its services via prerecorded messages and that despite a prior lawsuit for violating the TCPA, it continues to initiate such calls. ECF No. 18 at 11-12. The Court agrees that these allegations establish standing for relief specifically provided for by the TCPA. See Section 227(b)(3) (a private of action is conferred on "a person or entity ... to enjoin such violation").

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." Art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," and it thus "limits the category of litigants empowered to maintain a lawsuit in federal court...." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). On a motion to dismiss for lack of standing, "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the elements [of standing]." Id. That burden is readily met here, given the facial attack by AP Gas that requires that the Court consider the allegations of the Complaint as true.

> **\*5** The Supreme Court's well-known standing test sets forth an "irreducible constitutional minimum" of three elements that a plaintiff must satisfy: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court[,]" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 [ ] (1992).

Manuel v. NRA Grp. LLC, 722 F. App'x 141, 145 (3d Cir. 2018).

In Manuel, a panel of the United States Court of Appeals for the Third Circuit had no difficulty finding that the plaintiff had standing to assert a TCPA claim based on allegations in the complaint that he received calls on his cell phone placed by the defendant using an automatic telephone dialing system, without his consent, and in violation of the TCPA. Id. at 146 (citing Susinno v. Work Out World, Inc., 862 F.3d 346, 348 (3d Cir. 2017)). These allegations also met the requisite standing inquiry for statutory causes of action set forth in Lexmark In'tl, Inc. v. Static Control Components, Inc. 572 U.S. 118, 130-134 & 134 n.6 (2014) (announcing that zone-of-interests and proximate cause injury tests supply relevant limitations on statutory standing). Manuel, 2 F. App'x at 146 n. 7; see also Leyse v. Bank of Am. Nat. Ass'n, 804 F.3d 316, 326 (3d Cir. 2015) (applying zone-of-interests test to TCPA claim).

Here, along with allegations that AP Gas is aware of the requirements of the TCPA, Abramson alleges the elements of a TCPA claim to satisfy a demand for injunctive relief: (1) ongoing telemarketing by AP Gas using automated calls to send prerecorded messages; (2) Abramson's receipt of at least eleven prerecorded calls from AP Gas between August 9 and 18, 2002, without his consent; and (3) injury in the form of disturbed solitude and annoyance as well as being temporarily deprived of the use of his phone. ECF No. 1 ¶¶ 19-21. These allegations adequately place him within the zone of interests protected by the TCPA, and allege a pattern and practice by AP Gas of violating the TCPA. These allegations are accepted as true, and permit an inference of future violations that the TCPA seeks to enjoin.

### D. Class Allegations

AP Gas next seeks to strike the class allegations pursuant to Federal Rules of Civil Procedure 12(f) and 23 because: (1) the proposed class is impermissibly overbroad; (2) the class is not "fail-safe"; and (3) common questions of law and fact do not dominate. At this early stage of the litigation, the Court concludes that none of the arguments proffered by AP Gas warrant the relief requested. To that end, this Court recently found identical class allegations challenged on identical grounds by some of the identical counsel sufficient to survive a motion to dismiss. See Abramson v. Josco Energy, No. 21-1322 (W.D. Pa. Aug. 1, 2022) (ECF No. 30 at 6-8). The Court agreed with the plaintiff that the motion was premature given the self-limiting definition of the class and further "that such motions [to strike class allegations] should be granted only in the rare case where the complaint demonstrates that no amount of discovery will allow the Plaintiff to meet the requirements of class certification." Id. at 7-8 (citing

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 6 of 114

Abramson v. AP Gas & Electric (PA), LLC, Not Reported in Fed. Supp. (2023)

Swank v. Wal-Mart Stores, Inc., No. 13-CV-1185, 2015 WL 1508403, at *2 (W.D. Pa. Mar. 31, 2015), Sagar v. Kelly Auto. Grp., Inc., No. 21-CV-10540-PBS, 2021 WL 5567408, at *7 (D. Mass. Nov. 29, 2021); Rosenberg v. LoanDepot.com, LLC, 435 F. Supp. 3d 308 (D. Mass. 2020); Donaca v. Metro. Life Ins. Co., No. CV-13-0561, 2014 WL 12597152, at *3-4 (C.D. Cal. Jan 22, 2014); Adam v. CHW Grp., Inc., No. 21-CV-19-LRR, 2021 WL 7285905, at *11 (N.D. Iowa Sept. 9, 2021)(collecting cases)). In addition,

> **\*6** the Court agrees with Plaintiff that discovery will or will not reveal whether the commonality concerns raised by Defendant are well founded. Thus, because the Court determines that [ ] 'it is possible that [ ] discovery could possibly demonstrate the viability of the class,' ... it would be inappropriate to strike the class allegations at this stage, in that the Defendant's arguments in essence ask this Court to resolve, on the pleadings alone, whether class treatment would be permitted under Rule 23, and if so, the scope of a certified class. It is simply premature for the Court to do that in light of the principles outlined above.

Josco, at 8 (quoting Swank, 2015 WL 1508403, at *2).

For the same reasons, the Court denies the motion to strike class allegations by AP Gas.

## IV. CONCLUSION

For the foregoing reasons, Defendant AP Gas & Electric (PA), LLC's Motion to Dismiss Plaintiff's Complaint and/or to Strike Plaintiff's Class Allegations, ECF No. 13, is properly denied, without prejudice. Accordingly, the following Order is entered:

## ORDER

AND NOW, this 6th day of February, 2023, upon consideration of Defendant AP Gas & Electric (PA), LLC's Motion to Dismiss Plaintiff's Complaint and/or to Strike Plaintiff's Class Allegations, ECF No. 13, and the briefs filed in support and in opposition thereto, and for the reasons set forth in the accompanying Memorandum, the motion is DENIED, without prejudice.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the Plaintiff wishes to appeal from this Order he or she must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P., with the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

## All Citations

Not Reported in Fed. Supp., 2023 WL 1782728

Footnotes

1    Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment, with direct review by the United States Court of Appeals for the Third Circuit if an appeal is filed. ECF Nos. 16 and 21.

**End of Document**                                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 7 of 114

Bird v. Pro Star Builders, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 18216007
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Daniel BIRD

v.

PRO STAR BUILDERS, INC.

Case No. 2:22-cv-03610-JLS-JEM
|
Filed November 28, 2022

**Attorneys and Law Firms**

Rachel Kaufman, Kaufman PA, Coral Gables, FL, for Daniel Bird.

Jonesh G. Daryanani, Simon M. Feng, Perkins Coie LLP, Los Angeles, CA, for Pro Star Builders, Inc.

**PROCEEDINGS: (IN CHAMBERS) ORDER DENYING DEFENDANT'S MOTION TO DISMISS (Doc. 16)**

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a Motion to Dismiss filed by Defendant Pro Star Builders, Inc. ("Pro Star"). (Mot., Doc. 16). Plaintiff Daniel Bird ("Plaintiff") timely opposed the motion, and Pro Star replied. (Opp., Doc. 18; Reply, Doc. 19.) The Court finds this matter appropriate for decision without oral argument, and the hearing set for December 2, 2022, at 10:30 a.m. is VACATED. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. For the following reasons, the Court DENIES Pro Star's Motion.

**I. BACKGROUND**

On May 26, 2022, Plaintiff filed his Class Action Complaint against Pro Star in this Court. (Doc. 1.) After Pro Star filed a Motion to Dismiss on August 2, 2022, Plaintiff filed his First Amended Complaint ("FAC") on August 26, 2022. (Doc. 15.) Pro Star filed the instant Motion on September 2, 2022. (Mot.)

Plaintiff alleges one cause of action against Pro Star for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). (FAC ¶¶ 3, 44–48.) The gist of Plaintiff's allegations is that Pro Star violated the TCPA by placing telemarketing calls to his residential telephone despite his registration in the National Do Not Call Registry. (*Id.* ¶ 7.) Plaintiff alleges that Pro Star makes telemarketing calls to consumers who have no prior contact with Pro Star and who have never consented to receive their calls to generate leads. (*Id.* at ¶ 13.) He alleges that his telephone number has been registered on the National Do Not Call Registry continuously since 2008. (*Id.* ¶ 16.) Still, Plaintiff claims, Pro Star called him twice: the first time on February 24, 2022, and the second time on April 19, 2022. (*Id.* ¶ 18.) Plaintiff's Caller ID identified the same number, (213) 426-1021, as the source of both calls. (*Id.* ¶ 19.) Plaintiff states that he did not answer the first call, but did answer the second call. (*Id.* ¶ 22.) Plaintiff alleges that the second call "was from [Pro Star]" and that "Pro Star was attempting to reach [him] to promote its home remodeling services." (*Id.* ¶¶ 22–23.) Pro Star provided Plaintiff with a quote for a potential project and set up an appointment with Plaintiff. (*Id.* ¶¶ 24–25.) Thereafter, Plaintiff alleges, a Pro Star employee appeared at his home and left his Pro Star business card with Plaintiff. (*Id.* ¶¶ 26–27.)

Plaintiff avers that the telemarketing calls invaded his privacy and that he never consented to or requested the calls. (*Id.* ¶¶ 26–27.) He brings the instant action on behalf of himself and on behalf of "[a]ll persons in the United States whose (1) telephone

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 8 of 114

Bird v. Pro Star Builders, Inc., Not Reported in Fed. Supp. (2022)

numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing calls [sic] from or on behalf of Defendant (3) within a 12-month period, (4) from four years prior the filing of the Complaint through the date of trial." (*Id.* ¶¶ 33.) Plaintiff seeks: (1) certification of his proposed class; (2) appointment as class representative; (3) appointment of his counsel as class counsel; (4) a declaration that Pro Star violated the TCPA; (5) injunctive relief prohibiting Pro Star and its affiliates or agents from making calls to any residential number on the National Do Not Call Registry; and (6) damages. (*Id.* "Prayer for Relief.")

## II. LEGAL STANDARD

 **\*2**  In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555. Thus, a complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively[,]" and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## III. DISCUSSION

Pro Star argues that Plaintiff's claim as alleged in the FAC is deficient on two grounds. First, according to Pro Star, "plaintiff has not alleged facts sufficient to show that Pro Star initiated" the two calls at issue. (Mot. at 3, 6–7.) Second, Pro Star contends that "Plaintiff fails to allege that Pro Star made two calls within a twelve-month period because he interacted with two different entities—Pro Star and Pro Star's telemarketer." (*Id.* at 7–8.) Pro Star's arguments are not persuasive.

Section 227(c) of the TCPA directs the Federal Communications Commission ("FCC") to implement regulations to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). To advance these objectives, Section 227(c) authorizes the FCC to establish and operate a "national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations." *Id.* § 227(c)(3). Pursuant to Section 227(c), the FCC promulgated the following regulation:

> No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator.

47 C.F.R. § 64.1200(c)(2).

Section 227(c) provides a private right of action to anyone "who has received more than one telephone call within any -month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). An individual may initiate an action to enjoin any such violation and recover the greater of either actual monetary loss resulting from a violation or up to $500 in damages for each violation. *Id.*

To state a claim under Section 227(c), a plaintiff must plead facts plausibly showing that: (1) he or she received multiple calls within twelve months; (2) from the same entity; (3) to a phone number registered on the National Do Not Call Registry. *See, e.g., Smith v. Direct Building Supplies, LLC*, 2021 WL 4623275, at \*4 (E.D. Pa. Oct. 7, 2021).

Here, Pro Star has only put in issue the first and second elements. But Plaintiff's allegations are sufficient to show that he received two calls from Pro Star within twelve months. Plaintiff alleges that he received two calls from the same number—the first on February 24, 2022 and the second on April 19, 2022. (FAC ¶¶ 18–19.) He further alleges that on the second call "Pro Star inquired if the project [Plaintiff] was potentially interested would cost more than $4,000" and "Pro Star's telemarketer set up an appointment" to finalize a "quote." (*Id.* ¶¶ 24–25.) Reading the FAC in the light most favorable to Plaintiff, as the Court must at this stage, it is reasonable to infer that "Pro Star" and "Pro Star's telemarketer" here refer to the same entity—not two different entities, as Pro Star claims in its Motion. (Mot. at 6; Reply at 5–6.)

**\*3** Further, it is reasonable to infer that Pro Star was responsible for the alleged February 24 unanswered call from the same number as the second call on April 19. Indeed, courts in other districts have recently found that a plaintiff has sufficiently alleged multiple calls from the same entity when he or she received more than one call from the same number but traced the calls back to the defendant after having answered only once. *See, e.g., Chapman v. Nat'l Health Plans & Benefits Agency, LLC*, 2022 WL 3130225, at \*7 (E.D. Mich. Aug. 4, 2022) (finding that plaintiff plausibly pleaded that four calls—including three unanswered calls—had come from the same defendant because they had originated from the same number and the plaintiff alleged that other individuals had complained about receiving solicitations from that number); *Spurlark v. Dimension Serv. Corp.*, 2022 WL 2528098, at \*3 (S.D. Ohio July 7, 2022) (finding that plaintiff who had ignored multiple calls from the same number until he answered and was able to identify the caller plausibly pleaded that the calls were all placed by the defendant). The Court agrees that it is reasonable to infer that the same caller is responsible for calls from the same number, whether those calls are answered or not. Accordingly, the Court finds that Plaintiff has plausibly alleged that the two calls at issue came from Pro Star.

## IV. CONCLUSION

For the above reasons, the Court DENIES Pro Star's Motion to Dismiss.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 18216007

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 10 of 114

Buja v. Novation Capital, LLC, Not Reported in Fed. Supp. (2017)

 KeyCite Yellow Flag

Declined to Extend by Andrade v. Marceno, M.D.Fla., March 29, 2021

2017 WL 10398957
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Kevin BUJA, individually and on behalf of others similarly situated, Plaintiff,

v.

NOVATION CAPITAL, LLC, a foreign limited liability company; Novation Ventures, LLC, a foreign limited liability company; Novation Funding, LLC each doing business as "Novation Settlement Solutions," an unregistered fictitious entity, Defendants.

CASE NO. 15-81002-CIV-MARRA

|

Signed 03/30/2017

|

Entered 03/31/2017

**Attorneys and Law Firms**

Keith James Keogh, Pro Hac Vice, Keogh Law, Ltd., Chicago, IL, Patrick Christopher Crotty, Sean Martin Holas, Scott David Owens, The Law Office of Scott D. Owens, Hollywood, FL, for Plaintiff.

Blaine C. Kimrey, Pro Hac Vice, Bryan K. Clark, Pro Hac Vice, Vedder Price, PC, Chicago, IL, Dana Jane McElroy, Thomas & LoCicero PL, Fort Lauderdale, FL, for Defendants.

## ORDER

KENNETH A. MARRA, United States District Judge

**\*1** This Cause is before the Court upon Plaintiff's Renewed Motion for Leave to File a Second Amended Complaint ("Motion" and "Motion to Amend"). (DE 54) The proposed Second Amended Complaint is attached to the Motion as Exhibit A. (DE 54-1.) Defendants filed a Response in opposition to the Motion (DE 55), and Plaintiff filed a Reply (DE 58). In addition, with leave of Court, Defendants filed a Supplemental Reply (DE 63) and supporting deposition transcript (DE 63-1), and Plaintiff filed a Reply thereto (DE 66) and a supporting errata sheet (DE 66-1). On October 28, 2016, Defendants filed a Motion to Strike Errata Sheet (DE 67). Plaintiff filed a Response in opposition to the Motion to Strike Errata Sheet (DE 68), and Defendants filed a Reply (DE 69). The Court has carefully considered the argument of counsel and is otherwise fully advised in the premises.

In the proposed Second Amended Complaint, Plaintiff seeks to add a clam under 47 U.S.C. § 227(c), asserting a violation of the Telephone Consumer Protection Act ("TCPA") based upon Defendants' alleged failure to establish proper practices and procedures regarding do-not-call ("DNC") requests, contrary to 47 C.F.R. § 64.1200(d). For the reasons stated below, the Motion to Amend is granted insofar as Plaintiff seeks to add the DNC claim based upon a proper statutory and regulatory basis but is otherwise denied.

## I. BACKGROUND

### A. The Parties

Plaintiff Kevin Buja, a resident of Collier County, Florida, agreed to a structured settlement at some point prior to the filing of his complaint to resolve an unrelated legal matter. (DE 54-1, Proposed Second Amended Complaint ("SAC") ¶¶ 3, 16.)

Defendants are in the business of purchasing structured settlements and annuities for a lump sum of cash. (*Id.* ¶ 8.) To obtain clients, Defendants use a variety of means to identify recipients of structured settlements and/or annuities and then place telephone calls to them. (*Id.* ¶ 17.)

### B. Defendants' Do-Not-Call Policy

Defendants maintain a list of the names of individuals who do not wish to be called, referred to as a "Do Not Call List" or "Internal DNC List" ("IDNC list"). (*Id.* ¶ 25.) Defendants' Do-Not-Call policy mandates that any person whom Defendants call that expresses a desire not to receive telephone calls from Defendants must be added to Defendants' IDNC list. (*Id.* ¶ 26.)

### C. May 2014 Call

On May 8, 2014, Defendants called Plaintiff or caused Plaintiff to be called on his cellular telephone ("May 2014 call"). (*Id.* ¶ 28.) During the May 2014 call, Plaintiff "made it clear he did not desire to receive calls from or on behalf of Defendants," and Plaintiff then terminated the call. (*Id.* ¶ 26.) Following the May 2014 call, Defendants failed to add Plaintiff's name to Defendants' IDNC list pursuant to Defendants' Do-Not-Call Policy. (*Id.* ¶ 32.) Between the May 2014 call and July 1, 2015, Defendants called Plaintiff, or caused Plaintiff to be called, at least thirteen more times. (*Id.* ¶ 31.)

### D. July 1, 2015 Call

During a telephone call from Defendants on or about July 1, 2015 ("July 1, 2015 call"), Plaintiff told Defendants to include his name on Defendants' IDNC list. (*Id.* ¶ 35.) Following the July 1, 2015 call to Plaintiff, Defendants failed to add Plaintiff's name to Defendants' IDNC list or at the very least failed to refer to the IDNC list when making subsequent calls. (*Id.* ¶ 36.) Following the July 1, 2015 call to Plaintiff, Defendants called Plaintiff, or caused Plaintiff to be called, at least two more times. (*Id.* ¶ 38.)

### E. The Proposed DNC Claim in the SAC

**\*2** In the proposed SAC, Plaintiff seeks to add a clam under 47 U.S.C. § 227(c), relating to Defendants' alleged failure to establish proper practices and procedures regarding DNC requests. Plaintiff alleges that Defendants called persons who asked to be placed on Defendants' IDNC list. (*Id.* ¶ 61.) Plaintiff alleges that "Defendants did not have reasonable practices and procedures in place to effectively prevent telephone solicitations ... as evidenced by its calls to Plaintiff who repeatedly requested Defendants stop calling." (*Id.* ¶ 62.)

### F. Plaintiff's Previously-filed Motion to Amend and Related Proposed Complaint

Plaintiff previously filed a Motion to Amend to add a DNC claim but erroneously based the claim upon a violation of 16 C.F.R. § 310.4(b)(1)(iii)(A), which does not apply. The Court granted Plaintiff leave to file a revised Motion to Amend to add a DNC claim based upon a proper statutory basis. (DE 53.) The Court also permitted Plaintiff to delete the claim that Defendants placed calls featuring a prerecorded or artificial voice. (*Id.*) The Court did not permit any other amendments, and the deadline for amending pleadings, which was May 2, 2016, has passed. (DE 33, Scheduling Order.)

### G. Plaintiff's Motion to Amend to Add the DNC Claim and Related Briefing

In the Motion to Amend dated August 26, 2016, which is presently before the Court (DE 54), Plaintiff asks the Court for leave to add the DNC claim. In support of the Motion to Amend to add the DNC claim, Plaintiff points to audio recordings produced by Defendants that are in the record (DE 46, Notice of Filing Audio Recordings), as evidence that Plaintiff requested inclusion

on Defendants' IDNC list on multiple occasions. (DE 54, Motion to Amend at 2 n.2.) Plaintiff has also added several changes to the proposed SAC (DE 54-1) that were not contained within the original proposed SAC (DE 41-1), and do not relate to the correction of the statutory basis for the DNC claim ("New Changes").

In response to the Motion to Amend, Defendants make a number of arguments, including that the proposed amendment is made in bad faith and would be futile. In support of their futility argument, Defendants argue that the allegations are insufficient to state a DNC claim and, like Plaintiff, rely in part upon an audio recording in the record. (DE 55, Defendants' Resp. at 12-13 ("Plaintiff's allegation that he asked to be placed on Defendants' IDNC List on May 8, 2014 is demonstrably false.").) Defendants also emphasize that Plaintiff did not receive any phone calls more than thirty days after Plaintiff's DNC request during the July 1, 2015 call, thus contending that they did not violate the applicable regulation. *See* 47 C.F.R. § 64.1200(d) ("Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. *This period may not exceed thirty days from the date of such request.*" (emphasis added) ). Defendants also argue that the DNC claim must fail because Defendants are not "telemarketers" or "sellers" for purposes of the TCPA. Defendants assert that the class allegations are also futile. In addition, Defendants argue that Plaintiff has offered no justification for the New Changes in the proposed SAC.

In his Reply, Plaintiff insists that the allegations are sufficient to state a DNC claim and argues that the entries in Defendants' call log, which Plaintiff placed in the record (DE 45-4, Sealed Call Log), demonstrate that Plaintiff's statement during the telephone call was a sufficient DNC request. (DE 58, Pl.'s Reply at 2.) As to the thirty-day grace period, Plaintiff emphasizes that the regulations require telemarketers to honor DNC requests within "a reasonable time," and suggests that Defendants did not honor Plaintiff's DNC request within a reasonable time. Further, Plaintiff argues that Defendants' own documents support the fact that their calls are telemarketing. (*Id.*; *see* DE 43.) Plaintiff contends that Defendants' arguments attacking the certifiability of the putative class remain premature. Plaintiff fails to address Defendants' argument that he has not offered any justification for the New Changes in the proposed SAC.

 **\*3**  With leave of Court, Defendants filed a Supplemental Reply, attaching a transcript of Plaintiff's deposition under seal to show that Plaintiff did not make a DNC request during the May 2014 call. (DE 63-1, Sealed Deposition Transcript.) Plaintiff filed a Reply to Defendants' Supplemental Reply. (DE 66.)

## II. LEGAL STANDARD

Rule 15(a) of the Federal Rules of Civil Procedures provides that a party may amend the party's pleading "only with the opposing party's written consent or the court's leave" and states that the court should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a). In construing Rule 15(a), the Supreme Court has held as follows:

> In the absence of any apparent or declared reason–such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.–the leave sought should, as the rules require, be "freely given."
> *Foman v. Davis*, 371 U.S. 178, 182 (1962). District courts have "limited discretion in denying leave to amend, and should grant a motion to amend unless there are substantial reasons to deny it." *Bowers v. U.S. Parole Comm'n, Warden*, 760 F.3d 1177, 1185 (11th Cir. 2014) (citation, internal quotation marks, and alterations omitted).

"A proposed amendment may be denied for futility when the complaint as amended would still be properly dismissed." *Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010) (citation and internal quotation marks omitted). Leave to amend a complaint is also futile in an appropriate case when the complaint would "be immediately subject to summary judgment for the defendant." *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).[1]

Here, the Court will assess whether Plaintiff's proposed amended complaint would be futile under both the Rule 12(b)(6) motion-to-dismiss standard and the standard of Rule 56, i.e. whether the proposed DNC claim could survive a motion for summary judgment brought by Defendants.

## III. DISCUSSION

### A. Defendants' Futility Argument Concerning the DNC Claim

**\*4** Plaintiff asks this Court for leave to amend the Complaint to add a claim under 47 U.S.C. § 227(c), concerning "Defendants' systemic failure to stop calling persons who requested to be included on Defendants' Do-Not-Call List." (DE 54, Motion at 1.) Defendants assert that amendment would be futile because the allegations concerning Defendants' do-not-call procedures are not sufficient to state a DNC claim under the TCPA and are contradicted by the evidence in the record.

Pursuant to the authority granted to the Federal Communications Commission ("FCC") under the TCPA, *see* 47 U.S.C. § 227(c)(1), the FCC promulgated regulations that prohibit a person or entity from making a call for telemarketing purposes to a residential telephone subscriber "unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d). Further, the aforementioned rule set forth in paragraph (d) is applicable to "any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991." 47 C.F.R. § 64.1200(e) (internal quotation marks omitted).

As provided in 47 C.F.R. § 64.1200(d), telemarketers must institute procedures that meet the following minimum standards (among others):

> Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) *receives a request from a residential telephone subscriber not to receive calls from that person or entity*, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. *Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request.* If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

47 C.F.R. § 64.1200(d) (3) (emphasis added).

As aptly explained by one court, "[a] subsection (d)(3) violation is based on the fact that a telemarketer failed to implement certain procedures prior to the initiation of a phone call." *Simmons v. Charter Commc'ns, Inc.*, No. 3:15-CV-317 (SRU), 2016 WL 1257815, at \*13 (D. Conn. Mar. 30, 2016); *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 632 (6th Cir. 2009) ("The 'violation of the regulations' is therefore the initiation of the phone call without having implemented the minimum procedures."). "The regulations do not prohibit 'actually calling an individual after the individual has requested placement on a do-not-call list ... nor do the regulations specifically proscribe failing to record an individual's request to be placed on a do-not-call list.' " *Simmons*, 2016 WL 1257815, at \*13 (citing *Charvat v. DFS Servs. LLC*, 781 F. Supp. 2d 588, 592 (S.D. Ohio 2011) ). "Thus, in order to prove a subsection (d)(3) violation, a plaintiff cannot rely solely on the fact that a provider failed to record or honor an individual's request to be placed on a DNC list. Rather, the plaintiff must establish that the calls he or she received were initiated prior to the implementation of proper procedures." *Simmons*, 2016 WL 1257815, at \*13 (internal citation omitted).

### 1. The DNC Claim Would Survive a Motion to Dismiss

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 14 of 114

Buja v. Novation Capital, LLC, Not Reported in Fed. Supp. (2017)

**\*5**  "A plain reading of § 64.1200(d) reveals that any cause of action under it must include allegations that the consumer received a phone call from the telemarketer when the telemarketer did not have proper procedures in place to make such a phone call." *Benzion v. Vivint, Inc.*, No. 12-61826-CIV, 2014 WL 11531368, at \*5 (S.D. Fla. Jan. 17, 2014). The proposed DNC claim in the SAC here does just that. Plaintiff alleges that Defendants called persons who asked to be placed on Defendants' IDNC list. (*Id.* ¶ 61.) Plaintiff alleges that "Defendants did not have reasonable practices and procedures in place to effectively prevent telephone solicitations ... as evidenced by its calls to Plaintiff who repeatedly requested Defendants stop calling." (*Id.* ¶ 62.) These factual allegations are sufficient to "raise a right to relief above the speculative level" and state a plausible DNC claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alteration omitted).

Defendants argue that Plaintiff failed to allege the particular provision in 47 C.F.R. § 64.1200(d) that was allegedly violated. There are six basic procedures that a caller must have in placed before placing a telemarketing call. *See* 47 C.F.R. § 64.1200(d)(1)-(6) ( (1) written policy for maintaining DNC list, available on demand, (2) adequate training of personnel, (3) recording, disclosure, and honoring of DNC requests, (4) identification of sellers/telemarketers, (5) application of DNC requests to affiliated entities, (6) maintenance of records of a DNC list); *see also Simmons*, 2016 WL 1257815, at \*12. There is no doubt that Plaintiff's allegations center upon a violation of paragraph (d)(3), relating to the recording and honoring of DNC requests, and, if necessary, Plaintiff may otherwise narrow his § 64.1200(d) claim through discovery.

Based upon the allegations of the SAC, the Court concludes that the allegations would survive a motion to dismiss, and, therefore, the Court rejects Defendants' futility argument to the extent that it is based upon the four corners of the complaint.

### 2. The DNC Claim Would Survive a Motion for Summary Judgment

Defendants argue that Plaintiff's claim that Defendants failed to implement proper DNC practices and procedures fails because there is no evidentiary support for Plaintiff's allegations that Defendants failed to honor a DNC request made by Plaintiff on a timely basis.

### a. The May 2014 Call was not a DNC Request

Defendants argue that an audio recording in the record demonstrates that Plaintiff cannot prevail on a DNC claim. (DE 55, Defendants' Resp. at 12-13 ("Plaintiff's allegation that he asked to be placed on Defendants' IDNC List on May 8, 2014 is demonstrably false.").) In the proposed complaint, Plaintiff alleges that in May 2014, during a telephone call made by Defendants, "Plaintiff made it clear he did not desire to receive calls from or on behalf of Defendants, and Plaintiff then terminated the May 2014 call." (DE 30, SAC ¶ 30.) However, Defendants have presented undisputed evidence in the form of audio recordings that the only statement that Plaintiff made during the May 2014 telephone call was "No, uh, thanks a lot by goodbye." (DE 55, Resp. at 9.)

The TCPA regulations state that if a person makes a "request ... not to receive [a] call" from a telemarketer, the telemarketer must place that person on its IDNC list and not call that person without consent. 47 C.F.R. § 64.1200(d)(3). Neither the TCPA nor its regulations define what constitutes "a request." *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 389 (M.D.N.C. 2015).

While Plaintiff is correct that no magic words are required to constitute a request not to receive calls, the Court easily concludes that Plaintiff's terse words during the May 2014 call do not constitute such a request. Unlike the case in *Krakauer*, where the evidence demonstrated that the plaintiff wanted the telemarketer to "stop" calling him, *see id.* at 390, Plaintiff's brief words during the May 2014 call, i.e. "no, uh, thanks a lot by goodbye," and termination of the call did not amount to a directive for Defendants to do anything, much less stop calling him. Although Plaintiff points to certain comments made by Defendants' in their call log, Defendants' comments alone cannot change the substance of Plaintiff's statement during the call, which was not a

DNC request. Thus, the Court concludes that the May 2014 call did not amount to a DNC request, but, as more fully discussed below, the Court nevertheless concludes that the evidence in the record still supports a DNC claim.

b. The Reasonableness as to the Time it took Defendants to Honor the July 1, 2015 DNC Request is a Question of Fact

**\*6** The evidence in the record indicates that Plaintiff made a proper DNC request during the July 1, 2015 call with Defendants. Defendants claim that Plaintiff did not receive any phone calls more than thirty days after Plaintiff's DNC on July 1, 2015. However, as provided in 47 C.F.R. § 64.1200(d), "[p]ersons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a ... do-not-call request *within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request.*" *See* 47 C.F.R. § 64.1200(d)(3) (emphasis added).[2]

Here, the record demonstrates that the two calls that Plaintiff received after the DNC request were on July 14, 2015 (approximately two weeks after the DNC request) and July 23, 2015 (approximately three weeks after the DNC request). (DE 63-1, Sealed Deposition Transcript at 162, 169.) Based upon the evidence in the current record, this Court cannot conclude at this time that Defendants' taking two or three weeks to honor a DNC request is reasonable as a matter of law. *Martin v. Comcast Corp.*, No. 12 C 6421, 2013 WL 6229934, at \*6 (N.D. Ill. Nov. 26, 2013) (declining to decide as a matter of law that one or two weeks for a telemarketer to honor a plaintiff's DNC request was a reasonable amount of time as a matter of law). There is no evidence in the record concerning the capability and practices of Defendants in connection with processing a DNC request. Therefore, the evidence in the present record would survive a rule 56 motion for summary judgment, and, therefore, the Court rejects Defendants' futility argument to the extent that it is based upon the evidence in the record.

**B. Defendants' Futility Argument Pertaining to the Definition of Telemarketers**

Defendants argue that the DNC claim must fail because Defendants are not "telemarketers" or "sellers" for purposes of the TCPA. The term "telemarketing" means "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). The term "telemarketer" means "the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(11).

Defendants base their argument on the allegation in the SAC that "Defendants are in the business of purchasing structured settlements and annuities for a lump sum of cash." (DE 54-1, SAC ¶ 8.) Emphasizing the word "purchasing," Defendants argue that they are purchasers of structured settlements, not sellers of any goods or services. However, Defendants' argument ignores the many services they provide as part of the structured-settlement transfer transaction.

**\*7** As explained in the SAC, a structured settlement is a settlement which provides in whole or in part for periodic payments. (*Id.* ¶ 16 n.2.) Pursuant to the structured settlement, the annuitant must receive their money in payments over time. As purchasers of structured settlements, Defendants offer potential clients the option to obtain their money in a lump-sum rather than over a period of time. (DE 45-2 at 7.)

As part of the transaction, a structured-settlement company, such as Defendants, may perform a number of services to effectuate the transaction (for a fee charged to the payee[3]), including the following: (i) process the payee's application; (ii) compute the prevent value of the structured settlement; (iii) comply with underwriting requirements; (iv) prepare and process the contract; and (v) comply with applicable disclosure laws and other laws pertaining to court approval.[4] (*See e.g.*, DE 45-2, Defendants' Sales Manual, at 10 (present value); 17, 68 (contract processing); 20, 68 (application and underwriting processing); 21-22, 68 (court approval).)

Because Defendants initiated telephone calls to Plaintiff "for purpose of encouraging the purchase of ... services" provided by Defendants, as set forth in 47 C.F.R. § 64.1200(f)(11), (12), the Court concludes that Defendants and the calls they made fall within the purview of the TCPA. Accordingly, the Court is not persuaded by Defendants' argument that leave to amend should be denied based upon futility.

### C. Defendants' Bad-Faith Argument

Defendants argue that Plaintiff's assertion of false allegations in support of the DNC claim constitutes bad faith, justifying denial of the Motion to Amend. Although, as discussed above, Plaintiff's brief statement during the May 2014 call did not constitute a proper DNC request, the Court has concluded that the other allegations of the SAC state a viable DNC claim and could survive a motion for summary judgment based upon the evidence in the record. The Court does not find any bad-faith motive on the part of Plaintiff, and therefore refuses to deny the Motion to Amend on that basis.

### D. Defendants' Argument Concerning the Class Allegations

Defendants argue that Plaintiff has failed to plead a viable DNC class. However, as the Court stated in its Order dated January 8, 2016, "[t]he Court finds this inquiry to be premature. The issues raised by Defendants are more properly addressed when Plaintiff brings his motion to certify the class." (DE 32, Order at 3-4.)

### E. Defendants' Argument Concerning Unauthorized and Unjustified Amendments

Defendants argue that the proposed SAC makes a number of changes that are not within the scope of the Court's Order authorizing Plaintiff to file a revised motion to amend to add a DNC claim based upon a proper statutory basis. Defendants delineate the New Changes in Section C of their Response to the Motion to Amend. (DE 55, Defendants' Resp. at 18-22.) As noted above, when Plaintiff originally filed a motion to amend to add a DNC claim, Plaintiff erroneously based the claim upon a violation of 16 C.F.R. § 310.4(b)(1)(iii)(A), which does not apply. The Court granted Plaintiff leave to file a revised Motion to Amend to add a DNC claim under a proper statutory basis. (DE 53.) The Court also permitted Plaintiff to delete the claim that Defendants placed calls featuring a prerecorded or artificial voice. (*Id.*) Other than the addition of a corrected DNC claim and the deletion of another claim, the Court did not permit any other amendments, and the deadline for amending pleadings, which was May 2, 2016, had passed by the time Plaintiff filed his revised Motion to Amend. (DE 33, Scheduling Order.)

**\*8** Because Plaintiff has not demonstrated (or even attempted to demonstrate) the requisite diligence in seeking to make any of the New Changes delineated by Defendants in Section C of their Response (DE 55, Defendants' Resp. at 18-22), including the expanded injunctive relief, the Court denies Plaintiff's Motion to Amend. It would be unfair to Defendants for Plaintiff to take advantage of the courtesy the Court extended to him by making unprecedented changes to the First Amended Complaint when the Court only permitted him the option to file a revised motion to amend to correct the basis of his DNC claim.

### IV. CONCLUSION

Based upon the foregoing, this Court concludes that leave to amend the First Amended Complaint to add a DNC claim is granted. Leave to amend is denied to the extent that Plaintiff seeks to make unauthorized and unjustified New Changes, as defined herein.

Based upon the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Renewed Motion for Leave to File a Second Amended Complaint (DE 54) is **GRANTED IN PART AND DENIED IN PART.**

2. Plaintiff's request to amend insofar as he requests to add a DNC claim based upon a violation of 47 U.S.C. § 227(c)(1) and 47 C.F.R. § 64.1200(d) is granted. Leave to amend is denied to the extent that Plaintiff seeks to make any New Changes, as defined herein and set forth in Section C of Defendants' Response (DE 55).

Buja v. Novation Capital, LLC, Not Reported in Fed. Supp. (2017)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 17 of 114

3. Pursuant to this Court's Administrative Procedures, Plaintiff shall electronically **REFILE** the amended complaint consistent with the dictates of this Order, within five (5) days of the date of this Order.

4. Defendants' Motion to Strike Errata Sheet (DE 67) is **DENIED** as moot.

**DONE AND SIGNED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of March, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 10398957

Footnotes

1   "Where ... the parties have engaged in discovery and rely heavily on ... evidence [outside the pleadings] in making their arguments, the court must determine whether the proposed amendment would be futile under the summary judgment standard." *Sotheby's Int'l Realty, Inc. v. Black*, No. 06 CIV. 1725 (GEL), 2007 WL 4438145, at *1 (S.D.N.Y. Dec. 17, 2007) (internal citations and quotation marks omitted). Here, the parties have engaged in discovery concerning the proposed DNC claim, and both have extensively relied on materials outside of the proposed complaint in arguing the futility issue. In support of his Motion to Amend, Plaintiff filed audio recordings produced by Defendants (DE 46, Notice of Filing Audio Recordings; DE 54, Motion to Amend at 2 n.2), as well as Defendants' call log (DE 43-7; DE 45-4, Sealed Call Log). Defendants filed Plaintiff's deposition transcript. (DE 63-1, Sealed Deposition Transcript.) Plaintiff was the first party to submit evidence outside the four corners of the complaint, and neither party has argued that the Court should not consider matters outside the pleadings in addressing the Motion to Amend. Rather, it appears both parties seek to have the Court rule on the futility of the amended complaint based upon the parties' submissions, in addition to the allegations of the proposed SAC.

2   The FCC issued the following interpretive Report and Order concerning the amount of time for telemarketers to process a DNC request:

   We note that the Commission's rules require that entities must record company-specific do-not-call requests and place the subscriber's telephone on the do-not-call list at the time the request is made. Therefore, telemarketers with the capability to honor such company-specific do-not-call requests in less than thirty days must do so. We believe this determination adequately balances the privacy interests of those consumers that have requested not to be called with the interest of the telemarketing industry. Consumers expect their requests not to be called to be honored in a timely manner, and thirty days should be the maximum administrative time necessary for telemarketers to process that request.

   In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 F.C.C.R. 14014, 14,069, ¶ 94 (July 3, 2003) (footnotes omitted).

3   For example, Florida law requires the transferee of a structured-settlement transfer to provide the payee "[a]n itemized listing of all brokers' commissions, service charges, application fees, processing fees, closing costs, filing fees, referral fees, administrative fees, legal fees, and notary fees and other commissions, fees, costs, expenses, and charges payable by the payee or deductible from the gross amount otherwise payable to the payee." Fla. Stat. § 626.99296(3)(a)(2)(e).

4   Transfers of structured settlement payment rights are regulated by statute and court approval is required before a transfer may go forward. *See Rapid Settlements, Ltd. v. Dickerson*, 941 So. 2d 1275, 1276 (Fla. 4th DCA 2006).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 486687
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

CONSOLIDATED GRAIN & BARGE, INC.

v.

Randy ANNY, Serendipity Marine Services, LLC, and The United States Army Corps of Engineers.

Civil Action No. 11–2204, 11–2615.
|
Feb. 6, 2013.

**Attorneys and Law Firms**

Paul N. Vance, Brodie G. Glenn, Laurie W. Howenstine, Stephen P. Schott, Baldwin, Haspel, Burke & Mayer, LLC, New Orleans, LA, for Consolidated Grain & Barge, Inc.

Donovan Kenneth Hudson, Donovan Hudson, Attorney at Law, Namisha D. Patel, Roy Hyrum Maughan, Jr., The Maughan Law Firm, Baton Rouge, LA, Michael Kenneth Heltz, Kliebert & Heltz, Gramercy, LA, for Randy Anny, Serendipity Marine Services, LLC, and The United States Army Corps of Engineers.

*ORDER AND REASONS*

JAY C. ZAINEY, District Judge.

**\*1** Defendants Randy Anny and Serendipity Marine Services, L.L.C. have filed the instant **Motion to Dismiss (Rec.Doc.101).** Defendants move to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction arguing that Plaintiff lacks standing under Article III to assert its claims. The motion, which was set for hearing on November 7, 2012, was heard on the briefs without oral argument. For the following reasons, the motion is DENIED.

### I. BACKGROUND

This suit stems from a property dispute between Plaintiff Consolidated Grain and Barge, Inc. ("CGB"), and Defendant Randy Anny ("Anny"). CGB presently operates a barge fleeting operation on the left descending bank of the Mississippi River pursuant to a permit issued by the Army Corps of Engineers ("Corps").[1] CGB's permit, which was first issued in 1980 and has since been modified multiple times, currently authorizes CGB to fleet twenty-five tiers of barges along a specific stretch of the Mississippi River.

Defendant Anny also holds a permit, which was first issued by the Corps in 1993. Anny's permit originally allowed for a borrow pit, but was modified in 1997 to authorize sand dredging. In February 2011, Anny applied for a permit modification which would allow barge fleeting and revise the dredging area. During the public comment period, CGB submitted a written objection to the Corps regarding Anny's barge fleeting request based on three assertions: 1) CGB held a valid permit for the same area; 2) Anny could not prove his rights to the adjacent riparian land; and 3) CGB *could* prove its rights to the adjacent riparian land. CGB alleges that it requested and was denied a public hearing on these issues. Despite CGB's objections, on June 29, 2011, the Corps granted Anny's permit modification and authorized barge fleeting of nine tiers of ten barges. According to CGB, Anny's revised permit allows him to perform the same activities as CGB in the same location on the Mississippi River.

CGB subsequently filed a **Complaint for Temporary Restraining Order, Preliminary Injunction, Permanent Injunction, Damages, and Declaratory Judgment (Rec.Doc.1)** against Defendant Anny, Defendant Serendipity Marine Services, LLC ("SMS"), and Defendant the Corps.[2] CGB claims that Defendants have tortiously interfered with its barge fleeting operations in the Mississippi River, and seeks a declaration of its rights to operate the fleet pursuant to the permit issued by the Corps. According to CGB, Defendants Anny and/or SMS have disrupted its business operations and customer relations by, *inter alia:* contacting CGB's customers and informing them that they were not authorized to moor barges at CGB's mooring facility; entering the mooring facility and attempting, without permission, to move CGB's barges located therein; and approaching a surveyor hired by CGB to survey property owned or leased by CGB, accusing the surveyor of trespassing, and demanding that the surveyor cease his work on the property. CGB claims that the actions of Defendants Anny and SMS constitute a maritime tort, specifically, trespass. CGB asserts that Defendants' actions have resulted in irreparable harm and injury to CGB, and seeks damages for that harm.

**\*2** CGB's application for a temporary restraining order was denied (see **Rec. Doc. 6,** order by Vance, J.); however, its motion for declaratory judgment is still pending before the Court. In its complaint, CGB argues that Anny's permit was issued in violation of the Administrative Procedure Act ("APA") and is invalid because it was issued based on intentional and/or negligent misrepresentations by Anny to the Corps. According to CGB, Anny's permit application incorrectly stated that Anny owns the riparian land which forms the site of CGB's mooring facility. CGB asserts that, had the Corps known of said misrepresentations before issuing Anny's permit, the Corps would not have or should not have issued said permit.

According to CGB, it is not feasible for CGB's permit and Anny's permit to co-exist because the permits purport to allow the parties to maintain large barge fleets at the same location on the river. CGB asserts that, in the event that Anny were to attempt to conduct barge fleeting operations in the same location as CGB's mooring facility, as authorized by Anny's permit, their actions would "disrupt and interfere with CGB's barge fleet, create a dangerous condition on the Mississippi River, interfere with and endanger navigation on the Mississippi River, ... and endanger public health, safety, and welfare."

CGB presently seeks a declaratory judgment in its favor and against Defendants Anny and SMS declaring Anny's permit to be violative of the APA and null and void insofar as it purports to authorize Anny to maintain a barge fleet at the same location as CGB's fleet and mooring facility. In the alternative, CGB seeks a judgment that Anny's permit and rights to barge fleeting at that location are inferior and subject to CGB's permit and rights pursuant to it. CGB further seeks damages for trespass and for reputational harms caused by Anny's alleged conduct.

In the instant motion, Defendants argue that because CGB is allegedly not the entity conducting the permitted barge fleeting operations nor the entity possessing the riparian land rights required for fleeting, CGB lacks standing to assert the claims brought in this lawsuit and therefore those claims must be dismissed for want of subject matter jurisdiction.

## II. STANDARD OF REVIEW

1. *Lack of Subject Matter Jurisdiction*

Federal courts are courts of limited jurisdiction and possess power over only those cases authorized by the United States Constitution and federal statutes. *Coury v. Prot,* 85 F.3d 244, 248 (5th Cir.1996). If a district court lacks jurisdiction over the subject matter of a plaintiff's claims, dismissal is required. *See* Fed.R.Civ.P. 12(b)(1). The lack of subject matter jurisdiction may be raised at any time during the pendency of the case by any party or by the court. *See Kontrick v. Ryan,* 540 U.S. 443, 456 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); *McDonal v. Abbott Labs,* 408 F.3d 177, 182 n. 5 (5th Cir.2005) ("[A]ny federal court may raise subject matter jurisdiction *sua sponte."*).

**\*3** In ruling on a Rule 12(b)(1) motion to dismiss, the court may rely on (1) the complaint alone, presuming the allegations to be true, (2) the complaint supplemented by undisputed facts, or (3) the complaint supplemented by undisputed facts and by the

court's resolution of disputed facts. *Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 424 (5th Cir.2001); *see also Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996). The party asserting jurisdiction bears the burden of establishing that the district court has jurisdiction. *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001). A court's dismissal of a case for lack of subject matter jurisdiction is not a decision on the merits, and the dismissal does not ordinarily prevent the plaintiff from pursuing the claim in another forum. *See Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir.1977).

2. *Article III Standing*

Standing, as required under Article III, Section 2, of the Constitution addresses *who* may bring the suit.15–101 Moore's Federal Practice–Civil § 101.20 *(See Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1469–1470 (3d Cir.1994)). "The standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Id. (See Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Further, "[t]he standing requirement is part of the case or controversy needed to establish jurisdiction." 12–57 Moore's Federal Practice–Civil § 57.22. *(See Abbott Labs. v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Lastly, "[s]tanding must affirmatively appear in the record, and may not be inferred argumentatively from averments in pleadings." *Id. (See* Footnote 39. 28 U.S.C. § 2201(a). *See also* Advisory Committee Note to 1937 Adoption to Fed.R.Civ.P. 57 (see § 57App.01 [2] )).

As recently held by the Fifth Circuit in *In Re Mirant Corp.,* 675 F.3d 530 (5th Cir.2012): Constitutional standing requires three elements:

> First, the plaintiff must have suffered an "injury in fact" an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*In Re Mirant Corp.,* 675 F.3d 530, 33 (5th Cir.2012) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted).

### III. DISCUSSION

**\*4** In the present 12(b)(1) motion, Defendants argue that CGB lacks Article III standing. Defendants argue that CGB is not the proper party with a right of action in the instant case and therefore the Court lacks subject matter jurisdiction and must dismiss the litigation. Defendants cite *Williamson v. Tucker,* 645 F.2d 404, 412 (5th Cir.1981), among other cases, to establish that a motion for dismissal under Rule 12(b)(1) can be predicated upon either a "facial" attack, or a "factual" attack to jurisdiction. As explained in *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511:

> A "facial attack" on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. A "factual attack," however, challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered. Moreover, a "factual attack" under Rule 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist.

(Citations omitted). Further, when a "factual" attack to jurisdiction is raised no presumption of truthfulness attaches to the plaintiff's allegations. *Wiliamson,* 645 F.2d 404, 412. District courts are empowered to resolve disputed factual issues related to jurisdiction under 12(b)(1) motions because, as stated in *Wiliamson,* "[i]t is elementary that a district court has broader power to decide its own right to hear a case than it has when the merits of the case are reached." *Id.* at 413. Defendants in the instant motion assert a "factual" attack to jurisdiction and argue that the Court should resolve the disputed issue of standing in their favor and dismiss this case for want of subject matter jurisdiction because the wrong party brought this action.

In support of the instant motion, Defendants first point to the Department of the Army permit, SE (Mississippi River) 1117 ("permit 1117"), which was transferred from GW Contractors, Inc., to "Consolidated Grain & Barge, Inc." on or about December 12, 1996[3] and then subsequently modified by what Defendants have styled "other juridical entities" thereby ostensibly calling into question whether CGB is in fact still the holder of, or the proper party to hold, the permit. For example, on or about September 22, 1997 an application was filed with the Department of the Army to install anchor pipes and mooring chains in the vicinity of River Mile 165.7 by "CGB Marine Services at M.P. 164."[4] Then, on or about October 12, 1999 an application was filed with the Louisiana Department of Natural Resources, Coastal Management Division seeking permission to install a permanently moored deck barge with spud piling by "CGB Marine Services at M.P. 164, Inc.,"[5] Then on or about May 12, 2012 an application was filed with the Louisiana Department of Natural Resources, Office of Coastal Management, seeking permission to establish a new barge fleeting area to increase the capacity of an existing barge fleeting facility by "CGB Marine Services @ M.P. 164." Finally, Defendants point to a letter and attachments mailed on August 22, 2012 by counsel for CGB indicating that "CGB Marine Services at M.P. 164, Inc." held permit 1117 which had been issued on November 5, 1999 to "cover the installation and maintenance of a permanently moored deck barge with spud piling at an existing permitted barge fleeting facility, in the Miss. River, at a point about 165.2 miles above Head of Passes, on the LDB, near Central, Louisiana, in St. John Parish." Defendants argue that further confusion as to the identity of the holder of permit 1117 arises from the fact that the various required leases underpinning the permit list "CGB Marine Services at Mile 164, a division of Consolidated Grain & Barge, Inc." as the lessee.

**\*5** Based on the foregoing, Defendants dispute whether CGB has a valid permit which they argue would give rise to CGB having standing to assert the instant claim. Defendants state:

> According to its own attorney, [CGB] is fleeting under Permit # 1117; however, it is undisputed that this permit was assigned to and bears the name of [CGB Marine Services at M.P. 164, Inc.]. Because the assignment occurred in 1999, well before the filing of this suit, Plaintiff, CGB, has no standing to assert a claim for trespass against Anny. Given the absence of a legally protectable right, CGB lacks standing to assert any claim for interference because it is not the entity conducting the permitted barge fleeting operations at the location at issue.

> In addition to the absence of a valid fleeting permits (sic), CGB does not possess riparian rights required for fleeting. Lease agreements clearly indicate [CGB Marine Services at Mile 164, a division of Consolidated Grain & Barge] as the lessee and despite the fact that it is a division of CGB, it clearly has a separate and distinct juridical persona. [CGB Marine Services at Mile 164, a division of Consolidated Grain & Barge] has entered into leases which it claims are valid. It has applied for Coastal Use and USACE permits in its own name, and it has appeared in other court proceedings through its manager Frank Mellor.

Rec. Doc. 101–1 at 5. In conclusion, Defendants argue that:

> Contrary to CGB's assertion, it does not appear to hold a valid permit to fleet barges as claimed. It is beyond dispute that many of the leases granting the required riparian rights do not identify CGB as the Lessee. Because these are essential elements required for maintaining the current action, and essential to establish (sic) that this court has Subject Matter Jurisdiction, CGB is required to prove it has standing.

Rec. Doc. 101–1 at 5–6.

In response, CGB argues that the question of whether CGB was the proper party with a right of action, "is a red herring, however, as the name 'CGB Marine Services at Mile 164' is merely a trade name that CGB uses to identify a division of CGB that operates at the location in question." Rec. Doc. 114 at 7. Further CGB argues that "CGB Marine Services at Mile 164 is not a legal entity separate and distinct from CGB." *Id.* CGB continues its argument by referencing the other business names listed *supra* concluding that, "CGB is the proper party to bring the claims, since it, rather than a trade name that is not a separate, legal entity, suffered actual injury at the hands of the defendants." *Id.* at 5. The Court agrees.

CGB argues that the first prong of the Article III standing test, *supra,* is satisfied because it suffered an "injury in fact" when "SMS and Anny physically interfered with CGB's barge fleeting operations at mile 164 and sent disparaging letters to CGB's

customers." Rec. Doc. 114 at 7. CGB argues that the second prong is satisfied because, "it is undisputed that Anny and SMS performed the actions that led to CGB's 'injury in fact.' " *Id.* CGB argues lastly that the third prong is satisfied since a judgment against Defendants will redress CGB's injury.

**\*6** The essential dispute in this motion is whether CGB was the injured party. Defendants argue that if there was an injury, it was not suffered by CGB because CGB did not obtain the necessary leases and permits in its own name and therefore lacks standing to assert the claims in its complaint. The Court finds that, notwithstanding the fact that alternate names and abbreviations have appeared on various applications, permits, and leases, CGB ultimately is the actual legal entity with standing to bring its claims against Defendants. CGB has appeared as "CGB Marine Services at Mile 164, a division of Consolidated Grain & Barge, Inc." on each and every lease submitted by Defendants in support of their motion. Defendants have failed to establish that "CGB Marine Services at Mile 164" is anything other than a division of CGB. That is, Defendants have failed to establish that "CGB Marine Services at Mile 164" is legally independent of CGB. As these leases form the basis of the allegations contained in CGB's complaint, CGB is the only proper party to assert the claims contained in the complaint. After an analysis of the complaint, and considering the undisputed facts and the Court's resolution of disputed facts, the Court finds that CGB was the proper party to bring this action and accordingly must deny Defendants' motion to dismiss.

### IV. CONCLUSION

Accordingly;

IT IS ORDERED that Defendant's **Motion to Dismiss(Rec.Doc.101)** is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 486687

Footnotes

1   The Corps was originally a defendant in the instant suit. However, on February 17, 2012, the Court granted a **Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim upon Which Relief Can Be Granted (Rec.Doc.33)** filed by the Corps, finding that CGB did not state a jurisdictional basis for its declaratory judgment claim against the Corps, and that the claim against the Corps was not cognizable under either the RHA or the APA. Accordingly, the Corps is no longer a party to this suit. *See* Rec. Doc. 54.

2   As stated *supra,* all claims against the Corps have since been dismissed.

3   Transfer was finalized by the Department of the Army on December 20, 1996. *See* Rec. Doc. 101–4.

4   The Court notes that as part of this application, a Form of No Objection letter was entered by the State of Louisiana Department of Transportation and Development wherein "CGB Marine Service" is listed as the applicant. *See* Rec. Doc. 101–5 at 2.

5   The Court notes that as part of this application, even within the initial correspondence, "CGB Marine Services at M.P. 164, Inc.", "CGB Marine Services", and "CGB Marine" are all names listed in one form or another as the sole applicant. Further, by letter of October 27, 1999 from the State of Louisiana Department of Natural Resources "CGB Marine Services @ M.P. 164, Inc." is referenced as the applicant. *See generally* Rec. Doc. 101–6.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3100773
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, San Antonio Division.

Craig CUNNINGHAM, Plaintiff,

v.

WATTS GUERRA, LLP, et al., Defendants.

SA-22-CV-363-OLG (HJB), SA-23-CV-910-OLG (HJB)

|

Signed May 23, 2024

**Attorneys and Law Firms**

Adrian R. Bacon, Todd M. Friedman, Law Offices of Todd M. Friedman, P.C., Woodland Hills, CA, Alexander D. Kruzyk, Pardell, Kruzyk & Giribaldo PLLC, Austin, TX, for Plaintiff.

Alicia D. O'Neill, Francisco Guerra, IV, Mikal C. Watts, Paige Boldt, Travis Carey Headley, Watts Guerra LLP, San Antonio, TX, for Defendants.

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Henry J. Bemporad, United States Magistrate Judge

 **\*1  To the Honorable United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns three motions to dismiss pending in the above-styled consolidated cases.[1] Two of the motions were jointly filed by all Defendants: one for lack of standing ("12(b)(1) motion") (Docket Entry 94) and the other for failure to state a claim ("12(b)(6) motion") (Docket Entry 95). The third motion was filed separately by Defendant Watts Guerra LLC ("WG LLC") for lack of personal jurisdiction ("12(b)(2) motion"). (Docket Entry 96.) Pretrial matters have been referred to the undersigned for consideration. (Docket Entry 25.) For the reasons that follow, I recommend that the District Court **GRANT IN PART** and **DENY IN PART** Defendants' 12(b)(1) motion (Docket Entry 94), **DENY** WG LLC's 12(b)(2) motion (Docket Entry 96), and **DENY IN PART** and **DENY AS MOOT IN PART** Defendants' 12(b)(6) motion (Docket Entry 95).

**I. Jurisdiction.**

These consolidated cases concern, in part, a class-action complaint against several law firms for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). (*See* SA-23-CV-910-OLG, Docket Entry 1 (henceforth "CAC").) The Court has original jurisdiction over such claims pursuant to 28 U.S.C. §§ 1331. I have authority to issue this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1).

**II. General Background.**

Plaintiff alleges violations of the TCPA by several law firms: Watts Guerra, LLP ("WG LLP") and WG LLC (together, "Watts Guerra"); Henson Fuerst, P.A., ("Henson"); the Law Office of Douglas Boxer ("Boxer"); and the Biltmore Law Group, PLLC ("Biltmore"). Specifically, Plaintiff alleges that Defendants repeatedly called Plaintiff, and others similarly situated, "using (1) an automatic telephone dialing system ... or (2) an artificial or prerecorded voice," to solicit new clients to file tort claims regarding water contamination at Camp Lejeune.[2] (CAC, at 3, 11.)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 24 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

**\*2** According to the complaint, Plaintiff received "in excess of two dozen calls" between "December 2022 and ... April 2023" soliciting him "to submit a claim regarding the pending Camp Lejeune water contamination mass tort litigation." (CAC, at 3.) Plaintiff alleges that he "was greeted with artificial or prerecorded voice messages," and that he "respond[ed] to various prompts in order to be re-routed to live human beings." (*Id.*) Plaintiff alleges that the individuals he spoke to refused to disclose the entities on whose behalf they were calling unless he agreed to file a claim in the Camp Lejeune litigation, so he agreed to do so—using a pseudonym. (*Id.* at 3–4.) According to Plaintiff, the callers then requested his signature on written agreements to retain WG LLC, Biltmore, Boxer, and Henson to represent him "in all claims ... related to water contamination at Camp Lejeune." (*Id.* at 4.) After receiving the retainer agreement, Plaintiff alleges that he received "sporadic email requests from Defendants" and "at least 22 follow-up calls from Watts Guerra," asking him to sign the agreement. (*Id.* at 4–5.)

Plaintiff filed his class action complaint on July 20, 2023. (*See* CAC.) On August 1, 2023, Defendants filed their motions to dismiss. (*See* Docket Entry 94, at 14; Docket Entry 95, at 12; Docket Entry 96, at 9.) The District Court consolidated the cases after finding that they "involve the same parties and claims under the [TCPA]." (Docket Entry 73, at 1.)

### III. Analysis.

As noted above, Defendants have all moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) (Docket Entry 94) and for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6) (Docket Entry 95), while WG LLC has additionally filed a separate motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) (Docket Entry 96). This Report and Recommendation first considers the jurisdictional challenges under Rules 12(b)(1) and 12(b)(2), before turning to the Rule 12(b)(6) motion. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."); *United States v. Texas Tech Univ.*, 171 F.3d 279, 285 n.9 (5th Cir. 1999) (court "must ... decide issues of personal jurisdiction before ruling on the merits").

#### A. *Standing: Defendants' 12(b)(1) Motion.*

Federal Rule of Civil Procedure 12(b)(1) permits a party to challenge the court's subject-matter jurisdiction as a defense. *Attridge v. Colonial Sav. F.A.*, No. SA-20-CV-00205-OLG, 2023 WL 6444894, at \*2 (W.D. Tex. Sept. 28, 2023). A motion to dismiss under Rule 12(b)(1) may mount either a facial or a factual attack on the existence of subject-matter jurisdiction. *Id.* A facial attack "requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject-matter jurisdiction," in which case the allegations in the complaint "are taken as true for the purposes of the motion." *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). A factual attack, by contrast, "challenges the existence of subject-matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Attridge*, 2023 WL 6444894, at \*2 (quoting *Menchaca*, 613 F.2d at 511).

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). For there to be a case or controversy under Article III, "the plaintiff must have a ' "personal stake" ' in the case—in other words, standing." *Id.* (citation omitted). To establish standing, the plaintiff, as the party invoking federal jurisdiction, bears the burden of showing "(1) that she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that there is a fairly traceable connection between her injury and the defendant's alleged conduct; and (3) that the injury would likely be redressed by judicial relief." *Attridge*, 2023 WL 6444894, at \*3 (citing *TransUnion*, 594 U.S. at 423, and *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–66 (1992)).

1. *Injury.*

**\*3**  "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.*; *see TransUnion*, 594 U.S. at 427 ("[U]nder Article III, an injury in law is not an injury in fact."). While Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law, .... it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 594 U.S. at 425–26 (citations omitted). Thus, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants ... [him] a statutory right and purports to authorize ... [him] to sue to vindicate that right." *Spokeo*, 578 U.S. at 341. "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue ... over that violation in federal court." *TransUnion*, 594 U.S. at 427.

"[C]ertain harms readily qualify as concrete injuries under Article III.... such as physical harms and monetary harms." *TransUnion*, 594 U.S. at 425. However, "intangible harms can also be concrete." *Id.* In deciding whether the concrete-harm element has been satisfied, the Court must determine "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (citing *Spokeo, Inc.*, 578 U.S. at 341). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 424. Intangible harms traditionally providing a basis for suit include, for example, "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* (collecting cases).

Defendants argue that Plaintiff suffered no concrete injury-in-fact. (*See* Docket Entry 94, at 3.) Plaintiff counters that he was actually harmed by Defendants' alleged phone calls, analogizing the conduct to an "invasion of privacy, an intrusion into his life, and a private nuisance." (CAC, at 5.) For the reasons out below, the Court should find that Plaintiff has sufficiently pleaded a concrete injury by analogy to these common-law torts.

"[U]nwanted communications could cause concrete injuries similar to intrusion upon seclusion or other privacy torts." *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 826 (5th Cir. 2022). A person commits the tort of intrusion upon seclusion by "intentionally intrud[ing], physically or otherwise, upon the solitude of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person." *Id.* (quoting Restatement (Second) of Torts § 652B). "One pattern of liability is for repeated, harassing communications." *Perez*, 45 F.4th at 826 (citing RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d; *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)). And while the traditional intrusion-upon-seclusion tort required repeated communications, *TransUnion* held that "the harms elevated by Congress need only be similar 'in kind, not degree' "; accordingly, "a single unwanted communication could qualify as a concrete injury even though intrusion upon seclusion requires many." *Perez*, 45 F.4th at 826 (citing *Gadelhak*, 950 F.3d at 462). In any event, Plaintiff here alleges that he received not one, but "in excess of two dozen calls, .... using an artificial or prerecorded voice, from a rotating series of phone numbers." (CAC, at 3.) Thus, he has pleaded a harm from Defendants' alleged TCPA violations that is sufficiently alike in kind to an intrusion upon seclusion: "a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424.

**\*4**  The Fifth Circuit has also held that a plaintiff has standing to sue under the TCPA for unwanted text messages by analogy to the tort of a private nuisance. *See Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021). In *Cranor*, the Fifth Circuit explained that Congress enacted the TCPA because unrestricted telemarketing could be both "an intrusive invasion of privacy" and a "nuisance." *Id.* (quoting Pub. L. No. 102–243, § 2 ¶¶ 5, 10, 105 Stat. 2394, 2394 (1991)). The Court therefore concluded that "Cranor ha[d] alleged a cognizable injury in fact: nuisance arising out of an unsolicited text advertisement." *Cranor*, 998 F.3d at 690.

Based on the foregoing, Plaintiff has carried his burden of pleading a concrete injury for standing purposes at this early stage of the litigation. *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."). Thus, to the extent that Defendants seek to dismiss Plaintiff's complaint for lack of standing on the ground that he failed to plead a concrete injury, their motion should be denied.

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 26 of 114

2. *Traceability.*

A plaintiff lacks standing when they fail to show that their alleged injuries are " 'fairly traceable' to the 'allegedly unlawful conduct' of which they complain." *California v. Texas*, 593 U.S. 659, 669 (2021). Defendants argue that Plaintiff failed to trace his alleged injuries to the conduct of any specific Defendant. (*See* Docket Entry 94, at 3.) According to Defendants, Plaintiff "fails to allege that a particular defendant placed an automated call to him, and only generally alleges that Defendants collectively caused others to do so." (*Id.* at 11.) Plaintiff responds that he satisfied the traceability requirement because he alleged facts indicating that third parties acted in an agency capacity on Defendants' behalf. (Docket Entry 98, at 9–10.) He contends that the facts he alleged support this inference because, upon providing a pseudonym and playing along with the third-party callers, he subsequently received retainer agreements—the terms of which would have had Plaintiff hire all Defendants, jointly, with the exception of WG LLP. (*Id.* at 10–11.)

Other cases have held that an injury for a TCPA violation by an unnamed third party can be fairly traced to a once-removed Defendant, at least when there are plausible allegations that the third party acted on the Defendant's behalf.[3] Here, Plaintiff alleges that the offending calls he received from unknown third-parties were made on behalf of Defendants—an allegation supported by the additional allegation that his cooperation with the callers resulted in his receiving a retainer agreement for Defendants' legal services. (*See* CAC, at 5–6; Docket Entry 98, at 9–11.) These allegations together are sufficient to trace Plaintiff's alleged injuries to four of the five Defendants (all but WG LLP) at this early stage of the litigation. Thus, to the extent that Defendants WG LLC, Biltmore, Boxer, and Henson seek to dismiss Plaintiff's complaint for lack of standing because they cannot be fairly traced to his alleged injuries through the third-party callers' conduct, their motion to dismiss for lack of standing should be denied.[4]

**\*5** The same, however, cannot be said of WG LLP. Just as the presence of the other Defendants in Plaintiff's submitted documentation supports a reasonable inference that Plaintiff's alleged injuries are fairly traceable to them, the absence of any mention of WG LLP in any of that documentation forecloses any similar inference as to WG LLP. Thus, because Plaintiff has failed to fairly trace his alleged injuries to any alleged TCPA violation by WG LLP, his complaint should be dismissed for lack of standing as to Defendant WG LLP. Accordingly, Defendants' 12(b)(1) motion should be granted as to WG LLP.

3. *Redressability.*

Defendants lastly argue that Plaintiff's injuries are not cognizable, and hence not redressable, under the TCPA. (*See* Docket Entry 94, at 3.) But Defendants confuse redressability with the question of whether Plaintiff failed to state a claim. Redressability is about "the relationship between 'the judicial relief requested' and the 'injury' suffered." *California*, 593 U.S. at 671. Here, Plaintiff alleges he was injured when Defendants made dozens of automated robocalls to his cellular phone in violation of the TCPA. (CAC, at 3, 5, 11.) As a remedy, Plaintiff seeks an injunction and statutory damages, among other things. (*Id.* at 12.) There is no incongruity between the relief Plaintiff requests and the injuries he alleges. Indeed, the TCPA specifically created a private right of action "to seek both damages," whether actual or statutory, "and injunctive relief." *Cranor*, 998 F.3d at 688. Thus, to the extent that Defendants seek dismissal of Plaintiff's complaint for lack of standing on the grounds that the relief he seeks cannot redress his alleged injuries, their motion should be denied.

**B. *Personal Jurisdiction: WG LLC's 12(b)(2) Motion.***

As with subject-matter jurisdiction, the Court "must ... decide issues of personal jurisdiction before ruling on the merits." *Texas Tech Univ.*, 171 F.3d at 285 n.9; *see Hernandez v. Vanderbilt Mortg. & Fin., Inc.*, No. CIV. A. C-10-67, 2010 WL 1875796, at *3 (S.D. Tex. May 6, 2010) ("As jurisdictional matters must be resolved first, the Court first turns to the Rule 12(b)(2) Motion."). Unlike subject-matter jurisdiction, however, personal-jurisdiction challenges may be waived. *Seville v. Maersk Line, Ltd.*, 53

F.4th 890, 896 (5th Cir. 2022). This Report and Recommendation first considers the question of waiver before turning to the merits of the Rule 12(b)(2) motion.

1. *Waiver.*

As a threshold matter, Plaintiff argues that WG LLC waived its personal jurisdiction defense because—in concert with the other Defendants—it filed a 12(b)(1) motion and 12(b)(6) motion *before* filing its 12(b)(2) motion. (Docket Entry 99, at 6–8.) WG LLC responds that it has not waived its personal jurisdiction defense because it filed its 12(b)(2) motion on the same day as, and only very shortly after, the 12(b)(1) and 12(b)(6) motions. (*See* Docket Entry 100, at 2–5.)

Federal Rule of Civil Procedure 12(h)(1) provides that a party can waive a defense—including the defense of lack of personal jurisdiction—by "omitting it from a motion in the circumstances described in Rule 12(g)(2)." Fed. R. Civ. P. 12(h)(1)(A). Rule 12(g)(2), in turn, provides that a party who files a Rule 12 motion may not "make another motion under this rule raising a defense or objection that was available[ ] to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). The combined effect of these two rules is that the defense of "lack of personal jurisdiction is waived if a party omits the defense from a Rule 12 motion." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 249 (5th Cir. 2020) (citation omitted). In this case, it clearly appears that WG LLC waived its Rule 12(b)(2) personal-jurisdiction defense when it filed two other Rule 12 motions—one under 12(b)(1) and one under 12(b)(6)—before filing the 12(b)(2) motion.

**\*6** WG LLC argues, however, that the waiver rule should not apply because it "simultaneously filed each of its Rule 12(b) motions," and that they were "separately entered across 13 minutes only by the sequential necessitudes of this Court's filing system." (Docket Entry 100, at 4.) This is unavailing. The Court's CM/ECF filing system does not permit simultaneous filings—motions must be filed one at a time. Motions are automatically entered on the docket sheet once filed—hence, they are entered in the order in which they are filed. The docket sheet reveals that WG LLC's 12(b)(2) motion was the third Rule-12 motion filed. (*See* SA-:23-CV-910, Docket Entries 6–8.) Thus, WG LLC did not file the three motions to dismiss simultaneously. Rather, it filed the 12(b)(1) motion first, the 12(b)(6) motion second, and its 12(b)(2) motion last. And the 12(b)(2) motion's last-in-time status on the docket sheet is not a result of the "sequential necessitudes of the Court's filing system," but rather due to a decision made by WG LLC as to which motions to file first.

Because of the strict waiver provisions in Rule 12, litigants are "required to exercise *great diligence* in challenging personal jurisdiction because of the potential waiver a party might incur." *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, No. CIV.A.3:02-CV-2727-G, 2004 WL 833595, at *4 (N.D. Tex. Apr. 19, 2004) (emphasis in original) (citing *Golden v. Cox Furniture Mfg. Co.*, 683 F.2d 115, 118 (5th Cir. 1982)). If a party wishes to contest personal jurisdiction, that must be "his first defensive move." *Golden*, 683 F.2d at 118 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1391, at 855 (1969)). In this case WG LLC—a law firm represented by legal counsel—decided to make two "defensive moves" before challenging personal jurisdiction under Rule 12(b)(2). There is nothing extraordinary in finding that a litigant waived the 12(b)(2) defense in such circumstances.[5]

Based on the foregoing, the Court should conclude that WG LLC waived its personal jurisdiction defense and deny the Rule 12(b)(2) motion on that ground.

2. *Merits.*

Although the undersigned recommends that the Court deny WG LLC's 12(b)(2) motion based on waiver, this Report and Recommendation also addresses the merits of the argument. For the reasons set out below, the motion should also be denied on its merits.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 28 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

a. Legal standard.

"The plaintiff has the burden of establishing that the court has personal jurisdiction." *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 211 (5th Cir. 2016) (citation omitted). To carry that burden, a plaintiff need only "make a prima facie showing." *Id.* (citation omitted). This is a "liberal standard." *Van Rooyen v. Greystone Home Builders, LLC*, 295 F. Supp. 3d 735, 742 (N.D. Tex. 2018). To determine whether Plaintiff has met his burden, "the court may review pleadings, affidavits, interrogatories, depositions, oral testimony, exhibits, any part of the record, and any combination thereof." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 556 (N.D. Tex. 2003) (citing *Command-Aire Corp. v. Ontario Mech. Sales & Serv., Inc.*, 963 F.2d 90, 95 (5th Cir. 1992)). Ultimately, the Court "must accept the plaintiff's uncontroverted allegations, and resolve in his favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Id.* (citations omitted).

There are two kinds of personal jurisdiction: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). Plaintiff does not allege general jurisdiction. (*See* Docket Entry 99, at 8.) Thus, the only question before the Court with respect to the merits of WG LLC's 12(b)(2) motion is whether the Court has specific jurisdiction over it.

 **\*7**  A plaintiff must establish two things to establish specific jurisdiction over an out-of-state defendant—"*first*, that minimum contacts exist between the defendant and the state; and *second*, that the harm alleged arises out of or relates to the defendant's forum-related contacts." *Thomas v. Life Protect 24/7 Inc.*, 559 F. Supp. 3d 554, 561 (S.D. Tex. 2021) (citing *Bulkley & Assocs. LLC v. Dep't of Indus. Rels., Div. of Occupational Safety and Health of the State of Cal.*, 1 F.4th 346, 351 (5th Cir. 2021); *Ford*, 592 U.S. at 362). If a plaintiff carries its burden as to these first two prongs of the specific jurisdiction analysis, "the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (citation omitted).

*First prong: minimum contacts.* "The contacts needed ... go by the name 'purposeful availment.' " *Ford*, 592 U.S. at 359 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Thus, to satisfy the first prong, a plaintiff must make a prima facie showing that the defendant has taken "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Ford*, 592 U.S. at 359 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The contacts must have been "the defendant's own choice," rather than "random, isolated, or fortuitous." *Ford*, 592 U.S. at 359 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)). Those contacts "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploit[ing] a market' in the forum State or entering into a contractual relationship centered there." *Ford*, 592 U.S. at 359 (quoting W*alden v. Fiore*, 571 U.S. 277, 285 (2014)).

*Second prong: relatedness.* Even where a defendant has purposefully availed itself of the privilege of doing business in the forum state, a plaintiff must also make a prima facie showing that its claims "arise out of or relate to the defendant's contacts" with the forum. *Ford*, 592 U.S. at 359 (collecting cases). "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Id.* at 362. Ultimately, what is required is "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.' " *Id.* at 359–60 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 264 (2017).

*Third prong: fair play and substantial justice.* Even when the first two prongs have been satisfied, a defendant may "defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth*, 472 F.3d at 271. To do so, the defendant must show that maintenance of the suit would "offend traditional notions of fair play and substantial justice" *Ford*, 592 U.S. at 358 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Such a showing must be 'compelling.' " *Thomas*, 559 F. Supp. 3d at 561 (quoting *Sangha v. Navig8 Ship Mgmt. Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018)). On this issue, the Court must consider five factors: "(1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 29 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies." *McCormick v. ICE Enter., LLC*, No. 4:22-CV-878, 2023 WL 5216478, at *6 (E.D. Tex. Aug. 14, 2023) (citing *Burger King Corp.*, 471 U.S. at 477).

b. Analysis.

**\*8** Plaintiff argues that WG LLC is subject to specific personal jurisdiction in Texas because it "place[d], or cause[d] another to place, telemarketing calls to consumers in Texas, for the purposes of retaining those Texas consumers for legal representation by Texas attorneys." (Docket Entry 99, at 8.) Plaintiff further contends that, after cooperating with the callers to uncover their identities, WG LLC—in concert with the other Defendants—"served a retainer agreement to him for the purpose of providing legal representation in Texas, and repeatedly directed follow-up communications to him while knowing he was a resident of Texas." (*Id.*)

In support of these assertions, Plaintiff attached to his class action complaint copies of an attorney-employment contract, a health information disclosure authorization form, an administrative consent form, and a power-of-attorney form; he alleges he received these documents after providing an alias to the robocallers in an effort to discover their identities. (*See* Docket Entry 1-1.) WG LLC is listed as Plaintiff's would-be attorney on all of these documents. (*See id.*) Plaintiff also attached a copy of one of the follow-up emails he alleges he received from WG LLC, soliciting his signature on the aforementioned documents. (*See* Docket Entry 1-2.) Additionally, in his response to WG LLC's 12(b)(2) motion, Plaintiff attached verified screenshots of: (1) the front page of WG LLC's website, directing visitors to use a hyperlink to access a separate website for Camp Lejeune litigation; (2) a disclaimer and attorney bios from the Camp Lejeune website, listing Mikal Watts as part of the Camp Lejeune legal team; (3) Mikal Watts's attorney-profile page on the Texas Bar's website, which describes his firm as WG LLC and which lists his primary practice location as San Antonio, Texas; and (4) a *San Antonio Express News* article from 2021 about WG LLC's decision to relocate to Puerto Rico in order to "export" its legal services to Texas and elsewhere in the continental United States to benefit from a 2012 law capping income taxes at four percent for new exports businesses on the island. (*See* Docket Entries 99-1–99–6.)

WG LLC responds that Plaintiff failed to make a prima facie case of personal jurisdiction, as Plaintiff's class-action complaint "contains no jurisdictional allegation specific to WG LLC," and instead "lumps all defendants" together with general references. (Docket Entry 100, at 5; *see also* Docket Entry 96, at 6.) This is inadequate, WG LLC argues, because Plaintiff "must provide specific, individualized facts and/or statements of personal involvement or actions to make a prima facie case of personal jurisdiction." (Docket Entry 96, at 6.)

In support of its 12(b)(2) motion, WG LLC included declarations of Mikal Watts—WG LLC's lead attorney in this matter—and his former law partner at WG LLP, Francisco Guerra. (*See* Docket Entries 96-1–2.) In their declarations, they explain that Watts moved to Puerto Rico in 2020, at which time Guerra "agreed to continue his practice concerning individual personal injury cases under WG LLP in San Antonio," while Watts "would focus ... on mass tort litigation under ... WG LLC... in Guaynabo, Puerto Rico." (Docket Entry 96-1, at 4; Docket Entry 96-2, at 4.) Both declarants agree that Watts is "the President and principal owner of WG LLC." (Docket Entry 96-1, at 4; Docket Entry 96-2, at 3.) Furthermore, both declarants attest that "[a]ll of the firm's Camp Lejeune cases are being handled by WG LLC, with WG LLP providing only administrative support." (Docket Entry 96-1, at 4; Docket Entry 96-2, at 4.) Lastly, both declarants invariably deny that either WG LLC or WG LLP solicited prospective clients by phone or hired or authorized anyone else to do so on their behalf, and certainly never used or authorized others to use automated calls or artificial or pre-recorded voice messages. (*See* Docket Entries 96-1–2.)

**\*9** Resolving the conflicts in evidence in Plaintiff's favor, the Court finds that he carried his burden under the "liberal standard" applicable to personal jurisdiction. *See Van Rooyen*, 295 F. Supp. 3d at 742; *Quintana*, 259 F. Supp. 2d at 556. Based on all of the arguments and supporting materials presented, Plaintiff has at least made a prima facie showing that WG LLC purposefully availed itself of the benefits of doing business in Texas, and that his alleged injuries in this case relate to its Texas contacts.

WG LLC, although now operating out of Puerto Rico, exports its legal services into the United States, including Texas, and avails itself of the benefits of doing business here. Texas is where WG LLP handles administrative support for some of its mass tort litigation—including the Camp Lejeune litigation implicated in this case. (*See* Docket Entry 96-1, at 3–4; 96-2, at 3–4; Docket Entry 99-6.) And as late as August 8, 2023, Mikal Watts—the owner and president of WG LLC—advertised his services on the State Bar of Texas's website, representing that he worked for WG LLC in San Antonio, Texas, notwithstanding the relocation in Puerto Rico. (*See* Docket Entry 99-1, at 2; Docket Entry 99-5, at 3.)

Plaintiff also has sufficiently alleged injuries related to WG LLC's Texas contacts. He alleges that he was repeatedly solicited by telephone to file a claim in the Camp Lejeune litigation—*i.e.*, litigation handled by WG LLC, with administrative support from WG LLP. (*See* CAC, at 3.) Plaintiff alleges that, when he asked the callers *who* was soliciting his business, they were evasive, refusing to answer unless Plaintiff filed a claim in the Camp Lejeune litigation. (*See* CAC, at 3–4.) Plaintiff alleges he played along, providing an alias to uncover the identities of the callers. (*See id.* at 4.) From then on, Plaintiff alleges he received several documents which, if signed, purported to hire WG LLC to prosecute his Camp Lejeune claims on a contingency-fee basis and authorize the disclosure of Plaintiff's private health information to WG LLC. (*See id.* at 4–5.) Plaintiff further alleges that he "received at least 22 follow-up calls from Watts Guerra" to sign those documents. (*Id.* at 5.) Although WG LLC denies these allegations and provides contradicting declaratory evidence, at this stage the Court must resolve the conflicts in Plaintiff's favor. Applying that rule, Plaintiff's allegations are sufficient to meet his prim facie burden. *Cf. Thomas*, 559 F. Supp. 3d at 568 ("Here, Life Protect (allegedly) engaged in ... calling numbers robotically at random.... [and] *wherever* it reache[d] a consumer with a robocall, Life Protect has purposefully availed itself of that state's laws.") (emphasis in original).

For the above reasons, the Court has personal jurisdiction over WG LLC unless it carries its burden of showing that the exercise of such jurisdiction would offend traditional notions of fair play and substantial justice. *See Ford*, 592 U.S. at 358. Unlike the liberal prima facie showing required of Plaintiff, WG LLC's contrary showing must be "compelling." *Sangha*, 882 F.3d at 102; *Thomas*, 559 F. Supp. 3d at 561. Indeed, "[i]t is highly uncommon for an assertion of jurisdiction to be unfair once minimum contacts have been established, meaning that the 'fair play and substantial justice' factor is rarely outcome determinative." *McCormick*, 2023 WL 5216478, at *6 (citing *Elevacity U.S., LLC v. Schweda*, No. 4:22-CV-42, 2022 WL 3704537, at *10 (E.D. Tex. Aug. 26, 2022)). In this case, while WG LLC disputes Plaintiff's factual allegations supporting the existence of minimum contacts, it "does not make any attempt to satisfy its burden of showing that the Court's exercise of jurisdiction would be unfair or unreasonable." *McCormick*, 2023 WL 5216478, at *6. Thus, "in light of the steep burden" WG LLC bears on this point, its failure to address the issue is dispositive. Accordingly, even if it finds WG LLC did not waive its personal jurisdiction defense, the Court nevertheless should deny its Rule 12(b)(2) motion.

### C. *Failure to State a Claim: Defendants' 12(b)(6) Motion.*

1. *Legal standards.*

 **\*10**  The Court may dismiss a cause of action in a complaint when it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law," *Neitzke v. Williams*, 490 U.S. 319, 326 (1989), or a plaintiff's failure to allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 555 (2007). When analyzing a motion to dismiss for failure to state a claim, the Court accepts "all well pleaded facts as true, viewing them in the light most favorable to the plaintiff." *U.S. ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 344 (5th Cir. 2013). A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

Case 1:26-cv-00659-KM   Document 26-1   Filed 06/24/26   Page 31 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

the misconduct alleged." *Id.* In short, the factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 545. This "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [pertinent] evidence...." *Id.*

Although facts alleged in the complaint are presumed to be true, the Court does not extend this presumption of veracity to "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (citations omitted). Indeed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Firefighters' Ret. Sys. v. Grant Thornton, L.L.P.*, 894 F.3d 665, 669 (5th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). "But just as plaintiffs cannot state a claim using speculation, defendants cannot defeat plausible inferences using speculation." *Bryant v. Ditech Fin., L.L.C.*, No. 23-10416, 2024 WL 890122, at *3 (5th Cir. Mar. 1, 2024).

Generally, "[i]n determining whether to grant a motion to dismiss, the district court must not go outside the pleadings." *Bob Davis Paint & Drywall Inc. v. Valspar Corp.*, 452 F. Supp. 3d 589, 596 (S.D. Tex. 2020) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). However, there are three exceptions to this proscription: the Court may consider (1) documents attached to the complaint; (2) matters of which judicial notice may be taken; and (3) documents attached to the motion to dismiss that are both (a) referred to in the complaint and (b) central to the plaintiff's claims. *See Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But even when considering these additional materials, the Court "is still bound to draw all inferences in favor of the plaintiff." *Wood v. Bexar Cnty., Tex.*, No. 22-50888, 2023 WL 3563012, at *1 (5th Cir. May 19, 2023) (citing *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 413 (5th Cir. 2021)).

"When 'matters outside the pleading' are presented with a motion to dismiss under Rule 12(b)(6), a district court has complete discretion to either accept or exclude the evidence." *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007). If the Court elects to consider such materials—*i.e.*, attachments which are either not referred to in the complaint or not central to any of the claims therein—then the motion to dismiss "must be treated as a motion for summary judgment." *Causey*, 394 F.3d at 288; *see Hernandez v. Morales*, No. 7:13-CV-234, 2014 WL 794201, at *1 (S.D. Tex. Feb. 25, 2014) ("If the Court does consider matters outside the pleadings, then the Court has converted the motion to dismiss into a motion for summary judgment.").

2. *Analysis.*

**\*11** Before proceeding to the merits of Defendants' motion, the Court must address two threshold matters. First, Plaintiff argues that the Court must disregard Defendants' 12(b)(6) motion because, with the exception of WG LLC, they filed answers to his class action complaint after the 12(b)(6) motion was filed but before the Court has ruled on it. (Docket Entry 97, at 7.) According to Plaintiff, "the filing of an answer before a court has ruled upon a pending motion to dismiss moots that motion." (*Id.*) Plaintiff cites one unpublished district court case from the District of Delaware to support this proposition. *See Telebrands Corp. v. 1ByOne Prod. Inc.*, No. CV 17-997-JFB-SRF, 2017 WL 5593785, at *2 (D. Del. Nov. 21, 2017) ("When an answer is filed prior to the resolution of a motion to dismiss, the motion to dismiss becomes moot."). However, the Fifth Circuit has expressly held the opposite in a published case: when a defendant has filed a motion to dismiss, "they [a]re not obligated to wait to answer until the court ha[s] ruled on the motion." *Brunig v. Clark*, 560 F.3d 292, 294 (5th Cir. 2009). Thus, Defendants' 12(b)(6) motion is not moot as to the four Defendants who have filed answers in this case.

The second threshold matter concerns the fact that Defendants attached five declarations to their motion to dismiss. (*See* Docket Entry 95-1–5.) Because the class action complaint does not refer to any of these declarations—nor could it—they are matters outside the pleadings. *See Causey*, 394 F.3d at 288. As such, the Court must either disregard these declarations and press on, or convert the motion to dismiss into a motion for summary judgment. *See id.*; *Hernandez*, 2014 WL 794201, at *1. This Report and Recommendation adopts the first approach. *See Gen. Retail Servs., Inc.*, 255 F. App'x at 783. Accordingly, Defendants' 12(b)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 32 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

(6) motion will remain just that, and the Report and Recommendation disregards the attached declarations, without prejudice to the declarations being considered at later stages of the case.

On the merits, Defendants advance three arguments in their motion. First, they argue that Plaintiff failed to allege that he was charged for any of the automated calls he received—something Defendants contend is an indispensable element of any claim under 47 U.S.C. § 227(b)(1)(A)(iii). (*See* Docket Entry 95, at 3.) Second, they argue that Plaintiff failed to specify that any particular Defendant made or caused to be made any of the automated phone calls. (*Id.* at 4.) Third, Defendants argue that Plaintiff has pleaded insufficient facts to plausibly show that any of the Defendants made the calls themselves, directed others to make the calls, or ratified said calls. (*Id.* at 4–10.) Each argument is considered in turn.

a. Statutory interpretation.

Defendants cite no caselaw to support their first argument—that it is an essential element of a claim under 47 U.S.C. § 227(b)(1)(A)(iii) that the plaintiff was charged for the automated phone call he received. (*See* Docket Entry 95, at 2–3.) Plaintiff responds that the statute does not, in fact, always require that the recipient be charged for the call, because that condition "is part of a disjunctive list of criteria which also includes delivery of robocalls to a cellular telephone service." (Docket Entry 97, at 4.) Plaintiff likewise cites no caselaw to support its contention. (*See id.*) In the absence of cited precedent, this Report and Recommendation considers Defendants' argument solely by reference to the statute.

"As always, statutory interpretation begins 'with the plain language and structure of the statute.' " *Moore v. Bryant*, 853 F.3d 245, 252 (5th Cir. 2017). Plaintiff's class action complaint alleges a single claim under § 227(b)(1)(A). (*See* CAC, at 11.) That provision makes it unlawful to make non-emergency or non-consensual calls "using any automatic telephone dialing system or an artificial or prerecorded voice" in three instances; relevant to this case, it prohibits such calls to "any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call," with the exception (not relevant here) of calls made regarding debts owed to or guaranteed by the United States. 47 U.S.C. § 227(b)(1)(A)(iii).

**\*12**  The question in this case is whether the provision prohibiting calls to "any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call" limits the statute only to those instances in which the called party is charged for the call. In this regard, the undersigned notes that the charged-call provision is preceded by the word "or." The word "or" is "almost always disjunctive." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018). That is, it "create[s] alternatives." *Conjunctive/Disjunctive Canon*, Black's Law Dictionary (11th ed. 2019). If that normal reading is applied here, then an automated call made to a telephone number assigned to a cellular service, for example, would suffice to come within the statute's ambit without the additional requirement that the recipient be charged for the call—and vice versa. One *or* the other would do.

Defendants' argument appears to be that Congress's decision to add the catch-all "or any service for which the called party is charged for the call" at the end of the list of protected types of services was meant to *modify* the preceding listed services, revealing that they are additionally conditioned on the recipient's being charged for the call. This interpretation is unnatural absent the express inclusion of the word "other" between the words "any" and "service." *Cf., e.g., United States v. Mackay*, 757 F.3d 195, 197–98 (5th Cir. 2014) ("The word 'other' or 'any other' following an enumeration of particular classes ought to be read as 'other such like' and to include only those of like kind or character."). Congress did not include the word "other" before the charged-call provision—an omission that is particularly telling since it *did* include "other" just six words earlier, to modify "radio common-carrier service." In such circumstances, the Court must interpret the omission of the term "other" before the charged-call provision as deliberate. To do otherwise would violate the rule that the Court "must interpret the statute, not rewrite it." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

Accordingly, Defendants' first argument in support of their motion to dismiss fails.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 33 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

b. Failure to plead sufficient factual support.

Defendants' second and third arguments will be taken up together. Defendants argue that, while Plaintiff does allege he received automated calls from a rotating series of phone numbers, he "makes no allegation that any particular Defendant ... made, or directed to be made, these calls." (Docket Entry 95, at 3–4.) Without such specificity, Defendants contend, Plaintiff failed to state a plausible claim against any of the Defendants for a TCPA violation. (*See id.*) Defendants further argue that Plaintiffs' threadbare factual allegations do not support a reasonable inference that they are directly or vicariously liable for any TCPA violations. (*See id.* at 4–10.) Plaintiff responds that, while "unable to identify which of the Defendants [in particular] placed, or caused to be placed, the robocalls," he did eventually "identify Defendants as the entities responsible for those robocalls." (Docket Entry 97, at 4.) Plaintiff argues that his allegation of Defendants' joint involvement "is supported by ... the retainer attached to the complaint, and the follow-up communications thereafter." (*Id.*) From these allegations and supporting documents[6], Plaintiff argues the Court may reasonably infer that Defendants are vicariously liable because they apparently authorized[7] or ratified[8] the initial callers' TCPA violations (*See id.* at 14–21.)

 **\*13**  Given Plaintiff's allegations that he was solicited by robocallers to file a Camp Lejeune claim, that the callers refused to identify themselves or the law firms on whose behalf or for whose benefit they were calling unless Plaintiff agreed to file such a claim, and in light of the documents Plaintiff received from WG LLC, Biltmore, Boxer, and Henson after agreeing (under a pseudonym) to file said claim, the Court should find that Plaintiff has raised a plausible claim against these Defendants. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bryant*, 2024 WL 890122, at *2 (citation omitted). Plaintiff's complaint and supporting information allows the Court to draw a reasonable inference of liability here.

Defendants' argument that more specificity was required at this stage is untenable. To require more would effectively immunize savvier TCPA violators from liability—*i.e.*, those with the wherewithal and means to use middlemen—or a series of increasingly removed middlemen—to solicit business through prohibited robocalling operations. Or, as Plaintiff put it, "Defendants' argument, if tenable, would reward robocallers for attempting to obfuscate their identity in order to prevent TCPA liability." (Docket Entry 97, at 5.) Thus, given the practical realities of these sorts of violations—a TCPA claim is plausible when it relies on reasonable inferences drawn from the later-revealed identity of the caller or their beneficiary. Requiring anything more would demand speculation by the plaintiff—and allow speculation by Defendant; as the Fifth Circuit has recently explained, neither sort of speculation is appropriate. *See Bryant*, 2024 WL 890122, at *3 ("[J]ust as plaintiffs cannot state a claim using speculation, defendants cannot defeat plausible inferences using speculation."). For these reasons, Plaintiff's allegations, along with the corroborating documentation attached to his class action complaint, suffice to permit a reasonable inference that WG LLC, Biltmore, Boxer, and Henson are liable for the TCPA violations alleged. Accordingly, as to those four Defendants, the remaining Rule 12(b)(6) arguments likewise fail.[9]

### IV. Recommendation.

Based on the foregoing, I recommend that Defendants' Motion to Dismiss Plaintiff's Class Action Complaint Under Rule 12(b)(1) (Docket Entry 94) be **GRANTED** as to WG LLP, but **DENIED** as to the other Defendants; that WG LLC's Motion to Dismiss Plaintiff's Class Action Complaint Under Rule 12(b)(2) (Docket Entry 96) be **DENIED**; and that Defendants' Motion to Dismiss Plaintiff's Class Action Complaint Under Rule 12(b)(6) (Docket Entry 95) be **DENIED AS MOOT** as to WG LLP, and **DENIED** as to the other Defendants, without prejudice to consideration of extra-pleading documents they submitted at later stages in the case.

### V. Notice of Right to Object.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 34 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this Report and Recommendation must be filed within **fourteen (14) days** after being served with a copy of the same, unless this time period is modified by the District Court. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

 **\*14**  The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties. Absent leave of Court, **objections are limited to twenty (20) pages in length**. An objecting party must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## All Citations

Not Reported in Fed. Supp., 2024 WL 3100773

## Footnotes

1    Plaintiff's class action complaint is the first entry on the docket sheet in Cause No. SA-23-CV-910-OLG. The pending motions to dismiss were originally filed in that case. (*See* SA-:23-CV-910-OLG, Docket Entries 6–8.) That case was eventually consolidated with Cause No. SA-22-CV-363-OLG—the lead case. (*See* Docket Entry 73.) When the two cases were consolidated, the dispositive motions from SA-23-CV-910-OLG were added to the docket sheet for SA-22-CV-363-OLG. (*See* Docket Entries 94–96.) However, the class-action complaint that those motions seek to dismiss was never added to the docket sheet for SA-22-CV-363-OLG.

In this report, all citations are to docket entries in SA-22-CV-363-OLG, unless specifically noted otherwise. When cited, Plaintiff's class-action complaint will simply be referred to as "CAC."

2    Camp Lejeune is a United States Marine Corps base in North Carolina. Pursuant to the Camp Lejeune Justice Act of 2022, individuals who, during a specific window of time, "resided, worked, or w[ere] otherwise exposed ... to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action ... to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." PL 117-168, August 10, 2022, 136 Stat 1759.

3    *See, e.g., Hirsch v. USHealth Advs., LLC*, 337 F.R.D. 118, 132 (N.D. Tex. 2020) ("Defendants themselves did not contact Hirsch or the class members; instead, the solicitations were made by non-parties. [But] Defendants can still be liable under the TCPA if the calls were made 'on behalf of' Defendants.") (quoting 47 U.S.C. § 227(c)(5)); *Horton v. Palmer Admin. Servs. Inc.*, No. 3:20-CV-3526-X-BN, 2021 WL 8014654, at \*4 (N.D. Tex. June 8, 2021) ("While both sides agree that Palmer itself did not call Horton, Palmer 'can still be liable under the TCPA if the calls were made "on behalf of" [Palmer].' ") (quoting *Hirsch*, 337 F.R.D. at 132).

4    The undersigned notes that, when a dispute as to the existence of an agency relationship "intertwines" the traceability inquiry with "a central aspect of any TCPA claim," the Court may properly "assume jurisdiction and treat the attack as one on the merits of the claim under Rule 12(b)(6)." *Hunsinger v. Dynata LLC*, No. 3:22-CV-00136-G-BT, 2023 WL 2377481, at \*4 (N.D. Tex. Feb. 7, 2023), *report and recommendation adopted*, No. 3:22-CV-0136-G-BT, 2023 WL 2386710 (N.D. Tex. Mar. 4, 2023). Indeed, Defendants reiterate their position as to traceability in their 12(b)(6) motion. (*See* Docket Entry 95, at 3–10.) Accordingly, the agency issue is also addressed in conjunction with that motion. *See* Part III(C), *infra*.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 35 of 114

Cunningham v. Watts Guerra, LLP, Not Reported in Fed. Supp. (2024)

5    An argument might conceivably be made that an exception to the waiver rule should be made for Rule 12(b)(1) subject-matter jurisdiction motions, as the Rule suggests that subject-matter jurisdiction is the primary threshold issue which must be considered "at any time." Fed. R. Civ. P. 12(h)(3). But that exception would not apply here, as WG LLC filed both a 12(b)(1) and a 12(b)(6) motion before the 12(b)(2) motion.

6    To recap, the documents Plaintiff attached to his class action complaint—which he alleges he received "after submitting a pseudonym[ous] Camp Lejeune claim" to the robocallers—were (1) a contract to hire WG LLC, Biltmore, Boxer, and Henson to prosecute his Camp Lejeune claim for a contingency fee; (2) a form authorizing the disclosure of Plaintiff's private health information to WG LLC; (3) a form authorizing WG LLC to file an administrative claim arising from his exposure at Camp Lejeune; (4) a form granting WG LLC power of attorney for Plaintiff; and (5) an email from WG LLC and Biltmore, soliciting Plaintiff's signature on the aforementioned documents. (*See* Docket Entry 97, at 4; Docket Entry 1-1, at 2–9; Docket Entry 1-2, at 2.) Plaintiff points out that these documents—which he alleges he received from Defendants after he cooperated with the initial callers—"incorporate[ed] the information Plaintiff provided to the initial caller[s]." (Docket Entry 97, at 15.)

7    "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency § 27 (1958).

8    *See Insurasource, Inc. v. Fireman's Fund Ins. Co.*, No. 2:11-CV-82-KS-MTP, 2012 WL 1365083, at *3 (S.D. Miss. Apr. 19, 2012) ("[A] principal may ratify an agent's action 'by receiving ore retaining benefits it generates....' ").

9    As previously discussed, the absence of such corroborating documentation was fatal to the traceability of Plaintiff's alleged injuries to any conduct by WG LLP. *See* Part III(A)(2), *supra.* For that reason, the undersigned has recommended that Defendants' 12(b)(1) motion (Docket Entry 94) be granted as to WG LLP for lack of standing. Accordingly, Defendants' 12(b)(6) motion (Docket Entry 95) is now moot as to WG LLP and may be denied as such. To the extent the Court finds the Rule 12(b)(1) and Rule 12(b)(6) analyses so intertwined that it should address the merits of WG LLP's 12(b)(6) argument, *see* note 4, *supra*, then it should grant Defendants' 12(b)(6) motion as to WG LLP, as Plaintiff's class action complaint and supporting documentation do not permit a reasonable inference that WG LLP is liable for the TCPA violations alleged. *See Iqbal*, 556 U.S. at 678.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Ewing v. Freedom Forever LLC, Not Reported in Fed. Supp. (2021)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 36 of 114

 KeyCite Yellow Flag

Distinguished by In re PFA Insurance Marketing Litigation, N.D.Cal., June 15, 2022

2021 WL 1087100
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Anton EWING, Plaintiff,

v.

FREEDOM FOREVER LLC, a Delaware limited liability company; Brett Leon
Bouchy, an individual; and Greg Russell Albright, an individual, Defendants.

Case No.: 20-cv-880-JLS (AHG)
|
Signed 03/22/2021

**Attorneys and Law Firms**

Anton Ewing, San Diego, CA, Pro Se.

Julie Isen, Freedom Forever LLC, Temecula, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

(ECF No. 19)

Janis L. Sammartino, United States District Judge

 **\*1**  Presently before the Court is Defendants Freedom Forever LLC ("Freedom Forever"), Brett Leon Bouchy ("Mr. Bouchy"), and Greg Russell Albright's ("Mr. Albright") (collectively, "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint ("Mot.," ECF No. 19). Plaintiff Anton Ewing ("Plaintiff"), proceeding *pro se*, filed an Opposition to ("Opp'n," ECF No. 22), and Defendants filed a Reply in support of ("Reply," ECF No. 23), the Motion. The Court took the matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1). *See* ECF No. 24. Having carefully reviewed Plaintiff's First Amended Complaint ("FAC," ECF No. 11), the Parties' arguments, and the law, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion, as follows.

**BACKGROUND**[1]

Plaintiff asserts various claims stemming from alleged phone calls Defendants placed to Plaintiff without prior authorization. *See generally* FAC. Plaintiff alleges that Defendants made the phone calls with an Automatic Telephone Dialing System ("ATDS"), which can be verified by the "very distinct bubble popping sound" contained at the start of the call. *Id.* ¶ 63. Plaintiff alleges that Defendants called him with "a prerecorded voice message and an ATDS to initial [sic] the call. The robot required Plaintiff to push '1' to get to a live human." *Id.* Plaintiff asserts that the purpose of Defendants' calls was to "sell solar panels." *Id.* ¶¶ 5, 23, 63, 71. These calls allegedly harmed Plaintiff in various ways. *Id.* ¶¶ 48, 112. 150. Based on these facts, Plaintiff brings five claims: (1) negligent violations of the Telephone Consumer Protection Act ("TCPA") pursuant to 47 U.S.C. § 227(b)(1)(A); (2) willful violations of the TCPA pursuant to 47 U.S.C. § 227(b)(1)(A); (3) negligent violations of the TCPA pursuant to

47 U.S.C. § 227(c)(5); (4) willful violations of the TCPA pursuant to 47 U.S.C. § 227(c)(5); and (5) violation of California's Invasion of Privacy Act ("CIPA") pursuant to California Penal Code §§ 632.7 and 637.2. *See* FAC at 1; *see also id.* at 38–40.

On May 11, 2020, Plaintiff initiated this action. Defendants previously moved to dismiss Plaintiff's Complaint, and, in lieu of responding, Plaintiff filed his operative First Amended Complaint. ECF Nos. 10, 11. Accordingly, the Court denied Defendants' first motion to dismiss as moot. ECF No. 17. Defendants now move to dismiss the First Amended Complaint in its entirety. *See generally* Mot.

**LEGAL STANDARD**

**\*2** Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' ... it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts " 'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.*

Courts have a duty to construe a *pro se* litigant's pleadings liberally. *See Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). The district court should grant leave to amend if it appears "at all possible that the plaintiff can correct the defect," unless the court determines that "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130–31 (9th Cir. 2000) (en banc) (citing *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1990)).

**ANALYSIS**

Defendants argue that Plaintiff's FAC should be dismissed because (1) "most of the alleged calls and related alleged TCPA violations are barred by the applicable statute of limitations"; (2) Plaintiff's TCPA claims fail to allege sufficient facts to state a claim; (3) Plaintiff's CIPA claim also fails to allege sufficient facts to state a claim; and (4) "the FAC fails to sufficiently plead facts to hold the Defendants directly or vicariously liable for the allegedly violating phone calls." *See* Mot. at 12–13.

**I. Allegations of Direct and Vicarious Liability for TCPA Claims**

The Court will first address Defendants' arguments that Plaintiff's allegations as to Defendants' liability under the TCPA are inadequate. First, Defendants claim that Plaintiff has not adequately alleged Defendants' direct liability. Mot. at 19–20. Defendants argue that Plaintiff alleges that a third party, rather than Freedom Forever, made the calls, and that Plaintiff alleges Messrs. Bouchy and Albright supposedly made their calls to Plaintiff from their cell phones, so the calls were not made using an ATDS. *Id.* at 20. Second, Defendants claim that Plaintiff fails to adequately allege Defendants' vicarious liability based on principles of agency. Defendants argue that Plaintiff's allegations of their control over the lead source that made the calls are conclusory and do not support an inference of actual authority. Mot. at 22–23. Defendants further claim that Plaintiff fails to allege any facts to support an inference of apparent authority. *Id.* at 23. Finally, Defendants argue that Plaintiff has failed to adequately plead ratification, as there are insufficient allegations that the lead caller "acted or purported to act as an agent of Freedom Forever." *Id.* at 23–24.

 **\*3**  In response, Plaintiff declares that "[he] believe[s] that Defendant Freedom has and had actual and apparent authority over Tim Burton, their telemarketing agent," Plaintiff Anton Ewing's Declaration ("Ewing Decl.," ECF No. 22-1) ¶ 19; and that, "[o]n September 10, 2019, Jorrell Patterson informed me, in writing via email after he illegally telemarketed my DNC registered phone, that he worked for Defendant Freedom," *id.* ¶ 23.

The TCPA makes it unlawful for a person to "make" certain phone calls. *See* 47 U.S.C. § 227(b)(1)(A)(i). "For a person to 'make' a call under the TCPA, the person must either (1) directly make the call, or (2) have an agency relationship with the person who made the call." *Abante Rooter & Plumbing v. Farmers Group, Inc.*, No. 17-cv-03315-PJH, 2018 WL 288055, at \*4 (N.D. Cal. Jan. 4, 2018) (citing *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877–79 (9th Cir. 2014)). "Three theories of agency could support vicarious liability: (1) actual authority; (2) apparent authority; and (3) ratification." *Id.* (citing *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014)). "Although the precise details of the agency relationship need not be pleaded to survive a motion to dismiss, sufficient facts must be offered to support a reasonable inference that an agency relationship existed." *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1301 (D. Nev. 2014) (citation omitted).

Plaintiff does allege that each of Messrs. Bouchy and Albright called Plaintiff on his cell phone "on behalf of himself and his entity Freedom Forever." *See* FAC ¶¶ 64–67. Thus, Plaintiff does allege a basis for direct liability as to Messrs. Bouchy and Albright. *See, e.g.*, *Ott v. Mortg. Invs. Corp. of Ohio*, 65 F. Supp. 3d 1046, 1060–61 (D. Or. 2014) (noting that "corporate actors may be held individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute") (citations and internal quotation marks omitted). To the extent Defendants argue that Plaintiff fails to adequately plead the other elements of his TCPA claims against Messrs. Bouchy and Albright, such as their use of an ATDS, those arguments are addressed *infra* in Section III.

The Court agrees that, to the extent Plaintiff seeks to hold Freedom Forever liable, Plaintiff has not alleged that Freedom Forever itself placed any of the calls, *see generally* FAC, and accordingly any liability against Freedom Forever must be premised on vicarious liability. Indeed, a business organization cannot act on its own; rather, "[a]n organization's tortious conduct consists of conduct by agents of the organization that is attributable to it." Restatement (Third) of Agency § 7.03 cmt. c (2006).

As to Freedom Forever's vicarious liability, "[a]pparent authority is inapplicable because it can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.' " *Thomas*, 582 F. App'x at 679 (second and third alterations in original) (citing *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997); Restatement (Second) of Agency § 265 cmt. a (1958)). Plaintiff has alleged no act or statement by any Defendant made to him directly manifesting the alleged third-party caller's authority to act on Defendants' behalf. Further, " '[a]lthough a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it.' " *Id.* at 680 (citing *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003)). Accordingly, to the extent Plaintiff seeks to hold Freedom Forever liable for any purported violations of the TCPA, he must adequately allege an agency relationship premised on actual authority.

**\*4** Viewing the allegations of the First Amended Complaint in the light most favorable to Plaintiff and drawing all inferences in his favor, the Court finds that, at the pleading stage, Plaintiff has alleged adequate facts to state a claim against Freedom Forever premised on vicarious liability. "An agent is one who 'act[s] on the principal's behalf and subject to the principal's control.' " *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (citation omitted). "Agency means more than mere passive permission; it involves request, instruction, or command." *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1085 (C.D. Cal. 2012) (quoting *Klee v. United States*, 53 F. 2d 58, 61 (9th Cir. 1931)). Plaintiff alleges that "[t]he initiating lead source that dialed Plaintiff's phone number did so at the express direction, command, and order of Defendant Freedom Forever, LLC." FAC ¶ 16. Plaintiff alleges that the caller expressly told him as much at the end of a May 3, 2020 call. *Id.* Plaintiff also claims that the caller "acted and purported to act as an agent for Freedom Forever," *id.* ¶ 18; that "Freedom Forever has and did ratify the actions and illegal calls made on its behalf and at its express direction and control," *id.*; and "the alleged lead source acted with apparent authority of Freedom Forever in making the telemarking calls to Plaintiff," *id.* ¶ 19. Plaintiff further alleges that "Defendants requested, instructed and commanded their hired and paid lead source in such a manner and such a way as to constitute control and actual authority over said lead source," instructing the lead source "to ask specific questions like credit score, shade on roof, name of utility company, and several other personal questions like who was in title to the home." *Id.* ¶ 20. Further, Plaintiff claims that "Defendants controlled every aspect of its agent's operations including the scripts to be read on each call and the fact that Defendant required its agent to record each telemarking call." *Id.* ¶ 61. Courts within this Circuit have found similar, and even less detailed, allegations adequate to state a claim for vicarious liability and to survive a motion to dismiss. *See, e.g.*, *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1302 (D. Nev. 2014); *Tehrani v. Joie De Vivre Hosp., LLC*, No. 19-CV-08168-EMC, 2020 WL 5408120, at \*2 (N.D. Cal. Sept. 9, 2020). Accordingly, the Court finds that Plaintiff's allegations of Defendants' TCPA liability are adequate to survive the present Motion.

## II. TCPA Statute of Limitations

Defendants argue that "most of Plaintiff's claims of allegedly violating calls are barred by the applicable statute of limitation." Mot. at 13. Plaintiff's TCPA claims are subject to a four-year statute of limitations. *See* 28 U.S.C. § 1658(a) (enacting four-year statute of limitations as to "a civil action arising under an Act of Congress"); *Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 115 (2d Cir. 2013) (holding that the generally applicable four-year statute of limitations in 28 U.S.C. § 1658(a) governs TCPA actions); *Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*, 642 F.3d 560, 561 (7th Cir. 2011) (same); *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 281 (N.D. Cal. June 18, 2015) (same).

Because Plaintiff filed this action on May 11, 2020, *see* ECF No. 1, any TCPA claims based on alleged calls from before May 11, 2016 are barred by the applicable statute of limitations. Defendants identify seven calls that may not be time-barred, which took place on: (1) September 10, 2019; (2) October 9, 2019; (3) May 1, 2020; (4) May 3, 2020; (5) May 6, 2020; (6) May 6, 2020; and (7) May 9, 2020. Mot. at 13–14 (citing FAC ¶ 10). However, Plaintiff also alleges Defendants placed seventeen calls in 2015 and early 2016. FAC ¶ 68; *see also* Mot. at 13. Plaintiff does not dispute that some of the calls alleged in the FAC fall outside the statute of limitations, instead asserting that the "prior calls bolster the triple damage award that is within the sole discretion of the District Judge after a finding of liability." Opp'n at 6 (citing 47 U.S.C. § 227(b)(3)(C)). Accordingly, the Court **GRANTS** Defendants' Motion and **DISMISSES** Plaintiff's TCPA claims to the extent they are based on calls made prior to May 11, 2016; however, Plaintiff may plead these calls as evidence of willfulness.

## III. Sufficiency of TCPA Claims

### A. *Section 227(b)* *Claims*

Plaintiff alleges that Defendants both negligently and willfully violated section 227(b) of the TCPA. FAC ¶¶ 72, 127–34. Defendants argue that these claims must be dismissed because Plaintiff has failed to allege adequately that the calls were made to Plaintiff's cell phone or the use of an ATDS. *See* Mot. at 10, 16. In response, Plaintiff submits a declaration in support of his Opposition averring that "[he] did not fail to allege sufficient facts in the First Amended Complaint." Ewing Decl. ¶ 18.

Pursuant to section 227(b) of the TCPA:

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 40 of 114

Ewing v. Freedom Forever LLC, Not Reported in Fed. Supp. (2021)

It shall be unlawful for any person within the United States ... [¶] to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial prerecorded voice ... [¶] to any telephone number assigned to a ... cellular telephone service ... for which the called party is charged for the call....

**\*5** 47 U.S.C. § 227(b)(1)(A)(i). There are, therefore, three elements to a TCPA claim: "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system [or an artificial prerecorded voice]; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). Defendants challenge the adequacy of Plaintiff's allegations as to the first and second elements, *see* Mot. at 10, 16, as well as the sufficiency of Plaintiff's bare assertion that Defendants' alleged violations were "knowing and/or willful," *id.* at 17.

As to the first element, Plaintiff clearly alleges that the calls from September 10, 2019, *see* FAC ¶ 66; October 9, 2019, *see id.* ¶ 67; May 1, 2020, *see id.* ¶ 63; May 3, 2020, *see id.* ¶¶ 63, 64; and May 6, 2020, *see id.* ¶¶ 63, 65; were made to his cell phone. Such an allegation appears to be missing, however, as to the May 9, 2020 call. *See id.* ¶ 10. Accordingly, the Court agrees Plaintiff has not adequately alleged the first element of his claim as to the alleged May 9, 2020 call, and therefore Plaintiff's first and second claims are dismissed to the extent they are premised on the May 9, 2020 call; however, the first element appears satisfied as to the remaining alleged calls.

Regarding the second element, Plaintiff alleges that calls he received on May 1, 3, and 6, 2020 used a prerecorded voice message and that "[t]he robot required Plaintiff to push '1' to get to a live human," FAC ¶ 63, an allegation that is independently sufficient to support the second element of Plaintiff's TCPA claims as to those calls, *see Iniguez v. CBE Grp.*, 969 F. Supp. 2d 1241, 1247 (E.D. Cal. 2013). Such an allegation is "based on Plaintiff's own experience when she answered Defendant's phone calls, and it is therefore not vague or conclusory." *Id.* However, it is not clear on the face of the FAC that the May 3 and 6, 2020 calls by Mr. Bouchy, *see* FAC ¶¶ 64, 65; or the September 10 and October 9, 2019 calls by Mr. Albright, *see id.* ¶¶ 66, 67; were made using an artificial prerecorded voice. Rather, Plaintiff simply alleges that these individual Defendants "called Plaintiff," *id.* ¶¶ 64–67, and, with regards to Mr. Bouchy, that he "directly called Plaintiff," *id.* ¶ 98, suggesting an artificial prerecorded voice was not used. Thus, to the extent Plaintiff attempts to state section 227(b) claims based on the use of an artificial prerecorded voice as to these calls, Plaintiff fails to do so adequately.

As to Plaintiff's allegations concerning the use of an ATDS, "[w]hile the specific requirements for an allegation of the use of an ATDS to survive a Rule 12(b)(6) motion to dismiss have not been conclusively established by controlling authority, persuasive authority has generally followed one of two approaches." *Maier v. J.C. Penney Corp.*, No. 13CV0163-IEG DHB, 2013 WL 3006415, at \*3 (S.D. Cal. June 13, 2013). "The first approach has been to allow for minimal allegations regarding use of an ATDS in recognition of the fact that the type of equipment used by the defendant to place the 'call' is within the sole possession of the defendant at the pleading stage, and will therefore only come to light once discovery has been undertaken." *Id.* (citing *In re Jiffy Lube Int'l., Inc., Text Spam Litig.*, 847 F.Supp. 2d 1253, 1260 (S.D. Cal. 2012); *Blair v. CBE Grp. Inc.*, No. 13–CV–134–MMA(WVG), 2013 WL 2029155, at \*4 (S.D. Cal. May 13, 2013)). "The second approach has been that a TCPA plaintiff must go beyond simply using statutory language alleging the defendant's use of an ATDS and must include factual allegations about the 'call' within the complaint allowing for a reasonable inference that an ATDS was used." *Id.* (citing *Kramer v. Autobytel, Inc.*, 759 F. Supp 2d 1165, 1171 (N.D. Cal. 2010); *Johansen v. Vivant, Inc.*, 12 C 7159, 2012 WL 6590551, at \*3 (N.D. Ill. Dec. 18, 2012)). Within this District, courts seem to apply the second approach predominantly. *See, e.g.*, *Meza v. Sirius XM Radio, Inc.*, No. 17-CV-2252-AJB-JMA, 2018 WL 4599718, at \*3 (S.D. Cal. Sept. 25, 2018); *Vaccaro v. CVS Pharmacy, Inc.*, No. 13-CV-174-IEG RBB, 2013 WL 3776927, at \*2 (S.D. Cal. July 16, 2013); *Ewing v. 8 Figure Dream Lifestyle, LLC*, No. 18-CV-1063-AJB-AGS, 2019 WL 1429589, at \*7 (S.D. Cal. Mar. 29, 2019). Accordingly, this Court will also adhere to the second approach.

**\*6** Plaintiff claims that "Defendant Freedom Forever, LLC used a 'Vicidial' ATDS system to robodial Plaintiff on Plaintiff's cell phone." FAC ¶ 71. He claims the May 1, 3, and 6, 2020 calls were made using "an ATDS to initial [sic] the call," *id.* ¶ 63, and that "[t]here was also a very distinct bubble popping sound at the beginning of the call that indicates an ATDS was used," *id.* Thus, Plaintiff sufficiently alleges both the use of an ATDS and further indirect evidence that support the plausibility of

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 41 of 114

Ewing v. Freedom Forever LLC, Not Reported in Fed. Supp. (2021)

Plaintiff's allegations with regard to the May 2020 calls. Plaintiff claims Mr. Bouchy made his calls "through an ATDS device," but provides no similar indirect allegations to raise the inference that an ATDS was used. *Id.* ¶ 78. And Plaintiff makes no allegations as to whether Mr. Albright used an ATDS. Accordingly, to the extent Plaintiff attempts to state section 227(b) claims against Messrs. Albright and Bouchy based on their alleged use of an ATDS, Plaintiff has failed to do so.

Finally, while Defendants claim that the bare assertion that the alleged TCPA violations were willful or knowing is inadequate to state a claim, *see* Mot. at 17, numerous courts in the Ninth Circuit and this District have held otherwise, *see, e.g., Keifer v. HOSOPO Corp.*, No. 318CV1353CABKSC, 2018 WL 5295011, at *5 (S.D. Cal. Oct. 25, 2018) (finding sufficient for purposes of motion to dismiss allegation that " 'the foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the TCPA' " (citation omitted)); *Gulden v. Liberty Home Guard LLC*, No. CV-20-02465-PHX-JZB, 2021 WL 689912, at *6–7 (D. Ariz. Feb. 23, 2021) (rejecting same argument and finding similar allegations sufficient to survive motion to dismiss). The Court finds Plaintiff's allegations that Defendants' alleged violations were knowing and/or willful adequate at the pleading stage.

In sum, the Court finds that Plaintiff has failed to allege sufficient facts as to the May 3 and 6, 2020 calls by Mr. Bouchy; the September 10 and October 9, 2019 calls by Mr. Albright; and the May 9, 2020 call by an agent of Freedom Forever, and accordingly the Court **GRANTS** Defendants' Motion as to Plaintiff's first and second claims, to the extent they are premised on those calls. As to the May 1, 3, and 6, 2020 calls placed by an agent of Freedom Forever, however, the Court finds that Plaintiff has alleged adequate facts to state a claim. Accordingly, the Court **DENIES** Defendants' Motion as to Plaintiff's first and second claims to the extent they are premised on the May 1, 3, and 6, 2020 calls.

### B. *Section 227(c) Claims*

Plaintiff also alleges that Defendants both negligently and willfully violated section 227(c) of the TCPA. FAC ¶¶ 72, 135–42. Defendants argue that these claims must be dismissed, and in so doing incorporate the arguments made as to why Plaintiff's first and second claims fail as a matter of law. Mot. at 17–18. Again, in response, Plaintiff simply claims his allegations are adequate. Ewing Decl. ¶ 18.

"Section 227(c) directs the Federal Communications Commission to formulate regulations to protect telephone subscribers' privacy rights and to establish a national database of telephone subscribers who object to receiving telephone solicitations (the "Do Not Call Registry")." *Ewing v. Senior Life Plan., LLC*, No. 19-CV-1005-BAS-LL, 2019 WL 4573703, at *4 (S.D. Cal. Sept. 18, 2019) (citing *Kazemi v. Payless Shoesource, Inc.*, No. C 09-5142 MHP, 2010 WL 963225, at *2 (N.D. Cal. Mar. 16, 2010); 47 U.S.C. § 227(c)(3)). "The regulations promulgated under § 227(c) prohibit telephone solicitation to any telephone number on the Do Not Call Registry." *Id.* (citing, *inter alia*, 47 C.F.R. § 64.1200(c)). "Section 227(c)(5) establishes a private right of action for a person who has received a telephone call in violation of these regulations." *Id.* (citation omitted).

For the reasons provided *supra* in Section III.A, the Court finds that Plaintiff has adequately alleged two or more calls from an agent of Freedom Forever to his cell phone that potentially violate the TCPA. Moreover, Plaintiff alleges his cell phone is registered on the Do Not Call Registry. *See* FAC ¶ 8. Further, Plaintiff pleads that the calls were made "in an attempt to solicit Plaintiff to purchase Defendant's solar panel installation devices," *see id.* ¶ 63, thereby adequately alleging that the calls were "telephone solicitations," *see Waterbury v. A1 Solar Power Inc.*, No. 15CV2374-MMA (WVG), 2016 WL 3166910, at *4 (S.D. Cal. June 7, 2016) (calls made about services for solar installation found to be "telephone solicitation" such that plaintiff adequately stated section 227(c) claim for purposes of motion to dismiss). Accordingly, the Court finds that Plaintiff has adequately pleaded his third and fourth claims for negligent and willful violations of section 227(c) and **DENIES** Defendants' Motion as to these claims. *See, e.g., Senior Life Plan., LLC*, 2019 WL 4573703, at *4; *Drew v. Lexington Consumer Advoc.*, No. 16-CV-00200-LB, 2016 WL 9185292, at *6–7 (N.D. Cal. Aug. 11, 2016), *report and recommendation adopted*, No. C 16-00200 SBA, 2016 WL 9223901 (N.D. Cal. Sept. 2, 2016); *Mattson v. Quicken Loans, Inc.*, No. 3:17-CV-01840-YY, 2018 WL 2749571, at *2–3 (D. Or. June 7, 2018).

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 42 of 114

Ewing v. Freedom Forever LLC, Not Reported in Fed. Supp. (2021)

### IV. Sufficiency of CIPA Claim

**\*7** Finally, Plaintiff brings a claim against Defendants for violation of CIPA. FAC ¶¶ 72, 143–52. Defendants assert that Plaintiff's claim is defective and must be dismissed because Plaintiff impliedly consented to the alleged recording of the calls and because Defendants did not make the calls in question. Mot. at 18–19. Plaintiff argues that these claims contradict the facts pleaded in his First Amended Complaint and "are [not] allowed to be considered." Opp'n at 19.

"CIPA is California's anti-wiretapping and anti-eavesdropping statute and is designed 'to protect the right of privacy.' " *8 Figure Dream Lifestyle, LLC*, 2019 WL 1429589, at *8 (quoting Cal. Penal Code § 630). "[CIPA] provides for a civil action for damages based on violations of section 632 which prohibits recording a 'confidential communication' 'intentionally and without the consent of all of the parties.' " *Id.* (citing Cal. Penal Code §§ 630, 637.2(a)). "To state a claim for violation of section 632, the three elements that a plaintiff must plead are '(1) an electronic recording of (or eavesdropping on); (2) a "confidential" communication; [where] (3) all parties did not consent.' " *Id.* (alteration in original) (citing *Weiner v. ARS Nat'l Servs., Inc.*, 887 F. Supp. 2d 1029, 1032 (S.D. Cal. 2012); *Stoba v. Saveology.com, LLC*, No. 13CV2925, 2014 WL 3573404, at *3 (S.D. Cal. July 18, 2014)). "Section 632(c) defines a 'confidential communication' as including 'any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto.' " *Id.* (citing Cal. Penal Code § 632(c)). "Excluded from protection are communications in 'circumstance[s] in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.' " *Id.* (citing *Roberts v. Wyndham Int'l, Inc.*, No. 12CV5083, 2012 WL 6001459, at *5 (N.D. Cal. Nov. 30, 2012); Cal. Penal Code § 632(c)). Alternatively, "[i]n interpreting CIPA, the California Supreme Court has held that 'a conversation is confidential under section 632 if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded.' " *Ewing v. Flora*, No. 14CV2925 AJB (NLS), 2015 WL 12564225, at *4 (S.D. Cal. Mar. 25, 2015) (citing *Flanagan v. Flanagan*, 27 Cal. 4th 766, 777 (2002); *Mirkarimi v. Nevada Prop. 1 LLC*, No. 12CV2160, 2013 WL 3761530, at *2 (S.D. Cal. July 15, 2013)).

As the Court noted *supra* at note 1, when deciding a motion to dismiss, the Court must construe the allegations in the operative pleading in Plaintiff's favor. Thus, the Court can give no credence to Defendants' arguments premised on facts or evidence not appearing in the pleading. Plaintiff alleges Mr. Bouchy once "confessed, at the very end of the call, that the call was being recorded," but "he did not disclose the fact of recording at any time prior to that," FAC ¶ 78, and Plaintiff elsewhere alleges that Defendants recorded all of their calls to Plaintiff secretly, without his consent, and without disclosing the fact of the recording near the beginning of the calls, *id.* ¶¶ 51–55, 145–48. Moreover, Plaintiff alleges he "ha[d] a reasonable expectation of privacy during each call." *Id.* ¶ 149. Given that Plaintiff alleges that the calls included questions about his credit score, whether he owns his home, whether he has ever filed for bankruptcy, and the amount he pays each month for electricity bills, *see id.* ¶ 28, drawing all inferences in Plaintiff's favor, the Court can infer that Plaintiff had an objectively reasonable expectation that the call was confidential and not being recorded. *See Flora*, 2015 WL 12564225, at *4. Accordingly, the Court finds that Plaintiff has adequately alleged the elements of his CIPA claim and **DENIES** Defendants' Motion as to this claim.

### CONCLUSION

**\*8** Based on the foregoing and as stated above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss. Plaintiff may file an amended complaint, if any, within thirty (30) days from the date on which this Order is electronically docketed. Any amended filing must be complete in itself without reference to Plaintiff's First Amended Complaint. Any claim not re-alleged in Plaintiff's amended complaint will be considered waived. *See* S.D. CivLR 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *see also Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered waived if not repled."). Failure to file within the time allotted may result in the dismissal of this action in its entirety. *See Lira v. Herrera*, 427 F.3d 1164, 1169 (9th Cir. 2005) ("If a plaintiff

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 43 of 114

**Ewing v. Freedom Forever LLC, Not Reported in Fed. Supp. (2021)**

does not take advantage of the opportunity to fix his complaint, a district court may convert the dismissal of the complaint into dismissal of the entire action.").

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1087100

Footnotes

1    While Defendants' Motion contests the accuracy of many of the facts as pleaded in Plaintiff's First Amended Complaint and provides other facts to counter Plaintiff's narrative—for example, stating that Freedom Forever does not make sales calls, Mot. at 5, and that the alleged May 6, 2020 call clearly notified Plaintiff that the call was being recorded, *id.* at 6—the facts alleged in Plaintiff's First Amended Complaint are accepted as true for purposes of the present Motion. *See Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (holding that, in ruling on a motion to dismiss, the Court must "accept all material allegations of fact as true").

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 44 of 114

Harrison v. Humana, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 4828737
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

Carlton HARRISON, on behalf of herself and others similarly situated, Plaintiff

v.

HUMANA, INC., Defendant

CIVIL ACTION NO. 3:24-CV-00262-GNS
|
Signed November 19, 2024

**Attorneys and Law Firms**

Aleksandr Sasha Litvinov, Smith Krivoshey, PC, Boston, MA, Yeremey O. Krivoshey, Pro Hac Vice, Smith Krivoshey, PC, San Francisco, CA, for Plaintiff.

Akshay Soman, Pro Hac Vice, Martin Jaszczuk, Pro Hac Vice, Seth Corthell, Pro Hac Vice, Jaszczuk P.C., Chicago, IL, Robert B. Herrick, Annie Stewart Myers, Dinsmore & Shohl LLP, Louisville, KY, for Defendant.

## MEMORANDUM OPINION AND ORDER

Greg N. Stivers, Chief Judge

**\*1**  This matter is before the Court on Defendant's Motion to Dismiss (DN 21). The motion is ripe for adjudication.

## I. BACKGROUND

Plaintiff Carlton Harrison ("Harrison") alleges that he received at least seven prerecorded messages from various phone numbers between September 2022 and May 2023. (Compl. ¶¶ 3, 31-39, DN 1; Compl. Ex. A, at 1-2, DN 1-1). Harrison claims that the calls were made for the purpose of selling the insurance products and services of Defendant Humana, Inc. ("Humana") despite his cellular phone number being on the national do-not-call registry. (Compl. ¶ 5). Based on the investigation of his counsel, Harrison contends that the calls were made by a third party acting pursuant to a contractual relationship with Humana to solicit its products and services. (Compl. ¶ 30). While some of the calls were not answered or were terminated after listening to a prerecorded message and artificial voice, one of the calls on September 30, 2022, was allegedly transferred to a person purportedly with an entity called BAShealth.com and then transferred to Kevin M. Drake, who is employed by Humana and who expressed interest in selling its products and services to Harrison. (Compl. ¶¶ 32-38, 40-41).

Harrison filed this action against Humana asserting claims for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, on her own behalf and on behalf of others. (Compl. ¶¶ 47-82). Humana has moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Def.'s Mot. Dismiss, DN 21).

## II. DISCUSSION

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 45 of 114

Harrison v. Humana, Inc., Not Reported in Fed. Supp. (2024)

Generally, threshold challenges to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) should be decided before any ruling on the merits under Fed. R. Civ. P. 12(b)(6). *See Bell v. Hood*, 327 U.S. 678, 682 (1946). In most circumstances, a plaintiff bears the burden to survive Fed. R. Civ. P. 12(b)(1) motions to dismiss for lack of subject matter jurisdiction. *See id.*

Challenges to subject matter jurisdiction come in several varieties. Facial attacks challenge a plaintiff's establishment of jurisdiction in the Complaint and require the Court to examine the jurisdictional basis. *See United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citation omitted). Factual attacks contest the existence of factual prerequisites to jurisdiction. *See id.* In such motions, in contrast to motions under Fed. R. Civ. P. 12(b)(6), the Court is empowered to resolve the factual disputes affecting any jurisdictional prerequisites. *See Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986). The plaintiff bears the burden in both these situations. *See Bell*, 327 U.S. at 682.

When considering a Fed. R. Civ. P. 12(b)(6) motion, a court "must construe the complaint in the light most favorable to [the plaintiff] ...." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted). A court must also accept all of a plaintiff's allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Mere "labels and conclusions, or a formulaic recitation of the elements of a cause of action's elements" are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, this standard is satisfied when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

**\*2**  Under the TCPA, it is illegal for any person to: "(1) 'initiat[e] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party'; or (2) mak[e] live calls to residential telephone numbers that have been placed on the national do-not-call registry." *Lucas v. Telemarketer Calling from (407) 476-5680*, No. 18-3633, 2019 WL 3021233, at \*5 (6th Cir. May 29, 2019) (citations omitted). The Federal Communications Commission ("FCC"), the federal agency responsible for implementing and enforcing the TCPA, has defined the term "telemarketer" to mean "the person or entity that initiates a [telemarketing] call ...." *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of Cal., Ill., N.C., & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 FCC Rcd. 6574, 6583 (2013). A call is initiated by a person "when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities ... that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." *Id.* at 6583. The FCC has further explained:

> For even when a seller does not "initiate" a call under the TCPA, ... it may be held vicariously liable for certain third-party telemarketing calls. In particular, ... the seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers. In this regard, ... a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.

*Id.* at 6584; *see also* 47 U.S.C. § 227(5) (stating that there is a private cause of action for calls made in violation of the TPCA "by or on behalf of the same entity in violation of the regulations prescribed under this subsection").

### A. Fed. R. Civ. P. 12(b)(1)

In its motion, Humana seeks dismissal of the TCPA claim because any alleged injury suffered by Harrison is not traceable to Humana. (Def.'s Mem. Supp. Mot. Dismiss 5-7, DN 21-1). Thus, Humana contends that Harrison lacks standing to assert the TCPA claim against it. (Def.'s Mem. Supp. Mot. Dismiss 5-7).

"To satisfy Article III's standing requirements, a plaintiff must show: "(1) [she] has suffered an 'injury-in-fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016) (internal quotation marks omitted). In the Complaint, Harrison has alleged claims based on the theory that the callers were acting as agents of Humana. (Compl. ¶¶ 62, 68, 73, 79).

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 46 of 114

Harrison v. Humana, Inc., Not Reported in Fed. Supp. (2024)

In its motion, Humana disagrees with the allegations and instead argues that the callers were not its agents. (Def.'s Mem. Supp. Mot. Dismiss 5-7). That argument, however, goes to the merits of Harrison's claims against Humana. Because Harrison has stated colorable claims arising under the TPCA (as discussed below), this Court has standing to hear the matter and Humana may later challenge the sufficiency of the evidence supporting the TCPA claims. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 442 (6th Cir. 2006) ("Questions of statutory standing and cause of action often merge. ... Plaintiff alleges that he was an employee of the Defendant MTA when he became disabled. In fact, whether or not Plaintiff was an employee is determinative in the suit. It is circular to argue that because the Court has determined that Plaintiff was not an employee, Plaintiff lacked standing to sue and that this Court therefore lacks jurisdiction. Rather, Plaintiff had a colorable claim that he was an employee and that he was therefore covered by the statute. Logic dictates that the federal courts be able to reach this question."); *see also In re Flint Water Cases*, 482 F. Supp. 3d 601, 615-16 (E.D. Mich. 2020) ("If the jurisdictional issue is intertwined with the underlying substantive merits of the case, such evidentiary decisions should await a determination of the case on the merits." (citing *Moore*, 458 F.3d at 442). Accordingly, Humana's motion is denied to the extent it seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(1).

### B. Fed. R. Civ. P. 12(b)(6)

**\*3** Humana also seeks dismissal of the Complaint because the pleading fails to state a claim under the TCPA. (Def.'s Mem. Supp. Mot. Dismiss 7-10). It contends that Harrison failed to allege that Humana is vicariously liable or directly liable for any calls made in violation of the TCPA. (Def.'s Mem. Supp. Mot. Dismiss 7-10). Harrison asserts, however, that Humana may be liable based on agency law[1] and points to this Court's recent decision in *Jewell v. Magnolia Bank, Inc.*, No. 3:23-CV-78-RGJ, 2024 WL 203972 (W.D. Ky. Jan. 17, 2024). (Pl.'s Resp. Def.'s Mot. Dismiss 2-10, DN 22). In addition, Harrison contends that he has alleged that at least one of the calls was made by Humana. (Pl.'s Resp. Def.'s Mot. Dismiss 10-11).

For purposes of the motion to dismiss, the Court must consider whether Harrison has alleged "factual content that allows the court to draw the reasonable inference that [Humana] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Explicit pleading of an agency relationship is not required. *See Eldridge v. Cabela's Inc.*, No. 3:16-CV-536-DJH, 2017 WL 4364205, at \*5 (W.D. Ky. Sept. 29, 2017). While Humana is critical of Harrison's allegations, it would otherwise be impossible for her to know of the alleged caller's relationship with Humana—if any—without discovery. *See Hodgin v. Parker Waichman LLP*, No. 3:14-CV-733-DJH, 2015 WL 13022289, at \*2 (W.D. Ky. Sept. 30, 2015).

In *Jewell*, this Court considered whether a plaintiff had stated violations of the TCPA arising from calls allegedly made by a bank and its agents. *See Jewell*, 2024 WL 2023972, at \*1. In denying the motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court held that the plaintiff had stated TCPA claims based on direct liability and implied actual authority, but declined to consider whether those claims were supported based on theories of apparent authority or ratification. *See id.* at \*4.

### 1. *Apparent Authority*

Harrison contends that he has stated a claim against Humana for vicarious liability based on apparent authority. As this Court explained, "[a]pparent authority exists when (1) the principal manifests that another is the principal's agent, and (2) it is reasonable for a third person dealing with the agent to believe the agent is authorized to act for the principal." *Jewell*, 2024 WL 203972, at \*4 (citation omitted).

In this instance, Harrison alleges that "[t]he individuals to whom Plaintiff was ultimately transferred held themselves out as persons authorized to market Defendant's products and services, or were in fact employed by Defendant. Defendant directly employed Drake at the time Plaintiff received the calls and Drake held himself out as a Humana employee to Plaintiff." (Compl. ¶ 44). Harrison claims that during the call on September 30, 2022, she was transferred to an agent purportedly with BAShealth.com after the prerecorded message and was then transferred to Drake. (Compl. ¶ 37). Then on May 9, 2023, Harrison allegedly received another call which began with a prerecorded message and was then transferred to a person who identified him- or

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 47 of 114

Harrison v. Humana, Inc., Not Reported in Fed. Supp. (2024)

herself as being with Humana. (Compl. ¶ 38). Construing the Complaint as a whole, these allegations reflect that the callers were holding themselves out as agents of Humana and, under the circumstances, it was reasonable for Harrison to believe that the callers were agents of Humana. Thus, the allegations are sufficient to state claim against Humana based on the theory of apparent authority, and the motion is denied on this basis.

### 2. *Actual Authority*

**\*4** The parties also dispute whether Harrison has stated a claim against Humana based on actual authority. As this Court noted:

> "[A]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." A party may be held liable for the conduct of a third-party under a theory of actual authority where "(a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." Actual authority may be express or implied.

*Jewell*, 2024 WL 203972, at \*4 (internal citations omitted) (citation omitted).

In *Jewell*, this Court recognized that it was unnecessary to address other theories of liability based on agency after finding that the allegations were sufficient to permit the TCPA claims to proceed based on one theory. *See Jewell*, 2024 WL 203972, at \*4. Consistent with *Jewell*, it is unnecessary to consider whether Harrison has stated a claim based on actual liability.

### 3. *Ratification*

Humana also contends that Harrison has failed to state a claim based on ratification. (Def.'s Mem. Supp. Mot. Dismiss 9-10). As this Court has stated:

> "[R]atification occurs when an agent acts for the principal's benefit and the principal does not repudiate the agent's actions." "A principal can ratify an act by 'manifesting assent that the act shall affect the person's legal relations,' or by 'conduct that justifies a reasonable assumption that the person so consents.' " "A person may ratify an act if the actor acted or purported to act as an agent on the person's behalf."

*Jewell*, 2024 WL 203972, at \*4 (alteration in original) (internal citations omitted) (citation omitted). Because the TCPA claims are proceeding on the theory of apparent authority, it would be "similarly premature to draw any conclusion about ratification." *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017).

### 4. *Direct Liability*

Finally, Humana seeks dismissal of the TCPA claims to the extent that Harrison bases her claims on direct liability. (Def.'s Mem. Supp. Dismiss 7). In it reply, Humana contends that Harrison may have conceded that she had not stated a direct claim. (Def.'s Reply Mot. Dismiss 6-7, DN 23). In her response, Harrison notes the lack of clarity in a paragraph of the Complaint and states:

> In paragraph no. 38 of his Complaint, Plaintiff alleges he "was ultimately transferred to an agent who told Plaintiff they were with Humana." Defendant interpreted this allegation to mean there were multiple transfers before Plaintiff finally spoke to the Humana representative. Undersigned counsel admits the allegation in paragraph no. 38 of the Complaint could have been drafted more clearly. For clarity, there was only one transfer during this call and the live agent identified himself or herself as an employee of Humana. Plaintiff cannot recall with certainty whether the live agent had a male or female voice and Plaintiff did not catch the agent's name.

**\*5** (Pl.'s Resp. Def.'s Mot. Dismiss 11 n.2 (internal citations omitted)).

Case 1:26-cv-00659-KM   Document 26-1   Filed 06/24/26   Page 48 of 114

Harrison v. Humana, Inc., Not Reported in Fed. Supp. (2024)

In determining whether there has been a violation of the TCPA, "the relevant question is a Defendant's purpose in initiating the calls, not what occurred on each call." *Jewell*, 2024 WL 203972, at *3 (quoting *Bennett v. GoDaddy.com LLC*, No. CV-03908-PHX-ROS, 2019 WL 155291, at *8 (D. Ariz. Mar. 15, 2019)). "Where 'the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services,' the TCPA has been violated, even if the call was not answered." *Id.* (quoting *Bennett*, 2019 WL 1552911, at *8).

In the Complaint, Harrison alleges that the call on May 9, 2023, which was purportedly made from the number 225-208-4162, began with a prerecorded voice and was then transferred to a person who identified him- or herself as being with Humana. (Compl. ¶ 38). Harrison has also alleged that the callers were marketing Humana's products and services. (Compl. ¶¶ 43-44). Taking these allegations as true, Harrison has stated a TCPA claim for at least one call directly initiated by Humana. The motion to dismiss is denied for this reason.

## III. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (DN 21) is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4828737

Footnotes

1    As reflected in the Complaint, all four of the TCPA claims are couched in terms of "[t]he foregoing acts and omissions of Defendants and/or its agents ...." (Compl. ¶¶ 62, 68, 73 79).

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 203972
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

Tonia JEWELL, et al., Plaintiff

v.

MAGNOLIA BANK, INC., Defendant

Civil Action No. 3:23-cv-78-RGJ
|
Signed January 17, 2024
|
Filed January 18, 2024

**Attorneys and Law Firms**

Larry Forman, Forman & Associates, Louisville, KY, Yeremey O. Krivoshey, Pro Hac Vice, Bursor & Fisher, P.A., Walnut Creek, CA, for Plaintiff.

Brittany A. Andres, Pro Hac Vice, Eric J. Troutman, Pro Hac Vice, Troutman Amin, LLP, Irvine, CA, Jason Renzelmann, Frost Brown Todd LLC, Louisville, KY, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Rebecca Grady Jennings, District Judge

 **\*1**  Defendant Magnolia Bank, Inc. ("Magnolia") moves to dismiss Plaintiff Tonia Jewell's ("Jewell") class action Complaint against it. [DE 24]. Magnolia also moves to strike Jewell's class allegations. [DE 25]. Responses and replies were filed to both motions. [DE 26; DE 29; DE 27; DE 30]. These matters are ripe for adjudication. For the reasons below, Magnolia's Motion to Dismiss [DE 24] is **DENIED** and Magnolia's Motion to Strike Class Allegations [DE 25] is **DENIED**.

**I. BACKGROUND**

The Amended Complaint alleges that Jewell and a proposed class[1] of similarly situated Plaintiffs are registered on the national do-not-call registry but received telemarketing calls from Magnolia or a third-party telemarketing agency, Rasani, on behalf of Magnolia. [*See* DE 23 at 87-90 ¶¶ 6-21]. On November 10, 2022, Jewell alleges that she received a phone call from the number (301) 381-4665 marketing home mortgage refinancing services on behalf of Magnolia. [DE 23 at 88 ¶¶9-11]. Jewell received a phone call the next day from the number (626) 591-2985 also marketing home mortgage refinancing services on behalf of Magnolia. [*Id.* at ¶12-13]. During this call, Jewell was transferred to Anthony Beck ("Beck"), a "representative of Magnolia" who marketed home mortgage refinancing services on behalf of Magnolia. [*Id.* ¶ 13]. Jewell alleges that these phone calls were initiated by Rasani employees "Phil" and "Leo," respectively. [*Id.* ¶¶11-13]. Jewell received two more calls that she did not answer from the number (317) 743-0573, which Jewell alleges were from Beck. [DE 88-89 ¶¶14-16].

Jewell filed this action on February 20, 2023, pleading direct and vicarious liability theories against Magnolia for claims of negligent and knowing/willful violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). [DE

1]. Magnolia moved to dismiss for failure to state a claim [DE 18] and to strike class allegations. [DE 19]. On May 19, 2023, Jewell filed an Amended Complaint, adding a theory of vicarious liability and denying that she consented to any of the phone calls. [DE 23]. Magnolia again moves to dismiss, arguing Jewell has failed to sufficiently allege (1) Magnolia made a telephone solicitation or that the calls were made for a marketing purpose, or (2) Magnolia is liable for Rasani's conduct under theories of actual authority, apparent authority, or ratification. [DE 24 at 97-98]. Magnolia also moves to strike Jewell's class allegations, arguing that Jewell's current proposed class cannot be certified and cannot be cured in discovery. [DE 25 at 114].

## II. STANDARD

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citation omitted).

**\*2** To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "A complaint will be dismissed ... if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. Of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561-64, 127 S.Ct. 1955).

## III. DISCUSSION

### 1. Magnolia's Motion to Dismiss

The TCPA prohibits a person from: (1) "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party"; or (2) making live calls to residential telephone numbers that have been placed on the national do-not-call registry. *Lucas v. Telemarketer Calling from (407) 476-5680*, No. 18-3633, 2019 WL 3021233, at \*5 (6th Cir. May 29, 2019) (citing 47 U.S.C. § 227 *et seq.*). In *In re Dish Network, LLC*, the FCC explained that a "telemarketer" is "the person or entity that initiates a [telemarketing] call," i.e., "takes the steps necessary to physically place a telephone call, and generally does not include persons or entities ... that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." 28 FCC Rcd.6574, 6583, ¶26 (2013). Even so, the FCC clarified that inclusion of the phrase "on behalf of" in § 227(c)(5), which creates a private right of action to challenge multiple live calls, allowed for a "seller" to be held vicariously liable under traditional agency tenets, including "not only formal agency, but also principles of apparent authority and ratification." *Dish Network*, 28 FCC Rcd. at 6584.

Jewell's claims are based on two sets of phone calls: those she alleges were made by Beck that Magnolia is directly liable for, [DE 23 at 89 ¶¶16-17], and those made by Rasani employees that Magnolia is vicariously liable for. [DE 23 at 88-89 ¶¶9-15, 18].

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 51 of 114

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

**a. Direct Liability**

Magnolia moves to dismiss the claims based on the first set of calls claiming that Jewell has not plausibly alleged that (1) a telephone solicitation was made; or (2) that the telephone calls allegedly made by Beck from the (317) 743-0573 number were made for a marketing purpose. [DE 24 at 97].

The implementing regulations for the TCPA define a telephone solicitation as "the initiation of a telephone call or message," made for the purpose "of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(15). The regulations exclude a call or message "to any person with whom the caller has an established business relationship." 47 C.F.R. § 64.1200(f)(15)(ii). Whether an established business relationship exists is an affirmative defense not appropriately decided at the pleading stage. *See e.g., Bridging Communities v. Top Flite Finan. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (noting the "possibility of consent to receive faxes and/or prior existing business relationships as a defense to liability under the TCPA."); *Hodgin v. Parker Waichman Llp*, No. 3:14-CV-733-DJH, 2015 WL 13022289, at *3 (W.D. Ky. Sept. 30, 2015) (in a TCPA action, defendant bears the burden of proving the "affirmative defense" that a plaintiff "consented to receiving phone calls.")

 **\*3**  Because the TCPA can be violated merely upon the initiation of a call for a prohibited purpose, "the relevant question is a Defendant's *purpose* in initiating the calls, not what *occurred* on each call." *Bennett v. GoDaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911, at *8 (D. Ariz. Apr. 8, 2019). Where "the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services," the TCPA has been violated, even if the call was not answered. *Id.* (citing *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 816 (8th Cir. 2015)). As noted by the Ninth Circuit in approaching a similar issue under the TCPA, courts should "approach the problem" of determining why calls were made "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

Jewell alleges that she received a phone call and was "transferred to Anthony Beck, a representative of Magnolia Bank who continued marketing home mortgage refinancing services on behalf of Defendant," [DE 23 at 88 ¶13], was given a callback number for Beck at (317) 743-0573, [*Id.* at 89 ¶ 14], and "received two more calls from the number (317) 743-0573." [*Id.* ¶ 16]. Even though Jewell did not answer the two later phone calls, the context of those calls—allegedly made from Beck's number after he marketed home mortgage refinancing services to Jewell—suggest that they were "initiated and transmitted to a person for the purpose of promoting property, goods, or services." Presuming all factual allegations in the complaint to be true and making all reasonable inferences in favor of Jewell, these allegations plausibly allege that Magnolia made a telephone solicitation and that the calls were made for a marketing purpose.

Magnolia argues that the definition of telephone solicitation requires Jewell to allege facts that the calls were made without an inquiry—to allege that there was no established business relationship "on the basis of the subscriber's inquiry or application regarding products or services offered by the entity." 47 C.F.R. § 64.1200(f)(5); [DE 29 at 162]. Magnolia maintains that Jewell has not plausibly alleged that a telephone solicitation was made because "[c]ritically, Plaintiff never alleges she told Magnolia Bank she was disinterested in its products or affirmatively asked it *not* to call her back. So the only facts alleged in the FAC suggest an inquiry *did* take place and not vice versa."[2] [DE 24 at 109]. Yet neither the TCPA nor FRCP 12(b)(6) require these specific allegations. And as noted above, that a plaintiff consented to receiving phone calls through an inquiry is an affirmative defense, not an element of the claim.[3] As a result, the Court **DENIES** Magnolia's motion to dismiss as to Jewell's direct liability claims for the calls made from the - 0573 number.

**b. Vicarious Liability**

**WESTLAW**    © 2026  Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 52 of 114

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

Jewell's other claims are based on calls made by employees of a third-party telemarketing agency, Rasani, that she alleges Magnolia is vicariously liable. [DE 23 at 88-89 ¶¶9-15, 18]. Magnolia moves to dismiss these claims alleging that the Amended Complaint insufficiently alleges vicarious liability under theories of actual authority, apparent authority, or ratification. [DE 24 at 102].

*i. Actual and Apparent Authority*

 **\*4**  "[A]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 373 (6th Cir. 2015). A party may be held liable for the conduct of a third-party under a theory of actual authority where "(a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." *In re Dish Network*, 28 F.C.C. Rcd. at 6586 (2013). Actual authority may be express or implied. *See Bergin Fin., Inc. v. First Am. Title Co.*, 397 Fed. App'x 119, 124 (6th Cir. 2010). "Apparent authority exists when (1) the principal manifests that another is the principal's agent, and (2) it is reasonable for a third person dealing with the agent to believe the agent is authorized to act for the principal." *Deschamps v. Bridgestone Ams., Inc. Salaried Employees Ret. Plan*, 840 F.3d 267, 279 (6th Cir. 2016) (citing *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 150 F.3d 590, 593 (6th Cir. 1998)).

Other district courts have found implied authority plausibly alleged under similar facts to this case. *See e.g., Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) (dismissing claim based on apparent authority, but finding implied authority plausibly alleged where plaintiff "has alleged an unlawful telemarketing scheme the end result of which was the generation of business for [defendant], and he has alleged that [defendant] was an active participant in that scheme."); *Landy v. Nat. Power Sources, LLC*, No. 3:21-00425, 2022 WL 797967, at \*3 (D.N.J. Mar. 16, 2022) (*Landy II*) (finding that where plaintiff specifically alleged that the initial contact was made to market defendant's products, "an agency relationship [could] be inferred from ... the smooth transfer from the initial [automatic telephone dialing system] contact to the defendant's live agents ... [and defendant's] accepting the call and following up with an email after the call").

Like the plaintiff in *Landy II*, Jewell has alleged that Rasani "held themselves out as persons authorized to market Defendant's services." [DE 23 at 89 ¶18]. Jewell alleges that she was transferred from the initial call to one of Magnolia's employees, who accepted the call and later called twice more. [DE 23 at 88-89, ¶¶13-16]. These facts, taken as true and making all reasonable inferences in favor of Jewell, plausibly allege implied authority. As a result, the Court **DENIES** Magnolia's motion to dismiss to the extent that Jewell's claim relies on a theory of implied actual authority.

Because the claim moves forward on a theory of implied actual authority, the Court need not reach the argument of whether Jewell has plausibly alleged apparent authority. Jewell's Amended Complaint alleges statements made by Rasani that it "held themselves out as persons authorized to market Defendant's services," [DE 23 at 89 ¶18], but alleges no specific statements by *Magnolia* that held Rasani out as its agent. "The apparent power of an agent is to be determined by the act of the *principal* and not by the acts of the *agent*[.]" *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005) (emphasis added). At this stage of the litigation, it is a close call as to whether this theory is fully alleged.

*ii. Ratification*

"[R]atification occurs when an agent acts for the principal's benefit and the principal does not repudiate the agent's actions." *Lucas*, 2019 WL 3021233, at \*5 (citing *Sphere Drake Ins. v. Am. Gen. Life Ins.*, 376 F.3d 664, 677 (7th Cir. 2004)). "A principal can ratify an act by 'manifesting assent that the act shall affect the person's legal relations,' or by 'conduct that justifies a reasonable assumption that the person so consents.' " *Eldridge v. Cabela's Inc.*, No. 3:16-cv-536, 2017 WL 4364205, at \*6 (W.D. Ky. Sept. 29, 2017) (quoting Restatement (Third) of Agency § 4.01(2)). "A person may ratify an act if the actor acted

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 53 of 114

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

or purported to act as an agent on the person's behalf." Restatement § 4.03. Because Jewell has plausibly alleged Rasani acted with implied authority as an agent on Magnolia's behalf, "it [would be] similarly premature to draw any conclusion about ratification." *Cunningham*, 251 F. Supp. 3d 1187 at 1199. As a result, the Court **DENIES** Magnolia's motion to dismiss Jewell's vicarious liability claim insofar as it relies on a theory of ratification.

### 2. Magnolia's Motion to Strike

**\*5** Magnolia also moves to strike Jewell's class allegations under Federal Rule of Civil Procedure 12(f). [DE 25]. Magnolia argues Jewell's class allegations could never be certified because (1) the proposed class is overly broad and lacks commonality; (2) the class is not defined objectively; (3) the class definition is vague; and (4) Jewell does not meet the class definition. [*Id.* at 113-114].

Though procedurally permissible, striking a plaintiff's class allegations before discovery and a motion for class certification is a rare remedy. *See Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974); *see also Chen-Oster v. Goldman, Sachs & Co.*, 877 Fed. Supp. 2d 113, 117 (S.D.N.Y. 2012) (noting that, generally, "motions of this kind are deemed procedurally premature"). The moving party has the burden of establishing from the face of the complaint that "it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove [through discovery]." *Schilling v. Kenton Cnty.*, No. 10-143-DLB, 2011 WL 293759, at \*4, 2011 U.S. Dist. LEXIS 8050 (E.D. Ky. Jan. 27, 2011) (citations omitted); *see also* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1383 (3d ed. 2018) ("[C]lass allegations [are] stricken prior to a motion for certification only when class certification is a clear impossibility."). In other words, a court should strike class allegations only if "it is clear from the face of the complaint that a proposed class cannot satisfy the requirements of Rule 23." *Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010). The Sixth Circuit has stated that a district court should usually "defer decision on class certification issues and allow discovery 'if the existing record is inadequate for resolving the relevant issues.' " *Bearden*, 720 F. Supp. 2d 932 at 942.

### a. Overbreadth and Commonality

A proposed class definition may be overly broad if "it would include members who have not suffered harm at the hands of the Defendant and are not at risk to suffer such harm." *Brashear v. Perry Cnty., Ky.*, No. CIV.A. 6:06-143-DCR, 2007 WL 1434876, at \*2 (E.D. Ky. May 14, 2007). Jewell defines the proposed class as:

> All persons in the United States whose numbers are listed on the national do-not-call registry, and received two or more telemarketing calls within any 12-month period from Defendant or its agents to their residential telephone number 31 or more days after the telephone number was listed on the national do-not-call registry at any time in the period that begins four years before the filing of the complaint in this action to the date that class notice is disseminated (the "Class Period")

[DE 23 at 88-89 ¶23].

Magnolia contends that the proposed class is overly broad because "it includes individuals who either consented to be contacted by Magnolia Bank or had an established business relationship with Magnolia Bank," [DE 25 at 119], and lacks commonality because some class members will lack a valid claim for the same reasons. [*Id.* at 120]. Yet including only individuals who did not expressly consent to the receipt of the defendant's phone calls is the definition of an impermissible fail-safe class—"one that includes only those who are entitled to relief." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). *See, e.g., Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 625–26 (E.D. Pa. 2015) ("Both classes Zarichny defined are fail-safe classes.") ("The putative TCPA class is comprised of those people who received CPRS telephone calls without the recipient's 'prior express consent[.]' ... [T]here is no way to provide notice to that putative class without the sort of extensive fact-finding that class actions should avoid."); *Sauter v. CVS Pharm., Inc.*, No. 2:13-cv-846, 2014 WL 1814076, at \*8–9 (S.D. Ohio May 7, 2014) ("Each of the Plaintiff's proposed classes is defined to include only those individuals who did not expressly consent to the receipt of the defendant's phone calls made with the use of an ATDS.") ("In other words, 'the proposed class[es] consist[ ] solely of persons who can establish that defendant violated the TCPA.' "); *Boyer v. Diversified Consultants,*

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 54 of 114

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

*Inc.*, 306 F.R.D. 536, 540 (E.D. Mich. 2015) (finding the proposed classes were fail-safe because they only "consist of those people who did not provide prior express consent to be contacted by defendants, and therefore can establish a violation of the TCPA"). The proposed members of the class will have received a telemarketing call—and thus have a claim—but might not be entitled to relief due to the affirmative defense of an established business relationship or their consent to the calls. As a result, Jewell's proposed class is neither overly broad in that it would include members who do not have a claim, nor does it only include those who are entitled to relief.

**\*6**  To demonstrate commonality, the proposed member's "claims must depend on a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Young*, 693 F.3d 532 at 542 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011)). While Magnolia's consent/established business relationship defense may apply to some members of the class and not others, the plaintiffs' claims will still "depend on a common contention ... of such a nature that it is capable of classwide resolution." *Young*, 693 F.3d 532 at 542; *See Bridging Communities*, 843 F.3d at 1126 ("Even where defendants point to some evidence that a defense will indeed apply to some class members ... courts routinely grant certification because Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class.") (internal quotations omitted). As a result, Jewell's proposed class definition does not lack commonality.

### b. Objective Definition

"A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class." *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009) (citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.21[3][c] (3d ed. 2007)). Magnolia argues that the proposed class cannot be defined objectively and is therefore a fail-safe class requiring an individual merits evaluation for each member. [DE 25 at 121-122].

A fail-safe class is "one that includes *only* those who are *entitled* to relief." *Hodgin v. Parker Waichman Llp*, No. 3:14-CV-733-DJH, 2015 WL 13022289, at \*4 (W.D. Ky. Sept. 30, 2015). A class definition that requires the proposed members of the class to be able to *pursue* a claim for relief is different from requiring them to be *entitled* to relief, as federal courts do not have "the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S. Ct. 2190, 2208, 210 L. Ed. 2d 568 (2021). Magnolia "could establish that the violation was the result of error, that it obtained the subscriber's prior express permission, or that there was an [established business relationship]." *Hodgin*, 2015 WL 13022289, at \*4. Again, the proposed class is not fail-safe. Moreover, the class can be defined before the case is resolved on its merits. "If an individual received a telephone solicitation from [defendants] and her phone number was registered on the national do-not-call registry, then they can join the class. There is no need for this case to be resolved on the merits beforehand." *Id.* So too here. Jewell's proposed class definition does not require an individual merits evaluation and can be defined objectively.

### c. Vagueness

"Although the text of Rule 23(a) is silent on the matter, a class must not only exist, the class must be susceptible of precise definition. There can be no class action if the proposed class is 'amorphous' or 'imprecise.' " *Young*, 693 F.3d 532 at 538 (6th Cir. 2012). Magnolia argues that the phrase "Defendant **or its agents**" in the proposed class definition is too vague and ambiguous because it "may be intended to refer to employees of Magnolia Bank or third-parties making calls on Magnolia Bank's behalf or both." [DE 25 at 124].

The Amended Complaint alleges both direct liability for actions taken by a Magnolia Bank employee, [DE 23 at 89 ¶17], and vicarious liability based on the phone calls made by Rasani on Magnolia's behalf. [*Id.* ¶18]. Magnolia accuses Jewell of pulling a "bait and switch" because Jewell's class definition refers to "*agents*—plural" but the Amended Complaint "does not

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 55 of 114

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

allege that Rasani is the *only* agent whose calls are at issue." [DE 30 at 183]. Magnolia argues that until Jewell amends the proposed definition to include only calls by Rasani, it "refers only vaguely to 'agents' without any content or limitation—[and] is uncertifiably [sic] vague." [DE 30 at 184]. Yet Jewell's Amended Complaint identifies only two sets of calls at issue; one set that were made by Magnolia directly and the other by its alleged agent, Rasani. [*See* DE 23 at 89 ¶¶16-17]; [*Id.* at 88-89 ¶¶9-15, 18]. While the phrase "Defendant or its agents" could refer to employees of Magnolia Bank or third parties making calls on Magnolia Bank's behalf, that is not vagueness—it recognizes a distinction between claims brought under a theory of direct liability or vicarious liability; or indeed, both. Jewell's class is definition is not too vague to be uncertifiable.

### d. Representative of the Class

**\*7** Named plaintiffs "must also be members of the proposed 'class' " in order to "adequately protect the interest of the proposed class members." *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337 (E.D. Ky. 2002); *See* Fed. R. Civ. P. 23(a)(4). Magnolia argues that Jewell is not representative of the class because her injury "is different from those of the proposed class members." [DE 25 at 122]. "Magnolia argues that Jewell does not meet the class definition because Jewell 'did not answer the calls' from Magnolia Bank and so she cannot assert they were telemarketing calls," [DE 30 at 183], and maintains that Magnolia cannot be held vicariously liable for the calls Rasani made. Yet, as outlined above, Jewell's direct liability claim is plausibly alleged, in part because a plaintiff need not answer calls to assert that they were telemarketing calls. Moreover, Jewell also plausibly alleged vicarious liability for Rasani's calls. As a result, Jewell meets the proposed class definition.

It is Magnolia's burden to establish from the face of the complaint that "it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove [through discovery]." *Schilling v. Kenton Cnty.*, No. 10-143-DLB, 2011 WL 293759, at \*4, 2011 U.S. Dist. LEXIS 8050 (E.D. Ky. Jan. 27, 2011). Magnolia has failed to meet that burden. To be clear, the Court is not making a conditional certification of Jewell's proposed class. But in analyzing Magnolia's motion to strike, Jewell's proposed class definition is (1) not overly broad; (2) does not lack commonality; (3) is not vague, (4) does not lack an objective definition; and (5); Jewell is representative of the class. As a result, the Court **DENIES** Magnolia's motion to strike class allegations.

## IV. CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1) Magnolia's Motion to Dismiss [DE 24] is **DENIED**: Magnolia's Motion to Dismiss as to Jewell's claim for direct liability is **DENIED**. To the extent that Jewell's claims for vicarious liability rely on a theory of implied actual authority or ratification, Magnolia's Motion to Dismiss is **DENIED**. To the extent that Jewell's vicarious liability claim relies on a theory of apparent authority, Magnolia's Motion to Dismiss is **DENIED**.

(2) Magnolia's Motion to Strike Class Allegations [DE 25] is **DENIED**.

(3) Magnolia's first Motion to Dismiss [DE 18] and first Motion to Strike Class Allegations [DE 19] are **DENIED as MOOT**.

(4) The Court will refer the case for Rule 16 conference with the Magistrate Judge by separate order.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 203972

Footnotes

1    Jewell has not yet filed a motion for class certification.

2    This is a logical fallacy known as "denying the antecedent," concisely refuted because " 'If P then Q' does not mean 'If Not P then Not Q.' " *New England Power Generators Ass'n v. F.E.R.C.*, 707 F.3d 364, 370 (D.C. Cir. 2013).

3    And in any event, Jewell alleges that she had "no transaction nor submitted any inquiry to Defendant within the eighteen (18) months preceding the calls at issue in this Complaint. She has never consented in writing, or otherwise, to receive telemarketing calls from Defendant." [DE 23 at 90 ¶19].

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 10502631
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

Danna St JOHN and Luis Penuela, Plaintiffs,

v.

KELLER WILLIAMS REALTY, INC., Defendant.

Case No. 6:19-cv-1347-Orl-40DCI
|
Signed 02/04/2020

**Attorneys and Law Firms**

Rachel Elizabeth Kaufman, Avi Robert Kaufman, Kaufman P.A., Stefan Coleman, Law Offices of Stefan Coleman, PLLC, Miami, FL, for Plaintiff.

Andrew J.J. Collinson, Ruel W. Smith, Hinshaw & Culbertson, LLP, Tampa, FL, Todd Philip Stelter, Pro Hac Vice, Hinshaw & Culbertson LLP, Chicago, IL, for Defendant.

## ORDER

PAUL G. BYRON, UNITED STATES DISTRICT JUDGE

**\*1** This cause comes before the Court on Defendant's Motion to Dismiss the Amended Complaint (Doc. 27 (the "**Motion**")). Plaintiffs responded in opposition. (Doc. 38). For the reasons stated below, the Motion is due to be denied.

## I. BACKGROUND

Plaintiffs bring this putative class action against Defendant Keller Williams Realty, Inc. ("**Keller Williams**"), for violations of the Telephone Consumer Protection Act of 1991 ("**TCPA**"), 47 U.S.C. § 227 *et seq.*

Defendant is an international real estate franchise whose "marketing plan directs realtors to use certain prescribed practices to market Keller Williams' realty services, including unsolicited, prerecorded and autodialed calls." (Doc. 21, ¶ 13). Defendant "encourages" realtors to purchase potential leads for real estate listings from companies that generate lists of personal phone numbers associated with expired listings on the Multiple Listing Service. (*Id.* ¶ 14). Defendant also "provides training videos" and "promotes specific scripts" to assist Keller Williams realtors to market to consumers with expired listings. (*Id.* ¶¶ 15–16). Equipped with this training, Keller Williams realtors cold-call leads—including phone numbers placed on the National Do Not Call Registry—using an autodialer without the recipients' consent. (*Id.* ¶ 4).

Plaintiffs filed an Amended Complaint alleging four violations of the TCPA. Count I alleges that Keller Williams realtors called Plaintiffs' cellular phones using prerecorded voice messages without their consent. Count II alleges that Keller Williams realtors called Plaintiffs' cellular phones using an Automatic Telephone Dialing System without their consent. Count III alleges that Keller Williams realtors called cell phone numbers on the National Do Not Call Registry. Count IV alleges that Keller Williams realtors failed to maintain an *internal* Do Not Call List, as required by FCC regulations.

Defendant now moves to dismiss the Amended Complaint.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 58 of 114

John v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

## II. STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(1)*. Thus, in order to survive a motion to dismiss made pursuant to Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts are generally limited to the four corners of a complaint, *see St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002), but they may also consider attached exhibits and documents referred to in the complaint that are central to the claim, *see Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).

Though a complaint need not contain detailed factual allegations, mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Moreover, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam).

**\*2** In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 67, 129 S.Ct. 1262.

## III. DISCUSSION

### A. Vicarious Liability—All Counts

Defendant first argues that the entire Amended Complaint should be dismissed because Plaintiffs failed to allege any facts that support vicarious liability for the actions of Keller Williams realtors.[1] The FCC has determined that vicarious liability in the TCPA context is governed by the federal common law of agency. *See Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018). Three agency theories may support vicarious liability: actual authority, apparent authority, and ratification. *See Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014). The existence of an agency relationship is generally a question of fact. *See Ward v. Mgmt. Analysis Co. Emp. Disability Benefit Plan*, 135 F.3d 1276, 1283 (9th Cir. 1988). At the motion to dismiss stage, a plaintiff need only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016 WL 4651395, at *2, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sept. 7, 2016).

### 1. Actual Authority

Actual authority may be express or implied. *See Strickland v. United States*, 382 F. Supp. 2d 1334, 1344 (M.D. Fla. 2005). An agent acts with actual authority if it "reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Restatement (Third) of Agency § 2.01 (2006)*. Actual agency "does not require the principal to specify the singular acts for which [an agent's] authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." *Harrington v. Roundpoint Mortg. Servicing Corp.*, No. 2:15-cv-322, 2017 WL 1378539, at *7, 2017 U.S. Dist. LEXIS 55023, at *21 (M.D. Fla. Apr. 10, 2017).

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 59 of 114

John v. Keller Williams Realty, Inc., Not Reported in Fed. Supp. (2020)

For a TCPA claim, a plaintiff sufficiently pleads that a defendant directed an agent's calls by alleging that the agent "expressly mentioned" the defendant "by name"; that the defendant had the authority to "revise[ ]" call "scripts" or provide feedback regarding calls; that the defendant had the authority to "provide[ ] lead lists"; that the defendant was "aware" that an autodialer was being used; and/or other facts giving rise to an inference that the defendant was "heavily involved" in the "sales practices and marketing procedures." *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 922–23 (C.D. Ill. 2017).[2] Although these facts may not be sufficient to *prove* vicarious liability, they are "more than sufficient" to entitle a plaintiff to further discovery. *See Dolemba v. Ill. Farmers Ins.*, 213 F. Supp. 3d 988, 997 (N.D. Ill. 2016).

**\*3** Here, Plaintiffs allege that Defendant was heavily involved in Keller Williams realtors' unsolicited calls. (Doc. 21, ¶¶ 2– 6, 13–23, 26–31). Plaintiffs contend that, under the guise of training, Defendant effectively directed realtors to solicit business for their common benefit using techniques that violate the TCPA. Defendant allegedly instructed realtors on how frequently to make calls and what to say during calls—including identifying themselves as calling on behalf of Keller Williams. Furthermore, Defendant's "Approved Vendors" program directed realtors to utilize services which enabled them to dial leads "at a rate of 80 to 300 per hour and deliver[ ] a pre-recorded message." (*Id.* ¶ 25).

As alleged in the Amended Complaint, Defendant's training programs, training materials, and Approved Vendors program give rise to an inference that Keller Williams realtors reasonably believed that Defendant directed the manner and means of their unsolicited calls. Accordingly, Plaintiff states a plausible claim for vicarious liability based on actual authority.

*2. Apparent Authority*

Apparent authority "arises when a third-party reasonably believes that the ... agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations." *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011). In the TCPA context, apparent authority is "based on a reasonable person's perception of who authorized [the unsolicited communication]." *Hossfeld v. Gov't Emps. Ins. Co.*, 88 F. Supp. 3d 504, 511 n.13 (D. Md. 2015).

"To provide guidance in this area," the FCC has outlined "illustrative examples" of evidence that can support apparent authority giving rise to vicarious liability. *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd. 6574, 6588 (F.C.C. 2013). Apparent authority can arise when: (1) a principal gives the agent authority to use the seller's trade name, trademark, or service mark; (2) the principal approved, wrote, or reviewed telemarketing scripts; or (3) if the principal knew or reasonably should have known that the agent was violating the TCPA on the principal's behalf and the seller failed to take effective steps within its power to force the agent to cease that conduct. *Id.*

Here, Plaintiffs plead Defendant's vicarious liability predicated on apparent authority based on the same allegations supporting actual authority. Realtors identified themselves as calling from Keller Williams, Defendant provided instruction regarding call content and frequency, and Defendant facilitated realtors' access to lead lists and dialers with which to call them. At bottom, the Amended Complaint alleges that Defendant knew or should have known of realtors' TCPA violations and accepted the benefits of their calls anyway.

Thus, to the extent that the Motion is based on Plaintiffs' failure to allege facts supporting vicarious liability, Defendant is overruled.

**B. Autodialer—Count II**

Defendant next argues that Count II should be dismissed because Plaintiffs' allegations show that they did not receive calls from an Automatic Telephone Dialing System ("**ATDS**" or "**Autodialer**").

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Quite recently, the Eleventh Circuit interpreted this definition and held that the clause "using a random or sequential number generator" modified both "store" and "produce." *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, —— (11th Cir. 2020). Accordingly, an ATDS must have the capacity to randomly or sequentially generate telephone numbers and dial those numbers, or store them for later dialing. *Id.* at ——.

**\*4**  At this stage in the litigation, Plaintiffs' allegations are sufficient—even under the Eleventh Circuit's newly articulated definition. Plaintiffs repeatedly allege that Keller Williams realtors called their cellphones using an Autodialer. (Doc. 21 ¶¶ 4, 26, 28, 29). A number of courts consider that allegation alone sufficient. *See, e.g.*, *De Los Santos v. Millward Brown Inc.*, No. 13-80670-CV, 2014 WL 2938605 at \*3, 2014 U.S. Dist. LEXIS 88711 at \*3 (S.D. Fla. June 30, 2014) ("To state a claim under the TCPA, Plaintiff need only allege that Defendant used an autodialer"); *Hashw v. Dep't Stores Nat'l Bank*, 986 F. Supp. 2d 1058, 1061 (D. Minn. 2013) (finding that where a plaintiff "pleaded than an ATDS was used to make the calls to his cellular phone ... nothing more is required to state a claim for relief under the TCPA").

Plaintiffs further bolster their allegations with additional facts. (*See* Doc. 21 ¶¶ 39–59, 64–69). Specifically, Plaintiffs allege that: (1) they received multiple unsolicited calls from Keller Williams; (2) at least one such call began with a noticeable pause; and (3) Defendant trains Keller Williams relators to use autodialers and calling platforms capable of transmitting prerecorded voice and text messages. Such surrounding circumstances "create a plausible inference of autodialing." *Keim v. ADF Midatlantic, LLC*, No. 12-80577-CIV, 2015 WL 11713593, at \*4, 2015 U.S. Dist. LEXIS 159070, at \*12 (S.D. Fla. Nov. 9, 2015); *see also Scott v. 360 Mortg. Grp., LLC*, No. 17-cv-61055, 2017 U.S. Dist. LEXIS 207513 at \*17 (S.D. Fla. Dec. 14, 2017) ("Plaintiffs alleging the use of a particular type of equipment under the TCPA are generally required to rely on indirect allegations, such as the content of the message, the context in which it was received, and the existence of similar messages, to raise an inference that an automated dialer was utilized. Prior to the initiation of discovery, courts cannot expect more."); *Smith v. Royal Bahamas Cruise Line*, No. 14-cv-03462, 2016 WL 232425 at \*—— – ——, 2016 U.S. Dist. LEXIS 6204 at \*10-12 (N.D. Ill. Jan. 20, 2016) (finding that several calls to the same recipient supports the inference that the defendant used an autodialer).

Defendant argues that Plaintiffs "plead themselves out of Court on the ATDS issue because they allege that Landvoice is providing numbers associated with real estate listings, not some randomly or sequentially generated numbers." (Doc. 27, p. 13). According to Defendant, Plaintiffs' allegations—namely, that the offending calls were generated using a database of expired, for-sale-by-owner, and pre-foreclosure listings— "eliminate any plausible suggestion that Landvoice randomly or sequentially generated numbers and then dialed them automatically." (*Id.*). Defendant argues that these allegations concede that Landvoice is not an ATDS, and therefore is not regulated by the TCPA.

The Court disagrees. Recall that the TCPA defines an ATDS as having "the capacity" to perform two essential functions: "(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Defendant characterizes these requirements as incompatible with Plaintiffs' allegation that Landvoice identified numbers associated with real estate listings. However, such functionality does not necessarily preclude the related capacity to use a "random or sequential number generator." Plaintiffs do not allege that Landvoice could place calls *only* from a list of non-random numbers. Indeed, the Eleventh Circuit confirmed that the TCPA "applies to devices that have the 'capacity' to identify randomly generated numbers; it does not require that capacity to be used in every call." *Glasser*, 948 F.3d at 1312. At this stage in the litigation, the exact system used by Keller Williams realtors and its parameters are unknown. Therefore, the Court must accept Plaintiff's allegations as true. Plaintiffs allege that Keller Williams realtors used an ATDS with certain superfluous functions—they do not allege that the ATDS *lacked* any statutorily required function. Accordingly, the Amended Complaint is sufficient to survive a motion to dismiss.

### C. Private Right of Action—Count IV

**\*5**  Defendant next argues that Count IV should be dismissed because there is no private right of action for an individual to enforce an alleged violation of the relevant regulation promulgated under the TCPA.

The TCPA affords a private right of action to any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Under 47 C.F.R. § 64.1200(d), individuals are prohibited from "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." Subsection (d) lists certain "minimum standards" for these procedures, which includes honoring a telephone subscriber's request to be placed on the do-not-call request within thirty days from the date the request is made. 47 C.F.R § 61.1200(d)(3). Plaintiffs allege that Defendant violated this subsection in Count IV. According to Defendant, however, the FCC promulgated § 64.1200(d) pursuant to § 227(d)—not § 227(c)—and *that* section of the TCPA does *not* grant a private right of action.

The regulations to which § 227(c)(5) refers are, by the plain language of the statute, those that the FCC is directed to adopt pursuant to 47 U.S.C. § 227(c)(1)–(4). These regulations "concern[ ] the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Subsection (c) is widely associated with the FCC establishing and maintaining a national "do-not-call list." *See Hamilton v. Spurling*, No. 3:11CV00102, 2013 WL 1164336, at *1 n.2, 2013 U.S. Dist. LEXIS 38585, at *1 n.2 (S.D. Ohio Mar. 20, 2013). The regulations in § 61.1200(d) are not directly concerned with the *national* do-not-call list, but the requirement that companies maintain *internal* do-not-call lists. Nonetheless, the Sixth Circuit has expressly referred to § 64.1200(d) as a regulation arising out of § 227(c)(1):

> In addition to the restrictions on automated telephone equipment, the TCPA instructs the FCC to issue regulations "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Accordingly, the FCC issued regulations prohibiting "person[s] or entit[ies] [from] initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless [the] person or entity has instituted [certain listed] procedures for maintaining" a do-not-call list. 47 C.F.R. § 64.1200(d).

*Charvat v. NMP, LLC*, 656 F.3d 440, 443–44 (6th Cir. 2011). At least one district court within the Eleventh Circuit has reached the same conclusion. *See Wagner v. CLC Resorts & Devs., Inc.*, 32 F. Supp. 3d 1193, 1198 (M.D. Fla. 2014) (finding an alleged violation of 47 C.F.R. § 64.1200(d) sufficient to support claim a under 47 U.S.C. § 227(c)(5)).

In contrast, Defendant directs the Court's attention several district court cases which conclude that § 64.1200(d) was promulgated pursuant to § 227(d). (Doc. 27, pp. 15–16).[3] That subsection of the TCPA directs the FCC to "prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice via telephone." 47 U.S.C. § 227(d)(3). Defendant also points out that § 64.1200(d) uses the same statutory language as § 227(d).

 **\*6** Taken in isolation, it is plausible that § 64.1200(d) could have been promulgated under 47 U.S.C. § 227(d). While many portions of § 64.1200 could arguably be attributed to more than one subsection of the TCPA, the Court ultimately agrees with the Sixth Circuit that the internal do-not-call procedures of § 64.1200(d) fit cleanly under the rubric of § 227(c)'s general mandate to adopt adequate do-not-call regulations. Accordingly, a violation of § 64.1200(d) can give rise to a claim under § 227(c)(5). *See also Cunninham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1200–01 (M.D. Tenn. 2017) (holding same); *Simmons v. Charter Communs. Inc.*, 222 F. Supp. 3d 121, 130–31 (D. Conn. 2016) (holding same).

### D. Inconsistent Pleadings

Defendant's final argument is that Plaintiffs' Amended Complaint impermissibly contradicts allegations in their earlier complaint. Assuming *arguendo* that an amended complaint may not contradict allegations in a prior complaint, the Court rejects this basis for dismissal. Upon comparison of Plaintiffs' original and amended complaints, the Court disagrees that their current allegations contradict the prior allegations that Defendants cite as inconsistent.

## IV. CONCLUSION

Accordingly, it is **ORDERED and AJUDGED** that Defendant's Motion to Dismiss the Amended Complaint (Doc. 27) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on February 4, 2020.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 10502631

Footnotes

1      It appears undisputed that Plaintiffs do not allege direct liability against Defendant.

2      The fact that a principal may rarely have exercised these indicia of authority is irrelevant because "[t]he issue for purposes of agency analysis is the existence of the authority, not the actual use of the authority." *Id.*

3      None of these courts are inside the Eleventh Circuit.

---

**End of Document**                                           © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 636723
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Samuel KATZ, individually and on behalf of all others similarly situated, Plaintiff,

v.

ALLIED FIRST BANK, SB Defendant.

Case No. 22 C 5277

|

Signed March 6, 2026

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Jeffrey M. Schieber, Nelson Mullins Riley & Scarborough LLP, Chicago, IL, Kevin Polansky, Pro Hac Vice, Nelson Mullins Riley & Scarborough LLP, Boston, MA, Nathan E. Hoffman, Nelson Mullins Riley & Scarborough, Nashville, TN for Defendant.

## MEMORANDUM OPINION AND ORDER

Robert W. Gettleman, United States District Judge

 **\*1** Plaintiff Samuel Katz filed a first amended complaint on behalf of himself and a class of individuals against defendant, Allied First Bank, SB, and another defendant, Consumer Nsight LLC, asserting a single count—a claim for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The TCPA was enacted to help protect consumers from annoying telemarketing phone calls. According to plaintiff, he and the class members are listed on the National Do Not Call Registry, which was set up under the TCPA. Yet Consumer Nsight, he alleges, made unsolicited calls to them, and then transferred those calls to Allied—which, he avers, had contracted with Consumer Nsight to generate mortgage refinancing leads for Allied. Plaintiff thus alleges that Allied and Consumer Nsight violated the TCPA, and he seeks damages and injunctive relief on behalf of himself and the putative class.

Consumer Nsight has since settled with plaintiff, and has been dismissed as a defendant from the case. Allied has answered, denying liability. It also asserted a third-party complaint against Consumer Nsight, alleging that Allied entered into a contract with Consumer Nsight, under which Consumer Nsight agreed that its call transfers would not violate any laws. Allied therefore alleged that, if plaintiff's claim is successful, Consumer Nsight breached the contract and must indemnify Allied. Consumer Nsight moved to dismiss the third-party complaint for lack of personal jurisdiction, and the court granted that motion, dismissing Consumer Nsight from the case [125].

Allied is now the sole defendant here, and has moved for summary judgment under Fed. R. Civ. P. 56. Allied argues that summary judgment is proper here because there is no genuine dispute that neither Allied nor any agent of Allied initiated any telemarketing calls to plaintiff. Allied further argues that it "did not violate the TCPA as a matter of law": "The calls at issue did not violate the TCPA and, even if they did, [p]laintiff himself consented to be contacted." Plaintiff opposes the motion, contending that a reasonable jury could find in his favor. For the reasons below, the court grants in part and denies in part Allied's motion for summary judgment.

## BACKGROUND

Craig Mattson worked for Allied as a branch manager in Arizona. His responsibilities included managing roughly 80 loan officers and generating leads through various outlets. To that end, he worked with various companies to purchase leads. One such company was Consumer Nsight.

On January 28, 2022, Consumer Nsight's CEO, Rick Sabatino, contacted Mattson to see if Mattson would be interested in using Consumer Nsight's services for live call transfers to Allied for people interested in mortgage refinances. An agreement was eventually struck, under which Consumer Nsight would provide advertising services to Allied, including "consulting services for live contact telephone transfers from a call center to Allied ... representatives." (Quoting Sabatino's Decl.). Mattson controlled Consumer Nsight's targeting criteria for the types of consumers he was looking to have refinance a loan, and he hired Consumer Nsight with Allied's approval and managed the scope of the relationship with Consumer Nsight.

 **\*2** Sabatino states in a declaration that "Consumer Nsight is not a telemarketing firm" and "does not ... initiate telemarketing calls." So Consumer Nsight engaged a company called Iconic Results to conduct the calls and initiate the live call transfers to Allied. According to Sabatino, "Consumer Nsight had a relationship with Iconic ..., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. Iconic's CEO, Mituin Varma, further explains that Iconic's business was to call "consumers who placed mortgage rate inquiries in order to verify that certain requirements are met (size of mortgage, location of property, and so forth), and then transfer[ ] qualifying consumers to companies that placed orders for such 'warm transfer' calls." Consumer Nsight's Sabatino states that, under the agreement with Allied, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic transferred certain calls to a ... routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied ... via [the] routing number."

Between November 2021 and October 2022, Consumer Nsight placed three orders with Iconic for a total of 950 mortgage lead transfers, and received the warm transfers. Iconic invoiced Consumer Nsight for the calls it made as part of the campaign. Copies of invoices show that Allied accepted call transfers from Consumer Nsight and paid for them.

Mattson explained at his deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers. Mattson also explained that "everyone in the office knew that th[e] lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic."

Copies of internal Allied documents provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied ... initially and on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List. Allied's Compliance Officer, Adam Skeffington, testified at his deposition that Allied sends the internal Do Not Call list to team managers, who are then required to send it to vendors, but that he was not aware of Mattson having sent the list to Consumer Nsight.

Allied asserts that in January 2022, an online inquiry form was executed at the webpage LenderConsultant.com, and that the name provided on the form was "James Weim" and the phone number provided was (XXX) XXX-1001. Varma, Iconic's CEO, states in a declaration that Iconic called plaintiff at that number, which "had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." Plaintiff admitted at his deposition that he has used the alias "James Weim" in relation to telemarketing calls, and that his telephone number is the 1001 number. But he denies that he used this alias to complete any online form or that he submitted his information to lenderconsultant.com. According to plaintiff, he uses this alias only when responding to illegal telemarketing calls, not when submitting information online.

Varma states that the lenderconsultant.com website "confirmed that the following consent language had been agreed to along with the [plaintiff's] inquiry":

By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and prerecorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

**\*3**  Allied asserts that between January 12 and March 7, 2022, Iconic contacted "Mr. Weim" several times to discuss his interest in mortgage refinancing per the online inquiry. Allied further asserts that plaintiff finally answered the tenth call on March 7, 2022, stating that he was "James Weim" and confirming that he was interested in hearing mortgage rate offers. The phone-call transcript shows that the call was made by a woman who spoke with plaintiff and then transferred the call to an Allied loan officer named Jason Aldridge, who continued the call with plaintiff to discuss mortgage refinancing options. Plaintiff admits that he answered a call on March 7, 2022, and that he used the name "James Weim." But he denies that he confirmed that he was interested in hearing mortgage rate offers in any genuine sense, because, as he puts is, he was just "play[ing] along with that to the extent [he] needed to identify the party responsible for the illegal calls."

Two days later, on March 9, 2022, plaintiff sent a text message to Aldridge, asking Aldridge who the lead generator was that provided plaintiff's information. Aldridge responded, explaining that he was "not sure," that he did not have anything to do with marketing, and that the previous call had been "transferred," so Aldridge "assumed the information was provided by [plaintiff] to the person on the phone."

A few weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." In April 2022, Mattson refused a delivery of transfers from Consumer Nsight, stating he was "done with transfers." And at some point, he spoke directly to Iconic about the warm-transfer-lead campaign and told Iconic that the leads were "not good" and that he "wasn't very happy about that." Mattson stated at deposition that Consumer Nsight and Iconic were "just shoving over some people that were not very interested."

In September 2022, plaintiff filed this lawsuit, alleging that his number is on the national do-not-call registry and that Allied and Consumer Nsight violated the TCPA by calling him. As it turns out, plaintiff is no stranger to TCPA actions. Plaintiff estimates that he has filed between five and ten TCPA actions over the last decade. And in fact, this is the second TCPA complaint he has filed against Allied (the other in 2016).

Plaintiff has since settled his claims with Consumer Nsight and Iconic (who was not named as a defendant in this case). Plaintiff states in a declaration, though, that he has "not recovered [his] full measure of statutory damages from either of [them], including in the aggregate."

## DISCUSSION

Allied moves for summary judgment on plaintiff's sole claim—violations of the TCPA, 47 U.S.C. § 227. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it affects the outcome of the case under the governing law and a

dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a factfinder for resolution at trial. See id. at 249. The court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. It must instead "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. In the end, the court must analyze the motion in light of both the applicable substantive law and the question of whether a reasonable factfinder could return a verdict for the nonmovant. Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir. 1988). If, based on the record as a whole, a reasonable factfinder could not find for the nonmovant, there is no genuine issue for trial and summary judgment is appropriate. See Matsushita Elec., 475 U.S. at 587.

**\*4** Allied makes several arguments for why summary judgment is appropriate here. The court addresses each below.

## Whether the Calls did not Violate the TCPA as a Matter of Law

Allied contends that plaintiff's TCPA claim fails for a simple reason: plaintiff "cannot establish that the calls [to him] were placed with an [automatic telephone dialing system]." Without an autodialer system, Allied asserts, there can be no TCPA violation as a matter of law.

The court disagrees. To be sure, Congress passed the TCPA in response "to a torrent of vociferous consumer complaints about intrusive robocalls." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 614 (2020). And so it is not surprising that the TCPA addresses calls from autodialing systems—in particular, in § 227(b).

But Congress was concerned with more than just robocalls. Indeed, it had determined that "[u]nrestricted telemarketing ... can [also] be an intrusive invasion of privacy." Hossfeld v. Allstate Ins. Co., 726 F. Supp. 3d 852, 861 (N.D. Ill. 2024) (quoting 105 Stat. 2394, codified as Note to 47 U.S.C. § 227). It therefore enacted § 227(c), which directs the FCC to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). To aid the FCC in this endeavor, "Congress authorized the FCC to issue regulations, among other things, creating what is today commonly known as the national do-not-call registry." Hossfeld, 726 F. Supp. 3d at 862; see also 47 U.S.C. §§ 227(c)(1)(E), (c)(2), and (c)(3).

The FCC eventually issued those regulations in 2003, which are found in 47 C.F.R. § 64.1200(c)(2). They provide that, among other things, "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his ... number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). For "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the[se] regulations," the TCPA provides a private right to "bring ... (A) an action based on a violation of the regulations ... to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions." 47 U.S.C. § 227(c)(5).

Plaintiff's amended complaint here alleges violations related to the do-not-call registry. According to the amended complaint, Allied "or its affiliates, agents, [or] other persons or entities acting on [its] behalf" violated the TCPA "by making telemarketing calls ... to [plaintiff] and the Class despite their numbers being on the National Do Not Call Registry." The fact that the calls were not placed with an autodialing system, then, provides no basis to enter summary judgment for Allied on plaintiff's TCPA claim.

**Whether Plaintiff Consented to Receive the Calls**

Allied argues that plaintiff's claim also fails as a matter of law because he "consented to receive the calls." According to Allied, it can avoid liability under the TCPA if it proves that it made the calls with the recipient's prior express consent. And, it contends, "[t]here can be no genuine dispute that [plaintiff] filled out the online form" at lenderconsultant.com, in which he consented to receive mortgage refinancing calls. In support, Allied relies on Iconic's CEO Varma's declaration. Varma states that Iconic called plaintiff at the 1001 number, "which number had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." "That website," Varma says, "confirmed that the following consent language had been agreed to along with the inquiry":

> **\*5** By clicking 'Submit', you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot), regarding financial, home, credit, final expense and solar related offers and for them to contact you ... via telephone, mobile device ... even if ... your telephone number is currently listed on any ... federal ... Do Not Call list.

Allied further argues that plaintiff verified at his deposition that that he answered a call from Iconic, where he stated that he was "James Weim" and he confirmed his interest in learning about mortgage rate offers. Because plaintiff expressly consented to be contacted about mortgage refinancing, Allied concludes, "his claim for violation of the TCPA fails as a matter of law."

Plaintiff argues in response that summary judgment based on consent is improper for two reasons. First, he contends, there is a genuine factual dispute over whether he visited LenderConsultant.com and provided consent. On the one hand, plaintiff asserts, Allied fails to provide any evidence from LenderConsultant.com "to substantiate the fact that a website visit even took place," and Varma's assertions about the visit are inadmissible hearsay. And on the other hand, his own declaration—along with his uncontroverted deposition testimony—confirm that he never visited LenderConsultant.com. Second, plaintiff contends that the purported website language "is insufficient to constitute legally sufficient TCPA consent." That is because, he argues, neither Iconic, Consumer Nsight, Mattson, nor Allied are mentioned in it, and it does not "comply with the E-SIGN Act's requirements."

The court finds that Allied has failed to show that summary judgment is proper based on the consent issue. Under the FCC's regulations, an "entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating" the regulation against calling people on the do-not-call registry if "[i]t has obtained the subscriber's prior express invitation or permission." 47 C.F.R. § 64.1200(c)(2)(ii). "Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." Id. As the ABA's Business and Commercial Litigation in Federal Courts explains:

> The purpose of the agreement—obtaining consent to be called—must be clear and conspicuous, identify the specific seller to whom the consent is being provided, and not be a condition for the person to make a purchase. The agreement should include the person's telephone number, and must include the person's signature. An electronic signature in accordance with the National Commerce ("E-SIGN") Act is sufficient.

§ 114:7. National Do-Not-Call Registry—Express written consent exemption, 10 Bus. & Com. Litig. Fed. Cts. § 114:7 (5th ed.). "Express consent is an affirmative defense on which the defendant bears the burden of proof." Blow v. Bijora, Inc., 855 F.3d 793, 803 (7th Cir. 2017) (analyzing a TCPA claim under 47 U.S.C. § 227(b) based on the use of an autodialer).

Here, putting aside whether the "consent language" is itself legally sufficient, there is a genuine dispute as to whether plaintiff provided the online form at LenderConsultant.com in the first place. True, Varma states that a "James Weim" provided the form at LenderConsultant.com with plaintiff's phone number. And plaintiff admits that he has used that alias before and that the phone number is his. But Allied provides no direct proof from LenderConsultant.com, and plaintiff has affirmatively stated in his declaration and at deposition that he never visited that website. Consequently, this is an issue for a factfinder to resolve. Because there is a "genuine dispute as to a[ ] material fact," Allied is not entitled to summary judgment based on the consent issue. Fed. R. Civ. P. 56(a).

**Whether Allied is Directly or Vicariously Liable for the Calls at Issue**

**\*6** Allied argues that summary judgment is also proper because it cannot be found either directly or vicariously liable here. As explained above, the FCC's regulations provide that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his ... number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). And section 227(c)(5) allows "persons" to seek relief if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Allied asserts that it cannot be held liable under the TCPA because neither it nor its agent ever made any call to plaintiff.

Direct Liability

Allied first contends that it cannot be held directly liable because Varma's declaration shows that Iconic—not Allied—initiated the calls at issue, and this fact is undisputed. And indeed, plaintiff does not argue otherwise—declining to even address the issue. Although "one can imagine a circumstance in which a seller is so involved in the placing of a specific telephone call as to be directly liable for initiating it—by giving the third party specific and comprehensive instructions as to timing and the manner of the call, for example," Dish Network, LLC, 28 F.C.C. Rcd. 6574, 6583 (2013)—there is no evidence that Allied was so involved here. Because there is no dispute that the evidence establishes that Iconic placed the calls at issue, the court finds that no reasonable jury could conclude that Allied is directly liable. The court therefore grants summary judgment of no direct liability.

Vicarious Liability

Allied also argues that it cannot be found vicariously liable here. It points to Dish Network, explaining that the FCC there held that "while a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles for violations of either section 227(b) or 227(c) that are committed by third-party telemarketers." (Quoting Dish Network, 28 F.C.C. Rcd. at 6574). In particular, Allied asserts, "a seller may be [held] vicarious[ly] liab[le] for TCPA violations 'under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.' " (Quoting Dish Network, 28 F.C.C. Rcd. at 6584). But here, Allied argues, no "actual or apparent agent ... contacted [p]laintiff in violation of the TCPA," and Allied "did not ratify the alleged conduct of its agents who contacted [p]laintiff."

In response, plaintiff contends that Allied is not entitled to summary judgment. He, too, points to Dish Network in support of applying vicarious liability here, and further argues that, "[f]ollowing FCC's [Dish Network] Order, the Seventh Circuit has ruled [that] a TCPA defendant may be vicariously liable for its 'lead generator's unauthorized robocalling under actual authority, apparent authority, and ratification principles of agency liability.' " (Quoting Bilek v. Fed. Ins. Co., 8 F.4th 581, 587 (7th Cir. 2021)). And "[i]n this case," plaintiff argues, "liability as against Allied ... is clear under both actual authority and ratification theories."

The court begins by observing that both parties fail to note (or perhaps fail to appreciate) that the Supreme Court recently held in McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation, that a federal court "is not bound by the FCC's interpretation of the TCPA," and should instead "interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." 606 U.S. 146, 168 (2025). "The Supreme Court's instruction bears on this case because, previously, courts viewed the FCC's declaratory ruling in *Dish Network* as binding authority for the proposition that a seller may be vicariously liable under federal common law agency principles for a telemarketer's TCPA violation even if the seller did not itself 'initiate' the call." Moore v. Club Exploria, LLC, No. 1:19-

CV-02504, 2025 WL 2755076, at *10 (N.D. Ill. Sept. 26, 2025).[1] "But under the Supreme Court's recent teaching in *McLaughlin*, this Court is not bound to apply *Dish Network*." Id.

**\*7** This court, though, need not dwell long on the issue here. First, both parties agree that a seller like Allied can be vicariously liable under federal common law agency principles. Second, as plaintiff notes, the Seventh Circuit appears to have followed Dish Network in Bilek, where it cited the FCC's decision for the proposition that "[e]ach agency theory"—actual authority, apparent authority, and ratification—"offers an independent basis for ... vicarious liability" in a TCPA case (at least a § 227(b) robocall case). 8 F.4th at 587. And it is not clear that this court can disregard Bilek based on McLaughlin. Finally, the court finds that the FCC's interpretation of § 227(c) is correct, anyway—at least insofar as this case is concerned.

Indeed, starting with the statutory text itself, unlike § 227(b), § 227(c)(5) includes language that explicitly extends vicarious liability to violations under that subsection: it allows "persons" to bring an action if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations." 47 U.S.C. § 227(c)(5) (emphasis added). So the FCC's conclusion that "section 227(c)(5) contemplates, at a minimum, the application of ... principles of vicarious seller liability for do-not-call violations," is persuasive. Dish Network, 28 F.C.C. Rcd. at 6584. That conclusion is further bolstered by "the purpose of the TCPA itself[:] 'Congress intended for the TCPA to protect individuals from the annoyance and cost of receiving certain types of telemarketing calls without their prior consent,' and 'sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA.' " Moore, 2025 WL 2755076, at *10 (citation omitted). "For this reason, 'the vast majority of courts that have addressed the issue since the FCC's ruling' have similarly found that the FCC's determination squares with the TCPA's text and purpose." Id. (citation omitted); see also id. at *10-11 (finding post-McLaughlin that a seller may be vicariously liable for third-party violations of § 227(b)). The court therefore agrees with the FCC that a seller can be vicariously liable under § 227(c).

The only question, then, is whether the FCC was correct to "leave open the possibility that [it] could interpret section 227(c) to provide a broader standard of vicarious liability for do-not-call violations" than for robocalling violations under section 227(b). Dish Network, 28 F.C.C. Rcd. at 6586 (emphasis added). As the dissent in Dish Network explained: "Under section 227(b), sellers should be held vicariously liable under federal common-law agency principles for TCPA violations committed by third-party telemarketers"; "under section 227(c), third-party liability exists whenever a telemarketer initiates a call on a seller's behalf, even if that telemarketer is not under the seller's control." Id. at 6596-97 (Pai, dissenting in part) (emphasis added).[2] But the court need not reach the issue of just how far vicarious liability extends under § 227(c) in this case. That is because the parties argue here only about whether Allied is liable under the federal common law agency principles, and as explained further below, the court finds that summary judgment is not proper under those narrower agency principles—to which the court now turns.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Edelman v. Belco Title & Escrow, LLC, 754 F.3d 389, 396 (7th Cir. 2014) (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006)). "[W]hether an agency relationship exists is ultimately a question of fact." Bilek, 8 F.4th at 588. Or put more bluntly: "Agency is a notoriously fact-bound question." Spitz v. Proven Winners N. Am., LLC, 759 F.3d 724, 731 (7th Cir. 2014).

**\*8** Allied argues that it cannot be liable based on any agency principle—actual authority, apparent authority, or ratification. At a high-level: actual authority (or "formal agency") focuses on the relationship between the principal and its agent (whether the principal controlled or had the right to control the agent's conduct); apparent authority focuses on the relationship between the principal and a third party (whether the principal's words or actions led a third party to reasonably believe that the principal consented to an action done on the principal's behalf by the agent); and ratification focuses on the principal's conduct after the act has occurred (whether the principal knowingly accepted the benefits of the agent's act or approved it after the fact). See Showers v. Pelican Inv. Holdings Grp., LLC, 751 F. Supp. 3d 900, 909-10 (S.D. Ill. 2024). Allied contends that summary judgment of no vicarious liability is appropriate for all three theories.

Actual Authority

"Actual authority requires that at the time of an agent's conduct, 'the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.' " Bilek, 8 F.4th at 587 (quoting RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006)). Actual authority may be express or implied. Bridgeview Health Care Ctr., Ltd. v. Clark, 816 F.3d 935, 938-39 (7th Cir. 2016). "An agent has express actual authority when the principal expressly grants the agent the authority to perform a particular act." Aranda v. Caribbean Cruise Line, Inc., 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016). "A principal grants implied actual authority to an agent when the principal's reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf." Id. Ultimately, to prove actual authority, plaintiff "must show evidence that (1) a principal/agent relationship exists, (2) the principal controlled or had the right to control the alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency." Bilek, 8 F.4th at 587.

Allied asserts that plaintiff cannot make that showing here. It argues that its manager, Mattson, "entered into an agreement with Consumer Nsight" to provide "consulting services for live contact telephone transfers from a call center to Allied employees." (Cleaned up). But, Allied contends, Consumer Nsight was not Allied's agent because Allied "did not control any aspect as to how the warm transfer calls would be placed." And even if Consumer Nsight were Allied's agent, Allied asserts, Iconic—not Consumer Nsight—placed the calls at issue here, and Allied "had no contract" or other "relationship with Iconic."

In response, plaintiff argues that "a reasonable jury could find that Mattson, Consumer [Nsight], and Iconic were linked through a cascade of agent and subagent relationships and are each liable for Iconic's actions." According to plaintiff, Allied "authorized its managers, like Mattson to arrange for marketing activities, including making calls ... using vendors, and permitted them to specify criteria for the types of leads that would be best suited for their teams." Mattson, plaintiff asserts, then "went off and hired Consumer Nsight to do exactly what Allied ... authorized him to" do. And, plaintiff contends, there is "no evidence that Consumer Nsight acted contrary to any instruction of Allied ... or Mattson by hiring Iconic ... to conduct the actual calling, using the *exact same* criteria that Allied ... and Mattson authorized all along." (Emphasis by plaintiff). Plaintiff thus concludes that Iconic was a subagent "acting within the same scope of authority that Allied ... gave Mattson, and which Mattson in turn provided to Consumer Nsight."

The court agrees with plaintiff that Allied is not entitled to summary judgment on actual authority here: there are genuine disputes over material facts related to the relationships and control therein, and the evidence here prevents the court from concluding that no reasonable jury could find for plaintiff. Indeed, the parties agree that Mattson worked as a branch manager for Allied, that Mattson's duties included managing team member loan officers and generating leads, and that Mattson entered into an agreement for Consumer Nsight to provide "consulting services for live contact telephone transfers from a call center to Allied ... representatives." Allied also admits that Mattson "had full decision-making authority and oversight when it came to purchasing leads from Consumer Nsight." And plaintiff asserts in his Statement of Additional Facts—to which Allied never responded[3]— that Mattson "controlled Consumer Nsight's targeting criteria for the types of consumers he was looking to [have] refinance a loan," and that he "hired Consumer Nsight 'with the approval of the bank' and 'managed the scope of [the] relationship with Consumer Nsight.' " (Quoting Mattson's Dep.).

**\*9** Consumer Nsight's CEO, moreover, states in his declaration that "Consumer Nsight is not a telemarketing firm" and "does not ... initiate telemarketing calls." "Rather," he states, "Consumer Nsight had a relationship with Iconic ..., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. And, he says, under that agreement, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic transferred certain calls to a ... routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied ... via [the] routing number."

Plaintiff provides copies of invoices, moreover, showing that Allied accepted call transfers from Consumer Nsight and paid for them. Plaintiff also provides emails showing that Allied and Consumer Nsight "integrated their systems so that loan officers

could 'get notified of the calls coming in and to receive the post as the transfers are handed off,' " and that Mattson exercised control over call volume by refusing a delivery of transfers from Consumer Nsight in April, stating he was "done with transfers."

Mattson further stated at deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers. He also stated that "everyone in the office knew that th[e] lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic." And he further suggested that "a loan officer at Allied" was under no obligation to accept a transfer from Iconic. Mattson also explained that he spoke directly to Iconic about the warm-transfer-lead campaign and told them that the leads were "not good" and that he "wasn't very happy about that."

Finally, plaintiff further attaches copies of internal Allied documents that provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied ... initially and on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List.

Based on the above evidence, and viewing the facts and drawing reasonable inferences in plaintiff's favor, the court concludes that a reasonable jury could find that Allied and Consumer Nsight had a principal/agent relationship, that Allied controlled or had the right to control Consumer Nsight's live-transfer-call conduct, and that the conduct here fell within the scope of the agency. The court further concludes that a reasonable jury could also find that a subagency theory "bridge[s] the vicarious liability gap to" Iconic. Hossfeld, 726 F. Supp. 3d at 878.

"A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Id. (citation omitted). "An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent." Id.

As explained above, Consumer Nsight is not a telemarketing firm and does not initiate telemarketing calls. So a reasonable jury could find that Consumer Nsight reasonably believed that, by hiring Consumer Nsight for call transfers, Allied was consenting to Consumer Nsight using a company like Iconic to do the actual calling. This conclusion is further strengthened: (1) by the fact that Mattson directly spoke with Iconic and that it would show on the phone that the calls were coming from Iconic, see Moore, 2025 WL 2755076, at *12 (finding subagency existed between vendor and the call center that would actually make the calls, noting that it was "undisputed that [seller] knew that [the call center] would be the entity actually placing the calls ...."); and (2) by the fact that Allied identifies no evidence suggesting that Consumer Nsight was somehow prohibited from appointing a subagent, that Allied policy barred agents from subcontracting, or that industry-practice forbade vendors from appointing subagents for call transfers, see Hossfeld, 726 F. Supp. 3d at 879 ("No party argues that Gilmond or Fleming expressly or impliedly prohibited Transfer Kings from appointing a subagent, that any Allstate policy or practice forbade Transfer Kings from subcontracting, or that the practice in the industry was not to permit a vendor such as Transfer Kings from appointing subagents.").

 *10  And contrary to Allied's suggestion, the fact that Allied had no contract with Iconic is not dispositive: "the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent 'to perform functions assigned to the agent by the principal.' " Moore, 2025 WL 2755076, at *12 (citation omitted). Here, again, Iconic was appointed by Consumer Nsight to place the calls.

The court thus denies summary judgment on actual authority.

Apparent Authority

Allied next argues that plaintiff cannot show liability based on apparent authority. For his part, plaintiff does not meaningfully respond to Allied's argument. Although plaintiff argues that "apparent authority" "support[s] liability here," he never develops that argument. He has thus waived any argument in support of that theory to avoid summary judgment. Ennin v. CNH Indus. Am., LLC, 878 F.3d 590, 595 (7th Cir. 2017). Nevertheless, the court finds that summary judgment is not appropriate here. See Robinson v. Waterman, 1 F.4th 480, 483 (7th Cir. 2021) ("Even where a nonmovant fails to respond to a motion for summary judgment, the movant 'still had to show that summary judgment was proper given the undisputed facts,' ... with those facts taken as usual in the light most favorable to the nonmovant." (citation omitted)).

"To create apparent authority, the principal must speak, write, or otherwise act toward a third party." Bridgeview, 816 F.3d at 939. The principal's "conduct must make the third party reasonably believe that he has consented to an action done on his behalf by someone purporting to act for him." Id. Here, plaintiff is in the position of the third party for apparent-authority purposes. See id. ("In this case, the plaintiffs would be in the position of the third party, if apparent authority existed.").

Allied contends that it did not take any actions that would instill in a third party, like plaintiff, a reasonable belief that Iconic had authority to act as Allied's agent. In support, Allied points to evidence showing that after the call was transferred from Iconic to Allied, the Allied loan officer (Aldridge) who had taken the call responded to plaintiff's inquiry about who generated the lead by telling plaintiff that Aldridge "does not have anything to do with marketing and [that] he assumed that [plaintiff] would have provided his information to the person who made the initial call." "So," Allied argues, "to the extent that [p]laintiff even did believe that Iconic ... acted as the agent of Allied ..., such notion was dispelled immediately following the live transfer."

But the evidence suggests that a woman working for Iconic called plaintiff on March 7, 2022, and that after plaintiff answered, she spoke with him until the live call was transferred to Aldridge who then continued the conversation. According to the phone-call transcript, Aldrige comes on the line stating, "Alright, thank you, this is Jason Aldrige," and the woman then greets Aldridge and tells plaintiff that he was "in excellent hands with Mr. Aldridge." A reasonable jury could infer that Aldridge's conduct in continuing the conversation could make plaintiff reasonably believe that Allied consented to Iconic calling him on Allied's behalf. Although Aldridge later told plaintiff that he had nothing to with marketing and that Aldridge assumed that plaintiff had provided his information to the woman, the court disagrees with Allied that this fact mandates finding that Aldridge "dispelled [the notion that Iconic was Allied's agent] immediately following the live transfer." For one thing, Aldridge's comment came two days after the March 7 call—hardly "immediately." For another, it is unclear how Aldridge's comment would have "dispelled" the implication that Iconic was acting as Allied's agent in initiating the call to plaintiff.

**\*11** The court therefore denies summary judgment on apparent authority.

Ratification

Allied also argues that plaintiff cannot prove ratification here. "In general, 'ratification retroactively creates the effects of actual authority.' " Roehrman v. McAfee, LLC, 758 F. Supp. 3d 889, 899 (S.D. Ind. 2024) (quoting RESTATEMENT (THIRD) OF AGENCY § 4.02(1)). "Ratification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions." Showers, 751 F. Supp. 3d at 909 (citation omitted). "It requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." Id. at 909-10 (cleaned up). "A principal can ratify an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." Id. (citation omitted). Such consent can arise when a principal enjoys the benefits of the conduct and " 'had knowledge of facts that would have led a reasonable person to investigate further,' and the principal accepted the benefit 'without further investigation.' " Roehrman, 758 F. Supp. 3d at 899 (citation omitted). "A principal that

learns of illegal behavior committed by its agents, chooses to do nothing, and continues to receive the gains, is liable for the agent's acts." Id. (citation omitted). "The state of a principal's knowledge is a factual question." Id. (cleaned up).

Allied contends that "[t]here is absolutely no evidence ... that Allied ... ratified the conduct of Iconic." According to Allied, it had no knowledge of who conducted the call transfers or by what means Iconic placed the calls. And, Allied asserts, its "understanding [was] that consumers, like [p]laintiff, provided their information on an online web page to be contacted regarding mortgage refinancing options and that such form included a TCPA disclosure statement." It thus argues that Allied "had no reason to believe that Consumer Nsight violated the TCPA in effectuating these leads at the time it paid Consumer Nsight for its services and there is simply no evidence in the record to the contrary."

The court finds that summary judgment cannot be granted on ratification. Allied does not dispute that it accepted the benefits of the calling campaign. Indeed, Allied does not dispute that it accepted call transfers from Consumer Nsight and paid for them, including after the call to plaintiff. And the billing records confirm as much.

The issue here, then, is whether Allied had knowledge of facts that would have led a reasonable person to investigate further. The court finds that Allied has not shown that the court can summarily find for it on this issue. As for Allied's assertion that it had no knowledge of who conducted the call transfers, the evidence belies that assertion. Again, Mattson stated at his deposition that Consumer Nsight "introduced" him to someone from Iconic about getting transfers, and that it would show on the phone that the calls were coming from Iconic.

And as for Allied's assertion that its understanding was that the consumers who were being called had provided their information on an online form that included a TCPA disclosure statement, there is evidence that suggests that Allied had knowledge of facts that would have led a reasonable person to investigate further on this issue. Mattson stated at deposition, for example, that he wasn't happy with the quality of the leads, and that Consumer Nsight and Iconic were "just shoving over some people that were not very interested." And emails show that, weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." Further, Allied's Chief Compliance Officer, Skeffington, testified that Allied has an internal do-not-call list, and that Allied sends the list to team managers, like Mattson, who are then required to send it to vendors, like Consumer Nsight. But Allied has not pointed to evidence that Mattson ever sent that list to Consumer Nsight.

**\*12** The court finds that a jury could reasonably infer that Allied knew that not all of the consumers that Iconic was calling had in fact "provided their information on an online web page to be contacted regarding mortgage refinancing options," and so would not have seen the TCPA disclosure statement. And a jury could therefore find that a reasonable person would have investigated further about who was being called during the campaign. The court thus finds that the evidence presented is enough to send to the jury the factual issue of whether Allied had knowledge of facts that would have led a reasonable person to investigate further as to whether Iconic was placing unlawful calls. The court consequently denies summary judgment on ratification.

In sum, the court finds that Allied is entitled to summary judgment in its favor on direct liability, but denies summary judgment on vicarious liability.

**Whether Plaintiff Recovered All Available Damages**

Finally, Allied argues that summary judgment is proper because plaintiff recovered all available damages. That is so, Allied contends, because plaintiff settled with Consumer Nsight and Iconic and did so "in excess of the statutory maximum." The court finds that Allied has failed to show that summary judgment is appropriate on this basis.

Allied's sole support for asserting that plaintiff is no longer entitled to damages is its L.R. 56.1 statement of fact, in which it states: "While the terms of the settlement are confidential, upon information and belief, [plaintiff]'s settlements with Consumer Nsight and Iconic ... are in excess of the statutory maximum." This is not evidence that could support summary judgment. And regardless, in response, plaintiff provides his own declaration in which he states: "Although I have settled with both Consumer Nsight and Iconic Results, I have not recovered my full measure of statutory damages from either of [them], including in the aggregate, and thus have not been fully compensated for any alleged harm." Allied has accordingly failed to show that there is no genuine dispute over satisfaction here.

## CONCLUSION

For the above reasons, the court grants in part and denies in part defendant Allied's motion for summary judgment [139]. The court grants the motion in favor of Allied on the issue of direct liability. The court otherwise denies the motion. This matter is set for a telephonic hearing on April 6, 2026, at 9:00 a.m.

**All Citations**

Slip Copy, 2026 WL 636723

Footnotes

1    The Seventh Circuit has suggested in other cases that preceded McLaughlin that FCC Orders interpreting the TCPA are dispositive at the district court level under the Hobbs Act. See Blow, 855 F.3d at 802 ("absent a direct appeal to review the 2015 FCC Order's interpretation of an autodialer, we are bound to follow it").

2    The dissent in Dish Network provides both statutory and policy justifications for reading § 227(c)'s do-not-call provisions more broadly than § 227(b)'s robocall provisions. See id. at 2597-99.

3    Local Rule 56.1(e)(3) states that "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM   Document 26-1   Filed 06/24/26   Page 75 of 114

2022 WL 797967
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Brennan LANDY, Plaintiff,

v.

NATURAL POWER SOURCES, LLC d/b/a Suntuity,

a New Jersey limited liability company, Defendant.

Civil Action No. 3:21-cv-00425-PGS-TJB
|
Signed 03/14/2022
|
Filed 03/16/2022

**Attorneys and Law Firms**

Jeffrey Steven Arons, Arons & Arons LLC, South Orange, NJ, for Plaintiff.

Adlai J.J. Small, Spiro LLC, Short Hills, NJ, for Defendant.

**MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

PETER G. SHERIDAN, U.S.D.J.

**\*1** This case is before the Court on Defendant Natural Power Sources, LLC d/b/a Suntuity's ("Suntuity" or "Defendant") Motion to Dismiss (ECF No. 16) Plaintiff Brennan Landy's ("Plaintiff" or "Landy") First Amended Complaint (FAC). (ECF No. 13). Oral argument was held March 7, 2022. For the reasons that follow, Suntuity's motion is denied.

This Court has original jurisdiction over this matter pursuant the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, and the to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2). (FAC ¶ 5). Venue is proper under 28 U.S.C. § 1391(b) because Suntuity's headquarters are in New Jersey. (FAC at ¶ 7).

**I.**

The factual background and procedural history of this case are summarized in the Court's August 17, 2021 Order dismissing Landy's original complaint. (Order of Aug. 17, 2021, ECF No. 12). That summary is incorporated herein by reference. Relevant here, Landy brought a single count putative class action lawsuit alleging Suntuity, a purveyor of home solar panels, violated the TCPA by using an Automated Telephone Dialing System (ATDS) to call potential customers. (original complaint, ECF No. 1). Landy's cell telephone was connected to Suntuity through the following process: an unidentified operator utilizing an ATDS (initial ATDS contact) "solicited [Landy] to purchase solar panels or other green energy solutions," (*id.* at ¶¶ 9-20); Landy was then transferred to an intermediate operator identified as "Steve" with "US Home Solar," (*id.* at ¶ 21); who then initiated a "warm transfer"[1] to "Evelyn" with Suntuity, (*id.* at 122).

The Court dismissed Landy's original complaint because there was no allegation that Suntuity authorized the initial ATDS contact. (ECF No. 12).

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 76 of 114

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2022)

Within the FAC, Landy realleges the allegations brought in the original complaint and includes five new factual allegations:

27. On information and belief, including the nature of the services pitched to Plaintiff, the downline telemarketing agents that ultimately transferred the call to Suntuity, including "US Home Solar," were authorized to market Suntuity's products and services directly to consumers. The calls made to Plaintiff and the Class members were made to market and sell Defendant's products and services, and they were placed on behalf of, and for the benefit of, Suntuity.

28. Defendant is vicariously liable for the calls placed by its downline telemarketing agents, including "US Home Solar," under ordinary agency principles because Suntuity directed, authorized, or otherwise ratified the conduct of telemarketers like "US Home Solar," which resulted in the statutory violations alleged in this complaint.

29. By accepting transfer of the call, marketing its products directly to Plaintiff on the same call, and following up with an email after the call, Suntuity demonstrated consent to the initial, downline agent callers placing calls on its behalf and thereby ratified the conduct of the telemarketing agents involved in the call, including "US Home Solar."

 *2  30. Suntuity's conduct—including accepting transfer of the call and marketing its products directly to Plaintiff on the same call—caused Plaintiff to reasonably believe that any downline agents involved in the call had authority to act on behalf of Defendant.

31. Suntuity accepted the benefits of its downline agents' unlawful telemarketing practices by accepting transfer of unauthorized calls made to consumers and accepting payment from new customers and accounts that Suntuity had knowledge were generated through such telemarketing campaigns as the one alleged herein.

(FAC at ¶¶ 27-31). Suntuity seeks to dismiss the FAC under Rule 12(b)(6) for failure to state a claim for the same reason as the original complaint was dismissed. (Motion to Dismiss FAC, ECF No. 16).

## II.

Under Fed. R. Civ. P. 8(a)(2), a complaint "requires only a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss asserts a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d. Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard requires showing more than just the possibility that the defendant acted unlawfully. *Id.*

In reviewing a motion to dismiss, the Court "accept[s] as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Monroe v. Beard*, 536 F.3d 198, 205 (3d. Cir. 2008). The court should disregard legal conclusions and "recitals of the elements of a cause of action, supported by mere conclusory statements." *Santiago v. Warminster Township*, 629 F.3d 121, 128 (3d. Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

The Third Circuit set forth a three-part test for determining whether or not a complaint may survive a motion to dismiss for failure to state a claim:

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Id.* at 130 (alteration in original) (quoting *Iqbal*, 556 U.S. at 675, 679).

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 77 of 114

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2022)

## III.

"To assert a claim under the TCPA's autodialer provision, 47 U.S.C. § 227(b)(1)(A)(iii), a plaintiff must show that the defendant: (1) called her cell phone; (2) using an automatic telephone dialing system ("ATDS"); (3) without her prior express consent." *Valdes v. Century 21 Real Estate, LLC*, No. 19-05411, 2019 WL 5388162, at *2 (D.N.J. Oct. 22, 2019).

Generally, a defendant may be held vicariously liable for violations of this statutory provision. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016).

**\*3** Here, Landy alleges that she received a call on her cell phone; and there was a pause before the operator entered onto the call. (FAC at ¶ 9). The pause is sufficient to infer that an ATDS initiated the call. *Hazan v. Wells Fargo Home Mortg.*, No. 18-10228, 2020 WL 919183, at *3 (D.N.J. Feb. 26, 2020).

Since there was an interim operator ("Steve" of US Home Solar) between the ATDS and "Evelyn" of Suntuity, the issue arose as to whether Suntuity authorized the use of the ATDS. Here, Landy must plausibly demonstrate that said initial ATDS contact was consented to or directed by Suntuity. Landy may show this through actual and/or or apparent authority or ratification of the acts by Suntuity. See, *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013) (quoting Restatement (Third) of Agency § 2.01 (2006)). A plaintiff sufficiently pleads actual authority when the allegations establish that the defendant consented to or directed the agent to act on its behalf. *Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050, 2018 WL 6061405, at *18 (D.N.J. Nov. 20, 2018). Alternatively, "[a]pparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." *Covington*, 710 F.3d at 120. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Cunningham*, 2018 WL 6061405, at *6 (quoting Restatement Third of Agency, § 4.01 (2006)) (internal quotation marks omitted). The allegations in paragraphs 27 through 31 of the FAC are sufficient to plausibly plead such authorization. From the description of the process of the call, there is circumstantial evidence that "by accepting the call, and following up with an e-mail after the call, Suntuity demonstrated consent" to the use of ATDS. (FAC ¶ 29).

The FAC sufficiently alleges an agency relationship as it may be inferred from the context of the cell phone process. That is, the smooth transfer from the initial ATDS contact to "Steve" and then to "Evelyn" of Suntuity, (FAC at ¶¶ 20-22), shows a cooperative relationship from which one may infer authority or apparent authority of Suntuity to the initial contact by ATDS. *Cunningham*, 2018 WL 6061405, at *7. Additionally, the FAC alleges that the initial ATDS contact was made to market Suntuity's products, the initial call was made at the direction of Suntuity, and that Suntuity knew the initial caller utilized an ATDS to generate customers for Suntuity. (*Id.* at ¶¶ 27, 31). Although some of those assertions are based on "information and belief," the Third Circuit permits allegations "on information and belief" where "factual information is peculiarly within the defendant's knowledge or control." *McDermott v. Clondalkin Grp., Inc.*, 649 Fed. Appx. 263, 267-68 (3d Cir. 2016). Here it may be plausibly inferred from the nature of the transaction that Suntuity, in some fashion, directed and/or approved the initial ATDS contact.

## IV.

Finally, Suntuity moves to strike or dismiss Plaintiff's class allegations on the ground that the FAC's class definition is an "impermissible fail-safe class" and that the proposed class is not ascertainable. (Motion to Dismiss FAC 18-20, ECF No. 16). Plaintiff proposes the following class definition in the FAC:

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 78 of 114

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2022)

**\*4  No Consent Class:** All persons in the United States who (1) from the date four years prior to the filing of this Complaint through the date notice is sent to the Class; (2) received at least one call from Defendant, or a third person acting on behalf of Defendant; (3) on the person's cellular telephone; (4) for the purpose of selling Defendant's solar products and services; (5) using the same equipment that was used to call the Plaintiffs; and (6) for whom Defendant claims it obtained prior express written consent in the same manner as Defendant claims it obtained prior express written consent to call the Plaintiffs.

(FAC at ¶ 34).

A fail-safe class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012); *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 167 (3d Cir. 2015). "The class definition requires a determination on the merits before members are identified, creating what the Supreme Court called 'one-way intervention.' " *Zarichny v. Complete Payment Recovery Servs.*, 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974)). "Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. Further, "such a class impermissibly skirts the bar of res judicata." *Zarichny*, 80 F. Supp. 3d at 624. The Third Circuit has not yet determined that a fail-safe class is impermissible. *See Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 478 (E.D. Pa. 2021). However, some courts have found them impermissible. *See Macdonald v. Cashcall, Inc.*, 333 F.R.D. 331, 346 (D.N.J. 2019).

Here, on the face of the Complaint, Plaintiff does not propose a fail-safe class, because the class definition includes those who may have consented to receiving a call on behalf of Suntuity. (FAC at ¶ 34). Therefore, membership in the class does not depend on a determination of Suntuity's liability. *See Messner*, 669 F.3d at 825; *Valdes*, 2019 WL 5388162, at \*2. Additionally, it is premature at this stage of the litigation to dismiss Landy's class allegations on the grounds that the proposed class is not ascertainable because the Court lacks a factual record to determine whether class members can be identified. *Luppino v. Mercedes-Benz USA, LLC*, 2013 WL 6047556, at \*7 (D.N.J. Nov. 12, 2013). Further, sometimes the class can be better defined after discovery "by refining the class definition rather than by flatly denying the certification." *Messner*, 669 F. 3d at 825.

### ORDER

**THIS MATTER** having come before the Court on Defendant's Motion to Dismiss Plaintiff's FAC (ECF No. 16); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 14th day of March, 2022,

**ORDERED** that Defendant's motion to dismiss is **DENIED.**

### All Citations

Not Reported in Fed. Supp., 2022 WL 797967

Footnotes

1    The parties do not define this term, but "warm transfer" is commonly understood to mean that "the first operator stays on the line with the called party during a transfer until the second operator answers." (ECF No. 12 at pp. 10-11).

---

*End of Document*                                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Blue-Striped Flag

Appeal Filed by George Moore v. Club Exploria, LLC, 7th Cir., September 30, 2025

2025 WL 2755076

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

George MOORE, on behalf of himself and others similarly situated, Plaintiff,

v.

CLUB EXPLORIA, LLC, Defendant.

No. 1:19-CV-02504
|
Signed September 26, 2025

**Attorneys and Law Firms**

Keith James Keogh, Timothy J. Sostrin, Keogh Law, Ltd., Chicago, IL, Anthony Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Peter A. Silverman, Alexander Alberto Pabon, Smith, Gambrell & Russell, LLP, Chicago, IL, Brittany A. Andres, Pro Hac Vice, Eric J. Troutman, Pro Hac Vice, Puja J. Amin, Pro Hac Vice, Tori Lynn Guidry, Pro Hac Vice, Troutman Amin, LLP, Irvine, CA, for Defendant.

**Memorandum Opinion and Order**

Edmond E. Chang, United States District Judge

**\*1** George Moore brings this class-action suit against Club Exploria, LLC, alleging violations of the Telephone Consumer Protection Act (usually called the TCPA), 47 U.S.C. §§ 227 *et seq*. R. 55, Am. Compl.[1] Moore now moves for summary judgment on behalf of himself and the class under Section 227(b). R. 319, Pl.'s Mot. Even viewing the evidence in Exploria's favor, no reasonable jury could find that Exploria's prerecorded calls to the class were permissible under the TCPA. So Moore's motion is granted in full.

**I. Background**

In deciding a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party (here, Exploria) and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 907 (7th Cir. 2008). Exploria is a vacation company that owns and operates several resort properties throughout the United States. R. 320, PSOF ¶ 1; R. 320-1, Exh. 1, Rogers Dep. at 10:18–11:8. One of those properties is the Summer Bay resort in Orlando, Florida, which was the subject of a marketing campaign run by Exploria in 2018. PSOF ¶¶ 1–3; Rogers Dep. at 11:11–12:10. To assist with the Summer Bay campaign, Exploria contracted with two telemarketing vendors—Yodel and Ga Investments, LLC (the parties call the latter "GaI")—in the spring of 2018 to place outbound calls on its behalf. PSOF ¶¶ 2–3, 14; R. 320-3, Exh. 3, Yodel Agreement; R. 320-4, Exh. 4, Yodel Insertion Order; R. 320-15, Exh. 15, GaI Insertion Order; R. 320-24, Exh. 24, GaI Agreement.

Before GaI began working on the Summer Bay campaign, it subcontracted with Acquis, LLC, to perform GaI's responsibilities under the Exploria contract. PSOF ¶ 20; R. 320-19, Exh. 19, Connolly Decl. ¶ 3. Exploria was aware of this subcontract and even entered into its own additional marketing contract with Acquis around this time; the Exploria-Acquis contract bore identical terms to the Exploria-GaI contract. PSOF ¶ 21; R. 320-20, Exh. 20, Acquis Agreement. Acquis then appointed a call center —Prospects DM—to perform its work under the Exploria contract. PSOF ¶ 28; Connolly Decl., Exh. B, Prospects Insertion Order at 1; R. 320-22, Exh. 22, Acquis Insertion Order. Exploria was aware of this arrangement; the insertion order between Exploria and Acquis explicitly references Prospects as the call center that would be performing the calls to generate the live transfers to Exploria's agents. *See* Acquis Insertion Order at 1 (referring to the campaign as "Exploria Resorts Call Transfer at ProspectsDM call center"). The Prospects call center agents were to use the "approved telemarketing script" that was part of the contract between Exploria and Acquis. *See id.* (referencing the "script read ad message verbatim" which was approved by Exploria as the "Advertiser").

 **\*2**  The calls placed by Yodel and Prospects for the Summer Bay campaign were the result of "leads"—phone numbers—that Yodel had purchased from third-party website operators. PSOF ¶ 40; R. 320-2, Exh. 2, Wood Dep. at 13:20–14:5, 22:19–24, 27:20–28:8; R. 320-31, Exh. 31, Grant Dep. at 70:11–71:4, 74:7–14, 75:22–76:12. The leads were generated through "opt-in sites" that allowed people to authorize certain organizations to call them with sales offers. *See* Rogers Dep. at 71:14–25. For the Summer Bay campaign, the authorization form on the opt-in sites did *not* list Club Exploria as the seller that may call, and instead listed alternative names that the vendors did business as. Rogers Dep. at 77:20–78:8; *see also* R. 320-5, Exh. 5 at 1 (Exploria requesting Yodel's telemarketers use a script that introduced themselves as a "Trip Advisor" from the "Helping Hands association"). The opt-in sites were not owned or operated by any entity that was involved in the campaign itself, and Exploria did not investigate whether the opt-in data that the vendors were using was potentially fabricated or deficient. PSOF ¶¶ 41, 43; Rogers Dep. at 72:1–75:8; 80:19–81:5; Wood Dep. at 70:10–71:7; Grant Dep. at 69:2–5.

As part of the agreements, the vendors were supposed to generate "live transfers," which meant that the vendors' agents would place calls to the phone numbers obtained through leads and then play prerecorded prompts before transferring the call to Exploria. R. 335, Def.'s Resp. to PSOF ¶ 6; Yodel Insertion Order at 1; GaI Order at 1. Exploria gave scripts to the vendors to use during the calls, and the script offered a vacation package at a special rate in exchange for a cash payment. *See* Exh. 5 at 1; GaI Agreement at 1. Exploria hoped that once at the resort, customers would purchase a timeshare interest. R. 320-8, Exh. 8, Lizotte Dep. at 83:15–20. And as hoped, the Summer Bay calling campaign resulted in nearly $2 million in sales for Exploria. PSOF ¶¶ 54–55; Rogers Dep. at 65:16–66:14; R. 320-66, Exh. 66.

Moore received two calls from telemarketers on Exploria's behalf regarding the Summer Bay campaign. *See* PSOF ¶¶ 58–59; R. 320-67, Exh. 67, Woolfson Decl. ¶ 35. Moore later complained to Exploria by sending the company a demand letter in which he alleged a TCPA violation. *See* R. 320-44, Exh. 44 at 3. He then filed this class-action suit against Exploria, alleging that the two calls violated the TCPA and requesting certification for a nationwide class of individuals that received prerecorded calls on their cell phones as part of the Summer Bay campaign. *See generally* Am. Compl.

In August 2023, the previously assigned judge certified a class of "[a]ll persons in the United States subscribing to a cellular telephone number that received a prerecorded soundboard call promoting Club Exploria's Summer Bay Resort between March 1, 2018, and August 15, 2019, where the soundboard operator initiated a transfer of the call to Club Exploria." R. 225, Certification Order at 19. Moore—on behalf of himself and the class—now moves for summary judgment on his claim that Exploria violated the TCPA when its vendors used prerecorded technology to make sales calls to cellular numbers without prior consent. *See generally* Pl.'s Mot.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Arbitration

**\*3** Before considering the merits of Moore's summary judgment motion, the Court must first decide Exploria's motion for leave to file a motion to compel arbitration. *See* R. 339, Def.'s Mot. Exploria asserts that 1,026 class members visited a website where they opted-in to receive messages with promotional offers and agreed to mandatory arbitration for any claims relating to telemarketing messages that they received as a result of their opt-in. *Id*. at 4–5. According to Exploria, these 1,026 class members are thus bound by a valid arbitration agreement that governs the current dispute. *Id.* at 1–2. Exploria's motion for leave to file an arbitration motion is denied because this issue has already been decided by the previously assigned judge and, even if it had not, the motion comes much too late in this litigation.

### 1. Law of the Case

Moore first argues that the previously assigned judge already held that Exploria waived its arbitration defense and the holding is thus law of the case. Indeed, Exploria had already requested leave to file a third amended answer raising an arbitration defense, and that request was denied. *See* R. 248, Def.'s Mot. (requesting leave to add an arbitration defense to Exploria's answer); R. 272 at 11:14–17 (hearing transcript denying Exploria's motion for leave). According to Moore, the prior decision constitutes law of the case as to Exploria's waiver of any arbitration defense, and so this Court should deny Exploria's request to file an arbitration motion. *See* R. 350, Pl.'s Resp. at 6–7.

The law-of-the-case doctrine applies where—as here—a "different member of the same court re-examines a prior ruling." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). In those cases, the subsequent judge should not alter a previous ruling "merely because he has a different view of the law or the facts from the first judge." *Id.* (cleaned up).[2] Thus, courts apply a presumption that "earlier rulings will stand" when they touch on the same issue, absent new controlling law or clear error in the prior decision. *Id*. (cleaned up).

Exploria argues that the doctrine is inapplicable because Judge Leinenweber's statement was supposedly *dicta*. R. 352, Def.'s Reply at 6–7. It is true that statements touching on issues "not formally before the Court do not constitute binding determinations." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 533 (7th Cir. 1982) (citing *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979)). But Exploria's earlier motion for leave to file a third amended answer asserting an arbitration defense and its current motion for leave to file a motion to compel arbitration are centered on precisely the same issue: whether the arbitration defense was waived. The prior judge's denial of Exploria's earlier motion explicitly relied on a determination that Exploria had waived any arbitration defense. *See* R. 272 at 11:14–17 ("It seems to me that, ... it's too late, in my judgment, to raise arbitration. That was *clearly waived* by not bringing it up before now." (emphasis added)). And Exploria makes no showing of clear error or new

controlling law warranting departure from the prior holding—it does not even attempt to address that standard in the briefing. So the law-of-the-case doctrine applies, and this Court presumes that the prior ruling on waiver will stand.

### 2. Waiver

Even if the law-of-the-case doctrine did not apply at all—and this Court was to consider the waiver argument afresh—Exploria's request to file an arbitration motion would fail because it did, in fact, waive the defense. Waiver of the right to arbitrate may be express or inferred, and inferred waiver is a fact-dependent inquiry. *See St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., Inc.*, 969 F.2d 585, 587–588 (7th Cir. 1992). Exploria has not expressly waived its arbitration defense in this case, so the question is whether waiver may be inferred. A party implicitly waives its right to compel arbitration when, considering the totality of the circumstances, it "has acted inconsistently with the right to arbitrate." *Id.* at 588. Relevant facts to consider include whether the movant did "all it could reasonably have been expected to do" to detect the defense early, whether it participated in the litigation, whether there has been a substantial delay in its request, whether it participated in discovery, and whether the nonmovant was prejudiced by the delay. *See Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d 731, 737 (N.D. Ill. 2023) (cleaned up). As an example, the Seventh Circuit has affirmed a waiver of the right to arbitrate where the defendant filed a motion for summary judgment, because that type of merits presentation meant that the defendant was "submitting the case to the district court for decision," which is inconsistent with the desire to arbitrate. *St. Mary's,* 969 F.2d at 589 (explaining that summary judgment motions "preclude any arbitration ... by virtue of waiver" (cleaned up)).

 **\*4**  Just so here. This case was first filed in April 2019, R. 1, Compl., and the parties underwent two years of discovery before Exploria first moved for summary judgment in September 2021. R. 146, Def.'s Mot. for Summary Judgment. In that motion, Exploria advanced only an argument on vicarious liability; it did not mention an arbitration agreement. *See generally* Def.'s Mot. for Summary Judgment. The Court then denied Exploria's motion and certified the class in August 2023. *See* Certification Order. So Exploria, having submitted this case for a decision on the merits before ever raising arbitration and participating in years of discovery (including hiring its own expert witnesses), has acted inconsistently with the intent to arbitrate and thus waived the argument.[3]

Exploria argues that there was "no existing right" to arbitrate until after the class was certified and the notice period ended. Def.'s Reply at 12–14. But after the class was certified in August 2023, Exploria filed a flurry of motions the next month—including a motion to dismiss for lack of standing, R. 239, a motion to reopen discovery, R. 243, a motion to file a second amended answer, R. 241, and a motion to amend the Court's decision, R. 242. Despite all of those merits-related filings, Exploria still did not mention arbitration, and all of this was after the certification of the class. Exploria did not file its motion for leave to file an amended answer (with an arbitration defense) until October 2023. *See generally* Def.'s Mot. (filed Oct. 9, 2023). Both Exploria's pre-certification and *post*-certification litigation conduct thus are inconsistent with an intent to arbitrate. For these reasons, Exploria's motion for leave to file a motion to compel arbitration is denied.

### B. Evidence of Phone Calls

Moving on to Moore's summary judgment motion, the Court must first resolve a preliminary issue on the phone-call logs of Prospects and Yodel. Exploria argues that because Moore has not provided the call logs as evidence in the record, he has no proof that any of the calls actually occurred. R. 333, Def.'s Resp. at 9–11. Moore responds that multiple pieces of record evidence incorporated the call logs and, as a practical matter, he did not submit the actual call logs into the record because the files were too voluminous to be uploaded to the electronic-filing system and also could not be reviewed by this Court without specialized software. R. 358, Pl.'s Reply at 5–6. In particular, Moore argues that the call logs are admissible because they were authenticated through deposition testimony and are incorporated into Moore's expert report by Aaron Woolfson. *Id.* at 2–7; Woolfson Decl ¶ 22. Though Moore should have included the call logs directly in the record for simplicity's sake, this Court agrees that the

expert reports' incorporation of them and the deposition testimony authentication are sufficient foundations to consider the facts reflected in the call logs.

**\*5** First, the expert reports from *both* parties' experts incorporated the call logs into their respective analyses. Federal Rule of Evidence 703 "allows experts to rely on inadmissible facts or data in forming an opinion so long as 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.' " *Sansone v. Brennan*, 917 F.3d 975, 982 (7th Cir. 2019) (quoting Fed. R. Evid. 703). Here, plaintiff's expert Aaron Woolfson explicitly relied on the call logs from both vendors to support his opinion that 76,255 calls were placed to 66,682 unique cell-phone numbers by Prospects and Yodel on Exploria's behalf. Woolfson Decl. ¶¶ 3, 22 (naming the "*exploria_dialing*" file and "*travel exploria call logs*" file as the materials used to identify the calls at issue in this case); *see also id.* ¶¶ 30–56 (explaining how he identified the relevant calls from the two files); ¶ 56 (describing Woolfson's conclusions); R. 320-68, Exh. 68, Woolfson Rebuttal Report ¶ 7 (explaining that the "*exploria_dialing*" file was produced by Yodel and the "*travel exploria call logs*" file was produced by Prospects). Not surprisingly, Exploria's own expert, Jennifer Smith, testified that these logs are of the type reasonably relied on by experts in her field. *See* R. 195-23, Exh. EE, Smith Rep. ¶ 13 ("I have considered data and information from various sources, all of which are reasonably relied upon by experts in my field."), PDF p. 24 (listing the call logs she relied on by file name, which are the same listed in Woolfson's report). And Exploria does not argue that the call records do not meet the Rule 703 threshold for expert reliance—only that Moore has not shown that the data sets reviewed by Woolfson "have anything to do with this case at all." Def.'s Resp. at 10. Given the experts' reliance on them—the experts of *both* sides—there is some artfulness in saying that the call records have nothing to do with this case. Based on the expert-report reliance on the call logs, there is more than sufficient foundation to consider the logs.[4]

On top of that, the deposition testimony from the Yodel and Prospects representatives also adequately laid a foundation for the call logs as business records. The Seventh Circuit—in other TCPA cases—has explained that call logs may be authenticated by a custodian as business records. *See Norman v. AllianceOne Receivables Mgmt., Inc.*, 637 F. App'x 214, 216 (7th Cir. 2015) (non-precedential disposition). The custodian need only be "familiar with the company's record keeping practices," and need not "have personally made the calls to [the recipient] to testify about the meaning of the records." *Id.* (first citing *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 686 (7th Cir. 2015); and then citing *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 775–77 (7th Cir. 2006)). Indeed, "[w]hen it comes to testifying about business records, the custodian need not be the individual who personally gathered" them. *Cocroft,* 796 F.3d at 686 (cleaned up).

Yodel's CEO, Kyle Wood, testified that he "overs[aw] the management teams that run [outbound telephone campaigns]," and that Yodel produced the logs containing around 20 million call records for the calls that Yodel made on behalf of Exploria. Wood Dep. at 9:7–15; 12:17–24; 55:20–56:7. He confirmed that the data—a dialer record table—came from Yodel's data center in Florida and is "an actual log [of calls] that comes from [the] dialer table." *Id.* at 56:8–10, 57:12–13. He walked through each column to confirm which data they contained and explain which parts of the call were captured by the table. *Id.* at 56:8–69:1. Similarly, Prospect's president and CEO, Joshua Grant Kidd, testified that he personally searched for the call records in the database, and that they were "a record of all the transfers on the Exploria campaign." Grant Dep. at 12:9–17:6, 22:14–17, 41:13–18. He confirmed that the logs reflected *only* the calls for the Exploria campaign, *id.* at 63:16–22, that they were "typical" for what he would see in the business, *id.* at 64:23–65:3, and that he retrieved the records either from a dialer or an Excel database, *id.* at 64:5–7.

**\*6** As the above testimony clearly shows, Wood and Grant are familiar with their employers' record-keeping practices and laid a sufficient foundation to authenticate the logs as business records. And although Exploria blanketly argues that the call logs have not been authenticated as business records, Def.'s Resp. at 9, the company goes no further to challenge either of the custodians' ability to lay a foundation for the logs or the accuracy of the logs themselves. *See Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 685 (7th Cir. 2013) (explaining that there was no material dispute in a TCPA case where the company's representative detailed how the records were compiled and no competing evidence suggested that the records were inaccurate). Having established that Woolfson's expert testimony—or, alternatively, the records-custodian testimony—laid sufficient foundation for the call

logs at issue in this case, this Court may consider them in determining whether Moore is entitled to summary judgment on the TCPA claim.

## C. TCPA

The TCPA bans prerecorded telemarketing and advertising phone calls to cellular numbers unless the recipient has given prior express written consent. 47 U.S.C. § 227(b); 47 C.F.R. § 64.1200(a)(2). The statute offers a private cause of action for aggrieved individuals to sue the alleged violator and "receive $500 in damages for each such violation." § 227(b)(3). Thus, to win summary judgment on his TCPA claim, Moore must show that Exploria initiated (1) a telemarketing or advertising call; (2) using a prerecorded voice; (3) to a cellular number. *See* § 64.1200(a)(2). Prior express consent is an affirmative defense; as such, the party raising the consent defense—here, Exploria—bears the burden of proof. *Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017). Moore argues that he has met each element of the Section 227(b) claim and is entitled to judgment as a matter of law; by contrast, Exploria argues that Moore fails on each element. *See* Pl.'s Mot. at 4; Def.'s Resp. at 3. As explained next, Moore has demonstrated—even giving Exploria the benefit of reasonable inferences—that there is no genuine dispute as to any material fact on the elements of the class's TCPA claim, and no reasonable jury could find otherwise.

## 1. Telemarketing

To constitute a TCPA violation, the calls placed on Exploria's behalf must have "include[d] or introduce[d] an advertisement or constitute[d] telemarketing." § 64.1200(a)(2). Telemarketing is "the initiation of a telephone call ... for the *purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services." § 64.1200(f)(13) (emphasis added). Thus, whether a call constitutes telemarketing depends on the call's "context or purpose." *Legg v. PTZ Ins. Agency, Ltd.*, 2018 WL 3869970, at *2 (N.D. Ill. Aug. 15, 2018) (quoting *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015)). Moore points to Exploria-provided scripts that advertise the Summer Bay resort, deposition testimony from Exploria's Vice President of Marketing, and the contracts with the vendors as proof that the calls were telemarketing. Pl.'s Mot. at 4–5. Exploria counters that the scripts were not necessarily used by the vendors, and even if they were, they do not actually offer a good or service for money. Def.'s Resp. at 11–12. Based on the record evidence, Moore has met his burden of showing that any reasonable jury must conclude that the calls made by Yodel and Exploria constituted telemarketing under the TCPA.

First, the contracts with Yodel and Prospects evidence the parties' understanding that the purpose of the call campaign was telemarketing. The relevant calls in this case are those placed by Yodel and Prospects on Exploria's behalf. *See* DSOF ¶¶ 3–4, 22 (explaining that Yodel and GaI/Acquis, which contracted with Prospects, were retained by Exploria to provide live transfers); PSOF ¶¶ 3, 14, 20, 28 (same). The Yodel Services Agreement and the Insertion Order identify Exploria as the "Advertiser" and state that the Advertiser is in the business of selling products. *See* Yodel Agreement at 2; Yodel Insertion Order at 4. It further states that the Advertiser desires to engage Yodel—referred to as the "Call Center"—to "generate certain sales leads." Yodel Agreement at 2. Similarly, the Acquis Services Agreement states that Exploria is retaining Acquis to provide leads in the form of Live Transfer Calls. *See* Acquis Agreement at 2.[5] The Acquis Insertion Order includes an "Approved Telemarketing Script" that offers the recipients of Prospects' calls a stay at the Exploria resort in exchange for a $99 refundable room deposit which will be returned to the customer as a $100 resort gift card "which can be used in [Exploria's] restaurants, bars, snack and gift shops." Acquis Insertion Order, Exh. 1 at 3–4. The agreements and the script are all aimed at executing one thing: telemarketing.

 **\*7**  Second, Ranice Rogers, Exploria's director of national call centers at the time of the campaign, testified that Exploria engaged Yodel and GaI/Acquis to "place outbound telemarketing calls regarding the Summer Bay property." Rogers Dep. at 9:19–23; 12:4–10. Exploria's corporate counsel further confirmed that Exploria is "a real estate timeshare developer" that "sell[s] real estate," and sends potential buyers to the resorts while "hoping to sell them a timeshare interest." Lizotte Dep. at 8:11–9:13; 83:15–20. And to leave no room for doubt, Exploria's response to Moore's Rule 56.1 Statement explicitly states that it is "[u]ndisputed that Club Exploria retained vendors to place outbound telemarketing calls." R. 335, Def.'s Resp. to PSOF ¶ 2.

Thus, Moore has presented evidence that Exploria contracted with Yodel and Prospects to make the calls for the purpose of telemarketing—and with an absence of competing evidence to the contrary, no reasonable jury could find otherwise.

### 2. Prerecorded Technology

Next, Moore must show that every call to the class "us[ed] an artificial or prerecorded voice." § 64.1200(a)(2). Moore argues that Exploria's contracts with the telemarketing vendors expressly required the use of prerecorded scripts using a soundboard system, and so "every single call began with a prerecorded voice via the soundboard process." Pl.'s Mot. at 5–6. Exploria seemingly concedes that the calls did utilize soundboard technology but argues that the issue of whether soundboard technology qualifies as a "prerecorded call" under the TCPA is a "hotly-contested legal issue." Def.'s Resp. at 12–13.

The TCPA and its implementing regulations do not define "prerecorded." Statutory interpretation begins with the plain language of the statute. The Court must "assume that the legislative purpose of the statute is expressed by the ordinary meaning of the words used." *United States. v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (internal quotation marks and alterations omitted) (quoting *United States v. Lock*, 466 F.3d 594, 598 (7th Cir. 2006)). The plain language of the statute should be conclusive unless there is clearly expressed congressional intent to the contrary. *Id.* The statute's text merely prohibits any calls "using any ... prerecorded voice." § 227(b)(1)(A). As another court in this District observed in a similar TCPA suit, "prerecorded" simply means "recorded in advance." *Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188, at *3 (N.D. Ill. Dec. 9, 2019) (quoting *Prerecorded,* Merriam-Webster's Dictionary (2019)). And there is nothing within the statute itself to imply that Congress did not intend this meaning.

On the record evidence, the vendor testimony and Woolfson's expert report support the contention that every call from Prospects and Yodel used a "prerecorded voice." Wood testified that the calls placed by Yodel for Exploria were soundboard calls, which means an agent pressed buttons to play prerecorded messages. Wood Dep. at 14:24–15:5, 16:19–21. He explained that Yodel creates the prerecorded clips "[u]sing voice talents that [Yodel] hire[s]," and then Yodel agents press buttons to "progress through the script." *Id.* at 46:9–47:2. Similarly, Grant testified that he "definitely know[s] ... that sound board was used and prerecorded messages were used" by Prospects for the Exploria campaign. Grant Dep. at 117:2–4. In his words, soundboard technology uses "prerecorded voice clips" that the live Prospects agents "press[ed] a recording through one way or another," in lieu of using their own voice in real time. *Id.* at 62:8–13. And the expert report bolsters this testimony with the call data. According to Woolfson, he could discern which call records used prerecorded messages; the Yodel call logs listed a "call disposition" reflecting which calls conveyed prerecorded messages, and the Prospects call logs only reflected calls that were transferred to Exploria after the soundboard process that Grant described. Woolfson Decl. ¶¶ 33–35. Woolfson's process to identify the calls to the class now at issue in this case thus only includes calls that contained prerecorded messages. *Id.* ¶ 36 (explaining that he identified 16,566,899 calls from the Yodel and Prospects call logs to 8,359,019 unique phone numbers), ¶ 38 (explaining that he compiled the list of 8,359,019 unique phone numbers to then identify which ones were cellular).

**\*8** Exploria does not present competing evidence to suggest that any of the calls at issue actually did not feature a prerecorded voice. Given this, Moore has met his burden that the calls to the class placed by Yodel and Prospects were prerecorded; again, no reasonable jury could find otherwise.

### 3. Cellular Numbers

On the final element of his prima facie case, Moore must show that each of the 76,255 calls at issue in this case went to a cell-phone number. Moore presents Woolfson's data analysis of the call logs as evidence that each of the 66,682 numbers that received the 76,255 calls were assigned to a cell service. *See* Pl.'s Mot. at 6–7. Exploria responds by arguing that its expert,

Ken Sponsler, "hotly contests" Woolfson's methodology on this point and the question is ultimately one for the jury. Def.'s Resp. at 13–14.

Woolfson's report explains that he identified the wireless status of the numbers from the call logs, which specifically allowed him to discern which wireless carrier the numbers were tied to. *See* Woolfson Decl. ¶ 32. He did so by sending the list of numbers to TelLingua, which "tagged each telephone number ... with a label to indicate (a) whether the number is Wireless, and (b) the host Operating Company Number that the number was associated with on the date of the call record." *Id.* ¶ 38. Woolfson's call log analysis led him to conclude that "there were 76,255 calls to cellular numbers ... The 76,255 telephone calls consisted of 66,682 unique cellular numbers that received one or more calls." *Id.* ¶ 51. And although Exploria's expert disputes the reliability of identifying the *assignees* of wireless phone numbers for the purpose of identifying a class, he does not dispute that Woolfson could have reliably identified whether a number was *wireless* or not. *See* R. 334-14, Exh. 14, Sponsler Rep. ¶¶ 148–168. In fact, Sponsler testified that he "can identify any point in time back to 2003 whether a number was wireless at any particular point in history," and that "a lot of companies do that, including [his] own." R. 320-69, Exh. 69, Sponsler Dep. at 109:12–16. So there is no genuine dispute that any of the calls went to a non-cellular number, and Moore has met his burden.

### 4. Consent

Exploria argues that each class member consented to be contacted because the vendors only called numbers collected from an online opt-in web form. *See* Def.'s Resp. at 14–15. Telemarketing calls using prerecorded voices to cellular numbers do not fall within the TCPA's prohibition if they were made with the consent of the called party. 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2). Consent requires a written agreement clearly authorizing an identified seller to deliver telemarketing communications using a prerecorded voice. § 64.1200(f)(9). Express consent is an affirmative defense, so Exploria bears the burden of proving that it had prior express written consent for the calls at issue. *See Blow,* 855 F.3d at 803.

It is undisputed that Exploria's vendors did not own or operate the opt-in sites from which they purchased the leads. Def.'s Resp. to PSOF ¶¶ 40–43. Exploria concedes that the online opt-in forms did not list Exploria's name on them—instead, it argues that it did not need to. Def.'s Resp. at 15. According to Exploria, Yodel and Prospects were the "sellers," and the opt-in sites identified alternative business names for Yodel and Prospects, so the form sufficiently identified a seller. *Id.* But the implementing regulation makes clear that *Exploria* itself—not its telemarketing vendors—is the seller.[6]

**\*9** The FCC's regulation defines "seller" as the entity "on whose behalf a telephone call ... is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." § 64.1200(f)(10). By contrast, "telemarketer" is defined as the "entity that initiates a telephone call" for the purpose of sales or investment. *Id.* § 64.1200(f)(12). If Exploria is correct that Yodel and Prospects are sellers making calls on (supposedly) their own behalf, then there would never be a telemarketer—and the definition would be meaningless. *See Berkos,* 543 F.3d at 396 ("We avoid interpreting a statute in a way that renders a word or phrase redundant or meaningless.").

Exploria has not offered evidence that would allow a reasonable jury to find that even a single class member opted in to a consent form that identified *Exploria* as the seller. The company argues that "it is not possible for Club Exploria to answer Plaintiff's motion without the specific consent records supporting each call," Def.'s Resp. at 14, but it was Exploria's—not Moore's—responsibility to identify and present the evidence needed to support its affirmative defense. That argument is more of a concession than it is a contention. Given the absence of testimony or documentary evidence to show that any class member actually agreed to be contacted by Exploria itself, no reasonable factfinder could conclude that the calls were made with consent.[7]

The same is true even in light of the Supreme Court's recent decision, *McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation,* 606 U.S. 146 (2025), that courts are not bound by the FCC's interpretation of the TCPA. *Id.* at 155. Exploria argues that *McLaughlin* "throw[s] out" the FCC's interpretation of "prior express written consent," which includes identification of the seller that may contact the call recipient. R. 370, Def.'s Second Suppl. Auth. at 2. But Exploria's reading of *McLaughlin* goes

too far—the Supreme Court still instructed that district courts must "afford[ ] appropriate respect to the agency's interpretation." 606 U.S. at 155 (citing *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 402 (2024)). If this Court "independently determine[s]" that the FCC's interpretation of the consent requirement is "correct," then the interpretation is not thrown out at all. *Id.* at 157.

Section 227(b)(1)(B) clearly requires the "prior express consent of the called party." Exploria has already conceded that consent —at a minimum—must be "clearly and unmistakably stated." Def.'s Suppl. Auth. at 1; *see also* Def.'s Second Suppl. Auth. at 2 (reciting the Eleventh Circuit's case law holding that consent minimally must be clear and unmistakable). So the Court need not engage in any more statutory interpretation to determine whether the FCC's consent requirements run afoul of the TCPA's text—Exploria fails to provide any evidence that any class member "clearly and unmistakably" opted in to receive sales calls pertaining to *Exploria. See* Def.'s Resp. at 15 (arguing only that the forms naming the doing-business-as monikers of Yodel and Prospects sufficiently obtained consent even without mentioning Exploria).

### D. Vicarious Liability

 **\*10**  Neither party disputes the fact that Exploria itself did not actually make the calls in question. Moore argues that Exploria is vicariously liable through the federal common law of agency for its vendors' violations of the TCPA. *See* Pl.'s Mot. at 8–15.

Before addressing the merits of Moore's vicarious-liability arguments, there is a preliminary issue: is vicarious liability permitted under Section 227(b)? The Supreme Court recently held, in *McLaughlin,* that a federal court "is not bound by the FCC's interpretation of the TCPA," and should instead "interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." 606 U.S. at 168 The Supreme Court's instruction bears on this case because, previously, courts viewed the FCC's declaratory ruling in *Dish Network* as binding authority for the proposition that a seller may be vicariously liable under federal common law agency principles for a telemarketer's TCPA violation even if the seller did not itself "initiate" the call. *See, e.g.*, *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021) (citing *Dish Network, LLC*, 28 FCC Rcd. 6574, 6584 (2013)). But under the Supreme Court's recent teaching in *McLaughlin,* this Court is not bound to apply *Dish Network* and must instead engage in its own analysis—taking the FCC's interpretation into consideration—to determine whether a seller may be vicariously liable for its telemarketers' Section 227(b) violations. *McLaughlin*, 606 U.S. at 168.

The Court starts "with the text of the statute to ascertain its plain meaning." *United States v. Melvin*, 948 F.3d 848, 851 (7th Cir. 2020) (cleaned up). The design of the statute may also assist with the determination of the law's plain meaning. *Berkos*, 543 F.3d at 396 (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). Section 227(b) itself has no mention of vicarious liability. Faced with this silence, the Court "assume[s] that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley,* 537 U.S. 280, 285 (2003) (collecting cases). Indeed, to "abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (cleaned up). And "[n]othing in the language of Section 227(b) itself indicates that common-law agency principles are inapplicable." *Smith*, 30 F. Supp. 3d at 773–74. So this Court applies the assumption that Congress enacted Section 227(b) with the intention of incorporating longstanding vicarious liability principles.

This assumption squares with the purpose of the TCPA itself. "Congress intended for the TCPA to protect individuals from the annoyance and cost of receiving certain types of telemarketing calls without their prior consent," and "sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA." *Smith,* 30 F. Supp. 3d at 774. Allowing sellers like Exploria to avoid liability for—and even profit from—the TCPA violations of their hired telemarketers would run afoul of this purpose. And Congress' grant of a private cause of action for statutory damages under Section 227(b)—that is, a minimum amount of damages for every violation—is yet more evidence that the TCPA was designed to deter offenders. *See* § 227(b)(3). These same principles are what led the FCC to hold that sellers may be vicariously liable under Section 227(b). *See Dish Network*, 28 FCC Rcd. at 6587–89. For this reason, "the vast majority of courts that have addressed the issue since

the FCC's ruling" have similarly found that the FCC's determination squares with the TCPA's text and purpose. *Smith,* 30 F. Supp. 3d at 774–75 (collecting cases addressing the issue).

**\*11** Having determined that Exploria could be vicariously liable for Yodel's and Prospects' violations of Section 227(b), the Court turns next to Moore's agency arguments. Moore advances two theories: actual authority and ratification. Moore has presented conclusive evidence establishing that Yodel and Prospects acted with actual authority to make the calls violating the TCPA, and no reasonable jury could conclude otherwise.

### 1. Actual Authority

First, Moore argues that Exploria is liable for its vendors' actions under a theory of actual authority. Pl.'s Mot. at 9–12. Exploria responds that its contracts with the vendors "specifically forbade actions that would violate the law,"[8] and that in any case, the vendors did not have actual authority to violate the TCPA. *See* Def.'s Resp. at 16–22. But under federal common law,[9] actual authority may be either express or *implied*. *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 866 (7th Cir. 1998). To establish actual-authority liability, Moore must show that (1) Exploria and its vendors had a principal-agent relationship; (2) Exploria controlled or had the right to control the vendors; and (3) the vendors' conduct fell within the scope of its agency. *See Bilek*, 8 F.4th at 587. Moore has presented plentiful evidence to show that any reasonable jury would have to find that Yodel and Prospects had actual authority to conduct the telemarketing calls in this case.

First, Exploria and its vendors had an agency relationship. Agency arises when a principal manifests assent to an agent that the agent will act on the principal's behalf, subject to the principal's control. *Smith*, 30 F. Supp. 3d at 775 (citing Restatement (Third) of Agency § 1.01 (2006)). Moore presents dispositive evidence in the form of contracts and deposition testimony to establish that an agency relationship existed with both Yodel and Prospects.

Yodel and Exploria entered into a contract wherein "Yodel was hired to generate live transfers" for Exploria. Def.'s Resp. to PSOF ¶ 3; *see also* Yodel Insertion Order at 1–2. Exploria had the right to conduct performance reviews of Yodel's work, which Exploria tries to brush off by saying that the performance reviews were just an opportunity for them to "connect." Def.'s Resp. to PSOF ¶ 4; *see also* Yodel Agreement at 5. But Exploria—throughout the telemarketing campaign—asked for changes to the states that Yodel called into on its behalf and altered the day-to-day volume of calls; it expected the Yodel to "comply" with those changes. Rogers Dep. at 98:12–99:19, 100:23–101:1. Yodel's agents were given a script that offered a vacation package from Exploria, and Exploria said that it was the script it would "like to have used." Def.'s Resp. to PSOF ¶ 8; R. 320-7, Exh. 7 at 1. And Exploria "would make changes to the script throughout the campaign," with the expectation that Yodel would implement them. Rogers Dep. at 83:24–84:11. Thus, Moore has provided evidence showing that Yodel and Exploria had a principal-agent relationship in which Yodel conducted telemarketing calls on Exploria's behalf per the parties' contract, and Exploria regularly controlled Yodel's performance.

**\*12** With regard to Prospects, Exploria and Acquis entered into an agreement under which Acquis was to provide live transfers, providing daily counts and invoices to Exploria at the end of every week. Acquis Agreement at 2. Under that agreement, Acquis was to use the Prospects Call Center to place calls with "the script read ad message verbatim as approved in writing by" Exploria. Acquis Insertion Order at 2. It is undisputed that Exploria knew that Prospects would be the entity actually placing the calls, and Exploria and Prospects' president, Joshua Grant, were looped into the same communications about the Summer Bay campaign. *See* Def.'s Resp. to PSOF ¶¶ 29, 31; Acquis Insertion Order at 1; R. 320-27, Exh. 27. So Exploria approved of Prospects' role as a subagent to perform Acquis' duties under its contract with Exploria. *See* Restatement (Third) of Agency § 3.15 ("A subagent is a person appointed by an agent to perform functions that the agent has consented to perform ... An agent may appoint a subagent only if the agent has actual or apparent authority to do so."). Under the terms of that agency relationship, Exploria controlled the script that Prospects used and Exploria set the targeted demographics and regions that Prospects could call. *See* Acquis Insertion Order. Moore has thus conclusively proved that there was a principal-agent relationship between Exploria and Prospects.

Exploria asserts that the vendors operated outside of Exploria's normal business and that they performed their duties using their own workforce, tools, and facilities. *See* DSOF ¶¶ 13, 14, 29, 36; Rogers Dep. at 10:18–19; Wood Dep. at 126:18–127:1; Grant Dep. at 23:23–25:15, 189:2–10. They were paid based on "success"—Exploria only paid for calls that were 60 seconds or more—rather than an hourly wage by Exploria. DSOF ¶¶ 20, 35; Yodel Insertion Order at 1–2; Acquis Insertion Order at 1. And the contracts themselves disclaim an agency relationship. Yodel Agreement at 9; Acquis Agreement at 2. These facts are more relevant to whether the telemarketers were *employees*—which no one contends—and they do not rise to the level of creating a genuine dispute over Exploria's agency relationships with Yodel and Prospects given the overwhelming strength of Moore's evidence of the principal-agent relationship. No reasonable jury could rely on the sparse facts offered by Exploria to undermine the evidence that Exploria was in a principal-agent relationship with Yodel and Prospects.

Next, Exploria exercised control over Yodel and Prospects during the campaign. "A hallmark of the principal/agent relationship is the principal's right to control the conduct of the agent." *Wisc. Cent. Ltd. v. TiEnergy, LLC,* 894 F.3d 851, 858 (7th Cir. 2018); *see also Smith,* 30 F. Supp. 3d at 776 (describing "the power to give interim instructions" as "the hallmark of an agency relationship"). In similar TCPA cases, other judges in this District have held that the principal exercised a significant level of control where a seller required the telemarketer to use an approved script, exercised control over the call volume, and generally controlled how the calls would be placed. *See, e.g.*, *Thompson v. Sutherland Global Servs., Inc.*, 2019 WL 1470238, at *6–7 (N.D. Ill. Apr. 3, 2019).

In support of this point, Moore points to Rogers' testimony stating that Exploria expected all of its telemarketing vendors to comply with its directives throughout the campaign. Pl.'s Mot. at 11; Rogers Dep. at 83:24–84:11, 98:13–99:19, 100:23–101:1, 139:8–11. Indeed, as discussed above, Exploria controlled the script, volume, and the target demographics and states for both Yodel and Prospects during the campaign. Exploria also required weekly reports from the vendors and had the contractual right to conduct performance reviews. *See* Yodel Agreement at 5; Acquis Agreement at 2. Given the evidence, no reasonable jury could find that Exploria did not control Yodel and Prospects.

Exploria seems to argue that it could not have controlled Prospects because it did not have a contract with the company itself. Def.'s Resp. at 21–22. But the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent "to perform functions assigned to the agent by the principal." *See Griffin v. Safeguard Props. Mgmt., LLC,* 2020 WL 6118572, at *3 (N.D. Ill. Oct. 16, 2020) (cleaned up). As discussed already, the agreement between Acquis and Exploria directly referenced Prospects. Acquis Insertion Order at 2. Exploria has also admitted that it knew Prospects was going to be the call center placing the calls. *See* Def.'s Resp. to PSOF ¶¶ 29, 31. Prospects relied on Exploria's directions on when to make calls, which states to call into, and whom to target. R. 320-37, Exh. 37 (showing emails between Prospects and Acquis discussing the schedule of calls to run by Exploria), R. 320-38, Exh. 38 (showing emails from Exploria to Acquis about Exploria's holiday hours); Rogers Dep. at 37:17–38:23 (explaining that Exploria chose the locations and demographics to call with the "approved script"). Even when viewed in Exploria's favor, this is definitive evidence that Exploria controlled Prospects, even without a contractual provision explicitly establishing the control.

**\*13** Exploria also asserts that Prospects impermissibly employed Teleskills, a call center in the Philippines, to conduct the calls. DSOF ¶ 23; Grant Dep. 145:12–15, 147:24–148:5, 187:19–188:9, 209:1–18. The sole basis for this assertion appears to be the testimony from Grant, the Prospects CEO, stating that Prospects outsourced its calls to Teleskills for the Exploria campaign. Grant Dep. at 54:2-57:1; 209:1–18 (agreeing that the parties are "relying on [Grant's] memory in order to support the position" that Teleskills was involved). Despite participating in years of discovery in this case, Exploria has offered no further evidence that Teleskills was involved, aside from this best-that-I-can-remember, speculative testimony. So this, weighed against the evidence provided by Moore to support that *Prospects'* agents placed the calls, is not enough to create a genuine issue of material fact.

Finally, the calls that Yodel and Prospects placed for the Summer Bay campaign were within the scope of their agency with Exploria. The agreements required the use of prerecorded technology, Exploria requested that the vendors use scripts that marketed their property, and Exploria contracted with the vendors to buy leads from sites that did not list its name for consent

(after having an opportunity to review the consent form for TCPA compliance). *See* Yodel Insertion Order at 1–3; Exh. 7; Acquis Insertion Order; Rogers Dep. at 71:14–73:15, 76:14–78:8. The previously assigned judge's prior decision on vicarious liability concluded the same. *See* Certification Order at 12. No reasonable jury could find that Yodel and Prospects acted outside the scope of their agency when they placed the calls for Exploria in violation of the TCPA.

In sum, Moore has presented ample evidence to establish that Yodel and Prospects had actual authority to place calls on Exploria's behalf, and that those calls violated Section 227(b) of the TCPA. Exploria has not created a genuine issue of fact to allow a reasonable jury to conclude that the vendors' actions were not authorized by Exploria. And because Moore need only show that Exploria was vicariously liable under just one common law theory of agency, the Court need not consider the separate ratification argument.

### E. Motion to Decertify the Class

Lastly, Exploria requests to decertify the class because Moore's allegations pertaining to Yodel and Prospects are supposedly "two entirely different cases." Def.'s Resp. at 25–26. Exploria asserts that the two cases would require separate trials for juries to evaluate different bodies of evidence pertaining to each telemarketing vendor. *Id.* at 25. But there is no genuine issue of fact on the TCPA violations or Exploria's vicarious liability, and Moore is seeking only statutory damages, so no trial is needed. *See* Pl.'s Mot. at 15 (requesting $500 for each of the 71,538 prerecorded calls placed to the class members); § 227(b)(3)(B). So the basis of Exploria's decertification request is non-existent, and the request is denied.

### IV. Conclusion

Exploria's motion for leave to file a motion to compel arbitration, R. 339, is denied. Moore's motion for summary judgment on behalf of himself and the class, R. 319, is granted. The parties shall confer and file a status report proposing how to proceed with the entry of judgment of statutory damages for Moore and the class, and how to litigate attorneys' fees, expenses, and any incentive award. The parties also shall restart settlement negotiations given the entry of this decision. The parties shall file a joint status report by October 15, 2025.

### All Citations

Slip Copy, 2025 WL 2755076

Footnotes

1    Federal district courts have federal-question jurisdiction, 28 U.S.C. § 1331, for suits brought under the TCPA's private right of action. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

2    This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

3    Exploria argues that under Ninth Circuit precedent, Exploria's actions evidence only a lack of awareness of the right to arbitrate, and waiver requires knowledge. Def.'s Reply at 11 (citing *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023)). But this Court is bound by Seventh Circuit precedent instructing that it should "weigh heavily" whether a party did "all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[.]" *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). And although Exploria includes this precise language in its motion for leave, Def.'s Mot. at 17, it provides no information allowing this Court to determine that it did all it could do to detect a potential arbitration defense before its first mention of arbitration some four years after Moore's initial class-action complaint was filed.

4    Exploria also takes issue with Woolfson's methodology for identifying the calls that were transferred to Exploria's agents, arguing that Woolfson did not adequately explain his process. *See* Def.'s Resp. at 10. Rather than developing that argument in its 25-page response brief, Exploria filed a separate Rule 702 motion on the subject, which this Court declined to consider. R. 337, Def.'s Rule 702 Mot.; *see also* R. 349, Minute Entry (explaining the Court's decision to disregard the motion). In any case, Woolfson's same report was relied upon in the Court's class-certification decision in 2023, and Exploria did not attack his methods then. *See* Certification Order at 14 (relying on Woolfson's identification of the 66,682 cell-phone numbers to assess numerosity). So any Rule 702 challenge to Woolfson's methodology is forfeited at the summary judgment stage.

5    Remember that Acquis appointed Prospects as the call center to perform its work under the Exploria contract. *See infra* at 2; Acquis Insertion Order at 1 (titling the campaign "Exploria Resorts Call Transfer at ProspectsDM call center").

6    In connection with this point, Exploria filed a notice of supplemental authority on a decision from the Eleventh Circuit, which vacated the one-to-one consent rule promulgated by the FCC in 2023. *See* R. 361, Def.'s Suppl. Auth.; *Ins. Mktg. Coalition Ltd. v. FCC,* 127 F.4th 303 (11th Cir. 2025). According to Exploria, the court's holding that consent under the TCPA need only be " 'clearly and unmistakably' stated" means that the FCC's consent rule exceeds its authority to implement the TCPA. Def.'s Suppl. Auth. at 1 (quoting *Ins. Mktg. Coalition,* 127 F.4th at 314).

But the Eleventh Circuit's decision does not affect the more general rule that prior express written consent is required for prerecorded telemarketing calls, and consent must "clearly and unmistakably" state that the consumer is willing to receive calls from specific entities. *Id.* at 314 (listing cases finding consent where multiple entities were named in the form). In its holding, the court opined only on the one-to-one requirement and the logically-and-topically-related restrictions, both promulgated in 2023. *See id.* at 311–17. The one-to-one rule is not where Exploria's consent argument falters—it is the fact that there has been no showing that any class members consented to receive marketing calls on behalf of Exploria *specifically*.

7    Exploria also seems to argue that it is enough that its contracts with the vendors required them to comply with the TCPA and use opt-in data. Def.'s Resp. at 14. But as Judge Leinenweber explained in an earlier decision in this case, "Exploria negotiated a contract that requir[ed] the telemarketer to obey the TCPA, but also required the telemarketer to use a prerecorded voice for the telephone calls obtained from an opt-in registry that did not mention itself." Certification Order at 12. So the contracts' general prohibition against TCPA violations does not suffice as evidence of consent.

8    Exploria already filed for summary judgment on this point, and the previously assigned judge rejected its argument that it cannot be held vicariously liable for a vendor's TCPA violation merely because its contracts with vendors required them, on their face, to comply with the TCPA. *See* Certification Order at 8–12. Exploria does not argue that the decision was clearly wrong or that new controlling authority has come to light to strengthen its case that it cannot be liable where its contracts required compliance with the TCPA. *See Mendenhall,* 419 F.3d at 691. So this Court declines to re-examine the prior decision, particularly where Exploria does not argue that it should.

9    Because this case arises under the TCPA, the Court applies the federal common law of agency, which generally comports with the Restatement of Agency. *See Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 865 n.15 (7th Cir. 1998).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    13

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 92 of 114

Moore v. Healthcare Solutions Inc., Not Reported in Fed. Supp. (2022)

2022 WL 17487823
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

George MOORE, on behalf of himself and others similarly situated, Plaintiff,

v.

HEALTHCARE SOLUTIONS INC. and Prosperity Life Insurance Group LLC, Defendants.

Case No. 21-cv-4919

|

Signed December 7, 2022

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Jason Edward Hunter, Bryan Eliot Curry, Litchfield Cavo LLP, Chicago, IL, for Defendant Healthcare Solutions Inc.

## MEMORANDUM OPINION AND ORDER

Steven C. Seeger, United States District Judge

 **\*1** Plaintiff George Moore received two calls to his home phone from the same phone number, on the same day. He didn't answer the first call. But when the caller rang his phone a second time, he picked up. And it didn't take him long to regret it. Instead of hearing a friendly voice, he heard a sales pitch for a product that he didn't want.

The caller was a representative from Defendant Healthcare Solutions, Inc., offering to sell Moore an insurance policy. And just like that, Moore's home turned into an insurance bazaar, with a salesperson peddling products that Moore didn't want or need. Moore wasn't interested in insurance, so he hung up.

But Moore didn't leave it at that. His phone number is on the national Do Not Call Registry, and he isn't supposed to receive sales calls at home. So Moore turned the tables and delivered an unwelcome communication of his own. He sued Healthcare Solutions for violating the Telephone Consumer Protection Act ("TCPA") when it called him more than once.

Healthcare Solutions, in turn, moved to dismiss the complaint. For the following reasons, the Court denies Defendant's motion to dismiss.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

On August 13, 2021, Plaintiff George Moore received two phone calls to his residential telephone line from the same phone number. *See* Cplt., at ¶¶ 19, 22–23 (Dckt. No. 1). The calls went to a residential number "used by Mr. Moore only." *Id.* at ¶ 20. Moore's caller ID showed that both phone calls came from the same phone number. *Id.* at ¶ 23.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 93 of 114

Moore v. Healthcare Solutions Inc., Not Reported in Fed. Supp. (2022)

Moore didn't answer the first call. *Id.* at ¶ 24. The complaint does not reveal why. Maybe, like many of us when we receive a call from an unknown number, Moore simply ignored the call. After all, answering the phone from an unfamiliar number is a dicey proposition. Not much good can come from it. Most of the time, there is more downside than upside in exposing oneself to a stranger on the phone.

Maybe he had his hands full. Maybe the game was on, or maybe he simply didn't feel like getting interrupted. Whatever the reason, the key point is that someone called, and Moore didn't answer.

But when Moore received a second call from that number, he picked up. *Id.* at ¶ 26. Moore soon discovered that Carol Jandera, an employee of Defendant Healthcare Solutions, was on the other end of the line. And she wanted to sell.

Jandera offered to sell Moore an insurance policy from Prosperity Life Insurance Group. *Id.* at ¶ 28. Jandera then offered to transfer Moore to Prosperity Life so that he could sign up for an insurance policy. *Id.* at ¶ 29.

Moore apparently wasn't interested in buying insurance, so he ended the call. *Id.* at ¶ 30. Sometime later, Moore received an email from Jandera to confirm Prosperity Life's policy offer. *Id.* at ¶ 31. Jandera's email address had the domain "ourhcs.com," which is a domain owned by Healthcare Solutions. *Id.* at ¶¶ 32–33.

 **\*2**  That email, like the call, apparently didn't sit well with Moore. He wrote Healthcare Solutions and requested evidence showing that it had permission to contact him. *Id.* at ¶ 34. He never received a response. *Id.* at ¶ 35.

As it turns out, Moore's phone number was listed on the Do Not Call Registry since July 7, 2017. *Id.* at ¶ 21; *see also* 15 U.S.C. § 6151. He didn't expect unwanted calls as someone with a number on the Do Not Call Registry. He expected domestic tranquility. He didn't want calls from salespeople. He wanted peace and quiet.

Moore responded with his own form of unsolicited communication. He filed a class action complaint against Healthcare Solutions and Prosperity Life, alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq. See* Cplt., at ¶¶ 63–64 (Dckt. No. 1). He seeks statutory damages of up to $500 for each violation, and treble damages for any knowing or willful violation. *Id.* at ¶¶ 65–66.

Prosperity Life filed a motion to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. *See* Prosperity Life's Mtn. to Dismiss (Dckt. No. 11). After jurisdictional discovery, the parties agreed to dismiss Moore's claims against Prosperity Life with prejudice. *See* Stipulation of Dismissal (Dckt. No. 36); *see also* 6/1/22 Order (Dckt. No. 38).

Healthcare Solutions, the only remaining defendant, later filed a motion to dismiss. *See* Healthcare Solution's Mtn. to Dismiss (Dckt. No. 39). That motion is now before the Court.

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Case 1:26-cv-00659-KM     Document 26-1     Filed 06/24/26     Page 94 of 114

Moore v. Healthcare Solutions Inc., Not Reported in Fed. Supp. (2022)

**Discussion**

Moore's complaint has a single count. He alleges that Healthcare Solutions violated the TCPA by calling him more than once within a twelve-month period, even though his phone number is on the Do Not Call Registry. *See* Cplt., at ¶ 64 (Dckt. No. 1).

The TCPA creates a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." *See* 47 U.S.C. § 227(c)(5). One such regulation prohibits calls to numbers on the Do Not Call Registry.

Under the regulation, "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." *See* 47 C.F.R. § 64.1200(c)(2). The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *See* 47 U.S.C. § 227(a)(4).

 **\*3**  Once a telephone number is registered on the Do Not Call Registry, "registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *See* 47 C.F.R. § 64.1200(c)(2). A failure to respect those technological boundaries can lead to significant relief for the person receiving the call. A plaintiff suing under section 227(c)(5) can recover actual monetary losses or statutory damages up to $500. *See* 47 U.S.C. § 227(c)(5)(B).

Moore contends that the calls from Healthcare Solutions fit the bill. He alleges that Healthcare Solutions called him twice, the minimum number of times to bring a claim. And his residential phone number is on the Do Not Call Registry. So, as Moore sees it, he received too many calls to his phone when he should have received none.

Healthcare Solutions moves to dismiss on two grounds.

Healthcare Solutions first argues that the complaint does not allege that Moore received more than one telephone solicitation. Under the regulation, a caller cannot be liable for only one call. The regulation adopts a call-me-twice, shame-on-you approach.

The argument rests on the fact that Moore didn't pick up the first call. Healthcare Solutions points out that Moore "terminated the first call" without answering. *See* Cplt., at ¶ 24 (Dckt. No. 1). But he did answer the second call, and only then did Moore "engage[ ] the telemarketer ... to learn the purpose of the call." *Id.* at ¶ 24. So, according to Healthcare Solutions, Moore has no way of knowing whether the first call was a "telephone solicitation," or whether it was Healthcare Solutions calling at all.

Moore acknowledges that he never spoke with anyone – including anyone from Healthcare Solutions – during the first call. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 5 (Dckt. No. 40). That said, he points out that both calls came from the same number, on the same day. So, it is reasonable to assume that the same caller made both calls for the same reason.

The complaint includes enough facts to support a reasonable inference that Healthcare Solutions made two telemarketing calls. The issue of who made the first call isn't much of a whodunit. Moore received two calls from the same number, and the second caller was Healthcare Solutions. It is reasonable to conclude that Healthcare Solutions called the first time, too. Does Healthcare Solutions share a phone number with someone else? Unlikely.

Moore may not know for certain why Healthcare Solutions called him the first time. But the content of the second call gives a pretty good idea. As the plaintiff, Moore is entitled to reasonable inferences in his favor. It is a reasonable inference that the two calls from the same number on the same day were about the same thing.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 95 of 114

Moore v. Healthcare Solutions Inc., Not Reported in Fed. Supp. (2022)

If anything, it is hard to imagine why else Healthcare Solutions would have called him. There is no suggestion in the complaint that Moore worked there, or knew someone who worked there, or anything along those lines. Maybe Healthcare Solutions has some other story to tell, but if so, summary judgment – not a motion to dismiss – is the time to tell it. It is unlikely that an insurance agent was simply calling a stranger out of the blue to say "Hi."

Two judges in this district have held that the "content and timing" of an answered call can "allow[ ] the court to draw [the] reasonable inference" that unanswered calls were sales solicitations from the defendant. *See Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) (St. Eve, J.); *see also Moore v. Pro Custom Solar LLC*, 2022 WL 1092186, at *2–3 (N.D. Ill. 2022) (Kocoras, J.). The basic idea is that calls from the same number tend to come from the same person. And a salesperson tends to call for only one reason.

 **\*4**  In *Toney*, the plaintiff alleged that the defendant called her four times in a two-day period. *See Toney*, 75 F. Supp. 3d at 746. The first day, the plaintiff's caller ID showed that she received three calls from the same phone number. *Id.* at 732, 746. She didn't answer any of those calls. *Id.* The second day, she received a fourth call from the same phone number, and she finally picked up. *Id.* The caller was a representative of the defendant telemarketing company, offering to sell plaintiff a membership to a subscription retail-discount service. *Id.*

The defendant argued that by answering only one call, the plaintiff didn't plausibly allege that she had received at least two calls from the defendant. *Id.* at 746. Judge St. Eve rejected that argument. The plaintiff answered the fourth call and learned that it was a telemarketer. So it was a "reasonable inference" that the three unanswered calls from the same number a day earlier were from the same person for the same purpose. *Id.*

The inference that a telemarketer called to sell something wasn't much of a stretch. After all, that's what telemarketers do. That's the whole point. They use the telephone to market something. Telemarketers aren't known for calling people for other reasons.

Judge Kocoras reached a similar result in *Moore*. There, the plaintiff (George Moore, presumably the same George Moore in the case at hand) received six calls on five different days in July 2021. *See Moore*, 2022 WL 1092186, at *1. He "listened to and terminated" these calls without engaging the caller. *Id.* Only during the seventh call, in early August 2021, did the plaintiff engage the caller to learn who was calling. *Id.*

The defendant argued that "[b]ecause Moore was only able to identify the seventh caller in a stream of identical calls ... he [did] not allege he received the requisite two or more calls required under the TCPA." *Id.* at *2. Building on *Toney*, Judge Kocoras ruled that "it is reasonable to believe the first six calls from the same number with the same content were also from [defendant]." *Id.* at *3.

The case at hand does not require a daunting inferential leap, either. Moore received two calls from the same number, on the same day. Given the content of the second call, it is a reasonable inference that the first call was a telemarketing call from Healthcare Solutions.

If anything, the inference is almost unavoidable. Imagine asking your Average Joe on the street why an insurance agent called someone at home. It does not require much creativity to think that the call was about selling insurance. And then, imagine telling Average Joe that there were two calls from the insurance agent on the same day: Call #1 went unanswered, and Call #2 was about selling insurance. Average Joe isn't likely to be stumped about the reason for Call #1.

Maybe Healthcare Solutions can show that it wasn't behind the first call, or that the call wasn't a telephone solicitation. But that's a question for another day. At the motion-to-dismiss stage, the Court must draw all reasonable inferences in Moore's favor. *See AnchorBank*, 649 F.3d at 614. For now, the complaint plausibly alleges that Healthcare Solutions called him twice to peddle a policy.

A different approach would change the incentives against calling and calling and calling people. Congress recognized that unwanted phone calls are an unwelcome intrusion. That's true when you answer your phone. But it is also true when your phone rings, and then rings again – for call after call, again and again – when you don't pick up. The interruption exists without answering the phone. If the calls don't count under the TCPA unless the person picks up, telemarketers would escape liability for all previous interruptions, no matter how annoying or intrusive. Nothing in the statutory text supports giving callers a pass for such intrusions.

 **\*5**  Healthcare Solutions also makes a second argument, but it does not get very far. The argument is about whether Moore – as opposed to someone else – personally registered his phone number on the Do Not Call Registry.

As Healthcare Solutions points out, the regulation prohibits initiating a telephone solicitation to a "residential telephone subscriber who has *registered* his or her telephone number" on the Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2) (emphasis added). So, Healthcare Solutions argues that the regulation applies only if Moore himself registered his phone number.

Healthcare Solutions doesn't dispute that Moore's phone number was on the Do Not Call Registry. Instead, it argues that Moore cannot bring a claim because the complaint doesn't allege that Moore himself registered the phone number.

That argument rests on an unduly strict reading of the regulation. The text refers to a subscriber "who has registered" a telephone number. *Id.* Healthcare Solutions reads that provision to mean a subscriber "who has [personally] registered" a particular number. In effect, Healthcare Solutions is attempting to inject an adverb that is nowhere to be seen.

Nothing in the text ascribes any importance to the person who registered the number. The focus is on whether the number was registered, not who did the registration. The regulation protects numbers, not particular people. That's why the Registry includes numbers, not names.

That reading reflects the reality of living together. The regulation covers a "residential telephone subscriber." *Id.* People tend to share residences, and share home telephone numbers. It is hard to see why one spouse would receive the protections of the statute, and another spouse would not. After all, the same phone ringing in the same house could annoy several people. An unwanted phone call to a shared number could annoy everyone in earshot, even if only one member of the household took the time to register the number.

The most natural reading of the regulation prohibits unwanted calls to a number. It is natural to read the statute to protect a number, not simply the person who registered the number.

That reading of the regulation seems to fit with the breadth of the statutory text, too. The statute greenlights a claim by a "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." *See* 47 U.S.C. § 227(c)(5). It protects a "person" who "received more than one telephone call." *Id.* It doesn't seem to matter who registered the number. Anyone on the receiving end of the call can turn the tables and file suit.

It does not matter who registered the phone number on the Do Not Call Registry. But even if it mattered, the complaint would survive. The complaint alleges that Moore's phone number is registered, and that Moore is the only person who uses that number. That's more than enough to support a reasonable inference that Moore registered his number. *See* Cplt., at ¶¶ 19–21 (Dckt. No. 1).

**Conclusion**

For the foregoing reasons, the motion to dismiss the complaint is denied.

**Moore v. Healthcare Solutions Inc., Not Reported in Fed. Supp. (2022)**

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 97 of 114

**All Citations**

Not Reported in Fed. Supp., 2022 WL 17487823

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Perrong v. South Bay Energy Corp., Not Reported in Fed. Supp. (2021)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 98 of 114

2021 WL 1387506
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Andrew PERRONG, individually and on behalf of a class
of all persons and entities similarly situated, Plaintiff,

v.

SOUTH BAY ENERGY CORP., Defendant.

Case No. 2:20-cv-05781-JDW

|

Signed 04/13/2021

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, Gregory Clinton Kelley, Pittsburgh, PA, for Plaintiff.

Eric M. Hurwitz, Stradley Ronon Stevens & Young LLP, Cherry Hill, NJ, Samuel E. Paul, Stradley Ronon Stevens & Young LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM**

JOSHUA D. WOLSON, J.

**\*1** Andrew Perrong is a frequent filer of Telephone Consumer Protection Act lawsuits. As such, he sometimes pursues novel legal theories as part of his business model. However, Mr. Perrong's latest theory has no legs, and he lacks standing to bring the additional claim set forth in his proposed amended complaint. Because the claim would be futile based on the facts of this case, the Court will deny Mr. Perrong's Motion to Amend his Complaint to pursue it.

**I. BACKGROUND**

South Bay Energy Corp. is an electric generation supplier that sells residential electric services to customers. It utilizes telemarketing to make sales, and it hired Webman's World, LLC to make telemarketing calls on its behalf. Adam Webman owns and operates Webman's World. On November 11 and 12, 2020, Webman's World made telemarketing calls on behalf of South Bay to Mr. Perrong's residential telephone number. At the time that Webman's World made those calls, Mr. Perrong's phone number was listed on the national Do-Not-Call Registry (the "DNC List"). In addition, South Bay, Webman's World, and Mr. Webman (collectively "Defendants") did not have a written do-not-call policy in place when Webman's made those calls to Mr. Perrong. Mr. Perrong does not allege that he ever requested not to receive telemarketing calls made on behalf of South Bay.

On November 18, 2020, Mr. Perrong filed a putative class action complaint against South Bay for violating the TCPA by calling him even though his phone number is listed on the national DNC List. The Court entered a Scheduling Order in this case and ordered that any motions to amend the Complaint were due by March 31, 2021. On March 18, 2021, after receiving some discovery, Mr. Perrong moved to amend his Complaint in order to include the allegations set forth above, add Webman's World and Mr. Webman as defendants in this matter, and assert an additional claim against Defendants, in Count II, for violation of the TCPA, specifically 47 C.F.R. § 64.1200(d)(1). South Bay opposes the motion to amend with respect to the addition of Count II only. The motion is ripe for disposition.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 99 of 114

Perrong v. South Bay Energy Corp., Not Reported in Fed. Supp. (2021)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 15 conditions amendment of a pleading on the Court's leave or the opposing party's written consent. The rule instructs courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). This liberal amendment regime helps effectuate the "general policy embodied in the Federal Rules favoring resolution of cases on their merits." *Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017). The factors set out in the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178 (1962), guide a court's decision about whether to permit an amendment. A court may deny leave to amend based on undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, prejudice to the opposing party, and futility. *Id.* The *Foman* factors are not exhaustive, allowing a court to ground its decision, within reason, on consideration of other equitable factors, such as judicial economy/burden on the court and the prejudice denying leave to amend would cause. *See USX Corp. v. Barnhart*, 395 F.3d 161, 167-68 (3d Cir. 2004).

**\*2** " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 243 (3d Cir. 2010) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)). In determining whether a claim would be futile, "the district court applies the same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016).

## III. DISCUSSION

As the party invoking the Court's jurisdiction, Mr. Perrong must allege facts that demonstrate his standing to bring suit. *See LaSpina v. SEIU Pennsylvania State Council*, 985 F.3d 278, 284 (3d Cir. 2021) (quotation omitted). To do so, he "must show injury in fact, causation, and redressability." *Id.* (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Count II of Mr. Perrong's proposed amended complaint implicates the causation element, *i.e.* whether his injury "is fairly traceable to the challenged conduct" of Defendants. *Id.* (quotation omitted). "[T]he traceability element is 'akin to 'but for' causation in tort.' " *Id.* (same). "In assessing whether the defendant's particular conduct caused the plaintiff's injury, the variable to isolate and change is the conduct of the defendant the plaintiff challenges." *Id.* at 286. Thus, employing this framework, the Court must ask: Had Defendants' conduct that Mr. Perrong challenges not occurred, would he have suffered an injury? If he would have, then the challenged conduct did not actually cause Mr. Perrong's injury; if not, then it did. *See id.* at 285. In Count II of the proposed amended complaint, the challenged conduct is Defendants' alleged failure to have a written policy for maintaining a do-not-call list, as required by 47 C.F.R. § 64.1200(d)(1).

Mr. Perrong's injury does not come from Defendants' alleged violation of Section 64.1200(d)(1). That provision requires a company to maintain an internal list of subscribers who requested that the company not call them:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls **made by or on behalf of that person or entity**.

47 C.F.R. § 64.1200(d) (emphasis added). That provision applies only to individuals who have directed a company not to call them. Mr. Perrong never directed South Bay, Webman's World, or Mr. Webman not to call him. That is because Mr. Perrong did not satisfy the "regulatory prerequisite" before he could bring a claim under Section 64.1200(d)(1). *Drake v. FirstKey Homes, LLC*, 439 F. Supp. 3d 1313, 1325 (N.D. Ga. 2020). Even if one or more Defendants had maintained an internal do-not-call list, that compliance would not have prevented them from calling Mr. Perrong.

Mr. Perrong tries to avoid this conclusion by suggesting that Section 64.1200(d)(1) requires companies to maintain an internal policy to avoid calling anyone on the national DNC List, but the regulatory language does not support his interpretation. No party has directed the Court to any official FCC interpretation of Section 64.1200. The Court therefore turns to traditional canons of statutory interpretation. *See Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016); *McCann v. Unum Provident*, 907 F.3d 130, 144 (3d Cir. 2018) ("[T]he basic tenets of statutory construction hold true for the interpretation of a regulation.") (quotation omitted).

**\*3** "It is the cardinal canon of statutory interpretation that a court must begin with the statutory language." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010), *as amended* (May 7, 2010). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' " *Id.* (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)); *see also Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) ("Where the statutory language is plain an unambiguous, further inquiry is not required ...."). To determine whether statutory language is ambiguous, the Court must "read the statute in its ordinary and natural sense." *Id.* (quotation omitted).

Section 64.1200 is not ambiguous. The language "not to receive telemarking calls made by or on behalf of that person or entity" refers back to the "person or entity" that "initiate[s]" a call. Thus, the provision applies to calls that a company might make to a list of people that have directed the company not to call them. The regulation contemplates a specific list, which is different from (but might overlap with) the national DNC List.

The regulation's structure confirms this interpretation. Section 64.1200(d) prohibits a company from calling individuals who have directed the company not to call them. Section 64.1200(c)(2) prohibits calls to individuals on the national DNC List, with certain limited exceptions. If Section 64.1200(d) applied to every individual on the national DNC List, it would render Section 64.1200(c)(2) superfluous, or at least "insignificant." *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005).

Mr. Perrong might be right that Defendants violated the TCPA if they failed to maintain a list of individuals who directed South Bay not to call them. But Mr. Perrong never asked to be on such a list, so its non-existence did not cause his injury. "In other words, a caller could only violate the regulation if it called someone who had asked to be put on the list." *Drake*, 439 F. Supp. 3d at 1324. Put another way, even if Defendants had complied with the TCPA and maintained an internal do-not-call list, their compliance would not have prevented a call to Mr. Perrong because he would not have been on that list. Instead, Mr. Perrong's injury traces to the violation of a different provision, Section 64.1200(c)(2).

## IV. CONCLUSION

The TCPA regulation on which Mr. Perrong relies does not require a company to maintain a written policy concerning calls to people on the national DNC List. But that's the only list on which Mr. Perrong was listed. Because Defendants' compliance with Section 64.1200(d)(1) would not have avoided Mr. Perrong's injury, he does not have standing to sue for a violation of that provision. The Court will therefore deny his Motion to Amend his Complaint to the extent it seeks to add Count II. An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1387506

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 101 of 114

Shelton v. Pro Source Lending Group LLC, Not Reported in Fed. Supp. (2025)

2025 WL 817485
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

James E. SHELTON, individually and on behalf of all others similarly situated,

v.

PRO SOURCE LENDING GROUP LLC, d/b/a Fast Fund
Group, d/b/a Fast Funds Group, and Brittney Wilson

CIVIL ACTION No. 24-4394
|
Signed March 14, 2025

**Attorneys and Law Firms**

Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for James E. Shelton.

Jeffrey N. Rosenthal, Thomas Cialino, Blank Rome LLP, Philadelphia, PA, for Pro Source Lending Group LLC.

Joseph R. Heffern, Lance Rogers, Rogers Counsel, Ardmore, PA, for Brittney Wilson.

**MEMORANDUM**

McHUGH, United States District Judge

**\*1** Telemarketing calls are annoying to many consumers, leading Congress to enact the Telephone Consumer Protection Act ("TCPA"), which regulates telemarketing calls. The Act is partially enforced by two federal agencies, but also through provisions that create a private right of action rooted in strict liability imposing a monetary penalty for each violation.

For better or for worse, the availability of a private remedy draws both litigants and lawyers. In this case, James Shelton, a prolific plaintiff, and his counsel, Andrew Roman Perrong, equally prolific as a litigator under the TCPA, have joined forces to file a class complaint against Defendants Pro Source Lending Group LLC and Brittney Wilson, a Pro Source employee. Plaintiff alleges, on behalf of himself and others similarly situated, that Wilson impermissibly contacted him eight times over a 24-hour period on behalf of Pro Source, violating the TCPA. Both Defendants have moved to dismiss, in part on substantive legal grounds, and in part on the basis that as a serial litigator Plaintiff falls outside the protection of statute. The legal arguments advanced by the defense are unpersuasive, and the outcome of Shelton's prior litigation does not warrant dismissal unless it binds him in this case, which it does not. The motions will therefore be denied.

**I. Facts as Pled**

*1. Plaintiff creates his phone number, and subsequently uses it for business purposes.*

In 2015, Plaintiff obtained his phone number and registered it on the National Do Not Call Registry ("NDNC"). Compl. ¶ 32, ECF 12; Pl.'s Decl. ¶ 2, ECF 22-1 ("Shelton Decl."). The phone number is a residential, non-commercial telephone number. Compl. ¶ 23. At the time when he got the number and registered it on the NDNC, Plaintiff contends that he used the number for

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 102 of 114

Shelton v. Pro Source Lending Group LLC, Not Reported in Fed. Supp. (2025)

personal and household purposes. Compl. ¶¶ 30-32. In 2016, however, Plaintiff formed his business, Final Verdict Solutions,[1] at which point he began using the phone number for both business and personal purposes. Shelton Decl. ¶ 7.

In 2018, Plaintiff sued Target Advance LLC, alleging violations of Section 227 of the TCPA. *See Shelton v. Target Advance LLC*, No. 18-2070, 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019). Plaintiff alleged that his phone number, the same number at issue here, was properly registered on the NDNC, and that Target Advance contacted Plaintiff to solicit business in violation of the TCPA. *Id.* at *1-2. At the time Plaintiff sued Target Advance, the phone number at issue was listed on his business website, and Plaintiff admits that he used it for business purposes. Shelton Decl. ¶ 7. The Court dismissed Plaintiff's claim because Section 227 only provides a private right of action to "residential" numbers. *Target Advance*, 2019 WL 1641353 at *6. Judge Quiñones held that because his number was accurately categorized as mixed-use and because Plaintiff "held his phone number out to the world as a business phone number" he lacked standing under the TCPA on that claim. *Id.*

*2. Plaintiff resumes exclusive personal use of his phone number.*

 **\*2**  Beginning in June 2019, Plaintiff purportedly ceased all business use of the phone number at issue. Shelton Decl. ¶¶ 7-12. Plaintiff states that he obtained a separate number for exclusive business use, and began using the number at issue for only "personal, family, and household purposes." *Id.* ¶¶ 5-7. Plaintiff explains that he has not held the number at issue out to the public as a business number, nor has it appeared on any website since at least 2019. *Id.* ¶¶ 9-10.

In 2021, Plaintiff sued Pro Source Lending Group LLC,[2] a defendant in this case, for TCPA violations. Compl. ¶¶ 36-38. The parties settled and Plaintiff alleges he asked to be placed on Pro Source's internal do-not-call-list. Shelton Decl. ¶¶ 13-14. Plaintiff has never been a customer of Pro Source, nor has he ever consented to receive calls from them. Compl. ¶ 35.

*3. The July 2024 phone calls and texts.*

The calls and texts underlying the present action all occurred within the span of twenty-four hours. On July 22, 2024, Plaintiff alleges that he received a call on his personal phone number from Defendant Wilson, a Pro Source employee, seeking to sell him a loan. Compl. ¶¶ 42-44. Wilson contacted Plaintiff from her personal cell phone number. *Id.* ¶¶ 43-45. About ten minutes later, Plaintiff received an email with a proposed loan application that Plaintiff did not sign. *Id.* ¶ 50. Within five minutes, Wilson also sent Plaintiff a text stating that she was reaching out on behalf of Fast Funds Group and inviting Plaintiff to ask her questions about the loan process. *Id.* ¶ 51.

A few hours later, Plaintiff received two additional calls from Pro Source: one from an individual named "Sean," and another call from Wilson. *Id.* ¶ 52. Simultaneously, Plaintiff also received a text from Wilson asking him to call her about the loan application. *Id.* ¶ 53.

Calls and texts continued into the next day. At 10:03 AM, Wilson called Plaintiff again. *Id.* ¶ 54. Immediately after, Plaintiff emailed Wilson, stating "Hi Brittney please stop calling me thank you!" *Id.* ¶ 55. At 10:06 AM, Plaintiff received another text from Wilson, again asking him about the loan application. *Id.* ¶ 56. At 10:09 AM, Wilson responded to Plaintiff's email, stating "Will do, thank you." *Id.* ¶ 55. Later that day, Plaintiff received one final call from Pro Source. *Id.* ¶ 58.

Based on this batch of unwanted phone calls and texts, Plaintiff now brings suit on behalf of himself and a class of similarly situated individuals.

**II. Standard of Review**

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 103 of 114

Shelton v. Pro Source Lending Group LLC, Not Reported in Fed. Supp. (2025)

Defendants move for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. I construe the motion challenging subject matter jurisdiction under Rule 12(b)(1) as a facial attack, with the result that the analysis is identical for the arguments raised under both sections of the Rule. *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 n.1 (3d Cir. 2006). The governing standard is set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

### III. Discussion

Plaintiff's class complaint contains two counts. In Count I, Plaintiff alleges that Defendants violated the TCPA by making telemarketing calls to him, despite his registration on the NDNC. 47 U.S.C. § 227(c); 47 C.F.R. 64.1200(c)(2). Count II asserts that Defendants also violated the Statute in failing to maintain statutorily adequate internal policies, including an internal do-not-call list. 47 U.S.C. § 227(c)(5); 47 C.F.R. 64.1200(d).

**\*3** Defendant Pro Source argues that Plaintiff's number is not properly registered on the NDNC, and that Plaintiff's frequent TCPA litigation places him beyond the statute's zone of interests, therein depriving him of standing. Defendant Wilson joins in those arguments, and separately argues that that individual liability is unavailable under the TCPA.

### A. Plaintiff states a claim under the Section 227(c) and Section 64.1200(c)(2).

Under Section 227 of the TCPA, an individual may register their residential telephone number[3] on a National Do Not Call Registry. A registration on the NDNC "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." 47 C.F.R. § 64.1200(c)(2). The FCC has explicitly "decline[d] to require that business and wireless numbers be removed from the Registry." Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 29 FCC Red. 9779, 9785 (June 17, 2008). Both Section 227 and its implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers on the NDNC and provide consumers with a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227 (c)(5); 47 C.F.R. § 64.1200(c)(2).

**\*4** Plaintiff purports to have registered his residential number on the NDNC in 2015, a full year prior to starting his business. Plaintiff also represents that he exclusively uses his number for personal purposes and has done so since at least 2019. Defendants have not presented any evidence to contradict Plaintiff's representation of his behavior over the past five years. Even if Plaintiff used his number for mixed purposes prior to 2019, NDNC registrations must be honored indefinitely, and the FCC has indicated that business numbers are not removed from the Registry. *See, e.g. National Do Not Call Registry FAQs*, FTC Consumer Advice, https://perma.cc/NVC5-ZNR5 ("No, your registration will never expire. The FTC will only remove your number from the Registry if it's disconnected and reassigned, or if you ask to remove it."). Given these regulations, Plaintiff's personal residential phone number is presumptively still on the NDNC.

Plaintiff therefore states a claim under Section 227(c): he alleges that he has a residential phone number on the NDNC, and that Defendants called Plaintiff on that phone number eight times over the span of 24 hours.[4]

*1. Plaintiff's prior litigation does not preclude this suit.*

Pro Source appears to argue that Plaintiff's claims are collaterally estopped, though this argument is advanced only in a footnote. Under the doctrine of collateral estoppel, a Plaintiff is precluded from relitigating a claim where (1) the identical issue was previously adjudicated, (2) that issue was actually litigated, (3) the previous determination was necessary to the decision, and (4) the party being precluded from relitigating the issue was fully represented in the prior action. *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).

In 2019, Plaintiff brought suit in this district alleging similar violations of Section 227 against a different entity. At that time, however, Plaintiff advertised his number on his business website and also used it for business purposes, rendering it a mixed-use number. *Target Advance*, 2019 WL 1641353 at *6. The implementing regulations of Section 227 only prohibit telephone solicitations to "residential telephone subscriber[s]" on the NDNC. *See* 47 C.F.R. § 64.1200(c)(2). This led the Court to conclude that "because Plaintiff held the Phone number out to the world as a business phone number, he could not register it on the National Do Not Call Registry for purposes of avoiding business-to-business calls, such as those giving rise to this action," and it dismissed Plaintiff's Section 227(c) claims for lack of standing. *Target Advance*, 2019 WL 1641353, at *6.

As noted above, once registered, numbers are not removed from the NDNC, and five years have lapsed since the *Target* decision. In 2019, the phone number at issue was used for both business and personal purposes. In this action, filed in 2024, Plaintiff pleads that it is used exclusively for personal use, and has not been used for business purposes since 2019. In that respect, the issue here differs from the issue decided against Plaintiff in *Target.* And Defendants point to no legal authority supporting a conclusion that past commercial use of a number permanently eliminates standing where the number continues to be listed on the NDNC.[5] Conceptually, there is a temporal aspect to standing, as illustrated by the fact that in some cases standing is deemed not to exist because the injury alleged is hypothetical, and in other instances a case allowed to proceed is later dismissed as circumstances change.

*2. On the facts alleged, Plaintiff is not equitably estopped.*

 **\*5** Pro Source argues that in modifying his usage of the number at issue since the Court ruled in 2019, Plaintiff placed Pro Source in a "gotcha" – making it impossible for Pro Source to discern when a cause of action that was previously declared unavailable became available yet again. Pro Source Mot. to Dismiss, ECF 17-1 at 13. Although once again the argument is not fully formed, I construe it as one asserting equitable estoppel. Grounded in common law, equitable estoppel prevents a party from enforcing a right against another party when the right was gained through misleading actions. The party asserting equitable estoppel must show "(1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *U.S. v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987).

If Plaintiff took down the number from his business website and then immediately sued Pro Source or another marketer, I would be strongly inclined to find estoppel. But nearly five years have passed during which Plaintiff avers personal use only. Such a change in circumstance, if ultimately proven to be true, is not easily categorized as a misrepresentation. And it cannot be said that Pro Source could reasonably rely on how Plaintiff engaged with the public five years earlier. Legally, the onus is on Defendant to ensure that the number they are calling is not protected by the NDNC. With the number remaining on the NDNC, Pro Source could have checked whether Plaintiff's number was still listed on business websites or on Google as affiliated with his business before proceeding. The passage of time weighs against a finding of estoppel.

### B. Plaintiff's serial litigation does not bar standing.

For an individual to have standing under a "statutorily created cause of action," they must fall within the relevant statute's "zone of interest." *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). The "zone of interest" inquiry considers "the Congressional intent of the statute" and whether the "complainant's interests were 'among the sorts of interests' " the statute was specifically designed to protect. *Chem Serv., Inc. v. Envtl. Monitoring Sys. Lab.-Cincinnati of U.S. E.P.A.*, 12 F.3d 1256, 1262 (3d Cir. 1993).

Seeking to remove Plaintiff from within the TCPA's zone of protected interests, Pro Source compares Plaintiff here to the plaintiff in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016). In *Stoops*, the plaintiff purchased at least thirty-five cellphones with the specific intent of receiving telemarketing calls so that she could bring lawsuits under the TCPA. *Id.* at 788. "In her deposition testimony, the plaintiff stated that she had a 'business suing offenders of the TCPA'; that she had specifically bought the cellphones in order to manufacture TCPA claims; and that she did not use the cellphones for any other

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 105 of 114

Shelton v. Pro Source Lending Group LLC, Not Reported in Fed. Supp. (2025)

purpose." *See Target Advance*, 2019 WL 1641353 at *4 (discussing *Stoops*, 197 F. Supp.3d at 799). The *Stoops* Court found that "because Plaintiff has admitted that her only purpose in using her cellphones is to file TCPA lawsuits, ... the calls did not constitute the 'nuisance, invasion of privacy, cost, and inconvenience' from which Congress intended to protect consumers," depriving the plaintiff of standing for lack of injury-in-fact. *Stoops*, 197 F. Supp. at 800.

Plaintiff here has two phone numbers, not thirty-five. Historically, there was a distinct line between personal and business numbers. That line is eroding, but not to the point where it can be presumed that the only purpose in maintaining two numbers is to bait companies into making telemarketing calls.[6] This is especially so where the record has not yet been developed, and at this stage, there is no evidence that Plaintiff advertises his personal phone number to make it more likely to receive telemarketing calls than any other standard residential phone number.

 **\*6** If Defendant contacted Plaintiff eight times over the span of 24 hours, that would seem to be conduct the TCPA is intended to address. At this juncture I cannot rule as a matter of law that he falls outside the TCPA's "zone of interest" based solely on litigation history.[7]

### C. Plaintiff states a claim under Section 227(c)(5) and Section 64.1200(d).

In addition to the NDNC, companies must also maintain an "Internal Do Not Call" policy. 47 C.F.R. § 64.1200(d). This written policy must be available upon demand, must explain the company's plans to maintain a do-not-call list and train telemarketing personnel on its use, and must record and honor "do-not-call" requests for at least five years after a request is made. *Id.* Where an individual makes a do-not-call request, that request must be honored within a reasonable amount of time once made, up to thirty days. *Id.*

Plaintiff alleges that in 2021, Plaintiff and Pro Source reached a settlement regarding a previous batch of unwanted calls. Compl. ¶ 37. Plaintiff avers that throughout the settlement process, Plaintiff made it unambiguously clear that he no longer wished to receive calls from Pro Source, and that Defendant therefore had notice of Plaintiff's do-not-call request for two and a half years prior to its July 2024 calls.

Defendant disregards the prior dispute between the parties, and identifies July 22, 2024 as the relevant date, when Plaintiff first asked Defendant Wilson to cease contacting him with regard to the present batch of calls. By that measure, the calls are not actionable, because Pro Source would have been permitted thirty days within which to accommodate that request.

At this stage, I am obligated to accept Plaintiff's representations about the content of conversations surrounding the 2021 Settlement. Taking those allegations as true, Plaintiff should have been on Pro Source's internal do-not-call list as of two and a half years ago. Allegations that Defendants contacted Plaintiff while he was listed on their internal do-not-call list are sufficient to state a claim for violation of Pro Source's obligations under § 64.1200(d).

### D. Defendant Wilson may be held individually liable.

Defendant Wilson argues that she may not be held liable under the TCPA. But her position ignores the plain text of the statute. Section 217 of the TCPA states: "In construing and enforcing the provisions of this chapter, the act, omission, or failure of any officer, agent, or other person acting for or *employed by* any common carrier or user, *acting within the scope of [her] employment*, shall in every case also be deemed to be the act, omission, or failure of such carrier or user *as well as of that person*." (emphasis added). Plaintiff alleges that Ms. Wilson was directly involved in the communications with him, using her personal cell phone, a claim that falls within the literal terms of Section 217.

Citing a series of district court cases, the defense contends that the Third Circuit, in *City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154 (3d Cir. 2018), has called into doubt whether individual liability is permitted under the TCPA. Such a broad reading of *City Select* is untenable. There, the defendants were a business consulting company that sent a series of faxes,

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 106 of 114

Shelton v. Pro Source Lending Group LLC, Not Reported in Fed. Supp. (2025)

as well as the president and owner of the company. *Id.* at 156. There was conflicting evidence as to the personal involvement of the president, and the sole issue on appeal was whether the trial court properly charged the jury about the standard for imposing liability on a corporate officer. *Id.* at 161-62. *City Select* simply did not address the type of claim raised here and certainly cannot be read as repealing the clear language of the statute that creates liability for direct personal involvement.[8]

**\*7**  Plaintiff's claims against Wilson may therefore proceed.

## IV. Conclusion

For the reasons set forth above, Defendants' Motions to Dismiss will be denied. An appropriate order follows.

## All Citations

Not Reported in Fed. Supp., 2025 WL 817485

Footnotes

1    Defendants contend that the business existed for the purpose of generating TCPA claims. Pro Source Mot. to Dismiss, ECF 17-1 at 6.

2    Pro Source also does business as "Fast Fund(s) Group" and sells loans. Compl. ¶¶ 5, 39.

3    The FCC has yet to issue definitive guidance on numbers with a history of mixed-use, stating only that "we will review such calls as they are brought to our attention to determine whether or not the call was made to a residential subscriber." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("2005 TCPA Order"), 20 FCC Rcd. 3788, 3793 (2005).* A majority of other district courts, as well as the Ninth Circuit (the only circuit court to rule on this question) have found that mixed-use numbers are not per-se excluded from the TCPA's protections when registered on the NDNC, and that such numbers require a case-by-case evaluation. *See Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1223-1226 (9th Cir. 2022); *see also Mattson v. New Penn Fin., LLC*, No. 18-990, 2020 WL 6270907, at \*2 (D. Or. Oct. 25, 2020) ("Although [plaintiff's] use of a phone line for personal calls does not automatically transform it into a residential line for purposes of the TCPA, neither does his use of a personal line for business calls automatically transform it into a business line."); *Clements v. Porch.com, Inc.*, No. 20-3, 2020 WL 5739591, at \*5 (D. Alaska Sept. 24, 2020) (holding that phones used for home-based businesses fall within the TCPA's zone of interest); *Smith v. Truman Rd. Dev., LLC*, No. 18-670, 2020 WL 2044730, at \*12 (W.D. Mo. Apr. 28, 2020) (holding that a cell phone used at least 60 percent for personal purposes can be residential); *Blevins v. Premium Merch. Funding One, LLC*, No. 18-377, 2018 WL 5303973, at \*2-3 (S.D. Ohio Oct. 25, 2018) ("[C]ourts have routinely looked at the facts and circumstances surrounding a particular case before deciding whether TCPA protection extended to a particular telephone number that was used for both business and residential purposes."). In *Target, supra*, a member of this Court concluded that mixed-use numbers are not residential, and therefore fall outside the Act.

I need not rule on this issue, because as this stage I must accept Plaintiff's allegation that during the relevant time frame, the phone was only used personally, and had been used exclusively so since June 2019.

4    Under the TCPA, text messages are considered "calls." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 153 (2016). I will therefore address the 5 calls and 3 texts at issue as an aggregate of 8 calls.

5    On the facts as pleaded, this is not a case where Plaintiff's number was clearly a business number at the time when he registered it on the NDNC in 2015, which may raise a question as to whether his registration was void *ab initio*. Plaintiff instead asserts that he created the number and registered it on the NDNC in 2015 as a "residential telephone subscriber," "years prior" to forming his business in 2016, making his registration presumably proper. Compl. ¶ 32; ECF 22 at 6.

6    In fact, Plaintiff explicitly refutes this accusation in his sworn declaration, stating, "I do nothing to precipitate the illegal calls and messages which are placed to me ... I have never proactively created or found TCPA claims nor entrapped businesses." Shelton Dec. ¶¶ 17-18.

**Shelton v. Pro Source Lending Group LLC, Not Reported in Fed. Supp. (2025)**

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 107 of 114

7       Congress explicitly included a private right of action within the TCPA, signifying its intention that members of the public be tasked with the Statute's enforcement. In my view, absent abuse of the statute by a serial litigant such as *Stoops*, a court's inquiry should focus on the merits of the case before it.

8       It also bears mention that the discussion of personal liability of corporate officers was pure *dicta*, as the majority's opinion acknowledged when it observed that it was "neither litigated in the District Court nor fully briefed and argued on appeal," 885 F.3d at 161, a fact emphasized by Judge Shwartz in her concurrence. *Id.* at 163.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2528098
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern Division.

Royal SPURLARK, Plaintiff,

v.

DIMENSION SERVICE CORPORATION, et al., Defendants.

Case No. 2:21-cv-3803
|
Signed July 7, 2022

**Attorneys and Law Firms**

Brian K. Murphy, Jonathan P. Misny, Murray Murphy Moul + Basil LLP, Columbus, OH, Anthony Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Helen Marie MacMurray, Lisa Messner, Christopher Charles Wager, Erica R. Hollar, Mac Murray & Shuster, LLP, New Albany, OH, for Defendant Dimension Service Corporation.

William Wesley Patmon, III, Patmon Law Firm LLC, Columbus, OH, for Defendants Gustav Renny, Pelican Investment Holdings Group, LLC.

**OPINION AND ORDER**

EDMUND A. SARGUS, JR., UNITED STATES DISTRICT JUDGE

 **\*1** This matter is before the Court on four motions to dismiss Plaintiff Royal Spurlark's Amended Complaint (ECF Doc. 17) under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2)—or, alternatively, motions to strike the class claim allegations under Federal Rules of Civil Procedure 12(f) and 23—brought by Defendants Dimension Service Corporation ("Dimension"), Pelican Investment Holding, LLC ("AAP") and Gustav Renny. (ECF Nos. 25, 30–32.) For the reasons set forth below, Defendants' Motions to Dismiss and Motions to Strike are **DENIED.**

**I. BACKGROUND**

On December 1, 2021, Plaintiff filed his First Amended Complaint ("the Complaint") against Defendants alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, which prohibits unsolicited telemarketing calls made to individuals on the National Do Not Call List or containing pre-recorded messages. (*See generally* Compl., ECF Doc. 17.) Plaintiff alleges two counts under the TCPA that Dimension—by and through its agent AAP—engaged in prohibited conduct when calling his and other person's personal cellphone numbers. (*Id.* ¶¶ 76–86.) First, AAP made telephone calls with pre-recorded voice technology without first obtaining prior express consent by the Plaintiff and other putative class members. (*Id.* ¶ 77.) Second, AAP placed more than one telemarketing call to Plaintiff and other putative class members listed on the National Do-Not-Call Registry. (*Id.* ¶ 82.)

The Court accepts the following allegations as true. Dimension, an Ohio company, sells vehicle service warranty contracts and relies on pre-recorded telemarketing conducted by third parties to sell its services. (*Id.* ¶¶ 30–32.) One of the third parties

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

Dimension hired was AAP, operated by Gustav Renny, the "Managing Member." (*Id.* ¶ 2); (Dimension's Mot. to Dismiss, ECF No. 25-1 at 7). AAP was contractually required to promote Dimension services on the telemarketing calls in order to make sales. (Compl. ¶ 52; ECF No. 25-1.) Dimension maintained interim control over AAP's actions and had knowledge that AAP was engaging in pre-recorded telemarketing, including correspondence and other litigation about similarly violative conduct. (ECF No. 17 ¶¶ 53–58.) Mr. Renny, through his association with AAP, participated in the alleged telemarketing through involvement with the selection of telephone numbers to call, drafting of call scripts, and authorization of pre-recorded messages. (*Id.* ¶ 28.)

Plaintiff's telephone number is registered to a cellular telephone service primarily used for personal purposes. (*Id.* ¶¶ 35–38.) It had been on the National Do-Not-Call Registry for more than 30 days when he received pre-recorded calls from AAP for Dimension. (*Id.*) One of those calls occurred in August 2021. (*Id.* ¶ 38.) Plaintiff ignored multiple incoming calls which resulted in listening to generic pre-recorded messages regarding warranties where the company was not identified in the message. (*Id.* ¶¶ 39–40.) Eventually, Plaintiff engaged a telemarketer on September 3, 2021, in an attempt to identify the calling party. (*Id.* ¶ 41.) After answering the call, Plaintiff handed his phone over to a colleague, who provided his information to the caller and received an email confirming the call with AAP's logo as well as a policy packet for Dimension. (*Id.* ¶¶ 42–45.) The "seller information" on the packet was AAP and provided AAP's name and address. (*Id.* ¶ 46.)

**\*2** Since automated telemarketing is done *en masse*, Plaintiff is pursuing this action on behalf of two putative classes:

Robocall class: All persons within the United States: (1) to whose cellular telephone number (2) AAP or Dimension (or an agent acting on behalf of AAP or Dimension) placed a telemarketing call (3) within the four years prior to the filing of the Complaint (4) using an identical or substantially similar pre-recorded message used to place telephone calls to Plaintiff.

AAP or Dimension National Do Not Call Registry Class: All persons in the United States whose, (1) telephone numbers were on the National Do Not Call Registry for at least 30 days, (2) but received more than one telephone solicitation from or on behalf of AAP or Dimension (3) within a 12-month period, (4) from four years prior to the filing of this Complaint.
(*Id.* ¶ 63.)

## II. STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure 12 allows for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal under 12(b)(6), the complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the" plaintiff is entitled to the relief requested. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Accepting all the plaintiff's factual allegations as true, the Court construes the complaint in the light most favorable to the non-moving party when considering a Rule 12(b)(6) motion. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

The Court must read Rule 12(b)(6) in conjunction with Federal Rule of Civil Procedure 8(a), requiring a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 907 (S.D. Ohio 2013). Thus, the pleading's factual allegations, assumed to be true, must do more than create mere speculation or suspicion of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). As part of the 12(b)(6) inquiry, the Court considers the content of the complaint—as well as items appearing in the case record mentioned therein and central to its claims. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir. 1993).

Additionally, Federal Rule of Civil Procedure 12 allows for dismissal of a complaint for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). When a court considers a 12(b)(2) motion prior to discovery and without holding an evidentiary hearing, the plaintiff need only make a "*prima facie* showing that personal jurisdiction exists." *Serras v. First Tennessee Bank Nat. Ass'n*,

875 F.2d 1212, 1214 (6th Cir. 1989). This solely requires the plaintiff to demonstrate "with reasonable particularity" that the defendant's contacts with the forum state "support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (citation omitted). The district court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Serras*, 875 F.2d at 1214. The court cannot "weigh the controverting assertions of the party seeking dismissal." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020); *see also Olin-Marquez v. Arrow Senior Living Mgmt., LLC*, No. 2:21-CV-996, 2022 WL 479781, at *3 (S.D. Ohio Feb. 17, 2022).

### B. Motion to Strike

**\*3** Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "Because striking a portion of a pleading is a drastic remedy, such motions are generally viewed with disfavor and are rarely granted." *AT & T Global Info. Solutions Co. v. Union Tank Car Co.,* No. C2–94–876, 1997 WL 382101, at *1 (S.D. Ohio Mar. 31, 1997) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)). The action of striking a pleading should be "resorted to only when required for the purposes of justice" and when "the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp.*, 201 F.2d at 822.

### III. ANALYSIS

#### A. Motions to Dismiss

Congress enacted the TCPA in response to consumer outrage about the proliferation of intrusive, nuisance telemarketing calls. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). Section 227 expressly prohibits certain telemarketing practices. *See generally* 47 U.S.C. § 227. Telemarketers violate § 227(b) when they "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or pre-recorded voice ... to any telephone number assigned to a ... cellular telephone service ... or any service for which the called party is charged for the call." *See* 47 U.S.C. § 227(b)(1)(a). The TCPA provides a private right of action to anyone who receives calls in violation of that provision. 47 U.S.C. § 227(b)(3).

Additionally, § 227(c) of the TCPA requires the Federal Communications Commission ("FCC") to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Among these regulations promulgated pursuant § 227(c) is the National Do-Not-Call Registry. *Charvat v. NMP, LLC*, 656 F.3d 440, 443–44 (6th Cir. 2011) (citing 47 C.F.R. § 64.1200(d)). A telemarketer must honor "do not call" requests no later than thirty days after a "residential telephone subscriber" makes such a request. *See* 47 C.F.R. § 64.1200(d)(3). A "residential telephone subscriber" is a "subscriber to a telephone exchange service that is not a business subscriber." 47 C.F.R. § 64.2305(d).

The National Do-Not-Call Registry provides one method of making a "do not call" request, allowing consumers to register their telephone numbers to indicate a desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.* The Sixth Circuit has held that § 227(c) of the TCPA provides a private right of action for violations of do-not-call requests. *Charvat*, 656 F.3d at 444.

Accordingly, a consumer plausibly pleads claims under § 227(b)(1)(a) or § 227(c) of the TCPA by presenting facts that indicate a telemarketer called the consumer's personal telephone number without consent (1) utilizing a pre-recorded message, and/or (2) more than thirty days after the consumer placed their telephone number on the National Do-Not-Call Registry. Plaintiff has done just that. Plaintiff has indicated the timeframe he received calls with pre-recorded messages—which admittedly did not identify the caller—as August 2021. He ignored these calls until September 3, 2021, when he answered one and had a colleague engage with the telemarketer in an ultimately successful bid to identify the caller as AAP selling Dimension's product. (Compl.

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 111 of 114

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

¶¶ 41–48.) He also alleged he had been on the National Do-Not-Call Registry for more than 30 days prior to receiving the calls at issue. (*Id.* ¶ 35.) From these facts, the Court reasonably infers Defendants have engaged in conduct that violates the TCPA.

### 1. Defendant's common arguments

 **\*4** Defendants advance several arguments that neither call the plausibility of Plaintiff's Complaint into question nor otherwise render the Complaint so deficient as to warrant dismissal. (*See generally* Motions to Dismiss, ECF Nos. 25, 30–32). First, AAP and Mr. Renny argue that since Plaintiff did not identify the August 2021 callers, there is "zero basis" to hold either party responsible "for unknown calls." (ECF No. 30 at 7; ECF No. 32 at 10.) But Plaintiff has alleged facts indicating that AAP made at least made the September 2021 call utilizing a pre-recorded message, which multiple calls with the same pre-recorded message preceded. (Compl. ¶¶ 35–48.) The content and timing of the September 2021 call allows the court to draw the reasonable inference that AAP made the August 2021 calls to market Dimension's services. *See Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) (finding in a TCPA case that the content and timing of several unanswered calls compared to answered calls allows the court to draw the inference that the unanswered calls also came from the defendants).

Specific to Count II, AAP and Mr. Renny take issue with Plaintiff's omission of the exact date he placed his phone number on the National Do-Not-Call Registry. (ECF No. 30 at 5; ECF No. 32 at 9). But the omission of that fact, a readily verifiable piece of information that can be adduced in discovery, is not grounds for dismissal. Plaintiff has alleged the calls took place more than thirty days after he placed his number on the Registry.

Next, AAP and Mr. Renny assert Plaintiff is not a "residential telephone subscriber" because he alleges his cellphone is "primarily" used for personal purposes, indicating that it is also used for another purpose. (ECF No. 30 at 7 ECF No. 32 at 12.) While the National Do-Not-Call Registry provision of the TCPA applies only to "a residential telephone subscriber," the FCC defines the phrase as one who is not a "subscriber to a telephone exchange service for businesses." *See* 47 C.F.R. § 64.2305(b)-(d). Plaintiff's Complaint does not fall outside that definition simply because he alleged to "primarily" use his cellphone for personal purposes, particularly since he also alleged that the number "is not associated with a business." (Compl. ¶ 37.)

### 2. Mr. Renny's arguments against personal jurisdiction and liability

Mr. Renny individually asserts that this Court does not have personal jurisdiction over him and thus he must be dismissed from this lawsuit. (ECF No. 32 at 4). Plaintiff alleges that Mr. Renny is subject to specific personal jurisdiction in connection with this action. (ECF No. 34 at 16). At this stage of the litigation, Plaintiff need only allege a prima facie showing that personal jurisdiction exists, which requires Plaintiff to show that Mr. Renny falls within Ohio's long-arm statute. *Olin-Marquez v. Arrow Senior Living Mgmt., LLC*, No. 2:21-CV-996, 2022 WL 479781, at \*4 (S.D. Ohio Feb. 17, 2022).

Ohio Revised Code 2307.382(A)(1) provides that "a court may exercise personal jurisdiction over" an out-of-state-defendant when the relevant cause of action "aris[es] from" that defendant's "transacting" of "any business" within the State. The Ohio Supreme Court has observed that, in the context of this provision, "the term 'transact' ... encompasses 'to carry on business' and 'to have dealings,' and is broader ... than the word 'contract.' " *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 236, 638 N.E.2d 541 (1994).

A non-resident defendant "need not 'have a physical presence in Ohio' to be transacting business there." *Ohio Valley Bank Comp. v. MetaBank*, No. 2:19-cv-191, 2019 WL 4574528, at \*4 (S.D. Ohio Sept. 20, 2019) (citation omitted). Generally, "[c]ourts examine three factors when determining whether a non-resident defendant has transacted business" under Ohio's long-arm statute: (1) whether the non-resident defendant "initiated the dealing," (2) "whether the parties conducted their negotiations or discussions in the forum state, or with terms affecting the forum state," and (3) whether the non-resident defendant manifested

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 112 of 114

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

a "substantial connection" to Ohio. *Id.* (citations omitted). While these factors are somewhat open-ended, they are cabined by the long-arm statute's "arises from" clause, which the Sixth Circuit has interpreted to entail a " 'proximate cause' relationship between" the defendant's business conduct and the plaintiff's cause of action. *See Brunner v. Hampson*, 441 F.3d 457, 466 (6th Cir. 2006).

**\*5** Plaintiff's Complaint makes a prima facie showing that his claims under the TCPA arise from Mr. Renny's contacts with the state of Ohio while transacting business there. (*See* Compl. ¶ 13.) Mr. Renny had direct dealings in Ohio with Dimension regarding the telemarketing at issue. He signed the contract that formed the basis for the telemarketing relationship between AAP and Dimension, on which he identified himself as the "Managing Member" of AAP. (ECF No. 25-1 at 7.) That contract contains a forum-selection clause which states the parties to the contract "agree and consent to the exclusive jurisdiction of the federal and state courts located in Franklin County, Ohio, for the adjudication of any matters arising under or in connection with the Agreement." (*Id.* ¶ 5.2.) But for Mr. Renny forming this telemarketing contract with Dimension, an Ohio company, as an agent of AAP, the calls constituting Plaintiff's Complaint would not have occurred. Thus, Plaintiff has satisfied his burden.

Mr. Renny further argues that he cannot be held personally liable for AAP's actions since he is not an owner, member or director of the company. (ECF No. 32 at 10.) Section 217 of the TCPA reads as follows:

> "[T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person.*"

47 U.S.C. § 217 (emphasis added). Other courts have found the "any person" language in § 227 of the TCPA applies to individuals, including corporate officers. *See Williams v. Schanck*, No. 5:15-CV-01434-MHH, 2019 WL 4246570, at \*4 (N.D. Ala. Sept. 6, 2019) (citing *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011)). Again, Mr. Renny signed the contract that formed the basis for the telemarketing relationship between AAP and Dimension, which identifies him as the "Managing Member." (ECF No. 25-1 at 7.) Plaintiff alleges that Mr. Renny is in charge of AAP's telemarketing and that he is personally liable for the acts alleged in the Complaint pursuant 47 U.S.C. § 217. (Compl. ¶ 26.) Assuming the veracity of the allegations, Plaintiff has stated a claim against Renny.

### 3. Dimension may be vicariously liable for AAP's actions

Dimension argues that Plaintiff has failed to allege a theory of agency that could confer vicarious liability on the company for AAP's actions, thus requiring dismissal. This Court disagrees. The Sixth Circuit has determined "[t]he FCC has interpretive authority over the [TCPA]." *Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 466–67 (6th Cir. 2010). In 2013, the FCC ruled that sellers could be vicariously liable for the unlawful calls of third-party telemarketers based on "federal common law principles of agency," including theories of formal agency, apparent authority, and ratification. *See In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6582–84 (2013) ("2013 Order"); *see also Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 371–72 (6th Cir. 2015) (adopting the 2013 Order).

Plaintiff convincingly argues that he should be permitted discovery on the extent of the relationship between Dimension and AAP. As this Court has noted, the 2013 Order permits consumers to "acquire evidence of relationship between telemarketer and seller through discovery if they are not independently privy to such information" and that such proof need not be presented at the time of filing. *Charvat v. LE Energy, LLC*, No. 2:19-CV-1325, 2019 WL 3891830, at \*3 (S.D. Ohio Aug. 19, 2019) (Morrison, J.). This alone precludes dismissal.

But even if it did not, Plaintiff has adequately alleged the existence of a classical agency relationship between Dimension and AAP. "In TCPA cases, the Sixth Circuit looks to the Restatement of Agency to determine whether vicarious liability should be imposed." *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 586 (S.D. Ohio 2016). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's

behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." Restatement (Third) of Agency § 1.01. The essential element of an agency relationship is the principal's "right to control" the actor. *Id.* at § 1.01 cmt. f. A person may be an agent "although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment." *Id.* at § 1.01 cmt. c.

 **\*6**  Here, Plaintiff alleges Dimension maintained interim control over AAP's actions and had knowledge that AAP was engaging in pre-recorded telemarketing, including correspondence and other litigation about similarly violative conduct. (Compl. ¶¶ 53–58.) Plaintiff notes the following contract provisions that demonstrate Dimension's control over AAP:

- Requiring AAP to continue to service contracts it sold for Dimension, even after Dimension terminates them. (ECF No. 25-1 ¶ 2.3).

- AAP must specifically comply with the "underwriting, claims, guidelines and other procedures issued by the Company." (*Id.* ¶ 4.2.)

- AAP must use materials in its marketing that Dimension requires. (*Id.*)

- AAP must only sell the contracts "that qualify per [Dimension's] guidelines." (*Id.* ¶ 4.4.)

- AAP is restricted to use "telemarketing or direct marketing scripts approved by [Dimension]." (*Id.*)

- AAP allows Dimension to audit its business practices with any reasonable notice, including up to 1 year after termination of the agreement. (*Id.* ¶ 4.6)

This degree of control raises a plausible inference that an agency relationship existed. Even where, as here, Dimension and AAP expressly disclaimed an agency relationship between the two parties, (ECF No. 25-1 ¶ 5.14), that disclaimer does not negate the existence of an agency relationship, particularly where Plaintiff was unaware of such contractual provision. *Hodell-Natco Indus., Inc. v. SAP Am., Inc.,* 13 F. Supp. 3d 786, 806 n.7 (N.D. Ohio 2014). This Court finds an agency relationship or ratification of one, as plead, is not wholly implausible so as to require dismissal.

### B. Motions to Strike

The Court now turns to Defendants' collective motions to strike class claims. A court may strike class action allegations before a motion for class certification where the complaint demonstrates that the requirements for maintaining a class action cannot be met. *See Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 949 (6th Cir. 2011) (affirming the district court's striking class allegations prior to discovery where the defect involved "a largely legal determination" that "no proffered factual development offer[ed] any hope of altering"). However, "courts should exercise caution when striking class action allegations based solely on the pleadings," since it is often more prudent "to assess the propriety of class certification in the context of a fully briefed class certification motion rather than in the context of a motion to strike class claims at the pleading stage." *See Geary v. Green Tree Servicing, LLC,* No. 2:14-CV-00522, 2015 WL 1286347, at \*16 (S.D. Ohio Mar. 20, 2015).

Defendants argue that Plaintiff's proposed classes are "facially overbroad" and uncertifiable as improper "fail-safe" classes, that Plaintiff seeks injunctive relief only ancillary to statutory damages, that Plaintiff is atypical because he investigated to find out who was behind the calls—all of which justify striking class claims. Plaintiff argues that such arguments are either incorrect or do not render certification a legal impossibility and, for various reasons, such a determination regarding the class would be premature. This Court finds Plaintiff's arguments persuasive.

First, Plaintiff's class defined as those who have received unlawful calls is not "facially overbroad." Further, Plaintiff correctly notes that *inclusion*—rather than exclusion, as Defendants argue—of language about whether callers in the class had consented to the calls would render Plaintiff's class designations as improper "fail-safe" classes. *See Sauter v. CVS Pharmacy, Inc.*, No. 2:13–CV–846, 2014 WL 1814076, at \*2 (S.D. Ohio May 7, 2014) (requiring plaintiff to amend class designation to exclude language about consent to be called). Thus, excluding language about consent does not justify striking the class claims.

**WESTLAW**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    6

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

Case 1:26-cv-00659-KM    Document 26-1    Filed 06/24/26    Page 114 of 114

**\*7**  As to the primacy of injunctive relief, Plaintiff provides affidavits that purport to show illegal telemarketing calls made by AAP continue despite the litigation. (ECF Nos. 28-1, 28-2.) At this stage, the scope of Defendants calling conduct is unknown. Calling records that can be recovered indicating the number of calls made have yet to be produced. As Plaintiff notes, it is simply unknown what discovery will bring and how that will impact the viability and scope of a 23(b)(2) class in comparison to a 23(b)(3) class.

Further, a continuing relationship and the possibility of further violations does weigh on the analysis in a TCPA case when deciding to certify or strike a 23(b)(2) class as it relates to injunctive relief. *See Fisher v. MJ Christensen Jewelers, LLC*, No. 2:15-CV-00358-RFB-NJK, 2018 WL 1175215, at \*6 (D. Nev. Mar. 6, 2018) (striking where plaintiff failed to show a likelihood of future violations). Without discovery and full briefing on the class certification, such a determination is premature.

Lastly, Defendants take umbrage with Plaintiff's efforts to identify the callers behind the unlawful pre-recorded messages that form the basis of his complaint. Indeed, Defendants find such "deceptive" behavior to be atypical of the class. (ECF No. 25 at 16; ECF No. 30 at 13; ECF No. 32 at 17.) Whether the telemarketers in this case found themselves calling not a hapless consumer, but rather someone prepared to feign interest in their product to remove the mask of anonymity behind disembodied robocalls, has no bearing on whether he, and other members of the putative class, received illegal calls for which Defendants are liable. *See Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1194–95 (M.D. Tenn. 2017); *Charvat*, 630 F.3d at 461 ("Phillip Charvat has not been shy in taking on the role of a private attorney general under the [TCPA]."). This Court finds that Plaintiff's conduct, which served to identify the Defendants, has no relevance toward a determination to strike the class claims.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Defendant's Motions to Dismiss and Motions to Strike (ECF Nos. 25, 30–32).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2528098

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.