Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 1 of 116

Ahmed v. HSBC Bank USA, National Association, Not Reported in Fed. Supp. (2018)

2018 WL 501413
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Saber AHMED, et al.

v.

HSBC BANK USA, NATIONAL ASSOCIATION, et al.

Case No. ED CV 15–2057 FMO (SPx)
|
Filed 01/05/2018

**Procedural Posture(s):** Motion to Amend Scheduling Order; Motion to Stay Discovery; Motion for Reconsideration; Motion to Strike All or Part of a Pleading; Motion to Compel Discovery.

**Attorneys and Law Firms**

Alexander H. Burke, Pro Hac Vice, Burke Law Offices LLC, Chicago, IL, Joshua B. Swigart, Hyde and Swigart APC, San Diego, CA, Meghan Elisabeth George, Thomas Edward Wheeler, Todd M. Friedman, Adrian Robert Bacon, Law Offices of Todd M. Friedman PC, Woodland Hills, CA, Seyed Abbas Kazerounian, Jason A. Ibey, Matthew M. Loker, Kazerouni Law Group APC, Costa Mesa, CA, Adrienne D. McEntee, Pro Hac Vice, Beth E. Terrell, Jennifer Rust Murray, Pro Hac Vice, Terrell Marshall Law Group PLLC, Seattle, WA, Suren N. Weerasuriya, Burkhalter Kessler Clement and George LLP, Irvine, CA, for Saber Ahmed, et al.

Julia B. Strickland, Shannon Elizabeth Dudic, Arjun P. Rao, Bryan J. Weintrop, Stroock and Stroock and Lavan LLP, Kay Fitz–Patrick, Scott M. Pearson, Taylor Steinbacher, Ballard Spahr LLP, Los Angeles, CA, Daniel J. T McKenna, Pro Hac Vice, Ballard Spahr LLP, Philadelphia, PA, Matthew A. Morr, Pro Hac Vice, Ballard Spahr LLP, Denver, CO, for HSBC Bank USA, National Association, et al.

**Proceedings: (In Chambers) Order Re: Motion for Reconsideration**

Fernando M. Olguin, United States District Judge

**\*1** Having reviewed and considered all the briefing filed with respect to defendants' Motion for Reconsideration Pursuant to Federal Rule of Civil Procedure 54(b) (Dkt. 121, "Motion"), the court concludes that oral argument is not necessary to resolve the motion. See Fed. R. Civ. P. 78; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

## INTRODUCTION

On October 6, 2015, plaintiff Saber Ahmed ("Ahmed") filed a Complaint, individually and on behalf of all others similarly situated, against defendant HSBC Mortgage Corporation (USA) ("HSBC") alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, et seq. (See Dkt. 1, Complaint at ¶¶ 23–30). On March 15, 2017, Ahmed and plaintiff John Monteleone (collectively, "plaintiffs") filed a First Amended Complaint ("FAC") against HSBC and defendant PHH Mortgage Corporation ("PHH" and collectively, "defendants"), for negligent and willful violations of the TCPA. (See Dkt. 27, FAC at ¶¶ 65–73).

Defendants filed a Motion to Strike Class Allegations. (See Dkt. 76). Plaintiffs subsequently filed Motions to Compel Responses to Discovery (Dkts. 85–86), which defendants opposed. On September 25, 2017, the Magistrate Judge granted the Motions to Compel in part and denied them in part. (See Dkt. 101, Magistrate Judge's Order of September 25, 2017, at 14–15). At the time the Magistrate Judge issued her ruling, the court had yet to rule on defendants' Motion to Strike Class Allegations. Following the Magistrate Judge's ruling, defendants filed an Ex Parte Application to Stay Rulings (Dkt. 104, "Ex Parte Application"), a Motion to Modify Scheduling Order (Dkt. 105), and a Motion for Reconsideration re: Order on Motion to Compel (Dkt. 106, "Motion for Review") (collectively, "Discovery Motions"). On November 6, 2017, the court denied defendants' Motion to Strike Class Allegations and denied the Discovery Motions as moot. (See Dkt. 118, Court's Order of November 6, 2017, at 4). On November 13, 2017, defendants filed the instant Motion seeking reconsideration of the court's denial of the Discovery Motions and alternatively, requesting "that the Court facilitate an application for interlocutory appeal" pursuant to 28 U.S.C. § 1292(b).[1] (See Dkt. 121, Motion at 3–5).

## DISCUSSION

"In this district, motions for reconsideration are governed by Local Rule 7–18," Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., 568 F.Supp.2d 1152, 1162 (C.D. Cal. 2008), which provides that such a motion

> may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

**\*2** Local Rule 7–18. The Local Rule also admonishes that "[n]o motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." Id.

Defendants assert that the court erred in denying their Discovery Motions because the Motions were not mooted by the court's denial of defendants' Motion to Strike Class Allegations. (See Dkt. 121, Motion at 3). According to defendants, the Discovery Motions "were based on completely separate and independent grounds" and "had nothing to do with the Motion to Strike[.]" (Id.). Defendants' assertions are unpersuasive.

As the Magistrate Judge noted, "[t]he parties' discovery disputes largely stem from one overarching dispute regarding whether plaintiffs are entitled to class-wide discovery beyond what pertains to the named plaintiffs." (See Dkt. 101, Magistrate Judge's Order of September 25, 2017, at 4). With respect to the Discovery Motions, they, too, "largely stem" from defendant's contention that plaintiffs are not entitled to class-wide discovery.[2] (See Dkt. 104, Ex Parte Application at 5–6 (raising three arguments: (1) the magistrate judge's order should be reversed because defendants' Motion to Strike "is meritorious[;]" (2) plaintiffs lack standing; and (3) the magistrate judge's order was "clearly erroneous because it improperly compelled class-wide merits discovery before a class has been certified"); Dkt. 106, Motion for Review at 1–2 (raising same arguments as Ex Parte Application);[3] Dkt. 105, Motion to Modify Scheduling Order at 1–2 (arguing that modification of the Scheduling Order is warranted because class wide discovery is not appropriate as a matter of law and because "there are dispositive issues that can be determined now")). However, the court's Scheduling Order, filed on May 22, 2017, advised and cautioned the parties that the court would not "bifurcate discovery." (Dkt. 65, Court's Order of May 22, 2017, at 2). The parties were advised "that absent exceptional circumstances, discovery shall not be stayed while any motion is pending, including any motion to dismiss or motion for protective order." (Id.).

Defendants' claim that discovery should be bifurcated in class actions is largely based on a case that is more than 40 years old and involved securities fraud and a parallel state proceeding that had already resulted in a settlement. (See Dkt. 105, Motion to Modify Scheduling Order, at 9–10, relying on Kamm v. California City Dev. Co., 509 F.2d 205 (9th Cir. 1975)); Kamm, 509 F.2d at 210–11; Schwartz v. Lights of Am., Inc., 2012 WL 12883222, *10 (C.D. Cal. 2012) ("Unlike Kamm, in which remedies had 'already been instituted' and the purchasers obtained meaningful relief, here, remedies have not been determined .... Further

unlike Kamm, no settlement has been reached .... Because the distribution of relief in Kamm was the primary factor in finding that the state action was superior, this case is fundamentally distinguishable.") (citing Cartwright v. Viking Indus., 2009 U.S. Dist. LEXIS 83286, *47 (E.D. Cal. 2009) (finding that the most important distinction between that case and Kamm was that in the latter relief had been accorded and in the former it had not)); Moore v. Walter Coke, Inc., 294 F.R.D. 620, 629 (N.D. Ala. 2013) ("Kamm v. Cal. City Dev. Co., 509 F.2d 205 (9th Cir.1975), in which the court dismissed class claims 'without discovery where it was clear from the complaint and associated public records that the class could not satisfy Rule 23(b).' ... adds nothing new. It is distinguishable both as a securities fraud case and as a case in which well-underway parallel proceedings brought by state officials were clearly superior to the class action proposed.").[4] Defendants' argument ignores the realities of class action litigation today, which are governed by the Supreme Court's landmark decision in Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). In Dukes, the Supreme Court indicated that class certification requires a trial court to engage in a "rigorous analysis[ ] that the prerequisites of Rule 23(a) have been satisfied[.]" Id. at 351, 131 S.Ct. at 2551–52. This analysis usually frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim" because the "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id.; see Gusman v. Comcast Corp., 298 F.R.D. 592, 595 (S.D. Cal. 2014) ("Facts that are relevant to the class determination frequently will overlap with those relevant to the merits of the case."); McEwan v. OSP Grp., L.P., 2016 WL 1241530, *3 (S.D. Cal. 2016) ("In this regard, the Supreme Court had directed courts considering class certification motions to engage in a 'rigorous analysis' to determine whether Rule 23's prerequisites have been satisfied, an analysis that will frequently [ ]overlap with the merits of plaintiff's underlying claim.").

**\*3** In light of Dukes and the "rigorous analysis" requirement for class certification, many courts "are reluctant to bifurcate class-related discovery from discovery on the merits."[5] Chen–Oster v. Goldman, Sachs & Co., 285 F.R.D. 294, 299–300 (S.D.N.Y. 2012) (collecting cases). This is because the distinction between class certification and merits discovery is murky at best and impossible to determine at worst. See Munoz v. PHH Corp., 2016 WL 10077139, *4 (E.D. Cal. 2016) ("Courts have repeatedly acknowledged that there is no clear-cut division between discovery that relates to class certification and discovery that relates to the merits."); In re: Riddell Concussion Reduction Litig., 2016 WL 4119807, *2 (D.N.J. 2016) (explaining that the court had previously declined to bifurcate discovery because "more often than not there is no 'bright line' between class certification and merits issues."); Lakeland Regional Medical Center, Inc. v. Astellas US, LLC, 2011 WL 486123, *2 (M.D. Fla. 2011) ("Simply stated, if district courts as neutral arbiters of the law find the distinction between merits and class issues to be murky at best, and impossible to discern at worst, the Court cannot imagine how parties with an incentive to hold back damaging evidence, can properly draw the line between these categories of evidence during 'phased' discovery."). Separating merits and class discovery "raise[s] a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs, thereby causing additional litigation regarding the distinction between the two." True Health Chiropractic Inc. v. McKesson Corp., 2015 WL 273188, *3 (N.D. Cal. 2015); see Quinn v. Specialized Loan Servs., LLC, 321 F.R.D. 324, 327–28 (N.D. Ill. 2017) (observing that bifurcation "may give rise to disputes over whether a particular discovery request relates to the merits or to class certification"); Burges v. BancorpSouth, Inc., 2015 WL 13628132, *4 (M.D. Tenn. 2015) (same); City of Pontiac General Employees' Retirement System v. Wal–Mart Stores, Inc., 2015 WL 11120408, *1–2 (W.D. Ark. 2015) (bifurcation may force the court to resolve "endless discovery disputes"). For example, bifurcation often creates unnecessary gaps in the evidence as a defendant has a strong incentive to withhold evidence even if such evidence "overlap[s] with the merits of the plaintiff's underlying claim" or "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."[6] See Dukes, 564 U.S. at 351, 131 S.Ct. at 2551–52; see, e.g., Tyus v. Wendy's of Las Vegas, Inc., 2017 WL 3026403, *5 (D. Nev. 2017) ("Plaintiffs do not have the benefit of discovery into the merits of a case at the class certification stage and defendants frequently have withheld exactly the information needed to prove plaintiffs' case because it is common in putative class actions for defendants to seek 'bifurcated discovery' between class certification and merits issues, and this bifurcation results in a limited record at the class certification stage."); Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 488 (C.D. Cal. 2012) ("Indeed, it is often easy for a defendant to paint a dismal picture of plaintiffs' prospects because, at the class certification stage, plaintiffs do not have the benefit of discovery into the merits of a case and defendants frequently have withheld exactly the information needed to prove plaintiffs' case.").

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 4 of 116

Ahmed v. HSBC Bank USA, National Association, Not Reported in Fed. Supp. (2018)

In addition to "rais[ing] a slew of issues," True Health Chiropractic Inc., 2015 WL 273188, at *3, "[a]rbitrary insistence on the merits/class discovery distinction sometimes thwarts the informed judicial assessment that current class certification practice emphasizes." Mbazomo v. ETourandTravel, Inc., 2017 WL 2346981, *1–2 (E.D. Cal. 2017). For example, even if the class is not certified, the case will still continue and the discovery produced during the course of the case will be relevant and useful for the remainder of the case. See, e.g., In re Semgroup Energy Partners, L.P., Sec. Litig., 2010 WL 5376262, *2–3 (N.D. Okla. 2010) ("because of the number of investors and the enormity of losses they allege to have incurred, this case is likely to continue even if Lead Plaintiff is not found to be an adequate class representative or class certification is otherwise denied"); City of Pontiac, 2015 WL 11120408, at *1 ("Contrary to Defendant's assertions, there is no reason to believe that denial of class certification will terminate this litigation."); cf. Kelleher v. Fred Meyer Stores Inc., 302 F.R.D. 596, 599 (E.D. Wash. 2014) (granting motion to compel that sought personnel files of allegedly similarly situated employees, the identities of employees who requested leave or disability accommodation so that plaintiff could "attempt to demonstrate inconsistent treatment"); Lyoch v. Anheuser–Busch Companies, Inc., 164 F.R.D. 62, 70 (E.D. Mo. 1995) ("evidence of a pattern and practice of discrimination is relevant to an individual claim of discrimination").

 *4  In short, "[t]he decision to bifurcate discovery in putative class actions prior to certification is committed to the discretion of the trial court." True Health Chiropractic Inc., 2015 WL 273188, at *1; Mbazomo, 2017 WL 2346981, at *2 ("the Court is fully within its discretion to set either bifurcated or non-bifurcated discovery schedules in class action cases"). The court does not believe that bifurcation of discovery is warranted in this case. See, e.g., True Health Chiropractic Inc., 2015 WL 273188, at *3 (declining to bifurcate discovery in TCPA class action); Charvat v. Plymouth Rock Energy, LLC, 2016 WL 207677, *2–3 (E.D. N.Y. 2016) (same). Finally, the court has again reviewed the Magistrate Judge's Order of September 25, 2017, (Dkt. 101), and finds that it is neither clearly erroneous nor contrary to law, see Fed. R. Civ. P. 72, and, therefore, the court did not err in denying the Discovery Motions.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT Defendants' Motion for Reconsideration (**Document No. 121**) is **denied**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 501413

Footnotes

1    In their reply brief, defendants indicate they are withdrawing the request for certification. (See Dkt. 127, Reply in Support of Defendant's Motion [ ] at 5). Therefore, the court only addresses defendants' arguments with respect to reconsideration.

2    Indeed, one of the Discovery Motions, defendants' Motion for Review (Dkt. 106) directly challenged the Magistrate Judge's discovery order.

3    In denying the Motion to Strike Class Allegations, the court noted that defendants had failed to explain the basis for their standing argument and that such an argument was not properly raised in a Rule 12(f) motion. (See Dkt. 118, Court's Order of November 6, 2017, at 3–4).

4    Similarly, defendants' reliance on Harris v. comScore, Inc., 2012 WL 686709, *3 (N.D. Ill. 2012) is misplaced. First, this is non-binding authority. More importantly, the concerns that led the Harris court to bifurcate discovery are not present here. For example, in Harris, the court found that "it is possible to draw general lines in this case" severing class certification issues from merits issues. See Harris, 2012 WL 686709, at *4. Here, merits issues and class certification issues are "enmeshed" with one another. See Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, 131 S.Ct. 2541, 2552, 180 L.Ed.2d 374 (2011). Whether plaintiff is an adequate class representative, whether there is an agent/principal relationship, or other relationship giving rise to liability between HSBC and PHH, whether HSBC had knowledge of PHH's actions, and whether defendant HSBC and/or PHH used automatic telephone dialing

systems to place calls, are all factual and legal issues that must be considered in determining whether Rule 23's requirements have been satisfied, i.e., it is very difficult in this case to draw a line between class certification and merits issues. (See Dkt. 27, FAC at ¶¶ 8–22, 53–54, 58–73); see also Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012) ("The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent.").

5    The Federal Judicial Center's "Manual for Complex Litigation cautions that '[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary.' " In re Groupon, Inc. Securities Litig., 2014 WL 12746902, *2 (N.D. Ill. 2014); see Manual for Complex Litigation, Fourth § 21.14 (2004).

6    Bifurcation of discovery also enables a defendant to challenge the adequacy of plaintiff's counsel during the class certification proceedings. For example, in Moore v. Ulta Salon, Cosmetics & Fragrance, Inc., 311 F.R.D. 590 (C.D. Cal. 2015), a wage and hour class action, defense counsel challenged the adequacy of plaintiff's counsel, asserting that plaintiff's counsel had "done little to investigate the claims in this action—while they seek to certify a class of over 8,000 members, their motion is supported by 6 declarations covering 3 stores in one county." Id. at 607. Although plaintiff's counsel sought classwide discovery, defendant objected on a number of grounds, stating that plaintiff's discovery "seeks to elicit information that is beyond the scope of issues pertaining to class certification" and that "plaintiff should not be allowed to engage in class-wide merits discovery because discovery is limited to those issues necessary to establish class certification." Id. (internal quotation marks omitted). The Magistrate Judge limited the discovery plaintiff could receive, and required defendant to provide discovery responses only with respect to the stores where the named plaintiffs worked. This court rejected defendant's adequacy of counsel challenge, stating that "defendant's assertion that plaintiff's counsel is inadequate because of their inability to obtain the very discovery defense counsel refused to provide—because it was supposedly irrelevant to class certification—is utterly meritless, disingenuous, and not well-taken." Id.

---

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM     Document 28-1     Filed 06/24/26     Page 6 of 116

Bond v. Folsom Insurance Agency LLC, Not Reported in Fed. Supp. (2025)

2025 WL 863469
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Joseph BOND, on behalf of himself and all others similarly situated, Plaintiff,

v.

FOLSOM INSURANCE AGENCY LLC and Cody Folsom, Defendants.

No. 3:24-cv-2551-L-BN
|
Signed March 19, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law PC, Hingham, MA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, Sharon K. Campbell, Law Office of Sharon K. Campbell, Dallas, TX, for Plaintiff.

Jason Ray Jobe, Yesha Prakashcha Patel, Thompson Coe Cousins & Irons LLP, Dallas, TX, Haley S. Grissom, Dentons U.S. LLP, Dallas, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**

DAVID L. HORAN, UNITED STATES MAGISTRATE JUDGE

**\*1** Defendants Folsom Insurance Agency, LLC and Cody Folsom (collectively, "Folsom") have filed a Motion to Bifurcate Discovery. *See* Dkt. No. 30.

Plaintiff Joseph Bond filed a response. *See* Dkt. No. 31.

This case has been referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and an order of reference from United States District Judge Sam A. Lindsay. *See* Dkt. No. 32.

For the reasons explained below, the Court denies Folsom's Motion to Bifurcate Discovery [Dkt. No. 30].

**Background**

This case concerns a class action lawsuit alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

Plaintiff Joseph Bond alleges that Defendants placed at least one prerecorded telemarketing call to his cellular phone without his prior express written consent in violation of the TCPA. *See* Dkt. No. 6.

Bond alleges the following putative class:

**Robocall Class:** All persons within the United States: (1) to whose cellular telephone number or other number for which they are charged for the call (2) Defendants (or an agent acting on behalf of Defendants) placed a telemarketing call (3) within

Bond v. Folsom Insurance Agency LLC, Not Reported in Fed. Supp. (2025)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 7 of 116

the four years prior to the filing of the Complaint (4) using an identical or substantially similar pre-recorded message used to place telephone calls to Plaintiff (5) from four years prior to the filing of the Complaint through trial.

*Id.* at 9 (emphasis in original).

Folsom denies TCPA liability and contends that Bond cannot maintain his lawsuit as a class action because it fails to meet the requirements of Federal Rule of Civil Procedure 23.

The Parties have begun discovery and filed a joint status report to assist the Court in entering a scheduling order under Federal Rule of Civil Procedure 16(b). *See* Dkt. No. 29.

In the joint status report and this subsequent motion, Folsom asks the Court to bifurcate and limit discovery into two phases – individual and class-based discovery – and allow for class-based discovery only if Bond's individual claims survive dispositive motions. *See* Dkt. No.29 at 4-5; Dkt. 30 at 1.

**Legal Standards & Analysis**

"Under [Federal Rule of Civil Procedure] 42(b), district courts have discretion to bifurcate trials '[f]or convenience, to avoid prejudice, or to expedite and economize.' " *Pharmerica Corp. v. Advanced HCA LLC*, No. 2:17-cv-00180-JRG, 2018 WL 3326822, at *1 (E.D. Tex. May 1, 2018) (quoting Fed. R. Civ. P. 42(b)). "The decision to bifurcate 'is a matter within the sole discretion of the trial court.' " *Id.* (quoting *First Tex. Sav. Ass'n v. Reliance Ins. Co.*, 950 F.2d 1171, 1174 n.2 (5th Cir. 1992)).

And Federal Rule of Civil Procedure "26 affords trial courts ample authority to control the sequence and timing of discovery." *E.E.O.C. v. Lawler Foods, Inc.*, 128 F. Supp. 3d 972 (S.D. Tex. 2015).

The issue before the Court is whether it should birfucate and limit discovery into two phases – individual and class-based discovery,

Folsom contends that discovery should be bifurcated because rulings on Bond's individual claims will determine the validity of his class-based claims. *See* Dkt. No. 1 at 1. And it asserts that "bifurcation will be expedient and economical because it will help determine whether [Bond] is a proper class representative before broader discovery is taken." *Id.*

 **\*2** Bond contends that Folsom's bifurcation proposal is an "end-run" around the Court's Order granting in part Bond's motion to compel, which involved classwide discovery. *See* Dkt. No. 31 at 2-3; Dkt. No. 28.

In the order that Bond references, the Court stated:

As to Interrogatory Nos. 6 and 7, "[t]he Court will not engage in a preemptive merits analysis to determine whether [Bond] is entitled to discovery on the claim that [he] has pleaded and is pursuing." *Firebirds Intl, LLC v. Firebird Rest. Grp., LLC*, No. 3:17-cv-2719-B, 2018 WL 3655574, at *16 (N.D. Tex. July 16, 2018). "The Court will not prematurely assess the balance of the evidence on the merits of [Bond's] claim[s] against [Folsom Insurance] and will not credit [Folsom Insurance's] assessment to cut off [Bond] from seeking relevant evidence from this named party before discovery has closed and any summary judgment motion has been filed." *Velazquez v. El Pollo Regio LP, LLC*, No. 3:15-cv-3170-M, 2017 WL 2289185, at *6 (N.D. Tex. May 25, 2017). On the Court's reading, Bond has pleaded "call" broadly enough to include ringless voicemails, and, although the Court need not now determine whether a ringless voicemail can support liability as a matter of law under the statute, Folsom Insurance's answer is incomplete as to what Bond is asking based on what he has pleaded and is pursuing. And Folsom Insurance has not supported its other boilerplate objections and may not avoid appropriate classwide discovery that is – as Bond persuasively argues – necessary for a future class certification motion.

Dkt. No. 28.

Bond also asserts that there is "significant overlap" between discovery relevant to the merits of his individual claims and issues of class certification Dkt. No. 31 at 6. And, so, Bond argues that bifurcation would lead to duplication of discovery and may result in further discovery disputes regarding the distinction between merits and class discovery. *See id.* at 6-7. In Bond's view, bifurcation of discovery in this case would lead to the "opposite of judicial economy." *Id.* at 6.

As to class certification under Rule 23, the Supreme Court has instructed that "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' " *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

And "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (cleaned up).

Considering *Dukes* and the "rigorous analysis" requirement for class certification, district courts have been reluctant to bifurcate class-related discovery from discovery on the merits. *See Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. EDCV152057FMOSPX, 2018 WL 501413 (C.D. Cal. Jan. 5, 2018) (declining to bifurcate discovery in TCPA case and stating that "the distinction between class certification and merits discovery is murky at best and impossible to determine at worst"); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012) (collecting cases).

**\*3** In another TCPA case, *Cardenas v. Resort Sales by Spinnaker, Inc.*, No. 9:20-cv-00376-RMG, 2021 WL 733393 (D.S.C. Feb. 24, 2021), the Court found that bifurcation would not serve the interests of judicial economy given the plaintiff's "persuasive argument that the evidence needed to determine whether [they] have a claim substantially overlaps with [their] ability to represent a class under [Rule] 23." *Cardenas*, 2021 WL 733393, at \*3.

Similarly, here, the undersigned already found that Folsom "may not avoid appropriate classwide discovery that is – as Bond persuasively argues – necessary for a future class certification motion." Dkt. No. 28. And, so, the Court agrees with Bond that bifurcation would not promote efficiency because there is considerable overlap between discovery relevant to the merits of his individual claims and issues of class certification. *Accord True Health Chiropractic Inc. v. McKesson Corp.*, 2015 WL 273188, \*2-3 (N.D. Cal. 2015) (declining to bifurcate a TCPA class action and noting that individual and class discovery claims typically overlap).

And, in light of the bulk of authority discussing the lack of a "bright line" distinction between merits and class discovery, bifurcation could lead to avoidable, future disputes over whether a particular discovery request relates to the merits or to class certification. *See Quinn v. Specialized Loan Servs., LLC*, 321 F.R.D. 324, 327–28 (N.D. Ill. 2017); *see also City of Pontiac General Employees' Retirement System v. Wal–Mart Stores, Inc.*, 2015 WL 11120408, \*1–2 (W.D. Ark. 2015) (bifurcation may force the court to resolve "endless discovery disputes"); *True* Health, 2015 WL 273188, at \*3 (finding that bifurcation "raise[s] a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs, thereby causing additional litigation regarding the distinction between the two.").

And, so, considering the binding law from *Dukes* and persuasive authority from other district courts, the Court declines to bifurcate discovery in this case.

**Conclusion**

For the reasons explained above, the Court denies Folsom's Motion to Bifurcate Discovery [Dkt. No. 30]. The Court will separately enter a scheduling order under Federal Rule of Civil Procedure 16(b) in accordance with this Memorandum Opinion and Order.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2025 WL 863469

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17732717
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

Brandon CALLIER, Plaintiff,

v.

AMERICAN-AMICABLE LIFE INSURANCE
COMPANY OF TEXAS, a Florida Corporation, Defendant.

EP-22-CV-00018-FM
|
Signed October 18, 2022

**Attorneys and Law Firms**

Brandon Callier, El Paso, TX, Pro Se.

Danielle A. Gilbert, Husch Blackwell LLP, Austin, TX, for Defendant.

## ORDER DENYING MOTION TO DISMISS

FRANK MONTALVO, UNITED STATES DISTRICT JUDGE

**\*1** Before the court are "Plaintiff's Second Amended Complaint" ("Complaint") [ECF No. 24], filed August 9, 2022, by Brandon Callier ("Plaintiff") and "Defendant American-Amicable's Motion to Dismiss Plaintiff's Second Amended Complaint" ("Motion") [ECF No. 26], filed August 23, 2022, by American Amicable Life Insurance Company of Texas ("Defendant"). In its Motion, Defendant moves to dismiss Plaintiff Brandon Callier's claims pursuant to Federal Rules of Civil Procedure ("Rule") 8(a), 10(b), and 12(b)(6).[1] After due consideration of the Complaint, Motion, and applicable law, the Motion is **DENIED**.

## I. BACKGROUND

*A. Factual Background*

At this stage, the court accepts all non-conclusory allegations in the Complaint as true. They are as follows: Plaintiff has at all relevant times been on the National Do-Not-Call Registry ("DNC").[2] Nevertheless, throughout November and December 2021, he received nineteen cell phone calls featuring a prerecorded message ("Hi, this is Kate from Senior Benefits") soliciting senior life insurance products.[3] Plaintiff consented to none of these calls, and none had an emergency purpose.[4]

On one such call, Plaintiff opted to be connected to a representative who asked certain qualifying questions to determine if Plaintiff was eligible for the life insurance products being sold; upon hearing Plaintiff was only forty-seven years old, the telemarketer hung up.[5] Plaintiff continued to receive prerecorded calls from "Kate." During one of these calls he again opted to connect to a representative, but this time he claimed he was fifty years old "to qualify for an insurance policy in order to find out who was behind the calls."[6] Now qualified, Plaintiff was promptly transferred to Ms. Sophia Ahmed, an insurance agent for Defendant, "who sold Plaintiff a life insurance policy."[7] Shortly thereafter, Plaintiff received a life insurance policy from Defendant American-Amicable Life Insurance Company of Texas.[8]

### B. Procedural Background

Plaintiff filed his Complaint in August 2022, raising three claims for relief: damages from "non-emergency telemarketing robocalls" in violation of the Telephone Consumer Protection Act ("TCPA")[9]; damages from solicitation to his private phone number, which was listed on the DNC, in violation of the TCPA[10]; and damages pursuant to the Texas Business and Commerce Code, which prohibits telephone communications for purposes of solicitation.[11]

Defendant subsequently filed its Motion, arguing Plaintiff's complaint should be dismissed, first, for failure to meet "basic pleading standards under Rules 8 and 10" by improperly conflating and failing to differentiate between the parties and non-parties.[12] Second, Defendant asserts Plaintiff has not stated a claim for relief as his allegations 1) do not demonstrate vicarious liability and 2) are "entirely conclusory."[13]

## II. LEGAL STANDARD

**\*2** Rules 8 and 10 pertain to pleading clarity. Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[14] "Each allegation must be simple, concise, and direct."[15] Rule 10 requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances."[16]

Rule 12(b)(6) pertains to a pleading's substance, requiring dismissal of a complaint when it fails "to state a claim for which relief can be granted."[17] To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[18] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[19] Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[20] Therefore, a complaint is not required to set out "detailed factual allegations," but it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."[21] Although the court must accept well-pleaded allegations in a complaint as true, it does not afford conclusory allegations similar treatment.[22]

## III. DISCUSSION

Defendant argues Plaintiff's complaint should be dismissed pursuant to Rules 8(a) and 10(b) for failure to meet pleading standards and Rule 12(b)(6) for failure to state a plausible claim for relief. Defendant's overwrought, disingenuous contentions fail at every step.

### A. Failure to Meet Pleading Standards

Defendant complains that Plaintiff has improperly conflated alleged acts by Defendant and Defendant's insurance agent, Ms. Ahmed, who, until recently, was also a defendant in this case.[23] Specifically, Defendant points to Plaintiff's vague, occasional use of 1) "Defendant" in the singular and 2) "Defendants" without specification.[24] Defendant also takes issue with Plaintiff's imprecise reference to the actions by Ms. Ahmed "and/or" Defendant and by Defendants "and/or their affiliates or agents."[25]

According to Defendant, courts "consistently" dismiss "such facially-deficient pleadings ..., even in *pro se* cases."[26] Defendant cites several unreported, out-of-circuit cases. To say none of them are on point is putting it mildly. The best Defendant can muster is *Ewing v. GoNow Travel Club, LLC*[27] and *Cunningham v. Lifestyles Development, LLC*,[28] both of which pertained to inadequate pleading in the TCPA context. In *Ewing*, the plaintiffs' pleading failed because it lumped together and asserted

TCPA claims against multiple defendants, any one of whom was alleged to be the possible source behind the violative calls.[29] That is not the case here as Defendant is the only alleged principal.

**\*3** In *Cunningham*, the plaintiff failed to demonstrate that the entity who physically made the telemarketing call (inviting him to a time share seminar) had any principal-agency relationship with the defendant, which was one of several commercial entities involved in the seminar.[30] There was no indication the defendant had any control over, or even knew about, the violative calls. Thus, *Cunningham* is also inapposite as the alleged principal-agency relationship here is direct and straightforward: Defendant is the alleged principal, Ms. Ahmed its agent, and an unnamed telemarketer a subagent.[31]

Furthermore, Defendant is plainly wrong that Plaintiff's complaint is inadequately pled. The "liberal" pleading standards of the Federal Rules of Civil Procedure aim simply to ensure a defendant has "fair notice of the basis for" a plaintiff's claims.[32] Here, Plaintiff has provided a "short and plain statement" outlining his claim, as required by Rule 8(a), and he has done so in a way that clearly indicates agency relationships between Defendant, Ms. Ahmed, and the telemarketer. His pleadings easily put Defendant on notice, apprising it of the nature of his claims, which he has stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances," as required by Rule 10(b).[33] Additionally, the court must hold complaints by *pro se* litigants "to less stringent standards than formal pleadings drafted by lawyers."[34] Even if that were not the case, however, the court finds Plaintiff's Complaint is pled with sufficient clarity.

That said, it is true that Plaintiff does occasionally "conflate" Defendant and Ms. Ahmed. When he does, however, his allegations pertain to the relationship between Defendant "and/or" Ms. Ahmed, on the one hand, and the actual telemarketer, on the other. For example, he alleges "Ahmed and/or [Defendant] contracted with an unknown third-party telemarketer to market and solicit insurance products."[35] But such an allegation is permissible for two reasons. First, Plaintiff has no way of knowing who directly hired the telemarketer, although chances are it would have been Defendant and not Ms. Ahmed. Second, even if it had been Ms. Ahmed, she and Defendant allegedly had a principal-agency relationship, meaning Defendant, the principal, may be liable for her conduct to the extent she was acting as an agent for and on behalf of Defendant.[36] Therefore, the outcome is the same whether Defendant directly hired the telemarketer or Ms. Ahmed did: Defendant may be on the hook.

### B. Failure to State a Claim for Relief

Defendant next asserts Plaintiff has failed to state a claim upon which relief can be granted. Plaintiff's claims for relief arise from Defendant's alleged 1) non-emergency telemarketing[37]; 2) solicitation to a DNC-registered phone number[38]; and 3) violations of the Texas Business and Commerce Code, which prohibits telephone solicitations.[39]

### a. Non-Emergency Telemarketing

**\*4** Under the TCPA, it is "unlawful for any person within the United States ... to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using ... an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service."[40] Further, "under federal common-law principles of agency, there is vicarious liability for TCPA violations."[41] Under Texas law, a principal-agency relationship exists when an individual has actual or apparent authority to act on behalf of another or the latter ratifies the actions of former.[42]

Plaintiff asserts Defendant made, authorized, or ratified "non-emergency telemarketing robocalls" to his cell phone "without his prior express written consent."[43] Defendant does not dispute Plaintiff received violative calls. Instead, Defendant simply claims Plaintiff failed to allege any facts supporting an agency relationship and therefore vicarious liability.[44]

Defendant again fortifies its position primarily with unreported, inapposite, misapplied, out-of-circuit cases.[45] Yet even a cursory review of this court's TCPA caselaw demonstrates Plaintiff has plausibly alleged an agency relationship between Defendant and the unnamed telemarketer and therefore vicarious liability.

In *Callier v. National United Group, LLC*, this same plaintiff allegedly received a robocall, requested to connect to a live representative, and was then told by the telemarketer she would call him back so he could talk to a sales agent.[46] Mr. Callier received a call back shortly thereafter.[47] This court noted:

> Mr. Callier's information was provided to [the defendant] from the initial telemarketing call and [the defendant] subsequently contacted him because of the telemarketing call. The immediacy between the two calls and the purpose of both imply that the call back was closely linked to the preceding prerecorded call. The proximity and relatedness of these calls allows for a plausible inference that the first prerecorded call was made by or on behalf of [the defendant].[48]

The calls in this case are even more closely connected since no call back was necessary: Plaintiff was connected directly to Ms. Ahmed on the same initial call.[49]

In *Callier v. MultiPlan, Inc.*, although our intrepid litigator failed to identify which of three defendants was the principal, the agent, or the beneficiary behind the robocalls, the court nevertheless "reasonably infer[red] the existence of an agency relationship amongst" them because Mr. Callier claimed they had "authorized a third-party telemarketer to generate prospective customers."[50] "At the very least," this and other allegations suggested one of the defendants "was a principal that authorized other [d]efendants to make robocalls on its behalf or, alternatively, ratified the robocalls by accepting the benefits they yielded."[51]

When Mr. Callier has failed, it has been because he did not directly connect the sale of a solicited product to the original "producer" of that product. In *Callier v. SunPath Ltd.*, he allegedly purchased car warranty policies from an unnamed telemarketer—but he learned the policies were covered by the defendants only after those policies were mailed to his house.[52] The "mere fact that telemarketing calls were made on behalf of" the defendants, however, did not suffice to establish an agency relationship: although the defendants "undoubtedly benefited from the marketing calls, nothing in the pleadings indicate[d] either were aware of the actions allegedly in violation of the TCPA."[53]

 **\*5**  Such is not the case here. Plaintiff alleges Ms. Ahmed or Defendant "contracted with an unknown third-party telemarketer to market and solicit [its] insurance products," "supplied the telemarketer with the age, health, income, and state of residence requirements to purchase [those] insurance products," "provided the telemarketer with access to real-time quotes and pricing information for the solicited life insurance products," "authorized the third-party telemarketer to generate automated phone calls with prerecorded voice message scripts," and "gave access to proprietary information to the third-party telemarketer to assist in the robocalling campaign."[54] The telemarketer then called Plaintiff numerous times.[55] Once Plaintiff met the criteria to purchase Defendant's life insurance policy, he was transferred directly to Ms. Ahmed, its sales agent, who sold him a policy.[56]

These allegations are not, as Defendant claims, "wholly conclusory and speculative."[57] Moreover, if they are true, which the court must assume at this stage, they reasonably imply an agency relationship between Defendant and the unnamed telemarketer. First, the allegations demonstrate an agency relationship between the telemarketer and Ms. Ahmed given her direct involvement in the call.[58] Second, they show an agency relationship between Ms. Ahmed and Defendant since Ms. Ahmed is a registered insurance agent for Defendant and sells insurance on its behalf.[59] Thus, the telemarketer was allegedly Defendant's subagent. Texas courts hold a principal vicariously liable for the tortious acts of its subagents.[60]

Accordingly, Defendant's Motion is denied with respect to Plaintiff's first claim for relief.

### b. Solicitation to a DNC-Registered Phone Number

"No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government."[61] Plaintiff alleges that he has at all relevant times "been on" the DNC.[62]

Defendant contends this second claim for relief must fail for the same reason as Plaintiff's first: he has not adequately pled vicarious liability.[63] As discussed above, the court disagrees.

Defendant next argues Plaintiff's second claim for relief fails as he did not allege that *he himself* registered his number on the DNC.[64] Defendant cites *Rombough v. Robert D. Smith Ins. Agency, Inc.*, an unreported, out-of-circuit case, which dismissed a TCPA claim because the plaintiff, although she claimed her number was registered with the DNC, did not allege she had been the one to register it.[65] Defendant's contention borders on frivolous.

First, this court has already considered a TCPA claim in which a plaintiff alleged her number was registered on the DNC but did not specifically allege she did the registering.[66] That detail, however, did not doom her TCPA claim, to which this court found she was entitled to summary judgment.[67]

**\*6** Second, *Rombough*'s nitpicky formality is thoroughly unpersuasive. The DNC is not auto-populated: it is a list of phone numbers for individuals *who have requested* that telemarketers not contact them.[68] While it is possible a third-party may have registered a plaintiff's phone number before a plaintiff acquired it, this is unlikely given how infrequently people change numbers. And it is particularly unlikely here given Plaintiff's well-documented desire that telemarketers respect his registration with the DNC.[69]

Finally, at the motion to dismiss stage, "a district court must accept a plaintiff's allegations as true and *indulge all reasonable inferences in their favor.*"[70] A supremely reasonable inference from the allegation that Plaintiff's number was registered on the DNC is that *he* did the registering.

Defendant's Motion is therefore denied with respect to Plaintiff's second claim for relief.

### c. Telephone Solicitations Under Texas State Law

Texas Business and Commerce Code provides that anyone "who receives a communication that violates" the TCPA may seek an injunction and damages "against the person who originates the communication."[71]

Defendant makes two arguments against Plaintiff's final claim. First, "[b]ecause Plaintiff's TCPA claims fail," his state law claim also fails.[72] As discussed, however, Plaintiff's TCPA claims do not fail and therefore neither must his state law claim.[73]

Second, Defendant contends Plaintiff's state law claim should be dismissed because "allowing [him] to recover under both statutory schemes for the same alleged calls would amount to an improper double recovery."[74] But Plaintiff is not recovering anything at this stage; the court is simply assessing whether he has plausibly alleged his claims for relief. He has.

## IV. CONCLUSION

Accordingly, it is **HEREBY ORDERED** that "Defendant American-Amicable's Motion to Dismiss Plaintiff's Second Amended Complaint" [ECF No. 26] is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 17732717

Footnotes

1    "Defendant American-Amicable's Motion to Dismiss Plaintiff's Second Amended Complaint" ("Mot.") 3, ECF No. 26, filed Aug. 23, 2022.

2    "Plaintiff's Second Amended Complaint" ("Compl.") 5 ¶ 21, ECF No. 24, filed Aug. 9, 2022.

3    *Id.* at 6 ¶¶ 30–31, 7–8 ¶ 36.

4    *Id.* at 6 ¶ 30.

5    *Id.* at 8 ¶ 37.

6    *Id.* at 6–7 ¶ 33, 8 ¶ 39.

7    *Id.* at 1 ¶ 3, 7 ¶ 34.

8    *Id.* at 7 ¶ 35.

9    *Id.* at 18–19; *see* 47 U.S.C. § 227(b).

10   *Id.* at 19; *see* 47 U.S.C. § 227(c)(3)(F); 47 C.F.R. § 64.1200(c).

11   *Id.* at 20; *see* Tex. Bus. & Com. 305.053.

12   Mot. at 3.

13   *Id.* at 3, 2.

14   Fed. R. Civ. P. 8(a)(2).

15   *Id.* § 8(d)(1).

16   *Id.* § 10(b).

17   *Id.* § 12(b)(6).

18   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

19   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

20   *Id.* (citing *Twombly*, 550 U.S. at 556).

21   *Twombly*, 550 U.S. at 555.

22   *See Kaiser Aluminum & Chem. Sales, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citing *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).

23    *See* "Order to Dismiss Sophia Ahmed," ECF No. 28, entered Sept. 13, 2022.

24    Mot. at 6; *see* Compl. at 2 ¶ 5, 10 ¶ 51, 11–12 ¶ 64, 17 ¶¶ 91–94, 18 ¶ 97, 98, 19 ¶ 3, 20.

25    Mot. at 7 (emphasis removed).

26    *Id.* at 5 (citing *Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519702 (E.D. Tex. Apr. 26, 2019); *Cunningham v. Lifestyles Dev., LLC*, No. 4:19-CV-00006-ALM-CAN, 2019 WL 4282039 (E.D. Tex. Aug. 8, 2019); *Garig v. Travis*, No. 20-654-JWD-RLB, 2021 WL 2708910 (M.D. La. June 30, 2021); *Williams v. Am. Com. Lines, Inc.*, No. 20-139-SDD-EWD, 2020 WL 4574515 (M.D. La. July 23, 2020)); *see also id.* at 7 (citing *Ewing v. GoNow Travel Club, LLC*, No. 19-cv-297-BAS-AGS, 2019 WL 3253058 (S.D. Cal. July 19, 2019); *Mendoza v. J.P. Morgan Mortg. N.A.*, No. 7:17-CV-180, 2017 WL 2778250 (S.D. Tex. June 27, 2017); *Cobarobio v. Midland Cnty., Tex.*, No. MO:13-CV-00111-RAJ, 2015 WL 13608102 (W.D. Tex. Jan. 7, 2015)); id. at

27    *Ewing*, 2019 WL 3253058.

28    *Cunningham*, 2019 WL 4282039.

29    *See Ewing*, 2019 WL 3253058, at *3.

30    *Cunningham*, 2019 WL 4282039, at *4.

31    Compl. at 6 ¶ 29.

32    *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002).

33    Fed. R. Civ. P. 10(b).

34    *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002).

35    Compl. at 11 ¶ 55.

36    *See Schrum v. Land*, 12 F.Supp.2d 576, 582 (S.D. Tex. 1997) ("A principal is liable for its agent's acts when the agent has actual or apparent authority to commit those acts, or when the principal ratifies them.").

37    Compl. at 18–19; *see* 47 U.S.C. § 227(b).

38    *Id.* at 19; *see* 47 U.S.C. § 227(c)(3)(F); 47 C.F.R. § 64.1200(c).

39    *Id.* at 20; *see* Tex. Bus. & Com. 305.053.

40    47 U.S.C. § 227(b)(1).

41    *Callier v. MultiPlan, Inc.*, No. EP-20-CV-00318-FM, LLC, 2021 WL 8053527, *15 (W.D. Tex. Aug. 26, 2021).

42    *Debaillon v. Total Minatome Corp.*, 166 F.3d 339, 1998 WL 912094, *2 (5th Cir. 1998).

43    Compl. at 9 ¶ 43, 19 ¶ 2.

44    Mot. at 15.

45    *See generally id.* at 12–17.

46    *Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2021 WL 5393829, *4 (W.D. Tex. Nov. 17, 2021).

47    *Id.*

48    *Id.* at 7.

49   Compl. at 7 ¶ 34.

50   *MultiPlan*, 2021 WL 8053527, at *15 (internal quotation marks omitted).

51   *Id.*

52   *Callier v. SunPath Ltd.*, W.D. Tex, 3:20-cv-00106-FM, "Plaintiff's First Amended Complaint," 6 ¶¶ 30–33, ECF No. 27, filed Sept. 9, 2020.

53   *Callier v. SunPath Ltd.*, EP-20-CV-00106-FM, 2020 WL 10285659, *3–4 (W.D. Tex. Aug. 10, 2020).

54   Compl. at 5–6. Plaintiff alleges Defendant "and/or" Ms. Ahmed did these things. Again, however, such allegations nevertheless suffice to imply Defendant's vicarious liability.

55   *Id.* at 6 ¶¶ 32–33.

56   *Id.* at 8 ¶ 39, 7 ¶ 34.

57   Mot. at 15.

58   *See Callier v. Nat'l United Grp., LLC*, EP-21-CV-71-DB, 2022 WL 4088205, *6 (W.D. Tex. Sept. 6, 2022) (finding an agency relationship may have existed between an unnamed telemarketer and an insurance agent because, although the insurance agent was not present on the call, she had a "high degree of 'relatedness' " to the call as she was the one "responsible for the act of selling of insurance policies").

59   Compl. at 1 ¶ 3.

60   *See, e.g., Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 277 (Tex. 2012).

61   47 C.F.R. § 64.1200(c).

62   "Plaintiff's Second Amended Complaint" ("Compl.") 5 ¶ 21, ECF No. 24, filed Aug. 9, 2022.

63   Mot. at 17.

64   Mot. at 18.

65   *Id.* (citing *Rombough v. Robert D. Smith Ins. Agency, Inc.*, 2022 WL 2713278, *2–3 (N.D. Iowa June 9, 2022)).

66   *Atkinson v. Pro Custom Solar LLC*, SA-21-CV-00178-OLG, 2022 WL 4071998, *8 (W.D. Tex. Sept. 1, 2022).

67   *Id.*

68   *See* Federal Trade Commission, *National Do Not Call Registry*, https://www.donotcall.gov/.

69   *See, e.g., MultiPlan*, 2021 WL 8053527; *Nat'l United Grp., LLC*, 2022 WL 4088205; *Nat'l United Grp., LLC*, 2021 WL 5393829; *SunPath Ltd.*, 2020 WL 10285659.

70   *Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 WL 2688622, *2 (W.D. Tex. May 10, 2021) (citing *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009)) (emphasis added).

71   Tex. Bus. & Com. 305.053.

72   Mot. at 19.

73   *See, e.g., Nat'l United Grp., LLC*, 2021 WL 5393829, at *10 ("Since the Court has already found that Mr. Callier adequately states a claim under the TCPA, it also finds that he adequately states a claim under § 305.053.").

74      Mot. at 20.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

2013 WL 3417416
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

CEPHALON, INC., Plaintiff,

v.

SUN PHARMACEUTICAL INDUSTRIES, LTD., and

Caraco Pharmaceutical Laboratories, Ltd., Defendants.

Civil Action No. 11–5474 (FLW)(DEA).
|
July 8, 2013.

**Attorneys and Law Firms**

Allyn Zissel Lite, Mayra Velez Tarantino, Michael E. Patunas, Susana Cruz Hodge, Lite Depalma Greenberg, LLC, Newark, NJ, for Plaintiff.

Damian P. Conforti, Podvey, Meanor, Catenacci, Hildner Cocoziello & Chattman, PC, Newark, NJ, Gregory D. Miller, Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman PC, Newark, NJ, for Defendants.

OPINION

WOLFSON, District Judge.

**\*1** In this patent infringement action filed by Plaintiff Cephalon, Inc. ("Cephalon"), Defendants Sun Pharmaceutical Industries, Ltd. and Caraco Pharmaceutical Laboratories, Ltd. ("Defendants") have appealed the April 3, 2013 Letter Order of the Magistrate Judge, Dkt. No. 227, ("Letter Order") denying Defendants' request to bifurcate the case on the issues of liability and damages for discovery and trial purposes. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the Court affirms in part and vacates in part the decision of the Magistrate Judge.

**BACKGROUND**

The parties are familiar with the underlying facts in this matter, which the Court most recently detailed in its Opinion on December 20, 2012, denying Cephalon's motion for a preliminary injunction. *See* Dkt. No. 187. Thus, the Court will only briefly recite the facts necessary to deciding the instant appeal. During an Initial Scheduling Conference held on February 26, 2013, the Magistrate Judge rejected on the record the parties' Joint Discovery Plan, including Defendants' proposal to bifurcate liability and damages issues in this case. In a letter to the Magistrate Judge dated March 12, 2013, Defendants informally renewed their request to bifurcate both the discovery and trial portions of the case.[1] *See* Dkt. No. 219 at 2 ("Sun respectfully requests bifurcation of both discovery and trial of the potential issues of damages, willfulness and exceptional case ...."). Relying on the decision in *Princeton Biochemicals, Inc. v. Beckman Instruments, Inc.,* 180 F.R.D. 254 (D.N.J.1997), for support, Defendants contended that bifurcation was necessary because of the complexity of the case, the threat of prejudice due to jury confusion, and considerations of judicial economy. *See* Dkt. No. 219 at 3–7. After thoroughly considering the arguments from both sides, although not presented by formal motion, the Magistrate Judge rejected Defendants' renewed bifurcation request, finding that: (1) the case is not complex; (2) contrary to Defendants' position, bifurcation would likely delay the litigation and

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 20 of 116

result in duplication of effort rather than promote judicial economy; and (3) Defendants' reliance on the *Princeton* decision was misplaced. *See* Letter Order at 2. *Id.* Defendants then filed the instant appeal.

**STANDARD OF REVIEW**

A United States Magistrate Judge may hear and determine any non-dispositive pretrial matter pursuant to 28 U.S.C. § 636(b)(1) (A). To that end, a district court will only reverse a magistrate judge's decision on these matters if it is contrary to law or clearly erroneous. *Id.;* Fed.R.Civ.P. 72(a). "The party filing the notice of appeal bears the burden of demonstrating that the magistrate judge's decision was clearly erroneous or contrary to law." *Marks v. Struble,* 347 F.Supp.2d 136, 149 (D.N.J.2004). A ruling is "contrary to law" when the magistrate judge has misinterpreted or misapplied the applicable law. *Pharmaceutical Sales & Consulting Corp. v. J.W.S. Delavau Co., Inc.,* 106 F.Supp.2d 761, 764 (D.N.J.2000). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (citing *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Under this standard, "a district judge's simple disagreement with the magistrate judge's findings is insufficient to meet the clearly erroneous standard of review." *Andrews v. Goodyear Tire & Rubber Co., Inc.,* 191 F.R.D. 59, 68 (D.N.J.2000), and a district court will not reverse a magistrate judge's finding even "in circumstances where the [reviewing] court might have decided the matter differently." *Bowen v. Parking Auth. of City of Camden,* No. 00–5765(JBS), 2002 U.S. Dist. LEXIS 14585, at *3, 2002 WL 1754493 (D.N.J. July 30, 2002).

 **\*2** Where a magistrate judge has ruled on a non-dispositive matter "such as a discovery motion, his or her ruling is entitled to great deference and is reversible only for abuse of discretion." *Kresefksy v. Panasonic Communications & Sys. Co.,* 169 F.R.D. 54, 64 (D.N.J.1996). An abuse of discretion "may be found where the [magistrate] judge's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 527 (3d Cir.2004) (internal quotations omitted).

**DISCUSSION**

Initially, I address the scope of the Magistrate Judge's decision and the issues presented on appeal. Defendants initially raised —and the Magistrate Judge rejected—their bifurcation request in the context of the proposed Joint Discovery Plan, suggesting that Defendants sought bifurcation for discovery purposes. In Defendants' renewed letter application for bifurcation, however, Defendants raise arguments concerning bifurcation for both discovery and trial purposes, and, indeed, the Magistrate Judge's Letter Order could be read as denying bifurcation as to both the discovery and trial portions of this case. Such a determination regarding trial proceedings is premature in this matter, and, accordingly, to the extent that the Letter Order denied bifurcation at trial, I vacate that portion of the Magistrate Judge's decision. *See N.A.A.C.P. v. North Hudson Regional Fire and Rescue,* 255 F.R.D. 374, 393 (D.N.J.2009) (denying without prejudice a motion for bifurcation, filed in connection with motions for a preliminary injunction and class certification, on the basis that such a motion was premature "[g]iven the early stage of [the] litigation"). Although Defendants' application to bifurcate trial is premature at this stage, the parties may submit another application if and when trial should occur in this case—ideally, at the time of the final pretrial conference.

The sole issue, then, that remains on appeal is whether the Magistrate Judge abused his discretion in deciding not to bifurcate discovery relating to liability and damages issues. Generally, bifurcation is permitted "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed.R.Civ.P. 42(b). To that end, the Third Circuit has stated "the trial judge is entrusted with discretion [to decide case management issues such as bifurcation] because he is in a far better position than we to appraise the effect of [a particular procedure on the parties]." *Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128, 133 (3d Cir.1999). Thus, the decision to permit or deny bifurcation rests within the sound discretion of the court.[2] *Bair Laboratories, Inc., v. Abbott Laboratories,* 978 F.2d 98, 115 (3d Cir.1992); *Gardco Mfg. ., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1212 (Fed.Cir.1987); *Princeton,* 180 F.R.D. at 256.

**\*3** Courts in this district do not routinely grant motions to bifurcate discovery, unless there is some showing on the part of the moving party as to why bifurcation is appropriate. *E.g., In re GI Holdings Inc.,* 218 F.R.D. 428, 440 (D.N.J.2003) (denying motion to bifurcate discovery or trial based on finding that denial would cause no prejudice to moving party); *Glennon v. Wing Enterprises, Inc.,* CIV.A. 10–0324 JAP, 2010 WL 4782773, at \*17 (D.N.J. Nov.17, 2010) (denying bifurcation of discovery based on finding that issues were not sufficiently complex and that bifurcation would not promote settlement); *see also Innovative Office Prods. v. SpaceCo, Inc.,* No. 05–4037, 2006 U.S. Dist. LEXIS 29439, at \*4–5, 2006 WL 1340865 (E.D.Pa. May 15, 2006) ("bifurcation remains the exception rather than the rule"). In that connection, the moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties. *See Glennon,* 2010 WL 4782773, at \*17.

Notwithstanding the foregoing, Defendants argue that the Magistrate Judge clearly erred by finding that: (1) the case lacks complexity; (2) bifurcation would be less efficient, and (3) the *Princeton* decision does not mandate bifurcation. I address each of these issues in turn. First, Defendants contend that, in this case, "a full and fair evaluation of the issue of infringement—standing alone—presents a daunting task for anyone, particularly a jury." Def. Br. at 4. Similarly, with respect to damages, Defendants argue that "the question of a 'reasonable royalty' can be exceedingly complex." *Id.* at 5. Thus, Defendants reason that "this is precisely the type of case where bifurcation of liability and damages issues is necessary." *Id.* at 6. Much of that argument appears to relate to the issue of bifurcation of trial, no discovery. Defendants do not, however, point to any mistake of fact or law on this appeal showing that the Magistrate Judge abused his discretion in finding that the issues in this case were not so complex as to require bifurcation of discovery. Instead, Defendants simply reiterate the same arguments advanced before the Magistrate Judge, which he "thoroughly considered" and then rejected; indeed, Defendants have not provided any basis for this Court to determine that the Magistrate Judge erred when he found that there was "a relative lack of complexity" in the issues in this case. Letter Order at 2. Accordingly, the Court finds that the Magistrate Judge did not err in his findings or abuse his discretion in this regard.

Next, Defendants claim that bifurcation would promote judicial economy because the issue of damages is "purely contingent" upon a finding of liability.[3] Def. Br. at 8. In that respect, Defendants argue that it does not make sense "to expend the tremendous time and resources necessary to prepare damages issues for summary judgment or trial" because this Court has already denied Cephalon's preliminary injunction motion based in part on a failure to demonstrate likelihood of success on its claims. *Id.* Again, Defendants do not highlight any mistake of fact or law made by the Magistrate Judge. Rather, Defendants' argument is merely a disagreement with the Magistrate Judge's finding. Such disagreement is "insufficient to meet the clearly erroneous standard of review." *Andrews,* 191 F.R.D. at 68. Accordingly, Defendants' argument fails in this respect as well.

**\*4** Lastly, Defendants claim the Magistrate Judge abused his discretion by ignoring controlling case law, to wit, *Princeton Biochemicals, Inc. v. Beckman Instruments, Inc.,* 180 F.R.D. 254 (D.N.J.1997). To that end, Defendants rely on the following language in *Princeton:*

> In the normal case separate trial of issues is seldom required, but in a patent infringement suit considerations exist which suggest that efficient judicial administration would be served by separate trials on the issues of liability and damages. The trial of the damages question in such a suit is often difficult and expensive, while being easily severed from the trial of the questions of validity and infringement of the patent.

Def. Br. at 9 (quoting *Princeton,* 180 F.R.D. at 256). Even cursory review of this language reveals that Defendants' reliance on *Princeton* is misplaced. To begin, the issue of bifurcation in *Princeton* concerned trial, not discovery. Here, however, I am reviewing the Magistrate Judge's decision regarding bifurcation for discovery purposes only. Indeed, the complexity issue in *Princeton* related to a concern of jury confusion, which is not implicated in discovery proceedings.[4] Thus, the Magistrate Judge did not abuse his discretion in concluding that "the concerns and considerations presented in *Princeton* are, therefore, not similarly implicated here." Letter Order at 2.

Moreover, even assuming *arguendo* that the rationale in *Princeton* should be extended to discovery, bifurcation is still not mandated in the present case. Contrary to Defendants' position, *Princeton* does not stand for the principle that bifurcation is

*required* in any case; rather, the *Princeton* decision clearly explained that "the decision to bifurcate ... remains within the sound discretion of the district court." *Princeton,* 180 F.R.D. at 258. Indeed, as discussed *supra* in this Opinion, there is no bright line rule for when bifurcation is appropriate. *See id.* ("A substantial body of case law has arisen to which a court may turn to inform its discretion. However, the actual decision reached in any one of those cases is of limited value because only the specific facts and circumstances of the case before the court can provide the answer to the question of whether the advantages of bifurcation outweigh the disadvantages."). *Compare Dutch Branch of Streamserve Dev. AB v. Extream Software, LLC,* Civ. No. 08–343–SLR, 2009 WL 2706932, at *1 (D.Del. Aug.26, 2009) (stating that "bifurcation is appropriate, if not necessary, in all but exceptional patent cases"), *with Graco Inc. v. PMC Global, Inc.,* No. 08–1304(FLW), 2009 WL 904010, at *36 (D.N.J. Mar.31, 2009) (stating that "bifurcation is the exception rather than the rule in patent cases"). Thus, even were *Princeton* controlling in this case, it would not mandate bifurcation, and accordingly would not show that the Magistrate Judge abused his discretion in denying bifurcation.

**\*5** Overall, many of the concerns Defendants raised in the bifurcation application before the Magistrate Judge, and again here on appeal, relate to issues that would arise at trial. As explained in this Opinion, although I conclude that the Magistrate Judge did not abuse his discretion in denying bifurcation with respect to discovery, any ruling on the bifurcation of issues for trial is premature at this preliminary stage of the case. Thus, should a trial be necessary, the parties are free to revisit the issue of bifurcation at a more appropriate time, *e.g.,* during their final pretrial conference.

**CONCLUSION**

Defendants have failed to show that the Magistrate Judge abused his discretion in denying Defendants' request to bifurcate discovery, and accordingly, the Magistrate Judge's Letter Order is affirmed in that respect. To the extent that the Magistrate Judge also denied bifurcation of issues for trial, that portion of the Magistrate Judge's decision is vacated, as such an application is premature.

An appropriate order shall follow.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3417416

Footnotes

1    Specifically, Defendants seek bifurcation of liability from the issues of "damages, willfulness and exceptional case," and wish to stay all discovery and trial matters relating to these latter issues. *See* Dkt. No. 219 at 2 n. 2. For the sake of clarity, like Defendants, I refer to these issues collectively as "damages."

2    Defendants suggest, for the first time in a footnote in their reply brief, that the Magistrate Judge's bifurcation decision is a wholly legal conclusion subject to *de novo* review on appeal. *See* Def. Reply at 2 n. 2. Although unclear from the footnote, Defendants may have asserted such a position based on their understanding that the Magistrate Judge denied bifurcation as to both discovery and trial. As explained above, any ruling with respect to the bifurcation of trial is premature and thus vacated. With respect to discovery issues, however, the Magistrate Judge's determination regarding bifurcation necessarily entailed factual findings regarding the complexity of this case and whether bifurcation would promote judicial economy. Thus, I reject Defendants invitation to apply a *de novo* standard on this appeal to the Magistrate Judge's decision concerning bifurcation of discovery, and instead I follow the general rule that discovery disputes are subject to abuse of discretion review. *See Kresefksy v. Panasonic Communications & Sys. Co.,* 169 F.R.D. 54, 64 (D.N.J.1996).

3    Of course, Defendants' argument in this regard applies to *every* case, since the issue of damages is always contingent upon a finding of liability. In other words, according to Defendants, bifurcation is *always* appropriate. Such reasoning contravenes the language of Rule 42(b) and the case law cited in this Opinion. The Magistrate Judge certainly did not abuse his discretion in rejecting such reasoning.

4        In *Princeton,* I found the case to be complex and thus warranting bifurcation at trial because the jury would be require to process volumes of technical exhibits, and "this task would be surely overwhelming to even the most sophisticated jurors." *Princeton, 180 F.R.D. at 258.* Additionally, regarding judicial economy, I found that "litigating the damages issue ... may ultimately prove unnecessary" because the accused product was a multi-million dollar product line; thus, a liability determination would "define the parameters of the allegedly infringing product." *Id.* at 259. Neither of these findings exist at this point in the present case.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM     Document 28-1     Filed 06/24/26     Page 24 of 116

EQT Production Company v. Terra Services, LLC, Not Reported in Fed. Supp. (2014)

2014 WL 12838677
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

EQT PRODUCTION COMPANY, Plaintiff,

v.

TERRA SERVICES, LLC, Defendant.

Civil Action No. 14-1053
|
Signed 10/21/2014
|
Filed 10/22/2014

**Attorneys and Law Firms**

Patricia L. Dodge, Caleb M. Turner, Nicholas J. Bell, Chad I. Michaelson, Meyer, Unkovic & Scott LLP, Ryan James, Farneth Tomosovich, LLC, Pittsburgh, PA, for Plaintiff.

Daniel Carmeli, John K. Gisleson, Matthew H. Sepp, Morgan, Lewis & Bockius LLP, Pittsburgh, PA, Glen R. Stuart, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Kenneth S. Komoroski, Morgan, Lewis & Bockius LLP, Canonsburg, PA, for Defendant.

## MEMORANDUM ORDER

Nora Barry Fischer, United States District Judge

**\*1**  Pursuant to the Court's rulings at the Initial Case Management Conference, held on September 30, 2014, and the Court's Order of October 1, 2014, (Docket No. 21), Defendant, Terra Services, LLC ("Terra"), filed a Motion to Bifurcate Discovery on October 10, 2014, (Docket No. 25). Plaintiff, EQT Production Co. ("EQT"), filed its Response in Opposition on October 17, 2014. (Docket No. 30). The Motion is now ripe.

"The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis." *Hartley-Culp v. Credit Mgmt. Co.*, No. 14-282, 2014 WL 4630852, at \*3 (citing *Idzojtic v. Pa. R.R. Co.*, 456 F.2d 1228, 1230 (3d Cir. 1972) ). "Bifurcation "remains the exception rather than the rule." *Innovative Office Prods., Inc. v. Spaceco, Inc.*, No. 05-4037, 2006 WL 1340865, at \*1 (E.D. Pa. May 15, 2006). "Courts ... do not routinely grant motions to bifurcate discovery, unless there is some showing on the part of the moving party as to why bifurcation is appropriate." *Cephalon, Inc. v. Sun Pharm., Ltd.*, No. 11-5474, 2013 WL 3417416, at \*3 (D.N.J. July 8, 2013). "[T]he moving party bears the burden of demonstrating that bifurcation would serve judicial economy, avoid inconvenience, and not prejudice any of the parties." *Cephalon, Inc.*, 2013 WL 3417416 at \*3.

Though Terra argues that bifurcation would expedite proceedings in this case, its proposed schedule takes discovery in this case through the end of January, 2017. (Docket No. 25-1 at p. 2). EQT points out that this schedule "presumes an immediate decision from the Court on dispositive motions." (Docket No. 30 at p. 4). The Court agrees that this is unrealistic. Adding the several months it will no doubt take this Court to rule on said motions, under Terra's schedule, discovery in this case might remain open until 2018. Cognizant of the availability of witnesses and their diminishing ability to recall the events of 2012, the Court refuses to use its discretion to bifurcate discovery on this ground.

Case 1:26-cv-00659-KM     Document 28-1     Filed 06/24/26     Page 25 of 116

EQT Production Company v. Terra Services, LLC, Not Reported in Fed. Supp. (2014)

Additionally, as EQT argues, Terra's proposal would likely result in deposing the same witnesses twice–once in the liability phase, and again in the damages phase. This is the definition of inconvenience, and the additional cost of duplicative depositions and document review combine to counsel against bifurcation in this case.

Terra's objections are preserved as is the Court's right to bifurcate the trial of this action.

With the foregoing in mind, IT IS HEREBY ORDERED that Defendant's Motion to Bifurcate Discovery [25] is DENIED.

IT IS FURTHER ORDERED that the parties meet and confer and file a joint proposed case management order by **November 3, 2014**.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12838677

---

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2422617
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Joseph FRIEL, individually and on behalf of others similarly situated, Plaintiff

v.

LINE 5, LLC and Headstart Warranty Group, LLC, Defendants

No. 3:24cv1866
|
Signed August 21, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Brit J. Suttell, Barron & Newburger, P.C., Media, PA, for Defendant Line 5, LLC.

Andrew Michael Schwartz, Messer Strickler Burnette, Ltd., Downingtown, PA, Barry Guaglardi, Pro Hac Vice, Guaglardi & Meliti, LLP, Rochelle Park, NJ, for Defendant Headstart Warranty Group LLC.

**MEMORANDUM**

JULIA K. MUNLEY, JUDGE

 **\*1**  This putative class action case involves automated telephone calls allegedly sent by companies selling, guaranteeing, and/or financing vehicle service contracts, otherwise known as extended car warranties. After receiving numerous unsolicited extended-warranty calls over a two-month period, Plaintiff Joseph Friel filed this action pursuant to the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA"), seeking to represent a nationwide class of robocall recipients and a class of recipients on the National Do Not Call Registry ("DNCR"). Before the court is a motion to strike the class allegations from Friel's complaint prior to discovery. Also pending is a motion to bifurcate discovery, which actually requests that discovery be conducted in three separate phases. Both motions are ripe for disposition.

**Background**[1]
Friel's TCPA complaint alleges that former defendant JEA Management Services d/b/a Covered Auto ("JEA") sent prerecorded telemarketing calls on behalf of Defendants Headstart Warranty Group, LLC ("Headstart") and Line 5, LLC ("Line5"), including to recipients on the DNCR without the call recipient's express written consent. (Doc. 1, Compl. ¶ 5).

As for the extended car warranties involved in this TCPA litigation, Friel's complaint details a joint enterprise among the JEA, Headstart, and Line5 entities. Id. ¶ 17. As alleged, JEA and Headstart sell vehicle service contracts with JEA acting as a sales agent and Headstart acting as the guarantor of the contracts. id. ¶¶ 14–15. Line5 handles customer management, payment processing, and provides financing for the contracts sold by JEA and guaranteed by Headstart. Id. ¶ 16. To generate business, JEA places telemarketing calls, some of which are prerecorded, on behalf of Headstart and Line5. Id. ¶ 17.

Friel further alleges that he maintains a personal residential telephone number, which has been on the DNCR since 2011. Id. ¶¶ 18–20. According to the plaintiff, he has never been a customer of JEA, Headstart, or Line5 and never inquired into being

a customer of these entities. Id. ¶ 21. Nevertheless, Friel received at least fourteen (14) telemarketing calls from JEA between August 8, 2024 and September 27, 2024. Id. ¶ 22. The caller IDs from these incoming calls reflected different phone numbers from area codes associated with the Philadelphia, Allentown-Bethlehem-Easton, and Scranton-Wilkes-Barre metropolitan areas. Id. ¶¶ 22, 27.

Friel answered the calls. They all began with a prerecorded voice message with fake typing and office background noise. Id. ¶¶ 23, 24. A robotic voice greeted Friel by name, identified that it was calling on behalf of the "vehicle service department," and asked how the plaintiff was doing. Id. ¶ 24. Friel hung up on most of the calls. Id. ¶ 26.

Friel answered one of the calls on September 27, 2024. Id. ¶ 27. Plaintiff heard the above prerecorded message, responded to questions posed by the artificial intelligence agent, and was then transferred to a human representative. Id. ¶¶ 23–32. Next, Friel listened to that representative's sales speech about a vehicle service contract and the financing program offered by Defendant Line5. Id. ¶¶ 32–33. Subsequently, Friel received various emails and text messages from Line5 and a copy of a vehicle service contract for signature. Id. ¶ 36. From these communications, Friel discerned JEA, Headstart, and Line5's roles in the telephone calls. Id. ¶¶ 37–39.

**\*2**  Approximately one month later, on October 29, 2024, Friel initiated this putative class action against JEA, Headstart, and Line5 under 47 U.S.C. § 227(b) and 47 U.S.C. § 227(c)(5) seeking to represent himself and other similarly situated individuals. (Doc. 1, Compl. ¶¶ 90–99). JEA responded by filing three motions: 1) a motion to strike class allegations, (Doc. 29); 2) a motion to dismiss for failure to state a claim, (Doc. 31), and 3) a motion to trifurcate discovery, (Doc. 33). JEA filed briefs in support of each motion. (Docs. 30, 32, 34). Defendant Line5 joined JEA's motion to strike and motion to trifurcate discovery. (Docs. 45–46).

On March 25, 2025, Friel filed a notice of voluntary dismissal regarding JEA. (Doc. 50). JEA's dismissal rendered the motion to dismiss moot. (Doc. 51). The court determined that Line5's joinder to the other motions required oppositional briefing. Id. Friel subsequently filed his briefs in opposition as ordered. (Docs. 52–53). Line5 then filed a reply brief regarding the motion to trifurcate discovery, (Doc. 54), but not the motion to strike. Based on the briefs of JEA and Friel, the motion to strike plaintiff's TCPA class allegations is ripe for disposition. Similarly, the motion seeking phased discovery is ready for a decision based upon the briefs of JEA, Friel, and Line5.

**Jurisdiction**

Because Friel brings suit under a federal statute, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 387, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012) (holding that nothing in the text, structure, or legislative history of the TCPA calls for displacement of federal question jurisdiction).

**Analysis**

**1. The TCPA and the Proposed Classes**

This putative class action concerns alleged violations of the TCPA. "The TCPA protects businesses and consumers from intrusive telemarketing communications." McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp., 606 U.S. 146, 149, 145 S.Ct. 2006, ―― L.Ed.2d ―― (2025). The TCPA "makes it unlawful to use an automatic telephone dialing system or an artificial or prerecorded voice message, without the prior express consent of the called party, to call any... cellular telephone, or other service for which the receiver is charged for the call." Mims, 565 U.S. at 373, 132 S.Ct. 740 (citing 47 U.S.C. § 227(b)(1)(A)). The TCPA also "forbids using artificial or prerecorded voice messages to call residential telephone lines without prior express consent. Id. (citing 47 U.S.C. § 227(b)(1)(B)). "In plain English, the TCPA prohibited almost all robocalls to cell phones." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 615, 140 S.Ct. 2335, 207 L.Ed.2d 784 (2020) (footnote omitted).

Additionally, Section 227(b) contains a private right of action based on violations of that subsection or the regulations prescribed under that subsection. 47 U.S.C. § 227(b)(3). Under Section 227(b)(3), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(b)(3)(A)–(C). "The TCPA imposes tough penalties for violating the robocall restriction," including trebling the above damages for willful or knowing violations, "which can add up quickly in a class action." Barr, 591 U.S. at 616, 140 S.Ct. 2335.

Section 227(c) concerns further protections of residential telephone subscribers' privacy rights and directs the Federal Communications Commission ("FCC") to prescribe regulations regarding do-not-call systems. See 47 U.S.C. § 227(c)(1)–(4). Section 227(c) "authorizes a private right of action for violation of the FCC's implementing regulations[ ]" related to do-not-call. See 47 U.S.C. § 227(c)(5); Mims, 565 U.S. at 375 & n.5, 132 S.Ct. 740. Section 227(c)(5) permits a civil action by "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations[.]" 47 U.S.C. § 227(c)(5).[2] Under Section 227(c)(5), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(c)(5)(A)–(C). A plaintiff may also seek treble damages for willful or knowing violations of the do-not-call regulations. Id.

**\*3** These statutory provisions and attendant regulations form the basis of Friel's complaint against the defendants. They also form the basis of his two proposed classes. The proposed Robocall Class stems from the alleged Section 227(b) and related regulatory violations, while the proposed National Do Not Call Registry Class ("DNCR Class") derives from the alleged Section 227(c) and related regulatory violations.

### 2. Motion to Strike Class Allegations

There are two motions presently pending before the court. First, as mentioned above, Line5 joined in JEA's motion to strike the class allegations from Friel's complaint. The motion to strike is partly premised upon Rule 12(f) of the Federal Rules of Civil Procedure. Rule 12(f) provides that the court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Rule 12(f) motions are designed to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters. Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 284 F.R.D. 238, 243 (E. D. Pa. 2012) (citations omitted); see also Mclnerney v. Moyer Lumber and Hardware, Inc., 244 F.Supp.2d 393, 402 (E.D. Pa. 2002). Providing relief under Rule 12(f) is largely disfavored and such motions are typically denied "unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party." Miller v. Group Voyagers, Inc., 912 F.Supp. 164, 168 (E.D. Pa. 1996). In the class action context, however, it is unlikely that a defendant can show that a plaintiff's class allegations constitute matters usually contemplated by Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d 464, 496 (W.D. Pa. 2019) (citations omitted).

The motion to strike is also premised upon Federal Rule of Civil Procedure 23, which governs the administration of class actions in federal courts. See Perrigo Institutional Inv. Grp. v. Papa, No. 24-2861, 2025 WL 2315977, at \*4 (3d Cir. Aug. 12, 2025). Although "an ingenious procedural innovationM" Eubank v. Pella Corp., 753 F.3d 718, 719 (7th Cir. 2014), "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Thus, to ensure that named plaintiffs are appropriate representatives of the class whose claims they wish to litigate, Rule 23(a) contains four requirements: numerosity, commonality, typicality, and adequacy of representation. See id. at 348–49, 131 S.Ct. 2541. Additionally, for a class to be certified, the requirements of Rule 23(b)(1), (2), or (3) must also be met. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 590 (3d Cir. 2012).

Friel brings this putative TCPA class action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3). (Doc. 1, Compl. ¶ 73). Rule 23(b)(2) is used to pursue injunctions in class actions. See In re: Google Inc. Cookie Placement Consumer Priv. Litig., 934 F.3d 316, 323 (3d Cir. 2019). The complaint requests injunctive relief to prohibit defendants from using prerecorded voices in the future and from making telemarketing calls to telephone numbers on the DNCR. (Doc. 1, Compl. ¶¶ 94, 99). Friel, however, also seeks statutory damages on behalf of himself and the putative classes. Id. ¶¶ 92-93, 98. Rule 23(b)(2) certification is not authorized

when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant, or when each class member would be entitled to individualized award of monetary damages. Wal-Mart Stores, Inc., 564 U.S. at 360, 131 S.Ct. 2541. Rather, "individualized monetary claims belong in Rule 23(b)(3)." Id. at 362, 131 S.Ct. 2541. Under Rule 23(b)(3), a class action may be maintained if the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) are satisfied and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[3] FED. R. CIV. P. 23(b)(3).

 **\*4** Rule 23(c) further provides that "[a]t an early practicable time after a person sues... as a class representative, the court must determine by order whether to certify the action as a class action." FED. R. CIV. P. 23(c)(1)(A). Additionally, Rule 23(d) permits the court to issue orders that: 1) "determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument[,]" FED. R. CIV. P. 23(d)(1)(A), and/or 2) "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly[,]" FED. R. CIV. P. 23(d)(1)(D). Consequently, where the goal of the motion to strike is to eliminate class allegations prior to discovery, other district courts have concluded that such motions should be considered under the above provisions of Rule 23, not under Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d at 496; see also Johnson v. Ally Fin. Inc., No. 1:16-CV-1100, 2017 WL 3433689, at \*2 (M.D. Pa. Aug. 10, 2017) (Conner, J.) (concluding that a motion to strike class allegations is not an improper procedural device).

To determine whether the requirements of Rule 23 have been satisfied, "a district court must conduct a 'rigorous analysis.' " Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 93 (3d Cir. 2011) (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008)).[4] There are "rare few" instances in which "the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." Id. at 93, n.30. Thus, "delving into the propriety of class certification" can be "the wrong focus" at an early stage of a proceeding where there has been no motion for class certification and no discovery. Id. at 93–94. After all, "[a]n order striking class allegations is functionally equivalent to an order denying class certification[.]" Microsoft Corp. v. Baker, 582 U.S. 23, 34, n.7, 137 S.Ct. 1702, 198 L.Ed.2d 132 (2017).

One of the "rare few" instances where an early motion to strike class allegations may be granted is where the class definitions create impermissible fail-safe classes. See Zarichny v. Complete Payment Recovery Servs., Inc., 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015). "A fail-safe class is 'one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim.' " Id. (quoting Messner v. Northshore University HealthSystem, 669 F.3d 802, 825 (7th Cir .2012)).

Friel's Robocall Class is defined as:

> All persons in the United States who, (1) within four years prior to the commencement of this litigation until the class is certified (2) received one or more calls on their cellular telephone or any other protected telephone service (3) from or on behalf of JEA Management Services d/b/a Covered Auto, Headstart Warranty Group LLC, or Line 5, LLC, (4) sent using the same, or substantially similar, pre-recorded message used to contact the Plaintiff.

(Doc. 1, Compl. ¶ 74).

Friel's DNCR Class is defined as:

> All persons within the United States: (1) whose residential telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Defendants or a third party acting on Defendants' behalf; (3) within a 12-month period; (4) within the four years prior to the filing of the Complaint.

Id.

The motion to strike asserts that the proposed class definitions are facially uncertifiable. Line5 has adopted JEA's arguments that the proposed class definitions are overbroad, lack commonality, and are defined vaguely. There are no specific arguments that the proposed classes are fail-safe, yet this consideration hangs over the analysis.

### a. Overbreadth Arguments

**\*5**  Defendant Line5 has joined in former defendant JEA's argument that both the proposed Robocall Class and the DNCR Class are overbroad. The Robocall Class definition is challenged as overbroad because it fails to exclude calls to individuals who consented to their receipt.[5] Similarly, the DNCR Class is challenged because this proposed class may include calls made to individuals with an established business relationship ("EBR") with the defendants and may include individuals who did not personally place their number on the DNCR.[6]

After careful consideration, however, Friel appears to be in a situation where he is forced to choose between two vulnerable alternatives in proposing class definitions at the outset of the litigation. On one hand, Friel must define his classes with reference to objective criteria. See Lewis v. Gov't Emps. Ins. Co., 98 F.4th 452, 462 (3d Cir. 2024) (citing Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015)). On the other hand, if Friel uses certain qualifiers, his proposed definitions could be deemed to advance improper fail-safe classes.[7]

As indicated above, "[a] fail-safe class bases its membership upon the validity of putative members' legal claims, meaning that 'a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.'" Jackson, 2023 WL 2472606, at \*3 (quoting Messner, 669 F.3d at 825). More simply stated, fail-safe classes preclude membership in the class unless a putative member would prevail on the merits. See Orduno v. Pietrzak, 932 F.3d 710, 716 (8th Cir. 2019).

**\*6**  Fail-safe classes cannot satisfy the ascertainability requirement of some class actions. See Zarichny, 80 F. Supp. 3d at 625 (citation omitted); see also Byrd, 784 F.3d at 163 & n.7 (explaining that a plaintiff seeking certification under Rule 23(b)(3) must prove by a preponderance that the class is ascertainable, but that ascertainability is not a requisite of a Rule 23(b)(2) class). The ascertainability standard requires a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Byrd, 784 F.3d at 163 (citations omitted).

In Zarichny, the Honorable Stewart R. Dalzell in the Eastern District of Pennsylvania determined that a putative TCPA class was defined in a fail-safe manner and granted a motion to strike. 80 F.Supp. 3d at 623-26. The proposed TCPA class was comprised of "those people 'who received one or more telephone calls from [d]efendants on the individual's cellular telephone that was initiated using an automatic telephone dialing system' without prior con[s]ent[.]" Id. at 623. Because the class was defined in a manner which only would include those who did not provide the defendant with prior consent, the court determined that "there is no way to provide notice to that putative class without the sort of extensive fact-finding that class actions should avoid," and "at the conclusion of the litigation, should [the defendant] prevail against [the plaintiff], any other putative class recipient would be free to litigate the same claim against [the defendant]." Id. at 625–26. In other words, the TCPA class could not be certified as defined in the initial pleading because the issue of consent was central to the merits of the underlying dispute.

Accordingly, many district courts within the Third Circuit have determined that TCPA class definitions avoid fail-safe concerns by omitting the issue of consent or other merits-based criteria. See Jackson v. Direct Bldg. Supplies LLC, No. 4:23-CV-01569, 2024 WL 184449, at \*9 & n.101 (M.D. Pa. Jan. 17, 2024) (Brann, C.J.) (collecting cases); see also Abella v. Student Aid Ctr., Inc., No. CV 15-3067, 2015 WL 6599747, at \*4 (E.D. Pa. Oct. 30, 2015) (noting the lack of reference to an automatic telephone dialing system in the proposed class definition since that is a required element of a Section 227(b)(1)(A) claim).[8] Consequently, to avoid fail-safe issues with his proposed Robocall Class in this case, Friel asserts that he intentionally did not include consent language in his class definition. (Doc. 53, Pl. Br. in Opp. at 13).

As indicated above, Line5 has adopted arguments challenging the proposed Robocall Class definition because it fails to exclude calls made with consent. In joining the motion to strike, Line5 also finds fault in the proposed DNCR Class definition because it fails to exclude calls to individuals with an EBR. Adding these qualifiers to the class definitions would incorporate more elements of liability into the definitions. That would then arguably require all putative class members to have winning TCPA claims before being included in the class. Although non-binding, the above cases discussing fail-safe classes would provide defendants with different arguments to strike the class allegations if Friel included reference to a lack of consent or an EBR in his proposed definitions. The court cannot fault Friel for choosing to define his classes around TCPA merits-based criteria.

**\*7** As for authority binding on this court, "in the specific context of claims filed under the TCPA statute, it is difficult to resolve without discovery whether there are factual issues regarding class members' business relationships with defendants or whether they consented to the receipt of [automated phone calls]." Landsman, 640 F.3d at 93–94. Friel's complaint alleges that the proposed classes are identifiable as presently defined through defendants' dialer records, other phone records, and phone number databases. (Doc. 1, Compl. ¶ 79). In the absence of discovery into these records, the court is unwilling to determine whether Friel's classes are defined too broadly or whether they fall short of ascertainability. Line5 thus has not demonstrated a valid reason to strike Friel's class allegations based on the potential breadth of the proposed classes.

### b. Commonality Arguments

Line5 has also adopted JEA's arguments that Friel's proposed classes lack commonality, that is, "the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Wal-Mart Stores, Inc., 564 U.S. at 349, 131 S.Ct. 2541 (citing FED. R. CIV. P. 23(a)). Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury, not merely that they have all suffered violation of the same provision of law. See id. (citations omitted). The claims "must depend upon a common contention[,]" which "must be of such a nature that is capable of classwide resolution[,]" meaning that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. As observed, "[t]he commonality requirement is not especially arduous." Johnson, 2017 WL 3433689, at \*4.

For his part, Friel's complaint alleges that he received calls related to some extended-warranty sales effort using an artificial or prerecorded voice without his consent in violation of the TCPA. (Doc. 1, Compl. ¶¶ 18–31). Only discovery will reveal whether Friel's proposed classes sustained the same injuries from those sales efforts. Accordingly, the court also rejects arguments that the proposed classes are facially uncertifiable based on a lack of commonality.

### c. Vagueness Arguments

Lastly, Line5 has adopted JEA's arguments that the Robocall Class must be stricken for vagueness because that proposed definition uses the phrase "same, or substantially similar" when describing the prerecorded messages allegedly sent by the defendants. In support, the motion to strike argues that, as presently defined, there would be no way for defendants to know which putative class members received the exact message that Friel received, and which putative class members received a "substantially similar" message. (Doc. 30, JEA Br. in Supp. at 20–21). Furthermore, per the arguments advanced in the motion to strike, the "substantially similar" definition uses improper subjective criteria and is improperly imprecise for a class action. Id.

Friel counters that such a definition is not vague under the circumstances because it essentially contemplates that defendants could have violated the TCPA as to other putative class members through the same sales efforts, but by using a different robotic voice, for example, or the same voice with a different script. (Doc. 53, Pl. Br. in Opp. at 21). Moreover, Friel explains that, even with this definition, his proposed Robocall Class is limited to calls that presumably had the same factual predicate for being sent, i.e., sales calls. Id. at 22.

Friel's argument signals that he is open to adding more qualifiers to his class definitions as this case moves forward. The court, however, will not strike the definitions or adjust any portion *sua sponte*. Discovery has not yet commenced and no motion to certify the class has been filed. To the extent that there are critical vagueness issues with Friel's proposed Robocall Class

definition, those issues would be more easily understood following a period of discovery. Accordingly, the motion to strike Friel's class allegations will be denied.

### 3. Motion to Trifurcate Discovery

**\*8** On the issue of discovery, Defendant Line5 also joined in JEA's motion seeking to conduct discovery in three separate stages, that is, 1) discovery into Friel's individual claims; 2) discovery into the appropriateness of class certification if Friel's claims proceed; and 3) if any class is ultimately certified, merits discovery for the class or classes. (Doc. 34, JEA Br. in Supp.; Doc. 45, Line5 Joinder Notice). Friel opposes, arguing that, if this TCPA action has merit, a trifurcated course of discovery will lead to three rounds of written discovery, three rounds of depositions (with the same witnesses being deposed three times), three rounds of potential discovery disputes, and then three rounds of dispositive motions.[9] (Doc. 52, Pl. Br. in Opp. at 1-3).

Unlike JEA, which has been dismissed, Defendant Line5 filed an answer to Friel's complaint. (Doc. 20). Line5's answer does not raise any defenses unique to Friel's individual claims, only defenses common across the putative TCPA classes. (See Doc. 20, Affirmative and Other Defenses, ¶ 1 ("Line5 did not make or authorize any calls on its behalf."), ¶ 3 ("Upon information and belief, the alleged calls were not selling Line5's services, but rather the calls were made for the purpose of selling an extended car warranty provided by another of the defendants.")). Line5 has not otherwise demonstrated why Friel's specific TCPA claims would be any different from the claims of the putative class members. The court thus sees no reason to bifurcate, trifurcate, or otherwise order that discovery be conducted in phases at this time. Accordingly, the discovery motion will be denied, and this case will be scheduled for a case management conference.

### Conclusion

For the reasons set forth above, JEA's motion to strike class plaintiff's allegations and motion to trifurcate discovery will be denied. An appropriate order follows.

### All Citations

Slip Copy, 2025 WL 2422617

Footnotes

1    This background section derives from the facts alleged in plaintiff's complaint. The court makes no determination as to the veracity of these allegations.

2    Pursuant to FCC regulations, "[n]o person or entity shall initiate any telephone solicitation to: ... A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2).

3    At this juncture, it is unknown how Friel will proceed if this matter reaches a motion for class certification. Given the availability of statutory damages of up to $1500 per class member under the TCPA, it may be later determined that this case is more driven by money damages than equitable relief, which would make certification under Rule 23(b)(2) inappropriate. See e.g. Jackson v. Locust Med., LLC, No. 4:22-CV-00424, 2024 WL 2701695, at *5 (M.D. Pa. May 24, 2024) (Brann, C.J.) (denying a plaintiff's motion to certify a class under Rule 23(b)(2) where the complaint included a request for statutory damages under the TCPA).

4    Landsman is an opinion that has been reinstated in part, to the extent it is consistent with Mims. See No. 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012).

5    To succeed with a cause of action under 47 U.S.C. § 227(b)(1) under the circumstances alleged in the complaint, Friel must show that defendants: 1) made "any call...using any automatic telephone dialing system or an artificial or prerecorded voice[;]" 2) to "any

telephone number assigned to a...cellular telephone service[;] 3) without "the prior express consent of the called party[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

There are certain regulatory defenses to TCPA actions premised upon 47 U.S.C § 227(c) and the do-not-call regulations. Pursuant to the regulations, a "telephone solicitation" does not include a call to any person with whom the caller has an EBR. 47 C.F.R. § 64.1200(f)(15)(ii). EBR is separately defined in 47 C.F.R. § 64.1200(f)(5). Furthermore, pursuant to the do-not-call regulations, "[n]o person or entity shall initiate any telephone solicitation to...[a] residential subscriber who has registered his or her telephone on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). Defendant Line5 adopts JEA's argument that this requires individuals to personally register their phones on the DNCR. Friel counters that personal registration is not required and would be impossible to prove in any case. (Doc. 53, Pl. Br. in Opp. at 15–17). The court need not reach this issue in disposing of the motion to strike.

"Although the United States Court of Appeals for the Third Circuit has not explicitly considered whether fail-safe classes are permissible, it has approvingly cited rulings by other circuits that categorically disallow fail-safe classes." Jackson v. Meadowbrook Fin. Mortg. Bankers Corp., No. 4:22-CV-01659, 2023 WL 2472606, at *3 (M.D. Pa. Mar. 10, 2023) (Brann, C.J.) (citing Byrd, 784 F.3d at 167; In re Nexium Antitrust Litig., 777 F.3d 9, 22 (1st Cir. 2015); Messner, 669 F.3d at 825).

On the other hand, the Honorable Christopher C. Conner reached a slightly different result when faced with this issue on a motion to strike in Johnson. 2017 WL 3433689 at *2–*3. Although the proposed TCPA class in Johnson included reference to consent, Judge Conner determined that it was not a facially uncertifiable fail-safe class because the proposed class definition contained reference to business records, which, with discovery, could reveal an ascertainable class. Id. at *1, *4.

Defendant Line5 indicates in its reply brief (filed after JEA's dismissal) that it only wishes to *bifurcate*, not *trifurcate* discovery. (Doc. 54). After review of Line5's reply brief, Line5 proposes a course of discovery that has no discernable distinction from the one proposed by JEA in the motion as initially filed.

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Grippo v. Sugared + Bronzed, LLC, Not Reported in Fed. Supp. (2025)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 34 of 116

2025 WL 596095
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Zoe GRIPPO

v.

SUGARED + BRONZED, LLC

Case No. SA CV 24-01792-AB (DFMx)
|
Filed February 24, 2025

**Attorneys and Law Firms**

Adrian Robert Bacon, Todd M. Friedman, Law Offices of Todd Friedman PC, Woodland Hills, CA, Max S. Morgan, Pro Hac Vice, The Weitz Firm LLC, Philadelphia, PA, for Zoe Grippo.

Joseph R. Ashby, Mark David Johnson, Offit Kurman P.C., Los Angeles, CA, Jerome P. Doctors, Cozen O'Conner, Los Angeles, CA, Harold M. Walter, Pro Hac Vice, Offit Kurman, Timonium, MD, Nafiz Cekirge, Offit Kurman, Hackensack, NJ, for Sugared + Bronzed, LLC.

**Proceedings: (IN CHAMBERS)** Order re: Defendant's Motion to Bifurcate Discovery (Dkt. 31)

Douglas F. McCormick, United States Magistrate Judge

 **\*1**  Before the Court is Defendant Sugared + Bronzed's Motion to Bifurcate Discovery. See Dkt. 31. ("Mot."). Plaintiff Zoe Grippo opposed. See Dkt. 38 ("Opp'n"). Defendant replied. See Dkt. 40 ("Reply"). The matter was referred to me. See Dkt. 31.

The Court finds this matter appropriate for resolution without a hearing and therefore VACATES the March 4, 2025 hearing. See Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. For the reasons stated below, the Court DENIES Defendant's Motion.

**I. BACKGROUND**

Plaintiff asserts that Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq., ("TCPA") by sending telemarketing text messages to Plaintiff and the putative class members without consent. See Dkt. 1 ¶¶ 14, 50-55, 57.

Defendant argues that it did not send marketing text messages during the class period because it outsourced this function to two independent telemarketing companies, Mindbody, Inc. and Klaviyo, Inc. Defendant asks the Court to bifurcate discovery to resolve whether Mindbody and Klaviyo sent the marketing text messages, and if so, whether they did so as Defendant's agents within the meaning of the TCPA. See Mot. at 7. Defendant asserts that if discovery reveals that Mindbody and Klaviyo went rogue, Defendant "will have no direct or vicarious TCPA liability, and this entire case will go away." Id. Defendant represents that bifurcated discovery can be completed in sixty (60) days and that any summary judgment motions can be filed fourteen (14) days after the close of bifurcated discovery. See id. at 7 n.2.

**II. LEGAL STANDARD**

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). Under Rule 42(b), courts have the

"power to limit discovery to the segregated issues" to "permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of potentially dispositive preliminary issues." Ellingson Timber Co. v. Great N. Ry. Co., 424 F.2d 497, 499 (9th Cir. 1970).

"The decision to bifurcate discovery in putative class actions prior to certification is committed to the discretion of the trial court." True Health Chiropractic Inc. v. McKesson Corp., No. 13-02219, 2015 WL 273188, at *1 (N.D. Cal. Jan. 20, 2015). The court considers four factors in deciding whether to bifurcate: "(1) the overlap between individual and class discovery; (2) whether bifurcation will promote Rule 23's requirement that certification be decided at 'an early practicable time'; (3) judicial economy; and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery." Id. "The party seeking bifurcation bears the burden of proving that bifurcation is justified given the facts in the case." Kamrava v. Cenlar Capital Corp., No. 20-11465, 2021 WL 10373035, at *2 (C.D. Cal. Oct. 7, 2021) (citation omitted).

## III. DISCUSSION

Defendant argues bifurcation of discovery is warranted to determine the viability of Plaintiff's claims "before dragging Sugared + Bronzed into disproportionately burdensome class discovery." Mot. at 8. Plaintiff responds that Defendant has not met its burden to justify bifurcation, and that bifurcation will unnecessarily delay this case. See Opp'n at 6-7. The Court has considered the four factors and finds that bifurcation is unwarranted.

### A. Overlap Between Individual and Class Discovery

**\*2** The first factor weighs against bifurcation. The Supreme Court has repeatedly emphasized that class certification requires a "rigorous analysis" of Rule 23, which will "frequently entail overlap with the merits of the plaintiff's underlying claim." Comcast Corp. v. Behrend, 569 U.S. 27, 33-34 (2013). "Thus, the distinction between merits discovery and class discovery is not always clear, and many courts are, for this reason, reluctant to bifurcate class and merits discovery." Blair v. Assurance IQ LLC, No. 23-16, 2023 WL 6622415, at *6 (W.D. Wash. Oct. 11, 2023) (citation omitted); see also Ahmed v. HSBC Bank USA, Nat'l Ass'n, No. 15-2057, 2018 WL 501413, at *3 (C.D. Cal. Jan. 5, 2018) ("[T]he distinction between class certification and merits discovery is murky at best and impossible to determine at worst.").

Here, there is overlap between the class determination inquiry and the merits of Plaintiff's underlying claim. This overlap includes whether Defendant contacted Plaintiff and/or putative class members that were on the National-Do-Not Call Registry or after Defendant received a request to stop. See Dkt. 1 ¶ 75.

Defendant argues there is no overlap between discovery regarding whether Sugared + Bronzed or any of its agents sent the text messages at issue and discovery on class certification issues. See Mot. at 12. "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011). Whether Defendant sent the text messages at issue is a merits issue that will be relevant at the certification stage.

### B. Promote Certification at "an Early Practicable Time"

The second factor weighs against bifurcation. Federal Rule of Civil Procedure 23 indicates that class certification should occur "[a]t an early practicable time after a person sues or is sued as a class representative ...." Fed. R. Civ. P. 23(c)(1)(A). Defendant's proposed case schedule without bifurcation would have motions on class certification to be heard by August 1, 2025. See Dkt. 29-2.

Defendant submits that bifurcated discovery can be completed in sixty (60) days and any summary judgment motions can be filed fourteen (14) days after the close of bifurcated discovery. If so, discovery will not be complete until mid or late April 2025 and any motion for summary judgment would not be heard until June 2025. The Court would then have to rule on the motion for summary judgment, and only then could class discovery even begin. And as Plaintiff notes, Defendant's estimate does not

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 36 of 116

Grippo v. Sugared + Bronzed, LLC, Not Reported in Fed. Supp. (2025)

include the possibility of any discovery-related disputes or motions. The delay would not promote Rule 23's requirement that certification be decided at an early practicable time.

### C. Judicial Economy

The third factor is either neutral or weighs slightly in favor of bifurcation. Defendant argues that the resolution of whether Sugared + Bronzed or its agents sent the text messages is a threshold issue, the resolution of which could resolve this case. See Mot. at 19.

The Court agrees with Defendant that bifurcating discovery could possibly prevent unnecessary discovery if it is correct regarding TPCA liability. However, bifurcation also "has the potential to complicate this litigation," as separating the merits and class discovery raises "a slew of issues as to what discovery relates to the class, as opposed to Plaintiff, thereby causing additional litigation regarding the distinction between the two." Kamrava, 2021 WL 10373035, at *3 (citation omitted).

**\*3** Furthermore, the Court is concerned that Defendant's "dispositive question"—whether Sugared + Bronzed is vicariously liable under the TCPA for text messages that Mindbody and Klaviyo sent after Plaintiff opted out of receiving such messages —may be informed by class discovery.

A defendant may be held vicariously liable for the TPCA violations of third-party callers "where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and the third-party caller." Henderson v. U. Student Aid Funds, Inc., 918 F.3d 1068, 1072-73 (9th Cir. 2019). One way to establish an agency relationship is "ratification," which can be shown by the principal's "knowing acceptance of the benefit" or "willful ignorance." Id. at 1073-74. A plaintiff can establish willful ignorance if the defendant "knew facts that should led it to investigate [the third party's] work for TCPA violations." McCurley v. Royal Seas Cruises, Inc., No. 21-55099, 2022 WL 1012471, at *3 (9th Cir. Apr. 5, 2022).

Here, class discovery will likely be useful, and perhaps critical, to resolve TCPA liability. Whether there are other individuals similarly situated to Plaintiff appears relevant to the question of whether Sugared + Bronzed ratified Mindbody and Klaviyo's acts. See id. at *2-3 (considering the number of calls the principal received and the percentage of customers with mismatched data, among other things).

Defendant cites several out-of-circuit cases in which courts have bifurcated discovery in TCPA class actions where dispositive issues could be decided at the outset. Defendant's cases concern discrete issues such as Article III standing or whether an auto dialer was used. In contrast, Defendant's "threshold question" in this case is a wider endeavor that will likely bleed into class discovery. Cf. Pavelka v. Paul Moss Ins. Agency, LLC, No. 22-2226, 2023 WL 3728199 (N.D. Ohio May 30, 2023) (bifurcating discovery to first address individual liability claims); Fania v. Kin Ins., Inc., No. 22-12354, 2024 WL 2607303, at *2 (E.D. Mich. May 24, 2024) (bifurcating discovery to address the "case-dispositive questions" of whether plaintiff received a pre-recorded call and whether defendant was legally responsible for such calls); Newell v. Aliera Healthcare, Inc., No. 19-1489, 2020 WL 13568762, at *3 (N.D. Ga. Apr. 6, 2020) (bifurcating discovery to determine whether plaintiff was called by an ATDS and consent).

### D. Prejudice

The fourth factor is either neutral or weighs slightly against bifurcation. Defendant acknowledges that Plaintiff will be prejudiced, but that any prejudice will be outweighed by "expensive, exhaustive discovery." Mot. at 19-20 (citation omitted). Defendant has not demonstrated significant prejudice by its simple assertion that discovery costs money. See Kamrava, 2021 WL 10373035, at *3 ("[B]esides its simple assertions that having to engage in class-wide discovery is expensive and time consuming, Defendant did not provide any estimates of the expected costs and time to be incurred."). On the flip side, Plaintiff will be prejudiced by delay in this case.

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 37 of 116

Grippo v. Sugared + Bronzed, LLC, Not Reported in Fed. Supp. (2025)

The first two factors weigh against bifurcation. The last two factors are a toss-up. Bifurcation is not warranted here. Defendant's Motion is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2025 WL 596095

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 38 of 116

Hartley-Culp v. Credit Management Co., Not Reported in Fed. Supp. (2014)

2014 WL 4630852
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Dawn HARTLEY–CULP, individually and on behalf of all others similarly situated, Plaintiff

v.

CREDIT MANAGEMENT COMPANY, Defendant.

Civil Action No. 3:CV–14–0282.
|
Signed Sept. 15, 2014.

**Attorneys and Law Firms**

Cynthia Levin, Law Offices of Todd M. Friedman, PC., King of Prussia, PA, for Plaintiff.

James McNally, Justin M. Tuskan, Metz Lewis Brodman Must O'Keefe LLC, Pittsburgh, PA, for Defendant.

*MEMORANDUM AND ORDER*

THOMAS M. BLEWITT, United States Magistrate Judge.

**I. BACKGROUND.**

 **\*1**  This putative class action case was instituted, through counsel, on February 17, 2014, by Plaintiff Dawn Hartley–Culp, individually and on behalf of all others similarly situated. (Doc. 1). Named as sole Defendant is Credit Management Company ("CMC"). Plaintiff alleges that Defendant CMC began placing a series of calls to her cellular telephone ("cell phone") beginning in November of 2013. Plaintiff alleges that the calls made by Defendant CMC to her cell phone violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq.,* since the calls were placed by an automated telephone dialing system ("ATDS") or, by an artificial or recorded voice without her prior express consent. Plaintiff also alleges that Defendant CMC left numerous pre-recorded messages on her cell phone.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.[1]

On April 8, 2014, after being granted an extension of time, Defendant CMC filed its Answer to the Complaint with Affirmative Defenses. (Doc. 8). Defendant CMC admitted that it contacted Plaintiff for the purpose of collecting a debt which Plaintiff allegedly owed. In its Affirmative Defenses, Defendant CMC asserted that Plaintiff gave express consent to CMC's client to whom Plaintiff allegedly owed the debt, and that the calls made to Plaintiff were not placed via an ATDS.[2]

Subsequently, the Court issued a scheduling order and set case deadlines, and then extended the deadlines on two occasions. (Docs. 19, 22 & 26). The current discovery deadline is November 28, 2014. Plaintiff's Motion for Class Certification is due December 12, 2014.

Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the undersigned for all matters. (Doc. 17).

The parties are currently engaged in discovery. Plaintiff indicates that on July 26, 2014, she served written discovery on Defendant and scheduled a Rule 30(b)(6) deposition for August 26, 2014.

Case 1:26-cv-00659-KM   Document 28-1   Filed 06/24/26   Page 39 of 116

Hartley-Culp v. Credit Management Co., Not Reported in Fed. Supp. (2014)

On August 12, 2014, Defendant CMC filed a Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings. (Doc. 23). Defendant CMC simultaneously filed its support brief with Exhibits. (Docs. 24 & 24–1 to 24–4). Plaintiff filed her opposition brief on August 28, 2014. (Doc. 28). Defendant filed its reply brief on September 9, 2014, with Exhibits. (Docs. 29, 29–1 & 29–2).

Defendant CMC seeks the Court to bifurcate discovery into two phases with the first phase limited to the issue of whether Plaintiff expressly consented to receiving calls on her cell phone. Defendant CMC maintains that if it proves Plaintiff provided her express consent, then the calls it placed to her do not violate the TCPA. Defendant CMC then states that if it can show the calls placed to Plaintiff did not violate the TCPA, then Plaintiff will not be able to proceed as the representative of the purported class.

In the alternative, Defendant CMC moves the Court to stay all proceedings in this case since it contends that many of Plaintiff's allegations in her Complaint turn on issues currently pending before the Federal Communication Commission ("FCC"). Defendant CMC states that the FCC has primary jurisdiction to determine the issues raised by Plaintiff in this case.

## II. DISCUSSION.

 *2  Initially, based on the very recent Middle District of Pennsylvania case of *Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D. Pa. June 4, 2014, J. Conaboy), which is directly on point with our case, as well as *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013), and based on the well-reasoned decision of Judge Conaboy, with which we completely concur, we will deny Defendant CMC's alternative Motion to Stay all Proceedings in this case under the primary jurisdiction doctrine. This Court in *Fenescey* largely relied upon the Third Circuit's decision in *Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir.2013). This Court in *Fenescey* stated that "[g]iven the force and clarity of the [*Gager* ] precedential opinion, we have no need to further evaluate the doctrine of primary jurisdiction on the question of whether the TCPA applies to debt collection calls made to cellular phones." 2014 WL 2526571, *2. This Court in *Fenescey* also found that based on *Gager,* there was no basis to stay its case on the ATDS issue. *Id., *3.[3]

Since we concur entirely with the Court in *Fenescey,* we do not repeat its decision herein, and shall deny Defendant CMC's alternative Motion to Stay Proceedings in this case.

Next, we turn to Defendant CMC's primary Motion to Bifurcate Discovery.

As mentioned, Plaintiff alleged in her Complaint that Defendant CMC violated the TCPA by placing calls to her cellular telephone number without her prior express consent using an automatic telephone dialing system, and by leaving serval voice mail messages. The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Also, as stated, the TCPA applies to debt collection calls made to cellular phones. *Fenescey,* 2014 WL 2526571, *2(citing *Gager, supra* ). "Prior express consent is deemed to be granted only if the wireless number is provided by the consumer to the creditor, and the number was provided during the transaction that resulted in the debt owed." *Wattie–Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, *2 (M.D.Pa. Jan.14, 2014) (citation omitted). Also, the burden is on the creditor regarding the issue of whether express consent was provided and the creditor must show that the required prior express consent was obtained. *Id.* (citation omitted).

There is no question that the Court, in its discretion, can bifurcate discovery under Fed.R.Civ.P. 42. In *Stemrich v. Zabiyaka,* 2014 WL 931069, *1 (M.D.Pa. March 10, 2014), the Court stated:

Under Federal Rule of Civil Procedure 42, a trial court may, in its discretion, bifurcate a trial. The rule provides as follows:

 *3  For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed.R.Civ.P. 42(b). The decision to bifurcate, and the manner in which bifurcation should be ordered, is left to the trial court's informed discretion and must be decided on a case by case basis. *See Idzojtic v. Pennsylvania R.R. Co.,* 456 F.2d 1228, 1230 (3d Cir.1972) ("The district court is given broad discretion in reaching its decision whether to separate the issues of liability and damages."). In exercising its discretion, the court "must weigh the various considerations of convenience, prejudice to the parties, expedition, and economy of resources." *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984). The moving party bears the burden of establishing that bifurcation is appropriate. *See Innovative Office Prods., Inc. v. Spaceco, Inc.,* Civ. No. 05–cv–4037, 2006 WL 1340865, *1 (E.D.Pa. May 15, 2006).

We disagree with Defendant CMC and its contentions in its briefs that discovery at this stage of the case, *i.e.,* before Plaintiff files her Motion for Class Certification, should be limited to the issue of whether its calls to Plaintiff fall within the "prior express consent" exception. As stated, the burden is on the creditor (in this case Defendant CMC) regarding the issue of whether prior express consent was provided. Also, as stated, the burden is on Defendant CMC to demonstrate that it did not use an automated telephone service when it contacted Plaintiff. If Defendant CMC can meet either of its burdens, Defendant CMC will be entitled to summary judgment on Plaintiff's TCPA claim. On the other hand, if genuine disputes of material fact exist as to whether Defendant obtained Plaintiff's prior express consent, then Defendant will not be entitled to summary judgment on Plaintiff's TCPA claim. *Wattie–Bey v. Step hen and Michaels Assoc., Inc.,* 2014 WL 123597, *3. Likewise, if disputed issues of fact remain as to whether Defendant CMC used automated telephone services in its contacts with Plaintiff, then summary judgment will not be appropriate. *Id.,* *6(citations omitted). However, we concur with Plaintiff that "whether or not [Defendant] CMC had [prior express consent] to contact Plaintiff is not a threshold question that must be resolved at this stage, before the parties have had an opportunity to conduct class-wide discovery." (Doc. 28–1, p. 6, citing *Grant v. Capital Mgmt. Servs., L.P.,* 449 Fed.Appx. 598, 600 (9th Cir.2011) (" 'express consent' is not an element of a TCPA Plaintiff's prima face case, but rather is an affirmative defense for which the Defendant bears the burden of proof.").

We also agree with Plaintiff that despite Defendant CMC's contention and its Exhibits, that it would not be unduly burdensome on Defendant at this point of the case to respond to Plaintiff's discovery requests, including requests regarding the putative class action. Also, we find prejudice to Plaintiff if discovery was bifurcated as Plaintiff maintains. As Plaintiff points out, she "primarily seeks documents that are ordinarily maintained as business records, and to the extent that CMC will be burdened by having to produce any such documents, CMC can respond with the appropriate objections and substantiate them during the meet and confer process." (Doc. 28–1, p. 5). Defendant CMC will still be able to conduct any discovery it deems necessary to try and meet its burden as to its affirmative defenses, and it will be able to file a dispositive motion at the conclusion of discovery. Moreover, we agree with Plaintiff that she should have the benefit of discovery before she has to file her Motion for Class Certification, especially since Plaintiff has the burden of class certification. *See Hawk Valley, Inc. v. Taylor,* —— F.R.D. ——, 2014 WL1302097 (E.D.Pa. March 31, 2014) (citation omitted) (court granted Plaintiff's motion for class certification in a TCPA unsolicited-fax case since it found, in part, common issues of law and fact predominated).

**\*4** Finally, we concur with Plaintiff that bifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions.

### III. CONCLUSION.

Accordingly, the Court will deny entirely Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings (**Doc.23**).[4]

An appropriate Order will be issued.

### ORDER

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 41 of 116

Hartley-Culp v. Credit Management Co., Not Reported in Fed. Supp. (2014)

**AND NOW,** this *15* day of **September, 2014,** based on the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant CMC's Motion to Bifurcate Discovery, or in the alternative, to Stay Proceedings (**Doc.23**) is **DENIED IN ITS ENTIRETY.**

2. The discovery deadline in this case is extended to **December 29, 2014,** and the deadline for Plaintiff's Motion for Class Certification is extended to **January 12, 2015.**

**All Citations**

Not Reported in Fed. Supp., 2014 WL 4630852

Footnotes

1    Jurisdiction of this Court is properly based on federal question, 28 U.S.C. § 1331, pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq. See Fenescey v. Diversified Consultants, Inc.,* 2014 WL 2526571 (M.D.Pa. June 4, 2014).

2    According to Defendant CMC's Doc. 24 brief, p. 3 n. 2, Plaintiff allegedly owed a debt to Defendant CMC's client Extendicare Health Services, Inc. Defendant CMC notes that it is presently pursuing discovery to try and show that Plaintiff voluntarily provided her cell phone number to Extendicare staff during her intake interview upon becoming a patient of Extendicare's rehabilitation division.

3    *See Gager v. Dell Financail Services, LLC,* 727 F.3d 265, 2013 WL 4463305 (3d Cir. Aug.22, 2013) (Third Circuit Court reversed dismissal of case alleging violations of 47 U.S.C. § 227(b) (1)(A)(iii), "the TCPA's provision banning certain automated calls to cellular phones."). In *Gager,* Plaintiff alleged that Defendant was obliged under the TCPA to stop autodialed calls to her cellular phone since she withdrew her prior express consent to be called on said phone via an automatic dialing system. The District Court granted Defendant's Rule 12(b)(6) Motion to Dismiss since it found that Plaintiff could not revoke her prior express consent. *See Gager v. Dell Financail Services, LLC,* 2012 WL 1942079 (M.D.Pa. May 29, 2012). The Third Circuit Court reversed the dismissal and found that "(1) the TCPA affords [Plaintiff] the right to revoke her prior express consent to be contacted on her cellular phone via an autodialing system and (2) there is no temporal limitation on that right." 727 F.3d 265, 2013 WL 4463305, *2.

4    The Court notes that it will, sua sponte, extend the discovery deadline and the deadline for Plaintiff to file her Motion for Class Certification. The discovery deadline will be extended to December 29, 2014, and Plaintiff's Motion for Class Certification will be extended to January 12,2015.

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2014)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 42 of 116

2014 WL 12746902
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

IN RE GROUPON, INC. SECURITIES LITIGATION

This Document Relates to: All Actions.

Master File No. 12 C 2450
|
Signed 02/24/2014

## ORDER

Mary M. Rowland, District Judge

**\*1** Defendants' Joint Motion to Bifurcate Discovery [164] is DENIED.

## BACKGROUND

This is a securities fraud action, which arises from events surrounding Groupon's initial public offering (IPO) on November 4, 2011. Groupon is an internet-based marketing company that offers daily deals to consumers for discounts on goods and services offered by merchants. In his Consolidated Amended Complaint (CAC), Lead Plaintiff Michael Carter Cohn (Plaintiff) alleges that two sets of statements made by Groupon were materially misleading. First, he asserts claims under Sections 11, 12, and 15 of the Securities Act based on Groupon's financial results for the first three quarters of 2011, as reported in its IPO registration statement. Second, Plaintiff asserts claims under Sections 10(b) and 20(a) of the Exchange Act based on Groupon's reported financial results from the fourth quarter of 2011, as well as certain oral statements allegedly made by some of the individual defendants in February and March 2012. Plaintiff seeks to represent: (a) all persons or entities who purchased or acquired the common stock of Groupon pursuant and/or traceable to the IPO between November 4, 2011 through and including March 30, 2012 (the Securities Act Class Period); and (b) a subclass consisting of all persons who purchased or otherwise acquired the common stock of Groupon between February 9, 2012 through and including March 30, 2012 (the Exchange Act Class Period). (Dkt. 187).

On September 19, 2013, the Court denied Defendants' motions to dismiss. (Dkt. 158). On December 4, 2013, Plaintiff filed an amended motion for class certification. (Dkt. 187). Defendants' responses are due March 6, 2014, and Plaintiff's reply is due April 21, 2014. (Dkt. 161, 163).

On October 9, 2013, Defendants filed the instant motion to bifurcate discovery, requesting that discovery be limited to class certification issues pending resolution of the class certification motion. (Dkt. 164, 167). Plaintiff filed his response on October 17, 2013, and Defendants filed their reply on October 24, 2013. (Dkt. 172, 174). On February 3, 2014, the District Judge referred the Motion to the undersigned Magistrate Judge, along with other pretrial matters. (Dkt. 203).

## DISCUSSION

District courts have broad discretion to control discovery. *Crawford-El v. Britton*, 523 U.S. 574, 598–99 (1998); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002); *DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 CV 1531, 2008 WL

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 43 of 116

In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2014)

4812440, at *1 (N.D. Ill. Oct. 28, 2008). In accordance with the Federal Rules, a court may, "for good cause," limit the scope of discovery or control its sequence to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1); *see Crawford-El*, 523 U.S. at 598; *Tamburo v. Dworkin*, No. 04 C 3317, 2010 WL 4867346, at *1 (N.D. Ill. Nov. 17, 2010). In order to establish good cause, "courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2035, at 157–58 (3d ed. 2010).

**\*2** When ruling on motions to bifurcate class certification and merits discovery, courts consider the following factors:

(1) expediency, meaning whether bifurcated discovery will aid the court in making a timely determination on the class certification motion; (2) economy, meaning the potential impact a grant or denial of certification would have upon the pending litigation and whether the definition of the class would help determine the limits of discovery on the merits; and (3) severability, meaning whether class certification and merits issues are closely enmeshed.

*Harris v. comScore, Inc.*, No. 11 CV 5807, 2012 WL 686709, at *3 (N.D. Ill. Mar. 2, 2012) (citations omitted); *accord Reid v. Unilever U.S., Inc.*, No. 12 C 06058, 2013 WL 4050194, at *31 (N.D. Ill. Aug. 7, 2013). The Manual for Complex Litigation cautions that "[d]iscovery relevant only to the merits delays the certification decision and may ultimately be unnecessary." *Manual for Complex Litigation, Fourth*, § 21.14.

**1. Expediency**

Defendants contend that expediency favors bifurcation. (Mot. 6–7). They argue that bifurcation will aid the Court in making a timely determination of the class certification issue. (*Id.* 6). But Plaintiff has already filed his class certification motion, and the briefing schedule has been agreed to by the parties and entered by the Court. (Dkt. 161, 163, 187). In their Reply, Defendants argue for the first time that "[i]f the parties are required to proceed with highly burdensome merits discovery at the same time they are litigating class discovery, it is likely that, despite the parties' best efforts, a delay in the parties' submission of their briefs on the class certification issue may be unavoidable." (Reply 4).

The Court is not persuaded. First, Defendants do not describe with particularity the burden of the merits discovery being sought by Plaintiff that will forestall briefing on the class certification issue. Nor do they explain how defense counsel—a national law firm with over 450 attorneys—would be unable to respond to the class certification motion, given three months to do so, while also engaging in merits discovery. Second, it appears that Defendants have objected to producing any discovery that they deemed merits discovery since filing this motion, essentially staying merits discovery. (Dkt. 196 at ¶¶ 3, 5 & Ex. 1). Finally, Defendants will file their response in less than two weeks and will no longer face the burden of briefing the class certification issue.

Defendants' cases are unpersuasive because the parties in this case have agreed to an early briefing schedule that will allow for an expeditious ruling on the class certification issue. *See Reid*, 2013 WL 4050194, at *32 (granting bifurcation in a case alleging damage from a hair care product where issues of numerosity, commonality, and typicality required extensive discovery prior to discovery on the merits and, therefore, "proceeding with merits discovery may delay the parties' submission of their briefs on the class certification issue"); *Christian v. Generation Mortgage Co.*, No. 12 C 5336, 2013 WL 2151681, at *4 (N.D. Ill. May 16, 2013) (granting bifurcation and limiting discovery to whether defendant's broker-agents exercised pricing discretion in a common manner where plaintiffs sought discovery of more than 20,000 loan files of more than four to six million pages of data on the merits); *Harris*, 2012 WL 686709, at *3 (granting bifurcation largely because proceeding with merits discovery "which may well involve the review of millions of documents not directly relevant to the issues of class certification, may delay the parties' submission of supplemental briefing on the class certification issue"); *Am. Nurses' Ass'n v. State of Illinois*, No. 84 C 4451, 1986 WL 10382, at *3 (N.D. Ill. Sept. 12, 1986) (finding, without factual analysis, that bifurcation "will expedite the decision on class certification"); *Plummer v. Chicago Journeyman Plumbers' Local Union No. 130, U.A.*, 77 F.R.D. 399, 402 (N.D. Ill. 1977) (finding, without factual analysis, that bifurcation is warranted because "class determination should be made as early as practicable").[1] The Court is convinced that the class certification issue will be resolved expeditiously without the need to bifurcate discovery.

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 44 of 116

In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2014)

**\*3**  Moreover, under the Private Securities Litigation Reform Act (PSLRA), Plaintiff was precluded from conducting discovery prior to the Court's September 2013 Order denying the motions to dismiss.[2] Since that time, Defendants have objected to the production of any merits discovery. By the time the class certification motion is fully briefed, over two years will have passed since the case was filed. *See In re Semgroup Energy Partners, L.P.*, No. 08-MD-1989, 2010 WL 5376262, at \*1 (N.D. Okla. Dec. 21, 2010) (denying bifurcation in part because "this lawsuit has been pending more than two years, during which time, plaintiffs have been almost completely precluded from conducting discovery"); *see also In re Plastics Additives Antitrust Litig.*, No. 03 C 2038, 2004 WL 2743591, at \*3 (E.D. Pa. Nov. 29, 2004) (denying a motion to bifurcate discovery when the matter had already been on the docket for 18 months). Defendants assert that this fact is irrelevant. The Court acknowledges that this factor is not dispositive. However, securities litigation is unique in this regard and the Court, in its discretion, is free to consider this fact when weighing the expediency (or lack thereof) of bifurcation.

### 2. Economy

Defendants also contend that bifurcation would be more economical because denial of class certification would effectively end this litigation. (Mot. 7–8). They argue that "waiting until a class has been certified before allowing full-blown merits discovery will avoid wasting the Court's and the parties' resources on burdensome and expensive discovery that may prove unnecessary." (*Id.* 7). Plaintiff relies on cases noting a "strong policy favoring class actions in securities fraud actions." *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 5 (N.D. Ill. 1977); *see Weiner v. Quaker Oats Co.*, 1999 WL 1011381, at \*5 (N.D. Ill. Sept. 30, 1999) (same); *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006) ("It is established law in the Northern District of Illinois and the Seventh Circuit that class certifications are the preferred method of dealing with securities fraud cases."). Defendants, relying on *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), respond that Plaintiff's case law is dated and "long since superseded" by the Supreme Court's recent authority requiring rigorous analysis under Rule 23(a). (Reply 6). There is no doubt the rigors of Rule 23 have increased in recent years, but that does not reverse the law in this Circuit that class certification is the preferred method of addressing securities fraud cases. Notably, *Behrend* was an antitrust case, not a securities fraud case. Moreover, in terms of bifurcation, the lesson of *Behrend* is more detrimental to the Defendants' argument than helpful:

> Repeatedly, we have emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.

133 S.Ct. at 1432 (citations omitted).

Plaintiff also responds that the case will proceed to the merits even if the class certification motion is denied. (Resp. 6; *see* Dkt. 78 Ex. C (Plaintiff personally incurred losses exceeding $250,000)). In several of the cases cited by Defendants, the courts found that the cases likely would *not* proceed to the merits if class certification were denied. *See Harris*, 2012 WL 686709, at \*4 (finding that "the limited statutory damages available to Plaintiffs [in a consumer fraud case] are likely an insufficient motivation to litigate in the absence of class certification"); *Christian*, 2013 WL 2151681, at \*4 (where plaintiff's counsel conceded that without the same sort of statistical data rejected in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), he would be unable to establish commonality, court observed that the prospects for certification may be "dim" and granted bifurcation because "it would be utterly inefficient and unjust to subject a defendant to months, if not years, of onerous and expensive discovery so that the plaintiffs may continue a quixotic undertaking destined to fail").

**\*4**  Finally, although neither party addresses this issues, several courts have noted that bifurcation can actually increase the costs of litigation because of disputes over what constitutes merits and what constitutes class discovery. *See In re Hamilton Bancorp, Inc. Sec. Litig.*, No. 01 C 0156, 2002 WL 463314, at \*1 (S.D. Fla. Jan. 14, 2002) ("[B]ifurcation may well increase litigation expenses by protracting the completion of discovery, coupled with endless disputes over what is 'merit' versus 'class' discovery."); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 258 F.R.D. 167, 174 (D.C. 2009) ("Concurrent discovery is more efficient when bifurcation would result in significant duplication of effort and expense to the parties.") (citation omitted).

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 45 of 116

In re Groupon, Inc. Securities Litigation, Not Reported in Fed. Supp. (2014)

### 3. Severability

The parties disagree whether the class-and merits-based discovery overlap in this case. (*Compare* Mot. 8–9 *with* Resp. 7–9). Courts increasingly find that class certification and merits issues overlap. *See Newberg on Class Actions*, § 10:7 (5th ed. 2013). In *Dukes*, the Supreme Court found that class certification analysis "will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." 131 S. Ct. at 2551–52 (citations and footnote omitted). The Seventh Circuit has found that to determine whether all the class certification elements have been met, a court must frequently make a preliminary inquiry into the merits. *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ("On issues affecting class certification, however, a court may not simply assume the truth of the matters as asserted by the plaintiff. If there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class.") (citation omitted); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) ("And if some of the considerations under Rule 23(b)(3) ... overlap the merits[,] ... then the judge must make a preliminary inquiry into the merits."); *accord Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D. Ill. 2012) ("Because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, the court's rigorous analysis frequently entails some overlap with the merits of the plaintiff's underlying claim."). The Court's initial review of the CAC indicates that merits and class certification issues will have some overlap and that bifurcation will not create efficiencies.

### CONCLUSION

In sum, the Defendants have not established a "good reason" to bifurcate. Defendants have not demonstrated how allowing merits-based discovery to continue will delay the class certification briefing, and Plaintiff will likely continue to prosecute his individual claim if certification is denied. Based on the information available to the Court at this time, it appears that class and merits discovery is enmeshed. Finally, substantial delay has already occurred. *See McLaughlin on Class Actions*, § 3:10 (10th ed. 2013) ("Courts are more likely to decline requests to stay pure merits discovery when the nature of the putative representative's claims suggests that it would continue to prosecute individual claims if certification is denied, or a substantial delay has preceded the class certification motion.") (citations omitted). After carefully reviewing the appropriate factors, the Court finds that bifurcating class- and merits-based discovery is not warranted.

### All Citations

Not Reported in Fed. Supp., 2014 WL 12746902

### Footnotes

1    The securities cases cited by the Defendants are wholly unpersuasive since they have no discussion about why discovery was bifurcated. *See In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407 (N.D. Ill. 2009) (ruling on motion to compel); *Smith v. Dominion Bridge Corp.*, No. 96-7580, 2007 WL 1101272 (E.D. Penn. Apr. 11, 2007) (approving class action settlement); *In re: Sonus Networks, Inc.*, 229 F.R.D. 339 (D. Mass. 2005) (finding class representative who was convicted of selling crack cocaine unsuitable class representative and decertifying class); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 WL 2108410 (N.D. Ill. Sept. 21, 2004) (denying motion to compel plaintiff to provide a detailed calculation of damages sought).

2    Pursuant to the PSLRA, "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2004-2 Trade Cases P 74,620

🚩 KeyCite Yellow Flag

Distinguished by In re Special Grand Jury 89-2, 10th Cir.(Colo.), June 15, 2006

2004 WL 2743591

United States District Court, E.D. Pennsylvania.

In re PLASTICS ADDITIVES ANTITRUST LITIGATION

No. Civ.A. 03–2038.
|
Nov. 29, 2004.

*MEMORANDUM ORDER*

DAVIS, J.

**\*1** Presently before the Court are Defendants' Joint Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 88) filed on September 14, 2004; Plaintiffs' Opposition to Motion for Bifurcation (Doc. No. 92) filed on October 1, 2004; Defendants' Joint Memorandum in Further Support of Defendants' Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 98) filed on October 21, 2004; Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 93) filed on October 1, 2004; Defendants' Opposition to Plaintiffs' Motion for Entry of Proposed Scheduling Order (Doc. No. 96) filed on October 15, 2004; and Plaintiffs' Reply Memorandum in Support of Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 103) filed on November 10, 2004.

For the following reasons, Defendants' motion to bifurcate will be DENIED and Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order will be GRANTED in part and DENIED in part.

I. Factual and Procedural History

This case is a class action antitrust case concerning the plastics additives industry. Defendants are alleged manufacturers and/ or sellers of plastic additives. (Am. Compl. at ¶¶ 19–29). Plaintiffs are allegedly purchasers of "plastics additives," what the plaintiffs define as "heat stabilizers, impact modifiers, and processing aids used to process plastics." (Am. Compl. at ¶ 7). Plaintiffs seek to represent a nationwide class of purchasers of plastics additives for the time period of January 1, 1990 through December 31, 2003. (*Id.* at ¶ 1).

In February 2003, the United States Department of Justice Antitrust Division ("DOJ") commenced an investigation into the plastics additives industry. (Def. Mot. to Bifurcate, at 4). Two grand juries were convened in the Northern District of California. (*Id.*). Both grand juries are currently proceeding in secret. One grand jury is focusing on heat stabilizers and the other grand jury involves heat impact modifiers and processing aids. (*Id.*). All defendants have been subpoenaed as part of one or both of the investigations. (*Id.*).

On March 28, 2003, plaintiff Gitto/Global Corporation filed a complaint on behalf of themselves and the putative class, alleging that defendants engaged in a price-fixing scheme for the sale of plastic additives in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. (Doc. No. 1). Subsequently, six separate complaints were filed against defendants based upon alleged antitrust violations. On August 14, 2003, this Count entered a pretrial order consolidating the seven related actions under a master file, directing plaintiffs to file a consolidated complaint, and holding discovery in abeyance pending the resolution of motions filed in response to the complaint. (Doc. No. 23).[1]

2004-2 Trade Cases P 74,620

Plaintiffs filed an amended complaint on September 3, 2003. (Doc. No. 28). Plaintiffs contend that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in a conspiracy in restraint of trade to artificially raise, fix, and/or stabilize priecs for plastic additives in the United states. (*Id.* at ¶¶ 49–50). Plaintiffs contend that defendants agreed to charge prices at higher levels and to allocate prices in order to artificially manipulate the price of plastic additives. (Id. at ¶ 50). Plaintiffs further allege that they had no knowledge of the conspiracy because defendants fraudulently concealed it. (*Id.* at ¶ 52). As a result, plaintiffs allege that they and other members of the class were required to pay more for plastic additives than they would have in a competitive marketplace. (Id. at ¶ 11).

**\*2** On December 1, 2003, defendants moved for dismissal and partial dismissal. (Doc. No. 54, 56). This Court denied defendants' motions on May 26, 2004, prompting the parties to meet to discuss an ongoing plan for discovery. (Doc. No. 72). The parties failed to reach an agreement on a discovery schedule, and, on September 14, 2004, defendants moved for bifurcation of discovery and for a stay of merits-based discovery. (Doc. No. 88). On October 1, plaintiffs filed a motion for entry of plaintiffs' proposed scheduling order. (Doc. No. 92). After an array of briefs and response briefs, the final brief in support of the parties' respective positions was filed on November 10, 2004. (Doc. No. 103).

II. Motion to Bifurcate

Defendants have moved this Court to bifurcate discovery into class certification issues and merit-based issues. Defendants present three major reasons for bifurcation. First, defendants claim that bifurcation will promote the early and efficient resolution of class issues contemplated by Federal Rule of Civil Procedure 23©)(1). (Def. Mot. To Bifurcate, at 7–13). Second, defendants claim that bifurcation is necessary due to pending grand jury proceedings in California. (*Id.,* at 13–17). Third, defendants claim that bifurcation will save the parties time and expense because resolution of the class certification issue will influence further proceedings. (*Id.,* at 11). This Court rejects defendants' arguments in favor of bifurcation.

Class certification must be made "as soon as practicable after commencement of an action." Fed.R.Civ.P. 23(c)(1) & (3). This mandate recognizes that "class certification or its denial will have a substantial impact on further proceedings, including the scope of discovery, the definition of issues, the length and complexity of trial, and the opportunities for settlement." Federal Judicial Center, Manual For Complex Litigation § 11.213, at 40 (4th ed.2004). To ensure that the mandate of Federal Rule of Civil Procedure 23(c)(1) is followed, courts have the discretion to "allow classwide discovery on the certification issue and postpone discovery on the merits." *Washington v. Brown & Williamson Tobacco,* 959 F.2d 1566, 1570–1571 (11th Cir.1992).

The Third Circuit has not set a bright line test as to when a court should bifurcate discovery in class action litigation. Generally, however, courts allow classwide discovery on the certification issue and postpone classwide discovery on the merits of the claims when bifurcation serves the interests of "fairness and efficiency." *See* Manual for Complex Litigation § 11.213, at 40 ("discovery may proceed concurrently if bifurcating class discovery from merits discovery would result in significant duplication of effort and expense to the parties"); *see also Williamson Tobacco Corp.,* 959 F.2d at 1570–71 ("[t]o make early class determination practicable and to best serve the interests of fairness and efficiency, courts may allow classwide discovery on the certification issue and postpone classwide discovery on the merits").

**\*3** Both parties rely upon the Manual for Complex Litigation (the "Manual") as an authoritative source to determine when bifurcation is fair and efficient. (Def. Mot. to Bifurcate, at 5; Pl. Opp'n to Mot. to Bifurcate, at 9). According to the Manual, "courts often bifurcate discovery between certification issues and those related to the merits of the allegation." *Id.* § 21.14, at 256. Nonetheless, the Manual voices several concerns with bifurcation. The Manual notes that the distinction between merits-based discovery and class-related discovery if often blurry, if not spurious. *See id.* § 21.14, at 255 ("generally, application of the Rule 23 criteria requires the judge to examine the elements of the parties' substantive claims and defenses in order to analyze commonality, typicality, and adequacy of representation under Rule 23(a)"). The Manual further notes that "some merits discovery during the precertification period is generally more appropriate for cases that are large and likely to continue even if not certified." *Id.; see also Gray v. First Winthrop,* 133 F.R.D. 39, 41 (N.D.Cal.1990) (denying order to stay merits-based discovery until resolution of class certification motion would be "unworkable," "impracticable," and "inefficient" and would

2004-2 Trade Cases P 74,620

deny plaintiffs ability to develop facts in support of motion). Accordingly, the Manual suggests that the prime considerations in whether bifurcation is efficient and fair include whether merits-based discovery is sufficiently intermingled with class-based discovery and whether the litigation is likely to continue absent class certification.

Bifurcation would be inefficient, unfair, and duplicative in this case for several reasons. First, bifurcation would further delay the resolution of the litigation in derogation of Rule 1 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 1 (procedural rules must be administered to secure "the just, speedy, and inexpensive determination of every action"). This case has already been on the docket for over 18 months without a decision on class certification. Failure to permit simultaneous discovery of merits-related and class-related issues will further delay the length of the overall discovery period, thereby inhibiting plaintiffs from receiving an expeditious resolution of their claims.[2] *See, e.g., In re Sulfuric Acid Antitrust Litigation,* MDL No. 1561, No. 03 C 4576 (N.D.Ill.2003) (refusing to bifurcate discovery in antitrust litigation in part because of delays created by bifurcation). Bifurcation would also belie principles of judicial economy, as the Court may be forced to spend time and resources resolving discovery disputes over what is "merit" discovery as compared to "class" discovery. *See, e .g., In re Hamilton Bancorp, Inc. Securities Litigation,* 2002 WL 463314, at *1 (S.D.Fla. Jan.14, 2002) (noting that "bifurcation of discovery may well-increase litigation expenses by protracting the completion of discovery, coupled with endless disputes over what is 'merit' versus 'class' discovery").

**\*4** Second, class certification discovery in this litigation is not "easily" differentiated from "merits" discovery. *See, e.g., Gray,* 133 F.R.D. at 41 (noting that "discovery relating to class certification is closely enmeshed with merits discovery" and "cannot be meaningfully developed without inquiry into basic issues of the litigation"). There will be a substantial overlap between what is needed to prove plaintiff's price-fixing claims, as well as the information needed to establish class-wide defenses, and what is needed to determine whether the elements of class certification are met. For example, according to the defendants' proposed scheduling order, determination of whether the elements of class certification are met[3] would require discovery into whether the agreements between the parties for the sale of plastic additives, competitor contracts, defendants' business plans and strategies for marketing and selling plastic additives, the impact of the defendants' conduct on plaintiffs, and services provided by defendants to plaintiffs in connection with the sale of plastic additives. (Def. Proposed Scheduling Order, attached as Exhibit A). Discovery on these issues will also be necessary to prove the merit of plaintiffs' claim, namely whether defendants' engaged in a nation-wide price-fixing scheme for the sale of plastic additives and whether, as a result, the plaintiffs suffered damages. *See, e.g., In re Linerboard Antitrust Litigation,* 305 F.3d 145, 151 (3d Cir.2002) (damages in antitrust litigation can be proved by establishing that free market prices would be lower than prices paid and that plaintiffs made purchases at higher prices). Due to the intermingling of the facts necessary to evaluate class certification and the merits of plaintiffs' claims, separating the two would duplicate discovery efforts, which, in turn, would force both parties to incur unnecessary expenses and would further protract the litigation.

Third, contrary to defendants' assertions, there is no reason to believe that denial of class certification will terminate this litigation. *See* Manual for Complex Litigation § 21.14, at 256 (bifurcation not appropriate if litigation likely to proceed without certification). Seven individual lawsuits were filed against the defendants and then consolidated under this master file. The six additional lawsuits have not been terminated, but, instead, have been stayed pending class certification in this litigation. If class certification is denied, it is reasonable to assume that the individual plaintiffs will pursue their claims through the cases that are currently stayed. (Pl. Opp'n to Def. Mot. to Bifurcate, at 10). This is particularly true because one of the defendants, Crompton Corporation ("Crompton"), has been accepted into the Department of Justice's corporation leniency program, and has agreed to assist plaintiffs' counsel in the prosecution of claims against non-settling defendants. (*Id.,* at 10–11). The likelihood of the continuation of individual claims, regardless of class certification, belies whatever time and expense may be saved in the future through the narrowing of discovery pursuant to the resolution of class certification motions.

**\*5** Because bifurcation of discovery would be inefficient, unfair, and duplicative, this Court denies defendants' motion to bifurcate discovery into a class-based stage and a merits-based stage.[4]

### III. Motion to Stay Merits–Based Discovery

In addition to the request for straightforward bifurcation, defendants expressly ask this Court to issue a stay of all merits-based discovery pending a determination of class certification. (Def. Mot. to Bifurcate, at 12–13). Defendants support their argument by reference to the standard for determining whether to stay civil proceedings pending the resolution of related criminal proceedings. (*Id.,* at 12–13). In so doing, defendants implicitly ask this court to stay merits-based discovery until the outcome of ongoing grand jury proceedings in California. (*Id.,* at 15) ("If, however, the grand jury has not concluded by the time the class certification motion has been decided, the Court can re-evaluate at that time whether to permit merits discovery to go forward and with what limitations").

It is well-settled that defendants in a criminal prosecution do not have a due process right to stay proceedings in a parallel civil case. *United States v. Kordel,* 397 U.S. 1, 9–10, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). However, it is equally well-settled that the Court has the inherent authority to control the disposition of cases on it dockets. *See, e.g., Landis v. North Am. Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). This includes the power to stay civil discovery until termination of related criminal proceedings. *See Texaco, Inc. v. Borda,* 383 F.2d 607, 608 (3d Cir.1967).

The "stay" of a civil case is an "extraordinary remedy." *Weil v. Markowitz,* 829 F.2d 166, 174 n. 17 (D.C.Cir.1987). In determining whether the "extraordinary" remedy of a stay is appropriate, this Court looks at five competing interests:

(1) interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay;

(2) burden which any particular aspect of the proceedings may impose on defendants;

(3) convenience of the court in the management of its cases, and the efficient use of judicial resources;

(4) interests of persons not parties to the civil litigation; and

(5) interest of the public in the pending civil and criminal litigation.

*See, e.g., Golden Quality Ice Cream Co. v. Deerfield Specialty,* 87 F.R.D. 53, 56 (E.D.Pa.1980) (promulgating factors). Ultimately, the decision whether to grant a stay must be made on a case-by-case basis. *See Shirsat v. Mutual Pharmaceutical Co.,* 1995 WL 695109, at *1 (E.D.Pa. Nov.21, 1995).

This Court refuses to bifurcate discovery on the basis of concurrent grand jury proceedings that may extend indefinitely. To the extent that defendants are asking for an official stay on merits-based discovery pending the resolution of grand jury proceedings, and perhaps even criminal prosecutions, this Court also denies the defendants' request based upon a balancing of all relevant factors. *See Sterling Nat'l Bank v. A–1 Hotels Int'l, Inc.,* 175 F.Supp.2d 573, 579 (S.D.N.Y.2001) (treating request for stay of depositions for six months as request for stay of case pending resolution of ongoing grand jury proceedings and criminal investigations because "the argument for a further stay [six months later] will be at least as potent as it is now").

#### A. Plaintiffs' Interest and Potential Prejudice

**\*6** Staying merits-based discovery would prejudice plaintiffs by preventing the expeditious resolution of the lawsuit. *See, e.g ., Sterling Nat'l Bank,* 175 F.Supp.2d at 575 (concluding that "it would be perverse if plaintiffs who claim to be the victims of criminal activity were to receive slower justice than other plaintiffs because the behavior they allege is sufficiently egregious to have attracted the attention of the criminal authorities"). It is "only through the discovery procedure that a plaintiff can determine the merit (or lack of merit) in his [or her] case and develop the strategy which will guide him [or her] throughout the litigation." *Golden Quality Ice Cream Co.,* 87 F.R.D. at 56. While the initiation and resolution of the California grand jury proceedings against defendants may narrow the scope of this litigation, this possibility is too remote to be considered at this stage. Furthermore, staying discovery on this rationale would result in an indefinite stay, as there is no way to predict when grand jury proceedings will end, whether an indictment will be delivered, and whether criminal proceedings will ensue. *See*

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

*In re Residential Doors Antitrust Litigation,* 900 F.Supp. 749, 756 (E.D.Pa.1995) (rejecting argument that discovery can be stayed without prejudice to plaintiffs until completion of government's criminal investigation of unspecified others at unknown future date).

### B. Burden on Defendants

Defendants have not established that they would suffer actual prejudice if merits-based discovery proceeds. As corporations, defendants will not be able to invoke the privilege against self-incrimination. *United States v. Kordel,* 397 U.S. 1, 9, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) (right against self-incrimination not available to corporations). However, if defendants' employees invoke their Fifth Amendment right against self-incrimination during the discovery process, such as by refusing by refusing to answer deposition questions or interrogatories, the defendants' chances of success at trial may diminish. Indeed, a court may impose "reasonable" discovery sanctions in such a situation, such as preventing the witness from testifying on behalf of the defendant concerning the factual matters that were concealed by the invocation of the Fifth Amendment. *See, e.g., Securities & Exch. Comm'n v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir.1994) (reliance on Fifth Amendment right against self-incrimination in civil cases may give rise to adverse inference against party claiming benefits).

This Court recognizes the seriousness of defendants' concerns. However, the weight to be attached to these fears is minimized by the layers of speculation upon which they are built. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578 (denying motion to stay pending resolution of grand jury proceedings because "there is no way of measuring with any precision what questions defendants may refuse to answer, or what damage may be done to their position in the civil case by any assertions of privilege they choose to make"). Defendants presume that employees, who have yet to be indicted, will need to, and will actually invoke, their Fifth Amendment privilege during discovery. *Id.* Defendants then presume that this Court will impose discovery sanctions for the exercise of this right. *Id.* These presumptions render the actual prejudice to defendants "inherently unclear" at this pre-indictment phase. *Id* . at 577–578.

 **\*7**  This Court also finds defendants' fears concerning discovery sanctions incommensurate with defendants' request for a stay of merits-based discovery. Because merits-based discovery and class-based discovery overlap, the progression of class-based discovery, to which defendants have agreed, may require the defendants' employees to exercise their Fifth Amendment rights during discovery events. Paradoxically, this would lead to the very result that defendants' request for a stay seeks to prevent. Accordingly, defendants' failure to request a blanket stay of all discovery pending the resolution of criminal grand jury proceedings in California undermines their argument that a stay of merits-based discovery will avoid actual prejudice.

Finally, this Court notes that defendants have not argued that merits-based discovery will divert resources that may be necessary for defense of a possible criminal action. Nor have defendants argued that the expense of defending the civil litigation and the grand jury proceedings in California would be unreasonable. Accordingly, although the defendants may experience some future prejudice if this Court refuses to grant a stay of merits-based discovery, particularly with respect to negative inferences to be drawn from the exercise of Fifth Amendment rights by individual witnesses, this prejudice is both remote and uncertain. *See State Farm Mutual Automobile Ins. Co. v. Beckham–Easley,* 2002 WL 31111766, at \*2 (E.D.Pa. Sept.18, 2002) (pre-indictment requests for stay are typically denied because risks are more remote than for indicted defendant).[5]

### C. Burden on the Court

Staying merits-based discovery in the litigation hinders the Court's responsibility to keep its docket moving to provide litigants with a timely and effective resolution of their claims. *See, e.g., Dawson v. Dodd,* 1999 WL 410366, at \*3 (E.D.Pa. June 17, 1999) ("The Court has a responsibility to control the disposition of the cases on its docket with economy of time and effort for all actors including itself."). To delay merits-based discovery pending the resolution of grand jury proceedings at some unforeseeable date in the future would hinder the Court from performing its responsibility. This duty is particularly important when, as in the instant matter, the complaint that is the subject of the motion to stay has been lingering on the docket for more than 18 months.

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 51 of 116

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)
2004-2 Trade Cases P 74,620

The Court realizes that, in some instances, staying discovery until the resolution of parallel criminal proceedings may minimize the Court's burden. A stay may avoid duplicative judicial efforts, eliminating the need for parties to claim the Fifth Amendment right against self-incrimination or removing the burden upon plaintiffs to prove antitrust liability. *See, e.g., White v. Mapco Gas Products, Inc.,* 116 F.R.D. 498, 502 (E.D.Ark.1987). In this case, however, these possibilities are too remote to be given significant consideration. *See, e.g., Anthony v. City of Philadelphia,* 2001 WL 118964, at *2 (E.D.Pa. Feb.9, 2001) (rejecting argument as too speculative that plaintiff and court will benefit from stay because resolution of criminal case may reduce or simplify issues). There has been no indictment handed down in either of the grand jury proceedings. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 580 (refusing to grant stay of parallel civil proceedings when no indication that grand jury's investigation reached critical stage or that indictment is imminent because stay would "substantially halt the civil litigation indefinitely, without any predictability as to when the case would return to the Court's active docket"). As such, no criminal charges have been filed, nor has a date been set for trial. It is therefore uncertain how long the requested stay will last, and whether future criminal proceedings will alleviate the evidentiary and analytical burdens on the parties and on the court. *See Beckham–Easley,* 2002 WL 3111176, at *3 (denying motion to stay discovery despite defendants' contentions that indictment would be issued within 120 days from filing motion to stay). Accordingly, the interests of immediate judicial economy trump the defendants' speculations that waiting until the completion of grand jury proceedings would lessen the Court's burden.

### D. Burden on Non-parties

**\*8** Corporations speak and function only through their officers and employees. *See Upjohn,* 449 U.S. at 389–392. As the defendants note, the DOJ frequently requires current and former employees from companies under investigation to testify before the grant jury. (Def. Mot. To Bifurcate, at 14–15). These employees are not parties to this litigation. However, if faced with a discovery request, whether in the form of depositions, written interrogatories, or document production, these witnesses may have to invoke their Fifth Amendment right against self-incrimination to avoid disclosing information that may lead to a future criminal conviction. The pressure of whether to invoke this right during civil discovery can be severe. *See Golden Quality Ice Cream,* 87 F.R.D. at 58; *see also White,* 116 F.R.D. at 503 (noting that corporations' officers and managers may have Fifth Amendment privileges by virtue of grand jury probe and that interest of non-parties against self-incrimination favors staying discovery).

While the dilemma of whether a non-party should invoke her Fifth Amendment right against self-incrimination may be severe, the personal consequences that attach to this decision are not as grave. This Court may not impose discovery sanctions on non-parties who invoke their Fifth Amendment rights during civil discovery. Nor can the exercise of this right be used against such witnesses in future criminal prosecutions. *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (no adverse inference may be drawn nor penalty imposed on criminal defendant who chooses not to testify by exercising Fifth Amendment right against self-incrimination). Furthermore, to lessen the burden on non-party witnesses in deciding to invoke the privilege, defendants may seek the entry of a protective order, which forbids the dissemination of information gathered through civil discovery to outside parties. Finally, to this Court's knowledge, no indictments have been handed down against defendants or their employees, thereby further weakening the degree of risk to non-parties if merits-based discovery progresses. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 578 (noting that burden is greater to indicted party because risk of liberty, importance of safeguarding constitutional rights, and strain on resources and attention make defending parallel civil litigation particularly difficult). Consequently, the burden on non-parties in this instance is marginal.

### E. Public Interest

Public interest considerations weigh against granting a stay of merit-based discovery. The public's interest in vigorously enforcing national anti-trust laws through the expeditious resolution of a private antitrust litigation is particularly great. *See Golden Quality Ice Cream,* 87 F.R.D. at 58; *In re Residential Doors,* 900 F.Supp. at 756 (public interest prejudiced by delay in discovery proceedings in class action antitrust litigation). This interest is even greater when the nature of the litigation is a class action lawsuit, filed on behalf of nationwide consumers of a particular product over the course of more than a decade. Furthermore, the public also has a significant interest in ensuring the flow of this Court's judicial docket so that justice may be administered to the instant litigants, as well as all other litigants before this Court, in a timely fashion. These interests are

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

not rendered less acute by the federal government's decision to spend resources on behalf of the public investigating potential antitrust violations by defendants and convening grand jury proceedings, particularly when no indictments have been delivered and when the federal government has not intervened to request a stay of discovery on the basis of ensuring the secrecy, integrity, and timeliness of such proceedings. *See, e.g., Kaiser v. Steward,* 1997 WL 66186, at *5 (E.D.Pa.1997) (refusing blanket stay of civil proceedings pending outcome of criminal trial, even when government prosecuting parallel criminal case requests stay to prevent defendants from using civil discovery as vehicle to gain information on possible future criminal prosecutions); *Golden Quality Ice Cream,* 87 F.R.D. at 58 (public interest in quick and diligent resolution of antitrust violations through private litigation only weakened when federal government receives indictment and chooses to prosecute criminal antitrust case).

**\*9**  The defendants ask the Court to weigh these significant interests against the public interest in maintaining the secrecy of grand jury proceedings, as embodied in Rule 6(e) of the Federal Rules of Criminal Procedure. Defendants note that witnesses may be asked to provide testimony and documents that reveal information provided to the grand jury, thereby helping the litigants in this matter to identify other witnesses who have been called to testify before one or both grand juries. (Def. Mot. To Bifurcate, at 17). As stated more fully in Section III.A.1 of this opinion, Rule 6(e) neither applies to witnesses nor to documents created independent of grand jury proceedings. *See* Fed. R.Crim. Pro. 6(e). Accordingly, defendants' argument that permitting civil merits discovery will violate the grand jury secrecy provisions of Rule 6(e) is unfounded.

F. Conclusion

A careful weighing of the factors indicates that discovery should not be bifurcated. Nor should merits-based discovery be stayed pending the resolution of class certification, ongoing grand jury proceedings, or subsequent criminal prosecutions. This Court recognizes the legitimacy of defendants' concerns about possible prejudice from employees asserting their right against self-incrimination during the discovery process. Nonetheless, rather than delaying this litigation to allay defendants' speculative concerns, such as by staying merits-based discovery or preventing the taking of depositions of defendants' employees prior to class certification, this Court will progress with discovery and will attempt to accommodate defendants' concerns if and when the situations triggering these concerns actually arise.

IV. Plaintiffs' Motion for Entry of a Scheduling Order

Plaintiffs argue that the Court should enter the proposed scheduling order, which does not bifurcate discovery. Plaintiffs' scheduling order allocates sixty days for the completion of discovery concerning class certification issues. (Pl. Proposed Order, at ¶ 2(d)). It imposes the following obligations on the parties. First, it requires defendants to produce within forty-five days of the order all documents relating to plastics additives "that were produced to the Department of Justice, any grand jury, and any investigatory authority, foreign or domestic (including but not limited to the European Union, Canada, or Japan), on a rolling basis...." (*Id.* at ¶ 2(a)). Second, it requires defendants to produce within sixty days of the order "in electronic format, all transactional data relating to their sales of Plastics Additives, as defined in the Complaint, in the United States during the period January 1, 1990 through to December 31, 2003" and to make available defendants' documentation and computer personnel to help understand and use the data. (*Id.* at ¶ 2(b)). Third, it requires plaintiffs to produce within 45 days "all documents relating to their purchases of plastics additives ... from the defendants." (*Id.* at ¶ 2(c)).

**\*10**  Defendants object to this proposed scheduling order on several grounds. First, defendants contend that the production of all documents produced to the DOJ, any grand jury, or any domestic investigatory authority violates Rule 6(e) of the Federal Rules of Criminal Procedure. (Def. Opp'n to Pl. Mot., at 8–12). Second, defendants contend that the production of all documents produced to any foreign investigatory authority is excessively burdensome and not geared towards the acquisition of relevant evidence. (*Id.* at 11–13). Third, defendants contend that sixty days is insufficient to conduct class-related discovery and allows for inadequate time for factual development on class issues. (*Id.,* at 15). Fourth, defendants contend that the discovery plan imposes no reciprocal burden upon plaintiffs to produce data in electronic format and to provide technical assistance to defendants in understanding the use of that data. (*Id.*). Finally, defendants contend that they should be expressly allowed to take discovery from plaintiffs related to plaintiffs' sales of plastics products to their customers. (*Id.*).

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 53 of 116

In re Plastics Additives Antitrust Litigation, Not Reported in Fed. Supp. (2004)

2004-2 Trade Cases P 74,620

A. Documents related to plastic additives that were submitted to the Department of Justice, any grand jury, and any domestic investigatory body

Defendants claim that defendants should not have to produce documents related to plastic additives that were submitted as part of a domestic government investigation because Rule 6(e)(2) of the Federal Rules of Criminal Procedure bars disclosure and because case law does not dictate such a result. (Def. Mem. In Opp'n to Pl. Mot., at 8).

1. Rule 6(e)(2) is inapplicable.

Defendants claim that Federal Rule of Criminal Procedure 6(e)(2) prevents plaintiffs from receiving documents that defendants produced to the DOJ in connection with California grand jury investigations. (Def. Mem. in Opp'n to Pl. Mot., at 8). Defendants' arguments lack legal support.

Federal Rule of Criminal Procedure 6(e)(2)(A) states that "no obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Fed.R.Crim.P. 6(e)(2)(A). Rule 6(e)(2)(B) prohibits certain people from disclosing "a matter occurring before the grand jury." Fed.R.Crim.P. 6(e)(2)(B). This list of persons includes the following: a grand juror; an interpreter; a court reporter; an operator of a recording device; a person who transcribes recorded testimony; an attorney for the government; or any person to whom disclosure is made. *Id.* Conspicuously absent from this list are witnesses, whether witnesses that testify at grand jury proceedings or witnesses that provide documents to grand juries during the course of their proceedings. *See* Susan W. Brenner, Gregory G. Lockhart, Federal Grand Jury: A Guide to Law and Practice § 8.3.1 (2004); *see also* Andrea M. Nervi, FRCP 6(E) And the Disclosure of Documents Reviewed by a Grand Jury, 57 U. Chi. L.Rev. 221, 224– 225 (1990). This omission was not unintentional, as the Advisory Committee Note to Rule 6(e) specifies that the rule "does not impose any obligation of secrecy on witnesses." *Id.*

 **\*11**  Despite its express language, courts disagree as to whether Rule 6(e)(2) applies to witnesses and other private parties not listed in the rule. *Compare Illinois v. Sarbaugh,* 552 F.2d 768, 777–78 (7th Cir.1977) (private corporations indicted through grand jury proceedings subject to secrecy obligations of Rule 6(e), although state demonstrated particularized need within meaning of Rule 6(e) to force corporate employer of grand jury witness to turn over transcripts of grand jury testimony concerning highway construction fraud) *and Cumberland Farms, Inc. v. Browning–Ferris Ind., Inc. .,* 1989 WL 90884, at \*1 (E.D.Pa. April 18, 1989) (applying Rule 6(e) without discussion to private party defendants and requiring showing of particularized need for documents created by or for grand jury) *with In re Grand Jury Subpoena Duces Tecum,* 575 F.Supp. 1219, 1221 (E.D.Pa.1983) (Rule 6(e) does not impose obligation of secrecy on witnesses, nor does the court retain a general supervisory authority to impose restraints on witnesses who seek to disclose testimony given before grand jury). Although the Third Circuit has not squarely addressed this issue, this Court agrees with those courts holding that Rule 6(e)(2) does not impose secrecy obligations on a witness who supplies documents to a grand jury proceeding. *See, e.g., In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. 554, 555– 556 (D.Minn.1989) (defendants in antitrust litigation are not among the parties enumerated in Rule 6(e)(2) and are required to release documents which were produced independent of the grand jury); *Golden Quality Ice Cream Co., Inc.,* 87 F.R.D. at 59 (disclosure of documents produced by defendants in class action to grand jury not prohibited by Federal Rule of Criminal Procedure 6(e)). This analysis comports with the text of the rule and with the advisory comment explaining the purpose and genealogy of the rule. *See* Fed.R.Crim.P. 6(e) (no obligation of secrecy on any person except those listed in Rule 6(e)(2)(B)).

Furthermore, even if Rule 6(e)(2) was applicable to private parties not listed in the rule, documents generated for purposes independent of the grand jury investigation, such as during the ordinary course of a defendant's business, are not "matters occurring before the grand jury." *See, e.g., In re Grand Jury Matter* (Catania), 682 F.2d 61, 64 (3d Cir.1982) (information developed by the FBI during course of investigation and presented to federal grand jury was not subject to Rule 6(e) because information exists apart from and was developed independently of grand jury, even though developed with an eye towards ultimate use in grand jury proceeding); *In re Grand Jury Matter,* 640 F.Supp. 63, 65 (E.D.Pa.1986) (Rule 6(e) does not apply to materials created for purposes independent of the grand jury investigation and, thus, business records subpoenaed by grand jury could be disclosed to Inspector General as part of a separate investigation). The Third Circuit has expressly declared that "information does not become a matter occurring before the grand jury simply by being presented to the grand jury, particularly

where it was developed independently of the grand jury." *U.S. v. Chang,* 2002 WL 31108904, at *2 (3d Cir. Sept.20, 2002) (unpublished opinion); *In re Grand Jury Matter* (Catania), 682 F.2d at 64. Nonetheless, materials created at a grand jury's request, such as subpoenas, transcripts, and document lists, constitute matters "occurring before the grand jury" within the meaning of Rule 6(e), thereby requiring parties to demonstrated particularized need to acquire these materials. *See, e.g., United States v. Procter & Gamble Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (requiring party seeking grand jury transcript to demonstrate "particularized" need for disclosure).

**\*12** Because defendants are not one of the enumerated parties in Rule 6(e), and because the defendants have not asserted that the documents were created at the request of grand jury proceedings in California rather than during the ordinary course of defendants' business operations, the obligation of secrecy does not apply.[6] *See* Manual for Complex Litigation § 11.49 ("The production to a grand jury of otherwise discoverable material does not, however, entitle it to Federal Rule of [Criminal] Procedure 6 protection. Copies of material produced to a grand jury are subject to discovery ."). Indeed, this Court does not believe that the production of documents submitted during the California grand jury proceedings is likely to disclose the "essence" of those proceedings. *See, e.g., In re Grand Jury Investigation,* 630 F.2d 996, 1000 (3d Cir.1980) (holding that Rule 6(e)'s policy of secrecy "designed to protect from disclosure only the essence of what takes place in the grand jury room" and recognizing that mere fact that particular document was reviewed by grand jury does not subject document to Rule 6(e) protections). Consequently, defendants' objection to plaintiffs' proposed order on the ground of Rule 6(e)(2) lacks merit.

    2. Plaintiffs' request for all documents submitted to the DOJ, any grand jury, and any domestic investigatory body is supported by case law.

Rejecting the defendants' defense to plaintiffs' discovery request is not the same as endorsing the content of plaintiffs' proposed order. It appears, however, that defendants in antitrust litigation regularly agree through joint discovery schedules to produce documents submitted to the DOJ, grand juries, and other investigatory authorities concerning the basis for the antitrust civil suit. *See, e.g., In re Acrylonitrile Butadiene Rubber (NBR) Antitrust Litigation,* 03–cv–1898 (W.D. Pa. June 14, 2004) (parties agreeing in proposed discovery schedule to produce documents submitted to grand jury or DOJ); *In re Rubber Chemicals Antitrust Litigation,* 03–CV–1496 (N.D.Cal. Jan. 26, 2004) (documents produced to grand jury or DOJ subpoenas in related criminal investigation included within Rule 26 initial disclosures); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (PCD) (D.Conn. Oct. 31, 2003) (parties agreeing in proposed discovery schedule to produce all documents submitted to DOJ or grand jury). This willingness to produce such documents at the outset of litigation signals the appropriateness and relevance of such a discovery request.

Plaintiffs also cite several cases in which defendants have been compelled to produce documents relating to government investigations. *See, e.g., In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556 (requiring defendants to product "documents which they submitted to the government in response to an investigation of the wirebound box industry and which they created independently from any such investigation); *Golden Quality Ice Cream,* 87 F.R.D. at 59. These cases recognize the relevance of these documents to antitrust litigation. *See In re Wirebound Boxes Antitrust Litigation,* 126 F.R.D. at 556. They also recognize that the production of these documents will impose only a minimum burden on the defendants, "since the documents in question have already been identified and sorted." *See, e.g., Golden Quality Ice Cream,* 87 F.R.D. at 59. In fact, ordering production of these documents "seems to accord with prevailing practice." *Id.*[7]

**\*13** This Court agrees with the logic of *In re Wirebound Boxes AntiTrust Litigation* and *Golden Quality Ice Cream.*[8] Applying this logic, defendants shall be required to produce all documents that were produced to the DOJ, any grand jury, and any domestic investigatory authority in connection with an investigation of the plastics additives industry. *See* Grand Jury Law and Practice § 5:6 (2d ed.2004) (evidence obtained independently of the grand jury proceeding does not ordinarily constitute a "matter occurring before the grand jury," even if same witness or similar evidence has been or will be presented to grand jury).

    B. Documents related to plastics additives that were submitted to foreign investigatory bodies

Defendants present two major objections to the proposal that defendants produce all documents turned over to foreign investigatory bodies in conjunction with the investigation of the plastics additives industry. First, defendants claim that documents produced to foreign investigative authorities are irrelevant to this lawsuit. (Def. Opp'n To Pl. Mot., at 12). Specifically, defendants claim that plaintiffs have alleged only that defendants engaged in a price-fixing conspiracy "in the United States," rather than a foreign price-fixing conspiracy; that foreign investigators focus on domestic markets over which they have control and jurisdiction; and that foreign investigators generally conduct wholesale seizures of files, thereby collecting documents irrelevant to the antitrust issues in this litigation. (*Id.*)

Second, defendants claim that this request, at such an early stage in the litigation, would impose an unnecessary burden on the parties. (*Id.* at 13). Defendants stress that foreign investigators may object to the production of documents, as the United States often does, and that production may disclose information about ongoing investigations. (*Id.*). Defendants further claim that foreign criminal investigations into alleged antitrust violations involve a different process than domestic criminal investigations into alleged antitrust violations. (*Id.*). Accordingly, because of this methodological difference, defendants claim that they would need to conduct a thorough review of the documents to determine the applicability of evidentiary privileges, that this review would be complicated by the fact that many of the documents are not likely to be in English, and that companies in defendants' position are not likely to have copies of documents that were seized pursuant to a foreign investigation into the plastic additives industry. (*Id.*).

Plaintiffs respond to defendants' objections by arguing that documents produced to foreign investigative bodies are as relevant as those produced to grand juries in the United States. (Pl. Reply Mem., at 8). Plaintiffs cite a recent order from *In re: Automotive Refinishing Paint Antitrust Litigation,* MDL Docket No. 1426 (E.D.Pa. October 29, 2004) (J. Surrick), in which the court affirmed its previous order requiring antitrust defendants, in response to document requests and interrogatories, to produce documents submitted to foreign investigative bodies relating to the production, pricing, marketing, sale, or distribution of automotive refinishing paint. *Id.* at *5–6. The court reasoned that such information was relevant because foreign-price fixing activities would impact the domestic market for automotive refinishing paint, because evidence of foreign price-fixing among defendants would establish the existence of an illegal conspiracy in restraint of trade within the meaning of section 1 of the Sherman Act, and because evidence of foreign price-fixing would be material "to prove that they had the opportunity and ability to engage in domestic price-fixing for automotive refinishing paint." *Id.* at *8. The court further reasoned that the burden of producing these documents would not be significant because defendants had already agreed to produce all documents and information related to the United States; thus, requiring blanket production was easier than compelling defendants to sift through documents submitted to foreign investigative bodies for materials relevant to the United States. *Id.* at *10–11.

 **\*14**  It is well-settled that courts presiding over antitrust cases generally take a liberal view of relevance in determining the scope of discovery. *See, e.g., New Park Entm't, LLC v. Elec. Factory Concerts, Inc.,* 2000 WL 62315, at *3 (E.D.Pa. Jan.13, 2000)* (internal quotations omitted). Applying this expansive view of relevance, this Court agrees that documents produced to foreign investigative bodies are relevant to determine whether defendants have engaged in price-fixing that affects American commerce. Regardless of whether plaintiffs have alleged a global conspiracy, materials produced to international government authorities may cover transactions involving the sale or marketing of plastic additives in the United States. They may also cover transactions and decision-making outside the United States that influence the sale or marketing of plastic additives in the United States. Accordingly, these documents may lead to evidence that illuminates defendants' motive and opportunity for the alleged conspiracy within the United States, the breadth of the conspiracy, and the manner by which defendants fraudulently concealed the conspiracy from plaintiffs. *See, e.g., In re Vitamins Antitrust Litigation,* 2001 WL 1049433, at *11–12 (D.D.C. June 20, 2001)* (refusing to place geographic limitation on merits-based discovery in global price-fixing case because, although acts or communications outside the United States may be admissible to establish existence of conspiracy). In addition, such materials may help plaintiffs to discover the identity and location of potential witnesses and to impeach defendants' trial witnesses. *Id.*

This Court also rejects defendants' position that production of all documents submitted to international investigative authorities concerning plastic additives at this juncture in the litigation would pose a substantial burden on defendants. The scope of document production in antitrust litigation is often quite expansive. *See, e.g., In re Fine Paper Antitrust Litigation,* 685 F.2d

2004-2 Trade Cases P 74,620

810, 818 (3d Cir.1982) (no abuse of discretion where trial court permitted taking of 270 depositions and production of nearly two million documents in complex, nationwide antitrust claim); *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 614 (7th Cir.1997) (pretrial discovery involved more than 1,000 depositions and over fifty million pages of documents); *In re Linerboard Antitrust Litigation,* 296 F.Supp.2d 568, 577 (E.D.Pa.2003) (pretrial discovery required production of millions of pages of documents). Furthermore, although foreign antitrust investigations generally may be conducted in a distinct manner from domestic antitrust investigations, defendants have not provided this Court with specific, individualized reasons why the production of documents that defendants supplied to foreign investigative bodies would be burdensome in this particular litigation. Defendants fail to present evidence, such as affidavits from employees or written documentation, indicating that wholesale files were seized from defendants' international offices, that the documents produced to foreign investigative authorities are in languages other than English, or that defendants would need to review each and every document to determine whether it invokes applicable privileges. Nonetheless, this Court gives serious consideration to the defendants' generic contention that companies subject to foreign seizures of corporate records are not likely to have either lists of the documents seized or records indicating what was taken. Accordingly, defendants shall be required to provide documents related to plastic additives that were produced to foreign investigatory authorities, to the extent that defendants have knowledge of the identity of these documents and/or can reasonably obtain knowledge of the identity of these documents.

### C. Time Period

**\*15** Defendants contend that the proposed discovery schedule of 60 days for class-related discovery is unrealistic. (Def. Opp'n to Pl. Mot., at 15). Defendants claim that this period allows inadequate time for factual development on class issues. (*Id.*).

This Court has refused to bifurcate discovery. This decision may require the parties to spend substantial time in responding simultaneously to merits-based discovery and class-based discovery. Because merits-based discovery may deflect attention and resources from establishing a record for class certification, this Court agrees that sixty days for class-based discovery is inadequate, particularly when both party may employ expert witnesses in support of their respective positions on class certification. *See, e.g ., Larson v. Burlington Northern and Santa Fe Railway Co.,* 210 F.R.D. 663, 667 (D.Minn.2002) (granting bifurcation but supplying only ninety days to create record for class certification). Instead, this Court will give the parties 120 days to conduct fact-based discovery on the class certification issue.

### D. Production of Data in Electronic Format and Technical Assistance

Defendants also object to the obligation that defendants provide data in electronic format to plaintiffs and that defendants provide technical assistance to plaintiffs in understanding this data. (Def. Opp'n to Pl. Mot., at 15). Defendants do not question the relevance of these obligations, only the fact that no similar burden is imposed upon plaintiffs. (*Id.*).

This Court agrees with defendants' objections. Both parties must provide all transactional data in electronic format, to the extent reasonably feasible. *See, e.g., In re: Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 03–MD–1542 (D.Conn. October 31, 2003) (parties agree to produce transactional data in electronic format, but only to extent "reasonably feasible"). However, defendants shall not be required to make available "documentation and computer personnel" to help plaintiffs understand that data. Requiring this condition as a matter of right in contested litigation undermines the adversarial nature of antitrust litigation. Unless otherwise agreed upon, interpretations of data produced through discovery should be obtained through traditional discovery outlets and through the hiring of expert witnesses. Although the parties may privately agree to provide technical assistance to one another, this Court will not impose such an obligation on either party as a matter of course.

### E. Discovery of Downstream Data

Defendants further object to the plaintiffs' proposed discovery order on the basis that the discovery order does not require plaintiffs to produce information about "demand conditions on the end markets for defendants' products and the varying types of pricing terms to the proposed class members that have resulted from those conditions." (Def. Mem. In Opp'n to Pl. Mot.,

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 57 of 116

at 3). Defendants claim that this information must be provided at the outset of the discovery period because it is relevant to whether plaintiffs meet the elements necessary for class certification. (*Id.* at 15).

**\*16** Plaintiffs note that their proposal does not prohibit defendants from requesting this information, as both parties are free to serve discovery requests seeking any information they require. (Pl. Reply Mem., at 9). However, in an effort to preempt future discovery disputes, plaintiffs note that case law prevents discovery of events occurring in the chain of distribution after the initial sales of the price-fixed product, information otherwise known as "downstream data." (*Id.* at 15; Pl. Mem. In Opp'n to Def. Mot., at 19–25).

This Court agrees that plaintiffs' proposed schedule does not prohibit defendants from seeking downstream data, to the extent relevant, through discovery. This Court also agrees that defendants have not established the relevance of plaintiffs' downstream data to the merits of plaintiffs' claims or to class certification issues. Defendants provide no case law in support of their argument. In fact, the case law brought to the Court's attention holds that downstream data is irrelevant to determine whether defendants are liable for price-fixing under the Sherman Act. *See, e.g., Illinois Brick Co. v. Illinois,* 431 U.S. 720, 724–725, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (holding that the overcharged direct purchaser, and not other indirect purchasers who receive the passed-on price of the illegal overcharge, may sue to recover the illegal overcharge and that antitrust defendants may not introduce evidence that indirect purchasers were injured by illegal overcharge) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). As such, courts have refused to require production of downstream data in antitrust price-fixing cases. *See, e.g., In re Vitamins Antitrust Litigation,* 198 F.R.D. 296, 301 (D.D.C.2000) (noting that "no court has even allowed production of individualized downstream data" in antitrust case and refusing to grand defendants' motion to compel documents that relate to plaintiffs' use, manufacture, sale, marketing, distribution, or supply of vitamin products); *In re Wirebound Boxes Antitrust Litigation,* 131 F.R.D. 578 (D.Minn.1990) (denying motion to compel document requests for materials concerning plaintiffs' financial information in price-fixing antitrust litigation because plaintiffs do not seek to recover lost profits); *In re Carbon Dioxide Antitrust Litigation,* MDL 940, slip op. at 4 (M.D.Fl. Nov. 19, 1993) (refusing to permit discovery in antitrust litigation of plaintiffs' sales, profits, and costs of products for which liquid carbon dioxide and nitrogen are used because plaintiffs seek to recover overcharges from defendants' antitrust violations). Consequently, although this Court will not *per se* preclude defendants at this time from requesting downstream data through discovery, this Court will certainly not require plaintiffs to produce downstream data at the outset of the discovery period through the entry of a scheduling order.

V. Conclusion

For the following reasons, defendants' motion to bifurcate discovery is denied and plaintiffs' motion for entry of a discovery schedule is granted in part and denied in part. An order and scheduling order consistent with this opinion follow.

*ORDER*

**\*17** AND NOW, this _____ day of November 2004, upon consideration of Defendants' Join Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 88) filed on September 14, 2004, Plaintiffs' Opposition to Motion for Bifurcation (Doc. No. 92) filed on October 1, 2004, Defendants' Joint Memorandum in Further Support of Defendants' Motion for Bifurcation of Discovery and Entry of a Scheduling Order (Doc. No. 98) filed on October 21, 2004, Plaintiffs' Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 93) filed on October 1, 2004, Defendants' Opposition to Plaintiffs' Motion for Entry of Proposed Scheduling Order (Doc. No. 96) filed on October 15, 2004, and Plaintiffs' Reply Memorandum in Support of Motion for Entry of Proposed Discovery Scheduling Order (Doc. No. 103) filed on November 10, 2004, it is hereby ORDERED as follows:

1. Defendants' Motion for Bifurcation is DENIED.

2. Plaintiffs' Motion for Entry of a Proposed Scheduling Order is GRANTED in part and DENIED in part.

3. Discovery shall be completed according to the Scheduling Order that accompanies this Order.[*]

**All Citations**

Not Reported in Fed. Supp., 2004 WL 2743591, 2004-2 Trade Cases P 74,620

Footnotes

1     By order dated September 15, 2004, the other six cases against defendants were placed in deferred status pending the outcome of class certification in this litigation.

2     This delay is evident from the defendants' proposed order bifurcating discovery, which would not resolve the issue of class certification until (at a minimum) March 2006 and which, throughout this period, would not permit plaintiffs to engage in merits-based discovery. (Def. Mot. to Bifurcate, at 20). Defendants' proposed scheduling order delays both the class certification issue and the ultimate resolution of this litigation, whether through a trial on the merits, settlement, or dispositive motions. (*Id.*). Defendants' proposed scheduling order therefore violates the rationale of efficiency upon which the theory of discovery bifurcation is based.

3     Class action certification is appropriate only if the following four elements are met: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representatives will fairly and adequately protect the interests of the class ("adequacy of representation"). *See* Fed.R.Civ.P. 23(a).

4     This Court also disagrees with defendants' assertions that bifurcation is appropriate because other state courts, which are adjudicating state antitrust claims concerning plastics additives against the same defendants, have chosen to bifurcate discovery. Defendants cite two orders from parallel state litigation in Ohio and California for this proposition. However, these cases are not relevant to this Court's analysis. First, in *Competition Collision Center LLC v. Crompton Corp., et al.,* Case No. CGC–04–431278 (Cal.Super.Ct. May 18, 2004), the California Superior Court only stated that the discovery period *"may* be bifurcated into class certification and other issues" [emphasis added]. Second, in *Heritage Plastics, Inc. v. Rohm and Haas Company, et al.,* Case No. 03–CV–0113 (Ohio CCP July 26, 2004), the Court of Common Pleas for Belmont County, Ohio bifurcated discovery, but implied that bifurcation was appropriate primarily because of the congestion in the Court's docket and because federal antitrust litigation against the same defendants was proceeding in this Court.

5     Defendants claim that no general rule exists disfavoring pre-indictment requests for a stay of parallel civil proceedings. (Def. Mem. In Further Support of Mot. to Bifurcate, at 8 n. 7). Defendants also claim, that, if such a rule exists, it is inapplicable in this situation because defendants have not asked for a blanket stay of all civil proceeding, only merits-based discovery. (*Id.*). Although this Court agrees that there is no *per se* rule against pre-indictment stays of parallel civil proceedings, there is certainly a strong judicial preference against such stays. *See, e.g., Sterling Nat'l Bank,* 175 F.Supp.2d at 576–77 (courts generally grant the extraordinary remedy of stay only after defendant seeking stay has been indicted). Furthermore, the logic behind rejecting a blanket stay of parallel civil proceedings prior to a defendant's indictment applies with equal force to a determination of whether merits-based discovery should be stayed pending ongoing grand jury proceedings. In fact, the argument in favor of a stay of merits-based discovery at the pre-indictment phase may be weaker than the argument in favor of a blanket stay because, in the former situation, defendants and their employees may be forced into the Fifth Amendment dilemma through the progression of class-based discovery even if the stay is granted.

6     Defendants have not asked this Court to exercise its supervisory powers over grand jury proceedings as a basis to prevent disclosure of the documents at issue. Accordingly, this Court need not address whether a federal court has the authority to supplement the text of Rule 6(e)(2) by imposing the obligation of secrecy on witnesses or other private parties not mentioned in the rule. *See* Brenner, Federal Grand Jury § 8.3.1 (noting that "it is unclear whether courts have the authority to supplement" Rule 6(e)'s provisions to impose secrecy obligation on parties not enumerated).

7     In *In re Wirebound Boxes AntiTrust Litigation,* defendants were not required to produce all documents related to government investigations into the wirebound box industry 136 F.R.D. at 556. Instead, the court struck a compromise between the need of civil litigants to discover relevant materials and the need to preserve the secrecy of the grand jury process, regardless of the literal text of Rule 6(e). *Id.* The court achieved this balance by requiring defendants to produce all documents created independently from any

2004-2 Trade Cases P 74,620

government investigation, while requiring plaintiffs to show particularized need prior to disclosing documents created by a grand jury or at a grand jury's request, such as subpoenas, transcripts, and lists of documents. *Id.* Although this Court agrees with the general principles of *In re Wirebound Boxes AntiTrust Litigation,* it will not adopt a judicially created discovery limitation in contravention of the literal text of Rule 6(e), which imposes no secrecy obligation on witnesses or private parties who supply documents to grand jury proceedings.

8      The case cited in support of defendant's position, *In re Sulfuric Acid Antitrust Litigation,* 2004 WL 769376, at *3–5 (N.D.Ill. April 9, 2004), which prevented discovery in antitrust litigation of all documents related to sulfuric acid that were provided to a grand jury in connection with a related criminal investigation, is inapplicable. The court in *In re Sulfuric Acid Antitrust Litigation* was compelled to follow the Seventh Circuit's interpretation of Rule 6(e) as covering documents supplied to a grand jury, although created for purposes other than or independent of grand jury investigations. *Id.* at *3. It was also forced to follow the Seventh Circuit's interpretation of Rule 6(e)(2)(B) as covering civil defendants who have supplied documents to a grand jury in a related criminal investigation. *Id.* at *2.

*      Editor's Note: Scheduling Order is not included in this publication.

---

**End of Document**                                             © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011-1 Trade Cases P 77,329

2011 WL 486123
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

LAKELAND REGIONAL MEDICAL CENTER, INC., Plaintiff,

v.

ASTELLAS US, LLC and Astellas Pharma US, Inc., Defendants.

No. 8:10–cv–2008–T–33TGW.
|
Feb. 7, 2011.

**Attorneys and Law Firms**

Archie I. Grubb, Timothy R. Fiedler, W. Daniel Miles, III, Beasley, Allen, Crow, Methvin, Portis & Miles, PC, Montgomery, AL, Stephen R. Senn, Peterson & Myers, PA, Lakeland, FL, for Plaintiff.

Amanda Arnold Sansone, Chris S. Coutroulis, Carlton Fields, PA, Tampa, FL, David P. Frazier, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, John Treece, Megan M. Walsh, Sidley Austin, LLP, Chicago, IL, for Defendants.

*ORDER*

VIRGINIA M. HERNANDEZ COVINGTON, District Judge.

 **\*1** This matter is before the Court pursuant to Astellas's Motion for Phased Discovery (Doc. # 28), which was filed on December 28, 2010. Lakeland Regional filed a Response in Opposition on January 28, 2011. (Doc. # 37). For the reasons that follow, the motion for phased discovery is denied.

*Analysis*

Lakeland Regional initiated this putative class action antitrust litigation against Astellas on September 13, 2010. (Doc. # 1). Lakeland Regional alleges that Astellas has "engaged in anticompetitive, monopolistic, and exclusionary conduct in the marketing, distribution, and sale of a patent license for the process of inducing pharmacological stress in cardiac patients undergoing a 'stress test." (Doc. # 11 at 1). Lakeland Regional also alleges that Astellas has engaged in anticompetitive, monopolistic, and exclusionary conduct in the marketing of its product "Adenoscan." (*Id.*) Lakeland Regional filed an amended complaint on October 19, 2010, containing the following counts against Astellas: (1) unlawful tying in violation of the Sherman Act, 15 U.S.C. § 1; (2) exclusive dealing in violation of the Sherman Act and the Clayton Act, 15 U.S.C. § 14; (3) attempt to monopolize in violation of the Sherman Act, 15 U.S.C. § 2; (4) unreasonable restraint of trade in violation of the Florida Antitrust Act of 1980, Florida Statute Section 542.18; (5) attempted monopolization in violation of the Florida Antitrust Act of 1980; and (6) tortious interference with prospective economic advantage.[1]

Astellas seeks an order bifurcating discovery in this action between class certification based discovery and merits based discovery. Astellas refers to this relief as "phased discovery" and contends: "This matter is an antitrust class action case ... it involves the complex intersection of patent, food and drug, and antitrust law. Limiting Phase 1 discovery to the key class certification issue will enable a class certification motion to be brought, briefed, and adjudged at an early practicable time while avoiding the much greater costs, burdens and complexities that will be associated with full merits discovery." (Doc. # 28 at 2).

2011-1 Trade Cases P 77,329

Lakeland Regional, on the other hand, contends that class certification and merits discovery will necessarily overlap, and "the parties will likely disagree concerning whether certain items sought in discovery are material solely to *class* issues while other items are material solely to *merits* issues." (Doc. # 37 at 2–3) (emphasis in original). Lakeland Regional further asserts that "splitting discovery into 'phases' provides Astellas with grounds to object to discovery requests that fairly pertain to *class* issues by arguing that the information sought, while discoverable, should not be produced (at least not at that time) because it goes to the *merits* of [Lakeland Regional's] claims." (*Id.* at 3) (emphasis in original). Lakeland Regional also poses the thoughtful inquiry: "[W]ill counsel for either party be required to travel to depose certain witnesses on multiple occasions—once to deal with *class* issues, and again to deal with *merits* questions?" (Doc. # 37 at 3) (emphasis in original).

**\*2** After careful consideration of the arguments presented by both parties, the Court concludes that Astellas's request for phased discovery should be denied. The Court is not persuaded that phased discovery will conserve the resources of the parties or the Court. This is because the line between "class issues" and "merits issues" is practically difficult, if not impossible, to determine. In *LaBauve v. Olin Corp.,* 231 F.R.D. 632, 644 n. 21 (S.D.Ala.2005), the court, discussing its role in deciding class certification motions, noted: "[M]erits and Rule 23 issues are often intertwined, rendering it impossible to address the Rule 23 criteria without at least tangential discussion of the merits." The Eleventh Circuit has also noted, "evidence relevant to the commonality requirement [of Rule 23 of the Federal Rules of Civil Procedure] is often intertwined with the merits." *Nelson v. United States Steel Corp.,* 709 F.2d 675, 679 (11th Cir.1983).

Simply stated, if district courts as neutral arbiters of the law find the distinction between merits and class issues to be murky at best, and impossible to discern at worst, the Court cannot imagine how parties with an incentive to hold back damaging evidence, can properly draw the line between these categories of evidence during "phased" discovery.

Furthermore, the Court has reviewed the cases cited by Astellas and determines that none of the cited cases provides strong support for the request for phased discovery. In addition, none of the cases provide helpful or practicable guidance for this Court as to how phased discovery should proceed, and none of the cases draws helpful distinctions between merits based and class based discovery.

The Court agrees with Lakeland Regional that phased discovery will "unnecessarily prolong" this litigation and increase the expense involved for both sides. (Doc. # 37 at 3). The Court also finds that Phased discovery will lead to duplicative and delayed discovery. Accordingly, the Court denies the motion for phased discovery.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

Astellas's Motion for Phased Discovery (Doc. # 28) is **DENIED.**

**DONE** and **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 486123, 2011-1 Trade Cases P 77,329

Footnotes

1       Astellas filed a motion to dismiss the amended complaint on November 19, 2010, which has yet to be decided by the Court. (Doc. # 16).

**End of Document**                                                                © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Distinguished by Allen v. Protective Life Insurance Company, E.D.Cal., December 12, 2023

2016 WL 97511

Only the Westlaw citation is currently available.

United States District Court, N.D. California.

James LATHROP, et al., Plaintiffs,

v.

UBER TECHNOLOGIES, INC., Defendant.

Case No. 14-cv-05678-JST

|

Signed 01/08/2016

**Attorneys and Law Firms**

Hassan Ali Zavareei, Andrea R. Gold, Andrew J. Silver, Tycko & Zavareei LLP, Washington, DC, Evan Matthew Meyers, Myles P. McGuire, Mcguire Law, P.C. Chicago, IL, Kristen Law Sagafi, Tycko & Zavareei LLP, Oakland, CA, for Plaintiff.

James G. Snell Perkins Coie LLP, Palo Alto, CA, Debra Rae Bernard, Perkins Coie LLP, Martin Wojslaw Jaszczuk, Nick James Digiovanni, Locke Lord LLP, Chicago, IL, Nicola Carah Menaldo, Perkins Coie LLP, Seattle, WA, Sarah J. Crooks, Perkins Coie LLP, Portland, OR, Susan Jane Welde, Locke Lord LLP, Los Angeles, CA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO STAY PROCEEDINGS

Re: ECF No. 71

JON S. TIGAR, United States District Judge

**\*1** Before the Court is Defendant Uber Technologies, Inc.'s ("Uber") Motion to Stay. ECF No. 71. For the reasons set forth below, the Court will deny the motion.

## I. BACKGROUND

### A. Procedural History

On December 31, 2014, Plaintiffs filed this putative class action against Uber for alleged violations of the Telephone Consumer Protection Act ("TCPA"). Second Amended Complaint, ECF No. 54 ("SAC"). Uber "is a nationwide passenger transportation service that connects riders and drivers through a cellular telephone application." Id. ¶ 5. According to Plaintiffs, "Uber's recruiting tactics include sending prolific text messages to prospective Uber drivers." Id. ¶ 10. Plaintiffs allege that they received recruiting texts from Uber without providing prior express consent. Id. ¶¶ 32, 48, 61, 75, 88, 98. Plaintiffs Justin Bartolet, Sandeep Pal, Jonathan Grindell, and Jennifer Reilly further allege that they continued to receive texts after asking Uber to stop. Id. ¶¶ 53, 70, 82, 93. Plaintiffs allege that in making these texts, Uber used a device that qualifies as an "automatic telephone dialing system" as defined by 47 U.S.C. § 227(a)(1). Id. ¶¶ 30, 46, 59, 73, 86, 96.

On November 13, 2015, Uber filed a Motion to Stay Proceedings in light of two pending appeals.[1] ECF No. 71 at 1–2. Uber argues that both the D.C. Circuit's review of the FCC's 2015 Omnibus Order of the TCPA in ACA International, et al. v. Federal

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 63 of 116

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

Communications Commission, No. 15-1211 (D.C. Cir. filed July 10, 2015), and the Supreme Court's upcoming decision in Spokeo, Inc. v. Robins, 135 S.Ct. 1892 (2015), could fundamentally alter the outcome of this case. Id.

**B. The FCC's 2015 Order and the D.C. Circuit Appeal in ACA International**

On July 10, 2015, the FCC issued a Declaratory Ruling and Order, addressing a number of petitions related to the TCPA. See In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 F.C.C. Rcd. 7961 (July 10, 2015) ("2015 FCC Order"). Uber specifically highlights the FCC's rulings on "automatic telephone dialing system," "called party," and revocation of consent.[2] ECF No. 71 at 12–15. Uber contends that the definitions of these terms are at issue in this case and request a stay while the definitions of these terms are contested. Id. at 15–17.

 **\*2**  To qualify as an automatic telephone dialing system, equipment must have "the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1)(A). In its July 2015 order, the FCC clarified that the TCPA's use of the term "capacity" in the definition of "automatic telephone dialing system" does not exempt equipment that lacks the "present ability" to dial randomly or sequentially.[3] 2015 FCC Order ¶ 15. "In other words, the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." Id. ¶ 16.

The FCC also concluded that the term "called party" should be defined as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." Id. ¶ 73. The FCC created a very limited safe harbor for "callers who make calls without knowledge of reassignment and with a reasonable basis to believe they have valid consent to make the call." Id. at ¶ 72. Subject to this exception, "calls to reassigned wireless numbers violate the TCPA when a previous subscriber, not the current subscriber or customary user, provided the prior express consent on which the call is based." Id. at ¶ 73.

Although the TCPA does not explicitly discuss revocation of consent, the FCC determined that "the most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts." Id. ¶ 56.

After the FCC issued its ruling, nine companies, trade associations, and other entities filed petitions with the U.S. Court of Appeals for the District of Columbia Circuit seeking review of the 2015 FCC Order. The petitions were subsequently consolidated into a single case, ACA International, et al. v. Federal Communications Commission, No. 15-1211. The petitions request that the D.C. Circuit vacate the FCC's ruling with regard to the potential liability for calls to reassigned cell phone numbers and the definition of an "automatic telephone dialing system." The D.C. Circuit set a briefing schedule requiring all briefs to be filed by February 24, 2016. It is unknown when the D.C. Circuit will schedule oral argument or issue a decision.

**C. The Supreme Court's Pending Decision in Spokeo**

In Robins v. Spokeo, Inc., 742 F.3d 409 (9th Cir. 2014) cert. granted, 135 S. Ct. 1892 (2015), the plaintiff alleged violations of the Fair Credit Reporting Act ("FCRA"), based on a website's publication of inaccurate consumer information regarding the plaintiff. 742 F.3d at 410. The district court ruled that the plaintiff had not alleged any actual or imminent harm because plaintiff only alleged the misinformation harmed his employment prospects. Id. The Ninth Circuit reversed and held that the alleged violation of the plaintiff's statutory rights under the FCRA, in itself, was sufficient to satisfy the injury-in-fact requirement. Id. at 413–14. The Ninth Circuit held that the relevant interests protected by the FCRA were "sufficiently concrete and particularized" to satisfy the requirements of Article III. Id. Because the panel determined that the plaintiff had standing based on the alleged violations of his statutory rights, the panel did not decide whether harm to the plaintiff's "employment prospects or related anxiety could be sufficient injuries in fact." Id. at 414 n.3.

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 64 of 116

**\*3** On April 27, 2015, the United States Supreme Court granted the defendant's petition for a writ of certiorari, Spokeo, Inc. v. Robins, 135 S. Ct. 1892 (2015). The question presented was, "[w]hether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute," Pet. Writ of Cert. at i, Spokeo, Inc. v. Robins, No. 13-1339 (U.S. May 1, 2014); Br. of Pet'r at i, Spokeo, Inc. v. Robins, No. 13–1339 (U.S. July 2, 2015). The Supreme Court heard oral argument on November 2, 2015 and a decision is expected by June 2016.

Uber contends that the result in Spokeo is important because Plaintiffs have only alleged statutory damages without identifying concrete harm. ECF No. 71 at 20–21.

## II. LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). Whether to stay proceedings is entrusted to the discretion of the district court. See id. 254–55 ("How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").

In deciding whether to stay proceedings pending resolution of an appeal in another action, a district court must weigh various competing interests, including the possible damage which may result from granting a stay, the hardship a party may suffer if the case is allowed to go forward, and "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." Lockyer v. Mirant Corp., 398 F.3d 1098, 1110 (9th Cir. 2005). The burden is on the movant to show that a stay is appropriate. See Clinton v. Jones, 520 U.S. 681, 708 (1997).

## III. DISCUSSION

Uber contends that the possibility that the 2015 FCC Order will be vacated by the D.C. Circuit "is far from speculative." Id. at 16. Uber particularly stresses that two of the five FCC Commissioners issued strong dissents to the Order, arguing that the Order deviated from the plain language of the TCPA. Uber also brings two cases to the Court's attention in which the district courts granted stays pursuant to the D.C. Circuit's decision in ACA International: Gensel v. Performant Techs., Inc, No. 13-C-1196, 2015 WL 6158072 (E.D. Wisc. Oct. 20, 2015) and Fontes v. Time Warner Cable, Inc., No. CV14-2060-CAS(CWx), 2015 WL 9272790 (C.D. Cal. Dec. 17, 2015).

In Gensel v. Performant Techs., Inc, the court concluded that it appeared that the FCC's definition of "capacity" contradicted the plain language of the statute. 2015 WL 6158072, at \*2 (E.D. Wis. Oct. 20, 2015). As such, the agency's interpretation would not be entitled deference on appeal. The court stayed the case pending ACA International and a Seventh Circuit appeal. The court noted that "most importantly, if the Seventh Circuit were to rule that 'capacity' means 'present capacity' in accordance with the plain language of the statute, such a ruling would be dispositive of the instant case because it is undisputed that [the defendant's] telephony system did not and does not have the capacity to randomly or sequentially call phone numbers." Id. Fontes v. Time Warner Cable, Inc. similarly discussed the FCC's broadened definition of "capacity." See 2015 WL 9272790, at \*4 (C.D. Cal. Dec. 17, 2015) ("[T]he FCC adopted a broader definition of 'automatic telephone dialing system' that focuses on a device's *potential* capabilities, as opposed to a narrow definition based on a device's *present* capabilities." (emphasis in original)).

**\*4** Uber argues that should the D.C. Circuit vacate the FCC's "potential capacity" definition, the focus and scope of discovery would constrict. ECF No. 77 at 15. "For example, if the D.C. Circuit vacates the FCC's expanded definition of 'ATDS,' Plaintiffs will not be able to argue that they are entitled to discovery on the 'potential ability' of Uber's systems, significantly reducing discovery." Id. Uber asserts that it did not send text messages using an automatic telephone dialing system. See ECF No. 56 (Answer) at 17. Uber similarly contends that its discovery obligations may narrow should the D.C. Circuit address the definition of "called party" or the means a party may use to revoke consent. ECF No. 77 at 16.

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 65 of 116

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

Plaintiffs counter that the FCC Order's definitions are not new, are likely to be upheld due to their long-standing history, and have been adopted by numerous courts over the years. Id. at 15–18. Plaintiffs also point out that regardless of the D.C. Circuit's decision, the parties would "still need to obtain the relevant facts in discovery, as well as the expert opinions necessary, for the Court to apply the law to the undisputed facts." ECF No. 74 at 25. Thus, for example, even if the D.C. Circuit invalidated the FCC's interpretation of an ATDS, "[d]iscovery is still necessary and this Court must still determine whether the calling equipment that Uber actually used qualifies as an ATDS under the TCPA...." Id.

The Court finds that a stay in favor of the D.C. Circuit's decision in ACA International is not appropriate. First, while the briefing schedule is set in the case, oral argument has not yet been scheduled and neither the parties and nor the Court can forecast when the D.C. Circuit will ultimately issue a decision. Plaintiffs argue persuasively that they would suffer prejudice from a stay because the case would extend for an indeterminate length of time, increase the difficulty of reaching class members, and increase the risk that evidence will dissipate. ECF No. 74 at 26–27. Moreover, as counsel for Uber acknowledged at the hearing on this motion, the D.C. Circuit is unlikely to be the final step in the litigation over the FCC's 2015 Omnibus Order. Whichever party is unsuccessful in that court is almost certain to appeal to the Supreme Court. Thus, even the most optimistic estimate of the time required for a decision from the D.C. Circuit significantly understates both the delay a stay might engender and the concomitant prejudice to Plaintiff.

Second, although the decision in ACA International may vacate portions of the 2015 FCC Order, discovery in this case will be required regardless of the outcome in that one. See 28 U.S.C. § 2342(1) (stating that court of appeals, including the D.C. Circuit, may "enjoin, set aside, suspend (in whole or in part) or [ ]determine the validity" of final FCC orders). Even if the D.C. Circuit were to modify or vacate the 2015 FCC Order, factual disputes, such as whether an ATDS was used and whether text recipients provided their consent, will remain here. Although Uber may suffer hardship, in the form of additional discovery, the Court concludes that this potential hardship does not merit a stay in this case. Uber has not persuaded the Court that the potential changes in the playing field of this case—the size of which are currently unknowable—are so substantial or work such a hardship on Uber that a stay is necessary or appropriate.

The Court also declines to grant the stay based on the pendency of Spokeo. In the case at bar, Plaintiffs have articulated concrete harm to them, and are not simply relying on a bare violation of the statute. ECF No. 54 ¶¶ 114–116. In addition to claiming statutory and punitive damages, Plaintiffs allege they and members of the class "suffered damages in the form of text message, data, and other charges to their cellular telephone plans." Id. ¶ 116. Based on the allegations in the Second Amended Complaint, the Court concludes that Plaintiffs have sufficiently stated an injury in fact. See, e.g., Johnson v. Navient Sols., Inc., No. 115CV00716LJMMJD, 2015 WL 8784150, at *2 (S.D. Ind. Dec. 15, 2015) (denying motion to stay in TCPA action pursuant to Spokeo because plaintiff's intrusion of privacy allegation stated a claim for actual harm); Doe v. Selection.com, No. 15-cv-02338-WHO, 2015 WL 5853700 at *5 (N.D. Cal. Oct. 8, 2015) (denying motion to stay in FCRA action because plaintiff adequately alleged actual injury and because balance of hardships did not warrant a stay). As Uber concedes, it may seek discovery on "whether it can mount a *factual* attack" to Plaintiffs' claims of injury as well as class certification issues. ECF No. 77 at 21. But neither Uber's description of the proceedings in Spokeo nor the Court's independent review persuade the Court that Spokeo is likely to render this case moot.

 **\*5** In sum, Uber may face additional discovery obligations but has not established that this hardship justifies staying the case, which would otherwise be delayed with no identifiable end to the stay. Decisions in ACA International and Spokeo may have a beneficial impact on the case by clarifying questions of law. Nonetheless, Uber has not shown this is one of the "rare circumstances" in which a stay pending the resolution of an appeal in another case is appropriate. See Landis, 299 U.S. at 255.

**CONCLUSION**

For the foregoing reasons, the Court denies Uber's Motion to Stay.

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 66 of 116

Lathrop v. Uber Technologies, Inc., Not Reported in Fed. Supp. (2016)

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 97511

Footnotes

1    Three additional TCPA cases against Uber are pending: (1) Kolloukian v. Uber Technologies, Inc., Case No. 2:15-cv-02856-PSG-JEM filed in the Central District of California on April 17, 2015; (2) Vergara v. Uber Technologies, Inc., Case No. 1:15-cv-06942 filed in the Northern District of Illinois on August 7, 2015; and (3) Kafatos v. Uber Technologies, Inc., Case No. 3:15- cv-03727 filed in the Northern District of California on August 14, 2015. Uber filed motions to stay in each case. In Kolloukian, the plaintiff did not oppose the motion, and the court granted the motion to stay. See ECF No. 84, Ex. A. In Vergara, the court denied the motion to stay but encouraged the parties to limit discovery. See ECF No. 85, Exs. A and B. The motion to stay in Kafatos is currently pending before this Court.

2    Uber also flagged the FCC's interpretation of "call." See ECF No. 71 at 14. However, because petitioners did not brief this issue on appeal, Uber no longer relies on the challenge as a basis for granting the stay. ECF No. 77 at 8 n.2.

3    The FCC has previously interpreted an ATDS as "cover[ing] any equipment that has the specified capacity to generate numbers and dial them without human intervention, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." In re the Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14017 (2003) ("2003 FCC Order"). The FCC has also ruled that "predictive dialers" fall "within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." Id. Predictive dialers have hardware that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, from a database of numbers." Id. The 2015 FCC Order justified its "potential capacity" interpretation based on the 2003 FCC Order: "By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any "present use" or "current capacity" test." 2015 FCC Order ¶ 16.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2026  Thomson Reuters. No claim to original U.S. Government Works.    5

KeyCite Yellow Flag

Disagreed With by A Fast Sign Co., Inc. v. American Home Services, Inc., Ga., November 5, 2012

2007 WL 3169078

Only the Westlaw citation is currently available.

United States District Court, D. Maryland.

Bruce LEVITT, et al.

v.

FAX.COM, et al.

Civil No. WMN–05–949.

|

May 25, 2007.

**Attorneys and Law Firms**

Michael Craig Worsham, Law Office of Michael Craig Worsham, Forest Hill, MD, Stephen Howard Ring, Stephen H. Ring PC, Germantown, MD, for Bruce Levitt, et al.

Rodney E. Gould, Rubin Hay and Gould PC, Framingham, MA, Thomas S. Hood, Hood and Scholnick PA, Towson, MD, for Fax.Com, et al.

*MEMORANDUM*

WILLIAM M. NICKERSON, United States Senior District Judge.

**\*1** This suit arises out of three facsimile transmissions sent to Plaintiff Bruce Levitt in January and February of 2001. These transmissions advertised vacation packages offered by Defendant JD & T Enterprises, Inc. d/b/a Travel to Go (JD & T) and it is alleged that identical transmissions were sent, unsolicited, to thousands of Maryland residents. It is undisputed that the fax transmissions were actually sent by Defendant Fax.com. Furthermore, it is also undisputed that Fax.com was hired to send the faxes, not by JD & T directly, but by Creative Marketing Concepts (CMC), an independent marketing company hired by Defendant JD & T to market its vacation packages.

Plaintiff filed this action in the Circuit Court for Baltimore City on May 7, 2001, alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA). The TCPA makes it generally unlawful "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 42 U.S.C. § 227(b)(1)(C). Plaintiff initially named only Fax.com and JD & T as defendants.

On December 24, 2002, Judge Marcella Holland of the Baltimore City Circuit Court certified this suit as a class action. The class of plaintiffs was defined as:

All persons, including business entities of any form, in Maryland, who received unsolicited advertisements transmitted by Fax .com, Inc, via facsimile promoting products and services offered for sale by or through JD & T Enterprises, Inc.

Order dated Dec. 24, 2002. Shortly thereafter, the Baltimore City Circuit Court granted a motion for summary judgment in favor of all defendants and dismissed the case. This dismissal was subsequently reversed by the Maryland Court of Appeals. *Levitt v. Fax.com, Inc ., 857 A.2d 1089 (Md.2004).* After the case was remanded to the Circuit Court, Plaintiff filed a "Second Amended Class Action Complaint" on February 23, 2005. This pleading added new defendants, including Creative Marketing Concepts,

LLC and several individuals. Two of the newly added individual defendants,[1] Matthew Buecler and Jeanette Bunn, removed the action to this Court on April 7, 2005, pursuant to provisions of the then recently enacted "Class Action Fairness Act of 2005," 28 U.S.C. 1332(d) (CAFA). On October 12, 2005, this Court denied Plaintiff's motion to remand and on December 1, 2005, this Court granted a motion to dismiss Buecler and Bunn.

During the period of time between the certification of the class action and the denial of Plaintiff's motion to remand, *Fax.com* apparently went out of business and ceased its participation in this litigation. Thus, the only remaining active defendant is Defendant JD & T. On January 12, 2007, Defendant JD & T filed a motion to decertify the class action. Paper No. 40. That motion is now ripe.

"Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *General Tel. Co. of the Southwest v. Falcon,* 457 U .S. 147, 160 (1982). In fact, a court "is duty bound to monitor [the] class decision and, where certification proves improvident, to decertify, subclassify, alter, or otherwise amend its class certification." *Chisolm v. TranSouth Financial Corp.* 194 F.R.D. 538, 544 (E.D.Va.2000). Like the decision to initially certify a class, a decision to decertify a class is left to the court's discretion. *Doe v. Lally,* 467 F.Supp. 1339 (D.Md.1979).

 **\*2** Defendant JD & T raises three arguments as to why this Court should decertify the class. First, it argues that, now that the case is in a federal court, certification must be re-evaluated under the federal class certification rule. Although Maryland's class certification rule, Md. R. 2–231, is patterned after federal rule, Fed.R.Civ.P. 23, Defendant contends that the presumptions and burdens applied in interpreting the two rules are not identical. Second, Defendant contends that changes in the posture of the case, specifically, the fact that Fax.com is no longer actively participating in the litigation, have rendered continued treatment of this case as a class action unmanageable. Fax.com, according to JD & T, was the only source of critical information regarding the identity of those who received the facsimile transmissions, as well as those that may have consented to the transmissions. Finally, JD & T argues that the state court's certification decision was simply wrong.

For the reasons explained below, the Court finds JD & T's second argument compelling. Under the current posture of this litigation, class certification is no longer appropriate under Rule 23. Thus, the Court need not reach the issue of whether the state court's certification decision was flawed or whether it would have been different under the federal rule.

Rule 23(a) sets out four threshold requirements that must be satisfied by the putative class before a class action can be certified. The class representative must establish that

> 1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four prerequisites are frequently referred to as "numerosity," "commonality," "typicality," and "adequacy of representation," respectively.

Once these four prerequisites are established, the plaintiff must still satisfy one of the three criteria of section (b) of Rule 23 before a class can be certified. Under 23(b) the potential class representative must show either that: 1) separate actions would result in inconsistent adjudications or the interests of non-parties would be substantially impaired; 2) final injunctive or declaratory relief is appropriate to the class as a whole; or 3) common questions of law or fact predominate over any questions affected only individual members and a class action is the superior method of fairly and efficiently adjudicating the controversy. Here, Plaintiff asserted, and the state court found, that class certification was appropriate under the state rule equivalent of the third subparagraph of Rule 23(b). *See* Second Amend. Compl. ¶ 21 (citing Md. Rule 2–231(b)(3)). Defendant argues, and this Court agrees, that Plaintiff simply cannot establish the prerequisites of commonality or typicality, nor can he demonstrate that common questions predominate over questions affecting the individual class members.

**\*3** Commonality, by definition, requires that there are questions of law or fact that are "common" to the class. "A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees. A question is not common, by contrast, if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson–Pilot Life Ins. Co.,* 445 F.3d 311, 319 (4th Cir.2006) (internal quotations and citations omitted). The need for a case-by-case determination of a material issue for each class member's claim also denotes that the claims of the class representative are not "typical" of the claims of the individual class members. *See Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir.1990).

In order to establish a claim under the TCPA, a plaintiff must have received a facsimile transmission that was "unsolicited." Under the statute, "unsolicited" means transmitted without the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(5). The recipient's prior invitation or permission could have been given orally or in writing. *Id.* (stating that invitation or permission can be given "in writing or otherwise"); *see also Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 531 (Ga.2005).

Under the Federal Communications Commission's (FCC's) TCPA implementing regulations in effect at the time Plaintiff received the fax transmissions from JD & T, "express permission [was] also deemed given by those recipients having an 'established business relationship' " with the sender of the fax transmission.[2] *Carnett,* 610 S.E.2d at 531. An "established business relationship" is defined as "a prior or existing relationship formed by a voluntary two-way communication ... with or without an exchange of consideration...." 47 C.F.R. § 64.1200(f)(3). "The FCC has opined that the established business relationship exemption is broad and that you have an established business relationship with a person or entity if you have made an inquiry, application, purchase, or transaction regarding products of services offered by such person or entity." *Carnett,* 610 S.E.2d at 531–32 (internal citations omitted).[3]

It is this need to make a determination for each class member as to whether the facsimile transmission was unsolicited, both by the lack of express permission and by the absence of a prior business relationship, that makes class treatment of this action inappropriate and unmanageable. This determination of whether invitation or permission was given is, of necessity, highly individualized and would require a separate inquiry for each individual class member in light of their particular relationship or lack of relationship with each of the defendants. Under the current posture of this case, there is simply no available method for class-wide determination of this issue.

**\*4** Numerous courts, citing the lack of commonality, typicality and predominance of common issues, have determined that TCPA claims cannot be brought as a class action. *See, e.g., Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403–04 (E.D.Pa.1995)(observing that "the essential question of fact that each potential plaintiff must prove is whether a specific transmission to its machine was without express invitation or permission on its part."); *Kenro, Inc. v. Fax Daily, Inc.,* 962 F.Supp. 1162, 1169–70 (S.D.Ind.1997) (noting that it would be required "to conduct individual inquiries with regard to each potential class member in order to determine whether each potential class member had invited or given permission for transmission of the challenged fax advertisements."); *Blitz v.. Xpress Image, Inc.,* Civ. No. 05–679, 2006 WL 2425573 (N.C.Super.Aug.23, 2006) (denying class certification upon the conclusion that "there is no avoiding an individualized inquiry into the facts and circumstances of each recipient's 'invitation and permission' should this matter proceed as a class action," as well as need for individualized determination of applicability of "established business relationship"); *Carnett's Inc. v. Hammond,* 610 S.E.2d 529, 532 (Ga.2005) (noting that while the predominate *question* of whether facsimiles were unsolicited was common to all class members, "a common question is not enough when the *answer* may vary with each class member and is determinative of whether the member is properly part of the class."); *Rondos v. Lincoln Prop. Co.,* 110 S.W.3d 716, 721–22 (Tex.Ct.App.2003) (reversing certification of class upon concluding that the predominant issue for litigation would be whether individual fax owners gave permission to receive advertisements); *Livingston v. U .S. Bank, N.A.,* 58 P.3d 1088, 1091 (Colo.App.2002) (upholding trial court's determination that "the question whether any particular fax recipient gave 'prior express invitation or permission' would have to be decided on an individual basis and therefore would overwhelm, let alone predominate over, the common issues").

It is conceivable, while the actual transmitter of the facsimiles in question, Fax.com, was available to actively participate in this litigation, that these issues could have been resolved in some more global fashion. In moving to certify the class in the

state court and in his pleadings opposing this motion to decertify, Plaintiff averred that Fax.com had a database and log of the transmissions at issue in this matter. *See* Aug. 7, 2002, Mem. in Support of Class Cert.;[4] Opp. at 14. Information that Fax.com might have as to the source of its databases might be instructive as to issues of consent: was the database constructed from customer lists provided by CMC, lists purchased from some third party, numbers generated by Fax.com computers randomly dialing and hunting for fax machines, or some combination thereof? Regardless of what insight *Fax.com* might have been able to provide, however, there is no evidence in the record that JD & T has, or ever had, any information regarding the content or construction of the databases used by Fax.com.

 **\*5**  This absence of available information about the database renders this case, in its present posture, readily distinguishable from at least some of the cases relied upon by Plaintiff where class certification of TCPA claims was found appropriate. For example, in *Kavu, Inc. v. Omnipak Corp.,* Civ. No. 06–109, 2007 WL 201093, (W .D.Wash. Jan. 23, 2007), the record before the certifying court included the identity of the specific third party supplier of the database that was used to send the offending faxes as well as an explanation of the particular method used by that third party to construct the database. The defendant, in fact, asserted in the litigation that the recipients' inclusion in that database demonstrated consent to receive facsimiles. *Id.* at \*3. Because the validity of that assertion could be tested on a class-wide basis, the Court distinguished the case before it from the more typical TCPA case: "whether the facsimile was 'unsolicited' appears to be more of a common issue in this case than in the cases that denied class certification .... [where] the issue of whether each potential class member gave permission to receive the facsimiles was key." *Id.; see also, Gene & Gene, LLC v. Biopay, LLC,* Civ. No. 05–121, 2006 WL 3933312 at \*2 (M.D.La. Dec. 20, 2006) (record before the court contained database with names and contact information for the alleged unlawful facsimile transmissions).[5]

Implicitly acknowledging the importance of some means by which to identify those who received the offending facsimiles and those who may have consented to that receipt, Plaintiff devotes much of his opposition to an attempt to show that JD & T has or had possession of this information, or at least should have had possession of this information. In this attempt, however, Plaintiff seriously misconstrues the record. For example, Plaintiff declares that Jeannette Bunn, JD & T's president, "selected the geographic areas to be targeted" by the facsimile advertisements. Opp. at 6. This statement is presumably based upon a series of emails from JD & T to individuals associated with Fax.com and CMC. While Bunn makes geographic suggestions in these emails as to the *content* of the facsimile advertisements, *i.e.,* recommending the addition of particular vacation destinations,[6] there is nothing in these emails or elsewhere in the record to suggest that she had any input into the geographic areas to which those advertisement were to be sent.

Similarly, Plaintiff cites to a series of emails where complaints about the receipt of facsimiles are forwarded to Bunn and Bunn contacts the marketing company to have the telephone numbers removed from the call list. Plaintiff argues that these emails show that "JD & T thus helped 'maintain' the fax list" and "Bunn thus carelessly and recklessly proceeded to help in the deletion process, without taking the extra step of ascertaining whether prior consents were being obtained, and without implementing a policy to be sure they were obtained where needed." Opp. at 8, 9. While these emails might have relevance to issues of liability, they do not shed light on the propriety of class certification. If anything, they reinforce the fact that JD & T did not have immediate access to the database and thus had to relay the complaints elsewhere.

 **\*6**  In his opposition, Plaintiff asserts that he is attaching what he claims to be "3 representative pages" of "[t]he Fax.com database [which he] obtained through a former employee." Opp. at 8. Given the undisputed significance of this database, it is remarkable that Plaintiff mentions that it has come into his possession almost in passing. The Court surmises that Plaintiff's nonchalance with regard to this "evidence" is explained by Plaintiff's apparent inability to render it admissible. As JD & T observes, Plaintiff makes no effort, whatsoever, to authenticate this evidence. Furthermore, from the dates on the "representative pages," it appears this list is from a time period three years after the time relevant to this action. Finally, there is nothing about these pages indicating that they contain telephone numbers to which JD & T advertisements were sent. As evidence in this action, these pages as presented are essentially worthless and the Court suspects from the offhanded way that they were introduced that Plaintiff's counsel realizes as much.

Plaintiff also cites a January 28, 2003, letter from counsel for JD & T to Plaintiff's counsel in which it is stated that 36,877 transmissions of the specific advertisement at issue in this action were sent to Maryland fax numbers during the relevant time period. Pl.'s Ex. 7. This letter, Plaintiff claims, demonstrates that JD & T "had a method to determine Maryland recipients of the specific unsolicited travel faxes at issue." Opp. at 12. The value of this letter as evidence relevant to issues of class certification, however, is also highly suspect. First, the letter clearly states that it is a "***CONFIDENTIAL SETTLEMENT COMMUNICATION PER JUDGE HOLLAND—NOT TO BE USED IN LITIGATION.***" That aside, the letter also clearly relates that the information is coming from Fax.com, not JD & T.[7] Furthermore, the letter explains that, because of the way that the database was encrypted to protect its contents from theft, there is no way to obtain the individual numbers that comprise the database.

Unable to provide any evidence that JD & T actually had access to the database used by Fax.com to send the advertisement, Plaintiff argues, in the alternative, that JD & T *should* have had that access. Plaintiff opines that "[i]f Fax.com represented that it had obtained prior consents, one would expect that JD & T would want to confirm this fact, and see some kind of evidence in support." Opp. at 16. Plaintiff argues that, based upon JD & T's inability to prove that consent was given, a finding of lack of consent "should apply uniformly, across the board, as to all class members." *Id.* at 15.

This argument is based upon an interpretation of the statute not supported by the language of the statute itself or by the case law. Plaintiff contends, without citation, that "[e]ven if a member of the class had given permission to Fax.com to send faxes ... any such permission would not extend to JD & T." Opp. at 17. If, hypothetically, a consumer requested that Fax.com send information about travel packages and Fax.com then sent that consumer a facsimile about travel packages offered by JD & T, it is hard to imagine how that transmission could be deemed "unsolicited." Under the statute, the term " 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). The statute does not designate to whom the permission must be given. If permission is given to the transmitter of the facsimile, the marketing company, or the provider of the advertized product or services, the statute would not be violated.

 **\*7**  Once all the smoke is blown away, it appears that Plaintiff's true position is that this action is amenable to class treatment because the class members do not actually need to prove that the facsimiles in question were "unsolicited" in order to make out a claim under the TCPA. In Plaintiff's "common sense" view, "[i]t is unfathomable that anyone would actually give consent to receive via facsimile a barrage of ads like those at issue in this action." Opp. at 15 n. 7.[8] Thus, it can simply be presumed, according to Plaintiff, that the transmissions were unsolicited.

The Court has no doubt that this assumption would hold true for a majority of consumers. Most consumers do not wish for their facsimile machines to be tied up or their toner and paper wasted receiving and printing faxed advertisements. Just because that is true of most, however, does not permit the Court to adopt a presumption that it is true of all. Again, if Fax.com had remained involved in this litigation, information regarding the sources of telephone numbers in its database might have allowed some global determinations of consent. But without Fax.com's participation, that is simply not possible.[9]

Plaintiff raises one additional argument that warrants brief mention. Plaintiff argues that CAFA, the Class Action Fairness Act, somehow "weighs in favor of certification." Opp. at 2. Plaintiff correctly observes that this Court has already held that, because CAFA allows for the aggregating of class member claims, " 'there is no dispute that the instant suit satisfies' " CAFA's jurisdictional criteria. Opp. at 17 (quoting Oct. 12, 2005 Mem. at 2). Because Plaintiff's individual damages would be below the requisite amount in controversy for diversity jurisdiction, Plaintiff opines that decertification would divest this Court of subject matter jurisdiction of his claims. *Id.* at 18.

In the context of post-removal reduction of the amount in controversy under the general diversity jurisdiction statute, courts have uniformly held that "diversity jurisdiction is determined at the time the action commences, and a federal court is not divested of jurisdiction ... if the amount in controversy subsequently drops below the minimum jurisdictional level." *Hill v. Blind Indus. & Serv. of Md.,* 179 F.3d 754, 757 (9th Cir.1991). Because of the recentness of CAFA's enactment, few courts have considered the

effect of post-removal certification or decertification decisions on continued federal jurisdiction. In the one decision of which this Court is aware that reached the issue, *Davis v. Homecomings Financial,* Civ. No. 05–1466, 2007 WL 905939 (W.D.Wash. March 22, 2007), the court held that a similar "time of removal" principle would apply.

In *Davis,* the plaintiff proposed a nation-wide class. After removal to federal court, the class was certified as state-wide class only which brought the amount in controversy under CAFA's requisite $5 million threshold. Nonetheless, following the principle that the amount in controversy is determined as of the time of the removal, the court concluded that it could retain jurisdiction over the now diminished class action. The court reasoned that Congress is presumed to be aware of the legal context in which it is legislating and, despite this presumed knowledge, "there is no indication that Congress intended to alter the established authority regarding subsequent changes to the amount in controversy." *Id.* at * 1. This Court agrees with that reasoning and concludes that decertification of the class will not divest this Court of jurisdiction over Plaintiff's now lone claim.

**\*8** For the above stated reasons, the Court concludes that the class should be decertified. A separate order will issue.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3169078

Footnotes

1    There is no indication in the record that any of the other defendants added in the Second Amended Complaint were ever served with process.

2    Congress subsequently amended the TCPA to codify the "established business relationship" exception to TCPA liability in the facsimile context. 47 U.S.C. § 227(b)(1)(C)(i).

3    When Congress codified the "established business relationship" exception, it adopted by reference the FCC's definition of the term. 47 U.S.C. 227(a)(2) ("[t]he term 'established business relationship' for the purposes only of [47 U.S .C. § 227(b)(1)(C)(i) ] shall have the meaning given the term in [47 C.F.R. 64.1200]").

4    Defendant included quoted text from this memorandum in its motion, Mot. at 9, but the memorandum itself is not a part of record in this Court and Defendant did not supply it with its motion. As Plaintiff did not challenge Defendant's citation, the Court assumes its accuracy.

5    The court in *Gene & Gene,* did not base its decision on the availability of that database. Instead, after acknowledging that "federal courts have consistently denied class certification," 240 F.R.D. at 242, the court proceeded to examine "Fifth Circuit precedent in order to ascertain how a federal court within the Fifth Circuit should decide this matter." *Id.* Under its view of Fifth Circuit precedent, the court opined that the requirements of commonality and typically are "not demanding." *Id.* at 244. In contrast, the Fourth Circuit has held that, "in class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(b)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart v. Dryvit Systems, Inc.,* 255 F.3d 138, 147 n. 4 (4th Cir.2001) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997)). Thus, in the Fourth Circuit, "[t]he common questions must be dispositive and overshadow other issues." *Lienhart,* 255 F.3d at 146.

In addition to distinguishable facts and law, all three of the cases relied upon by Plaintiff—*Kavu, Gene & Gene;* and *Lampkin v. GGH,* 146 P.3d 847 (Okla.Civ.App.2006), a recent decision from the intermediate appellate court of Oklahoma—endorsed what this Court views as a flawed class definition. The class definitions in all three actions, like the class definition approved by the state court in the instant action, required a determination of the merits in that all the definitions limit class membership to those who received "unsolicited" facsimiles. *Kavu,* 2007 WL 201093 at * 2 (defining class as "[a]ll persons who received an unsolicited advertisement ..."); *Gene & Gene,* 240 F.R.D. at 241 (defining class as "all recipients of unsolicited telefacsimile messages and/or advertisements ..."); *Lampkin,* 146 P.3d at 851 (defining class as "[h]imself and all entities and persons ... who received unsolicited fax advertisements ..."); Dec. 24, 2002, Order (defining class as "[a]ll persons, including business entities of any form, in Maryland, who received unsolicited advertisements transmitted by Fax.com, Inc...."). Deciding the merits of individuals' claims in order to

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 73 of 116

determine the members of the class is not appropriate. *See Eisen v. Carlisle v. Jacquelin,* 417 U.S. 156, 177 (1974); *See also, Forman,* 164 F.R .D. at 403; *Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 404–06 (Tex.2000) (collecting cases and explaining why a "fail-safe class," *i.e.,* a class whose definition includes a determination of the merits, is untenable).

6    *See, e.g.,* Opp. at 10 (" '... regarding adding some areas to the fax piece? I asked if you could add Sun Valley, ID as it is a popular destination for skiing and we have inventory there that is not moving at all.' ") (quoting Oct. 6, 2001 email from Bunn to Robin Posser).

7    For a brief period of time, early in this litigation, counsel for Fax.com also represented JD & T. At the time this letter was sent, Fax.com was clearly the main target of this litigation as evidenced by the fact that JD & T is mentioned nowhere in the letter.

8    Annoying as unsolicited facsimiles might be, the Court questions if three facsimiles can be fairly deemed "a barrage."

9    In an effort to compensate for Fax.com's absence from this litigation, Plaintiff submitted materials from other proceedings related to Fax.com. For example, Plaintiff submitted a portion of the testimony of Thomas Roth, one of Fax.com's officers, given in a January 31, 2003, hearing before the Securities and Exchange Commission. In his testimony, Mr. Roth states that some of the numbers in Fax.com's database were obtained by having computers randomly dial phone numbers fishing for facsimile machines. Faxes to these numbers, Roth acknowledged, would be unsolicited. But Roth also testified that *Fax.com* would purchase some numbers from list brokers. He made no representation in the testimony provided by Plaintiff that faxes sent to numbers on those purchased lists would be unsolicited. There is no testimony regarding the source of the database used to fax the JD & T material. Furthermore, as JD & T had no opportunity to cross examine Roth, this testimony is likely inadmissible in this action.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM   Document 28-1   Filed 06/24/26   Page 74 of 116

Nock v. PalmCo Administration, LLC, Not Reported in Fed. Supp. (2025)

2025 WL 100894
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Robert NOCK, on behalf of himself and others similarly situated, Plaintiff,

v.

PALMCO ADMINISTRATION, LLC, et al., Defendants.

Civil Case No. 24-cv-00662-RDB

|

Signed January 15, 2025

**Attorneys and Law Firms**

Jacob U. Ginsburg, Pro Hac Vice, Kimmel & Silverman, Ambler, PA, Ethan Preston, Dallas, TX, for Plaintiff.

Charles A. Zdebski, Eckert Seamans Cherin & Mellott LLC, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

J. Mark Coulson, United States Magistrate Judge

**\*1** Plaintiff, Robert Nock, individually and on behalf of all others similarly situated, alleges that Defendants, PalmCo Administration, LLC d/b/a Indra Energy, and PalmCo Power MD, LLC d/b/a Indra Energy, and PalmCo Energy MD, LLC d/b/a Indra Energy (collectively, "Indra" or "Defendants") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* as well as the Maryland Telephone Consumer Protection Act, Md. Com. Law § 14-3201, *et seq.* (ECF No. 28). Specifically, Plaintiff contends Defendants contacted him and others similarly situated in violation of these statutes, and that Defendants' agents attempted to mask these violations by disguising them as in-person solicitations rather than telephone contacts so as to avoid liability. *Id.* at 15-16.[1] Presently before the Court is Defendants' Motion to Bifurcate Discovery. (ECF Nos. 54, 68).[2] The issues have been fully briefed, (ECF Nos. 68, 70), and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall DENY Defendants' motion.

### I. BACKGROUND

This matter was referred to the undersigned for discovery and all related scheduling by U.S. District Judge Richard Bennett on November 7, 2024. (ECF No. 49). On November 13, 2024, the parties filed a joint letter with the Court identifying several discovery disputes, (ECF No. 50), and filed their respective position letters regarding the disputes on November 18, 2024. (ECF Nos. 54, 56). These disputes included: (1) the completeness of Defendants' production as to certain emails and document types; (2) Defense counsel's instruction to a fact witness not to answer certain questions during a deposition; and (3) bifurcation of individual and class discovery. *Id.* The Court held a telephonic discovery conference with the parties on November 26, 2024, and issued a written Memorandum Opinion and Order addressing the disputes the following day. (ECF No. 60). In the November 27, 2024 Memorandum Opinion, the undersigned ordered additional briefing on the limited issue of bifurcation, directing Defendants to file their brief by December 16, 2024, and Plaintiff to file his Opposition by January 6, 2025. *Id.* The parties' briefing deadlines were thereafter extended by seven days, to December 23, 2024, and January 13, 2025, respectively. (ECF No. 67).

Also relevant to the current dispute is Judge Bennett's July 26, 2024 Order addressing a previous discovery issue raised by the parties. (ECF No. 36). Judge Bennett directed Defendants to produce "communications with Neil St. Lous/NSL Marketing, LLC and any other Indra sales agents who enrolled Maryland consumers with Defendants between April 1, 2021, and July 1, 2021." *Id.* Further, Judge Bennett ordered that Defendants produce a fact witness, Jonathan Cleckley, for a two-hour deposition. *Id.* As noted in the Court's November 27, 2024 Memorandum Opinion, based on the allegations of the Amended Complaint, it appears Judge Bennett concluded this information was relevant to the issue of whether Defendants knew or had notice of the alleged practice of Defendants' sales agents of substituting telephone solicitations for in-person solicitations.

## II. LEGAL STANDARD

**\*2** "Whether to order bifurcation, during discovery or at trial, is an issue squarely within the broad discretion of the district court." *Singh v. Lenovo*, No. CCB-20-1082, 2021 WL 1516032, at \*1 (D. Md. Apr. 16, 2021) (citing Fed. R. Civ. P. 42(b)). Courts consider four factors in determining whether bifurcation of liability and class discovery is appropriate:

> (1) [T]he overlap between individual and class discovery, (2) whether bifurcation will promote Federal Rule of Civil Procedure 23's requirement that certification be decided at "an early practicable time," (3) judicial economy, and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery.

*Id.* at \*2 (citing 1 McLaughlin on Class Actions § 3:10 (17th ed. 2020)); *see also Akselrod v. MarketPro Homebuyers LLC*, CCB-20-2966, 2021 WL 100666, at \*2 (D. Md. Jan. 11, 2021). Bifurcation of discovery is generally the exception rather than the rule. *Id.* at \*1 (citing *Cardenas v. Resort Sales by Spinnaker, Inc.*, No. 9:20-cv-00376-RMG, 2021 WL 733393, at \*1 (D.S.C. Feb. 24, 2021)).

In *Singh*, Judge Blake of this Court explained that following the United States Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, district courts have been "reluctant to bifurcate class-related discovery from discovery on the merits." *Id.* at \*1 (first citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), then citing *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012); *Cardenas*, 2021 WL 733393 at \*2 (citation omitted); *Hunichen v. Atonomi LLC*, No. C19-0615-RAJ-MAT, 2020 WL 5759782, at \*1 (W.D. Wash. Sept. 28, 2020)). This reluctance stems from *Dukes'* directive that district courts engage in a "rigorous analysis" to determine class certification requirements, an analysis which often overlaps with the merits of the individual plaintiff's underlying claims. *Id.* (quoting *Dukes*, 564 U.S. at 350-51) (citation omitted). Because the distinction between class certification and merits discovery is "murky at best and impossible to determine at worst," distinguishing between the two may raise "a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs," resulting in further litigation. *Id.* (quoting *Cardenas*, 2021 WL 733393 at \*2 (citation omitted)).

## III. ANALYSIS

Indra argues that good cause exists to bifurcate discovery because Plaintiff lacks factual support for his individual claims, and because Nock is the only named Plaintiff in this matter, whether he received calls from Indra or its agents "is a discrete, dispositive issue that will determine whether this action will proceed." (ECF No. 68 at 6). Indra further contends that there is little to no overlap between the discovery necessary to prove Plaintiff's claim and class discovery because "Plaintiff's claims lack any form of record support," and that bifurcation will still permit class certification to be determined "at an early practicable time" as required by the Federal Rules, given that Indra has proposed an "expeditious and streamlined five-month period to complete individual discovery and submit summary judgment briefs." *Id.* at 14. Finally, Indra submits that judicial economy is best served by bifurcation, as the parties will not be required to engage in class discovery unless Nock's individual claims survive dispositive motions, and that any prejudice resulting from the denial of bifurcation "will be substantially and exclusively experienced by Defendants, who have already gone to great lengths to attempt to satisfy Plaintiff's discovery demands." *Id.* Defendants additionally attach an order in a TCPA case brought by Nock and his counsel in the United States District Court for the Southern District of New York case (*Nock v. Spring Energy*, Case No. 1:23-cv-1042) where discovery was bifurcated. (ECF No. 68-1 at 2).

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 76 of 116

Nock v. PalmCo Administration, LLC, Not Reported in Fed. Supp. (2025)

**\*3**  Plaintiff counters that he has produced call recordings reflecting calls to Nock and others, and, as Defendants concede, one of these calls purportedly made to Nock mentions Indra. (ECF No. 70 at 6). Plaintiff additionally provides recordings of calls made to other consumers, ostensibly on behalf of Indra, and alleges these calls correspond to records of consumers enrolled with Indra. *Id.* Plaintiff further argues that bifurcation at this late stage in the litigation would compound prejudice to Nock from Indra's already-belated discovery responses and would thwart judicial economy. *Id.* at 14. Finally, Plaintiff asserts that it is impracticable to separate class and merits discovery in this matter because evidence of Indra's knowledge of the alleged scheme to disguise telemarketing as in-person solicitation is relevant to both Nock's individual claims and the claims of prospective class members. *Id.* at 14-15. Regarding the *Nock v. Spring Energy* order, Plaintiff responds that although the Southern District of New York initially bifurcated discovery, the parties jointly moved to terminate bifurcation two months later because "bifurcation [was] no longer tenable." *Id.* at 6; ECF No. 70-2 at 5.

Having considered the parties' arguments and the four factors identified in *Singh*, the Court concludes that bifurcation is not appropriate in this matter. Starting with the first factor, the undersigned agrees that evidence of notice to Indra of the alleged scheme to mask telemarketing enrollments as in-person solicitations could be relevant to Nock's individual claims and the claims of prospective class members.[3] Because individual and class discovery overlaps, the difficulty of drawing the line between the two is likely to cause further discovery disputes and place greater demands on the Court's time. This result also implicates the third factor, judicial economy, and weighs against bifurcation. *See Singh*, 2021 WL 1516032 at \*3 ("The parties in this action have different ideas about what constitutes merits discovery and what constitutes class discovery. This confirms...that the line between the two is murky and that the court would be required to expend resources drawing those lines for the parties as disputes arise.").

With respect to the second factor, although Indra proposes a five-month schedule for individual discovery and dispositive motions briefing, this does not account for the time it takes the Court to decide those motions. Even if dispositive motions were decided within six months of this Order, well over one year would have passed from the date that this action was initiated in March 2024. (ECF No. 1). Permitting class and individual discovery to proceed simultaneously will best allow the Court to comply with Federal Rule of Civil Procedure 23's mandate that certification be decided at "an early practicable time" and is in the interests of judicial economy.

Turning to the final factor, prejudice, while the Court acknowledges that Indra may expend more resources in responding to discovery if bifurcation is denied, the undersigned is also concerned that Plaintiff's case will be prejudiced by further delay in this matter.[4] Further, as noted in Defendants' Memorandum of Law, Indra has already produced documents that it deems relevant primarily to class discovery, pursuant to Judge Bennett's July 26, 2024 Order. (ECF Nos. 36, 68 at 13). It seems the parties have engaged in concurrent individual and class discovery for close to eight months,[5] and it makes little sense to change course now. Accordingly, the Court will deny Defendants' Motion to Bifurcate Discovery.

## IV. CONCLUSION

**\*4**  For the reasons stated, Defendants' Motion to Bifurcate Discovery (ECF No. 54) is DENIED. Accordingly, it is hereby ORDERED that:

1) Pursuant to the Court's November 27, 2024 Order, (ECF No. 60), Defendants shall produce all TPV.com data for all attempted and successful enrollments between April and July of 2021 within thirty (30) days of the entry of this Order; and

2) Pursuant to the Court's November 27, 2024 Order, (ECF No. 60), Defendants shall, within thirty (30) days of the entry of this Order, produce either (1) all recordings for quality assurance calls for door to door enrollment between April and July of 2021 or (2) recordings for quality assurance calls for door to door enrollment where the consumer indicated that the sales agents telephoned them rather than visited them in person between April and July of 2021;[6] and

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 77 of 116

Nock v. PalmCo Administration, LLC, Not Reported in Fed. Supp. (2025)

3) Pursuant to Rule 26(g) of the Federal Rules of Civil Procedure, at least one attorney of record shall sign the production to certify that the production is complete to the best of the attorney's knowledge, information and belief formed after a reasonable inquiry.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2025 WL 100894

Footnotes

1    When the Court cites to a particular page number or range, the Court is referring to the page numbers located in the electronic filing stamps provided at the top of each electronically filed document.

2    ECF No. 54 is Defendants' position letter regarding the parties' discovery disputes, but is docketed as a Motion to Bifurcate Individual and Class Discovery, and does include an overview of Defendants' arguments for bifurcation. Defendants' arguments are fully briefed at ECF No. 68.

3    As before, the undersigned is guided by Judge Bennett's July 26, 2024 decision, in that Judge Bennett already found that "communications" between Defendants' sales agents and Defendants regarding Maryland consumers who were enrolled with Indra is within the scope of discovery. (ECF No. 36).

4    Defendants cite *Akselrod v. MarketPro Homebuyers LLC*, a TCPA case from this District in which Judge Blake bifurcated liability and class discovery and limited discovery to potentially dispositive issues. 2021 WL 100666 at *2. Judge Blake explained that bifurcation in *Akselrod* was appropriate because "[l]imited discovery ha[d] the potential to simplify the case and to save both parties the time and expense of class discovery, which can be particularly resource intensive." *Id.* However, the facts of *Akselrod* are distinguishable from the instant case, largely because of the different timelines between the two. The *Akselrod* defendant moved for bifurcation less than 20 days after filing its Answer, whereas Indra filed its Motion to Bifurcate Discovery four days before the discovery deadline. (ECF Nos. 36, 54). Additionally, Judge Blake noted that class certification could not be determined in *Axselrod* until a relevant Supreme Court case was decided. 2021 WL 100666 at *2.

5    Plaintiff states he served discovery requests on Indra in May 2024. (ECF No. 70 at 14).

6    As explained in the Court's November 27, 2024 Memorandum Opinion, it may be logistically easier for Defendants to produce all calls, rather than review them and identify which are responsive to Plaintiff's request. (ECF No. 60 at 4). Defendants may choose either option.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3330376
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Jeffrey E. PERELMAN

v.

Raymond G. PERELMAN, et al.

Civil Action No. 10–5622.
|
Aug. 3, 2011.

**Attorneys and Law Firms**

James T. Smith, Rebecca D. Ward, Blank Rome LLP, Philadelphia, PA, Paul A. Friedman, Blank Rome LLP, New York, NY, for Jeffrey E. Perelman.

Marjorie M. Obod, Dilworth Paxson LLP, Michael S. Doluisio, Dechert, Price & Rhoads, Philadelphia, PA, Andrew J. Levander, Dechert LLP, New York, NY, Jamie P. Yadgaroff, Law Offices of Jamie P. Yadgaroff, Barry L. Katz, Bala Cynwyd, PA, for Raymond G. Perelman, et al.

*MEMORANDUM*

PADOVA, District Judge.

**\*1** In this ERISA action, Plaintiff Jeffrey Perelman alleges that Defendants, the trustees and administrators of the General Refractories Company Plan for Salaried Employees (the "Plan"), invested Plan assets in Revlon corporate bonds for improper purposes and failed to make complete and accurate disclosures to Plan participants, in breach of their fiduciary and statutory duties.[1] Plaintiff seeks an order directing Defendants to restore to the Plan any losses suffered by the Plan and any profits realized by Defendants, as well as various forms of injunctive relief. Before the Court is Defendants' Motion to Stay Discovery pending a decision on Defendants' Motion for Summary Judgment, which asserts that Plaintiff lacks standing to bring this suit. For the reasons that follow, we grant Defendants' Motion to Stay insofar as it seeks to limit discovery to the issue of standing until we have decided Defendants' Motion for Summary Judgment.

"The decision to stay discovery pending resolution of a potentially dispositive motion is within the discretion of the district court." *Babalola v. Donegal Mut. Ins. Co.,* Civ. A. No. 08–612, 2008 WL 5278393, at \*1 (M.D.Pa. Dec.18, 2008) (citing *Coastal States Gas Corp. v. Dep't of Energy,* 84 F.R.D. 278, 282 (D.Del.1979), and *In re Orthopedic Bone Screw Prod. Liab. Litig.,* 264 F.3d 344, 365 (3d Cir.2001)). The burden is on the party seeking the stay to show "good cause." *19th Street Baptist Church v. St. Peters Episcopal Church,* 190 F.R.D. 345, 348 (E.D.Pa.2000) (citation omitted); *see also* Fed.R.Civ.P. 26(c). In the end, "a stay is proper where the likelihood that [the pending] motion may result in a narrowing or outright elimination of discovery outweighs the likely harm to be produced by the delay." *Weisman v. Mediq, Inc.,* Civ. A. No. 95–1831, 1995 WL 273678, at \*2 (E.D.Pa.1995) (citation omitted). In order to measure the likelihood that a pending motion may result in a narrowing or outright elimination of discovery, we need not "form[ ] an opinion as to the merits" of the motion. *Id.* Rather, we consider the scope of the motion and ask whether it "may potentially lead to" the end of the case, and whether it will provide the parties with "full knowledge as to which claims are viable and, correspondingly, as to what discovery need occur." *Id.* We "balance the competing interests of each party to determine whether the benefits of [the] stay outweigh the likely harm to the plaintiff."

*Babalola,* 2008 WL 5278393, at * 1. In deciding whether the balance of factors favors a stay, we consider (1) the scope of the pending motion; (2) the breadth of the non-party discovery underway; (3) the harm and expense to which continued discovery would subject the movant or third parties; and (4) the harm that a delay in discovery would cause for the non-movant. *See Weisman,* 1995 WL 273678, at *2.

Defendants argue that a stay is warranted because Plaintiff has been mounting "a wide-ranging and abusive discovery campaign" against not only Defendants but also "any entity even remotely associated with the Plan," including Defendants' various "businesses and charitable foundations." (Defs.' Mem. in Support of Mot. to Stay at 2.) Defendants state that Plaintiff has served 120 document requests on Defendants and has served 18 third-party subpoenas. (*Id.* at 4.) Defendants argue that "the substance of [Plaintiff's] third-party subpoenas demonstrates that he is using this case—and the broad subpoena powers enjoyed by a litigant in a federal lawsuit—as a means to burden anyone associated with the Plan," as part of a larger effort to "pressure his father and brother into resolving other legal actions pending between the parties." (*Id.* at 5.) For example, Defendants state that Plaintiff has served "[a] subpoena to New York Life, which administers an annuity contract purchased by the Plan in the mid–1980s and as to which there is no allegation of wrongdoing," as well as "[s]ubpoenas nominally directed to two charitable foundations that, in substance, request every communication between those foundations and various entities with which [Defendant] Ronald Perelman is associated, without any limit as to subject matter." (*Id.* at 5.) Defendants argue that "[s]taying discovery would prevent [Plaintiff] from abusing the discovery process and avoid the significant expenses— and discovery disputes—that [Plaintiff's] scorched earth discovery campaign no doubt will engender." (*Id.* at 2.) Defendants principally seek an order staying all discovery but argue, in the alternative, that discovery should be limited to the issue of standing until the Motion for Summary Judgment is decided.

**\*2** Plaintiff opposes Defendants' Motion to Stay Discovery on several grounds. Plaintiff argues that he has directed his discovery toward information that is relevant either to the Plan's assets and liabilities or to the theories of recovery set forth in Plaintiff's Second Amended Complaint, which is now the operative Complaint. Plaintiff further argues that discovery has not been unduly burdensome to third parties. Plaintiff states that, of the eighteen third parties served with subpoenas, only six have asserted blanket objections, and all six are represented by the attorneys who represent Defendants in this matter. Plaintiff also states that he has worked amicably to resolve objections raised in connection with other third party subpoenas. Plaintiff also argues that a temporary stay would only delay but could not eliminate the costs and expenses of discovery, because at least some of his claims are likely to survive summary judgment.

As we discussed above, we need not determine, at this juncture, whether any of Plaintiff's claims are likely to survive summary judgment. *See Weisman,* 1995 WL 273678, at *2. We ask merely whether Defendants' Motion for Summary Judgment could narrow the issues in this case and correspondingly narrow discovery. *Id.* Accordingly, we consider the scope of the Motion, without forming an opinion as to its merits. *Id.* In the Motion for Summary Judgment, Defendants argue that Plaintiff only has standing if there is some risk that he will not be paid his monthly pension benefit as it comes due, that record evidence conclusively establishes that the Plan is fully funded, and that consequently Plaintiff lacks standing to proceed. In opposition to Defendants' Motion for Summary Judgment, Plaintiff argues that he is entitled to discovery with respect to the funding status of the Plan, that the documents already turned over demonstrate that there is a genuine issue of material fact with respect to the funding status of the Plan, and that he can proceed on his requests for injunctive relief even if record evidence does establish that the Plan is fully funded.

Having reviewed the Motion for Summary Judgment, we conclude that, even if the Motion is not granted in its entirety, a partial grant of summary judgment may potentially narrow the issues in this case and correspondingly narrow discovery. While we express no opinion on the merits of the Motion at this time, if we were to conclude that Plaintiff is required to make a showing of individual harm in order to seek restitution and disgorgement to the Plan, and if we were further to conclude that Plaintiff cannot make such a showing, the resulting partial grant of summary judgment could eliminate the need for discovery on losses suffered by the Plan and profits made by the fiduciaries. Accordingly, we conclude that the scope of Defendants' Motion for Summary Judgment weighs in favor of the conclusion that a stay is warranted. *See Weisman,* 1995 WL 273678, at *2 (concluding that a

stay was warranted where resolution of dispositive motion could "potentially lead to" the end of the case and would certainly provide the parties with "full knowledge as to which claims are viable and, correspondingly, as to what discovery need occur").

 **\*3**  With respect to the breadth of non-party discovery underway, Defendants argue that Plaintiff's non-party discovery has been not only broad but "abusive." (Defs.' Mem. in Support of Mot. to Stay at 2.) A motion to stay discovery is not the proper vehicle in which to challenge the appropriateness of Plaintiff's discovery requests to third parties. We do note, however, that Plaintiff has engaged in broad non-party discovery, that six of eighteen third parties served with subpoenas have asserted blanket objections, and that, accordingly, a stay "will potentially save time and money for all concerned." *Id.* Accordingly, we conclude that both the breadth of non-party discovery underway and the expense of continued discovery weigh in favor of the conclusion that a stay is warranted.

Finally, we consider the harm or prejudice that a stay would create for Plaintiff. Plaintiff emphasizes, both in his response to Defendants' Motion to Stay Discovery and in his response to Defendants' Motion for Summary Judgment, that he has not yet received sufficient discovery to demonstrate his standing.[2] Because Defendants have chosen to challenge Plaintiff's standing by means of a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, Plaintiff is entitled to discovery that is "essential to justify [his] opposition." *See* Fed.R.Civ.P. 56(d). As we discussed above, Defendants' Motion for Summary Judgment may require us to determine whether there is a genuine issue of material fact with respect to the Plan's ability to pay Plaintiff's monthly pension benefit as it comes due. Plaintiff is entitled to discovery on that factual issue. *See* Fed.R.Civ.P. 56(d). Accordingly, we conclude that a general stay of all discovery is not appropriate. *C.f. Weisman,* 1995 WL 273678, at \*2 (concluding that a stay should "not allow defendants to avoid their responsibility to produce their self-executing discovery" because the plaintiff was "entitled" to such discovery). However, Plaintiff has not made any argument that he would be prejudiced by a stay of all discovery not pertaining to the funding status of the Plan until the standing issue is resolved, and we can perceive no basis for such an argument. Accordingly, we conclude that the final factor—the likely harm or prejudice to Plaintiff—weighs in favor of the conclusion that a limited stay is warranted. *C.f. id.* (concluding that a stay of all discovery other than the defendants' self-executing disclosures was appropriate where the Court "d[id] not find that plaintiff will be prejudiced ... in any significant way" by such a stay).

For the foregoing reasons, we conclude that a temporary, limited stay of discovery is appropriate in these circumstances. "Indeed, such a procedure is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." *Coastal States Gas Corp. v. Dep't of Energy,* 84 F.R.D. 278, 282 (D.Del.1979) (citations omitted). Discovery may continue only as it pertains to the factual issue of whether there is a genuine issue of material fact with respect to the Plan's ability to pay Plaintiff's monthly pension benefit as it comes due.[3] All other discovery shall halt until further Order of this Court.

 **\*4**  An appropriate Order follows.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3330376

Footnotes

1    In the interest of precision, we note that Plaintiff also complains of a February 1, 2008 investment of $2.7 million in Revlon corporate debt.

2    Plaintiff states that he has not yet had an opportunity to depose the purported experts whose affidavits Defendants attached to their Motion for Summary Judgment, and that he also has not yet received a number of documents from third parties.

3    Although summary judgment will also involve the legal issue of whether Plaintiff is required to show that there is some risk he will not be paid his pension benefit as it comes due—that is, whether Plaintiff is required to show individual harm—in order to seek restitution and disgorgement to the Plan and in order to seek injunctive relief, we see no need for discovery on that issue.

**End of Document**                                                                 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Cited in uploaded document as:

Saleh v. Crunch, Ltd. Liab. Co., No. 17-62416-Civ-COOKE/HUNT, 2018 U.S. Dist. LEXIS 36764, at *4-5 (S.D. Fla. Feb. 28, 2018)

2018 WL 11264884
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Bilal SALEH, individually and on behalf of a class of others similarly situated, Plaintiff,

v.

CRUNCH, LLC, a Delaware limited liability company, Crunch Franchising, LLC, a Delaware limited liability company and DeLiu, LLC, a Delaware limited liability company doing business as Crunch Fitness Oakland Park, Defendants.

Case No. 17-62416-Civ-COOKE/HUNT
|
Signed 02/28/2018

**Attorneys and Law Firms**

Jibrael Jarallah Said Hindi, The Law Offices of Jibrael S. Hindi, Fort Lauderdale, FL, Bret Leon Lusskin, Jr., Bret Lusskin, P.A., Aventura, FL, Sean Martin Holas, Scott David Owens, Scott D. Owens, P.A., Hollywood, FL, for Plaintiff.

Ian C. Ballon, Pro Hac Vice, Lori Chang, Pro Hac Vice, Valerie W. Ho, Pro Hac Vice, Greenberg Traurig LLP, Los Angeles, CA, Ian M. Ross, Stumphauzer Foslid Sloman Ross & Kolaya, PLLC, Miami, FL, Paul K. Silverberg, Silverberg & Weiss, P.A., Weston, FL, for Defendants Crunch, LLC, Crunch Franchising, LLC.

David K. Markarian, Markarian & Hayes, Palm Beach Gardens, FL, Paul K. Silverberg, Silverberg & Weiss, P.A., Weston, FL, for Defendant DeLiu, LLC c/o Marc Delisle, Managing Member 4801 Peregrine Point Circle West Sarasota, FL 34231.

## ORDER DENYING MOTION TO STAY PROCEEDINGS

MARCIA G. COOKE, United States District Judge

**\*1** THIS CAUSE came before the Court on Defendants Crunch, LLC's and Crunch Franchising, LLC's Motion to Stay Proceedings Pending a Decision by the Ninth Circuit Court of Appeals (ECF No. 35), which Defendant DeLiu, LLC has since joined. *See* Notice of Adoption/Joinder, ECF No. 40. Plaintiff filed a Response in Opposition (ECF No. 43), and Defendants subsequently filed a Reply (ECF No. 45). I have reviewed the pertinent portions of the record, and am otherwise fully advised in the premises. For the reasons stated below, Defendants Motion to Stay is denied.

Defendants move to stay the instant proceedings pending a decision by the Ninth Circuit Court of Appeals in *Marks v. Crunch San Diego, LLC*, Appeal No. 14-56834 (9th Cir.). According to Defendants, the Ninth Circuit in *Marks* is set to rule on whether the Texmunication platform is an automatic telephone dialing system ("ATDS") within the meaning of the Telephone Consumer Protection Act ("TCPA"),[1] an appeal from a district court ruling in *Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1292 (S.D. Cal. 2014) which found that Textmunication did not constitute an ATDS. In Plaintiff's Complaint (ECF No. 1), Plaintiff alleges Defendants sent texts through the Textmunication platform; Defendants therefore argue this case should be stayed pending the Ninth Circuit's decision because "an affirmance of that case would be authoritative of Crunch's liability in this case." Motion, 2.

A district court has broad discretion in determining whether a stay is appropriate. *Clinton v. Jones*, 520 U.S. 681, 706 (1997). A stay is "based on a balancing test in which the movant bears the burden of showing either 'a clear case of hardship or inequity' if the case proceeds, or little possibility the stay will harm others." *Dunn v. Air Line Pilots Ass'n*, 836 F. Supp. 1574, 1584 (S.D. Fla. 1993), *aff'd,* 193 F.3d 1185 (11th Cir. 1999) (citing *Landis v. North American Co.,* 299 U.S. 248, 254–55 (1936)). "The proponent of a stay bears the burden of establishing its need." *Clinton*, 520 U.S. at 708. I find that a stay in this matter is not appropriate at this time.

First, a decision in *Marks v. Crunch San Diego, LLC*, Appeal No. 14-56834 (9th Cir.) would not necessarily be authoritative. The ruling on appeal in *Marks* was made on a motion for summary judgment, after the parties had developed a factual record. While the texting platform at issue may be the same in both cases, it is possible that the Plaintiff in the instant case may discover or present different facts than the parties in *Marks*. "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). Further, a decision in *Marks* will not define the rights of both parties nor will it automatically moot this case. While the Ninth Circuit's affirmance or rejection of the district court's finding might be persuasive in the instant matter, it is not binding on this Court. *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("A circuit court's decision binds the district courts sitting within its jurisdiction...."). Nor would there be a preclusive effect, as "[Plaintiff] was not a party to the [California] action, [his] interests were not adequately represented, and [he] did not have the opportunity to litigate the issues presented in the [California] action." *Int'l Ship Repair & Marine Servs., Inc. v. N. Assur. Co. of Am.*, 503 F. App'x 681, 683 (11th Cir. 2013). After a ruling by the Ninth Circuit, the parties would still need to litigate the applicability of the *Marks* decision to the facts of the instant case. As such, Plaintiff should be allowed to litigate this matter and develop his own factual record. Defendants can argue the correctness and applicability of the Ninth Circuit's ruling once it has been made.

**\*2**  Second, if the D.C. Circuit's and Ninth Circuit's decisions are imminent, as Defendants argue, then there is a good chance the decisions will be issued in time to shape the parties' discovery and/or any motions for summary judgment. Third, and last, Defendants have not shown that a denial of the stay will result in any undue prejudice to them other than that they *may* have more favorable caselaw to bolster their position at a later date. These are not sufficient reasons to warrant a stay of this matter, especially where a stay would prolong this matter on the Court's docket and could conceivably prejudice Plaintiff by the fading memory of any witnesses. *See Yong v. Peraza*, 2015 WL 4639736, \*2 (S.D. Fla. Aug. 4, 2015).

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** that Defendant's Motion to Stay Proceedings (ECF No. 35) is **DENIED**.

**DONE and ORDERED** in chambers, at Miami, Florida, this 28th day of February 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 11264884

Footnotes

1    The Ninth Circuit is, in turn, awaiting a ruling from the D.C. Circuit in *ACA Int'l v. F.C.C.*, Appeal No. 15-1211 (D.C. Cir.) on the validity of the Federal Communication Commission's 2015 Regulations, which, the petitioners in the case argue, expanded the statutory definition of an ATDS impermissibly. *See Marks v. Crunch San Diego, LLC*, No. 14-56834 (9th Cir.) ECF No. 62.

**End of Document**                                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Cited in uploaded document as:

Sanaah v. Howell, No. 08-cv-02117-REB-KLM, 2009 U.S. Dist. LEXIS 35260, at *2 (D. Colo. Apr. 9, 2009)

2009 WL 980383
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

Emmanuel SANAAH, Plaintiff,

v.

Nurse Debb HOWELL, Warden Arellano, Major Scott Grover, Life Safety Coordinator
and Maintenance Supervisor, and Maintenance Worker Lt. Bosley, Defendants.

Civil Action No. 08–cv–02117–REB–KLM.
|
April 9, 2009.

**Attorneys and Law Firms**

Emmanuel Sanaah, Crowley, CO, pro se.

**ORDER**

KRISTEN L. MIX, United States Magistrate Judge.

 **\*1**  This matter is before the Court on Defendants' **Motion to Stay Discovery** [Docket No. 33; Filed April 8, 2009] (the "Motion"). The Court has reviewed the Motion, the entire case file and applicable case law and is sufficiently advised in the premises.

Defendants request that the above-captioned case be stayed until resolution of their pending Motion to Dismiss [Docket No. 32; Filed April 8, 2009]. *Motion* [# 33] at 1. As grounds, Defendants argue that they have raised the defense of qualified immunity in their Motion to Dismiss, and that all discovery should be stayed until the Court makes a legal determination on Defendants' entitlement to qualified immunity. *Id.*

IT IS HEREBY **ORDERED** that the Motion is **DENIED** for the reasons set forth below.

Stays are generally disfavored in this District. *See Wason Ranch Corp. v. Hecla* (unpublished decision). However, a stay may be appropriate in certain circumstances, and the Court weighs several factors in making a determination regarding the propriety of a stay. *See String Cheese Incident, LLC v. Stylus Show, Inc.,* No. 02–cv–01934, 2006 WL 894955, at * 2 (D.Colo. Mar. 30, 2006) (unpublished decision) (denoting a five-part test). The Court considers (1) the interest of Plaintiff; (2) the burden on Defendants in going forward; (3) the Court's convenience; (4) the interest of nonparties, and (5) the public interest in general. *Id.* Here, those factors weigh against entry of a stay.

Although Plaintiff's position on this issue is not known, the Court has generally found that with the passage of time, the memories of the parties and other witnesses may fade, witnesses may relocate or become unavailable, or documents may become lost or inadvertently destroyed. As such, delay may diminish Plaintiff's ability to proceed. By contrast, Defendants do not suggest any undue burden in proceeding with the case, other than the ordinary burdens associated with defending a case. While Defendants do contend that their assertion of a qualified immunity defense entitles them to a stay, a review of the Motion to Dismiss reveals

that success on the merits of such a defense is not assured.[1] On balance, the Court finds that the consideration of these two factors weighs against the imposition of a stay in this case.

The Court also considers its own convenience, the interest of nonparties, and the public interest in general. None of these factors prompts the Court to reach a different result. The Court is inconvenienced by an ill-advised stay because the delay in prosecuting the case which results from imposition of a stay makes the Court's docket less predictable and, hence, less manageable. This is particularly true where there is a pending Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for which ultimate success is not guaranteed. While the Court identifies no particular interest of persons not parties to the litigation, the Court identifies a strong interest held by the public in general regarding the prompt and efficient handling of all litigation. Under these circumstances, the Court finds that a stay of the case is not warranted.

**\*2** The parties are reminded of their obligation to comply with my Order of February 11, 2009 [Docket No. 24] setting a Preliminary Scheduling Conference in this matter for **April 21, 2009 at 10:30 a .m.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 980383

Footnotes

1    The Court expresses no opinion about the merits of the Motions to Dismiss, but merely notes that Defendants' qualified immunity defense is not particularly well developed or compelling on its face.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 86 of 116

 KeyCite Yellow Flag

Disagreed With by Wiggins v. Bank of America, North America, S.D.Ohio, September 22, 2020

Cited in uploaded document as:

Simon v. Ultimate Fitness Grp., LLC, No. 19-cv-890, 2019 U.S. Dist. LEXIS 147676, at *18, 21-22 (S.D.N.Y. Aug. 19, 2019)

2019 WL 4382204

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Caroline SIMON, individually and on behalf of all others similarly situated, Plaintiff,

v.

ULTIMATE FITNESS GROUP, LLC d/b/a Orangetheory Fitness,

and Does 1 Through 10, inclusive, and each of them, Defendants.

No. 19 Civ. 890 (CM)

|

Signed 08/19/2019

**Attorneys and Law Firms**

Todd Friedman, Law Offices of Todd M. Friedman, Woodland Hills, CA, for Plaintiff.

Cary Brian Samowitz, Rachael C. Kessler, Cassandra Beckman Widay, DLA Piper US LLP, New York, NY, Edward Dean Totino, Baker & McKenzie LLP, Los Angeles, CA, for Defendants.

**MEMORANDUM DECISION AND ORDER DENYING MOTIONS TO DISMISS OR STAY**

McMahon, C.J.:

**\*1** Plaintiff Caroline Simon brings this class action against Ultimate Fitness Group, LLC d/b/a Orangetheory Fitness ("Defendant" or "Orangetheory") and ten unnamed employees or agents of Orangetheory, alleging violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"). The TCPA prohibits the making and sending of telemarketing calls and texts through an automated telephone dialing system ("ATDS" or "autodialer") without the consent of the recipient.

Orangetheory now moves to dismiss the Class Action Complaint (hereinafter referred to as the "Complaint") for lack of personal jurisdiction and for failure to state a claim. In the event that the motion to dismiss is denied, Defendant also moves to stay the proceedings while awaiting the Federal Communications Commission's ("FCC's") release of the revised definition of an ATDS.

For the reasons set forth below, all of Orangetheory's motions are denied.

**I. Factual Background**

The following facts are drawn from the allegations in the Complaint, which are presumed true for the purposes of these motions.

Plaintiff Caroline Simon ("Plaintiff" or "Simon") is a resident of New York. (Compl. dated Jan. 31, 2019, Dkt. No. 11 ("Compl.") ¶ 4.)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 87 of 116

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

The Complaint originally stated in error that Orangetheory had its principal place of business in New York City. (Compl. ¶ 5.) However, Plaintiff now agrees that Orangetheory is a Delaware corporation with its principal place of business and headquarters in Florida. (See Pl.'s Mem. of Law in Opp. Mot. to Dismiss, Dkt. No. 36 ("PL MTD Opp.") at 4 n.2; Def.'s Mem. of Law in Supp. of Mot. to Dismiss, Dkt. No. 32 ("Def. MTD Br.") at 1; see also Decl. of Charlene Barone in Supp. of Def.'s Mot. to Dismiss, Dkt. No. 33 ("Barone Decl.") ¶¶ 2–3.)

In or about May 2018, Simon received an unsolicited text message from Defendant on her cell phone. (Compl. ¶ 8.) The last four digits of the sender's number were "5443." (*Id.*) In or about June 2018, Simon continued to receive unsolicited text messages from Defendant, sent from Defendant's "text number" 797-979. (*Id.* ¶ 9.) Defendant allegedly contacted or attempted to contact Simon from telephone numbers confirmed to belong to Defendant, including but not limited to 797-979. (*Id.* ¶ 11.)

Although Simon does not allege what the text messages said, she alleges Defendant sent her "spam advertisements and/or promotional offers." (*Id.* ¶ 9.) She alleges the text messages were sent via Defendant's "SMS blasting platform," which she alleges is classified as a prohibited "automatic telephone dialing system" (ATDS) under the Telephone Consumer Protection Act ("TCPA"). (*Id.* ¶ 10.)

Simon was never a customer of Orangetheory, and never provided her cellular telephone number to it. (*Id.* ¶ 14.) Defendant and its agents never received Simon's prior express consent to receive unsolicited text messages, pursuant to 47 U.S.C. § 227(b)(1)(A). (*Id.*) Defendant's texts were not for emergency purposes, as defined by 47 U.S.C. § 227(b)(1)(A). (*Id.* ¶ 12.)

 **\*2**  Simon now brings this action on behalf of a putative class of individuals within the United States who also received unsolicited text messages from Defendant within four years of the date of Simon's filing of her Complaint. (*Id.* ¶ 16.) While Simon is not sure exactly how large the putative class is, she believes the class could contain hundreds of thousands of people. (*Id.* ¶ 18.)

With respect to injury, Simon alleges that she and members of the putative class were harmed by Defendant's acts because the unsolicited text messages caused the class members to "incur certain telephone charges or reduce cellular telephone time for which Plaintiff and the Class members previously paid, and invad[ed] the privacy of said Plaintiff and the Class members." (*Id.* ¶ 19.)

## II. Procedural History

In her Complaint filed on January 31, 2019, Simon asserts two causes of action on behalf of herself and the class: first, for negligent violations of the TCPA (Count 1), and, second, for knowing and/or willful violations of the TCPA (Count 2). (*Id.* ¶¶ 28–37.) The Complaint seeks $500 in statutory damages for each of Defendant's negligent violations of the TCPA (*Id.* ¶¶ 28–31), and up to $1,500 in statutory damages for each of Defendant's knowing and/or willful violations of the TCPA. (*Id.* at 6.)

Orangetheory now moves to dismiss the Complaint against it for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Dkt. No. 31.) Should those motions fail, Orangetheory asks the Court to stay Simon's action pending new FCC rules that might affect the definition of an autodialer under the TCPA. (Dkt. No. 34.)

## III. Discussion

### A. Defendant's Motion to Dismiss Under Rule 12(b)(2) for Lack of Personal Jurisdiction Is Denied

#### 1. Applicable Legal Standard

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendants. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *DiStefano v.*

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 88 of 116

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

*Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's burden of proof "depends upon the procedural context in which the jurisdictional challenge is raised." *Navaera Scis., LLC v. Acuity Forensic Inc.*, 667 F. Supp. 2d 369, 373 (S.D.N.Y. 2009). Where, as here, no evidentiary hearing has been held, plaintiffs "need only make a *prima facie* showing of personal jurisdiction." *Southern New England Telephone Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted). "This showing may be made through the plaintiff's own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Id.* The pleadings, affidavits, and other supporting materials are construed in a light most favorable to plaintiffs, and all doubts are resolved in their favor. *Id.*

Because Simon's claim is based on the TCPA, which is silent about service of process, state law informs whether the court has personal jurisdiction over Orangetheory. *Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 358 (E.D.N.Y. 2007) (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990)).

To determine whether personal jurisdiction exists over a non-domiciliary, the court engages in a two-step inquiry. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007)). The court first applies the long-arm statute of the forum state, to see whether it permits the exercise of personal jurisdiction over the defendants. If the laws of the forum state permit jurisdiction, the court then considers whether the exercise of such jurisdiction comports with constitutional due process. *See Best Van Lines*, 490 F.3d at 244.

**\*3** Because the Court is located in New York, the Court applies New York law. *See Chloe*, 616 F.3d at 163. Under New York's long-arm statute, there are two ways to establish personal jurisdiction over a defendant: (1) "general jurisdiction" under N.Y. C.P.L.R. § 301; and (2) "specific jurisdiction" under N.Y. C.P.L.R. § 302. As will be discussed, only the latter constitutes a possible basis for asserting personal jurisdiction over Orangetheory in this case.

## 2. The Court Has Specific Jurisdiction over Orangetheory with Respect to Simon's Claim

Simon originally plead in error that Defendant's principal place of business was in New York City. (Compl. ¶ 5.) If that were true, there would be no question that Defendant is "at home" in New York and is thus subject to the general jurisdiction of this Court. *Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014). However, because Orangetheory is actually a Delaware corporation with its principal place of business in Florida, the Court can only exercise specific jurisdiction over it—that is, jurisdiction that arises out Simon's and the putative class members' claims with respect to Defendant's conduct alleged in the suit. (Pl. MTD Opp. at 4); *see Daimler*, 571 U.S. at 137.

Defendant does not challenge that this Court has specific jurisdiction over Defendant with respect to Simon's claim and the claims of any New York residents who may be in the putative class. (Def. MFD Br. at 4 ("... the Court presumably has specific jurisdiction over [Plaintiff's] claim against Defendant....").) Defendant argues, however, that Supreme Court's recent decision in *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), prevents the Court from exercising personal jurisdiction over Defendant with respect to the claims of putative class members who are not New York residents.

## 3. The *Bristol-Myers Squibb* Decision

Defendant argues that *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), requires this Court to dismiss the claims of absent, non-New York class members, because the Court lacks specific jurisdiction over Orangetheory with respect to those claims. (Def. MTD Br. at 4.)

In *Bristol-Myers Squibb*, a group of 678 plaintiffs filed a mass action, under eight identical complaints, against Bristol-Myers Squibb in California state court, for injuries caused by one of Bristol-Myers Squibb's drugs, Plavix. *Bristol-Myers Squibb*, 137 S. Ct. at 1778. Only 86 of the plaintiffs were California residents. *Id.* The other 592 plaintiffs were residents of other States, and

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 89 of 116

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

so had not suffered their injuries within California. *Id.* The California Supreme Court found that the lower courts had personal jurisdiction over Bristol-Myers Squibb, given the company's extensive contacts with California and the similarities between the claims of the California plaintiffs and the non-California plaintiffs. *Id.* at 1779. The Supreme Court reversed: without an actual connection between the out-of-state plaintiffs' claims and the defendant's activities in California, California state courts' exercise of personal jurisdiction over Bristol-Myers Squibb with respect to the non-California plaintiffs' claims would violate the Due Process Clause of the Fourteenth Amendment. *Id.* at 1781, 1783.

The Supreme Court explicitly "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784. The Supreme Court therefore left it to the lower courts to determine whether *Bristol-Myers Squibb*'s holding applies to nationwide class actions brought pursuant to Fed. R. Civ. P. 23. In practice, this question has fallen to the district courts; as far as this Court is aware, no circuit court has yet to weigh in on the matter. *See Suarez v. Cal. Nat. Living, Inc.*, 17-cv-9847, 2019 WL 1046662, at *6 (S.D.N.Y. Mar. 5, 2019).

**\*4**  District courts generally take one of three approaches.

First, many courts hold that *Bristol-Myers Squibb* does not apply outside of the context of mass tort cases. *See, e.g., Sanchez v. Launch Tech. Workforce Solutions, LLC*, 297 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126 (D.D.C. 2018); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 09-md-2047, 2017 WL 5971622, at *12–*14 (E.D. La. Nov. 30, 2017); *Cabrera v. Bayer Healthcare, LLC*, LA 17-cv-8525, 2019 WL 1146828, at *8 (C.D. Cal. Mar. 6, 2019); *Gress v. Freedom Mortg. Corp.*, No. 1:19-cv-375, 2019 WL2612733, at *6–*7 (M.D. Pa. June, 26, 2019); *Hicks v. Rous. Baptist Univ.*, 17-cv-629, 2019 WL 96219, at *5–*6 (E.D.N.C. Jan. 3, 2019). Under this view, there is no constitutional unfairness in subjecting a defendant to the class claims of out-of-state plaintiffs in Rule 23 class actions, as long as a court has jurisdiction over the class representative's claims. *Sanchez*, 297 F. Supp. 3d at 1366. The due process issue is avoided because Rule 23 class certification already protects a defendant's due process rights. *Id.* at 1365–66 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)).

Another set of district courts holds the opposite: the same due process concerns that animated *Bristol-Myers Squibb* necessarily apply to nationwide class actions in federal courts. They hold there is no principled way to distinguish between the strictures of the Fourteenth Amendment Due Process Clause and the Fifth Amendment Due Process Clause. *See, e.g., Gazzillo v. Ply Gem Indus., Inc.*, 17-cv-1077, 2018 WL 5253050, at *7 (N.D.N.Y. Oct. 22, 2018); *DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018); *Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 874–75 (N.D. Ill. 2017); *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 850–51 (N.D. Ohio 2018).

A third set of district courts opts to defer this issue until class certification: since unnamed plaintiffs are merely *potential* class members who may never actually be joined to this action, it would be premature for a court to decide whether there is specific jurisdiction over the defendant(s) with respect to their claims. *See Suarez*, 2019 WL 1046662, at *6 (citing *Gonzalez v. Costco Wholesale Corp.*, 16-cv-2590, 2018 WL 4783962, at *8 (E.D.N.Y. Sept. 29, 2018)); *Chernus v. Logitech, Inc.*, No. 17-cv-673, 2018 WL 1981481, at *7–*8 (D.N.J. Apr. 27, 2018); *see also Campbell v. Freshbev LLC*, 322 F. Supp. 3d 330, 337 (E.D.N.Y. 2018) (citing the "unsettled nature of the law following *Bristol-Myers*" as another reason to defer on personal jurisdiction).

**4. The Court Defers This Question Until Class Certification**

Orangetheory "believes that it would be preferable to make this argument at the time that Plaintiff moves to certify a class." (Def. MTD Br. at 4 n.2.) Orangetheory represents that it made its motion now only to preserve the issue of personal jurisdiction, which is waived if not raised in a responsive pleading or motion to dismiss. (*Id.; see also* Reply in Supp. of Def.'s Mot. to Dismiss Pl.'s Class Action Compl., Dkt. No. 38 ("Def. MTD Reply") at 2.)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 90 of 116

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

**\*5**  The Court agrees that it is appropriate to defer questions regarding the class claims until class certification. *See Campbell,* 322 F. Supp. 3d at 337; *Gonzalez,* 2018 WL 4783962, at \*8. "[I]n contrast to *Bristol-Meyers*, there are no actual 'non-forum state plaintiffs' or putative class members to speak of yet in this case, making Defendants' motion to dismiss or strike patently premature." *Bank v. CreditGuard of Am.*, No. 18-cv-1311, 2019 WL 1316966, at \*12 (E.D.N.Y. Mar. 22, 2019). The Court will consider this issue when and if Plaintiff moves for class certification. The Court notes that the issue is preserved.

**B. Defendant's Motion to Dismiss Count 1 (Negligent Violation of the TCPA) and Count 2 (Knowing or Willful Violation of the TCPA) for Failure to State a Claim under Rule 12(b)(6) Is Denied**

**1. Applicable Legal Standard**

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (internal citation omitted), The claims will survive the motion to dismiss as long as they contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The plaintiff must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**2. The Telephone Consumer Protection Act (TCPA)**

Congress enacted the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA") to hold telemarketers accountable for spamming customers with intrusive nuisance calls. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71 (2012). The TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any *automatic telephone dialing system* ... to any telephone number assigned to a ... cellular telephone service ... unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]" 47 U.S.C. § 227(b)(1)(a)(iii) (emphasis added).

The TCPA defines an "automatic telephone dialing system," or "ATDS," as "equipment which has the *capacity*—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added).

The definition of an "automatic telephone dialing system"—and the attendant concept of "capacity"—are central to the statute.

"The FCC has the authority to promulgate regulations implementing the TCPA." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 474 (2d Cir. 2018) (citing 47 U.S.C. § 227(b)(2)). "In 2015, the FCC issued a Declaratory Ruling and Order that, among other things, attempted to clarify the TCPA's requirement that, to qualify as an autodialer under the statute, a device must have the 'capacity' to dial random and sequential numbers." *Id.* (citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Red. 7961, 7973–74 (2015) (the "2015 Ruling")). "The Commission asserted that an expansive interpretation of the term 'capacity' was consistent with both Congress's intent that the TCPA have a broad protective reach, and with the Commission's previous orders. Accordingly, the FCC 'declined to define a device's "capacity" in a manner confined to its "present capacity." Instead, the agency construed a device's "capacity" to encompass its "potential functionalities" with modifications such as software changes.' " *Id.* (quoting *ACA Int'l v. FCC*, 885 F.3d 687, 693–94 (D.C. Cir. 2018) (in turn quoting 2015 Ruling)).

**\*6**  In 2018, the 2015 Ruling was struck down by the D.C. Circuit in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). The D.C. Circuit held that, per the text of the statute, the ATDS' *present* functions must include the ability to generate random or sequential numbers, even if that function was turned off when the system sent the offending calls or text messages in question. *Id.* at 699.

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 91 of 116

After the D.C. Circuit vacated the 2015 Ruling, the FCC sought public comment on the meaning of "capacity" under the TCPA's definition of an autodialer. *See* Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's *ACA International* Decision, 83 Fed. Reg. 26,284 (June 6, 2018). The notice stated that the agency would take comments until October 24, 2018. The FCC has taken no further action.

In the meantime, on June 29, 2018, the Second Circuit published a decision adopting the definition of "capacity" articulated by the D.C. Circuit in *ACA International*:

> In sum, we conclude that the term "capacity" in the TCPA's definition of a qualifying autodialer should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software. That definition does not include every smartphone or computer that might be turned into an autodialer if properly reprogrammed, but does include devices whose auto dialing features can be activated, as the D.C. Circuit suggested, by the equivalent of "the simple flipping of a switch."

*King*, 894 F.3d at 481 (citing *ACA Int'l*, 885 F.3d at 696).

At present—in the absence of any valid agency rule interpreting "capacity"—the Second Circuit's decision in *King* is binding on this Court.

### 3. Simon Has Plausibly Plead that Orangetheory Used an ATDS

To state either a negligent violation or willful violation claim under the TCPA, a plaintiff must allege the following basic elements: "(1) [a defendant] called her on her cell phone; (2) using an automated dialing system or pre-recorded voice; (3) without her consent." *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015), *rev'd on other grounds*, 894 F.3d 473 (2d Cir. 2018); *see also Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 474 (S.D.N.Y. 2018).

The parties agree that Simon has pleaded the first and third elements. Simon alleges that she received text messages from Defendant on multiple occasions between May and June 2018. (Compl. ¶ 9.) Since a text message is the same as a "call" under the TCPA, Simon has shown the first element of her claim. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666–67 (2016). In addition, Simon also alleges that she has never been a customer of Defendant's and that she has never given Defendant her cell phone number. (Compl. ¶ 14.) This allows the Court to draw a direct inference that Defendant never received Simon's "prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii).

Defendant instead moves to dismiss both TCPA claims (Counts 1 and 2) on the ground that Simon has not plausibly plead enough facts suggesting the use of an ATDS.

I find that she has.

Courts find that the use of a "short code telephone number" plausibly indicates that the Defendant used an ATDS. *Rotberg*, 345 F. Supp. 3d at 476–77; *see also Krady v. Eleven Salon Spa*, No. 16-cv-5999, 2017 WL 6541443, at *4 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 6542462 (E.D.N.Y. Dec. 21, 2017) (collecting cases on short codes and other indicia of ATDS). In addition, courts have found that if the texts are of an "impersonal, generic nature," they plausibly indicate the use of an ATDS. See *Krady*, 2017 WL 6541443, at *4; *see also Unchageri v. YuppTV USA, Inc.*, No. 17-CV-3862, 2018 WL 1184737, at *3 (N.D. Ill. Mar. 7, 2018).

**\*7** Here, Simon asserts that she received the text message via "Defendant's SMS blasting platform," which plausibly alleges that the text messages were sent widely and to multiple numbers. (Compl. ¶ 10.) Although Simon does not allege the specific contents of the text messages, she alleges Defendant sent her "spam advertisements and/or promotional offers"—which plausibly

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 92 of 116

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

suggest impersonal, generic messages. Most persuasively, Simon claims to have received several unsolicited text messages over a period of two months from a variety of numbers, including the short code text number "797-979," which, as other courts have held, is plausible indicia of an ATDS. (*Id.* ¶ 9.) At this stage, Plaintiff has done all she must to plead this element of her claim.

Defendant's motion to dismiss Counts 1 and 2 of the Complaint for failure to state a claim under Rule 12(b)(6) is, therefore, DENIED.

### C. Defendant's Motion to Stay Is Denied

Defendant has filed a separate motion asking the Court stay the case until the FCC promulgates a new final rule, or issues a new declaratory ruling, defining "autodialer" and "capacity." Defendant identifies two grounds for such a stay: *first*, the Court's inherent power to issue stays to control its docket, and, *second*, the Court's authority to issue a stay under the doctrine of primary jurisdiction.

For the following reasons, Orangetheory's motion is denied without prejudice to renewal at a later stage of the litigation.

### 1. Defendant Has Not Shown It Is Entitled to a Stay

In deciding whether to grant a stay under its inherent powers, the Court must consider: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007).

Defendant fails to make the required showing on any of these factors. Orangetheory has not made *any* showing—let alone a strong one—that any ruling by the FCC would likely exclude the device used by Orangetheory to spam Simon, so as to enable it to succeed on the merits. In addition, Orangetheory has not demonstrated irreparable injury; it notes only that it is potentially on the hook for substantial damages, given the putative nationwide class. Monetary damages, of course, do not by themselves constitute irreparable injury.

Simon, on the other hand, persuasively argues that she would be injured by a stay, particularly because discovery has yet to commence, and evidence is at risk of being lost. This injury, which is both likely and irreparable, far outweighs the injury posed by a potential future judgment for money damages.

Finally, Orangetheory argues that the public interest favors issuing a stay, because of the "risk of disparate interpretations of the TCPA in the absence of clear guidance from the FCC." (Mem. of Law in Supp. of Def.'s Mot. to Stay, Dkt. No. 35 ("Def. Stay Br.") at 15.) However, the Second Circuit's interpretation of "capacity" in *King*, according to Orangetheory, is in line with nearly all other circuits that have reached the issue. (*See id.* at 12–14.) The risk seems small. If and when the FCC rules, we will deal with it.

### 2. The Primary Jurisdiction Doctrine Does Not Mandate a Stay

Defendant also argues that the abstention doctrine of primary jurisdiction requires staying the case.

"The doctrine of primary jurisdiction allows a federal court to refer" or stay "a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222–23 (2d Cir. 1995). In the Second Circuit, the "inquiry has generally focused on four factors:

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 93 of 116

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

**\*8**  (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82–83 (2d Cir. 2006). Courts "must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 83 (internal quotation omitted).

Defendant argues that "the FCC is currently considering the precise questions at issue here," because, in its June 2018 request for comments, it asked the following questions: "What constitutes an [ATDS]? How "automatic" must dialing be for equipment to qualify as an [ATDS]? Must such a system dial numbers without human intervention? If equipment cannot itself dial random or sequential numbers, can that equipment be an [ATDS]?" (Def. Stay Br. at 3.)

Putting aside for the moment that agency requests for comment are often broader than the scope of the final rule, the takeaway from Defendant's brief is that degree of human interaction with the purported autodialer lies at the heart of this lawsuit. But neither Simon nor this Court knows anything about the system that was allegedly used to send text messages on behalf of Orangetheory. The Court certainly does not know if "human intervention" is what will tip the scales in favor of either plaintiff or defendant, and therefore whether this case is susceptible of resolution by the FCC's rulemaking—if that is even what the FCC intends to do. *See Gould v. Farmers Ins. Exch.*, 326 F.R.D. 530, 531 (E.D. Mo. 2018) ("[T]he FCC has not indicated whether it will pursue a formal rulemaking or some other proceeding following the collection of comments on this issue" of what constitutes "capacity."). Put differently, "a stay is not prudent at this time because, at a minimum, discovery of the nature of [Defendant's] calling system and [Defendant's] contacts with Plaintiffs is required before any definitive legal standard under the TCPA can be applied to [Defendant's] conduct herein." *Somogyi v. Freedom Mortg. Corp.*, No. 17-cv-6546, 2018 WL 3656158, at \*1 (D.N.J. Aug. 2, 2018).

Finally, even if Orangetheory had identified the specific question at issue and the Court were convinced that the FCC was taking action would resolve it—I am not—delay and prejudice would still justify denying the motion. It is well known that, "If the FCC does proceed with a formal rulemaking, such a process will likely take years[.]" *Gould*, 326 F.R.D. at 532. Further, any final rule promulgated by the FCC would almost certainly be subject to a pre-enforcement challenge—and would likely be stayed pending the resolution of that challenge, which could also take years. In the meantime, it is clear that critical evidence, including records from any third parties that Orangetheory may have contracted with for its telephone marketing, may be lost or destroyed.

That said, it is possible that the regulatory landscape will have changed significantly once discovery concludes. Therefore, while the Court denies Orangetheory's motion to stay the case now, that ruling is without prejudice to Orangetheory's renewal of its motion, if and when: (1) the issues for trial are narrowed; (2) the scope and timeline of the FCC's action becomes clearer; and (3) a stay would not pose irreparable harm to Plaintiff and the putative class.

## IV. Conclusion

**\*9**  For the aforementioned reasons, Defendant's motion to dismiss for lack of personal jurisdiction is denied; the motion to dismiss for failure to state a claim is denied; and the motion to stay is denied.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 31 and 34.

This constitutes the written decision and order of the Court.

Simon v. Ultimate Fitness Group, LLC, Not Reported in Fed. Supp. (2019)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 94 of 116

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4382204

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Valenzuela v. Crest-Mex Corporation, Not Reported in Fed. Supp. (2017)

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 95 of 116

2017 WL 2778104
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Felipe VALENZUELA, et al., Plaintiffs,

v.

CREST-MEX CORPORATION, et al., Defendants.

No. 3:16-cv-1129-D
|
Signed 06/26/2017

**Attorneys and Law Firms**

Jamie Harrison Zidell, Joshua Aaron Petersen, Robert Lee Manteuffel, J.H. Zidell PC, Dallas, TX, for Plaintiffs.

Leland C. de la Garza, Barrett Christopher Lesher, Hallett & Perrin PC, Derek D. Rollins, Martha Hardwick Hofmeister, Timothy D. Zeiger, Michelle Morgan, Shackelford, Melton, McKinley & Norton, LLP, Dallas, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**[1]

DAVID L. HORAN, UNITED STATES MAGISTRATE JUDGE

**\*1** Defendants Thomas Townsend, Crest-Mex Corporation d/b/a La Sierra Apartments, MTORMA Trust, Dallas Net Lease Trust, Sierra Management Trust, Sierra Management Co., La Sierra Apartments Trust, Cedar Sierra Management Co., LLC., and 3328 Cedar Plaza Lane Apartments, Inc. (collectively, the "Townsend Defendants") have filed a Motion for Temporary Stay of Discovery and Protective Order [Dkt. No. 45], and Defendant Kelly Goodwin has filed a Motion for Protective Order [Dkt. No. 47].

United States District Judge Sidney A. Fitzwater has referred both motions to the undersigned United States magistrate judge for determination under 28 U.S.C. § 636(b)(1)(A). *See* Dkt. No. 48.

Plaintiffs Felipe Valenzuela and Jose Guillermo Gandara have filed a response to each motion, *see* Dkt. Nos. 50 & 51, and the Townsend Defendants and Goodwin have filed replies, *see* Dkt. Nos. 52 & 54.

For the reasons explained below, the Court DENIES the Townsend Defendants' Motion for Temporary Stay of Discovery and Protective Order [Dkt. No. 45] and Defendant Kelly Goodwin's Motion for Protective Order [Dkt. No. 47].

**Background**

In support of their Motion for Temporary Stay of Discovery and Protective Order, the Townsend Defendants explain that

Plaintiffs sued ten defendants alleging that they all employed Plaintiffs, for purposes of the [Fair Labor Standards Act ("FLSA") ], and claiming that they were not paid $23,273.00 in wages for work as maintenance workers on the La Sierra Apartments located in Dallas, Texas. Defendants moved to dismiss because the FLSA does not cover Plaintiffs and because Defendant Townsend is not an "employer" of Plaintiffs under the FLSA. Defendants' motion to dismiss presented threshold

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 96 of 116

Valenzuela v. Crest-Mex Corporation, Not Reported in Fed. Supp. (2017)

issues that should be addressed before Defendants are subjected to the considerable expense and burden of this type of litigation. The motion to dismiss is pending. Defendants also recently filed a motion to compel arbitration based on newly discovered arbitration agreements. Defendants requested that the Court rule on the motion to compel arbitration prior to ruling on the motion to dismiss.

Meanwhile, Plaintiffs have initiated a barrage of discovery directed at all Defendants, including hundreds of discovery requests and seeking to depose all nine defendants in this lawsuit. Much of the written discovery is subject to objection given its overbreadth, request for irrelevant material, and the undue burden that would be imposed on Defendants. If discovery is not stayed, Defendants will be forced to spend an amount complying with the discovery that exceeds Plaintiffs' damages, all before Defendants' threshold motions are ruled upon. Defendants are hereby moving for protection from such discovery by asking the Court to exercise its discretion to protect Defendants from discovery until the Court rules on Defendants' motion to compel arbitration and/or motion to dismiss. For the reasons shown below, good cause exists for the Court to exercise its discretion.

Dkt. No. 45 at 1-2 (footnote omitted).

**\*2** More specifically, the Townsend Defendants contend that their request should be granted after considering the relevant factors of "(1) the breadth of discovery sought; (2) the burden of responding to such discovery; and (3) the strength of the dispositive motion filed by the party seeking the stay." *Id.* at 4. They assert, as to the first factor, that

Plaintiffs served on the nine moving Defendants a total of 603 discovery requests: 13 requests for admission, 12 interrogatories, and 42 requests for production for each of the nine moving Defendants. These discovery requests are wide-reaching and will require much work by Defendants to comply with the requests. In addition, on April 26, 2017, Plaintiffs' counsel requested dates for the depositions of corporate representatives of the eight corporate Defendants and Defendant Townsend. .... The topics listed in Plaintiffs' counsel's letter are equally wide-reaching.

*Id.* at 4-5 (citations omitted). As to the second factor, the Townsend Defendants argue that

Plaintiffs' counsel is seeking to conduct all of Plaintiffs' discovery while Defendants' Motions are pending, thereby subjecting Defendants to the burden of this discovery even if its motions are meritorious and are ultimately granted. The burden is substantial. The discovery has been propounded on all nine moving Defendants and in total comprise 603 discovery requests. The large number of discovery requests demonstrates the obvious burden that will be imposed on Defendants.

Beyond the sheer magnitude of the discovery, as reflected in the attached declaration of Defendant Townsend, it will take Defendants at least thirty hours to comply with the discovery requests. Exhibit F, Townsend Decl., ¶ 3 (App. 46). And, as reflected in the attached declaration of Barrett Lesher, one of Defendants' counsel, it will take Defendants' counsel at least ten hours to prepare the discovery responses. Exhibit G, Lesher Decl., ¶ 3 (App. 48).

The depositions of the eight corporate representatives and Defendant Townsend, a total of nine depositions, is expected to take at least eight hours of preparation and potentially as much as 63 hours of depositions (7 hours times 9 depositions). Exhibit G, Lesher Decl., ¶ 4 (App. 48). Thus, Plaintiffs seek to impose on Defendants as much as 101 hours of discovery burden, seeking discovery on all issues in the case, while Defendants' potentially dispositive Motion is pending.

*Id.* at 5. And, as to the third factor, the Townsend Defendants assert that,

[a]t the threshold of this case, Defendants challenged Plaintiffs' standing to bring a claim under the Fair Labor Standards Act ("FLSA") because there is no individual or enterprise coverage. And, Defendant Townsend challenged Plaintiff's right to sue him as an "employer" under the FLSA.

Plaintiffs claim they worked as maintenance employees at the La Sierra Apartments in Dallas until March 1, 2006. (Complaint, ¶ 20, 21) Plaintiffs claim, in conclusory fashion, that Defendants' business and Plaintiffs' work for Defendants "affected interstate commerce" because "materials and goods that Plaintiffs used" in their job "moved through interstate commerce prior to and subsequent to Plaintiffs' use." (Complaint, ¶ 22) Plaintiffs claim that Defendant Townsend ran the apartment

business primarily from California, while making trips to Texas to supervise on-site operations. (Complaint, ¶ 22) Based on these allegations, Plaintiffs assert coverage under the FLSA.

**\*3** Defendants' Motion challenges Plaintiffs' pleading of FLSA coverage, both from Plaintiffs' side and from Defendants' side. Defendants' Motion cites numerous authorities, including this Court's own decision in *Lopez-Santiago v. Coconut Thai Grill*, 2014 WL 840052 (N.D. Tex. 2014), rejecting FLSA coverage allegations similar to those in Plaintiffs' complaint. The Court should rule on this threshold issue (and Townsend's "employer" issue) before Defendants are subjected to the burden of all-out discovery in this case. If the FLSA does not apply, then Plaintiffs' lawsuit based solely on the FLSA should not be allowed to proceed and Defendants should not be subjected to the burden of Plaintiffs' discovery. It would be manifestly unjust to give Plaintiffs' full discovery before they have even made it past the threshold FLSA coverage issue.

Additionally, Defendants' motion to compel arbitration is as equally strong. Defendants presented the court with two arbitration agreements that were provided to Plaintiffs, and Plaintiffs continued to work and accept pay after receiving the agreements. Additionally, Plaintiffs' claims fall within the scope of the agreements. Therefore, Defendants have provided strong arguments in support of arbitration.

*Id.* at 5-7.

Finally, the Townsend Defendants contend that a stay is appropriate where they have presented substantial arguments for dismissal, where Plaintiffs have served objectionable and harassing discovery, and where a temporary stay of discovery will not unduly delay litigation. *See id.* at 7-9.

Goodwin similarly explains that she has filed a motion to dismiss Plaintiffs' case under Federal Rule of Civil Procedure 12(b)(6), asserting "that Plaintiffs lack standing, and because Goodwin does not meet the statutory definition of 'employer,' " and that "Plaintiffs served three (3) sets of written discovery on Goodwin: (1) requests for production, (2) requests for admissions, and (3) interrogatories (collectively, the 'Discovery Requests')." Dkt. No. 47 at 1. Goodwin asserts that, "[i]f the Court does not protect Goodwin from the Discovery Requests, she will be forced to spend time and money responding to the Discovery Requests that would otherwise be unnecessary should the threshold issues made the subject of her motion to dismiss be decided in her favor and/or should the issues made the subject of her co-defendants' motions concerning arbitration (which seeks to stay this entire proceeding) be decided in their favor." *Id.* at 2. Goodwin explains that her

dispositive motion challenges Plaintiffs' pleadings, and the cases cited therein (including this Court's own prior decision) reject FLSA coverage in cases with similar allegations. The Court should rule on this threshold issue (and Goodwin's "employer" issue) before Goodwin is subjected to the burden and expense of discovery in this case.

If the FLSA does not apply, then Plaintiffs' FLSA lawsuit should not be allowed to proceed and, correspondingly, Goodwin should not be subjected to the burden or expense of responding to the Discovery Requests (or, additional discovery such as depositions). It would be manifestly unfair, costly to Goodwin, and burdensome to require Goodwin to participate in full discovery before Plaintiffs have even made it past the threshold issues described herein.

*Id.* at 3 (footnote omitted). "Notwithstanding these arguments, Goodwin concurs with her co-defendants' assertion the arguments made the subject of their motion to compel arbitration are strong and would suffice as an independent basis on which to wholly protect Goodwin from the Discovery Requests." *Id.* at 3 n.1. "Goodwin, therefore, moves this Court for complete protection from the Discovery Requests, or at least until such time as the Court has ruled on Goodwin's motion to dismiss and/or her co-defendants' motions concerning arbitration." *Id.* at 2.

**\*4** Plaintiffs respond that the "Townsend Defendants' Motion to Dismiss does not assert an outright legal defense against the allegations in the Complaint other than the statute of limitations as to some of Plaintiffs' claims, but instead attacks the sufficiency of the pleadings under Rule 12(b)(6) and alleges that Plaintiffs have failed to plead any facts to support their individual and enterprise coverage allegations or that Defendant Townsend was their employer"; that, "even if the Court finds that Plaintiffs need to provide further factual development," the Court is likely to allow Plaintiffs to replead; that, "[a]s to the breadth of discovery sought, Plaintiffs' discovery requests in this case inquire into basic elements of Plaintiffs' FLSA claims, i.e., hours

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 98 of 116

Valenzuela v. Crest-Mex Corporation, Not Reported in Fed. Supp. (2017)

worked, identification of goods and materials used, identity of co-workers (who are witnesses with knowledge of relevant facts such as the Plaintiffs' hours worked and the Defendants' wage and hour policies and practices), amounts paid to Plaintiffs, Defendants' wage and hour policies, and issues related to FLSA coverage and employer status of the various Defendants"; that, "[w]hile the Townsend Defendants refer to a total of 603 discovery requests, this is a result of the fact that there are nine separate entities involved in the business structure created by Defendant Townsend himself," where "Plaintiffs served thirteen requests for admissions, twelve interrogatories, and forty-two requests for production on each of the Townsend Defendants"; and that, "[g]iven the relationship between the Townsend Defendants, it is likely that the majority of the Townsend Defendants will have similar, if not identical, responses to most of Plaintiffs' discovery requests." Dkt. No. 50 at 2, 3, 4-5.

Plaintiffs further respond that,

[a]s to the burden of responding to Plaintiffs' discovery requests, the Townsend Defendants argue in conclusory fashion that the burden of responding to Plaintiffs' discovery requests would be "substantial." The Townsend Defendants' counsel provided an affidavit estimating that it would take at least ten hours to respond to the Plaintiffs' discovery requests. This amounts to barely over an hour per party. That the Townsend Defendants' counsel is representing nine separate entities in this litigation is a fact that is completely out of Plaintiffs' control. The Townsend Defendants' calculation of the discovery burden also incorporates a "worst case" scenario as to the requested depositions of the parties, presuming that all of the depositions will last the full seven hours provided for in the Federal Rules of Civil Procedure. Furthermore, the burden of deposing the Townsend Defendants will fall more heavily on Plaintiffs as they will be required to engage the services of a court reporter and bear the full cost associated therewith, at least until such time as they may prevail in this matter. Finally, the Townsend Defendants have already responded to Plaintiffs' discovery requests with naught but objections; albeit the responses are generally improper under *Heller v. City of Dallas*, 303 F.R.D. 466 (N.D. Tex. Nov. 12, 2014), and a motion to compel may ultimately be necessary.

*Id.* at 4 (citations omitted).

Plaintiffs also note,

[a]s one final matter, [that] Defendants previously requested that the Court stay all discovery until after deciding the Defendants' motions to dismiss when the parties filed their Joint Status Report Regarding Scheduling Proposal. The Court did not stay discovery when it entered its Scheduling Order on March 20, 2017. As this issue was previously raised with the Court and the Court declined to enter a similar stay of discovery less than three months ago, the current request to stay discovery should be declined as well.

*Id.* at 8-9 (citations omitted).

As to Goodwin's Motion for Protective Order, Plaintiffs oppose for many of the same reasons as they raise in opposition to the Townsend Defendants' motion, but Plaintiff also note that, in her motion, Goodwin did not address any of the relevant factors in detail and that she "argues only in conclusory fashion that she should not be subjected to the burden or expense of responding to the discovery requests." Dkt. No. 51 at 3.

**Legal Standards and Analysis**

**\*5** The Court has discretion to stay discovery "for good cause shown." Fed. R. Civ. P. 26(c)(1); *accord Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 436 (5th Cir. 1990); *see generally Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). Under Federal Rule of Civil Procedure 26(c), the Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. *See* Fed. R. Civ. P. 26(c)(1). "[T]he burden is upon [the party seeking the protective order] to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998) (citations omitted); *see also E.E.O.C. v. BDO*

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 99 of 116

Valenzuela v. Crest-Mex Corporation, Not Reported in Fed. Supp. (2017)

*USA, L.L.P.*, 856 F.3d 356, 367 (5th Cir. 2017), as revised (May 8, 2017). A protective order is warranted in those instances in which the party seeking it demonstrates good cause and a specific need for protection. *See Landry*, 901 F.2d at, 435. The Court has broad discretion in determining whether to grant a motion for a protective order. *See Harris v. Amoco Prod. Co.*, 768 F.2d 669, 684 (5th Cir. 1985). "The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

In particular, "[t]he Court has broad discretion and inherent power to stay discovery' while a motion to dismiss is pending," but "[s]uch a stay is not [ ] automatically granted whenever a motion to dismiss is pending." *Stanissis v. Dyncorp Int'l LLC*, No. 3:14-cv-2736-D, 2014 WL 7183942, at *1 (N.D. Tex. Dec. 17, 2014) (internal quotation marks omitted). "[N]o federal rule, statute, or binding case law applies here to automatically stay discovery pending a ruling on" defendants' motions to dismiss. *Escareno ex rel. A.E. v. Lundbeck, LLC*, No. 3:14-cv-257-B, 2014 WL 1976867, at *2 (N.D. Tex. May 15, 2014). "In fact, such a stay is the exception rather than the rule." *Glazer's Wholesale Drug Co., Inc. v. Klein Foods, Inc.*, No. 3:08-cv-774-L, 2008 WL 2930482, at *1 (N.D. Tex. July 23, 2008). "[H]ad the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) would stay discovery, the Rules would contain a provision to that effect." *Id.* (internal quotation marks omitted).

The law is the same as to a pending motion to compel arbitration, although "[a] trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987).

As the Townsend Defendants note, courts in this jurisdiction have explained that relevant "factors that inform the court's discretion are: (1) the breadth of discovery sought; (2) the burden of responding to such discovery; and (3) the strength of the dispositive motion filed by the party seeking a stay." *Von Drake v. Nat'l Broad. Co.*, No. 3:04-cv-652-R, 2004 WL 1144142, at *1 (N.D. Tex. May 20, 2004).

Here, the Court is persuaded that the discovery requests that Plaintiffs have served and the depositions that they seek are not so voluminous and do not present such an undue burden as the defendants make them out, considering that multiple, apparently related defendants have been sued here and are jointly represented. The Court finds that the defendants' assertions—which "only detail[ ] the usual inconveniences and costs that are associated with discovery practice"—"do not suffice to show hardship or inequity" or other good cause that would justify a stay of discovery and protective order under Rule 26(c)(1). *Ashford Inc. v. Unite Here*, No. 3:15-cv-0262-M, 2015 WL 11121019, at *2 (N.D. Tex. May 12, 2015).

And, as to the pending dispositive motions, the Townsend Defendants and Goodwin raise threshold challenges to Plaintiffs' FLSA claims that are not uncommon and have not generally resulted in staying discovery—even in cases to which the defendants' briefing points—and that the Court notes, without suggesting a view on the merits of defendants' pending motions to dismiss, often have resulted in leave to replead. *See, e.g.*, *Lopez-Santiago v. Coconut Thai Grill*, No. 3:13-cv-4268-D, 2014 WL 840052, at *4-*5 (N.D. Tex. Mar. 4, 2014). That all weighs heavily in favor of the Court's "declin[ing] in the exercise of its broad discretion to ... preclude all discovery in this case during the time it will take to decide the instant motions to dismiss and (if applicable) any motions addressed to amended pleadings." *Stanissis*, 2014 WL 7183942, at *1. And, although the motion to compel arbitration might, if granted, result in the complete dismissal of this case as pending in this Court, that possibility alone does not, considering all the other factors discussed above, justify taking the extraordinary step of staying discovery.

**\*6** Accordingly, the Court determines, in an exercise of its broad discretion, that a stay of discovery and protective order, as requested, are not appropriate here. And, after considering all of the circumstances presented, the Court further determines that the parties will bear their own expenses, including attorneys' fees, in connection with the Townsend Defendants' Motion for Temporary Stay of Discovery and Protective Order [Dkt. No. 45] and Defendant Kelly Goodwin's Motion for Protective Order [Dkt. No. 47].

**Conclusion**

For the reasons explained above, the Court DENIES the Townsend Defendants' Motion for Temporary Stay of Discovery and Protective Order [Dkt. No. 45] and Defendant Kelly Goodwin's Motion for Protective Order [Dkt. No. 47].

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2778104

Footnotes

1    Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[ ] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM   Document 28-1   Filed 06/24/26   Page 101 of 116

Watson v. Manhattan Luxury Automobiles, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 4586407
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Brian WATSON, et al., Plaintiffs,

v.

MANHATTAN LUXURY AUTOMOBILES, INC., Defendant.

20 Civ. 4572 (LGS)
|
Signed September 29, 2022

**Attorneys and Law Firms**

Elizabeth Easley Apostola, Daniel Zemel, Zemel Law LLC, Patterson, NJ, for Plaintiffs Brian Watson, Daniel Samarghitan.

Daniel Zemel, Zemel Law LLC, Patterson, NJ, for Plaintiffs Annmarie Greene, Jose Espinal, Lymell Jackson.

Jason Marc Myers, Thomas Arthur Leghorn, London Fischer LLP, New York, NY, Salvatore A. Giampiccolo, Stephanie Lopez, Stevens & Lee, Elmwood Park, NJ, for Defendant Manhattan Luxury Automobiles, Inc.

CDK Global, LLC, Pro Se.

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

 **\*1**  Plaintiffs Brian Watson, Danial Samarghitan, Annmarie Greene, Jose Espinal and Lymell Jackson bring this action against Defendant Manhattan Luxury Automobiles, Inc., alleging that Defendant's practice of sending unsolicited text messages to consumers violates the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and regulations promulgated thereunder. Plaintiffs move to certify three classes pursuant to Federal Rule of Civil Procedure 23(b)(3) and to preclude testimony by Defendant's expert witnesses. Defendant moves to preclude testimony by Plaintiffs' expert witnesses. For the reasons stated below, Plaintiffs' motion for class certification is granted in part and denied in part; Plaintiffs' *Daubert* motion is granted in part and denied in part; and Defendant's *Daubert* motions are denied.

**I. BACKGROUND**

**A. Factual Background**

The facts below are taken from the parties' submissions in connection with the pending motions, and factual disputes are resolved as necessary for the disposition of the motions. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011); *Clune v. Barry*, No. 16 Civ. 4441, 2019 WL 3369455, at \*2 (S.D.N.Y. July 26, 2019).

In January 2017, the car dealership Honda of Manhattan ("HOM") closed. HOM agreed with its "sister dealership," the Defendant in this case, that Defendant would offer service to HOM customers. On January 31, 2017, HOM sent its customers emails and text messages notifying them that Defendant could service their vehicles, and those communications contained an option to opt of future communications. Some HOM customers who had purchased or leased vehicles from HOM had signed contracts purportedly agreeing that HOM could contact them and share certain personal information with certain third

Case 1:26-cv-00659-KM   Document 28-1   Filed 06/24/26   Page 102 of 116

Watson v. Manhattan Luxury Automobiles, Inc., Not Reported in Fed. Supp. (2022)

parties. Defendant then sent text messages offering vehicle maintenance, service and inspections to HOM customers who did not affirmatively opt out of communications. Defendant used a platform called Zipwhip to send the text messages, and the parties dispute many details of how the Zipwhip platform worked. Many HOM customers received more than one message. After receiving messages, some named Plaintiffs went on to discuss and even purchase services, and others replied that they were not interested. None received a message after opting out.

### B. Proposed Classes

Plaintiffs seek to certify the "ATDS Class" consisting of all HOM customers who received a text message from Defendant to a non-business cell phone, sent using the Zipwhip platform, with certain content, within four years of the action being filed. Plaintiffs allege on behalf of themselves and the ATDS Class that Defendant violated 47 U.S.C. § 227(b), which prohibits certain uses of an Automatic Telephone Dialing System ("ATDS") and creates a private right of action.

Plaintiffs also seek to certify the National Do-Not-Call Registry Class ("NDNCR Class"), consisting of all members of the ATDS Class who received at least two such text messages in a 12-month period when their phone numbers had been registered on the National Do-Not-Call Registry ("NDNCR") for at least thirty-two days. Plaintiffs allege that 47 U.S.C. § 227(c)(3)(F), (5), and the regulations thereunder, 47 C.F.R. § 64.1200(c), prohibit such messages and provide a private right of action to anyone who receives more than one such message.

**\*2**  Plaintiffs also seek to certify the Internal Do-Not-Call List Class ("IDNC Class"), consisting of all members of the ATDS Class who received messages while Defendant failed to institute procedures to maintain a list of persons who requested not to receive telemarketing calls. Plaintiffs allege that 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d) prohibit such messages and provide a private right of action.

## II. DISCUSSION

### A. *Daubert* Motions

Plaintiffs and Defendant have each submitted expert reports in support of their respective positions on class certification and on the merits. Plaintiffs' expert Anya Verkhovskaya opines on a methodology for identifying class members. Plaintiffs' expert Randall Snyder opines on technical characteristics of the Zipwhip platform that are relevant to whether it is an ATDS. Defendant's expert Ken Sponsler purports to rebut both. Each party has filed a *Daubert* motion to preclude the others' witness(es). For the reasons below, Plaintiffs' *Daubert* motion is granted in part and denied in part, and Defendant's *Daubert* motions are denied.

Federal Rule of Evidence 702, which governs admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if [ ] (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

District courts play a " 'gatekeeping' function" under Rule 702 and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). A Rule 702 inquiry focuses on three issues: (1) whether a witness is qualified as an expert, (2) whether the witness's "opinion is based upon reliable data and methodology" and (3) whether "the expert's testimony (as to a particular matter) will assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (cleaned up); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 543 (S.D.N.Y. 2021). "[A] slight modification of an otherwise

reliable method will not render an expert's opinion per se inadmissible." *United States v. Jones*, 965 F.3d 149, 160 (2d Cir. 2020) (internal quotation marks omitted). The party proffering the expert bears the burden of establishing Rule 702's requirements by a preponderance of the evidence. *Id.* at 161.

The *Daubert* and Rule 702 concepts of "gatekeeping" and admissibility are ill suited for a class certification motion, which is determined by the Court. There is no admission or exclusion of testimony before a jury and no "gate" requiring threshold reliability determinations. In sum, every objection goes to the weight of the testimony. The Supreme Court has offered "limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *accord In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D 5, 28-29 (S.D.N.Y. 2020). Because of these dicta, because Rule 702 provides a useful framework for evaluating expert testimony and because the parties have filed *Daubert* motions, this Opinion briefly addresses those motions separately before turning to Plaintiffs' class certification motion.

### 1. Defendant's Motion to Preclude Snyder

**\*3** Defendant's motion to preclude Snyder is irrelevant to class certification because Snyder opines solely on whether the technical features of Defendant's Zipwhip system are consistent with the statutory definition of an ATDS. Whatever the answer may be to that merits question, it is a common question with a common answer for purposes of class certification. *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). However, because the parties intend to proceed with summary judgment motions following the resolution of class certification, Defendant's motion is addressed below.

First, Defendant's request to preclude Snyder's January 2021 report is denied as moot because Plaintiffs are relying exclusively on Snyder's June 2021 report.

Second, Defendant argues Snyder's June 2021 report is unreliable and may confuse a jury because Snyder analyzed the wrong version of the Zipwhip system. Contrary to Defendant's characterization, Snyder testified that he used only documentation applicable to the correct version when that was possible to discern, and that he reviewed and accounted for testimony by Zipwhip's CTO and Co-Founder, James Lapic in doing so. The fact that Defendant only read technical documentation and did not test the system, and that Defendant did not agree in every respect with Lapic's conclusions goes to weight, not admissibility.

Defendant's remaining arguments are similarly unavailing. Snyder's testimony that he was providing "lay" opinions meant only that his were not *legal* opinions on the meaning of the TCPA. Presumably, if Snyder had offered legal opinions, Defendant would move to preclude on that ground. Defendant's argument that courts in several other cases have precluded or criticized Snyder's testimony, without attempting to analogize to this case, is unpersuasive. Even if all seven of the cases Defendant cites were analogous in some way, Snyder's CV of hundreds of prior expert engagements is over 100 pages long. The weight of the evidence favors Plaintiffs.

In its reply, Defendant points to particular paragraphs and lines in Snyder's testimony and report and argues that they are not supported by the evidence on which Snyder relied. Because Snyder's report is not excludable in full, and none of the disputed points is relevant to the present motion, it would be premature to resolve those merits issues at this stage. Defendant may renew these arguments at summary judgment and/or in a motion *in limine. See Glasser v. Hilton Grand Vacations Co.*, 341 F. Supp. 3d 1305, 1312-13 (M.D. Fla. 2018) (addressing Snyder's opinions at summary judgment). As with Sponsler's report, discussed below, the Court will disregard any of Snyder's opinions that offer mere *ipse dixit* or legal conclusions on whether the Zipwhip system meets the legal definition of an ATDS. *See Marshall v. CBE Grp., Inc.*, No. 16 Civ. 2406, 2018 WL 1567852, at \*3 n.2 (D. Nev. Mar. 30, 2018) (disregarding similar opinions of Snyder's).

**2. Defendant's Motion to Preclude Verkhovskaya**

Defendant's motion to preclude Verkhovskaya is denied. Defendant mounts four independent arguments for preclusion. One is moot and the other three are unpersuasive.

First, Defendant moves to preclude Verkhovskaya's identification of members of the IDNC Class as unreliable. This motion is denied as moot because, as discussed below, the IDNC claims are dismissed, and the motion to certify the IDNC Class is denied.

Second, Defendant argues that Verkhovskaya's methodology to identify class members is unreliable because it has been tweaked several times, often in response to Plaintiffs' experts pointing out errors. Without resolving the parties' dispute over who is to blame for the number of reports, the fact that Verkhovskaya refined her methodology and fixed supposed problems suggests it is now more rather than less reliable. Defendant points to individual phone numbers or class members who may have been misclassified at some point, but that does not undermine the methodology. "[P]laintiffs need not precisely enumerate the class members." *Basso v. N.Y. Univ.*, 363 F. Supp. 3d 413, 421 (S.D.N.Y. 2019) (citing *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)); *see In re Petrobras Sec.*, 862 F.3d 250, 266 n.16 (2d Cir. 2017) ("Of course, identifiable does not mean identified; ascertainability does not require a complete list of class members at the certification stage." (cleaned up)).

 **\*4**  Third, Defendant argues that Verkhovskaya cannot distinguish between residential and business phone numbers, and that LexisNexis does not provide sufficiently accurate data to do so. This argument was persuasively rejected in the only case cited by Defendant. *See Chinitz v. Intero Real Est. Servs.*, No. 18 Civ. 5623, 2020 WL 7391299, at \*6 (N.D. Cal. July 22, 2020). Verkhovskaya's approach of assuming that most unpublished numbers are residential is sound for the reason Verkhovskaya gives: Most businesses publish their phone numbers because they want to bring in business, making them more likely to be found in commercial databases than non-business numbers. That this step in Verkhovskaya's methodology may be accomplished in part through manual review and is not automated is irrelevant.

Fourth, Defendant's argument that Verkhovskaya's "reverse lookup" or "reverse append" methodology is unreliable is unpersuasive. The progression of Verkhovskaya's reports shows that the need to reverse-append data has diminished as more information on the class has become available. Verkhovskaya's methodology also uses more sources than the process disapproved in *Hunter v. Time Warner Cable Inc.*, No. 15 Civ. 6445, 2019 WL 3812063, at \*10-12 (S.D.N.Y. Aug. 14, 2019), including backup sources if LexisNexis data is lacking. This methodology has withstood *Daubert* motions in other cases more analogous than *Hunter*. *See, e.g.*, *Krakauer v. Dish Network, L.L.C.*, No. 14 Civ. 333, 2015 WL 5227693, at \*11 (M.D.N.C. Sept. 8, 2015).

**3. Plaintiffs' Motion to Preclude Sponsler**

Plaintiffs' motion to preclude Sponsler's opinions is granted in part and denied in part. Plaintiffs' motion to preclude Sponsler's first opinion, on whether the Zipwhip platform is an ATDS, is granted. Assuming, without deciding, that Sponsler is qualified to opine on this issue, his opinions are not "based upon reliable data and methodology" nor will they "assist the trier of fact." *Nimely*, 414 F.3d at 397. Sponsler lists several documents that he purportedly reviewed, but there is no indication as to most that they form the basis for his ATDS opinions. Instead, most of this portion of Sponsler's report restates Lapic's characterization of the Zipwhip platform, which will not help the jury more than Lapic's testimony alone. Sponsler buttresses Lapic's testimony by describing one experience using Zipwhip. That is insufficient to show what the platform *cannot* do, and this testimony could mislead the jury. Other portions of Sponsler's report are either irrelevant history or unsupported assertions. Still other passages provide basic facts that do not require expert testimony -- e.g., that a smartphone user can input contacts into his or her phone, "select the contacts that will receive the text, and then manually send texts" -- to support policy arguments about the proper interpretation of the TCPA. Sponsler's rebuttal report is an extended legal argument that Plaintiffs' expert, Snyder,

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 105 of 116

Watson v. Manhattan Luxury Automobiles, Inc., Not Reported in Fed. Supp. (2022)

misunderstands the Supreme Court's decision in *Facebook Inc. v. Duguid.* An expert report is not the appropriate vehicle for legal argument. Sponsler's "Opinion One" is precluded in full.

Sponsler's second opinion is also precluded because it "will not assist the trier of fact." *Nimely*, 414 F.3d at 397. Sponsler opines that there is no way to determine who "received" a text message, based on the common-sense proposition that no database can tell you whether a person actually read a given text message. The opinion is improper because it seems to assert a legal proposition that a message must be "read" to be "received," and because it states an obvious factual proposition.

Plaintiffs' motion is denied to the extent Plaintiffs seek to preclude Sponsler's third opinion, which is offered to rebut Verkhovskaya's opinions. Contrary to Plaintiffs' cursory argument about Sponsler's qualifications, his extensive experience in the telemarketing industry, and specifically with the NDNCR, qualifies him to opine on the many difficulties of matching cell phone numbers to individual human beings, and on the prevalence of business phone numbers on the NDNCR. Plaintiffs' remaining arguments about whether Sponsler's opinions effectively rebut Verkhovskaya's go to their weight, not admissibility.

### B. Standing

**\*5** Neither Article III standing nor "statutory standing" is an impediment to certifying the ATDS Class and the NDNCR Class. Each of the named Plaintiffs has standing to seek relief for Defendant's alleged use of an ATDS, and Plaintiff Espinal has standing to seek relief for Defendant's alleged violation of the NDNCR regulations. *See Kachalsky v. County of Westchester*, 701 F.3d 81, 84 n.2 (2d Cir. 2012) (holding that only one named plaintiff need have standing with respect to each claim). Each of the ATDS and NDNCR classes is "defined in such a way that anyone within it would have standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). However, none of the named Plaintiffs has Article III standing to seek relief for Defendant's alleged violation of the IDNC regulations. The IDNC claims are dismissed for lack of standing, and the motion to certify the IDNC Class is denied as moot.

"Article III standing has three elements: (i) 'the plaintiff must have suffered an injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (ii) 'there must be a causal connection between the injury and the conduct complaint of'; and (iii) 'it must be likely ... that the injury will be redressed by a favorable judicial decision. *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)), *cert. denied*, 142 S. Ct. 757 (2022). Standing must be shown for each claim. *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017).

What has, in the past, "been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.' " *Irvin v. Harris*, 944 F.3d 63, 68 n.4 (2d Cir. 2019) (quoting *Am. Psych. Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016), in turn quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)). Because Defendant has framed some of its arguments about whether Plaintiffs have statutory causes of action under the old heading of "statutory standing," those arguments are addressed in this section.

### 1. The ATDS Class

As to the ATDS Class, Plaintiffs' receipt of allegedly unwanted text messages is itself injury-in-fact sufficient to confer Article III standing. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93-95 (2d Cir. 2019). The "nuisance and privacy invasion" inherent in receiving such messages were "the harms Congress identified when enacting the TCPA" and "the very injury [the TCPA] is intended to prevent." *Id.* at 93. Because Plaintiffs allegedly received unwanted text messages, "they 'need not allege any *additional* harm beyond the one Congress has identified.' " *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016)). Defendant's argument that Plaintiffs lack standing because Defendant's Zipwhip platform is not in fact an ATDS is a merits argument, not a standing challenge. *See id.* at 94 n.6 (holding that defendant's argument about "whether the text messages in question were actually sent by an ATDS" is a merits argument, not standing, and declining to address it at class certification).

Case 1:26-cv-00659-KM   Document 28-1   Filed 06/24/26   Page 106 of 116

Watson v. Manhattan Luxury Automobiles, Inc., Not Reported in Fed. Supp. (2022)

Defendant also argues that the classes cannot be certified because some class members may have consented or failed to object to receiving messages and thus lack standing. *See Denney*, 443 F.3d 253 at 264. As discussed below, Plaintiffs dispute whether the forms they signed or their failure to "opt out" constitutes "prior express consent" under the TCPA. *See* 47 U.S.C. § 227(b)(1)(B) (prohibiting certain communications "without the prior express consent of the" receiving party). Defendant's argument is, "in other words, plaintiffs were not injured because their claims are meritless." *Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018); *see Melito*, 923 F.3d at 94 n.6 (declining to address defendant's argument about "whether absent class members ineffectively revoked consent" because, though "though framed as [a] challenge[ ] to the district court's subject-matter jurisdiction, [it] actually attack[s] the merits of Plaintiffs' claims"). Defendant's argument fails because a court may not "decide the merits of the claim en route to determining its justiciability." *Dubuisson*, 887 F.3d at 574 (holding that a court must "assum[e] [plaintiffs] would be successful on the merits ... for purposes of [the] threshold jurisdictional analysis"); *see Denney*, 443 F.3d at 264 (noting that "injury-in-fact" for standing purposes "need not be capable of sustaining a valid cause of action under applicable ... law").

**\*6** Plaintiffs have met their "burden by alleging harm in the form of" text messages received from an allegedly illegal ATDS. *Dubuisson*, 887 F.3d at 575. "[T]hey have standing to pursue their ... claims irrespective of the fact that defendants propose a reading of a statute that would, if accepted, undermine the merits of plaintiffs' claims." *Id.* Even if lack of consent were necessary to have suffered an injury in fact, standing is not a barrier to class certification because Plaintiffs allege that they and class members did not consent, and the merits of Defendant's class-wide consent arguments can be resolved on a collective basis at a later stage of the litigation. *See Melito*, 923 F.3d at 94 n.6; *Denney*, 443 F.3d at 264-65; *Dubuisson*, 887 F.3d at 574-75.[1]

### 2. The NDNCR Class

Neither Article III nor "statutory" standing is a barrier to certification of the NDNCR class. Plaintiff Espinal, the only proffered representative plaintiff for this class, received unwanted text messages and therefore has Article III standing. *See Melito*, 923 F.3d at 93-95. Espinal's standing is sufficient to meet the jurisdictional requirement of Article III standing. *See Kachalsky*, 701 F.3d at 84 n.2. Even assuming consent is relevant to an NDNCR claim, which Plaintiffs dispute, consent does not defeat standing for the reasons discussed above.

Defendant argues that Plaintiffs lack "statutory standing" because one must have received more than one unwanted text message in the relevant period to bring suit under the NDNCR regulation. *See* 47 U.S.C. § 227(c)(5). This argument is unavailing because Plaintiff Espinal, the only named plaintiff offered to represent the NDNCR Class, undisputedly received more than one text message in the relevant time period. The NDNCR Class is defined to include only similarly situated persons who also received more than one message in the relevant period and therefore have a cause of action under the statute.

Defendant's other arguments that Espinal lacks a cause of action are similarly unpersuasive. That Espinal's name was not on the phone account or was not "assigned" the number is irrelevant. Espinal used the phone and received the unwanted messages. The statute provides a cause of action to "[a] person who has received" unwanted communications. *Id.* Defendant points out that a different cause of action under the TCPA arises when a party receives a phone call that they pay for, § 227(b)(1)(A)(iii), but that is irrelevant to standing, whether constitutional or "statutory," to assert an NDNCR claim. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press...."). Defendant's argument that "Espinal never objected" to receiving automated texts is meritless, since Espinal testified that he registered with the NDNCR. Defendant asserts that Espinal does not have "documentation that he registered with the NDNCR," but Espinal's sworn testimony is sufficient evidence of his registration at this stage.

### 3. The Putative IDNC Class

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 107 of 116

Watson v. Manhattan Luxury Automobiles, Inc., Not Reported in Fed. Supp. (2022)

Turning to the IDNC class, Plaintiffs have failed to show that any injury they suffered is traceable to a violation of the IDNC rules. The TCPA and its regulations prohibit solicitations unless the "entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that ... entity." 47 C.F.R. § 64.1200(d). Defendant asserts, and Plaintiffs do not dispute, that no Plaintiff ever requested not to receive messages "made by or on behalf of" Defendant prior to receiving a message. Thus, even if Defendant had complied perfectly with the IDNC provision of the TCPA, Plaintiffs still would have received those messages. Plaintiffs' injuries are thus not traceable to that violation, and Plaintiffs lack standing to bring this claim. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271-72 (11th Cir. 2019).

**\*7** Plaintiffs' request that their IDNC claims be remanded to state court and not dismissed is denied because the Court lacks statutory authority to remand. "An ordinary reading of" 28 U.S.C. § 1447(c)[2] "indicates that the statute refers to an instance in which a federal court 'lacks subject matter jurisdiction' over a 'case,' and not simply over one claim within a case." *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 392 (1998). Section 1447(c) is not most naturally read to authorize severance and remand of individual claims, particularly in light of the specific grant of authority in § 1441(c) to "sever" unremovable claims and "remand the severed claims" at the time of removal. *See City of Almaty v. Ablyazov*, No. 15 Civ. 5345, 2021 WL 1180058, at *6 (S.D.N.Y. Mar. 29, 2021). The IDNC claims are dismissed for lack of standing, and the motion to certify the IDNC Class is denied as moot. Because the IDNC claims fail for lack of Article III standing, it is unnecessary to consider Defendant's statutory standing arguments.

### C. Class Certification

Federal Rule of Civil Procedure 23(a) provides that plaintiffs may sue on behalf of a class where:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Where class certification is sought pursuant to Rule 23(b)(3), a plaintiff must also show (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Second Circuit recognizes " 'an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.' " *Petrobras*, 862 F.3d at 260 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)); *accord Basso*, 363 F. Supp. 3d at 420.

Courts give Rule 23 a "liberal rather than restrictive construction, and courts are to adopt a standard of flexibility." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (citation omitted); *accord B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17 Civ. 2738, 2021 WL 234550, at *9 (E.D.N.Y. Jan. 19, 2021). Plaintiffs must establish by a preponderance of the evidence that Rule 23's requirements are met. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 264 (2d Cir. 2016); *accord In re Perrigo Co. Sec. Litig.*, 493 F. Supp. 3d 291, 294 (S.D.N.Y. 2020).

Plaintiffs' motion to certify the IDNC Class is denied for lack of standing as discussed above, and Plaintiffs' motion to certify the ATDS and NDNCR Classes is granted for the reasons discussed below.

### 1. Class Redefinition

Plaintiffs' decision to seek certification of a different class than proposed in the Amended Complaint is not a reason to deny certification. The Court's authority to reform the class and create subclasses on its own motion, or to permit Plaintiffs to redefine their own class(es), is well-settled. *See, e.g.*, *Royal Park Invs. SA/NV v. Bank of N.Y. Mellon*, No. 14 Civ. 6502, 2017 WL 3835339, at *5 (S.D.N.Y. Aug. 30, 2017).

Revising the class definition after *Daubert* motions were briefed has not caused any prejudice to Defendant, since the reliability of Plaintiffs' experts' opinions is independent of the merits of their class certification arguments. This is particularly true here where many of the opinions at issue pertain to the merits and are irrelevant to class certification.

### 2. Ascertainability

**\*8** Defendant frames its argument about identification of class members in terms of ascertainability, but it does not dispute that the class is defined "by objective criteria." *Petrobras*, 862 F.3d at 264 (internal quotation marks omitted). Whether a class member received a text message containing certain content during a particular time period is an objective inquiry. To the extent Defendant argues that the members of the putative classes have not already been ascertained, that is not required at the class certification stage. At this stage, class members must be identifiable but need not have been identified. *Id.* at 266 n.16. To the extent Defendant argues that objective determinations of class membership will require individualized inquiries, as opposed to Verkhovskaya's class-wide approach, that argument goes to predominance, as discussed below. *See id.* at 268.

### 3. Predominance

As discussed above, Defendant argues that Verkhovskaya's purportedly common, class-wide method of identifying class members fails. Defendant also points to two other purportedly individual issues that predominate over common issues: consent and the identity of the person who actually registered their phone number with the NDNCR. As explained below, these arguments are unpersuasive. The many common issues -- including whether the Zipwhip system is an ATDS, whether messages of the form that define the class are solicitations and whether class members' common acts constitute effective across-the-board consent -- predominate over what are speculative individual issues.

### a. Class Member Identification

Defendant's argument that individual inquiries will be required to identify class members is unsuccessful for the same reason as Defendant's *Daubert* motion to preclude Verkhovskaya. Courts have repeatedly approved the use of LexisNexis's phone number databases for reliably identifying business numbers, which are especially likely to be associated publicly with their owners. *See Chinitz*, 2020 WL 7391299, at \*14 (collecting cases). Once business phone numbers are weeded out, it is common sense to label the remaining numbers "most likely residential." As discussed above, it is doubtful whether the "reverse append" process remains relevant at all. The full class lists produced by Defendant and a third party obviate the need to reverse-append class members' names to numbers. To the extent Verkhovskaya's methodology will still require some reverse-appending, it is more robust than the LexisNexis-only methodology criticized by other courts. *Cf. Hunter*, 2019 WL 3812063, at \*10-12.

### b. Consent

Defendant argues that individualized inquiries will be required to determine whether each class member consented to receive text messages. The parties agree that consent is a defense to an alleged violation of the TCPA's ATDS provision. That provision prohibits certain calls made using an ATDS only "without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B). Plaintiffs dispute whether consent is also a defense to an NDNCR violation, which contains no similar language. Even assuming consent is a defense to liability under any of Plaintiffs' surviving claims, it does not preclude a finding of predominance. Defendant makes two potentially viable consent arguments. Neither requires individualized inquiries, and both can be resolved with class-wide evidence.

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 109 of 116

Watson v. Manhattan Luxury Automobiles, Inc., Not Reported in Fed. Supp. (2022)

First, Defendant argues that certain class members signed two forms by which they purportedly consented to receive texts: a contact authorization form and a privacy notice and acknowledgment. Those forms were signed by every person who purchased or leased a vehicle from HOM, including named Plaintiffs Watson, Espinal, Samarghitan and Greene. Because every class member in that category signed the same forms, the legal issue of whether those signatures support a consent defense and whether that consent transferred to Defendant can be adjudicated with common proof.

**\*9** Second, Defendant argues that even class members who did not sign those forms, such as Plaintiff Jackson, had the opportunity to opt out in response to a text or email. When HOM closed, it texted and emailed its customers, including those who did not purchase or lease vehicles from HOM but only received service, to let them know that Defendant could still service their vehicles. Those texts and emails offered an opportunity to opt out. Defendant asserts that it then sent further messages only to those customers who did not opt out. The legal issues of whether failure to opt out constitutes consent again can be litigated on a common basis because every class member received the same opportunity to opt out.

Plaintiffs suggest creating two sub-classes within the ATDS Class according to the type of purported consent given. Plaintiffs do not suggest the same approach for the NDNCR Class because Plaintiffs argue that consent is not a defense to an NDNCR claim. The issue of subclasses need not be resolved now. Whether applied to one or both classes, adjudicating two class-wide consent defenses will be manageable.

Defendant suggests two other forms of consent that lack legal merit. First, Defendant suggests that some customers have a "preexisting business relationship" with HOM. Defendant has not offered any examples or suggested what kind of relationship a customer might have with her car dealership that would constitute a defense. Second, Defendant suggests that a class member might have consented merely by providing his phone number to HOM. Even if consent were implied by providing one's phone number (which seems unlikely), that theory would be superfluous here. If one of Defendant's theories above involving more explicit consent has merit, Defendant has established consent as to that group of class members. If those more explicit consent theories lack merit, then merely sharing one's number necessarily does not suffice. In any case, the Court will not need to consider, for any class member, whether disclosing one's phone number alone constitutes consent.

### c. NDNCR Registration

Whether each class member registered their number on the NDNCR is irrelevant, so that issue cannot predominate over common issues. Defendant suggests that a class member might have inherited a phone number that is registered on the NDNCR by a prior user of that number. That would not affect that class member's entitlement to relief. The NDNCR regulation provides that, once a phone number is registered, it remains protected until it is affirmatively removed from the registry. Several other courts have found "no reason that the private right of action should be limited only to those who can list their numbers on the registry." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019); *see Chinitz*, 2020 WL 7391299, at \*14 ("[Defendant] has provided no basis for its argument that the subsequent call to a number listed on the NDNCR must be to the person who registered the number on the NDNCR.").

Defendant claims that only a person who registered his or her number on the NDNCR can assert a claim under relevant TCPA regulations, and a person whose number was registered by someone else cannot. In support of its reading, Defendant relies on the language of the regulation prohibiting solicitations to a person "who has registered his or her telephone number on the" NDNCR. 47 C.F.R. § 64.1200(c)(2). Defendant's reading does not account for the language that appears immediately after, which provides that "[s]uch do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*; *see Williams v. PillPack LLC*, No. C19-5282, 2021 WL 535215, at \*8 (W.D. Wash. Feb. 12, 2021), *class decertified on other grounds*, 2021 WL 5113467. That provision anticipates the issue Defendant raises, that as phone numbers change hands, the NDNCR may not always perfectly reflect which consumers requested to be included. To resolve the potential ambiguity about who is protected from unwanted calls, the regulation provides that numbers remain protected until they are removed, regardless of whether they "should" still be on the

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 110 of 116

list. The regulation lists two events that result in a phone number no longer being protected – cancellation by the consumer and removal by the administrator -- and the reassignment of a number is not such an enumerated event.

### 4. Fail-safe Class

**\*10** "A fail-safe class requires a court to decide the merits of individual class members' claims to determine class membership." *Nypl v. JP Morgan Chase & Co.*, No. 15 Civ. 9300, 2022 WL 819771, at \*9 (S.D.N.Y. Mar. 18, 2022). Fail-safe classes are "defined in terms of a legal injury" and "beg[ ] the very legal question at issue in the case." *Lawrence v. NYC Med. Prac., P.C.*, No. 18 Civ. 8649, 2021 WL 2026229, at \*6 (S.D.N.Y. May 20, 2021) (cleaned up). Courts decline to certify fail-safe classes because they "are unfair to defendants, prevent an adverse judgment being entered against plaintiffs, and are unmanageable." *Id.* (cleaned up).

The ATDS Class is not a fail-safe class. The ATDS Class includes customers who received "any text messages from" Defendant "using the Zipwhip texting platform" with certain content during a specified period. None of the key liability issues are baked into that class definition, such as whether the Zipwhip platform is an ATDS, whether the messages at issue constituted solicitations or whether class members' conduct constituted consent. Class membership can be determined before any of those questions are adjudicated. If Defendant wins on any or all of those questions, all class members will be bound to that adverse judgment. Defendant's remaining "fail-safe" arguments are simply merits arguments that are premature.

### 5. Commonality and Typicality

Typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *accord Dixon v. Bemis*, Nos. 19 Civ. 3356, 19 Civ. 3412, 2020 WL 7212082, at \*3 (S.D.N.Y. Mar. 10, 2020). In order to be typical, however, "the lead plaintiff's claims need not be identical to the claims of the class...." *Dixon*, 2020 WL 7212082, at \*3 (cleaned up). Defendant's argument that the named Plaintiffs may be subject to unique Article III standing and consent defenses is unpersuasive because, as discussed above, Defendant asserts those defenses against all ATDS Class members on identical grounds. Defendant's argument that Espinal's claims are atypical of the NDNCR Class because he is only the user and not the accountholder for his phone also is unsuccessful. The alleged injury that Espinal and every other class member suffered is *receiving* text messages, not paying for them. *See Melito*, 923 F.3d at 93-95. Defendant has not asserted any meritorious defense based on Espinal's supposed atypicality, so any differences between him and other class members are immaterial.

The commonality requirement is satisfied if questions "capable of classwide resolution" will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Johnson*, 780 F.3d at 137 (quoting *Wal-Mart*, 564 U.S. at 350). As discussed above, common issues include whether Defendant sent solicitations and whether class members provided across-the-board consent. Those issues are central enough to predominate over individual issues, so the commonality requirement necessarily is satisfied as well. *See Johnson*, 780 F.3d at 138 ("Rule 23(b)(3)'s predominance requirement is 'more demanding than Rule 23(a).' ").

### 6. Adequacy & Class Counsel

Defendant's arguments that the Zemel firm cannot adequately represent the class are unpersuasive. Defendant fails to explain why a "conflict" exists because the Zemel firm solicited Plaintiffs or why counsel's and Plaintiffs' interests may not be aligned in this litigation. Especially if Defendant is correct that this action is largely lawyer-driven, then it appears that Plaintiffs' counsel have done extensive work "in identifying or investigating potential claims in the action." Fed. R. Civ. P. 23(g)(1)(A)(i).

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 111 of 116

Watson v. Manhattan Luxury Automobiles, Inc., Not Reported in Fed. Supp. (2022)

**\*11** Plaintiffs' counsel have been appointed as class counsel many times before. They have extensive experience representing consumers and deep, specialized knowledge of the law in TCPA cases. *See* Fed. R. Civ. P. 23(g)(1)(A)(ii), (iii). That counsel's extensive TCPA experience and extensive class action experience have not yet overlapped does not diminish their competence. Nor does the fact that Plaintiffs' counsel have yet to be appointed class counsel in a case in New York. Defendant has given no reason to question counsel's sworn declarations that they will continue to commit the resources required to prosecute this case. *See* Fed. R. Civ. P. 23(g)(1)(A)(iv).

Plaintiffs' motion to appoint class counsel is granted, and Plaintiffs' counsel from Zemel Law LLC are appointed to serve as class counsel.

### 7. Superiority

Defendant argues that "[t]he superiority requirement is not met here for the same reasons that Plaintiffs cannot show predominance or commonality." That argument is rejected for the same reasons Defendant's predominance and commonality arguments are rejected above. "Courts routinely hold that a class action is superior where," as here, "potential class members are aggrieved by the same policies and the damages suffered are small relative to the expense and burden of individual litigation." *Clark v. City of New York,* No. 18 Civ. 2334, 2021 WL 603046, at \*6 (S.D.N.Y. Feb. 16, 2021) (cleaned up). A class action is "superior to other available methods for fairly and efficiently adjudicating" this controversy as well. Fed. R. Civ. P. 23(b)(3).

### III. Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED in part and DENIED in part. Plaintiffs' motion is GRANTED as to the ATDS Class and the NDNCR Class, and Plaintiffs' motion is DENIED as to the IDNC Class. The IDNC claims in the Amended Complaint are DISMISSED for lack of Article III standing. Plaintiffs' motion to appoint the Zemel Law Firm as class counsel is GRANTED. It is hereby ORDERED that

(1) Plaintiffs are appointed class representatives to sue on behalf of the ATDS Class of all HOM customers within the United States that were sent any text messages from Defendant, using the Zipwhip texting platform, stating "Can I text you regarding maintenance of your Honda vehicle" or a similar variant thereof, to nonbusiness wireless telephone numbers, within four years of the filing of this action.

(2) Plaintiff Espinal is appointed the class representative to sue on behalf of the NDNCR Class of all HOM customers within the United States that were sent two or more text messages from Defendant within a 12 month period, using the Zipwhip texting platform, stating "Can I text you regarding maintenance of your Honda vehicle" or a similar variant thereof, to non-business wireless telephone numbers, whose telephone numbers were registered on the NDNCR more than thirty-two days before the first message was sent, within four years of the filing of this action.

(3) Zemel Law LLC is appointed class counsel for both classes.

(4) The parties shall confer as to Notice and any proposed Class Action Notice Administration form, and Plaintiffs shall submit a proposed form of Class Notification to the Court for review and approval within twenty-one days of this Order.

Plaintiffs' motion to preclude Sponsler's first and third opinions is GRANTED to the extent stated above and otherwise DENIED. Defendant's motion to preclude Verkhovskaya's opinion is DENIED, and Defendant's motion to preclude Snyder's opinion is DENIED without prejudice to renewing arguments for precluding or disregarding specific opinions at later stages of the case.

**\*12** Defendant's motion to strike certain statements from Plaintiffs' letter at Docket Number 177 and Plaintiffs' motion to strike certain of Defendant's exhibits are both DENIED as moot. This Opinion does not rely upon the materials that are the subject of these motions.

The Clerk of Court is respectfully directed to close the motions at Docket Number 139, 147, 164 and 186.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4586407

Footnotes

1    Defendant's other standing argument -- that class members might have received messages to a business phone number -- is incorrect. Each class expressly excludes business numbers. Apart from its arguments about Article III standing, Defendant does not separately argue that Plaintiffs lack "statutory standing" to pursue ATDS claims.

2    "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

---

**End of Document**                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM   Document 28-1   Filed 06/24/26   Page 113 of 116

Wilson v. Quest Diagnostics, Incorporated, Not Reported in Fed. Supp. (2019)

🚩   KeyCite Yellow Flag

Distinguished by Holton v. Finley, M.D.Pa., April 14, 2022

2019 WL 7560932
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Judy WILSON, on behalf of herself and all others similarly situated, Plaintiff,

v.

QUEST DIAGNOSTICS, INCORPORATED, Defendant.

Civil Action No. 18-11960 (WJM)
|
Signed 08/22/2019

**Attorneys and Law Firms**

Andrew Joseph Obergfell, Bursor & Fisher PA, New York, NY, for Plaintiff.

Michael T. Hensley, Jorkeell Echeverria, Bressler Amery & Ross, PC, Florham Park, NJ, for Defendant.

## ORDER

MARK FALK, Chief U.S. Magistrate Judge

 **\*1  THIS MATTER** having come before the Court by way of Defendant's motion to stay the case, or in the alternative, bifurcate discovery [ECF No. 23]; and the Court having considered the papers in support of and in opposition to the motion; and for the reasons stated below, Defendant's motion is **DENIED**.

## IT APPEARING THAT:

**1.** On July 23, 2018, Plaintiff, Judy Wilson, filed a putative class action complaint alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). Plaintiff claims that Defendant called on her cellular telephone, using an automatic telephone dialing system ("ATDS"), about a debt. However, Plaintiff alleges that she does not owe a debt to Defendant, is not a customer of Defendant, and has never provided Defendant with consent to call her. Plaintiff's Complaint seeks to certify a nationwide class, alleging that Defendant has a pattern and practice of autodialing consumers who have not provided consent.

**2.** On August 14, 2018, Defendant filed a pre-answer motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6).

**3.** On August 31, 2018, Plaintiff filed an Amended Complaint. In response, Defendant filed a motion to dismiss the amended complaint on September 10, 2018. The crux of Defendant's motion was that Plaintiff's Amended Complaint failed to state a claim because Plaintiff had not sufficiently pleaded facts alleging that Quest called her cellphone using an ATDS.

**4.** On December 17, 2018, the Honorable William J. Martini, U.S.D.J., denied Defendant's motion to dismiss. Judge Martini expressly found that Plaintiff had sufficiently pleaded the use of an ATDS. (Opinion at 5; ECF No. 14.) Judge Martini also commented on the need for discovery to proceed in this case, noting that "[d]uring discovery, the parties can explore the actual configuration of the dialing equipment used to call Plaintiff," and that "[w]ith the benefit of discovery as to the type of equipment Quest used and the nature and extent of Quest's contacts with Plaintiff, the case will be well postured to assess Quest's conduct

under the TCPA." Judge Martini concluded the Opinion stating "[t]he Court will thus unlock the doors of discovery." (*Id.*; quotations omitted).

**5.** On January 29, 2019, the Undersigned issued an Order scheduling an initial conference.

**6.** On February 8, 2019, Defendant filed a formal motion seeking to stay the case. As an alternative to a stay, Defendant seeks to bifurcate discovery and focus on the issue of Plaintiff's "consent." (ECF No. 23.) Defendant contends that the FCC is engaged in notice and comment rulemaking on the issue of whether certain equipment qualifies as an ATDS – equipment they claim is at issue in this case – and thus, could impact Plaintiff's ability to bring a claim. In the alternative, Defendant wants to bifurcate discovery to focus solely on the issue of Plaintiff's consent. Defendant contends that Plaintiff's husband provided the phone number that was called in this case, and that he is a "customary" user of the phone, which it claims equates to consent under the TCPA.

 **\*2  7.** Plaintiff opposes the motion to stay and/or bifurcate. She contends that the FCC process is lengthy and could drag on for months or years without resolution. Moreover, Plaintiff contends that, since there has been no discovery on the subject of what dialing equipment Defendant used, the equipment might constitute an ATDS regardless of the FCC's interpretation. Finally, Plaintiff opposes bifurcation on the grounds that whether her husband used her cell phone or not, consent is not implied and she is the only person with the authority to consent, which she did not do. She also contends that bifurcation will delay the case, cause discovery inefficiency and disputes, and result in duplication, such as deposing Plaintiff twice.

**8.** On July 3, 2019, while the motion to stay and/or bifurcate was pending, Defendant filed a motion for reconsideration of Judge Martini's decision on the motion to dismiss. Plaintiff opposes reconsideration as both untimely and substantively deficient.

**9.** Defendant seeks a stay of the case pursuant to (1) the Court's inherent authority; and (2) the primary jurisdiction doctrine.

A stay pursuant to the Court's inherent authority is completely discretionary. *See, e.g.*, *Bechtel Corp. v. Local 215 Laborers' Int'l Union of N.A.*, 544 F. 2d 1207, 1215 (3d Cir. 1976). Deciding whether to stay a case requires "an exercise in judgment, which must weigh competing interests and maintain an even balance." *Landis v. North Am. Co.*, 299 U.S. 248, 255-56 (1936). Considerations generally include: the hardship to the moving party should the case proceed; the potential prejudice to the non-moving party; the length of the requested stay; the similarity of issues; and judicial economy. *See, e.g.*, *Ford Motor Credit v. Chiorazzo*, 529 F. Supp. 2d 535, 542 (D.N.J. 2008).

With respect to the primary jurisdiction doctrine, courts in the Third Circuit consider the following factors when determining whether the doctrine applies: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *See* *Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 691 (3d Cir. 2011).

**10.** Requests to bifurcate discovery are controlled by Rule 42(b). *See, e.g.*, *Cephalon, Inc. v. Sun Pharm., Indus., Ltd.*, 2013 WL 3417416, at \*2 (D.N.J. Aug. 31, 2016). "Bifurcation is the exception and the moving party bears the burden of demonstrating that bifurcation is needed." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 2016 WL 4541870, at \*2 (D.N.J. Aug. 31, 2016). "Whether the advantages of bifurcation outweigh the disadvantages is a factual inquiry assessed on a case by case basis." *Id*. As a practical matter, bifurcation of discovery in this District, which is in a serious judicial emergency, is extremely rare, since bifurcation often delays cases and leads to serial motion practice.

**11.** Defendant's motion to stay is **denied**. At the outset, the parties' briefs read like briefs on the merits of the case. However, Defendant already had an opportunity to make a pre-answer motion to dismiss and it did not prevail. Indeed, Judge Martini's decision expressly states that the Court is "unlock[ing] the doors of discovery." We are now at the discovery stage; disagreement

with a pre-answer decision is no basis to seek to stay the case and hope that intervening events from the FCC change its course. Putting that aside, consideration of the traditional factors do not support a stay in this case.

**\*3 12.** There is no basis for a stay under the primary jurisdiction doctrine.

First, determining what constitutes an ATDS is something that courts routinely consider and decide, and is well within the "conventional" role of judges. Case law supporting this view is expansive. *See, e.g.*, *Baum v. ADT, LLC*, 2018 WL 5255219, at \*3 (W.D. Pa. Oct. 22, 2018); *Grogan v. Aaron's Inc.*, 2018 WL 6040195, at \*7 (N.D. Ga. Oct. 26, 2018); *Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at \*3 (N.D. Cal. July 2, 2018); *Bieler v. GC Servs. L.P.*, 2014 WL 5531169, at \*3 (M.D.N.C. Nov. 3, 2014). Thus, the first primary jurisdiction factor does not support a stay.

Second, while the parties agree that what constitutes an ATDS is within the FCC's discretion, that does not mean that this case is a ripe for a stay. As cited with respect to factor one, judges are routinely called upon to, and do, decide what constitutes an ATDS. *See, e.g.*, *Grogan*, 2018 WL 6040195, at \*7 ("While it is beyond cavil that the issues implicated in this case ... fall within the FCC's purview, that does not lead to the inexorable conclusion that they are beyond ... this Court to analyze and adjudicate, even in the absence of binding regulatory guidance from the FCC."). Nothing about this case suggests that is an exceptional case that warrants abstention on primary jurisdiction grounds.

Third, the risk of inconsistent rulings does not require a stay. The case is already more than a year old and no discovery has taken place. There is no certainty with respect to when the FCC will issue anything, and even if something was issued soon, it would still be subject to further appeals and proceedings. Thus, while some risk of inconsistent determinations is theoretically conceivable, it is not definite enough as to warrant halting TCPA litigation and waiting an undetermined period of time for the FCC to issue guidance and then for that guidance to be further challenged. *See, e.g.*, *Grogan*, 2018 WL 6040195, at \*8 ("While the Court is mindful that a concrete pronouncement from the FCC would prove beneficial in navigating the turbulent waters that lie ahead, neither is the Court willing to stay this matter for what could end up being years."). Moreover, as Plaintiff notes, it's "wholly possible" that Defendant's system could constitute an ATDS regardless of any future FCC guidance.

Finally, Defendant has not itself made an application to the FCC, which the majority of Courts generally deem necessary for the final factor to weigh in favor of a stay. *See, e.g.*, *Demmick v. Cellco Partnership*, 2011 WL 1253733, at \*6 (D.N.J. Mar. 29, 2011).

**13.** The Court also declines to stay this case pursuant to its inherent authority. First, Defendant has not established any prejudice that will result from proceeding with the case. Defendant had the benefit of a stay of discovery while its motion to dismiss was pending - and the case is now more than year old. Judge Martini denied the motion to dismiss and directed discovery to proceed. It is time to proceed with the case. To the extent Defendant claims that Plaintiff's discovery demands themselves are burdensome or disproportionate or expensive, that can be addressed pursuant to the discovery rules, *see* Fed. R. Civ. P. 26; it is not, however, a basis to avoid discovery altogether. Nor does engaging in balanced and appropriate discovery constitute any prejudice.

**\*4** Second, there is likely prejudice to the non-moving party. The case has been pending for a fairly lengthy period of time with no discovery. The longer the case sits dormant, the longer the wait for the case to be decided on the merits.

Third and Fourth, the length of the stay and judicial economy are addressed together – and neither supports a stay. The period of stay sought here could be lengthy. No one knows when the FCC may act. It could be many months, and with no certainty whatsoever that what the FCC does will affect this case. It certainly may not be binding. At the same time, Plaintiff will be precluded from discovery, and the case will potentially be years away from trial.

**14.** Bifurcation would be inefficient and contrary to judicial economy. Bifurcation of discovery is a discretionary matter that is considered on a case-by-case basis. Here, no special basis for bifurcation has been shown. Defendant contends that the issue of consent could be dispositive of the case and thus should proceed first. However, that position is untenable and unfair. The Court should not allow one side to pick one defense of its choosing, limit discovery to that issue, and then presumably try a summary

Case 1:26-cv-00659-KM    Document 28-1    Filed 06/24/26    Page 116 of 116

judgment motion. Both sides have a right to discovery. Further, if the ensuing summary judgment motion was denied, the case would just be starting and there would likely be subsequent rounds of dispositive motion practice – a completely impractical approach. Also, Defendant's argument that considering its chosen issue first would dispose of the case could be (and often is) made in every case. However, allowing that approach to case management would not only be unfair to plaintiff, it would wreak havoc on the docket, extending resolution of cases for years. For example, following a motion on the consent issue, one would assume Defendant (and perhaps Plaintiff) would seek to make additional, merits-based summary judgment motions after the close of fact discovery. Generally, one round of summary judgment motions following the close of discovery is the Court's practice. And nothing in this case suggests that it is unique or different such that it should be permitted two different dispositive motions before any discovery is taken. For that reason, bifurcation will only delay the disposition of the entire case, and therefore, is contrary to judicial economy.

**FOR THE REASONS STATED ABOVE**,

**IT IS on this 22nd day of August 2019,**

**ORDERED** that, Defendant's motion to stay, or in the alternative to bifurcate discovery [ECF No. 23] is **DENIED**. The parties are directed to confer and submit a joint discovery plan within 14 days.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7560932

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.