Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 1 of 103

2021 WL 2323282
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Todd C. BANK, Plaintiff,

v.

GOHEALTH, LLC, Defendant.

19 CV 5459 (MKB) (CLP)
|
Signed 03/08/2021

**Attorneys and Law Firms**

Todd C. Bank, Law Office of Todd C. Bank, Kew Gardens, NY, for Plaintiff.

Danielle C. Zolot, Davis & Gilbert LLP, New York, NY, John W. McGuinness, Manatt, Phelps & Phillips, Washington, DC, for Defendant.

### REPORT AND RECOMMENDATION

POLLAK, Chief United States Magistrate Judge:

**\*1** On September 25, 2019, plaintiff Todd C. Bank, proceeding pro se, commenced this action against defendant GoHealth, LLC, pursuant to the Telephone Consumer Protection Act ("TCPA"), 🚩47 U.S.C. § 227, and 🚩New York General Business Law ("GBL") § 399-p. Currently pending before this Court on referral from the Honorable Margo K. Brodie, Chief United States District Judge, is defendant's motion to dismiss the plaintiff's Second Amended Complaint. Also pending before this Court is plaintiff's motion seeking sanctions against defendant's counsel.

For the reasons set forth below, it is respectfully recommended that defendant's motion to dismiss be granted and that plaintiff's motion for sanctions be denied.

### FACTUAL BACKGROUND

Plaintiff Bank, an attorney proceeding pro se, brings this action against defendant GoHealth, LLC ("GoHealth"), alleging that defendant is a "lead-generation business" that sells consumer leads to health-insurance agents and brokers. (Am. Compl. [1] ¶ 17). According to plaintiff, defendant employs the GoHealth Virtual Marketing Organization, or "GoHealth VMO," to generate leads, through the use of a "BrokerDialer," an " 'automatic dialer tool that calls prospects and quality leads.' " (Id. ¶ 19).

Plaintiff alleges that on August 19, 2019, while he was in the Eastern District of New York, he received a telephone call (the "Call") at a residential telephone number, which plaintiff alleges he regularly shared with the subscriber of the phone. (Id. ¶¶ 20, 25-28). According to the Complaint, the caller identification that appeared was "Wireless Caller, xxx-xxx-xxxx," which plaintiff alleges was fabricated. (Id. ¶¶ 21, 22). Plaintiff alleges that the caller identification was made to appear as if the call was a local call, in order to cause the person receiving the call to be more likely to answer it, a practice alleged to be called "neighborhood spoofing." (Id. ¶¶ 23, 24). Plaintiff claims that when he answered the Call, a voice that sounded "robotic," claimed to offer discounts for "Medicare Supplement," also called "Medigap." (Id. ¶¶ 29, 30).

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 2 of 103

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

Plaintiff attempted to speak to the voice, but it did not respond. (Id. ¶ 31). According to plaintiff, after the recording was played, plaintiff was transferred to an individual who identified himself as "Jason." (Id. ¶ 34). When plaintiff told Jason that he had Medicare Parts A and B, he was transferred to another individual who identified himself as "Marc." (Id. ¶ 36). After plaintiff gave Marc a fake name, he was transferred to a "licensed agent," and while on hold waiting for the transfer, a recording indicated that he might be placed in touch with an agent "who is not affiliated with GoHealth to reduce your weight." (Id. ¶¶ 39, 40, 41). The message gave GoHealth's number and indicated that if the caller wished to be placed on GoHealth's do-not-call list, the caller should contact that number, which plaintiff alleges is GoHealth's phone number. (Id. ¶¶ 41, 42).

 **\*2**  The Complaint further alleges that after a minute on hold, a third live person named Jared came on the phone and told plaintiff that he was a licensed agent of GoHealth. (Id. ¶¶ 45, 54). Jared took plaintiff's email address and, approximately one minute after the Call ended, plaintiff received an email from Jared. (Id. ¶¶ 53, 60, 61). On August 19, 2019, plaintiff sent an email to Jared asking how he had gotten plaintiff's number, to which Jared replied that plaintiff must have filled out something online. (Id. ¶¶ 62-64).

Plaintiff seeks to represent two separate classes of similarly situated persons – the "New York Class," which encompasses a period beginning three years prior to the commencement of this action, and the "Federal Class," which encompasses a period beginning four years prior to the commencement of this action. Plaintiff alleges that during the respective class periods, GoHealth initiated numerous telephone calls to residential telephones, using a prerecorded voice to encourage the purchase of services provided by GoHealth. (Id. ¶ 65). Plaintiff alleges that there was no written consent given prior to these telephone calls being made. (Id. ¶ 67). Plaintiff further alleges that the calls were made using equipment designed to disseminate a prerecorded message without the use of an operator. (Id. ¶ 68). The recorded message did not state the name, address, or phone number of the person on whose behalf the calls were placed. (Id. ¶¶ 69-71).

The Complaint alleges two causes of action: 1) a claim for statutory and injunctive relief on behalf of the Federal Class, based on GoHealth's alleged violation of 47 U.S.C. § 227(b)(1) (First Cause of Action); and 2) a claim for damages and injunctive relief on behalf of the New York Class, based on GoHealth's alleged violation of New York General Business Law § 399-p(3)(a) (Second Cause of Action). (Id. ¶¶ 72-81).

PROCEDURAL HISTORY

Following the commencement of this action on September 25, 2019, defendant requested a pre-motion conference on November 22, 2019, seeking permission to file a motion to dismiss or strike certain allegations in plaintiff's Complaint. (ECF No. 12). Thereafter, during the course of briefing the motion, plaintiff filed an Amended Complaint on February 5, 2020 attempting to address certain deficiencies in the pleadings. (ECF No. 16). On February 19, 2020, plaintiff filed a second Amended Complaint (ECF No. 18), which is the operative pleading at issue in this motion to dismiss.

Defendant moves to dismiss the plaintiff's Second Amended Complaint on several grounds. First, defendant contends that plaintiff lacks standing to bring a claim under the Telephone Consumer Protection Act; and second, that the Complaint fails to state a plausible claim under the TCPA. With respect to the claim asserted under the GBL, defendant argues that the claim is conclusory, plaintiff lacks standing to bring a GBL claim, and, in any event, the Court should decline to exercise jurisdiction over the state law claim if the TCPA claim is dismissed.

DISCUSSION

I. Defendant's Motion to Dismiss for Lack of Standing

### A. Legal Standard: Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendant moves to dismiss plaintiff's Second Amended Complaint for lack of federal subject matter jurisdiction, arguing that plaintiff fails to plead facts sufficient to establish Article III standing.

In determining whether there is subject matter jurisdiction over a claim, the court must examine whether the complaint states "a right to recover under the laws of the United States." Goldman v. Gallant Sec., Inc., 878 F.2d 71, 73 (2d Cir. 1989) (per curiam) (citing Bell v. Hood, 327 U.S. 678, 681 (1946)). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d 381, 386-86 (E.D.N.Y. 2007).

**\*3** When considering a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the court must "accept as true all material factual allegations in the complaint." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citations omitted); see also Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d at 387; Country Rock Cafe, Inc. v. Truck Ins. Exch., 417 F. Supp. 2d 399, 402 (S.D.N.Y. 2006). While the court will " 'draw all reasonable inferences in favor of plaintiff,' " Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d at 387 (quoting Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) (quoting Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000))), the plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Makarova v. United States, 201 F.3d at 113; Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996).

In analyzing subject matter jurisdiction under Rule 12(b)(1), the court must "give the plaintiff's factual allegations closer scrutiny" than it would in the context of a motion to dismiss pursuant to Rule 12(b)(6), "[b]ecause subject-matter jurisdiction focuses on the court's power to hear the claim." Physicians Comm. For Responsible Med. v. U.S. Envtl. Prot. Agency, 451 F. Supp. 2d 223, 228 (D.C. Cir. 2006) (citing cases). The court is "not limited to the allegations contained in the complaint," id. at 228, and may consider materials outside the pleadings to resolve disputed jurisdictional facts. Makarova v. United States, 201 F.3d at 113; Country Rock Café, Inc. v. Truck Ins. Exch., 417 F. Supp. 2d at 402. See also Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (holding that a court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts").

### 1. Article III Standing

One component of the Article III jurisdictional limit of federal courts to decide "cases" or "controversies" is the concept of standing. Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 85 (2d Cir. 2006). "The Supreme Court has called Article III standing 'perhaps the most important' of the case-or-controversy doctrines placing limits on federal judicial power." Id. (quoting Allen v. Wright, 468 U.S. 737, 750 (1984)). A district court must "generally resolve material factual disputes and establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits." Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d at 85 (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998)). Challenges to standing are properly brought as a motion under Rule 12(b)(1), rather than a motion for dismissal under Rule 12(b)(6) because a determination that there has been a failure to state a claim "is an adjudication on the merits with preclusive effect." Id. at 88, n.6 (citing cases).

Defendants may make a facial challenge to the plaintiff's Article III standing that accepts the jurisdictional facts pleaded, but contests their sufficiency, or they may make a factual challenge, in which case the court has "leeway as to the procedure it wishes to follow." Id. at 88 (citing Gibbs v. Buck, 307 U.S. 66, 71-72 (1939) (holding "[a]s there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court")).

**\*4** The procedural posture of the case determines the standard by which the court assesses challenges to standing. Here, the defendant has raised a facial challenge to the sufficiency of plaintiff's pleadings. Given that there has been no discovery and no evidence presented in connection with the standing question, the Court "presume[s] the general factual allegations embrace those facts necessary to support the claim, ... and [is] constrained not only to accept the truth of the plaintiffs' jurisdictional allegations, but also to construe all reasonable inferences to be drawn from those allegations in plaintiffs' favor." Connecticut v. American Elec. Power Co., Inc., 582 F.3d 309, 333 (2d Cir. 2009), rev'd on other grounds, 131 S. Ct. 2527 (2011) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Warth v. Seldin, 422 U.S. 490, 501-02 (1975); Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001)).

In order to assert standing, a plaintiff must demonstrate that he

> suffered an 'injury-in-fact'– an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lee v. Board of Governors of the Fed. Res. Sys., 118 F.3d 905, 910 (2d Cir. 1997) (quoting Bennett v. Spear, 520 U.S. 154, 167 (1997)). See also Lujan v. Defenders of Wildlife, 504 U.S. at 560-61. "To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be 'concrete and particularized' as well as 'actual or imminent, not "conjectural" or "hypothetical." ' " Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003) (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560). In evaluating whether a plaintiff alleges injury sufficient to confer standing, courts are concerned with whether the "injury 'affect[s] plaintiff in a personal and individual way' ... to avoid having the federal courts serve as 'merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding.' " Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. at 560 n.1; Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 473 (1968)).

### 2. The TCPA

Plaintiff's Complaint asserts federal jurisdiction under the TCPA, which bans certain "invasive telemarketing practices." The TCPA was passed in 1991 to address complaints by consumers that telemarketers were using technology, such as computerized phone calls to private homes, and escaping state law protections against nuisance calls by operating interstate. Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368 (2012). The Act authorizes private individuals to bring claims for violations of the Act or regulations " 'in an appropriate court of [a] State,' " " 'if [such an action is] otherwise permitted by the laws or rules of court of

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 5 of 103

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

[that] State.' " 47 U.S.C. §§ 227(b)(3), (c)(5). Federal courts have subject-matter jurisdiction over TCPA claims pursuant to 28 U.S.C. § 1331. Mims v. Arrow Fin. Servs., LLC, 565 U.S. at 386-87.

Section 227(b)(1)(B) makes it unlawful for any person "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes...." 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(3). The statute provides that for each proven violation, the plaintiff may recover the greater of the monetary loss caused by the violation or $500, unless the plaintiff can demonstrate that the violations are willful, in which case the plaintiff may recover up to $1,500. 47 U.S.C. § 227(b)(3). Although "claims based on alleged violations of the TCPA need not be pled with particularity," Jackson v. Caribbean Cruise Line, Inc., 88 F. Supp. 3d 129, 138 (E.D.N.Y. 2015) (citing McCabe v. Caribbean Cruise Line, Inc., No. 13 CV 6131, 2014 WL 3014874, at *4 (E.D.N.Y. July 3, 2014)), the plaintiff must still allege facts sufficient to state a plausible claim of direct liability for a violation of the TCPA.

### B. Analysis

#### 1. Injury-in-Fact

**\*5** In moving to dismiss plaintiff's TCPA claim for lack of Article III standing, defendant argues that plaintiff has failed to allege facts demonstrating an injury-in-fact traceable to GoHealth or that would be redressable by a favorable outcome in this case. (Def.'s Mem. [2] at 7-10, 18-19). Defendant argues that plaintiff has not alleged that he sustained any harm, and is seeking only legal fees, statutory damages, and injunctive relief. (Id. at 9). Defendant further argues that any "purported injury was self-inflicted" because he answered a phone that did not belong to him. (Id. at 9). Defendant argues that Bank's decision to remain on the phone speaking with multiple people before being transferred to a GoHealth employee is not enough to establish injury-in-fact. (Id.) (citing Bank v. CreditGuard of America, No. 18 CV 1311, 2019 WL 1316966, at *11 (E.D.N.Y. Mar. 22, 2019)). [3]

Plaintiff argues that he has suffered an injury-in-fact and relies on the decision in Leyse v. Lifetime Entertainment Services, LLC, where the Second Circuit held that the injury requirement of Article III standing was satisfied when the defendant left a prerecorded voicemail message which the plaintiff listened to on a device where the plaintiff resided and had legitimate access. (Pl.'s 1st Opp. [4] at 12) (citing Leyse v. Lifetime Entm't Servs., LLC, 679 F. Appx. 44, 46-47 (2d Cir. 2017)). Similarly, in Melito v. Experian Mktg. Sols., Inc., the Second Circuit found that plaintiffs' "receipt of the unsolicited text messages, sans any other injury, is sufficient to demonstrate injury-in-fact" under the TCPA. 923 F.3d 85, 88 (2d Cir. 2019). The court reasoned that the unwanted messages presented "the same 'nuisance and privacy invasion' envisioned by Congress when it enacted the TCPA." Id. at 93 (quoting Pub. L. No. 102-243 §§ 5,12). Since the harms Congress envisioned were closely related to harms remediable by traditional causes of action, the court concluded that the plaintiffs did not need to allege any further harm beyond receipt of the call. Id. at 93-94 (concluding, "the receipt of unwanted advertisements *is itself* the harm (emphasis in original)); see also Fischer v. Verizon New York, Inc., No. 18 CV 11628, 2019 WL 2265039, at *2 (collecting cases that, "applying Leyse, have similarly held that the receipt of unauthorized, prerecorded phone calls is sufficient to confer standing to bring suit under the TCPA").

**\*6** Consequently, because the plaintiff here has alleged that he received an unsolicited robocall, he has sufficiently alleged an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 6 of 103

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

2. Traceability and Redressability

Defendant, however, also challenges plaintiff's Article III standing by arguing that plaintiff has failed to allege facts showing that the alleged injury can be fairly traced to GoHealth. (Id. at 9 (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125 (2014))). Defendant contends that the Amended Complaint fails to plead facts showing conduct directly or indirectly attributable to GoHealth, fails to plead any basis for concluding that the call was initiated by an agent of GoHealth, and fails to plead that there is any relationship between GoHealth and the third party that initiated the call. (Id. at 9 (citing Holland v. JPMorgan Chase Bank, N.A., No. 19 CV 00233, 2019 WL 4054834, at *7 (S.D.N.Y. Aug. 28, 2019))). Defendant notes further that there is no allegation as to what control, if any, GoHealth had over the party that initiated the call. (Def.'s Mem. at 9). Finally, defendant contends that because plaintiff has not alleged facts showing any conduct attributable to GoHealth, he cannot establish redressability; "imposing damages on GoHealth will not prevent the purported unlawful conduct of any of the unidentified third parties who allegedly placed the call." (Id. at 10).

Plaintiff does not allege that the initial Call identified the organization or person on whose behalf the call was placed. (Am. Compl. ¶¶ 29-31). In fact, he alleges that the caller's identity was concealed through a disguised phone number. (Id. ¶¶ 21-24). However, he alleges that he was subsequently transferred to a person who identified himself as an agent of GoHealth. (Id. ¶ 45). He also alleges that during the course of the call, there was an automated message instructing him to call a phone number associated with GoHealth if he wished to be placed on GoHealth's do-not-call list. (Id. ¶¶ 41-42).

These allegations differ from the circumstances in the case relied upon by defendant, Holland v. J.P. Morgan Chase Bank, N.A. In that case, the plaintiff alleged claims against two legally distinct entities but provided no basis for an inference that both were responsible for plaintiff's injury. 2019 WL 4054834, at *8. Here, while the allegations against GoHealth may not be enough to eventually establish liability on the part of GoHealth (see discussion infra), they suffice to allege that plaintiff's injury is traceable to the defendant and, if proven, make it likely that the injury would be redressable if there were a favorable outcome in the case.

Having considered the allegations in the Complaint, the Court concludes that plaintiff has adequately alleged facts that qualify as an "injury-in-fact" sufficient to confer constitutional standing.

II. Motion to Dismiss for Failure to State a Claim

A. Legal Standard Under Rule 12(b)(6)

In addition to challenging plaintiff's Article III standing to bring this action, defendant also moves to dismiss plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that plaintiff has failed to adequately allege specific facts necessary to "state a claim to relief that is plausible on its face." See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)). (Defs.' Mem. at 7).

**\*7** When deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Second Circuit has stated that a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993); see also Gorman v. Consol. Edison Corp., 488 F.3d 586, 591-92 (2d Cir. 2007), cert. denied, 553 U.S. 1093 (2008). In addition, the court must give plaintiff's claims "a liberal construction." Johnson v. New York City Transit Auth., 639 F. Supp. 887, 891 (E.D.N.Y. 1986) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)), aff'd in part and vacated in part on other grounds, 823

F.2d 31 (2d Cir. 1987). However, the court is not required to accept the truth of legal conclusions couched as factual allegations. See Papasan v. Allain, 478 U.S. 265, 286 (1986).

In Bell Atlantic Corporation v. Twombly and Ashcroft v. Iqbal, the Supreme Court clarified the pleading standards under which courts are to evaluate a motion to dismiss, "arguably shift[ing] pleading standards from 'simple notice pleading' to a 'more heightened form of pleading.' " Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 214 (S.D.N.Y. 2010) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Ashcroft v. Iqbal, 556 U.S. 662 (2009)). Now, when deciding a Rule 12(b)(6) motion to dismiss, the court should consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678; see also Hayden v. Paterson, 594 F.3d 150, 160-61 (2d Cir. 2010). Under this heightened pleading standard, labels, conclusions, and mere recitation of the elements of a cause of action will not suffice. Ashcroft v. Iqbal, 556 U.S. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. at 545. Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. However, "plausibility" does not rise to the level of probability but instead requires " 'more than a sheer possibility that a defendant has acted unlawfully.' " Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 215 (quoting Ashcroft v. Iqbal, 556 U.S. at 678). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808 (1996). Ultimately, when the well-pleaded facts allow no more than an inference of a "mere possibility of misconduct" and plaintiff has only alleged, rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied. Ashcroft v. Iqbal, 556 U.S. at 679.

As a general matter, while a pro se litigant's pleadings " 'are held to less stringent standards than formal pleadings drafted by lawyers,' " Oyekoya v. United States, 108 F. Supp. 2d 315, 317 (S.D.N.Y. 2000) (quoting Santiago v. Meinsen, 89 F. Supp. 2d 435, 438 (S.D.N.Y. Feb. 25, 2000)), in this case, plaintiff is in fact an attorney. Thus, while the Court is mindful that " 'when [a] plaintiff proceeds pro se ... a court is obliged to construe his pleadings liberally,' " Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (quoting McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)), in this case, the court analyzes the pleadings with the understanding that as a licensed attorney, Mr. Bank is not afforded the special latitude afforded to pro se plaintiffs who are not attorneys. See Bank v. U.S. Dep't of Health & Human Servs., 708 F. App'x 43, 44 (2d Cir. 2018); see also Bank v. Vivint Solar, Inc., No. 18 CV 2555, 2019 WL 1306064, at n. 1 (E.D.N.Y. March 22, 2019).

### B. Analysis

#### 1. Statutory Standing Under the TCPA

**\*8** In addition to challenging plaintiff's standing under Article III, defendant also argues that plaintiff lacks statutory standing under the TCPA because he was not the subscriber of the phone and was not the "called party." (Def.'s Mem. at 10-14). This question is properly analyzed under Rule 12(b)(6). See Am. Psychiatric Ass'n v. Anthem Health Plans, 821 F. Supp. 3d 352, 359 (2d Cir. 2016) (explaining that " 'statutory standing' in fact is not a standing issue, but simply a question of whether the

particular plaintiff 'has a cause of action under the statute.' ") (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014)).

Specifically, GoHealth argues that under the TCPA, a violation occurs when an artificial or prerecorded voice is used to deliver a message to a residential telephone "without the prior express consent of the *called party.*" (Id. at 11) (quoting 47 U.S.C. § 227(b)(1)(B) (emphasis added)). Conceding that the term "called party" is not defined in the statute, defendant cites the regulations of the Federal Communications Commission ("FCC"), which define "called party" as "best understood to mean the subscriber to whom the dialed [ ] number is assigned." 30 FCC Rcd. 7961, 8000-01 (July 10, 2015).

Defendant argues that plaintiff is not the subscriber to the phone and has "concede[d] his claim is based on a single call to a residential phone line that does not belong to him, and in fact, belongs to his mother." (Def.'s Mem. at 8) (citing Am. Compl. ¶¶ 26-27 (admitting that plaintiff was not the subscriber of the phone line); McGuinness Decl.,[5] Ex. C at 2 (conceding that "The telephone line at issue belongs to my mother"); Ex. E at 3 (same)). Since Bank is not the subscriber to the phone, defendant argues that he cannot claim an invasion of his own privacy interests or that he had any expectation of privacy in his mother's landline phone. (Def.'s Mem. at 8).[6]

Although Bank concedes that he is not the subscriber to the phone, he contends that standing is not limited to the "called party" but includes persons within the zone of interests the TCPA was intended to protect. (Pl.'s 1st Opp. at 2 (citing Owens v. Starion Energy, Inc., No. 16 CV 1912, 2017 WL 2838075, *7 (D. Conn. June 30, 2017))). He argues that Section 227(b)(3) of the TCPA confers a private right of action upon "[a] person," and is not limited to 'subscribers' or 'called parties.' (Id.) Citing the Third Circuit's decision in Leyse v. Bank of America, plaintiff argues that he has standing under the TCPA because he "was within the zone of interests the TCPA protects as a 'regular user of the phone line and occupant of the residence that was called.' " (Id. at 3 (quoting Leyse v. Bank of America, 804 F.3d 316 (3d Cir. 2015))). In the Amended Complaint, plaintiff acknowledges that while he is not the subscriber to the phone that was called, he "regularly shared [the phone number] with the subscriber." (Am. Compl. ¶ 27). In his Memorandum in Opposition to the Motion to Dismiss, he elaborates on this fact, asserting that he spends "approximately one-third of his time at his mother's residence, during which, discovery would show, he has the authority to treat his mother's telephone line as his own." (Pl.'s 1st Opp. at 3).

**\*9** The regulations relied upon by defendant to argue that plaintiff cannot claim to be the "called party," recognize that individuals who are not the official subscriber may be considered the "called party" when, "due to the relationship to the subscriber, [they] are the number's customary user." 30 FCC Rcd. 7961, 8000-01 (Jul. 10, 2015). Thus, in Duran v. La Boom Disco, Inc., the court found that the non-subscriber plaintiff was a customary user where he had a phone on a family plan subscribed to by his mother. 369 F. Supp. 3d 476, 481 (E.D.N.Y. 2019), vacated and remanded on other grounds, No. 19 CV 600, 2020 WL 1682773 (2d Cir. Apr. 7, 2020); see also Rodriguez v. Premier Bankcard, LLC, No. 16 CV 2541, 2018 WL 4184742, at *1 (N.D. Ohio Aug. 31, 2018) (finding the wife was a customary user of the phone subscribed to by her husband where the account provided each spouse with a phone). Similarly, in Leyse, the case relied upon by plaintiff, roommates shared a landline. When one roommate answered a prerecorded call intended for the other roommate, the Third Circuit held that the answering roommate was a "called party" for purposes of the TCPA because he fell within the zone of interest protected by the statute. Leyse v. Bank of America Nat. Ass'n, 804 F.3d at 326. The court noted that by contrast, a visitor or mere guest who picked up the phone would not be considered within the zone of interests protected by the TCPA. See id.

Thus, if plaintiff can establish that due to his relationship with the subscriber of the phone, he was a customary user of the phone, he may fall within the zone of interest protected by the TCPA. Bank has alleged that, at the time of the Call, he "had regularly shared the Receiving Number with the subscriber of the Receiving Number." (Am. Compl. ¶ 27). This allegation seems to satisfy the bare minimum required in order to allege that plaintiff has standing under the TCPA.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 9 of 103

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

Plaintiff also disputes GoHealth's argument regarding the issue of consent. Under 47 U.S.C. § 227(b)(1)(B), robocalls are unlawful except those that are made with the "prior express consent of the called party." Defendant argues that, because the line belonged to Bank's mother, his mother was the one with authority to consent, and therefore Bank cannot state a claim as an unconsenting called party. (Def.'s Mem. at 12-13).

Plaintiff points to the assertion in the Amended Complaint that "Bank, based upon his use of the Receiving Number, had the legal authority to give consent to the placement, to the Receiving Number, of telephone calls that, solely as a result of that consent, would not violate the TCPA." (Pl.'s 1st Opp. at 5 (citing Am. Compl. ¶ 28)). Thus, plaintiff argues that because he resides at his mother's home approximately one-third of the time, he had the authority to consent and therefore consent by either plaintiff or his mother would have been a defense regardless of who the plaintiff was. (Id. at 4-5 (citing Duran v. La Boom Disco, Inc., 369 F. Supp. 3d 476, 481 (E.D.N.Y. 2019) (holding that "called party" includes individuals who, "due to their relationship to the subscriber, are the number's customary user and can provide express consent for the call"))). Plaintiff again relies on the holding in Leyse to argue that being the called party does not impact who may bring a lawsuit, nor does conferring standing on others beside the subscriber raise the specter that such conferral of standing would subject businesses to liability to any individual who answers the phone. (Id. at 4 (citing Leyse v. Bank of America Nat. Ass'n, 804 F.3d at 327)).

Defendant, however, argues that the question is not whether plaintiff could have conferred consent, but rather whether his mother did confer consent. (Def.'s Mem. at 12). GoHealth argues that because the phone was subscribed to in plaintiff's mother's name, and assuming the allegations in the Amended Complaint are true, "it is no wonder then that the caller did not seem to have 'any idea who Bank was nor that Bank was the person who answered the call,' " noting that the call intercepted by Bank was regarding a Medicare supplement intended for his mother. (Def.'s Mem. at 12-13). In response, Bank argues that the prerecorded voice did not indicate a desire to speak to anyone in particular and even when the first live person came on the phone, that person did not ask to speak to Bank's mother. (Pl.'s 1st Opp. at 7).[7]

**\*10** The Court finds the consent arguments to be immaterial to the facts at hand. Plaintiff pleads that "The GoHealth Telephone Calls were not preceded by the written consent of anyone who had the legal authority to provide such consent." (Am. Compl. ¶ 67). Whether plaintiff, his mother, or both of them had such authority, plaintiff plausibly alleges that no consent for the call was given by anyone.

Considered as a whole, plaintiff's Complaint alleges something less than the facts that courts have previously found to support statutory standing under the TCPA. Unlike the parties in Duran, where the plaintiff's personal phone was part of a family plan, or Rodriguez, where the husband and wife each had a phone as part of a single shared account, cf. Duran v. La Boom Disco, Inc., 369 F. Supp. 3d at 481; Rodriguez v. Premier Bankcard, LLC, 2018 WL 4184742, at \*1, plaintiff's relationship to his mother's phone would seem to be closer to that of a roommate. However, unlike the plaintiff in Leyse, who was called on a land line that was shared with a full-time roommate, plaintiff concedes that he stays with his mother only one-third of the time. He also is less than a co-subscriber; he does not allege that he pays for the telephone line or that the line is connected to another one that he pays for. Based on his allegations, he could be seen as more akin to a "visitor or mere guest," albeit a frequent one. Leyse v. Bank of America Nat. Ass'n., 804 F.3d at 326. As such, he would not have a privacy interest in his mother's home, and there would be no interest to protect against intrusion. Whether the time that plaintiff spent at his mother's house was of a quantity and nature such that he was a "customary user" appears to be a question of fact that it would be inappropriate to decide at this stage, in light of his allegation that he "regularly shared" the telephone line with the subscriber. Accordingly, the Court respectfully recommends a finding that he has plausibly alleged statutory standing under the TCPA.

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 10 of 103

## 2. Direct or Vicarious Liability

Defendant also urges the Court to dismiss plaintiff's TCPA claims for failing to state a claim for direct liability on the part of GoHealth. (Def.'s Mem. at 14). Specifically, defendant argues that in order to hold the defendant directly liable under the TCPA, there must be an allegation that defendant either made or initiated the call. (Id. (citing In the matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7980 (Jul. 10, 2015) (stating that there must be a "direct connection" between the person or entity and the making of the call))). Under Section 227(b)(1), a plaintiff seeking to impose direct liability against a defendant must allege that the defendant initiated the unsolicited call. See Banks v. Pro Custom Solar, No. 17 CV 613, 2018 WL 3637960 (E.D.N.Y. July 31, 2018) (finding that Mr. Bank had "fail[ed] to allege that Defendant initiated the Calls, which is required to successfully plead direct liability"). In Bank v. Vivint Solar, Inc., the court dismissed a similar direct liability claim brought by this same plaintiff, finding that there was "an insufficient basis upon which to infer that [defendant] made the [initial call]." 2019 WL 2280731, at *3 (E.D.N.Y. Feb. 25, 2019), adopted by, 2019 WL 1306064 (E.D.N.Y. Mar. 22, 2019).

Defendant argues that there must be a "direct connection" between the person or entity and the making of the call before there can be direct TCPA liability. (Def.'s Mem. at 14 (citing In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7980 (Jul. 10, 2015))). Defendant notes that Bank has previously had a case dismissed for failure to allege sufficiently the direct connection. (Id. at 14-15 (citing Bank v. Vivint Solar, 2019 WL 2280731, at *3)). See also Childress v. Liberty Mut. Ins. Co., No. 17 CV 1051, 2018 WL 4684209, at *1 (D.N.M. Sept. 28, 2018); Melito v. American Eagle Outfitters, Inc., No. 14 CV 2440, 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015). Defendant argues that plaintiff not only failed to allege that GoHealth physically placed the call to him, but Bank also failed to include any factual allegations that tie GoHealth to the alleged calls made to the rest of the putative class. (Def.'s Mem. at 16).

**\*11** Plaintiff does not contest GoHealth's argument that he has failed to state a claim for direct liability, but maintains that the Amended Complaint states a claim on a theory of vicarious liability. (Pl.'s 1st Opp. at 12). Citing to the regulatory definition of "seller," plaintiff argues that a "seller" is the "person or entity on whose behalf a [telemarketing] call or message is initiated," 47 C.F.R. 64.1200(f)(9), and a "telemarketer" is "the person or entity that initiates a [telemarketing] call." 47 C.F.R. 64.1200(f)(11). (See Pl.'s 1st Opp. at 13). Even when the seller does not initiate the call, it may be held vicariously liable for certain third-party telemarketing calls initiated by the third party. See DISH Network LLC Declaratory Ruling, 28 FCC Rcd. 6574, 6583 (2013); see also Bank v. Vivint Solar, Inc., 2019 WL 1306064, at *3 (noting that the FCC has "ruled that, under federal common-law principles of agency, there is vicarious liability for TCPA violations"); McCabe v. Caribbean Cruise Line, Inc., 2014 WL 3014874 at *3 (finding that "traditional principles of vicarious liability apply to actions brought under the TCPA"). Specifically, plaintiff grounds his vicarious liability allegations on the agency concept of "apparent authority." (Pl.'s 1st Opp. at 13).

To the extent that Bank is alleging vicarious liability, GoHealth argues that plaintiff has failed to allege an agency relationship between the maker of the call and GoHealth. (Id.) (citing Bank v. Vivint Solar, Inc., 2019 WL 2280731, at *3 (holding that the "plaintiff asserting vicarious liability in a TCPA action 'must allege an agency relationship between' the maker of the call ... and the defendant"); Melito, 2015 WL 7736547, at *4-5 (holding that a plaintiff "must allege some facts regarding the relationship between an alleged principal and agent ... and cannot simply allege general control in a vacuum")).

Here, plaintiff's Amended Complaint brings claims against GoHealth, but concedes that the phone number that called the residential line was not a GoHealth number, but rather was a "Wireless Caller," which plaintiff alleges was "fabricated." (Am.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 11 of 103

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

Compl. ¶¶ 21, 22). Plaintiff further alleges that later in the conversation with the third live person to whom he was transferred, he obtained a different telephone number for GoHealth that was given by a person he alleges was a GoHealth employee. (Am. Compl. ¶¶ 47-48). There are no allegations in the Amended Complaint that the prerecorded call disclosed either the name or address of GoHealth or any other entity on whose behalf the call was made. Unlike the circumstances in Pro Custom Solar, 2018 WL 3637960, where the caller was sent directly from the robocall to a live representative who confirmed that the call was to promote defendant's services, here plaintiff does not allege that anyone at any time confirmed that the Call was initiated by or made on behalf of GoHealth. See also Bank v. Vivint Solar, Inc., 2019 WL 2280731 at *2. The Complaint does not allege that either of the two individuals to whom plaintiff was transferred before he spoke to the GoHealth employee claimed to be calling on behalf of GoHealth. He was transferred twice to two other individuals, "Jason" and "Marc" before speaking to a purported representative of GoHealth, but there are no allegations in the Complaint that either of these individuals were GoHealth agents, nor does he allege any facts to show that the original call had any connection to GoHealth. (Am. Compl. ¶¶ 34, 36, 43, 69-71). By contrast, in Bank v. CreditGuard of America, the plaintiff alleged that the defendant whose employee he ultimately spoke with "maintained a commingled business relationship," and "share[d] a single place of business" with the defendant he was initially transferred to, which the court found supported a "reasonable inference that each ... [d]efendant acted with the apparent authority" of the others. 2019 WL 1316966, at *9. In the absence of any allegation that the call was initiated by an agent of GoHealth or any allegations whatsoever as to who made the Call, there is no basis on which to determine that the caller was an agent of GoHealth. (Am. Compl. ¶¶ 20-29).

 *12  Where, as here, there are no factual allegations on which to base an agency relationship between GoHealth and the caller, courts have dismissed complaints. For example, in Jackson v. Caribbean Cruise Line, Inc., the plaintiff alleged that he received text messages sent by a marketing company on behalf of the defendant. 88 F. Supp. 3d at 133. To establish the liability of the second defendant, the plaintiff pled that the defendant was "responsible for making or causing the making of" the messages, "contracted with" the marketing firm to send the text messages, and that the marketing firm "sent the text message calls on behalf of, and at the direction of" the defendant. Id. at 138. The court in Jackson dismissed the complaint, finding that the allegations were insufficient to support an agency relationship necessary to bring a claim of vicarious liability. Id. at 138-39.

Here, Bank has alleged even less than the facts the Jackson court found inadequate to support an agency relationship. There is no mention of a contract with another entity; there is no allegation that the Call was made "on behalf of" or "caused by" GoHealth. (See generally Am. Compl.). See also Bank v. Alliance Health Networks, LLC, No. 15 CV 213, 2015 WL 4645317, at * 1 (E.D.N.Y. Aug. 4, 2015) (dismissing complaint for failure to plead vicarious liability where plaintiff only alleged that calls were "made by, or on behalf of, or with the authorization of" the defendants); Bank v. Philips Elec. North Am. Corp., No. 14 CV 5312, 2015 WL 1650926, at * 3 (E.D.N.Y. Apr. 14, 2015) (dismissing complaint where there were "no allegations of fact that establish an agency relationship between [defendant] and the authorized dealers" or any control by defendant).

Nor is plaintiff's reliance on an "apparent authority" theory availing. Apparent authority arises "when a principal, either intentionally or by lack of ordinary care, induces a third party to believe that an individual has been authorized to act on its behalf." Bank v. Vivint Solar, Inc., 2019 WL 1306064 at *4 (quoting Highland Capital Mgmt. LP v. Schneider, 607 F.3d 322, 328 (2d Cir. 2010)). Although plaintiff's brief expounds at length about how the apparent authority theory has been applied in previous cases (see Pl.'s 1st Opp. at 17-23), the Amended Complaint lacks any allegations that would justify its application in the instant case. The Amended Complaint is silent as to the plaintiff's belief regarding who authorized the initial Call, or any action taken by GoHealth to induce such a belief. (See generally Am. Compl.). Bank does not allege that he believed the Call was authorized or initiated by GoHealth, the employer of his third contact. Instead, the Call could have been made on behalf of or authorized by the entities represented by the prior two individuals with whom he spoke. There is no allegation in the Complaint that either of these two individuals claimed to be affiliated with GoHealth or that they identified the entities they represented as being agents of GoHealth. (Id.) Bank has also not alleged that the GoHealth employee with whom plaintiff

eventually spoke and corresponded with, Jared, made any representations of a relationship or purpose underlying the initial Call or two subsequent transfers. Cf. Banks v. Pro Custom Solar, 416 F. Supp. 3d 171, 174-75 (E.D.N.Y. 2018) (denying motion to dismiss where defendant's employee stated that the unconsented prerecorded call was placed by defendant's operating service to promote its goods and services). In Bank v. Vivint Solar, Inc., the court dismissed plaintiff's complaint, finding that "the absence of non-conclusory allegations of [ ] an agency relationship and/or control is a fatal flaw in each of plaintiff's various theories of vicarious liability." 2019 WL 2280731, at *6. The Court specifically found fault with plaintiff's apparent authority arguments, finding, as here, that "[t]he amended Complaint does not allege that Bank believed that the Prerecorded Call was placed by an agent of [defendant], let alone that such a belief was reasonable." Id. at *5. Similarly, the Court finds that, in this case, the plaintiff has failed to allege plausible facts to support a claim of vicarious liability, and accordingly respectfully recommends that plaintiff's TCPA claims be dismissed. [8]

III. Motion to Dismiss Bank's State Law Claims

**\*13** Defendant also moves to dismiss plaintiff's state law claims under the GBL, arguing that other courts have dismissed plaintiff's state law claims when his TCPA claim failed. (Def.'s Mem. at 18 (citing Bank v. Vivint Solar, Inc., 2019 WL 2280731, at *6; Bank v. Alliance Health Networks, LLC, 2015 WL 4645317, at *1; Bank v. Philips Elec. North Am. Corp., 2015 WL 1650926, at *3)). A court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction. See 28 U.S.C. § 1367(c)(3). Here, plaintiff has not alleged diversity of the parties and the amount in controversy under plaintiff's state law claim does not exceed $75,000. Plaintiff does not appear to contest that the Court lacks an independent basis to assert jurisdiction over the state law claims in the event that the federal law claims are dismissed. (See Pl.'s 2nd Opp. (omitting any discussion of this argument)).

Accordingly, the Court respectfully recommends that the state law claims be dismissed.

IV. Motion to Strike Certain Allegations from the Second Amended Complaint

Defendant seeks to strike a number of claims in the Second Amended Complaint as an alternative to dismissal.

Rule 12(f) of the Federal Rules of Civil Procedure provides that a Court "may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). See Bank v. CreditGuard of America, 2019 WL 1316966, *7-8. Motions to strike material from a pleading are disfavored, and should generally be denied "unless it can be shown that no evidence in support of the allegation would be admissible." See Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976).

Defendant argues that a pro se plaintiff may not seek to represent the interests of third parties, and that therefore plaintiff's class claims should be struck. (Def.'s Mem. at 22-24). Defendant further argues that plaintiff is not entitled to attorney's fees as a pro se party, and requests that his fee demand be struck. (Id. at 24). In response, plaintiff argues that it is premature to strike the class claims and request for attorney's fees. He points out that he only represents himself at this stage of the litigation, and has not indicated any intent to be appointed counsel for the class. (Pl.'s 3rd Opp. [9] at 3-6). In addition, if the case proceeds to class certification, Bank and the putative class members may yet opt to retain counsel. (Id. at 6).

Finally, defendant asserts that plaintiff's allegations regarding GoHealth VMO and BrokerDialer are impertinent and immaterial and consequently should be struck. (Def.'s Mem. at 22-24). Plaintiff argues that these assertions are relevant to his GBL claims in that he alleges their use with respect to his GBL claims. (Pl.'s 3rd Opp. at 6-7). He further argues that defendant "does not explain why" the agents described in connection with VMO and BrokerDialer "could not have been involved with the 'call[s] relating to Medicare.' " (Id. at 7 (quoting Def.'s Mem. at 25)).

To the extent that defendant seeks to dismiss the plaintiff's class claims and claims for attorney's fees, the Court finds that such a motion is premature at this stage. As the Court in Bank v. CreditGuard of America noted, "Plaintiff's inability to serve as class counsel is a matter to be addressed at the time of class certification and is irrelevant to the Court's resolution of the instant motion to dismiss." 2019 WL 1316966, *1, n.2 (citing Bank v. R&D Strategic Sols. LLC, No. 12 V 1368, 2013 WL 1171108 (E.D.N.Y. Mar. 20, 2013)). The same is true of plaintiff's claims for fees.

**\*14** In addition, the Court respectfully recommends denial of defendant's motion to strike the allegations against GoHealth VMO and BrokerDialer as impertinent and immaterial. Since the Court respectfully recommends dismissal of the plaintiff's claims under Rule 12(b)(6), it need not reach the question of whether to strike these allegations and requests for relief on the grounds asserted by defendant.

### V. Plaintiff's Motion for Sanctions

Plaintiff has asked the Court to impose sanctions on defendant's counsel for conduct that plaintiff asserts is in violation of Rule 8.4(d) of the New York Rules of Professional Conduct. (Pl.'s Mem. [10] at 3). Specifically, plaintiff contends that defendant's references to his history as a repeat TCPA litigant, citations to prior cases in which plaintiff was involved, and the arguments raised by counsel regarding standing, are sanctionable because they were " 'obvious attempts' " to prejudice the Court. (Id. at 4). Defendant disagrees and contends that the statements are true and accurate and made "appropriately" in a legal brief in support of defendant's position. (Def.'s Sanctions Mem. at 1-2). Moreover, defendant asserts that plaintiff cannot demonstrate that the statements were made in bad faith or for an improper purpose. (Id.)

Rule 8.4 of the New York Rules of Professional Conduct prohibits a lawyer or firm from "engag[ing] in conduct that is prejudicial to the administration of justice." In order to "prejudice the administration of justice," the attorney's conduct must "at a minimum, pose a substantial risk of seriously impeding cooperation between counsel without justification." Alexander Interactive Inc. v. Adorama, Inc., No. 12 CV 6608, 2014 WL 4058705, at * 2 (S.D.N.Y. Aug. 14, 2014) (declining to impose sanctions upon an attorney who used "intemperate language," noting that this is matter for the Grievance Committee).

As an initial matter, the Court notes that plaintiff has failed to provide any authority in support of his argument that the Court may impose sanctions against opposing counsel based solely on a violation of the Rules of Professional Conduct. In Bank v. Caribbean Cruise Line, Inc., the court denied a motion by Mr. Bank for similar sanctions in violation of the New York Rules of Professional Conduct 3.3(a)(1), 8.4(b) and 8.4(d), finding "neither a factual nor a legal basis for imposing sanctions." No. 12 CV 584 (E.D.N.Y. June 12, 2012). Here, the statements about which plaintiff complains were all made in the context of a pending motion and none of them evidence the type of conduct that Rule 8.4(d) was designed to deter. See Alexander Interactive, Inc. v. Adorama, Inc., 2014 WL 4058705, at *2 (discussing counsel's use of "vulgar, insulting, and offensive language toward an adversary").

Even if Mr. Bank's motion is made pursuant to the Court's inherent powers, he has failed to carry his burden to show that the "(1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 336 (2d Cir. 1999). Not only has Mr. Bank failed to even argue that any of the defendant's statements were "without a colorable basis," but there is no evidence cited to support any claim that the statements were made in bad faith or for an improper purpose. To the extent that Bank raises an issue regarding comments made by defendant relating to his prior cases, other courts have considered Bank's similar claims that the defendant was making "defamatory misrepresentations" based on his litigation history and rejected those claims. See Bank v. CreditGuard of America, Inc., No. 18 CV 1311, 2020 WL 1516107, at *4 n. 6 (E.D.N.Y. Mar. 30, 2020) (noting that Bank, although proceeding "pro se" was "an attorney," and "one, the Court also notes of some notoriety in this Circuit, including as a self-proclaimed 'annoyance' attorney").

Case 1:26-cv-00659-KM     Document 31-1     Filed 07/15/26     Page 14 of 103

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

**\*15** To the extent that plaintiff is arguing that the legal arguments made by defendant in challenging plaintiff's standing were made in an effort to prejudice the Court against plaintiff, the Court has reviewed defendant's arguments on standing and find the arguments are supported by existing law and not interposed for any improper purpose. In addition, other courts have rejected Bank's arguments where the defendant has made truthful references to Bank's prior history and supported those references with citations to precedents. See, e.g., McCabe v. Lifetime Entm't Servs., LLC, 761 F. App'x 38, 41 (2d Cir.) (summary order), cert. denied, 140 S. Ct. 81 (2019).

Having thoroughly considered plaintiff's arguments in support of his motion for sanctions, the Court finds them completely without merit, and respectfully recommends that plaintiff's motion for sanctions be denied.

### VI. Leave to Amend the Complaint

Finally, plaintiff seeks leave to amend the Complaint in the event that his claims were dismissed, as the Court recommends. Although leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), the decision whether to grant a motion to file an amended pleading remains within the court's discretion. See Zahra v. Town of Southhold, 48 F.3d 674, 685 (2d Cir. 1995). An amendment should not be allowed where there has been bad faith or dilatory motives, or where the amendment would be futile or would cause undue delay or undue prejudice to the opposing party. See Foman v. Davis, 371 U.S. at 182; Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel, 145 F.3d 85, 89 (2d Cir. 1998); Zahra v. Town of Southhold, 48 F.3d at 685; John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994); Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993); Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1198 (2d Cir. 1989). The party opposing amendment bears the burden of demonstrating good reason to deny the motion. Speedfit, LLC v. Woodway USA, Inc., No. 13 CV 1276, 2015 WL 6143697, at \*3 (E.D.N.Y. Oct. 19, 2015); see also Fariello v. Campbell, 860 F. Supp. 54, 70 (E.D.N.Y. 1994) (citing Panzella v. Skou, 471 F. Supp. 303, 305 (S.D.N.Y. 1979)).

Defendant argues that it would be futile to allow plaintiff to amend his complaint, because he has failed to state a claim despite having re-pleaded his claims twice already and having filed similar lawsuits in the past. (Def.'s Mem. at 21). Defendant further argues that Bank has acted in bad faith by waiting to file two prior amendments to his Complaint until after GoHealth filed its motion to dismiss. (Id. at 22).

In response, plaintiff argues he did not act in bad faith because one of his amendments was "due to a minor error," and the amendment was stipulated by GoHealth. (Pl.'s 1st Opp. at 25). He further argues that, unlike defendant's cited case where a repeat litigant was denied leave to amend, his litigation history is not comparable and in any event, the Court in that case "relied upon 'the incomprehensible nature of the Complaint.'" (Pl.'s 1st Opp. at 24 (citing Scotto v. New York Univ. Hosp., No. 19 CV 4756, 2019 WL 6307414 (E.D.N.Y. Nov. 25, 2019))).

While normally, the Court would recommend that plaintiff be given an opportunity to amend his Complaint, here plaintiff has already amended the substantive allegations in his Complaint once after reviewing the arguments raised by defendant in support of dismissal. [11] Moreover, plaintiff, having filed numerous TCPA cases in the past, is fully aware of the elements necessary to withstand a motion to dismiss. Indeed, the very problems identified by this Court with his pleadings in this case have resulted in the dismissal of other cases where the courts identified similar deficiencies. Unlike in Bank v. Vivint Solar, where plaintiff provided the court with proposed allegations that he sought to add in amending the Complaint, in this case, plaintiff does not offer any arguments to contest defendant's argument that amending the complaint would be futile. He has not suggested that there are any additional facts that, if added to the existing pleading, would cure the deficiencies noted herein. Had the plaintiff been in possession of additional facts or information that would have allowed him to allege the elements necessary to establish vicarious liability, he should have done so already or at least identified those additional facts in his briefing on the motion to dismiss. Not only did he not suggest any such additional facts existed, he failed to even respond to defendant's futility argument.

Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 15 of 103

**\*16** Accordingly, it is respectfully recommended that plaintiff not be given yet a third opportunity to amend his Complaint.

CONCLUSION

In light of the foregoing, the Court respectfully recommends that plaintiff's TCPA claim be dismissed with prejudice for failure to state a claim, and that his GBL claim be dismissed for lack of jurisdiction. The Court respectfully recommends denial of plaintiff's motion for sanctions.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2323282

---

**Footnotes**

1    Citations to "Am. Compl." refer to plaintiff's Second Amended Complaint, filed on February 19, 2020, ECF No. 18.

2    Citations to "Def.'s Mem." refer to defendant's Memorandum in Support of its Motion to Dismiss Plaintiff's Second Amended Complaint, filed June 5, 2020, ECF No. 25.

3    In Bank v. CreditGuard of America, 2019 WL 1316966 at *11, Judge Chen dismissed plaintiff's state law claims because she found he had not sufficiently alleged injury-in-fact to sustain a GBL claim. In that case, the defendants did not seek dismissal of the TCPA claims on standing grounds, and those claims were preserved after the court found that plaintiff plausibly alleged TCPA violations. Id. at *9; see discussion infra.

4    Citations to "Pl.'s 1st Opp." refer to plaintiff's first Memorandum in Opposition to the Motion to Dismiss Plaintiff's Federal Cause of Action, filed as an unmarked attachment to plaintiff's response in opposition to defendant's motion to dismiss, ECF No. 28. The Court notes that plaintiff has addressed each of defendant's three requests for relief in a separate brief, arguing that each request constitutes a separate motion. (Pl.'s 1st Opp., cover page). This strained interpretation would lead to absurd results if accepted by the Court, as it would multiply the number of pages allowed potentially into the hundreds on typical motions, and have the effect of constraining movants to a much smaller page limit than non-moving parties. Defendant requests that, as plaintiff's 33 pages of briefing exceed the court's 25-page limit, the briefs should be stricken in their entirety or disregarded with respect to the pages after page 25. (Defendant's Reply in Support of its Motion to Dismiss ("Def.'s Reply"), cover page, n.1). Although the Court declines to follow this course of action at present, plaintiff is warned that this approach is not appropriate and in the future, the Court will recommend striking plaintiff's submissions to the extent that they fail to comply with the court's rules.

5    Citations to "McGuinness Decl." refer to the Declaration of John W. McGuinness in Support of Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint, ECF No. 27.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 16 of 103

**Bank v. GoHealth, LLC, Not Reported in Fed. Supp. (2021)**

In response, Bank first takes issue with defendant's assertion that the phone belonged to his mother, arguing that nowhere in the Amended Complaint does Bank assert that. (Pl.'s 1st Opp.) at 1). Arguing that under Rule 12(b)(6), the Court is limited to review of the allegations in the Complaint and may not consider evidence beyond the record, Bank contends that the letters cited by defendant in which Bank concedes that the phone belongs to his mother are not properly considered by the Court. (Id.) Nevertheless, after raising this objection, Bank states in his papers that he "waives his right to object to the Court's consideration of those letters with respect to the Rule 12(b)(1) branch of the motion as well as the Rule 12(b)(6) branch, as discovery would show that Bank's statements are accurate, i.e., that he spends 'approximately one-third of the time at his mother's residence.' " (Id.) Although the Court would not ordinarily look beyond the facts alleged in the pleadings, since plaintiff has "waived his right" to such a constraint, the Court will, in the interest of judicial efficiency, consider the facts as plaintiff has stipulated them.

Defendant also argues that plaintiff is not within the zone of interests that the TCPA is intended to protect, but instead is a "serial litigant" who intentionally answered the phone to manufacture standing. (Def.'s Mem. at 13 (citing Stoops v. Wells Fargo Bank, N.A., 197 F. Supp. 3d 782, 801 (W.D. Pa. 2016))). Plaintiff disputes this characterization and argues that this case is distinguishable from Stoops where the plaintiff purchased nearly 40 cellphones in the hope of receiving a large number of calls in violation of the TCPA. (Pl.'s Mem. at 10). By contrast, plaintiff argues that his mother's phone was not maintained for the sole purpose of filing lawsuits. (Id. at 10-11). While plaintiff has filed numerous TCPA cases, Stoops is distinguishable and therefore, the Court has not considered the arguments regarding plaintiff's supposed motivation persuasive.

This conclusion is not in tension with the Court's finding that Bank suffered an injury-in-fact that is fairly traceable to GoHealth. Plaintiff's burden to plausibly allege liability of the defendant is more stringent than the burden to allege traceability. See Rothstein v. UBS AG, 708 F.3d 82, 92 (2d Cir. 2013) (concluding that "the test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause"). If this was not so, the Court would be deprived of jurisdiction in instances where liability was not successfully pleaded.

Citations to "Pl.'s 3rd Opp." refer to plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Strike, filed as an unmarked attachment to plaintiff's response in opposition to defendant's motion to dismiss, ECF No. 28.

Citations to "Pl.'s Mem." refer to plaintiff's Memorandum in Support of Sanctions, filed as an unmarked attachment to plaintiff's response in opposition to defendant's motion to dismiss, ECF No. 28.

Defendant served its pre-answer motion to dismiss on January 15, 2020. (ECF No. 15). Plaintiff amended his complaint as of right on February 5, 2020. (ECF No. 16). This amendment contained extensive new factual allegations regarding the Call that forms the basis of this action. Then, plaintiff amended the complaint again by stipulation on February 19, 2020, this time changing only two paragraphs. (ECF No. 18).

---

**End of Document**                                             © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 17 of 103

Bird v. Pro Star Builders, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 18216007
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Daniel BIRD

v.

PRO STAR BUILDERS, INC.

Case No. 2:22-cv-03610-JLS-JEM
|
Filed November 28, 2022

**Attorneys and Law Firms**

Rachel Kaufman, Kaufman PA, Coral Gables, FL, for Daniel Bird.

Jonesh G. Daryanani, Simon M. Feng, Perkins Coie LLP, Los Angeles, CA, for Pro Star Builders, Inc.

**PROCEEDINGS: (IN CHAMBERS) ORDER DENYING DEFENDANT'S MOTION TO DISMISS (Doc. 16)**

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a Motion to Dismiss filed by Defendant Pro Star Builders, Inc. ("Pro Star"). (Mot., Doc. 16). Plaintiff Daniel Bird ("Plaintiff") timely opposed the motion, and Pro Star replied. (Opp., Doc. 18; Reply, Doc. 19.) The Court finds this matter appropriate for decision without oral argument, and the hearing set for December 2, 2022, at 10:30 a.m. is VACATED. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. For the following reasons, the Court DENIES Pro Star's Motion.

**I. BACKGROUND**

On May 26, 2022, Plaintiff filed his Class Action Complaint against Pro Star in this Court. (Doc. 1.) After Pro Star filed a Motion to Dismiss on August 2, 2022, Plaintiff filed his First Amended Complaint ("FAC") on August 26, 2022. (Doc. 15.) Pro Star filed the instant Motion on September 2, 2022. (Mot.)

Plaintiff alleges one cause of action against Pro Star for violations of the Telephone Consumer Protection Act, 🚩47 U.S.C. § 227 ("TCPA"). (FAC ¶¶ 3, 44–48.) The gist of Plaintiff's allegations is that Pro Star violated the TCPA by placing telemarketing calls to his residential telephone despite his registration in the National Do Not Call Registry. (*Id.* ¶ 7.) Plaintiff alleges that Pro Star makes telemarketing calls to consumers who have no prior contact with Pro Star and who have never consented to receive their calls to generate leads. (*Id.* at ¶ 13.) He alleges that his telephone number has been registered on the National Do Not Call Registry continuously since 2008. (*Id.* ¶ 16.) Still, Plaintiff claims, Pro Star called him twice: the first time on February 24, 2022, and the second time on April 19, 2022. (*Id.* ¶ 18.) Plaintiff's Caller ID identified the same number, (213) 426-1021, as the source of both calls. (*Id.* ¶ 19.) Plaintiff states that he did not answer the first call, but did answer the second call. (*Id.* ¶ 22.) Plaintiff alleges that the second call "was from [Pro Star]" and that "Pro Star was attempting to reach [him] to promote its home remodeling services." (*Id.* ¶¶ 22–23.) Pro Star provided Plaintiff with a quote for a potential project and set up an appointment with Plaintiff. (*Id.* ¶¶ 24–25.) Thereafter, Plaintiff alleges, a Pro Star employee appeared at his home and left his Pro Star business card with Plaintiff. (*Id.* ¶¶ 26–27.)

Plaintiff avers that the telemarketing calls invaded his privacy and that he never consented to or requested the calls. (*Id.* ¶¶ 26–27.) He brings the instant action on behalf of himself and on behalf of "[a]ll persons in the United States whose (1) telephone

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 18 of 103

**Bird v. Pro Star Builders, Inc., Not Reported in Fed. Supp. (2022)**

numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing calls [sic] from or on behalf of Defendant (3) within a 12-month period, (4) from four years prior the filing of the Complaint through the date of trial." (*Id.* ¶¶ 33.) Plaintiff seeks: (1) certification of his proposed class; (2) appointment as class representative; (3) appointment of his counsel as class counsel; (4) a declaration that Pro Star violated the TCPA; (5) injunctive relief prohibiting Pro Star and its affiliates or agents from making calls to any residential number on the National Do Not Call Registry; and (6) damages. (*Id.* "Prayer for Relief.")

## II. LEGAL STANDARD

**\*2**  In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555. Thus, a complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively[,]" and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## III. DISCUSSION

Pro Star argues that Plaintiff's claim as alleged in the FAC is deficient on two grounds. First, according to Pro Star, "plaintiff has not alleged facts sufficient to show that Pro Star initiated" the two calls at issue. (Mot. at 3, 6–7.) Second, Pro Star contends that "Plaintiff fails to allege that Pro Star made two calls within a twelve-month period because he interacted with two different entities—Pro Star and Pro Star's telemarketer." (*Id.* at 7–8.) Pro Star's arguments are not persuasive.

Section 227(c) of the TCPA directs the Federal Communications Commission ("FCC") to implement regulations to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). To advance these objectives, Section 227(c) authorizes the FCC to establish and operate a "national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations." *Id.* § 227(c)(3). Pursuant to Section 227(c), the FCC promulgated the following regulation:

> No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 19 of 103

Bird v. Pro Star Builders, Inc., Not Reported in Fed. Supp. (2022)

47 C.F.R. § 64.1200(c)(2).

Section 227(c) provides a private right of action to anyone "who has received more than one telephone call within any - month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). An individual may initiate an action to enjoin any such violation and recover the greater of either actual monetary loss resulting from a violation or up to $500 in damages for each violation. *Id.*

To state a claim under Section 227(c), a plaintiff must plead facts plausibly showing that: (1) he or she received multiple calls within twelve months; (2) from the same entity; (3) to a phone number registered on the National Do Not Call Registry. *See, e.g., Smith v. Direct Building Supplies, LLC*, 2021 WL 4623275, at *4 (E.D. Pa. Oct. 7, 2021).

Here, Pro Star has only put in issue the first and second elements. But Plaintiff's allegations are sufficient to show that he received two calls from Pro Star within twelve months. Plaintiff alleges that he received two calls from the same number—the first on February 24, 2022 and the second on April 19, 2022. (FAC ¶¶ 18–19.) He further alleges that on the second call "Pro Star inquired if the project [Plaintiff] was potentially interested would cost more than $4,000" and "Pro Star's telemarketer set up an appointment" to finalize a "quote." (*Id.* ¶¶ 24–25.) Reading the FAC in the light most favorable to Plaintiff, as the Court must at this stage, it is reasonable to infer that "Pro Star" and "Pro Star's telemarketer" here refer to the same entity—not two different entities, as Pro Star claims in its Motion. (Mot. at 6; Reply at 5–6.)

**\*3** Further, it is reasonable to infer that Pro Star was responsible for the alleged February 24 unanswered call from the same number as the second call on April 19. Indeed, courts in other districts have recently found that a plaintiff has sufficiently alleged multiple calls from the same entity when he or she received more than one call from the same number but traced the calls back to the defendant after having answered only once. *See, e.g., Chapman v. Nat'l Health Plans & Benefits Agency, LLC*, 2022 WL 3130225, at *7 (E.D. Mich. Aug. 4, 2022) (finding that plaintiff plausibly pleaded that four calls—including three unanswered calls—had come from the same defendant because they had originated from the same number and the plaintiff alleged that other individuals had complained about receiving solicitations from that number); *Spurlark v. Dimension Serv. Corp.*, 2022 WL 2528098, at *3 (S.D. Ohio July 7, 2022) (finding that plaintiff who had ignored multiple calls from the same number until he answered and was able to identify the caller plausibly pleaded that the calls were all placed by the defendant). The Court agrees that it is reasonable to infer that the same caller is responsible for calls from the same number, whether those calls are answered or not. Accordingly, the Court finds that Plaintiff has plausibly alleged that the two calls at issue came from Pro Star.

## IV. CONCLUSION

For the above reasons, the Court DENIES Pro Star's Motion to Dismiss.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 18216007

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 20 of 103

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

KeyCite Yellow Flag
Distinguished by  Shelton v. Freedom Forever, LLC,  C.D.Cal.,  October 14, 2025

2024 WL 3367536
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Stephanie BROWN, individually and on behalf of others similarly situated, Plaintiff,

v.

NANO HEARING TECH OPCO, LLC d/b/a Nano Hearing Aids, Defendant.

Case No.: 3:24-cv-00221-BTM-JLB
|
Signed July 9, 2024

**Attorneys and Law Firms**

Aryanna Yvette Young, Ryan Lee McBride, Kazerouni Law Group, APC, San Diego, CA, for Plaintiff.

Kenneth M. Fitzgerald, Fitzgerald Knaier LLP, San Diego, CA, Michael L. Simes, Pro Hac Vice, Simes Law P.C., New York, NY, for Defendant.

**ORDER GRANTING DEFENDANT NANO HEARING AIDS' MOTION TO DISMISS**

**[ECF NO. 6]**

Barry Ted. Moskowitz, United States District Judge

**\*1**  Defendant Nano Hearing Tech Opco, LLC doing business as Nano Hearing Aids ("Nano") has filed a Motion to Dismiss Plaintiff's Complaint. (ECF No. 6 ("Def.'s MTD").) In response, Plaintiff Stephanie Brown ("Brown") filed an opposition. (ECF No. 7 ("Pls.' Opp'n")). Nano then filed a reply. (ECF No. 10 ("Def.'s Reply").) For the reasons discussed below, the Court **grants** Nano's Motion to Dismiss and Motion to Strike.

**I. BACKGROUND**

Brown, on behalf of herself and a potential class, filed suit against Nano alleging unsolicited marketing that constitutes negligent and willful violations of the Telephone Consumer Protection Act ("TCPA"),  47 U.S.C. § 227(c)(5). (ECF No. 1 ("Complaint").) Brown alleges she "has been on the National Do Not Call Registry since approximately June 12, 2009," and that she has never consented to contact from Nano. (Id. at ¶¶ 28, 35.) Brown alleges that despite the above, she received two phone calls on or around January 19, 2023 from the phone numbers 727-431-6059 and 727-413-6449, both of which she alleges "[u]pon information and belief ... belong[ ] to Defendant and/or Defendant's agent." (Id. at ¶¶ 30–31.) She alleges the callers both promoted Nano Hearing Aids to her. (Id.) Next, Brown alleges she received another phone call on or around February 15, 2023 from the phone number 727-373-1759, during which she "spoke to Daniel Houston who said he was with Life Care." (Id. at ¶ 32.) Mr. Houston then transferred the call to someone named Ken, who gave Brown a callback number of 619-348-6968 x 21. (Id.) Brown alleges this call was also made by Defendant's agent who also spoke to her about Nano Hearing Aids, and that "[w]hen called back, this number goes to Nano Hearing." (Id.)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 21 of 103

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

Brown's Complaint asks for declaratory and injunctive relief and damages under section 277 of the TCPA. (Id. at 14.) Brown seeks to represent a putative class of similarly situated individuals, called a "Federal TCPA DNC Class," which she defines in her Complaint as:

> All persons within the United States who received two phone calls within a 12-month period from Defendant to said person's telephone, and such person had previously included their name on the National Do Not Call Registry at least 31 days prior to receiving Defendant [sic] first call, within the four years prior to the filing of this Complaint.

(Id. at ¶ 41.)

## II. STANDARD

Nano moves to dismiss Brown's Complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) for failure to state a claim and 12(b)(1) for lack of subject matter jurisdiction. (ECF No. 6.) In the alternative or in addition, Nano moves to strike the class allegations under FRCP 12(f) and 23. (Id.) For the reasons discussed below, the Court grants Nano's Motion to Dismiss and Motion to Strike.

### A. Motion to Dismiss for failure to state a claim under 12(b)(6)

A motion to dismiss under FRCP 12(b)(6) should be granted only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). When reviewing a motion to dismiss, the allegations of material fact in plaintiff's complaint are taken as true and construed in the light most favorable to the plaintiff. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Although detailed factual allegations are not required, factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Only a complaint that states a plausible claim for relief will survive a motion to dismiss. *Id.*

### B. Motion to Dismiss for lack of subject matter jurisdiction under 12(b)(1)

**\*2** Nano challenges the Complaint, in part, on the ground that Brown lacks Article III standing. (ECF No. 6.) Standing is an element of subject matter jurisdiction. Therefore, Nano moves to dismiss Brown's Complaint for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. Fed. R. Civ. P. 12(b)(1). In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Generally, on a 12(b)(1) motion regarding subject matter jurisdiction, unlike a 12(b)(6) motion, a court need not defer to a plaintiff's factual allegations. *Id.* But the Supreme Court has held that where a 12(b)(1) motion to dismiss is based on lack of standing, the court must defer to the plaintiff's factual allegations and must "presume[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Therefore, to show standing "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 22 of 103

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

party invoking federal subject matter jurisdiction has the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).

### C. Motion to Strike class allegations under 12(f) and 23

Rule 12(f) authorizes courts to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Before a motion to strike is granted, the court must be convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim or defense succeed." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009) (citing *RDF Media Ltd. v. Fox Broadcasting Co.*, 372 F. Supp. 2d 556, 566 (C.D. Cal. 2005)). "When considering a motion to strike, a court must view the pleadings in a light most favorable to the non-moving party." *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 888 (N.D. Cal. 2012) (citation omitted).

Plaintiffs bear the burden of pleading, and ultimately demonstrating, compliance with Rule 23's requirements. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). Though "[i]n general, the appropriateness of proceeding as a class action is not tested at the pleading stage," *Hernandez v. State Farm Fire & Cas. Co.*, No. 16CV200-LAB (JLB), 2017 WL 932198, at *2 (S.D. Cal. Mar. 9, 2017), "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982). "In the Ninth Circuit, motions to strike are proper, even if the material is not prejudicial to the moving party, if granting the motion would make trial less complicated or otherwise streamline the ultimate resolution of the action." *Brown*, 913 F. Supp. 2d at 888 (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)).

### III. DISCUSSION

#### A. <u>Motion to Dismiss for failure to state a claim under 12(b)(6)</u>

**\*3** Brown seeks relief under the TCPA for three phone calls allegedly placed to her cellular telephone. There are two potential theories of liability under the TCPA: (1) direct liability and (2) vicarious liability. *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014). In other words, "[f]or a person to 'make' a call under the TCPA, the person must either (1) directly make the call, or (2) have an agency relationship with the person who made the call." *Pascal v. Agentra, LLC*, No. 19-CV-02418-DMR, 2019 WL 5212961, at *2 (N.D. Cal. Oct. 16, 2019) (citation omitted).

#### I. Direct TCPA Liability

First, Nano argues Brown's Complaint does not plausibly allege that Nano, rather than some third party, physically placed the alleged calls. (ECF No. 6, 8–10.) In response, Brown argues the Complaint plausibly alleges direct liability because it alleges all three calls promoted Nano's products and that "an individual associated with the final call gave a callback number (with an extension) that is directly associated with Nano Hearing." (ECF No. 7, 10–11.)

Direct liability under the TCPA applies only to persons or entities that directly "make" or "initiate" calls, which requires "tak[ing] the steps necessary to physically place" the call. *Sheski v. Shopify (USA) Inc.*, No. 19-CV-06858-HSG, 2020 WL 2474421, at *2 (N.D. Cal. May 13, 2020) (analyzing claim under section 227(b) of TCPA) (citing *In re Dish Network, LLC*, 28

F.C.C. Rcd. 6574, 6583 ¶ 26 (2013)); *see Naiman v. Freedom Forever, LLC*, No. 19-CV-00256-JSC, 2019 WL 1790471, at *4 (N.D. Cal. Apr. 24, 2019) (applying substantially similar rule to claims asserted under TCPA section 227(c)).

Here, Brown merely alleges "on information and belief" that these phone numbers belonged to Nano or Nano's agent. (ECF No. 1, ¶¶ 30–32.) The Complaint does not explain the reasons behind this belief. In her Opposition, Brown explains that she believed these numbers belonged to Nano or its agent because the callers promoted Nano Hearing Aids to her and because one of the calls was transferred to a phone number that connects to Nano. (ECF No. 7, 11.) Brown does not allege that any of the callers identified themselves as representatives of Nano. These allegations are insufficient to establish that Nano directly made the calls. *See Canary v. Youngevity Int'l, Inc.*, No. 5:18-CV-03261-EJD, 2019 WL 1275343, at *3 (N.D. Cal. Mar. 20, 2019) (holding "the Complaint lacks sufficient facts to support a plausible inference that [the defendant] dialed [the plaintiff's] telephone number" where plaintiff only alleged the calls were made by defendant's agent based on "understanding and belief" and a callback number which reached an individual who may have been employed by defendant); *Naiman*, No. 19-CV-00256-JSC, 2019 WL 1790471, at *4 (finding allegations that "Defendant made the calls in question" without "further details (i.e., how the caller identified itself or what entity it was calling on behalf of)" did not show direct liability for DNC claim).

Further, the only caller whose identity Brown describes in the Complaint identified himself as an employee of Life Care, not Nano. (ECF No. 1, ¶ 32.) Brown does not allege that "Life Care" is Nano or affiliated with Nano. In addition, the only phone number which Brown alleges she called is the alleged callback number, 619-348-6968 ("619 Number"). (Id.) Even if the Court takes Brown's allegation that the 619 Number belongs to Nano as true, the Complaint indicates that no call was placed *from* the 619 Number. The allegation that, after being transferred from a representative of Life Care, someone identified only as "Ken" gave Brown a callback number that reaches Nano is insufficient to show that Nano made any of the calls to Brown. (See id.)

### II. Vicarious TCPA Liability

 **\*4**  "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd but criticized on other grounds*, 577 U.S. 153 (2016), *as revised* (Feb. 9, 2016). "To determine whether a plaintiff has established an agency relationship, the Ninth Circuit 'relies on the Restatement (Third) of Agency.' " *Ewing v. Freedom Forever, LLC*, No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at *7 (S.D. Cal. Jan. 19, 2024) (quoting *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018)). Common law agency under the Restatement requires a consensual relationship between an alleged principal and agent. Restatement (Third) of Agency, § 1.01, cmt. C. This is "more than mere passive permission; it involves request, instruction, or command." *Klee v. United States*, 53 F.2d 58, 61 (9th Cir. 1931). "For an agency relationship to exist, an agent must have authority to act on behalf of the principal and '[t]he person represented [must have] a right to control the actions of the agent.' " *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (quoting Restatement (Third) Of Agency § 1.01, cmt. C). "Though 'the precise details of the agency relationship need not be pleaded to survive a motion to dismiss, sufficient facts must be offered to support a reasonable inference that an agency relationship existed.' " *Ewing*, No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at *7 (quoting *Kristensen*, 12 F. Supp. 3d at 1301).

"Three theories of agency could support vicarious liability: (1) actual authority; (2) apparent authority; and (3) ratification." *Abante Rooter & Plumbing v. Farmers Grp., Inc.*, No. 17-CV-03315-PJH, 2018 WL 288055, at *4 (N.D. Cal. Jan. 4, 2018) (citing *Thomas*, 582 Fed. App'x at 679).

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 24 of 103

### i. Actual Authority

Nano argues Brown failed to allege sufficient facts to establish that Nano had an agency relationship with any third parties who allegedly placed the calls. (ECF No. 6, 12–13.) In response, Brown argues the Complaint plausibly alleges actual authority because it alleges all three calls promoted Nano's products and Nano's phone number was provided as a callback number in the last call. (ECF No. 7, 12–14.)

To allege actual authority, a plaintiff must allege facts showing that (1) the principal "controlled or had the right to control" the agent; (2) the principal " 'manifest[ed] assent' to their right to control" the agent; and (3) the principal "either communicated a direction to" the agent to make the calls or the calls were "consistent with" the principal's "general statement of what [the agent] [was] supposed to do." *Pascal*, No. 19-CV-02418-DMR, 2019 WL 5212961, at \*3 (quoting *Mavrix*, 873 F.3d at 1054).

Here, Brown's conclusory allegations are also insufficient to show actual authority. Brown does not allege that any of the callers identified themselves as Nano's agents or had any interactions with Nano. Brown's allegations that "[u]pon information and belief, [each] number belongs to Defendant and/or Defendant's agent" are conclusory and insufficient to plead vicarious liability. (ECF No. 1, ¶¶30–32); *see Naiman*, No. 19-CV-00256-JSC, 2019 WL 1790471, at \*4 (finding "boilerplate allegation asserting the existence of an agency relationship" that "each and every Defendant was acting as an agent and/or employee of each of the other Defendants" "is wholly conclusory" and insufficient to plead vicarious liability).

Further, even if Brown had sufficiently alleged Life Care made the third call on Nano's behalf, she still fails to allege facts showing the three prongs necessary for actual authority. There are no allegations supporting the existence of an agency relationship between the two companies, any "request, instruction, or command," *Klee*, 53 F.2d at 61, or that Nano demonstrated "a right to control the actions of [an] agent." Restatement (Third) Of Agency § 1.01, cmt. C. Since Brown has failed to allege "sufficient facts ... to support a reasonable inference that an agency relationship existed," *Ewing*, No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at \*7, she cannot hold Nano liable under vicarious liability through actual authority. *See Panacci v. A1 Solar Power, Inc.*, No. 15-CV-00532-JCS, 2015 WL 3750112, at \*7 (N.D. Cal. June 15, 2015) (finding no vicarious liability where plaintiff did not allege that defendant "controlled, authorized, or even knew about [third party's] phone calls or that [defendant] had any control over" the caller, and where plaintiff pleaded "virtually no [factual] allegations regarding the relationship" between defendant and the caller). Finally, Brown also fails to allege any facts that connect Life Care or Nano to the first two calls she received, as the calls came from different phone numbers, and Brown does not allege any identifying information of either caller.

**\*5** Brown made nearly identical arguments in *Barnes v. SunPower Corp.*, No. 22-CV-04299-TLT, 2023 WL 2592371 (N.D. Cal. Mar. 16, 2023), and the Northern District of California rejected them for the same reasons. The *Barnes* court explained, "[a]ccording to Plaintiff Brown, the ability of the caller to transfer her directly to ... [']Sarah at [Defendant] indicates that the caller either worked at [Defendant] or was previously authorized to the place the call by [Defendant], as did the confirmatory text and email,' but this allegation is conclusory and insufficient to establish that Defendant directly made the call or that Defendant has an agency relationship with 'solar project' who made the initial call." No. 22-CV-04299-TLT, 2023 WL 2592371, at \*3 (citation omitted). Similarly here, even if the 619 Number belongs to Nano, this allegation is insufficient to establish that Nano made or authorized any of the calls through an agent.

This case is unlike *Ewing*, where this Court found the plaintiff alleged actual authority by pleading "each of the [ ] callers indicated that they were acting on behalf of Freedom Forever, either by introducing themselves as a 'master dealer' for Freedom Forever, indicating that they refer leads to Freedom Forever, or emailing links to websites associated with Freedom Forever." No. 23-CV-1240 JLS (AHG), 2024 WL 221777, at \*7. The *Ewing* Court also relied on the facts of *Bilek v. Fed. Ins. Co.*, 8 F.4th 581 (7th Cir. 2021), where the Seventh Circuit "determined that the plaintiff had met his burden by pleading that: (1)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 25 of 103

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

the defendant authorized the callers to make calls using its approved scripts, tradename, and proprietary information; (2) the callers quoted him the defendant's health insurance[;] and (3) the defendant provided said callers those quotes and permitted said callers to enter information into its system." *Id.* (citing 🚩8 F.4th at 587–88). Unlike the plaintiffs in *Ewing* and *Bilek*, Brown failed to plead concrete facts meeting the elements of actual authority. *See* 🚩*id.*; 8 F.4th at 589.

### ii. Apparent Authority

Brown argues she also sufficiently alleged apparent authority because it is "obvious that some agreement existed between Defendant and its agents regarding the placing of calls, the promotion of Defendant's products, and the transfer of that call to Defendant." (ECF No. 7, 15.) In response, Nano argues Brown failed to plead apparent authority because the allegations do not sufficiently connect Nano to the callers, and the caselaw she relies on was overruled. (ECF No. 10, 3–5.)

An agency relationship may also be created through apparent authority. 🚩*Mavrix Photographs, LLC*, 873 F.3d at 1054 (citation omitted). "Apparent authority results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969). "The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority." *Id.* (citation omitted). Apparent authority "can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.' " 🚩*Thomas*, 582 F. App'x at 679 (quoting 🚩*NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997)).

Here, Brown's apparent authority theory fails because Brown fails to allege any facts of interaction between Nano and Brown or Nano and the callers that could support a belief that the callers had authority to make calls on Nano's behalf. *See* 🚩*Thomas*, 582 F. App'x at 679. Allegations of the alleged agents' statements alone are insufficient. *See Hawaiian Paradise Park Corp.*, 414 F.2d at 756; *Hanson v. Am. W. Airlines, Inc.*, 544 F. Supp. 2d 1038, 1043 (C.D. Cal. 2008) ("Only the acts of the principal, not of the agent, give rise to apparent authority.") (citing 🚩*C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 479 (9th Cir. 2000)).

**\*6** Brown's arguments in her Opposition also fail. Brown relies on a single case to support an apparent authority theory based entirely on the actions of the callers, but the case was overruled on the exact ground for which Brown relies on it. (ECF No. 7, 16); *see* 🚩*Mey v. Monitronics Int'l, Inc.*, 959 F. Supp. 2d 927 (N.D.W. Va. 2013), *subsequently rev'd sub nom.* 🚩*In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 527 (N.D.W. Va. 2016), *aff'd sub nom.* 🚩*Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243 (4th Cir. 2018) ("This Court is well aware that in so ruling, I am rejecting the prior decision of this Court in this case[:] *Mey v. Monitronics International, Inc.*, 959 F.Supwp.2d 927 (N.D.W. Va. 2013)."). Brown argues, "[s]imilarly to *Mey*, Plaintiff here has clearly pled that the representatives on the calls were holding themselves out as representatives of Defendant." (ECF No. 7, 16.) In overruling *Mey*, the *Monitronics* court held that "the fact that entities were permitted to hold themselves out as authorized dealers or some similar description is insufficient" to hold a defendant vicariously liable. 🚩*In re: Monitronics International, Inc., Telephone Consumer Protection Act Litigation*, 223 F. Supp. 3d at 527–28; *see also* 🚩*Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW AGRX, 2015 WL 3526253, at \*10 (C.D. Cal. May 18, 2015) (disagreeing generally with the conclusion reached in *Mey*, 959 F. Supp. 2d, that an agreement allowing an entity to hold itself out as an authorized dealer of another's products was sufficient to establish apparent authority). The court explained this is because "the mere fact that a dealer uses a supplier[']s name does not render it an agent of the supplier, just as every bar

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 26 of 103

**Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)**

which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise." *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d at 527–28.

### iii. Ratification

In response to Nano's arguments that Brown failed to plead vicarious liability, Brown argues the Complaint also alleges vicarious liability through a theory of ratification because Nano "ratified its agent's actions through accepting the benefits of their telemarketing services." (ECF No. 7, 16–17.) Nano responds that the Complaint never mentions ratification, and that a vicarious liability theory based on ratification fails regardless because it still requires proof of an agency relationship. (ECF No. 10, 6–7.)

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) Of Agency § 4.01. "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Id.* "The set of effects that ratification creates are the consequences of actual authority." *Id.*, cmt. B. "Although a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it." *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003), *superseded in part by statute on other grounds as stated in* *Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017).

Here, Brown's ratification theory fails for the same reasons her other vicarious liability theories fail: she has not sufficiently pleaded an agency relationship. The Complaint lacks facts alleging that Nano acted as a principle or that it ratified any of the alleged conduct. Brown "cannot show [Nano] is liable under a ratification theory because 'the principal-agent relationship is still a requisite.' " *Abante Rooter & Plumbing*, No. 17-CV-03315-PJH, 2018 WL 288055, at *6 (quoting *Batzel*, 333 F.3d at 1036).

Accordingly, the Court **GRANTS** Nano's FRCP 12(b)(6) Motion to Dismiss with leave to amend.

### B. Motion to Dismiss for lack of subject matter jurisdiction under 12(b)(1)

### I. Article III Standing

Next, Nano argues that Brown's Complaint should be dismissed for lack of subject matter jurisdiction under FRCP 12(b)(1) because it fails to meet the causation and redressability elements of Article III standing.

Standing is a necessary element of federal court jurisdiction under Article III of the U.S. Constitution. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Accordingly, standing is a "threshold question in every federal case." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (citing *Warth*, 422 U.S. at 498.). To establish standing, (i) a plaintiff must have suffered a "concrete and particularized" "injury in fact"; (ii) "there must be a causal connection between the injury and the conduct complained of" ("causation"); and (iii) the injury must be capable of being "redressed by a favorable decision" ("redressability"). *Lujan*, 504 U.S. at 560–61. "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007).

**\*7** For causation, "the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. Eastern*

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 27 of 103

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

*Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)). In order to establish causation under a theory of vicarious liability, the plaintiff must show a causal relationship between the agent making the calls and the actions of the principle. *Freidman v. Massage Envy Franchising, LCC*, No. 3:12-CV-02962-L-RBB, 2013 WL 3026641, at *4 (S.D. Cal. June 13, 2013). For redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43).

Here, Nano argues Brown's complaint fails for many of the reasons discussed above. First, the Complaint fails to plead causation. As explained above, the Complaint does not establish direct or vicarious liability because Brown fails to allege facts showing that Nano or an agent of Nano placed any of the calls. *See, e.g.,* *Freidman*, No. 3:12-CV-02962-L-RBB, 2013 WL 3026641, at *4 (finding no Article III standing where plaintiff did not plead direct or vicarious liability); *Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399, 414 (N.D. Cal. 2009) (finding allegations that "all of the named Defendants engaged in the conduct alleged and caused each of them injury" and that one defendant "is an 'agent, subsidiary, parent, joint venturer or predecessor'" of another are insufficient for standing). Accordingly, Brown's injury is not fairly traceable to Nano. *Lujan*, 504 U.S. at 560–61 (citation omitted). Further, the absence of facts establishing this connection to Nano leaves room for a substantial possibility that any injury was "th[e] result [of] the independent action of some third party not before the court." *Id.* (citation omitted).

Second, the Complaint also fails to plead redressability. Since the injury may have been caused by someone other than Nano, a decision favorable to Brown and against Nano would not necessarily redress the injury. *See* *Simon*, 426 U.S. at 41.

Since causation and redressability are speculative at best, Brown lacks standing.

## II. Injunctive Relief

Nano also argues Brown's Complaint lacks standing to seek injunctive relief. (ECF No. 6, 14–15.) In response, Brown argues the Complaint plausibly alleged future harm for purposes of injunctive relief. (ECF No. 7, 17–18.)

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citations omitted). For injunctive relief, the threat of injury must be "actual and imminent," or "*certainly impending*," not merely conjectural or hypothetical. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). "Allegations of possible future injury do not satisfy the requirements." *Whitmore*, 495 U.S. at 158. "Where standing is premised entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that he will again be wronged in a similar way.'" *Davidson*, 889 F.3d at 967 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (citing *Lujan*, 504 U.S. at 560).

**\*8** Here, Brown requests injunctive relief in her Complaint. (ECF No. 1, 14, ¶ 60 ("Plaintiff and the class are also entitled to an injunction against future calls.").) However, Brown fails to allege any likelihood of future injury. The Complaint does not allege any facts regarding potential future calls. In addition, Brown alleges she received three calls within one month in 2023 and does not allege she has received any additional calls since then. (ECF No. 1, ¶¶ 30–32.) The timing and number of calls do

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 28 of 103

Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)

not show "a sufficient likelihood that [s]he will again be wronged in a similar way." *Lyons*, 461 U.S. at 111; *see Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) ("The fact that a class member was a target of collection efforts sometime between 2008 and 2011, however, does not without more establish that he or she would likely be contacted by ARS again after October 2013."); *Miller v. Time Warner Cable Inc.*, No. 816CV00329CASASX, 2016 WL 7471302, at *4 (C.D. Cal. Dec. 27, 2016) (granting motion to dismiss plaintiff's claims for injunctive relief because, without evidence to the contrary, "the risk [defendant] will continue to make unsolicited phone calls to plaintiff's phone is too speculative to establish a real or immediate threat of repeated injury."). Brown's conclusory argument in her Opposition that the Complaint "demonstrated a pattern of unlawful behavior that will not cease without court intervention" does not resolve the lack of any facts alleging that this pattern would continue. (ECF No. 7, 17.) Thus, Brown lacks standing to seek injunctive relief.

Accordingly, the Court **GRANTS** Nano's FRCP 12(b)(1) Motion to Dismiss with leave to amend.

### C. Motion to Strike class allegations under 12(f) and 23

Next, Nano moves to strike class allegations from the Complaint on two grounds. First, Nano argues Brown's class allegations should be stricken as overbroad. (ECF No. 6, 15–17.) Second, Nano argues Brown's class allegations should be stricken because Brown is not a member of the class she seeks to represent. (Id. at 17–18.) Brown responds to both arguments that "the class allegations have been sufficiently pled," "the proposed class may evolve throughout discovery," and regardless, the Court should not rule on class issues prior to a motion for class certification. (ECF No. 7, 18–19.)

### I. Sufficiency of Class Definition

A defendant may move to strike class allegations before discovery when the complaint shows a class action could not be maintained on the facts alleged. *Sanders*, 672 F. Supp. 2d at 990. "[N]o class may be certified that contains members lacking Article III standing." *Id.* at 991 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). In *Sanders*, the court granted a motion to dismiss and struck class allegations under FRCP 12(f) because the class definition "include[d] all persons within the United States who own a 20–inch Aluminum iMac," which "necessarily include[d] individuals who did not purchase their 20–inch Aluminum iMac, individuals who either did not see or were not deceived by advertisements, and individuals who suffered no damages." *Id.* The court explained that "[s]uch individuals would lack standing to bring these claims." *Id.*

Here, the class definition is overly broad because it fails to exclude any members who may have consented to receiving phone calls from Nano. The TCPA expressly precludes claims made by individuals who consented to be called. 47 U.S.C. § 227(b)(1)(A) (excluding from liability any call "made with the prior express consent of the called party.") Brown's class definition necessarily includes any individuals who have consented to calls from Nano. (*See* ECF No. 1, ¶ 41.) Like in *Sanders*, these individuals would also lack standing. 672 F. Supp. 2d at 991; *see Hernandez*, No. 16CV200-LAB (JLB), 2017 WL 932198, at *6 (striking class allegations in part "[b]ecause the class definition includes insureds who were not injured at all.").

### II. Typicality

Rule 23(a)(3) requires that an individual plaintiff's claims be typical of those that the proposed class would advance. Fed. R. Civ. P. 23(a)(3). The test for Rule 23(a) typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 29 of 103

**Brown v. Nano Hearing Tech Opco, LLC, Not Reported in Fed. Supp. (2024)**

the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).

**\*9**  Here, Brown has not alleged that she falls into her own class definition. For the reasons discussed above, Brown failed to plead she was injured by Nano because the Complaint does not sufficiently allege the calls were made by Nano or its agent. As a result, her claims cannot be typical of those that the proposed class would advance, and other class members cannot "have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984. Since the Complaint does not name any other plaintiffs, the purported class lacks typicality. *See Galan Segura v. CRST Van Expedited, Inc.*, No. EDCV1201901TJHSPX, 2014 WL 12567799, at *2 (C.D. Cal. June 16, 2014) (denying class certification in part for lack of typicality because the named plaintiff "has not suffered any injuries under the alleged [ ] violations ... and, therefore, is not a class member.").

Accordingly, the Court **GRANTS** Nano's FRCP 12(f) Motion to Strike class allegations with leave to amend.

## IV. CONCLUSION

For the reasons discussed above, Nano's Motion to Dismiss Brown's Complaint under FRCP 12(b)(6) and 12(b)(1) is **GRANTED.** Nano's Motion to Strike class allegations from the Complaint under FRCP 12(f) and 23 is also **GRANTED**. Brown has leave to file an amended complaint by August 6, 2024.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3367536

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3984951
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Robert DOYLE, et al.
v.
GOHEALTH, LLC

Civil Action No. 22-04291
|
Signed March 30, 2023

**Attorneys and Law Firms**

Ross H. Schmierer, Kazerouni Law Group, APC, Mount Laurel, NJ, for Robert Doyle, et al.

Matthew F. Bruno, Manatt, Phelps & Phillips, LLP, New York, NY, for GoHealth, LLC.

**LETTER ORDER**

MADELINE COX ARLEO, United States District Judge

**\*1**  Dear Litigants:

Before the Court is Defendant GoHealth, LLC's ("Defendant") Motion to Dismiss the First Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 8. Plaintiff Robert Doyle ("Plaintiff"), individually and on behalf of all others similarly situated, opposes the Motion. ECF No. 16. For the reasons set forth below, the Motion is **GRANTED**.

**I. BACKGROUND** [1]

This case arises out of an unsolicited telemarketing phone call Plaintiff received to his cell phone on November 4, 2021. FAC ¶¶ 24-29, ECF No. 4. The call came from an unknown number, (689) 209-1190, and a "pre-recorded voice" identified the caller as "Sarah, a Medicare Specialist." Id. ¶¶ 29-30. Plaintiff was able to determine that he was not speaking to a live representative at the outset of the call, and that the message was prerecorded because of the "generic content ... [and] the tone, cadence and inflection of the voice message." Id. ¶¶ 42-43. A live person, Jason, then began speaking, and told Plaintiff he was a "licensed Medicare specialist." Jason told Plaintiff that "GoHealth" and "GoMedicare" are the same company, and that he wanted to speak with Plaintiff about their program. Id. ¶¶ 32-33. Jason read Plaintiff "some type of disclaimer," and told Plaintiff that "their website was GoHealth.com" before he transferred Plaintiff to a woman named Jocelyn. Id. ¶¶ 34-36.

Jocelyn explained that she "works for GoHealth," and "listed a bunch of insurance companies that her company works with." Id. ¶¶ 36-37. After Jocelyn, an individual Dennis Hunter began speaking, and told Plaintiff his phone number was (855) 673-3578, extension 4363. Id. ¶¶ 38-39. Dennis Hunter also emailed Plaintiff to confirm that he was calling from GoHealth. Id. ¶ 40. The call was not for emergency purposes, and Plaintiff did not provide any express written consent to receive the call to his cell phone. Id. ¶¶ 46-47.

Plaintiff seeks to represent the following class of persons pursuant to ⚑ Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3):

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 31 of 103

Doyle v. GoHealth, LLC, Not Reported in Fed. Supp. (2023)

> All persons within the United States who received any telephone call/s from Defendant, its employees and/or agents, for the purpose promoting Defendant's goods or services, to said person's cellular telephone made through the use of an artificial or prerecorded voice and such person had not previously consented in writing to receiving such calls within the four years prior to the filing of this action.

FAC ¶ 54. Plaintiff maintains that Defendant "has called thousands of wireless telephone customers" without their consent, and he corroborates this allegation by asserting that Defendant is the subject of "several TCPA lawsuits and class actions complaining of unsolicited marketing calls." Id. ¶¶ 50-51.

Plaintiff argues the phone call invaded his privacy and expressly violated 47 U.S.C. § 227(b)(1). He filed his first Complaint in this Court on June 27, 2022. ECF No. 1. He later filed the FAC on July 18, 2022, alleging two counts: (1) negligent violations of the Telephone Consumer Protection Act (the "TCPA") 47 U.S.C. § 227, et seq. (Count I), and (2) knowing and/or willful violations of the TCPA, 47 U.S.C. § 227, et seq. (Count II). See FAC ¶¶ 70-82. The instant Motion followed.

## II. STANDARD OF REVIEW

**\*2** Under Rule 12(b)(1), Plaintiff bears the burden of persuading the Court that subject matter jurisdiction exists. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). In resolving a Rule 12(b)(1) motion, a court must first determine whether the motion presents a "facial" or "factual" attack. See Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014). A facial attack argues that a claim on its face "is insufficient to invoke the subject matter jurisdiction of the court," id. at 358, and "does not dispute the facts alleged in the complaint," Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). A court reviewing a facial attack must "consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Constitution Party of Pa., 757 F.3d at 358. Here, Defendant's motion to dismiss is a facial attack because it asserts Plaintiff lacks Article III standing, and thus the Court lacks subject matter jurisdiction over the matter. See Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 175 (3d Cir. 2000). "Although 'general factual allegations of injury resulting from the defendant's conduct may suffice,' the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." Reilly v. Ceridian Corp., 664 F.3d 38, 41 (3d Cir. 2011).

In resolving a Rule 12(b)(6) motion to dismiss, the Court accepts all pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citations omitted). To survive a motion to dismiss, the claims must be facially plausible, meaning that the pleaded facts "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

## III. ANALYSIS

Defendant moves to dismiss the FAC on several grounds. Defendant first alleges that Plaintiff's FAC must be dismissed under Rule 12(b)(1) because Plaintiff lacks Article III standing. Def. Mem. at 5-9. Second, Defendant argues the FAC should be dismissed under Rule 12(b)(6) for failure to state a claim, as Plaintiff fails to plead facts supporting direct or vicarious liability

Doyle v. GoHealth, LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 32 of 103

under the TCPA, and he does not establish any willful or knowing violation of the TCPA. Def. Mem. at 9-22. The Court addresses each in turn, after a brief background on the relevant portions of the TCPA.

The TCPA restricts certain telemarketing and robocalls. Specifically, the statute prohibits making: "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ["ADTS"] or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). To state a claim under the TCPA, a plaintiff must plead that the defendant "(1) made a non-emergency call without prior express consent, (2) using an ATDS or artificial or prerecorded voice, (3) to a cell phone." Johnson v. Comodo Grp., Inc., No. 16-4469, 2020 WL 525898, at *5 (D.N.J. Jan. 31, 2020) (emphasis removed).

## A. Article III Standing

Defendant moves to dismiss Plaintiff's FAC for lack of Article III standing, arguing that Plaintiff has failed to plead facts establishing his injury is fairly traceable to Defendant, and therefore cannot be redressed by Defendant. See Def. Mem. at 5-8. Plaintiff counters that he has plausibly alleged his injury is traceable to Defendant because two agents with whom he spoke indicated they were working for or calling on behalf of Defendant. Pl. Opp. at 5. The Court agrees with Plaintiff.

**\*3** To establish Article III standing, the plaintiff has the burden of establishing three elements: "(1) [he] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). The Third Circuit addressed the "injury in fact" component of Article III standing in this context in Susinno v. Work Out World, Inc., 862 F.3d 346, 350-51 (3d Cir. 2017). There, the Court held that the "nuisance and invasion of privacy resulting from a single prerecorded telephone call" qualify as "the very harm that Congress sought to prevent." Id. (internal quotation marks omitted).

Defendant challenges the second element of standing, traceability, and argues Plaintiff's FAC fails to establish any link between the prerecorded call Plaintiff received and Defendant's business. Def. Mem. at 6. To show traceability, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... traceable to the challenged action of the defendant and not ... th[e] result [of] the independent action of some third party not before the court." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976) (alterations in original)). Defendant maintains Plaintiff has failed to plead that the initial call from "Sarah, a Medicare Specialist" had any connection to Defendant, and that the subsequent transfers to live agents are insufficient to tie Defendant to the initial prerecorded call. Def. Mem. at 6.

Plaintiff relies on Bank v. GoHealth, No. 19-5459, 2021 WL 2323282 (E.D.N.Y. May 11, 2021). Pl. Opp. at 5-6. There, the plaintiff received a similar prerecorded call claiming to offer discounts for Medicare Supplement plans, and after being transferred to two live agents, the third live person with whom he spoke identified himself as a "licensed agent of [the defendant]." Bank, 2021 WL 2323282, at *1. Although, like here, the plaintiff did not allege that the initial call identified defendant, the Court concluded that the facts pled "suffice[d] to allege that plaintiff's injury is traceable to the defendant and, if proven, make it likely that the injury would be redressable if there were a favorable outcome in the case." Id. at *6.

The Court sees no reason to depart from Bank's logic with respect to Article III standing and traceability. Here, the FAC alleges that "[u]pon information and belief ... Defendant called Plaintiff using a pre-recorded message," FAC ¶ 41. The FAC also alleges that the first live person with whom Plaintiff spoke named the Defendant business – a closer connection than the third live person in Bank. Although the allegations may not be sufficient to eventually establish liability, they are enough to support standing. See Bank, 2021 WL 2323282, at *10-12 (finding the plaintiff failed to allege plausible facts to support liability under the TCPA); Perrong v. Quotewizard.com, LLC, No. 20-2506, 2020 WL 5039445, at *4 (E.D. Pa. Aug. 26, 2020) (finding plaintiff pled

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 33 of 103

Doyle v. GoHealth, LLC, Not Reported in Fed. Supp. (2023)

sufficient facts to establish Article III standing even though he could not directly connect the initial prerecorded call to the defendant).

### B. Liability Under the TCPA

Defendant next argues that Plaintiff fails to plead facts to support direct or vicarious liability under the TCPA. Def. Mem. at 9-20. Plaintiff, on the other hand, maintains that he has alleged facts plausibly supporting a reasonable inference that Defendant is either directly or vicariously responsible for the robocall he received. Pl. Opp. at 11-23. The Court agrees with Defendant.

**\*4** Under the TCPA, a plaintiff establishes direct liability by showing that the defendant was the person or entity that "initiated" the telemarketing call.[2] A person or entity "initiates" a telephone call when "it takes the steps necessary to physically place a telephone call." In re Joint Petition filed by Dish Network, LLC, 28 F.C.C.R. 6574, 6583 ¶ 26 (2013). Accordingly, an entity "is not directly liable for a violation of the TCPA unless it initiates a call." Id. at 6582 ¶ 24. In addition to direct liability, the TCPA " 'creates a form of vicarious liability making an entity liable when a third party sends unsolicited communications on its behalf in violation of the Act.' " City Select Auto Sales, Inc. v. David/Randall Assocs., Inc., 96 F. Supp. 3d 403, 419 (D.N.J. 2015) (quoting Brodsky v. HumanaDental Ins. Co., No. 10–C–3233, 2014 WL 2780089, at \*6 (N.D. Ill. June 12, 2014)). Federal common law principles of vicarious liability are applicable where the plaintiff establishes an agency relationship between the defendant and a third-party caller. See Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 168 (2016); Cunningham v. Cap. Advance Sols., LLC, No. 17-13050, 2018 WL 6061405, at \*6 (D.N.J. Nov. 20, 2018).

It is well established that vicarious liability may be established under three agency theories: actual authority, apparent authority, and ratification. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114, 120 (3d Cir. 2013) (citation and quotations omitted). Apparent authority, on the other hand, can be shown "in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." Id. (citation and quotations omitted). Finally, "[r]atification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement Third of Agency, § 4.01 (2006).

Here, the Court is not convinced that Plaintiff has alleged direct liability under the TCPA. Plaintiff acknowledges that the initial telemarketing call he received only identified the caller as "Sarah, a Medicare Specialist," and he does not allege that the number associated with the call – 629-209-1190 – belonged to Defendant. FAC ¶¶ 29-30; see also Camunas v. Nat'l Republican Senatorial Comm., 541 F. Supp. 3d 595, 602 (E.D. Pa. 2021) (dismissing the plaintiff's claims on direct liability grounds where plaintiff did not allege the number that sent unsolicited text messages was owned or operated by the defendant); Smith v. Vision Solar LLC, No. 20-2185, 2020 WL 5632653, at \*3 (E.D. Pa. Sept. 21, 2020) (dismissing plaintiff's claims as insufficient to support direct liability under the TCPA where the plaintiff did " 'not show plausibly that defendant actually, physically initiated the telephone calls at issue' ") (quoting Aaronson v. CHW Group, Inc., No. 18-1533, 2019 WL 8953349, at \*2 (E.D. Va. Apr. 15, 2019)). As such, direct liability is not established because there are no facts to support the conclusion that Defendant "physically placed" the call. In re Dish Network, LLC, 28 F.C.C.R. at 6583 ¶ 26.

**\*5** Neither has Plaintiff pled sufficient facts to allow the Court to "draw the reasonable inference" that Defendant is vicariously liable for the telemarketing call Plaintiff received. See Iqbal, 556 U.S. at 678. Plaintiff relies upon Landy v. Nat. Power Sources, LLC, in which an unidentified operator utilizing ADTS called the plaintiff's cell phone and made a generic solicitation regarding solar panels. No. 3:21-00425, 2022 WL 797967, at \*1 (D.N.J. Mar. 16, 2022) (hereinafter, "Landy II"). The plaintiff was then transferred to a live agent associated with a third-party named "US Home Solar," before a second live agent identified

Doyle v. GoHealth, LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 34 of 103

herself as the defendant's agent. Id. There, the Court held that the plaintiff had pled sufficient facts to plausibly plead vicarious liability on the part of the defendant. Id. at *3. The Court determined that the "description of the process of the call" established "circumstantial evidence that by accepting the call, and following up with an e-mail after the call, [defendant] demonstrated consent to the use of ATDS." Id. (internal quotation marks omitted). The Court further reasoned that "an agency relationship [could] be inferred from ... the smooth transfer from the initial ATDS contact to" the two live agents, which showed "a cooperative relationship from which one may infer authority or apparent authority of [defendant] to the initial contact by ATDS." Id.

In Landy II, however, the plaintiff amended his complaint after an initial dismissal for failure to state a claim, to include new factual allegations regarding the "nature of the services" initially offered to plaintiff, and specifically "allege[d] that the initial ATDS contact was made to market [defendant's] products." Id. at *1. The amended complaint further supplemented the original by adding that "the initial call was made at the direction of [defendant], and that [defendant] knew the initial caller utilized an ATDS to generate customers for [defendant]." Id. at *3. Plaintiff here has not alleged any such facts.

First, Plaintiff does not provide any details regarding Defendant's relationship to Sarah and Jason, and he does not explain Jason's relationship to Jocelyn.[3] While the FAC states that Jason, the first live agent with whom Plaintiff spoke, indicated that "GoHealth and GoMedicare are the same company," FAC ¶ 33, Plaintiff does not allege any agency relationship between GoHealth and Jason, nor whether and how GoMedicare is related to Defendant. See Landy v. Nat. Power Sources, LLC, No. 3:21-00425, 2021 WL 3634162, at *4 (D.N.J. Aug. 17, 2021) ("Landy I") (dismissing the plaintiff's TCPA claims where he did "not allege that the initial caller referenced [defendant], t[ell] him to expect contact from [defendant], or otherwise indicate[ ] a relationship with [defendant]"); Klein v. Just Energy Grp., Inc., No. CV 14-1050, 2016 WL 3539137, at *9-13 (W.D. Pa. June 29, 2016) (rejecting plaintiff's vicarious liability allegations as based on speculation that the defendant "accepted or received any benefit" from the call, and where plaintiff offered no evidence of defendant's affirmance, assent, or consent to the call).

Moreover, Plaintiff failed to allege that Sarah and Jason were attempting to sell him GoHealth-specific Medicare services, and "the purported interrelatedness" of GoHealth to Medicare is not explained anywhere in the Complaint. See Doyle v. Matrix Warranty Sols., Inc., No. 22-3198, 2023 WL 1794838, at *5 (D.N.J. Feb. 6, 2023). While Plaintiff presented proofs demonstrating GoHealth's Medicare business for the first time when he opposed Defendant's Motion to Dismiss, those exhibits are "not appropriately considered as part of the Court's Rule 12(b)(6) analysis." Id. Plaintiff may not attempt to make such a connection via his briefing, as "the Complaint may not be amended by the briefs in opposition to a motion to dismiss." Pennsylvania ex rel. v. Zimmerman v. Pepsico, 836 F.2d 173, 181 (3d Cir. 1988).[4]

**\*6** Accordingly, the FAC makes insufficient allegations for this Court to infer that Defendant bears responsibility for the initial telemarketing call.[5]

**IV. CONCLUSION**

Defendant's Motion to Dismiss pursuant to Rule 12(b)(6), ECF No. 8, is accordingly **GRANTED**. Plaintiff may amend his Complaint within 30 days of this Order to cure any deficiencies identified herein.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3984951

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 35 of 103

**Footnotes**

| | |
|---|---|
| 1 | These facts are principally drawn from the FAC. |
| 2 | Plaintiff has satisfied the TCPA requirement that the caller use an artificial or prerecorded voice, and the parties do not dispute this. See Pl. Opp. at 9-10; Somogyi v. Freedom Mortg. Corp., No. 17-6546, 2018 WL 3656158, at *7 (D.N.J. Aug. 2, 2018) (The "complaint must include some factual allegations beyond "the call had a prerecorded voice," such as descriptions of the voice's "clarity and cadence" or "the absence of anything specific" to a live person such as saying "the name of the person being called."). |
| 3 | Plaintiff's attempts to explain that the use of the word "their" website indicates that Jason was associated with GoHealth are unavailing, and as noted below, are after-the-fact explanations that were not included in Plaintiff's pleadings, and will therefore not be considered at this stage. Pl. Opp. at 15-17. |
| 4 | The Court similarly rejects Plaintiff's request for judicial notice of Defendant's website, as "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" at the motion to dismiss stage. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). |
| 5 | At this stage, the Court also declines to issue an order certifying the matter as a class action with Plaintiff as Class Representative, FAC ¶ 82(a). Plaintiff may bring a formal motion to certify the class if he so chooses. |

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 36 of 103

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 203972
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

Tonia JEWELL, et al., Plaintiff

v.

MAGNOLIA BANK, INC., Defendant

Civil Action No. 3:23-cv-78-RGJ
|
Signed January 17, 2024
|
Filed January 18, 2024

**Attorneys and Law Firms**

Larry Forman, Forman & Associates, Louisville, KY, Yeremey O. Krivoshey, Pro Hac Vice, Bursor & Fisher, P.A., Walnut Creek, CA, for Plaintiff.

Brittany A. Andres, Pro Hac Vice, Eric J. Troutman, Pro Hac Vice, Troutman Amin, LLP, Irvine, CA, Jason Renzelmann, Frost Brown Todd LLC, Louisville, KY, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Rebecca Grady Jennings, District Judge

**\*1**  Defendant Magnolia Bank, Inc. ("Magnolia") moves to dismiss Plaintiff Tonia Jewell's ("Jewell") class action Complaint against it. [DE 24]. Magnolia also moves to strike Jewell's class allegations. [DE 25]. Responses and replies were filed to both motions. [DE 26; DE 29; DE 27; DE 30]. These matters are ripe for adjudication. For the reasons below, Magnolia's Motion to Dismiss [DE 24] is **DENIED** and Magnolia's Motion to Strike Class Allegations [DE 25] is **DENIED**.

**I. BACKGROUND**

The Amended Complaint alleges that Jewell and a proposed class[1] of similarly situated Plaintiffs are registered on the national do-not-call registry but received telemarketing calls from Magnolia or a third-party telemarketing agency, Rasani, on behalf of Magnolia. [*See* DE 23 at 87-90 ¶¶ 6-21]. On November 10, 2022, Jewell alleges that she received a phone call from the number (301) 381-4665 marketing home mortgage refinancing services on behalf of Magnolia. [DE 23 at 88 ¶¶9-11]. Jewell received a phone call the next day from the number (626) 591-2985 also marketing home mortgage refinancing services on behalf of Magnolia. [*Id.* at ¶12-13]. During this call, Jewell was transferred to Anthony Beck ("Beck"), a "representative of Magnolia" who marketed home mortgage refinancing services on behalf of Magnolia. [*Id.* ¶ 13]. Jewell alleges that these phone calls were initiated by Rasani employees "Phil" and "Leo," respectively. [*Id.* ¶¶11-13]. Jewell received two more calls that she did not answer from the number (317) 743-0573, which Jewell alleges were from Beck. [DE 88-89 ¶¶14-16].

Jewell filed this action on February 20, 2023, pleading direct and vicarious liability theories against Magnolia for claims of negligent and knowing/willful violations of the Telephone Consumer Protection Act, ⚑47 U.S.C. § 227, *et seq.* ("TCPA").

[DE 1]. Magnolia moved to dismiss for failure to state a claim [DE 18] and to strike class allegations. [DE 19]. On May 19, 2023, Jewell filed an Amended Complaint, adding a theory of vicarious liability and denying that she consented to any of the phone calls. [DE 23]. Magnolia again moves to dismiss, arguing Jewell has failed to sufficiently allege (1) Magnolia made a telephone solicitation or that the calls were made for a marketing purpose, or (2) Magnolia is liable for Rasani's conduct under theories of actual authority, apparent authority, or ratification. [DE 24 at 97-98]. Magnolia also moves to strike Jewell's class allegations, arguing that Jewell's current proposed class cannot be certified and cannot be cured in discovery. [DE 25 at 114].

## II. STANDARD

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citation omitted).

**\*2** To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "A complaint will be dismissed ... if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. Of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561-64, 127 S.Ct. 1955).

## III. DISCUSSION

### 1. Magnolia's Motion to Dismiss

The TCPA prohibits a person from: (1) "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party"; or (2) making live calls to residential telephone numbers that have been placed on the national do-not-call registry. *Lucas v. Telemarketer Calling from (407) 476-5680*, No. 18-3633, 2019 WL 3021233, at *5 (6th Cir. May 29, 2019) (citing 47 U.S.C. § 227 *et seq.*). In *In re Dish Network, LLC*, the FCC explained that a "telemarketer" is "the person or entity that initiates a [telemarketing] call," i.e., "takes the steps necessary to physically place a telephone call, and generally does not include persons or entities ... that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." 28 FCC Rcd.6574, 6583, ¶26 (2013). Even so, the FCC clarified that inclusion of the phrase "on behalf of" in § 227(c)(5), which creates a private right of action to challenge multiple live calls, allowed for a "seller" to be held vicariously liable under traditional agency tenets, including "not only formal agency, but also principles of apparent authority and ratification." *Dish Network*, 28 FCC Rcd. at 6584.

Jewell's claims are based on two sets of phone calls: those she alleges were made by Beck that Magnolia is directly liable for, [DE 23 at 89 ¶¶16-17], and those made by Rasani employees that Magnolia is vicariously liable for. [DE 23 at 88-89 ¶¶9-15, 18].

### a. Direct Liability

Magnolia moves to dismiss the claims based on the first set of calls claiming that Jewell has not plausibly alleged that (1) a telephone solicitation was made; or (2) that the telephone calls allegedly made by Beck from the (317) 743-0573 number were made for a marketing purpose. [DE 24 at 97].

The implementing regulations for the TCPA define a telephone solicitation as "the initiation of a telephone call or message," made for the purpose "of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(15). The regulations exclude a call or message "to any person with whom the caller has an established business relationship." 47 C.F.R. § 64.1200(f)(15)(ii). Whether an established business relationship exists is an affirmative defense not appropriately decided at the pleading stage. *See e.g.,* *Bridging Communities v. Top Flite Finan. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (noting the "possibility of consent to receive faxes and/or prior existing business relationships as a defense to liability under the TCPA."); *Hodgin v. Parker Waichman Llp*, No. 3:14-CV-733-DJH, 2015 WL 13022289, at *3 (W.D. Ky. Sept. 30, 2015) (in a TCPA action, defendant bears the burden of proving the "affirmative defense" that a plaintiff "consented to receiving phone calls.")

**\*3** Because the TCPA can be violated merely upon the initiation of a call for a prohibited purpose, "the relevant question is a Defendant's *purpose* in initiating the calls, not what *occurred* on each call." *Bennett v. GoDaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911, at *8 (D. Ariz. Apr. 8, 2019). Where "the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services," the TCPA has been violated, even if the call was not answered. *Id.* (citing *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 816 (8th Cir. 2015)). As noted by the Ninth Circuit in approaching a similar issue under the TCPA, courts should "approach the problem" of determining why calls were made "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

Jewell alleges that she received a phone call and was "transferred to Anthony Beck, a representative of Magnolia Bank who continued marketing home mortgage refinancing services on behalf of Defendant," [DE 23 at 88 ¶13], was given a callback number for Beck at (317) 743-0573, [*Id.* at 89 ¶ 14], and "received two more calls from the number (317) 743-0573." [*Id.* ¶ 16]. Even though Jewell did not answer the two later phone calls, the context of those calls—allegedly made from Beck's number after he marketed home mortgage refinancing services to Jewell—suggest that they were "initiated and transmitted to a person for the purpose of promoting property, goods, or services." Presuming all factual allegations in the complaint to be true and making all reasonable inferences in favor of Jewell, these allegations plausibly allege that Magnolia made a telephone solicitation and that the calls were made for a marketing purpose.

Magnolia argues that the definition of telephone solicitation requires Jewell to allege facts that the calls were made without an inquiry—to allege that there was no established business relationship "on the basis of the subscriber's inquiry or application regarding products or services offered by the entity." 47 C.F.R. § 64.1200(f)(5); [DE 29 at 162]. Magnolia maintains that Jewell has not plausibly alleged that a telephone solicitation was made because "[c]ritically, Plaintiff never alleges she told Magnolia Bank she was disinterested in its products or affirmatively asked it *not* to call her back. So the only facts alleged in the FAC suggest an inquiry *did* take place and not vice versa."[2] [DE 24 at 109]. Yet neither the TCPA nor FRCP 12(b)(6) require these specific allegations. And as noted above, that a plaintiff consented to receiving phone calls through an inquiry is an affirmative defense, not an element of the claim.[3] As a result, the Court **DENIES** Magnolia's motion to dismiss as to Jewell's direct liability claims for the calls made from the - 0573 number.

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 39 of 103

**b. Vicarious Liability**

Jewell's other claims are based on calls made by employees of a third-party telemarketing agency, Rasani, that she alleges Magnolia is vicariously liable. [DE 23 at 88-89 ¶¶9-15, 18]. Magnolia moves to dismiss these claims alleging that the Amended Complaint insufficiently alleges vicarious liability under theories of actual authority, apparent authority, or ratification. [DE 24 at 102].

*i. Actual and Apparent Authority*

**\*4** "[A]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 373 (6th Cir. 2015). A party may be held liable for the conduct of a third-party under a theory of actual authority where "(a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." *In re Dish Network*, 28 F.C.C. Rcd. at 6586 (2013). Actual authority may be express or implied. *See Bergin Fin., Inc. v. First Am. Title Co.*, 397 Fed. App'x 119, 124 (6th Cir. 2010). "Apparent authority exists when (1) the principal manifests that another is the principal's agent, and (2) it is reasonable for a third person dealing with the agent to believe the agent is authorized to act for the principal." *Deschamps v. Bridgestone Ams., Inc. Salaried Employees Ret. Plan*, 840 F.3d 267, 279 (6th Cir. 2016) (citing *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 150 F.3d 590, 593 (6th Cir. 1998)).

Other district courts have found implied authority plausibly alleged under similar facts to this case. *See e.g., Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) (dismissing claim based on apparent authority, but finding implied authority plausibly alleged where plaintiff "has alleged an unlawful telemarketing scheme the end result of which was the generation of business for [defendant], and he has alleged that [defendant] was an active participant in that scheme."); *Landy v. Nat. Power Sources, LLC*, No. 3:21-00425, 2022 WL 797967, at \*3 (D.N.J. Mar. 16, 2022) (*Landy II*) (finding that where plaintiff specifically alleged that the initial contact was made to market defendant's products, "an agency relationship [could] be inferred from ... the smooth transfer from the initial [automatic telephone dialing system] contact to the defendant's live agents ... [and defendant's] accepting the call and following up with an email after the call").

Like the plaintiff in *Landy II*, Jewell has alleged that Rasani "held themselves out as persons authorized to market Defendant's services." [DE 23 at 89 ¶18]. Jewell alleges that she was transferred from the initial call to one of Magnolia's employees, who accepted the call and later called twice more. [DE 23 at 88-89, ¶¶13-16]. These facts, taken as true and making all reasonable inferences in favor of Jewell, plausibly allege implied authority. As a result, the Court **DENIES** Magnolia's motion to dismiss to the extent that Jewell's claim relies on a theory of implied actual authority.

Because the claim moves forward on a theory of implied actual authority, the Court need not reach the argument of whether Jewell has plausibly alleged apparent authority. Jewell's Amended Complaint alleges statements made by Rasani that it "held themselves out as persons authorized to market Defendant's services," [DE 23 at 89 ¶18], but alleges no specific statements by *Magnolia* that held Rasani out as its agent. "The apparent power of an agent is to be determined by the act of the *principal* and not by the acts of the *agent*[.]" *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005) (emphasis added). At this stage of the litigation, it is a close call as to whether this theory is fully alleged.

*ii. Ratification*

"[R]atification occurs when an agent acts for the principal's benefit and the principal does not repudiate the agent's actions." *Lucas*, 2019 WL 3021233, at *5 (citing *Sphere Drake Ins. v. Am. Gen. Life Ins.*, 376 F.3d 664, 677 (7th Cir. 2004)). "A principal can ratify an act by 'manifesting assent that the act shall affect the person's legal relations,' or by 'conduct that justifies a reasonable assumption that the person so consents.' " *Eldridge v. Cabela's Inc.*, No. 3:16-cv-536, 2017 WL 4364205, at *6 (W.D. Ky. Sept. 29, 2017) (quoting Restatement (Third) of Agency § 4.01(2)). "A person may ratify an act if the actor acted or purported to act as an agent on the person's behalf." Restatement § 4.03. Because Jewell has plausibly alleged Rasani acted with implied authority as an agent on Magnolia's behalf, "it [would be] similarly premature to draw any conclusion about ratification." *Cunningham*, 251 F. Supp. 3d 1187 at 1199. As a result, the Court **DENIES** Magnolia's motion to dismiss Jewell's vicarious liability claim insofar as it relies on a theory of ratification.

### 2. Magnolia's Motion to Strike

 **\*5** Magnolia also moves to strike Jewell's class allegations under Federal Rule of Civil Procedure 12(f). [DE 25]. Magnolia argues Jewell's class allegations could never be certified because (1) the proposed class is overly broad and lacks commonality; (2) the class is not defined objectively; (3) the class definition is vague; and (4) Jewell does not meet the class definition. [*Id.* at 113-114].

Though procedurally permissible, striking a plaintiff's class allegations before discovery and a motion for class certification is a rare remedy. *See Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974); *see also Chen-Oster v. Goldman, Sachs & Co.*, 877 Fed. Supp. 2d 113, 117 (S.D.N.Y. 2012) (noting that, generally, "motions of this kind are deemed procedurally premature"). The moving party has the burden of establishing from the face of the complaint that "it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove [through discovery]." *Schilling v. Kenton Cnty.*, No. 10-143-DLB, 2011 WL 293759, at *4, 2011 U.S. Dist. LEXIS 8050 (E.D. Ky. Jan. 27, 2011) (citations omitted); *see also* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1383 (3d ed. 2018) ("[C]lass allegations [are] stricken prior to a motion for certification only when class certification is a clear impossibility."). In other words, a court should strike class allegations only if "it is clear from the face of the complaint that a proposed class cannot satisfy the requirements of Rule 23." *Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010). The Sixth Circuit has stated that a district court should usually "defer decision on class certification issues and allow discovery 'if the existing record is inadequate for resolving the relevant issues.' " *Bearden*, 720 F. Supp. 2d 932 at 942.

#### a. Overbreadth and Commonality

A proposed class definition may be overly broad if "it would include members who have not suffered harm at the hands of the Defendant and are not at risk to suffer such harm." *Brashear v. Perry Cnty., Ky.*, No. CIV.A. 6:06-143-DCR, 2007 WL 1434876, at *2 (E.D. Ky. May 14, 2007). Jewell defines the proposed class as:

> All persons in the United States whose numbers are listed on the national do-not-call registry, and received two or more telemarketing calls within any 12-month period from Defendant or its agents to their residential telephone number 31 or more days after the telephone number was listed on the national

do-not-call registry at any time in the period that begins four years before the filing of the complaint in this action to the date that class notice is disseminated (the "Class Period")

[DE 23 at 88-89 ¶23].

Magnolia contends that the proposed class is overly broad because "it includes individuals who either consented to be contacted by Magnolia Bank or had an established business relationship with Magnolia Bank," [DE 25 at 119], and lacks commonality because some class members will lack a valid claim for the same reasons. [*Id.* at 120]. Yet including only individuals who did not expressly consent to the receipt of the defendant's phone calls is the definition of an impermissible fail-safe class—"one that includes only those who are entitled to relief." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). *See, e.g.*, *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 625–26 (E.D. Pa. 2015) ("Both classes Zarichny defined are fail-safe classes.") ("The putative TCPA class is comprised of those people who received CPRS telephone calls without the recipient's 'prior express consent[.]' ... [T]here is no way to provide notice to that putative class without the sort of extensive fact-finding that class actions should avoid."); *Sauter v. CVS Pharm., Inc.*, No. 2:13-cv-846, 2014 WL 1814076, at *8–9 (S.D. Ohio May 7, 2014) ("Each of the Plaintiff's proposed classes is defined to include only those individuals who did not expressly consent to the receipt of the defendant's phone calls made with the use of an ATDS.") ("In other words, 'the proposed class[es] consist[ ] solely of persons who can establish that defendant violated the TCPA.' "); *Boyer v. Diversified Consultants, Inc.*, 306 F.R.D. 536, 540 (E.D. Mich. 2015) (finding the proposed classes were fail-safe because they only "consist of those people who did not provide prior express consent to be contacted by defendants, and therefore can establish a violation of the TCPA"). The proposed members of the class will have received a telemarketing call—and thus have a claim—but might not be entitled to relief due to the affirmative defense of an established business relationship or their consent to the calls. As a result, Jewell's proposed class is neither overly broad in that it would include members who do not have a claim, nor does it only include those who are entitled to relief.

**\*6** To demonstrate commonality, the proposed member's "claims must depend on a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Young*, 693 F.3d 532 at 542 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011)). While Magnolia's consent/established business relationship defense may apply to some members of the class and not others, the plaintiffs' claims will still "depend on a common contention ... of such a nature that it is capable of classwide resolution." *Young*, 693 F.3d 532 at 542; *See Bridging Communities*, 843 F.3d at 1126 ("Even where defendants point to some evidence that a defense will indeed apply to some class members ... courts routinely grant certification because Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class.") (internal quotations omitted). As a result, Jewell's proposed class definition does not lack commonality.

### b. Objective Definition

"A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class." *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009) (citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.21[3][c] (3d ed. 2007)). Magnolia argues that the proposed class cannot be defined objectively and is therefore a fail-safe class requiring an individual merits evaluation for each member. [DE 25 at 121-122].

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 42 of 103

Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)

A fail-safe class is "one that includes *only* those who are *entitled* to relief." *Hodgin v. Parker Waichman Llp*, No. 3:14-CV-733-DJH, 2015 WL 13022289, at *4 (W.D. Ky. Sept. 30, 2015). A class definition that requires the proposed members of the class to be able to *pursue* a claim for relief is different from requiring them to be *entitled* to relief, as federal courts do not have "the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431, 141 S. Ct. 2190, 2208, 210 L. Ed. 2d 568 (2021). Magnolia "could establish that the violation was the result of error, that it obtained the subscriber's prior express permission, or that there was an [established business relationship]." *Hodgin*, 2015 WL 13022289, at *4. Again, the proposed class is not fail-safe. Moreover, the class can be defined before the case is resolved on its merits. "If an individual received a telephone solicitation from [defendants] and her phone number was registered on the national do-not-call registry, then they can join the class. There is no need for this case to be resolved on the merits beforehand." *Id.* So too here. Jewell's proposed class definition does not require an individual merits evaluation and can be defined objectively.

### c. Vagueness

"Although the text of Rule 23(a) is silent on the matter, a class must not only exist, the class must be susceptible of precise definition. There can be no class action if the proposed class is 'amorphous' or 'imprecise.' " *Young*, 693 F.3d 532 at 538 (6th Cir. 2012). Magnolia argues that the phrase "Defendant **or its agents**" in the proposed class definition is too vague and ambiguous because it "may be intended to refer to employees of Magnolia Bank or third-parties making calls on Magnolia Bank's behalf or both." [DE 25 at 124].

The Amended Complaint alleges both direct liability for actions taken by a Magnolia Bank employee, [DE 23 at 89 ¶17], and vicarious liability based on the phone calls made by Rasani on Magnolia's behalf. [*Id.* ¶18]. Magnolia accuses Jewell of pulling a "bait and switch" because Jewell's class definition refers to "*agents*—plural" but the Amended Complaint "does not allege that Rasani is the *only* agent whose calls are at issue." [DE 30 at 183]. Magnolia argues that until Jewell amends the proposed definition to include only calls by Rasani, it "refers only vaguely to 'agents' without any content or limitation—[and] is uncertifiably [sic] vague." [DE 30 at 184]. Yet Jewell's Amended Complaint identifies only two sets of calls at issue; one set that were made by Magnolia directly and the other by its alleged agent, Rasani. [*See* DE 23 at 89 ¶¶16-17]; [*Id.* at 88-89 ¶¶9-15, 18]. While the phrase "Defendant or its agents" could refer to employees of Magnolia Bank or third parties making calls on Magnolia Bank's behalf, that is not vagueness—it recognizes a distinction between claims brought under a theory of direct liability or vicarious liability; or indeed, both. Jewell's class is definition is not too vague to be uncertifiable.

### d. Representative of the Class

 **\*7**  Named plaintiffs "must also be members of the proposed 'class' " in order to "adequately protect the interest of the proposed class members." *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337 (E.D. Ky. 2002); *See* Fed. R. Civ. P. 23(a)(4). Magnolia argues that Jewell is not representative of the class because her injury "is different from those of the proposed class members." [DE 25 at 122]. "Magnolia argues that Jewell does not meet the class definition because Jewell 'did not answer the calls' from Magnolia Bank and so she cannot assert they were telemarketing calls," [DE 30 at 183], and maintains that Magnolia cannot be held vicariously liable for the calls Rasani made. Yet, as outlined above, Jewell's direct liability claim is plausibly alleged, in part because a plaintiff need not answer calls to assert that they were telemarketing calls. Moreover, Jewell also plausibly alleged vicarious liability for Rasani's calls. As a result, Jewell meets the proposed class definition.

It is Magnolia's burden to establish from the face of the complaint that "it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove [through discovery]." *Schilling v. Kenton Cnty.*, No. 10-143-DLB, 2011 WL 293759, at *4, 2011 U.S. Dist. LEXIS 8050 (E.D. Ky. Jan. 27, 2011). Magnolia has failed to meet that burden. To be clear, the Court is not making a conditional certification of Jewell's proposed class. But in analyzing Magnolia's motion to

**Jewell v. Magnolia Bank, Inc., Not Reported in Fed. Supp. (2024)**

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 43 of 103

strike, Jewell's proposed class definition is (1) not overly broad; (2) does not lack commonality; (3) is not vague, (4) does not lack an objective definition; and (5); Jewell is representative of the class. As a result, the Court **DENIES** Magnolia's motion to strike class allegations.

## IV. CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1) Magnolia's Motion to Dismiss [DE 24] is **DENIED**: Magnolia's Motion to Dismiss as to Jewell's claim for direct liability is **DENIED**. To the extent that Jewell's claims for vicarious liability rely on a theory of implied actual authority or ratification, Magnolia's Motion to Dismiss is **DENIED**. To the extent that Jewell's vicarious liability claim relies on a theory of apparent authority, Magnolia's Motion to Dismiss is **DENIED**.

(2) Magnolia's Motion to Strike Class Allegations [DE 25] is **DENIED**.

(3) Magnolia's first Motion to Dismiss [DE 18] and first Motion to Strike Class Allegations [DE 19] are **DENIED as MOOT**.

(4) The Court will refer the case for Rule 16 conference with the Magistrate Judge by separate order.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 203972

---

**Footnotes**

1       Jewell has not yet filed a motion for class certification.

2       This is a logical fallacy known as "denying the antecedent," concisely refuted because " 'If P then Q' does not mean 'If Not P then Not Q.' " *New England Power Generators Ass'n v. F.E.R.C.*, 707 F.3d 364, 370 (D.C. Cir. 2013).

3       And in any event, Jewell alleges that she had "no transaction nor submitted any inquiry to Defendant within the eighteen (18) months preceding the calls at issue in this Complaint. She has never consented in writing, or otherwise, to receive telemarketing calls from Defendant." [DE 23 at 90 ¶19].

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 636723
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Samuel KATZ, individually and on behalf of all others similarly situated, Plaintiff,

v.

ALLIED FIRST BANK, SB Defendant.

Case No. 22 C 5277
|
Signed March 6, 2026

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Jeffrey M. Schieber, Nelson Mullins Riley & Scarborough LLP, Chicago, IL, Kevin Polansky, Pro Hac Vice, Nelson Mullins Riley & Scarborough LLP, Boston, MA, Nathan E. Hoffman, Nelson Mullins Riley & Scarborough, Nashville, TN for Defendant.

## MEMORANDUM OPINION AND ORDER

Robert W. Gettleman, United States District Judge

**\*1** Plaintiff Samuel Katz filed a first amended complaint on behalf of himself and a class of individuals against defendant, Allied First Bank, SB, and another defendant, Consumer Nsight LLC, asserting a single count—a claim for violations of the Telephone Consumer Protection Act ("TCPA"), ⚑47 U.S.C. § 227. The TCPA was enacted to help protect consumers from annoying telemarketing phone calls. According to plaintiff, he and the class members are listed on the National Do Not Call Registry, which was set up under the TCPA. Yet Consumer Nsight, he alleges, made unsolicited calls to them, and then transferred those calls to Allied—which, he avers, had contracted with Consumer Nsight to generate mortgage refinancing leads for Allied. Plaintiff thus alleges that Allied and Consumer Nsight violated the TCPA, and he seeks damages and injunctive relief on behalf of himself and the putative class.

Consumer Nsight has since settled with plaintiff, and has been dismissed as a defendant from the case. Allied has answered, denying liability. It also asserted a third-party complaint against Consumer Nsight, alleging that Allied entered into a contract with Consumer Nsight, under which Consumer Nsight agreed that its call transfers would not violate any laws. Allied therefore alleged that, if plaintiff's claim is successful, Consumer Nsight breached the contract and must indemnify Allied. Consumer Nsight moved to dismiss the third-party complaint for lack of personal jurisdiction, and the court granted that motion, dismissing Consumer Nsight from the case [125].

Allied is now the sole defendant here, and has moved for summary judgment under Fed. R. Civ. P. 56. Allied argues that summary judgment is proper here because there is no genuine dispute that neither Allied nor any agent of Allied initiated any telemarketing calls to plaintiff. Allied further argues that it "did not violate the TCPA as a matter of law": "The calls at issue did not violate the TCPA and, even if they did, [p]laintiff himself consented to be contacted." Plaintiff opposes the motion, contending that a reasonable jury could find in his favor. For the reasons below, the court grants in part and denies in part Allied's motion for summary judgment.

**WESTLAW**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    1

**BACKGROUND**

Craig Mattson worked for Allied as a branch manager in Arizona. His responsibilities included managing roughly 80 loan officers and generating leads through various outlets. To that end, he worked with various companies to purchase leads. One such company was Consumer Nsight.

On January 28, 2022, Consumer Nsight's CEO, Rick Sabatino, contacted Mattson to see if Mattson would be interested in using Consumer Nsight's services for live call transfers to Allied for people interested in mortgage refinances. An agreement was eventually struck, under which Consumer Nsight would provide advertising services to Allied, including "consulting services for live contact telephone transfers from a call center to Allied ... representatives." (Quoting Sabatino's Decl.). Mattson controlled Consumer Nsight's targeting criteria for the types of consumers he was looking to have refinance a loan, and he hired Consumer Nsight with Allied's approval and managed the scope of the relationship with Consumer Nsight.

 **\*2**  Sabatino states in a declaration that "Consumer Nsight is not a telemarketing firm" and "does not ... initiate telemarketing calls." So Consumer Nsight engaged a company called Iconic Results to conduct the calls and initiate the live call transfers to Allied. According to Sabatino, "Consumer Nsight had a relationship with Iconic ..., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. Iconic's CEO, Mituin Varma, further explains that Iconic's business was to call "consumers who placed mortgage rate inquiries in order to verify that certain requirements are met (size of mortgage, location of property, and so forth), and then transfer[ ] qualifying consumers to companies that placed orders for such 'warm transfer' calls." Consumer Nsight's Sabatino states that, under the agreement with Allied, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic transferred certain calls to a ... routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied ... via [the] routing number."

Between November 2021 and October 2022, Consumer Nsight placed three orders with Iconic for a total of 950 mortgage lead transfers, and received the warm transfers. Iconic invoiced Consumer Nsight for the calls it made as part of the campaign. Copies of invoices show that Allied accepted call transfers from Consumer Nsight and paid for them.

Mattson explained at his deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers. Mattson also explained that "everyone in the office knew that th[e] lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic."

Copies of internal Allied documents provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied ... initially and on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List. Allied's Compliance Officer, Adam Skeffington, testified at his deposition that Allied sends the internal Do Not Call list to team managers, who are then required to send it to vendors, but that he was not aware of Mattson having sent the list to Consumer Nsight.

Allied asserts that in January 2022, an online inquiry form was executed at the webpage LenderConsultant.com, and that the name provided on the form was "James Weim" and the phone number provided was (XXX) XXX-1001. Varma, Iconic's CEO, states in a declaration that Iconic called plaintiff at that number, which "had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." Plaintiff admitted at his deposition that he has used the alias "James Weim" in relation to telemarketing calls, and that his telephone number is the 1001 number. But he denies that he used this alias to complete any online form or that he submitted his information to lenderconsultant.com. According to plaintiff, he uses this alias only when responding to illegal telemarketing calls, not when submitting information online.

Varma states that the lenderconsultant.com website "confirmed that the following consent language had been agreed to along with the [plaintiff's] inquiry":

> By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and prerecorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

**\*3** Allied asserts that between January 12 and March 7, 2022, Iconic contacted "Mr. Weim" several times to discuss his interest in mortgage refinancing per the online inquiry. Allied further asserts that plaintiff finally answered the tenth call on March 7, 2022, stating that he was "James Weim" and confirming that he was interested in hearing mortgage rate offers. The phone-call transcript shows that the call was made by a woman who spoke with plaintiff and then transferred the call to an Allied loan officer named Jason Aldridge, who continued the call with plaintiff to discuss mortgage refinancing options. Plaintiff admits that he answered a call on March 7, 2022, and that he used the name "James Weim." But he denies that he confirmed that he was interested in hearing mortgage rate offers in any genuine sense, because, as he puts is, he was just "play[ing] along with that to the extent [he] needed to identify the party responsible for the illegal calls."

Two days later, on March 9, 2022, plaintiff sent a text message to Aldridge, asking Aldridge who the lead generator was that provided plaintiff's information. Aldridge responded, explaining that he was "not sure," that he did not have anything to do with marketing, and that the previous call had been "transferred," so Aldridge "assumed the information was provided by [plaintiff] to the person on the phone."

A few weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." In April 2022, Mattson refused a delivery of transfers from Consumer Nsight, stating he was "done with transfers." And at some point, he spoke directly to Iconic about the warm-transfer-lead campaign and told Iconic that the leads were "not good" and that he "wasn't very happy about that." Mattson stated at deposition that Consumer Nsight and Iconic were "just shoving over some people that were not very interested."

In September 2022, plaintiff filed this lawsuit, alleging that his number is on the national do-not-call registry and that Allied and Consumer Nsight violated the TCPA by calling him. As it turns out, plaintiff is no stranger to TCPA actions. Plaintiff estimates that he has filed between five and ten TCPA actions over the last decade. And in fact, this is the second TCPA complaint he has filed against Allied (the other in 2016).

Plaintiff has since settled his claims with Consumer Nsight and Iconic (who was not named as a defendant in this case). Plaintiff states in a declaration, though, that he has "not recovered [his] full measure of statutory damages from either of [them], including in the aggregate."

## DISCUSSION

Allied moves for summary judgment on plaintiff's sole claim—violations of the TCPA, 47 U.S.C. § 227. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it affects the outcome of the case under the governing law and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a factfinder for resolution at trial. See id. at 249. The court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. It must instead "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. In the end, the court must analyze the motion in light of both the applicable substantive law and the question of whether a reasonable factfinder could return a verdict for the nonmovant. Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir. 1988). If, based on the record as a whole, a reasonable factfinder could not find for the nonmovant, there is no genuine issue for trial and summary judgment is appropriate. See Matsushita Elec., 475 U.S. at 587.

**\*4** Allied makes several arguments for why summary judgment is appropriate here. The court addresses each below.

### Whether the Calls did not Violate the TCPA as a Matter of Law

Allied contends that plaintiff's TCPA claim fails for a simple reason: plaintiff "cannot establish that the calls [to him] were placed with an [automatic telephone dialing system]." Without an autodialer system, Allied asserts, there can be no TCPA violation as a matter of law.

The court disagrees. To be sure, Congress passed the TCPA in response "to a torrent of vociferous consumer complaints about intrusive robocalls." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 614 (2020). And so it is not surprising that the TCPA addresses calls from autodialing systems—in particular, in § 227(b).

But Congress was concerned with more than just robocalls. Indeed, it had determined that "[u]nrestricted telemarketing ... can [also] be an intrusive invasion of privacy." Hossfeld v. Allstate Ins. Co., 726 F. Supp. 3d 852, 861 (N.D. Ill. 2024) (quoting 105 Stat. 2394, codified as Note to 47 U.S.C. § 227). It therefore enacted § 227(c), which directs the FCC to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). To aid the FCC in this endeavor, "Congress authorized the FCC to issue regulations, among other things, creating what is today commonly known as the national do-not-call registry." Hossfeld, 726 F. Supp. 3d at 862; see also 47 U.S.C. §§ 227(c)(1)(E), (c)(2), and (c)(3).

The FCC eventually issued those regulations in 2003, which are found in 47 C.F.R. § 64.1200(c)(2). They provide that, among other things, "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his ... number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). For "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the[se] regulations," the TCPA provides a private right to "bring ... (A) an action based on a violation of the regulations ... to enjoin

such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions." ⚑ 47 U.S.C. § 227(c)(5).

Plaintiff's amended complaint here alleges violations related to the do-not-call registry. According to the amended complaint, Allied "or its affiliates, agents, [or] other persons or entities acting on [its] behalf" violated the TCPA "by making telemarketing calls ... to [plaintiff] and the Class despite their numbers being on the National Do Not Call Registry." The fact that the calls were not placed with an autodialing system, then, provides no basis to enter summary judgment for Allied on plaintiff's TCPA claim.

### Whether Plaintiff Consented to Receive the Calls

Allied argues that plaintiff's claim also fails as a matter of law because he "consented to receive the calls." According to Allied, it can avoid liability under the TCPA if it proves that it made the calls with the recipient's prior express consent. And, it contends, "[t]here can be no genuine dispute that [plaintiff] filled out the online form" at lenderconsultant.com, in which he consented to receive mortgage refinancing calls. In support, Allied relies on Iconic's CEO Varma's declaration. Varma states that Iconic called plaintiff at the 1001 number, "which number had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." "That website," Varma says, "confirmed that the following consent language had been agreed to along with the inquiry":

> **\*5** By clicking 'Submit', you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot), regarding financial, home, credit, final expense and solar related offers and for them to contact you ... via telephone, mobile device ... even if ... your telephone number is currently listed on any ... federal ... Do Not Call list.

Allied further argues that plaintiff verified at his deposition that that he answered a call from Iconic, where he stated that he was "James Weim" and he confirmed his interest in learning about mortgage rate offers. Because plaintiff expressly consented to be contacted about mortgage refinancing, Allied concludes, "his claim for violation of the TCPA fails as a matter of law."

Plaintiff argues in response that summary judgment based on consent is improper for two reasons. First, he contends, there is a genuine factual dispute over whether he visited LenderConsultant.com and provided consent. On the one hand, plaintiff asserts, Allied fails to provide any evidence from LenderConsultant.com "to substantiate the fact that a website visit even took place," and Varma's assertions about the visit are inadmissible hearsay. And on the other hand, his own declaration—along with his uncontroverted deposition testimony—confirm that he never visited LenderConsultant.com. Second, plaintiff contends that the purported website language "is insufficient to constitute legally sufficient TCPA consent." That is because, he argues, neither Iconic, Consumer Nsight, Mattson, nor Allied are mentioned in it, and it does not "comply with the E-SIGN Act's requirements."

The court finds that Allied has failed to show that summary judgment is proper based on the consent issue. Under the FCC's regulations, an "entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating" the regulation against calling people on the do-not-call registry if "[i]t has obtained the subscriber's prior express invitation or permission." ⚑ 47 C.F.R. § 64.1200(c)(2)(ii). "Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." Id. As the ABA's Business and Commercial Litigation in Federal Courts explains:

> The purpose of the agreement—obtaining consent to be called—must be clear and conspicuous, identify the specific seller to whom the consent is being provided, and not be a condition for the person to make a purchase. The agreement should include the person's telephone number, and must include the person's signature. An electronic signature in accordance with the National Commerce ("E-SIGN") Act is sufficient.

§ 114:7. National Do-Not-Call Registry—Express written consent exemption, 10 Bus. & Com. Litig. Fed. Cts. § 114:7 (5th ed.). "Express consent is an affirmative defense on which the defendant bears the burden of proof." Blow v. Bijora, Inc., 855 F.3d 793, 803 (7th Cir. 2017) (analyzing a TCPA claim under 47 U.S.C. § 227(b) based on the use of an autodialer).

Here, putting aside whether the "consent language" is itself legally sufficient, there is a genuine dispute as to whether plaintiff provided the online form at LenderConsultant.com in the first place. True, Varma states that a "James Weim" provided the form at LenderConsultant.com with plaintiff's phone number. And plaintiff admits that he has used that alias before and that the phone number is his. But Allied provides no direct proof from LenderConsultant.com, and plaintiff has affirmatively stated in his declaration and at deposition that he never visited that website. Consequently, this is an issue for a factfinder to resolve. Because there is a "genuine dispute as to a[ ] material fact," Allied is not entitled to summary judgment based on the consent issue. Fed. R. Civ. P. 56(a).

### Whether Allied is Directly or Vicariously Liable for the Calls at Issue

**\*6** Allied argues that summary judgment is also proper because it cannot be found either directly or vicariously liable here. As explained above, the FCC's regulations provide that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his ... number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). And section 227(c)(5) allows "persons" to seek relief if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Allied asserts that it cannot be held liable under the TCPA because neither it nor its agent ever made any call to plaintiff.

#### Direct Liability

Allied first contends that it cannot be held directly liable because Varma's declaration shows that Iconic—not Allied—initiated the calls at issue, and this fact is undisputed. And indeed, plaintiff does not argue otherwise—declining to even address the issue. Although "one can imagine a circumstance in which a seller is so involved in the placing of a specific telephone call as to be directly liable for initiating it—by giving the third party specific and comprehensive instructions as to timing and the manner of the call, for example," Dish Network, LLC, 28 F.C.C. Rcd. 6574, 6583 (2013)—there is no evidence that Allied was so involved here. Because there is no dispute that the evidence establishes that Iconic placed the calls at issue, the court finds that no reasonable jury could conclude that Allied is directly liable. The court therefore grants summary judgment of no direct liability.

#### Vicarious Liability

Allied also argues that it cannot be found vicariously liable here. It points to Dish Network, explaining that the FCC there held that "while a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles for violations of either ⚑section 227(b) or ⚑227(c) that are committed by third-party telemarketers." (Quoting ⚑Dish Network, 28 F.C.C. Rcd. at 6574). In particular, Allied asserts, "a seller may be [held] vicarious[ly] liab[le] for TCPA violations 'under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.' " (Quoting ⚑Dish Network, 28 F.C.C. Rcd. at 6584). But here, Allied argues, no "actual or apparent agent ... contacted [p]laintiff in violation of the TCPA," and Allied "did not ratify the alleged conduct of its agents who contacted [p]laintiff."

In response, plaintiff contends that Allied is not entitled to summary judgment. He, too, points to Dish Network in support of applying vicarious liability here, and further argues that, "[f]ollowing FCC's [Dish Network] Order, the Seventh Circuit has ruled [that] a TCPA defendant may be vicariously liable for its 'lead generator's unauthorized robocalling under actual authority, apparent authority, and ratification principles of agency liability.' " (Quoting ⚑Bilek v. Fed. Ins. Co., 8 F.4th 581, 587 (7th Cir. 2021)). And "[i]n this case," plaintiff argues, "liability as against Allied ... is clear under both actual authority and ratification theories."

The court begins by observing that both parties fail to note (or perhaps fail to appreciate) that the Supreme Court recently held in McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation, that a federal court "is not bound by the FCC's interpretation of the TCPA," and should instead "interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." ⚑606 U.S. 146, 168 (2025). "The Supreme Court's instruction bears on this case because, previously, courts viewed the FCC's declaratory ruling in *Dish Network* as binding authority for the proposition that a seller may be vicariously liable under federal common law agency principles for a telemarketer's TCPA violation even if the seller did not itself 'initiate' the call." ⚑Moore v. Club Exploria, LLC, No. 1:19-CV-02504, 2025 WL 2755076, at *10 (N.D. Ill. Sept. 26, 2025). [1] "But under the Supreme Court's recent teaching in *McLaughlin*, this Court is not bound to apply *Dish Network*." Id.

 **\*7**  This court, though, need not dwell long on the issue here. First, both parties agree that a seller like Allied can be vicariously liable under federal common law agency principles. Second, as plaintiff notes, the Seventh Circuit appears to have followed Dish Network in Bilek, where it cited the FCC's decision for the proposition that "[e]ach agency theory"—actual authority, apparent authority, and ratification—"offers an independent basis for ... vicarious liability" in a TCPA case (at least a ⚑§ 227(b) robocall case). ⚑8 F.4th at 587. And it is not clear that this court can disregard Bilek based on McLaughlin. Finally, the court finds that the FCC's interpretation of ⚑§ 227(c) is correct, anyway—at least insofar as this case is concerned.

Indeed, starting with the statutory text itself, unlike ⚑§ 227(b), ⚑§ 227(c)(5) includes language that explicitly extends vicarious liability to violations under that subsection: it allows "persons" to bring an action if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations." ⚑47 U.S.C. § 227(c)(5) (emphasis added). So the FCC's conclusion that "⚑section 227(c)(5) contemplates, at a minimum, the application of ... principles of vicarious seller liability for do-not-call violations," is persuasive. ⚑Dish Network, 28 F.C.C. Rcd. at 6584. That conclusion is further bolstered by "the purpose of the TCPA itself[:] 'Congress intended for the TCPA to protect individuals from the annoyance and cost of receiving certain types of telemarketing calls without their prior consent,' and 'sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA.' " ⚑Moore, 2025 WL 2755076, at *10 (citation omitted). "For this reason, 'the vast majority of courts that have addressed the issue since the FCC's ruling' have similarly found that the FCC's determination squares with the TCPA's text and purpose." Id. (citation omitted); see also ⚑id.

at \*10-11 (finding post-McLaughlin that a seller may be vicariously liable for third-party violations of ⚑ § 227(b)). The court therefore agrees with the FCC that a seller can be vicariously liable under ⚑ § 227(c).

The only question, then, is whether the FCC was correct to "leave open the possibility that [it] could interpret ⚑ section 227(c) to provide a broader standard of vicarious liability for do-not-call violations" than for robocalling violations under ⚑ section 227(b). Dish Network, 28 F.C.C. Rcd. at 6586 (emphasis added). As the dissent in Dish Network explained: "Under ⚑ section 227(b), sellers should be held vicariously liable under federal common-law agency principles for TCPA violations committed by third-party telemarketers"; "under ⚑ section 227(c), third-party liability exists whenever a telemarketer initiates a call on a seller's behalf, even if that telemarketer is not under the seller's control." ⚑ Id. at 6596-97 (Pai, dissenting in part) (emphasis added).[2] But the court need not reach the issue of just how far vicarious liability extends under ⚑ § 227(c) in this case. That is because the parties argue here only about whether Allied is liable under the federal common law agency principles, and as explained further below, the court finds that summary judgment is not proper under those narrower agency principles —to which the court now turns.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." ⚑ Edelman v. Belco Title & Escrow, LLC, 754 F.3d 389, 396 (7th Cir. 2014) (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006)). "[W]hether an agency relationship exists is ultimately a question of fact." ⚑ Bilek, 8 F.4th at 588. Or put more bluntly: "Agency is a notoriously fact-bound question." ⚑ Spitz v. Proven Winners N. Am., LLC, 759 F.3d 724, 731 (7th Cir. 2014).

 **\*8**  Allied argues that it cannot be liable based on any agency principle—actual authority, apparent authority, or ratification. At a high-level: actual authority (or "formal agency") focuses on the relationship between the principal and its agent (whether the principal controlled or had the right to control the agent's conduct); apparent authority focuses on the relationship between the principal and a third party (whether the principal's words or actions led a third party to reasonably believe that the principal consented to an action done on the principal's behalf by the agent); and ratification focuses on the principal's conduct after the act has occurred (whether the principal knowingly accepted the benefits of the agent's act or approved it after the fact). See Showers v. Pelican Inv. Holdings Grp., LLC, 751 F. Supp. 3d 900, 909-10 (S.D. Ill. 2024). Allied contends that summary judgment of no vicarious liability is appropriate for all three theories.

<u>Actual Authority</u>

"Actual authority requires that at the time of an agent's conduct, 'the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.' " ⚑ Bilek, 8 F.4th at 587 (quoting RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006)). Actual authority may be express or implied. ⚑ Bridgeview Health Care Ctr., Ltd. v. Clark, 816 F.3d 935, 938-39 (7th Cir. 2016). "An agent has express actual authority when the principal expressly grants the agent the authority to perform a particular act." ⚑ Aranda v. Caribbean Cruise Line, Inc., 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016). "A principal grants implied actual authority to an agent when the principal's reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf." Id. Ultimately, to prove actual authority, plaintiff "must show evidence that (1) a principal/agent relationship exists, (2) the principal controlled or had the right to control the alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency." ⚑ Bilek, 8 F.4th at 587.

Allied asserts that plaintiff cannot make that showing here. It argues that its manager, Mattson, "entered into an agreement with Consumer Nsight" to provide "consulting services for live contact telephone transfers from a call center to Allied employees." (Cleaned up). But, Allied contends, Consumer Nsight was not Allied's agent because Allied "did not control any aspect as to how the warm transfer calls would be placed." And even if Consumer Nsight were Allied's agent, Allied asserts, Iconic—not Consumer Nsight—placed the calls at issue here, and Allied "had no contract" or other "relationship with Iconic."

In response, plaintiff argues that "a reasonable jury could find that Mattson, Consumer [Nsight], and Iconic were linked through a cascade of agent and subagent relationships and are each liable for Iconic's actions." According to plaintiff, Allied "authorized its managers, like Mattson to arrange for marketing activities, including making calls ... using vendors, and permitted them to specify criteria for the types of leads that would be best suited for their teams." Mattson, plaintiff asserts, then "went off and hired Consumer Nsight to do exactly what Allied ... authorized him to" do. And, plaintiff contends, there is "no evidence that Consumer Nsight acted contrary to any instruction of Allied ... or Mattson by hiring Iconic ... to conduct the actual calling, using the *exact same* criteria that Allied ... and Mattson authorized all along." (Emphasis by plaintiff). Plaintiff thus concludes that Iconic was a subagent "acting within the same scope of authority that Allied ... gave Mattson, and which Mattson in turn provided to Consumer Nsight."

The court agrees with plaintiff that Allied is not entitled to summary judgment on actual authority here: there are genuine disputes over material facts related to the relationships and control therein, and the evidence here prevents the court from concluding that no reasonable jury could find for plaintiff. Indeed, the parties agree that Mattson worked as a branch manager for Allied, that Mattson's duties included managing team member loan officers and generating leads, and that Mattson entered into an agreement for Consumer Nsight to provide "consulting services for live contact telephone transfers from a call center to Allied ... representatives." Allied also admits that Mattson "had full decision-making authority and oversight when it came to purchasing leads from Consumer Nsight." And plaintiff asserts in his Statement of Additional Facts—to which Allied never responded [3] — that Mattson "controlled Consumer Nsight's targeting criteria for the types of consumers he was looking to [have] refinance a loan," and that he "hired Consumer Nsight 'with the approval of the bank' and 'managed the scope of [the] relationship with Consumer Nsight.' " (Quoting Mattson's Dep.).

 **\*9**  Consumer Nsight's CEO, moreover, states in his declaration that "Consumer Nsight is not a telemarketing firm" and "does not ... initiate telemarketing calls." "Rather," he states, "Consumer Nsight had a relationship with Iconic ..., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. And, he says, under that agreement, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic transferred certain calls to a ... routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied ... via [the] routing number."

Plaintiff provides copies of invoices, moreover, showing that Allied accepted call transfers from Consumer Nsight and paid for them. Plaintiff also provides emails showing that Allied and Consumer Nsight "integrated their systems so that loan officers could 'get notified of the calls coming in and to receive the post as the transfers are handed off,' " and that Mattson exercised control over call volume by refusing a delivery of transfers from Consumer Nsight in April, stating he was "done with transfers."

Mattson further stated at deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers. He also stated that "everyone in the office knew that th[e] lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic." And he further suggested that "a loan officer at Allied" was under no obligation to accept a transfer from Iconic. Mattson also explained that he spoke directly to Iconic about the warm-transfer-lead campaign and told them that the leads were "not good" and that he "wasn't very happy about that."

Finally, plaintiff further attaches copies of internal Allied documents that provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the

telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied ... initially and on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List.

Based on the above evidence, and viewing the facts and drawing reasonable inferences in plaintiff's favor, the court concludes that a reasonable jury could find that Allied and Consumer Nsight had a principal/agent relationship, that Allied controlled or had the right to control Consumer Nsight's live-transfer-call conduct, and that the conduct here fell within the scope of the agency. The court further concludes that a reasonable jury could also find that a subagency theory "bridge[s] the vicarious liability gap to" Iconic. Hossfeld, 726 F. Supp. 3d at 878.

"A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Id. (citation omitted). "An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent." Id.

As explained above, Consumer Nsight is not a telemarketing firm and does not initiate telemarketing calls. So a reasonable jury could find that Consumer Nsight reasonably believed that, by hiring Consumer Nsight for call transfers, Allied was consenting to Consumer Nsight using a company like Iconic to do the actual calling. This conclusion is further strengthened: (1) by the fact that Mattson directly spoke with Iconic and that it would show on the phone that the calls were coming from Iconic, see Moore, 2025 WL 2755076, at *12 (finding subagency existed between vendor and the call center that would actually make the calls, noting that it was "undisputed that [seller] knew that [the call center] would be the entity actually placing the calls ...."); and (2) by the fact that Allied identifies no evidence suggesting that Consumer Nsight was somehow prohibited from appointing a subagent, that Allied policy barred agents from subcontracting, or that industry-practice forbade vendors from appointing subagents for call transfers, see Hossfeld, 726 F. Supp. 3d at 879 ("No party argues that Gilmond or Fleming expressly or impliedly prohibited Transfer Kings from appointing a subagent, that any Allstate policy or practice forbade Transfer Kings from subcontracting, or that the practice in the industry was not to permit a vendor such as Transfer Kings from appointing subagents.").

 *10  And contrary to Allied's suggestion, the fact that Allied had no contract with Iconic is not dispositive: "the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent 'to perform functions assigned to the agent by the principal.' " Moore, 2025 WL 2755076, at *12 (citation omitted). Here, again, Iconic was appointed by Consumer Nsight to place the calls.

The court thus denies summary judgment on actual authority.

### Apparent Authority

Allied next argues that plaintiff cannot show liability based on apparent authority. For his part, plaintiff does not meaningfully respond to Allied's argument. Although plaintiff argues that "apparent authority" "support[s] liability here," he never develops that argument. He has thus waived any argument in support of that theory to avoid summary judgment. Ennin v. CNH Indus. Am., LLC, 878 F.3d 590, 595 (7th Cir. 2017). Nevertheless, the court finds that summary judgment is not appropriate here. See Robinson v. Waterman, 1 F.4th 480, 483 (7th Cir. 2021) ("Even where a nonmovant fails to respond to a motion for summary judgment, the movant 'still had to show that summary judgment was proper given the undisputed facts,' ... with those facts taken as usual in the light most favorable to the nonmovant." (citation omitted)).

"To create apparent authority, the principal must speak, write, or otherwise act toward a third party." 🚩Bridgeview, 816 F.3d at 939. The principal's "conduct must make the third party reasonably believe that he has consented to an action done on his behalf by someone purporting to act for him." Id. Here, plaintiff is in the position of the third party for apparent-authority purposes. See id. ("In this case, the plaintiffs would be in the position of the third party, if apparent authority existed.").

Allied contends that it did not take any actions that would instill in a third party, like plaintiff, a reasonable belief that Iconic had authority to act as Allied's agent. In support, Allied points to evidence showing that after the call was transferred from Iconic to Allied, the Allied loan officer (Aldridge) who had taken the call responded to plaintiff's inquiry about who generated the lead by telling plaintiff that Aldridge "does not have anything to do with marketing and [that] he assumed that [plaintiff] would have provided his information to the person who made the initial call." "So," Allied argues, "to the extent that [p]laintiff even did believe that Iconic ... acted as the agent of Allied ..., such notion was dispelled immediately following the live transfer."

But the evidence suggests that a woman working for Iconic called plaintiff on March 7, 2022, and that after plaintiff answered, she spoke with him until the live call was transferred to Aldridge who then continued the conversation. According to the phone-call transcript, Aldrige comes on the line stating, "Alright, thank you, this is Jason Aldrige," and the woman then greets Aldridge and tells plaintiff that he was "in excellent hands with Mr. Aldridge." A reasonable jury could infer that Aldridge's conduct in continuing the conversation could make plaintiff reasonably believe that Allied consented to Iconic calling him on Allied's behalf. Although Aldridge later told plaintiff that he had nothing to with marketing and that Aldridge assumed that plaintiff had provided his information to the woman, the court disagrees with Allied that this fact mandates finding that Aldridge "dispelled [the notion that Iconic was Allied's agent] immediately following the live transfer." For one thing, Aldridge's comment came two days after the March 7 call—hardly "immediately." For another, it is unclear how Aldridge's comment would have "dispelled" the implication that Iconic was acting as Allied's agent in initiating the call to plaintiff.

**\*11**  The court therefore denies summary judgment on apparent authority.

Ratification

Allied also argues that plaintiff cannot prove ratification here. "In general, 'ratification retroactively creates the effects of actual authority.' " Roehrman v. McAfee, LLC, 758 F. Supp. 3d 889, 899 (S.D. Ind. 2024) (quoting RESTATEMENT (THIRD) OF AGENCY § 4.02(1)). "Ratification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions." Showers, 751 F. Supp. 3d at 909 (citation omitted). "It requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." Id. at 909-10 (cleaned up). "A principal can ratify an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." Id. (citation omitted). Such consent can arise when a principal enjoys the benefits of the conduct and " 'had knowledge of facts that would have led a reasonable person to investigate further,' and the principal accepted the benefit 'without further investigation.' " Roehrman, 758 F. Supp. 3d at 899 (citation omitted). "A principal that learns of illegal behavior committed by its agents, chooses to do nothing, and continues to receive the gains, is liable for the agent's acts." Id. (citation omitted). "The state of a principal's knowledge is a factual question." Id. (cleaned up).

Allied contends that "[t]here is absolutely no evidence ... that Allied ... ratified the conduct of Iconic." According to Allied, it had no knowledge of who conducted the call transfers or by what means Iconic placed the calls. And, Allied asserts, its "understanding [was] that consumers, like [p]laintiff, provided their information on an online web page to be contacted regarding mortgage refinancing options and that such form included a TCPA disclosure statement." It thus argues that Allied "had no reason to believe that Consumer Nsight violated the TCPA in effectuating these leads at the time it paid Consumer Nsight for its services and there is simply no evidence in the record to the contrary."

The court finds that summary judgment cannot be granted on ratification. Allied does not dispute that it accepted the benefits of the calling campaign. Indeed, Allied does not dispute that it accepted call transfers from Consumer Nsight and paid for them, including after the call to plaintiff. And the billing records confirm as much.

The issue here, then, is whether Allied had knowledge of facts that would have led a reasonable person to investigate further. The court finds that Allied has not shown that the court can summarily find for it on this issue. As for Allied's assertion that it had no knowledge of who conducted the call transfers, the evidence belies that assertion. Again, Mattson stated at his deposition that Consumer Nsight "introduced" him to someone from Iconic about getting transfers, and that it would show on the phone that the calls were coming from Iconic.

And as for Allied's assertion that its understanding was that the consumers who were being called had provided their information on an online form that included a TCPA disclosure statement, there is evidence that suggests that Allied had knowledge of facts that would have led a reasonable person to investigate further on this issue. Mattson stated at deposition, for example, that he wasn't happy with the quality of the leads, and that Consumer Nsight and Iconic were "just shoving over some people that were not very interested." And emails show that, weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." Further, Allied's Chief Compliance Officer, Skeffington, testified that Allied has an internal do-not-call list, and that Allied sends the list to team managers, like Mattson, who are then required to send it to vendors, like Consumer Nsight. But Allied has not pointed to evidence that Mattson ever sent that list to Consumer Nsight.

*12 The court finds that a jury could reasonably infer that Allied knew that not all of the consumers that Iconic was calling had in fact "provided their information on an online web page to be contacted regarding mortgage refinancing options," and so would not have seen the TCPA disclosure statement. And a jury could therefore find that a reasonable person would have investigated further about who was being called during the campaign. The court thus finds that the evidence presented is enough to send to the jury the factual issue of whether Allied had knowledge of facts that would have led a reasonable person to investigate further as to whether Iconic was placing unlawful calls. The court consequently denies summary judgment on ratification.

In sum, the court finds that Allied is entitled to summary judgment in its favor on direct liability, but denies summary judgment on vicarious liability.

### Whether Plaintiff Recovered All Available Damages

Finally, Allied argues that summary judgment is proper because plaintiff recovered all available damages. That is so, Allied contends, because plaintiff settled with Consumer Nsight and Iconic and did so "in excess of the statutory maximum." The court finds that Allied has failed to show that summary judgment is appropriate on this basis.

Allied's sole support for asserting that plaintiff is no longer entitled to damages is its L.R. 56.1 statement of fact, in which it states: "While the terms of the settlement are confidential, upon information and belief, [plaintiff]'s settlements with Consumer Nsight and Iconic ... are in excess of the statutory maximum." This is not evidence that could support summary judgment. And regardless, in response, plaintiff provides his own declaration in which he states: "Although I have settled with both Consumer Nsight and Iconic Results, I have not recovered my full measure of statutory damages from either of [them], including in the aggregate, and thus have not been fully compensated for any alleged harm." Allied has accordingly failed to show that there is no genuine dispute over satisfaction here.

## CONCLUSION

For the above reasons, the court grants in part and denies in part defendant Allied's motion for summary judgment [139]. The court grants the motion in favor of Allied on the issue of direct liability. The court otherwise denies the motion. This matter is set for a telephonic hearing on April 6, 2026, at 9:00 a.m.

**All Citations**

Slip Copy, 2026 WL 636723

---

### Footnotes

1 The Seventh Circuit has suggested in other cases that preceded <u>McLaughlin</u> that FCC Orders interpreting the TCPA are dispositive at the district court level under the Hobbs Act. <u>See</u> <u>Blow, 855 F.3d at 802</u> ("absent a direct appeal to review the 2015 FCC Order's interpretation of an autodialer, we are bound to follow it").

2 The dissent in <u>Dish Network</u> provides both statutory and policy justifications for reading § 227(c)'s do-not-call provisions more broadly than § 227(b)'s robocall provisions. <u>See id.</u> at 2597-99.

3 Local Rule 56.1(e)(3) states that "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 57 of 103

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2021)

⚑   KeyCite Yellow Flag

Distinguished by   Atkinson v. Choice Home Warranty,   D.N.J.,   January 11, 2023

2021 WL 3634162
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Brennan LANDY, Plaintiff,

v.

NATURAL POWER SOURCES, LLC d/b/a Suntuity, Defendant.

Case No. 3:21-cv-00425
|
Filed 08/17/2021

**Attorneys and Law Firms**

Jeffrey Steven Arons, Arons & Arons LLC, South Orange, NJ, for Plaintiff.

Adlai J.J. Small, Spiro LLC, Short Hills, NJ, for Defendant.

### MEMORANDUM AND ORDER GRANTING MOTION TO DISMISS AND ALLOWING PLAINTIFF TO AMEND COMPLAINT

PETER G. SHERIDAN, U.S.D.J.

#### I. **Introduction**

**\*1**  This matter comes before the Court on Defendant Natural Power Sources, LLC d/b/a Suntuity's ("Suntuity" or "Defendant") motion to dismiss Brennan Landy's ("Plaintiff" or "Landy") class action complaint under the Telephone Consumer Protection Act ("TCPA"), 42 U.S.C. § 227. (ECF No. 7.) The Court heard oral argument on July 20, 2021. For the reasons that follow, Defendant's motion to dismiss is granted without prejudice.

#### II. **Background**

On or around October 29, 2020, Landy received a call on his cell phone from an unknown caller who solicited him to purchase green energy products. (Compl. ¶¶ 18-20, ECF No. 1.) Landy heard a pause and click before an operator came on the line, which allegedly indicates the use of an automatic telephone dialing system ("ATDS"). (Compl. ¶ 19.)

Then, Landy was transferred to an operator named Steve who identified himself as working for US Home Solar. (Compl. ¶ 21.) Landy alleges he heard a beep – but not a pause or click – before being connected with Steve. (*Id.*) Steve also solicited Landy to purchase green energy products. (*Id.*)

After speaking with Steve, Landy alleged he was transferred via a "warm transfer"[1] to a third operator named Evelyn, from Suntuity, who solicited Landy to purchase Suntuity's solar energy products. (Compl. ¶¶ 7, 22.) Landy does not allege that he heard a pause and click before being connected to Evelyn. After the call with Evelyn concluded, Landy received a follow-up email from Brendan McGrane, another Suntuity representative, who solicited Suntuity's products. (Compl. ¶ 23.)

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 58 of 103

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2021)

Landy claims he never consented to the initial call and, therefore, it was made in violation of the TCPA. (Compl. ¶¶ 24-26). He alleges Suntuity is vicariously liable for that violation because it "knew about the calls, received the benefits of the calls, directed the calls to be placed, and ratified the calls." (Compl. ¶ 16).

Landy asserts that he and the proposed class members sustained injuries in the form of aggravation, nuisance, invasion of privacy, monies paid to the wireless caller for the receipt of unwanted calls, interference with the use and enjoyment of their phones, depletion of battery life, and wear and tear on their phones. (Compl. ¶¶ 27, 42.) He defines the proposed class as follows:

> **No Consent Class:** All persons in the United States who (1) from the date four years prior to the filing of this Complaint through the date notice is sent to the Class; (2) received at least one call from Defendant, or a third person acting on behalf of Defendant; (3) on the person's cellular telephone; (4) for the purpose of selling Defendant's solar products and services; (5) using the same equipment that was used to call the Plaintiffs; and (6) for whom Defendant claims it obtained prior express written consent in the same manner as Defendant claims it obtained prior express written consent to call the Plaintiffs.

(Compl. ¶ 29.) Landy alleges that his claims are typical of the class members, he can adequately represent the class, there are common questions of law and fact, Defendant's conduct is common to all class members, and the class members are too numerous to be individually joined. (Compl. ¶¶ 31-35.)

 **\*2**  Landy timely filed his complaint on January 8, 2021. *See* 28 U.S.C. § 1658; *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 608 (3d Cir. 2018). He seeks an injunction against further unauthorized calls, as well as statutory damages and attorneys' fees for class members under the TCPA's private right of action provision, 47 U.S.C. § 227(b)(3)(B). (Compl. ¶¶ 28, 42.)

### III. Jurisdiction & Venue

This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, "because each of the alleged Classes consists of over 100 persons, there is minimal diversity, and the claims of the class members when aggregated together exceeds $5 million." (Compl. ¶ 5.) Venue is proper under 28 U.S.C. § 1391(b) because Suntuity's headquarters are in New Jersey. (Compl. ¶ 7.)

### IV. Legal Standard

Under Fed. R. Civ. P. 8(a)(2), a complaint "requires only a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss asserts a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d. Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). This standard requires showing more than just the possibility that the defendant acted unlawfully. *Id.*

In reviewing a motion to dismiss, the Court "accept[s] as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Monroe v. Beard*, 536 F.3d 198, 205 (3d. Cir. 2008). The court should disregard legal conclusions and "recitals of the elements of a cause

Case 1:26-cv-00659-KM   Document 31-1   Filed 07/15/26   Page 59 of 103

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2021)

of action, supported by mere conclusory statements." *Santiago v. Warminster Township*, 629 F.3d 121, 128 (3d. Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

The Third Circuit set forth a three-part test for determining whether or not a complaint may survive a motion to dismiss for failure to state a claim:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Id.* at 130 (alteration in original) (quoting *Iqbal*, 556 U.S. at 675, 679, 129 S.Ct. 1937).

## V. Discussion

### A. TCPA Claim

"To assert a claim under the TCPA's autodialer provision, 47 U.S.C. § 227(b)(1)(A)(iii), a plaintiff must show that the defendant: (1) called her cell phone; (2) using an automatic telephone dialing system ("ATDS"); (3) without her prior express consent." *Valdes v. Century 21 Real Estate, LLC*, No. CV 2:19-05411, 2019 WL 5388162, at *2 (D.N.J. Oct. 22, 2019). Pursuant to the TCPA's restrictions on use of automated telephone equipment:

> **\*3** (1) Prohibitions. It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

> [...]

> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

U.S.C. § 227(b)(1)(A)(iii).

Landy alleges that he was called on his cell phone without his consent. (Compl. ¶¶ 10-11.) The identity of the initial caller is unknown. (Compl. ¶ 18-20.) However, Landy alleges that because he was eventually transferred to Suntuity, the previous callers acted on Suntuity's behalf and at its direction, thereby establishing vicarious liability. (Compl. ¶ 16.)

### 1. Direct Liability

Courts have held that under the TCPA, 47 U.S.C. § 277(b)(1)(A)(iii), liability is imposed on the party that places the call or text. *See Klein v. Just Energy Grp., Inc.*, No. CV 14-1050, 2016 WL 3539137, at *8 (W.D. Pa. June 29, 2016) (citing *Melito v. Am. Eagle Outfitters, Inc.*, Civ. Act. Nos. 14-02240, 15-39, and Nos. 15-2370, 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015)). Here, Landy does not allege that Suntuity placed the initial call to Landy; he only alleges the initial caller used an ATDS to call him without his consent. Once that call was initiated, he was transferred to US Home Solar and Suntuity. Therefore, Landy can only pursue a TCPA claim against Suntuity on a vicarious liability theory.

### 2. Vicarious Liability

An entity cannot be held liable under the TCPA "merely because they stand to benefit from the call." *Id.* at *8; *In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6593 (F.C.C. 2013). Instead, a defendant that is not the initial caller can be held vicariously liable under the TCPA based on common law agency principles. *Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563, 584 (W.D. Pa. 2017). Vicarious liability can be established through actual authority, apparent authority, or ratification. *Cunningham v. Cap. Advance Sols., LLC*, Civil Action No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, at *6, 2018 WL 6061405 (D.N.J. Nov. 20, 2018). The following subsections will discuss each of those theories.

### i. Actual Authority

Landy does not allege facts that establish an agency theory through actual authority. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Cunningham* 2018 WL 6061405, at *17 (quoting *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 120 (3d Cir. 2013)).

A plaintiff sufficiently pleads actual authority when the allegations establish that the defendant consented to or directed the agent to act on its behalf. *Cunningham*, 2018 WL 6061405, at *18. In *Cunningham*, the plaintiff alleged that, pursuant to a contract, Capital Advance Solutions, LLC ("Capital"), placed telemarketing calls on behalf of the bank defendants and received a commission for each successful loan solicitation. *Id.* at *7. Further, Capital allegedly facilitated the submission of loan applications to the bank defendants, as acknowledged in the approval and rejection letters the defendants sent to loan applicants. *Id.* Based on those allegations, the court could "reasonably infer that the Bank Defendants exercised a certain level of control over, or, at a minimum, were aware of, Capital's telemarketing efforts." *Id.*

**\*4** Landy does not allege any facts that establish the initial caller had actual authority to make telemarketing calls on Suntuity's behalf. Unlike *Cunningham*, in which the plaintiff alleged specific facts indicating the defendants directed or consented to solicitation via Capital, Landy simply alleges that because he was transferred to Suntuity, the initial caller was acting at Suntuity's direction. He does not plead facts to support his argument that Suntuity authorized the initial caller, directed them, or was aware of their conduct. As such, the complaint does not sufficiently allege an actual authority relationship between Suntuity and the initial caller.

### ii. Apparent Authority

Landy does not allege enough facts to establish vicarious liability under apparent authority. "[A]pparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." *Cunningham,* 2018 WL 6061405, at *6 (quoting *Covington*, 710 F.3d at 120). In a declaratory ruling, the Federal Communications Commission stated that:

> Apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 61 of 103

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2021)

service mark may also be relevant. It may also be persuasive that the seller approved, wrote, or reviewed the outside entity's telemarketing scripts.

*In re Dish Network, LLC*, ⚑ 28 F.C.C. Rcd. at 6593.

A plaintiff sufficiently pleads apparent authority "when a third party reasonably believes that the ... agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations." ⚑*Valdes*, 2019 WL 5388162 at *4 (omission in original) (quoting *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011)). In *Valdes*, the plaintiff alleged that defendant Century 21 was "heavily involved in realtors' unsolicited calls," including directing and training realtors on how to make solicitation calls and what to say. *Id.* Further, the defendant allegedly told callers "to identify themselves as calling on behalf of Century 21, to offer the Century 21 pledge," and it "facilitated realtors' access to lead lists and autodialers." *Id.* Those allegations were sufficient for the court to hold that a third party could reasonably believe that the realtors had authority to act on behalf of Century 21, thereby establishing apparent authority. *Id.*

Unlike the plaintiff in *Valdes*, Landy does not plead any facts that indicate Suntuity's conduct led him to reasonably believe the initial caller had authority to act on Suntuity's behalf. He merely alleges that, because he was transferred to Suntuity and was solicited to buy green energy products, Suntuity must have directed the initial call and known about the initial caller's TCPA violation. Landy's complaint, however, does not assert facts that suggest the initial caller had any relationship with Suntuity, or that would lead a reasonable person to believe the initial caller had authority to act on Suntuity's behalf.

Further, Landy's allegation that Suntuity sent a follow-up email to solicit its products does not support an apparent authority theory. In *Smith v. Vision Solar*, the plaintiffs received telemarketing calls from an Exchange Energy representative, who attempted to sell solar products and stated that Vision Solar would contact them to follow up. ⚑*Smith v. Vision Solar LLC*, No. CV 20-2185, 2020 WL 7230975, at *1-2 (E.D. Pa. Dec. 8, 2020). After the initial call from Exchange Energy, Vision Solar called at least one plaintiff to follow up about the solar products. *Id.* Apparent authority was established because the plaintiff alleged that the "purported principal followed-up with the plaintiff after she provided information to the telemarketer, thereby demonstrating that the principal knew of and benefited from the marketing calls." *Id.* at *3. By contrast, Landy does not allege that the initial caller referenced Suntuity, told him to expect contact from Suntuity, or otherwise indicated a relationship with Suntuity.

### iii. **Ratification**

**\*5** Finally, Landy does not plead facts that support an agency theory based on ratification.

(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.

(2) A person ratifies an act by

(a) manifesting assent that the act shall affect the person's legal relations, or

(b) conduct that justifies a reasonable assumption that the person so consents.

Restatement (Third) Of Agency § 4.01 (2006).

A plaintiff must plead facts that indicate the defendant consented to the initial caller making calls on the defendant's behalf. *Just Energy*, 2016 WL 3539137, at *12. In *Just Energy*, the plaintiff alleged that the defendant ratified telemarketing and debt collection calls made by Collectcents employees, who identified themselves as "Just Energy" during the phone calls. *Id.* at *4,

12. The court rejected the plaintiff's argument that the defendant consented to Collectcents' conduct simply because it might have received a benefit from the calls. *Id.* at \*12. Because the plaintiff's allegation was based on speculation that the defendants could be receiving a benefit, and there was no evidence of defendant's affirmation, assent, or consent, the facts pleaded were insufficient to support a ratification theory. *Id.*

Similarly, Landy's complaint does not include facts that show Suntuity manifested assent to the initial caller calling on its behalf. Like the plaintiff in Just Energy, Landy speculates that because he was eventually transferred to Suntuity and solicited to buy green energy products, Suntuity must have assented to and received a benefit from the prior callers' actions. Such speculative allegations are insufficient to allege an agency relationship based on ratification.

In sum, Landy's complaint does not allege enough facts to indicate that there was an agency relationship between the initial caller and Suntuity. As such, he has failed to allege that Suntuity can be held vicariously liable for the initial caller's TCPA violations.

### B. ATDS

To support a claim under the TCPA, the plaintiff must demonstrate the nonconsensual call was made using an ATDS. *See* 47 U.S.C § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In the Third Circuit, pleading that there was a brief pause or silence before the operator speaks is sufficient to allege the use of an ATDS. *Hazan v. Wells Fargo Home Mortg.*, No. CV1810228 (MAS/TJB), 2020 WL 919183, at \*3 (D.N.J. Feb. 26, 2020). Thus, Landy's allegation that he heard a pause before the operator of the initial call came on the line is sufficient to allege that an ATDS was used. (*See* Compl. ¶ 19.)

### C. Consent

To allege a violation under the TCPA, the call must be made without the called party's prior express consent. 47 U.S.C. § 227(b)(1)(A); *Valdes*, 2019 WL 5388162 at \*2. Suntuity argues that, because Landy admitted he was transferred to Evelyn via a "warm transfer," he consented to speak to Suntuity. However, neither party defines the term "warm transfer." A warm transfer occurs when the first operator stays on the line with the called party during a transfer until the second operator answers. *See, e.g.*, *Reeves v. Nuvox Commc'ns*, No. C.A.6:08-4031(HMH/WMC), 2009 WL 4016617, at \*5 (D.S.C. Nov. 18, 2009), *aff'd sub nom. Reeves v. Nuvox Commc'ns, Inc.*, 384 F. App'x 255 (4th Cir. 2010); *Tate v. Washington Mut.*, No. 02 C 5853, 2004 WL 1794924, at \*1 (N.D. Ill. Aug. 10, 2004). That definition does not imply that the called party consented to speak to either operator.

### VI. Conclusion

**\*6** Because Landy does not provide enough facts to plausibly allege a claim against Suntuity under the TCPA, Defendant's motion to dismiss shall be granted without prejudice. Landy shall have 30 days to file an amended complaint if he wishes to do so. Defendant may move to dismiss the amended complaint in accordance with the timeframes set forth in the Federal Rules of Civil Procedure.

### ORDER

**THIS MATTER** having come before the Court on a motion to dismiss filed by Defendant Natural Power Sources, LLC d/b/a Suntuity (ECF No. 7); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 63 of 103

**IT IS** on this 16th day of August, 2021,

**ORDERED** that Defendants' motion to dismiss is **granted without prejudice**, and it is further

**ORDERED** that Landy will have 30 days to file an amended complaint.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3634162

---

**Footnotes**

1       Neither Plaintiff nor Defendant defines this term. Its significance will be discussed in Section V.C.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM   Document 31-1   Filed 07/15/26   Page 64 of 103

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 797967
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Brennan LANDY, Plaintiff,

v.

NATURAL POWER SOURCES, LLC d/b/a Suntuity, a New Jersey limited liability company, Defendant.

Civil Action No. 3:21-cv-00425-PGS-TJB
|
Signed 03/14/2022
|
Filed 03/16/2022

**Attorneys and Law Firms**

Jeffrey Steven Arons, Arons & Arons LLC, South Orange, NJ, for Plaintiff.

Adlai J.J. Small, Spiro LLC, Short Hills, NJ, for Defendant.

### MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

PETER G. SHERIDAN, U.S.D.J.

**\*1**  This case is before the Court on Defendant Natural Power Sources, LLC d/b/a Suntuity's ("Suntuity" or "Defendant") Motion to Dismiss (ECF No. 16) Plaintiff Brennan Landy's ("Plaintiff" or "Landy") First Amended Complaint (FAC). (ECF No. 13). Oral argument was held March 7, 2022. For the reasons that follow, Suntuity's motion is denied.

This Court has original jurisdiction over this matter pursuant the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, and the to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2). (FAC ¶ 5). Venue is proper under 28 U.S.C. § 1391(b) because Suntuity's headquarters are in New Jersey. (FAC at ¶ 7).

### I.

The factual background and procedural history of this case are summarized in the Court's August 17, 2021 Order dismissing Landy's original complaint. (Order of Aug. 17, 2021, ECF No. 12). That summary is incorporated herein by reference. Relevant here, Landy brought a single count putative class action lawsuit alleging Suntuity, a purveyor of home solar panels, violated the TCPA by using an Automated Telephone Dialing System (ATDS) to call potential customers. (original complaint, ECF No. 1). Landy's cell telephone was connected to Suntuity through the following process: an unidentified operator utilizing an ATDS (initial ATDS contact) "solicited [Landy] to purchase solar panels or other green energy solutions," (*id.* at ¶¶ 9-20); Landy was then transferred to an intermediate operator identified as "Steve" with "US Home Solar," (*id.* at ¶ 21); who then initiated a "warm transfer" [1] to "Evelyn" with Suntuity, (*id.* at 122).

The Court dismissed Landy's original complaint because there was no allegation that Suntuity authorized the initial ATDS contact. (ECF No. 12).

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 65 of 103

Landy v. Natural Power Sources, LLC, Not Reported in Fed. Supp. (2022)

Within the FAC, Landy realleges the allegations brought in the original complaint and includes five new factual allegations:

27. On information and belief, including the nature of the services pitched to Plaintiff, the downline telemarketing agents that ultimately transferred the call to Suntuity, including "US Home Solar," were authorized to market Suntuity's products and services directly to consumers. The calls made to Plaintiff and the Class members were made to market and sell Defendant's products and services, and they were placed on behalf of, and for the benefit of, Suntuity.

28. Defendant is vicariously liable for the calls placed by its downline telemarketing agents, including "US Home Solar," under ordinary agency principles because Suntuity directed, authorized, or otherwise ratified the conduct of telemarketers like "US Home Solar," which resulted in the statutory violations alleged in this complaint.

29. By accepting transfer of the call, marketing its products directly to Plaintiff on the same call, and following up with an email after the call, Suntuity demonstrated consent to the initial, downline agent callers placing calls on its behalf and thereby ratified the conduct of the telemarketing agents involved in the call, including "US Home Solar."

 **\*2**  30. Suntuity's conduct—including accepting transfer of the call and marketing its products directly to Plaintiff on the same call—caused Plaintiff to reasonably believe that any downline agents involved in the call had authority to act on behalf of Defendant.

31. Suntuity accepted the benefits of its downline agents' unlawful telemarketing practices by accepting transfer of unauthorized calls made to consumers and accepting payment from new customers and accounts that Suntuity had knowledge were generated through such telemarketing campaigns as the one alleged herein.

(FAC at ¶¶ 27-31). Suntuity seeks to dismiss the FAC under Rule 12(b)(6) for failure to state a claim for the same reason as the original complaint was dismissed. (Motion to Dismiss FAC, ECF No. 16).

## II.

Under Fed. R. Civ. P. 8(a)(2), a complaint "requires only a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss asserts a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220 (3d. Cir. 2011) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This standard requires showing more than just the possibility that the defendant acted unlawfully. Id.

In reviewing a motion to dismiss, the Court "accept[s] as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." Monroe v. Beard, 536 F.3d 198, 205 (3d. Cir. 2008). The court should disregard legal conclusions and "recitals of the elements of a cause of action, supported by mere conclusory statements." Santiago v. Warminster Township, 629 F.3d 121, 128 (3d. Cir. 2010) (quoting Iqbal, 556 U.S. at 678).

The Third Circuit set forth a three-part test for determining whether or not a complaint may survive a motion to dismiss for failure to state a claim:

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 66 of 103

there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Id.* at 130 (alteration in original) (quoting 🚩*Iqbal*, 556 U.S. at 675, 679).

## III.

"To assert a claim under the TCPA's autodialer provision, 🚩47 U.S.C. § 227(b)(1)(A)(iii), a plaintiff must show that the defendant: (1) called her cell phone; (2) using an automatic telephone dialing system ("ATDS"); (3) without her prior express consent." 🚩*Valdes v. Century 21 Real Estate, LLC*, No. 19-05411, 2019 WL 5388162, at *2 (D.N.J. Oct. 22, 2019).

Generally, a defendant may be held vicariously liable for violations of this statutory provision. 🚩*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016).

**\*3** Here, Landy alleges that she received a call on her cell phone; and there was a pause before the operator entered onto the call. (FAC at ¶ 9). The pause is sufficient to infer that an ATDS initiated the call. *Hazan v. Wells Fargo Home Mortg.*, No. 18-10228, 2020 WL 919183, at *3 (D.N.J. Feb. 26, 2020).

Since there was an interim operator ("Steve" of US Home Solar) between the ATDS and "Evelyn" of Suntuity, the issue arose as to whether Suntuity authorized the use of the ATDS. Here, Landy must plausibly demonstrate that said initial ATDS contact was consented to or directed by Suntuity. Landy may show this through actual and/or or apparent authority or ratification of the acts by Suntuity. See, 🚩*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 120 (3d Cir. 2013) (quoting Restatement (Third) of Agency § 2.01 (2006)). A plaintiff sufficiently pleads actual authority when the allegations establish that the defendant consented to or directed the agent to act on its behalf. 🚩*Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050, 2018 WL 6061405, at *18 (D.N.J. Nov. 20, 2018). Alternatively, "[a]pparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority despite the absence of an actual agency relationship." 🚩*Covington*, 710 F.3d at 120. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." 🚩*Cunningham*, 2018 WL 6061405, at *6 (quoting Restatement Third of Agency, § 4.01 (2006)) (internal quotation marks omitted). The allegations in paragraphs 27 through 31 of the FAC are sufficient to plausibly plead such authorization. From the description of the process of the call, there is circumstantial evidence that "by accepting the call, and following up with an e-mail after the call, Suntuity demonstrated consent" to the use of ATDS. (FAC ¶ 29).

The FAC sufficiently alleges an agency relationship as it may be inferred from the context of the cell phone process. That is, the smooth transfer from the initial ATDS contact to "Steve" and then to "Evelyn" of Suntuity, (FAC at ¶¶ 20-22), shows a cooperative relationship from which one may infer authority or apparent authority of Suntuity to the initial contact by ATDS. 🚩*Cunningham*, 2018 WL 6061405, at *7. Additionally, the FAC alleges that the initial ATDS contact was made to market Suntuity's products, the initial call was made at the direction of Suntuity, and that Suntuity knew the initial caller utilized an ATDS to generate customers for Suntuity. (*Id.* at ¶¶ 27, 31). Although some of those assertions are based on "information and belief," the Third Circuit permits allegations "on information and belief" where "factual information is peculiarly within the defendant's knowledge or control." *McDermott v. Clondalkin Grp., Inc.*, 649 Fed. Appx. 263, 267-68 (3d Cir. 2016). Here it may be plausibly inferred from the nature of the transaction that Suntuity, in some fashion, directed and/or approved the initial ATDS contact.

## IV.

Finally, Suntuity moves to strike or dismiss Plaintiff's class allegations on the ground that the FAC's class definition is an "impermissible fail-safe class" and that the proposed class is not ascertainable. (Motion to Dismiss FAC 18-20, ECF No. 16). Plaintiff proposes the following class definition in the FAC:

> **\*4  No Consent Class:** All persons in the United States who (1) from the date four years prior to the filing of this Complaint through the date notice is sent to the Class; (2) received at least one call from Defendant, or a third person acting on behalf of Defendant; (3) on the person's cellular telephone; (4) for the purpose of selling Defendant's solar products and services; (5) using the same equipment that was used to call the Plaintiffs; and (6) for whom Defendant claims it obtained prior express written consent in the same manner as Defendant claims it obtained prior express written consent to call the Plaintiffs.

(FAC at ¶ 34).

A fail-safe class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012); *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 167 (3d Cir. 2015). "The class definition requires a determination on the merits before members are identified, creating what the Supreme Court called 'one-way intervention.'" *Zarichny v. Complete Payment Recovery Servs.*, 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974)). "Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. Further, "such a class impermissibly skirts the bar of res judicata." *Zarichny*, 80 F. Supp. 3d at 624. The Third Circuit has not yet determined that a fail-safe class is impermissible. *See Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 478 (E.D. Pa. 2021). However, some courts have found them impermissible. *See Macdonald v. Cashcall, Inc.*, 333 F.R.D. 331, 346 (D.N.J. 2019).

Here, on the face of the Complaint, Plaintiff does not propose a fail-safe class, because the class definition includes those who may have consented to receiving a call on behalf of Suntuity. (FAC at ¶ 34). Therefore, membership in the class does not depend on a determination of Suntuity's liability. *See Messner*, 669 F.3d at 825; *Valdes*, 2019 WL 5388162, at \*2. Additionally, it is premature at this stage of the litigation to dismiss Landy's class allegations on the grounds that the proposed class is not ascertainable because the Court lacks a factual record to determine whether class members can be identified. *Luppino v. Mercedes-Benz USA, LLC*, 2013 WL 6047556, at \*7 (D.N.J. Nov. 12, 2013). Further, sometimes the class can be better defined after discovery "by refining the class definition rather than by flatly denying the certification." *Messner*, 669 F. 3d at 825.

## ORDER

**THIS MATTER** having come before the Court on Defendant's Motion to Dismiss Plaintiff's FAC (ECF No. 16); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 14th day of March, 2022,

**ORDERED** that Defendant's motion to dismiss is **DENIED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 797967

---

## Footnotes

1    The parties do not define this term, but "warm transfer" is commonly understood to mean that "the first operator stays on the line with the called party during a transfer until the second operator answers." (ECF No. 12 at pp. 10-11).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 69 of 103

Moore v. Healthcare Solutions Inc., Not Reported in Fed. Supp. (2022)

2022 WL 17487823
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

George MOORE, on behalf of himself and others similarly situated, Plaintiff,

v.

HEALTHCARE SOLUTIONS INC. and Prosperity Life Insurance Group LLC, Defendants.

Case No. 21-cv-4919
|
Signed December 7, 2022

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Jason Edward Hunter, Bryan Eliot Curry, Litchfield Cavo LLP, Chicago, IL, for Defendant Healthcare Solutions Inc.

## MEMORANDUM OPINION AND ORDER

Steven C. Seeger, United States District Judge

**\*1** Plaintiff George Moore received two calls to his home phone from the same phone number, on the same day. He didn't answer the first call. But when the caller rang his phone a second time, he picked up. And it didn't take him long to regret it. Instead of hearing a friendly voice, he heard a sales pitch for a product that he didn't want.

The caller was a representative from Defendant Healthcare Solutions, Inc., offering to sell Moore an insurance policy. And just like that, Moore's home turned into an insurance bazaar, with a salesperson peddling products that Moore didn't want or need. Moore wasn't interested in insurance, so he hung up.

But Moore didn't leave it at that. His phone number is on the national Do Not Call Registry, and he isn't supposed to receive sales calls at home. So Moore turned the tables and delivered an unwelcome communication of his own. He sued Healthcare Solutions for violating the Telephone Consumer Protection Act ("TCPA") when it called him more than once.

Healthcare Solutions, in turn, moved to dismiss the complaint. For the following reasons, the Court denies Defendant's motion to dismiss.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See* *Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

On August 13, 2021, Plaintiff George Moore received two phone calls to his residential telephone line from the same phone number. *See* Cplt., at ¶¶ 19, 22–23 (Dckt. No. 1). The calls went to a residential number "used by Mr. Moore only." *Id.* at ¶ 20. Moore's caller ID showed that both phone calls came from the same phone number. *Id.* at ¶ 23.

Moore didn't answer the first call. *Id.* at ¶ 24. The complaint does not reveal why. Maybe, like many of us when we receive a call from an unknown number, Moore simply ignored the call. After all, answering the phone from an familiar number is a dicey proposition. Not much good can come from it. Most of the time, there is more downside than upside in exposing oneself to a stranger on the phone.

Maybe he had his hands full. Maybe the game was on, or maybe he simply didn't feel like getting interrupted. Whatever the reason, the key point is that someone called, and Moore didn't answer.

But when Moore received a second call from that number, he picked up. *Id.* at ¶ 26. Moore soon discovered that Carol Jandera, an employee of Defendant Healthcare Solutions, was on the other end of the line. And she wanted to sell.

Jandera offered to sell Moore an insurance policy from Prosperity Life Insurance Group. *Id.* at ¶ 28. Jandera then offered to transfer Moore to Prosperity Life so that he could sign up for an insurance policy. *Id.* at ¶ 29.

Moore apparently wasn't interested in buying insurance, so he ended the call. *Id.* at ¶ 30. Sometime later, Moore received an email from Jandera to confirm Prosperity Life's policy offer. *Id.* at ¶ 31. Jandera's email address had the domain "ourhcs.com," which is a domain owned by Healthcare Solutions. *Id.* at ¶¶ 32–33.

**\*2** That email, like the call, apparently didn't sit well with Moore. He wrote Healthcare Solutions and requested evidence showing that it had permission to contact him. *Id.* at ¶ 34. He never received a response. *Id.* at ¶ 35.

As it turns out, Moore's phone number was listed on the Do Not Call Registry since July 7, 2017. *Id.* at ¶ 21; *see also* 15 U.S.C. § 6151. He didn't expect unwanted calls as someone with a number on the Do Not Call Registry. He expected domestic tranquility. He didn't want calls from salespeople. He wanted peace and quiet.

Moore responded with his own form of unsolicited communication. He filed a class action complaint against Healthcare Solutions and Prosperity Life, alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq. See* Cplt., at ¶¶ 63–64 (Dckt. No. 1). He seeks statutory damages of up to $500 for each violation, and treble damages for any knowing or willful violation. *Id.* at ¶¶ 65–66.

Prosperity Life filed a motion to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. *See* Prosperity Life's Mtn. to Dismiss (Dckt. No. 11). After jurisdictional discovery, the parties agreed to dismiss Moore's claims against Prosperity Life with prejudice. *See* Stipulation of Dismissal (Dckt. No. 36); *see also* 6/1/22 Order (Dckt. No. 38).

Healthcare Solutions, the only remaining defendant, later filed a motion to dismiss. *See* Healthcare Solution's Mtn. to Dismiss (Dckt. No. 39). That motion is now before the Court.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See* *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See* *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### Discussion

Moore's complaint has a single count. He alleges that Healthcare Solutions violated the TCPA by calling him more than once within a twelve-month period, even though his phone number is on the Do Not Call Registry. *See* Cplt., at ¶ 64 (Dckt. No. 1).

The TCPA creates a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." *See* 47 U.S.C. § 227(c)(5). One such regulation prohibits calls to numbers on the Do Not Call Registry.

Under the regulation, "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." *See* 47 C.F.R. § 64.1200(c)(2). The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *See* 47 U.S.C. § 227(a)(4).

**\*3** Once a telephone number is registered on the Do Not Call Registry, "registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *See* 47 C.F.R. § 64.1200(c)(2). A failure to respect those technological boundaries can lead to significant relief for the person receiving the call. A plaintiff suing under section 227(c)(5) can recover actual monetary losses or statutory damages up to $500. *See* 47 U.S.C. § 227(c)(5)(B).

Moore contends that the calls from Healthcare Solutions fit the bill. He alleges that Healthcare Solutions called him twice, the minimum number of times to bring a claim. And his residential phone number is on the Do Not Call Registry. So, as Moore sees it, he received too many calls to his phone when he should have received none.

Healthcare Solutions moves to dismiss on two grounds.

Healthcare Solutions first argues that the complaint does not allege that Moore received more than one telephone solicitation. Under the regulation, a caller cannot be liable for only one call. The regulation adopts a call-me-twice, shame-on-you approach.

The argument rests on the fact that Moore didn't pick up the first call. Healthcare Solutions points out that Moore "terminated the first call" without answering. *See* Cplt., at ¶ 24 (Dckt. No. 1). But he did answer the second call, and only then did Moore "engage[ ] the telemarketer ... to learn the purpose of the call." *Id.* at ¶ 24. So, according to Healthcare Solutions, Moore has no way of knowing whether the first call was a "telephone solicitation," or whether it was Healthcare Solutions calling at all.

Moore acknowledges that he never spoke with anyone – including anyone from Healthcare Solutions – during the first call. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 5 (Dckt. No. 40). That said, he points out that both calls came from the same number, on the same day. So, it is reasonable to assume that the same caller made both calls for the same reason.

The complaint includes enough facts to support a reasonable inference that Healthcare Solutions made two telemarketing calls. The issue of who made the first call isn't much of a whodunit. Moore received two calls from the same number, and the second

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 72 of 103

Moore v. Healthcare Solutions Inc., Not Reported in Fed. Supp. (2022)

caller was Healthcare Solutions. It is reasonable to conclude that Healthcare Solutions called the first time, too. Does Healthcare Solutions share a phone number with someone else? Unlikely.

Moore may not know for certain why Healthcare Solutions called him the first time. But the content of the second call gives a pretty good idea. As the plaintiff, Moore is entitled to reasonable inferences in his favor. It is a reasonable inference that the two calls from the same number on the same day were about the same thing.

If anything, it is hard to imagine why else Healthcare Solutions would have called him. There is no suggestion in the complaint that Moore worked there, or knew someone who worked there, or anything along those lines. Maybe Healthcare Solutions has some other story to tell, but if so, summary judgment – not a motion to dismiss – is the time to tell it. It is unlikely that an insurance agent was simply calling a stranger out of the blue to say "Hi."

Two judges in this district have held that the "content and timing" of an answered call can "allow[ ] the court to draw [the] reasonable inference" that unanswered calls were sales solicitations from the defendant. *See* ⚑ *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) (St. Eve, J.); *see also Moore v. Pro Custom Solar LLC*, 2022 WL 1092186, at *2–3 (N.D. Ill. 2022) (Kocoras, J.). The basic idea is that calls from the same number tend to come from the same person. And a salesperson tends to call for only one reason.

 **\*4** In *Toney*, the plaintiff alleged that the defendant called her four times in a two-day period. *See* ⚑ *Toney*, 75 F. Supp. 3d at 746. The first day, the plaintiff's caller ID showed that she received three calls from the same phone number. ⚑ *Id.* at 732, 746. She didn't answer any of those calls. *Id.* The second day, she received a fourth call from the same phone number, and she finally picked up. *Id.* The caller was a representative of the defendant telemarketing company, offering to sell plaintiff a membership to a subscription retail-discount service. *Id.*

The defendant argued that by answering only one call, the plaintiff didn't plausibly allege that she had received at least two calls from the defendant. ⚑ *Id.* at 746. Judge St. Eve rejected that argument. The plaintiff answered the fourth call and learned that it was a telemarketer. So it was a "reasonable inference" that the three unanswered calls from the same number a day earlier were from the same person for the same purpose. *Id.*

The inference that a telemarketer called to sell something wasn't much of a stretch. After all, that's what telemarketers do. That's the whole point. They use the telephone to market something. Telemarketers aren't known for calling people for other reasons.

Judge Kocoras reached a similar result in *Moore*. There, the plaintiff (George Moore, presumably the same George Moore in the case at hand) received six calls on five different days in July 2021. *See Moore*, 2022 WL 1092186, at *1. He "listened to and terminated" these calls without engaging the caller. *Id.* Only during the seventh call, in early August 2021, did the plaintiff engage the caller to learn who was calling. *Id.*

The defendant argued that "[b]ecause Moore was only able to identify the seventh caller in a stream of identical calls ... he [did] not allege he received the requisite two or more calls required under the TCPA." *Id.* at *2. Building on *Toney*, Judge Kocoras ruled that "it is reasonable to believe the first six calls from the same number with the same content were also from [defendant]." *Id.* at *3.

The case at hand does not require a daunting inferential leap, either. Moore received two calls from the same number, on the same day. Given the content of the second call, it is a reasonable inference that the first call was a telemarketing call from Healthcare Solutions.

If anything, the inference is almost unavoidable. Imagine asking your Average Joe on the street why an insurance agent called someone at home. It does not require much creativity to think that the call was about selling insurance. And then, imagine telling

Average Joe that there were two calls from the insurance agent on the same day: Call #1 went unanswered, and Call #2 was about selling insurance. Average Joe isn't likely to be stumped about the reason for Call #1.

Maybe Healthcare Solutions can show that it wasn't behind the first call, or that the call wasn't a telephone solicitation. But that's a question for another day. At the motion-to-dismiss stage, the Court must draw all reasonable inferences in Moore's favor. *See* *AnchorBank,* 649 F.3d at 614. For now, the complaint plausibly alleges that Healthcare Solutions called him twice to peddle a policy.

A different approach would change the incentives against calling and calling and calling people. Congress recognized that unwanted phone calls are an unwelcome intrusion. That's true when you answer your phone. But it is also true when your phone rings, and then rings again – for call after call, again and again – when you don't pick up. The interruption exists without answering the phone. If the calls don't count under the TCPA unless the person picks up, telemarketers would escape liability for all previous interruptions, no matter how annoying or intrusive. Nothing in the statutory text supports giving callers a pass for such intrusions.

**\*5**  Healthcare Solutions also makes a second argument, but it does not get very far. The argument is about whether Moore – as opposed to someone else – personally registered his phone number on the Do Not Call Registry.

As Healthcare Solutions points out, the regulation prohibits initiating a telephone solicitation to a "residential telephone subscriber who has *registered* his or her telephone number" on the Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2) (emphasis added). So, Healthcare Solutions argues that the regulation applies only if Moore himself registered his phone number.

Healthcare Solutions doesn't dispute that Moore's phone number was on the Do Not Call Registry. Instead, it argues that Moore cannot bring a claim because the complaint doesn't allege that Moore himself registered the phone number.

That argument rests on an unduly strict reading of the regulation. The text refers to a subscriber "who has registered" a telephone number. *Id.* Healthcare Solutions reads that provision to mean a subscriber "who has [personally] registered" a particular number. In effect, Healthcare Solutions is attempting to inject an adverb that is nowhere to be seen.

Nothing in the text ascribes any importance to the person who registered the number. The focus is on whether the number was registered, not who did the registration. The regulation protects numbers, not particular people. That's why the Registry includes numbers, not names.

That reading reflects the reality of living together. The regulation covers a "residential telephone subscriber." *Id.* People tend to share residences, and share home telephone numbers. It is hard to see why one spouse would receive the protections of the statute, and another spouse would not. After all, the same phone ringing in the same house could annoy several people. An unwanted phone call to a shared number could annoy everyone in earshot, even if only one member of the household took the time to register the number.

The most natural reading of the regulation prohibits unwanted calls to a number. It is natural to read the statute to protect a number, not simply the person who registered the number.

That reading of the regulation seems to fit with the breadth of the statutory text, too. The statute greenlights a claim by a "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." *See* 47 U.S.C. § 227(c)(5). It protects a "person" who "received more than one telephone call." *Id.* It doesn't seem to matter who registered the number. Anyone on the receiving end of the call can turn the tables and file suit.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 74 of 103

It does not matter who registered the phone number on the Do Not Call Registry. But even if it mattered, the complaint would survive. The complaint alleges that Moore's phone number is registered, and that Moore is the only person who uses that number. That's more than enough to support a reasonable inference that Moore registered his number. *See* Cplt., at ¶¶ 19–21 (Dckt. No. 1).

## Conclusion

For the foregoing reasons, the motion to dismiss the complaint is denied.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 17487823

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1387506
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Andrew PERRONG, individually and on behalf of a class of all persons and entities similarly situated, Plaintiff,

v.

SOUTH BAY ENERGY CORP., Defendant.

Case No. 2:20-cv-05781-JDW
|
Signed 04/13/2021

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA, Gregory Clinton Kelley, Pittsburgh, PA, for Plaintiff.

Eric M. Hurwitz, Stradley Ronon Stevens & Young LLP, Cherry Hill, NJ, Samuel E. Paul, Stradley Ronon Stevens & Young LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM**

JOSHUA D. WOLSON, J.

**\*1** Andrew Perrong is a frequent filer of Telephone Consumer Protection Act lawsuits. As such, he sometimes pursues novel legal theories as part of his business model. However, Mr. Perrong's latest theory has no legs, and he lacks standing to bring the additional claim set forth in his proposed amended complaint. Because the claim would be futile based on the facts of this case, the Court will deny Mr. Perrong's Motion to Amend his Complaint to pursue it.

**I. BACKGROUND**

South Bay Energy Corp. is an electric generation supplier that sells residential electric services to customers. It utilizes telemarketing to make sales, and it hired Webman's World, LLC to make telemarketing calls on its behalf. Adam Webman owns and operates Webman's World. On November 11 and 12, 2020, Webman's World made telemarketing calls on behalf of South Bay to Mr. Perrong's residential telephone number. At the time that Webman's World made those calls, Mr. Perrong's phone number was listed on the national Do-Not-Call Registry (the "DNC List"). In addition, South Bay, Webman's World, and Mr. Webman (collectively "Defendants") did not have a written do-not-call policy in place when Webman's made those calls to Mr. Perrong. Mr. Perrong does not allege that he ever requested not to receive telemarketing calls made on behalf of South Bay.

On November 18, 2020, Mr. Perrong filed a putative class action complaint against South Bay for violating the TCPA by calling him even though his phone number is listed on the national DNC List. The Court entered a Scheduling Order in this case and ordered that any motions to amend the Complaint were due by March 31, 2021. On March 18, 2021, after receiving some discovery, Mr. Perrong moved to amend his Complaint in order to include the allegations set forth above, add Webman's World and Mr. Webman as defendants in this matter, and assert an additional claim against Defendants, in Count II, for violation of the TCPA, specifically 🚩47 C.F.R. § 64.1200(d)(1). South Bay opposes the motion to amend with respect to the addition of Count II only. The motion is ripe for disposition.

**II. LEGAL STANDARD**

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 76 of 103

Perrong v. South Bay Energy Corp., Not Reported in Fed. Supp. (2021)

Federal Rule of Civil Procedure 15 conditions amendment of a pleading on the Court's leave or the opposing party's written consent. The rule instructs courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). This liberal amendment regime helps effectuate the "general policy embodied in the Federal Rules favoring resolution of cases on their merits." *Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017). The factors set out in the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178 (1962), guide a court's decision about whether to permit an amendment. A court may deny leave to amend based on undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, prejudice to the opposing party, and futility. *Id.* The *Foman* factors are not exhaustive, allowing a court to ground its decision, within reason, on consideration of other equitable factors, such as judicial economy/burden on the court and the prejudice denying leave to amend would cause. *See* USX Corp. v. Barnhart, 395 F.3d 161, 167-68 (3d Cir. 2004).

**\*2** " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 243 (3d Cir. 2010) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)). In determining whether a claim would be futile, "the district court applies the same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016).

## III. DISCUSSION

As the party invoking the Court's jurisdiction, Mr. Perrong must allege facts that demonstrate his standing to bring suit. *See* LaSpina v. SEIU Pennsylvania State Council, 985 F.3d 278, 284 (3d Cir. 2021) (quotation omitted). To do so, he "must show injury in fact, causation, and redressability." *Id.* (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Count II of Mr. Perrong's proposed amended complaint implicates the causation element, *i.e.* whether his injury "is fairly traceable to the challenged conduct" of Defendants. *Id.* (quotation omitted). "[T]he traceability element is 'akin to 'but for' causation in tort.' " *Id.* (same). "In assessing whether the defendant's particular conduct caused the plaintiff's injury, the variable to isolate and change is the conduct of the defendant the plaintiff challenges." *Id.* at 286. Thus, employing this framework, the Court must ask: Had Defendants' conduct that Mr. Perrong challenges not occurred, would he have suffered an injury? If he would have, then the challenged conduct did not actually cause Mr. Perrong's injury; if not, then it did. *See* id. at 285. In Count II of the proposed amended complaint, the challenged conduct is Defendants' alleged failure to have a written policy for maintaining a do-not-call list, as required by 47 C.F.R. § 64.1200(d)(1).

Mr. Perrong's injury does not come from Defendants' alleged violation of Section 64.1200(d)(1). That provision requires a company to maintain an internal list of subscribers who requested that the company not call them:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls **made by or on behalf of that person or entity**.

47 C.F.R. § 64.1200(d) (emphasis added). That provision applies only to individuals who have directed a company not to call them. Mr. Perrong never directed South Bay, Webman's World, or Mr. Webman not to call him. That is because Mr. Perrong

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 77 of 103

Perrong v. South Bay Energy Corp., Not Reported in Fed. Supp. (2021)

did not satisfy the "regulatory prerequisite" before he could bring a claim under 🚩Section 64.1200(d)(1). *Drake v. FirstKey Homes, LLC*, 439 F. Supp. 3d 1313, 1325 (N.D. Ga. 2020). Even if one or more Defendants had maintained an internal do-not-call list, that compliance would not have prevented them from calling Mr. Perrong.

Mr. Perrong tries to avoid this conclusion by suggesting that 🚩Section 64.1200(d)(1) requires companies to maintain an internal policy to avoid calling anyone on the national DNC List, but the regulatory language does not support his interpretation. No party has directed the Court to any official FCC interpretation of 🚩Section 64.1200. The Court therefore turns to traditional canons of statutory interpretation. *See* 🚩*Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016); 🚩*McCann v. Unum Provident*, 907 F.3d 130, 144 (3d Cir. 2018) ("[T]he basic tenets of statutory construction hold true for the interpretation of a regulation.") (quotation omitted).

**\*3** "It is the cardinal canon of statutory interpretation that a court must begin with the statutory language." 🚩⚠️*In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010), *as amended* (May 7, 2010). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' " *Id.* (quoting 🚩*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)); *see also* 🚩*Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) ("Where the statutory language is plain an unambiguous, further inquiry is not required ...."). To determine whether statutory language is ambiguous, the Court must "read the statute in its ordinary and natural sense." *Id.* (quotation omitted).

🚩Section 64.1200 is not ambiguous. The language "not to receive telemarking calls made by or on behalf of that person or entity" refers back to the "person or entity" that "initiate[s]" a call. Thus, the provision applies to calls that a company might make to a list of people that have directed the company not to call them. The regulation contemplates a specific list, which is different from (but might overlap with) the national DNC List.

The regulation's structure confirms this interpretation. 🚩Section 64.1200(d) prohibits a company from calling individuals who have directed the company not to call them. 🚩Section 64.1200(c)(2) prohibits calls to individuals on the national DNC List, with certain limited exceptions. If 🚩Section 64.1200(d) applied to every individual on the national DNC List, it would render 🚩Section 64.1200(c)(2) superfluous, or at least "insignificant." *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005).

Mr. Perrong might be right that Defendants violated the TCPA if they failed to maintain a list of individuals who directed South Bay not to call them. But Mr. Perrong never asked to be on such a list, so its non-existence did not cause his injury. "In other words, a caller could only violate the regulation if it called someone who had asked to be put on the list." *Drake*, 439 F. Supp. 3d at 1324. Put another way, even if Defendants had complied with the TCPA and maintained an internal do-not-call list, their compliance would not have prevented a call to Mr. Perrong because he would not have been on that list. Instead, Mr. Perrong's injury traces to the violation of a different provision, 🚩Section 64.1200(c)(2).

**IV. CONCLUSION**

The TCPA regulation on which Mr. Perrong relies does not require a company to maintain a written policy concerning calls to people on the national DNC List. But that's the only list on which Mr. Perrong was listed. Because Defendants' compliance with 🚩Section 64.1200(d)(1) would not have avoided Mr. Perrong's injury, he does not have standing to sue for a violation of that provision. The Court will therefore deny his Motion to Amend his Complaint to the extent it seeks to add Count II. An appropriate Order follows.

Case 1:26-cv-00659-KM   Document 31-1   Filed 07/15/26   Page 78 of 103

**Perrong v. South Bay Energy Corp., Not Reported in Fed. Supp. (2021)**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1387506

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00659-KM   Document 31-1   Filed 07/15/26   Page 79 of 103

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2528098
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern Division.

Royal SPURLARK, Plaintiff,
v.
DIMENSION SERVICE CORPORATION, et al., Defendants.

Case No. 2:21-cv-3803
|
Signed July 7, 2022

**Attorneys and Law Firms**

Brian K. Murphy, Jonathan P. Misny, Murray Murphy Moul + Basil LLP, Columbus, OH, Anthony Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Helen Marie MacMurray, Lisa Messner, Christopher Charles Wager, Erica R. Hollar, Mac Murray & Shuster, LLP, New Albany, OH, for Defendant Dimension Service Corporation.

William Wesley Patmon, III, Patmon Law Firm LLC, Columbus, OH, for Defendants Gustav Renny, Pelican Investment Holdings Group, LLC.

**OPINION AND ORDER**

EDMUND A. SARGUS, JR., UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court on four motions to dismiss Plaintiff Royal Spurlark's Amended Complaint (ECF Doc. 17) under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2)—or, alternatively, motions to strike the class claim allegations under Federal Rules of Civil Procedure 12(f) and ⚑23—brought by Defendants Dimension Service Corporation ("Dimension"), Pelican Investment Holding, LLC ("AAP") and Gustav Renny. (ECF Nos. 25, 30–32.) For the reasons set forth below, Defendants' Motions to Dismiss and Motions to Strike are **DENIED.**

**I. BACKGROUND**

On December 1, 2021, Plaintiff filed his First Amended Complaint ("the Complaint") against Defendants alleging violations of the Telephone Consumer Protection Act ("TCPA"), ⚑47 U.S.C. § 227, which prohibits unsolicited telemarketing calls made to individuals on the National Do Not Call List or containing pre-recorded messages. (*See generally* Compl., ECF Doc. 17.) Plaintiff alleges two counts under the TCPA that Dimension—by and through its agent AAP—engaged in prohibited conduct when calling his and other person's personal cellphone numbers. (*Id.* ¶¶ 76–86.) First, AAP made telephone calls with pre-recorded voice technology without first obtaining prior express consent by the Plaintiff and other putative class members. (*Id.* ¶ 77.) Second, AAP placed more than one telemarketing call to Plaintiff and other putative class members listed on the National Do-Not-Call Registry. (*Id.* ¶ 82.)

The Court accepts the following allegations as true. Dimension, an Ohio company, sells vehicle service warranty contracts and relies on pre-recorded telemarketing conducted by third parties to sell its services. (*Id.* ¶¶ 30–32.) One of the third parties Dimension hired was AAP, operated by Gustav Renny, the "Managing Member." (*Id.* ¶ 2); (Dimension's Mot. to Dismiss, ECF

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 80 of 103

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

No. 25-1 at 7). AAP was contractually required to promote Dimension services on the telemarketing calls in order to make sales. (Compl. ¶ 52; ECF No. 25-1.) Dimension maintained interim control over AAP's actions and had knowledge that AAP was engaging in pre-recorded telemarketing, including correspondence and other litigation about similarly violative conduct. (ECF No. 17 ¶¶ 53–58.) Mr. Renny, through his association with AAP, participated in the alleged telemarketing through involvement with the selection of telephone numbers to call, drafting of call scripts, and authorization of pre-recorded messages. (*Id.* ¶ 28.)

Plaintiff's telephone number is registered to a cellular telephone service primarily used for personal purposes. (*Id.* ¶¶ 35–38.) It had been on the National Do-Not-Call Registry for more than 30 days when he received pre-recorded calls from AAP for Dimension. (*Id.*) One of those calls occurred in August 2021. (*Id.* ¶ 38.) Plaintiff ignored multiple incoming calls which resulted in listening to generic pre-recorded messages regarding warranties where the company was not identified in the message. (*Id.* ¶¶ 39–40.) Eventually, Plaintiff engaged a telemarketer on September 3, 2021, in an attempt to identify the calling party. (*Id.* ¶ 41.) After answering the call, Plaintiff handed his phone over to a colleague, who provided his information to the caller and received an email confirming the call with AAP's logo as well as a policy packet for Dimension. (*Id.* ¶¶ 42–45.) The "seller information" on the packet was AAP and provided AAP's name and address. (*Id.* ¶ 46.)

**\*2**  Since automated telemarketing is done *en masse*, Plaintiff is pursuing this action on behalf of two putative classes:

Robocall class: All persons within the United States: (1) to whose cellular telephone number (2) AAP or Dimension (or an agent acting on behalf of AAP or Dimension) placed a telemarketing call (3) within the four years prior to the filing of the Complaint (4) using an identical or substantially similar pre-recorded message used to place telephone calls to Plaintiff.

AAP or Dimension National Do Not Call Registry Class: All persons in the United States whose, (1) telephone numbers were on the National Do Not Call Registry for at least 30 days, (2) but received more than one telephone solicitation from or on behalf of AAP or Dimension (3) within a 12-month period, (4) from four years prior to the filing of this Complaint.

(*Id.* ¶ 63.)

## II. STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure 12 allows for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal under 12(b)(6), the complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the" plaintiff is entitled to the relief requested. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Accepting all the plaintiff's factual allegations as true, the Court construes the complaint in the light most favorable to the non-moving party when considering a Rule 12(b)(6) motion. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

The Court must read Rule 12(b)(6) in conjunction with Federal Rule of Civil Procedure 8(a), requiring a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 907 (S.D. Ohio 2013). Thus, the pleading's factual allegations, assumed to be true, must do more than create mere speculation or suspicion of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). As part of the 12(b)(6) inquiry, the Court considers the content of the complaint— as well as items appearing in the case record mentioned therein and central to its claims. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir. 1993).

Additionally, Federal Rule of Civil Procedure 12 allows for dismissal of a complaint for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). When a court considers a 12(b)(2) motion prior to discovery and without holding an evidentiary hearing, the plaintiff need only make a "*prima facie* showing that personal jurisdiction exists." *Serras v. First Tennessee Bank Nat. Ass'n.*, 875 F.2d 1212, 1214 (6th Cir. 1989). This solely requires the plaintiff to demonstrate "with reasonable particularity" that the defendant's contacts with the forum state "support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (citation omitted). The district court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Serras*, 875 F.2d at 1214. The court cannot "weigh the controverting assertions of the party seeking dismissal." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020); *see also Olin-Marquez v. Arrow Senior Living Mgmt., LLC*, No. 2:21-CV-996, 2022 WL 479781, at *3 (S.D. Ohio Feb. 17, 2022).

### B. Motion to Strike

**\*3** Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "Because striking a portion of a pleading is a drastic remedy, such motions are generally viewed with disfavor and are rarely granted." *AT & T Global Info. Solutions Co. v. Union Tank Car Co.,* No. C2–94–876, 1997 WL 382101, at *1 (S.D. Ohio Mar. 31, 1997) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)). The action of striking a pleading should be "resorted to only when required for the purposes of justice" and when "the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp.*, 201 F.2d at 822.

## III. ANALYSIS

### A. Motions to Dismiss

Congress enacted the TCPA in response to consumer outrage about the proliferation of intrusive, nuisance telemarketing calls. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). Section 227 expressly prohibits certain telemarketing practices. *See generally* 47 U.S.C. § 227. Telemarketers violate § 227(b) when they "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or pre-recorded voice ... to any telephone number assigned to a ... cellular telephone service ... or any service for which the called party is charged for the call." *See* 47 U.S.C. § 227(b)(1)(a). The TCPA provides a private right of action to anyone who receives calls in violation of that provision. 47 U.S.C. § 227(b)(3).

Additionally, § 227(c) of the TCPA requires the Federal Communications Commission ("FCC") to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Among these regulations promulgated pursuant § 227(c) is the National Do-Not-Call Registry. *Charvat v. NMP, LLC*, 656 F.3d 440, 443–44 (6th Cir. 2011) (citing 47 C.F.R. § 64.1200(d)). A telemarketer must honor "do not call" requests no later than thirty days after a "residential telephone subscriber" makes such a request. *See* 47 C.F.R. § 64.1200(d)(3). A "residential telephone subscriber" is a "subscriber to a telephone exchange service that is not a business subscriber." 47 C.F.R. § 64.2305(d).

The National Do-Not-Call Registry provides one method of making a "do not call" request, allowing consumers to register their telephone numbers to indicate a desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 82 of 103

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

number is removed by the database administrator." *Id.* The Sixth Circuit has held that § 227(c) of the TCPA provides a private right of action for violations of do-not-call requests. ⚑*Charvat*, 656 F.3d at 444.

Accordingly, a consumer plausibly pleads claims under § 227(b)(1)(a) or § 227(c) of the TCPA by presenting facts that indicate a telemarketer called the consumer's personal telephone number without consent (1) utilizing a pre-recorded message, and/or (2) more than thirty days after the consumer placed their telephone number on the National Do-Not-Call Registry. Plaintiff has done just that. Plaintiff has indicated the timeframe he received calls with pre-recorded messages—which admittedly did not identify the caller—as August 2021. He ignored these calls until September 3, 2021, when he answered one and had a colleague engage with the telemarketer in an ultimately successful bid to identify the caller as AAP selling Dimension's product. (Compl. ¶¶ 41–48.) He also alleged he had been on the National Do-Not-Call Registry for more than 30 days prior to receiving the calls at issue. (*Id.* ¶ 35.) From these facts, the Court reasonably infers Defendants have engaged in conduct that violates the TCPA.

### 1. Defendant's common arguments

 **\*4**  Defendants advance several arguments that neither call the plausibility of Plaintiff's Complaint into question nor otherwise render the Complaint so deficient as to warrant dismissal. (*See generally* Motions to Dismiss, ECF Nos. 25, 30–32). First, AAP and Mr. Renny argue that since Plaintiff did not identify the August 2021 callers, there is "zero basis" to hold either party responsible "for unknown calls." (ECF No. 30 at 7; ECF No. 32 at 10.) But Plaintiff has alleged facts indicating that AAP made at least made the September 2021 call utilizing a pre-recorded message, which multiple calls with the same pre-recorded message preceded. (Compl. ¶¶ 35–48.) The content and timing of the September 2021 call allows the court to draw the reasonable inference that AAP made the August 2021 calls to market Dimension's services. *See* ⚑*Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) (finding in a TCPA case that the content and timing of several unanswered calls compared to answered calls allows the court to draw the inference that the unanswered calls also came from the defendants).

Specific to Count II, AAP and Mr. Renny take issue with Plaintiff's omission of the exact date he placed his phone number on the National Do-Not-Call Registry. (ECF No. 30 at 5; ECF No. 32 at 9). But the omission of that fact, a readily verifiable piece of information that can be adduced in discovery, is not grounds for dismissal. Plaintiff has alleged the calls took place more than thirty days after he placed his number on the Registry.

Next, AAP and Mr. Renny assert Plaintiff is not a "residential telephone subscriber" because he alleges his cellphone is "primarily" used for personal purposes, indicating that it is also used for another purpose. (ECF No. 30 at 7 ECF No. 32 at 12.) While the National Do-Not-Call Registry provision of the TCPA applies only to "a residential telephone subscriber," the FCC defines the phrase as one who is not a "subscriber to a telephone exchange service for businesses." *See* 47 C.F.R. § 64.2305(b)-(d). Plaintiff's Complaint does not fall outside that definition simply because he alleged to "primarily" use his cellphone for personal purposes, particularly since he also alleged that the number "is not associated with a business." (Compl. ¶ 37.)

### 2. Mr. Renny's arguments against personal jurisdiction and liability

Mr. Renny individually asserts that this Court does not have personal jurisdiction over him and thus he must be dismissed from this lawsuit. (ECF No. 32 at 4). Plaintiff alleges that Mr. Renny is subject to specific personal jurisdiction in connection with this action. (ECF No. 34 at 16). At this stage of the litigation, Plaintiff need only allege a prima facie showing that personal jurisdiction exists, which requires Plaintiff to show that Mr. Renny falls within Ohio's long-arm statute. *Olin-Marquez v. Arrow Senior Living Mgmt., LLC*, No. 2:21-CV-996, 2022 WL 479781, at \*4 (S.D. Ohio Feb. 17, 2022).

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 83 of 103

Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)

Ohio Revised Code 2307.382(A)(1) provides that "a court may exercise personal jurisdiction over" an out-of-state-defendant when the relevant cause of action "aris[es] from" that defendant's "transacting" of "any business" within the State. The Ohio Supreme Court has observed that, in the context of this provision, "the term 'transact' ... encompasses 'to carry on business' and 'to have dealings,' and is broader ... than the word 'contract.' " 🚩*Goldstein v. Christiansen*, 70 Ohio St.3d 232, 236, 638 N.E.2d 541 (1994).

A non-resident defendant "need not 'have a physical presence in Ohio' to be transacting business there." *Ohio Valley Bank Comp. v. MetaBank*, No. 2:19-cv-191, 2019 WL 4574528, at *4 (S.D. Ohio Sept. 20, 2019) (citation omitted). Generally, "[c]ourts examine three factors when determining whether a non-resident defendant has transacted business" under Ohio's long-arm statute: (1) whether the non-resident defendant "initiated the dealing," (2) "whether the parties conducted their negotiations or discussions in the forum state, or with terms affecting the forum state," and (3) whether the non-resident defendant manifested a "substantial connection" to Ohio. *Id.* (citations omitted). While these factors are somewhat open-ended, they are cabined by the long-arm statute's "arises from" clause, which the Sixth Circuit has interpreted to entail a " 'proximate cause' relationship between" the defendant's business conduct and the plaintiff's cause of action. *See* 🚩*Brunner v. Hampson*, 441 F.3d 457, 466 (6th Cir. 2006).

**\*5** Plaintiff's Complaint makes a prima facie showing that his claims under the TCPA arise from Mr. Renny's contacts with the state of Ohio while transacting business there. (*See* Compl. ¶ 13.) Mr. Renny had direct dealings in Ohio with Dimension regarding the telemarketing at issue. He signed the contract that formed the basis for the telemarketing relationship between AAP and Dimension, on which he identified himself as the "Managing Member" of AAP. (ECF No. 25-1 at 7.) That contract contains a forum-selection clause which states the parties to the contract "agree and consent to the exclusive jurisdiction of the federal and state courts located in Franklin County, Ohio, for the adjudication of any matters arising under or in connection with the Agreement." (*Id.* ¶ 5.2.) But for Mr. Renny forming this telemarketing contract with Dimension, an Ohio company, as an agent of AAP, the calls constituting Plaintiff's Complaint would not have occurred. Thus, Plaintiff has satisfied his burden.

Mr. Renny further argues that he cannot be held personally liable for AAP's actions since he is not an owner, member or director of the company. (ECF No. 32 at 10.) Section 217 of the TCPA reads as follows:

> "[T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person.*"

47 U.S.C. § 217 (emphasis added). Other courts have found the "any person" language in § 227 of the TCPA applies to individuals, including corporate officers. *See Williams v. Schanck*, No. 5:15-CV-01434-MHH, 2019 WL 4246570, at *4 (N.D. Ala. Sept. 6, 2019) (citing 🚩*Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011)). Again, Mr. Renny signed the contract that formed the basis for the telemarketing relationship between AAP and Dimension, which identifies him as the "Managing Member." (ECF No. 25-1 at 7.) Plaintiff alleges that Mr. Renny is in charge of AAP's telemarketing and that he is personally liable for the acts alleged in the Complaint pursuant 47 U.S.C. § 217. (Compl. ¶ 26.) Assuming the veracity of the allegations, Plaintiff has stated a claim against Renny.

### 3. Dimension may be vicariously liable for AAP's actions

Dimension argues that Plaintiff has failed to allege a theory of agency that could confer vicarious liability on the company for AAP's actions, thus requiring dismissal. This Court disagrees. The Sixth Circuit has determined "[t]he FCC has interpretive authority over the [TCPA]." 🚩*Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 466–67 (6th Cir. 2010). In 2013, the FCC ruled that sellers could be vicariously liable for the unlawful calls of third-party telemarketers based on "federal common law principles of agency," including theories of formal agency, apparent authority, and ratification. *See In re DISH Network, LLC*,

28 FCC Rcd. 6574, 6582–84 (2013) ("2013 Order"); *see also Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 371–72 (6th Cir. 2015) (adopting the 2013 Order).

Plaintiff convincingly argues that he should be permitted discovery on the extent of the relationship between Dimension and AAP. As this Court has noted, the 2013 Order permits consumers to "acquire evidence of relationship between telemarketer and seller through discovery if they are not independently privy to such information" and that such proof need not be presented at the time of filing. *Charvat v. LE Energy, LLC*, No. 2:19-CV-1325, 2019 WL 3891830, at *3 (S.D. Ohio Aug. 19, 2019) (Morrison, J.). This alone precludes dismissal.

But even if it did not, Plaintiff has adequately alleged the existence of a classical agency relationship between Dimension and AAP. "In TCPA cases, the Sixth Circuit looks to the Restatement of Agency to determine whether vicarious liability should be imposed." *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 586 (S.D. Ohio 2016). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." Restatement (Third) of Agency § 1.01. The essential element of an agency relationship is the principal's "right to control" the actor. *Id.* at § 1.01 cmt. f. A person may be an agent "although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment." *Id.* at § 1.01 cmt. c.

**\*6** Here, Plaintiff alleges Dimension maintained interim control over AAP's actions and had knowledge that AAP was engaging in pre-recorded telemarketing, including correspondence and other litigation about similarly violative conduct. (Compl. ¶¶ 53–58.) Plaintiff notes the following contract provisions that demonstrate Dimension's control over AAP:

- Requiring AAP to continue to service contracts it sold for Dimension, even after Dimension terminates them. (ECF No. 25-1 ¶ 2.3).

- AAP must specifically comply with the "underwriting, claims, guidelines and other procedures issued by the Company." (*Id.* ¶ 4.2.)

- AAP must use materials in its marketing that Dimension requires. (*Id.*)

- AAP must only sell the contracts "that qualify per [Dimension's] guidelines." (*Id.* ¶ 4.4.)

- AAP is restricted to use "telemarketing or direct marketing scripts approved by [Dimension]." (*Id.*)

- AAP allows Dimension to audit its business practices with any reasonable notice, including up to 1 year after termination of the agreement. (*Id.* ¶ 4.6)

This degree of control raises a plausible inference that an agency relationship existed. Even where, as here, Dimension and AAP expressly disclaimed an agency relationship between the two parties, (ECF No. 25-1 ¶ 5.14), that disclaimer does not negate the existence of an agency relationship, particularly where Plaintiff was unaware of such contractual provision. *Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, 13 F. Supp. 3d 786, 806 n.7 (N.D. Ohio 2014). This Court finds an agency relationship or ratification of one, as plead, is not wholly implausible so as to require dismissal.

### B. Motions to Strike

The Court now turns to Defendants' collective motions to strike class claims. A court may strike class action allegations before a motion for class certification where the complaint demonstrates that the requirements for maintaining a class action cannot be met. *See Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011) (affirming the district court's striking class allegations prior to discovery where the defect involved "a largely legal determination" that "no proffered factual development offer[ed] any hope of altering"). However, "courts should exercise caution when striking class action allegations based solely

on the pleadings," since it is often more prudent "to assess the propriety of class certification in the context of a fully briefed class certification motion rather than in the context of a motion to strike class claims at the pleading stage." *See Geary v. Green Tree Servicing, LLC*, No. 2:14-CV-00522, 2015 WL 1286347, at \*16 (S.D. Ohio Mar. 20, 2015).

Defendants argue that Plaintiff's proposed classes are "facially overbroad" and uncertifiable as improper "fail-safe" classes, that Plaintiff seeks injunctive relief only ancillary to statutory damages, that Plaintiff is atypical because he investigated to find out who was behind the calls—all of which justify striking class claims. Plaintiff argues that such arguments are either incorrect or do not render certification a legal impossibility and, for various reasons, such a determination regarding the class would be premature. This Court finds Plaintiff's arguments persuasive.

First, Plaintiff's class defined as those who have received unlawful calls is not "facially overbroad." Further, Plaintiff correctly notes that *inclusion*—rather than exclusion, as Defendants argue—of language about whether callers in the class had consented to the calls would render Plaintiff's class designations as improper "fail-safe" classes. *See Sauter v. CVS Pharmacy, Inc.*, No. 2:13–CV–846, 2014 WL 1814076, at \*2 (S.D. Ohio May 7, 2014) (requiring plaintiff to amend class designation to exclude language about consent to be called). Thus, excluding language about consent does not justify striking the class claims.

 **\*7** As to the primacy of injunctive relief, Plaintiff provides affidavits that purport to show illegal telemarketing calls made by AAP continue despite the litigation. (ECF Nos. 28-1, 28-2.) At this stage, the scope of Defendants calling conduct is unknown. Calling records that can be recovered indicating the number of calls made have yet to be produced. As Plaintiff notes, it is simply unknown what discovery will bring and how that will impact the viability and scope of a 23(b)(2) class in comparison to a 23(b)(3) class.

Further, a continuing relationship and the possibility of further violations does weigh on the analysis in a TCPA case when deciding to certify or strike a 23(b)(2) class as it relates to injunctive relief. *See Fisher v. MJ Christensen Jewelers, LLC*, No. 2:15-CV-00358-RFB-NJK, 2018 WL 1175215, at \*6 (D. Nev. Mar. 6, 2018) (striking where plaintiff failed to show a likelihood of future violations). Without discovery and full briefing on the class certification, such a determination is premature.

Lastly, Defendants take umbrage with Plaintiff's efforts to identify the callers behind the unlawful pre-recorded messages that form the basis of his complaint. Indeed, Defendants find such "deceptive" behavior to be atypical of the class. (ECF No. 25 at 16; ECF No. 30 at 13; ECF No. 32 at 17.) Whether the telemarketers in this case found themselves calling not a hapless consumer, but rather someone prepared to feign interest in their product to remove the mask of anonymity behind disembodied robocalls, has no bearing on whether he, and other members of the putative class, received illegal calls for which Defendants are liable. *See Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1194–95 (M.D. Tenn. 2017); *Charvat, 630 F.3d at 461* ("Phillip Charvat has not been shy in taking on the role of a private attorney general under the [TCPA]."). This Court finds that Plaintiff's conduct, which served to identify the Defendants, has no relevance toward a determination to strike the class claims.

### IV. CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Defendant's Motions to Dismiss and Motions to Strike (ECF Nos. 25, 30–32).

**IT IS SO ORDERED.**

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 86 of 103

**Spurlark v. Dimension Service Corporation, Not Reported in Fed. Supp. (2022)**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2528098

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1001186
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

TEMPLE UNIVERSITY HOSPITAL, INC.

v.

RUSSELL REIMBURSEMENT ADVISORS, INC., et al.

CIVIL ACTION No. 16-2645
|
Signed 03/15/2017

**Attorneys and Law Firms**

Howard R. Maniloff, Tabas & Rosen, P.C., Philadelphia, PA, for Temple University Hospital, Inc.

Jason A. Landro, Joseph A. Arnold, Joshua H. Romirowsky, Gordon Rees Scully Mansukhani LLP, Philadelphia, PA, John A. Bonventre, Landman Corsi Ballaine & Ford, Newark, NJ, for Russell Reimbursement Advisors, Inc., et al.

MEMORANDUM

Legrome D. Davis, District Judge

**\*1**  Plaintiff Temple University Hospital, Inc. ("TUH") sues Defendant National Railroad Passenger Corp. ("Amtrak") for breach of contract, asserting that Amtrak is obligated to pay $1,628,095.28 for inpatient hospital services that TUH provided to a passenger of the Amtrak train 188, which derailed in Philadelphia on May 12, 2015. [1] Second Am. Compl. (ECF 35). In addition, TUH sues Defendants Russell Reimbursement Advisors, Inc. ("RRA") and MCMC, L.L.C. ("MCMC"), asserting that they acted as agents for Amtrak. TUH's Complaint asserts that RRA's and MCMC's conduct, which was authorized by Amtrak, created a contract binding Amtrak to a promise to pay TUH the sum demanded. Alternatively, if Amtrak did not authorize the making of that promise, the Complaint asserts that RRA and MCMC are individually liable, and Amtrak is liable because it ratified their unauthorized promise. RRA and MCMC jointly move and Amtrak separately moves to dismiss the action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); Defs. Mots. (ECF 37, 38) TUH opposes dismissal. TUH Resps. (ECF 40, 41). [2] Jurisdiction is diversity, 28 U.S.C. § 1332.

The principal inquiry here is whether the Second Amended Complaint provides "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face,' " as is required by the Supreme Court's decisions in Iqbal and Twombly. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). In essence, "we look for well-pled factual allegations, assume their veracity, and then 'determine whether they plausibly give rise to an entitlement to relief.' " Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012) (quoting Iqbal, 556 U.S. at 679); Santiago v. Warminster Twp., 629 F.3d 121, 129-30 (3d Cir. 2010). That inquiry "is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " Bistrian, 696 F.3d at 365 (quoting Iqbal, 556 U.S. at 679).

Here, the Second Amended Complaint is viewed within a broader context than this action alone. After Amtrak's train derailed on May 12, 2015, various health facilities provided urgent medical and rehabilitative services to injured passengers. The Complaint

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 88 of 103

Temple University Hospital, Inc. v. Russell Reimbursement Advisors, Inc., Not Reported in Fed. Supp. (2017)

alleges, and the parties do not dispute, that during May 13, 2015, through July 28, 2015, TUH provided inpatient hospital care for 14 of the injured passengers, including the passenger ("A.L.") whose bill for medical services is at the core of this dispute. Second Am. Compl. ¶¶ 9, 12.

**\*2** Many lawsuits ensued from the derailment. On October 13, 2015, the Judicial Panel on Multidistrict Litigation consolidated in this Court all related actions originally filed in and transferred or removed to this Court. In re Amtrak Train Derailment, No. 15-md-2654 (E.D. Pa. 2015) (the "MDL"). On October 27, 2016, the Court approved a global resolution of the MDL. Case Mgmt. Order, dated Nov. 3, 2016 (ECF 145). Amtrak accepted liability in the MDL for compensatory damages and agreed to fund a settlement program. Id. The money available to compensate the many injured passengers is limited by a cap on Amtrak's liability arising "from a single accident." ⚑49 U.S.C. § 28103(a)(2). A.L. is a plaintiff in the MDL who has agreed to participate in the settlement program.

Immediately after the derailment, Amtrak voluntarily paid for urgent medical treatment of the injured passengers. However, Amtrak preserved all rights and full control over which medical services and what proportion of the services that it would pay gratuitously. TUH's Complaint alleges, and the parties do not dispute, that Amtrak chose to not pay TUH the demanded sum of $1,628,095.64. Second Am. Compl. ¶¶ 26, 29. The Complaint alleges, and the parties do not dispute, that Amtrak paid TUH the sum of $2,754,228.49 for inpatient hospital services provided to 13 of the injured passengers, other than A.L. Amtrak Br. at 5 (ECF 38-1).

TUH acknowledges that A.L. was insured by Medicare. TUH Resp. (ECF 41 at 6, 8 n.5). A.L. had no other health insurance. TUH submits that Medicare would have paid about $265,469.08 for the inpatient hospital services provided to A.L. Id. TUH acknowledges that it did not receive any Medicare insurance proceeds for the services provided to A.L., because TUH did not timely submit a claim to Medicare within the required one-year period from the date that the inpatient hospital services were provided. Id.

I. PROCEDURAL BACKGROUND

On May 27, 2016, TUH commenced this action by filing a complaint against RRA and MCMC, suing to recover payment for the inpatient hospital services provided to A.L. Compl. (ECF 1). The complaint was dismissed for failure to state a claim. Order, dated Sept. 6, 2016 (ECF 11) (ruling that the "Complaint fails to put Defendants on notice of the claims asserted against them, and improperly leaves Defendants as well as the Court guessing which particular claims are being asserted."). On September 8, 2016, TUH filed an amended pleading, again suing to recover payment for A.L.'s bill from RRA and MCMC. First Am. Compl. (ECF 12). The first amended complaint survived RRA's and MCMC's motion to dismiss. Order, dated Nov. 21, 2016 (ECF 17). TUH was permitted to again amend the pleadings. Order, dated Jan. 31, 2017 (ECF 31). On February 1, 2017, TUH amended the pleadings by adding Amtrak as a defendant and suing to recover payment for A.L.'s bill from Amtrak. Second Am. Compl. (ECF 35). TUH acknowledges that "the causes of action against RRA and MCMC are identical in the first and second amended complaints." TUH Resp. (ECF 41 at 3-4). On February 17, 2017, RRA and MCMC filed the present dismissal motions. Defs. Mots. (ECF 37, 38).

The dismissal motions filed by RRA, MCMC, and Amtrak attach a copy of a "Letter of Agreement," signed by TUH and RRA on October 23, 2015 (the "Letter"). R&M Mot. (ECF 37-2); Amtrak Mot., Ex. E (ECF 38-4 at 6-8). TUH did not attach a copy of the Letter to any of its pleadings. In addition, Amtrak's dismissal motion attaches email exchanges among various representatives for TUH, RRA, and MCMC. Id., Exs. D, F, G (ECF 38-4 at 2-15). The emails document the parties' discussion about the charges billed by TUH during May 13, 2015, through July 28, 2015, for the 14 injured passengers that TUH treated as inpatients, including A.L. Specifically, the Letter and the emails document the following communications.

**\*3** On Thursday, October 22, 2015, at 4:47 p.m., Brenda G. Calia, Sr. Vice President of MCMC, emailed E. Patrick Clarke and Deborah Scialanca of Amtrak, attaching a worksheet. Amtrak Br., Ex. D (ECF 38-4 at 2-4). Calia wrote that the "worksheet came from Temple to Russell [RRA]." Id. The worksheet summarized charges billed by TUH for the 14 injured passengers

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 89 of 103

Temple University Hospital, Inc. v. Russell Reimbursement Advisors, Inc., Not Reported in Fed. Supp. (2017)

that TUH treated as inpatients. In line-itemized entries for each patient, the worksheet listed TUH's "Total Charges" and the "Amtrak Settlement offer (75% chgs)." Id. Among other entries, the worksheet listed the total amount of charges billed for all 14 patients, discounted by 25%: "$4,382,324.13" (75% of the total charges billed). Id. The worksheet listed the discounted amount for A.L.: "$1,628,095.64." Id. However, Calia noted that charges billed for five of the patients had not been submitted by Amtrak for negotiation. Instead, TUH had listed the charges billed for those five patients on the worksheet and had submitted the worksheet to RRA. The charges billed for A.L. was one of the five bills that TUH unilaterally chose to list on the worksheet. Calia wrote that RRA and MCMC "understand that these bills may not be allowable because they did not come from us (and ultimately, approved by you, Amtrak)." Id. Calia also wrote: "In following our protocol, only bills that were received from Amtrak (initialed and authorized for payment) can be processed." Id. Calia asked Clarke and Scialanca for further instructions.

On October 22, 2015, at 6:16 p.m., Amtrak's representative, Scialanca, responded and instructed MCMC's representative, Calia: "I'm not sure why A.L.'s bill is listed as we have written on all his bills 'do not pay.' " Amtrak Br., Ex. D (ECF 38-4 at 2-4). On October 22, 2015, at 8:15 p.m., Calia responded to Scialanca: "Temple sent those bills directly to [RRA] as they were negotiating with [RRA] on other Amtrak bills. I suspected they were skirting the process we have in place, hence, why I was inquiring about those bills." Id. "We will let Temple know the bills for A.L. will not be included in our negotiations." Id.

On Friday, October 23, 2015, TUH's representative and RRA's representative, Christy Salas, signed the "Letter of Agreement," which "sets forth the agreement of the Parties with respect to certain services provided by [TUH]." Amtrak Br., Ex. E (ECF 38-4 at 6-8). Those services were summarized in Exhibit A to the Letter. In substance, Exhibit A listed the same information that was listed earlier on the worksheet. In line-itemized entries for each patient, Exhibit A listed the "Total Charges" billed by TUH, and the "Amtrak Settlement offer (75% chgs)." Id. Exhibit A listed the total amount of charges billed for all 14 patients, discounted by 25%: "$4,382,324.13" (75% of the total billed charges). Id. Exhibit A listed the discounted amount for A.L.: "$1,628,095.64." Id. On its face, the Letter stated that it was "effective as of October 26, 2015." Id.

On October 23, 2015, at 6:34 p.m., MCMC's representative, Calia, emailed RRA's representative, Salas, stating: "Amtrak DOES NOT want ANY of A.L. bills paid." Amtrak Br., Ex. E (ECF 38-4 at 11-13). Calia attached the emails sent the day before on October 22, 2015, highlighting in red Amtrak's earlier instructions that A.L.'s bills were not to be paid.

On Monday, October 26, 2015, at 9:02 a.m., RRA's representative, Salas, emailed TUH's administrative director for patient accounts, Philip Palma. Amtrak Br. at 5 (ECF 38-4 at 15). Salas wrote: "I heard back from Amtrak regarding the 5 outstanding bills you sent. The only bill in question is the $2m bill for A.L. Amtrak is not paying any of his bills at this time." Id.

II. Allegations of the Second Amended Complaint and the Parties' Contentions

TUH's Complaint asserts that Amtrak "retained" RRA and MCMC "to act as its agents to negotiate the payment of the charges incurred by certain patients who were treated by TUH." Second Am. Compl. ¶ 9. The Complaint asserts that on October 23, 2016, representatives of RRA and MCMC "signed a written agreement" promising to pay TUH $4,382,324.13 for the medical services that TUH provided to the 14 injured passengers, which total included the sum of $1,628,095.28 for the inpatient hospital services provided by TUH to A.L. Id. ¶ 12.

As to whether RRA and MCMC acted within the scope of their authority as agents for Amtrak, the Complaint asserts alternative claims. Count III of the Complaint asserts that RRA and MCMC had Amtrak's authority to "enter into the agreement with TUH." Second Am. Compl. ¶ 28. The "agreement" was a promise to pay TUH $4,382,324.13 in total for the inpatient hospital services that TUH provided to the 14 injured passengers, which total included the sum of $1,628,095.28 for the inpatient hospital services provided by TUH to A.L. Id. ¶¶ 12, 28. And, it is also asserted, Amtrak is bound by that "written agreement." Id. ¶ 28.

*4 Alternatively, Count I of the Complaint asserts that Amtrak's "agents," RRA and MCMC, "exceeded the scope of their authority for Amtrak." Second Am. Compl. ¶¶ 9, 12, 17. The Complaint alleges that on October 22, 2015, RRA and MCMC "proposed to Amtrak that Amtrak pay TUH $4,382,324.13" for the inpatient hospital services that TUH provided to the 14 injured passengers. Id. ¶ 10. The Complaint also alleges that on October 22, 2015, Amtrak "told" RRA and MCMC that "they

were not authorized to enter into the proposed agreement and that Amtrak would agree to pay only $2,754,228.49 for thirteen (13) of these patients." Id. ¶ 11. The Complaint asserts that on October 23, 2015, RRA acted without Amtrak's authority by "sign[ing] a written agreement" promising to pay TUH $4,382,324.13 for the services that TUH provided to all 14 injured passengers, which total included the sum of $1,628,095.28 for the services provided to A.L. Id. ¶¶ 9, 12. And, it is asserted, RRA and MCMC are bound by that agreement and "are liable to TUH for their unauthorized conduct." Id. ¶ 17.

In addition, TUH's Complaint asserts that even if RRA and MCMC acted beyond the scope of their authority as agents for Amtrak by entering into the agreement promising to pay for the inpatient hospital services provided to A.L., Amtrak "ratified the unauthorized conduct" by paying TUH "$2,754,228.29 pursuant to the terms of that agreement." Second Am. Compl. ¶ 24. And, the Complaint asserts, Amtrak affirmed and is bound by the unauthorized promise contained in the "agreement" signed by RRA. Id. ¶¶ 12, 24-25.

Amtrak maintains that it never agreed to pay for the inpatient hospital services that TUH provided to A.L. Amtrak Br. at 3, 10 (ECF 38-1). Amtrak also maintains that it did not ever authorize RRA or MCMC to negotiate or agree to pay for the inpatient hospital services provided A.L. Id. at 3, 9. Amtrak acknowledges that it hired MCMC to "negotiate medical bills incurred by injured passengers at various health care facilities," including TUH. Id. at 4. However, Amtrak asserts that it did not hire RRA and did not even know of its existence until this dispute arose. Id. at 5 ("At the time the [Letter of] Agreement was signed, Amtrak was unaware that RRA even existed, much less was negotiating on its behalf."). The record does not establish whether RRA is subsidiary or affiliate of MCMC, or a subcontractor, or some other entity. See id. at 5 n.2 ("RRA is apparently owned by the same parent corporation as MCMC.").

Furthermore, Amtrak maintains that it did not affirm or ratify any promise or conduct by either RRA or MCMC as to TUH's charges for the inpatient hospital services provided to A.L. Amtrak asserts that it "promptly disavowed and clearly repudiated" any purported agreement by RRA or MCMC to pay for the services provided to A.L. Amtrak Br. at 3, 10. Amtrak also maintains: "At no time did Amtrak manifest any intention to pay A.L.'s bill or act in any way inconsistent with its disaffirmance as to paying A.L.'s bill." Id. at 10 (internal quotation marks and alteration omitted). Furthermore, Amtrak contends that its payment of the charges billed for the other 13 injured passengers, "did not obligate Amtrak to pay A.L.'s bill." Id.

RRA and MCMC seek dismissal of TUH's claim for breach of contract based principally on two asserted defects. R&M Br. (ECF 37 at 3-18). They maintain that TUH has not alleged the existence of an enforceable contract. Id. at 2, 8-12. Specifically, they maintain that the Complaint does not allege any facts that would constitute consideration for the pled agreement to pay for the inpatient hospital services provided by TUH to A.L. This is so, they maintain, because the Complaint alleges, and the parties do not dispute, that TUH had already provided the services to all 14 of the hospital inpatients at the time the Letter was signed. RRA and MCMC maintain that past consideration, as a matter of law, cannot support an enforceable contract. Id. And, they assert: "TUH does not allege that it provided the medical services as a condition of, or with the expectation of, any payment by Amtrak." Id. at 8, 12. TUH does not allege otherwise.

 *5  RRA and MCMC also seek dismissal of the Complaint's claim that they misrepresented their authority as agents for Amtrak. Second Am. Compl. ¶¶ 13, 17, 21; R&M Br. at 2, 12-13, 14-15. RRA and MCMC acknowledge that RRA's representative, Salas, lacked Amtrak's authorization to sign the Letter, and RRA and MCMC lacked authority to enter into any agreement for the payment of A.L.'s inpatient hospital services. However, they maintain that the Complaint fails to allege the existence of an enforceable contract, which is a necessary element of the Complaint's cause of action for breach of an implied warranty of authority. Id. at 12-13. In addition, they maintain, the Complaint "fails to allege that [TUH] relied to its detriment on any representation made by RRA and MCMC," which detrimental reliance or prejudice is an element of any asserted cause of action for tortious misrepresentation. Id. at 2, 14-15.

## III. DISCUSSION

### A. Legal Standard

Temple University Hospital, Inc. v. Russell Reimbursement Advisors, Inc., Not Reported in Fed. Supp. (2017)

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a claim for "failure to state a claim upon which relief can be granted." Accordingly, a Rule 12(b)(6) dismissal motion tests the sufficiency of claims contained in a complaint against Rule 8(a)'s pleading requirements.

In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556). The "touchstone" of the pleading standard is plausibility:

> "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."

Bistrian, 696 F.3d at 365 (quoting Iqbal, 556 U.S. at 678). Accord Argueta v. U.S. Immigration & Customs Enf't, 643 F.3d 60, 70-73 (3d Cir. 2011); Santiago, 629 F.3d at 129-30; Fowler v. UPMC Shadyside, 578 F.3d 203, 209-11 (3d Cir. 2009).

Under Rule 12(b)(6), the well-pled factual allegations of a complaint must not only be accepted as true, but also all reasonable inferences from those allegations must be drawn in the plaintiff's favor. In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 633 (3d Cir. 2017) (citing Iqbal, 556 U.S. at 678); Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd., 836 F.3d 261, 264 n.1, 268 (3d Cir. 2016) (citing Fowler, 578 F.3d at 210). Whereas "[f]actual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, "a plaintiff 'need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element.' " Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 147 (3d Cir. 2014) (quoting Fowler, 578 F.3d at 213 (citations and quotation marks omitted)). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). And legal conclusions must be disregarded. Horizon, 846 F.3d at 633 (citing Santiago, 629 F. 3d at 128).

### B. The Record on the Dismissal Motions

**\*6** For purposes of Rule 12(b)(6), "a court 'must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.' " Hartig, 836 F.3d at 268, 273 (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)). A "document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." Angstadt v. Midd–West Sch. Dist., 377 F.3d 338, 342 (3d Cir. 2004) (citation and internal quotation marks omitted). In other words, a district court "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). "Otherwise, a plaintiff with a legally deficient claim could survive a motion

to dismiss simply by failing to attach a dispositive document on which it relied." Id. (citing Goodwin v. Elkins & Co., 730 F.2d 99, 113-14 (3d Cir. 1984) (Becker, J., concurring)).

TUH acknowledges that the Letter of Agreement attached to the dismissal motions is an authentic copy of the written agreement pled in TUH's Complaint. The Complaint asserts that Amtrak's payment of $2,754,228.49 for the inpatient hospital services provided to 13 of the injured passengers that TUH treated, other than A.L., was made "pursuant to the terms" of a "written agreement" signed by TUH and RRA. Second Am. Compl. ¶¶ 12, 14, 24-25. The Complaint asserts that pursuant to that "agreement," either Amtrak or RRA and MCMC are obligated to pay the remaining balance of $1,628,095.28. Id. ¶¶ 12-15, 21-22, 24-25, 28. In response to the dismissal motions, TUH identified the pled agreement as the "Letter of Agreement," signed by TUH and RRA on October 23, 2015. TUH Resps. (ECF 40 at 3, 5-7; ECF 41 at 3, 5-8). Accordingly the Letter will be treated as part of the dismissal record, without converting the dismissal motions into ones for summary judgment.

TUH does not contest the authenticity of the emails that are attached to Amtrak's dismissal motion. TUH does not mention the emails at all. However, the emails document communications, some of which support and some which are directly at odds with the Complaint's assertions and factual allegations. See, e.g., Second Am. Compl. ¶¶ 10-13, 24-25, 28. The question as to whether the emails should be part of the dismissal record need not be reached. The Complaint can be evaluated without the emails.

   C. The Complaint Does Not Allege an Enforceable Contract
To determine whether TUH's Complaint meets the pleading standard, the analysis starts by outlining the elements that must be pled in order to state a claim to relief—here, the elements that TUH must plead and prove for an actionable breach of contract claim. Bistrian, 696 F.3d at 365; Santiago, 629 F.3d at 130. Under Pennsylvania law, a plaintiff suing for breach of contract must plead and prove " '(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract[,] and (3) resultant damages.' " Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). "The necessary material facts that must be alleged for such an action are simple: there was a contract, the defendant breached it, and plaintiffs suffered damages from the breach." McShea v. City of Philadelphia, 995 A.2d 334, 339-40 (Pa. 2010); accord Donaldson v. Davidson Bros., Inc., 144 A.3d 93, 103 (Pa. Super. Ct. 2016).

"It is basic contract law that for there to be an enforceable contract, 'the parties themselves must agree upon the material and necessary details of the bargain.' " Peck v. Delaware Cty. Bd. of Prison Inspectors, 814 A.2d 185, 191 (Pa. 2002) (quoting Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)). A contract exists only if there was an offer, acceptance, and exchange of consideration. Pa. Workers' Comp. Judges Prof'l Ass'n v. Exec. Bd. of Commonwealth, 39 A.3d 486, 493 (Pa. Commw. Ct. 2012), aff'd, 66 A.3d 765 (Pa. 2013); Mundie v. Christ United Church of Christ, 987 A.2d 794, 801 (Pa. Super. Ct. 2009), appeal denied, 14 A.3d 829 (Pa. 2010). As ruled by our Court of Appeals, contract formation under Pennsylvania law requires: "(1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009).

 **\*7** Having identified the elements of TUH's claim for breach of contract, the next step is to "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth,' " Santiago, 629 F.3d at 130 (quoting Iqbal, 556 U.S. at 678), and then "peel away those allegations," Bistrian, 696 F.3d at 365. TUH's Complaint contains the following conclusions that will be disregarded.

The Complaint only concludes that there was an enforceable agreement. The Complaint asserts that on October 23, 2015, "RRA and TUH signed a written agreement," and RRA and MCMC "entered into said agreement." Second Am. Compl. ¶¶ 12-13,

15, 21. The Complaint asserts that Amtrak authorized RRA and MCMC "to enter into the agreement," and "Amtrak is bound by the agreement." Id. ¶ 28. Alternatively, it is asserted, even if Amtrak did not authorize RRA and MCMC "to enter into the agreement," RRA and MCMC "are liable to TUH for their unauthorized conduct." Id. ¶¶ 13, 15, 17. And "Amtrak ratified" and "became bound by the terms of the agreement." Id. ¶¶ 24-25. The Complaint asserts that Amtrak paid "TUH $2,754,228.49 under said agreement," and that "TUH has suffered a financial loss of $1,628,095.64 ... under the terms of the October 23, 2015 agreement." Id. ¶¶ 14-15, 21-22. The Letter of Agreement does not add factual content to the Complaint's conclusory assertion of an enforceable agreement. The Letter, just like the Complaint, is devoid of any factual content that would support a reasonable inference of an offer, acceptance, and consideration–the essential elements for an enforceable contract.

The "test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986) (citing Lombardo, 123 A.2d at 666). An offer is "a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Cobaugh v. Klick–Lewis, Inc., 561 A.2d 1248, 1249 (Pa. Super. Ct. 1989) (citing Restatement (Second) of Contracts § 24). "It is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made. An offer must be intentional, definite, in its terms and communicated; otherwise, no meeting of the minds can occur." Stumpp v. Stroudsburg Mun. Auth., 658 A.2d 333, 335 (Pa. 1995).

The Letter of Agreement identifies TUH and Amtrak as the "Parties." The Letter recites "the agreement of the Parties" with respect to the services and charges "listed on Exhibit A." The Letter does not memorialize reciprocal promises by the Parties. Instead, the Letter recites one promise that Amtrak "shall pay to TUH ... $4,382,324.13" for the services and charges listed on Exhibit A, and the Letter labels that sum the "Settlement Amount." Exhibit A then labels a column of figures with the heading, "Amtrak Settlement offer (75% chgs)." The labels—"Settlement" and "Settlement offer"—are conclusory. Neither the Letter nor its Exhibit A provides any information as to who offered what to whom, how, when, or where. Neither the Letter nor its Exhibit A says what rights and liabilities are being settled and compromised by whom. At best, the Letter recites a unilateral promise purportedly made by Amtrak, offering to pay the stated sum of money, "$4,382,324.13."

 **\*8**  The Complaint as well asserts a unilateral promise to pay—whether made by Amtrak or instead, made by RRA and MCMC. The Complaint then concludes that the promise formed an enforceable contract upon RRA's signing of the Letter, which conferred instant liability on Amtrak or on RRA and MCMC to pay TUH the sum of $4,382,324.13 for all 14 patients that TUH treated. But this is not enough to form a contract. Our Court of Appeals instructs:

> Unlike bilateral contracts, which are premised on reciprocal promises, "unilateral contracts ... involve only one promise and are formed when one party makes a promise in exchange for the other party's act or performance. Significantly a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance."

Giant Eagle, Inc. v. Comm'r Internal Revenue, 822 F.3d 666, 673 (3d Cir. 2016) (quoting First Home Sav. Bank, FSB v. Nernberg, 648 A.2d 9, 14 (Pa. Super. Ct. 1994) (internal citations omitted)); accord Cobaugh, 561 A.2d at 1249-50. See also Pacitti v. Macy's, 193 F.3d 766, 774-75 (3d Cir. 1999) (a unilateral promise results in an enforceable contract if the offeree performs the required action before the offer is withdrawn).

As pled here, the promise by Amtrak does not specify or request any performance by TUH. The Complaint and Letter are silent as to how TUH understood that it could accept the pled offer by Amtrak and collect the promised money simply by performing a task specified by the offer. Importantly, the Complaint and Letter are also silent as to any performance by TUH that would be exchanged for Amtrak's promise to pay money, which would be the consideration for Amtrak's promise. TUH's brief only concludes that the "term 'settlement' necessarily implies that the parties have a bargained-for-exchange that constitutes consideration." TUH Resp. (ECF 41 at 5-6). However, consideration is "an essential element of an enforceable contract."

Stelmack v. Glen Alden Coal Co., 14 A.2d 127, 128 (Pa. 1940). "The requirement of consideration as an essential element of a contract is nothing more than a requirement that there be a bargained for exchange." Cobaugh, 561 A.2d at 1250. "Consideration confers a benefit upon the promisor or causes a detriment to the promise." Id. (citing Cardamone v. Univ. of Pittsburgh, 384 A.2d 1228, 1232 n.6 (Pa. Super. Ct. 1978)). Neither the Letter nor its Exhibit A nor the Complaint contains factual content that would permit a reasonable inference of a bargained for exchange between TUH and RRA or MCMC, or between TUH and Amtrak.

In addition, the Complaint does not give rise to a plausible inference that TUH suffered any detriment at the request of Amtrak. Although TUH argues that upon signing the Letter of Agreement, it gave up rights to recover its charges from the injured passengers or their insurers, none the asserted bases for this contention is well-grounded in fact or law. See TUH Resp. (ECF 41 at 6, 8) (asserting that "TUH gave up any right to collect some greater portion of its charges" and "the hospital cannot seek any payment from any other source"). That TUH gave up the right to recover from Medicare for A.L.'s treatment was caused by TUH's admitted failure to file a timely claim with Medicare. See TUH Resp. (41 at 6, 8 n.5). TUH did not give up or forbear anything whatsoever in exchange for the pled promise by Amtrak to pay $4,382,324.13 for the inpatient hospital services provided to 14 of the injured passengers, or by Amtrak's payment of $2,754,228.49 for the inpatient hospital services provided to 13 of the injured passengers.

*9 The Complaint is devoid of any well-pled factual allegations supporting a reasonable inference of an offer, acceptance, or consideration. The Complaint only asserts the existence an "agreement," and then concludes that the "agreement" formed an enforceable contract. Again, "naked assertions devoid of further factual enhancement" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statement," must be disregarded. Iqbal, 556 U.S. at 677-78. The pled "agreement" is not entitled to a presumption of truth, and the pled contract will be dismissed.

Furthermore, the Complaint does not raise a reasonable expectation that discovery will reveal an enforceable contract. Where there are well-pled factual allegations, their veracity is assumed, and then it must be determined " 'whether they plausibly give rise to an entitlement to relief.' " Bistrian, 696 F.3d at 365 (quoting Iqbal, 556 U.S. at 679 and citing Argueta, 643 F.3d at 73); Santiago, 629 F.3d at 130. Here, the well-pled allegations of the Complaint more plausibly give rise to the conclusion that there was no contract at all.

The Complaint alleges, and the parties do not dispute, the following facts, which are entitled to a presumption of truth. During May 13, 2015, through July 28, 2015, TUH provided inpatient services to 14 of the injured passengers, including the passenger A.L. More than two months later, on October 23, 2015, RRA's representative signed the Letter of Agreement. Amtrak has not paid TUH the demanded sum of $1,628,095.64 for inpatient hospital services that TUH provided to A.L. Amtrak paid TUH the sum of $2,754,228.49 for the inpatient hospital services that TUH provided to 13 of the injured passengers, other than A.L.

"It is too well-settled to require citation that generally for an act to constitute consideration it is essential that it or the promise to do it be simultaneous with the execution of the contract." In re Lueders' Estate, 164 F.2d 128, 135 (3d Cir. 1947); Kilborn v. Pyne, 279 F. 864, 865-66 (3d Cir. 1922) (holding that services rendered by the defendant in the past were not consideration for the plaintiff's subsequent promise to relieve the defendant of his liability on a note). Services rendered prior to the execution of an agreement "furnish no basis for holding that there was a binding legal agreement since past consideration is insufficient." Cardamone, 384 A.2d at 1232. Accord Blackmon v. Iverson, 324 F. Supp. 2d 602, 611-12 (E.D. Pa. 2003) (applying Pennsylvania law and holding that "past consideration is insufficient to create a binding contract").

TUH sues to recover its charges for inpatient hospital services that TUH provided to the injured passengers before the Letter of Agreement was signed—that is, before the pled contract was formed. The Complaint does not allege that Amtrak bargained for the performance of the services by TUH. The Complaint does not allege that TUH provided those services to the injured passengers in exchange for Amtrak's promise to pay TUH's charges for treating the patients. The Complaint is devoid of any

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 95 of 103

Temple University Hospital, Inc. v. Russell Reimbursement Advisors, Inc., Not Reported in Fed. Supp. (2017)

allegation that the services were part of any bargaining process by anyone. Accordingly, the inpatient hospital services provided by TUH prior to formation of the pled agreement constitute past consideration, and therefore, as a matter of law, those inpatient hospital services are inadequate to support a claim for breach of contract.

Amtrak's payment of $2,754,228.49 is consistent with a voluntary, gratuitous payment. " 'If the promisor merely intends to make a gift to the promisee upon the performance of a condition, the promise is gratuitous and the satisfaction of the condition is not consideration for a contract.' " Pennsy Supply, Inc. v. Am. Ash Recycling Corp., 895 A.2d 595, 601 (Pa. Super. Ct.), appeal denied, 907 A.2d 1103 (Pa. 2006) (quoting Weavertown Transp. Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003), appeal denied, 849 A.2d 242 (Pa. 2004) (quoting Stelmack, 14 A.2d at 128-29) (citations omitted)). Here, the Complaint "pleads facts that are 'merely consistent with' a defendant's liability," and it " 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

### D. The Complaint Does Not Allege A Plausible Agency Relationship

**\*10**  The Complaint asserts that Amtrak "retained" RRA and MCMC to "act as its agents to negotiate the payment of charges incurred" by the injured passengers. Second Am. Compl. ¶ 9. The Complaint asserts that on October 23, 2015, "TUH and RRA signed a written agreement," later identified by TUH as the Letter of Agreement. Id. ¶ 12. The Complaint asserts that "if RRA and MCMC had ... Amtrak's authority to enter into the agreement with TUH," then "Amtrak is bound by the agreement and it is obligated to pay TUH the $1,628,095.64 that is due under its terms." Id. ¶ 28. In briefing, TUH does not argue or support the assertion that Amtrak is liable as a principal for the acts of its agents, RRA and MCMC. Nonetheless, the Complaint asserts that RRA's signing of the Letter Agreement should be imputed to Amtrak. Id. ¶¶ 12, 28.

As Pennsylvania's Supreme Court ruled, the "imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority." Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. Price Waterhouse Coopers, LLP, 989 A.2d 313, 333(Pa. 2010). The imputation doctrine presumes that a principal has "selected and delegated responsibility" to its agents and "creates incentives for the principal to do so carefully and responsibly." Id. The doctrine protects a party who conducts business with the principal through its agents "believing the agent's conduct is with the authority of his principal." Id. However, before the words or acts of one person can be imputed to another, there must be an agency relationship between them. Pennsylvania law requires the party asserting an agency relationship to plead and prove:

"(1) 'the manifestation by the principal that the agent shall act for him," (2) 'the agent's acceptance of the undertaking[,]' and (3) 'the understanding of the parties than the principal is to be in control of the undertaking.' "

Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 299 (E.D. Pa. 2008) (quoting Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980)) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)).

The Complaint's assertion that RRA and MCMC were Amtrak's "agents" is a legal conclusion. Second Am. Compl. ¶ 9. The Complaint alleges as a fact only that Amtrak "retained" RRA and MCMC to "negotiate the payment of charges incurred" by the injured passengers. Id. Otherwise, the Complaint is devoid of any factual allegations that suggest Amtrak was a principal in an agency relationship with RRA and MCMC.

Even assuming the veracity of the pled undertaking by RRA and MCMC "to negotiate the payment of charges," that undertaking is consistent with an independent contractor's work. The defining characteristic of an independent contractor is that " 'the person engaged in the work has the exclusive control over the manner of performing it, being responsible only for the result.' " Jones v. Century Oil U.S.A., Inc., 957 F.2d 84, 86 (3d Cir. 1992) (quoting Feller v. New Amsterdam Cas. Co., 70 A.2d 299, 300 (Pa. 1950)); accord Moon Area Sch. Dist. v. Garzony, 560 A.2d 1361, 1367-68 (Pa. 1989). On the facts pled here,

it is just as likely that MCMC was responsible for producing a result—a negotiated proposal for payment of a bill. Amtrak controlled which bills would be submitted to MCMC for negotiation and which bills would be paid. But the Complaint does not suggest that Amtrak had the right to direct the manner in which the bills were negotiated. And no facts are pled showing that Amtrak delegated to RRA and MCMC the authority to enter into binding promises to pay any proposals. Again, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " 🚩Iqbal, 556 U.S. at 678 (quoting 🚩Twombly, 550 U.S. at 557 (alteration omitted)).

 **\*11**  Alternatively, the Complaint again starts from the assertion that Amtrak "retained" RRA and MCMC to "act as its agents." Second Am. Compl. ¶ 9. The Complaint then alleges that on October 22, 2015, Amtrak instructed RRA and MCMC that they "were not authorized to enter into" the Letter of Agreement, but on October 23, 2015, RRA signed the Letter. Id. ¶¶ 11, 12. The Complaint concludes: "If ... RRA and MCMC exceeded the scope of their authority for Amtrak, RRA and MCMC are liable to TUH for their unauthorized conduct." Id. ¶ 17. TUH maintains that the "cause of action against RRA and MCMC is premised on the rule that imposes liability on an agent who acts without the authority of its principal." TUH Resp. (ECF 41 at 3).

As ruled above, the Complaint does not permit a reasonable inference to be drawn that either RRA or MCMC, or both, were in an agency relationship with Amtrak. Also as ruled above, the Complaint does not permit a reasonable inference to be drawn that there was an enforceable contract—either between TUH and Amtrak, or between TUH and either RRA or MCMC, or both. Consequently, the Complaint does not present a plausible claim that RRA and MCMC are individually liable to TUH for breach of contract.


   E. The Complaint Does Not Plausibly Allege That Amtrak Ratified a Contract

The Complaint once again starts from the assertion that Amtrak "retained" RRA and MCMC to "act as its agents." Second Am. Compl. ¶ 9. The Complaint then alleges that on October 22, 2015, Amtrak instructed RRA and MCMC that they "were not authorized to enter into" the Letter of Agreement, but on October 23, 2015, RRA signed the Letter. Id. ¶¶ 11, 12. The Complaint concludes: "Amtrak ratified the unauthorized conduct by ... RRA and MCMC when Amtrak paid plaintiff $2,754,228.49 pursuant to the terms of that agreement." Id. ¶ 24.

Under Pennsylvania law, "a principal is generally not liable on account of acts committed by an agent outside the actual or apparent scope of his authority unless the acts are subsequently ratified by the principal." In re Bankers Trust Co., 752 F.2d 874, 882 (3d Cir. 1985) (citing Elderton State Bank v. Citizen's Ins. Agency & Mortg. Co., 86 Pa. Super. 85, 86-87 (1925)).

Ratification can validate a contract. 🚩Senyshyn v. Karlak, 299 A.2d 294, 297 (Pa. 1973); In re Trust of Coho, 219 A.2d 657, 658-59 (Pa. 1966); Restatement (Second) of Contracts §§ 3, 380 (1981). "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01 (2006). See also 🚩Advanced Disposal Servs. East, Inc. v. NLRB, 820 F.3d 592, 602-03 (3d Cir. 2016) ("Ratification to be effective imports knowledge of all materials facts on the part of those ratifying.") (quoting Toebelman v. Missouri–Kansas Pipe Line Co., 130 F.2d 1016, 1022 (3d Cir. 1942)); Bauman v. Eschallier, 184 F. 710, 711 (3d Cir. 1911) ("No one can be held to have ratified the unauthorized act of an agent unless he has knowledge of all the material facts.").


The Complaint only concludes that Amtrak ratified RRA's unauthorized signing of the Letter of Agreement. No facts are alleged that suggest Amtrak was willing to go forward by paying the total sum of $4,382,324.13 that was recited in the Letter and its Exhibit A. No facts are alleged that suggest Amtrak knew anything about RRA's negotiations or the Letter until this dispute arose. No facts are alleged suggesting that Amtrak manifested an intention to affirm any words or conduct by either RRA or MCMC in their negotiations with TUH. To the contrary, the Complaint acknowledges that "Amtrak allegedly told ... RRA and MCMC they were not authorized to enter into the proposed agreement and that Amtrak would agree to pay only $2,754,228.49" for the 13 injured passengers other than A.L. Second Am. Compl. ¶ 11. No detail is pled as to how or when TUH became aware of Amtrak's position. Amtrak contends that on October 26, 2015, the next business day following RRA's signing of the Letter on October 23, 2015, RRA's representative, Salas, informed TUH that Amtrak disavowed and repudiated any obligation to pay

anything for A.L.'s medical services. October 26, 2015 was the purported effective date of the Letter. The Complaint itself raises questions as to whether the whole story as to what happened has been pled. See Second Am. Compl. ¶¶ 10-12.

**\*12** The Complaint alleges, and the parties do not dispute, that Amtrak paid $2,754,228.49 to TUH for 13 of the hospital inpatients that TUH treated. But Amtrak's payment of that sum alone does not permit a reasonable inference that Amtrak intended to affirm the Letter of Agreement's recitation of a promise to pay a greater sum—that is, a sum that included TUH's charges for inpatient hospital services for A.L. In short, "[f]actual allegations must be enough to raise a right to relief above the speculative level," which the Complaint fails to do. Twombly, 550 U.S. at 555. And once again, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557 (alteration omitted)).

In addition, TUH's ratification theory fails as a matter of law. The essential facts required for application of the theory are not to be found in the Complaint. As ruled above, the Complaint does not permit a reasonable inference to be drawn that Amtrak and either RRA or MCMC, or both, were in an agency relationship. As also ruled above, the Complaint does not permit a reasonable inference to be drawn that there was an enforceable contract—either between TUH and Amtrak, or between TUH and either RRA or MCMC, or both.

### F. The Complaint Does Not Plausibly Allege Misrepresentation

The Complaint asserts "RRA and MCMC represented to TUH that they had Amtrak's authority to act on Amtrak's behalf as Amtrak's agents." Second Am. Compl. ¶ 13. The Complaint asserts that "RRA and MCMC misrepresented that they had authority to act for Amtrak when they entered into the October 23, 2015 agreement," that is, the Letter of Agreement. Id. ¶ 21. TUH maintains that under Stiteler v. Ditzenberger, 45 Pa. Super. 266 (1910), Kennedy v. Faush, 268 A.2d 209, 211 (Pa. Super. Ct. 1970), and the Restatement (Second) of Agency § 329 (1958), RRA's and MCMC's "misrepresentation" of authority renders them individually liable under the Letter to pay TUH the outstanding sum of $1,628,095.64 for the inpatient hospital services provided to A.L. Id. ¶¶ 18-21.

The Complaint's citation to authority will be disregarded. The "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. In addition, the Complaint only asserts that RRA and MCMC "represented" that they had Amtrak's authority to act as its agents and they "misrepresented" their authority. These assertions are conclusory. Otherwise, the Complaint is silent as to who said what to whom, when, where, how, or why. These assertions will be disregarded because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

Furthermore, the Complaint does not raise a reasonable expectation that discovery will reveal an actionable misrepresentation —whether the theory is cast as one for breach of an implied warranty of authority or breach of a tort duty. As ruled above, the Complaint does not permit a reasonable inference to be drawn that there was an enforceable promise—an essential element for cause of action based on breach of implied warranty. And the Complaint does not allege any facts suggesting that TUH reasonably relied to its detriment upon any specific statements or conduct by RRA and MCMC. The Complaint does not contain any factual allegations as to how TUH was damaged, injured, or otherwise prejudiced by words or conduct of RRA and MCMC. TUH maintains that "the most palpable form of prejudice visited upon TUH ... is a loss of the bargain"—that is, a contract right to receive the sum of $4,382,324.13, as recited in the Letter and its Exhibit A. TUH Resp. (ECF 41 at 8, 7-8). But the Complaint does not plausibly suggest that TUH ever had an enforceable contract right to recover that sum. The Complaint simply does not present a plausible claim for misrepresentation on any cognizable cause of action.

### IV. CONCLUSION

Temple University Hospital, Inc. v. Russell Reimbursement Advisors, Inc., Not Reported in Fed. Supp. (2017)

**\*13** TUH has had three opportunities and ample time to plead a plausible case against Amtrak, RRA, and MCMC, but has not done so. At this juncture, it is fair to conclude that TUH has not done so because TUH cannot put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary elements for a viable cause of action. Accordingly, the Complaint will be dismissed with prejudice.

An Order accompanies this Memorandum.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1001186

---

**Footnotes**

| | |
|---|---|
| 1 | After the derailment, TUH treated and separately billed other passengers who were not hospitalized. Amtrak paid TUH's charges for those medical services. |
| 2 | In addition, RRA and MCMC sue Amtrak for contribution and indemnity. Third-Party Compl. (ECF 20). Amtrak moves under Federal Rule of Civil Procedure 12(c) for judgment on the third-party pleadings. Amtrak Answer & R. 12(c) Mot. (ECF 25, 38). RRA and MCMC oppose judgment on the third-party pleadings. Defs. Resp. (ECF 39). Decision on Amtrak's Rule 12(c) motion will be reserved. |

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5016558
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

Michael C. WORSHAM, Plaintiff,

v.

TSS CONSULTING GROUP, LLC and Marcos I. Taveras, Defendants.

Case No: 6:18-cv-1692-LHP

|

Signed August 7, 2023

**Attorneys and Law Firms**

Michael C. Worsham, Forest Hill, MD, Pro Se.

Josue Manuel Merino, Alisha Hixon, Forest Lake Law, Apopka, FL, for Defendants.

**ORDER GRANTING SUMMARY JUDGMENT**

LESLIE HOFFMAN PRICE, UNITED STATES MAGISTRATE JUDGE

**I. BACKGROUND**

 **\*1** Plaintiff Michael C. Worsham, a former attorney proceeding *pro se*, asserted numerous claims under the Telephone Consumer Protection Act ("TCPA"), and the Maryland Telephone Consumer Protection Act ("MD TCPA") against Defendants TSS Consulting Group, LLC ("TSS"), and Marcos I. Taveras, related to a multitude of unsolicited phone calls to Plaintiff's cellphone. Doc. No. 47. Following conclusion of Defendants' bankruptcy proceedings, the only claims that remained were those seeking injunctive relief under the TCPA. *See* Doc. Nos. 160-61, 165-66. Plaintiff ultimately moved for summary judgment on these claims (Doc. No. 221), Defendants responded (Doc. No. 224), and Plaintiff filed an authorized reply (Doc. No. 228).

On March 28, 2023, the Court denied Plaintiff's motion for summary judgment in its entirety, finding that the motion was both procedurally and substantively deficient. Doc. No. 231. Among the procedural deficiencies, the Court found that Plaintiff flagrantly ignored a prior order directing that any summary judgment motion must be all inclusive, and shall not incorporate by reference any prior filings or materials, other than the third amended complaint and answers thereto. *Id.*, at 5, 10; *see also* Doc. No. 220, at 7. As to the substantive deficiencies, the Court found that Plaintiff failed to establish as a matter of law that Defendants could be held directly liable for any of the phone calls at issue, and failed to establish as a matter of law that Defendants could be held vicariously liable for the phone calls, under the theories of actual agency, apparent agency, or ratification. Doc. No 231, at 12-36.

After reviewing all of the evidence submitted, including the improperly incorporated materials, the Court also found that entry of summary judgment in favor of Defendants would be appropriate. *Id.*, at 36-39; *see also* Fed. R. Civ. P. 56(f). However, prior to taking such action, the Court directed Plaintiff to show cause in writing why the Court should not *sua sponte* enter summary judgment in favor of Defendants as to all remaining claims. Doc. No. 231, at 39-40. *See also* ⚑*Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) ("Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.' " (quoting ⚑*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *First Mercury Ins. Co. v. First Fla. Bldg. Corp.*,

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 100 of 103

Worsham v. TSS Consulting Group, LLC, Not Reported in Fed. Supp. (2023)

No. 8:20-cv-1929-CEH-MRM, 2023 WL 23116 (M.D. Fla. Jan. 3, 2023) (granting summary judgment in favor of non-movant under Rule 56(f), but only after providing movant an opportunity to show cause why summary judgment should not be granted).

Plaintiff timely filed his response, (Doc. No. 232) and upon consideration of the arguments made by Plaintiff, the Court concludes that summary judgment is warranted in favor of Defendants as to all remaining claims in this case.

## II. LEGAL STANDARD

**\*2**  The court may grant summary judgment *sua sponte* pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, which states:

> **(f) Judgment Independent of the Motion**. After giving notice and a reasonable time to respond, the court may:
>
> (1) grant summary judgment for a nonmovant;
>
> (2) grant the motion on grounds not raised by a party; or
>
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f)

Summary judgment may be granted *sua sponte* "only in those circumstances in which the dismissed claims have been fully developed in the evidentiary record and the non-moving party has received adequate notice." *Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003). In *Artistic Entertainment*, "the merits of the claims were fully briefed and evidence was accepted and considered in conjunction with the simultaneous motion to amend," which meant that "the district court had all the information necessary to rule on the legal issues." *Id.*

A grant of summary judgment is appropriate only when the court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1184 (11th Cir. 2003). Issues of fact are "genuine" only if a reasonable jury, considering the evidence presented, could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248.

## III. ANALYSIS

As discussed in detail in the Court's March 28, 2023 order denying summary judgment, the admissible evidence in this case is not in dispute, and the evidentiary record is complete. *See* Doc. No. 221, at 4; Doc. No. 231, at 37. And in his response, Plaintiff does not argue otherwise. Doc. No. 232. Rather, Plaintiff spends the first six (6) pages of his response arguing that the Court did not consider all of Plaintiff's submitted evidence (in particular, various Requests for Admissions), did not properly account for the fact that the phone number that called Plaintiff's cellphone was a "spoofed" number, and did not properly credit Plaintiff's testimony in his affidavits and an affidavit from Telnyx, LLC. *Id.*, at 1-6. These arguments are unpersuasive.

First, despite Plaintiff's deliberate violation of the Court's June 28, 2022 Order (Doc. No. 220), the Court did, in fact, consider all of the evidence Plaintiff referenced, including the materials he incorporated from prior filings. *See* Doc. No. 231, at 27-36. Second, the Court did consider the fact that a "spoofed" phone number called Plaintiff, but noted the lack of any expert or other testimony on this point beyond Plaintiff's own speculation. *Id.*, at 34, n. 13. And third, the Court carefully considered the various affidavits submitted and found that the evidence – to the extent it was not inadmissible hearsay – simply was insufficient to conclusively tie Defendants to the phone calls at issue, was insufficient to establish that Defendants had any sort

of agency relationship with either Murtaza Hussain or OneTen Communication such that vicarious liability could exist, and was insufficient to establish individual corporate officer liability as to Taveras. *Id.*, at 15-25, 33-35. Plaintiff's arguments with respect to the evidentiary record merely rehash those previously made and considered, do not accurately state the rulings and analysis undertaken by the Court in the March 28, 2023 Order, and are without legal authority in support. The Court therefore finds these arguments without merit.

**\*3** Next, Plaintiff argues that the language of 47 U.S.C. § 227(c)(5) of the TCPA establishes that Defendants can be held liable regardless of whether an agency relationship exists between them and/or Murtaza Hussain or OneTen Communication. Doc. No. 232, at 7-10. Plaintiff points to the Third Amended Complaint, [1] and argues that he has sought relief under two separate private right of action provisions from the TCPA: 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5). *Id.*, at 7-8. Specifically, Plaintiff claims that Counts 2, 4, and 5 of his third amended complaint seek relief under § 227(c)(5), which the Court failed to address in ruling on summary judgment. *Id.*, at 8. And Plaintiff argues that the language of § 227(c)(5) provides for liability even where there is no agency relationship between the entities that made the calls and the parties being sued. *Id.* Not only is this argument confusing, but it also runs directly contrary to persuasive legal authority.

To begin, while Plaintiff does cite to § 227(c)(5) in his Third Amended Complaint, the citation is contained in one lone paragraph related to the claims still at issue (*i.e.*, injunctive relief), which merely states that both § 227(b)(3)(A) and § 227(c)(5)(A) "provide for injunctive relief to enjoin violations of the FCC's regulations prescribed under the TCPA." Doc. No. 47, ¶ 105. Plaintiff then asserts that he "requests injunctive relief prohibiting Defendants and all persons they control from calling Plaintiff and any person in the U.S. in violation of the TCPA...." *Id.*, ¶ 106. Nowhere in his pleading does Plaintiff specifically tie *any* of his TCPA claims to § 227(c)(5)(A). *See generally* Doc. No. 47. Plaintiff did not provide any clarity in his summary judgment motion, and failed to identify at all which of his asserted claims formed the legal basis for the requested injunctive relief. Doc. No. 221; *see also* Doc. No. 231, at 9-10. It is only in response to the Court's Order to Show Cause that Plaintiff makes any attempt to clarify.

In any event, the language of the statutes Plaintiff references contradicts the very argument he makes. There are two sections of the TCPA that provide a private right of action: § 227(b)(3) and § 227(c)(5). Section 227(b)(3) provides, in relevant part, that a person or entity may bring an action to seek actual damages, statutory damages, and/or injunctive relief based on any violation of § 227(b)(1), which prohibits any person from initiating any calls using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party. 47 U.S.C. § 227(b)(3); *see also* 47 U.S.C. § 227(b)(1)(B). Section 227(c)(5), on the other hand, provides a private right of action for violations of the regulations pertaining to the National Do Not Call phone registry. Specifically, any person "who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of [the regulations creating the National Do Not Call registry] may" file an action for injunctive relief, to recover actual damages, and/or to recover statutory damages. 47 U.S.C. § 227(c)(5). Plaintiff focuses on the "by or on behalf of" language of § 227(c)(5), and argues that this phrase creates automatic liability, regardless of whether an agency relationship exists. Doc. No. 232, at 9.

Plaintiff misinterprets this language. The phrase "by or on behalf of" by its very terms implicates an agency relationship and, in turn, vicarious liability. To that end, numerous courts throughout the United States have held that the plain language of § 227(c)(5) imposes vicarious liability. *See, e.g., Oparaji v. Home Retention Corp.*, No. 21 CV 2758 (ENV)(LB), 2022 WL 987560, at \*10 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2023 WL 2155764 (E.D.N.Y. Feb. 22, 2023) ("Section 227(c)(5) of the TCPA imposes liability for telephone 'calls made 'by or on behalf of' a person.' This language permits actions under a vicarious liability theory against persons or entities who did not directly place the solicitation call in

question but requested that the call be made on their behalf. Liability under the TCPA may be established against a defendant where a plaintiff successfully alleges an agency relationship between defendant and the party placing the call." (first quoting *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 135 (E.D.N.Y. 2015), then citing *Bank v. Philips Elec. N. Am. Corp.*, No. 14-CV-5312(JG)(VMS), 2015 WL 1650926, at *3 (E.D.N.Y. Apr. 14, 2015))); *Khouri v. Nat'l Gen. Ins. Mktg., Inc.*, 501 F. Supp. 3d 353, 358 (M.D.N.C. 2020) ("'By its plain language, the TCPA's private right of action contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly.' In considering the 'on behalf of' language in [§ 227(c)(5) of] the TCPA, the court assumes normal agency principles apply, including vicarious liability." (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659-60 (4th Cir. 2019))); *Scruggs v. CHW Grp., Inc.*, No. 2:20cv48, 2020 WL 9348208, at *8 (E.D. Va. Nov. 12, 2020) (citing 47 U.S.C. § 227(c)(5) and noting that "a defendant to such a claim may be liable under theories of direct or vicarious liability." (citations omitted)); *Roylance v. ALG Real Est. Servs., Inc.*, No. 5:14-cv-02445-PSG, 2015 WL 1522244, at *4 (N.D. Cal. Mar. 16, 2015), *report and recommendation adopted as modified*, 2015 WL 1544229 (N.D. Cal. Apr. 3, 2015) ("The FCC has 'repeatedly acknowledged the existence of vicarious liability under the TCPA' and 'has clarified that vicarious liability is imposed under federal common law principles of agency for violations of either Section 227(b) or (c) that are committed by third-party telemarketers.' " (quoting *Gomez v. Campbell–Ewald Co.*, 768 F.3d 871, 877–78 (9th Cir. 2014))).

**\*4** In sum, the plain language of § 227(c)(5) clearly incorporates a theory of vicarious liability which, in turn, implicates common law principles of agency. The decisional authority cited above buttresses this point, and Plaintiff has provided no authority to the contrary.[2] Thus, the Court's failure to expressly cite to § 227(c)(5) in the March 28, 2023 summary judgment order does not change the fact that Plaintiff has failed to establish, as a matter of law, that Defendants may be held either directly or indirectly liable under the TCPA in this case under either § 227(b)(1) or § 227(c)(5).

Plaintiff's third and final argument is a repetition of his non-delegation doctrine argument, which the Court previously found without merit. Doc. No. 231, at 26-27. Plaintiff has not only failed to point to any legal authority suggesting that the non-delegation doctrine applies to this case, but his argument itself is contradictory, as he simultaneously asserts that the TCPA already incorporates vicarious liability while also arguing that the non-delegation doctrine mandates strict liability and/or an independent contractor theory of liability (a theory which Plaintiff never raised in his summary judgment filings). *See* Doc. No. 232, at 10-15. Plaintiff also now, for the first time, argues that the FCC rulings should be given no deference, even though he relied on them in his summary judgment reply brief. *Compare* Doc. No. 228, at 9-12, *with* Doc. No. 232, at 12-15. These arguments are unpersuasive and are not supported by any binding or persuasive authority. The Court's prior ruling rejecting application of the non-delegation doctrine stands.

## IV. CONCLUSION

**\*5** As the Court explained in detail in the March 28, 2023 summary judgment order, Plaintiff has failed – based on the undisputed evidentiary record submitted (including the improperly incorporated materials) – to show as a matter of law that Defendants can be held directly or vicariously liable for the phone calls at issue in this case. Doc. No. 231. Plaintiff's show cause response does nothing to change this determination. Doc. No. 232. As such, pursuant to Federal Rule of Civil Procedure 56(f), the Court finds that summary judgment is due to be granted in favor of Defendants and against Plaintiff as to all remaining claims.

The Clerk is therefore **DIRECTED** to enter judgment in favor of Defendants TSS Consulting Group, LLC and Marcos I. Tavares and against Plaintiff as to all remaining claims, terminate any and all pending motions, and close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 7, 2023.

Case 1:26-cv-00659-KM    Document 31-1    Filed 07/15/26    Page 103 of 103

Worsham v. TSS Consulting Group, LLC, Not Reported in Fed. Supp. (2023)

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5016558

---

**Footnotes**

1    In his response, Plaintiff cites to his Second Amended Complaint, (Doc. No. 232, at 7), however the operative pleading is the Third Amended Complaint. Doc. No. 47; *see also* Doc. No. 211. The Court presumes this was a scrivener's error.

2    The cases Plaintiff cites do not aide his cause. In *Worsham v. Nationwide Ins. Co.*, 772 A.2d 868, 877 (Md. 2001), a case involving Plaintiff, the state court of appeals found that summary judgment was inappropriate where there were fact issues as to whether the entity that placed telemarketer calls was either an agent of the defendant (which would create liability under the TCPA) or an independent contractor (which would not). Notably, Plaintiff argued in favor of vicarious liability in that case – a position opposite to that in this case. Plaintiff also points to a footnote in *Nationwide* that cites to a Georgia state appeals case, but the Georgia case similarly held that fact issues existed as to whether the defendant in that case could be held liable for the actions of the entity that actually made the phone calls under a theory of vicarious liability and/or respondeat superior. *See Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468, 472 (Ga. 2000). And as previously discussed in detail, Plaintiff's evidentiary submissions in this case are insufficient as a matter of law to establish liability under those theories. Next, Plaintiff references *State ex rel. Charvat v. Frye*, 114 Ohio St. 3d 76, 2007-Ohio-2882, 868 N.E.2d 270, *Ewing v. California*, 538 U.S. 11, 27 (2003), and *State ex rel. Russo v. McDonnell*, 110 Ohio St. 3d 144, 2006-Ohio- 3459, 852 N.E.2d 145, *abrogated by Barnes v. Univ. Hosps. of Cleveland*, 119 Ohio St. 3d 173, 2008-Ohio-3344, 893 N.E.2d 142, for the proposition that courts cannot add conditions to statutes, a proposition the Court has no quarrel with. To the contrary, the Court is merely applying the statute according to its plain terms. The remainder of Plaintiff's decisional authority either is cited to show that § 227(c)(5)(A) creates a private cause of action for claims similar to those alleged by Plaintiff, *Worsham v. Discount Power, Inc.*, Civil Action No. RDB-20-0008, 2022 WL 3100762 (D. Md. Aug. 4, 2022), or is cited for the uncontroverted proposition that an injunction should issue where an aggrieved party establishes that the applicable statutory conditions have been satisfied. *Henderson v. Burd*, 133 F. 2d 515 (2d Cir. 1943); *Bowles v. Swift & Co.*, 56 F. Supp. 679 (D. Del. 1944). But what none of these cases establish is that the "by or on behalf" language of § 227(c)(5) removes the requirement of a finding of vicarious liability to obtain injunctive relief under the TCPA.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.